IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4201

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, Jr., District Judge*

———————————

OPENING BRIEF OF THE UNITED STATES

———————————

Jessica D. Aber                    Jacqueline R. Bechara
United States Attorney             Assistant United States Attorney

Shea M. Gibbons                    2100 Jamieson Avenue
Erik S. Siebert                    Alexandria, Virginia 22314
Assistant United States Attorneys  (703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ................................................................. iii

Jurisdictional Statement ...............................................................1

Introduction ..................................................................................2

Issues Presented ...........................................................................5

Statement of the Case...................................................................5

    A.     Officers try to stop Moore's car, which has the same fake
            license plate as two other cars, and he flees.........................5

    B.     Moore moves to suppress the gun recovered from his car and
            his statements to the officers. ................................................7

    C.     Moore supplements his motion to suppress with a claim of
            selective enforcement. ...........................................................8

    D.     The parties submit expert reports on traffic stop data.........10

    E.     Moore files a second supplement to his motion to suppress..............14

    F.     The government moves to exclude the defense experts.....................15

    G.     The district court hears evidence on Moore's
            selective-enforcement claim..................................................17

    H.     Moore submits historical evidence of racial discrimination in
            Richmond. ............................................................................21

    I.      The district court grants in part and denies in part Moore's
            motion to suppress................................................................24

    J.      The district court dismisses the indictment. .........................24

i

Summary of Argument ........................................................................26

Argument............................................................................................28

I.      The district court applied the wrong standard of proof in evaluating
        Moore's selective-enforcement claim. ..........................................28

II.     Moore failed to establish that the officers who stopped his car acted
        with discriminatory purpose. ..........................................................35

        A.      Probable cause to believe Moore committed a traffic offense
                suggested a legitimate reason for the stop...........................36

        B.      Citywide traffic stop statistics did not show that the officers
                who stopped Moore had discriminatory intent. ...................39

        C.      Remote historical evidence did not show that the officers who
                stopped Moore in 2020 had discriminatory intent. .............46

III.    The district court erred in concluding that the officers' decision to
        stop Moore's car had a discriminatory effect. ..............................53

        A.      The district court erred in concluding that a statistical disparity
                alone showed discriminatory effect....................................53

        B.      The district court erred in determining that remote historical
                evidence showed discriminatory effect. ..............................57

Conclusion .......................................................................................58

Statement Regarding Oral Argument .................................................59

Certificate of Compliance .................................................................59

# Table of Authorities

## Cases

*Abbott v. Perez*, 585 U.S. 579 (2018) .................................................. 36, 47

*Conley v. United States*, 5 F.4th 781 (7th Cir. 2021) ................................ 33

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ...................... 15

*English v. Clarke*, 90 F.4th 636 (4th Cir. 2024) ...................................... 34

*Gonzalez v. Trevino*, 144 S. Ct. 1663 (2024) (per curiam) ....................... 32

*Hartman v. Moore*, 547 U.S. 250 (2006) ............................................... 34

*Johnson v. Holmes*, 782 F. App'x 269 (4th Cir. 2019) (per curiam) ........... 40, 44

*Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019) .................................... 30

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc) .......... 32

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................... 7

*N.C. State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ........................................................... 36

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ................................................. 38

*Riddick by Riddick v. Sch. Bd.*, 784 F.2d 521 (4th Cir. 1986) ................... 47, 48

*Segura v. United States*, 468 U.S. 796 (1984) ........................................ 34

*Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810 (4th Cir. 1995) ................ 42

*United States v. Armstrong*, 517 U.S. 456 (1996) ............................. passim

*United States v. Bass*, 536 U.S. 862 (2002) (per curiam) .................. 35, 53, 54

*United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996) ............................. 29, 30

*United States v. Chem. Found.*, 272 U.S. 1 (1926) .................................. 28, 29

*United States v. Hare*, 820 F.3d 93 (4th Cir. 2016) .......................... passim

*United States v. Hastings*, 126 F.3d 310 (4th Cir. 1997) .......................... 34, 40

*United States v. Khan*, 461 F.3d 477 (4th Cir. 2006) ............................... 38

*United States v. Marshall*, 872 F.3d 213 (4th Cir. 2017) .......................... 13

*United States v. Mason*, 774 F.3d 824 (4th Cir. 2014) ...................... passim

*United States v. Monsoor*, 77 F.3d 1031 (7th Cir. 1996)........................................34

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996).......................................... passim

*United States v. Perez*, 30 F.4th 369 (4th Cir. 2022)....................................37

*United States v. Perry*, 92 F.4th 500 (4th Cir. 2024)....................................37

*United States v. Rundo*, 108 F.4th 792 (9th Cir. 2024) ........................................46

*United States v. Sanchez-Garcia*, 98 F.4th 90 (4th Cir. 2024) ........................ 36, 47

*United States v. Suarez*,
   321 F. App'x 302 (4th Cir. 2009) (per curiam)......................... 30, 31, 44, 54

*United States v. Thorpe*, 471 F.3d 652 (6th Cir. 2006) ........................................50

*United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997)........................................50

*United States v. Venable*, 666 F.3d 893 (4th Cir. 2012) ................................ passim

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).............................................................................. passim

*Watkins v. Angelone*,
   No. 97-9, 1998 WL 2861 (4th Cir. 1998) (per curiam)..............................48

*Wayte v. United States*, 470 U.S. 598 (1985) ........................................ 29, 36, 49

*Whren v. United States*, 517 U.S. 806 (1996)........................................28

**Statutes**

42 U.S.C. § 1983 .......................................................................................34

Va. Code § 46.2-612 ................................................................................37

Va. Code § 46.2-722 ................................................................................37

Virginia Community Policing Act of 2020, 2020 Va. Acts ch. 1165......................8

**Rules**

Fed. R. Crim. P. 12(c) ..............................................................................9

Fed. R. Crim. P. 16..................................................................................17

Fed. R. Evid. 702 .............................................................................. 15, 17

## Jurisdictional Statement

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231.  On February 12, 2024, the district court entered an order dismissing the indictment against Keith Moore with prejudice.  JA1817.  On February 16, 2024, the government timely moved for reconsideration of that order.  JA1818–1822.  On March 11, 2024, the district court denied the motion for reconsideration.  JA1840–1843.  On April 8, 2024, the government filed a timely notice of appeal and a certification by the United States Attorney that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.  JA1844–1846.  The Court has jurisdiction over the government's appeal from the district court's order dismissing the indictment under 18 U.S.C. § 3731.

**Introduction**

On the evening of December 5, 2020, Richmond Police Department ("RPD") Officers Dominic Collombo, Keegan Mills, and Nakia Williams and Sergeant Michael Spinos saw three cars with the same fake, temporary license plate in Richmond's Fourth Precinct. When officers tried to initiate a stop of the third car, the car drove away, ran multiple stop signs, and crashed into the curb. The driver then took off running. Officers pursued the driver on foot, detained him, and identified him as Keith Moore.

Meanwhile, Moore had left his car running with the door open. Officers saw a firearm in plain view on the floorboard. A records check revealed that Moore had previously been convicted of a felony, and he admitted that he knew he could not lawfully possess a gun. A federal grand jury charged Moore with one count of felon in possession of a firearm.

Moore moved to suppress the gun recovered from his car and the statements he made to police after he was detained. In supplemental briefing on the motion to suppress, Moore requested dismissal of the indictment on the ground that the officers selectively enforced the traffic laws against him because he is Black. He submitted an expert report analyzing the traffic stops conducted by all RPD officers from July 1, 2020 through December 6, 2020. The expert reported that 77 percent of the stops in the sample were of Black drivers and stated that "[i]n

comparison to White drivers, Black drivers were 5.13 times more likely to be stopped." JA357. Moore later submitted a second expert report describing racial discrimination in Richmond from 1865 to 1989.

In February 2024, the district court concluded that Moore had met his burden of proving selective enforcement and dismissed the indictment against him with prejudice. That conclusion reflects at least three grave errors.

First, the district court determined that Moore had to prove his selective-enforcement claim only by a preponderance of the evidence. In doing so, the court discarded this Court's consistent precedent applying the clear-evidence standard articulated in *United States v. Armstrong*, 517 U.S. 456 (1996), to claims of selective enforcement.

Second, although the court found no evidence that Sergeant Spinos and Officers Collombo, Mills, and Williams acted in bad faith, the court nonetheless concluded that the officers acted with discriminatory purpose in stopping Moore's car. But, as the court recognized in denying Moore's motion to suppress the gun, officers had a legitimate reason to stop Moore's car for a traffic offense after seeing the same fake, temporary license plate for the third time that night. Moore's statistical and historical evidence failed to overcome the inference that the officers stopped Moore's car because of his likely traffic offense, not because of his race. Specifically, Moore failed to connect the citywide statistical evidence or the

historical evidence, which left off at 1989, to the officers involved in this 2020 traffic stop.

Third, the district court erred in concluding that the same statistical and historical evidence proved that the officers' decision to stop Moore's car had a discriminatory effect. Moore's statistical evidence, like the statistical evidence rejected in *Armstrong* and its progeny, lacked an appropriate comparator because it failed to demonstrate that similarly situated drivers could have been stopped for traffic offenses but were not. Absent information about the total driving population, the racial disparity in traffic stops, by itself, could not show that Black drivers were any more likely to be stopped than white drivers. Additionally, decades-old historical evidence of racial discrimination in Richmond did not show that the officers' decision to stop Moore in 2020 had a discriminatory effect.

Because Moore failed to satisfy the demanding standard required to obtain dismissal of a criminal indictment based on a claim of selective enforcement, the Court should reverse the dismissal order and reinstate the indictment.

## Issues Presented

1.      Did the district court apply the wrong standard of proof in evaluating Moore's selective-enforcement claim?

2.      Did Moore prove that the officers who stopped his car acted with a discriminatory purpose?

3.      Did the district court err in concluding that Moore established clear evidence of discriminatory effect?

## Statement of the Case

### A.      Officers try to stop Moore's car, which has the same fake license plate as two other cars, and he flees.

Sergeant Michael Spinos and Officers Dominic Collombo, Keegan Mills, and Nakia Williams were assigned to the Focus Mission Team of RPD's Fourth Precinct.  JA51, JA91, JA145, JA177.[1]  The Focus Mission Team aims to get guns and drugs off the streets.  JA67.

On the evening of December 5, 2020, Officers Collombo, Mills, Spinos, and Williams encountered three different cars in the Fourth Precinct with the same fake, temporary license plate.  At 5:46 p.m., officers stopped a white Cadillac sedan.  JA51, JA53.  Officers entered the license plate number, 111 34Y, in a

---

[1] For ease of reference, the government will herein refer to Spinos as an "officer" but recognizes that his official title before retiring was sergeant.

police database and determined that it was fake. JA53–54. About an hour later, officers stopped a second car. JA55. Officer Collombo was a "bit shocked" and "confused" to see that the second car had the same license plate number, 111 34Y, as the first car. JA57.

Shortly before 9:45 p.m., officers saw a car "pull[] out from [a] gas station" and "abruptly stop[]" when the police passed. JA58; *see* JA61. The driver "reached down in front of him," "[k]ind of on the floorboard." JA58. Officers observed that the car had the same fake license plate as the two cars they had stopped earlier that evening. JA58, JA180. At that point, the officers activated their lights to initiate a traffic stop. JA71. The driver failed to stop, drove through multiple stop signs, and "ran straight into the curb." JA58–59. The driver then exited his car and took off running. JA59. Officers Collombo and Spinos pursued the driver on foot. JA59.

Sergeant Spinos eventually detained the driver, and Officer Collombo identified him as Keith Moore. JA61, JA180. Officers found Moore's car running with the door open and saw a gun on the floorboard. JA62, JA138–139, JA190; *see* JA222. Officer Mills ran a records check and learned that Moore was a convicted felon. JA94. Eventually, Officer Williams read Moore his *Miranda*

rights.[2]  JA143.  During the ride to the police station, Moore engaged an officer in conversation and admitted that he ran from police because he had a gun in the car and that he knew he could not lawfully possess a gun because he was a convicted felon.  JA196–197.

### B.    Moore moves to suppress the gun recovered from his car and his statements to the officers.

In May 2021, a federal grand jury sitting in Richmond, Virginia, returned an indictment charging Moore with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  JA16.  Moore moved to suppress the gun recovered from his car and the statements he made to officers after being apprehended.  He argued that the traffic stop violated the Fourth Amendment because it was not justified by the temporary license plate on his car and that the officers violated the Fifth Amendment by interrogating him before and after providing *Miranda* warnings.  JA20–24.  He did not raise a selective-enforcement claim.

In July 2021, the district court held a hearing on the motion to suppress.  The government called Officers Collombo, Mills, Spinos, and Williams, who testified to the events summarized above.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Moore called Lee Hush, an investigator with the Office of the Federal Public Defender ("OFPD").  JA201.  OFPD had obtained RPD records of the Fourth Precinct's Focus Mission Team's citizen encounters on December 5, 2020 until 9:45 p.m.  JA204.  Further, Hush explained that the University of Virginia had created a map depicting the race of "each individual who answered the census" in 2010.  JA207.  Hush testified that all of the traffic stops reported in the Fourth Precinct Focus Mission Team's citizen encounters on December 5, 2020 occurred within the area of the map predominantly occupied by Black residents.  JA209.

Hush also accessed the Virginia State Police database created pursuant to the Virginia Community Policing Act of 2020, 2020 Va. Acts ch. 1165 (codified as amended at Va. Code § 52-30.2).  JA211.  He testified that, for the period from July 1, 2020 to December 5, 2020, 76 percent of RPD's stops were of Black people.  JA212; *see* JA280.  He added that United States census data from 2019 indicated that "[r]oughly 47 to 48 percent" of the population of Richmond was Black.  JA213–214.

At the conclusion of the hearing, the district court granted defense counsel's request to submit supplemental briefing on the motion to suppress.  JA215.

### C.  Moore supplements his motion to suppress with a claim of selective enforcement.

In August 2021, Moore filed a supplement to his motion to suppress.  He now argued that the district court should dismiss the indictment because RPD

violated his right to equal protection under the Fourteenth Amendment by targeting

Black drivers for traffic stops. JA291–294. Moore recognized that "[t]he Fourth

Circuit has adopted the standard the Supreme Court set forth in *United States v.*

*Armstrong*, 517 U.S. 456 (1996), for cases of racially animated law enforcement."

JA292 (quoting *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014)). He

claimed that the Fourth Precinct's Focus Mission Team was "having a

discriminatory effect on black drivers in Richmond" because (1) 76 percent of

RPD's traffic stops "are of black persons," whereas "black people make up less

than half of the population of Richmond"; and (2) the Focus Mission Team

"searched every single car stopped for minor traffic violations on December 5,

2020," all of which had Black drivers. JA293. Moore added that "[t]he stark

numbers and heavy-handed policing tactics of minority neighborhoods in

Richmond . . . warrant an inference of discriminatory intent." JA294.

　　In response, the government argued that the district court should not dismiss

the indictment because any such motion was untimely under Federal Rule of

Criminal Procedure 12(c), and Moore had not shown good cause. JA308–310.

Alternatively, the government maintained that Moore's selective-enforcement

claim failed on the merits. First, Moore failed to show discriminatory effect

because he had not presented evidence of similarly situated drivers who were

treated differently than him. JA312. The government also rebutted Moore's claim

that the Focus Mission Team searched every car stopped on December 5, 2020,
given that officers did not search the first two cars stopped with the same fake,
temporary license plate.  JA313–314.  Second, the government argued that there
was no evidence of discriminatory purpose, particularly given that Officers
Collombo, Mills, Spinos, and Williams stopped his car for the legitimate purpose
of investigating the fake license plate.  JA314–315.

In September 2021, the district court held a hearing on Moore's
supplemental motion.  After the hearing, the court ordered Moore "to consult with
an expert regarding the statistical significance of the evidence presented in support
of the defendant's motion to dismiss the indictment and to consider additional
evidence in support of the motion."  JA339.

### D.    The parties submit expert reports on traffic stop data.

Moore retained Dr. Eli Coston, an assistant professor in the Department of
Gender, Sexuality, and Women's Studies at Virginia Commonwealth University,
to prepare an expert report.  JA353.  Dr. Coston analyzed a set of data collected
under the Virginia Community Policing Act reflecting all traffic stops conducted
by RPD from July 1, 2020 through December 6, 2020.  JA355.  After excluding
stops in locations outside RPD's jurisdiction and stops involving "Asian, American
Indian, or drivers of 'Unknown' races," Dr. Coston analyzed a total sample of
2,279 stops.  JA355–356.

Dr. Coston's report described three sets of findings. First, Dr. Coston reported that 1,925 stops out of the 2,279 stops in the sample, or 77 percent of the stops, were of Black drivers. JA357–358. Based on that proportion, Dr. Coston stated that "[i]n comparison to White drivers, Black drivers were 5.13 times more likely to be stopped." JA357. Dr. Coston also reported that 179 stops out of the 2,279 stops in the sample, or 7.17 percent of the stops, resulted in the arrest of the driver. JA358. According to Dr. Coston, "Black drivers were 12.67 times more likely than White drivers to be arrested as the result of a stop." JA358. Second, Dr. Coston performed a correlational test to determine the relationship between "the race of the driver and [the] primary result of the stop (arrest, summons/citation, or warning)." JA358. Dr. Coston found that there was "a weak to moderate, but substantive effect of race of driver on the result of a stop." JA358. Third, Dr. Coston prepared a set of maps depicting the traffic stop data, JA361–362, including a figure overlaying a heat map displaying the density of traffic stops of Black drivers on the 2015–2019 racial demographics of the area, JA363 (Figure 5). Based on these maps, Dr. Coston inferred that "Black drivers are pulled over in areas where they are both the majority and the minority." JA363.

The government retained Dr. Michael Smith, a professor in the Department of Criminology and Criminal Justice at the University of Texas at San Antonio, to

prepare an expert report. JA1415. Dr. Smith had performed quantitative research in the field of criminal justice for over twenty-five years and published about fifteen articles on criminology and racial disparity in policing. JA1416–1417. He did major studies with the Miami Dade Police Department, the Los Angeles Police Department, and the San Jose Police Department. JA1420. In his report, Dr. Smith discussed the relationship between race and traffic stops during an officer's initial decision to stop a driver and in the outcome of the traffic stop.

First, Dr. Smith explained the need for an appropriate benchmark to assess the relationship between traffic stops and driver race. In 2001, Dr. Smith "published the first peer-reviewed article to investigate racial disparities in traffic stops and stop outcomes using traffic stop data from Richmond." JA446. Even in 2001, Dr. Smith "recognized that examining the raw percentages of drivers stopped by race is meaningless unless, at a minimum, those percentages can be compared against an estimate of the population of *drivers* in the jurisdiction of interest." JA446. Today, census data is considered a crude benchmark because "the population of persons who *live* in an area often serves as a poor representation of persons who *drive* in an area or who are *at risk* for being stopped by the police." JA447. Dr. Smith added that "[s]imple mapping techniques like those used by Dr. Coston show only *where* people drive and *who they are* (race) but account for none of the factors that otherwise influence the racial composition of traffic stops

12

or how or why they occur in some areas more than others." JA448.

Second, Dr. Smith explained the need to "control for factors that may confound the relationship between driver race and outcomes such as searches, arrests, or citations." JA449. For arrests, "researchers must control for the influence of exogenous factors such as pre-existing warrants or the seriousness of the offense." JA450.[3] Similarly, for searches, researchers must control for "low discretion searches," such as searches incident to arrest and inventory searches. JA450. Accordingly, Dr. Smith opined that "Dr. Coston's conclusions that Black drivers were more likely to experience searches or arrests than Whites based on simple bivariate analyses without controlling for other variables known to correlate with those outcomes" were "not scientifically supportable." JA450. Dr. Smith submitted that Dr. Coston could not conclude with "scientific rigor" that "the race of drivers in Richmond has a *causal influence* on [] whether they are stopped, searched, arrested, or cited" by RPD officers. JA452.

---

[3] The government has omitted internal quotation marks, alterations, and citations throughout this brief, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

### E. Moore files a second supplement to his motion to suppress.

In March 2022, Moore filed a second supplement to his motion to suppress. Moore now argued that a defendant must demonstrate a selective-enforcement claim by only a preponderance of the evidence. JA342 & n.2.

Moore asserted that statistical evidence established both discriminatory effect and discriminatory purpose. He cited Dr. Coston's report for the proposition that "black drivers in the city of Richmond were 5.15 times more likely to be stopped" and "12.67 times more likely to be arrested as a result of the stop" than white drivers. JA346. He added that data showing that RPD stopped "far more black people than white people" in the predominantly white Third Precinct further established a discriminatory effect. JA347. Moore also claimed that evidence that the Fourth Precinct Focus Mission Team's goal is "to get guns and drugs off the street," "not traffic enforcement," proved discriminatory effect. JA348. Moore also argued that historical evidence of racial discrimination in Richmond established discriminatory purpose. JA350–351.

In response, the government maintained that "[t]he standards from *Armstrong* have long governed selective enforcement claims in the Fourth Circuit," and that the district court was bound by this precedent. JA472. The government also argued that Moore failed to prove either component of his selective-enforcement claim. Dr. Coston's correlational analysis failed "to

14

demonstrate discriminatory effect by clear evidence and that similarly situated individuals of a different race were treated differently."  JA477.

The government  also argued that Moore failed to show discriminatory purpose.  Officers had probable cause to stop Moore "after seeing the identical fake tag on three different vehicles in the same shift," and Dr. Coston's analysis failed to demonstrate anything more than statistical evidence of some disparity.  JA477–479.  The government added that Moore's historical evidence of racial discrimination in Richmond was too attenuated to support his present claim of selective enforcement.  JA479–480.

### F.    The government moves to exclude the defense experts.

The government moved to exclude Dr. Coston's opinions for failure to satisfy Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  JA424–444.  In response, Moore argued, in relevant part, that the Virginia Department of Criminal Justice Services' ("VDCJS") first annual report on the data collected under the Virginia Community Policing Act confirmed that Dr. Coston's analysis was "correct."  JA487.

Specifically, in July 2021, VDCJS published a report analyzing the data from 613,483 traffic stops reported by Virginia law-enforcement agencies between July 1, 2020 and March 31, 2021.  JA502.  VDCJS compared "the percentage of persons in each racial/ethnic group in Virginia's population age 15 and older

(generally the legal age to drive in Virginia) to the percentage of persons in each racial/ethnic group among drivers in traffic stops." JA503. VDCJS used the "ratio between these two percentages" to calculate a disparity index "for stops for each driver group." JA503.

VDCJS reported that, on a statewide basis, "Black drivers were stopped at higher rates than White drivers." JA504. "Although only 19.6% of Virginia's driving-age population in the dataset was Black, 31% of drivers stopped were Black." JA504. VDCJS also reported that RPD had a disparity index for Black drivers of 1.6 based on 1,991 stops over 238 traffic days. JA541. A disparity index of 1.1 to 1.9 "indicates there was moderate overrepresentation for a group in how likely it is that a driver will be stopped." JA503.

VDCJS cautioned that the disparity index "simply tells us that members of a group are being disproportionately stopped compared to their presence in the population. It cannot tell us the motivations of the officers making the stops." JA528. The report added that "[a] major limitation of this study is that it used each racial/ethnic group's proportion of the resident driving-age population as a benchmark for measuring traffic stop disparities." JA509. This metric "provides only a rough estimate of that group's proportion of the actual driving population in that locality." JA509.

In June 2022, defense counsel notified the government of the defense's intent to call Dr. Marvin Chiles, an assistant professor of African American History at Old Dominion University, as an expert at the hearing on Moore's selective-enforcement claim. JA714. The government moved to exclude Dr. Chiles's testimony as inadmissible under Rule 702, untimely, and for failure to comply with Federal Rule of Criminal Procedure 16. JA709–712.

### G. The district court hears evidence on Moore's selective-enforcement claim.

In July 2022, the district court held a two-day evidentiary hearing on Moore's selective-enforcement claim.

Moore called Dr. Coston to testify as an expert in statistical analysis and research methodology. JA1271. As Dr. Coston described their analysis, the district court asked whether "the existence of a relationship . . . tell[s] us why the police do something." JA1299. The following exchange ensued:

> THE WITNESS: So, what we can do with data, what we attempt to do with statistics is to understand large scale patterns. We cannot work backwards from those large scale patterns to say this is why one individual person –
>
> THE COURT: You can't say –
>
> THE WITNESS: – did the thing they did.
>
> THE COURT: – that Mr. Moore was stopped because he was an African-American.
>
> THE WITNESS: No.

JA1299–1300.

Later, the district court observed that "there ought to be a strong relationship between the race of the driver and the fact of the stop based on the fact that 77 percent of the people stopped are black and 14 percent are white." JA1312. The court asked, "So would you characterize that as a strong substantive relationship between race and being stopped?" JA1312. Dr. Coston responded that "there exists a large disparity here. With this particular type of data, though, just the frequency and percents we can't determine statistical significance." JA1313. Dr. Coston explained that "we would have to know also what the population of drivers who were not stopped was." JA1313.

On cross-examination, Dr. Coston testified that they did not "use [] benchmarking for the statistical analyses" and "[o]nly used the census benchmark to create[] the maps." JA1377. Dr. Coston also confirmed that their analysis did not "have data on the percentage of drivers on the road." JA1378. The government asked Dr. Coston about VDCJS's representation that the poor quality of the initial data collected under the Virginia Community Policing Act "prevented drawing any further conclusions about whether traffic stops were caused by bias." JA1385. An extended exchange with the court followed:

THE COURT: . . . .

The question was, are you aware that [V]DCJS said you can't reach any conclusions about causation from the data that they have?

THE WITNESS: I am not making conclusions about causation.

THE COURT: Okay.

Well, isn't one of the things we have to prove in this case is that race caused this disparity?

THE WITNESS: I am [] drawing conclusions about the large scale patterns and relationships between race and the other variables that were examined, but I can't—I am not characterizing those as a causal relationship.

JA1385–1386. When the government resumed its examination, the court interjected:

THE COURT: Mr. Gibbons, do you agree that the burden is on the defendant to prove that race caused this disparity?

MR. GIBBONS: Your Honor, emphatically.

THE COURT: Do you agree that the witness just admitted that doesn't show that?

MR. GIBBONS: Yes, Your Honor.

THE COURT: And why are you continuing to ask questions?

JA1387.

On the second day of the hearing, the government called Dr. Smith to testify as an expert in racial disparities in law enforcement and quantitative methods. JA1421. Dr. Smith discussed the need for an appropriate benchmark. He

explained that knowing that "the percentage of a population of stops is comprised of some percentage of whites, blacks, Hispanics and Asian[s], for example, is meaningless unless you can compare that to a meaningful population." JA1438. If the question is "whether the police are disproportionately targeting minority drivers, then the only way to answer that question is if you have an estimate of the population of persons who are available to be stopped and the racial composition of those people." JA1440–1441. Later, Dr. Smith posited that "[i]t may hypothetically be the case that there are no or very few white drivers in black neighborhoods in Richmond," so that "there are no or very few white drivers available to be stopped in those neighborhoods." JA1509–1510. Consequently, "[w]ithout information about who is driving in those areas you can't reach the conclusion that race had an influence on the outcome here, in this case traffic stops." JA1509.

The government also called James McDonough, the Director of the Criminal Justice Research Center at VDCJS, who testified about the annual report required by the Virginia Community Policing Act. McDonough testified that VDCJS found "instances where drivers of a given race were stopped at a higher rate than their percentage of the population. But given the quality of data, the lack of a valid benchmark and [] a range of other issues," VDCJS "could not draw conclusions at all regarding whether or not racial bias, or bias based policing, played any role in

these disparities." JA1545. VDCJS was "cautious" because it was "aware there are multiple other variables that could explain why you could have a mismatch between the percentage of drivers of any given race stopped and the percentage of those[] of driver-age in that racial group within a locality." JA1551. VDCJS did not use general census data as a benchmark like Dr. Coston did because "using this chunk of the population that is highly unlikely to be driving and subject to being stopped would only make the data even noisier and of less quality." JA1555.

### H. Moore submits historical evidence of racial discrimination in Richmond.

At the evidentiary hearing, the district court agreed that Moore's disclosure of Dr. Chiles's testimony was deficient and directed counsel to file an expert report before he could testify. JA1263. Accordingly, after the hearing, Moore submitted an expert report prepared by Dr. Chiles. His report proceeded in two parts.

First, Dr. Chiles described the history of racial segregation in Richmond, JA1603–1609, noting that "federal law and local activism helped curb systemic residential segregation between the 1960s and 1980s," JA1607, and "effectively ended racial steering by Richmond's real estate community by the mid-1980s," JA1609.

Second, Dr. Chiles described historical tensions between RPD and Black residents of Richmond. He wrote that "blacks were the most harassed and arrested people by RPD between 1782 and 1865." JA1610. Dr. Chiles posited that, after

the end of slavery, vagrancy laws and subsequent laws depriving Blacks of the right to vote "resulted in blacks being disproportionately arrested, publicly whipped (ended in 1881), and killed by RPD between 1865 and 1900." JA1610–1611. He further stated that Black neighborhoods became "primary targets for RPD enforcement" as a result of "Progressive Era (1890–1929) reforms on police malfeasance, as well as civil crimes of drug distribution, alcohol consumption, and prostitution." JA1611. After World War II, "RPD remained at odds with black residents, particularly in their enforcement of segregation law in opposition to protests (sit-ins)" during the Civil Rights Movement. JA1611. In 1966, Black residents "led a call for a Police Review Board," a proposal which RPD and city officials rejected. JA1612.

RPD created the Narcotics Division in 1984, the Select Neighborhood Action Patrol Division in 1986, and the Drugs and Firearms Strike Force in 1987. JA1613. These RPD divisions developed operations "in which dozens of RPD officers exclusively patrolled . . . high-density, low-income areas—notably housing projects—that ha[d] been breeding grounds for crime." JA1613. Dr. Chiles opined that neither the appointment of the first Black RPD Chief in 1989 nor "the increased number of black policemen" changed the relationship between Black Richmonders and RPD. JA1614. Dr. Chiles did not provide any information past 1989.

In October 2022, the district court reopened the evidentiary hearing to permit Dr. Chiles's testimony. As Dr. Chiles summarized his claim that, in the 1980s, RPD started "targeting . . . the high crime areas" of Richmond, the court asked "how they identified African-American areas as high crime areas." JA1693. Dr. Chiles conceded that he did not know whether RPD had data showing "which areas were high crime and which areas weren't." JA1694. When the court pressed for an explanation of his opinion that "there was more crime in black areas of town than white areas of town," Dr. Chiles responded that it was the result of "[p]overty" and that "history has consequences." JA1695–1696.

On cross-examination, Dr. Chiles conceded that he did not know what RPD's precinct boundaries looked like in 1977 and therefore did not know whether "the precinct boundaries in the past have tracked racial boundaries." JA1726–1727. He did not have any evidence that RPD ever changed a precinct boundary in response to shifting racial demographics in Richmond. JA1727. He acknowledged that RPD is not and has not been involved in residential segregation. JA1727. The government asked whether Dr. Chiles had any information from within Moore's lifetime. JA1734. Dr. Chiles conceded that he did not have any relevant information past 1989. JA1734.

## I. The district court grants in part and denies in part Moore's motion to suppress.

In November 2023, the district court issued an opinion granting in part and denying in part Moore's motion to suppress. As relevant here, the court denied Moore's motion to suppress the gun found in his car. The court concluded that Officers Collombo, Mills, Spinos, and Williams "did not violate Moore's Fourth Amendment rights by trying to pull him over" because they "suspected Moore had violated a traffic law" and therefore were "legally justified" in stopping his car. JA1785.

## J. The district court dismisses the indictment.

In February 2024, the district court issued an opinion and order dismissing the indictment. At the outset, the court denied the government's motions to exclude the testimony of Dr. Coston and Dr. Chiles. JA1796–1808.[4]

Next, the court addressed the required showing for a criminal defendant claiming selective enforcement. The court emphasized the "critical distinction" between selective-enforcement and selective-prosecution claims. JA1808. The court agreed with Moore that this Court "has not squarely held that a Black driver pulled over due to his race must specifically identify similarly situated white

---

[4] The government does not renew its challenges to the defense experts in this appeal.

drivers who were not stopped to prevail on his selective enforcement claim." JA1809. Accordingly, the court determined that Moore must establish his selective-enforcement claim only by a preponderance of the evidence. JA1811.

Under that framework, the district court found that Dr. Coston's and Dr. Chiles's testimony "establishe[d] that RPD's actions cause a discriminatory effect." JA1812. The court relied on Dr. Coston's findings that "Black drivers were 5.13 times more likely to be stopped than white drivers," that RPD was "far more likely to search Black drivers and their cars than they were to search white drivers," and that "Black drivers were 12.67 times more likely than White drivers to be arrested as a result of the stop." JA1812. The court added that "Dr. Chiles's testimony regarding Richmond's history of racialized policing informs the Court's understanding of why three of Richmond's four police precincts overlay the City's predominately Black communities." JA1812.

Turning to the discriminatory-purpose analysis, the court recognized that Moore had "presented no evidence of the four officers' invidious or bad faith." JA1812. Nonetheless, the court concluded that "[t]he data showing that RPD stops Black drivers five times as often as it stops white drivers, coupled with the evidence of Richmond's history of discrimination, reveals that RPD's discriminatory purpose contributed to its officers' decision to stop Moore." JA1815.

The United States Attorney moved for reconsideration of the order dismissing the indictment. JA1818–1822. The district court denied that motion, JA1840–1843, and the government timely noted this appeal, JA1844.

## Summary of Argument

The district court dismissed the indictment against Moore based on its conclusion that RPD selectively enforced the traffic laws against Moore because he is Black. Because that decision depends on three fundamental errors, the Court should reverse the dismissal order and reinstate the indictment.

*First*, the district court erroneously applied a preponderance-of-the-evidence standard, instead of a clear-evidence standard, in assessing Moore's selective-enforcement claim. This Court has repeatedly held that the clear-evidence standard for proving a claim of selective prosecution described in *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996), is the standard for proving a claim of selective enforcement. That precedent is binding, and the district court erred in discarding it.

*Second*, the district court should have rejected Moore's claim because there was simply no evidence that Officers Collombo, Mills, Spinos, and Williams stopped his car for a discriminatory purpose. In denying Moore's motion to suppress the gun recovered from his car, the district court recognized that "the officers [w]ere legally justified in stopping Moore's vehicle" for a traffic offense

after seeing the same fake, temporary license plate for the third time that night. JA1785. That probable cause strongly suggested that the officers stopped Moore's car because of the likely traffic offense, not because of his race, and Moore failed to rebut that inference.

Moore "presented no evidence of the four officers' invidious or bad faith." JA1812. He also introduced no evidence that the officers implemented an official RPD policy of stopping Black drivers because of their race. And Moore's statistical and historical evidence did not meet his burden. The statistical evidence reflecting the traffic stops conducted by all RPD officers across the City of Richmond did not support an inference that the four officers who stopped Moore's car did so because of his race. Further, Moore's expert conceded that the statistical evidence could not establish a causal link between a driver's race and a traffic stop. Likewise, the historical evidence, which left off at 1989, shed no light on the officers' decision to stop Moore's car in December 2020. Moore's failure to prove discriminatory purpose, by itself, warrants reversal of the dismissal order.

*Third*, the district court erred in concluding that Moore's statistical and historical evidence proved that the officers' decision to stop Moore's car had a discriminatory effect. The court improperly determined, based on the statistic that 77 percent of the traffic stops in Dr. Coston's sample involved Black drivers, that "Black drivers were 5.13 times more likely to be stopped than white drivers."

JA1812.  Without any information about the total driving population, the district court could not reach any conclusion about the likelihood of a particular driver being stopped.  Further, the district court failed to address how the historical evidence leaving off at 1989 showed that the officers' decision to stop Moore in December 2020 had a discriminatory effect.  Therefore, if the Court does not reverse for lack of discriminatory purpose, then it should, at minimum, remand for the district court to conduct a proper discriminatory-effect analysis in the first instance.

## Argument

## I.   The district court applied the wrong standard of proof in evaluating Moore's selective-enforcement claim.

The Equal Protection Clause of the Fifth Amendment and the equal-protection component of the Fourteenth Amendment "prohibit[] selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).  At the same time, a "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926).

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court reviewed the requirements for a criminal defendant to establish a claim of selective prosecution.  The standard of proving a selective-prosecution claim "is a

demanding one." *Id.* at 463. "[T]o dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Id.* at 465. Drawing on "ordinary equal protection standards," a defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Further, the Supreme Court underscored that "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim [] require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468. Accordingly, to obtain discovery on a selective-prosecution claim, a criminal defendant must establish "some evidence tending to show the existence of" discriminatory effect and discriminatory intent. *Id.* at 468–69.

"This Court has adopted *Armstrong*'s standard for proving selective prosecution as the standard for proving selective enforcement." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (citing *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996)); *see also United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (same). Like a selective-prosecution claim, a selective-enforcement claim "asks a court to exercise judicial power over a special province of the Executive." *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464). Given "the great danger of unnecessarily impairing the performance of a core executive

constitutional function," a criminal defendant must prove a selective-enforcement claim by "clear evidence." *Id.* (quoting *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)). "This 'standard is intended to be a demanding and rigorous one.'" *Id.* (quoting *Olvis*, 97 F.3d at 743).

The district court, however, determined that Moore had to prove his selective-enforcement claim by only a preponderance of the evidence. JA1811. The court accepted Moore's assertion that this Court "has yet to h[o]ld after pointed consideration that a challenger must prove selective enforcement by clear evidence." JA1808. That reasoning cannot be squared with this Court's decisions consistently applying *Armstrong*'s clear-evidence standard to claims of selective enforcement. *See Hare*, 820 F.3d at 99; *Mason*, 774 F.3d at 829; *United States v. Suarez*, 321 F. App'x 302, 305 (4th Cir. 2009) (per curiam); *Bullock*, 94 F.3d at 899.

In each of these decisions, *Armstrong*'s clear-evidence standard was "clearly integral to the analytical foundations" of the Court's holdings, and "not dicta." *Lennear v. Wilson*, 937 F.3d 257, 273 (4th Cir. 2019). For example, in *Bullock*, the Court rejected on the merits the claim that the traffic stop "was motivated by a race-based drug courier profile," reasoning that the defendant had "failed to meet the rigorous standard for proving" an equal-protection violation based on "racially motivated law enforcement." 94 F.3d at 899 (citing *Armstrong*, 517 U.S. at 468).

Similarly, in *Suarez*, the Court applied the "demanding" standard articulated in *Armstrong* and *Bullock* to conclude that the claim that the traffic stop "was racially motivated" was "without merit." 321 F. App'x at 305.

In *Mason*, the defendant asserted that his trial counsel should have challenged the traffic stop as impermissibly race-motivated. 774 F.3d at 828. Recognizing that "[t]his Court has adopted the standard the Supreme Court set forth in" *Armstrong* "for cases of racially animated law enforcement," the Court held that "counsel were not ineffective in appreciating the difficulty of this course." *Id.* at 829. Indeed, "[b]oth the Supreme Court and this court have explained why this is a difficult contention on which to prevail." *Id.* Accordingly, counsel could "hardly be deemed ineffective for taking the Supreme Court's own statements as to its difficulty and as to its separation of powers implications into account." *Id.* at 830.

Most recently, in *Hare*, the Court applied *Armstrong* to conclude that the defendants were not entitled to discovery on their selective-enforcement claim. The Court acknowledged that it has not "specifically addressed whether *Armstrong*'s standard for discovery applies in the selective enforcement context," yet applied that standard as "the starting point for [its] analysis." 820 F.3d at 99. The Court considered at length the defendants' arguments that "their selective enforcement claim should not be held to the discovery standard articulated in

*Armstrong* for claims of selective prosecution" given the "differences in proving the two types of claims." *Id.* at 100. Nevertheless, the Court did not disturb its existing precedent holding that "*Armstrong*'s standard for proving selective prosecution" is "the standard for proving selective enforcement." *Id.* at 99; *cf. McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc) (applying "the basic principle that one panel cannot overrule a decision issued by another panel").

The district court emphasized the "critical distinction" between selective-prosecution and selective-enforcement claims. JA1808. The court apparently understood *Armstrong* to require a defendant claiming selective prosecution to identify by name similarly situated individuals who were not prosecuted. *See* JA1808. Accordingly, the district court disclaimed any requirement that Moore demonstrate that RPD treated similarly situated drivers differently based on race. *See* JA1810–1811.

But a claim of racially selective law enforcement, by definition, is a claim that officers treated similarly situated persons of other races more favorably than the defendant. *See Armstrong*, 517 U.S. at 469 ("[S]elective prosecution implies that a selection has taken place."). And a defendant claiming selective enforcement need not identify similarly situated individuals by name. *Cf. Gonzalez v. Trevino*, 144 S. Ct. 1663, 1667 (2024) (per curiam) (confirming that a

civil plaintiff alleging retaliatory arrest need not provide "examples of identifiable people" as "comparator evidence"). Indeed, *Armstrong* itself recognized that a defendant could prove his selective-prosecution claim using aggregate statistics. *See* 517 U.S. at 466–67. Likewise, this Court has consistently considered aggregate statistics as permissible evidence of selective prosecution. *See, e.g.*, *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012); *Olvis*, 97 F.3d at 745–46. Accordingly, the district court erred in concluding that the available *forms* of proof dictated a different *standard* of proof for selective-enforcement and selective-prosecution claims.

The district court embraced the Seventh Circuit's decision in *Conley v. United States*, 5 F.4th 781, 796 (7th Cir. 2021), which held that a criminal defendant claiming selective enforcement, as opposed to selective prosecution, must prove his claim only by a preponderance of the evidence. *See* JA1811. But this Court's precedent bound the district court to apply a clear-evidence standard. For good reason: A criminal defendant should not be able to circumvent *Armstrong*'s demanding standard and obtain dismissal of a federal indictment by framing his claim as a challenge to the actions of the police officer rather than the actions of the prosecutor. The decision to conduct a traffic stop and the decision to prosecute are independent events which occur at different moments in time, completed by different actors, grounded in different justifications. Moreover, an

indictment breaks the chain of events by interposing a prosecutor, who must decide to bring charges, and a grand jury, who must find probable cause to believe that the defendant committed a federal crime. *Cf. Hartman v. Moore*, 547 U.S. 250, 262–63 (2006).[5]

If an officer conducts a traffic stop for a discriminatory reason, then the driver can hold the officer accountable for his actions, for example, in a civil enforcement action under 42 U.S.C. § 1983. *See, e.g.*, *English v. Clarke*, 90 F.4th 636, 648–49 (4th Cir. 2024). Absent any evidence of coordination between the officer and the prosecutor, however, any impermissible motive harbored by the officer does not equate to an impermissible motive on the part of the prosecutor. *See, e.g.*, *United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) (declining to "impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution"); *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir. 1996) ("[T]he animus of a referring agency is not, without more, imputed to federal prosecutors."). Accordingly, the "justifications" for applying "a rigorous standard" to a defendant seeking dismissal of an indictment based on a claim of

---

[5] Given this attenuation, it is not clear why dismissal of a federal indictment would ever be an appropriate remedy for a state law enforcement officer's selective enforcement of state law. *Cf. Segura v. United States*, 468 U.S. 796, 815 (1984) (reasoning that "[s]uppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity").

selective prosecution apply with equal force to a defendant seeking dismissal of an indictment based on a claim of selective enforcement. *See Armstrong*, 517 U.S. at 468. Indeed, the discovery order challenged in *Armstrong* itself sought information about both the investigation and the prosecution of a cocaine distribution ring. *See id.* at 459. Nonetheless, the court treated both categories of information under the same framework.

Accordingly, the district court erred in applying a preponderance-of-the-evidence standard, instead of a clear-evidence standard, to Moore's selective-enforcement claim. But even under a preponderance-of-the-evidence standard, the district court erred in dismissing the indictment because Moore failed to meet his burden of proving selective enforcement.

## II.     Moore failed to establish that the officers who stopped his car acted with discriminatory purpose.

To prevail on a claim of selective enforcement, "[t]he defendant must show both 'discriminatory effect and that [the officer's action] was motivated by a discriminatory purpose.'" *Mason*, 774 F.3d at 829 (quoting *Armstrong*, 517 U.S. at 465). Failure to satisfy either requirement is fatal to the defendant's claim. *See, e.g.*, *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam) (summarily reversing based solely on the defendant's failure to show some evidence of discriminatory effect). This Court reviews de novo a district court's disposition of a selective-enforcement claim. *See, e.g.*, *Hare*, 820 F.3d at 98; *Venable*, 666 F.3d

at 900.

To establish discriminatory purpose on a claim of selective enforcement, Moore had to show that the decision to stop his car was "invidious or in bad faith." *Olvis*, 97 F.3d at 743. Discriminatory purpose "implies that the government 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Venable*, 666 F.3d at 903 (quoting *Wayte*, 470 U.S. at 610). Ultimately, there must be some connection between the alleged animus and the challenged conduct. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 608 (2018); *United States v. Sanchez-Garcia*, 98 F.4th 90, 97 (4th Cir. 2024); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020).

### A. Probable cause to believe Moore committed a traffic offense suggested a legitimate reason for the stop.

"Where there exists an objectively reasonable basis for the officer's conduct after rigorous challenge," it is unlikely "that an *Armstrong* claim would get off the ground." *Mason*, 774 F.3d at 831. After an evidentiary hearing on Moore's motion to suppress, the district court correctly found that the officers were "legally justified in stopping Moore's vehicle." JA1785. Specifically, on the evening of December 5, 2020, Officers Collombo, Mills, Spinos, and Williams had stopped two different cars in the Fourth Precinct with the same temporary license plate. JA52–53, JA55–JA56, JA92, JA145. Police determined that the license plate

number was fake after running it through a computer database.  JA53–54.  A few hours later, the officers observed Moore's car with the same fake, temporary license plate, and initiated a traffic stop.  JA58, JA71.

Multiple provisions of Virginia law prohibit the use of fake or altered license plates.  *See, e.g.*, Va. Code § 46.2-612(B)(1) (providing that no person shall "[d]isplay or cause or permit to be displayed" any license plate "that he knows is fictitious"); Va. Code § 46.2-722 (prohibiting the fraudulent alteration, forgery, or counterfeiting of a license plate and the holding and use of a license plate "knowing it to have been altered, forged, or falsified").  Therefore, the officers had probable cause to stop Moore for a traffic offense upon seeing the same fake, temporary license plate for the third time that night.  *See United States v. Perry*, 92 F.4th 500, 510 (4th Cir. 2024) ("When an officer observes a traffic offense— however minor—he has probable cause to stop the driver of the vehicle."); *United States v. Perez*, 30 F.4th 369, 375 n.7 (4th Cir. 2022) ("[B]ecause the vehicle's license plate was expired and—based on [the officer's] experience—likely fictitious, [the officer] had a legitimate reason to stop [the defendant].").  As the district court observed during the suppression hearing, "How much probable cause do they need?  They have got three identical tags.  You know something is afoot." JA86.

The existence of probable cause indicates that the potential traffic offense, not discriminatory intent, caused the officers to stop Moore's car. *See Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (observing that, "because probable cause speaks to the objective reasonableness of an arrest," "the presence of probable cause will suggest" that the "potentially criminal conduct," rather than "the officer's malice," caused the arrest); *Mason*, 774 F.3d at 832–33 (concluding, where the officer had "a sufficient and reasonable basis" to "suspect criminal activity was afoot," that the "facts of this case" did "not suggest a successful *Armstrong* claim"); *United States v. Khan*, 461 F.3d 477, 498 (4th Cir. 2006) (holding that "the district court did not err in denying discovery on defendants' selective prosecution claim because the available evidence demonstrate[d] that legitimate prosecutorial factors motivated the government's prosecutorial decisions"). The district court acknowledged as much, commenting, "[I]n this case, we have got the gentleman driving around with a fake license plate on and all that. Maybe that gets stopped regardless of bias." JA1549.

As the district court recognized, Moore introduced no direct or circumstantial evidence to rebut the inference that Officers Collombo, Mills, Spinos, and Williams stopped him for a legitimate reason. He "presented no evidence of the four officers' invidious or bad faith." JA1812. The district court even noted that it had "observed a whole lot of the interactions between the police

that evening" and thought "the police essentially treated him with great respect, treated him nicely." JA336. Nor did Moore introduce evidence that the officers implemented an official RPD policy of stopping Black drivers because of their race. In fact, RPD's Chief of Police had issued a General Order on Bias Reduction in February 2018, which provided that

> In all enforcement decisions, officers shall be able to articulate specific facts, circumstances, and conclusions, which support probable cause or reasonable suspicion for arrests, searches, seizures, and stops of citizens. Officers shall not stop, detain, arrest, search or attempt to search anyone based solely upon the person's race, sexual orientation, gender, national origin, ethnicity, age, religion, or economic status.

JA467. Instead, Moore relied on raw statistical disparities and decades-old historical information to show discriminatory purpose. Because that evidence fell far short of *Armstrong*'s demanding standard, Moore failed to demonstrate that officers decided to stop his car for a discriminatory purpose.

### B. Citywide traffic stop statistics did not show that the officers who stopped Moore had discriminatory intent.

The district court first determined that Moore established discriminatory purpose based on Dr. Coston's statistical evidence. For at least three reasons, that statistical evidence failed to show that officers stopped Moore's car because of his race.

First, there was no connection between the general traffic stop data and the officers who stopped Moore's car. Dr. Coston analyzed the traffic stops conducted

by all RPD officers from July 1, 2020 through December 6, 2020. JA355. Based on that citywide data, Dr. Coston reported that 77 percent of the stops in the sample were of Black drivers and that "[i]n comparison to White drivers, Black drivers were 5.13 times more likely to be stopped." JA357. But Officers Collombo, Mills, Spinos, and Williams were assigned to RPD's Fourth Precinct. JA51, JA91, JA145, JA177. There is no evidence that these officers were aware of the citywide data, let alone that they shared the motives of the officers who conducted the citywide stops.

Thus, even if Dr. Coston's statistics showed some evidence of discriminatory purpose by some RPD officers at some point in the preceding six months, there was no clear evidence that the officers who stopped Moore's car on December 5, 2020 did so because of his race. *See, e.g.*, *Hastings*, 126 F.3d at 314 (holding that a defendant claiming selective prosecution failed to offer "credible evidence" of discriminatory purpose because, "even if there were some evidence of political animus on the part of the IRS's civil or criminal" investigators, there was "no evidence that the government official who actually made the decision to prosecute the case was motivated by impermissible considerations"); *cf. Johnson v. Holmes*, 782 F. App'x 269, 282 (4th Cir. 2019) (per curiam) (reasoning that, because the plaintiffs in this § 1983 suit "charge[d] one officer, Holmes, with selectively enforcing traffic laws based on race (as opposed to an entire

department)," the plaintiffs could "compare the data about Holmes's traffic stops and summonses by race with similar data from the rest of the police force and from individual officers assigned to the same sectors as Holmes").

Second, the district court erred in concluding that the statistical evidence demonstrated discriminatory purpose given that Dr. Coston repeatedly cautioned that the data could not establish causation. *See, e.g.*, JA1299–1300 ("[W]hat we attempt to do with statistics is to understand large scale patterns. We cannot work backwards from those large scale patterns to say this is why one individual person . . . did the thing they did."); JA1385–1386 ("I am not making conclusions about causation."); JA1386 ("I am [] drawing conclusions about the large scale patterns and relationships between race and the other variables that were examined, I can't—I am not characterizing those as a causal relationship."). Indeed, the district court suggested the government's cross-examination of Dr. Coston was unnecessary given this concession:

> THE COURT: Mr. Gibbons, do you agree that the burden is on the defendant to prove that race caused this disparity?
>
> MR. GIBBONS: Your Honor, emphatically.
>
> THE COURT: Do you agree that the witness just admitted that doesn't show that?
>
> MR. GIBBONS: Yes, Your Honor.
>
> THE COURT: And why are you continuing to ask questions?

JA1387.

The district court stated in its opinion that it recognized the limits of the statistical evidence. *See, e.g.*, JA1813 ("This correlation, on its own, does not prove causation."); JA1814 ("In analyzing the statistics in this case, Dr. Coston never asserted that race caused a particular stop."). Nonetheless, the court concluded that Moore established discriminatory purpose because the statistics constituted "evidence of a consistent pattern of actions by RPD that disparately impact[s] Black drivers in Richmond." JA1813.

It is well-established, however, that even when official action "disparately impacts members of a particular racial group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an 'invidiously discriminatory' intent." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). Indeed, "there is an element of causation that is a necessary part of [this] showing." *Id.* at 819 n.2. Given Dr. Coston's consistent testimony that the statistics could not show that RPD officers stopped Black drivers because of their race, the district court erred in concluding that the statistical evidence satisfied Moore's burden of proving discriminatory purpose. *See, e.g.*, *Olvis*, 97 F.3d at 745 (applying the "general rule" that "statistical evidence of racial disparity is insufficient to infer that

42

prosecutors in a particular case acted with a discriminatory purpose").

Third, the statistical evidence suffered from the same defect as the studies previously rejected by the Supreme Court and this Court: It lacked "an appropriate basis for comparison." *Olvis*, 97 F.3d at 745. And "absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim." *Id.* (citing *Armstrong*, 517 U.S. at 469–70). "Notably, there is *not* a presumption that unexplained statistical evidence of racial disparity proves racial animus." *Venable*, 666 F.3d at 903. Instead, the defendant bears the burden of showing that the statistical evidence is clear evidence of discriminatory purpose.

*Armstrong* and its progeny make clear that Moore's statistical evidence failed to meet his burden here. In *Armstrong*, the defendants offered a study showing that all of the defendants in drug cases closed by the OFPD in 1991 were Black. 517 U.S. at 459. The Supreme Court concluded that the study "did not constitute some evidence" of either element of a selective-prosecution claim because it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.* at 470.

Similarly, in *Olvis*, the defendants introduced "statistical evidence that more than 90% of those who had been tried since 1992 for crack cocaine offenses" in the

Eastern District of Virginia's Norfolk and Newport News Divisions were Black. 97 F.3d at 742. This Court reversed the district court's discovery order, reasoning that "[e]ven if the study had a basis for comparison that showed discriminatory effect, it would not necessarily prove discriminatory intent." *Id.* at 746.

In *Venable*, the defendant submitted a spreadsheet showing that, for the years 2005, 2006, and 2007, 86.71 percent of the individuals charged with violating 18 U.S.C. § 922(g) by the Richmond Division of the U.S. Attorney's Office for the Eastern District of Virginia were Black. 666 F.3d at 898–99. This Court held that the statistical evidence failed to satisfy the defendant's burden of showing discriminatory intent because it "contain[ed] no appropriate basis for comparison." *Id.* at 903. That is, "[i]t provide[d] no statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes." *Id.*

In the same way, here, Moore's statistical evidence contained no appropriate basis for comparison. This Court has recognized that, in assessing a claim that an officer stopped a driver because of the driver's race, the relevant comparator is the total population of drivers who could have been stopped but were not. *See, e.g.*, *Suarez*, 321 F. App'x at 305 (reasoning that the defendant failed to prove selective enforcement where there was "no evidence" showing "that the officers failed to stop individuals of other races for exceeding the speed limit by more than ten miles

44

per hour"); *cf. Johnson*, 782 F. App'x at 282 (reasoning that "the percentage of white drivers stopped and ticketed by the other officers patrolling the same locations as [the defendant officer] serve[d] as a proxy to show the general racial composition of drivers on the road that [the defendant] could have pulled over but did not").

Further, both Dr. Smith, the government's expert, and James McDonough, the Director of the Criminal Justice Research Center at the Virginia Department of Criminal Justice Services, explained that the relevant comparator to assess racial disparity in traffic stops is the total population of drivers who could be stopped for a traffic offense in a particular jurisdiction. *See* JA1440–1441 (Dr. Smith testifying that, if the question is "whether the police are disproportionately targeting minority drivers, then the only way to answer that question is if you have an estimate of the population of persons who are available to be stopped and the racial composition of those people"); JA1555 (McDonough testifying that, in order "to have some measure of what those numbers would look like if there were not bias," VDCJS used the population of people over the age of 16 as a "very crude preliminary" measure of the driving population).

Dr. Coston recognized that they could not determine the statistical significance of the racial disparity in traffic stops without knowing "what the population of drivers who were not stopped was." JA1313. But their analysis did

not consider "data on the percentage of drivers on the road."  JA1378.  In fact,

neither Dr. Coston's summary of the proportion of stops of Black drivers nor the

analysis of the relationship between the race of the driver and the result of the stop

reflected any basis for comparison.  *See* JA1377–1378 ("I didn't use the

benchmarking for the statistical analyses.  Only used the census benchmark to

create[] the maps.").  Therefore, the statistical evidence failed to satisfy Moore's

burden of proving that officers stopped his car for a discriminatory purpose.  *Cf.*

*United States v. Rundo*, 108 F.4th 792, 808 (9th Cir. 2024) (highlighting "the

importance of the 'similarly situated' exercise," without which "a district court

cannot actually isolate the reason for the defendant's prosecution").

### C.      Remote historical evidence did not show that the officers who stopped Moore in 2020 had discriminatory intent.

The district court also determined that Moore established discriminatory

purpose based on historical evidence.  A court considering "whether invidious

discriminatory purpose was a motivating factor" for a decision may consider "such

circumstantial and direct evidence of intent as may be available."  *Vill. of Arlington*

*Heights*, 429 U.S. at 266.  And "[t]he historical background of the decision is one

evidentiary source, particularly if it reveals a series of official actions taken for

invidious purposes."  *Id.* at 267.  But none of Moore's historical evidence had any

connection to a present-day RPD policy, let alone to the officers who stopped

Moore's car.  Therefore, it failed to provide clear evidence that officers stopped

him on December 5, 2020 because of his race.

First, the district court cited Dr. Chiles's testimony regarding "the Confederate foundations of RPD" and "Richmond's racialized zoning, redlining," as well as Dr. Chiles's testimony that "the historical segregation of the City of Richmond is the product of the tide of history." JA1814. To be sure, Richmond's "history of discrimination cannot and should not be ignored." *Riddick by Riddick v. Sch. Bd.*, 784 F.2d 521, 539 (4th Cir. 1986). But "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case." *Abbott*, 585 U.S. at 603. Consequently, historical evidence must be reasonably contemporaneous with the challenged decision to support an inference of discriminatory purpose. *See Vill. of Arlington Heights*, 429 U.S. at 268 (reasoning that "legislative or administrative history may be highly relevant, especially where there are *contemporaneous* statements by members of the decisionmaking body, minutes of its meetings, or reports" (emphasis added)).

In this case, Dr. Chiles's evidence left off at 1989, thirty-one years before the traffic stop. JA1614; *see* JA1734 ("Beyond 1989 I don't have anything."). Without more, that evidence is not probative of RPD's motives in December 2020. *See, e.g.*, *Sanchez-Garcia*, 98 F.4th at 99–100 (holding that "the intent behind" a 1929 predecessor statute was "of limited probative force when it c[ame] to the

47

intent of 1952's Congress in passing [8 U.S.C.] § 1326" given "the substantial chronological gap between the legislative act directly at issue . . . and the 1929" statute); *Watkins v. Angelone*, No. 97-9, 1998 WL 2861, at *6 n.3 (4th Cir. 1998) (per curiam) (reasoning that evidence that Danville, Virginia, "was the capital of the Confederacy in the waning days of the Civil War, that many black citizens were assaulted in an effort by the Democrat Party to defeat the Readjuster-Republican coalition in the 1883 election, and that civil rights activists suffered at the hands of local officials in the 1960s" could not "support a challenge to a 1988 jury"); *Riddick*, 784 F.2d at 539 (rejecting the argument that "the Norfolk school board must continue to justify all of its actions because of the history of segregation," because otherwise "virtually every action of the school board with respect to any of its various affairs would be suspect").

Further, much of Dr. Chiles's evidence described the actions of private parties. *See, e.g.*, JA1604–1607 (expert report describing the conduct of realtors, mortgage lenders, and white residents of Richmond that facilitated racially segregated housing). Indeed, the district court interrupted Dr. Chiles's testimony to ask, "Are we going to relate this to law enforcement at some point?" JA1688. Under *Arlington Heights*, it is not just any history that is relevant but specifically history that "reveals a series of *official actions* taken for invidious purposes." 429 U.S. at 267 (emphasis added). Dr. Chiles conceded that RPD is not and has

not been involved in residential segregation.  JA1727.  Thus, the historical

evidence of racial discrimination by private parties in the housing market is not

probative of RPD's motives in 2020.  *Cf. Armstrong*, 517 U.S. at 470 (reasoning

that a newspaper article, "which discussed the discriminatory effect of federal drug

sentencing laws, was not relevant to an allegation of discrimination in decisions to

prosecute").

Second, the district court relied on Moore's argument that the boundaries of

"three RPD precincts [] overlap [with] Black neighborhoods in Richmond and a

fourth RPD precinct [] aligns exactly with the boundaries of the white section of

Richmond."  JA1814.  Dr. Chiles admitted that he did not know whether RPD's

"precinct boundaries in the past have tracked racial boundaries" and did not have

any evidence that RPD had ever changed a precinct boundary in response to

shifting racial demographics in Richmond.  JA1727.  Moore otherwise offered no

evidence that RPD devised the precinct boundaries *because of* the racial

composition of those neighborhoods.  *Cf. Venable*, 666 F.3d at 903 (explaining that

"discriminatory intent implies that the government 'selected or reaffirmed a

particular course of action at least in part *because of*, not merely in spite of, its

adverse effects upon an identifiable group'" (quoting *Wayte*, 470 U.S. at 610)

(emphasis added)).

Instead, the government presented maps showing the density of homicides

and manslaughters in Richmond, overlaid with RPD's precincts, from January 1, 1999 to August 16, 2022, and from January 1, 2018 to August 16, 2022. *See* JA1621–1622 & n.4. These maps showed that, for a period of at least twenty years, murders and homicides disproportionately occurred in Richmond's First, Second, and Fourth precincts. To the extent that RPD allocated its limited resources to the areas of the city experiencing the most violent crime, that did not establish discriminatory purpose. *See, e.g.*, *United States v. Thorpe*, 471 F.3d 652, 664 (6th Cir. 2006) (holding that the defendant failed to show some evidence of discriminatory purpose based on "the racial composition of the counties selected by the U.S. Attorney for participation in the [Project Safe Neighborhoods] initiative" because he "presented no evidence" that these "counties were selected on the basis of their racial composition as opposed to being selected because of their level of gun violence"); *United States v. Turner*, 104 F.3d 1180, 1185 (9th Cir. 1997) (rejecting the claim that "selection of a particular community for a particular enforcement operation constitutes racial discrimination if it is foreseeable that because of the ethnic composition of the community one race will necessarily provide most of the government's targets").

Third, the district court improperly credited Moore's claim that "studies have shown that RPD officers have stop[ped] far more [B]lack drivers than white drivers for traffic offenses [f]or at least twenty years." JA1814. Moore relied on

two isolated pieces of information.  *See* JA351.  First, he cited Dr. Smith's 2000 study of RPD traffic stops, which found that "Blacks comprise[d] 51% of the city's 16-and-over population but accounted for 64.2% of the motorists stopped." JA580.  At the time, Dr. Smith cautioned that "one limitation of this study is that [they] did not have baseline traffic violation data available as means for comparison."  JA590.  Thus, Dr. Smith's 2000 study suffered from the same defect as the statistical evidence rejected in *Armstrong*, *Olvis*, and *Venable*.  Moreover, Moore did not show any connection between the officers who conducted the traffic stops in 2000 and the officers who stopped Moore's car in 2020.

Moore also relied on a report published by the Richmond Transparency and Accountability Project in June 2019.  Moore represented that "[i]n 2017 and 2018, Richmond Police Officers were 30.7% more likely to pull over a black driver than a white driver."  JA351.  What the report said, however, is that "Black people were 30.7% more likely to be *arrested* during a traffic stop than white people."  JA418 (emphasis added).  The report provides no information about how this statistic was calculated.  Nor is it clear that information about a racial disparity in arrests following a traffic stop demonstrates discriminatory intent in the initial stop.

Ultimately, even if the 2000 study or the 2019 report provided some information about racial disparities in RPD's traffic stop decisions at two distinct periods in time, this isolated data hardly established a sustained pattern of racially

51

disparate traffic stops over twenty years.  And, absent any link to the 2020 traffic stop, it did not satisfy his burden of showing clear evidence of discriminatory purpose.

Fourth, the district court improperly concluded that Moore had met his burden based on his argument that "Virginia would not have enacted the Community Policing Act but for a valid concern regarding racial profiling in Virginia."  JA1814.  The decision of the Virginia General Assembly to improve transparency in law enforcement by enhancing reporting requirements in no way proves that RPD had an official policy of racial discrimination, let alone that the officers who stopped Moore's car did so because of his race.

***

In sum, Moore did not provide clear evidence of discriminatory purpose because he failed to connect the statistical and historical evidence to the officers' decision to stop his car.  To hold otherwise would mean that any Black driver stopped by an RPD officer could prove discriminatory purpose based on the exact same statistical and historical evidence, regardless of the actual motives of the officer who stopped his car.  Because controlling precedent required proof that this traffic stop was motivated by a discriminatory purpose, Moore failed to meet his burden of proving selective enforcement.

**III.** **The district court erred in concluding that the officers' decision to stop Moore's car had a discriminatory effect.**

By itself, the lack of clear evidence that the officers stopped Moore's car because of a discriminatory purpose warrants reversal of the dismissal order.  *See Bass*, 536 U.S. at 863–64.  The district court only further erred in concluding that the same defective statistical and historical evidence satisfied Moore's burden of proving discriminatory effect.  Therefore, if the Court does not reverse the dismissal of the indictment outright based on the failure to prove discriminatory purpose, then it should remand for the district court to conduct a proper discriminatory-effect analysis in the first instance.

**A.** **The district court erred in concluding that a statistical disparity alone showed discriminatory effect.**

"To show discriminatory effect," a defendant must show "that similarly situated individuals of a different race were not similarly targeted by law enforcement."  *Mason*, 774 F.3d at 830; *see Armstrong*, 517 U.S. at 465.  A defendant can demonstrate discriminatory effect using aggregate statistics if the statistical evidence provides an "appropriate basis for comparison."  *Hare*, 820 F.3d at 99.  The district court erred in its discriminatory-effect analysis in at least two ways.

First, the Supreme Court and this Court have repeatedly rejected comparable statistical evidence as insufficient to show some evidence of discriminatory effect

because of the lack of an appropriate comparator. *See supra* part II.B (discussing

*Armstrong*, *Olvis*, and *Venable*); *see also*, *e.g.*, *Bass*, 536 U.S. at 863–64 (holding

that nationwide statistics showing that the government "charges blacks with a

death-eligible offense more than twice as often as it charges whites" did not

establish discriminatory effect because the defendant "failed to submit relevant

evidence that similarly situated persons were treated differently"); *Hare*, 820 F.3d

at 99 (holding that statistics showing that "all 32 defendants prosecuted in stash

house sting cases in the District of Maryland have been Black" was insufficient

evidence of discriminatory effect because this evidence "contain[ed] no data on

similarly situated white individuals who could have been targeted for stash house

sting investigations but were not").

Given this consistent precedent holding that comparable evidence failed to

meet the lower showing of discriminatory effect required to obtain discovery,

Moore's statistical evidence necessarily failed to meet the higher burden required

to prove his claim on the merits. *See, e.g.*, *Mason*, 774 F.3d at 830 (holding that

the defendant was unlikely to succeed on selective-enforcement claim because

"there was no evidence of similarly situated whites being treated differently");

*Suarez*, 321 F. App'x at 305 (rejecting defendants' selective-enforcement claim

because there was "no evidence" that "the officers failed to stop individuals of

other races for exceeding the speed limit by more than ten miles per hour").

Dr. Coston did not "use [] benchmarking for the statistical analyses." JA1377. They "[o]nly used the census benchmark to create[] the maps." JA1377. In other words, the only comparator reflected in Dr. Coston's analysis was the 2015–2019 American Community Survey data on the racial demographics of Richmond, which Dr. Coston only used to create the overlay map of traffic stops of Black drivers. *See* JA363 (Figure 5). But the population of all residents of Richmond, which included residents below driving age, was not an appropriate comparator to the drivers stopped by RPD. *Cf. Hare*, 820 F.3d at 99–100 (observing that it was "far from clear" that a "white crew involved in robberies and drug distribution in the District of Maryland" was similarly situated to the defendants because it was unknown whether "they would be receptive to a stash house robbery scenario, or whether ATF had the means of infiltrating this crew undercover"). Absent evidence about the population of non-Black drivers who could have been stopped for traffic offenses but were not, Moore's statistics did not provide clear evidence of discriminatory effect.

Second, the district court's analysis depended on a flawed statistical premise. At the threshold, the district court mistakenly reasoned that Moore did not need to provide evidence of similarly situated individuals to prove his selective-enforcement claim. *See supra* part I. The district court then accepted the claim that, because 77 percent of the drivers stopped by RPD from July 1, 2020

through December 6, 2020 were Black, that meant that "Black drivers were 5.13 times more likely to be stopped than white drivers." JA1812; *see* JA357. This 5.13 figure was simply the number of Black drivers stopped as a multiple of the number of white drivers stopped. *See* JA357–358. But the district court's characterization of this number as reflecting the relative likelihood of a traffic stop by race implies that this statistic accounted for the total driving population. Dr. Coston made clear that this statistic did not reflect "data on the percentage of drivers on the road." JA1378. Absent evidence as to the total numbers of Black drivers and white drivers, including those who were not stopped, Moore's statistics could not determine the likelihood that a Black driver would be stopped relative to the likelihood that a white driver would be stopped. Because the district court disclaimed the need to show similarly situated comparators, it erred in accepting Moore's statistics as clear evidence that RPD's decision to stop Moore had a discriminatory effect.

Another way to understand the error in the court's analysis is to consider a hypothetical. Based on the district court's methodology, if the data showed that 50 percent of stops were of Black drivers and 50 percent of stops were of white drivers, then that would indicate that a Black driver is equally likely to be stopped as a white driver. But if only five percent of the drivers on the road were Black, then it would be inaccurate to conclude that Black drivers and white drivers were

equally likely to be stopped simply because 50 percent of the stops involved Black drivers. Accordingly, the district court erred in concluding that evidence of a statistical disparity in the race of stopped drivers, regardless of context, established clear evidence of discriminatory effect.

### B. The district court erred in determining that remote historical evidence showed discriminatory effect.

Finally, the district court erroneously determined that Moore satisfied his burden of proving discriminatory effect based on Dr. Chiles's historical evidence. *See* JA1812. To begin, it is not clear that historical evidence can show discriminatory effect. In *Arlington Heights*, the Supreme Court approved the consideration of historical evidence as circumstantial evidence of discriminatory *purpose*. *See* 429 U.S. at 266. That is because the discriminatory-purpose inquiry is "relatively easy" only in the "rare" case where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Id.* Otherwise, assessing discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* The Supreme Court has observed that the same evidentiary difficulty is not present for discriminatory effect. *See Armstrong*, 517 U.S. at 470 (reasoning that "if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently").

Regardless, even if historical evidence in some case could provide circumstantial evidence of discriminatory effect, neither Moore nor the district court explained how historical evidence of racial discrimination in Richmond leaving off at 1989 could prove that the officers' decision to stop Moore in December 2020 had a discriminatory effect. Moore's historical evidence lacked any connection to the present-day RPD, let alone the officers who stopped his car. *See supra* part II.C. Consequently, the district court erred in concluding that Dr. Chiles's historical evidence constituted clear evidence of discriminatory effect.

## Conclusion

The Court should reverse the dismissal order, reinstate the indictment, and remand the case to the district court for further proceedings.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____

Jacqueline R. Bechara
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States respectfully requests that the Court hold oral argument in this case.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,992 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, signature block, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____
/s/

Jacqueline R. Bechara
Assistant United States Attorney