IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4201

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, District Judge*

———————————

CORRECTED JOINT APPENDIX
VOLUME I OF VI (PAGES 1–482)

———————————

Geremy C. Kamens
Federal Public Defender

Patrick L. Bryant
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800

*Counsel for Keith Moore (continued)*

Jessica D. Aber
United States Attorney

Jacqueline R. Bechara
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Counsel for the United States (continued)*

Amy L. Austin
Laura J. Koenig
Assistant Federal Public Defenders
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
(804) 565-0880

*Additional Counsel for Keith Moore*

Shea M. Gibbons
Erik S. Siebert
Assistant United States Attorneys
919 East Main Street
Suite 1900
Richmond, Virginia 23219
(804) 819-5400

*Additional Counsel for the United States*

# Table of Contents

**Description**                                                                 **Page**

## Volume I

District Court Docket Sheet (as of Aug. 23, 2024)........................................................1

Indictment (May 4, 2021, Doc. No. 3)........................................................16

Moore's Motion to Suppress Evidence and Statements
(June 21, 2021, Doc. No. 17) ............................................................18

Government's Opposition to Motion to Suppress Evidence and Statements
(July 6, 2021, Doc. No. 22)................................................................25

Moore's Reply to Government's Response to Motion to Suppress Evidence
and Statements (July 13, 2021, Doc. No. 28) ....................................40

Transcript of Motion Hearing (July 26, 2021, Doc. No. 33)....................................45

    Testimony of Dominic Collombo:

    Direct Examination by Mr. Elliker....................................................50
    Cross Examination by Ms. Koenig ....................................................64

    Testimony of Keegan Mills:

    Direct Examination by Mr. Elliker....................................................91
    Cross Examination by Ms. Koenig ....................................................100

    Testimony of Jakob Torres:

    Direct Examination by Mr. Elliker....................................................136
    Cross Examination by Ms. Koenig ....................................................143

Testimony of Nakia Williams:

    Direct Examination by Mr. Elliker ...................................................145
    Cross Examination by Ms. Koenig ..................................................156

Testimony of Michael Spinos:

    Direct Examination by Mr. Elliker...................................................176
    Cross Examination by Ms. Koenig ..................................................182

Testimony of John Gilbert:

    Direct Examination by Mr. Elliker...................................................188
    Cross Examination by Ms. Koenig ..................................................198

Testimony of Lee Hush:

    Direct Examination by Ms. Koenig ................................................201

Selected Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 3, Photograph of Moore's car, dated Dec. 5, 2020...................221

    Gov. Exhibit 6, Photograph of firearm seized from Moore's car .................222

    Gov. Exhibit 10, Moore's license plate...........................................223

Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit A, Hanover Traffic Ticket, dated Oct. 9, 2020 ........................224

    Def. Exhibit C, 0485 Map ..............................................................228

    Def. Exhibit I, Richmond Police Department
    Incident/Investigation Report, dated Dec. 5, 2020.........................................229

Def. Exhibit J, 0485 Net Viewer Event Information .......................................238

Def. Exhibit K, 0497 Net Viewer Event Information ....................................242

Def. Exhibit L, 0502 Net Viewer Event Information .....................................248

Def. Exhibit N, 0571 Net Viewer Event Information ....................................253

Def. Exhibit O, 0574 Net Viewer Event Information ....................................257

Def. Exhibit P, 0579 Net Viewer Event Information.....................................262

Def. Exhibit Q, Axon Report for Keegan Mills.............................................265

Def. Exhibit R1, University of Virginia Dot Map of Richmond ...................267

Def. Exhibit R2, University of Virginia Dot Map of Richmond ...................268

Def. Exhibit W, 0579 Net Viewer Event Unit ..............................................269

Def. Exhibit X1, Boundaries of Richmond Police Precinct 1.......................276

Def. Exhibit X2, Boundaries of Richmond Police Precinct 2.......................277

Def. Exhibit X3, Boundaries of Richmond Police Precinct 3.......................278

Def. Exhibit X4, Boundaries of Richmond Police Precinct 4.......................279

Def. Exhibit Y1, Screen Capture of Richmond Police Department
Stops by Race and Stops by Ethnicity ..........................................................280

Def. Exhibit Y2, Screen Capture of Richmond Police Department
Stops by Gender and Vehicles Searched during a stop..................................281

Order (July 27, 2021, Doc. No. 31) ..............................................................282

Supplement to Moore's Motion to Suppress Evidence and Statements
(Aug. 3, 2021, Doc. No. 32)..............................................................283

Government's Supplemental Response to Motion to Suppress
Evidence and Statements (Aug. 12, 2021, Doc. No. 36) ..............................297

Transcript of Motion Hearing (Sept. 15, 2021, Doc. No. 137) ............................317

Order (Sept. 15, 2021, Doc. No. 44)......................................................339

Moore's Second Supplement to Motion to Suppress Evidence and Statements
(Mar. 9, 2022, Doc. No. 66)..............................................................340

Def. Exhibit A, Dr. Eli Coston, Traffic Stops by the Richmond Police
Department: July 1, 2020 – December 6, 2020......................................353

Def. Exhibit B, Emma Pierson et al., A large-scale analysis of racial
disparities in police stops across the United States,
dated July 2020..........................................................................367

Def. Exhibit C, McGuire Woods,
Zoning and Segregation in Virginia: Part 1 ..........................................379

Def. Exhibit D, Why is Richmond still segregated?,
Richmond Times Dispatch, dated May 3, 2015 ....................................387

Def. Exhibit E, Mark Bowes, Traffic Arrest Pattern; In Chesterfield,
29% Are Black and Almost 69% Are White, dated July 15, 2001 ........403

Def. Exhibit F, Richmond Transparency and Accountability Project,
Our Streets, Our Say: Policing in Richmond, dated June 2019 ............408

iv

Government's Motion to Exclude Defense Expert
(Apr. 8, 2022, Doc. No. 70) ...........................................................................424

Gov. Exhibit A, Dr. Michael R. Smith, Expert Report .................................446

Gov. Exhibit B, Richmond Police Department General Order 1-2,
dated Feb. 11, 2019, and General Order 1-4, dated Feb. 13, 2018 ........457

Government's Response to Moore's Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 8, 2022, Doc. No. 71) .................471

## Volume II

Moore's Response to Motion to Exclude Defense Expert
(Apr. 22, 2022, Doc. No. 72) ........................................................................483

Def. Exhibit G, Virginia Department of Criminal Justice Services,
Report on Analysis of Traffic Stop Data Collected Under
Virginia's Community Policing Act, dated July 1, 2021 ......................499

Def. Exhibit H, Michael R. Smith & Matthew Petrocelli,
Racial Profiling? A Multivariate Analysis of Police
Traffic Stop Data, dated Mar. 2001 ..........................................................572

Def. Exhibit I, An act to amend and re-enact section 46 of the Code of
Virginia, dated Mar. 20, 1924 ..................................................................596

Def. Exhibit J, Joseph Ferrandino, Minority Threat Hypothesis and
NYPD Stop and Frisk Policy, dated 2015 ...............................................597

Def. Exhibit K, Sunghoon Roh & Matthew Robinson, A Geographic
Approach to Racial Profiling: The Microanalysis and Macroanalysis of
Racial Disparity in Traffic Stops, dated June 2009 ...............................618

Def. Exhibit L, Prabhaker Mishra et al., Selection of Appropriate
Statistical Methods for Data Analysis, dated Sept. 2019 ......................671

Def. Exhibit M, Steven J. Briggs & Kelsey A. Keimig,
The Impact of Police Deployment on Racial Disparities in
Discretionary Searches, dated 2017 ........................................................676

Moore's Reply to Government's Response to Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 23, 2022, Doc. No. 73) ...............696

Government's Motion to Exclude Defense Expert
(June 20, 2022, Doc. No. 82) ..........................................................707

Gov. Exhibit A, Moore's Expert Notice, dated June 16, 2022 .....................714

Moore's Response to Motion to Exclude Second Defense Expert
(July 6, 2022, Doc. No. 86) ............................................................716

Def. Exhibit N, Curriculum Vitae for Dr. Marvin T. Chiles .........................724

Def. Exhibit O, Virginia Freedom of Information Act Request,
dated Feb. 1, 2022 ......................................................................729

Def. Exhibit P, Moore's Ex Parte Motion to Enforce Subpoena
Duces Tecum, dated May 20, 2022 .......................................................731

Def. Exhibit Q, Letter Regarding Ex Parte Subpoena Duces Tecum,
dated May 27, 2022 ......................................................................741

Def. Exhibit R, Marvin T. Chiles, "Here We Go Again": Race and
Redevelopment in Downtown Richmond, Virginia,
1977–Present, dated 2021 ...............................................................747

Def. Exhibit S, Marvin T. Chiles, Richmond's urban crisis: Racial transition
during the Civil Rights Era, 1960–1977, dated May 2016 ...................774

Def. Exhibit T, Marvin T. Chiles, "Tough on Conduct:" Punitive
Leadership in Urban Public Schools, A Case Study of
*Angry Principal* Dr. Roy A. West, 1986–1991, dated 2020 .................903

Def. Exhibit U, Marvin T. Chiles, "A Period of Misunderstanding,"
dated 2021...............................................................................935

**Volume III**

Def. Exhibit V, Louis Bernard Cei, Law Enforcement in Richmond:
A History of Police-Community Relations, 1737–1974,
dated June 1975 ......................................................................................971

Government's Reply in Support of Motion to Exclude Defense Expert
(July 11, 2022, Doc. No. 89).........................................................1246

## Volume IV

Transcript of Motion Hearing, Day I (July 18, 2022, Doc. No. 100) ................1252

    Testimony of Dr. Eli Coston:

        Direct Examination by Ms. Koenig ............................................1268
        Cross Examination by Mr. Gibbons............................................1351

Transcript of Motion Hearing, Day II (July 19, 2022, Doc. No. 101) ...............1404

    Testimony of Dr. Michael Smith:

        Direct Examination by Mr. Gibbons ..........................................1415
        Cross Examination by Ms. Koenig ............................................1477

    Testimony of Keon Turner:

        Direct Examination by Mr. Siebert ............................................1510
        Cross Examination by Ms. Austin .............................................1525

    Testimony of James McDonough:

        Direct Examination by Mr. Siebert ............................................1535
        Cross Examination by Ms. Austin .............................................1562

    Testimony of Josh Valot:

        Direct Examination by Mr. Gibbons ..........................................1573
        Cross Examination by Ms. Koenig ............................................1582

    Testimony of Dr. Eli Coston, resumed:

        Direct Examination by Ms. Koenig ............................................1586
        Cross Examination by Mr. Gibbons............................................1590

Order (July 19, 2022, Doc. No. 99) ....................................................1599

Moore's Notice of Expert Report and Curriculum Vitae
(Aug. 5, 2022, Doc. No. 102).......................................................1601

Attachment 1, Report to the Eastern District Court of Virginia .................1603

Government's Renewed Motion to Exclude Defense Expert
(Aug. 22, 2022, Doc. No. 103).......................................................1615

Gov. Exhibit A, City of Richmond Neighborhood Statistics
(1980 Census), dated Nov. 1985 ..........................................1625

Moore's Response to Government's Renewed Motion to Exclude
Second Defense Expert (Sept. 9, 2022, Doc. No. 107)...............................1629

Government's Reply in Support of Renewed Motion to Exclude Defense Expert
(Sept. 16, 2022, Doc. No. 108) ....................................................1639

**Volume V**

Transcript of Motion Hearing, continued (Oct. 28, 2022, Doc. No. 110) ..........1644

    Testimony of Dr. Marvin Chiles:

        Direct Examination by Ms. Koenig ...........................................................1650
        Cross Examination by Mr. Gibbons...........................................................1720

Opinion (Nov. 13, 2023, Doc. No. 124) ...............................................................1781

Opinion (Feb. 12, 2024, Doc. No. 126) ................................................................1792

Final Order (Feb. 12, 2024, Doc. No. 127)............................................................1817

Government's Motion to Reconsider and Memorandum in Support
    (Feb. 16, 2024, Doc. No. 128)........................................................................1818

Moore's Opposition to Government's Motion to Reconsider
    the Court's Final Order (Feb. 26, 2024, Doc. No. 130)................................1824

Government's Reply to Motion to Reconsider
    (Feb. 29, 2024, Doc. No. 131)........................................................................1834

Memorandum Order (Mar. 11, 2024, Doc. No. 132) ...........................................1840

Notice of Appeal (Apr. 8, 2024, Doc. No. 134) ...................................................1844

    Attachment 1, Certification for Appeal.........................................................1846

xi

**Volume VI (Digital Media)**

Additional Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 4.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Gov. Exhibit 5.mp4, Body-Camera Footage, dated Dec. 6, 2020

    Gov. Exhibit 12.mp4, Body-Camera Footage, dated Dec. 6, 2020

Additional Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit U3.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Def. Exhibit U4.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Def. Exhibit V3.mp4, Body-Camera Footage, dated Dec. 5, 2020

These files were confirmed virus-free through virus scan by Trellix Endpoint Security.

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Richmond)
## CRIMINAL DOCKET FOR CASE #: 3:21-cr-00042-JAG All Defendants

Case title: USA v. Moore

Date Filed: 05/04/2021

Date Terminated: 02/12/2024

Assigned to: District Judge John A. Gibney, Jr

Appeals court case number: 24-4201 USCA

### Defendant (1)

**Keith Rodney Moore**
*TERMINATED: 02/12/2024*

represented by **Laura Jill Koenig**
Office of the Federal Public Defender (Richmond)
701 E Broad Street
Suite 3600
Richmond, VA 23219
(804) 343-0800
Email: laura_koenig@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

**Amy L. Austin**
Office of the Federal Public Defender
701 E. Broad Street
Suite 3600
Richmond, VA 23219
804-565-0880
Fax: 804-648-5033
Email: amy_austin@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

### Pending Counts

18:922(g)(1); IN ACCORDANCE WITH
18:924(d), INCORPORATED BY
28:2461(c); POSSESSION OF A FIREARM
AND AMMUNITION BY A CONVICTED
FELON; FORFEITURE ALLEGATION
(1)

### Disposition

DISMISSED PURSUANT TO ORDER
ENTERED 2/12/24

### Highest Offense Level (Opening)

Felony

**JA0001**

**Terminated Counts**                                     **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                            **Disposition**

None

---

**Plaintiff**

USA                                   represented by   **Kevin Spencer Elliker**
                                                       Hunton Andrews Kurth LLP
                                                       Riverfront Plaza, East Tower
                                                       951 E. Byrd Street
                                                       Richmond, VA 23219
                                                       804-788-8200
                                                       Email: kelliker@huntonak.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: US Attorney*

                                                       **Erik Sean Siebert**
                                                       United States Attorney's Office (Richmond)
                                                       SunTrust Building
                                                       919 East Main Street
                                                       Suite 1900
                                                       Richmond, VA 23219
                                                       804-819-5400
                                                       Email: erik.s.siebert@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jacqueline Bechara**
                                                       DOJ-USAO
                                                       Eastern District of Virginia
                                                       2100 Jamieson Avenue
                                                       Alexandria, VA 22314
                                                       703-299-3819
                                                       Email: jacqueline.bechara@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jessica Diane Aber**
                                                       US Attorney Office (Richmond)
                                                       SunTrust Building
                                                       919 East Main Street
                                                       Suite 1900
                                                       Richmond, VA 23219
                                                       804-819-5400
                                                       Fax: 804-771-2316
                                                       Email: Jessica.D.Aber@usdoj.gov

**JA0002**

*ATTORNEY TO BE NOTICED*

**Shea Matthew Gibbons**
United States Attorney's Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
804-819-5400
Email: shea.gibbons@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/04/2021 | 1 | MOTION to Seal Indictment by USA as to Keith Rodney Moore. (jsmi, ) (Entered: 05/05/2021) |
| 05/04/2021 | 2 | ORDER TO SEAL as to Keith Rodney Moore. Signed by Magistrate Judge Elizabeth W. Hanes on 5/4/2021. (jsmi, ) (Entered: 05/05/2021) |
| 05/04/2021 | 3 | INDICTMENT as to Keith Rodney Moore (1) count 1. (jsmi, ) (Entered: 05/05/2021) |
| 05/04/2021 | 5 | MOTION for Arrest Warrant by USA as to Keith Rodney Moore. (jsmi, ) (Entered: 05/05/2021) |
| 05/05/2021 | 6 | ORDER granting 5 Motion for Warrant as to Keith Rodney Moore (1). Signed by Magistrate Judge Elizabeth W. Hanes on 5/5/2021. (jsmi, ) (Entered: 05/05/2021) |
| 05/05/2021 | 7 | Arrest Warrant Issued in case as to Keith Rodney Moore. Placed in USM box for service of process. (jsmi, ) (Entered: 05/05/2021) |
| 06/01/2021 | | Case unsealed as to Keith Rodney Moore.(mful) (Entered: 06/01/2021) |
| 06/01/2021 | | Arrest of Keith Rodney Moore. (mful) (Entered: 06/01/2021) |
| 06/01/2021 | 8 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes: Initial Appearance as to Keith Rodney Moore held on 6/1/2021 via ZOOM; Deft waived in court appearance and agreed to appear via ZOOM; Govt summarized charges; Deft advised of rights; Deft requested counsel and was questioned about financial status; Deft found to be eligible for court appointed counsel - FPD Laura Koenig appointed; Govt seeking detention - Granted; Arraignment and Detention set for 6/4/2021 at 11:00 AM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes; Deft remanded. (FTR)(mful) (Entered: 06/01/2021) |
| 06/01/2021 | | ORAL ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Keith Rodney Moore. (mful) (Entered: 06/01/2021) |
| 06/01/2021 | 9 | Temporary Detention Order as to Keith Rodney Moore. Signed by Magistrate Judge Elizabeth W. Hanes on 6/1/21. (mful) (Entered: 06/01/2021) |
| 06/02/2021 | 10 | Arrest Warrant Returned Executed on 5/27/21 in case as to Keith Rodney Moore. (jsau, ) (Entered: 06/02/2021) |
| 06/04/2021 | | Set as to Keith Rodney Moore: Jury Trial set for 8/5/2021 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 06/04/2021) |
| 06/04/2021 | 11 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes: Arraignment and Detention Hearings as to Keith Rodney Moore held on 6/4/2021; Deft waived formal arraignment; Deft entered plea of not guilty as to count 1 and requested |

| | | |
|---|---|---|
| | | jury trial; Govt adduced evidence at Detention Hearing; Arguments heard; Findings stated from the bench; Deft released on home detention with electronic monitoring and third party custodian; Court reminded counsel of prosecutorial obligations as required under Rule 5(f) Jury Selection set for 8/5/2021 at 9:00 AM and Jury Trial set for 8/6/2021 at 9:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney Jr. (FTR) (mful) (Entered: 06/07/2021) |
| 06/04/2021 | 12 | ORDER Setting Conditions of Release ; Deft released on home detention, electronic monitoring, and third party custodian.. Signed by Magistrate Judge Elizabeth W. Hanes on 6/4/21. (mful) (Entered: 06/07/2021) |
| 06/04/2021 | 13 | ORDER regarding prosecutorial obligations as required under Rule 5(f). Signed by Magistrate Judge Elizabeth W. Hanes on 6/4/21. (mful) (Entered: 06/07/2021) |
| 06/07/2021 | 14 | Arrest as a detainer Warrant Returned Executed on 6/4/21 in case as to Keith Rodney Moore. (mful) (Entered: 06/07/2021) |
| 06/07/2021 | 15 | ORDER that the Court set this case for trial on August 5, 2021. The Court sets the following pretrial deadlines: 1) Within fourteen (14) days of this Order, the following motions are due: motions (1) challenging the sufficiency of the indictment, information, warrant, or violation notice; (2) raising any issues of venue or jurisdiction; (3) for discovery or production; (4) to suppressevidence; (5) for any mental examination; (6) objecting to use by the opposing party of any particular evidence known by a party that may be subject to pretrial ruling; and (7) raising any other pretrial matter. Response briefs are due within fourteen (4) days of the filing of the motion, and rebuttal briefs are due three (3) days thereafter. 2) All other motions are due twenty-one (21) days before trial, unless a party shows good cause for filing later. 3) Subpoenas are due fourteen (14) days before trial. 4) Proposed voir dire questions and jury instructions are due seven (7) days before trial. The parties shall email their proposed voir dire questions and jury instructions to Chambers. The parties must submit jury instructions both with and without citations. The proposed voir dire questions and jury instructions shall be typed in 12-point Times New Roman font using normal capitalization. The parties shall not capitalize a ll the proposed voir dire questions and jury instructions.5) If the parties wish to schedule a hearing on a motion, they should contact Chambers. It is so ORDERED. Signed by District Judge John A. Gibney, Jr. on 6/7/2021. (sbea,) (Entered: 06/07/2021) |
| 06/21/2021 | 16 | Consent MOTION to Modify Conditions of Release *(Temporarily)* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 06/21/2021) |
| 06/21/2021 | 17 | MOTION to Suppress *Evidence and Statements* by Keith Rodney Moore. (Koenig, Laura) (Entered: 06/21/2021) |
| 06/22/2021 | 18 | TRANSCRIPT of Proceedings held on 6/4/2021, before Judge Elizabeth Hanes. Court reporter/transcriber Krista Liscio Harding, Telephone number 804-916-2296. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/22/2021. Redacted Transcript Deadline set for 8/23/2021. Release of Transcript Restriction set for 9/20/2021.(liscio, krista) (Entered: 06/22/2021)** |
| 06/23/2021 | | Jury Trial continued as to Keith Rodney Moore: trial to be rescheduled upon resolution of motion to suppress. (wtuc) (Entered: 06/23/2021) |

**JA0004**

| 06/23/2021 | 19 | ORDER granting 16 Motion to Modify Conditions of Release as to Keith Rodney Moore ; Deft is allowed a time out on 6/27/21 to attend his child's baby shower. Signed by Magistrate Judge Elizabeth W. Hanes on 6/23/21. (mful) (Entered: 06/23/2021) |
| --- | --- | --- |
| 06/25/2021 | | Set re Motion in case as to Keith Rodney Moore 17 MOTION to Suppress *Evidence and Statements* : Motion Hearing set for 7/26/2021 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 06/25/2021) |
| 07/06/2021 | 22 | Opposition by USA as to Keith Rodney Moore re 17 MOTION to Suppress *Evidence and Statements* (Elliker, Kevin) (Entered: 07/06/2021) |
| 07/09/2021 | 25 | Consent MOTION for Extension *of Reply Deadline* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 07/09/2021) |
| 07/12/2021 | 26 | ORDER as to Keith Rodney Moore. It is hereby ORDERED that the Defendant's Motion to Extend Reply Deadline in this case is GRANTED. The defense must file any reply to the government's response to Mr. Moore's motion to suppress evidence and statements by July 12, 2021. It is SO ORDERED. Signed by District Judge John A. Gibney, Jr. on 7/12/2021. (sbea,) (Entered: 07/12/2021) |
| 07/13/2021 | 27 | REPLY TO RESPONSE to by Keith Rodney Moore re 17 MOTION to Suppress *Evidence and Statements*, 22 Opposition (Koenig, Laura) (Entered: 07/13/2021) |
| 07/13/2021 | 28 | *(Corrected)* REPLY TO RESPONSE to by Keith Rodney Moore re: 17 MOTION to Suppress *Evidence and Statements*, 22 Opposition (Koenig, Laura). Modified docket text on 7/14/2021. (sbea,) (Entered: 07/13/2021) |
| 07/23/2021 | 29 | *Mr. Moore's* EXHIBIT LIST by Keith Rodney Moore (Koenig, Laura) (Entered: 07/23/2021) |
| 07/26/2021 | 30 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Motion Hearing as to Keith Rodney Moore held on 7/26/2021 re 17 MOTION to Suppress Evidence and Statements filed by Keith Rodney Moore; evidence adduced; dft has 7 days to file brief; govt has 4 days to respond (Attachment: # 1 Witness and Exhibit List)(Court Reporter G. Halasz, OCR.)(wtuc) (Entered: 07/26/2021) |
| 07/27/2021 | 31 | ORDER that the Court gave the defendant until August 2, 2021, to submit his initial post-hearing brief. The government has until August 6, 2021, to file its response. Because briefing on the defendant's motion to suppress will not finish before August 5, 2021, **the Court CONTINUES GENERALLY trial in this case.** The Court excludes from the speedy trial calculation any delay in trial caused by the Court's consideration and prompt disposition of the defendant's motion to suppress. **The Court will set a new trial date at the appropriate time.** It is so ORDERED. Signed by District Judge John A. Gibney, Jr. on 7/27/2021. (sbea,) (Entered: 07/27/2021) |
| 08/03/2021 | 32 | Supplemental Memorandum by Keith Rodney Moore re 17 MOTION to Suppress *Evidence and Statements* (Koenig, Laura) (Entered: 08/03/2021) |
| 08/03/2021 | 33 | TRANSCRIPT of Proceedings held on 07/26/2021, before Judge Hon. John A. Gibney, Jr.. Court reporter Gil Halasz, Telephone number 804-916-2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER** |

| | | |
|---|---|---|
| | | **Redaction Request due 9/2/2021. Redacted Transcript Deadline set for 10/4/2021. Release of Transcript Restriction set for 11/1/2021.**(halasz, gil) (Entered: 08/03/2021) |
| 08/04/2021 | 34 | CONSENT MOTION for Extension of Time to File Response as to 32 Supplemental Memorandum by USA as to Keith Rodney Moore. (Attachment: # 1 Proposed Order) (Elliker, Kevin). Modified docket text on 8/5/2021. (sbea,) (Entered: 08/04/2021) |
| 08/05/2021 | 35 | ORDER as to Keith Rodney Moore. It is hereby ORDERED that the 34 Motion for an Extension of Time to File Supplemental Response is GRANTED. The United States shall file its supplemental response by August 13, 2021. It is SO ORDERED. Signed by District Judge John A. Gibney, Jr. on 8/5/2021. (sbea,) (Entered: 08/05/2021) |
| 08/12/2021 | 36 | Supplemental Memorandum by USA as to Keith Rodney Moore re 17 MOTION to Suppress *Evidence and Statements* (Elliker, Kevin) (Entered: 08/12/2021) |
| 08/19/2021 | | Set in case as to Keith Rodney Moore 17 MOTION to Suppress *Evidence and Statements* : Motion Hearing set for 9/15/2021 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 08/19/2021) |
| 09/07/2021 | 37 | Petition on Order on Violation of Pretrial Release as to Keith Rodney Moore. Signed by Magistrate Judge Elizabeth W. Hanes on 9/7/21. (mful) (Entered: 09/07/2021) |
| 09/14/2021 | 40 | PETITION AND ORDER for Writ of Habeas Corpus Ad Prosequendum as to Keith Rodney Moore. Signed by District Judge John A. Gibney, Jr. on 9/13/2021. (sbea,) (Entered: 09/14/2021) |
| 09/14/2021 | 42 | Writ of Habeas Corpus ad Prosequendum Issued as to Keith Rodney Moore for September 15, 2021 at 9:00 a.m. before the Honorable John A. Gibney, Jr. Clerk hand delivered three (3) certified copies to the U.S. Marshals. (sbea,) (Entered: 09/14/2021) |
| 09/15/2021 | 43 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Motion Hearing as to Keith Rodney Moore held on 9/15/2021 re 17 MOTION to Suppress Evidence and Statements filed by Keith Rodney Moore; arguments heard; the Court will allow each side to gather further evidence in support of motion to suppress/dismiss; a status conference (by phone) is scheduled for Oct 18 at 9:00 a.m.; dft remanded (in state custody) (Court Reporter G. Halasz, OCR.)(wtuc) (Entered: 09/15/2021) |
| 09/15/2021 | 44 | ORDER as to Keith Rodney Moore. The Court DIRECTS the defendant to consult with an expert regarding the statistical significance of the evidence presented in support of the defendant's motion to dismiss the indictment and to consider additional evidence in support of the motion. **The Court SCHEDULES a status conference for Monday, October 18, 2021, at 9:00 a.m.** It is so ORDERED. Signed by District Judge John A. Gibney, Jr. on 9/15/2021. (sbea, ) (Entered: 09/15/2021) |
| 09/15/2021 | 45 | NOTICE OF ATTORNEY APPEARANCE Erik Sean Siebert appearing for USA. (Siebert, Erik) (Entered: 09/15/2021) |
| 09/15/2021 | 46 | NOTICE OF ATTORNEY APPEARANCE Shea Matthew Gibbons appearing for USA. (Gibbons, Shea) (Entered: 09/15/2021) |
| 09/27/2021 | 47 | **DISREGARD - DOCKETED IN ERROR** - WAIVER of Detention Hearing .(mful) Modified on 9/27/2021 (mful, ). (Entered: 09/27/2021) |
| 09/28/2021 | | Arrest of Keith Rodney Moore.(mful) (Entered: 09/29/2021) |
| 09/28/2021 | 48 | Arrest Warrant Returned Executed on 9/28/21 in case as to Keith Rodney Moore. (mful) (Entered: 09/29/2021) |
| 09/28/2021 | 49 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes: Initial Appearance re Revocation of Pretrial Release as to Keith Rodney Moore held on |

| | | |
|---|---|---|
| | | 9/28/2021; Govt summarized charges; Deft advised of rights; Govt seeking detention - Granted; Deft made oral motion to continue preliminary and detention hearing until after his state court matter scheduled for 10/7/21 - Granted; Preliminary and Detention Hearing set for 10/12/2021 at 3:00 PM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes; Deft remanded.(FTR)(mful) (Entered: 09/29/2021) |
| 09/28/2021 | 50 | Temporary Detention Order as to Keith Rodney Moore. Signed by Magistrate Judge Elizabeth W. Hanes on 9/28/21. (mful) (Entered: 09/29/2021) |
| 10/06/2021 | 54 | Consent MOTION to Continue *Preliminary and Detention Hearings* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 10/06/2021) |
| 10/07/2021 | 55 | ORDER granting 54 Motion to Continue as to Keith Rodney Moore. Signed by Magistrate Judge Elizabeth W. Hanes on 10/7/21. (mful) (Entered: 10/07/2021) |
| 10/07/2021 | | Terminate Deadlines and Hearings as to Keith Rodney Moore: preliminary and detention hearings continued. (mful) (Entered: 10/07/2021) |
| 10/12/2021 | | Set Hearings as to Keith Rodney Moore: Preliminary and Detention Hearing set for 10/18/2021 at 2:30 PM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes.(mful) (Entered: 10/12/2021) |
| 10/14/2021 | | Set Hearing as to Keith Rodney Moore: Status Conference set for 10/18/2021 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 10/14/2021) |
| 10/14/2021 | 56 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes: Preliminary and Detention Hearing as to Keith Rodney Moore held on 10/14/2021; Govt moved to Dismiss Petition for Action - Granted; Deft released on same terms as previously imposed with added condition that Deft shall have no contact with Jayvonne Brown - Order to follow. (FTR)(mful) (Entered: 10/15/2021) |
| 10/14/2021 | 57 | ORDER as to Keith Rodney Moore releasing Deft on same conditions as previously imposed with added condition that Deft shall not have any contact with Jayvonne Brown - see order for details. Signed by Magistrate Judge Elizabeth W. Hanes on 10/14/21. (mful) (Entered: 10/15/2021) |
| 10/18/2021 | | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Conference call as to Keith Rodney Moore held on 10/18/2021; next conference call scheduled for November 18 at 9:00 a.m. (wtuc) (Entered: 10/18/2021) |
| 10/18/2021 | 58 | ORDER as to Keith Rodney Moore. On September 15, 2021, the Court held a hearing on the defendant's supplemental brief, (id.), and the government's response, (ECF No. 36 ). Following the hearing, the Court directed the defendant to consult with an expert regarding the statistical significance of the evidence presented in support of the defendant's motion to dismiss the indictment and to consider additional evidence in support of the motion, and scheduled a statusconference for Monday, October 18, 2021, (ECF No. 44 ). For the reasons stated during the October 18 conference call, **the Court SCHEDULES a telephonic status conference for Thursday, November 18, 2021, at 9:00 a.m.** It is so ORDERED. Signed by District Judge John A. Gibney, Jr. on 10/18/2021. (sbea) (Entered: 10/18/2021) |
| 11/18/2021 | 59 | ORDER - The Court DIRECTS the defendant to provide a copy of its expert report to the government on or before Friday, December 31, 2021. The parties shall file a status report-jointly, if possible-on or before Friday, January 14, 2022, explaining whether the government intends to prepare an expert report and proposing a briefing schedule on the defendant's motion. (ECF No. 32.) SEE ORDER FOR DETAILS. Signed by District Judge John A. Gibney, Jr. on 11/18/2021. (smej, ) (Entered: 11/18/2021) |

| 11/18/2021 | | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Conference call as to Keith Rodney Moore held on 11/18/2021 (wtuc) (Entered: 11/26/2021) |
|---|---|---|
| 12/07/2021 | 60 | Consent MOTION to Modify Conditions of Release *(Temporarily)* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 12/07/2021) |
| 12/07/2021 | 61 | ORDER that the Defendants Motion 60 to Temporarily Modify Release Conditions to Allow Mr. Moore to Attend Funeral and Burial in this case is GRANTED. Mr. Moore may travel to his cousins funeral beginning at 1:00 p.m. on Friday, December 10, 2021; attend the funeral and interment; and return to his regular home detention schedule Friday evening, December 10, 2021, by 6:00 p.m. He will remain in the custody of his third-party custodian, his mother, during this temporary modification of the release conditions. Signed by Magistrate Judge Elizabeth W. Hanes on 12/7/2021. (adun, ) (Entered: 12/07/2021) |
| 12/30/2021 | 62 | Consent MOTION for Extension *of Disclosure Deadline by Two Weeks* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 12/30/2021) |
| 12/30/2021 | 63 | ORDER that Defendant's 62 Motion to Extend Disclosure Deadline by Two Weeks in this case is GRANTED. The defense must disclose its expert report regarding the Richmond Police Department data to the government on or before Friday, January 14, 2022. The parties must submit a status reportjointly, if possibleon or before Friday, January 28, 2022, explaining whether the government intends to prepare an expert report and proposing a briefing schedule on the defendants Equal Protection challenge in 32 . Signed by District Judge John A. Gibney, Jr. on 12/30/2021. (jsmi, ) (Entered: 12/30/2021) |
| 01/28/2022 | 64 | NOTICE *JOINT STATUS REPORT REGARDING EXPERT AND BRIEFING DEADLINES* by USA as to Keith Rodney Moore (Gibbons, Shea) (Entered: 01/28/2022) |
| 01/31/2022 | 65 | ORDER that this matter comes before the Court on the parties' joint status report, (ECF No. 64 ). The parties state that the government "has retained an expert to assist it in responding to the defendant's motion and expert report in support or the motion." (Id.) The parties also propose a briefing schedule for the defendant's motion, (ECF No. 32 ). Upon due consideration, the Court SETS the following briefing schedule: The defendant must file a supplemental motion incorporating the defendant's expert report **on or before March 8, 2022**; The government shall file any response, and produce its expert report to the defendant, **on or before April 8, 2022**; The defendant shall file any reply **on or before April 22, 2022**. It is so ORDERED. Signed by Senior United States District Judge John A. Gibney, Jr. on 1/31/2022. (sbea) (Entered: 01/31/2022) |
| 03/09/2022 | 66 | Second Supplemental Memorandum by Keith Rodney Moore re: 17 MOTION to Suppress *Evidence and Statements*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Koenig, Laura). Modified docket text on 3/10/2022. (sbea) (Entered: 03/09/2022) |
| 04/08/2022 | 70 | MOTION to Exclude *Defense Expert* by USA as to Keith Rodney Moore. (Attachments: # 1 Exhibit A: Dr. Smith Expert Report, # 2 Exhibit B: Richmond Police Department Policies)(Gibbons, Shea) (Entered: 04/08/2022) |
| 04/08/2022 | 71 | RESPONSE by USA as to Keith Rodney Moore re 66 Supplemental Memorandum, (Gibbons, Shea) (Entered: 04/08/2022) |
| 04/22/2022 | 72 | RESPONSE in Opposition by Keith Rodney Moore re 70 MOTION to Exclude *Defense Expert* (Attachments: # 1 Exhibit G, # 2 Exhibit H, # 3 Exhibit I, # 4 Exhibit J, # 5 Exhibit K, # 6 Exhibit L, # 7 Exhibit M)(Koenig, Laura) (Entered: 04/22/2022) |
| 04/23/2022 | 73 | REPLY TO RESPONSE to by Keith Rodney Moore re 71 Response (Koenig, Laura) (Entered: 04/23/2022) |

| 05/16/2022 | | Set in case as to Keith Rodney Moore 70 MOTION to Exclude *Defense Expert*, 17 MOTION to Suppress *Evidence and Statements* : Motion Hearing set for 6/27/2022 at 01:30 PM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 05/16/2022) |
| 05/18/2022 | 74 | Petition on Order on Violation of Pretrial Release as to Keith Rodney Moore. Signed by Magistrate Judge Elizabeth W. Hanes on 5/18/22. (mful) (Entered: 05/18/2022) |
| 05/18/2022 | | Set Hearings as to Keith Rodney Moore: Initial Appearance on Revocation Proceedings set for 5/19/2022 at 2:45 PM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes. (mful) (Entered: 05/18/2022) |
| 05/18/2022 | 75 | Summons Issued in case as to Keith Rodney Moore.(mful) (Main Document 75 replaced on 5/18/2022 correcting date of hearing) (mful, ). (Entered: 05/18/2022) |
| 05/19/2022 | 76 | Summons Returned Executed on 5/19/22 as to Keith Rodney Moore.(mful) (Entered: 05/20/2022) |
| 05/19/2022 | 77 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes: Initial Appearance re Revocation of Pretrial Release Violation as to Keith Rodney Moore held on 5/19/22; Govt summarized charges; Deft advised of rights; Joint recommendation to continue Deft on same conditions previously imposed with added condition of no alcohol; Bond Revocation Hearing set for 6/27/22 at 1:00 PM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes. (FTR)(mful) (Entered: 05/20/2022) |
| 05/19/2022 | 78 | ORDER as to Keith Rodney Moore continuing Deft on same conditions as previously imposed with added condition of no alcohol - see order for details. Signed by Magistrate Judge Elizabeth W. Hanes on 5/19/22. (mful) (Entered: 05/20/2022) |
| 06/20/2022 | 82 | MOTION to Exclude *Defense Expert Dr. Marvin Chiles* by USA as to Keith Rodney Moore. (Attachments: # 1 Exhibit A: Defendant's Expert Notice)(Gibbons, Shea) (Entered: 06/20/2022) |
| 06/21/2022 | | Reset in case as to Keith Rodney Moore 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles*, 70 MOTION to Exclude *Defense Expert*, 17 MOTION to Suppress *Evidence and Statements* : Motion Hearing continued to 7/18/2022 at 01:00 PM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 06/21/2022) |
| 06/22/2022 | 83 | ORDER as to Keith Rodney Moore. This matter comes before the Court on the government's motion to exclude the defendant's expert Dr. Marvin Chiles. (ECF No. 82 ). The Court ORDERS that the defendant shall file any response **on or before July 5, 2022.** The government shall file any reply **on or before July 8, 2022.** It is so ORDERED. Signed by Senior United States District Judge John A. Gibney, Jr. on 6/22/2022. (sbea) (Entered: 06/22/2022) |
| 06/27/2022 | 84 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes:Bond Revocation Hearing as to Keith Rodney Moore held on 6/27/2022; By agreement, Petition for Action is continued until 7/18/22; Deft remains on the same terms and conditions of release previously imposed; Bond Revocation Hearing set for 7/18/2022 at 12:45 PM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes. (FTR.)(jsau, ) (Entered: 06/27/2022) |
| 06/27/2022 | 85 | ORDER as to Keith Rodney Moore continuing Bond Revocation Hearing to July 18, 2022 at 12:45 p.m. Signed by Magistrate Judge Elizabeth W. Hanes on 6/27/22. (mful) (Entered: 06/27/2022) |

| 07/06/2022 | 86 | RESPONSE in Opposition by Keith Rodney Moore re 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles* (Attachments: # 1 Exhibit N, # 2 Exhibit O, # 3 Exhibit P, # 4 Exhibit Q, # 5 Exhibit R, # 6 Exhibit S, # 7 Exhibit T, # 8 Exhibit U, # 9 Exhibit V) (Koenig, Laura) (Entered: 07/06/2022) |
|---|---|---|
| 07/06/2022 | 87 | Consent MOTION to Accept Late Filing re 86 Response in Opposition, by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 07/06/2022) |
| 07/07/2022 | 88 | ORDER as to Keith Rodney Moore. It is hereby ORDERED that the Defendant's 87 Motion to Accept Late Filing in this case is GRANTED. The Defendant's Response to Motion to Exclude Second Expert in ECF No. 86 is deemed timely filed. Further, the government may file any reply to that response **on or before Monday, July 11, 2022**. It is SO ORDERED Signed by Senior United States District Judge Henry E. Hudson on 7/7/2022. (sbea) (Entered: 07/07/2022) |
| 07/11/2022 | 89 | REPLY TO RESPONSE to USA as to Keith Rodney Moore re 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles* (Gibbons, Shea) (Entered: 07/11/2022) |
| 07/18/2022 | 90 | EXHIBIT LIST by Keith Rodney Moore (Koenig, Laura) (Entered: 07/18/2022) |
| 07/18/2022 | 91 | WITNESS LIST by Keith Rodney Moore (Koenig, Laura) (Entered: 07/18/2022) |
| 07/18/2022 | 92 | WITNESS LIST by USA as to Keith Rodney Moore (Gibbons, Shea) (Entered: 07/18/2022) |
| 07/18/2022 | 93 | EXHIBIT LIST by USA as to Keith Rodney Moore (Gibbons, Shea) (Entered: 07/18/2022) |
| 07/18/2022 | 94 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes: Bond Revocation Hearing as to Keith Rodney Moore held on 7/18/2022; Govt moved to dismiss the Petition for Action - Granted; Deft to remain on the same terms and conditions of release previously imposed including to refrain from alcohol. (FTR.)(jsau, ) (Entered: 07/18/2022) |
| 07/18/2022 | 95 | ORDER as to Keith Rodney Moore. This matter is before the Court for a Bond Revocation Hearing on the Petition for Action on Conditions of Pretrial Release (ECF No. 74 ). On the oral motion of the United States and for the reasons set forth on the record on July 18, 2022, the Petition is hereby DISMISSED. Therefore, the Defendant shall be continued on the same terms of pretrial release as ordered on June 4, 2021 (ECF No. 12 ) and as amended on October 14, 2021, and May 19, 2022 (ECF Nos. 57 and 78 ). Signed by Magistrate Judge Elizabeth W. Hanes on 7/18/22. (jsau, ) (Entered: 07/18/2022) |
| 07/18/2022 | 96 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Motion Hearing as to Keith Rodney Moore held on 7/18/2022 re 17 MOTION to Suppress *Evidence and Statements* filed by Keith Rodney Moore, 70 MOTION to Exclude *Defense Expert* filed by USA, 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles* filed by USA; as to expert Chiles, the Court will keep the record open following this hearing and the defendant shall file a summary report of the testimony by Aug 8 and the govt has until Aug 22 to inform the Ct if they will need their own expert or file a daubert motion; evidence adduced with Dr. Costen; matter continued to July 19 at 9:00 a.m.; Dft continued on bond (Court Reporter G. Halasz, OCR.)(wtuc, ) (Entered: 07/18/2022) |
| 07/18/2022 | | Set in case as to Keith Rodney Moore 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles*, 70 MOTION to Exclude *Defense Expert*, 17 MOTION to Suppress *Evidence and Statements*. Motion Hearing (day 2) set for 7/19/2022 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 07/18/2022) |

**JA0010**

| 07/18/2022 | 97 | *Amended* EXHIBIT LIST by USA as to Keith Rodney Moore (Gibbons, Shea) (Entered: 07/18/2022) |
|---|---|---|
| 07/19/2022 | 98 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr:Motion Hearing (Day 2) as to Keith Rodney Moore held on 7/19/2022 re 17 MOTION to Suppress *Evidence and Statements* filed by Keith Rodney Moore, 70 MOTION to Exclude *Defense Expert* filed by USA, 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles* filed by USA; evidence adduced; matter kept open until there is a resolution on whether the testimony of Dr. Chiles will be allowed; dft continued on bond (Court Reporter G. Halasz, OCR.)(wtuc) (Entered: 07/19/2022) |
| 07/19/2022 | 99 | ORDER as to Keith Rodney Moore. The Court FINDS that Moore's expert disclosure for Dr. Chiles does not comply with Federal Rule of Criminal Procedure 16.The Court thus SETS the following deadlines: 1) Moore SHALL file a Rule 16-compliant summary **on or before Monday, August 8, 2022**. The summary must provide sufficient detail to allow the government to respond. 2) The Court GIVES LEAVE for the government to file a supplemental *Daubert* motion challenging Dr. Chiles's testimony **on or before Monday, August 22, 2022**. Moore SHALL file any response to the supplemental motion **on or before Tuesday, September 6, 2022**. The government SHALL file any reply to the supplemental motion **on or before Friday, September 9, 2022**. 3) The government SHALL file a document designating any rebuttal expert, or explaining that it does not intend to designate a rebuttal expert, **on or before Monday, August 22, 2022**. Moore SHALL file any *Daubert* motion challenging the government's rebuttal expert's testimony **on or before Tuesday, September 6, 2022**. The government SHALL file any response to the motion **on or before Tuesday, September 20, 2022**. Moore SHALL file any reply to the motion **on before Friday, September 23, 2022**. 4) The parties SHALL contact Chambers **on or before Tuesday, August 23, 2022**, to schedule a *Daubert* hearing on Dr. Chiles's testimony and any *Daubert* motion to be filed by the defendant. The Court DEFERS DISPOSITION or Moore's motion to dismiss the indictment and the government's motions to exclude. The Court will rule on the motions after the *Daubert* hearing on Dr. Chiless testimony. It is so ORDERED. Signed by Senior United States District Judge John A. Gibney, Jr. on 7/19/2022. (sbea) (Entered: 07/19/2022) |
| 07/26/2022 | 100 | TRANSCRIPT of Proceedings held on 07/18/20222, before Judge Hon. John A. Gibney, Jr.. Court reporter Gil Halasz, Telephone number 804-916-2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 8/25/2022. Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 10/24/2022.(halasz, gil) (Entered: 07/26/2022)** |
| 07/27/2022 | 101 | TRANSCRIPT of Proceedings held on 07/19/2022, before Judge Hon. John A. Gibney, Jr.. Court reporter Gil Halasz, Telephone number 804-916-2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request** |

| | | |
|---|---|---|
| | | due 8/26/2022. **Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 10/25/2022.**(halasz, gil) (Entered: 07/27/2022) |
| 08/05/2022 | 102 | NOTICE *of Expert Report and Curriculum Vitae* by Keith Rodney Moore re: 99 Order. (Attachments: # 1 Dr. Chiles's Report, # 2 Dr. Chiles's Curriculum Vitae)(Koenig, Laura). Modified on 8/5/2022. (sbea) (Entered: 08/05/2022) |
| 08/22/2022 | 103 | Second MOTION to Exclude *Dr. Chiles* by USA as to Keith Rodney Moore. (Attachments: # 1 Exhibit A: Census Statistics)(Gibbons, Shea) (Entered: 08/22/2022) |
| 08/22/2022 | 104 | NOTICE *REGARDING HISTORICAL EXPERT* by USA as to Keith Rodney Moore (Gibbons, Shea) (Entered: 08/22/2022) |
| 08/25/2022 | | Set Hearing as to Keith Rodney Moore: Daubert Hearing set for 10/13/2022 at 02:00 PM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 08/25/2022) |
| 09/06/2022 | 105 | Consent MOTION for Extension of Time to File Response/Reply as to 103 Second MOTION to Exclude *Dr. Chiles*, 99 Order by Keith Rodney Moore. (Attachment: # 1 Proposed Order)(Koenig, Laura). Modified on 9/7/2022. (sbea) (Entered: 09/06/2022) |
| 09/08/2022 | 106 | ORDER This matter comes before the Court on Defendant Keith Rodney Moore's consent motion to extend the time to file a response to the government's supplemental Daubert motion. (ECF No. 105 .) On July 19, 2022, the Court ordered Moore to file his response to the government's supplemental motion on or before Tuesday, September 6, 2022. (ECF No. 99.) After due consideration and for good cause shown, the Court GRANTS Moore's motion to extend the time to file a response. (ECF No. 105 .) Moore SHALL file any response to the government's supplemental motion on or before September 9, 2022, and the government SHALL file any reply to the supplemental motion on or before September 16, 2022. Signed by District Judge Henry E. Hudson on 9/8/2022. (asho, ) (Entered: 09/08/2022) |
| 09/09/2022 | 107 | RESPONSE to Motion by Keith Rodney Moore re 103 Second MOTION to Exclude *Dr. Chiles* (Koenig, Laura) (Entered: 09/09/2022) |
| 09/16/2022 | 108 | REPLY TO RESPONSE to USA as to Keith Rodney Moore re 107 Response to Motion (Gibbons, Shea) (Entered: 09/16/2022) |
| 09/20/2022 | | Reset in case as to Keith Rodney Moore 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles*, 70 MOTION to Exclude *Defense Expert*, 103 Second MOTION to Exclude *Dr. Chiles*, 17 MOTION to Suppress *Evidence and Statements*. Motion Hearing RESCHEDULED for 10/28/2022 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 09/20/2022) |
| 10/28/2022 | 109 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Motion Hearing as to Keith Rodney Moore held on 10/28/2022 re 103 Second MOTION to Exclude Dr. Chiles filed by USA, 17 MOTION to Suppress *Evidence and Statements* filed by Keith Rodney Moore, 70 MOTION to Exclude *Defense Expert* filed by USA, 82 MOTION to Exclude *Defense Expert Dr. Marvin Chiles* filed by USA; evidence adduced; arguments heard; an opinion and order to enter; dft continued on bond (Court Reporter G. Halasz, OCR.)(wtuc, ) (Entered: 10/28/2022) |
| 11/02/2022 | 110 | TRANSCRIPT of Proceedings held on 10/28/2022, before Judge Hon. John A. Gibney, Jr.. Court reporter Gil Halasz, Telephone number 804-916-2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website** |

| | | |
|---|---|---|
| | | at **www.vaed.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 12/2/2022. Redacted Transcript Deadline set for 1/2/2023. Release of Transcript Restriction set for 1/31/2023.(halasz, gil) (Entered: 11/02/2022) |
| 11/16/2022 | 111 | Consent MOTION to Modify Conditions of Release *to Attend Son's Birthday Party* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 11/16/2022) |
| 11/16/2022 | 112 | ORDER granting 111 Motion to Modify Conditions of Release as to Keith Rodney Moore (1); the defendant may leave home in his mother's custody on Nov 19 at 4:00 p.m. to attend his son's birthday party, to return by 9:00 p.m. (see order for complete condition). Signed by District Judge John A. Gibney, Jr. on 11/16/22. (wtuc) (Entered: 11/16/2022) |
| 12/06/2022 | 113 | MOTION to Modify Conditions of Release *to Attend Prenatal Appointments* by Keith Rodney Moore. (Attachments: # 1 Proposed Order)(Koenig, Laura) (Entered: 12/06/2022) |
| 12/06/2022 | 114 | RESPONSE in Opposition by USA as to Keith Rodney Moore re 113 MOTION to Modify Conditions of Release *to Attend Prenatal Appointments* (Gibbons, Shea) (Entered: 12/06/2022) |
| 12/06/2022 | 115 | ORDER as to Keith Rodney Moore. It is hereby ORDERED that the Defendant's Motion to Modify Release Conditions to Allow Mr. Moore to Attend His Partner's Prenatal Appointments in this case is GRANTED. Mr. Moore may attend the prenatal appointments for his twins as approved in advance of each appointment by the United States Probation Office. It is SO ORDERED. Signed by Senior United States District Judge John A. Gibney, Jr. on 12/6/2022. (sbea) (Entered: 12/06/2022) |
| 12/22/2022 | 116 | Petition on Order on Violation of Pretrial Release as to Keith Rodney Moore. PRAYING THAT THE COURT WILL ORDER A SUMMONS be issued directing the defendant appear before the Court to show cause why bond should not be revoked for violating the conditions of release. Signed by District Judge John A. Gibney, Jr. on 12/22/2022. (adun, ) (Entered: 12/22/2022) |
| 12/23/2022 | 118 | Summons issued as to Keith Rodney Moore. Placed in USM box for service.(adun, ) (Entered: 12/23/2022) |
| 12/23/2022 | | Set Hearing as to Keith Rodney Moore: Bond Revocation Hearing set for 1/6/2023at 10:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney Jr. (jsau, ) (Entered: 12/23/2022) |
| 01/06/2023 | 121 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.:Bond Revocation Hearing as to Keith Rodney Moore held on 1/6/2023; the Court accepts the government's proffer of evidence; the defendant does not contest the revocation of his bond; the Court revokes the defendant's bond and remands the dft to the custody of the Marshals (Court Reporter G. Halasz, OCR.)(wtuc) (Entered: 01/06/2023) |
| 01/06/2023 | 120 | Addendum to Petition on Conditions of Pretrial Release as to Keith Rodney Moore. Signed by District Judge John A. Gibney, Jr. on 1/6/23. (wtuc) (Entered: 01/06/2023) |
| 01/06/2023 | 122 | ORDER OF REVOKING BOND as to Keith Rodney Moore. Signed by District Judge John A. Gibney, Jr. on 1/6/23. (wtuc) (Entered: 01/06/2023) |
| 01/13/2023 | 123 | Summons Returned Executed on January 3, 2023 as to Keith Rodney Moore. (sbea) (Entered: 01/13/2023) |

| | | |
|---|---|---|
| 11/13/2023 | 124 | OPINION. Signed by District Judge John A. Gibney, Jr on 11/13/2023. (Kat) (Entered: 11/13/2023) |
| 11/13/2023 | 125 | ORDER This matter comes before the Court on the defendant's motion to suppress 17 . For the reasons stated from the bench and in the accompanying Opinion, the Court GRATNS IN PART and DENIES IN PART the motion to suppress evidence and statements 17 . It is so ORDERED. Signed by District Judge John A. Gibney, Jr on 11/13/2023. (Kat) (Entered: 11/13/2023) |
| 02/12/2024 | 126 | OPINION as to Keith Rodney Moore. Signed by District Judge John A. Gibney, Jr. on 2/12/24. (wtuc) (Entered: 02/12/2024) |
| 02/12/2024 | 127 | FINAL ORDER; the Court GRANTS the motion to dimiss the indictment [32,66] and DISMISSES WITH PREJUDICE Count One of the Criminal Indictment; the Court DENIES the motion to exclude defense expert Dr. Eli Coston 70 and Dr. Marvin Chiles 82 ; the Court DIRECTS the Clerk to close the case. Signed by District Judge John A. Gibney, Jr. on 2/12/24. (wtuc) (Entered: 02/12/2024) |
| 02/16/2024 | 128 | MOTION of the United States to Reconsider and Memorandum in Support re: 127 Final Order, by USA as to Keith Rodney Moore (Aber, Jessica). Modified on 2/21/2024. (sbea) (Entered: 02/16/2024) |
| 02/20/2024 | 129 | ORDER re 128 MOTION for Reconsideration re 127 Order on Motion to Exclude filed by USA; the Court directs the defendant to respond to the government's motion on or before Monday, February 26, 2024. Signed by District Judge John A. Gibney, Jr. on 2/16/24. (wtuc) (Entered: 02/20/2024) |
| 02/26/2024 | 130 | RESPONSE in Opposition by Keith Rodney Moore re: 128 MOTION for Reconsideration, 127 Order *and Memorandum in Support* (Koenig, Laura). Modified on 2/29/2024. (sbea) (Entered: 02/26/2024) |
| 02/29/2024 | 131 | Reply by USA as to Keith Rodney Moore re: 128 MOTION for Reconsideration *and Memorandum in Support*, 127 Final Order (Aber, Jessica). Modified on 3/1/2024. (sbea) (Entered: 02/29/2024) |
| 03/11/2024 | 132 | MEMORANDUM ORDER DENYING 128 Motion for Reconsideration filed by USA as to Keith Rodney Moore (1). Signed by District Judge John A. Gibney, Jr. on 3/11/24. (wtuc) (Entered: 03/11/2024) |
| 04/08/2024 | 133 | NOTICE OF ATTORNEY APPEARANCE Jacqueline Bechara appearing for USA. (Bechara, Jacqueline) (Entered: 04/08/2024) |
| 04/08/2024 | 134 | NOTICE OF APPEAL by USA as to Keith Rodney Moore as to 132 Order on Motion for Reconsideration, 127 Order on Motion to Exclude,,,,, (Attachments: # 1 Certification for Appeal)(Bechara, Jacqueline) (Entered: 04/08/2024) |
| 04/09/2024 | 135 | Transmission of Notice of Appeal to 4CCA as to Keith Rodney Moore to US Court of Appeals re 134 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Lgar, ) (Entered: 04/09/2024) |
| 04/16/2024 | | USCA Case Number 24-4201: Case Manager, EBorneisen, for 134 Notice of Appeal filed by USA. (Lgar, ) (Entered: 04/16/2024) |
| 04/16/2024 | 136 | ORDER of USCA as to Keith Rodney Moore re 134 Notice of Appeal: The court appoints the Federal Defender for the Eastern District of Virginia to represent Keith Rodney Moore in this case. (24-4201) (Lgar, ) (Entered: 04/16/2024) |

JA0014

| 04/29/2024 | 137 | TRANSCRIPT of proceedings as to Keith Rodney Moore for dates of 09/15/2021 before Judge Hon. John A. Gibney, Jr., re 134 Notice of Appeal Court Reporter Gil Halasz, Telephone number 804-916-2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/29/2024. Redacted Transcript Deadline set for 7/1/2024. Release of Transcript Restriction set for 7/29/2024.(halasz, gil) (Entered: 04/29/2024)** |
|---|---|---|
| 04/29/2024 | 138 | Transcript Order Acknowledgment from USCA re 134 Notice of Appeal : Court Reporter/Transcriber Gil Halasz. (24-4201) (Lgar, ) (Entered: 04/29/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/23/2024 21:11:46 | | |
| **PACER Login:** | jbechara29 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cr-00042-JAG |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

**JA0015**



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:21cr 042 |
| | ) | |
| v. | ) | Possession of a Firearm and |
| | ) | Ammunition by a Convicted Felon |
| | ) | 18 U.S.C. § 922(g)(1) |
| KEITH RODNEY MOORE, | ) | (Count One) |
| | ) | |
| Defendant. | ) | |
| | ) | Forfeiture Allegation |

May 2021 TERM - At Richmond, Virginia

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### COUNT ONE
(Possession of a Firearm by a Convicted Felon)

On or about December 5, 2020, in the Eastern District of Virginia and within the

jurisdiction of this Court, the defendant, KEITH RODNEY MOORE, knowing that he had

previously been convicted of a crime punishable by imprisonment for a term exceeding one year,

knowingly possessed a firearm, to wit: a Taurus pistol, Model PT24/7, .40 caliber, Serial number

SXC55177, all in and affecting interstate and foreign commerce.

(In violation of Title 18, United States Code, Section 922(g)(1).)

### FORFEITURE ALLEGATION

Pursuant to Rule 32.2 Fed. R. Crim. P., the defendant is hereby notified that upon

conviction of the offense alleged in Count One of this Indictment, as part of the sentencing of the

defendant pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), he shall forfeit to the United

**JA0016**

States any firearm or ammunition involved in or used in any knowing violation of the offense.

Property subject to forfeiture·includes, but is not limited to:

    a Taurus pistol, Model PT24/7, .40 caliber, Serial number SXC55177.

(In accordance with Title 18, United States Code, Section 924(d), incorporated by Title 28, United States Code, Section 2461(c).)

A TRUE BILL: Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

_____

**FOREPERSON**

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: _Kevin S. Elliker_

Kevin S. Elliker
Assistant United States Attorney

2

JA0017

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Case No. 3:21cr42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
| Defendant | ) |

**<u>MR. MOORE'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS</u>**

Keith Moore, through counsel, moves the Court to suppress evidence of a handgun that

police found after initiating an unconstitutional traffic stop of Mr. Moore in this case and to

suppress statements after interrogating Mr. Moore in violation of his Fifth Amendment right to

remain silent.

**FACTS**

On Saturday night, December 5, 2020, Mr. Moore was at a gas station at Brookland Park

Boulevard and Third Avenue in the East Highland Park neighborhood of Richmond, Virginia.

According to the University of Virginia's "Racial Dot Map" that plotted 2010 census data, the

entire neighborhood of that section of East Highland Park is almost exclusively black residents:



1

**JA0018**

That same night, members of the Richmond Police Department had been stopping and ticketing other black residents in and visitors to the neighborhood around Brookland Park Boulevard and Third Avenue.  Many of these traffic stops were for only minor traffic infractions.  In a recorded body camera video, two members of the Richmond Police Department who transported Mr. Moore to the local jail discussed looking for traffic infractions that night in hopes that the traffic stops turned into drug investigations.

As Mr. Moore left the gas station that night, he got into the car that he had bought last year from a local car dealership.  The car had the same temporary license plate that the car dealership staff had put on the car when Mr. Moore bought it.  After Mr. Moore got into the car, he turned right out of the gas station parking lot.  A police car immediately pulled right behind him and turned on its emergency lights to initiate a traffic stop.  At that point, Mr. Moore had not committed any traffic infraction and was not reasonably suspected of committing any crime.  Police reports and the body worn camera videos indicate that the police had initiated a traffic stop of Mr. Moore because they thought his temporary tag was phony.

The police reported pulling over two other individuals before Mr. Moore with the same temporary tag number on December 5, 2020.  When the police officers ran the tag number, at least one of the other temporary tags properly identified the car's VIN number on the temporary tag. The police let that individual go because she had committed no crime.  The temporary tag on Mr. Moore's car also properly identified the car and the car's VIN number.  When the police ran the information, the information properly returned back to Mr. Moore's car.  Not too long before the traffic stop in this case, Mr. Moore was stopped for speeding while driving this same car with the same temporary tag in Hanover County.  The police in Hanover County ran the information for Mr. Moore's car through the database and found no problem with the temporary tag.

**JA0019**

After police initiated the traffic stop, Mr. Moore did not immediately pull over, but hit his car on a curb.  He then ran from the police before they caught up to him.  Mr. Moore stopped running and the police took Mr. Moore forcefully to the ground.  The police found a handgun and ammunition in Mr. Moore's car underneath the driver's seat.  They handcuffed him, arrested him, and put him in the back of a police car.  After taking Mr. Moore into custody, police officers clearly questioned Mr. Moore and solicited statements from him before ever reading him his *Miranda* rights.  After soliciting these statements, another police officer then read Mr. Moore his *Miranda* rights.  Mr. Moore then invoked his right to remain silent.  Mere minutes later, that same officer and other officers began re-interrogating Mr. Moore again at the scene and on the way to the local jail.  Mr. Moore then made further incriminating statements.

After being arrested, Mr. Moore ultimately obtained a bond in state court and obtained two jobs while on bond.  The federal government indicted Mr. Moore on May 4, 2021, alleging that he was a felon in possession of the handgun on December 5, 2020.  ATF officers arrested Mr. Moore on a warrant for the federal indictment on May 28, 2021, when Mr. Moore was at his daytime job.  This Court released Mr. Moore, and he remains on release.  He now moves to suppress all fruits of the poisonous tree flowing from the illegal traffic stop, including the handgun.

### ARGUMENT

I.    **The police violated Mr. Moore's Fourth Amendment right to remain free of unreasonable seizures when they pulled Mr. Moore over to investigate a temporary dealer tag.**

The Fourth Amendment protects the right of people to be secure in their persons against unreasonable searches and seizures.  U.S. Const. amend. IV.  A police officer may "initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020)

3

**JA0020**

(quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)). The "reasonable suspicion" needed to justify a traffic stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). Inchoate suspicion or a hunch that an individual is engaging in criminal activity is not sufficient to justify a traffic stop. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

Simply having temporary tags on a car is not a reasonable basis for a traffic stop. *See United States v. Wilson*, 205 F.3d 720, 724 (4th Cir. 2000) ("Upholding a stop on these facts would permit the police to make a random, suspicionless stop of any car with a temporary tag. The Fourth Amendment does not afford the police such unbridled discretion."). While it is a crime in Virginia to display a license tag one knows to be fictitious, *see* Va. Code § 46.2-612(b)(1), the police should have known that if any person was responsible for issuing a fictitious tag, it was the car dealership staff member, not Mr. Moore. The police allege that they had already pulled over two other cars that same night with the same temporary tag number. The temporary tag for least one of those other cars[1] properly displayed the car's VIN number and listed the name of the dealership. The police determined that the driver had thus not committed any crime and let her go. Yet, that same night, they initiated a traffic stop of Mr. Moore based only on a hunch and through no fault of Mr. Moore's at all. Thus, this Court must suppress all evidence that the police obtained after initiating the traffic stop in violation of Mr. Moore's right to remain free from unreasonable seizures.

---

[1] Undersigned counsel has requested discovery for these other two purported stops on December 5, 2020, but has not yet received that discovery from the government.

> **II.    The police violated Mr. Moore's Fifth Amendment right to remain silent by interrogating him both before and after *Miranda* warnings and after he invoked his right to remain silent.**

*Miranda* warnings are required when a defendant is in custody. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) ("[I]f the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt."). Whether a person is in custody for *Miranda* purposes "is an objective inquiry, and essentially asks "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017). Here, after the police chased Mr. Moore, tackled him, arrested him, and put him in handcuffs in the back of a police car. The police told him repeatedly that he was under arrest. No reasonable person would have felt that he was free to leave at that point. Mr. Moore's pre-*Miranda* statements must be suppressed because all statements "made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda*[.]" *Giddins*, 858 F.3d at 879.

After interrogating Mr. Moore in handcuffs for quite some time while he was surrounded by armed police officers, a female police officer on scene finally gave Mr. Moore the required *Miranda* advisements. Before making any further statements and shortly after the advisements, Mr. Moore invoked his right not to speak with the officers. Therefore, the interrogation that followed and resulted in Mr. Moore confirming and then expanding on his prior un-*Mirandized* statements does not and cannot overcome the prior invocation. *See, e.g., Edwards v. Arizona*, 451 U.S. 477, 484 (1981) ("additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded

5

**JA0022**

to further police-initiated custodial interrogation even if he has been advised of his rights"); *see also Missouri v. Seibert*, 542 U.S. 600 (2004) (condemning the deliberate avoidance of *Miranda* through a two-step interrogation: first interrogating a suspect without warnings, then administering the warnings and re-asking the same questions). Here, the police interrogated Mr. Moore for several minutes before a female police officer administered *Miranda* warnings. After administering the warnings, the officers used Mr. Moore's responses from the previous interrogation to re-elicit the same information.

Such a procedure results in suppression if it was implemented deliberately. *See United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005) (acknowledging Justice Kennedy's concurrence and deliberate-avoidance test as the controlling opinion in *Seibert*). In determining whether the procedure was deliberate and whether "midstream" *Miranda* warnings were effective, the Court should consider "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S at 615 (Kennedy, J. concurring). The test appears to be an objective one. *Id.* ("by any objective measure...").

Here, all of the factors weigh in favor of suppression. First, the officers asked detailed questions during the first interrogation about what they found in the car and about why Mr. Moore ran from the police. Second, the contents of the two interrogations overlapped nearly completely. Next, the timing of the first and second interrogations was in almost immediate succession. Mr. Moore was interrogated for several minutes before the *Miranda* warnings were given. Then the police began the second round of questioning almost immediately after the warnings and continued as the officers were transporting Mr. Moore to jail. Lastly, the same officers conducted significant

**JA0023**

portions of both interrogations in the span of about thirty minutes. Therefore, "by any objective measure," the two-step interrogation in this case violated *Seibert* and the statements must be suppressed.

## CONCLUSION

As explained above, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and suppress statements the police obtained after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent.

> Respectfully submitted,
> KEITH RODNEY MOORE
>
> By:  _____/s/_____
> Laura Koenig
> Va. Bar No. 86840
> Counsel for Defendant
> Office of the Federal Public Defender
> 701 E Broad Street, Suite 3600
> Richmond, VA 23219-1884
> Ph. (804) 565-0881
> Fax (804) 648-5033
> laura_koenig@fd.org

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21-cr-42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' OPPOSITION TO
### MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant Keith Moore has been indicted for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). He now asks the Court to suppress evidence found in his car following an attempted traffic stop (a gun) and statements he made after he fled from police (including his admissions that he ran because he had the gun in the car). His motion is premised on both incomplete presentation of the facts and inadequate application of Fourth and Fifth Amendment precedents. The Court should deny the motion in its entirety.

Regarding the purported Fourth Amendment violation, Moore contends that the gun officers found after initiating a traffic stop must be suppressed as the fruit of an "unreasonable seizure." Moore is wrong on this point. Police had a sufficient basis to try to pull Moore over because his car displayed a temporary tag they reasonably believed to be fake. But more important, under *Hodari D.* and binding Fourth Circuit precedent, Moore was not seized until after he sped away, ran three stop signs, crashed his car, abandoned the car, sprinted another two blocks, and finally surrendered to police. By that time, his actual seizure was supported by reasonable suspicion and probable cause that he had committed several crimes. And by then, he had abandoned the gun in plain view, meaning officers could seize it regardless of the original basis for the attempted stop.

**JA0025**

Regarding the alleged Fifth Amendment violation, Moore complains that officers violated *Miranda* by interrogating him before giving him warnings, refusing to respect his right to remain silent after *Miranda*, and using a prohibited two-part interrogation before and after he was read his *Miranda* rights. The evidence refutes these suggestions. Moore's pre-*Miranda* interactions with various officers consisted of unanswered questions posed by police, unprompted statements volunteered by Moore, and a 60-second conversation about the purchase of his car. Then, after *Miranda*, Moore told an officer to take him to jail and then immediately re-engaged the officers with conversation by demanding to know why police had tried to stop him. After Moore initiated the post-*Miranda* conversation, he admitted twice to two different officers that he fled because he had the gun in his car—a far cry from the prohibited practice of using pre-*Miranda* conversations to draw out post-*Miranda* admissions

Police did not obtain the gun or Moore's admissions by violating the Constitution. The Court should deny the motion to suppress.

## Facts

### I.    The Attempted Traffic Stop

When a unit of four Richmond police—Officers Colombo, Williams, Mills, and Sgt. Spinos—saw the temporary tag "11134Y" on Keith Moore's Chrysler 300, it was the third time they had seen that tag number on a different car that night. They knew the tag was likely fictitious. A few hours earlier, around 5:30 p.m., those officers stopped a white Cadillac sedan with a broken headlight and an expired "11134Y" temporary tag. Information from the state vehicle database indicated the tag did not correspond to any known vehicle. They warned the driver to fix the headlight and tag and let him go. About an hour later, around 6:30 p.m., those same four officers stopped a dark Acura sedan. In the minute-long stop, the driver explained she had just broken her own car window after accidentally locking her baby in the car. The officers

2

**JA0026**

saw the "11134Y" temporary tag on the Acura and were perplexed:  the tag number matched the previously stopped white Cadillac but it also displayed the Acura's vehicle identification number (VIN).  They briefly asked that driver whether she had given that tag to anyone else—she said she had not—and they let her (and the baby) go.

    At about 9:45 p.m., those same four officers saw Moore's white Chrysler 300 in the gas station parking lot at the corner of Brookland Park Boulevard and 3rd Avenue.  They saw the driver of the Chrysler, Moore, slow down before pulling onto the road and observed him manipulating something in his lap.  As the police pulled around the parking lot and came up behind the Chrysler, they saw the same "11134Y" temporary tag.   As the Chrysler approached 4th Avenue, officers turned on their lights to stop the vehicle and investigate the tag.

    The Chrysler 300 sped away.  The car sped south down 4th Avenue, ran a stop sign, and made a sharp right onto Custer Street.  As police gave chase, the Chrysler accelerated on Custer, ran the stop signs at 3rd and then 2nd Avenues, then wrecked on the curb at the intersection of Custer and 2nd Avenue.  Moore jumped out of the car and sprinted down the street.  Officer Colombo and Sgt. Spinos ran after Moore while Officers Williams and Mills continued the pursuit in their police vehicle.  After another two blocks of chasing down Custer Street, Moore gave up and was taken into custody.  Colombo and Mills stayed with Moore while Sgt. Spinos and Officer Williams returned to the abandoned Chrysler 300.  Within seconds, additional police, including Officers Gilbert and Torres, converged on the site of the accident.  Through the open door of the Chrysler 300 they saw a handgun on the floorboard in front of the driver's seat.[1]

---

[1] Police also saw in plain view a baggie containing marijuana in the Chrysler 300.  Officers then conducted a search of the vehicle.  No additional contraband was located, but officers found documents corroborating that the car belonged to Moore.  Because Moore's Fourth Amendment suppression argument hinges solely on the attempted traffic stop, the propriety of the vehicle search (other than as a "fruit" of the traffic stop) is not at issue in this

**JA0027**

## II.    Moore's Statements

About twenty minutes passed between the moment Moore was taken into custody and when he was read the *Miranda* warning.  During the first few minutes, Officers Colombo and Mills asked him basic questions to which he didn't respond, like "What's your name, boss?" and "What's your name, man?" and "You have warrants or something?"

Four minutes after detaining Moore, Officer Colombo advised him that he was under arrest and took Moore's wallet from his pocket.  Colombo identified Moore from his driver's license, then walked back two blocks to assist in the search of the Chrysler.  Mills stepped away to run Moore's name through his computer and do a criminal records check.  For the next six minutes, Officer Gilbert and another officer stood over Moore for long stretches of silence punctuated by Moore's unprompted requests to get items out of his pocket and complaints about being uncomfortable.  Gilbert asked Moore at one point, "What you running for, man?" but Moore did not respond.  No one mentioned the gun to Moore during this time.

At about 9:55 p.m., Officer Mills advised Moore he was under arrest "because there's a gun in the car."  The officers stood Moore up and Mills asked questions related to the pat-down, like whether Moore had anything on him or items hidden in his underwear.  Moore told the police he had his girlfriend's wallet on him and asked that he be allowed to keep that in his pocket.  Around that time, a woman Moore identified as his cousin walked up.  Moore directed the officers to hand everything in his pockets to her, but the officers decided to keep the items with Moore for the time being.

---

case.  *See* Mot. at 3 (moving "to suppress all fruits of the poisonous tree flowing from the illegal traffic stop, including the handgun"); *id.* at 4 (focusing on "evidence that police obtained after initiating the traffic stop"); *id.* at 7 (concluding with request to "suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop").

JA0028

Speaking directly to his cousin, Moore told her the police "pulled me over out the gas station." He complained to his cousin, "I know a n****'s tellin' now, that shit's crazy." Officer Mills interjected, "Telling on you about what though?" But Moore responded, "I'm talking to my people" and didn't explain what he meant. Mills did not inquire further. About a minute later, Moore was taken to Officer Gilbert's vehicle. Officer Mills readjusted Moore's handcuffs at Moore's request, and Moore was put in the back seat.

Officer Gilbert then drove Moore back to the site of the accident. Moore asked Gilbert what police intended to do with his car and whether it would be towed. Gilbert said he did not know but suggested it was possible. Then, Moore shouted through his open window to the officers searching the Chrysler to ask what they were going to do with his car. Sgt. Spinos walked over and asked if the car belonged to Moore. Moore said it did and that he had just bought it recently. Spinos went to Officer Williams, who had not been part of any of the questioning or custody of Moore to that point, and suggested she read Moore the *Miranda* rights. As Williams walked over, Officer Torres asked Moore how much he paid for the Chrysler (Moore said $3600) and where he bought it (Moore described a dealership on Chamberlayne across the street from a McDonald's with "A & R" in the name).

At 10:05 p.m., Officer Williams read Moore his *Miranda* rights, pausing after each sentence to confirm Moore understood them. After completing the *Miranda* advisement, Williams asked whether Moore wanted to "have a conversation." Moore just looked at her. Williams asked again if he wanted to answer her questions. Moore responded, "Just get me down to jail man." Williams said "alright" and started to walk away.

Less than thirty seconds later, Moore shouted out to the group of police officers demanding to know why they pulled him over. Sgt. Spinos walked back over to Moore and

**JA0029**

explained that he had bad tags on the car. Moore argued back that the DMV was closed and that there had been a 90-day extension for expired tags and complained, "Y'all pulled me for nothing." Spinos asked where he had gotten the tags ("The dealer," Moore said). Williams asked who the dealer was ("I just said the dealer's on Chamberlayne," Moore responded). Moore then told the officers he had been pulled over for speeding in Hanover County in the same car and those officers had not said anything to him about the tags. Hearing this, Officer Williams asked him: "If that's the case, then why didn't you just stop, if you knew you had already been through this with another agency?" Moore responded to Williams he didn't stop because he "had that tool"—a reference Williams understood to mean the gun in the car.

A few minutes later, around 10:14 p.m., Officer Gilbert was preparing to transport Moore to the jail. Moore demanded to know who had his girlfriend's wallet, and Gilbert reminded him that Officer Mills had put it back in Moore's pocket. Moore realized his mistake and apologized to Gilbert. "You're good," Gilbert responded, then asked "What you run for today, man?" Moore replied, "Y'all know the deal man, I got a gun in the car. Y'all know the deal." On the way to the jail, Moore confirmed to Gilbert he was a convicted felon and admitted he knew he could not have a gun.

### Legal Argument

**I.    The Court should not suppress Moore's gun because the traffic stop that led to its discovery was neither a "seizure" nor "unreasonable."**

Under the Fourth Amendment, officers may not conduct "unreasonable searches and seizures," U.S. Const. amend. IV, but "not every police-citizen encounter" constitutes a seizure. *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021). Instead, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). When "physical force is

**JA0030**

absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Assuming a driver complies with police commands, a traditional traffic stop is "a 'seizure' within the meaning of the Fourth Amendment and must be reasonable under the circumstances." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016). "Without question," police can conduct such a stop for "failure to comply with traffic safety laws." *Id.* at 649.

Moore's suppression motion misses a threshold issue that undermines his Fourth Amendment contention: whatever the reason for the attempted stop, Moore failed to submit to that show of authority. He took off and led police on a short but reckless chase by car and then on foot. "That is no seizure." *Hodari D.*, 499 U.S. at 626. That kind of "headlong flight" demonstrates "at most an attempted seizure," which does not implicate any Fourth Amendment protections. *Stover*, 808 F.3d at 997, 998 (internal quotation marks omitted); *see also United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) ("A defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated.").

During his headlong flight, Moore left behind his car with the gun sitting in plain view through the open driver-side door. By abandoning the car and the gun, Moore lost "any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995); *see also Stover*, 808 F.3d at 1001 (recognizing that "under controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not

apply"). And apart from Moore's flight and abandonment, the propriety of seizing the gun is not a close question under the plain-view doctrine. *See United States v. Rumley*, 588 F.3d 202, 206 (4th Cir. 2009) (upholding as lawful the seizure of a pistol that came into plain view during a traffic stop).

Taking Moore's argument on its own terms, the police had a sufficient justification to try to pull him over. Moore rightly concedes that the knowing display of a fake license plate is a violation of Virginia's traffic safety laws.[2] Even so, he complains police should not have attempted to pull him over because the bad actor must have been a car dealership employee, not Moore. *See* Mot. at 4. But Moore cannot deny he was displaying the "11134Y" tag on his Chrysler 300, and he does not contest that police reasonably believed the "11134Y" temporary tag was fake after having seen it on two other cars that same night. Nor can Moore seriously argue that police may never pull over the driver of a car with bad plates just because it may be possible someone else put them there. Officers had the reasonable and articulable suspicion to attempt the stop of Moore for traffic violations related to the bad temporary tag.

Finally, Moore does not contest that officers had a sufficient basis to seize him after police caught up to him following the foot chase. After police attempted to pull him over, Moore evaded the officers, ran through three stop signs, and drove recklessly. The sum of this conduct gave officers both reasonable suspicion and probable cause to seize Moore for various violations of Virginia law, by which point he had already abandoned the evidence he now seeks to suppress.

---

[2] *See* Mot. at 4 (citing Va. Code § 46.2-612(2)(B)(1)); *see also, e.g.*, Va. Code § 46.2-722 (prohibiting the fraudulent alteration, forgery, or counterfeiting of license plates or decals as well as the use of "any license plate or decal knowing it to have been altered, forged, or falsified" and making the violation of such prohibitions a Class 1 misdemeanor).

There was no Fourth Amendment violation in this encounter. The Court should reject Moore's argument to the contrary and deny his request to suppress the firearm.

## II.    The Court should not suppress Moore's voluntary pre-*Miranda* statements or any of his post-*Miranda* statements.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), police must give the familiar warnings to a subject who is interrogated while in custody. The government does not dispute that Moore was in custody when officers put him in handcuffs and that he made incriminating statements following that moment. The Fifth Amendment issues raised by Moore's suppression motion, therefore, focus on whether and how the right to remain silent under *Miranda* applies to those statements.[3]

Without specifically identifying any particular statements, Moore argues that everything he said, whether pre- or post-*Miranda*, must be suppressed. A charitable interpretation of Moore's arguments draws out three distinct theories: (1) everything Moore said pre-*Miranda* must be suppressed because officers had not read him his rights; (2) everything Moore said post-*Miranda* must be suppressed because police continued to interrogate him after he invoked his right to remain silent; and (3) everything Moore said post-*Miranda* must be suppressed because officers engaged in a prohibited two-part interrogation technique that effectively rendered his post-*Miranda* statements involuntary. None of these theories accounts for the actual facts in this case. The government addresses these contentions in turn.

---

[3] Moore focuses solely on the right to remain silent and does not challenge any statements given as a violation of the right to have an attorney present under *Miranda*. *See* Mot. at 5 ("Mr. Moore invoked his right not to speak with the officers.").

JA0033

A.    **Moore's voluntary pre-*Miranda* statements do not implicate *Miranda*.**

Moore claims "all statements" given pre-*Miranda* must be suppressed without making

any distinction between things Moore said voluntarily and Moore's response to police questions.

In all events, the government has reviewed the evidence in this case and determined that it would

seek admission of only two sets of Moore's pre-*Miranda* utterances:  his statements to his cousin

who arrived on the scene, including "I know a n****'s tellin' now, that shit's crazy," and his

statements and questions to the officers regarding what would happen to his Chrysler 300.[4]

Voluntary statements made outside an interrogation context do not implicate *Miranda*.

*See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (explaining *Miranda*'s safeguards "are

required not where a suspect is simply taken into custody, but rather where a suspect in custody

is subjected to interrogation").  Put differently, suppression of custodial statements under

*Miranda* focuses on the questioning officers' words or actions and whether they "are designed to

illicit an incriminating response."  *United States v. Hanes*, 26 F. App'x 123, 133 (4th Cir. 2001)

(citing *Innis*, 446 U.S. at 301).  When a suspect in custody says something unprompted by police

conduct, he speaks at his own peril.  *See, e.g.*, *Arizona v. Mauro*, 481 U.S. 520, 523–29 (1987)

(rejecting *Miranda*-based suppression argument over a conversation between an arrested

defendant and his wife that took place in the presence of police officers).

The two pre-*Miranda* statements identified above were not the product of interrogation.

No one was interrogating Moore when he made the unprompted musing to his cousin that

---

[4] Most of Moore's pre-*Miranda* statements have no bearing on this case, like his focus on the girlfriend's wallet, his requests to get up or readjust handcuffs, and his responses to police about whether he had any items on him during the pat-down.  None of those would be suppressible under *Miranda* anyhow, as they were voluntary statements by Moore or given in response to questions focused on officer safety.  Separately, as explained below in Part II-C, Moore responded to a couple of questions about where he purchased the car before he was read *Miranda*, but the United States does not intend to use Moore's answers to those questions at trial.

someone must have said something to tip police off to him.  And Moore was the one doing the interrogating when he demanded to know from Officer Gilbert and then other police what would happen to his car.  Under *Innis*, those words are not suppressible simply because Moore said them before he was read his *Miranda* rights.  The Court should thus deny the motion to suppress as to those voluntary statements.

> **B.    Moore did not unambiguously and unequivocally invoke his right to remain silent, but even if he did, he waived that right by immediately re-engaging with officers following the *Miranda* warnings.**

Invocation of the right to remain silent must be unequivocal and unambiguous.  *See Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010).  In this context, ambiguity turns on whether "reasonable police officer under the circumstances would have understood the suspect intended to invoke his Fifth Amendment rights."  *United States v. Abdallah*, 911 F.3d 201, 210 (4th Cir. 2018) (internal quotation marks).  Such circumstances include the events preceding the *Miranda* warning.  *See id.* at 211.  Yet even when a defendant invokes the right to remain silent, he may waive that right at any time and thus render post-*Miranda* statements admissible at trial.  *See Berghuis*, 560 U.S. at 382.  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *Id.* at 385; *see also United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) ("A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions.").

Moore acknowledges Officer Williams advised him of his *Miranda* rights.  He does not contend, and there is no basis to conclude, that he did not understand his rights.  Officer Williams read Moore each component of *Miranda*, one-by-one, stopping to confirm Moore understood each right.  Although Moore did not loudly say "yes" following each right—he

11

**JA0035**

interrupted Officer Williams asking if she was done yet—context makes clear that he did understand his rights. Moore spoke and understood English. When Williams began reading Moore his rights, he claimed another officer had already done so. And as Williams continued to go through the list of *Miranda* rights, Moore acknowledged what she was doing and told her "just do your thing." Moore understood his right to remain silent.

At the conclusion of the *Miranda* warnings, Moore told Officer Williams, "just get me down to jail." That was not an unequivocal and unambiguous invocation of the right to remain silent. Although Moore did not need to speak any magic words to invoke that right, *see Abdallah*, 911 F.3d at 210, his request to be taken to jail did not clearly indicate a refusal to speak with the officers. *See, e.g. id.* at 210 (finding defendant invoked right to remain silent by stating he "wasn't going to say anything at all"); *id.* (listing other examples of unambiguous invocations, such as "I have decided not to say any more"; "I don't want to talk no more"; and "I don't want nothing to say to anyone"). Moore engaged with the officers before *Miranda*, and then, after receiving the warning, he said nothing suggesting he wished to remain silent.

Even if Moore's request to be taken to jail was an unequivocal invocation of his right to remain silent, he almost immediately waived that right by voluntarily re-engaging with police. In *Berghuis*, the Supreme Court held that a suspect's uncoerced statements given "about three hours after receiving a *Miranda* warning" indicated "a course of conduct indicating waiver of the right to remain silent." 560 U.S. at 386 (internal quotation marks omitted). Here, Moore spoke up *thirty seconds* after the warning by asking the police questions and then getting into the back-and-forth over his temporary tag. And yelling out to police post-*Miranda,* then continuing to talk with them when they respond, does not show any coercion, much less the kind that might otherwise render a waiver of the right to remain silent invalid.

**JA0036**

Just as in *Berghuis*, "[t]here is no basis to conclude that [Moore] did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak." *Id.* at 385. Police did not violate *Miranda* when they asked Moore why he ran, and his responses to questions post-*Miranda*, including that he fled because of the gun and his admission that he knew he was not allowed to have the gun, are admissible.

### C.    Officers did not coerce Moore's post-*Miranda* statements through a prohibited two-part interrogation.

Finally, Moore contends that his post-*Miranda* admissions were the product of a "deliberate" bifurcated interrogation where police used his pre-*Miranda* responses "to elicit the same information" after the warning. Mot. at 6. Under those kinds of facts, the Court would need to consider whether police had engaged in a "deliberate 'question-first' strategy" to skirt *Miranda*. *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (citing *Missouri v. Seibert*, 542 U.S. 600, 615–16 (Kennedy, J., concurring)). But that is not the case here.

According to Moore, "the officers asked detailed questions during the first interrogation about what they found in the car and why Mr. Moore ran from the police." Mot. at 6. In fact, no one asked Moore about the contents of the car during the entire encounter. Indeed, the only mention of the gun—other than Moore's admissions—came when Officer Mills told Moore he was under arrest because they found the gun in the car. And, pre-*Miranda*, only one officer asked Moore why he ran. Moore gave no response and there was no follow-up.

Moore also claims "the contents of the two interrogations overlapped nearly completely." But the only pre-*Miranda* questioning resembling an "interrogation" to which Moore responded focused on where Moore bought his car. Then, after Moore implicitly waived *Miranda*, officers engaged with him about the legality of his temporary tag (the first time Moore learned why he was pulled over), what happened when he got pulled over in Hanover County (information

**JA0037**

offered by Moore only post-*Miranda*), and then why Moore ran from police (the first time Moore ever gave an explanation). The "two interrogations" overlapped only insofar as police wanted to know about the origin of Moore's car and Moore wanted to know why he was pulled over. But Moore's admission that he ran because the gun was in the car bore no relation to the officers' pre-*Miranda* inquiries.

Finally, Moore says he "was interrogated for several minutes before the *Miranda* warnings were given" and "the same officers conducted significant portions of both interrogations in the span of about thirty minutes." Mot. at 6–7. Around thirty minutes passed from when police attempted the traffic stop until Officer Gilbert drove off to take Moore to jail. The relevant window of questioning lasts from around 60 seconds before the *Miranda* warnings to about 90 seconds after Moore re-engaged with the officers post-*Miranda*—a span of about four minutes. During that time, Moore voluntarily asked officers about the fate of his car, spoke with Spinos and Torres about the purchase of the Chrysler (without Williams present), was read *Miranda* by Williams, told Williams "just get me down to jail," then invited a dispute over the validity of his tags, before he finally admitted to Williams that he ran because he had the gun. Seven minutes later, Moore made his incriminating admissions to Officer Gilbert, who was not with Spinos or Williams during their earlier questioning of Moore. These facts refute Moore's suggestion of a prohibited two-part interrogation.

At bottom, "by any objective measure," there are no facts suggesting a coordinated or deliberate effort by police to use Moore's pre-warning statements to coerce post-warning admissions. The Court should reject Moore's argument to the contrary.

**JA0038**

## Conclusion

The facts show police did not violate Moore's Fourth or Fifth Amendment rights. The prohibited gun was lawfully found in Moore's Chrysler 300. His subsequent voluntary statements and his admissions that he ran because of the gun were not obtained in violation of *Miranda*. The Court should deny the motion to suppress in its entirety.


Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By:        _____/s/_____
Kevin S. Elliker
Assistant United States Attorney
Virginia Bar Number 87498
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Kevin.Elliker@usdoj.gov

**JA0039**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21cr42** |
| | ) | |
| **KEITH RODNEY MOORE,** | ) | |
| Defendant | ) | |

**MR. MOORE'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS**
**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Keith Moore, through counsel, replies as follows to the government's response to his motion to suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore in this case and to suppress statements after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent[1]:

I. **The police violated Mr. Moore's Fourth Amendment right to remain free of unreasonable seizures when they pulled Mr. Moore over to investigate a temporary dealer tag.**

The government's primary argument on the Fourth Amendment violation in this case is that the police ultimately did not seize Mr. Moore until other events occurred after the police initiated a(n improper) traffic stop. *See* ECF No. 22 at 6-7. The government argues that it should not matter whether the police had a proper basis to initiate the traffic stop unless the individual immediately pulled over in response to the police officers' show of authority. But, that is not the law of traffic investigations. Traffic stop investigations are akin to *Terry* stops, and just like a *Terry* stop, must be just from the inception. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968) ("And in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—

---

[1] The government's contentions regarding the Fifth Amendment violations in this case appear to be factual in nature and will be addressed at the evidentiary hearing in this case scheduled for July 26, 2021.

1

**JA0040**

whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."); *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (observing that a seizure is justified from its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.").

In this case, Mr. Moore was undoubtedly seized when several police officers chased him, drew guns at him, and forcefully pulled him to the ground and put him in handcuffs. The question in this case is not then whether Mr. Moore was seized, but rather whether the events between when the police officers initiated the traffic stop and when they ultimately seized Mr. Moore negate the illegality at the inception. The answer to this question must be no. *See, e.g.*, *Wingate v. Fulford*, 987 F.3d 299, 310 (4th Cir. 2021) (finding that *Terry* stop not justified at inception did not develop into legal seizure after citizen fled from police officer). Were that not the case, there would be no reason for over half a century of caselaw to hold that a seizure must be justified based on the circumstances at the beginning of the police intrusion into a person's privacy. *See Terry*, 392 U.S. at 19-20; *see also United States v. Fambo*, 2006 WL 2990461, at *18 (W.D.N.Y. Oct. 19, 2006) ("In essence, the officers were utilizing this alleged traffic stop with either a hope or suspicion that the defendant may subsequently do something that violates the law.") (internal quotation marks omitted).

Here, all Mr. Moore did was walk out of a gas station convenience store and get into his car in a part of town made up of almost exclusively black residents and turn out of the gas station parking lot. At that point, several police cars got right behind his car and immediately turned on the cars' emergency lights, ordering Mr. Moore to pull over. Mr. Moore, who was simply driving as a black man in a black neighborhood, was very concerned and did not pull over immediately.

He ultimately put the car in park on a curb and ran until police officers pointed guns straight at him grabbing his clothes and pulling him to the ground.  An illegal stop cannot be made legal by incriminating behavior that comes after the suspect is stopped.  *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 271 (2000).  And if subsequent incriminating events cannot justify an unreasonable stop, then it logically follows that subsequent incriminating events should not be able to justify an unreasonable order to stop.  Unreasonable stops and unreasonable orders to stop are both abuses of police power, and there is no principled basis for prohibiting the former but not the latter.

The government next argues that in any event, the seizure was justified from the inception because of the allegedly fake temporary tag.  As the government described, the police officers reported having encountered that same license plate number that same night.  The second incident revealed that the plate properly identified the VIN number of the car and the VIN number matched the car's description with the Department of Motor Vehicles.  Having determined that the second individual had committed no crime, the police officers let her go.  Not a single case in Virginia cites Va. Code § 46.2-612(b)(1), which criminalizes the knowing display of fictitious license plates, the statute clearly requires proof that the individual knew the tag was fake.  Unlike handwritten temporary tags or obviously fake tags, there was nothing about this particular tag that indicated to anyone that Mr. Moore was knowingly displaying a fake temporary tag.  *See United States v. Wilson*, 205 F.3d 720, 724 (4th Cir. 2000) ("Upholding a stop on these facts would permit the police to make a random, suspicionless stop of any car with a temporary tag.  The Fourth Amendment does not afford the police such unbridled discretion."); *see also Wingate*, 987 F.3d at 305 ("We have often emphasized that the Fourth Amendment requires particularity—a *particularized* and objective basis for suspecting *the particular person* stopped of criminal

**JA0042**

activity.") (internal quotation marks omitted).  Contrary to the government's argument, this encounter was illegal from its inception.

The government's final argument is that Mr. Moore abandoned his car and its contents when he parked it and ran.  Whether an individual abandoned property is primarily a question of the person's intent at the time of the alleged abandonment.  *See United States v. Colbert*, 474 F.2d 174, 176-77 (5th Cir. 1973) (finding that two individuals who had disclaimed all interest in briefcases before police searched them and where officers "in no way compelled these actions" had abandoned interest in briefcases.).  "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.* at 176.  If there is a nexus between the alleged abandoned property and illegal police conduct, the evidence must be suppressed. *See United States v. Maryland*, 479 F.2d 566, 568 (5th Cir. 1973) ("If there is a 'nexus between . . . lawless police conduct and the discovery of the challenged evidence' which has not 'become so attenuated as to dissipate the taint,' then the evidence should be suppressed. The nexus between the arrest and the discovery of the evidence is strong in this case, for the arrest obviously motivated appellant to attempt to conceal the bills in the police vehicle.") (internal citation omitted); *see also United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) ("An abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary. Consequently, even if the district court correctly concluded that defendant abandoned the bag at the security office, we must determine whether that abandonment was the result of an earlier Fourth Amendment violation.").

4

**JA0043**

Here, Mr. Moore left his car and its contents parked by the side of the road. He was gone from the car for a matter of minutes. When police officers brought Mr. Moore back to the area of his car (and the numerous police cars surrounding it), he clearly indicated that it was his car and demonstrated his intent to retain his interest in that property. Unlike the bag of drugs at issue in *California v. Hodari D.*, 499 U.S. 621 (1991), one cannot simply fling aside a hunk of plastic and metal weighing thousands of pounds. One does not abandon a car and its contents by walking, or running, away from it briefly. Thus, this Court must suppress all evidence that the police obtained after initiating the traffic stop in violation of Mr. Moore's right to remain free from unreasonable seizures.

**CONCLUSION**

As explained above and in his motion to suppress, *see* ECF No. 17, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and suppress statements the police obtained after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent.

Respectfully submitted,
KEITH RODNEY MOORE

By:    _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

5

**JA0044**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                    plaintiff,

        versus                    3:21CR042

KEITH RODNEY MOORE,

                    defendant,


Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge


Motions hearing


July 26, 2021

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219


**JA0045**

APPEARANCES


Kevin Spencer Elliker, Esq.

Stephan Anthony, Esq.

Assistant United States Attorneys

for the United States




Laura Jill Koenig, Esq.

Assistant Public Defender

for the defendant

The defendant in his own proper person

1          THE CLERK:  Case number 3:21 CR 42.

2          United States of America versus Keith Rodney

3     Moore.

4          Mr. Kevin Elliker and Mr. Stephan Anthony

5     represent the United States of America.

6          Ms Laura Koenig represents the defendant.

7          Are counsel ready to proceed?

8          MR. ELLIKER:  United States is ready, Your

9     Honor.

10         Good morning, Your Honor.

11         MS KOENIG:  Defense is ready.  Good morning.

12         THE COURT:  All right.  Good morning.

13         Mr. Elliker, good to see you, sir.

14         MR. ELLIKER:  Good to see you.

15         THE COURT:  We are here today on the motion to

16    suppress the evidence in this case of essentially a

17    stop, there was a gun in the car, and then some

18    statements that Mr. Moore made before and after his

19    Mirandizing.

20         So, Mr. Elliker, call your first witness.

21         MS KOENIG:  Before we call witnesses --

22         THE COURT:  What?

23         MS KOENIG:  Before The Court calls witnesses,

24    or Mr. Elliker calls them, I ask for a formal order

25    separating the witnesses and telling them not to

1    talk.

2         THE COURT:  All witnesses that are going to

3    testify remain outside, except for the witnesses

4    that are testifying.

5         MR. ELLIKER:  I have -- Ms Koenig was kind

6    enough to give me a heads-up.  I did speak to the

7    officers outside to make sure they knew not --

8         THE COURT:  Okay.

9         MR. ELLIKER:  Before I call the first witness,

10   I want to, if I can, Your Honor, put something on

11   the record to make sure it is clear.  It is in the

12   reply brief that was filed on July 13th at ECF 27.

13   There was a statement that the government had not

14   provided discovery of the two earlier traffic stops

15   that precipitated the third traffic stop of the

16   defendant.  That was not accurate.  And Ms Koenig

17   when I pointed out that the government had produced

18   those videos about a week and a half earlier, it

19   filed a corrected brief and removed that statement,

20   but the pages for the corrected brief wasn't

21   indicated.  And I just wanted to make sure that the

22   record was clear that all of that discovery had

23   actually been provided then, Your Honor.

24        Just to give you a sense of where I intend to

25   go really quick today.  Because of the nature of

**JA0048**

1    traffic stop and issues that the defense has raised

2    I have tried to work my way through if I could call

3    fewer than six witnesses.  I couldn't get there.  I

4    wanted to let you know who those six witnesses are.

5         The first two witnesses are Officers Colombo

6    and Mills.  They were involved in all three traffic

7    stops involved in the pursuit of the defendant and

8    detaining him.

9         The third witness is Officer Torres, who was

10   not involved in the earlier traffic stop, but did

11   respond to assist the pursuit, saw the gun, and had

12   a brief conversation with the defendant pre-Miranda.

13        The fourth witness is Officer Williams, who was

14   involved in all three traffic stops, assisted in the

15   search of the defendant's vehicle, is the officer

16   who read the defendant Miranda and heard him make

17   incriminating statements after Miranda.

18        The fifth witness is Michael Spinos, who is

19   retired sergeant from R P D, also involved in all

20   three traffic stops, also involved in the pursuit,

21   and had conversations with the defendant both pre

22   and post Miranda.

23        And then the last witness is Officer Gilbert,

24   who responded to assist the pursuit and was involved

25   in transporting the defendant to lockup, during

Collombo - direct

 1   which he made some incriminating statements.

 2        So, I will work my way quickly through those,

 3   but I wanted to let you know I was intentional about

 4   this, but I couldn't work the way around based on

 5   the nature the arguments made by defendant.

 6        So I would first call Officer Dominic Colombo.

 7        THE COURT:  All right.

 8                   DOMINIC COLLOMBO

 9        AFFIRMED AND TESTIFIED AS FOLLOWS:

10        THE COURT:  All right, thank you, Officer

11   Collombo.  I appreciate you coming today.

12        Go ahead, Mr. Elliker.

13                   DIRECT EXAMINATION

14   BY MR. ELLIKER:

15   Q    Please state your name and spell the name for

16   the record.

17   A    Dominic Collombo.  Dominic, D-O-M-I-N-I-C

18   Collombo, C-O-L-L-O-M-B-O.

19   Q    How are you employed?

20   A    I am a Richmond police officer, Fourth

21   Precinct, part of FMT.

22   Q    You said the Fourth, FMT.  What does that stand

23   for?

24   A    Focus Mission Team.

25   Q    How long have you been employed?

Collombo - direct

1        THE COURT:  Okay.  Let's just get down to it.

2   BY MR. ELLIKER:

3   Q    Were you on patrol with Fourth F M T on

4   December 5, 2020?

5   A    I was.

6   Q    Did you encounter multiple vehicles with the

7   same temporary tag number that evening?

8   A    I did.

9   Q    How many times did you see that tag on

10  different vehicles?

11  A    Two other times.  Three total.

12  Q    Was the first stop involving a white Cadillac

13  sedan?

14  A    Yes.

15  Q    What part of the Fourth Precinct were you?

16  A    Highland Park.

17  Q    Were you wearing your body-worn camera during

18  that encounter?

19  A    I was.

20  Q    Have you had the opportunity to review footage

21  from that incident before today?

22  A    I did.

23  Q    I would like you to -- inside of that redwell

24  folder there is a binder.  If you could take a look

25  actually in the binder.  No, inside.  There you go.

**JA0051**

Collombo - direct

1       Behind tab number one is a document marked as

2  exhibit 1.  Do you recognize this?

3  A    I do.

4  Q    What is it?

5  A    That stop on the white Cadillac, my body cam.

6  Q    This is a still shot from your body camera?

7  A    Yes.

8  Q    Is it true and accurate as to the footage that

9  was recorded that evening?

10  A    It is.

11       MR. ELLIKER:  Your Honor, we move exhibit 1

12  into evidence.

13       MS KOENIG:  No objection, Your Honor.

14       THE COURT:  Admitted.

15  BY MR. ELLIKER:

16  Q    Officer Colombo, I believe you said this

17  picture shows the first car that you pulled over

18  that evening; is that right?

19  A    Correct.

20  Q    You see in the top right corner a time code?

21  A    I do.

22  Q    What is the time code?

23  A    22 oh, time code is F8 1314637.

24  Q    The line above that might be the time code.

25  A    22:43:56.

**JA0052**

Collombo - direct

1          THE COURT:  So it is 10:43 at night?

2          MR. ELLIKER:  Your Honor, the parties actually

3    stipulate that the time code shown on the body

4    camera is zulu time, Greenwich mean time, five hours

5    ahead of the actual time.

6          THE COURT:  Okay.  So, it is.

7          MR. ELLIKER:  I believe that?

8          THE COURT:  That makes it 5:46.

9    BY MR. ELLIKER:

10   Q    That's right.  So who is standing by the

11   driver's side window in this photograph, Officer?

12   A    That is Sergeant Spinos.

13   Q    Can you make out the tag number?  Maybe we can

14   blow that up for him.

15   A    111 34Y.

16   Q    Did you run that tag number in your computer on

17   the car that you were driving?

18   A    My partner may have.  Made the traffic stop and

19   called out the tag number.  The dispatcher sends it

20   through.

21   Q    You reviewed the computer with respect to the

22   validity of that tag number?

23   A    Correct.

24   Q    Could you look at exhibit two?  Is this a

25   screen shot from your body cam?

**JA0053**

Collombo - direct

```
 1   A     It is.

 2   Q     Is it true and accurate as to the recording

 3   that was made that night?

 4   A     It is.

 5   Q     Your Honor, we move exhibit two into evidence.

 6         DFT COUNSEL:  No objection, Your Honor.

 7         THE COURT:  Admitted.

 8   BY MR. ELLIKER:

 9   Q     If we could blow up the portion that shows the

10   computer screen.

11         THE COURT:  I can actually read that.

12         Go ahead.

13   BY MR. ELLIKER:

14   Q     Does this show the temporary tag number on the

15   Cadillac that you had pulled over?

16   A     It does.

17   Q     What does the computer data base tell you about

18   the validity of that tag?

19   A     That nothing comes back --

20   Q     What?

21   A     -- on the tag.

22   Q     So where it says, "no recovered," what does

23   that mean to you as police officer?

24   A     That the tags are fake.

25   Q     Now, did you ultimately let this driver go with
```

**JA0054**

Collombo - direct

1    a warning?

2    A    I did.

3    Q    Could you have written this up there, given a

4    citation?

5    A    I could have.

6    Q    All right.

7         I would like to talk about the second encounter

8    you said a second time that you saw the same tag?

9    A    Correct.

10   Q    I would like to show you if you look behind tab

11   three.

12        THE COURT:  Is this an hour later?  Go ahead.

13   BY MR. ELLIKER:

14   Q    Is this a screen shot of body camera footage

15   from that second stop?

16   A    It is.

17   Q    Is it a true and accurate as to the recording

18   that was made?

19   A    It is.

20   Q    Your Honor, we move exhibit three into

21   evidence.

22        DFT COUNSEL:  No objection, Your Honor.

23        THE COURT:  Admitted.

24   BY MR. ELLIKER:

25   Q    If we could zoom up the tag on that.

**JA0055**

USCA4 Appeal: 24-4201     Doc: 22-1     Filed: 09/04/2024     Pg: 70 of 496

Collombo - direct

1      THE COURT:  I can read it from here,

2   Mr. Elliker, 111 34Y.

3   BY MR. ELLIKER:

4   Q    Is that the same tag as the Cadillac that you

5   had pulled over roughly an hour earlier?

6   A    It is.

7   Q    Were you wearing your body-worn camera during

8   this encounter?

9   A    I was.

10  Q    Have you had opportunity to review that camera

11  footage from this incident?

12  A    I did.

13  Q    I think in front of you you have a stack of

14  CDs.  Is there one marked with government four?

15  A    Yes.

16  Q    Do you recognize that disc?

17  A    I do.

18  Q    What is it?

19  A    It is from that stop.

20  Q    How do you know that your recording from that

21  stop is on the disc?

22  A    Because I reviewed it and signed it.

23  Q    Does it contain a true and accurate recording

24  of your body camera footage from the second stop?

25  A    It is.

**JA0056**

Collombo - direct

1        MR. ELLIKER:  Your Honor, we move exhibit four

2    into evidence.

3        DFT COUNSEL:  No objection.

4        MR. ELLIKER:  Admitted.

5    BY MR. ELLIKER:

6    Q    If we can play all of exhibit four.  A little

7    less than two minutes.

8        (Being played).

9        Officer, what was your reaction to seeing the

10   same tag on the second occur an hour later?

11   A    I bit shocked, confused at first.

12   Q    Did you ultimately let the driver go without

13   writing a citation?

14   A    I did.

15   Q    Could you have written a citation?

16   A    I could have.

17   Q    Now, you said that you encountered --

18        THE COURT:  Let me ask you a question.  Was

19   there some dealer who was selling these cars with

20   these fake tags on them, or were people buying tags

21   because they didn't want to register their car?

22        THE WITNESS:  I believe that different, certain

23   dealerships were giving them fake tags.

24        THE COURT:  Did anybody go take down the dealer

25   that was running this nefarious fake dealer tag team

Collombo - direct

1    in Richmond?

2         THE WITNESS:  I know people are looking into

3    it, sir.

4         THE COURT:  Well, I am glad to hear that.

5         Go ahead, Mr. Elliker.  Getting to the bottom

6    of crime in Richmond now.

7    BY MR. ELLIKER:

8    Q    Could you please tell The Court about how you

9    encountered the tags the third time?

10   A    The third time we were driving Brookland Park.

11   Observed a vehicle pulling out from the gas station.

12   When we passed by the driver of the vehicle abruptly

13   stopped, put on his brakes, and looked like he

14   didn't want to pull out.  At that point he reached

15   down in front of him.  Kind of on the floorboard.

16   And my, one of my partners observed a tag, same

17   tags.  We went and parked right across the street in

18   the Dollar Store parking lot.  Eventually he pulled

19   out.  We got behind him and initiated a traffic

20   stop.

21   Q    What happened when you initiated the traffic

22   stop?

23   A    He failed to stop.  Failed to stop.

24   Q    Did he flee from the police?

25   A    He did.

Collombo - direct

1    Q    What was the route of his flight?

2    A    I believe right on Brookland Park on to Forest

3    Ave.  Through a stop sign at -- making a right on to

4    Custer.  And from there it was just straight through

5    Third and Second where he wrecked out.

6    Q    Did he run multiple stop signs as he was

7    fleeing police?

8    A    Yes.

9    Q    When you say he wrecked out, what happened?

10   A    He was going too fast.  He went through the

11   last stop sign and ran straight into the curb.

12   Skidded his tires.  Hit the curb.  Got out of the

13   vehicle and runs.

14   Q    Did you pursue the defendant on foot after

15   that?

16   A    I did.

17   Q    I would like you to look at the disc that is

18   marked exhibit five.  Do you recognize that disc?

19   A    I do.

20   Q    Does that contain your body camera footage from

21   the incident that we are talking about right now?

22   A    It does.

23   Q    Did you initial that disc?

24   A    I did.

25   Q    Does it contain a true and accurate depiction

**JA0059**

Collombo - direct

1   of the body camera footage from that stop?

2   A    It does.

3       MR. ELLIKER:  Your Honor, we move five into

4   evidence.

5       MS KOENIG:  I just want to clarify for the

6   record.  This is entitled FA, felon foot chase; is

7   that right?

8       THE COURT:  Called what?

9       MS KOENIG:  FA, felon foot chase.

10      THE COURT:  Okay.

11      MS KOENIG:  Is that correct?

12      THE COURT:  Well, you can't ask him questions.

13      MS KOENIG:  I wanted just want to have it

14  verified to make sure that is, that is the video I

15  understand is his body camera.

16      THE COURT:  Let's look at the video, and she

17  can figure out from that whether it is, that is the

18  one she thinks about, or are we going to listen to

19  the video?

20      MR. ELLIKER:  The witness has identified the

21  disc as containing his body camera footage from that

22  evening.  And verified --

23      THE COURT:  Well, if it is different than the

24  one you have, you let me know and we will take care

25  of it.  Okay, Ms Koenig?

Collombo - direct

1        MS KOENIG:  Thank you, Your Honor.

2        MR. ELLIKER:  Play the first minute and seven

3   seconds of this clip:

4        (Being played).

5        THE COURT:  Is this after the chase starts?

6        THE WITNESS:  Yes.

7        THE COURT:  Going through the stop sign.

8   BY MR. ELLIKER:

9   Q    At first can you just put on the record what

10  the time code is at the top right corner, Officer?

11  A    2004557Z.

12       MR. ELLIKER:  Your Honor, I think with the

13  stipulation that makes it 9:45.

14       THE COURT:  All right.

15  BY MR. ELLIKER:

16  Q    Now, after the officers had the driver in

17  custody, what did you do, Officer?

18  A    I thought I observed something fall from his

19  hand.  I paced back and forth and looked for that.

20  Eventually we obtained Mr. Moore's I D.

21  Q    Did you find anything on the ground?

22  A    No.

23  Q    Did you end up standing near the driver while

24  he was in custody?

25  A    I did.

**JA0061**

Collombo - direct

1    Q    Okay.  Can we play from 206, play about a

2    three-minute clip?

3         (Being played).

4         All right.  So during that stretch did you ask

5    the driver of the car some questions, Officer?

6    A    I asked him for his name.

7    Q    Did he give any answer?

8    A    No.

9    Q    Where did you go following this clip we just

10   watched?

11   A    I walked down the street to his car.

12   Q    And when you got back to his car did you see a

13   gun on the floorboard?

14   A    I did.

15   Q    Officer Collombo, to your knowledge do you

16   know --

17        THE COURT:  Is that one gun or two guns?

18        THE WITNESS:  One gun, sir.

19        THE COURT:  What is the long thing?

20        THE WITNESS:  It is like pistol brace adapter.

21   You put a pistol inside of it, and it makes it like

22   a shorter fire brace.

23        THE COURT:  All right.  Thank you.

24   BY MR. ELLIKER:

25   Q    After handling the gun what did you do with it?

**JA0062**

Collombo - direct

1   A    I made it safe, and brought it to the police

2   car.

3   Q    If you could, look in the binder behind tab

4   six.  Do you recognize this?

5   A    I do.

6   Q    What is it?

7   A    That is a picture we took while doing property.

8   Q    Is that a true and accurate depiction of the

9   firearm that you took out of the defendant's car?

10  A    It is.

11       MR. ELLIKER:  Your Honor, we move exhibit six

12  into evidence.

13       MS KOENIG:  No objection.

14       THE COURT:  Hold on.

15       What was the one hundred?

16       THE WITNESS:  That would be a hundred guns that

17  my unit and I had gotten that year.

18       THE COURT:  Okay.  Thank you.

19  BY MR. ELLIKER:

20  Q    But I believe you had described earlier the

21  brace mechanism, that is what is shown on the left

22  side of the photograph with the firearm?

23  A    It is.

24  Q    Did you subsequently assist in the search of

25  Mr. -- of the defendant's vehicle?

**JA0063**

Collombo - cross

1    A     I did.

2    Q     From that point on did you speak with the

3    defendant at the scene of his arrest?

4    A     No.

5    Q     Your Honor, I don't have any other questions

6    for the officer.

7          THE COURT:  Cross examination?

8                     CROSS EXAMINATION

9    BY DFT COUNSEL:

10   Q     Good morning, Officer.

11   A     Good morning.

12   Q     I want to start with something you said on

13   direct examination, is that when you and the other

14   officers pulled up next to Mr. Moore you saw him

15   fiddling with something on the floorboard of his

16   car.  That is what you said on direct, right?

17   A     Correct.

18   Q     You went to the police academy, right?

19   A     I did.

20   Q     All right.

21         When did you go to the police academy?

22   A     Five and a half years ago.

23   Q     Okay.

24         At the police academy, they taught you how to

25   write police reports?

Collombo - cross

 1   A    Right.

 2   Q    You write search police reports for a lot of

 3   vehicles?

 4   A    Yes.

 5   Q    Stressed it's very important to make the police

 6   report as accurate as possible?

 7   A    Correct.

 8   Q    And that is because you have a lot of things

 9   going on as the police officer, right?

10   A    Sometimes.

11   Q    How many traffic stops have you made since

12   December 5 of 2020?

13   A    I don't have a number.

14   Q    More than a hundred?

15   A    Possibly.

16   Q    More than two hundred?

17   A    I don't know.

18   Q    You have a few things going on in your life,

19   right?

20   A    Yes.

21   Q    One of the reasons that you write a police

22   report is that when you are putting the information

23   in at the time that it happened it is fresh in your

24   mind, right?

25   A    Correct.

Collombo - cross

1   Q    And when it is fresh in your mind it is

2   accurate, right?

3   A    Correct.

4   Q    And the things that you put in your police

5   report are accurate, right?

6   A    Correct.

7   Q    And let's take a look at your police report.

8   Do you have it in front of you?

9   A    Yes.

10  Q    Let's look at the third page and you see this

11  is the narrative portion of your statement, right?

12  A    Yes.

13  Q    Look at the third line.  You wrote "The driver

14  slowed up before pulling on to the road and seen

15  manipulating something around his lap," right?

16  A    Yes.

17  Q    Where in the report do you write that you saw

18  him manipulating something on the floorboard?  You

19  can take your time.

20  A    May have been in this general area.

21  Q    Gesturing in your lap area?

22  A    Yes, right here.

23  Q    Let's go back to the Focus Mission Team.  You

24  graduated from the police academy 2015.  How long

25  have you been with the Focus Mission Team?

**JA0066**

Collombo - cross

 1   A    Three and a half years.

 2   Q    That is from today's date?

 3   A    Yes.

 4   Q    Okay.

 5        The focus of the Focus Mission Team is not

 6   enforcing Virginia traffic laws, right?

 7        THE COURT:  Unfortunately may not be, but the

 8   Supreme Court has said these kind of pre-textual

 9   stops are allowed.

10        MS KOENIG:  I think it is different than

11   pre-textual.  That is what I am getting at.

12        THE COURT:  All right.

13   BY MS KOENIG:

14   Q    The primary concern of the team is not making

15   sure everybody gets license plates renewed on time,

16   right?

17        THE COURT:  The Focus Mission Team is trying to

18   get guns off the street; is that right?

19        THE WITNESS:  One of many things; but yes, sir.

20        THE COURT:  All right.

21   BY MS KOENIG:

22   Q    And drugs, right?  Guns and drugs is the

23   primary focus?

24   A    Right.

25   Q    Correct.  And as the Judge was indicating, you

Collombo - cross

 1    all use traffic violations to pull people over,

 2    right?

 3    A     Sometimes.

 4    Q     You look, you do the traffic violation to pull

 5    people over to look for evidence of more serious

 6    crime, right?

 7    A     Correct.

 8    Q     And so in December 5 of 2020 you were working

 9    with the Fourth Precinct Focus Mission Team, right?

10    A     Correct.

11    Q     And that night you guys were out making a bunch

12    of traffic stops right?

13    A     A few, correct.

14    Q     And around 9:45 that night you were in a marked

15    police car, and you were the driver, right?

16    A     Correct.

17    Q     Officer Mills was in the front passenger seat,

18    right?

19    A     I don't recall who was sitting where.

20    Q     We will look at your body cam in just a minute.

21    Sergeant Spinos was behind you, right?  Officer

22    Williams behind Officer Mills, right?

23    A     Yes.

24    Q     And you guys were parked at the Family Dollar

25    Store in the Six Points Commercial area off of Lady

Collombo - cross

1    Street, right?

2    A    It's right across from the Exxon.

3    Q    And so I am going to bring your attention,

4    there is a thicker folder in front of you.  If you

5    look at exhibit C for me.

6         THE COURT:  C?

7         MS KOENIG:  C as in cat or Charlie.

8         THE COURT:  All right.

9    BY MS KOENIG:

10   Q    Do you recognize the area depicted in this map?

11   A    Yes.

12   Q    Is this the general vicinity of where you all

13   were parked at 9:45 p.m. on December 5 of 2020?

14   A    Yes.

15        MS KOENIG:  Your Honor, I move admission of

16   this, exhibit C.

17        THE COURT:  Admitted.

18   BY MS KOENIG:

19   Q    It is dark outside, right?

20   A    Correct.

21   Q    Family Dollar Store is right across the street

22   from a Sunoco gas station, right?

23   A    Correct.

24   Q    You see Mr. Moore coming out of the gas

25   station; is that right?

**JA0069**

Collombo - cross

```
 1   A     Correct.

 2   Q     And he is a very tall black man, right?

 3   A     I mean he is tall -- I can't recall.  I think I

 4   just saw him in the car.

 5   Q     Okay.  Any way, he gets in his car, right?

 6   A     In the car.

 7   Q     And he pulls out of the parking lot at the gas

 8   station, right?

 9   A     Correct.

10   Q     And that's at Brookland Park and Third Avenue,

11   right, where he pulled out, right?

12   A     Yes.

13   Q     And you see him making this movement near his

14   lap, right?

15   A     Correct.

16   Q     And you immediately get behind him, right?

17   A     I think then we pull into the Dollar Store.

18   Q     You think you pulled in to the Dollar Store?

19         Go back to your report, Officer Colombo.  Maybe

20   that will help refresh your recollection.  Look at

21   third and fourth line of page three of your report.

22   Do you see that it says officers pulled around in

23   the parking lot, observed the vehicle pull on to the

24   street, and then pulled behind it?

25   A     Yes.
```

Collombo - cross

 1  Q    You didn't detour back into the Family Store,

 2  right?

 3  A    No, I was saying I saw it -- I was thinking we

 4  passed by him, pulled in the parking lot, he pulled

 5  out and we pulled out.

 6  Q    Pulled out behind him after he have pulled out?

 7  A    Correct.

 8  Q    All right.

 9       And you notice that the temporary tag is 111

10  34Y, right?

11  A    Correct.

12  Q    Which, as you have indicated, is the same

13  number as the two other temporary tags you pulled?

14  A    Correct.

15  Q    That is when you turn the flashing lights on,

16  right?

17  A    Correct.

18  Q    Flashing lights indicate to the person that you

19  are signaling to, they are supposed to pull over,

20  right?

21  A    Correct.

22  Q    All right.

23       One of the things from your time at the police

24  academy, you had to learn the criminal laws of

25  Virginia so you know what elements of crime people

Collombo - cross

1    could be charged with, right?

2    A    Right.

3    Q    You had to learn punishments that Virginia law

4    allows for crimes, right?

5    A    Yes.

6    Q    And you have to learn types of traffic laws

7    that Virginia has, so, again you know the elements

8    of those traffic laws, right?

9    A    Yes.

10   Q    Again the punishment, right?

11   A    Yes.

12   Q    And you had to learn about the procedural laws

13   of Virginia so you know what your obligations are

14   under those laws, right?

15   A    Yes.

16   Q    As well as the Federal Constitutional

17   obligations that you have to use, right?

18   A    Yes.

19   Q    In Virginia it is a crime to disregard a signal

20   from a law enforcement officer to stop, right?

21   A    Yes.

22   Q    That is what we call eluding, right?

23        THE COURT:  Called what?

24        MS KOENIG:  Eluding.

25        THE COURT:  All right.

**JA0072**

Collombo - cross

 1   BY MS KOENIG:

 2   Q    And that Virginia code section is 46.2-87?

 3   Does that sound right?

 4   A    I don't know right off the top of my head.

 5   Q    All right.

 6        But any way, that code section criminalizes

 7   anybody who is made aware that there is a police

 8   officer trying to pull them over and they don't

 9   stop, right?

10   A    Yes.

11   Q    And that is a class two misdemeanor?

12   A    I would have to read it.

13   Q    Okay.  All right.

14        But any time, the point is, that any time you

15   turn your flashing lights on in a police car and

16   person you are signaling doesn't pull over, they

17   committed a crime, right?

18   A    Correct.

19   Q    All right.

20        Go back to the other two stops that you made

21   that night, was the same temporary tag.  Again, you

22   are in a parked police car that night, same sitting

23   position we have already gone over, right?

24   A    Yes.

25   Q    And at the time of the first stop of the driver

**JA0073**

Collombo - cross

```
 1   with same temporary tags you are in the driver seat,

 2   right?

 3   A    Yes.

 4   Q    And you have got body-worn camera on, right?

 5   A    Correct.

 6   Q    And you didn't -- if we can pull up what has

 7   been marked as exhibit U 3.

 8        THE COURT:  "U?"

 9        MS KOENIG:  "U" as in umbrella.  Your Honor.

10        THE COURT:  Not on mine.

11        MS KOENIG:  It is a disc, and we have the -- if

12   I could hand this to the witness, please.

13        If we can pull up exhibit 3.  We may need to

14   switch over to the defense computer.  All right.

15        So, Officer Collombo, from this body camera we

16   see that this person is in the driver seat, right?

17   A    Yes.

18   Q    And you are in the driver's seat?

19   A    Yes.

20   Q    All right.

21        So, did you also know that other officers had

22   body camera footage at the same traffic stop?

23   A    If they were with me, we all turned them on --

24   most of the time.

25   Q    Did you write a report of this traffic stop?
```

**JA0074**

Collombo - cross

1    A    No.

2    Q    All right.

3         Do you have any independent recollection of

4    this particular traffic stop?

5    A    I reviewed the body cam.

6    Q    So if -- what is in the body cam is what you

7    remember, right?

8    A    Yes.

9    Q    All right.

10        Your Honor, I move to admit exhibit U 3.

11        THE COURT:  Objection?

12        MR. ELLIKER:  No objection, Your Honor.

13        THE COURT:  Admitted.

14   BY MS KOENIG:

15   Q    All right.

16        Let's pull it up to 54 seconds into the video,

17   which is based on the time stamp on the bottom left

18   screen.

19   A    All right.

20   Q    So once the car is pulled over you approached

21   the driver, right?

22   A    Yes.

23   Q    And the driver is a young black man, right?

24   A    Yes.

25   Q    And you tell him --

Collombo - cross

```
 1        THE COURT:  Involved the Cadillac; is that
 2   right?
 3        THE WITNESS:  Say what, sir?
 4        THE COURT:  This is the stop of the Cadillac?
 5        THE WITNESS:  Yes, sir.
 6        THE COURT:  Okay.
 7   BY MS KOENIG:
 8   Q    You say, "okay, listen, your tags, you can't
 9   read them at all."  Is that what you tell him?
10   A    I believe so.
11   Q    All right.
12        At that time were you aware that Officer Mills
13   had already typed in the license plate number while
14   you all were driving before you pulled him over?
15   A    There is a --
16        THE COURT:  The question is, did you know the
17   other officers had typed in the license plate
18   number?
19        THE WITNESS:  I wasn't sure if he did that or
20   dispatch did.
21   BY MS KOENIG:
22   Q    Did you have like a license plates reader on
23   the car?
24   A    No.
25   Q    Somebody has to have provided that information,
```

**JA0076**

Collombo - cross

1    right?  Dispatch is not out on the scene, right?

2    A    Correct.  When you make a traffic stop and call

3    Virginia tag 111 34Y we are at this location,

4    eventually when they generate a call or report

5    number and it comes on the computer, that

6    information that we gave will come up.

7    Q    Okay.

8         So, the reason that you pulled this man over

9    was that he didn't have headlights on, right?

10   A    I don't recall.

11   Q    All right.  We will get it through somebody

12   else.

13        Go to one minute and ten seconds on the bottom

14   left time frame.  Let's play this.  Until 116.

15        (Being played).

16        Let's stop it just a minute.

17        Does the audio come off the microphone?

18        THE COURT:  I can barely hear it.  Go ahead.

19   BY MS KOENIG:

20   Q    Let's go back again to one minute and ten

21   seconds in.  And play it until I say "stop."

22        See if this helps.

23        (Being played).

24        Let's stop.

25        Could you hear that, Officer Collombo?

**JA0077**

Collombo - cross

1    A    Yes.

2    Q    You asked the gentleman if he had any drugs or

3    weapons, right?

4         THE COURT:  I thought he asked what his name

5    was.

6    BY MS KOENIG:

7    Q    Okay.  Let's keep playing.

8         (Being played).

9         Let's go back to 105.

10        Let's go back to one minute.

11        Let's play from here.

12        (Being played)

13        Stop.

14        So you asked him if he had any weapons in the

15   car, right?

16   A    Correct.

17   Q    He said, "No, hell no."  Right?

18   A    Correct.

19   Q    You said, it is just something that I like to

20   ask.  It is not illegal, right?

21   A    Yes.

22   Q    And then you will get his name and social

23   security number, right?

24   A    I believe so, yes.

25   Q    And then let's play again at 140 to 150.

**JA0078**

Collombo - cross

1        (Being played)

2        What we just looked at was your flashlight,

3   right?

4   A    I would have to watch again.

5   Q    Let's go back.

6        THE COURT:  It was his flash light.  I can see

7   that.

8   BY MS KOENIG:

9   Q    You are using your flashlight to look in the

10  other interior parts of the car, right?

11  A    Yes.

12  Q    After you that you go back to your police car,

13  right?

14  A    Yes.

15  Q    You type the driver's information into the

16  computer in the car, right?

17  A    Yes.

18  Q    And you start looking up various data bases you

19  all have access to, right?

20  A    I believe it just one data base, but yes.

21  Q    And you find out that the driver has been

22  charged with driving on suspended at least three

23  times before, right?

24  A    I don't know if I saw that.

25  Q    Go to two minutes and 58 seconds in to the

Collombo - cross

1    video.

2         (Being played).

3         All right.

4         In the lower right hand side do you see where

5    it says right there, right where you marked it.  It

6    says third offense within ten years.

7    A    Okay.

8    Q    Right?  That means that is what your computer

9    told you, right?

10   A    Okay.

11   Q    Is that -- obviously been driving on suspended

12   a few times, is that fair?

13   A    Yes.

14   Q    All right.

15        So, you also know that in the State of Virginia

16   it is a crime to drive while your license is

17   suspended, right?

18   A    Yes.

19   Q    While you are in the car you also put the car

20   VIN number into the car, right?

21   A    I believe so.

22   Q    You see that the VIN comes back to the right

23   car, right, it is listed as a white Cadillac, right?

24   A    Yes.

25   Q    You saw the car has been sold, right?

**JA0080**

Collombo - cross

```
 1   A    Yes.

 2   Q    You go back up and talk to the driver, right?

 3   A    Yes.

 4   Q    And he asked you if you can just park the car

 5   and find a ride home, right?

 6   A    Yes.

 7   Q    And you tell him he is good to go, right?

 8   A    I believe so.

 9   Q    You didn't get any evidence that the driver

10   knew that the tags didn't come back to his car,

11   right?

12   A    I think he said something like he just got it.

13   Q    Sure.  But he doesn't indicate to you in any

14   way that he knows the tags doesn't come back to his

15   car, right?

16   A    Yes.

17   Q    And you don't give him a ticket?

18   A    Right?

19   Q    Don't give him a summons?

20   A    Correct.

21   Q    You let him go?

22   A    Yes.

23   Q    So the guy has been driving on a suspended, no

24   ticket, right?

25   A    Yes.
```

**JA0081**

Collombo - cross

1    Q    No headlight, right?

2    A    Correct.

3    Q    And he has got expired tag, too, right?

4    A    Yes.

5    Q    Nothing.  No ticket, right?

6    A    Correct.

7    Q    All right.

8         Let's turn to the second stop that you all made

9    with the temporary tag that same night.

10        So, again, you are in a marked police car that

11   night with Officer Mills, Sergeant Spinos and

12   Officer Williams, right?

13   A    Yes.

14   Q    The time of the second stop you are again in

15   the driver seat, right?

16   A    Yes.

17   Q    And did you know that other officers also had

18   body cam of that same stop?

19   A    Yes.

20   Q    Did you write a report for this traffic stop?

21   A    I don't believe so.

22   Q    You all pulled her over because you thought the

23   tags were expired, right?

24        Or you don't remember?

25   A    I don't remember like what the actual reason

Collombo - cross

1    was at the time.

2    Q    Fair enough.

3         So let's go back to the stop itself.  When you

4    first talk to the driver of car she told you she had

5    to break her window out because she lost her keys in

6    the car, right?

7    A    Yes.

8    Q    At the time you are talking to the driver you

9    saw, I think this is Government's exhibit 4 --

10         THE COURT:  On the other side looking in the

11    car vigorously with his flashlight.  I saw that.

12         MS KOENIG:  Thank you, Your Honor.

13    BY MS KOENIG:

14    Q    Sergeant Spinos is out looking at the VIN

15    number on the license plate tag, right?

16    A    Yes.

17    Q    And he goes up to the front of the car and

18    checks the VIN number on the front windshield of the

19    car, right?

20    A    Yes.

21    Q    And they match, right?

22    A    Yes.

23    Q    And you tell her, this is weird.  And you let

24    her go saying, all right, ma'am, you just have a

25    good safe night, right?

Collombo - cross

```
 1   A    Yes.
 2   Q    Again, there is no evidence that this driver
 3   knew that the tags did not come back to her car,
 4   right?
 5   A    No.
 6   Q    And you didn't give her a ticket, right?
 7   A    No.
 8   Q    No summons?
 9   A    No.
10   Q    No nothing?
11   A    Nope.
12   Q    So let's get back to you all pulling behind
13   Mr. Moore.  Again, just left the station parking
14   lot, right?
15   A    Yes.
16   Q    You turn your flashing lights on and pull him
17   over within one block, right?
18   A    Yes.
19   Q    You didn't run the tags this time, right?
20   A    I don't know if myself or if Officer Mills did.
21   I don't know.
22   Q    You are relying on the other two times that you
23   all had run the tags that night right?
24   A    Yes.
25   Q    And at the time that you turn on the emergency
```

**JA0084**

Collombo - cross

1    lights to pull over the driver of the white Chrysler

2    300 you all had no evidence that that driver knew

3    that his tags were on the wrong car?

4    A    Correct.

5    Q    Okay.

6         Before the night of December 5, 2020 have you

7    ever seen Keith Moore before?

8    A    I don't believe so.

9    Q    Did you know anything about him that night?

10   A    No.

11   Q    You just knew he was a black man driving a car

12   fiddling with something in his lap, right?

13   A    I just knew he was operating the vehicle with

14   the wrong tag.

15   Q    No further questions.

16        THE COURT:  That is it?

17        MS KOENIG:  That is it.

18        THE COURT:  So can you tell me where we are

19   going with all this?  I would like to know what the

20   strategy is.

21        MS KOENIG:  What we have, Your Honor, is we

22   have gotten quite a bit of evidence that what the

23   Focus Mission Team does is pull people over for

24   purportedly minor violations and they search the

25   car.

Collombo - cross

1      THE COURT:  And they what?

2      MS KOENIG:  Search the car every time.

3      THE COURT:  Right.

4      MS KOENIG:  When they do that they either find

5  something or they don't.

6      THE COURT:  Right?

7      MS KOENIG:  And so they prolong the stop,

8  actually commit a number of other Constitutional

9  violations in the process -- we will see a few of

10  those -- but what happens is there is nothing that

11  they develop that indicates before they pull

12  Mr. Moore over that they would have known that he or

13  they had probable cause to know that he knew the

14  tags were violated.  They let the other two people

15  with the same number go that night with no warning,

16  no ticket, no nothing --

17      THE COURT:  Wait a second.  How much probable

18  cause do they need?  They have got three identical

19  tags.  You know something is afoot.

20      MS KOENIG:  Well, that is a hunch, Your Honor.

21      THE COURT:  No, it is not a hunch.  I don't

22  think -- I will take judicial notice D M V doesn't

23  issue the same tags in triplicate.

24      MS KOENIG:  Your Honor, what happens is the

25  statute that is, that requires -- let me get back to

**JA0086**

Collombo - cross

1    my desk and get the right folder -- the statute that

2    requires, that criminalizes, makes it a traffic

3    violation for somebody to pull somebody over for

4    having a tag is Virginia code 46.2-612.  And that

5    criminalizes someone who knowingly is displaying a

6    false tag.  Simply displaying a false tag is not a

7    crime.

8        THE COURT:  Well, okay.  So -- all right.  And

9    so, the guy is driving along with false tag.  Aren't

10   they allowed to stop him to see if he -- and say, is

11   that, did you know that a false tag, or to say -- or

12   to investigate it?

13       MS KOENIG:  Well, the law requires that they

14   have to have probable cause that someone has

15   committed a traffic violation.  You don't have some

16   pieces of an element of a crime.  You have to have

17   probable cause on all the pieces.  The key word

18   here --

19       THE COURT:  You have to have probable cause to

20   think somebody -- not that they are guilty, but that

21   they essentially might have committed a traffic

22   violation.

23       MS KOENIG:  Well, sure, but that is not what we

24   have here.  We have got the -- we have the --

25       THE COURT:  I understand your point.  All

**JA0087**

Collombo - cross

1    right.

2         MS KOENIG:  Thank you, Your Honor.

3         THE COURT:  Thank you.

4         Ms Brightwell, will you do me a favor, please,

5    and go get me the file on the Interior Molded Doors

6    case off the window in my office and bring it back.

7         Never mind, he has got it.  Thank.

8         All right.

9         Let's pause for a second.  Is everybody here on

10   the Interior Molded Doors case?

11        Mr. Shumadine.

12        MR. SHUMADINE:  I am here.

13        THE COURT:  You are here, but anybody else on

14   the other side?

15        AUDIENCE MEMBER:  Good morning, Your Honor,

16   Bill Reiss.  Two of my colleagues are supposed to be

17   here as well.

18        THE COURT:  Why not see if they are here.  I

19   will take you up.  Here come a bunch of folks.

20        AUDIENCE MEMBER:  One is coming.

21        MR. SHUMADINE:  Mr. Williams is here, too, Your

22   Honor.

23        THE COURT:  All right.  Get up here.

24        MR. ELLIKER:  I have maybe two questions for

25   redirect before we could release Officer Collombo.

**JA0088**

Collombo - redirect

1          THE COURT:  Go ahead and ask the questions.

2                    REDIRECT EXAMINATION

3   BY MR. ELLIKER:

4   Q    Officer Collombo, in the video where you had

5   told the driver of the Cadillac, we can't see your

6   tags at all, do you recall what you meant by that?

7   A    I said that something is probably covering it,

8   or if they have something like a, one of the plate

9   covers or sometimes they put it in something

10  glossy-like film.  I don't recall.

11  Q    Then when you say that you let him go, did you

12  actually let the driver of the Cadillac drive away

13  from the scene?

14  A    No.  He said he would park it.  Had a bunch of

15  kids' gifts in there.

16         THE COURT:  Had a bunch of what?

17         THE DEFENDANT:  His kids' gifts.  They went

18  shopping.  So I wasn't going to do anything with the

19  car.

20  BY MR. ELLIKER:

21  Q    Second driver who you did let drive away, I

22  believe you said, and you could hear there is a baby

23  in the car at that time?

24  A    Yes.

25  Q    Did either of the first two drivers evade

**JA0089**

Collombo - redirect

1   police?

2   A    No.

3   Q    That is all I have.

4        THE COURT:  Thank you.

5        Let's take a recess on this case.  You can

6   stand aside.

7                  (Witness stood aside)

8                    (A recess was taken)

9        THE COURT:  All right, Mr. Elliker, let's go,

10   buddy.  Where is your opponent, the other side?

11        MS KOENIG:  My client had to go to the

12   bathroom, Your Honor.  And the one on this floor is

13   closed.  He is coming right back.

14        MR. ELLIKER:  I wanted to confirm that Officer

15   Collombo could be released.

16        THE COURT:  Yes, he may.  Unless you need him

17   to stay, ma'am.

18        MS KOENIG:  I don't.

19        MR. ELLIKER:  Okay.  Thank you.

20        THE COURT:  Is this going to take all day,

21   ma'am?

22        MS KOENIG:  Your Honor, the next witness is my

23   longest.  Unless there is questioning -- the other

24   three government witnesses -- I don't know about the

25   fourth one -- are probably fairly short.  And I have

Mills- direct

1    one relatively short witness.

2         THE COURT:  Okay.  Thank you.

3         MS KOENIG:  We are ready, Your Honor.

4         THE COURT:  Call your next witness.

5         MR. ELLIKER:  Officer Keegan Mills.

6         If you don't mind switching us back over.

7         THE CLERK:  Oh, yes.

8         THE COURT:  The name of the witness?

9         MR. ELLIKER:  Officer Mills.  M-I-L-L-S.

10                       KEEGAN MILLS

11           AFFIRMED AND TESTIFIED AS FOLLOWS:

12         THE COURT:  Thank you for coming today, Officer

13    Mills.  I appreciate it.

14                    DIRECT EXAMINATION

15    BY MR. ELLIKER:

16    Q    Sir, please state your name for the record.

17    A    Officer Keegan Mills, Richmond Police.

18    Q    Officer Mills, are you assigned to the Fourth

19    Precinct Focus Mission Team?

20    A    Yes.

21    Q    Were you so assigned on December 5 of 2020?

22    A    Yes.

23    Q    That evening did you see the same temporary tag

24    on three different vehicles?

25    A    Yes.

**JA0091**

Mills- direct

1    Q    There is a skinny binder in front of you.  I

2    think under the one that is opened.

3        If you could you flip to tab one, which has

4    already been admitted as exhibit 1.

5        Does this image show the first car that your

6    team pulled over that night with the temporary tag?

7    A    Yes, sir.

8    Q    If you could flip to tab three.  This is

9    already admitted as exhibit 3.  Does this show the

10   second car that you pulled over that evening with

11   that temporary tag?

12   A    Yes, sir.

13   Q    Now, what happened when you tried to pull over

14   the third car with the temporary tag?

15   A    It didn't stop.  It continued driving until the

16   intersection of Second and Custer, it ran into the

17   curb there.  And the driver then took off on foot.

18   Q    Did you activate body-worn camera during that

19   event?

20   A    Yes, sir.

21   Q    Have you had an opportunity to review the

22   footage of your recording before today?

23   A    I have.

24   Q    There should be a disk in front of you marked

25   exhibit Government exhibit 7.

Mills- direct

1   A    Yes, sir.

2   Q    You recognize that disc?

3   A    Yes.

4   Q    Does that contain the recording of your

5   body-worn camera footage from that incident?

6   A    Yes.

7        MR. ELLIKER:  Your Honor, we would move 7 into

8   evidence.

9        MS KOENIG:  No objection.

10       THE COURT:  Admitted.

11  BY MR. ELLIKER:

12  Q    If we could please play from the beginning of

13  exhibit 7 until the 225 marker on the video.

14       (Being played).

15       Who was the officer that was standing with you

16  at the end of that video?

17  A    Office Collombo.

18  Q    During the clip we just watched did you ask the

19  driver some questions?

20  A    Yes.

21  Q    Did he give you any answers?

22  A    No.

23  Q    Now, what did you do following where we just

24  paused?

25  A    I made contact with officers who were at the

**JA0093**

Mills- direct

1    vehicle scene, the crash, to find out specifically

2    what they had seen in the vehicle.

3    Q    What did you learn they found in the car?

4    A    A firearm.

5    Q    Let's pick up at 326 on this video and play

6    until 425.

7        (Being played).

8        All right.  Officer Mills, what did Officer

9    Collombo hand you at the end of that clip?

10   A    Identification card for Mr. Keith Moore.

11   Q    What did you do with the identification card?

12   A    I went back to the police vehicle, ran that

13   information on the computer that we have there.  I

14   also called teletype so they could run a check of

15   his record to see if he was a convicted felon or

16   not.

17   Q    During those checks did you learn the defendant

18   is in fact a convicted felon?

19   A    Yes, I did.

20   Q    Let's pick up at 1020 and play until 1112.

21       (Being played).

22       What are you doing at this point, Officer?

23   A    He is going to be transported to Richmond City

24   Jail.  I had to perform a search of his person

25   incident to that arrest.

Mills- direct

1   Q    Was he being cooperative?

2   A    Yes.

3   Q    Was he speaking with you?

4   A    Yes.

5   Q    Did you ask him any questions about the gun?

6   A    No.

7   Q    Did you ask him any questions about the car?

8   A    No.

9   Q    Let's pick up and play at 1215 for about 20

10  seconds to 1236.

11       (Being played).

12       So what is the defendant asking you to do in

13  this clip, Officer?

14  A    He wanted me to give his wallet to someone

15  else.  So I had to look through it before I did

16  anything like that.

17       He asked me to look through it in front of him.

18  Q    Whose wallet did he say it was you were

19  holding?

20  A    His girl's.

21  Q    Did you do as he asked?

22  A    Yes.

23  Q    All right.

24       Let's play again for another ten or 15 seconds.

25       (Being played).

**JA0095**

Mills- direct

1          So who is this individual that the defendant

2     identified who just walked up?

3     A     His cousin.

4     Q     And at this point did you overhear the

5     defendant speaking to his cousin?

6     A     Yes.

7     Q     Let's play until 1320, please.

8          (Being played)

9          While the cousin -- while the defendant was

10    talking to his cousin did you hear him tell his

11    cousin that someone must have been telling on him?

12    A     Yes.

13    Q     Let's go ahead and play until 1343.

14         (Being played)

15         Did you hear him say someone was telling on

16    him?

17    A     Yes, sir.

18    Q     And do recall what you did with the defendant's

19    Girlfriend's wallet?

20    A     I believe I put it back on his person.

21    Q     Let's play until 1404, please.

22         (Being played)

23         All right.  So after this interaction did you

24    assist in loading the defendant into the transport

25    vehicle?

Mills- direct

1    A    Yes.

2    Q    During all of your interactions with the

3    defendant here at the stop where he was apprehended,

4    did you ask him any questions about the gun?

5    A    I don't believe so.

6    Q    Did you ask him any questions about his car?

7    A    No, sir.

8    Q    From the time that you stopped the defendant --

9    well, I just asked you that -- let's move forward in

10   time a little.  Did you encounter the defendant at

11   lockup?

12   A    Yes.

13   Q    While at lockup did you overhear the defendant

14   make statements about the gun?

15   A    Yes.

16   Q    At any time during the conversation did that,

17   did the defendant tell you he did not want to answer

18   any questions?

19   A    I don't believe he did.

20   Q    Did he tell you I want to remain silent?

21   A    No.

22   Q    Was the defendant talkative with police at

23   lockup?

24   A    Yes.

25   Q    Did you have your body-worn camera activated

**JA0097**

Mills- direct

 1   during a portion of this interaction?

 2   A    Yes.

 3   Q    Have you reviewed that recording before today's

 4   hearing?

 5   A    Yes.

 6   Q    There should be a disk marked Government's

 7   exhibit 8.

 8   A    Yes, sir.

 9   Q    Do you recognize this disc?

10   A    Yes.

11   Q    Does that contain the recording of your body

12   camera from the interaction with the defendant at

13   lockup?

14   A    Yes, it does.

15       MR. ELLIKER:  Your Honor, we move exhibit 8

16   into evidence.

17       MS KOENIG:  Your Honor, again asking for the

18   title.  I don't believe I have that.

19       MR. ELLIKER:  You do.  It's called "lockup."

20       MS KOENIG:  I don't.

21       THE COURT:  All right.  Let's take a

22   three-minute break while you sort this out.

23                     (recess)

24       THE COURT:  Have you figured out what the

25   problem was with the exhibit?

**JA0098**

Mills- direct

1       MS KOENIG:  We have.

2       No objection to exhibit 8.

3       THE COURT:  Sorry.  What?

4       MS KOENIG:  No objection to exhibit 8.

5       THE COURT:  Okay.  Let's go ahead.

6       MR. ELLIKER:  Again just to --

7       THE COURT:  So we are down at the lockup now.

8   BY MR. ELLIKER:

9   Q    All right.

10       Can we play from the marker 533 until marker

11   630.

12       (Being played).

13       Officer, during this clip did the defendant

14   tell you and the other officers that the gun didn't

15   shoot?

16   A    Yes.  It hasn't been shot.

17   Q    Why did officers ask Mr. -- ask the defendant

18   if the gun had been, if they could swab his hands

19   for gun powder residue?

20   A    I think to see what he would say, but it is in

21   reference to a reported earlier incident in the same

22   area around the 3100 block of Meadowbridge, I

23   believe, involving a Chrysler that was involved in a

24   random gunfire, we call it.  A shooting, basically.

25       MR. ELLIKER:  No other questions for Officer

**JA0099**

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 114 of 496

Mills - cross

1   Mills.

2        THE COURT:  All right.

3        Was this car a Chrysler?

4        THE WITNESS:  Yes, sir.

5        THE COURT:  Okay.  All right.

6        Ms Koenig.

7                CROSS EXAMINATION

8   BY MS KOENIG:

9   Q    Good morning, Officer Mills.

10  A    Good morning.

11  Q    You all at the police department have the

12  ability to do -- well, you have access to a forensic

13  lab, right?

14  A    Yes.

15  Q    And so the shooting that you are referring to,

16  there were ballistics that were sent off from the

17  gun that was found in the white Chrysler Mr. Moore

18  was pulled over in, right?

19  A    Correct.

20  Q    And the gun, the evidence of the bullets that

21  were collected from the Meadowbridge area did not

22  match up to the gun that was found in Mr. Moore's

23  car, right.

24  A    I don't know.

25  Q    Okay.

**JA0100**

Mills - cross

1        THE COURT:  Well, are you saying that at the
2    time they were asking this question they knew about
3    this gun, about the bullets from the Meadowbridge
4    shooting?
5        MS KOENIG:  I was just asking that there is no
6    factual evidence that links the two together.
7        THE COURT:  All right.  Okay.
8    BY MS KOENIG:
9    Q    All right, Officers Mills.
10       So, on December 5 of 2020 you were working on
11   Fourth Precinct Focus Mission Team, right?
12   A    Yes.
13   Q    And the Fourth Precinct is one of four
14   precincts in Richmond, right?
15   A    Correct.
16   Q    And I want you to look in the bigger black
17   binder in front of you at the tab that is marked X.
18       THE COURT:  Say what?
19       MS KOENIG:  X.
20       THE COURT:  X.
21       MS KOENIG:  X as in as Xylophone.
22       THE COURT:  X marks the spot.
23   BY MS KOENIG:
24   Q    That's right.
25       If you could look at the four images that are

**JA0101**

Mills - cross

1    in there.  That's 1, X 2, and X 3 and X 4.

2    A    All right.

3    Q    Do you recognize those images as the rough map

4    of the Fourth Precinct, the four police precincts in

5    Richmond?

6    A    Yes.

7    Q    X 1 is first precinct; is that right?

8    A    I believe so.

9    Q    X 2 is second precinct?

10   A    Yes.

11   Q    X 3 is the third precinct.

12   A    Yes, ma'am.

13   Q    X 4 is the fourth Precinct?

14   A    Yes.

15   Q    I move for admission of X 1 through 4.

16        THE COURT:  Admitted.

17   BY MS KOENIG:

18   Q    Look again at Fourth Precinct.  So that was

19   your area that night, right?

20   A    Yes.

21   Q    And the Fourth Precinct is essentially bounded

22   on the left hand side by where 95 runs through

23   downtown Richmond?

24   A    I guess so, ma'am.

25        THE COURT:  What are we looking at.  Four?

Mills - cross

1    BY MS KOENIG:

2    Q    That thick blue line that runs across Belvedere

3    Street, where 95 guess through?

4         THE COURT:  Yes.

5    A    You are asking?

6    Q    Yes.

7    A    Yes.

8    Q    On the right hand side, the area where the

9    yellow and the, sort of each meet, that is the Six

10   Points Commercial, right?

11   A    I don't believe so.

12   Q    Sorry.  Above there.  Where Brookland and Dill

13   meet up?

14   A    Right around there.

15   Q    And then on the north hand side the Fourth

16   Precinct boarded by Henrico County?

17   A    Yes, ma'am.

18   Q    South side of the precinct goes a little bit

19   below Broad Street downtown, right?

20   A    Yes.

21   Q    On December 5 of 2020 you are working with the

22   Fourth Precinct Focus Mission Team, and you guys

23   were making traffic stops, right?

24   A    Yes, ma'am.

25   Q    And when you make a traffic stop you are

Mills - cross

1    calling in on your radio in the car to let the

2    dispatchers know what you all are doing, right?

3    A    Yes, ma'am.

4    Q    And that information that you call in gets put

5    into a data base, right?

6    A    There is a record of it, I believe.

7    Q    A record is made?

8    A    Yes.

9    Q    And the record that you all keep at the

10   Richmond Police Department are called the I-Net

11   Viewer, right?

12   A    I am not familiar with that.  I have heard that

13   name before.

14   Q    The police car you were in that night had a

15   police department computer in it, right?

16   A    Yes.

17   Q    Information that you type into the police

18   department computer ends up in the incident report,

19   right?

20   A    Yes.

21   Q    Okay.

22        Let's look at exhibit J.  A few pages, so go

23   ahead and scan, especially page, the third page.

24   You recognize your name on the third page?

25        THE COURT:  Wait a second.  This is -- it

**JA0104**

Mills - cross

1    says --

2         MS KOENIG:  At the top, Your Honor, it says

3    202012050485 dash TS, and then it indicates traffic

4    stop that was officer-initiated.

5         THE COURT:  At Letcher and Highland.

6         MS KOENIG:  That's correct.

7         THE COURT:  All right.  Where does it say his

8    name?

9         MS KOENIG:  In the --

10        THE COURT:  Okay.

11        MS KOENIG:  -- seventh column over, Your

12   Honor --

13        THE COURT:  Okay.

14        MS KOENIG:  -- part of the way down.

15   BY MS KOENIG:

16   Q    Officer Mills, do you see that this is a record

17   that reflects stop that you and Officer Williams

18   had made that night?

19   A    Yes, ma'am.  Yes, ma'am.

20   Q    Okay.  Sorry.  Didn't hear what you said.

21        So, in this stop where it says 20201205 and

22   then 0485, that indicates that this is the 485th

23   incident from December 5 of 2020; right?

24        MR. ELLIKER:  Your Hoor, this exhibit has not

25   been admitted.

Mills - cross

1          THE COURT:  What?

2          MR. ELLIKER:  This exhibit has not been

3     admitted.

4          MS KOENIG:  I move its admission.

5          MR. ELLIKER:  The witness said he is not

6     familiar with the --

7          THE COURT:  I think she is laying a foundation

8     for it.

9          Go ahead.  Finish the foundation and tell us

10    what thing is.

11         MS KOENIG:  Thank you, Your Honor.

12         So, this, the number at the top reflects the

13    date that the stop happened as well as incident

14    number, right?

15    A    Yes.

16    Q    Okay.

17         And then indicates it is a traffic stop that

18    was initiated by officers, right?

19    A    Yes.

20    Q    And it happened at Letccher Avenue and Highland

21    Avenue in Richmond, right?

22    A    Yes.

23         THE COURT:  This is a record kept by the police

24    department, right?

25         MS KOENIG:  That's correct, Your Honor.  It's a

**JA0106**

Mills - cross

1    certified copy from Richmond Police Department.

2          Move for admission, Your Honor.

3          THE COURT:  Well, sir, this is a record kept by

4    the police department, right?

5          THE WITNESS:  As far as I know, Your Honor.

6          THE COURT:  All right.

7          It is admitted.

8          Did you want to object to that, Mr. Elliker?

9          MR. ELLIKER:  I may save my powder for

10   relevance, Judge.

11         MS KOENIG:  Let's look now at exhibit Q.

12         THE COURT:  Exhibit what?

13         MS KOENIG:  "Q" as in quick.

14   BY MS KOENIG:

15   Q    So Officer Mills, when you are on duty with the

16   Richmond Police Department you are required to have

17   a body-worn camera, right?

18   A    Yes.

19   Q    You all use the Axon body-worn camera, right?

20   A    Yes.

21   Q    When you get back to the police department at

22   the end of the shift you download the videos that

23   were, that you made on your shift that night, right?

24   A    Yes, ma'am.

25   Q    When you are downloading them, you have type in

**JA0107**

Mills - cross

1    a title, right?

2    A    Yes, ma'am.

3    Q    And that way you can then later pull them up if

4    you need to, right?

5    A    Yes.

6    Q    Will you look at exhibit Q for me.

7         Is this the record of the videos that you

8    downloaded on December 5 in early morning hours of

9    December 6 of 2020?

10   A    Looking at the wrong one.

11        Yes, ma'am.

12   Q    Okay.

13        So let's look at the last event on page 1 of

14   exhibit Q.  It indicate that the ID number is

15   20201205 dash 0485, right?

16   A    Yes, ma'am.

17   Q    That Is the same number when we look back

18   through to exhibit J, right?  That's the same number

19   as listed on the top of that exhibit, right?

20   A    Yes, ma'am.

21   Q    Okay.

22        And then it indicate that you downloaded the

23   video, right?

24   A    Yes, ma'am.

25   Q    And you titled video TS, and then it has a

Mills - cross

1    number, right?

2    A    Yes, ma'am.

3    Q    And then it has BM, right?

4    A    Yes.

5    Q    No lights.  Right?

6    A    Yes, ma'am.

7    Q    3000 Meadowbridge?

8    A    Correct.

9    Q    So, let's go back to exhibit J.  Do you see at

10   the top it indicate it is a traffic stop?  Is there

11   anywhere in this document exhibit J that tells you

12   what the basis of the traffic stop is?

13   A    I don't think so, ma'am.

14        THE COURT:  Talking about page 3.  You are

15   asking him whether that has anything on it?

16        MS KOENIG:  Anywhere in exhibit J, Your Honor.

17        THE COURT:  Well, that is four pages long.  It

18   has a map, it has got something on the back of it,

19   and it has a whole bunch of writing on page 4.  And

20   I don't have any idea what it is all is.

21        MS KOENIG:  Your Honor, I looked at exhibit J

22   Quite closely.

23        THE COURT:  Well, you are asking him to do that

24   from the witness stand.

25        Are you familiar with exhibit J before today?

**JA0109**

Mills - cross

1        THE DEFENDANT:  No, Your Honor.

2        THE COURT:  All right.

3        Well, take your time and allow him to go ahead

4    and look at it --

5        MS KOENIG:  That Is fine.

6        THE COURT:  -- as opposed to having the exhibit

7    speak for itself.

8        All right.  This is just gamesmanship here.

9        MS KOENIG:  Your Honor, actually --

10       THE COURT:  It is a document -- if it doesn't

11   have it in it, it doesn't have it in it.  You don't

12   need him to look through and say, I read it and it

13   doesn't have it in it.

14       MS KOENIG:  I want to ask the next question.

15       THE DEFENDANT:  Go to the next question.

16   BY MS KOENIG:

17   Q    Officer Mills, you are familiar that in July of

18   2020 the General Assembly in Virginia passed what is

19   called the Community Policing Act, right?

20   A    Yes, ma'am.

21   Q    And the Community Policing Act requires that

22   officers, every officer in Virginia that initiates a

23   traffic stop has to make a record of the stop,

24   right?

25   A    Yes.

**JA0110**

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 125 of 496

Mills - cross

```
 1   Q    And it requires that they document the basis

 2   for the stop, right?

 3   A    Yes, ma'am.

 4   Q    And the race of the individual stopped?

 5   A    Yes.

 6   Q    And the age, the gender, right?

 7   A    Yes.

 8   Q    And then whether or not the individual also was

 9   given a ticket or a summons or a warning, or what

10   the outcome of the stop was, right?

11   A    Yes.

12   Q    And then whether or not the vehicle was

13   searched, right?

14   A    Yes.

15   Q    And that law was effective July 1st of 2020,

16   right?

17   A    Yes.

18   Q    So when you are making your body camera title

19   you are doing your best to comply with some aspects

20   of that law, right?

21   A    Yes.

22   Q    Because you are putting in there, for instance,

23   the last entry on exhibit Q, you put in the "TS,"

24   which stands for traffic stop, right?

25   A    Yes.
```

Mills - cross

1    Q    You put in a number.  That number is the

2    individual's birth date that you stopped, right?

3    A    Yes.

4    Q    And then you put "B M," which stands for black

5    male, right?

6    A    Yes.

7    Q    No lights means the basis for the stop with no

8    headlights?

9    A    Yes.

10   Q    Then you put the location of the stop was 3000

11   Meadowbridge, right?

12   A    Yes.

13   Q    So although the I-Net does not reflect the

14   information that the Community Policing Act

15   requires, your body camera titles at least attempts

16   to do so, right?

17   A    Yes.

18   Q    All right.

19        Let's go to exhibit L.

20        I'm sorry.  I have one question about exhibit J

21   that I have not asked.  On exhibit J on the last

22   page -- so this is the fourth page of that

23   exhibit -- you see a little above the halfway mark

24   of the page there is an event remark that says

25   vehicle search completed at 182509, right?

Mills - cross

1          THE COURT:  Wait.  Date component is 18:43:3,

2     right?

3          MS KOENIG:  18:25:09.

4          THE COURT:  Well, the --

5          MS KOENIG:  Tenth -- well, no, it's the

6     eleventh item entry down.

7          THE COURT:  Well, on mine it says on the left

8     hand column it says 18:40:32.

9          MS KOENIG:  Exhibit J, Your Honor.

10         THE COURT:  Yes, ma'am.  No.  I'm sorry.  That

11    is exhibit K.

12         All right.  Got you 18:25:09.  All right.  The

13    vehicle search completed.  All right.

14         MS KOENIG:  Which means that in some fashion

15    that car was searched, right?

16         THE WITNESS:  I don't know why that remark is

17    there.

18    BY MS KOENIG:

19    Q    It is there, right?

20    A    It is there.

21    Q    Presumably the dispatcher is not making stuff

22    up to put in the report, right?

23    A    Yes, ma'am.  But I have never advised the

24    dispatcher whether or not I have searched a vehicle

25    on the radio.

**JA0113**

Mills - cross

1   Q    Okay.

2        You don't know where that information comes

3   from?

4   A    Correct.

5   Q    But it there -- right?

6   A    Yes.

7   Q    So now let's look at exhibit L.

8        And let's look at the top part of exhibit L

9   where it says 202012050502, right?

10  A    Yes, ma'am.

11  Q    Look back to the exhibit Q, which is your Axon

12  report.

13       Do you see that the fifth entry down indicates

14  that you made a body camera video for that same

15  incident?

16  A    Yes, ma'am.

17  Q    You titled that video "TXEM with a number,

18  expired tag, Magnolia?"

19  A    Yes, ma'am.

20  Q    Which means that there was a traffic stop for

21  expired tags of a black male with that birth date on

22  Magnolia?

23  A    Yes.

24  Q    Let's go back to exhibit L.

25       And, again, this has the same incident number

**JA0114**

Mills - cross

 1   at the top, right?

 2   A    Yes.

 3   Q    It indicates that it was a traffic stop, right?

 4   A    Yes.

 5   Q    And it indicates, again, on -- this is the

 6   fifth page that you and Officer Williams had

 7   conducted this traffic stop, right?

 8        THE COURT:  On the fifth page?

 9        MS KOENIG:  The last page of this exhibit, Your

10   Honor.

11        THE COURT:  All right.

12        MS KOENIG:  On the seventh column of the fifth

13   down is where I see Mr. Mills' name the first time.

14        THE COURT:  Okay.

15        MS KOENIG:  On the third page -- so, move for

16   admission of exhibit L.

17        THE COURT:  Okay.  Admitted.

18   BY MS KOENIG:

19   Q    On the third page, the third event up from the

20   bottom where the time stamp is 18:56:46, it again

21   says, event remark, vehicle search completed, right?

22        THE COURT:  That is what it says.

23        Go ahead.

24   BY MS KOENIG:

25   Q    All right.

**JA0115**

Mills - cross

1          THE COURT:  I don't know why you can't

2     acknowledge, Officer, is that what it says?

3          THE WITNESS:  I had trouble finding it, Your

4     Honor.  All right.  Well, it is the third one up

5     from the bottom.  It says 18:56:46.

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  It says in that remark "vehicle

8     search completed at 1205."

9          Is that what it says?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  All right.  So let's --

12     BY MS KOENIG:

13     Q    Go to exhibit N, Your Honor.

14     A    "N?"

15     Q    "N" as in Nancy.

16          THE COURT:  All right.

17          So, Officer Mills, at the top of exhibit N on

18     left the hand corner you see the number that says

19     202012050571, right?

20     A    Yes, ma'am.

21     Q    Put on to the Axon camera in exhibit Q, you see

22     that the sixth entry down indicates that you made a

23     body camera video for that same incident number?

24     A    Yes, ma'am.

25     Q    And the title on exhibit Q is TSES, and number,

Mills - cross

1    and expired tag, right?

2    A    Yes, ma'am.

3    Q    Which indicates it was a traffic stop with

4    black female with that birth date for expired tag,

5    right?

6    A    Yes.

7    Q    So going back to exhibit N.  Look on the third

8    page of exhibit N and seventh column, you see that

9    this report indicates that you and Officer Collombo

10   had conducted this traffic stop, right?

11   A    Yes, ma'am.

12   Q    And on the last page with the event remark that

13   says, at 21:04:55 the event remark says LOI search

14   completed?

15   A    Do you see that yes?

16        THE COURT:  You lost me.  What page?

17        MS KOENIG:  Last page of exhibit N., Your

18   Honor.

19        THE COURT:  Which exhibit?  Which line is it?

20        MS KOENIG:  The last page in.  It's the

21   eleventh entry down, which is 21:04:55.

22        THE COURT:  All right.

23   BY MS KOENIG:

24   Q    LOI search completed.  Does L O I stand for

25   location of incident?

**JA0117**

Mills - cross

1  A    I don't know.

2  Q    Okay.

3       But some search was completed is what it

4  indicates?

5       Let's look at exhibit P.

6       THE COURT:  Exhibit what?

7       MS KOENIG:  P as in Paul.

8  BY MS KOENIG:

9  Q    And in the upper left hand corner it says

10  202012050579, right?

11  A    Yes.

12  Q    And then flipping to exhibit Q, which is your

13  Axon body camera report, we have got a third

14  incident down which indicates that you made a body

15  camera video for that same incident number, right?

16  A    Yes.

17  Q    And the title was TSBM number, failure to stop

18  Peggy and Meadowbridge, right?

19  A    Yes.

20  Q    Traffic stop of black male with that birth

21  date, failing to stop, right?

22  A    Yes.

23  Q    All right.

24       Going back to exhibit P.

25       THE COURT:  Exhibit what?

Mills - cross

1          MS KOENIG:  Sorry.  Let me go to W.  This is

2     the one that doesn't --

3          Let's go to exhibit W.

4          Do you see on the top left hand side of exhibit

5     W it says 202012050579, which is the same incident

6     number we have been talking about.  Exhibit N.  I'm

7     sorry, exhibit P and exhibit Q.

8          And in the seventh column it indicates that you

9     and Officer Williams had conducted this traffic

10    stop, right?

11    A     Yes, ma'am.

12    Q     And on the fourth page of exhibit W, third

13    event down, it indicates that there was a vehicle

14    search completed at 21:17:40, right?

15    A     That's what it says, yes.

16    Q     Okay.

17         Your Honor, I move for admission of exhibit P,

18    W and N, which I think I had not done before.

19         THE COURT:  All right.

20         They are admitted.

21         MR. ELLIKER:  Your Honor --

22         MS KOENIG:  If I haven't already.

23         THE COURT:  Hold on.

24         MR. ELLIKER:  Your Honor, object on the

25    relevance of the exhibit and the line of

**JA0119**

Mills - cross

1    questioning.

2         THE COURT:  Okay.  But I think what she is

3    doing is trying to establish that these folks are

4    just driving around stopping people and then

5    searching their cars.

6         Is that fair to say, Ms Koenig?

7         MS KOENIG:  That's correct, Your Honor.

8         THE COURT:  Well, you know, it may not carry

9    the day if there is some sort of an offense, or

10   ostensible offense that they are observing, but I

11   think she is allowed to put that in.

12        Go ahead, Mr. Elliker, did you want to say

13   something?

14        MR. ELLIKER:  I just would say that I still

15   don't think it is relevant as to the issues at hand

16   in the court, and particularly because I don't think

17   that Officer Mills has any independent recollection

18   of these stops, and no one can talk about anything

19   other than what document that he himself has not

20   seen before today, actually.

21        THE COURT:  Well, you know that they are

22   records of the police defendant, and what they show

23   is, so far, that these gentlemen in this unit drive

24   around and stop people, and then search their cars.

25        Now, whether that carries the day is another

**JA0120**

Mills - cross

```
 1    question.  But, I am sure Ms Koenig will have
 2    something to say about that.
 3         MS KOENIG:  I may, Your Honor.
 4         THE COURT:  So I am going to admit it.  And see
 5    where it goes.  Thank you.
 6    BY MS KOENIG:
 7    Q    Officer Mills, I am going to to go back to the
 8    other two stops.
 9         You can take this folder now, thank you.
10         I want to go back to the other two stops that
11    you have participated in that night with temporary
12    tags with the same number.
13         The first stop of the driver -- are you aware
14    that you made a body camera video?
15    A    Yes.
16    Q    If we can pull up exhibit U-4.
17         In this incident that night on December 5th you
18    were the front passenger in this marked police car,
19    right?
20    A    Right.
21    Q    It appears that way, yes.
22         And when you make the body camera video, you
23    downloaded it, right?
24    A    Yes.
25    Q    If we look at exhibit Q, you titled this
```

**JA0121**

Mills - cross

1    incident -- this is the last incident on the page --

2    traffic stop, black male, no lights, 3000

3    Meadowbridge, right?

4    A    Yes.

5    Q    Okay.  And move to admit exhibit 4, Your Honor.

6    U-4, Your Honor.

7         THE COURT:  All right.  Admitted subject to

8    Mr. Elliker's --

9         MR. ELLIKER:  No objection.

10        THE COURT:  -- objection.  All right.  Or not

11   objection.

12   BY MS KOENIG:

13   Q    All right.

14        So, let's go to -- well, at the -- in the

15   police car that you all are driving around that

16   night, there is a computer, right, that is mounted

17   on the front, or somehow affixed to part of the

18   police car, right?

19   A    Yes.

20   Q    And that computer has access to different data

21   bases right?

22   A    Yes.

23   Q    One of them is vehicle inquiry, right?

24   A    Correct.

25   Q    You can also access someone's criminal record,

**JA0122**

Mills - cross

1    right?

2    A      No, you cannot.

3    Q      You cannot access criminal records?

4           THE COURT:  You are going to have have to get

5    up closer to the mic.

6           THE WITNESS:  No, you can't.

7    BY MS KOENIG:

8    Q      So if Officer Collombo was able to access

9    earlier, you don't know how he was able to do that?

10   A      You can look at past incidents with Richmond

11   Police Department, and you can see if they have

12   warrants, but the official criminal history you can

13   not do.

14          THE COURT:  You can't get into VCIN on that?

15          THE WITNESS:  Correct, sir.

16   BY MS KOENIG:

17   Q      But if the person had stopped, or incident with

18   Richmond Police Department, that is what you can

19   access?

20   A      Yes.

21   Q      Okay.

22          And so on this particular night -- let's go to

23   ten seconds into this video.

24          (Being played).

25          Pause it.

Mills - cross

```
 1        You had access to the vehicle inquiry, right?

 2   A    Yes, ma'am.

 3   Q    In the upper left hand portion it indicates

 4   that it is the LIC.  Does that stand for the license

 5   number?

 6   A    Yes.

 7   Q    License plate number?

 8   A    Yes.

 9   Q    All right.  Let's play it for the 20 seconds,

10   21 seconds in.

11        (Being played).

12        Okay.  So are you typing that information in,

13   or is dispatch doing that?  Who is doing that?

14   A    I believe I am.

15   Q    So if you are typing information in, that means

16   you are able to see what the license plate says,

17   right?

18   A    Yes.

19   Q    Okay.  Let's keep playing until we get to 27

20   seconds.

21        (Being played).

22        Okay.

23        Stop.

24        Now, your hand was blocking it for a minute,

25   but if we look very closely it says LIC, and then
```

**JA0124**

Mills - cross

1    the next, the middle bit of text, can you make out

2    the license plate number that you typed in?

3    A    I can't, no.

4    Q    You can not.  Okay.

5    A    No.

6    Q    The license plate that you all pulled over that

7    night was 111-34Y right?

8    A    Yes.

9    Q    Okay.  It makes sense that is what you typed in

10   to the record, right?

11   A    Yes.

12   Q    And it indicates that there is no record

13   received for that license plate, right?

14   A    Yes.

15   Q    Now, you all did not pull that car over because

16   the license plate wasn't coming back, right?

17   A    Correct.

18   Q    You pulled him over because he didn't have his

19   headlights on, right?

20   A    Correct.

21   Q    Okay.  All right.

22        Go forward to one minute in.  And for the

23   record, the time stamp is on the bottom screen as

24   you play the video.  One minute in.

25        THE COURT:  Okay.  Thank you.

**JA0125**

Mills - cross

```
 1        (Being played)

 2   BY MS KOENIG:

 3   Q    All right.

 4        Let's look at this scene here.  So we have on

 5   the driver side of the car the first person, is that

 6   Officer Collombo?

 7   A    Yes.

 8   Q    And behind you is Sergeant Spinos, right?

 9   A    Yes.

10   Q    And we can see Officer Williams who is on the

11   passenger side of the car the rear passenger side?

12   A    Yes.

13   Q    And then the woman on the right hand side with

14   the mask pulled down under her chin is the passenger

15   of the car, right?

16   A    Yes.

17   Q    All right.  Play it until we get to 122.

18        (Being played)

19        She indicates, the passenger indicates that she

20   had just purchased the car?

21   A    Yes.

22   Q    All right.  Keep playing.

23        (Being played).

24        Keep playing.

25        (Being played).
```

**JA0126**

Mills - cross

```
 1        Pause.
 2        Officer Williams then asked the passenger, the
 3   passenger, do you have any weapons on you, right?
 4   A    Yes.
 5   Q    All right.  Go ahead.
 6        (Being played).
 7        All right.  Pause.
 8        Then Officer Williams again patting the
 9   passenger down, right?
10   A    After she says "go ahead," yes.
11   Q    And you all had no reason to believe that the
12   passenger was armed and dangerous, right?
13   A    I don't remember.
14   Q    Did you hear Officer Williams tell her that she
15   had to pat her down?  You can go back and play it
16   again.
17   A    She said, "I am going to pat you down."
18   Q    So she tells you, I am going to at you down,
19   right?
20   A    Yes.
21   Q    And then she does, right?
22   A    After she says "go ahead," yes.
23   A    All right.
24        THE COURT:  Just answer the question.  You
25   don't need to argue your case.  Okay?
```

**JA0127**

Mills - cross

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Okay.

3     BY MS KOENIG:

4     Q   All right.  Let's go to 146.

5          Go ahead and play it.

6          (Being played)

7          All right.  Pause here.

8          So we see Officer Collombo had his flashlight,

9     right?

10    A   Yes.

11    Q   He is aiming it in the back seat of the car,

12    right?

13    A   Yes.

14    Q   And go to about 206 in the video.

15         We just saw a light.  Go back for one second.

16    Play it again.

17         All right.  We just saw a light.  That was your

18    flashlight, right?

19         THE COURT:  Reflecting off the window; is that

20    right?

21         THE WITNESS:  Yes.

22    BY MS KOENIG:

23    Q   And that indicating, because your are also

24    looking at the interior of the car, right?

25    A   Yes.

**JA0128**

Mills - cross

1   Q    All right.

2        Let's go to four minutes and 50 seconds into

3   the video.

4        THE COURT:  So is the point here that although

5   they stopped this fellow for not having his lights

6   on, they used this as an occasion to scope out his

7   car from the outside?

8        MS KOENIG:  Yes.

9        THE COURT:  All right.  I have got that point.

10       MS KOENIG:  Okay.

11  BY MS KOENIG:

12  Q    Let's go to the second point.  Before I leave

13  this incident.  At any point in time did you ever

14  develop any evidence that the driver knew that the

15  tags had not come back to his car?

16  A    Not to my knowledge.

17  Q    You -- he was given no ticket, no summons, no

18  arrest, right?

19  A    Correct.

20  Q    All right.  Let's go to the second incident.

21       So, again, you made a body camera video of

22  this, right?

23  A    Yes.

24  Q    Let's look at your Axon report at the sixth

25  incident down, right?  You titled this video PSTX

Mills - cross

1   number, expired tag, right?

2   A     Sorry.  That is ins Q?

3   Q     Q, and it's the sixth incident down, the one

4   that ends in 0571.

5   A     Yes, ma'am.

6   Q     All right.

7         So, this means that exhibit V-3 that has that

8   same title, that means that is your clip, right?

9   A     Yes, ma'am.

10  Q     Move to add might V-3, Your Honor.

11        THE COURT:  Admitted.

12  BY MS KOENIG:

13  Q     All right.

14        So down at the beginning of this video we see

15  the computer again, right --

16  A     Yes.

17  Q     -- in the car?

18        Let's go to 20 seconds in.

19        (Being played)

20        All right.  So again you typed in a number into

21  the -- let's go back to that about one second -- you

22  have typed a number again into the vehicle inquiry

23  license portion of the computer, right?

24  A     Yes.

25  Q     Go to 27 seconds, please.

Mills - cross

1          (Being played).

2          All right.

3          Maybe scroll back a little bit clearer.

4          Let's play it from here and then pause it

5     quickly.

6          (Being played)

7          Pause.

8          Go back one second.

9          (Being played)

10         Okay.

11         Can you make out that it says, "no record" for

12    that license plate, or could you make out when I

13    played it?

14    A    I didn't.

15    Q    Do you see it before you turn the page?

16    A    I believe that is what it says, ma'am.

17    Q    Okay.  All right.

18         And so you all pulled that car over not because

19    of anything to do with the plate, although you had

20    run the plate before you pulled her over, right?

21    A    I don't recall to this one.

22    Q    You pulled her over.  You indicated in your

23    body camera titling it was for expired tag, right?

24    A    Yes.

25    Q    Okay.

Mills - cross

1        THE COURT:  So, are you going to establish

2    through all of this that while they said they were

3    pulling it over for expired tag, what they did once

4    they pulled it over was to do a thorough search of

5    the vehicle as they could from outside the car?

6        MS KOENIG:  Yes.

7        THE COURT:  All right.

8        So is that what happened?  You pulled the guy

9    over for expired tag, and then you went in, looked

10    in the car with your flashlight, and found whatever

11    you found or didn't find; is that right?

12        THE WITNESS:  During the course of a traffic

13    stop we look inside the vehicle as much as we can.

14        THE COURT:  Okay.  And do you do that on all of

15    the traffic stops you do?

16        THE WITNESS:  Yes.

17        THE COURT:  All right.

18    BY MS KOENIG:

19    Q    All right.

20        So at this second stop you all saw no evidence

21    that the driver knew that the tags would not come

22    back to the car, right?

23    A    That's correct.

24    Q    Again, no ticket, no summons, no arrest.

25    Right?

Mills - cross

1   A    Correct.

2   Q    All right.

3        Let's turn back to you guys pulling over behind

4   Mr. Moore.  This time you had not run the tag ahead

5   of time, right?

6        THE COURT:  They hadn't not run the tag?

7        MS KOENIG:  When they -- when you get behind

8   Mr. Moore you didn't, like these other two

9   incidents, type the license plate into the vehicle

10  inquiry, right?

11       THE COURT:  Well, they didn't have to.  They

12  knew what it is going to be.

13       MS KOENIG:  I was using that question --

14       THE COURT:  So you knew that the tag was going

15  to come back not good, right?

16  A    Yes, sir.

17       THE COURT:  All right.

18  BY MS KOENIG:

19  Q    All right.

20       So at that time you had no additional evidence

21  that the driver of the white Chrysler 300 knew that

22  the tags had not come back to his car, right?

23  A    Correct.

24  Q    And before the December 5 of 2020 had you ever

25  seen Mr. Moore before?

**JA0133**

Mills - redirect

```
 1   A    No.

 2   Q    Did you know anything about him before that

 3   night?

 4   A    No.

 5   Q    No further questions, Your Honor.

 6        THE COURT:  All right.

 7        Thank you.

 8        Mr. Elliker, do you have any redirect?

 9        MR. ELLIKER:  Very briefly.

10        THE COURT:  All right.  Thank you.

11                  REDIRECT EXAMINATION

12   BY MR. ELLIKER:

13   Q    Officer Mills, after you pulled over the first

14   car did you search it?

15   A    I did not.

16   Q    After you pulled over the second car did you

17   search it?

18   A    No.

19   Q    Did the third car stop when the police

20   commanded dollars it to stop?

21   A    No, it did not.

22   Q    No further questions, Your Honor.

23        THE COURT:  Weil, did he search it?  I don't

24   know.  Looking at the car, isn't that a search?

25        MR. ELLIKER:  Well, did you engage in a vehicle
```

Mills - redirect

1    search of either of the first two cars where the --

2         THE COURT:  Vehicle search.  You mean a car

3    search?

4         MR. ELLIKER:  Well --

5         THE COURT:  You mean where they open the doors

6    and look inside, is that what a vehicle search is?

7    BY MR. ELLIKER:

8    Q    Did you physically search beyond just looking

9    in through the windows with your flashlight the

10   first two cars?

11   A    No.

12        THE COURT:  Okay.

13        MR. ELLIKER:  Thank you.

14        THE COURT:  Okay.

15        May this officer go?

16        MS KOENIG:  Yes, Your Honor.

17        THE COURT:  All right.

18        Officer, thank you very much for coming.  I

19   appreciate it.

20        THE WITNESS:  Yes, sir.

21              (Witness stood aside)

22        THE COURT:  All right.

23        Call the next witness.

24        Mr. Elliker, do you have a short one?

25        MR. ELLIKER:  Yes, Your Honor.

**JA0135**

Torres - direct

```
 1        THE COURT:  I have a phone conference at 11:30

 2   I have to take.

 3        MR. ELLIKER:  We call Officer Jacob Torres.

 4        THE COURT:  What is Torres' role in this thing?

 5   Did he give him the Miranda?

 6        MR. ELLIKER:  He responds to the scene with the

 7   first officer who saw the gun in plain view.

 8        THE COURT:  Okay.  Of the car.

 9        Well, does the fact that Officer Torres -- I

10   have seen a picture of the gun on the floor of the

11   car.

12        MR. ELLIKER:  He also engaged in the

13   pre-Miranda conversation that lasts about 30

14   seconds.  I would be happy to stipulate that the gun

15   was not in plain view, Your Honor.

16        THE COURT:  The old plain view exception.

17                    JAKOB TORRES

18          AFFIRMED AND TESTIFIED AS FOLLOWS:

19                  DIRECT EXAMINATION

20   BY MR. ELLIKER:

21   Q    Officer, could you please state --

22        THE COURT:  Let him sit down.

23        MS KOENIG:  Please state and spell your name

24   for the record.

25        THE WITNESS:  Jakob Torres, J-A-K-O-B Torres,
```

**JA0136**

Torres - direct

1    T-O-R-R-E-S.

2    BY MR. ELLIKER:

3    Q    Are you employed by the Richmond Police

4    Department?

5    A    I am.

6    Q    Are you assigned to the Fourth Precinct Focus

7    Mission Team?

8    A    Yes.

9    Q    Were you so assigned on December 5 of 2020?

10   A    I was.

11   Q    On that evening did you respond to a call for

12   assistance in the Highland Park area?

13   A    I did.

14   Q    What was the call that went out?

15   A    Call for back up.  My partner unit tried to

16   stop a vehicle that took off running.

17   Q    In other words, you were not in the vehicle

18   that tried to pull the vehicle, pull the defendant's

19   vehicle over?

20   A    That's correct.  Just backing up that unit.

21   Q    Were you wearing a body-worn camera during this

22   incident?

23   A    Yes.

24   Q    Have you had an opportunity to review the

25   footage from that recording before today?

Torres - direct

```
 1   A     I did.

 2   Q     There should be a disc in front of you labeled

 3   Government's exhibit 9.  Do you recognize that disc?

 4   A     I do.

 5   Q     Does it contain the recording footage from that

 6   incident that night from your camera?

 7   A     Yes.

 8         MR. ELLIKER:  Your Honor, we move exhibit 9

 9   into evidence.

10         MS KOENIG:  No objection.

11         THE COURT:  Admitted.

12   BY MR. ELLIKER:

13   Q     If we can -- I think we need to switch over to

14   the government's evidence, Ms Tuck.

15         If we could play exhibit 9, the first 34

16   seconds.

17         (Being played).

18         Officer Torres, were you one of the first

19   officers to respond to this vehicle?

20   A     I was.

21   Q     Was the door open when you arrived?

22   A     Yes.

23   Q     Was the car running?

24   A     Yes.

25   Q     On the left do you see some flashing lights in
```

Torres - direct

1    the distance?  What is that?

2    A    That is the other unit that initiated the

3    traffic stop.

4    Q    When you came upon the vehicle was the door

5    opened?  Did you see anything on the floorboard of

6    the car?

7    A    I saw a firearm.

8    Q    Let's play from minute 131 to 150, please.

9         (Being played).

10        Now, I think you heard you say PDW.

11   A    Personal defense weapon.

12   Q    I think I also heard you say you weren't going

13   to touch the gun.

14        Did anyone touch the gun as far as you saw

15   while it was still sitting in the car?

16   A    No.

17   Q    And moving forward, did you assist in this

18   incident by investigating the temporary tag?

19   A    I did.

20   Q    Did you pull the temporary tag off the car?

21   A    Yes.

22   Q    Let's go to 527, and play for ten seconds.

23        (Being played)

24        There is a skinny binder there in front of you

25   under the larger one.  If you look behind tab ten

Torres - direct

1    there is an exhibit marked exhibit ten.

2         Do you recognize that?

3    A    I do.

4    Q    What is it?

5    A    The tag from the vehicle.

6    Q    Is that a true and accurate copy of the tags

7    you pulled off the Chrysler that night?

8    A    It is.

9         MR. ELLIKER:  Your Honor, we move exhibit ten

10   into evidence.

11        MS KOENIG:  No objection.

12        THE COURT:  Admitted.

13   BY MR. ELLIKER:

14   Q    Officer Torres, did you compare the VIN on the

15   vehicle that was at the curb with the VIN listed on

16   this temporary tag?

17   A    Yes.

18   Q    Did that match?

19   A    It did.

20   Q    Did you run the VIN in your computer system to

21   identify the owner of the vehicle?

22   A    Yes.

23   Q    Do you recall the owner of the vehicle

24   according to your computer system?

25   A    It was like a bank or a leasing company.

**JA0140**

Torres - direct

1    Q    Now, after you ran the vehicle VIN did you have

2    conversation with the defendant?

3    A    Yes.

4    Q    How did that conversation come about?

5    A    I approached him and asked him about the tag,

6    or where he got his car.

7    Q    We have already admitted your body camera

8    footage as exhibit 9.  We can go back and play from

9    1802 to 1919, please.

10        (Being played).

11        Officer Torres, after this point did you have

12   any further conversation with the defendant?

13   A    No.

14   Q    In the conversation that we just watched did

15   you ask him anything about the firearm you found in

16   his car?

17   A    No.

18   Q    Did he tell you anything about the firearm he

19   found in his car?

20   A    No.

21        THE COURT:  What exactly did he tell you?

22   Because I couldn't quite understand.

23        THE WITNESS:  He told me where he bought the

24   car from, and how much for.

25        THE COURT:  Where did he get it?

**JA0141**

Torres - direct

1          THE WITNESS:  From ANR, I think that is what he

2     was trying to say.  A place across from our

3     precinct.

4          THE COURT:  Okay.

5          MR. ELLIKER:  If we can play here the next

6     little clip.

7          THE COURT:  All right.  We can't right now

8     because I have a conference call.

9          We are going to take a recess.  I will be back

10    as soon as the conference call is done.

11               (A recess was taken)

12         THE COURT:  All right.

13         Sorry.  I had to conference call in order to

14    set a criminal case for trial in Norfolk.  All

15    right.

16         Mr. Elliker, we were going through with Officer

17    Torres.  And we had just introduced the false tag.

18         MR. ELLIKER:  That is right, Your Honor.  And I

19    think we had just watched a clip of the conversation

20    that Officer Torres had with the defendant through

21    the rear of a police vehicle.

22         THE COURT:  Or something to that effect.

23         MR. ELLIKER:  That is what the officer

24    testified to.

25    BY MR. ELLIKER:

**JA0142**

Torres - cross

1    Q    If we could play just the next few seconds on

2    the body cam video.

3         (Being played).

4         Officer Torres, what did we just see happen on

5    that last part of your body camera video?

6    A    I turned my camera off.

7    Q    Immediately before that.

8    A    Officer reading Miranda.

9    Q    Who was the officer reading the defendant

10   Miranda?

11   A    Officer Williams.

12   Q    Did you coordinate with her so she would be

13   informed about the information the defendant had

14   just told you?

15   A    No.

16        THE COURT:  So, Mr. Moore told you that he

17   owned the car in your conversation with him, and

18   then he was Mirandized; is that right?

19   A    Yes.

20   Q    Thank you.

21        THE COURT:  All right.  Thank you.

22                  CROSS EXAMINATION

23   BY MS KOENIG:

24   Q    At any point did you ever Mirandize Mr. Moore

25   that evening?

**JA0143**

Williams - direct

```
 1   A    No.
 2   Q    Are you aware of any other officer that was on
 3   the scene aside from Officer Williams ever reading
 4   any Miranda rights to Mr. Moore?
 5   A    No.
 6   Q    No further questions.
 7        THE COURT:  Thank you.
 8        Any redirect?
 9        MR. ELLIKER:  No, Your Honor.
10        THE COURT: All right.
11        Officer Torres, thank you very much for coming,
12   sir.  I appreciate it.
13                  (Witness stood aside)
14        May he be excused?
15        MR. ELLIKER:  Yes, Your Honor.
16        MS KOENIG:  He can, Your Honor.
17        THE COURT:  Thank you, sir.  Have a good rest
18   of the day.
19        THE WITNESS:  Thank you.
20        THE COURT:  All right.
21        Who is next.
22        MR. ELLIKER:  United States calls Officer Nakia
23   Williams, Judge.
24                  NAKIA WILLIAMS
25            AFFIRMED AND TESTIFIED AS FOLLOWS:
```

**JA0144**

Williams - direct

1                    DIRECT EXAMINATION

2    BY MR. ELLIKER:

3    Q    Good morning.

4         Please state and spell your name for the

5    record.

6    A    Nakia, first name N-A-K-I-A.  Last name

7    Williams, W-I-L-L-I-A-M-S.

8    Q    Are you employed by the Richmond Police

9    Department as a police officer?

10   A    I am.

11   Q    Officer Williams, are you assigned to the

12   Fourth Precinct Focus Mission Team?

13   A    I am.

14   Q    Were you so assigned on the evening of

15   December 5 of 2020?

16   A    Yes.

17   Q    That evening were you involved in a series of

18   traffic stops having to do with a fake temporary

19   tag?

20   A    Yes.

21   Q    How many times did you see that temporary tag

22   on different vehicles that evening?

23   A    Three times.

24        THE COURT:  Was she in the same car with the

25   other gentleman we heard from?

Williams - direct

1    BY MR. ELLIKER:

2    Q    Officer Williams, were you in the same car as

3    officer Mills and Collombo that evening?

4    A    Yes.

5    Q    What happened when you attempted to pull over

6    the third car?

7    A    When we attempted to pull over the third car,

8    after we initiated our lights, the car pulled away

9    and ended up crashing at Second and Custer.

10   Q    What did you do during the pursuit of the car?

11   A    I got into the -- I was passenger originally,

12   and then I got into the driver's seat and attempted

13   to drive behind them just in case he kept running.

14   Q    Why did you have to get into the driver's seat?

15   A    Officer Collombo got out and ran.

16   Q    Now, after the driver was detained, where did

17   you go?

18   A    Back to the vehicle.

19   Q    When you say "vehicle," you are referring to

20   the defendant's vehicle?

21   A    Yes.

22   Q    Now, and then when you went back to the

23   vehicle, did you observe the temporary tag on the

24   back of the Chrysler 300?

25   A    Yes.

**JA0146**

Williams - direct

1   Q    There should be skinny binder in front of you.

2   A    Is that it?

3   Q    That has a tag -- yes, that is the one.

4        Are you looking at something marked exhibit 10?

5   A    Yes.

6   Q    Is that the tag that you saw?

7   A    Yes.

8   Q    Did participate in a search of the vehicle?

9   A    I did.

10  Q    What prompted Officers to search the Chrysler?

11  A    Marijuana baggy on the floorboard of the

12  vehicle.

13       THE COURT:  Marijuana where?

14       THE WITNESS:  On the floor board of the

15  vehicle.

16  BY MR. ELLIKER:

17  Q    Were you wearing your body worn camera during

18  this incident?

19  A    Yes.

20  Q    Have you had an opportunity to review that

21  footage before today?

22  A    Yes.

23  Q    There should be a disc in front of you that is

24  marked Government's exhibit 12.

25       Do you recognize that disc?

**JA0147**

Williams - direct

1   A    Yes.

2   Q    What is it?

3   A    Stop number three, which would be Chrysler,

4   which has my initials and the date when I viewed it.

5   Q    Does that indicate that the disc contains a

6   true and accurate copy of your recording from that

7   stop?

8   A    Yes.

9        MR. ELLIKER:  The united States would seek to

10  admit exhibit 12 into evidence, Your Honor.

11       MS KOENIG:  No objection, Your Honor.

12       THE COURT:  Admitted.

13  BY MR. ELLIKER:

14  Q    Let's go to minute marker.  228.  And play

15  until 240.

16       (Being played).

17       So, does that memorialize your observation of

18  marijuana in the car?

19  A    Yes.

20  Q    During your search of the vehicle did you find

21  anything inside with the name Keith Moore on it?

22  A    Yes.

23  Q    If you flip in that binder to tab 13, there is

24  a series of pages.  Do you recognize those

25  documents?

Williams - direct

```
1    A    Yes.

2    Q    What are they?

3    A    Documents with Keith Moore's name in it.  On

4    it.  I'm sorry.

5    Q    Are those documents, photocopies of documents

6    you found in the vehicle?

7    A    Yes.

8    Q    All right.

9         Your Honor, we would seek to admit exhibit 13

10   into evidence.

11        MS KOENIG:  No objection.

12        THE COURT:  Admitted.

13   BY MR. ELLIKER:

14   Q    Look at the first page of exhibit 13.  Does

15   this have Keith Moore's name on it?

16   A    It does.

17   Q    Do you remember where you found this document?

18   A    Inside the glove compartment.

19   Q    If we go to exhibit 12 at 1130, and play until

20   1153, please.

21        THE COURT:  Well, wait a second.  Before she

22   gets to that, what -- the fourth document on that,

23   the fourth, the last page of that document says

24   something about a 2001 Infinity.  Was that found in

25   the Chrysler?
```

**JA0149**

Williams - direct

1    A    Yes.

2         THE COURT:  Okay.  Go ahead.

3    BY MR. ELLIKER:

4    Q    If we play at 1130 to 1153, please.

5         (Being played)

6         So when you look at page one of exhibit 13 it

7    said, Keith Moore -- I think I overheard an Officer

8    say Keith More, activate now.  Is that in reference

9    to this document?

10   A    Yes.

11   Q    And then I believe we also heard Officer say,

12   "American Freight?"

13   A    Yes.

14   Q    Flip to the fourth page.  Is that in reference

15   to this document?

16   A    Yes.

17   Q    The Judge already got to where I was going,

18   ultimately going.  If you look at page five of

19   exhibit 13, where was this document found?

20   A    Inside of the arm rest.

21   Q    If we can go to marker 1030 and play until

22   1050.

23        (being played)?

24        THE COURT:  I didn't hear what she said.  Could

25   you tell me what you just said?

Williams - direct

```
 1        THE WITNESS:  I said that they are getting
 2   people to print the fake tags.
 3        THE COURT:  You said -- who is it?
 4        THE WITNESS:  Someone is getting someone to
 5   print fake tags based off the paper.
 6        THE COURT:  Somebody is getting someone to
 7   print fake tags.  And how does that come from the
 8   Infinity thing?
 9        THE WITNESS:  I mean it is rare that you see
10   people with make and model of a car and a VIN number
11   and the color.
12        THE COURT:  So you think this is somehow
13   affiliated with --
14        THE WITNESS:  Yes.
15        THE COURT:  -- the temporary tag crime spree in
16   Richmond?
17        THE WITNESS:  Yes.
18        THE COURT:  Okay.
19   BY MR. ELLIKER:
20   Q    Officer Williams, if you look behind tab ten,
21   which we just looked at, and compare that with the
22   information on the last page of tab 13, does the
23   sheet from the end of tab 13 contain the information
24   that one would put on a temporary tag?
25   A    Yes.
```

**JA0151**

Williams - direct

1   Q    Now, after searching of the vehicle did you

2   read the defendant his Miranda rights?

3   A    I did.

4   Q    Let's go ahead to 1728 and play until 1804.

5        (Being played).

6        At the beginning of this clip who was speaking

7   to you?

8   A    Sergeant Spinos.

9   Q    Do you recall him telling you to go and read

10  the defendant Miranda?

11  A    Yes.

12  Q    Did he tell you anything about what Moore had

13  said previous to being read Miranda?

14  A    He may have gotten the vehicle from the same

15  place, or the tag from the same place.

16  Q    Did Sergeant Spinos tell you anything the gun?

17  A    I don't recall, no.

18  Q    Now, as you approached the car was the

19  defendant already talking with an Officer?

20  A    No.

21  Q    Let's go back a few seconds before you read

22  Miranda.

23       (Being played).

24       Walking up to read the defendant Miranda were

25  you aware he had been speaking with other officers?

Williams - direct

1   A     I see now that he has been.

2   Q     Play this now until 1932.

3         (Being played)

4         Now, after you -- as you were reading the

5   defendant his rights, did he do or say anything that

6   make you think he did not understand what you were

7   saying to him?

8   A     No.

9   Q     And after you finished and asked if you wanted

10  to have a conversation, what did he say to you?

11  A     He said, "Take me on to jail."

12  Q     Did he say, I will not answer any questions?

13  A     No.

14  Q     Did he say, I would like to remain silent?

15  A     No.

16  Q     After you walked away did the defendant then

17  engage other officers in a conversation?

18  A     Yes.

19  Q     Let's pick up right where we left off.

20        (Being played).

21        Now, what was this post-Miranda conversation

22  about, Officer Williams?

23  A     Him getting his tags put on the car like it

24  came with the car.  Tags came with the car.

25  Q     Who was the defendant speaking with?

**JA0153**

Williams - direct

```
1   A    Sergeant Spinos.

2   Q    Did he tell you that he previously had been

3   pulled over?

4   A    Yes.

5   Q    Where?

6   A    He told Sergeant Spinos that.

7   Q    Sorry?

8   A    He told Sergeant Spinos that.

9   Q    Where did the defendant indicate he had

10  previously been pulled over?

11  A    Hanover.

12  Q    After this point in the conversation did the

13  defendant make a statement to you about the gun that

14  was found in his car?

15  A    Yes.

16  Q    What did he tell you?

17  A    I asked him, why didn't he stop.  And he

18  already had encountered with another agency.  He

19  told me that I had, but I had a whole iron in the

20  car.

21       THE COURT:  Had a what?

22       THE WITNESS:  A whole iron in the car.

23       THE COURT:  I don't know what that means.

24  BY MR. ELLIKER:

25  Q    Is that conversation captured on the camera
```

**JA0154**

Williams - direct

1   footage?

2   A    Yes.

3   Q    Let's go ahead and play until 2157.

4        (Being played).

5        Pause right there.

6        Did he just say, "I had a whole iron" in the

7   car?

8   A    Yes.

9   Q    Now, through your training and experience are

10  you familiar slang with guns?

11  A    Yes.

12  Q    Is "iron" a slang term for a gun?

13  A    Yes.

14  Q    Do you know other terms for guns?

15  A    Tool.

16  Q    Tool is another slang term for a gun.

17       After this conversation did you go and tell

18  your fellow officers that the defendant had admitted

19  there was a gun in the car?

20  A    Yes.

21  Q    What term did you tell your other officers the

22  defendant had used?

23  A    Tool.

24  Q    If we can look at Government's exhibit seven,

25  which has already been admitted.

**JA0155**

1    At 2730 until the very end of this clip.

2        (Being played).

3        Do "tool" and "iron" mean the same thing?

4   A    Yes.

5   Q    Did you get the two words mixed up?

6   A    Yes.

7   Q    Did you write the police report that got filed

8   with the police department in this case?

9   A    No.

10  Q    Those are all the questions I have, Your Honor.

11       THE COURT:  All right.

12       Cross examination.

13               CROSS EXAMINATION

14  BY MS KOENIG:

15  Q    Good almost-afternoon, Officer Williams.

16  A    Good afternoon.

17  Q    Let's talk about --

18       THE COURT:  How long do you think your cross

19  examination will take?

20       MS KOENIG:  Five minutes.  Ten minutes at the

21  most.

22  BY MS KOENIG:

23  Q    Let's talk about the other stops that you had

24  made that night on December 5 of 2020.  On

25  December 5 of 2020 you were working with the Fourth

**JA0156**

```
 1   Precinct Focus Mission Team, right?

 2   A    Yes.

 3   Q    Okay.

 4        You were with Sergeant Spinos, Officer Mills,

 5   and Officer Collombo, right?

 6   A    Yes.

 7   Q    Because you all are riding around in the same

 8   police car, right?

 9   A    Yes.

10   Q    Making a bunch of traffic stops, right?

11   A    Yes.

12   Q    When you were making those traffic stops you

13   weren't really trying to get traffic violations, you

14   were looking for evidence of, evidence of more

15   serious crimes, right?

16   A    Yes.

17   Q    Okay.

18        And so, one stop you made, there was that

19   before the stop of Mr. Moore, there were two other

20   stops where you all had found the same license plate

21   number, right?

22   A    Correct.

23   Q    And the second stop was a stop of a young black

24   woman who was driving a blue car, right?

25   A    Correct.
```

 1   Q     And in that stop you got out of the car and you

 2   watched what happened, right?

 3   A     Correct.

 4   Q     And you actually have a body camera video of

 5   that, right?

 6   A     I do.

 7   Q     And during that stop, Officer Collombo was

 8   questioning the lawyer -- the woman, right?

 9   A     Correct.

10   Q     Whatever?

11   A     Yes.

12   Q     And Officer Mills doing a visual inspection of

13   the interior of the car with his flashlight, right?

14   A     Correct.

15   Q     And Sergeant Spinos was looking at the VIN

16   number that was on the temporary tag on the back of

17   that woman's car, right?

18   A     Correct.

19   Q     And he matched it up to the VIN number that was

20   on the plate of the car in the front windshield,

21   right?

22   A     Correct.

23   Q     Okay.

24         When you go to make stops you have to put in

25   information -- when you make a traffic stop you have

```
1    to call it in over the radio, right?

2    A    Yes.

3    Q    Or you can do it on your computer, too.

4    A    Right.

5    Q    Either way, there is a record that is made,

6    right?

7    A    Right.

8    Q    Records are important in police work right?

9    A    Yes.

10   Q    Because you guys have lot of work you have to

11   do, right?

12   A    Correct.

13   Q    How many traffic stops do you think you have

14   made since December 5 of 2020?

15   A    I don't have an exact number.

16   Q    A hundred?  More than a hundred?

17   A    I mean a lot.

18   Q    More than two hundred?

19   A    I don't know.

20   Q    More or less than 500?

21   A    Approximately --

22        THE COURT:  She doesn't know how many, but it

23   is a lot.

24   BY MS KOENIG:

25   Q    Okay.
```

1          When you are going back and thinking about

2      these traffic stops you probably don't remember each

3      individual one, right?

4      A     No, not really.

5      Q     And having things like body camera footage is

6      helpful to refresh your recollection, right?

7      A     Correct.

8      Q     Also the report that dispatch makes of the

9      information that is input about the traffic stop,

10     right?

11     A     Correct.

12     Q     Okay.

13         I want to show you what has been marked as

14     exhibit K.  You can look in the big binder in front

15     of you, the bigger black binder, and look at exhibit

16     K.  On the top left corner do you see something that

17     says 202012050497?

18     A     Yes.

19     Q     Go to the third, I'm sorry, the third page of

20     this exhibit.

21         Look in the seventh column.  Do you see your

22     name there, right?

23         It says Nakia Williams.  Do you see that?  You

24     might have flipped too far.  I have this doubled

25     sided.  That is a trick question.  The third actual

**JA0160**

 1   page going right back to where your right hand is

 2   now.  Go back some more.  There you go.

 3   A     Yes, I see my name.

 4   Q     You also see Michael Spinos, which is Sergeant

 5   Spinos' name?

 6   A     Correct.

 7   Q     And so at the top it says that there is a

 8   traffic stop that was officer-initiated in the 1200

 9   block of Highland Avenue, right?

10   A     Correct.

11   Q     Does this record reflect the police information

12   of the stop that you and Officer or Sergeant Spinos

13   made that night, right?

14   A     Correct.

15   Q     Move to admit exhibit K.

16         THE COURT:  Admitted.

17   BY MS KOENIG:

18   Q     So, let's look at the last physical page.  This

19   is the actual page of the exhibit.

20         It says, there are some time stamps on the left

21   hand side.  Do you see those under the date of

22   December 5 of 2020?

23   A     Yes.

24   Q     Do you see that the eleventh one down at

25   18:40:32?

```
1    A    Okay.

2    Q    Do you see where it says event remark?

3    A    Yes.

4    Q    Vehicle search completed.  And it has the time?

5    A    Yes.

6    Q    Okay.

7         Officer Williams, are you aware of the

8    Community Policing Act?

9    A    No.

10   Q    Okay.

11        As part of your -- when did you go through

12   police academy?

13   A    2017.

14   Q    When did you become a member of the Fourth

15   Precinct Focus Mission Team?

16   A    January of 2020 I believe.

17   Q    So, 12 months before this stop?

18   A    Correct.

19   Q    Eleven months really.  Okay.

20        And so you are not aware of the obligation that

21   you all have under Virginia law to keep certain

22   statistics and information about all traffic stops

23   in the State of Virginia?

24   A    It may have been taught to me in a different

25   way.  I mean a different, like if I was telling you
```

```
 1    right now.  It doesn't ring a bell.
 2    Q    For every traffic stop you make do you keep a
 3    race, age and gender of the person that you stopped?
 4    A    We don't.  We had started it, but like it is
 5    just, I guess --
 6    Q    Fell off?
 7    A    Yes.
 8    Q    Let's go to the search of Mr. Moore's car on
 9    December 5 of 2020.  When you went to the police
10    academy they taught you it was very important to
11    preserve evidence, right?
12    A    Correct.
13    Q    Probably spent days or weeks at a time
14    practicing and how you are supposed to preserve
15    evidence, right?
16    A    Correct.
17    Q    And you were taught that there are many reasons
18    why it is important to preserve evidence, right?
19    A    Correct.
20    Q    Important to preserve evidence so it can be
21    tested later, right?
22    A    Correct.
23    Q    And important to preserve evidence so it could
24    be used in court later, right?
25    A    Correct.
```

**JA0163**

1   Q    Important to preserve evidence so if you have

2   question about why you took a particular action you

3   can point to the evidence to justify your action,

4   right?

5   A    Correct.

6   Q    And so on December 5 of 2020 you wanted to

7   search Mr. Moore's car, right?

8   A    Correct.

9   Q    If we could pull up exhibit 12, please, at 205.

10       205 in the video.

11       (Being played).

12       Okay.  Stop.

13       Did you see that light shining?  Let's go back

14  a minute.  We can do that again, Ms Dandridge.

15       Do you see that light reflecting -- on the car?

16  A    Yes.

17  Q    Let's play the again.

18       (Being played).

19       Is that our voice?

20  A    Yes.

21  Q    Keep playing for me.

22       (Being played).

23       Stop.

24       Do you just see your right hand come up and it

25  has what appears to be flashlight?

**JA0164**

```
 1   A    Yes.

 2   Q    You are looking in the interior of the car

 3   right?

 4   A    Yes.

 5   Q    Let's just keep playing.

 6        (Being played).

 7        All right.  Pop.

 8        You say, what is in that book bag, right?

 9   A    Right.

10   Q    Meaning you would like to know if there is any

11   evidence in that book bag, right?

12   A    To see if there are any firearms, correct.

13   Q    All right.

14        Let's go to two minutes and 33 seconds into the

15   video, please, Ms Dandridge.

16        (Being played).

17        Okay, pause right there.

18        All right.  So that is where you say, "Oh weed.

19   And you say, "Camera weed.  Weed camera," right?

20   A    Yes.

21   Q    What is the thing that you think is the weed in

22   this picture?  Can you circle it?  You can touch the

23   screen?

24   A    This right here.

25   Q    Okay.  Did you collect that?
```

**JA0165**

1   A    I did.

2   Q    Oh, you did.  What happens when you collect

3   evidence?  What do you do with it at the police

4   department?

5   A    You collect the evidence.  You put it into

6   property.

7   Q    Property keeps a log of those things, right?

8   A    Correct.

9   Q    Okay.  And when you have a log of evidence you

10  end up having a property list, right, of things that

11  were seized from that, from that stop?

12  A    Correct.

13  Q    So, things are really important to make sure

14  that those property lists are accurate, right?

15  A    Correct.

16  Q    When you have to go back and pull evidence from

17  the evidence department, you have to know, hey, I

18  need this bag from this instance, right?

19  A    Right.

20  Q    You can go and say this is the incident report,

21  here is where I have logged this in, please give me

22  this piece of item or this piece of evidence,

23  correct?

24  A    Correct.

25  Q    Let me hand you the report that Officer

**JA0166**

```
 1    Collombo made in this case that has the evidence

 2    attached to it.

 3         Do you recognize that as Officer Collombo's

 4    report from this incident?

 5    A    Correct.

 6    Q    You didn't write a separate report, right?

 7    A    I did not.

 8    Q    Okay.

 9         Do you see the evidence sheet that's listed

10    there on the last page?

11    A    I do.

12    Q    Where does it indicate that there was any

13    marijuana seized as evidence in this case?

14    A    This -- it does not, but this is not -- this is

15    from the report.  This is not the evidence that we

16    put in.  This is two different reports.

17    Q    So you have a separate report?

18    A    So, normally is that evidence page for the

19    evidence that we log into evidence, and then this as

20    our report.

21    Q    Do you have that?

22    A    I don't.

23    Q    Okay.  I don't have it.

24         All right.  Let's go to 18 minutes and ten

25    seconds into this video, please, Ms Dandridge.
```

**JA0167**

1        Officer Williams, as far as you know you are

2    the only person who read Mr. Moore his Miranda

3    rights that evening, right?

4    A    As far as I know, yes.

5    Q    When you read them to him he is already in

6    handcuffs, right?

7    A    Correct.

8    Q    And he is sitting in the back of a police car,

9    right?

10   A    Correct.

11   Q    There are bars on those windows that would

12   prevent him from escaping from the car, right?

13   A    Correct.

14   Q    Definitely not free to leave, right?

15   A    Correct.

16   Q    Okay.

17        So, once you read the rights, you ask Mr. Moore

18   specifically, "With these rights in mind do you wish

19   to have a conversation with me," right?

20   A    Correct.

21   Q    And he says, "Aren't you reading the card,"

22   right?

23   A    Yes.

24   Q    And you said, "I am done."

25   A    Correct.

**JA0168**

1   Q    And then he says, "Oh, all right, so you are

2   done now," right?

3   A    Correct.

4   Q    And you say, "So no, you don't want to answer

5   none of my questions," right?

6   A    Correct.

7   Q    Did you see him tilt his head, "No?"

8   A    No.  He said, he said "Take me to jail."

9   Q    You say, "Okay," right?

10  A    And I walked away.

11  Q    Because he doesn't want to talk, correct?

12  A    Right.

13  Q    So you come back after Sergeant Spinos is

14  questioning him, right?

15  A    Yes, I came back.

16  Q    All right.

17       You say, "If that is the case, then why didn't

18  you just stop if you knew that you had already been

19  through this with another agency," right?

20  A    Correct.

21  Q    And then you said that he said, "But I have --

22  because I had a whole iron in the car," right?

23  A    Correct.

24  Q    And what you said in response to that, "So,"

25  is, "So that is why you didn't want to stop?  That

**JA0169**

 1   could have been dealt with in a different way."

 2   Right?

 3   A    Correct.

 4   Q    Okay.  So your response to him telling you, I

 5   have a gun in the car is "That is reason for the

 6   stop?  That could have been held, treated

 7   differently.  That could have been handled in a

 8   different way?"

 9   A    Meaning he didn't have to run, and it could

10   have been dealt with in a different way, correct.

11   Q    So then he says, "I am not talking to you,"

12   right?

13   A    Correct.

14   Q    And then he says, "I am done," right?

15   A    Correct.

16   Q    All right.

17        And so after that you know that then he is

18   taken into -- he is taken by Officers Gilbert and

19   another officer down to the police station, right?

20   Or the jail.

21   A    Correct.

22   Q    You are there when he is booked in, right?

23   A    Correct.

24   Q    And did you ever tell Officer Gilbert that he

25   had told you, "I am not talking to you, I am done?"

1    A    No.

2    Q    So did you ever tell at the police station, or

3    the jail, when you and Officer Collombo and Officer

4    Mills are questioning him about putting, testing the

5    gun for fingerprints, did you ever tell him, oh, by

6    way he told me he didn't want to talk to us any

7    more?

8    A    No.

9    Q    All right.

10       So going back to this note on the fifth page of

11   Government's exhibit 13, which is the skinny page.

12       You just found this handwritten note somewhere

13   in the car, right, in the glove -- in the armrest?

14       What else was in the armrest?

15   A    A bunch of miscellaneous stuff of, I guess,

16   like personal items.

17   Q    Just a handwritten note, right?

18   A    Yes.

19   Q    Could have been from a car that Mr. Moore --

20       THE COURT:  All right.  I have a meeting at

21   noon.  You said five minutes.

22       Recess.

23       You may not discuss your testimony with anyone.

24       MS KOENIG:  What time are you do you want us

25   back?

## JA0171

Williams - redirect

1         THE COURT:  Come back at ten after 1:00.
2                   (A recess was taken)
3         All right.  Let's go back to cross examination.
4    Oh, there you are.  You came back.  Thank you,
5    ma'am.
6         Go ahead.
7         MS KOENIG:  No further questions of Officer
8    Williams.
9         THE COURT:  Well, I am glad we took a recess.
10        Mr. Elliker?
11                  REDIRECT EXAMINATION
12   BY MR. ELLIKER:
13   Q    I do have some redirect.
14        Officer Williams, do you recall before the
15   break Ms Koenig asked you if the defendant at one
16   point during this post Miranda conversation
17   indicated that he didn't want to speak to you?
18        Do you remember that?
19   A    I don't recall.  I just remember him saying,
20   "Take me to jail."
21   Q    Okay.
22        If --
23        THE COURT:  Well, I think that is what she
24   said.  He was sitting there in the car and you would
25   talk with him for a while and finally, according to

**JA0172**

Williams -  redirect

1    your testimony, what he said was, "I am not talking

2    to you.  I am done."

3           THE WITNESS:  Okay.

4           THE COURT:  Do you remember that.

5           THE WITNESS:  Yes.

6           THE COURT:  And then he didn't talk to you any

7    more?

8           THE WITNESS:  Um hum.

9           THE COURT:  And then he went to the police

10   station and they started -- there was some

11   conversation.

12          MR. ELLIKER:  In fact, Your Honor, if we could

13   show Officer Williams' body-camera footage, which is

14   exhibit 12, and start that at, at lest cue it up at

15   2346.

16   BY MR. ELLIKER:

17   Q    Officer Williams, do you recall the defendant

18   asking you what was going to happen to personal

19   effects that had been on him when he was arrested?

20   A    I don't recall.

21   Q    Okay.  Why don't we go ahead and play at 2346.

22          (Being played).

23          Pause it.

24          What was it that he said to you at that moment?

25   A    Just now?

**JA0173**

Williams -  redirect

1    Q    Yes.

2    A    "Remember my face."

3    Q    Let's play it again.

4         (Being played).

5         Let's pause?

6         THE COURT:  You and he were talking about what

7    happens to his wallet?

8         THE WITNESS:  He had a wallet on his person,

9    yes.

10        THE COURT:  On his person, you mean like in his

11   pocket?

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.

14        And you told him that after he made his first

15   phone call the property people at the jail would

16   take it; is that right?

17        THE WITNESS:  I said he could ask them if the

18   person whose wallet it belonged to could come get it

19   from the jail.

20        THE COURT:  Okay.

21        Did you give it back -- did he have it -- he

22   had it back by that time?

23        THE WITNESS:  He had it on his person in the

24   car, yes.

25        THE COURT:  On his person.

Williams - redirect

1          THE WITNESS:  In his pocket.

2          THE COURT:  Does that means like in his pocket?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Thank you.

5   BY MR. ELLIKER:

6   Q    At the tail end of that did the defendant tell

7   you he might see you again?

8   A    Yes.

9   Q    Did he say it might be on a date?

10  A    Yes.

11  Q    Did he say he might try to get pulled over on

12  purpose to see you again?

13  A    Yes.

14  Q    Was the defendant threatening you?

15         THE COURT:  No, I think it was a proposal of

16  marriage, Mr. Elliker.  Of course he was flirting

17  with her.

18  BY MR. ELLIKER:

19  Q    Was all this after Miranda?

20  A    Yes.

21  Q    Thank you.

22         THE COURT:  Well, that opened the door.

23         Does that cross examination raise any further

24  questions by you?

25         MS KOENIG:  No, Your Honor.

**JA0175**

Spinos - direct

 1          THE COURT:  Okay.  Thank you.

 2          May this officer, Officer Williams, be excused?

 3          MR. ELLIKER:  Yes, Your Honor.

 4          MS KOENIG:  Yes.

 5          THE COURT:  Do you have any need for her?

 6          Officer Williams, thank you very much for

 7     coming.

 8          THE WITNESS:  Thank you.

 9          THE COURT:  I appreciate you being here today.

10                    (Witness stood aside)

11          MR. ELLIKER:  The United States calls Michael

12     Spinos.

13          THE COURT:  How do you spell that?

14          MR. ELLIKER:  S-P-I-N-O-S.

15                      MICHAEL SPINOS

16            AFFIRMED AND TESTIFIED AS FOLLOWS:

17                    DIRECT EXAMINATION

18     BY MR. ELLIKER:

19     Q    Sir, please state your name and spell it for

20     the record.

21     A    It is Michael Spinos.  M-I-C-H-A-E-L.  Last

22     name S-P-I-N-O-S.

23     Q    Are you retired from Richmond Police dis --

24     excuse me, retired from the Richmond Police

25     Department?

**JA0176**

Spinos - direct

1    A    Yes, I am.

2    Q    When did you retire?

3    A    June first of this year.

4    Q    After how many years of service?

5    A    Twenty-two years.

6    Q    Were you employed by Richmond Police on

7    December 5, 2020?

8    A    Yes, I was.

9    Q    What was your rank on that date?

10   A    I was sergeant in charge of the Fourth

11   Precinct.

12   Q    Were you on patrol with the Fourth Precinct on

13   of December 5, of 2020?

14   A    Yes, I was.

15   Q    Were you in a vehicle with Officers Collombo,

16   Mills and Williams?

17   A    Yes, I was.

18   Q    And during that shift did you encounter

19   multiple cars with the same temporary tag number on?

20   A    I did.

21   Q    If you could take a look at -- there is skinny

22   notebook in front of you that has a tab 1.

23        It has already been admitted Government's

24   exhibit 1.

25        Does that show the first car that your group of

**JA0177**

Spinos - direct

1    officers pulled over with the temporary tag that

2    night?

3    A    Yes, it does.

4    Q    If you look behind --

5         THE COURT:  I was paying attention to the prior

6    witnesses, so I think I know what cars they pulled

7    over in what order and the license plate number.

8    BY MR. ELLIKER:

9    Q    I will skip ahead.  Did the third car attempt

10   to elude police?

11   A    Yes, it did.

12        THE COURT:  I paid attention to that, too.

13   BY MR. ELLIKER:

14   Q    Were you wearing a body-worn camera during that

15   incident?

16   A    Yes, I was.

17   Q    And have you reviewed the footage from that

18   body-worn camera before your testimony today?

19   A    Yes.

20   Q    There should be a disc in front of marked

21   Government's exhibit 11.  Do you recognize that

22   disc?

23   A    Yes.

24   Q    Does that have your body camera footage from

25   the attempted stop of the third vehicle that

Spinos - direct

1    evening?

2    A    Yes, it does.

3    Q    Did you initial it because it is a true and

4    accurate recording of your body camera footage?

5    A    Yes, it is.

6         MR. ELLIKER:  Your Honor, we move exhibit

7    eleven into evidence.

8         MS KOENIG:  No objection.

9         THE COURT:  Admitted.

10        Let me ask you a question.

11        How come when these body camera things video

12   start there is no sound for a while and then there

13   is sound?

14        THE WITNESS:  The way they are designed, when

15   you hit -- so they are on continuously during your

16   whole shift.  When you actually hit the button to

17   start recording it loops back 30 seconds, so it will

18   catch something just prior to you turning it on, but

19   those 30 seconds that loops back doesn't have sound.

20        THE COURT:  And what is it that -- you activate

21   it yourself of does it turn on when you turn on the

22   blue lights?

23        THE WITNESS:  It will activate itself.  Tasers,

24   if someone turns on their Taser, anyone within a

25   close proximity of the Taser will turn on the

**JA0179**

Spinos - direct

1    camera.

2        THE COURT:   Thank you.

3    BY MR. ELLIKER:

4    Q    Now, are you the officer who first detained the

5    defendant at the end of the pursuit?

6    A    Yes.

7    Q    Following the apprehension of the defendant

8    where did you go?

9    A    Once other officers got there I turned over

10   custody to them, and I walked back towards the

11   vehicle.

12   Q    Did you observe the temporary tag on the back

13   of the vehicle?

14   A    Yes, I did.

15   Q    If we could show the still of minute marker

16   621.

17       Is this the tag that you observed on the back

18   of the defendant's vehicle?

19   A    Yes, it is.

20   Q    Is it the same tag number you saw on the two

21   cars previously that evening?

22   A    Yes, it is.

23   Q    Now, after observing the tag did you have a

24   conversation with the defendant about his car?

25   A    Yes.

Spinos - direct

1   Q    How did that conversation come about?

2   A    He started asking if there was something wrong

3   with the vehicle.  Because it was resting up against

4   the curb.  And started talking to him about the

5   vehicle.

6   Q    During that conversation did you talk to him

7   about the gun that was found in the car?

8   A    No, I didn't.

9   Q    After you spoke with the defendant did you

10  suggest that another officer read him Miranda?

11  A    Yes, I did.

12  Q    Why did you suggest a different officer read

13  him Miranda rather than doing it yourself?

14  A    Because I am the sergeant in charge of the

15  unit, so I try to stay out of the way of the

16  investigation for the officers.  And at that point

17  just be more of a supportive and, you know, guide

18  with the case instead of getting involved.

19  Q    After the defendant was Mirandaed did he talk

20  with you more about his car?

21  A    He might have made a couple statements about

22  the license plates and the registration, and things

23  like that, yes.

24  Q    Did the defendant ever tell you that he did not

25  want to talk to you or answer your questions?

**JA0181**

Spinos- cross

1    A    No.

2    Q    I don't have any other questions for this

3    witness, Your Honor.

4           THE COURT:  All right.

5                   CROSS EXAMINATION

6    BY MS KOENIG:

7    Q    Good afternoon, sir, Sergeant.

8    A    Good afternoon.

9    Q    Sergeant, when you were -- start at the

10   beginning of the encounter with Mr. Moore,

11   December 5 of 2020.  You were riding in a police car

12   with Officer Collombo, Officer Mills and Officer

13   Williams, right?

14   A    Yes.

15   Q    You were in that passenger seat behind the

16   driver, right?

17   A    Back passenger, yes.

18   Q    And when Mr. Moore stopped his car Officer

19   Collombo stopped the car long enough that you and

20   Officer Collombo peeled out, right, and started

21   running?

22   A    Yes.

23   Q    Okay.  You both chased Mr. Moore on foot?

24   A    Yes.

25   Q    And you both had your guns out while you were

**JA0182**

Spinos- cross

1   chasing him?

2   A    Not out when I was chasing him, but when I got

3   up to him I did pull a weapon, yes.

4   Q    So not while you were running?

5   A    No.

6   Q    So if your body-worn camera suggests otherwise

7   do you have any reason to refute that?

8   A    No.

9   Q    But if your body-worn camera indicates you had

10  your gun out before you get to him, that is

11  accurate?

12  A    Well, before, yes.  But, I mean, we are kind of

13  splitting hairs.  Initially running, once he started

14  to basically stopped running, and that is when I

15  pulled the weapon to challenge him.

16  Q    Fair enough.  And Officer Collombo had his gun

17  out at that point, too, right?

18  A    I can't say if he did or not.  I was focused

19  more on Mr. Moore.

20  Q    Collombo definitely yells at Mr. Moore, "Get on

21  the ground," right?

22  A    Yes.

23  Q    And you are yelling the same thing, right?

24  A    Yes.

25  Q    You actually grabbed his shirt, run up to him

**JA0183**

Spinos- cross

1    and grabbed his shirt and pull him to the ground,

2    right?

3    A    I didn't pull him to the ground, but I was

4    motioning to the ground.  He got down on the ground.

5    He is a pretty tall guy.  I couldn't have pulled him

6    down with one hand.

7    Q    Let's look at Government exhibit 2.

8         Ms Dandridge, if you could pull it up to 5

9    seconds, then, please.

10        I'm sorry.  Government's exhibit 11.

11        (Being played).

12        Okay.  Wait a second.

13        So this -- there is a car that is in front of

14   you at this point, right?

15   A    Yes.

16   Q    Officer Collombo is in front of you at this

17   point, too?

18   A    Yes.

19   Q    The car is being driven by Officer Williams and

20   Officer Mills is in the back seat, right?

21   A    Yes.

22   Q    You are coming around on the left side of this

23   car, right?

24   A    Yes.

25   Q    Keep playing, please.

**JA0184**

Spinos- cross

1          (Being played)

2          Pause.

3          So we see that you have got your gun out in

4    your left hand, right?

5    A     Yes.

6    Q     You see Mr. Moore has stopped right here.  He

7    is this individual in the black, white and red

8    shirt, right?

9    A     Yes.

10   Q     Keep playing.

11         (Being played).

12         Okay.

13         Pause.

14         To me that looks like you pulled him down,

15   right?

16   A     Okay.

17   Q     Okay.

18   A     But he willingly cooperated what I was saying.

19   Like I said, if he was resisting I couldn't have

20   pulled him by one arm.

21   Q     I'm not trying to get to resisting.

22   A     All right.

23   Q     I'm just --

24   A     No, I just --

25         THE COURT:  All right.

Spinos- cross

```
 1        What is pull him down for one person is
 2   signaling to get down to another.
 3        MS KOENIG:  All right.
 4        THE COURT:  In any event, it doesn't appear
 5   that Mr. Moore was injured, and it seems to me there
 6   are exchanges after that are relatively polite.
 7        MS KOENIG:  Sure.
 8   BY MS KOENIG:
 9   Q    At that point someone else puts Mr. Moore in
10   handcuffs, right?
11   A    Yes.
12   Q    He remains in handcuffs the rest of the evening
13   while he is on that scene, right?
14   A    Yes.
15   Q    He gets immediately from the ground where he's
16   taken down.  When he gets up he is put in a patrol
17   car, right?
18   A    At some point, yes.
19   Q    Then taken to the jail, right?
20   A    Yes.
21   Q    And not a free person at any point after you
22   pull him down to the ground, right?
23   A    Correct.
24   Q    You never read Mr. Moore his Miranda rights
25   that night, right?
```

**JA0186**

Spinos- cross

```
 1   A    No.
 2   Q    And you didn't read him Miranda before you
 3   pulled him down on the ground, right?
 4   A    No.
 5   Q    And you didn't read him Miranda after he is put
 6   in handcuffs?
 7        MR. ELLIKER:  Your Honor, asked and answered.
 8        THE COURT:  Well, I don't know whether it was
 9   asked and answered, but it is pretty clear he didn't
10   get his Miranda warnings until Officer Williams gave
11   them to him back at the paddy wagon.
12   BY MS KOENIG:
13   Q    And as far as you know, Officer Williams is the
14   only individual who raid Miranda rights that night,
15   right?
16   A    Yes.
17   Q    No further questions.
18        THE COURT:  Thank you.
19        May he be excused?  Mr. Elliker, do you have
20   another question?
21        MR. ELLIKER:  No more questions.
22        MS KOENIG:  He can be excused.
23        THE COURT:  He can leave.
24        Thank you very much.  I hope you are enjoying
25   retirement.
```

**JA0187**

Gilbert - direct

```
 1        THE DEFENDANT:  Yes, sir.

 2                   (Witness stood aside)

 3        THE COURT:  Call your next witness.

 4        MR. ELLIKER:  Your Honor, Government's last

 5   witness is Officer John Gilbert.

 6        THE COURT:  All right.

 7                   JOHN GILBERT

 8        AFFIRMED AND TESTIFIED AS FOLLOWS:

 9                   DIRECT EXAMINATION

10        THE COURT:  Thank you for coming today, Officer

11   Gilbert. I appreciate it.

12        THE WITNESS:  Yes, sir.

13   BY MR. ELLIKER:

14   Q    Please state your name and spell it for the

15   record.

16   A    John Wheler Gilbert.  J-O-H-N  W-H-E-L-E-R

17   G-I-L-B-E-R-T.

18   Q    And you are you employed by the Richmond Police

19   Department?

20   A    I am, yes, sir.

21   Q    Are you assigned to the Fourth Precinct?

22   A    I am, yes, sir.

23   Q    Were you on patrol on the evening of

24   December 5th of 2020?

25   A    Yes, sir, that is correct.
```

**JA0188**

Gilbert - direct

1    Q    Did you respond to a call for assistance that

2    evening in the Highland Park area of Fourth

3    Precinct?

4    A    I did, yes, sir.

5    Q    What was the call that went out?

6    A    The F. M. T. Tac Unit ended up getting on to a

7    call with a traffic stop, I believe, and I was

8    called to assist for transportation.

9    Q    Were you wearing your body-worn camera during

10   this incident?

11   A    I was.

12   Q    Have you had an opportunity to review that

13   footage before today?

14   A    I have, yes, sir.

15   Q    There should be in front of you a disc that is

16   marked Government's exhibit 14.

17   A    Yes, sir.

18   Q    Do you recognize that disc?

19   A    I do, yes, sir.

20   Q    Does that contain a recording of your body

21   camera footage from this incident that evening?

22   A    It does, yes, sir.

23   Q    Did you initial it because it contains a true

24   and accurate recording of your body-camera footage?

25   A    I did, yes, sir.

**JA0189**

Gilbert - direct

1        MR. ELLIKER:  Your Honor, we move Government's

2   exhibit 14 into evidence.

3        MS KOENIG:  No objection.

4        THE COURT:  Admitted.

5   BY MR. ELLIKER:

6   Q    All right.  If we could play the first minute

7   and 20 seconds of Officer Gilbert's footage, please.

8        (Being played).

9        What were you saying "hot dog" in response to,

10  Officer?

11  A    There was a weapon in plain view on the

12  floorboard of the driver's seat, or on the floor

13  board of the driver's side.

14  Q    I think you said earlier that you arrived to

15  provide transportation for the other officers?

16  A    Yes, sir, that's correct.

17  Q    So after this, did you go down to meet the

18  other officers with your vehicle to transport the

19  suspect?

20  A    I did, yes, sir.

21  Q    When you arrived were you asked to stay with

22  the suspect by the officers who were currently

23  holding him in custody?

24  A    Yes, sir, that is correct.

25  Q    If we could go to the three minute 55 second

**JA0190**

Gilbert - direct

1    mark, please.

2         THE COURT:  Do you have some kind of special

3    car that is equipped to transport inmates?

4         THE WITNESS:  Yes, Judge, that is correct.  It

5    is a cage-equipped vehicle that allows safe

6    transportation.

7         THE COURT:  Do they still have paddy wagons?

8         THE WITNESS:  We do, yes.

9         THE COURT:  Thank you.

10   BY MR. ELLIKER:

11   Q    Play until four minutes 35 seconds, please.

12        (Being played).

13        All right.  At the very beginning of that did I

14   hear you ask him, "What you running for, man?"

15   A    Yes, sir, that's correct.

16   Q    Did he give you a response to that question?

17   A    He did not, no, sir.

18   Q    Did you question him about his car?

19   A    No, sir, I did not.

20   Q    Who is the other officer who is standing there

21   with you?

22   A    Officer Michael Triano.

23   Q    Did you hear Officer Triano question this

24   defendant about the car?

25   A    He did not, no, sir.

Gilbert - direct

1   Q    As the suspect was on the ground did you or

2   Officer Triano question him about the gun?

3   A    We did not, no, sir.

4   Q    Let's play at six -- six minutes until 645,

5   please.

6        (Being played).

7        Again, during this period any questions posed

8   by officers to the defendant?

9   A    No, sir.

10  Q    Let's go ahead to nine minutes 20 seconds and

11  play for a minute.

12       (Being played).

13       So at this point who comes back into the

14  picture, Officer?

15  A    Officer Keegan Mills.

16  Q    Did you assist Officer Mills as he patted the

17  defendant down?

18  A    I did.

19  Q    As this happening during another civilian

20  arrive on the scene?

21  A    That is correct.

22  Q    Go to eleven minutes and 35 seconds, please.

23       (Being played).

24       So the defendant identified this woman?

25  A    I believe he said it was his cousin.

Gilbert - direct

1    Q    Did your body-worn camera capture statements

2    the defendant made to his cousin?

3    A    Yes, sir, it did.

4    Q    Let's play 1255 until 1315.

5         (Being played).

6         THE COURT:  Is this when he told the cousin

7    "Someone must we telling me?"

8         MR. ELLIKER:  Yes.

9         THE COURT:  I remember that.  Move on.

10        MR. ELLIKER:  I will move on.

11   BY MR. ELLIKER:

12   Q    Did you subsequently assist putting the

13   defendant in the back of your vehicle?

14   A    I did, yes, sir.

15   Q    During that time did he make requests that

16   Officers reset the handcuffs?

17   A    He did, yes, sir.

18   Q    Did officers reset those handcuffs?

19   A    Yes, sir, that is correct.

20   Q    Did officers during that entire stretch ask him

21   any questions about the gun in the car?

22   A    No, sir.

23   Q    If we go to -- as you -- and then once he was

24   in the back of your vehicle where did you take him?

25   A    Once he was back in the rear of the vehicle we

**JA0193**

                        Gilbert - direct

1    brought him back out to where his vehicle was

2    located.

3    Q    Let's play 1620 until about 1640.

4         (Being played).

5         What is the defendant asking you about here?

6    A    He asked me if his car was going to be towed.

7    Q    After this did you step out of the vehicle?

8    A    I did, yes, sir.

9    Q    Where did you stand?

10   A    To the front of the vehicle on the right side.

11   Q    Did you observe other officers in conversation

12   with the defendant?

13   A    I did, yes, sir.

14   Q    Play 1735.

15        THE COURT:  Before you get to that, is there an

16   exception that allows law enforcement officers to

17   use their cell phones while they are driving?  An

18   exception to the law?

19   A    I find a way, Judge, on that.

20        THE COURT:  Thank you.

21   BY MR. ELLIKER:

22   Q    1735 and play that until 1804, please.

23        (Being played).

24        Who was it you were referring to as "sergeant"

25   in this clip?

Gilbert - direct

1    A    Sergeant Spinos.

2    Q    At the end of this clip who is it that Sergeant

3    Spinos is talking?

4    A    To the defendant.

5    Q    Why did he start talking to the defendant?

6    A    It appeared that the defendant engaged Sergeant

7    Spinos as we were talking.

8    Q    And were you close enough for your body-worn

9    camera to see some of this conversation?

10   A    Yes, sir.

11   Q    If we can play 1804 until 1949.

12        (Being played).

13        Now, during this time period were you

14   participating in any conversations with the

15   defendant?

16   A    I was not, no, sir.

17   Q    At the very end here, who is standing next to

18   the car window with the flashlight?

19   A    Officer Williams.

20   Q    What is Officer Williams doing?

21   A    Reading him Miranda.

22   Q    Now, at that point going forward you are aware

23   the defendant has been read his Miranda rights?

24   A    That is correct, yes, sir.

25   Q    Did anyone tell you the defendant refused to

**JA0195**

Gilbert - direct

1    answer questions?

2    A     No, sir.

3    Q     Did you observe the defendant talking with

4    other officers after he had been read his Miranda

5    rights?

6    A     I did, yes, sir.

7    Q     If we can go to 2129, please.

8          (Being played).

9          So is this conversation happening post Miranda,

10   Officer Gilbert?

11   A     It is, yes, sir.

12   Q     Now, after this did you take the defendant to

13   lockup?

14   A     I did, yes, sir.

15   Q     While he was in the back of your car did the

16   defendant engage you in a conversation?

17   A     He did, yes, sir.

18   Q     Let's go to 2838 and play until 2916.

19         (Being played).

20         So, here, what was he asking about, Officer

21   Gilbert?

22   A     He first asked if his phone was in his car, if

23   somebody had his phone.

24   Q     What did he ask you after that?

25   A     Afterwards he asked where his wallet was.

**JA0196**

Gilbert - direct

1   Q    Did you ask him any questions during this?

2   A    No, sir.

3   Q    After this did you ask him a question?

4   A    After this, yes, sir, I did.

5   Q    Let's just pick up and play.

6        (Being played).

7        What did you ask him?

8   A    I asked why he ran.

9   Q    What did he say in response?

10  A    He stated, "You know how it is when you have a

11  gun in the car."

12  Q    Now, let's play on from this point 2926 until

13  3008.

14       (Being played).

15       Did the defendant admit that he is a convicted

16  felon?

17  A    He did, yes, sir.

18  Q    Did he admit to you that he knew he could not

19  have a gun?

20  A    He did, yes, sir.

21  Q    Did all of these admissions happen after you

22  saw the defendant had been read his Miranda rights?

23  A    Yes, sir.

24  Q    Did any officer ever tell you the defendant did

25  not want to answer questions?

**JA0197**

                    Gilbert - cross

 1   A    No, sir.

 2   Q    Did the defendant ever tell you he did not want

 3   to answer questions?

 4   A    No, sir.

 5        MR. ELLIKER:  I have no further questions, Your

 6   Honor.

 7        THE COURT:  All right.

 8                    CROSS EXAMINATION

 9   BY MS KOENIG:

10   Q    Good afternoon, Officer Gilbert.

11   A    Good evening, ma'am.

12   Q    When did you graduate from the police academy?

13   A    July of 2020, ma'am.

14   Q    Oh, last summer?

15   A    Yes, ma'am.

16   Q    You were freshly minted.

17   A    Yes, ma'am.

18   Q    And at the police academy they spent quite a

19   bit of time talking to you about Constitutional

20   rights?

21   A    Yes, ma'am.

22   Q    One of those rights is the right for a criminal

23   defendant to remain silent, right?

24   A    Yes, ma'am.

25   Q    And you know that when we are talking about

                    **JA0198**

Gilbert - cross

```
 1   Miranda, Miranda warnings are that somebody has the
 2   right to remain silent, they have the right to have
 3   counsel, and if they can't -- with them during
 4   questioning, and if they can't afford a lawyer then
 5   one will be appointed for them, right?
 6   A    Yes, ma'am.
 7   Q    You are taught those, right?
 8   A    Yes, ma'am.
 9   Q    And you know that when someone says they want
10   to remain silent, you have to honor that right?
11   A    Yes, ma'am.
12   Q    And if someone had told you that after being
13   read his Miranda rights that Mr. Moore said, "I am
14   not talking to you, I am done," you wouldn't have
15   asked him that question about why he was running,
16   right?
17   A    If I was told that he didn't want to speak
18   further, no, ma'am.
19   Q    Okay.  And you never read Mr. Moore his Miranda
20   rights?
21   A    I did not, no, ma'am.
22   Q    No further questions.
23        THE COURT:  Thank you.
24        Any redirect?
25        MR. ELLIKER:  No, Your Honor.
```

Hush - direct

1        THE COURT:  All right.

2        May he excused?

3        MR. ELLIKER:  Yes.

4        THE COURT:  Ms Koenig, do you need him?

5        MS KOENIG:  I don't.

6        THE COURT:  All right, sir, thank you very much

7   for coming.  Very nice to see you.  And have a good

8   rest of the day.

9        THE WITNESS:  Thank you, sir.

10                (Witness stood aside)

11        THE COURT:  All right.  That is it for you?

12        MR. ELLIKER:  Yes, sir.  I would like to

13   confirm that Government's exhibit one through 14

14   have been admitted.

15        THE COURT:  Are they all in?

16        THE CLERK:  Only question was about five.

17        MS KOENIG:  I had no objection to five, Your

18   Honor.

19        THE COURT:  They are all in.

20        MR. ELLIKER:  Thank you.

21        THE COURT:  All right.

22        Do you have witnesses?

23        MS KOENIG:  One witness.  Lee Hush.

24                    LEE HUSH

25            AFFIRMED AND TESTIFIED AS FOLLOWS:

**JA0200**

Hush - direct

1                        DIRECT EXAMINATION

2    BY MS KOENIG:

3    Q    Good afternoon, Mr. Hush.

4    A    Good afternoon.

5    Q    Can you state your name for the record, please?

6    A    Lee Hush.

7    Q    How do you spell the last?

8    A    H-U-S-H.

9    Q    Where do you work, Mr. Hush?

10   A    Investigator with the Federal Public Defender

11   Office here in Richmond.

12   Q    How long have you been with that office?

13   A    I have been with this particular office, which

14   opened in October of 2001.

15   Q    And before you that other investigative

16   experience?

17   A    Correct.

18   Q    As part of your work with the Federal Public

19   Defender Office have you been investigating this

20   case against Mr. Moore?

21   A    Yes.

22   Q    As part of the investigation into Mr. Moore's

23   case did you collect a copy of a speeding ticket

24   that Mr. Moore got in Hanover County on October 9th

25   of 2020?

**JA0201**

Hush - direct

1   A    Yes.

2   Q    Let's look at what has been marked as exhibit

3   A.  It is in the bigger binder in front of you.

4        Do you recognize what is in exhibit A?

5   A    Excuse me.

6   Q    We have a few things up there.

7   A    Did you ask if I recognize it?

8   Q    Yes.  Do you recognize what is in exhibit A?

9   A    Yes, ma'am.

10  Q    What is in exhibit A?

11  A    It is scanned copies of two summonses out of

12  Hanover County; one for reckless or speeding

13  violation, and one for driving on a suspended

14  license or revoked license.

15  Q    Is this the scanned copy of the copy of there

16  ticket Mr. Moore had given you?

17  A    That's correct.

18  Q    I move for admission, Your Honor, of exhibit A.

19       THE COURT:  Admitted.

20  BY MS KOENIG:

21  Q    I want to look closely at the first page of

22  exhibit A.  Do you see on the right hand side where

23  it has in pre-printed letters, license number?

24  A    Yes.

25  Q    What is that license plate number listed?

**JA0202**

Hush - direct

```
 1   A    111-34Y.

 2   Q    What is the make of the car that is listed off

 3   to the left there of those letters?

 4   A    Chrysler.

 5   Q    What is the year as far as we can tell?

 6   A    2006.

 7   Q    Okay.

 8        What is the date of that offense below that

 9   area?

10   A    It is hard for me to tell.  Looks like

11   October 8.  October 9 of 2020.

12   Q    Going to the third page of exhibit A, is that a

13   second summons that was issued at that time?

14   A    That's correct.

15   Q    Does that contain the same license and make and

16   year information?

17   A    Yes, it does.

18   Q    Did you review the on-line charges filed

19   against Mr. Moore in Hanover County based on that

20   same traffic stop?

21   A    Yes, I did.

22   Q    Did Hanover ticket Mr. Moore for anything

23   related to the temporary tag on his car?

24   A    No, there is just these two corresponding

25   charges.
```

Hush - direct

1  Q    I want to turn your attention now to the Fourth

2  Precinct Focus Mission Team.  As part of the

3  investigation in this case where we interested in

4  the racial make up of the area that the Fourth

5  Precinct, Four Police Precinct was working in on

6  December 5 of 2020?

7  A    Yes, we were.

8  Q    And did we subpoena records relating to all

9  citizen encounters from the Richmond Police

10 Department Fourth Focus Mission Team from that day

11 up until 9:45 p.m.

12 A    We did.

13 Q    In response to that did we get some materials

14 from Richmond Police Department?

15 A    Yes, we did.

16 Q    And I want to turn your attention to what has

17 been marked as exhibit I.

18       Exhibit I.  Do you recognize exhibit I?

19 A    Yes, I do.

20 Q    Are those materials we received in response to

21 the subpoena from the Fourth Precinct Focus Mission

22 Team activities on December 5?

23 A    Yes, they are.

24       MS KOENIG:  I move admission of exhibit I.

25       THE COURT:  Admitted.

**JA0204**

Hush - direct

1   BY MS KOENIG:

2   Q    Does exhibit I, which has -- look at the top,

3   first page of exhibit I, do you see that in the

4   upper right hand side it says case number?

5   A    Yes.

6   Q    What is the last four digits of that case

7   number?

8   A    0464.

9   Q    Does this incident report reflect an incident

10  that began with a traffic stop?

11  A    It appears to, yes.

12  Q    Does it indicate where the stop happened?

13  A    It does.

14  Q    Does the report indicate what the basis of the

15  traffic stop was?

16  A    Yes, it does.

17  Q    What was the basis?

18  A    Officers observed vehicle driving with no

19  headlights on.

20       THE COURT:  Where does it say that?

21  BY MS KOENIG:

22  Q    I believe, Mr. Hush, are you looking at the

23  third page under officer narrative?

24       THE COURT:  Okay.

25       THE WITNESS:  That's correct.

**JA0205**

Hush - direct

```
 1   BY MS KOENIG:

 2   Q    Does officer -- does exhibit I indicate in

 3   anyplace the race, gender, and age of the driver of

 4   the car?

 5   A    Not that I am aware of.  Not that I saw.

 6   Q    All right.

 7        On the next, on the page five of the report

 8   where it says incident report suspect list, does it

 9   indicate, exhibit I indicate the age, race and sex

10   of the passenger of the car?

11   A    Yes, it does.

12   Q    Okay.  That Is a 33 year old black man?

13   A    Correct.

14   Q    Did the officers end up searching this car?

15   A    Yes, they did.

16   Q    I am going to turn your attention now to what

17   has been marked exhibit 0.

18   A    Okay.

19   Q    Do you recognize what is in exhibit O?

20   A    This is more of the documentation we received

21   to our subpoena.

22   Q    From the Richmond Police Department?

23   A    Correct.

24        MS KOENIG:  I move admission of exhibit O.

25        THE COURT:  Admitted.
```

**JA0206**

Hush - direct

1   BY MS KOENIG:

2   Q    Mr. Hush, at the top of the first page of

3   exhibit O do you see where it says 202012050574?

4   A    Yes.

5   Q    Is that -- does this record indicate that that

6   incident number that ends in 0574, did that begin

7   with a traffic stop?

8        Do you see at the top it says TSOI, traffic

9   stop?

10  A    Yes, just after that says traffic stop, yes.

11  Q    Does anywhere in this exhibit indicate the

12  basis for the traffic stop?

13  A    Not that I would be able to determine.

14  Q    Does it indicate race, gender or age of the

15  driver?

16  A    No.

17  Q    Okay.  I want to turn your attention now to the

18  University of Virginia racial dot map.  What is the

19  University of Virginia racial dot map?

20  A    There is a center at University of Virginia

21  called the Weldon Copper School for Public Services.

22  Q    What did they do with the 2010 census data?

23  A    They took a bunch of different demographic data

24  and did various things, one of which was pinpoint by

25  race each individual who answered the census in the

**JA0207**

Hush - direct

1    United States.

2    Q    I want to show you what has been marked as

3    exhibit R 1.

4         Do you recognize what is in exhibit R 1?

5    A    Yes, I do.

6    Q    What Is it?

7    A    This is a drill down to a specific area in

8    Richmond from that census block data map.

9    Q    From the UVA racial dot map?

10   A    That's correct.

11        MS KOENIG:  Your Honor, I move to admit R 1?

12        MR. ELLIKER:  Your Honor, I think this is

13   irrelevant.

14        THE COURT:  Well, I think what -- okay.  I am

15   not sure that it is going to get her too far in this

16   case, but I have a sense, sneaky suspicion that she

17   is creating a record for me, or perhaps a higher

18   court to judge the legitimacy of the tactics by the

19   police.

20        Is that fair to say?

21        MS KOENIG:  That's correct, Your Honor.

22        THE COURT:  Let it go.  It's not like we are in

23   front of a jury.

24   BY MS KOENIG:

25   Q    Mr. Hush, in the census, in the UVA racial dot

**JA0208**

Hush - direct

1   map, did UVA plot racial people who were living in

2   certain areas according to different colors based on

3   their race?

4   A    Yes, they did.

5   Q    What color did green depict?

6        THE COURT:  I can read the key on the map.  I

7   went to William and Mary.  I can understand that.

8   BY MS KOENIG:

9   Q    Mr. Hush, have you reviewed the location of all

10  of the stops that we received information for in

11  response to our 16 F from the Richmond Police

12  Department?

13  A    Yes, I have.

14  Q    Did all of the stops fall within what we see is

15  the predominantly green area in R 1?

16  A    Yes, they did.

17  Q    I want you to take a look at what has been

18  marked as our defense exhibit R 2.  What do you see

19  in defense exhibit R 2?

20  A    Just a broader picture of the Richmond area

21  with that same dot census map.

22  Q    From the UVA Racial dot map?

23  A    Yes.

24       MS KOENIG:  I move to admit R 2.

25       THE COURT:  All right.  It's admitted.

**JA0209**

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 224 of 496

Hush - direct

1       MR. ELLIKER:  Subject to the same objection.

2   Thank you.

3       THE COURT:  I understand.

4   BY MS KOENIG:

5   Q    Mr. Hush, I am going to turn your attention now

6   to what is in exhibit X, which is --

7   A    F or X?

8   Q    X as in xylophone, which has been previously

9   admitted.

10  A    Okay.

11  Q    Do you recognize these as the four precincts,

12  police precincts from Richmond Police Department?

13  A    Yes, ma'am.

14  Q    If you were to overlay precincts two, four

15  and -- four, two and one; four, one, and two, I

16  guess, do those precincts, four, one and two,

17  correspond to what we see as the green areas of the

18  map on R 2?

19  A    Sorry.  Four, one and two?

20  Q    Yes.

21  A    They would fall into what is predominantly the

22  green areas.

23  Q    The blue area on the map, which is to the left

24  of where we see Richmond, that would be Precinct

25  Three?

**JA0210**

Hush - direct

1    A    Roughly, yes.

2    Q    Okay.

3         Also through your investigation in this case

4    did you become aware of Community Policing Act of

5    2020?

6    A    Yes.

7    Q    What is that?

8    A    A law that was passed in 2020 by the Virginia

9    legislature to compile various data in traffic

10   stops.

11   Q    Was that law effective January 1st of 2020?

12   A    Yes, it was.

13   Q    Did part of the Community Policing Act require

14   the creation of an open source data base?

15   A    It did.

16   Q    To hold the data collected in response to the

17   law?

18   A    That is my understanding, yes.

19   Q    And did you access that data base to determine

20   information about the traffic stops that Richmond

21   Police Department is collecting?

22   A    Yes, that data base is maintained by Virginia

23   State Police, and it is on line if --

24   Q    And I want to show you what has been marked, or

25   what has been marked as exhibit Y 1.

Hush - direct

 1   A    Okay.

 2   Q    Do you recognize what is in this exhibit?

 3   A    Yes.

 4   Q    Is this a screen shot that is taken from that

 5   open source data that is in response to the

 6   Community Policing Act?

 7   A    Yes, it is.

 8   Q    And the filter at top indicates that the

 9   filters for this data are Richmond Police Department

10   from dates July 1st of 2020 to December 5 of 2020?

11   A    It is cut off.  It says December 5, but that is

12   December 5 of 2020.

13   Q    Okay.  And that indicates that stops by race by

14   the Richmond Police Department from those dates was

15   76 percent people of the African-American race?

16   A    Yes.

17        MS KOENIG:  Judge, I move to admit defendant's

18   exhibit Y 1.

19        MR. ELLIKER:  Subject to the objection that it

20   is irrelevant to the Constitutional issues before

21   The Court.

22        THE COURT:  Admitted.

23   BY MS KOENIG:

24   Q    Mr. Hush, I want to turn your attention to Y 2.

25   A    Okay.

**JA0212**

Hush - direct

1    Q    Do you also recognize this as a screen shot

2    from the open source data base that you had accessed

3    before?

4    A    Yes, the same incident date with the 2020 cut

5    off on the December date.

6    Q    With the same filter that we were just talking

7    about?

8    A    Yes.

9    Q    Does that indicate that 84 percent of the cars

10   that were stopped were not searched?

11   A    Yes, that is what it indicates.

12   Q    Meaning only 16 percent are searched?

13   A    Yes.

14   Q    And have you also reviewed as part of your

15   investigation into this case the census data from

16   the United States census Bureau Quick Facts in 2019?

17   A    I did.

18   Q    Did that indicate what percentage of Richmond

19   is composed of white people and black people?

20   A    It does.

21   Q    What did those rough percentages?

22   A    Depending on how you define white, it could be

23   as low as 42 percent or as high as 46 depending on

24   if you include Hispanic population or not.

25   Q    What is the black population of Richmond?

**JA0213**

Hush - direct

1   A      Roughly 47 to 48 percent.

2          MS KOENIG:  No further questions, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Mr. Elliker, do you have any questions?

5          MR. ELLIKER:  No questions, Your Honor.

6          THE COURT:  All right.

7          Thank you, Mr. Hush.  Thank you very much.

8   Have a good rest of the day.

9          And he may be excused?

10         MS KOENIG:  He can, Your Honor.

11         MR. ELLIKER:  Yes, Your Honor.

12         THE COURT:  Thank very much, sir.  Have a good

13  rest of the afternoon.

14                   (Witness stood aside)

15         THE COURT:  All right.

16         Do you have any other witnesses?

17         MS KOENIG:  No other witnesses, Your Honor.

18         THE COURT:  All right.

19         Well, I have a sentencing at 2:00 o'clock.

20         Let's sort of figure out where we are going to

21  go from here.

22         Do you have additional argument, Ms Koenig,

23  beyond what is in the written motion?

24         MS KOENIG:  Your Honor, I will be frank that

25  most of the evidence that I have presented to The

```
 1    Court today I got within the last few days, and so I
 2    do believe I may have some additional arguments that
 3    may merit additional briefing that could be helpful
 4    for The Court.
 5        THE COURT:  All right.
 6        MS KOENIG:  So I guess I am asking for an
 7    opportunity to submit a supplemental motion to
 8    suppress evidence based on the evidence as was
 9    given, and I would appreciate being able to have --
10        THE COURT:  You may file a supplemental brief
11    in support each of those.
12        MS KOENIG:  It may be helpful to have the
13    transcript to be able to cite --
14        THE COURT:  As part of a gift to my law clerk I
15    will allow you to file a brief within seven days.
16        Okay.
17        Mr. Elliker, you can file a response brief
18    three days after that.
19        MR. ELLIKER:  Four days?
20        THE CLERK:  Seven and four, that's 11.
21        MS KOENIG:  Your Honor, I do see Mr. Halasz is
22    shaking his --
23        THE COURT:  What?
24        MS KOENIG:  -- I do see that Mr. Halasz is
25    shaking his head at me that we wouldn't be able to
```

**JA0215**

 1   get a transcript within that time frame, so it would

 2   have to be relying on my notes.

 3       THE COURT:  You have to rely on your memory.

 4       MS KOENIG:  Thank you.

 5       THE COURT:  Don't worry about it.

 6       I am sure your memory will be pretty good in

 7   that short period of time.

 8       Anything else?

 9       MR. ELLIKER:  No, Your Honor.  Thank you.

10       THE COURT:  Let me just say, Ms Koenig, I

11   understand what the law to be, that if the police

12   can come up with evidence that some kind of crime or

13   offense, they can stop somebody, and then they can

14   certainly look in their car from the outside.

15       Do you disagree with that?  That is pretty much

16   what the Supreme Court has said, isn't it?

17       MS KOENIG:  So, I think this is little bit more

18   of a complicated question.

19       THE COURT:  Start with that proposition.  If

20   that proposition is true.

21       MS KOENIG:  So, I will agree with The Court

22   that Wren versus United States allows the government

23   to, the police officers to stop cars under what we

24   would call pre-textual circumstances.

25       THE COURT:  All right.

**JA0216**

```
 1      MS KOENIG:  Wren versus United States also had
 2   a stop that was committed based on probable cause
 3   that some traffic violation had actually been
 4   committed.  I will also submit to The Court that the
 5   evidence before this Court, and the evidence that is
 6   growing before other courts, is significantly
 7   different than what was before those courts at that
 8   time.  And so the government has made, you know,
 9   arguments about Hodari D., which I just don't think
10   applies in this circumstance.  And I have some cases
11   that will make clear to The Court why that is.
12      But law has evolved over time to denigrate the
13   rights of minority citizens, and it is done so in
14   such a way that it is often lawyers like myself
15   coming up and making those arguments but without
16   evidence that shows that.  I think I have it in this
17   case.  So, I want to be able to present to The Court
18   a more complete picture about what I think the law
19   is, and potentially where it needs to go.
20      THE COURT:  Well, so your point in this case is
21   that while, yes, they can search anybody's car they
22   want to, they can't go around picking
23   African-American people, or picking on people in the
24   African-American community because, you know, I must
25   say, I looked at those charts from the Weldon Cooper
```

**JA0217**

```
 1    Institute and I was pretty well shocked there are
 2    absolutely no Caucasians that live in Highland Park,
 3    and very few African-Americans that live over there
 4    on the other side of Broad Street, but --
 5         MS KOENIG:  I think, Your Honor -- so, I am not
 6    in a position where I am at a case where there is
 7    like clearly, you know there is something that would
 8    be just unquestionable, like a stop.  My position
 9    is, and I think the evidence will show, has shown,
10    that this is a questionable stop at best.  In that
11    circumstance what we have is we do have to look at
12    both pieces of this.  The cases that have come
13    before The Court so far have not had that
14    circumstance when it is resolved against the
15    defendant.  We are talking about pre-textual stops,
16    something that is a clear violation of the law.  I
17    don't think that that is what we have here.
18         THE COURT:  Okay.  Well, you know, as I
19    understand the law that has been given to me by the
20    Supreme Court and the Court of Appeals, it looks
21    like you don't win this motion.  But, I hope you do.
22         If not here, in the Fourth Circuit or the
23    Supreme Court.
24         MS KOENIG:  I appreciate that, Your Honor.
25         THE COURT:  All right.
```

**JA0218**

```
 1          Mr. Elliker.  Thank you all very much.
 2          Let's recess court.
 3
 4                    HEARING ADJOURNED
 5       THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.
 6                 GILBERT FRANK HALASZ, RMR
 7                  Official Court Reporter
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

index

```
     Witness - event                       pg     ln

     Collombo - direct                      7      8
     Collombo - cross                      21      8
     Collombo - redirect                   46      2
     Mills - direct                        48     10
     Mills - cross                         57      8
     Mills - redirect                      91     11
     Torres - direct                       93     17
     Torres - cross                       100     22
     Williams - direct                    101     22
     Williams - cross                     113     14
     Williams - redirect                  129     12
     Spinos - direct                      133      6
     Spinos - cross                       139     6k
     Gilbert - direct                     145      7
     Gilbert - cross                      155      8
     Hush - direct                        157     24
```

**JA0220**



2020-12-05 T23:39:50Z
AXON BODY 2 X81316075

GOVERNMENT
EXHIBIT
**3**
3:21CR42

USCA4 Appeal: 24-4201      Doc: 22-1      Filed: 09/04/2024      Pg: 235 of 496



GOVERNMENT
EXHIBIT
**6**
3:21CR42



**IMPORTANT:**
**READ NOTICE ON REVERSE SIDE.**

VUS REV. 7-01-15

**VIRGINIA UNIFORM SUMMONS**

19- 187258

**HANOVER COUNTY SHERIFF'S OFFICE**

YOU ARE SUMMONED TO APPEAR IN THE [CITY] COUNTY OF

**HANOVER**

☐ GENERAL DISTRICT COURT (TRAFFIC)
☐ GENERAL DISTRICT COURT (CRIMINAL)
☐ JUVENILE & DOMESTIC RELATIONS DISTRICT COURT

**HANOVER COURTHOUSE, VIRGINIA**

**P.O. BOX 176, HANOVER, VIRGINIA 23069**

ON _____ 20__ AT ____ ☐ A.M. ☐ P.M.
ADDRESS

FOR VIOLATION OF ☐ STATE ☐ COUNTY ☐ CITY ☐ TOWN

LAW SECTION _____ ☐ DESCRIBE CHARGE:

COMMERCIAL MOTOR VEHICLE ☐ YES ☐ NO
HAZARDOUS MATERIALS ☐ YES ☐ NO
RESULTED IN FATALITY ☐ YES ☐ NO
HIGHWAY SAFETY CORRIDOR ☐ YES ☐ NO

I PROMISE TO APPEAR AT THE TIME AND PLACE SHOWN ABOVE. SIGNING THIS SUMMONS IS NOT AN ADMISSION OF GUILT. I CERTIFY THAT MY CURRENT MAILING ADDRESS IS AS SHOWN BELOW

YOU MUST APPEAR AT TRIAL (JUVENILES MUST APPEAR WITH PARENT/ LEGAL GUARDIAN).

☐ YOU MAY AVOID COMING TO COURT ONLY IF THIS BLOCK IS CHECKED AND ALL INSTRUCTIONS ON DEFENDANT'S COPY ARE FOLLOWED.

ONLY CALL **(804) 365-6191 OR 730-6191** IF MORE HELP IS NEEDED.

MAILING ADDRESS: ☐ SAME AS ABOVE AT RIGHT    P.O. BOX/STREET
☐ CHANGE FROM D.L.

**WAIVER OF A TRIAL (PLEA OF GUILTY)**

BY SIGNING BELOW, I CERTIFY THAT I HAVE READ THE NOTICE AND I AM ENTERING MY WRITTEN APPEARANCE IN THE COURT CASE RESULTING FROM THE VIOLATION CHARGED ON THIS SUMMONS. I UNDERSTAND THAT INSTEAD OF A TRIAL, WHICH I AM GIVING UP, I ALSO UNDERSTAND THAT MY PLEA OF GUILTY WILL HAVE THE SAME FORCE AND EFFECT AS A FINDING OF GUILTY BY A JUDGE AND THAT A RECORD OF MY GUILTY PLEA TO AN OFFENSE PERTAINING TO THE OPERATION OF A MOTOR VEHICLE WILL BE SENT TO THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES (OR TO THE LICENSING AUTHORITY OF THE STATE WHICH ISSUED MY LICENSE). I FURTHER UNDERSTAND THAT IF ANY OF THE BLOCKS TO THE RIGHT LABELED "COMMERCIAL MOTOR VEHICLE," "HAZARDOUS MATERIALS," "RESULTED IN FATALITY," "HIGHWAY SAFETY CORRIDOR" OR "CDL HOLDER" ARE CHECKED "YES", MY PLEA IS AN ADMISSION THAT, AT THE TIME OF THE VIOLATION CHARGED, I WAS OPERATING A COMMERCIAL MOTOR VEHICLE, CARRYING HAZARDOUS MATERIALS, DRIVING IN A HIGHWAY SAFETY CORRIDOR THAT A CDL HOLDER, AND/OR THE VIOLATION RESULTED IN A FATALITY, AS INDICATED BY THE "YES" CHECK MARKS. UNDERSTANDING ALL THIS, I PLEAD GUILTY TO THE VIOLATION CHARGED, WAIVE MY RIGHT TO A TRIAL, AND ENCLOSE THE FINE, COSTS AND FEES PRESCRIBED.

SIGNATURE _____

DATE _____

**IF ACCUSED IS A JUVENILE**

IF ACCUSED IS UNDER 18 YEARS OF AGE, THE ACCUSED'S PARENT OR LEGAL GUARDIAN MUST ALSO SIGN BELOW. IF A COPY OF THE FORM IS MAILED TO THE COURT, PARENT'S OR LEGAL GUARDIAN'S SIGNATURE MUST BE NOTARIZED.

SIGNATURE OF PARENT/GUARDIAN    DATE

SWORN AND SUBSCRIBED TO BEFORE ME THIS DATE.

☐ NOTARY PUBLIC ☐ CLERK ☐ MAGISTRATE    DATE

CITY/COUNTY    STATE

MY COMMISSION EXPIRES:

19-

**CASE NO.** _____

NAME _____ LAST _____ FIRST _____ MIDDLE _____

RES. ADDRESS _____ RES. JURIS _____

CITY/TOWN _____ STATE _____ ZIP _____

RACE ☐ SEX ☐ HT. ___ IN. ___ WGT. ___ EYES ___ HAIR ___

DL/CDL # IF CRIMINAL OFFENSE OR IF NO LICENSE, USE SSN) _____ STATE _____

CDL HOLDER ☐ YES ☐ NO

V YEAR _____ MAKE _____ TYPE _____ LICENSE NO. _____ STATE _____
E
H YEAR _____

JURISDICTION OF OFFENSE _____ DATE OF OFFENSE _____ DAY OF WEEK _____ TIME _____ ☐ A.M. ☐ P.M.

**042**

DIRECTION _____ ACCIDENT ☐ YES ☐ NO    WEATHER _____ ROUTE NUMBER/STREET _____

LOCATION OF OFFENSE: _____

ARREST DATE _____    ARREST LOCATION _____

OFFICER _____    CODE/BADGE NO. _____

P.O. BOX/STREET _____ CITY/TOWN _____ STATE _____ ZIP _____

**PRETRIAL WAIVER AND PREPAYMENT INSTRUCTIONS**

1. CALCULATE THE AMOUNT OWED FROM PREPAYABLE OFFENSE INFORMATION SHEET IF GIVEN A COPY BY THE ARRESTING OFFICER, OTHERWISE:
   A. PROMPTLY CALL THE TELEPHONE NUMBER LISTED ABOVE.
   B. IF YOU HEAR A PRE-RECORDED MESSAGE, LISTEN TO THE ENTIRE MESSAGE. OTHERWISE, TELL THE PERSON ANSWERING THE TELEPHONE THAT YOU WISH TO WAIVE TRIAL AND "PREPAY" THE FINE, COSTS AND FEES. STATE THE EXACT CHARGE DESCRIPTION AND LAW SECTION NUMBER (IF ANY WRITTEN ON THE SUMMONS). DISTRICT COURTS ACCEPT PERSONAL CHECKS AND CREDIT CARDS BUT, IF YOU WISH TO PAY BY CREDIT CARD, YOU SHOULD ASK THE COURT WHICH TYPE OF CREDIT CARD IT ACCEPTS.
   C. WRITE DOWN THE AMOUNT TO BE PAID AND ANY SPECIAL INSTRUCTIONS.
2. SIGN AND DATE THE WAIVER OF A TRIAL ON THIS SUMMONS. ALSO COMPLETE PROCEDURE "IF ACCUSED IS A JUVENILE" IF YOU ARE CHARGED WITH A MOTOR VEHICLE OFFENSE AND ARE UNDER AGE 18.
3. PROMPTLY MAIL OR DELIVER TO THE COURT THIS SUMMONS WITH PAYMENT ATTACHED. PAYMENT MUST BE RECEIVED BY THE COURT BEFORE THE TRIAL DATE. TIMELY DELIVERY BY MAIL IS AT THE SENDER'S RISK.

**READ NOTICE ON REVERSE.**

*IF PREPAYMENT IS MADE, ATTACH PAYMENT HERE.*    DEFENDANT'S COPY - PAGE 3

**JA0224**

# NOTICE

○ THE FINAL OUTCOME OF YOUR CASE RESTS WITH THE COURT AND IS A MATTER OVER WHICH NEITHER THE ARRESTING OFFICER NOR HIS DEPARTMENT HAS ANY CONTROL.

○ YOU ARE PRESUMED INNOCENT UNTIL PROVEN GUILTY BEYOND A REASONABLE DOUBT.

○ YOU HAVE THE RIGHT TO HIRE A LAWYER.

○ YOU HAVE THE RIGHT TO HAVE THE CLERK ISSUE SUBPOENAS TO REQUIRE WITNESSES TO APPEAR ON YOUR BEHALF IN VIRGINIA, IF A WRITTEN REQUEST IS FILED IN THE CLERK'S OFFICE AT LEAST TEN (10) DAYS BEFORE TRIAL.

○ YOU HAVE THE RIGHT TO PLEAD GUILTY OR NOT GUILTY OR NOLO CONTENDERE TO ANY CHARGE PLACED AGAINST YOU.

○ IF CONVICTED BY THE DISTRICT COURT YOU HAVE THE RIGHT TO APPEAL WITHIN TEN (10) DAYS AFTER TRIAL.

○ BY SIGNING THIS SUMMONS, YOU HAVE CERTIFIED TO YOUR CURRENT MAILING ADDRESS. OFFICIAL NOTICES WILL BE MAILED TO THAT ADDRESS (UNLESS YOU HAVE NOTIFIED THE COURT OF A CHANGE OF ADDRESS) AND SUCH NOTICES ARE CONSIDERED ADEQUATE NOTICE EVEN IF YOU DO NOT ACTUALLY RECEIVE THEM. YOU MUST NOTIFY THE COURT OF ANY CHANGE OF ADDRESS TO ALLOW SUCH NOTICES TO REACH YOU. IF THE COURT HAS BEEN NOTIFIED OF A CHANGE OF ADDRESS, OFFICIAL NOTICES WILL BE MAILED TO THAT NEW ADDRESS, AND NOTICES SENT TO SUCH ADDRESS WILL BE CONSIDERED ADEQUATE NOTICE.

○ IF YOU FAIL TO ENTER A WRITTEN OR COURT APPEARANCE, YOU MAY BE TRIED IN YOUR ABSENCE. IF FOUND GUILTY, THE COURT WILL IMPOSE SENTENCE. IN ADDITION, THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES OR THE LICENSING AUTHORITY WHICH ISSUED YOUR DRIVER'S LICENSE WILL BE NOTIFIED OF ALL CONVICTIONS PERTAINING TO THE OPERATION OF A MOTOR VEHICLE.

○ YOUR FAILURE TO TIMELY PAY FINES, COSTS AND FEES IMPOSED UPON A FINDING OF GUILT WILL RESULT IN THE SUSPENSION OF YOUR DRIVER'S LICENSE AND VIRGINIA DRIVING PRIVILEGES.

○ IF THE OFFENSE INVOLVED THE OPERATION OF A COMMERCIAL MOTOR VEHICLE OR A VEHICLE CARRYING HAZARDOUS MATERIALS, THE CONVICTION MAY AFFECT YOUR RIGHT TO OPERATE SUCH A VEHICLE IN THE FUTURE PURSUANT TO THE VIRGINIA COMMERCIAL DRIVER'S LICENSE ACT OR SIMILAR LAWS IN OTHER STATES.

○ IF YOUR LICENSE IS SUSPENDED OR REVOKED, YOU WILL BE REQUIRED TO PAY A REINSTATEMENT FEE TO THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES AND COMPLY WITH THE APPLICABLE ADMINISTRATIVE REINSTATEMENT REQUIREMENTS OF THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES.

○ IN ADDITION TO THE PRETRIAL WAIVER AND PREPAYMENT INSTRUCTIONS ON THIS SUMMONS, YOU MAY ALSO BE ABLE TO PREPAY ON THE INTERNET BY GOING TO VIRGINIA'S JUDICIAL WEBSITE AT: http//www.courts.state.va.us.

TO COMMENT TO THE LAW ENFORCEMENT AGENCY REGARDING THE PROFESSIONAL BEHAVIOR OR DEMEANOR OF THE OFFICER ISSUING THIS SUMMONS PLEASE CALL (804) 365-6110 . THIS NUMBER IS **NOT** FOR RESOLVING THE CHARGE INDICATED ON THE SUMMONS, WHICH CAN ONLY BE DONE THROUGH THE COURTS.

**JA0225**

**VIRGINIA UNIFORM SUMMONS**

19- 187259

CASE NO.

## IMPORTANT:
## READ <u>NOTICE</u> ON REVERSE SIDE.

**HANOVER COUNTY SHERIFF'S OFFICE**

YOU ARE SUMMONED TO APPEAR IN THE ☒ TOWN ☐ COUNTY OF)

**HANOVER**

NAME ___ LAST ___ FIRST ___ MIDDLE

RES. ADDRESS

CITY/TOWN ___ STATE ___ ZIP ___ RES. JURIS.

☐ GENERAL DISTRICT COURT (TRAFFIC)
☐ GENERAL DISTRICT COURT (CRIMINAL)
☐ JUVENILE & DOMESTIC RELATIONS DISTRICT COURT

**HANOVER COURTHOUSE, VIRGINIA**

**P.O. BOX 176, HANOVER, VIRGINIA 23069**

RACE ___ SEX ___ HT. ___ WGT. ___ EYES ___ HAIR

ADDRESS

ON ___ 20 ___ AT ___ ☐ A.M. ☐ P.M.

FOR VIOLATION OF ☐ STATE ☐ COUNTY ☐ CITY ☐ TOWN

DL/DL ☐ IF CRIMINAL OFFENSE OR TO USE LICENSE, USE SSN)

CDL HOLDER ☐ YES ☐ NO

LAW SECTION ___ DESCRIBE CHARGE:

YEAR ___ MAKE ___ TYPE ___ LICENSE NO. ___ STATE

DATE OF OFFENSE

042

JURISDICTION OF OFFENSE ___ DATE OF OFFENSE ___ DAY OF WEEK ___ TIME ___ ☐ A.M. ☐ P.M.

DIRECTION ___ ACCIDENT ☐ YES ☐ NO ___ WEATHER ___ ROUTE NUMBER/STREET

COMMERCIAL MOTOR VEHICLE ☐ YES ☐ NO
HAZARDOUS MATERIALS ☐ YES ☐ NO
RESULTED IN FATALITY ☐ YES ☐ NO
HIGHWAY SAFETY CORRIDOR ☐ YES ☐ NO

LOCATION OF OFFENSE:

I PROMISE TO APPEAR AT THE TIME AND PLACE SHOWN ABOVE. SIGNING THIS SUMMONS IS NOT AN ADMISSION OF GUILT. I CERTIFY THAT MY CURRENT MAILING ADDRESS IS AS SHOWN BELOW

ARREST DATE ___ ARREST LOCATION

OFFICER ___ CODE/BADGE NO.

SIGNATURE

YOU MUST APPEAR AT TRIAL (JUVENILES MUST APPEAR WITH PARENT/ LEGAL GUARDIAN):

P.O. BOX/STREET ___ CITY/TOWN ___ STATE ___ ZIP

ONLY CALL **(804) 365-6191 OR 730-6191.** IF MORE HELP IS NEEDED.

MAILING ADDRESS:☐ SAME AS ABOVE AT RIGHT
☐ CHANGE FROM D.L.

### PRETRIAL WAIVER AND PREPAYMENT INSTRUCTIONS

1. CALCULATE THE AMOUNT OWED FROM PREPAYABLE OFFENSE INFORMATION SHEET IF GIVEN A COPY BY THE ARRESTING OFFICER, OTHERWISE:
   A. PROMPTLY CALL THE TELEPHONE NUMBER LISTED ABOVE.
   B. IF YOU HEAR A PRE-RECORDED MESSAGE, LISTEN TO THE ENTIRE MESSAGE. OTHERWISE, TELL THE PERSON ANSWERING THE TELEPHONE THAT YOU WISH TO WAIVE TRIAL AND "PREPAY" THE FINE, COSTS AND FEES. STATE THE EXACT CHARGE DESCRIPTION AND LAW SECTION NUMBER (IF ANY) WRITTEN ON THE SUMMONS. DISTRICT COURTS ACCEPT PERSONAL CHECKS AND CREDIT CARDS BUT, IF YOU WISH TO PAY BY CREDIT CARD, YOU SHOULD ASK THE COURT WHICH TYPE OF CREDIT CARD IT ACCEPTS.
   C. WRITE DOWN THE AMOUNT TO BE PAID AND ANY SPECIAL INSTRUCTIONS.
2. SIGN AND DATE THE WAIVER OF A TRIAL ON THIS SUMMONS. ALSO COMPLETE PROCEDURE "IF ACCUSED IS A JUVENILE" IF YOU ARE CHARGED WITH A MOTOR VEHICLE OFFENSE AND ARE UNDER AGE 18.
3. PROMPTLY MAIL OR DELIVER TO THE COURT THIS SUMMONS WITH PAYMENT ATTACHED. PAYMENT MUST BE RECEIVED BY THE COURT BEFORE THE TRIAL DATE. TIMELY DELIVERY BY MAIL IS AT THE SENDER'S RISK.

**WAIVER OF A TRIAL (PLEA OF GUILTY)**

SIGNING BELOW, I CERTIFY THAT I HAVE READ THE NOTICE AND I AM ENTERING MY WRITTEN APPEARANCE, A PERSONAL APPEARANCE IN THE COURT CASE RESULTING FROM THE VIOLATION CHARGED ON THIS SUMMONS. I UNDERSTAND THAT I HAVE A RIGHT TO A TRIAL, WHICH I AM GIVING UP. I ALSO UNDERSTAND THAT MY PLEA OF GUILTY WILL HAVE THE SAME FORCE AND EFFECT AS A FINDING OR GUILTY BY A JUDGE AND THAT A RECORD OF MY GUILTY PLEA TO AN OFFENSE PERTAINING TO THE OPERATION OF A MOTOR VEHICLE WILL BE SENT TO THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES (OR TO THE LICENSING AUTHORITY WHICH ISSUED MY LICENSE). I FURTHER UNDERSTAND THAT IF ANY OF THE BLOCKS TO THE RIGHT LABELED "COMMERCIAL MOTOR VEHICLE," "HAZARDOUS MATERIALS," "RESULTED IN FATALITY," "HIGHWAY SAFETY CORRIDOR" OR "CDL HOLDER" ARE CHECKED "YES", MY PLEA IS AN ADMISSION THAT, AT THE TIME OF THE VIOLATION CHARGED, I WAS OPERATING A COMMERCIAL MOTOR VEHICLE, CARRYING HAZARDOUS MATERIALS, DRIVING IN A HIGHWAY SAFETY CORRIDOR, WAS A CDL HOLDER, AND/OR THE VIOLATION RESULTED IN A FATALITY, AS INDICATED BY THE "YES" CHECK MARKS. UNDERSTANDING ALL THIS, I PLEAD GUILTY TO THE VIOLATION CHARGED, WAIVE MY RIGHT TO A TRIAL, AND ENCLOSE THE FINE, COSTS AND FEES PRESCRIBED.

SIGNATURE ___

DATE ___

**IF ACCUSED IS A JUVENILE**

IF ACCUSED IS UNDER 18 YEARS OF AGE, THE ACCUSED'S PARENT OR LEGAL GUARDIAN MUST ALSO SIGN, IN PERSON AT THE COURT, OR IF THE FORM IS MAILED TO THE COURT, PARENT'S OR LEGAL GUARDIAN'S SIGNATURE MUST BE NOTARIZED.

SIGNATURE OF PARENT/GUARDIAN ___ DATE ___

SWORN AND SUBSCRIBED TO BEFORE ME THIS DATE.

☐ NOTARY PUBLIC ☐ CLERK ☐ MAGISTRATE ___ DATE ___

CITY/COUNTY ___ STATE ___

MY COMMISSION EXPIRES:

19- 187259

**IF PREPAYMENT IS MADE, ATTACH PAYMENT HERE.** DEFENDANT'S COPY - PAGE 3 **READ NOTICE ON REVERSE.** VUS REV. 7-01-15

**JA0226**

# NOTICE

○ THE FINAL OUTCOME OF YOUR CASE RESTS WITH THE COURT AND IS A MATTER OVER WHICH NEITHER THE ARRESTING OFFICER NOR HIS DEPARTMENT HAS ANY CONTROL.

○ YOU ARE PRESUMED INNOCENT UNTIL PROVEN GUILTY BEYOND A REASONABLE DOUBT.

○ YOU HAVE THE RIGHT TO HIRE A LAWYER.

○ YOU HAVE THE RIGHT TO HAVE THE CLERK ISSUE SUBPOENAS TO REQUIRE WITNESSES TO APPEAR ON YOUR BEHALF IN VIRGINIA, IF A WRITTEN REQUEST IS FILED IN THE CLERK'S OFFICE AT LEAST TEN (10) DAYS BEFORE TRIAL.

○ YOU HAVE THE RIGHT TO PLEAD GUILTY OR NOT GUILTY OR NOLO CONTENDERE TO ANY CHARGE PLACED AGAINST YOU.

○ IF CONVICTED BY THE DISTRICT COURT YOU HAVE THE RIGHT TO APPEAL WITHIN TEN (10) DAYS AFTER TRIAL.

○ BY SIGNING THIS SUMMONS, YOU HAVE CERTIFIED TO YOUR CURRENT MAILING ADDRESS. OFFICIAL NOTICES WILL BE MAILED TO THAT ADDRESS (UNLESS YOU HAVE NOTIFIED THE COURT OF A CHANGE OF ADDRESS) AND SUCH NOTICES ARE CONSIDERED ADEQUATE NOTICE EVEN IF YOU DO NOT ACTUALLY RECEIVE THEM. YOU MUST NOTIFY THE COURT OF ANY CHANGE OF ADDRESS TO ALLOW SUCH NOTICES TO REACH YOU. IF THE COURT HAS BEEN NOTIFIED OF A CHANGE OF ADDRESS, OFFICIAL NOTICES WILL BE MAILED TO THAT NEW ADDRESS, AND NOTICES SENT TO SUCH ADDRESS WILL BE CONSIDERED ADEQUATE NOTICE.

○ IF YOU FAIL TO ENTER A WRITTEN OR COURT APPEARANCE, YOU MAY BE TRIED IN YOUR ABSENCE. IF FOUND GUILTY, THE COURT WILL IMPOSE SENTENCE. IN ADDITION, THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES OR THE LICENSING AUTHORITY WHICH ISSUED YOUR DRIVER'S LICENSE WILL BE NOTIFIED OF ALL CONVICTIONS PERTAINING TO THE OPERATION OF A MOTOR VEHICLE.

○ YOUR FAILURE TO TIMELY PAY FINES, COSTS AND FEES IMPOSED UPON A FINDING OF GUILT WILL RESULT IN THE SUSPENSION OF YOUR DRIVER'S LICENSE AND VIRGINIA DRIVING PRIVILEGES.

○ IF THE OFFENSE INVOLVED THE OPERATION OF A COMMERCIAL MOTOR VEHICLE OR A VEHICLE CARRYING HAZARDOUS MATERIALS, THE CONVICTION MAY AFFECT YOUR RIGHT TO OPERATE SUCH A VEHICLE IN THE FUTURE PURSUANT TO THE VIRGINIA COMMERCIAL DRIVER'S LICENSE ACT OR SIMILAR LAWS IN OTHER STATES.

○ IF YOUR LICENSE IS SUSPENDED OR REVOKED, YOU WILL BE REQUIRED TO PAY A REINSTATEMENT FEE TO THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES AND COMPLY WITH THE APPLICABLE ADMINISTRATIVE REINSTATEMENT REQUIREMENTS OF THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES.

○ IN ADDITION TO THE PRETRIAL WAIVER AND PREPAYMENT INSTRUCTIONS ON THIS SUMMONS, YOU MAY ALSO BE ABLE TO PREPAY ON THE INTERNET BY GOING TO VIRGINIA'S JUDICIAL WEBSITE AT: http//www.courts.state.va.us.

TO COMMENT TO THE LAW ENFORCEMENT AGENCY REGARDING THE PROFESSIONAL BEHAVIOR OR DEMEANOR OF THE OFFICER ISSUING THIS SUMMONS PLEASE CALL (804) 365-6110 . THIS NUMBER IS **NOT** FOR RESOLVING THE CHARGE INDICATED ON THE SUMMONS, WHICH CAN ONLY BE DONE THROUGH THE COURTS.



JA0228

Filed: 09/04/2024    Pg: 243 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

## INCIDENT/INVESTIGATION
## INTERNAL COPY

| INCIDENT DATA | | |
|---|---|---|
| Agency Name | *Richmond Police Department* | Case# *2020-12050464* |
| ORI | *VA1220000* | Date / Time Reported *12/05/2020  19:20  Sat* |
| | | Last Known Secure *12/05/2020  19:20  Sat* |

| Location of Incident | Premise Type | Sector/DispZone | |
|---|---|---|---|
| *2600 2ND AVE - BLK, Richmond VA 23222-* | *Highway / Road / Alley* | 411, 093A | At Found *12/05/2020  19:20  Sat* |

| | Crime Incident(s) | (Com) | Weapon / Tools | | | | Activity |
|---|---|---|---|---|---|---|---|
| #1 | *Drug/narcotic Violation* *35A1* | | | | | | *D* |
| | | | Entry | Exit | | Security | |
| #2 | Crime Incident *Weapon Law Violations* *520A* | (Com) | Weapon / Tools *Handgun* | | | | *P* |
| | | | Entry | Exit | | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | | Activity |
| | | | Entry | Exit | | Security | |

MO

| VICTIM | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| # of Victims  1 | Type: SOCIETY/COMMONWEALTH OF | | Injury: | | | | | | |
| V1 | Victim/Business Name (Last, First, Middle) *Commonwealth Of Virginia* | | Victim of Crime # *1,2* | DOB  Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | Home Phone | | |
| Employer Name/Address | | | | | | Business Phone | | Mobile Phone | |
| VYR | Make | Model | Style | Color | Lic/Lis | | VIN | | |

CODES: V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)

| OTHERS INVOLVED | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Type: | | | Injury: | | | | | | |
| Code | Name (Last, First, Middle) | | Victim of Crime # | DOB  Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | Home Phone | | |
| Employer Name/Address | | | | | | Business Phone | | Mobile Phone | |
| Type: | | | Injury: | | | | | | |
| Code | Name (Last, First, Middle) | | Victim of Crime # | DOB  Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | Home Phone | | |
| Employer Name/Address | | | | | | Business Phone | | Mobile Phone | |

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | 13 | EVID | $0.00 | | 1 | Firearms | 380/RUGAR/Lcpii | 380212987 |
| | 59 | EVID | $0.00 | | 6 | CARTRIDGES | 380/ | |
| | 20 | EVID | $475.00 | | 1 | CASH | | |
| | 75 | EVID | $0.00 | | 1 | IPHONE | APPLE/Iphone | |
| | 11 | EVID | $0.00 | | 1 | DRUG EQUIPMENT | | |
| | 25 | EVID | $0.00 | | 1 | BACKPACK | | |

| Officer/ID# | *TORRES, J. A.* | | | |
|---|---|---|---|---|
| Invest ID# | *TORRES, J. A.* | | Supervisor | *SPINOS, M. E.* |
| Status | Complainant Signature | Case Status *Cleared By Arrest*  *12/05/2020* | Case Disposition: | Page 1 |

| R_CS11BR | Printed By: PRENDERGASB, | Sys#: 1041562 | 07/09/2021 12:16 |
|---|---|---|---|

**JA0229**

*Richmond Police Department*

Case # *2020-12050464*

| Status Codes | 1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown |
|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D R U G S | E | 6 | 50.000 | GM | Marijuana | |
| | E | EVI | 50.000 | GM | Marijuana | |
| | E | EVI | 1.000 | GM | Marijuana | |
| | A | EVI | 1.000 | GM | Crack Cocaine | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:   *None (No Bias)*

**INCIDENT/INVESTIGATION REPORT**

Narr. (cont.)  OCA: 2020-12050464          *Richmond Police Department*

N A R R A T I V E

JA0230

| OCA |
| --- |
| *2020-12050464* |

| *Richmond Police Department* | | |
| --- | --- | --- |
| Victim | Offense | Date / Time Reported |
| *Society* | *DRUG/NARCOTIC VIOLATION* | *Sat 12/05/2020 19:20* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Traffic stop yielding marijuana, crack and a firearm.

On 12/05/2020, at approximately 1735 hours, 4th FMT officers Torres, Digirolamo, and Young were patrolling in a marked vehicle, traveling north in the 3000 block of Meadowbridge ave. The officers observed a 2010 white Pontiac bearing Virginia license plate USJ9842 traveling south in the 3000 block of Meadowbridge ave. The officers observed the vehicle driving with no headlights on. The officers turned around and caught up to the vehicle in the 2600 block of 2nd ave where they initiated their emergency lights and conducted a traffic stop at that location.

Upon initial approach, Officer Digirolamo approached the driver side of the vehicle and engaged the driver. During the officer's encounter at the driver's side window, he observed a small amount of marijuana in the driver's side door handle. He informed the officers about the marijuana, then went back to the marked vehicle to run the driver's information.

Upon initial approach, Officer Torres approached the passenger side of the vehicle, which is where the offender, Laferamo Booker, was sitting. Officer Torres observed a a black backpack sitting on the passenger floor between Mr. Booker's legs.

When Officer Digirolamo re-approached the vehicle, he instructed the driver to exit the vehicle. Once he was patted down, Officer Torres instructed Mr. Booker to exit the vehicle. As the officer conducted a pat down, he asked Mr. Booker if he had any firearms. Mr. Booker initially did not respond. When asked again, he stated that he did not have any. Officer Torres then instructed the offender to move to the rear of the vehicle.

At the rear of the vehicle, Officer Digirolamo asked if there was anymore marijuana in the vehicle. Mr. Booker stated there was as he walked toward the passenger door. He was instructed to stay at the rear of the vehicle. He said "I was going to give it to you," and "can you grab my bookbag."

Officer Torres then began to search the vehicle due to the marijuana observed in plain view by Officer Digirolamo. During the search, Officer Torres picked up the black backpack that was sitting on the passenger floor between the offender's legs. Underneath the black backpack, on the passenger floor was a firearm, a Rugar LCPII .380. The Offender and the driver were immediately placed in handcuffs.

Officer Torres stated to Mr. Booker "you said that there was marijuana in your backpack right." Mr. Booker responded with "yeah you didn't get it." The officer asked again if the backpack was his to which he replied "yeah." He also stated "I can show you where it is."

Inside of the main compartment of the black backpack was a black bag containing a large vacuum sealed bag. As well as a small red vacuum sealed baggie used for individual packaging and distribution of controlled substances in smaller quantities. There was also a small scale. Inside of the vacuum sealed plastic bag was 50 grams of marijuana. Inside of the small red vacuum sealed baggie was later discovered to contain an off-white rock-like substance believed to be crack cocaine.

Also in the backpack were multiple plastic baggies as well as more small red vacuum sealed baggies, which were unused. Nothing else was found in the vehicle. On his person, was $470 in multiple denominations as well as his cell phone.

On scene the marijuana was weighed with the offenders small scale to be over 28 grams. It was later weighed to be 50 grams.

| Reporting Officer: *TORRES, J. A.* *R_CS3NC* | Printed By: PRENDERGASB, | 07/09/2021 12:16 | Page 3 |
| --- | --- | --- | --- |

| Richmond Police Department | | OCA |
| --- | --- | --- |
| | | *2020-12050464* |
| Victim | Offense | Date / Time Reported |
| *Society* | *DRUG/NARCOTIC VIOLATION* | *Sat 12/05/2020 19:20* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Officer Torres then read Mr. Booker Miranda rights. The offender had already admitted that the backpack was his, and that there was marijuana inside of it. During questioning, he stated that he does give marijuana to his friends. He also stated that the firearm is not his but that he will take responsibility for it.

Due to the amount of marijuana, the scale, the additional packaging materials, the cash, and the confession that he gives marijuana to his friends, Mr. Booker was charged with Marijuana PWID. Due to the handgun being hidden from common observation and located underneath of the offenders backpack as well as his statements acknowledging the firearm, Mr. Booker was charged with Concealed weapon.

The offender was taken to lock-up and charged with the following:
    18.2-248.1 PWID Marijuana
    18.2-308 Concealed weapon

When the officers were packaging the evidence at approximately 1920 hours, Officer Digirolamo located the crack cocaine that was inside of the small red vacuum sealed baggie with the marijuana.

Officer Torres will contact the CA about placing additional charges on Mr. Baker for the following:
    18.2-250 Possession of controlled substance schedule I/II Crack cocaine
    18.2-308.4 Possession of firearm and controlled substance schedule I/II Crack cocaine
Officer Torres also placed Mr. Booker's cell phone in property for evidence pending a search warrant.

The marijuana and the crack cocaine was sent to the lab for further analysis.

Officers: Torres
       Digirolamo
       Young

Pg: 246 of 496    Filed: 09/04/2024    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0232**

## Incident Report Suspect List

OCA: 2020-12050464

**1**

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| *BOOKER, LAFERAMO LAMONT* | | *1300 N 19TH ST - 7*<br>*RICHMOND, VA 23223*<br>*804-918-6465* |

| Business Address | *MEN'S WAREHOUSE, 7TH GRADE, 1315 WILLIAMSBURG ROAD* |
|---|---|

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State |
|---|---|---|---|---|---|---|---|---|---|---|
| | *33* | *B* | *M* | *N* | *509* | *240* | *BLK* | *BLK* | *LGT* | |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* | Suspect Age | | Race | Sex | Eth | Height | | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|---|---|
| Weapon, Type | Feature | Make | | Model | | | Color | Caliber | Dir of Travel | |
| | | | | | | | | | Mode of Travel | |
| VehYr/Make/Model | | Drs | Style | | Color | | Lic/St | | VIN | |

| Notes | Physical Char |
|---|---|

**JA0233**

Filed: 09/04/2024    Pg: 247 of 496

Doc: 22-1

USCA4 Appeal: 24-4201

*Richmond Police Department*

OCA: *2020-12050464*

| 1 | Property Description **Firearms** | | | | Make **RUGAR** | | Model **LCPII** | | | Caliber **380** |
|---|---|---|---|---|---|---|---|---|---|---|
| | Color | Serial No. **380212987** | | Value **$0.00** | | Qty **1.000** | | Unit | Jurisdiction **Locally** | |
| | Status **Evidence** | Date **12/05/2020** | NIC # | | State # | | Local # | | OAN | |
| | Name (Last, First, Middle) **Booker, Laferamo Lamont** | | | | | DOB | | Age **33** | Race **B** | Sex **M** |

Notes

| 2 | Property Description **Marijuana** | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| | Color | Serial No. | | Value **$0.00** | | Qty **50.000** | | Unit **GM** | Jurisdiction **Locally** | |
| | Status **Evidence** | Date **12/05/2020** | NIC # | | State # | | Local # | | OAN | |
| | Name (Last, First, Middle) **Booker, Laferamo Lamont** | | | | | DOB | | Age **33** | Race **B** | Sex **M** |

Notes

| 3 | Property Description **Marijuana** | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| | Color | Serial No. | | Value **$0.00** | | Qty **1.000** | | Unit **GM** | Jurisdiction **Locally** | |
| | Status **Evidence** | Date **12/05/2020** | NIC # | | State # | | Local # | | OAN | |
| | Name (Last, First, Middle) **Booker, Laferamo Lamont** | | | | | DOB | | Age **33** | Race **B** | Sex **M** |

Notes

| 4 | Property Description **CARTRIDGES** | | | | Make | | Model | | | Caliber **380** |
|---|---|---|---|---|---|---|---|---|---|---|
| | Color | Serial No. | | Value **$0.00** | | Qty **6.000** | | Unit **XX** | Jurisdiction **Locally** | |
| | Status **Evidence** | Date **12/05/2020** | NIC # | | State # | | Local # | | OAN | |
| | Name (Last, First, Middle) **Booker, Laferamo Lamont** | | | | | DOB | | Age **33** | Race **B** | Sex **M** |

Notes

**JA0234**

*Richmond Police Department*

OCA: *2020-12050464*

| 5 | Property Description | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Crack Cocaine** | | | | | | | | | |
| | Color | Serial No. | | Value | | Qty | | Unit | Jurisdiction | |
| | | | | $0.00 | | 1.000 | | GM | Locally | |
| | Status | Date | NIC # | | State # | | Local # | | OAN | |
| | Evidence | 12/05/2020 | | | | | | | | |
| | Name (Last, First, Middle) | | | | | DOB | | Age | Race | Sex |
| | Booker, Laferamo Lamont | | | | | 1 | | 33 | B | M |
| | Notes | | | | | | | | | |

| 6 | Property Description | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| | **CASH** | | | | | | | | | |
| | Color | Serial No. | | Value | | Qty | | Unit | Jurisdiction | |
| | | | | $475.00 | | 1.000 | | | Locally | |
| | Status | Date | NIC # | | State # | | Local # | | OAN | |
| | Evidence | 12/05/2020 | | | | | | | | |
| | Name (Last, First, Middle) | | | | | DOB | | Age | Race | Sex |
| | Booker, Laferamo Lamont | | | | | | | 33 | B | M |
| | Notes | | | | | | | | | |

| 7 | Property Description | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| | **IPHONE** | | | | **APPLE** | | **IPHONE** | | | |
| | Color | Serial No. | | Value | | Qty | | Unit | Jurisdiction | |
| | **Black** | | | | $0.00 | | 1.000 | | Locally | |
| | Status | Date | NIC # | | State # | | Local # | | OAN | |
| | Evidence | 12/05/2020 | | | | | | | | |
| | Name (Last, First, Middle) | | | | | DOB | | Age | Race | Sex |
| | Booker, Laferamo Lamont | | | | | | | 33 | B | M |
| | Notes | | | | | | | | | |
| | grey and white case | | | | | | | | | |

| 8 | Property Description | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| | **DRUG EQUIPMENT** | | | | | | | | | |
| | Color | Serial No. | | Value | | Qty | | Unit | Jurisdiction | |
| | | | | $0.00 | | 1.000 | | | Locally | |
| | Status | Date | NIC # | | State # | | Local # | | OAN | |
| | Evidence | 12/05/2020 | | | | | | | | |
| | Name (Last, First, Middle) | | | | | DOB | | Age | Race | Sex |
| | Booker, Laferamo Lamont | | | | | | | 33 | B | M |
| | Notes | | | | | | | | | |

plastic baggies
vacumn sealed baggies
scale
case that marijuana and crack was found in

**JA0235**

*Richmond Police Department*

OCA: *2020-12050464*

| 9 | Property Description<br>**BACKPACK** | | | | Make | | Model | | | Caliber | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Color<br>**Black** | Serial No. | | | Value<br>**$0.00** | | Qty<br>**1.000** | Unit | Jurisdiction<br>**Locally** | | |
| | Status<br>**Evidence** | Date<br>**12/05/2020** | NIC # | | State # | | Local # | | OAN | | |
| | Name (Last, First, Middle)<br>**Booker, Laferamo Lamont** | | | | | DOB<br>. . | | Age<br>**33** | Race<br>**B** | Sex<br>**M** | |

<u>Notes</u>

**JA0236**

# 4th Precinct – Activity Sheet

## December 5, 2020    6 OFFICERS + Sgt SPINOS

| | Highland Park | VUU | City Center | |
|---|---|---|---|---|
| FELONIES | 2 | | | 2 |
| MISDEMEANORS | 1 | | | 1 |
| SUMMONSES | 0 | | | 0 |
| WARRANTS SERVED | 0 | | | 0 |
| KNOCK AND TALKS | 0 | | | 0 |
| CRACK COCAINE (GM) | 1 | | | 1 |
| POWDER COCAINE (GM) | 0 | | | 0 |
| HEROIN (GM) | 0 | | | 0 |
| MARIJUANA (GM) | 50 | | | 50 |
| MISC. DRUGS | 0 | | | 0 |
| FIRS | 0 | | | 0 |
| CURRENCY SEIZED | 475 | | | 475 |
| FIREARMS SEIZED | 2 | | | 2 |
| VEHICLES SEIZED | 0 | | | 0 |
| DEBRIEFS | 0 | | | 0 |
| SURVEILLANCES | 0 | | | 0 |
| SEARCH WARRANTS | 0 | | | 0 |
| TRAFFIC STOPS | 8 | | | 8 |
| BUY WALKS | 0 | | | 0 |
| CRIME STOPPERS | 0 | | | 0 |
| POP COMPLAINTS | 0 | | | 0 |
| NARC K9 REQUESTS | 1 | | | 1 |
| NARC K9 NA | 1 | | | 1 |



### Narcotics Violation – 2600 2nd Ave

Officers initiated a traffic stop for driving without headlights. When officers approached they observed marijuana in plain view. A search of the vehicle revealed 50 grams of marijuana, 1 gram of crack cocaine, and packaging material and scales consistent with distribution. Also discovered was a Ruger 380 pistol illegally concealed under a backpack. Mr. Booker was arrested for PWID marijuana and concealed weapon. He had $475 on his person.

### Weapons Violation – 2nd and Custer Ave.

Officers initiated a traffic stop for fradulent tags. Officers had conducted two traffic stops on vehicles displaying the license 11134Y. Officers observed another vehicle, driver by Mr. Keith Moore and initiated a traffic stop. Mr. Moore attempted to flee from the stop but drove directly into a curb and then fled on foot. He was apprehended a short distance later. Inside the vehicle, officers observed a Taurus .40 pistol inside a conversion kit in the driver floorboard area. Mr. Moore was arrested for possession of a firearm by convicted felon.

### This is the 100th illegal firearm seized by 4th FMT Tac in 2020.



JA0237

**202012050485 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED
LETCHER AVE/HIGHLAND VIEW AVE RICH**

CERTIFIED COPY *CHW*

EVENT INFORMATION - 202012050485        12/05/20

**Event Type :** TS, **Event ID :** 202012050485; **Priority :** 3; **Status :** A; **Source :** OFFICER; **DGroup :** PREC4;
**Disposition Code :** 11,11; **Terminal :** ecc-p4; **Calltaker ID:** 3587

AGENCY INFORMATION

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC4; **ESZ :** 909201; **Area :** 411C; **Added :** 12/05/20 18:25:07;
**Dispatched :** 12/05/20 18:25:07; **Arrived :** 12/05/20 18:25:07; **Closed :** 12/05/20 18:39:01; **Close ID :** 3954;
**Close Terminal :** $463; **Event ID :** 202012050485; **Primary Unit :** 462;

REMARKS

CALLER INFORMATION

    **Name:**
    **Phone:**
    **Address:**

LOCATION INFORMATION

LETCHER AVE/HIGHLAND VIEW AVE RICH

X-STREET 1: LETCHER AVE
X-STREET 2: HIGHLAND VIEW AVE

**Location Choices**



SUPPLEMENTAL INFORMATION

    Person 0

    Vehicle 1

    **Model**                 **Make :**
    **Year**
                       **State :** VA
    **Model**

**JA0238**

**License** UTJ4393

**Remarks**

**License** PC
**Type**

Vehicle
Color

License
Year

**Unit** : 462
**ID**

Property 0

Contact Name 0

Incident Times 0

JA0239



CERTIFIED COPY *CHW*

**202012050485 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**LETCHER AVE/HIGHLAND VIEW AVE RICH**

| Unit ID | Call ID | Agency | Dispatch Group | Status | Time | Employee | ID | Terminal | Location | Comment | Misc Amount | Employee Group |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 462 | | RPD | PREC4 | DP | 18.25.07 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | LETCHER AVE/HIGHLAND VIEW AVE RICH | | | |
| 462 | | RPD | PREC4 | AR | 18.25.07 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | LETCHER AVE/HIGHLAND VIEW AVE RICH | | | |
| 462 | | RPD | PREC4 | UC | 18.25.09 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | | Unit {462} Inf Issue Qry 0 RIP4 00000 230179716 QV VA122121N IJC/UTJ4393 LIS/VA LIT/PC | | |
| 462 | | RPD | PREC4 | UC | 18.25.11 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | | Unit {462} Inf Issue Qry 0 dbo.usplpsWarrantMain(%    null) | | |
| 463 | 170834 | RPD | PREC4 | DP | 18.25.17 | MILLS , KEEGAN T | 3587 | ecc-p4 | LETCHER AVE/HIGHLAND VIEW AVE RICH | | | 0003780E/MDT/De System (3954)* |
| 463 | 170834 | RPD | PREC4 | UC | 18.26.27 | MILLS , KEEGAN T | 3954 | $463 | | Unit {463} Inf Issue Qry 0 RIM5 00000 231550963 QV VA12200M5 IJC/UTJ4393 LIS/VA LIT/PC | | 0003780E/MDT/De System (3954)* |
| 463 | 170834 | RPD | PREC4 | UC | 18.26.28 | MILLS , KEEGAN T | 3954 | $463 | | dbo.usplpsWarrantMain    [call :null"1    null) | | 0003780E/MDT/De System (3954)* |
| 463 | 170834 | RPD | PREC4 | UC | 18.27.08 | MILLS , KEEGAN T | 3954 | $463 | | Unit {463} Inf Issue Qry 0 RIM5 00000 231550963 QD VA12200M5 SOC/279852065 | | 0003780E/MDT/De System (3954)* |
| 463 | 170834 | RPD | PREC4 | UC | 18.27.09 | MILLS , KEEGAN T | 3954 | $463 | | dbo.usplpsWarrantMain(%    /l) | | 0003780E/MDT/De System (3954)* |
| 463 | 170834 | RPD | PREC4 | ~ | 18.27.17 | MILLS , KEEGAN T | | ecc-s2 | LETCHER AVE/HIGHLAND VIEW AVE RICH | System Unit Alarm | | 0003780E/MDT/De System (3954)* |
| 462 | | RPD | PREC4 | SC | 18.28.00 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | LETCHER AVE/HIGHLAND VIEW AVE RICH | 4113 WILLIAMS | | |
| 462 | | RPD | PREC4 | ~ | 18.28.07 | WILLIAMS , NAKIA W | | ecc-s2 | LETCHER AVE/HIGHLAND VIEW AVE RICH | System Unit Alarm | | |
| 463 | 170834 | RPD | PREC4 | SC | 18.28.15 | MILLS , KEEGAN T | 3587 | ecc-p4 | LETCHER AVE/HIGHLAND VIEW AVE RICH | 3954 MILLS | | 0003780E/MDT/De System (3954)* |
| 462 | | RPD | PREC4 | AV | 18.38.10 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | | | | |
| 463 | 170834 | RPD | PREC4 | AM | 18.39.01 | MILLS , KEEGAN T | 3954 | $463 | | | | 0003780E/MDT/De System (3954)* |

USCA4 Appeal: 24-4201     Doc: 22-1     Filed: 09/04/2024     Pg: 254 of 496

**JA0240**

**202012050485 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**LETCHER AVE/HIGHLAND VIEW AVE RICH**



CERTIFIED COPY *CHW*

☑ System Comments

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 18:25:07 | ecc-p4 | 3587 | EVENT CREATED - Type: TS - OI - TRAFFIC STOP - OFFICER-INITIATED, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Agency: RPD, Group: PREC4, Beat: 411C, Status: P, Priority: 3 |
| 12/05/20 18:25:07 | ecc-p4 | 3587 | INITIAL CALL - Call Source: OFFICER, Caller Name: , Caller Phone Number: , Caller Address: |
| 12/05/20 18:25:07 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 18:25:07 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: DP, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: |
| 12/05/20 18:25:07 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: AR, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: |
| 12/05/20 18:25:07 | ecc-p4 | 3587 | EVENT REMARK - Field Event |
| 12/05/20 18:25:08 | ecc-p4 | 3587 | ADD SUPPLEMENTAL- Revision Number: 1, Supplemental Type: Vehicle, License: UTJ4393 License Type: PC State: VA Unit ID: 462 |
| 12/05/20 18:25:08 | ecc-p4 | 3587 | EVENT UPDATED - First Unit Dispatched Time: 12/05/20 18:25:07, Primary Employee Id: , Primary Unit Id: 462, |
| 12/05/20 18:25:08 | ecc-p4 | 3587 | EVENT UPDATED - First Unit Arrived Time: 12/05/20 18:25:07, |
| 12/05/20 18:25:09 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: UC, Location: , Employees, |
| 12/05/20 18:25:09 | cad-94-db1 | 3587 | EVENT REMARK - ** VEH search completed at 12/05/20 18:25:09 |
| 12/05/20 18:25:11 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: UC, Location: , Employees: |
| 12/05/20 18:25:17 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 2, |
| 12/05/20 18:25:17 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 463, Status: DP, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: |
| 12/05/20 18:26:27 | $463 | 3954 | UNIT UPDATED - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 18:26:28 | $463 | 3954 | UNIT UPDATED - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 18:27:08 | $463 | 3954 | UNIT UPDATED - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 18:27:09 | $463 | 3954 | UNIT UPDATED - Unit: 463, Status: UC, Location: , Employees: , |
| 12/05/20 18:27:17 | ecc-s2 | 0 | UNIT UPDATED - Unit: 463, Status: ~, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: 3954 |
| 12/05/20 18:28:00 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: SC, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: |
| 12/05/20 18:28:07 | ecc-s2 | 0 | UNIT UPDATED - Unit: 462, Status: ~, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: |
| 12/05/20 18:28:15 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 463, Status: SC, Location: LETCHER AVE/HIGHLAND VIEW AVE RICH, Employees: |
| 12/05/20 18:38:10 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 18:38:10 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: AV, Location: , Employees: |
| 12/05/20 18:38:11 | ecc-p4 | 3587 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 18:39:01 | $463 | 3954 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 18:39:01 | $463 | 3954 | EVENT UPDATED - Total Assigned Units: 0, |
| 12/05/20 18:39:01 | $463 | 3954 | EVENT CLOSED - |
| 12/05/20 18:39:01 | $463 | 3954 | UNIT UPDATED - Unit: 463, Status: AM, Location: , Employees: |

Filed: 09/04/2024    Pg: 255 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0241**

**202012050497 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**1200-BLK HIGHLAND**

CERTIFIED COPY *CHW*

### EVENT INFORMATION - 202012050497                          12/05/20

**Event Type :** TS; **Event ID :** 202012050497; **Priority :** 3; **Status :** A; **Source :** OFFICER; **DGroup :** PREC4;
**Disposition Code :** 11,14; **Terminal :** ecc-p4; **Calltaker ID:** 3587

#### AGENCY INFORMATION

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC4; **ESZ :** 909201; **Area :** 411C; **Added :** 12/05/20 18:40:31;
**Dispatched :** 12/05/20 18:40:31; **Arrived :** 12/05/20 18:40:31; **Event ID :** 202012050497; **Primary Unit :** 462;

#### REMARKS

#### CALLER INFORMATION

**Name:**
**Phone:**
**Address:**

#### LOCATION INFORMATION

1200-BLK HIGHLAND

X-STREET 1:
X-STREET 2

**Location Choices**



#### SUPPLEMENTAL INFORMATION

Person 0

Vehicle 1

Model                          Make :
Year                           State :  VA
Model

USCA4 Appeal: 24-4201      Doc: 22-1      Filed: 09/04/2024      Pg: 256 of 496

**JA0242**

**License** 11134Y

**Remarks**

**License Type** PC

**Vehicle Color**

**License Year**

**Unit ID** 462

Property 0

Contact Name 0

Incident Times 0

**JA0243**



CERTIFIED COPY _CHW_

**202012050497 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**1200-BLK HIGHLAND**

| Unit ID | Car ID | Agency | Dispatch Group | Status | Time | Employee | ID | Terminal | Location | Comments | Unit Remark | Employee Remark | Extra |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 462 | | RPD | PREC4 | DP | 18:40:31 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | 1200-BLK HIGHLAND | | | | |
| 462 | | RPD | PREC4 | AR | 18:40:31 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | 1200-BLK HIGHLAND | | | | |
| 462 | | RPD | PREC4 | UC | 18:40:32 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | 1200-BLK HIGHLAND | Unit [462] Inf Issue Qry<br>0 RIP4 00000 210179716 QV VA122121N LIC/11134Y LIS/VA LIT/PC | | | |
| 460 | | RPD | PREC4 | DP | 18:40:40 | SPINOS , MICHAEL E | 3587 | ecc-p4 | 1200-BLK HIGHLAND | | | | |
| 460 | | RPD | PREC4 | – | 18:42:40 | SPINOS , MICHAEL E | | ecc-t7 | 1200-BLK HIGHLAND | System Unit Alarm | | | |
| 462 | | RPD | PREC4 | – | 18:43:31 | WILLIAMS , NAKIA W | | ecc-h1 | 1200-BLK HIGHLAND | System Unit Alarm | | | |
| 460 | | RPD | PREC4 | CU | 18:45:24 | SPINOS , MICHAEL E | 3587 | ecc-p4 | 1200-BLK HIGHLAND | Alarm Timer Extended: 0 | | | |
| 462 | | RPD | PREC4 | CU | 18:45:25 | WILLIAMS , NAKIA W | 3587 | ecc-p4 | 1200-BLK HIGHLAND | Alarm Timer Extended: 0 | | | |
| 462 | | RPD | PREC4 | AV | 18:52:20 | WILLIAMS , NAKIA W | 2740 | ecc-h1 | | | | | |
| 460 | | RPD | PREC4 | AV | 18:52:28 | SPINOS , MICHAEL E | 2740 | ecc-h1 | | | | | |

**JA0244**

**202012050497 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**1200-BLK HIGHLAND**



CERTIFIED COPY CHW

☑ **System Comments**

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 18:40:31 | ecc-p4 | 3587 | EVENT CREATED - Type: TS - OI - TRAFFIC STOP - OFFICER-INITIATED, Location: 1200-BLK HIGHLAND, Agency: RPD, Group: PREC4, Beat: 411C, Status: P, Priority: 3 |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | INITIAL CALL - Call Source: OFFICER, Caller Name: , Caller Phone Number: , Caller Address: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: DP, Location: 1200-BLK HIGHLAND, Employees: 4113 |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: AR, Location: 1200-BLK HIGHLAND, Employees: 4113 |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | EVENT REMARK - Field Event |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | ADD SUPPLEMENTAL- Revision Number: 1, Supplemental Type: Vehicle, License: 11134Y License Type: PC State: VA Unit ID: 462 |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | EVENT UPDATED - First Unit Dispatched Time: 12/05/20 18:40:31, Primary Employee Id: 4113, Primary Unit Id: 462, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | EVENT UPDATED - First Unit Arrived Time: 12/05/20 18:40:31, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: UC, Location: , Employees: 4113 |
| 12/05/20 18:40:32 | cad-94-db1 | 3587 | EVENT REMARK - ** VEH search completed at 12/05/20 18:40:32 |
| 12/05/20 18:40:40 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 2, |
| 12/05/20 18:40:40 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 460, Status: DP, Location: 1200-BLK HIGHLAND, Employees: 2235 |
| 12/05/20 18:42:40 | ecc-f2 | 0 | UNIT UPDATED - Unit: 460, Status: ~, Location: 1200-BLK HIGHLAND, Employees: 2235 |
| 12/05/20 18:43:31 | ecc-h1 | 0 | UNIT UPDATED - Unit: 462, Status: ~, Location: 1200-BLK HIGHLAND, Employees: 4113 |
| 12/05/20 18:45:24 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 460, Status: CU, Location: 1200-BLK HIGHLAND, Employees: 2235 |
| 12/05/20 18:45:25 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: CU, Location: 1200-BLK HIGHLAND, Employees: 4113 |
| 12/05/20 18:52:20 | ecc-h1 | 2740 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 18:52:20 | ecc-h1 | 2740 | UNIT UPDATED - Unit: 462, Status: AV, Location: , Employees: 4113 |
| 12/05/20 18:52:21 | ecc-h1 | 2740 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 18:52:28 | ecc-h1 | 2740 | DISPOSITION ASSIGNED - 14 |
| 12/05/20 18:52:28 | ecc-h1 | 2740 | UNIT UPDATED - Unit: 460, Status: AV, Location: , Employees: 2235 |

Filed: 09/04/2024    Pg: 259 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0245**



**202012050497 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**1200-BLK HIGHLAND**

CERTIFIED COPY *CHW*

☑ System Comments

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 18:40:31 | ecc-p4 | 3587 | EVENT CREATED - Type: TS - OI - TRAFFIC STOP - OFFICER-INITIATED, Location: 1200-BLK HIGHLAND, Agency: RPD, Group: PREC4, Beat: 411C, Status: P, Priority: 3 |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | INITIAL CALL - Call Source: OFFICER, Caller Name: , Caller Phone Number: , Caller Address: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: DP, Location: 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: AR, Location: 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | EVENT REMARK - Field Event |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | ADD SUPPLEMENTAL- Revision Number: 1, Supplemental Type: Vehicle, License: 11134Y License Type: PC State: VA Unit ID: 462 |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | EVENT UPDATED - First Unit Dispatched Time: 12/05/20 18:40:31, Primary Employee Id: Primary Unit Id: 462, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | EVENT UPDATED - First Unit Arrived Time: 12/05/20 18:40:31, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: UC, Location: , Employees: |
| 12/05/20 18:40:32 | cad-94-db1 | 3587 | EVENT REMARK - ** VEH search completed at 12/05/20 18:40:32 |
| 12/05/20 18:40:40 | ecc-p4 | 3587 | EVENT UPDATED - Total Assigned Units: 2, |
| 12/05/20 18:40:40 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 460, Status: DP, Location: 1200-BLK HIGHLAND, Employees: . |
| 12/05/20 18:42:40 | ecc-f2 | 0 | UNIT UPDATED - Unit: 460, Status: ~, Location: 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:43:31 | ecc-h1 | 0 | UNIT UPDATED - Unit: 462, Status: ~, Location: 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:45:24 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 460, Status: CU, Location: 1200-BLK HIGHLAND, Employees: . |
| 12/05/20 18:45:25 | ecc-p4 | 3587 | UNIT UPDATED - Unit: 462, Status: CU, Location: 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:52:20 | ecc-h1 | 2740 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 18:52:20 | ecc-h1 | 2740 | UNIT UPDATED - Unit: 462, Status: AV, Location: , Employees: |
| 12/05/20 18:52:21 | ecc-h1 | 2740 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 18:52:28 | ecc-h1 | 2740 | DISPOSITION ASSIGNED - 14 |
| 12/05/20 18:52:28 | ecc-h1 | 2740 | UNIT UPDATED - Unit: 460, Status: AV, Location: , Employees: |

Filed: 09/04/2024    Pg: 260 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0246**

**202012050497 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**1200-BLK HIGHLAND**



CERTIFIED COPY _CHW_

☑ **System Comments**

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 18:40:31 | ecc-p4 | 3587 | **EVENT CREATED** - Type: TS - OI - TRAFFIC STOP - OFFICER-INITIATED, **Location:** 1200-BLK HIGHLAND, Agency: RPD, Group: PREC4, Beat: 411C, Status: P, Priority: 3 |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | **INITIAL CALL - Call Source:** OFFICER, Caller Name: , Caller Phone Number: , Caller Address: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | **UNIT UPDATED - Unit:** 462, **Status:** DP, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | **UNIT UPDATED - Unit:** 462, **Status:** AR, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:40:31 | ecc-p4 | 3587 | **EVENT REMARK** - Field Event |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | **ADD SUPPLEMENTAL- Revision Number:** 1, Supplemental Type: Vehicle, License: 11134Y License Type: PC State: VA Unit ID: 462 |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | **EVENT UPDATED - Total Assigned Units:** 1, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | **EVENT UPDATED - First Unit Dispatched Time:** 12/05/20 18:40:31, Primary Employee Id Primary Unit Id: 462, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | **EVENT UPDATED - First Unit Arrived Time:** 12/05/20 18:40:31, |
| 12/05/20 18:40:32 | ecc-p4 | 3587 | **UNIT UPDATED - Unit:** 462, **Status:** UC, **Location:** , Employees: |
| 12/05/20 18:40:32 | cad-94-db1 | 3587 | **EVENT REMARK - ** VEH search completed at 12/05/20 18:40:32 |
| 12/05/20 18:40:40 | ecc-p4 | 3587 | **EVENT UPDATED - Total Assigned Units:** 2, |
| 12/05/20 18:40:40 | ecc-p4 | 3587 | **UNIT UPDATED - Unit:** 460, **Status:** DP, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:42:40 | ecc-f2 | 0 | **UNIT UPDATED - Unit:** 460, **Status:** ~, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:43:31 | ecc-h1 | 0 | **UNIT UPDATED - Unit:** 462, **Status:** ~, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:45:24 | ecc-p4 | 3587 | **UNIT UPDATED - Unit:** 460, **Status:** CU, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:45:25 | ecc-p4 | 3587 | **UNIT UPDATED - Unit:** 462, **Status:** CU, **Location:** 1200-BLK HIGHLAND, Employees: |
| 12/05/20 18:52:20 | ecc-h1 | 2740 | **EVENT UPDATED - Total Assigned Units:** 1, |
| 12/05/20 18:52:20 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 462, **Status:** AV, **Location:** , Employees: |
| 12/05/20 18:52:21 | ecc-h1 | 2740 | **DISPOSITION ASSIGNED - 11** |
| 12/05/20 18:52:28 | ecc-h1 | 2740 | **DISPOSITION ASSIGNED - 14** |
| 12/05/20 18:52:28 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 460, **Status:** AV, **Location:** , Employees: |

**JA0247**

Filed: 09/04/2024    Pg: 261 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**202012050502 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED MECHANICSVILLE TPKE/WOOD ST RICH**

CERTIFIED COPY *CHW*

### EVENT INFORMATION - 202012050502 12/05/20

**Event Type :** TS; **Event ID :** 202012050502; **Priority :** 3; **Status :** A; **Source :** OFFICER; **DGroup :** PREC4;
**Disposition Code :** 11,11; **Terminal :** ecc-h1; **Calltaker ID:** 2740

### AGENCY INFORMATION

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC1; **ESZ :** 910401; **Area :** 113B; **Added :** 12/05/20 18:56:29; **Closed :**
12/05/20 18:56:47; **Close ID :** 8071; **Close Terminal :** ecc-p1; **Event ID :** 202012050503; **Comments :**
Duplicate and Cancel

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC4; **ESZ :** 909201; **Area :** 411C; **Added :** 12/05/20 18:56:00;
**Dispatched :** 12/05/20 18:56:00; **Arrived :** 12/05/20 18:56:00; **Closed :** 12/05/20 21:04:25; **Close ID :** 3954;
**Close Terminal :** S463; **Event ID :** 202012050502; **Primary Unit :** 462;

### REMARKS

| | |
|---|---|
| 12/05/20 18:56:29 (ecc-h1) | Cancel Request from agency RPD : RPD event 202012050502: location changed to MECHANICSVILLE TPKE/WOOD ST RICH |
| 12/05/20 18:56:29 (ecc-h1) | >>>> by: STUART W. KEESLING at 12/05/20 18:56:29 on terminal: ecc-h1 |
| 12/05/20 18:56:46 (ecc-p1) | Duplicate Event: RICH, Cross Street 1 = MECHANICSVILLE TPKE, Cross Street 2 = WOOD ST, Type = TS TRAFFIC STOP, Subtype = OI OFFICER-INITIATED, Call Source = OFFICER, Alarm Level = 0 |
| 12/05/20 18:56:47 (ecc-p1) | Cancel Request from agency RPD : RPD event 202012050502: location changed to MECHANICSVILLE TPKE/WOOD ST RICH |
| 12/05/20 18:56:47 (ecc-p1) | >>>> by: STUART W. KEESLING at 12/05/20 18:56:29 on terminal: ecc-h1 |
| 12/05/20 18:56:47 (ecc-p1) | Duplicate Event: RICH, Cross Street 1 = MECHANICSVILLE TPKE, Cross Street 2 = WOOD ST, Type = TS TRAFFIC STOP, Subtype = OI OFFICER-INITIATED, Call Source = OFFICER, Alarm Level = 0 |
| 12/05/20 18:56:47 (ecc-p1) | End of Duplicate Event data |

### CALLER INFORMATION

**Name:**
**Phone:**
**Address:**

### LOCATION INFORMATION

MECHANICSVILLE TPKE/WOOD ST RICH

X-STREET 1: MECHANICSVILLE TPKE
X-STREET 2: WOOD ST

**Location Choices**



### SUPPLEMENTAL INFORMATION

cad-94-netview/NetViewer/InquiryCommand/EventInformation?EventId=202012050502&isSearchResult=True

Filed: 09/04/2024 Doc: 22-1 USCA4 Appeal: 24-4201 Pg: 262 of 496

**JA0248**

Person 0

Vehicle 2

| | |
|---|---|
| Model | Make : |
| Year | |
| Model | State : VA |
| License ugk6106 | Vehicle Color |
| Remarks | License Year |
| License PC Type | Unit : 462 ID |

| | |
|---|---|
| Model 0 | Make : |
| Year | |
| Model | State : VA |
| License ugk6106 | Vehicle Color |
| Remarks | License Year |
| License PC Type | Unit : 462 ID |

Property 0

Contact Name 0

Incident Times 0

**202012050502 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**MECHANICSVILLE TPKE/WOOD ST RICH**



CERTIFIED COPY *CHW*

☑ System Comments

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **EVENT CREATED - Type:** TS - OI - TRAFFIC STOP - OFFICER-INITIATED, **Location:** LL(-77:25:20.6490,37:34:16.8490): MECHANICSVILLE/WOOD, **Agency:** RPD, **Group:** PREC4, **Beat:** 411C, **Status:** P, **Priority:** 3 |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **INITIAL CALL - Call Source:** OFFICER, **Caller Name:** , **Caller Phone Number:** , **Caller Address:** |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **ADD SUPPLEMENTAL- Revision Number:** 1, **Supplemental Type:** Vehicle, **License:** ugk6106 **License Type:** PC **State:** VA **Unit ID:** 462 |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **EVENT UPDATED - Total Assigned Units:** 1, |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **EVENT UPDATED - First Unit Dispatched Time:** 12/05/20 18:56:00, **Primary Employee Id:** · **Primary Unit Id** 462, |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **EVENT UPDATED - First Unit Arrived Time:** 12/05/20 18:56:00, |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 462, **Status:** DP, **Location:** LL(-77:25:20.6490,37:34:16.8490): MECHANICSVILLE/WOOD, **Employees:** · |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 462, **Status:** AR, **Location:** LL(-77:25:20.6490,37:34:16.8490): MECHANICSVILLE/WOOD, **Employees:** |
| 12/05/20 18:56:00 | ecc-h1 | 2740 | **EVENT REMARK - Field Event** |
| 12/05/20 18:56:01 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 462, **Status:** UC, **Location:** , **Employees:** |
| 12/05/20 18:56:01 | cad-94-db1 | 2740 | **EVENT REMARK - ** VEH search completed at 12/05/20 18:56:00** |
| 12/05/20 18:56:02 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 462, **Status:** UC, **Location:** , **Employees:** |
| 12/05/20 18:56:11 | ecc-h1 | 2740 | **EVENT UPDATED - Total Assigned Units:** 2, |
| 12/05/20 18:56:11 | ecc-h1 | 2740 | **UNIT UPDATED - Unit:** 463, **Status:** DP, **Location:** LL(-77:25:20.6490,37:34:16.8490): MECHANICSVILLE/WOOD, **Employees:** |
| 12/05/20 18:56:29 | ecc-h1 | 2740 | **EVENT UPDATED - Cross Street1:** MECHANICSVILLE TPKE, **Cross Street2:** WOOD ST, **Has Loi Data:** True, **Latitude:** 37.552605, **Longitude:** -77.412191, |
| 12/05/20 18:56:29 | ecc-h1 | 2740 | **EVENT REMARK - ** Event Location changed from "LL(-77:25:20.6490,37:34:16.8490): MECHANICSVILLE/WOOD" to "MECHANICSVILLE TPKE/WOOD ST" at:** 12/05/20 18:56:29 |
| 12/05/20 18:56:29 | ecc-h1 | 2740 | **EVENT REMARK - ** >>>> by:** STUART W. KEESLING on terminal: ecc-h1 |
| 12/05/20 18:56:29 | ecc-h1 | 2740 | **EVENT REMARK - Cancel Request from agency RPD : RPD event 202012050502: location changed to MECHANICSVILLE TPKE/WOOD ST RICH** |
| 12/05/20 18:56:29 | ecc-h1 | 2740 | **EVENT REMARK - >>>> by:** STUART W. KEESLING at 12/05/20 18:56:29 on terminal: ecc-h1 |
| 12/05/20 18:56:29 | ecc-h1 | 2740 | **EVENT REMARK - ** RPD event 202012050502 requested to cancel** |
| 12/05/20 18:56:29 | cad-94-db1 | 2740 | **EVENT REMARK - ** LOI search completed at 12/05/20 18:56:29** |
| 12/05/20 18:56:30 | ecc-h1 | 2740 | **EVENT REMARK - ** RPD event 202012050503 created** |
| 12/05/20 18:56:46 | ecc-p1 | 2740 | **ADD SUPPLEMENTAL- Revision Number:** 1, **Supplemental Type:** Vehicle, **License:** ugk6106 **License Type:** PC **Model Year:** 0 **State:** VA **Unit ID:** 462 |
| 12/05/20 18:56:46 | ecc-p1 | 8071 | **UPDATED/ADDITIONAL CALL - Call Source:** OFFICER, **Caller Name:** , **Caller Phone Number:** , **Caller Address:** |
| 12/05/20 18:56:46 | ecc-p1 | 8071 | **EVENT REMARK - Duplicate Event:** RICH, **Cross Street 1** = MECHANICSVILLE TPKE, **Cross Street 2** = WOOD ST, **Type** = TS TRAFFIC STOP, **Subtype** = OI OFFICER-INITIATED, **Call Source** = OFFICER, **Alarm Level** = 0 |
| 12/05/20 18:56:46 | ecc-p1 | 8071 | **EVENT REMARK - Field Event** |
| 12/05/20 18:56:46 | ecc-p1 | 8071 | **EVENT REMARK - ** VEH search completed at 12/05/20 18:56:00** |
| 12/05/20 18:56:46 | ecc-p1 | 8071 | **EVENT REMARK - ** Event Location changed from "LL(-77:25:20.6490,37:34:16.8490): MECHANICSVILLE/WOOD" to "MECHANICSVILLE TPKE/WOOD ST RICH" at:** 12/05/20 18:56:29 |
| 12/05/20 | ecc-p1 | 8071 | **EVENT REMARK - ** >>>> by:** STUART W. KEESLING on terminal: ecc-h1 |

Filed: 09/04/2024    Pg: 264 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0250**

| | | | |
|---|---|---|---|
| 18:56:47 | | | |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - Cancel Request from agency RPD : RPD event 202012050502: location changed to MECHANICSVILLE TPKE/WOOD ST RICH |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - > > > > by: STUART W. KEESLING at 12/05/20 18:56:29 on terminal: ecc-h1 |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - ** RPD event 202012050502 requested to cancel |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - ** LOI search completed at 12/05/20 18:56:29 |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - ** RPD event 202012050503 created |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - Duplicate Event: RICH, Cross Street 1 = MECHANICSVILLE TPKE, Cross Street 2 = WOOD ST, Type = TS TRAFFIC STOP, Subtype = OI OFFICER-INITIATED, Call Source = OFFICER, Alarm Level = 0 |
| 12/05/20 18:56:47 | ecc-p1 | 8071 | **EVENT REMARK** - End of Duplicate Event data |
| 12/05/20 18:57:06 | ecc-h1 | 2740 | **UNIT UPDATED** - Unit: 463, Status: AR, **Location**: MECHANICSVILLE TPKE/WOOD ST RICH, **Employees**:   i |
| 12/05/20 18:57:25 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: UC, Location: , Employees |
| 12/05/20 18:57:26 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: UC, Location: , Employees |
| 12/05/20 18:59:00 | ecc-f2 | 0 | **UNIT UPDATED** - Unit: 462, Status: ~, **Location**: LL(-77:25:20.6490,37:34:16.8490): MECHANCSVILLE/WOOD, Employees: |
| 12/05/20 19:00:06 | ecc-p4 | 0 | **UNIT UPDATED** - Unit: 463, Status: ~, Location: MECHANICSVILLE TPKE/WOOD ST RICH, Employees: |
| 12/05/20 19:03:25 | ecc-p4 | 3587 | **DISPOSITION ASSIGNED** - 11 |
| 12/05/20 19:03:25 | ecc-p4 | 3587 | **EVENT UPDATED** - **Total Assigned Units**: 1, |
| 12/05/20 19:03:25 | ecc-p4 | 3587 | **UNIT UPDATED** - Unit: 462, Status: AV, Location: , Employees: ., |
| 12/05/20 19:35:26 | ecc-p4 | 8080 | **UNIT UPDATFD** - Unit: 463, Status: CU, Location: MECHANICSVILLE TPKE/WOOD ST RICH, Employees: |
| 12/05/20 20:53:33 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 20:56:31 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 20:57:41 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 20:57:42 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: UC, Location: , Employees: |
| 12/05/20 21:04:25 | $463 | 3954 | **DISPOSITION ASSIGNED** - 11 |
| 12/05/20 21:04:25 | $463 | 3954 | **EVENT UPDATED** - **Total Assigned Units**: 0, |
| 12/05/20 21:04:25 | $463 | 3954 | **EVENT CLOSED** - |
| 12/05/20 21:04:25 | $463 | 3954 | **UNIT UPDATED** - Unit: 463, Status: AM, Location: , **Employees**: |

Filed: 09/04/2024    Pg: 265 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0251**



CERTIFIED COPY *CHW*

**202012050502 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**MECHANICSVILLE TPKE/WOOD ST RICH**

| Unit ID | C = ID | Agency | Dispatch Group | Status | Time | Employee | ID | Terminal | Location | Comment | Misc Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 462 | | RPD | PREC4 | DP | 18:56:00 | WILLIAMS , NAKIA W | 2740 | eci-h1 | LL(-77.25.20.6490,37.34.16.8490) MECHANICSVILLE/WOOD | | |
| 462 | | RPD | PREC4 | AR | 18:56:00 | WILLIAMS , NAKIA W | 2740 | eci-h1 | LL(-77.25.20.6490,37.34.16.8490) MECHANICSVILLE/WOOD | | |
| 462 | | RPD | PREC4 | UC | 18:56:01 | WILLIAMS , NAKIA W | 2740 | eci-h1 | | Unit (462) Inf Issue Qry 0 RIH1 00000 2281508111 QV VA12204 1N LIC/ugk6106 LIS/VA LIT/PC | |
| 462 | | RPD | PREC4 | UC | 18:56:02 | WILLIAMS , NAKIA W | 2740 | eci-h1 | | dbo.usplpsWarrantMan(""     Unit (462) Inf... | null|| |
| 463 | 170834 | RPD | PREC4 | DP | 18:56:11 | MILLS , KEEGAN T | 2740 | eci-h1 | LL(-77.25.20.6490,37.34.16.8490) MECHANICSVILLE/WOOD | | |
| 463 | 170834 | RPD | PREC4 | AR | 18:57:06 | MILLS , KEEGAN T | 2740 | eci-h1 | MECHANICSVILLE TPKE/WOOD ST RICH | | |
| 463 | 170834 | RPD | PREC4 | UC | 18:57:25 | MILLS , KEEGAN T | 3954 | $463 | | Unit (463) Inf Issue Qry 0 RIM5 00000 231550963 QD VA12200M5 SOC/A6427B882 | |
| 463 | 170834 | RPD | PREC4 | UC | 18:57:26 | MILLS , KEEGAN T | 3954 | $463 | | dbo.usplpsWarrantMan     Unit (462)... | null|| |
| 462 | | RPD | PREC4 | -- | 18:59:00 | WILLIAMS , NAKIA W | | eci-t2 | LL(-77.25.20.6490,37.34.16.8490) MECHANICSVILLE/WOOD | System Unit Alarm | |
| 463 | 170834 | RPD | PREC4 | -- | 19:00:06 | MILLS , KEEGAN T | | eci-p4 | MECHANICSVILLE TPKE/WOOD ST RICH | System Unit Alarm | |
| 462 | | RPD | PREC4 | AV | 19:03:25 | WILLIAMS , NAKIA W | 3587 | eci-p4 | | | |
| 463 | 170834 | RPD | PREC4 | CU | 19:35:26 | MILLS , KEEGAN T | 8080 | $463 | MECHANICSVILLE TPKE/WOOD ST RICH | Alarm Timer Extended: 0 | |
| 463 | 170834 | RPD | PREC4 | UC | 20:53:33 | MILLS , KEEGAN T | 3954 | $463 | | Unit (463) Inf Issue Qry 0 RIM5 00000 231550963 RQ VA12200M5 WY TXT1JC/21284 LIY/2020 LIT/PC | |
| 463 | 170834 | RPD | PREC4 | UC | 20:56:31 | MILLS , KEEGAN T | 3954 | $463 | | Unit (463) Inf Issue Qry 0 RIM5 00000 231550963 QV VA12200M5 LIC/230611818 LIS/VA LIT/PC | |
| 463 | 170834 | RPD | PREC4 | UC | 20:57:41 | MILLS , KEEGAN T | 3954 | $463 | | Unit (463) Inf Issue Qry 0 RIM5 00000 231550963 QD VA12200M5 SOC/230611838 | |
| 463 | 170834 | RPD | PREC4 | UC | 20:57:42 | MILLS , KEEGAN T | 3954 | $463 | | dbo.usplpsWarrantMan("MINN"     U... | null|| |
| 463 | 170834 | RPD | PREC4 | AM | 21:04:25 | MILLS , KEEGAN T | 3954 | $463 | | | |

**JA0252**

**202012050571 - SS - OI - SUBJECT STOP - OFFICER-INITIATED**
**200 W CHARITY ST RICH**

CITY OF RICHMOND, VA

CERTIFIED COPY *CHW*

### EVENT INFORMATION - 202012050571                              12/05/20

**Event Type :** SS; **Event ID :** 202012050571; **Priority :** 3; **Status :** A; **Source :** OFFICER; **DGroup :** PREC4;
**Disposition Code :** 11,11; **Terminal :** ecc-p4; **Calltaker ID:** 8080

### AGENCY INFORMATION

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC4; **ESZ :** 908501; **Area :** 411A; **Added :** 12/05/20 21:04:54;
**Dispatched :** 12/05/20 21:04:54; **Arrived :** 12/05/20 21:04:54; **Closed :** 12/05/20 21:07:00; **Close ID :** 8080;
**Close Terminal :** ecc-p4; **Event ID :** 202012050571; **Primary Unit :** 463;

### REMARKS

12/05/20 21:04:54 (ecc-p4) : SPECIAL ADDRESS COMMENT
12/05/20 21:04:54 (ecc-p4) : ***RFD: TARGET HAZARD***
12/05/20 21:05:10 (ecc-p4) : OUT WITH 1

### CALLER INFORMATION

**Name:**
**Phone:**
**Address:**

### LOCATION INFORMATION

200 W CHARITY ST RICH

X-STREET 1 : ST PAUL ST
X-STREET 2: ST PETER ST

**Location Choices**



### SUPPLEMENTAL INFORMATION

Person 0

Vehicle 0

Property 0

Contact Name 0

Filed: 09/04/2024      Pg: 267 of 496

Doc: 22-1

USCA4 Appeal: 24-4201

**JA0253**

Incident Times 0

JA0254

I/NetViewer : Event Unit



CERTIFIED COPY CHW

**202012050571 - SS - OI - SUBJECT STOP - OFFICER-INITIATED**
**200 W CHARITY ST RICH**

| Unit ID | Card ID | Agency | Dispatch Group | Status | Time | Employee | ID | Terminal | Location | Comment | First Beeper | Employee Devices | Flight |
|---------|---------|--------|----------------|--------|------|----------|-----|----------|----------|---------|--------------|------------------|--------|
| 461 | 170834 | RPD | PREC 4 | DP | 21:04:54 | MILLS , KEEGAN T | 8080 | rcc-p4 | 200 W CHARITY ST RICH | | | 0001780E/MDT/Default System (3954)* | |
| 461 | 170834 | RPD | PREC 4 | AR | 21:04:54 | MILLS , KEEGAN T | 8080 | rcc-p4 | 200 W CHARITY ST RICH | | | 0001780E/MDT/Default System (3954)* | |
| 466 | | RPD | PREC 4 | DP | 21:05:01 | COLOMBO , DOMINIC J | 8080 | rcc-p4 | 200 W CHARITY ST RICH | | | | |
| 466 | | RPD | PREC 4 | AR | 21:05:04 | COLOMBO , DOMINIC J | 8080 | rcc-p4 | 200 W CHARITY ST RICH | | | | |
| 466 | | RPD | PREC 4 | AV | 21:06:56 | COLOMBO , DOMINIC J | 8080 | rcc-p4 | | | | | |
| 461 | 170834 | RPD | PREC 4 | AM | 21:07:00 | MILLS , KEEGAN T | 8080 | rcc-p4 | | | | 0001780E/MDT/Default System (3954)* | |

**JA0255**



CERTIFIED COPY *CHW*

**202012050571 - SS - OI - SUBJECT STOP - OFFICER-INITIATED**
**200 W CHARITY ST RICH**

☑ System Comments

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT CREATED - Type: SS - OI - SUBJECT STOP - OFFICER-INITIATED, Location: 200 W CHARITY ST RICH, Agency: RPD, Group: PREC4, Beat: 411A, Status: P, Priority: 3 |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | INITIAL CALL - Call Source: OFFICER, Caller Name: , Caller Phone Number: , Caller Address: |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT UPDATED - First Unit Dispatched Time: 12/05/20 21:04:54, Primary Employee Id: Primary Unit Id: 463, |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT UPDATED - First Unit Arrived Time: 12/05/20 21:04:54, |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 463, Status: DP, Location: 200 W CHARITY ST RICH, Employees: |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 463, Status: AR, Location: 200 W CHARITY ST RICH, Employees: |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT REMARK - Field Event |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT REMARK - SPECIAL ADDRESS COMMENT: |
| 12/05/20 21:04:54 | ecc-p4 | 8080 | EVENT REMARK - ***RFD: TARGET HAZARD*** |
| 12/05/20 21:04:55 | cad-94-db1 | 8080 | EVENT REMARK - ** LOI search completed at 12/05/20 21:04:54 |
| 12/05/20 21:05:01 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 2, |
| 12/05/20 21:05:01 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 468, Status: DP, Location: 200 W CHARITY ST RICH, Employees: |
| 12/05/20 21:05:04 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 468, Status: AR, Location: 200 W CHARITY ST RICH, Employees: |
| 12/05/20 21:05:10 | ecc-p4 | 8080 | EVENT REMARK - OUT WITH 1 |
| 12/05/20 21:06:56 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 468, Status: AV, Location: , Employees: |
| 12/05/20 21:06:57 | ecc-p4 | 8080 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 21:06:57 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 21:07:00 | ecc-p4 | 8080 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 21:07:00 | ecc-p4 | 8080 | EVENT CLOSED - |
| 12/05/20 21:07:00 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 0, |
| 12/05/20 21:07:00 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 463, Status: AM, Location: , Employees: |

Filed: 09/04/2024    Pg: 270 of 496    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0256**

**202012050574 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**MAGNOLIA ST/RADY ST RICH**

CERTIFIED COPY *CHW*

### EVENT INFORMATION - 202012050574                    12/05/20

**Event Type :** TS; **Event ID :** 202012050574; **Priority :** 3; **Status :** A; **Source :** OFFICER; **DGroup :** PREC4;
**Disposition Code :** 11,11,11; **Terminal :** ecc-p4; **Calltaker ID:** 8080

### AGENCY INFORMATION

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC4; **ESZ :** 909302; **Area :** 411B; **Added :** 12/05/20 21:09:36;
**Dispatched :** 12/05/20 21:09:37; **Arrived :** 12/05/20 21:09:37; **Closed :** 12/05/20 21:14:16; **Close ID :** 8080;
**Close Terminal :** ecc-p4; **Event ID :** 202012050574; **Primary Unit :** 469;

### REMARKS

### CALLER INFORMATION

**Name:**
**Phone:**
**Address:**

### LOCATION INFORMATION

MAGNOLIA ST/RADY ST RICH

X-STREET 1  MAGNOLIA ST
X-STREET 2  RADY ST

**Location Choices**



### SUPPLEMENTAL INFORMATION

Person 0

Vehicle 1

**Model**
**Year**                              Make :
                                      **State** :  VA
**Model**

**JA0257**

**License**  B142

**Remarks**

**License Type**  PC

**Vehicle Color**

**License Year**

**Unit ID**  469

Property 0

Contact Name 0

Incident Times 0



CERTIFIED COPY *CHW*

**202012050574 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**MAGNOLIA ST/RADY ST RICH**

| Unit No | Car ID | Agency | Beat or Group | Status | Time | Employee | ID | Terminal ID | Location | Comment | Unit Number | Structure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 469 | | RPD | PREC4 | DP | 21:09:37 | YOUNG , NICO S | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | | | |
| 469 | | RPD | PREC4 | AR | 21:09:37 | YOUNG , NICO S | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | | | |
| 467 | 160103 | RPD | PREC4 | DP | 21:09:41 | DIGIROLAMO , PATRICK J | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | | | 0003779F/MI System (- |
| 467 | 160103 | RPD | PREC4 | AR | 21:09:44 | DIGIROLAMO , PATRICK J | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | | | 0003779F/MI System (- |
| 468 | | RPD | PREC4 | DP | 21:09:52 | TORRES , JAKOB A | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | | | |
| 468 | | RPD | PREC4 | AR | 21:09:54 | TORRES , JAKOB A | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | | | |
| 469 | | RPD | PREC4 | UC | 21:10:32 | YOUNG , NICO S | 8080 | rcc-p4 | | Unit [469] Inf Issue Qry 0 RIP4 00000 223635307 QV VA122121N LIC/8142 LIS/VA LIT/PC | | |
| 469 | | RPD | PREC4 | UC | 21:10:33 | YOUNG , NICO S | 8080 | rcc-p4 | | dbo.snplpsWarrantMain/ | /RJ | |
| 469 | | RPD | PREC4 | -- | 21:12:37 | YOUNG , NICO S | | rcc-p2 | MAGNOLIA ST/RADY ST RICH | System Unit Alarm | | |
| 467 | 160103 | RPD | PREC4 | -- | 21:12:44 | DIGIROLAMO , PATRICK J | | rcc-p1 | MAGNOLIA ST/RADY ST RICH | System Unit Alarm | | 0003779F/MI System (- |
| 467 | 160103 | RPD | PREC4 | AM | 21:12:49 | DIGIROLAMO , PATRICK J | 4116 | $467 | | | | 0003779F/MI System (- |
| 468 | | RPD | PREC4 | -- | 21:12:54 | TORRES , JAKOB A | | rcc-p1 | MAGNOLIA ST/RADY ST RICH | System Unit Alarm | | |
| 468 | | RPD | PREC4 | CLI | 21:14:04 | TORRES , JAKOB A | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | Alarm Timer Extended  0 | | |
| 469 | | RPD | PREC4 | CLI | 21:14:04 | YOUNG , NICO S | 8080 | rcc-p4 | MAGNOLIA ST/RADY ST RICH | Alarm Timer Extended  0 | | |
| 468 | | RPD | PREC4 | AV | 21:14:13 | TORRES , JAKOB A | 8080 | rcc-p4 | | | | |
| 469 | | RPD | PREC4 | AV | 21:14:16 | YOUNG , NICO S | 8080 | rcc-p4 | | | | |

JA0259



CERTIFIED COPY *CHW*

**202012050574 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**MAGNOLIA ST/RADY ST RICH**

☑ System Comments

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 12/05/20 21:09:36 | ecc-p4 | 8080 | EVENT CREATED - Type: TS - OI - TRAFFIC STOP - OFFICER-INITIATED, Location: MAGNOLIA ST/RADY ST RICH, Agency: RPD, Group: PREC4, Beat: 411B, Status: P, Priority: 3 |
| 12/05/20 21:09:36 | ecc-p4 | 8080 | INITIAL CALL - Call Source: OFFICER, Caller Name: , Caller Phone Number: , Caller Address: |
| 12/05/20 21:09:36 | ecc-p4 | 8080 | EVENT REMARK - Field Event |
| 12/05/20 21:09:37 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 21:09:37 | ecc-p4 | 8080 | EVENT UPDATED - First Unit Dispatched Time: 12/05/20 21:09:37, Primary Employee Id: Primary Unit Id: 469, |
| 12/05/20 21:09:37 | ecc-p4 | 8080 | EVENT UPDATED - First Unit Arrived Time: 12/05/20 21:09:37, |
| 12/05/20 21:09:37 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 469, Status: DP, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:09:37 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 469, Status: AR, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:09:41 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 2, |
| 12/05/20 21:09:41 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 467, Status: DP, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:09:44 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 467, Status: AR, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:09:52 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 3, |
| 12/05/20 21:09:52 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 464, Status: DP, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:09:54 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 464, Status: AR, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:10:32 | ecc-p4 | 8080 | ADD SUPPLEMENTAL- Revision Number: 1, Supplemental Type: Vehicle, License: 8142 License Type: PC State: VA Unit ID: 469 |
| 12/05/20 21:10:32 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 469, Status: UC, Location: , Employees: |
| 12/05/20 21:10:32 | cad-94-db1 | 8080 | EVENT REMARK - ** VEH search completed at 12/05/20 21:10:32 |
| 12/05/20 21:10:33 | ecc-p4 | 8080 | ==UNIT UPDATED - Unit: 469, Status: UC, Location: , Employees:== |
| 12/05/20 21:12:37 | ecc-p2 | 0 | UNIT UPDATED - Unit: 469, Status: ~, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:12:44 | ecc-p1 | 0 | UNIT UPDATED - Unit: 467, Status: ~, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:12:49 | $467 | 4116 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 21:12:49 | $467 | 4116 | EVENT UPDATED - Total Assigned Units: 2, |
| 12/05/20 21:12:49 | $467 | 4116 | UNIT UPDATED - Unit: 467, Status: AM, Location: , Employees |
| 12/05/20 21:12:54 | ecc-p1 | 0 | UNIT UPDATED - Unit: 464, Status: ~, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:14:04 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 464, Status: CU, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:14:04 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 469, Status: CU, Location: MAGNOLIA ST/RADY ST RICH, Employees: |
| 12/05/20 21:14:13 | ecc-p4 | 8080 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 21:14:13 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 1, |
| 12/05/20 21:14:13 | ecc-p4 | 8080 | UNIT UPDATED - Unit: 464, Status: AV, Location: , Employees: |
| 12/05/20 21:14:13 | ecc-p4 | 8080 | DISPOSITION ASSIGNED - 11 |
| 12/05/20 21:14:16 | ecc-p4 | 8080 | EVENT CLOSED - |
| 12/05/20 21:14:16 | ecc-p4 | 8080 | EVENT UPDATED - Total Assigned Units: 0, |

Pg: 274 of 496    Filed: 09/04/2024    Doc: 22-1    USCA4 Appeal: 24-4201

**JA0260**

| 12/05/20<br>21:14:16 | ecc-p4 | 8080 | **UNIT UPDATED - Unit:** 469, **Status:** AV, **Location:** , **Employees:** |

**202012050579 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED CRAIGIE AVE/GROVELAND AVE RICH**



CERTIFIED COPY *CHW*

### EVENT INFORMATION - 202012050579                    12/05/20

**Event Type :** TS; **Event ID :** 202012050579; **Priority :** 3; **Status :** A; **Source :** OFFICER; **DGroup :** PREC4;
**Disposition Code :** 11,11; **Terminal :** ecc-p4; **Calltaker ID:** 8080

#### AGENCY INFORMATION

**Agency :** RPD; **Priority :** 3; **DGroup :** PREC4; **ESZ :** 909201; **Area :** 411C; **Added :** 12/05/20 21:17:39;
**Dispatched :** 12/05/20 21:17:39; **Arrived :** 12/05/20 21:17:39; **Event ID :** 202012050579; **Primary Unit :** 462;

#### REMARKS

12/05/20 21:20:05 (ecc-p4)  OCC X1

#### CALLER INFORMATION

**Name:**
**Phone:**
**Address:**

#### LOCATION INFORMATION

CRAIGIE AVE/GROVELAND AVE RICH

X-STREET 1: CRAIGIE AVE
X-STREET 2: GROVELAND AVE

**Location Choices**



#### SUPPLEMENTAL INFORMATION

Person 0

Vehicle 1

**Model**                          Make :
**Year**                           **State :** VA
**Model**

cad-94-netview/NetViewer/InquiryCommand/EventInformation?EventId=202012050579&isSearchResult=True

1/2

**JA0262**

7/20/2021

I/NetViewer : Event Information

**License** UYJ9083

**Remarks**

**License Type** PC

Vehicle Color

License Year

**Unit ID**   462

Property 0

Contact Name 0

Incident Times 0

cad-94-netview/NetViewer/InquiryCommand/EventInformation?EventId=202012050579&isSearchResult=True

2/2

**JA0263**



CERTIFIED COPY *CHW*

**202012050579 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**CRAIGIE AVE/GROVELAND AVE RICH**

| Unit ID | Tac ID | Agency | Dispatch Group | Status | Time | Employee | ID | Terminal | Location | Command | Unit Events |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 462 | | RPD | PREC4 | DP | 21 17 39 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | LL(-77.25 20 6490,37.34 16 8490); CR/GRO | | |
| 462 | | RPD | PREC4 | AR | 21 17 39 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | LL(-77.25 20 6490,37.34 16 8490); CR/GRO | | |
| 462 | | RPD | PREC4 | UC | 21 17 40 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | | Unit [462] Inf Issue Qry 0 RIP4 00000 223635307 QV VA122121N LIC/LY9083 LIS/VA LIT/PC | |
| 462 | | RPD | PREC4 | UC | 21 17 41 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | | dbo usplpsWarrantMain( | ) |
| 462 | | RPD | PREC4 | UC | 21 17 42 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | | dbo usplpsWarrantMa Unit [462] Inf Issue Qry 0 RIM5 | |
| 463 | 170834 | RPD | PREC4 | DP | 21 17 44 | MILLS , KEEGAN T | 8080 | PCC-p4 | LLI(-77.25 20 6490,37.34 16 8490); CR/GRO | | |
| 463 | 170834 | RPD | PREC4 | AR | 21 17 47 | MILLS , KEEGAN T | 8080 | PCC-p4 | LL(-77.25 20 6490,37.34 16 8490); CR/GRO | | |
| 463 | 170834 | RPD | PREC4 | UC | 21 18.16 | MILLS , KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 RIM5 00000 231550963 QD VA12200M5 SOC/T64267988 | |
| 463 | 170834 | RPD | PREC4 | UC | 21 18.17 | MILLS , KEEGAN T | 3954 | $463 | | Unit [463] Inf dbo usplpsWarrantMain( ,null0) | |
| 463 | 170834 | RPD | PREC4 | UC | 21 19.50 | MILLS , KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 RIM5 00000 231550963 QV VA12200M5 LIS/VA LIT/PC | |
| 463 | 170834 | RPD | PREC4 | UC | 21 19.51 | MILLS , KEEGAN T | 3954 | $463 | | dbo usplpsWarrantMa '.null0) | |
| 463 | 170834 | RPD | PREC4 | UC | 21 19.52 | MILLS , KEEGAN T | 3954 | $463 | | Unit [463] Inf dbo usplpsWarrantMain null0) | |
| 462 | | RPD | PREC4 | – | 21.20.39 | WILLIAMS , NAKIA W | | PCC-h1 | LLI(-77.25 20 6490,37.34 16 8490); CR/GRO | System Unit Alarm | |
| 463 | 170834 | RPD | PREC4 | – | 21.20.47 | MILLS , KEEGAN T | | PCC-p2 | LLI(-77.25 20 6490,37.34 16 8490); CR/GRO | System Unit Alarm | |
| 463 | 170834 | RPD | PREC4 | CU | 21.21.17 | MILLS , KEEGAN T | 8080 | PCC-p4 | LL(-77.25 20 6490,37.34 16 8490); CR/GRO | Alarm Timer Extended @ | |
| 462 | | RPD | PREC4 | CU | 21.21.17 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | LL(-77.25 20 6490,37.34 16 8490); CR/GRO | Alarm Timer Extended @ | |
| 463 | 170834 | RPD | PREC4 | UC | 21.23.38 | MILLS , KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 RIM5 00000 231550963 QV VA12200M5 LIC/UPB7705 LIS/VA LIT/PC | |
| 463 | 170834 | RPD | PREC4 | UC | 21.23.39 | MILLS , KEEGAN T | 3954 | $463 | | dbo usplpsWarrantMain( '.null0) | |
| 462 | | RPD | PREC4 | AV | 21.31.52 | WILLIAMS , NAKIA W | 8080 | PCC-p4 | | | |
| 463 | 170834 | RPD | PREC4 | AM | 21.31.54 | MILLS , KEEGAN T | 8080 | PCC-p4 | | | |

USCA4 Appeal: 24-4201　　　Doc: 22-1　　　Filed: 09/04/2024　　　Pg: 278 of 496

**JA0264**



**Report generated by:**

| | |
|---|---|
| **Department** | Richmond Police Department - VA |
| **Local Timezone** | Unknown |
| **Generated on** | Jul 20, 2021 5:58 PM |

| Evidence ID | ID | Title | Evidence Group | Owner | Uploaded by | Uploaded on | Recorded on | Duration | Category | Status | Shared To | Shared From |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| c5aff353584c48 36a86655df3f8b 854e | 20201205-0601 | Lock Up | | Mills, Keegan (3954) | Mills, Keegan (3954) | 06 Dec 2020 00:34:38 | 05 Dec 2020 22:34:45 | 7m 44s | 2-Evidentiary | Active | Richmond City (VA) Commonwealth Attorney's Office | - |
| 521cabb3e73a4 3d88858f4574f6 78b8a6 | 20201205-0601 | Keith Moore | | Mills, Keegan (3954) | Mills, Keegan (3954) | 06 Dec 2020 00:32:40 | 05 Dec 2020 21:45:50 | 27m 51s | 2-Evidentiary | Active | Richmond City (VA) Commonwealth Attorney's Office | - |
| 294fd5d2a2ac4 u68adde76ch30 dfea0a | 20201205-0579 | TS BM 090186 Fail To Stop Craigie Meadowbridge | | Mills, Keegan (3954) | Mills, Keegan (3954) | 06 Dec 2020 00:03:02 | 05 Dec 2020 21:16:46 | 4m 46s | 1-Non-Evidentia ry | Active | - | - |
| 278f17caea144 ac977fcbf44385 4ef9 | 20201205-0000 | SS | | Mills, Keegan (3954) | Mills, Keegan (3954) | 06 Dec 2020 00:01:49 | 05 Dec 2020 20:54:53 | 7m 10s | 1-Non-Evidentia ry | Active | Richmond City (VA) Commonwealth Attorney's Office, Richmond City (VA) Commonwealth Attorney's Office | - |
| b56112db67af4 460b8f4c999cd 60133d | 20201205-0502 | Ts Bm 053098 Expired Tags Magnolia | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 23:59:52 | 05 Dec 2020 18:55:31 | 5m 11s | 1-Non-Evidentia ry | Active | - | - |
| dba778315c944 5569570a6ea3b c17b68 | 20201205-0571 | TS BF 030481 Expired Tags | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 23:59:26 | 05 Dec 2020 18:39:44 | 1m 53s | 1-Non-Evidentia ry | Active | Richmond City (VA) Commonwealth Attorney's Office | - |
| 0bde1cd8fcd64 3fc800b2ad7e14 194c5 | 20201205-0000 | TS BF Speeding Letcher Highland View 111199 | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 23:57:55 | 05 Dec 2020 18:24:28 | 11m 45s | 1-Non-Evidentia ry | Active | Richmond City (VA) Commonwealth Attorney's Office, Richmond City (VA) Commonwealth Attorney's Office | - |
| c8efff1c91b144 a6b53d4a94f9b 76a57 | 20201205-0485 | TS 102993 BM No Lights 3000 Meadowbridge | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 23:54:38 | 05 Dec 2020 17:38:52 | 6m 56s | 1-Non-Evidentia ry | Active | Richmond City (VA) Commonwealth | - |

Page 1

**JA0265**

| Evidence ID | ID | Title | Evidence Group | Owner | Uploaded by | Uploaded on | Recorded on | Duration | Category | Status | Shared To | Shared From |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Attorney's Office, Richmond City (VA) Commonwealth Attorney's Office | |
| ec07cd3adda74 92c9604e3b5ab afc6d4 | 20201204-0626 | Assist | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 01:39:47 | 04 Dec 2020 23:08:45 | 12m 6s | 2-Evidentiary | Active | Richmond City (VA) Commonwealth Attorney's Office | - |
| d1aa583f32034 847afb223332d 8fcd18 | 20201204-0614 | TS | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 01:36:05 | 04 Dec 2020 22:40:01 | 10m 15s | 1-Non-Evidentia ry | Active | - | - |
| 4d6440f92c9d4 799a3cc297f3b 704ff1 | 20201204-0592 | TS | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 01:33:02 | 04 Dec 2020 22:28:29 | 4m 6s | 1-Non-Evidentia ry | Active | - | - |
| 6b4aef53fld774 daf85491f9a613 e2b6dd | 20201204-0471 | Warrant | | Mills, Keegan (3954) | Mills, Keegan (3954) | 05 Dec 2020 01:31:49 | 04 Dec 2020 18:34:40 | 20m 48s | 1-Non-Evidentia ry | Active | - | - |

JA0266



## 2010 Census Block Data

1 Dot = 1 Person

- 🔵 White
- 🟢 Black
- 🔴 Asian
- 🟠 Hispanic
- 🟤 Other Race / Native American / Multi-racial

**What am I looking at...?**



EXHIBIT

R1



2010 Census Block Data

1 Dot = 1 Person

- White
- Black
- Asian
- Hispanic
- Other Race / Native American / Multi-racial

What am I looking at...?

Dustin A. Cable | University of Virginia | Weldon Cooper Center for Public Service | Reference Data by Stamen Design

Keyboard shortcuts    Image may be subject to copyright    Terms of Use

DEFENDANT'S EXHIBIT

R2 7/26/21

7/20/2021

I/NetViewer : Event Unit

## 202012050579 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED
## CRAIGIE AVE/GROVELAND AVE Rich

| Unit ID | Car ID | Agency | Dispatch Group | Status | Time | Employee | ID | Terminal | Location | Comment | Unit Devices | Employee Devices | Dispatch Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 462 | | RPD | PREC4 | DP | 21:17:39 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | | | | |
| 462 | | RPD | PREC4 | AR | 21:17:39 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | | | | |
| 462 | | RPD | PREC4 | UC | 21:17:40 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | | Unit [462] Inf Issue Qry 0.RIP4.00000.223635307.QV.VA122121N.LIC/UYJ9083.LIS/VA.LIT/PC | | | |
| 462 | | RPD | PREC4 | UC | 21:17:41 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | | Unit [462] Inf Issue Qry 0 (call dbo.uspIpsWarrantMain(' | | | |
| 462 | | RPD | PREC4 | UC | 21:17:42 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | | Unit [462] Inf Issue Qry 0 (call dbo.uspIpsWarrantMain("MOORE"," | | | |
| 463 | 170834 | RPD | PREC4 | DP | 21:17:44 | MILLS, KEEGAN T | 8080 | ecc-p4 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | AR | 21:17:47 | MILLS, KEEGAN T | 8080 | ecc-p4 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | UC | 21:18:16 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0.RIM5.00000.231550963.QO.VA12200M5.SOC/164267988 | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | UC | 21:18:17 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 (call dbo.uspIpsWarrantMain( | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | UC | 21:19:50 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0.RIM5.00000.231550963.QV.VA12200M5.LIC/UYJ9083.LIS/VA.LIT/PC | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | UC | 21:19:51 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 (call dbo.uspIpsWarrantMain("A ...) | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | UC | 21:19:52 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 (call dbo.uspIpsWarrantMai | | 0003780E/MDT/Default System (3954)* | |
| 462 | | RPD | PREC4 | ~ | 21:20:39 | WILLIAMS, NAKIA W | | ecc-h1 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | System Unit Alarm | | | |
| 463 | 170834 | RPD | PREC4 | ~ | 21:20:47 | MILLS, KEEGAN T | | ecc-p2 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | System Unit Alarm | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | CU | 21:21:17 | MILLS, KEEGAN T | 8080 | ecc-p4 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | Alarm Timer Extended: 0 | | 0003780E/MDT/Default System (3954)* | |
| 462 | | RPD | PREC4 | CU | 21:21:17 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | LL(-77.25.20.6490,37.34:16.8490): CR/GRO | Alarm Timer Extended: 0 | | | |
| 463 | 170834 | RPD | PREC4 | UC | 21:23:38 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0.RIM5.00000.231550963.QV.VA12200M5.LIC/UYPB7205.LIS/VA.LIT/PC | | 0003780E/MDT/Default System (3954)* | |
| 463 | 170834 | RPD | PREC4 | UC | 21:23:39 | MILLS, KEEGAN T | 3954 | $463 | | Unit [463] Inf Issue Qry 0 (call dbo.uspIpsWarrantMain(" | | 0003780E/MDT/Default System (3954)* | |
| 462 | | RPD | PREC4 | AV | 21:31:52 | WILLIAMS, NAKIA W | 8080 | ecc-p4 | | | | | |
| 463 | 170834 | RPD | PREC4 | AM | 21:31:54 | MILLS, KEEGAN T | 8080 | ecc-p4 | | | | 0003780E/MDT/Default System (3954)* | |

**JA0269**



USCA4 Appeal: 24-4201     Doc: 22-1     Filed: 09/04/2024     Pg: 284 of 496

**JA0270**

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 285 of 496



**Intergraph® I/NetViewer®**

Main | Events | Units | Messages | Lineups | Facility | Inquiry | Configure

**202012050579 - TS - OI - TRAFFIC STOP - OFFICER-INITIATED**
**CRAIGIE AVE/GROVELAND AVE RICH**

Overview | Chronology | Event Unit | View Map | Event Details | Event Calls (1)

☑ System Comments

| | |
|---|---|
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **EVENT CREATED**<br>**Type:** TS - OI - TRAFFIC STOP - OFFICER-INITIATED<br><br>**LOCATION:**<br>LL(-77:25:20.6490,37:34:16.8490): CR/GRO<br><br>**Agency:** RPD<br>**Group:** PREC4<br>**Beat:** 411C<br>**Status:** P<br>**Priority:** 3 |
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **INITIAL CALL**<br>**Call Source:** OFFICER<br>**Caller Name:**<br>**Caller Phone Number:**<br>**Caller Address:** |
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **EVENT UPDATED**<br>**Total Assigned Units:** 1 |
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **EVENT UPDATED**<br>**First Unit Dispatched Time:** 12/05/20 21:17:39<br>**Primary Employee Id:** 4113<br>**Primary Unit Id:** 462 |
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **UNIT UPDATED**<br>**Unit:** 462<br>**Status:** DP<br>**Location:** LL(-77:25:20.6490,37:34:16.8490): CR/GRO<br>**Employees:** 4113 |
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **UNIT UPDATED**<br>**Unit:** 462<br>**Status:** AR<br>**Location:** LL(-77:25:20.6490,37:34:16.8490): CR/GRO<br>**Employees:** 4113 |
| 12/05/20 21:17:39<br>Terminal: ecc-p4<br>Operator: 8080 | **EVENT REMARK**<br>Field Event |
| 12/05/20 21:17:40<br>Terminal: ecc-p4<br>Operator: 8080 | **ADD SUPPLEMENTAL**<br>**Revision Number:** 1<br>**Supplemental Type:** Vehicle<br>**License:** UY9083<br>**License Type:** PC<br>**State:** VA<br>**Unit ID:** 462 |

**JA0271**

12/05/20 21:17:40
Terminal: ecc-p4
Operator: 8080

**EVENT UPDATED**
First Unit Arrived Time: 12/05/20 21:17:39

12/05/20 21:17:40
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 462
Status: UC
Location:
Employees: 4113

12/05/20 21:17:40
Terminal: cad-94-db1
Operator: 8080

**EVENT REMARK**
** VEH search completed at 12/05/20 21:17:40

12/05/20 21:17:41
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 462
Status: UC
Location:
Employees: 4113

12/05/20 21:17:42
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 462
Status: UC
Location:
Employees: 4113

12/05/20 21:17:44
Terminal: ecc-p4
Operator: 8080

**EVENT UPDATED**
Total Assigned Units: 2

12/05/20 21:17:44
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 463
Status: DP
Location: LL(-77:25:20.6490,37:34:16.8490); CR/GRO
Employees: 3954

12/05/20 21:17:47
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 463
Status: AR
Location: LL(-77:25:20.6490,37:34:16.8490); CR/GRO
Employees: 3954

12/05/20 21:17:56
Terminal: ecc-p4
Operator: 8080

**EVENT UPDATED**
Cross Street1: CRAIGIE AVE
Cross Street2: GROVELAND AVE
Latitude: 37.572549
Longitude: -77.421126

12/05/20 21:17:56
Terminal: ecc-p4
Operator: 8080

**EVENT REMARK**
** Event Location changed from "LL(-77:25:20.6490,37:34:16.8490); CR/GRO" to "CRAIGIE AVE/GROVELAND AVE RICH" at: 12/05/20 21:17:56

12/05/20 21:17:56
Terminal: ecc-p4
Operator: 8080

**EVENT REMARK**
** > > > > by: BRUCE JOHNSON on terminal: ecc-p4

12/05/20 21:17:57
Terminal: cad-94-db1
Operator: 8080

**EVENT REMARK**
** LOI search completed at 12/05/20 21:17:57

**UNIT UPDATED**

**JA0272**

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 286 of 496

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 287 of 496

| 12/05/20 21:18:16 | Unit: 463 |
| Terminal: $463 | Status: UC |
| Operator: 3954 | Location: |
| | Employees: 3954 |

| 12/05/20 21:18:17 | **UNIT UPDATED** |
| Terminal: $463 | Unit: 463 |
| Operator: 3954 | Status: UC |
| | Location: |
| | Employees: 3954 |

| 12/05/20 21:19:50 | **UNIT UPDATED** |
| Terminal: $463 | Unit: 463 |
| Operator: 3954 | Status: UC |
| | Location: |
| | Employees: 3954 |

| 12/05/20 21:19:51 | **UNIT UPDATED** |
| Terminal: $463 | Unit: 463 |
| Operator: 3954 | Status: UC |
| | Location: |
| | Employees: 3954 |

| 12/05/20 21:19:52 | **UNIT UPDATED** |
| Terminal: $463 | Unit: 463 |
| Operator: 3954 | Status: UC |
| | Location: |
| | Employees: 3954 |

| 12/05/20 21:20:05 | **EVENT REMARK** |
| Terminal: ecc-p4 | OCC X1 |
| Operator: 8080 | |

| 12/05/20 21:20:39 | **UNIT UPDATED** |
| Terminal: ecc-h1 | Unit: 462 |
| Operator: 0 | Status: ~ |
| | Location: LL(-77:25:20.6490,37:34:16.8490): CR/GRO |
| | Employees: 4113 |

| 12/05/20 21:20:47 | **UNIT UPDATED** |
| Terminal: ecc-p2 | Unit: 463 |
| Operator: 0 | Status: ~ |
| | Location: LL(-77:25:20.6490,37:34:16.8490): CR/GRO |
| | Employees: 3954 |

| 12/05/20 21:21:17 | **UNIT UPDATED** |
| Terminal: ecc-p4 | Unit: 463 |
| Operator: 8080 | Status: CU |
| | Location: LL(-77:25:20.6490,37:34:16.8490): CR/GRO |
| | Employees: 3954 |

| 12/05/20 21:21:17 | **UNIT UPDATED** |
| Terminal: ecc-p4 | Unit: 462 |
| Operator: 8080 | Status: CU |
| | Location: LL(-77:25:20.6490,37:34:16.8490): CR/GRO |
| | Employees: 4113 |

| 12/05/20 21:23:38 | **UNIT UPDATED** |
| Terminal: $463 | Unit: 463 |
| Operator: 3954 | Status: UC |
| | Location: |

Employees: 3954

---

12/05/20 21:23:39
Terminal: $463
Operator: 3954

**UNIT UPDATED**
Unit: 463
Status: UC
Location:
Employees: 3954

---

12/05/20 21:31:52
Terminal: ecc-p4
Operator: 8080

**DISPOSITION ASSIGNED**
11

12/05/20 21:31:52
Terminal: ecc-p4
Operator: 8080

**EVENT UPDATED**
Total Assigned Units: 1

---

12/05/20 21:31:52
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 462
Status: AV
Location:
Employees: 4113

---

12/05/20 21:31:54
Terminal: ecc-p4
Operator: 8080

**DISPOSITION ASSIGNED**
11

12/05/20 21:31:54
Terminal: ecc-p4
Operator: 8080

**UNIT UPDATED**
Unit: 463
Status: AM
Location:
Employees: 3954

---

USCA4 Appeal: 24-4201      Doc: 22-1      Filed: 09/04/2024      Pg: 288 of 496

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 289 of 496



**JA0275**



EXHIBIT

X1

tables'



EXHIBIT

X 2

tables



EXHIBIT

exhibit

X3

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 292 of 496



EXHIBIT

xy

tabbies

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 293 of 496



**Filters (3)**
Clear All

AGENCY NAME
Richmond Police Depart...

JURISDICTION
RICHMOND CITY

RACE
Select...

ETHNICITY
Select...

INCIDENT DATE
From 7/1/2020 to 12/5/...

Less ∧

## Stops by Race

▼ Filters ∨

| RACE | Count of Rows (person... | Percent of Total |
|---|---|---|
| BLACK OR AFRICAN AMERIC... | 1,803 | 76% |
| WHITE | 355 | 15% |
| UNKNOWN | 201 | 8% |
| ASIAN/PACIFIC ISLANDER | 16 | 1% |
| AMERICAN INDIAN | 1 | 0% |

## Stops by Ethnicity- Hispani...

If no data is shown when filtered by age...

▼ Filters ∨

| ACTIO... | Count ... | Percen... |
|---|---|---|
| WARNING | 72 | 55% |
| CITATION/S... | 54 | 42% |
| ARREST | 4 | 3% |



EXHIBIT



Filters (3)
Clear All

AGENCY NAME
Richmond Police Depart...

JURISDICTION
RICHMOND CITY

RACE
Select...

ETHNICITY
Select...

INCIDENT DATE
From 7/1/2020 to 12/5/...

Less ^

### Stops by Gender

▼ Filters

| GENDER | Count of Rows... | Percent of Total |
|--------|------------------|------------------|
| MALE | 1,565 | 66% |
| FEMALE | 788 | 33% |
| OTHER | 18 | 1% |
| MISSING | 5 | 0% |

### Vehicles Searched during a stop

▼ Filters (1)

| VEHICLE SEAR... | Count of Rows | Percent of Total |
|-----------------|---------------|------------------|
| NO | 1,512 | 84% |
| YES | 291 | 16% |

EXHIBIT
42

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
                    Defendant.

## ORDER

This matter comes before the Court on its own initiative.  On June 4, 2021, the Court set this case for trial on August 5, 2021.  On June 21, 2021, the defendant filed a motion to suppress.  The Court held a hearing on that motion on July 26, 2021.  After the hearing, the defendant's attorney asked for the opportunity to submit additional briefing.  The Court granted that request and gave the defendant until August 2, 2021, to submit his initial post-hearing brief.  The government has until August 6, 2021, to file its response.  Because briefing on the defendant's motion to suppress will not finish before August 5, 2021, the Court CONTINUES GENERALLY trial in this case.  The Court excludes from the speedy trial calculation any delay in trial caused by the Court's consideration and prompt disposition of the defendant's motion to suppress.  *See* 18 U.S.C. § 3161(h)(1))(D) (excluding from the speedy trial calculation any period of delay "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion").  The Court will set a new trial date at the appropriate time.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 27 July 2021
Richmond, VA

                                        /s/
                                        John A. Gibney, Jr.
                                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21cr42** |
| | ) | |
| **KEITH RODNEY MOORE,** | ) | |
| Defendant | ) | |

**SUPPLEMENT TO MR. MOORE'S MOTION TO SUPPRESS**
**EVIDENCE AND STATEMENTS**

Keith Moore, through counsel, has moved the Court to suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore in this case and to suppress statements after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent.  *See* ECF Nos. 17 and 28.  After an evidentiary hearing on that motion on July 26, 2021, he supplements that motion here.

> **I.**    **The police violated Mr. Moore's Fourth Amendment right to remain free of unreasonable seizures when they pulled Mr. Moore over to investigate a temporary dealer tag.**

The Fourth Amendment protects the right of people to be secure in their persons against unreasonable searches and seizures.  U.S. Const. amend. IV.  A police officer may "initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").  The "reasonable suspicion" needed to justify a traffic stop "is dependent upon both the content of information possessed by police and its degree of reliability."  *Alabama v. White*, 496 U.S. 325,

1

**JA0283**

330 (1990). Inchoate suspicion or a hunch that an individual is engaging in criminal activity is not sufficient to justify a traffic stop. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

### a. *Traffic stops must be valid from their inception.*

Traffic stop investigations are akin to *Terry* stops, and just like a *Terry* stop, must be just from the inception. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968) ("And in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."); *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (observing that a seizure is justified from its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation."). The Fourth Circuit adopted this standard for evaluating the constitutionality of traffic stops—that traffic stops must be valid from inception—more than a quarter of a century ago. *See, e.g.*, *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994) (recognizing that Fourth Circuit sided with Fifth, Seventh, and Eighth Circuits adopting standard "that any traffic stop, which is legally justified at its inception, is constitutionally valid for the purpose of a search later conducted on probable cause").

Such a rule makes sense in the context of traffic stops. Many states, like Virginia, criminalize failing to pull over once a police officer signals to do so by using flashing lights. *See* Va. Code § 46.2-817 (providing that anyone who "having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal" commits a class 2 misdemeanor). It is not a defense to the eluding provision in § 46.2-817 when a person fails to pull over because the police did not

have a lawful basis to initiate the traffic stop.  Rather, the only way that an individual could try to avoid a conviction for an eluding charge after failing to pull over for an unlawful traffic stop would be to challenge the legality of the stop itself from its inception as violating the Fourth Amendment and argue that the failure to stop was a fruit of the poisonous tree that must be suppressed.

Nothing about *California v. Hodari D.*, 499 U.S. 621 (1991), changes that.  In *Hodari D.*, a kid simply ran after seeing a police officer.  The police officer had no reasonable, articulable suspicion to believe that the kid was engaging in any criminal activity.  The police officer just chased the kid after the kid started to run.  Nothing about that series of events was illegal.  As the kid ran, he threw what later turned out to be a small bag of drugs.  The question was whether the officer had arrested the kid simply by chasing after him.  *Id.* (using the word "arrest" at least twenty-four times in the majority opinion to describe the question at hand).  The Court answered no.  More was required to find that the officer had arrested the kid before the officer tackled the kid.

A traffic stop, on the other hand, is more akin to a *Terry* stop that allows police to conduct a brief investigative detention.  It can be based only on "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Glover*, 140 S. Ct. at 1187 (internal quotation marks omitted).  It thus makes sense then that a traffic stop must be valid from its inception, particularly when state law turns a knowing disregard for a signal to pull over into a crime.  If the police are allowed to signal for someone to pull over based only on a particularized and objective basis that the person is engaging in or has engaged in criminal activity, the particularized and objective basis must exist from the beginning of the signal to pull over.  To hold otherwise, would mean that the police could turn their lights on at any time behind anyone without

**JA0285**

cause and just wait for people to disregard the signal—effectively entrapping innocent persons into committing the crime of eluding.

> As the Supreme Court recited nearly a half century ago:
>
> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 228-29 (1973) (internal quotation marks omitted).  And so too here.  This Court cannot, and should not, look past the inception of the traffic stop for justification for the traffic stop.  *See, e.g.*, *United States v. Williams*, 843 F. App'x 111 (10th Cir. 2021) (finding stop unlawful where police followed car they lacked reasonable articulable suspicion to pull over until it committed a traffic infraction); *United States v. $45,000 in United States Currency*, 749 F.3d 709, 715 (8th Cir. 2014) ("the critical inquiry in a probable-cause determination in the traffic-stop context is what the stopping officer observed before pulling over a motorist"); *United States v. Esteban*, 283 F. Supp. 3d 1115 (D. Utah 2017) (finding that cop who followed driver until driver committed traffic infraction of not putting turn signal on for full two seconds violated requirement that traffic stop be valid from inception); *United States v. Ochoa*, 4 F. Supp. 2d 1007, 1011-13 (D. Kan. 1998) (suppressing evidence after officers followed car they wanted to pull over until the car drifted onto the shoulder of the road, which was not a technical violation of the traffic laws).

### b.  The Court cannot ignore the knowledge requirement in Va. Code § 46.2-612(b)(1).

At the evidentiary hearing on July 26, 2021, the Court questioned whether the police officers had to have reason to believe that Mr. Moore knew the temporary tag on his car was fake as opposed to simply having reason to believe that the tag itself was fake.  "[W]hen an element of the crime includes a mens rea, there also needs to be probable cause to warrant a belief that the suspect had the requisite mens rea to commit a violation of the law or statute at issue." *Thurston v. Avery County Sheriff's Office*, 2021 WL 1093097, at \*7 (W.D.N.C. Mar. 22, 2021) (citing *Stubbs v. Las Vegas Metro. Police Dep't*, 792 F. App'x 441, 442 (9th Cir. 2019); *Kleinschnitz v. Phares*, No. 1:13-cv-0209-MEF, 2013 WL 5797621 (M.D. Ala. 2013); and *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 619-20 (2000)).

Courts must look to the text of the traffic code in question to determine whether it was reasonable for an officer to believe that a traffic violation had been committed.  *See, e.g.*, *United States v. Flores*, 798 F.3d 645, 647-50 (7th Cir. 2015) (analyzing text of license plate statute and finding that officer could not have reasonably misunderstood law requiring plate to be "clearly visible" and "clearly legible" when dealer plate holder obscured portion of the outside edge of the plate); *United States v. $45,000 in United States Currency*, 749 F.3d 709, 714-15 (8th Cir. 2014) (finding it unreasonable for officer to believe that license plate was not plainly visible when he could read the plate about 100 feet away and analyzing textual phrase "plainly visible"); *United States v. Ochoa*, 4 F. Supp. 2d 1007, 1011-13 (D. Kan. 1998) (analyzing text of statute to find that car that drifted onto shoulder did not constitute lane violation based on plain language of statute).

Virginia Code § 46.2-612(b)(1) provides in relevant part: "No person shall: Display or cause or permit to be displayed any . . . license plate or decal that he knows is fictitious . . . ."  The plain text of the statute requires that the person knowingly display a fictitious license plate.  The

5

**JA0287**

question here is whether the officers reasonably believed that Mr. Moore was knowingly displaying a fictitious license plate on December 5, 2020[1]. The evidence indicates that they did not.

First, while the police had determined earlier that night that the tag number on Mr. Moore's car did not return to any Virginia DMV record, they developed no evidence that the drivers in the earlier two stops knew that the license plate was fictitious. Both Officers Colombo and Mills testified to this fact at the evidentiary hearing. The Court also has body camera footage of both earlier stops. *See* Gov't Ex. 4, Def. Exs. U-3, U-4, V-3. These four videos indicate that at no time was there any indication that the drivers of the other two cars knew that the license plate was fictitious. The license plate in the second stop in particular had a VIN number that matched the VIN number on the car. Neither car from the earlier stops was reported stolen. Rather, the driver of the first car indicated that he had recently bought the car and just needed to get a permanent license plate for the car.

Second, in both of the earlier stops, the police did not pull over the cars because they suspected that the license plate was fictitious. This absence is notable because Officer Mills ran both plates before the officers pulled over both cars. *See* Def. Exs. U-4, V-3. The officers did not ticket either driver in the earlier stops for having a fictitious license plate. They did not seize the

---

[1] To the extent that the government tries to argue that Officer Colombo's observation that Mr. Moore fiddled with something on his lap provided a reasonable basis to pull Mr. Moore over, that argument will not go far. *See, e.g.*, *United States v Black*, 707 F3d 531, 539 (4th Cir. 2013) ("At least four times in 2011, we admonished against the Government's misuse of innocent facts as indicia of suspicious activity. *See United States v. Powell*, 666 F.3d 180 (4th Cir.2011); *Massenburg*, 654 F.3d 480; *United States v. Digiovanni*, 650 F.3d 498 (4th Cir.2011); and *United States v. Foster*, 634 F.3d 243 (4th Cir.2011). Although factors "susceptible of innocent explanation," when taken together, may "form a particularized and objective basis" for reasonable suspicion for a *Terry* stop, this is not such a case. Instead, we encounter yet another situation where the Government attempts to meet its *Terry* burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion.") (internal citation omitted).

temporary tags for further investigation.  They did not even do a moderately thorough investigation into the origin of the temporary tags in either of the earlier stops.  Rather, they did what they set out to do that night—pull over black drivers and search their cars in hopes of finding evidence of more serious crimes.

Thus, by the time that the officers saw Mr. Moore with the same temporary tag number on his car, it was not reasonable for the officers to believe that Mr. Moore was knowingly displaying fictitious temporary tags.  All officers had at that time was a hunch that Mr. Moore may have known something about the temporary tag being fake.  "The Government bears the burden of articulating facts sufficient to establish reasonable suspicion, and although the standard of proof is obviously less demanding than that for probable cause, the government must be able to articulate something more than an inchoate and unparticularized suspicion or hunch."  *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (internal citation and quotation marks omitted).  If the officers really wanted to investigate the origin of the temporary tag on Mr. Moore's car, they could simply have followed him to his destination and asked to engage in a consensual encounter.

But, consensual encounters were not the mission of the Fourth Precinct Focus Mission Team on December 5, 2020.  To the contrary, the blatant mission of the Fourth Precinct Focus Mission Team was to use minor traffic violations as a pretext to pull over black drivers and look for evidence of more serious drug and gun crimes.  On each minor traffic violation stop the Fourth Precinct Focus Mission Team conducted that night, the officers pulled over a black driver and searched the car or area involved.  *See* Def. Exs. J, K, L, N, O, P, Q, U-3, U-4, V-3, W; Gov't Ex. 4.  Racial profiling can in no way save a questionable traffic stop.  *See, e.g., United States v. Johnson*, 874 F.3d 571, 581 (7th Cir. 2017) (Hamilton, J., dissenting) (observing in scathing dissent: "What made the officers decide so fast to swoop in to seize this car? On this record, the

7

**JA0289**

only explanation is the neighborhood, and the correlation with race is obvious. It is true that Johnson has not made an issue of race, but we should not close our eyes to the fact that this seizure and these tactics would never be tolerated in other communities and neighborhoods. If we tolerate these heavy-handed tactics here, we enable tactics that breed anger and resentment, and perhaps worse, toward the police."); *United States v. Warfield*, 727 F. App'x 182, 188 (6th Cir. 2018) ("While the law allows pretextual stops based on minor traffic violations, no traffic law prohibits driving while black. The protections of the Fourth Amendment are not so weak as to give officers the power to over-police people of color under a broad definition of suspicious behavior.").

Under the totality of the circumstances, the Court must consider Mr. Moore's race and the Fourth Precinct Focus Mission Team's practice and tactics to find that this stop was not justified from its inception.  Rather, the Fourth Precinct Focus Mission Team did what they had been doing all night—finding a black person to pull over on a purported minor traffic violation.  Only this time, they ignored the plain language of the traffic law they said they were attempting to enforce, which cannot be used now to justify the stop.

### c. The government's theory of abandonment does not apply here because of the nexus between the police officers' lawless conduct and the discovery of the gun here.

The government has argued that Mr. Moore abandoned his car and its contents when he parked it and ran.  In so arguing, the government has ignored that abandonment cannot save a traffic stop invalid from its inception.  If there is a nexus between the alleged abandoned property and illegal police conduct, the evidence must be suppressed. *See United States v. Maryland*, 479 F.2d 566, 568 (5th Cir. 1973) ("If there is a 'nexus between . . . lawless police conduct and the discovery of the challenged evidence' which has not 'become so attenuated as to dissipate the taint,' then the evidence should be suppressed. The nexus between the arrest and the discovery of the evidence is strong in this case, for the arrest obviously motivated appellant to attempt to conceal

8

**JA0290**

the bills in the police vehicle.") (internal citation omitted); *see also United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) ("An abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary. Consequently, even if the district court correctly concluded that defendant abandoned the bag at the security office, we must determine whether that abandonment was the result of an earlier Fourth Amendment violation."); *Com. of Mass. v. Painten*, 368 F.2d 142 (1st Cir. 1966); *United States v. Merritt*, 293 F.2d 742 (3d Cir. 1961); *Hobson v. United States*, 226 F.2d 890 (8th Cir. 1955).

As Mr. Moore set forth above, the traffic stop was invalid from its inception. But for the invalid traffic stop, Mr. Moore would not have left his car with the door wide open. He was gone from the car for a matter of minutes. When police officers brought Mr. Moore back to the area of his car (and the numerous police cars surrounding it), he clearly indicated that it was his car and demonstrated his intent to retain his interest in that property. To the extent the Court finds that Mr. Moore abandoned his car and its contents, that doctrine is inapplicable once the Court first finds that the traffic stop itself was illegal from its inception.

**II.    The police violated Mr. Moore's Fourteenth Amendment right to equal protection of the laws by targeting him and other black residents of the Fourth Police Precinct in Richmond, Virginia for enforcement of minor traffic violations in order to search their cars.**

The Equal Protection Clause of the "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996); see *also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167

(10th Cir. 2003) ("Racially selective law enforcement violates this nation's constitutional values the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment.").

The "Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). "The Fourth Circuit has adopted the standard the Supreme Court set forth in *United States v. Armstrong*, 517 U.S. 456 (1996), for cases of racially animated law enforcement." *See United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (citing *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir.1996)). The defendant must show both "discriminatory effect and that [the officer's action] was motivated by a discriminatory purpose." *Id.* (citing *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Although discriminatory effect can be established by showing that similarly situated individuals of a different race were not prosecuted, *see id.*, proving the existence of such a class is not required when there is direct evidence of racially motivated decision-making. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 n.4 (6th Cir. 2002); *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) ("[I]t is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification."); *Avery*, 137 F.3d at 355 ("discrimination can be proved through direct evidence, which seldom exists, or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence.").

Here, the evidence shows that the City of Richmond is made up of four distinct police precincts. Three of those precincts correspond to nearly entirely black neighborhoods in

10

**JA0292**

Richmond.  *Compare* Def. Ex. X (1-4) *with* Def. Ex. R (1-2).  Virginia's Community Policing Act, which the Fourth Precinct Focus Mission Team is not complying with aside from Officer Mills's attempt to capture some of the required data in his body worn camera video titles, has compiled additional data for the Richmond Police Department.  First, seventy-six percent of the Richmond Police Department's traffic stops are of black persons.  *See* Def. Ex. Y-1.  Yet, as Mr. Hush testified regarding 2019 census date, black people make up less than half of the population of Richmond. White people also make up just less than half of the population of Richmond.  Yet, white people make up only fifteen percent of the Richmond Police Department's traffic stops.  Second, eighty-four percent of all of the cars the Richmond Police Department stops for traffic violations are not searched.  *See* Def. Ex. Y-2.  And yet, the Fourth Precinct Focus Mission Team searched every single car stopped for minor traffic violations on December 5, 2020.  *See* Def. Exs. J, K, L, N, O, P, Q, U-3, U-4, V-3, W; Gov't Ex. 4.  And every single car that they stopped that night had a black driver.  *Id.*

This evidence demonstrates that the Fourth Precinct Focus Mission Team's racial profiling was actively having a discriminatory effect on black drivers in Richmond.  *See, e.g.*, *Maryland State Conference of NAACP Branches v. Maryland State Police*, 454 F. Supp. 2d 339, 349 (D. Md. 2006) ("if the stop was 'not really' for speeding, then the basis for it is unclear. And, this unclear basis for the stop exists against a backdrop of powerful circumstantial evidence of racial profiling in the form of statistics compiled by the Maryland State Police—and the senior officer corps' conclusions based upon those statistics, i.e., that 'a remarkable deviation' in regard to the percentage of African–Americans stopped and searched existed in the JFK Barrack area—which shows, at least, discriminatory effect from the practices afoot in the JFK Barrack patrol area").

"Discriminatory purpose implies more than intent as awareness of consequences.  It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of its adverse effects upon an identifiable group."  *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001) (quoting *McClesky v. Kemp*, 481 U.S. 279, 298 (1987)).   In evaluating discriminatory intent, the Court must take account of the totality of the circumstances.  Here, the totality of the circumstances shows that the Fourth Precinct Focus Mission Team is pulling over black people for minor traffic violations, surrounding the cars with four police officers, conducting at least one unwarranted pat-down of a passenger, and having multiple police officers blatantly search the entire interior of the car before letting anyone not suspected of more serious crimes go.  As Judge Hamilton observed regarding similar tactics in Milwaukee: "Imagine that the police tried these tactics in Milwaukee's affluent east side. Citizens would be up in arms, and rightly so. No police officer could expect to keep his job if he treated a car standing in front of a store as worthy of such an intrusive *Terry* stop."  *Johnson*, 874 F.3d at 581.  The stark numbers and heavy-handed policing tactics of minority neighborhoods in Richmond—a city that feels it needs to devote three of its four police precincts to policing the sections of town made up almost entirely of black citizens—warrant an inference of discriminatory intent.  *See, e.g.*, *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing that, if severe enough, statistical evidence of discriminatory effect can raise an inference of discriminatory intent).

Mr. Moore, and other black citizens in Richmond, are entitled to and deserve equal protection of the laws.  Because the Fourth Precinct Focus Mission Team has ignored this protection, the Court must suppress the evidence seized and dismiss the indictment in this case.

12

**JA0294**

**III.**  **The police violated Mr. Moore's Fifth Amendment right to remain silent by interrogating him both before and after *Miranda* warnings and after he invoked his right to remain silent.**

*Miranda* warnings are required when a defendant is in custody.  *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) ("[I]f the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt.").  Whether a person is in custody for *Miranda* purposes "is an objective inquiry, and essentially asks "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017).  Here, after the police chased Mr. Moore, tackled him, arrested him, and put him in handcuffs in the back of a police car, he was certainly seized.  By that point, the police told him repeatedly that he was under arrest.  No reasonable person would have felt that he was free to leave at that point.

Officer Williams was the only officer that night that gave Mr. Moore the required *Miranda* advisements.  Before making any further statements and shortly after the advisements, Mr. Moore invoked his right not to speak with the officers.  He blatantly told Officer Williams, "I'm not talking to you.  I'm done."  After that, Officer Williams did not tell anyone that Mr. Moore had clearly invoked his right to remain silent.  Officer Gilbert testified that if any other officer had told him that Mr. Moore had invoked his right to remain silent, he certainly would not have questioned Mr. Moore about why he ran away from police that night.  And Officer Williams herself participated in further questioning Mr. Moore at the police precinct that same night about the gun.  But, again, she never told the other two officers she was with that Mr. Moore had invoked his right to remain silent.  She also never read Mr. Moore his Miranda rights again.  This Court must

suppress statements that Mr. Moore in response to continued police interrogation after a blatant disregard of his exercising his right to remain silent.

### CONCLUSION

As explained above and in ECF Nos. 17 and 28, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and suppress statements the police obtained after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent.

Respectfully submitted,
KEITH RODNEY MOORE

By:    _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

14

**JA0296**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21-cr-42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**UNITED STATES' SUPPLEMENTAL RESPONSE TO MOTION TO SUPPRESS
EVIDENCE AND STATEMENTS**</u>

The defendant has raised Fourth and Fifth Amendment-based arguments to suppress

evidence found in his car and statements he made in the presence of officers.  His supplemental

brief refines some of his suppression contentions following the presentation of evidence at the

suppression hearing.  For the reasons given in the government's opposition and below, the Court

should deny those requests.  The defendant now also raises an equal protection argument to seek

dismissal of the indictment against him.  The Court should reject that argument as untimely.  But

even on the merits, the defendant falls far short of the standard for proving a selective

enforcement claim, so the Court should deny that motion, too.

<u>**Argument**</u>

I.     **Police did not obtain evidence from the defendant's car—abandoned during his
headlong flight from police—in violation of the Fourth Amendment.**

The defendant insists that police seized the firearm and other evidence from his car in

violation of the Fourth Amendment's protection against unreasonable searches and seizures.  But

the law does not support his arguments.  The simplest analysis here is also the correct one:  The

1

**JA0297**

defendant was not seized until he was caught at the end of the foot chase.[1]  By the time he was seized, police had lawful and constitutional bases to do so—not only reasonable suspicion from the fake 11134Y temporary tag, but also probable cause for evading police, running multiple stop signs, and recklessly speeding through a residential neighborhood.  And by that time, the evidence he now seeks to suppress was two blocks away from where he had sprinted during his flight, sitting in his car with the door wide open and the engine still running.

There is no applicable case—from the Supreme Court, the Fourth Circuit, or anywhere else—that requires the suppression of the evidence found in the defendant's car.  Indeed, the defendant's arguments to the contrary tilt against binding precedent.  The Court should reject his motion.

### A.    Under *Hodari D.*, the Fourth Amendment analysis hinges on the moment the defendant was seized, not the moment officers commanded him to stop.

The *Hodari D.* case explains the standard for when a defendant is seized under the Fourth Amendment:  when police apply physical force or, in the absence of physical force, when he submits to the assertion of authority.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (explaining that, in the absence of physical force, seizure requires both a police command to stop and submission to that command).  No doubt, the police made an assertion of their authority in this case by turning on their lights and signaling for the defendant to pull over.  But the defendant was not seized at that moment

---

[1] On this point, the parties appear to agree.  *See* Def. Reply 2 ("The question in this case is not then whether Mr. Moore was seized, but rather whether the events between when the police officers initiated the traffic stop and *when they ultimately seized Mr. Moore* negate the illegality at the inception.") (emphasis added); Def. Supp. Br. 13 ("Here, after the police chased Mr. Moore, tackled him, arrested him, and put him in handcuffs in the back of a police car, *he was certainly seized*.").

because he did not comply.  *See United States v. Smith*, 396 F.3d 579, 586 & n.5 (4th Cir. 2005) (finding no seizure when police activated lights but car continued driving).

The defendant insists that *Hodari D.* is irrelevant here.  By his telling, that case was solely about "whether the officer had arrested the kid"—a defendant who dropped drugs after he saw police approaching—"simply by chasing after him."  Def. Supp. Br. 3.  But the very first sentence of the Supreme Court's analysis shows why that case decides this one:  "As this case comes before us, the only issue presented is whether, at the time he dropped the drugs, [the defendant] had been 'seized' within the meaning of the Fourth Amendment."  *Hodari D.*, 499 U.S. at 623.  "If not," the Court explained, "the drugs were abandoned by [the defendant] and lawfully recovered by the police, and the evidence should have been admitted."  *Id.* at 624.  Ultimately, the Court held that defendant had not been seized because he did not submit to the officers' commands that he stop running, so the evidence he discarded during his flight should not be suppressed under the Fourth Amendment.  *Id.* at 626.  Just so here.

While ignoring *Hodari D.*, the defendant places great weight on cases explaining "that traffic stops must be valid from inception."  Def. Supp. Br. 2.  But to be clear, *there was no traffic stop* here.  At most, police *attempted* to stop the defendant, "and the Supreme Court has held that the Fourth Amendment does not protect attempted seizures."  *Stover*, 808 F.3d at 997.  The defendant's reliance on "inception" precedent is thus misplaced.  Those cases examined the constitutionality of traffic stops where drivers complied with the command to pull over—and were thus seized—and police subsequently identified additional bases for suspicion.  Those cases did not involve drivers eluding police.[2]

---

[2] *See United States v. Bernard*, 927 F.3d 799, 802 (4th Cir. 2019) (describing police basis for conducting the traffic stop and additional behavior observed after the driver pulled over);

Throughout his briefing, the defendant has conflated the initiation of a traffic stop with the "inception" of a Fourth Amendment seizure, thereby treating as identical the moment the police turn on their lights to signal the driver to pull over and the moment the driver pulls over. Indeed, in his reply brief the defendant claimed, "there is no principled basis for prohibiting" "unreasonable stops" but not "unreasonable orders to stop." Def. Reply 2.  But *Hodari D.* makes that principled distinction:  the Fourth Amendment "does not remotely apply … to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. *That is no seizure*." *Hodari D.*, 499 U.S. at 626 (emphasis added).  The defendant's request to treat "stops" and "orders to stop" as the same is thus foreclosed by *Hodari D*—precedent that the Supreme Court just reaffirmed.  *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (reaffirming that under *Hodari D.*, where police make a show of authority and there is no compliance, there is no seizure).

To be sure, police had sufficient justification to signal the defendant here to pull over and, had he complied, to briefly detain him to investigate the temporary tag.  *See infra* Part I-C.  In that hypothetical situation, as in most traffic stops, the moment of "initiation" by police and "inception" of the seizure would be essentially identical.  But because the defendant refused to

---

*United States v. Jeffus*, 22 F.3d 554, 556 (4th Cir. 1994) (same); *United States v. $45,000 in U.S. Currency*, 749 F.3d 709, 711 (8th Cir. 2014) (same in civil in rem forfeiture proceeding). Additionally, several cases cited by the defendant for his "inception" argument do not actually stand for the points he touts them for.  *Compare United States v. Williams*, 843 F. App'x 111, 112 (10th Cir. 2021) (reversing suppression determination that government conceded hinged on whether officers had reasonable suspicion that a specific murder suspect was in the vehicle), *with* Def. Supp. Br. 4 (claiming *Williams* was about an unlawful stop "where police followed a car they lacked reasonable articulable suspicion to pull over until it committed a traffic infraction"); *compare United States v. Esteban*, 283 F. Supp. 3d 1115, 1129 (D. Utah 2017) (holding that an officer "provoked to two-second traffic violation" by quickly driving up behind the defendant, which reasonably led the defendant to believe the officer "wanted his vehicle to move out of the way as soon as possible"), *with* Def. Supp. Br. 4 (claiming *Esteban* was about an officer "who followed the driver until driver committed traffic infraction").

**JA0300**

pull over, he was not seized. Accordingly, the basis for initiating the *attempted* traffic stop does not dictate whether the seizure of evidence he discarded while fleeing was constitutional. To hold otherwise would fly in the face of *Hodari D.*, where the collection of discarded evidence was upheld even when police conceded they lacked reasonable suspicion to command the defendant to stop. *Hodari D.*, 499 U.S. at 623 n.1.[3]

**B.    By the time police seized the defendant, he had abandoned his car and the property within it—including his gun.**

During his brief, reckless flight from police, the defendant crashed his car into a curb, jumped out while the engine stayed running, left the door wide open, and ran two blocks down the street to try to get away. As explained in the government's opposition brief, the defendant abandoned his car to elude the police and left the gun in plain view. *See* Opp'n Br. 7–8. There is therefore no basis to suppress the evidence he left behind. *See, e.g.*, *United States v. Hopkins*, 568 F. App'x 214, 216 (4th Cir. 2014) ("When Hopkins fled from the police, he abandoned his

---

[3] The defendant raises a suggestion, both fanciful and unburdened by legal authority, that a driver must be allowed to raise a Fourth Amendment challenge to an attempted traffic stop even when he refuses to pull over so that he can claim his flight was the fruit of unconstitutional police conduct. Def. Supp. Br. 2–3. But *Hodari D.* answers this concern, too, within the framework of the exclusionary rule's focus on deterrence:

> Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.

*Hodari D.*, 499 U.S. at 627. In other words, the defendant would create an incentive for drivers to elude police based on their own personal beliefs that attempted stops are unlawful, but that regime would be both dangerous to public safety and pointless as a matter of Fourth Amendment jurisprudence.

**JA0301**

car, thereby forfeiting any privacy interest in the car or its contents."); *United States v. Kirlew*, 291 F. App'x 536, 538 (4th Cir. 2008) ("[A]bandonment may be found where a fleeing defendant relinquishes an object to make his flight easier.").

The defendant's only response to this line of authority hinges on the assumption that the police officers engaged in "lawless conduct." Def. Supp. Br. 8–9 ("But for the invalid traffic stop, Mr. Moore would not have left his car with the door wide open."). As explained below, police did not engage in any lawless conduct by attempting to pull the defendant over. What's more, the defendant's characterization of the events suggesting he hadn't abandoned his property—he "left his car and its contents parked by the side of the road," Def. Reply 5, and "was gone from the car for a matter of minutes," Def. Supp. Br. 9—is belied by the evidence shown to the Court. This was not a driver who briefly double-parked his car to run a quick errand. He jumped out of a still-running car after it crashed because he wanted to get away from the police.[4] He abandoned that property to make his flight easier. He cannot now claim he'd just left it behind for a moment because he was unsuccessful in eluding capture. *See Stover*, 808 F.3d at 1001 (recognizing that "under controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not apply").

**C.    In all events, the defendant is wrong that police lacked reasonable suspicion to initiate the traffic stop based on the fake temporary tag.**

Although this case calls for a faithful application of *Hodari D.*, there is an important distinction here that makes the case for denying suppression even stronger: unlike the officers in

---

[4] Evidence before the Court reveals the defendant admitting as much. *See* Ex. 12 at 30:14–30:37 (telling Officer Gilbert that if he had seen the curve he crashed into, he would have escaped the police).

*Hodari D.*, Richmond police had a sufficient justification to command the defendant to stop.  As the evidence at the suppression hearing made clear, the police officers from the Fourth Precinct FMT saw the same temporary tag number—11134Y—on two other cars (a Cadillac, then an Acura) in the same neighborhood during the same shift just a few hours before seeing it on the defendant's car (a Chrysler).  By the time they saw the 11134Y tag on the defendant's car, they knew the tag was not valid and even suspected it was a fake.

The display of a fake or fraudulent license plate gives rise to several violations of Virginia's traffic laws.  The defendant has highlighted one such provision—Va. Code § 46.2-612(B)(1), which focuses on "fictitous" plates or decals[5]—but there are others.  *See, e.g.*, Va. Code § 46.2-722 (targeting the use of forged, altered, or counterfeit plates or decals).[6]  Homing in on the "fictitious" plate statute, the defendant argues officers lacked authority to pull him over because that statute requires the defendant to know the plate is fictitious to sustain a conviction, and he claims police lacked evidence suggesting he knew the plates were not real.  Def. Supp. Br. 5.  In support of this argument, he cites a series of civil-rights cases in which courts

---

[5] "No person shall … [d]isplay or cause or permit to be displayed any registration card, certificate of title, or license plate or decal that he knows is fictitious or that he knows has been canceled, revoked, suspended, or altered; or display or cause or permit to be displayed on any motor vehicle, trailer, or semitrailer any license plate or decal that he knows is currently issued for another vehicle. Violation of this subdivision shall constitute a Class 2 misdemeanor."  Va. Code § 46.2-612(B)(1).

[6] "Any person who, with fraudulent intent, alters any license plate or decal issued by the Department or by any other state, forges or counterfeits any license plate or decal purporting to have been issued by the Department under the provisions of this title or by any other state under a similar law or who, with fraudulent intent, alters, falsifies, or forges any assignment thereof, or who holds or uses any license plate or decal knowing it to have been altered, forged, or falsified, shall be guilty of a Class 1 misdemeanor.  The owner of a vehicle who operates it while it displays altered or forged license plates or decals shall be presumed to have knowledge of the alteration or forgery."  Va. Code § 46.2-722.

**JA0303**

examined civil claims that law enforcement officers lacked probable cause to arrest individuals for offenses with mens rea elements. *See* Def. Supp. Br. 5.

The defendant's citations are misplaced. The standard for evaluating an investigatory traffic top—assuming the driver complies with the command—is "reasonable suspicion," not probable cause. *See United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020). This "commonsense, nontechnical standard" focuses on an officer's articulation of "why a particular behavior is suspicious" or "likely to be indicative of some more sinister activity than may appear at first glance." *Id.* at 523 (internal quotation marks omitted). Reasonable suspicion "is a less demanding standard than probable cause and requires showing considerably less than preponderance of the evidence," but it still "requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000). That standard does not require officers "to rule out the possibility of innocent conduct." *Feliciana*, 974 F.3d at 524. At bottom, the officer must have "a reasonable, articulable suspicion that criminal activity is afoot." *Wardlaw*, 528 U.S. at 124. Indeed, even under the standards for probable cause, an officer need not accept an arrestee's denial of the requisite intent. *See, e.g., Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) ("Given the requirements that arrests be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."). Officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Amobi v. District of Columbia Dept. of Corrections*, 755 F.3d 980, 990 (D.C. Cir. 2014) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

8

**JA0304**

But especially under the minimum level of objective justification needed for reasonable suspicion, the defendant's arguments fall short. Police knew the temporary tag 11134Y was no good after pulling over the Cadillac. They began to suspect something strange was afoot when they saw it on the Acura.[7] Within two hours, they saw the tag on the defendant's Chrysler. It is objectively reasonable for police to believe that drivers know the provenance of their license plates. *Cf. Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (officer who conducted *Terry* stop of vehicle reasonably drew inference that registered owner of vehicle, whose license was suspended, would be the vehicle's driver). And besides that, the officers were entitled to rely on the legal presumption outlined in Va. Code § 46.2-722: "The owner of a vehicle who operates it while it displays altered or forged license plates or decals shall be presumed to have knowledge of the alteration or forgery." Even so, it is not necessary that officers had reasonable suspicion of every element of a particular traffic violation to conduct the stop. All that was necessary was a totality of facts suggesting some criminal activity that "eliminate[d] a substantial portion of innocent travelers." *Feliciana*, 974 F.3d at 523. That was present here.

Because the defendant defied the police command to pull over, the issue of reasonable suspicion based solely on the 11134Y temporary tag is beside the point. By the time they seized the defendant, police had myriad other bases to hold him. But the Court should not be troubled by the basis for the attempted traffic stop. All four officers who rode in that police car that night testified that the basis for the attempted stop was a temporary tag that they all knew was no good

---

[7] In his body camera recording, Sgt. Spinos explained to other officers his theory of the fake temporary tag: after seeing the temporary tag on the Acura (and that the VIN on that tag matched the Acura), he hypothesized that perhaps the driver of the Cadillac had taken one of the Acura's tags and put it on his own car. It was only after seeing the tag on the Chrysler that Sgt. Spinos started to believe that the tags were counterfeits being unlawfully produced by someone. *See* Ex. 11 at 12:40.

9

**JA0305**

and were surprised to see for the third time in one shift.  That was enough to justify the attempted

stop.  *See United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (observing "without

question" that police can conduct traffic stops for "failure to comply with traffic safety laws").

And as the Supreme Court has repeatedly held, Fourth Amendment analysis turns on whether

"the circumstances, viewed objectively, justify [the challenged] action."  *Ashcroft v. al-Kidd*, 563

U.S. 731, 736 (2011) (citations omitted).

## II.     Police did not obtain the defendant's incriminating statements following his arrest in violation of the Fifth Amendment.

There are two sets of incriminating statements made by the defendant following his arrest

that should not be suppressed:  (1) his unprompted pre-*Miranda* voluntary statements, including

to his cousin that he suspected someone had been "telling on" him and to police expressing

ownership of the abandoned car; and (2) his various post-*Miranda* admissions revealing that he

knew he had a prohibited gun in the car.  In his reply brief, the defendant did not address any of

the government's arguments against suppression, claiming them "to be factual in nature" and

thus left them to be addressed at the evidentiary hearing.  Def. Reply 1 n.1.

Now, in his supplemental brief, the defendant relies on a single Fifth Amendment

argument:  He insists he invoked his right to remain silent when he told Officer Williams, "I'm

not talking to you, I'm done," so any interrogation that followed violated *Miranda*.  Def. Supp.

Br. 13.  But even assuming that those words were an unambiguous and unequivocal invocation

of the right to remain silent, they came twenty seconds *after* he'd made his post-*Miranda*

confession to Williams that he ran because he had "a whole iron in the car."  *Compare* Gov. Ex.

12 at 21:23 ( "I got a whole iron in the car"), with *id.* at 21:45 ("I'm not talking to you, I'm

done").  Under the defendant's own argument, therefore, the "iron" statement was not obtained

in violation of *Miranda*.

10

**JA0306**

What's more, the defendant's reliance on his "I'm done" statement ignores his subsequent conduct indicating a waiver of the right to remain silent. After he told Officer Williams "I'm done," the defendant voluntarily shouted out to other officers and continued to engage Officer Williams in a conversation. A couple of minutes later, the defendant began asking unprompted questions to Officer Gilbert, who was preparing to take the defendant to jail—"Where's my cell phone?" and "Who has my girl's wallet?" *See* Gov. Ex. 14 at 28:34–29:15. It was in the context of that defendant-initiated conversation that Gilbert asked why the defendant ran, the defendant admitted "I got a gun in the car," and the defendant acknowledged that he knew he couldn't have the gun as a convicted felon. *Id.* at 29:19–30:08. Similarly, at the jail, the defendant did not sit in silence, but continued to question officers regarding why he was pulled over. During that conversation, the defendant acknowledged the gun in his car. *See* Gov. Ex. 8 at 5:33–6:30.

All these incriminating statements came shortly after *Miranda*, and the defendant does not contend, nor is there any reason to believe, that he did not understand those warnings. Thus, even if he did invoke the right to remain silent by telling Williams he didn't want to talk to her at that moment, "on these facts it follows that he chose not to invoke or rely on those rights when he did speak." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).[8]

---

[8] The defendant does not address his contention that *all* his pre-*Miranda* statements, including the voluntary utterances unprompted by police questioning, must be suppressed. He also no longer forwards the contention that police engaged in an intentional two-part interrogation by using pre-*Miranda* admissions to secure post-*Miranda* statements. The government is satisfied to rely on its opposition brief to explain why those theories fail. *See* Opp'n Br. 9–14.

11

**JA0307**

**III.    Police did not violate the defendant's right to equal protection under the law.**

Finally, the defendant raises in his supplemental brief—for the first time—that Richmond police violated his right to equal protection "by targeting him and other black residents of the Fourth Police Precinct in Richmond, Virginia for enforcement of minor violations in order to search their cars." Def. Supp. Br. 9.  Based on that supposition, the defendant asks the Court to dismiss the indictment against him. *Id.* at 12.  The Court should not even consider this new argument, which the defendant has shoehorned into a supplemental brief filed more than six weeks after the deadline imposed by the Court for pretrial motions.  But even on its merits, the defendant's equal protection argument falls far short of the high standard imposed by the Supreme Court and recognized by the Fourth Circuit for finding selective enforcement of the laws.  Simply put, there is no basis to argue police targeted the defendant due to his race, and the Court should reject his argument to the contrary.

**A.    The defendant's motion to dismiss the indictment on equal protection grounds is untimely and there is no good cause for the delay.**

Rule 12 requires a defendant to file most motions before trial, including those concerning a defect in the prosecution related to "selective or vindictive prosecution" and "suppression of evidence." Fed. R. Crim. P. 12(b)(3)(A)(iv), (C).   If the defendant does not file a pretrial motion within the time set by the trial court, "the motion is untimely" and the trial court may consider it only "if the party shows good cause" for the delay. Fed. R. Crim. P. 12(c)(3).  In this case, the deadline for pretrial motions fell on June 21, 2021, the day the defendant filed his motion to suppress.  *See* ECF No. 15 (June 7, 2021 scheduling order requiring pretrial motions to be filed within 14 days).  The defendant's motion raised only Fourth and Fifth Amendment arguments for suppression of evidence found in his vehicle and statements he made to police.  It did not

mention equal protection rights or unconstitutionally selective enforcement of the law. The defendant withheld that line of attack until he filed his supplemental brief on August 2, 2021.

In retrospect, it now seems clear the defendant intended to pursue the undisclosed equal protection claim by the July 23, 2021 evidentiary hearing. During that proceeding, the defendant, through counsel, adduced evidence regarding the racial makeup of the City of Richmond, statistics regarding the racial demographics of drivers pulled over by Richmond police in the latter half of 2020, and records regarding traffic stops completely unrelated to the defendant's save for the fact that they also occurred in the Fourth Precinct on December 5, 2020. The United States objected to the relevance of this evidence given that it bore no relation to whether police lawfully seized the gun from the defendant's car or to the propriety of the circumstances surrounding his incriminating statements. *See, e.g.*, Tr. 75:24–76:1. The Court overruled those objections.

At no point during the hearing did the defendant acknowledge or allege a theory of attack on the constitutionality of the indictment separate from the existing Fourth and Fifth Amendment suppression requests. Indeed, at the conclusion of the hearing, defense counsel asked the Court "for an opportunity to submit a *supplemental motion to suppress evidence* based on the evidence as was given." Tr. 171:6–9. The Court granted that request and required the supplemental brief to be filed within seven days with the government's response due four days after that. *See id.* at 171:14–20.[9]

_____

[9] Presumably the Court intended a relatively quick turnaround on both the defendant's supplemental brief and the government's response because it appeared the defendant's briefing would remain focused on the Fourth and Fifth Amendment issues posed and preserved by the original motion to suppress. After receiving the defendant's supplemental filing that raised a request to dismiss the indictment on equal protection grounds, the government obtained a seven-day extension to file its supplemental response. *See* ECF No. 35.

13

**JA0309**

The Court should not excuse fidelity to the procedures outlined in the Federal Criminal Rule 12, Local Criminal Rule 12, or the Court's scheduling orders. The defendant's failure to abide by those deadlines goes beyond a technical mishap in this case. To the contrary, the defendant set out to create a factual record at the suppression hearing based on an undisclosed legal theory (an equal protection violation) with an unmentioned goal (dismissal of the indictment) and now asks the Court to consider those arguments alongside the original timely suppression motion. The defendant has not acknowledged the tardiness of the dismissal request, much less offered the "good cause" required to excuse that delay. *See* Fed. R. Crim. P. 12(c)(3). More than that, the defendant's strategic silence prejudiced the government's ability to prepare for and counter that line of inquiry at the suppression hearing, when the defendant flooded the record with evidence aimed at purported racial disparities that remain irrelevant to the Fourth and Fifth Amendment issues raised in the suppression motion. *See, e.g.*, Def. Supp Br. 7 (citing eleven defense exhibits in support of contention that police officers were racially profiling black drivers on December 5, 2020); *id.* at 11 (citing the same exhibits in support of argument that police discriminated against drivers based on race). On these facts, the Court should deny the defendant's equal protection argument for dismissal of the indictment as untimely.

**B.      In the alternative, the Court should deny the equal protection argument because the defendant has failed to show police acted with discriminatory effect or intent during their December 5, 2020 interactions with him.**

Setting aside its untimeliness, the defendant's equal protection argument falls far short of high standard for proving racially animated selective law enforcement. That standard, articulated by the Supreme Court in *United States v. Armstrong*, requires the defendant to "show *both* discriminatory effect *and* that the officer's action was motivated by a discriminatory purpose." *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (emphasis added) (citing *Armstrong*, 517 U.S. 456, 465 (1996)). Generally, that dual showing requires proof (1) "that similarly

14

**JA0310**

situated individuals of a different race" were treated differently and (2) that the decision to enforce the law against the defendant "was invidious or in bad faith." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016). The defendant must prove those elements by "clear evidence"—an intentionally "demanding and rigorous" standard—because "a selective law enforcement claim 'asks a court to exercise judicial power over a special province of the Executive.'" *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464).

The defendant has not brought forward any cognizable evidence of discriminatory effect or purpose. At most, the defendant's effort to marshal such proof boils down to the following:

- Data compiled between July 1 and December 5, 2020, indicates that 76% and 15% of *all* RPD traffic stops were of black and white drivers, respectively.

- Census data from 2019 indicates that Richmond's population is less than 50% black and less than 50% white.

- "[T]he Fourth Precinct Focus Mission Team searched every single car stopped for minor traffic violations on December 5, 2020."

*See* Def. Supp. Br. 10–11.[10] The defendant rests his entire equal protection argument on those factual contentions, but they cannot bear the weight of that heavy accusation.

### 1. The defendant has failed to show that he was treated differently than similarly situated individuals of a different race.

To show discriminatory effect under *Armstrong*, the defendant "*must* make a credible showing that similarly situated individuals of a different race" were treated differently by police. 517 U.S. at 465 (emphasis added); *see also Hare*, 820 F.3d at 99 (recognizing the *Armstrong* standard applies to prove selective enforcement). The defendant fails to meet this threshold requirement.

---

[10] The defendant also complains that three of the four police precincts in Richmond "correspond to nearly entirely black neighborhoods in Richmond," but does not explain how that observation relates to his contention that police selectively enforced the law against him.

15

**JA0311**

The thrust of the defendant's argument is that police in the Fourth Precinct have targeted black drivers for minor traffic violations to then search their cars. *See* Def. Supp. Br. 9. Under *Armstrong*, therefore, he must credibly show that similarly situated non-black drivers were treated differently. Notably, the defendant doesn't attempt to identify any "similarly situated" non-black peers. Perhaps they would be all non-black drivers who commit minor traffic violations in the Fourth Precinct but are not pulled over, or maybe they are all non-black drivers who are pulled over for minor violations in the Fourth Precinct but not subjected to a search of their vehicle. The defendant doesn't say. And without identifying any class of similarly situated comparators, he cannot begin to satisfy the first part of the stringent *Armstrong* standard. In all events, the defendant presents no evidence at all that similarly situated non-black drivers who commit minor traffic violations were treated differently than the defendant.

To be sure, the defendant points to high-level statistics regarding the overall racial demographics of traffic stops city-wide in late 2020 and compares those numbers to the overall racial makeup of Richmond in 2019. Those statistics are silent on police interactions within the Fourth Precinct, where the defendant claims police targeted him based on his race, and he does not say whether the data encompasses all traffic stops or only the "minor" violations. These general figures reinforce the Fourth Circuit's instructions that, "'absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim.'" *Hare*, 820 F.3d at 99 (quoting *United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996)). Put differently, the defendant cannot tout "unexplained evidence of racial disparity" to prove "racial animus." *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (internal quotation marks omitted). But that is all the defendant has done.

Finally, it is worth noting that the last piece of "evidence" forwarded by the defendant is demonstrably untrue:  the Fourth Precinct FMT did *not* "search[] every single car stopped" on December 5, 2020.  As the Court saw in body camera footage and the FMT officers testified, the first two cars stopped with the fake 11134Y temporary tag were *not* searched.  Officers stopped the driver of the Cadillac and briefly questioned him, but they gave him a warning and they did not search his car.  *See* Def. Ex. U-3 at 6:30.  Similarly, officers stopped the driver of the Acura for less than two minutes before letting her go.  *See* Gov't Ex. 4 at 1:30.   There was no search of either car.  *See Texas v. Brown*, 460 U.S. 730, 739–40 (1983) (explaining that looking through the window of a car, even with a flashlight, does not constitute a search under the Fourth Amendment).

Beyond that, the Court should not rely on the defendant's contention that dispatch records show that Fourth Precinct FMT officers searched "every single car stopped."  One of the dispatch records containing the notation "VEH search completed" relates to the traffic stop (and non-search) of the Cadillac.  *See* Def. Ex. J.[11]  Another dispatch record containing the notation "LOI search completed" relates to the traffic stop (and non-search) of the Acura.  *See* Def. Ex. N.[12]  Yet the defendant relies on both records and others using "search" notations from the dispatcher as proof that police searched those vehicles.  *See, e.g.*, Def. Supp. Br. 11.  Because the

---

[11] The Court can corroborate this connection by comparing Defense Exhibit J (the I-Net Viewer record for incident 0485), Defense Exhibit Q (the Axon body camera list for Officer Mills, which shows a recording titled "TS 102993 BM No Lights 3000 Meadowbridge" for incident 0485), and Defense Exhibit U-4 (Officer Mills' body camera recording of the Cadillac stop, titled "TS_102993_BM_No_Lights_3000_Meadowbridge").

[12] Again, the Court can corroborate this connection by comparing Defense Exhibit N (the I-Net Viewer record for incident 0571), Defense Exhibit Q (the Axon body camera list for Officer Mills, which shows a recording titled "TS BF 030481 Expired Tags" for incident 0571), and Defense Exhibit V-3 (Officer Mills' body camera recording of the Acura stop, titled "TS_BF_030481_Expired_Tags").

**JA0313**

defense failed to call any witness that could explain what those notations meant, and the notations appear for stops where no Fourth Amendment searches were conducted, the Court should not give them the meaning assigned by the defendant.[13]

At bottom, the Court cannot credit the defendant's assertion that the FMT searched every car they pulled over on December 5, 2020. Video evidence disproves it, and the defendant's interpretation of dispatch records is not supported by the record. Thus, at best, the defendant can only contend that every stop (fewer than 10, by the defendant's own evidence) conducted by the FMT in the Fourth Precinct that evening (a predominately black precinct, according to the defendant's evidence, *see* Tr. 166:14–22), involved a black driver. This "statistical evidence, with its relatively small sample size and weak basis for comparison, is clearly insufficient." *Hare*, 820 F.3d at 100.

> **2.    The defendant has failed to show that police acted with a discriminatory purpose when they attempted to pull him over for having a bad temporary tag.**

Even if the defendant had presented sufficient evidence showing that similarly situated non-black drivers were treated differently than him, he would also have to prove that the police decision to target him for an attempted traffic stop "was invidious or in bad faith." *Venable*, 666 F.3d at 903. There is simply nothing in the record that bears out such purpose. To the contrary,

---

[13] It is worth emphasizing that it is the solely defense's own unsupported contention that the notation "VEH search completed" refers to a physical search of the vehicle. None of the witnesses claimed to know what that notation meant. Indeed, Officer Mills told the Court he was not familiar with the dispatch records before being shown them on the witness stand. *See* Tr. 65:25–66:1. He also testified that he did not know why dispatch records would note a vehicle search at all, because he has "never advised the dispatcher whether or not" he had searched a car. Tr. 69:23–25. Perhaps "VEH search completed" refers to the dispatcher's completion of a vehicle records check after a license plate is radioed in from the officer. *See, e.g.*, Tr. 33:2–6. It seems clear, however, that "VEH search completed" is not a reliable indicator that police conducted a Fourth Amendment search of the car.

**JA0314**

the evidence is overwhelming that police targeted the defendant for a defensible and reasonable enforcement purpose: to investigate his display of a temporary tag they suspected was fake.

Notably, the defendant does not even argue that the police decision to target *him* was based on an invidious purpose. Instead, he invokes "[t]he stark numbers and heavy-handed policing tactics of minority neighborhoods in Richmond" to suggest that every traffic stop of a black driver in the Fourth Precinct betrays a discriminatory purpose. Def. Supp. Br. 12. But that argument is foreclosed by binding precedent:

> In order for a decision to [enforce the law] to be "invidious or in bad faith," thereby reflecting discriminatory intent, the government must be more than aware that a [law enforcement] policy may result in the prosecution of one group more than another because discriminatory intent implies that the government "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Venable*, 666 F.3d at 903 (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)). In this case, there is no evidence whatsoever that the Richmond Police Department or its Fourth Precinct FMT has selected a course of action in conducting traffic stops to specifically target black citizens. The best the defendant can muster is a weak "inference" based on generalized statistics—figures that, as explained above, do not show any meaningful proof of discrimination. And in this context, those statistics are not enough. *See Hare*, 820 F.3d at 100 ("As a general matter, in cases involving discretionary judgments essential to the criminal justice process, statistical evidence of racial disparity is insufficient to infer discriminatory purpose.") (internal quotation marks and ellipses omitted).

**JA0315**

### Conclusion

The evidence presented at the suppression hearing shows that police acted within

constitutional bounds throughout their interactions with the defendant.  Evidence was not

obtained in violation of the Fourth Amendment, the defendant's incriminating statements were

not obtained in violation of the Fifth Amendment, and there is no evidence that police targeted

the defendant (or anyone else) for selective enforcement of the law in violation of the

Constitution's guarantee of equal protection.  The Court should deny both the defendant's

motion to suppress and the late-filed request to dismiss the indictment.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: _____/s/_____
Kevin S. Elliker
Assistant United States Attorney
Virginia Bar Number 87498
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Kevin.Elliker@usdoj.gov

20

**JA0316**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                                        Plaintiff,

           versus                                3:21 CR 042

KEITH RODNEY MOORE,

                                        Defendant


Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge


September 15, 2021

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219


**JA0317**

APPEARANCES


Kevin Spencer Elliker, Esq.
Assistant United States Attorney
For the United States



Laura Jill Koenig, Esq.
For the defendant
The Defendant
In his own proper person

```
 1          THE CLERK:  Case number 3:21 CR 42.

 2          The United States Keith Rodney Moore.

 3          Mr. Kevin Elliker represents the United States and Ms

 4     Laura Koenig represents the defendant.

 5          Are counsel ready to proceed?

 6          MR. ELLIKER:  United States is ready, Your Honor.

 7          Good morning.

 8          MS KOENIG:  The defense is ready, Your Honor.

 9          THE COURT:  All right.

10          So we are here today on a re-argument, I guess, or

11     continued argument, of the motion to suppress in this

12     case.

13          We are also here because Mr. Moore's motion to

14     suppress turned into a motion to dismiss the indictment on

15     the grounds of discriminatory prosecution.

16          Ms Koenig, I thought Mr. Moore was out on bond.

17          MS KOENIG:  He is in this case, Your Honor.

18          THE COURT:  What?

19          MS KOENIG:  He is in this case.  Actually being held

20     on a different case in a different jurisdiction at this

21     moment.

22          THE COURT:  Sorry.  Say that again.

23          MS KOENIG:  Actually being held on a different case

24     in a different jurisdiction at this moment.

25          THE COURT:  Oh.
```

4

1          Well, that is unfortunate.

2          Okay.  So, let me just sort of tell you how I look at

3     this.

4          I think the law with respect to the stop, the fourth

5     amendment law, doesn't look too good from your side of the

6     fence.  The Supreme Court made it pretty clear that

7     pre-textual stops are acceptable.

8          I think the pre-Miranda statement, the government has

9     some problems with those.

10          But, unfortunately, Mr. Moore, who I must say seems

11     like a, you know, a pretty sociable guy in the things that

12     I saw, started talking after he was Mirandized.  I believe

13     the -- I haven't decided on this yet, but I believe he

14     waived his right to remain silent as to post-Miranda

15     statements.

16          Where I -- where I have trouble with this case is

17     with the motion to dismiss the indictment, which really

18     hasn't -- which has been been briefed more or less as --

19     this is not a criticism of you -- as an after thought to

20     the motion to suppress.

21          I will tell you the questions that I have about it.

22     And they are evidentiary questions.

23          I think if I were to decide it on the evidentiary

24     record that we have now, as I think Mr. Elliker pointed

25     out in his brief, there are some problems from the defense

**JA0320**

1    side.

2        But here are the things that I have been thinking

3    about, because I spent a lot of time thinking about this

4    case since we were here before.

5        What is the relevant universe of stops, of police

6    activity in Richmond?  Does it include -- does it include

7    Windsor Farms?  Because there don't to be so many of these

8    kinds of stops there.  I say that anecdotally because, you

9    know, I have been sitting up here now for ten years

10   looking at these cases and I have never had a case with a

11   white driver.  Never in ten years.  But I have had a lot

12   of cases where young African-American men get stopped by

13   the police in Richmond and elsewhere for traffic offenses.

14   And they, of course, wind up having a gun or drugs.  And

15   they get indicted.  And that is how they wind up before

16   me.

17       So, in addition to my experience on the bench I have

18   my experience in real life, which is that I live in

19   Richmond, I have lived in the Richmond area.  And I drive

20   home through the City of Richmond, and I drive home

21   through a predominantly suburban sort of an area on Forest

22   Hill Avenue and out towards Bon Air.  I don't ever see any

23   of this happening.  Where I live is not by any stretch of

24   the imagination anything like Windsor Farms, which for the

25   sake of the record I will note is a very wealthy white

1   area.

2       And when I drive in other places in the City I

3   frequently see stops with young African-American men

4   standing outside their cars.

5       And I just think it is an intolerable situation.  It

6   is intolerable that the City puts up with it.

7       I recognize that there is an argument on the other

8   side, which is, that the City, the police are stopping

9   people in places where crime occurs.  And I also recognize

10  that the people who live in those areas have a right to

11  live without crime.  They have a right to feel safe in

12  their homes, as I do in mine.

13      All that is not really illegal as far as Mr. Moore is

14  concerned.  It is a sociological observation.

15      But, I wonder whether the correct universe to review

16  is all four precincts in the City.  And I wonder whether

17  the statistical evidence that you have provided me is in

18  its own right probative of what you want to show.  I

19  understand you offered me these statistics that show the

20  overwhelming majority of people who get stopped over there

21  in the fourth precinct are African-American drivers.

22      But at one time I did some work representing the

23  Commonwealth of Virginia in voting, redistricting.  This a

24  long time ago.  And one of the things that we looked at

25  was the statistical significance.  And what I found

7

1    through looking at that is that numbers that appear

2    overwhelming to a casual observer may be the result of

3    something other than intentional discrimination or

4    prejudice.

5        So they had statistician to take a look at this kind

6    of evidence to determine whether it is statistically

7    significant, which I am not expert in this, but at a base

8    level what I think it shows, or intended to show, is that

9    this is not just the result of happenstance.

10       And I think that analysis requires an analysis of

11   what the relevant universe is.  Does it include the entire

12   City?  So what you have presented to me is evidence that

13   in what is a predominantly African-American part of the

14   City.  Most of the people who are getting stopped are

15   African-American.  But I also know, because I have driven

16   through this very area myself, that Caucasian people drive

17   through there, and I don't know whether they get stopped

18   or not in the same percentages as other drivers.

19       Have you thought about consulting with a statistician

20   about this?

21       MS KOENIG:  So, Your Honor, I appreciate all The

22   Court's comments.  I think that The Court is absolutely

23   correct in that as I represented to The Court on page 170

24   and 171 of the transcript of the July 26 hearing the

25   evidence that I obtained and presented to The Court at

**JA0323**

1    that hearing, the bulk of it I got mere days before that

2    hearing.  I spent the weekend digesting that data trying

3    to figure out what it meant.  Around that same time is

4    when I learned about the community policing act, and that

5    there was this data base that was publicly available.  And

6    that is where we had gotten the statistics that Mr. Hush

7    testified to.

8         To the extent that the Government's issue with my

9    filing this claim post-hearing is really that he wants a

10   chance to present evidence about this.  I am happy to have

11   that hearing, Your Honor.  I think a full-fledged

12   evidentiary hearing about what is happening in the City of

13   Richmond in terms of racialized policing is warranted and

14   would help this Court decide all of those questions that

15   The Court just raised.

16        In terms of the universe, I think The Court is right.

17   I mean especially knowing what we know now about the

18   make-up of the precincts in terms of the residents in the

19   City of Richmond, it was shocking to me.  At the beginning

20   of the case I knew from the University of Virginia dot map

21   that the neighborhood we were talking about was made up

22   almost entirely of black citizens.  But when I looked at

23   the broader scope of the dot map, once I had found the

24   precinct map, and it lined up that three of the four

25   precincts in Richmond are in black neighborhoods, and only

1    one of them is in white neighborhoods, predominantly white

2    neighborhoods.  I don't know that in the City of Richmond

3    we would be able to distinguish the equal protection claim

4    without looking at the broader scope of the evidence

5    because of that.  If the neighborhoods were more

6    integrated, perhaps that is something that could be done.

7    But they are not.

8         So I guess to the extent that The Court's question is

9    what is the universe of data that we were looking for, I

10   do believe at this point that it is the broader city

11   because of the segregated nature of where people in the

12   city of Richmond live.

13        I think that, I mean, the statistics that we have

14   already found are immensely troubling.  That the City

15   make-up of Richmond is less than half percent, less than

16   half of the population is black citizens; less than half

17   the white population is white citizens; but just under

18   group.  Yet only 15 percent of the traffic stops in

19   Richmond are made up of white citizens.  And I think

20   common sense tells us, I mean, I am not committing traffic

21   violations all the time.  I am a very white person.  I

22   have yet once to be pulled over in the City of Richmond or

23   any of the surrounding counties for that matter.

24        THE COURT:  That may change.

25        MS KOENIG:  Fair enough.

**JA0325**

1          THE COURT:  I don't think that is true.

2          I have been impressed with the honesty and integrity

3     of the police.  That is a cynical sense of humor and is

4     not an accurate reflection of the police department.

5          MS KOENIG:  I take it as that, Your Honor.

6          But I do think we find ourselves in the position that

7     Judge Hamilton was finding himself in when he was looking

8     at the City of Milwaukee, I believe, in the case, in the

9     Johnson case in the Seventh Circuit.  That is to say if

10    this was actually happening to white citizens of Richmond

11    there would be an uproar, and we would have heard about

12    it, and we would know about it.  So I think on the record

13    that The Court has before it The Court certainly has

14    grounds to find that it is a meritorious claim,

15    particularly given the holding in the Forth, which is that

16    Sixth Circuit case that recognizes if the statistics are

17    severe enough that a discriminatory effect can raise an

18    inference of discriminatory intent.  But, again, if

19    Mr. Elliker's issue with how this claim was raised is that

20    he didn't have a fair opportunity to present evidence on

21    it, I am happy to have a full-blown hearing.

22         THE COURT:  Well, I think he didn't.  I think you

23    didn't either.  You know, they say figures don't lie, but

24    liars figure.  And I think that is what a more fulsome

25    examination of the statistical data will do for us.  But I

**JA0326**

1    think in order to -- I am going to give you a chance to

2    put on some evidence in the course of a hearing, but I

3    think you need to have someone who is skilled at

4    statistical analysis to look at this and tell us whether

5    it actually means anything.  You know, if what I have done

6    in cases like that in the past is I have gone down to VCU

7    and found an expert and asked them if they would do it for

8    free.

9        MS KOENIG:  Sure.  I am sure I can find someone that

10   would be very well qualified, Your Honor, for free or not.

11   We would figure that out.

12       THE COURT:  I think, you know --

13       MS KOENIG:  I do, if The Court is so inclined, I do

14   have an argument about the other questions The Court had

15   asked on the other two claims if The Court wants me to

16   briefly address those.  I think I have laid it out in the

17   papers.

18       THE COURT:  I think you have, too.  But if you want

19   to say something, go ahead.

20       MS KOENIG:  The only thing I wanted to point out that

21   maybe is not as elucidated as clearly as it could be in

22   the papers on the fourth amendment claim, Your Honor, is

23   that Hodari dealt with a situation in which someone is

24   walking away, actually running away from a police officer.

25   So the question in that case is, if the police officer

1    doesn't have any justification, but gives -- to stop the
2    individual -- but orders them to stop and they continue
3    fleeing, at that point are they seized?  And I think what
4    separates this situation from that situation is that we
5    have -- in that situation if someone is ordered on foot by
6    the police officers to stop and they don't think there is
7    justification, no harm, no foul, they can walk, run away.
8    There is nothing the police could do about it.  But in
9    this case because of Virginia's law about eluding, that as
10   soon as the cop turns the lights on if you ignore that and
11   you keep driving, it doesn't matter whether there is a
12   justification or not.  You meet the definition of the
13   crime of eluding.  So I do think that that separates from
14   that point.
15        In terms of the government's reference to the Smith
16   case from the Fourth Circuit, my position is that that is
17   dicta in that case because in that case the person had
18   already -- the court spent the majority of the time
19   talking about whether it is reasonable to suspect that
20   someone is evading a roadblock because they turn off
21   before they get to the roadblock.
22        And then the defendant argued in that case that he
23   was then blocked in, and he couldn't go anywhere else, so
24   at that point that the cop turns his lights on and blocks
25   him in, that that is when he is seized.

**JA0328**

1          The Court in a footnote, certainly not essential to

2     The Court's holding in that case, cites Hodari for that

3     point.

4          But I don't think that is -- certainly not the

5     argument that -- that The Court did not analyze the

6     argument that we have presented here, that the traffic

7     stop must be valid from its inception.

8          In terms of the Fifth Amendment question, Your Honor,

9     the only point I will make to The Court that I haven't

10    made in the papers already is that the questions that

11    Mr. Moore is asking are not related to the substance of

12    what he is accused of until he is specifically questioned

13    about it by the police.  He is asking, where is my wallet?

14    What is going to happen with my car?  When do I get to get

15    out of here?  Can you give this to my girl friend?  You

16    know, those kinds of transactional, I would say, questions

17    about what is going to happen next to him.  He is not in

18    any way from my understanding of the videos and the

19    evidence indicating an initiation of questioning about the

20    offense.

21          Thank you, Your Honor.

22          THE COURT:  So, Mr. Elliker, I will hear from you on

23    this.

24          I know that you have pointed out accurately that the

25    motion to dismiss is a little behind the schedule that I

1    outlined.  But -- and there is really no excuse for it

2    other than, I guess, she didn't get the data quickly.

3         But I am going to allow it to go forward.

4         MR. ELLIKER:  Understood, Judge.

5         I thought it was relevant to at least raise because I

6    thought it was a way to close the loop on the objections I

7    raised on relevance at the suppression hearing, bringing

8    in the evidence that I think in retrospect was obviously

9    brought in to support an argument that hadn't actually

10   been fronted to The Court or to The United States yet.

11   But in any event --

12        THE COURT:  So, what do you think about -- I think

13   you are in pretty good shape on most of the suppression,

14   pre-Miranda statements, which really aren't, I don't think

15   too critical to your case.

16        MR. ELLIKER:  Well, on that point, not to stand in

17   the way of progress, I think in the response I think I

18   tried to make clear that the only pre-Miranda statements

19   that we argued were not suppressible were his voluntary

20   utterances to other individuals, not any responses he gave

21   to any questions by the officers.

22        THE COURT:  What do you think about my musings about

23   the statistical evidence in this case?

24        MR. ELLIKER:  Well, Judge, you said something that I

25   agree with, which was that it is not really legal

**JA0330**

15

1 argument.  I think that that is actually relevant to the

2 legal standard outlined for these kinds of claims from the

3 Supreme Court's Armstrong decision.

4   Courts, including the Fourth Circuit, have emphasized

5 that for these kinds of discriminatory enforcement or

6 discriminatory prosecution claims it is necessarily a high

7 burden.  That is what the Fourth Circuit indicated in

8 Venable.  And in Mason, another Fourth Circuit decision

9 cited in the briefs, I believe they are actually citing

10 back to Armstrong calling it a demanding and rigorous

11 burden.  And the justification given for that is that in

12 essence a defendant is raising a constitutional argument

13 to combat what may otherwise be a policy-making decision

14 by law enforcement executives in the jurisdiction by which

15 I mean, it seems to me that at the bottom the thrust of

16 the defendant's argument is the use of the Focused Mission

17 Team in the fourth precinct, predominantly

18 African-American precinct, is objectionable because of the

19 resulting apparent, according to these statistics offered

20 by the defendant, racial disparity in outcomes.

21   I understand Your Honor's point about not being able

22 to really adequately understand on the record what the

23 statistical significance of those outcomes really are in

24 the City of Richmond given the division of the precincts.

25 And Ms Koenig has indicated that because of the de facto

**JA0331**

1    historical residential segregation of the City, and the
2    way the precincts fall, it may not be helpful to narrow
3    down to only the fourth precinct to look at outcomes
4    statistically.  But I think that what it comes down to,
5    Judge, is it really is trying to create an equal
6    protection argument to combat what otherwise is a
7    policy-making- decision of the City of Richmond in terms
8    of how to police certain areas.  And that is something
9    that is left to the discretion of the Executive.
10         THE COURT:  Well, that is an interesting argument.
11   You know, Judge Brown in Washington, D C says that in
12   ruling on, you remember Joe Arpaio, the Sheriff in
13   Arizona --
14         MR. ELLIKER:  I do, Judge.  I am nervous to be
15   associated that.
16         THE COURT:  No, you are not associated with it.
17         She said that under our system of Federal Courts
18   there are vast areas of executive actions that are
19   essentially unreviewable.  You are saying that how they
20   assign officers might be one of those.  Or the strategy of
21   policing might be.
22         MR. ELLIKER:  I wouldn't go so far as to say it is
23   unreviewable, Judge.  I would just emphasize that grasping
24   for evidence that may or may not show, or get over that
25   hurdle, I think exemplifies the difficulty of trying to

**JA0332**

 1    examine these kinds of decisions.  I think --

 2         THE COURT:  But didn't you say in your papers that

 3    they have got to show that, I guess, these officers had

 4    discriminatory intent in stopping Mr. Moore?  How could

 5    you ever possibly show that without essentially reviewing

 6    statistical evidence to demonstrate that is part of a

 7    pattern and practice?

 8         MR. ELLIKER:  I think that is just the point, that

 9    you can't use statistical evidence to point that out.

10         THE COURT:  How else would you prove it?

11         MR. ELLIKER:  I think statistical evidence, Judge, to

12    the extent it is relevant goes towards, I guess it could

13    raise an inference at the end of the day, but to bring

14    things back to where the legal standard is on these

15    claims, there is a two-part test outlined in Armstrong and

16    adopted by the Fourth Circuit for cases -- for an argument

17    like this, I should say -- that the defendant has to show

18    this clear evidence; first, that is similarly-situated

19    individuals of a different race were treated differently;

20    second, that the decision to enforce the law as to this

21    defendant was, quote, invidious or in bad faith.

22         THE COURT:  See, that is the thing.  Unless you have

23    some sort of a quisling in the police department who says,

24    yes, we decided we would go out and prosecute

25    African-Americans, you will never have evidence to satisfy

1    number two.  You could probably get past number one, the

2    first point you raise, with statistical evidence.  You

3    know, I am not sure you would ever prove number two.

4         How would you prove number two?

5         MR. ELLIKER:  Well, Judge, I think in the Fourth

6    Circuit case that goes through the best discussion of

7    these separate, of the factors separately is the Venable

8    decision, which is from 2012 written by Judge Dunkin.  And

9    in it she explains that in essence that first part of the

10   test is really about is there a discriminatory effect that

11   is discernible comparing similarly-situated drivers or

12   defendants.

13        The second part goes towards showing discriminatory

14   intent, invidious or bad faith.  What the Fourth Circuit

15   has said, I think, perhaps unhelpfully, is saying what is

16   not enough as opposed to saying what is enough.

17        THE COURT:  You are clearly the smartest law clerk I

18   ever had -- with the exception of my current clerk --

19   could you explain to me, give me an example of what would

20   prove this?  Interestingly, this is called counter-factual

21   analysis, and it is a principle that comes up in physics

22   lessons.

23        MR. ELLIKER:  Judge, I think if you did have

24   situations where there was evidence of comments made by

25   police officers with respect to a particular defendant, or

1    if there were evidence about potentially -- and again

2    emphasizing counter-factual, Judge -- if there were

3    evidence of a departmental policy, even an informal one

4    having to do with targeting particular kinds of defendants

5    based on their race, which, not for nothing, I might nod

6    towards the former sheriff in Arizona on that, but I

7    certainly don't think that is evidence here.  And what the

8    Fourth Circuit --

9        THE COURT:  None of that.

10       MR. ELLIKER:  And what Judge Dunkin had said is with

11   respect to, because we were talking about statistics, and

12   there is this concern about statistical relevance, Judge,

13   Judge Dunkin wrote in Venable, having to do with

14   discriminatory intent the government must be more -- this

15   a quote from that opinion at page 903 -- the government

16   must be more than aware that a prosecutorial policy may

17   result in the prosecution of one group more than another

18   because discriminatory intent implies that the government

19   selected or reaffirmed a particular course of action at

20   least in part because of, not merely in spite of, its

21   adverse effects on an identifiable group.

22       THE COURT:  Okay.

23       It is difficult burden.

24       MR. ELLIKER:  So the only reason I started by, I

25   hesitate to lead any argument with policy, discussions of

1    policy considerations, but I think that is really what

2    this boils down to is the justification for why it is that

3    that burden is so high is that what could appear to be, as

4    you said, without having clear statistical analysis what

5    could appear to be numbers that jump off the page, may

6    otherwise be explained by a race-neutral policy

7    justification --

8         THE COURT:  Right.

9         MR. ELLIKER:  -- such as crime rates in particular

10   areas.

11        THE COURT:  Right.

12        And I don't mean to say with respect to invidious

13   intent towards Mr. Moore in particular.  I have observed a

14   whole lot of the interactions between the police that

15   evening.  I thought, you know, the police essentially

16   treated him with great respect, treated him nicely.  So I

17   didn't see it from -- I said videotape earlier -- dating

18   myself -- from the recoding.

19        All right.  Okay.  Thank you, Mr. Elliker.

20        Here is what we are going to do.

21        I will set a status conference in this case.  I am

22   just trying to figure out what I have going on.

23        How about the 18th at 9:00 o'clock.  Will you still

24   be around then?

25        MR. ELLIKER:  No, Judge, but someone from the United

**JA0336**

1    States will be.

2         THE COURT:  Okay.

3         The 18th at 9:00 o'clock, a conference call.

4         MS KOENIG:  What date?

5         THE COURT:  October 18.

6         MS KOENIG:  Okay.

7         THE COURT:  Ms Koenig, at that time I hope that you

8    will have -- I am not expecting you to have all the

9    statistical stuff done by then, but I will expect you to

10   have an outline of where you expect to go.  And then we

11   will be able to set a briefing schedule on this.

12        Mr. Elliker or his -- the United States will have an

13   opportunity once they see your evidence to pull together

14   whatever that statistical data they think is necessary.

15        All right.

16        MS KOENIG:  Yes, sir.

17        THE COURT:  Okay.

18        Anything else?

19        MR. ELLIKER:  No, Your Honor.  Thank you.

20        MS KOENIG:  Not from the defendant.

21        THE COURT:  Thank you very much.

22        Mr. Moore, sorry we didn't resolve this today, but we

23   will try to get it right.

24        And I wish you well.

25        Mr. Moore, on the 18th we are going to have a

```
 1   telephone call with the lawyers to discuss procedural
 2   matters.  And you will not need to be present for that.
 3       Okay?
 4       THE DEFENDANT:  Yes, sir.
 5       THE COURT:  All right.
 6       Thank you all very.
 7       Let's recess.
 8                   HEARING ADJOURNED.
 9
10       THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.
11
12               GILBERT FRANK HALASZ
13               Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
                 Defendant.

## **ORDER**

This matter comes before the Court on the defendant's motion to suppress. (ECF No. 17.) On July 26, 2021, the Court held a hearing on the motion. (ECF No. 30.) During the hearing, the Court granted the defendant's request for the opportunity to submit additional briefing. (ECF Nos. 30, 31.) In the defendant's supplemental brief on the motion to suppress, the defendant also moved to dismiss the indictment. (ECF No. 32.) On September 15, 2021, the Court held a hearing on the defendant's supplemental brief, (*id.*), and the government's response, (ECF No. 36).

For the reasons stated from the bench, the Court DIRECTS the defendant to consult with an expert regarding the statistical significance of the evidence presented in support of the defendant's motion to dismiss the indictment and to consider additional evidence in support of the motion. The Court SCHEDULES a status conference for Monday, October 18, 2021, at 9:00 a.m.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: _15_ September 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )    **Case No. 3:21cr42** |
| | ) |
| **KEITH RODNEY MOORE,** | ) |
| Defendant | ) |

**SECOND SUPPLEMENT TO MR. MOORE'S**
**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Keith Moore, through counsel, moved the Court to suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore in this case and to suppress statements after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent. *See* ECF Nos. 17, 28, and 32. After an evidentiary hearing on that motion on July 26, 2021, Mr. Moore supplemented his Fourth and Fifth Amendment challenges with a Fourteenth Amendment challenge because of the Richmond Police Department's selective enforcement of Virginia's traffic laws. *See* ECF No. 32.

Statistical, historical, and contemporary evidence demonstrates that if you are driving while black in the city of Richmond—like Mr. Moore, you are far more likely to pulled over, searched, and arrested. White drivers on the other hand not only are essentially given a pass on traffic stops, but when they get pulled over, they are far more likely than black drivers to receive a summons or citation to come to court. Such discriminatory enforcement of facially neutral laws violates our Constitution's guarantee of equal protection of the laws regardless of the color of one's skin and cannot be tolerated. This Court must suppress all evidence stemming from the traffic stop in this case and dismiss the case against Mr. Moore.

1

**JA0340**

I.    **The Fourteenth Amendment guarantees to all those in the United States the right to equal protection of the laws regardless of the color of their skin.**

The Equal Protection Clause of the "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) ("Racially selective law enforcement violates this nation's constitutional values the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment.").

The "Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997).  An equal protection challenge to police action "does not fit neatly into the various stages of Fourth Amendment search and seizure analysis" because "the central intention behind the Equal Protection Clause is the prevention of official conduct discriminating on the basis of race." *Id.* at 353 (6th Cir. 1997) ("A citizen's right to equal protection of the laws, however, does not magically materialize when he is approached by the police.  Citizens are cloaked at all times with the right to have the laws applied to them in an equal fashion—undeniably, the right not to be exposed to the unfair application of the laws based on their race.").

To prove that police officers were selectively enforcing[1] a facially neutral law against a particular race, the defendant must show by a preponderance of the evidence that the challenged police action: 1) was motivated by a discriminatory purpose; and 2) had a discriminatory effect on a racial group to which the defendant belongs. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272–74 (1979); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–66 (1977); *Washington v. Davis*, 426 U.S. 229, 239–42 (1976); *see also Conley v. United States*, 5 F.4th 781, 789-96 (7th Cir. 2021) (observing after thorough analysis that defendant must prove a selective enforcement claim by preponderance of the evidence)[2].

As to the first prong of the selective enforcement test—discriminatory purpose, a defendant must prove that there was a discriminatory purpose behind the course of action. The defendant need not, however, prove that the "challenged action rested solely on racially discriminatory

---

[1] It is critical to recognize that Mr. Moore's claim is one of selective enforcement, not one of selective prosecution. "Selective prosecution occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race. Selective enforcement occurs when police investigate people of one race but not similarly-situated people of a different race." *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021).

[2] As the *Conley* court noted, the Fourth Circuit has relied on *United States v. Armstrong*, 517 U.S. 456 (1996)—which is a selective prosecution case, to posit that a defendant must "demonstrate 'clear evidence' of racially animated selective law enforcement." *United States v. Mason*, 774 F.3d 824 (7th Cir. 2014) (quoting *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (observing in a selective prosecution case that the Supreme Court required a defendant to "support a selective-prosecution claim with 'clear evidence,'" quoting *Armstrong*). In *Mason*, the Fourth Circuit evaluated a habeas petition based in part on the defendant alleging that his attorney was ineffective because he failed to raise a racially selective law enforcement argument. 774 F.3d at 826. In rejecting that argument, the *Mason* court simply observed that proving equal protection challenges are difficult and then simply cited—without analyzing—selective prosecution claims without discussing the difference between that type of claim and a selective enforcement claim. *Id.* at 829-30.

As the *Conley* court recognized, prosecutors enjoy "a powerful privilege" and are "covered by a presumption of constitutional behavior." 5 F.4th at 791. Police officers, on the other hand, "are regularly called before courts to justify their tactics" and thus, selective enforcement claims do not warrant the heightened evidentiary standard applicable to selective prosecution claims. *Id. Mason*'s passing reference then to the applicable standard of proof is not a binding holding on this Court. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.").

purposes." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (stating that "an additional purpose . . . would not render nugatory the purpose to discriminate against all Blacks"); *Feeney*, 442 U.S. at 277 ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not."). A showing of discriminatory intent need not be made with direct evidence, but can be shown through circumstantial evidence. *See Avery*, 137 F.3d at 355 ("[o]ften it is difficult to prove directly the invidious use of race," so "'an invidious discriminatory purpose may often be inferred from the totality of the relevant facts'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). In some cases, blunt statistical evidence of a racially disparate impact may be sufficient to prove the discriminatory intent element of an equal protection claim. *See, e.g., Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination.").

As to the second prong of the selective enforcement test—discriminatory effect, police action has a racially discriminatory effect when members of a protected racial group—here, black citizens in Richmond—receive less favorable treatment than nonmembers. The Supreme Court has long relied on statistical analysis to show a discriminatory effect. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding that a San Francisco ordinance banning the operation of laundries in wooden buildings was discriminatorily applied to Chinese launderers where the city denied the petitions of some two hundred Chinese applicants who applied for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese launderers who

applied); *see also Hunter*, 471 U.S. at 227 (finding that the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was "indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites"). In selective enforcement claims, statistical evidence of racial disparity can be sufficient[3] to show a discriminatory effect. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 661 (S.D.N.Y. 2013) (finding that evidence showed that the New York Police Department stopped more black and Hispanic residents, were more likely to stop blacks and Hispanics than whites within defined geographical areas, were more likely to use force against blacks and Hispanics than whites, and stopped blacks and Hispanics with less justification than whites).

---

[3] In an unpublished, per curiam opinion that is not binding on this Court, the Fourth Circuit reviewed a Fourth Amendment challenge to a traffic stop. *See United States v. Suarez*, 321 F. App'x 302 (4th Cir. Jan. 30, 2009). The defendants argued that the traffic stop was pretextual and therefore violated the Fourth Amendment. *Id.* at 304. In dicta, the *Suarez* court observed that "[a]llegations of racially motivated law enforcement implicate the Equal Protection Clause rather than the Fourth Amendment." *Id.* at 305. And again, like the *Mason* court, the *Suarez* court simply observed that proving equal protection challenges are difficult and then cited—without analyzing—*Armstrong* (a selective prosecution case) for the proposition that a "defendant must show that the law enforcement practice was not enforced against "similarly situated individuals of a different race." 321 F. App'x at 305 (internal quotation marks omitted). Again, *Suarez*'s passing reference then to the applicable standard of proof is not a binding holding on this Court. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.").

As the Second Circuit observed in *Pyke v. Cuomo*, 258 F.3d 107, 108-09 (2d Cir. 2001), "[a] plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals." It is in the special case of selective prosecution rather than selective enforcement, where the "exercise of one of the core powers of the Executive Branch of the Federal Government, the power to prosecute" is at issue, *Armstrong*, 517 U.S. at 457, that a challenger must point to a similarly situated individual who could have been prosecuted but was not. "[T]hat is because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." *Pyke*, 258 F.3d at 109. With a claim that a facially neutral law or policy has been applied in a discriminatory manner, there is no justification for requiring proof of a specific similarly situated individual who was not stopped for a traffic offense. *Id.* at 110 ("a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection").

5

**JA0344**

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21; *see also Hunter*, 471 U.S. at 228 (1985). "If the [government] comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established." *Floyd*, 959 F. Supp. 2d at 572 (internal quotation marks omitted).

II.    **The data on the Richmond Police Department's traffic stops paints a bleak picture: black drivers are far more likely to be stopped, searched, and arrested than white drivers no matter where they are driving in Richmond.**

In this case, the evidence is stark. If you are a black driver in Richmond, you are far more likely to be stopped, searched, and arrested than if you are a white driver. The Richmond Police Department has divided its patrol functions into four distinct police precincts. *See* Def. Ex. X (1-4). According to the police department itself, the department "decentralized all of its patrol functions and instituted a Neighborhood Precinct Plan" in 1977. *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). Three of those precincts correspond to the nearly entirely black neighborhoods in Richmond. *Compare* Def. Ex. X (1-4) *with* Def. Ex. R (1-2). The third precinct—the west end of Richmond—is the only precinct made up of primarily white neighborhoods. *Id.*

The ratio of traffic stops that the Richmond Police Department conducts of black drivers to white drivers is appalling. Black people make up just less than half of the population of Richmond. *See* 7/26/21 Tr. at 169-70 (reporting that black population of Richmond as of 2019 was about 47-48% of the city's entire population). White people also make up less than half of the population of Richmond. *Id.* (reporting that white population of Richmond as of 2019 was

6

**JA0345**

about 42-46% of the city's entire population).  Yet, seventy-six percent of the Richmond Police Department's traffic stops are of black persons.  *See* Def. Ex. Y-1.  White people make up only fifteen percent of the Richmond Police Department's traffic stops.  *Id.*  The Richmond Police Department has not reported the race of another eight percent of people stopped, *id.*, in violation of the Virginia Community Policing Act, *see* Va. Code § 52-30.2.  At least in this case, none of the officers on the Fourth Precinct Focus Mission Team complied formally with the Virginia Community Policing Act.  *See* 7/26/21 Tr. at 118-19.  Yet, because Officer Mills kept at least some of the required data in his body camera video titles, *see id.* at 66-68, we know that every individual that the Fourth Precinct Focus Mission Team stopped the night of Mr. Moore's arrest was black, *see* Def. Exs. J, K, L, N, O, P, Q, U-3, U-4, V-3, W; Gov't Ex. 4.  We also know that the Fourth Precinct Focus Mission Team searched every car that they stopped that night.  *Id.*

Eli Coston, an expert statistician who teaches at Virginia Commonwealth University and has studied the discriminatory effect of the Richmond Police Department's traffic enforcement over time, has found this data to represent a statistically significant effect on black drivers.  *See* Ex. A 3/8/22.  In comparison with white drivers, black drivers in the city of Richmond were 5.15 times more likely to be stopped by the Richmond Police Department.  *Id.* at 5.  In comparison with white drivers, black drivers in the city of Richmond were 12.67 times more likely to be arrested as a result of the stop.  *Id.* at 6.  In comparison with white drivers, black drivers were more likely to be searched during the stop.  *Id.* at 7.  In comparison with white drivers, black drivers were far more likely to have their cars searched during the stop.  *Id.*  White drivers were also far more likely to receive a summons or citation than black drivers.  *Id.*  Black drivers were also far more likely to be arrested than white drivers when the basis for the stop was an equipment violation.  *Id.* at 8.

**JA0346**

These findings are particularly important when we consider that black drivers do not commit traffic offenses more often than white drivers. *See* Ex. A 3/8/22 at 1-2; *see* Ex. B 3/8/22 at 2-3. Yet, in Richmond, local police officers are stopping black drivers for alleged traffic offenses at a rate that is five times higher than they are stopping white drivers. This evidence— this stark evidence of discriminatory effect—paints a powerful picture of racial discrimination in traffic enforcement in Richmond. *See, e.g., United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir. 1977) ("Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation. . . . In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." (internal citations omitted); *see also Int'l Bhd. of Teamsters*, 431 U.S. at 339 n.20 ("absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant . . . .").

The racially discriminatory impact of the Richmond Police Department's selective enforcement of the traffic laws is even more blunt when we consider the location of the traffic stops. Setting aside for the time being that the lines of the police precincts in Richmond line up perfectly with the lines of racial segregation in the city, if police officers were not selectively enforcing the laws based on race, we could perhaps expect to see more white people than black people stopped for traffic and equipment offenses in the white part of town—the third precinct. That is not at all, however, what the data shows. Rather, the data reveals that even in the third police precinct, the Richmond Police Department stops far more black people than white people.

8

**JA0347**

*See* Ex. A 3/8/2022 at 9-11.  We also see a significant number of black drivers that are stopped in or near the third precinct are stopped near the boundaries of the third precinct.  *Id.* at 9, Fig. 2. Such a pattern is indicative of the Richmond Police Department effectively patrolling the boundaries of the white neighborhoods in the third precinct.

Lastly, the mission of the Fourth Precinct Focus Mission Team is not traffic enforcement. Rather, it is to get guns and drugs off the street.  *See* 7/26/21 Tr. at 23-24.  The Fourth Precinct Focus Mission Team simply uses minor traffic infractions to pull black people over to search for evidence of more serious criminal activity.  *Id.* at 24.  That evidence is consistent with the overall picture of what the Community Policing Act data shows: if you are driving while black in the city of Richmond, you should expect to have less than equal protection of the laws because of the color of your skin.  The evidence demonstrates that the Fourth Precinct Focus Mission Team's racial profiling was actively having a discriminatory effect on black drivers in Richmond.  *See, e.g.*, *Maryland State Conference of NAACP Branches v. Maryland State Police*, 454 F. Supp. 2d 339, 349 (D. Md. 2006) ("if the stop was 'not really' for speeding, then the basis for it is unclear. And, this unclear basis for the stop exists against a backdrop of powerful circumstantial evidence of racial profiling in the form of statistics compiled by the Maryland State Police—and the senior officer corps' conclusions based upon those statistics, i.e., that 'a remarkable deviation' in regard to the percentage of African–Americans stopped and searched existed in the JFK Barrack area— which shows, at least, discriminatory effect from the practices afoot in the JFK Barrack patrol area").

In evaluating discriminatory intent, the Court must take account of the totality of the circumstances.  Here, the totality of the circumstances shows that the Fourth Precinct Focus Mission Team pulls black people over for minor traffic violations, surrounds the driver's car with

**JA0348**

four police officers, and blatantly searches the entire interior of the car before letting anyone of color not suspected of more serious crimes go. As Judge Hamilton observed in his dissent regarding similar tactics in Milwaukee: "Imagine that the police tried these tactics in Milwaukee's affluent east side. Citizens would be up in arms, and rightly so. No police officer could expect to keep his job if he treated a car standing in front of a store as worthy of such an intrusive *Terry* stop." *United States v. Johnson*, 874 F.3d 571, 581 (7th Cir. 2017). The stark numbers and heavy-handed policing tactics of minority neighborhoods in Richmond—a city that feels it needs to devote three of its four police precincts to policing the sections of town made up almost entirely of black citizens—warrant an inference of discriminatory intent. *See, e.g.*, *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing that, if severe enough, statistical evidence of discriminatory effect can raise an inference of discriminatory intent).

Mr. Moore, and other black citizens in Richmond, are entitled to and deserve equal protection of the laws. Because the Richmond Police Department, and the Fourth Precinct Focus Mission Team in particular, has ignored this protection, the Court must suppress the evidence seized and dismiss the indictment in this case.

### III.    Circumstantial and historical evidence indicate that the Richmond Police Department has a long history of discriminatorily enforcing traffic laws against black people in Richmond.

In addition to the severe statistical evidence of the discriminatory effect that the Richmond Police Department's selective enforcement of traffic laws has had on black drivers in Richmond, circumstantial evidence indicates a long history of the Richmond Police Department selectively enforcing traffic and criminal laws against black citizens. The history of the Richmond Police Department is inseparably entangled with racial discrimination. In 1861 when Virginia seceded from the United States, Richmond Police Department officers wore confederate badges and were

10

**JA0349**

considered part of the confederate militia. *See* City of Richmond, *History of the Richmond Police Department: 1807-1899*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). After the civil war ended and the federal government had established martial law in Richmond, the Richmond Police Department was abolished. *Id.* It was only when Virginia rejoined the United States in 1870 that Richmond was allowed to reestablish a police department. *Id.*

At the turn of the twentieth century, Richmond used a variety of tactics to racially segregate the city. In 1911, the "city of Richmond, using its charter powers, adopted the first ordinance dividing the city into separate blocks for white and 'colored'." *See* Ex. C 3/8/22 at 4. When explicit racialized zoning was outlawed in 1917, "racial zoning gave way to the broader notion of a race-based comprehensive planning process and racially informed zoning districts." *Id.* The city then used Virginia's law against interracial marriage as a basis to continue prohibiting black citizens from living in white neighborhoods. *See* Ex. D 3/8/22 at 2. When restrictive covenants based on race were banned in 1948, Richmond relied on redlining—or the process by which banks drew red lines around predominantly black neighborhoods to prevent financial investment in those areas—to continue racial residential segregation. *Id.* at 2-4.

By the 1970s, whites in Richmond had resorted to leaving the city in droves for the surrounding counties. *Id.* at 4. The city of Richmond responded in 1970 by annexing a large portion of Chesterfield County—to increase its white population. *See* Roberto Roldan, *Richmond's Controversial Chesterfield County Annexation, 50 Years Later*, VPM (May 20, 2020), https://vpm.org/news/articles/13596/richmonds-controversial-chesterfield-annexation-50-years-later ("This particular case though is interesting because of how the white leaders decided to suppress the black vote. What the Richmond oligarchy decided to do was to simply reduce the

**JA0350**

black population. And the way to do that was to annex thousands, tens of thousands of white people from the adjoining County, Chesterfield County."). It was against this backdrop that the Richmond Police Department decentralized its patrol functions and instituted a "Neighborhood Precinct Plan" in 1977. *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). That the third police precinct aligns exactly with the boundaries of the white section of Richmond is not a coincidence.

For at least twenty years, data has shown that Richmond Police Officers stop far more black drivers than white drivers for traffic offenses. *See* Ex. E 3/8/22 at 2. In 2000, a study of all traffic stops in Richmond during a six-week period showed that sixty-four percent of the drivers stopped were black, while thirty-two percent of the drivers were white. *Id.* Comparable data of the counties surrounding Richmond—Henrico and Chesterfield—much more closely aligned the ratio of the race of drivers stopped with the racial make-up of those counties. *Id.* In 2017 and 2018, Richmond Police Officers were 30.7% more likely to pull over a black driver than a white driver. *See* Ex. F 3/8/22 at 11. The 2017 and 2018 data reflected racial discrimination in not only traffic stops, but also the Richmond Police Department's use of force, pedestrian contacts, reports of "suspicious activities," curfew violations, and truancy violations. *See* Ex. F 3/8/22.

Mr. Moore has shown at least a prima facie case that the Richmond Police Department selectively enforces traffic laws against black drivers in Richmond. He anticipates presenting additional evidence of discriminatory intent at the evidentiary hearing this Court intends to schedule at the conclusion of this supplemental briefing.

**JA0351**

**CONCLUSION**

As explained above and in ECF Nos. 17, 28, and 32, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and dismiss this case.

<div style="margin-left:40%">

Respectfully submitted,
KEITH RODNEY MOORE

</div>

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

# Traffic Stops by the Richmond Police Department:
# July 1, 2020 – December 6, 2020

**Dr. Eli Coston**
Department of Gender, Sexuality, and Women's Studies
Virginia Commonwealth University

## Introduction

Racial bias and racial disparities in the criminal legal system exist at many levels, from sentencing of criminal defendants (Levinson, Bennett, and Hioki, 2017; Rachlinski, Johnson, Wistrich, and Guthrie, 2008), jury decision-making (Sweeny and Haney, 1992), prosecutorial discretion (Smith and Levinson, 2011), to policing (Baumgartner, Christiani, Roach, and Shoub, 2017; Dunn, 2009; Glaser, 2015; Kahn and Martin, 2016). In all of these areas, we find that racial bias plays a role in the decision-making process, resulting in Black people and other racial and ethnic minorities often facing harsher scrutiny or punishment than their White peers. Though each step of the system is an important contributor to the overall disparities that exist within the criminal legal system, many interactions with the criminal legal system begin with routine traffic stops. However, it is not speeding, lack of use of a seatbelt, or another violation that typically results in greater interaction with the criminal legal system, but the fact that officers use these stops to look for evidence of other crime (Baumgartner, Christiani, Roach, and Shoub, 2017; Carroll and Gonzalez, 2014; Makofske, 2020; Richmond Transparency and Accountability Project, 2019). Concern with racial disparities occurring in traffic stops dates back to the war on drugs, in which specific characteristics, including race were used to develop profiles of drug couriers on our nation's highways (Harris, 1999). During the 1990's, stops of Black drivers were so ubiquitous that the term "Driving While Black" or "Driving While Brown" was coined to describe the phenomena (Harris, 1999). Though profiling specifically based on race is not legal, that does not mean that all profiling involving race has been eliminated, nor does it mean that profiling based solely on race does not occur (Fredrickson and Siljander, 2002). In fact, the enduring presence of racial disparities in traffic stops has led many states or jurisdictions, including Virginia, to track demographic data regarding individuals stopped, as well as the outcome of stops and other actions (such as searches) that took place during the stop (Baumgartner, Christiani, Roach, and Shoub, 2017).

*Traffic Stops*

The first issue to consider in examining racial disparities in police stops is whether Black drivers commit traffic infractions more often than White drivers, as this would make them more likely to be pulled over. However, there is very limited data that would suggest that Black drivers commit more traffic infractions than White drivers (Harris, 1999; Lundman and Kowalski, 2009; Norton, Fung, and Stayton, 2021). Self-report studies of speeding from New York collected over several years, consistently show that Black drivers report speeding less often than White drivers (Norton, Fung, and Stayton, 2021); although there is no reason to expect that drivers in Richmond would differ, the New York study is one of the only ones that speaks to this issue. Lange, Blackman, and Johnson (2001) in their study of speeding on the New Jersey Turnpike suggested that Black drivers were more likely to engage in excessive speeding (more than 15 MPH over the speed limit), however, Lundman and Kowalski's (2009) work showed that both age and gender account for much of that effect. Moreover, excessive speeding was evident in a relatively small



proportion of cases, which would not account for the larger disparities witnessed in traffic stops along the New Jersey Turnpike (Lundman and Kowalski, 2009). Pierson et al. (2020) have suggested that it is not differences in driving behavior, but driver race that is the primary predictor in traffic stops. Pierson's team analyzed the impact of darkness hours on rates of traffic stops, comparing stops during the daytime and the evening. Their analysis demonstrated that racial differences in rates of stops diminished under the "veil of darkness" (Pierson et al, 2020). These studies show minimal evidence of differences in driving behavior between Black and White drivers, but do suggest that racial bias plays a role in stops.

It is also important to consider whether there are differences in the likelihood to be pulled over. Langan (2001) used nationally representative data to examine this question, finding that even though there are proportionally fewer Black drivers than White drivers (that is to say, Black people are less likely to have a driver's license than White people). Black drivers are still stopped more often than White drivers. Additionally, in examining people who were pulled over more than once in the prior year, Black drivers were much more likely to have been pulled over multiple times. The Langan (2001) study is especially important because it utilizes nationally representative data including those who were pulled over, as well as those who were not pulled over, in order to assess differences between racial groups. Most data collected is only once a stop has occurred, telling us less about the entire population of drivers than they type of nationally representative data that Langan utilized.

*Reason for Stops*

The reason for a stop is another important factor in understanding the complexities behind racial profiling, particularly as it relates to the issue of pretextual stops. (England and Calnon, 2004; Johnson, 2010; Makofske, 2020). Traffic stops can be made for a number of reasons, most often for traffic violations (which can vary greatly in severity). But equipment violations are also violations of the traffic code that can result in a stop. Pretextual stops are those that are not specifically out of regard to concern for public safety, such as having a side marker out on one's vehicle. Pretextual stops have greater latitude in the amount of discretion an officer can use in whether to conduct the stop itself; for example, it would be more difficult for an officer to ignore someone driving dangerously than someone with a minor equipment violation. Likewise, there is a substantial amount of discretion in how they utilize any stop as a means of investigating other potential crime. Though pretextual stops are legal, there is concern among criminologists and legal scholars as to how much they may contribute to racial bias in traffic stops. (England and Calnon, 2004; Johnson, 2010; Makofske, 2020). In one specific example, Makofske (2020) found especially high rates of arrest for "failure to signal" in Louisville, KY, even when failure to signal was the sole reason for the stop. Likewise, Higgins, Vito, and Walsh (2008) discovered an abnormally high number of stops in Louisville for equipment violations, as compared to other jurisdictions, which they suggest were pretextual stops. Thus, equipment violations, particularly as they relate to pretextual stops, may be an important factor in understanding racial disparities in traffic stops.

*Searches Conducted During Stops*

Once a stop has occurred, it is important to examine whether there are differences in what occurs during the stop itself, based upon the race of the driver. One of the most examined aspects in this regard is searches conducted during the stop. Perhaps the most comprehensive study regarding

searches conducted during traffic stops is Baumgartner, Christiani, Roach, and Shoub's (2017) analysis of 132 jurisdictions' data on traffic stops across multiple years of data, resulting in analysis of over 50 million traffic stops from across the U.S. They found that in most jurisdictions, searches of Black drivers were more common than searches of White drivers. On average, Black drivers were 2.5 times more likely to be searched. Due to the differing nature of data collection across jurisdictions, this figure combines both searches of persons and searches of vehicles (Baumgartner, Christiani, Roach, and Shoub, 2017). However, similar findings regarding Black drivers being searched more frequently than White drivers have been found across multiple smaller studies (Carroll and Gonzalez, 2014; Engel and Calnon, 2004; Ridgeway, 2009).

*Outcome of Stops*

Ultimately, the outcome of the stop is one of the most important aspects of a traffic stops, as this also determines whether or not there will be continued contact with the criminal legal system as a result of the encounter. Those who are arrested may experience serious impacts to their livelihood due to pretrial detention (Harvey, 2019). Even those who eventually cannot pay the fee for a citation may face serious disruptions to their lives due to later incarceration (Harvey, 2019). When examining national data, Black drivers are more likely to be arrested as the result of a traffic stop than White drivers (Engel and Calnon, 2004). Black drivers nationally are also more likely to be ticketed than White drivers (Engel and Calnon, 2004). Analyses of particular locations, such as Cleveland, OH, Cincinnati, OH, Houston, TX, or New Jersey, reveals similar patterns of higher ticketing and/or arrests of Black drivers (Dunn, 2009; Harris, 1999; Ridgeway, 2009; Roh, and Robinson, 2009). Similarly, in 2019, the Richmond Transparency and Accountability Project released a report analyzing data from the Richmond Police department regarding traffic arrests, showing that in Richmond, Black drivers were more likely to be arrested than White drivers.

**Data**

The data analyzed was provided by the Richmond Police Department and contains data collected in accordance with Virginia's *Community Policing Act*, which was specifically established to prohibit and monitor "biased-based profiling" in policing in Virginia. "Biased-based profiling" refers to policing that relies solely on a characteristic such as race or gender in making decisions about policing, such as the decision to stop an individual. The data contains all traffic stops conducted from July 1, 2020 through December 6, 2020 by the Richmond Police Department (RPD).

**Sample**

During the time period analyzed, 2,582 stops occurred. As subsequent analyses required location data, only stops with valid location data were included in the final analysis. 82 of the 2,582 stops (3.18%) included locations outside of RPD's jurisdiction. These had no impact on the overall results, thus, these were omitted from final analyses. Additionally, for chi-square ($\chi^2$) analyses involving race, the small number of stops involving Asian, American Indian, or drivers of

"Unknown" races led to those categories being excluded from analyses leading to a final analytic sample of 2279 for most analyses[1].

**Description of Key Variables**

*Location:* Location in the original data was noted as an address, intersection, or block number. The location information was processed by Geocodio to generate latitude and longitude coordinates for each stop. Geocodio also provides accuracy analysis based on the location provided. For all locations with less than a .6 accuracy score, locations were checked and corrected by an intern with the public defender's office. I verified a random selection of these to ensure accuracy in corrected latitude and longitude, and found no discrepancies in the corrections. Only 11 items retained in the final analysis had location scores of less than .6, representing less than 1% of the data. Again, inclusion of these data did not impact the overall analysis.

*Race of Driver:* Race of driver is a categorical variable with Black (76%), White (15%), Asian (1%), American Indian (<1%), or "Unknown" (8%) as possible response options.

*Reason for Stop:* The reason for stop is a categorical variable indicating why the initial stop occurred. Most commonly stops were for traffic violations (69%) or equipment violations (36%), though other reasons for stops were noted (5%).

*Action Taken as Result of Stop:* This variable is a categorical variable representing the most serious action taken as the result of a stop. Resultant outcomes (from most to least serious) include arrest (7%), citation or summons issued (24%), or a warning issued (69%).

*Search of Persons:* This is a binary variable (yes or no) indicating whether any person was searched as a result of the stop. Searches occurred in 10% of cases.

*Search of the Vehicle:* This is a binary variable (yes or no) indicating whether the vehicle was searched as a result of the stop. Searches occurred in 14% of cases.

*Arrest of Person Other than Driver:* This is a binary variable (yes or no) indicating whether an individual other than the driver was arrested as a result of the stop. Arrest of a person other than the driver occurred in 3% of cases.

**Analysis**

The analyses examine whether there are statistically significant differences in the nature of traffic stops conducted by the Richmond Police Department according to race of the driver of a vehicle. Although regression has been used to examine similar data, those techniques were not appropriate due the distribution of the data in this instance. Specifically, the data contained high levels of multicollinearity (indicating interrelationships among the independent variables), which make the chi-square analysis more appropriate. Thus, a series of chi square ($\chi^2$) tests were utilized to examine the relationship between the race of the driver and several characteristics of

---

[1] See "Analysis" section for more detail on chi-square test and decisions regarding inclusion/exclusion of data.

the traffic stops. The $\chi^2$ test has several assumptions, such as independence of observations, having mutually exclusive categories for analysis, and perhaps most important to this analysis, a minimum of 5 expected observations in each cell for 80% of the cells is required (McHugh, 2013). Though all other assumptions were met, the minimum expected cell count was violated for variables related to race of the driver, requiring changes to the analytic strategy. Specifically, this led to traffic stops involving Asian, American Indian, and drivers of "Unknown" races being dropped from final $\chi^2$ tests[2]. Dropping these cases did not result in changes to overall significance or changes to the overall pattern of findings for each individual analysis. Additionally, in the analysis of equipment violations and race of the driver, one cell (rather than several) presented a small number of cases, in order to correct for this, a variation of the chi-square test, the Fisher's exact test was used. In order to assess the strength of the association, Cramer's V was computed for significant $\chi^2$ tests with more than four cells (Healey, 2014; McHugh, 2013), while Kendall's Tau was computed for significant $\chi^2$ tests with only four cells (Cliff and Charlin, 1991; Daniels, 1978). Analysis of individual cells contribution to the $\chi^2$ statistic was also performed for all significant findings (Sharpe, 2015). Stata/SE 16.1 was used for these analyses. In examining the results of the chi-square analyses, the $\chi^2$ test indicates that there is a significant relationship between the variables if the associated p-value is less than .05, while the Cramer's V or Kendall's Tau indicates how strong that association is (with larger numbers in terms of absolute value indicating a stronger association).

ArcGIS Pro was used to examine the data in relation to spatial relationships among stops. Specifically, the location data was used to visualize the location of stops across Richmond and to determine the precinct in which individual stops occurred based on geo-location data. Additionally, heat maps were generated to identify the locations in which stops occur more frequently on the basis of clustering of the data (Scott and Janikas, 2010). Maps of the police precincts are provided as an overlay to the map of stops, as well as the most recent (2015-2019) racial demographic data from the American Community Survey.

**Findings**
Summary data can be found in Table 1. The majority of stops in Richmond during the time period under investigation were of Black drivers (77%). In comparison to White drivers, Black drivers were 5.13 times more likely to be stopped. The majority of stops involved traffic

---

[2] For example, in examining the outcome of stops (arrest, citation/summons, or warning) by race of the driver (American Indian, Asian, Black, White, and "Unknown") each outcome by race category produces a cell to be used in the analysis for a total of 15 cells. The counts for many of these cells was less than five; only 2 Asian drivers were arrested and none of the cells (arrest, summons/citation, or warning) contained 5 cases for Native American drivers. While a chi-square statistic can be computed with low cell counts, it can lead to inaccurate p-values (measures of statistical significance); likewise, use of data with low cell counts could lead to inaccurate estimation of the strength of an association. To ensure that the p-values were accurate and that strength of association was appropriately assessed, only Black and White drivers were included in the final analyses presented in this report. To ensure this did not impact the overall findings, chi-square tests were also run including all racial groups for each test presented and the significance did not change for any of the analyses; thus the findings are robust with regard to inclusion or omission of the additional racial groups.

violations (69%), with equipment violations also comprising a large portion of stops conducted (36%). Additionally, most stops resulted in a warning being issued (69%). However, in the 7% of cases in which arrest of the driver occurred, Black drivers were 12.67 times more likely than White drivers to be arrested as the result of a stop. During most stops, additional actions were not taken, such as searches of persons, searches of the vehicle, or arrest of individuals other than the driver; these occurred only in a minority of cases.

Table 1. Summary Data

| Variable | | Frequency | Percent |
|---|---|---|---|
| Race of Driver | | | |
| | American Indian | 2 | 0.08 |
| | Asian | 19 | 0.76 |
| | Black | 1925 | 77 |
| | White | 354 | 14.16 |
| | Unknown | 200 | 8 |
| Outcome of Stop | | | |
| | Arrest | 179 | 7.17 |
| | Citation/Summons | 560 | 22.44 |
| | Warning | 1756 | 70.38 |
| Reason Stopped | | | |
| | Traffic Violation | 1426 | 58.48 |
| | Equipment Violation | 910 | 36.4 |
| | Other | 128 | 0.05 |
| Search of Person | | | |
| | Yes | 266 | 10.65 |
| | No | 2232 | 89.35 |
| Search of Vehicle | | | |
| | Yes | 367 | 14.68 |
| | No | 2133 | 85.32 |
| Arrest of Person Other than Driver | | | |
| | Yes | 86 | 3.82 |
| | No | 2165 | 96.18 |

The primary analysis was to conduct a chi-square test of independence on the traffic stop data regarding the race of the driver and primary result of the stop (arrest, summons/citation, or warning). Based on the Chi-square test, there are significant differences in the result of a stop based on driver race ($\chi^2$ (2, N=2276) = 33.19, p < .01) the results of this analyses are presented in Table 2. Cramer's V = .12, indicating that there is a weak to moderate, but substantive effect of race of driver on the result of a stop. In examining individual cells, Black drivers faced the most severe outcome, arrest, more often than expected by chance; while White drivers

experienced arrest less often than expected by chance. This pattern was reversed for summons/citations; with White drivers receiving summons more often than expected by chance and Black drivers less often than expected by chance. The overall contribution to the analysis of receiving a warning based upon race was minimal.

Table 2. Chi-Square Tests of Association on Race of Driver and Result of Traffic Stop

| Race of Driver | Arrest | Outcome of Stop Summons/Citation | Warning | Total |
|---|---|---|---|---|
| Black | 152 | 390 | 1380 | 1922 |
| | {7.91} | {20.29} | {71.80} | {100} |
| White | 12 | 117 | 225 | 354 |
| | {3.39} | {33.05} | {63.56} | {100} |
| Total | 164 | 507 | 1605 | |
| | {7.21} | {22.28} | {70.52} | |

Chi-square (2, N=2276) = 33.19, p < .01

Cramer's V = .12

Note: Counts are provided with row percentages in {}

Additional chi-square tests of independence on the traffic stop data regarding the race of the driver and other actions taken during the stop were conducted; specifically, whether a person was searched during the stop, whether the vehicle was searched during the stop, or whether a person other than the driver was arrested as the result of a stop. Based on these Chi-square tests, there are significant differences in searches conducted during a stop based on driver race, but not in arrests of additional persons. The results of each of these analyses are presented individually.

In regard to a person being searched during the stop, the results were statistically significant ($\chi^2$ (1, N= 2277 )= 6.25, p = .01). The results of this analyses are presented in Table 3. Kendall's Tau was used to measure strength of association, with $\tau$ = -0.05, indicating that there is a weak effect of race of driver on searches of persons performed during a stop. In examining individual cells, Black drivers were searched more often than expected by chance; while White drivers were searched less often than expected by chance.

In regard to the vehicle being searched during the stop, the results were statistically significant ($\chi^2$(1, N=2279) = 20.73, p < .01) the results of this analyses are also presented in Table 3. Kendall's Tau was used to measure strength of association, with $\tau$ = -0.10, indicating that there is a weak effect of race of driver on searches of the vehicle performed during a stop. In examining individual cells, the vehicles of Black drivers were searched more often than expected by chance; while the vehicles of White drivers were searched less often than expected by chance.

The results of the analysis regarding the arrest of additional persons based on the race of the driver were not significant ($\chi^2$ = 0.17, p = .68).

**JA0359**

Table 3. Chi-Square Tests of Association on Race of Driver and Searches of Vehicles and Persons

| Race of Driver | Search of Person | | | | Search of Vehicle | | | |
|---|---|---|---|---|---|---|---|---|
| | Yes | No | Total | | Yes | No | Total | |
| Black | 223 | 1701 | 1924 | | 317 | 1608 | 1925 | |
| | {11.59} | {88.41} | {100} | | {16.47} | {83.53} | {100} | |
| White | 25 | 328 | 353 | | 25 | 329 | 354 | |
| | {7.08} | {92.92} | {100} | | {7.06} | {92.94} | {100} | |
| Total | 248 | 2029 | | | 342 | 1937 | | |
| | {10.89} | {89.11} | | | {15.01} | {84.99} | | |
| | Chi-square (1, N=2277) = 6.25, p = .01 | | | | Chi-square (1, N=2279) = 20.74, p < .01 | | | |
| | Kendall's Tau = -0.05 | | | | Kendall's Tau = -0.10 | | | |

Note: Counts are provided with row percentages in {}

Additional analyses were conducted to determine whether the reason for the stop (equipment violation or traffic violation) had an impact on the outcome of the stop. The results of the analysis regarding differences in outcomes for stops involving traffic violations based on the race of the driver was significant ($\chi^2(2, N=1323) = 14.07, p < .01$). Cramer's V was used to measure strength of association, with V = .10, indicating that there is a weak effect of race of driver on the outcome of stops for traffic violations. In examining individual cells, White drivers were given a summons or citation more often than expected by chance; while Black drivers received a summons or citation less often than expected by chance. In regard to differences in outcomes for stops involving equipment violations based on the race of the driver, the test was statistically significant ($\chi^2(2, N=848) = 7.24, p = .02$). Cramer's V was used to measure strength of association, with V = 0.09, indicating that there is a weak effect of race of driver on the outcome of a stop for equipment violations. Similar to traffic stops, White drivers were given a summons or citation more often than expected by chance; while Black drivers received a summons or citation less often than expected by chance. However, Black drivers were more likely than chance to be arrested as the result of a stop for an equipment violation. The results of these analyses can be found in Table 4.

Table 4. Chi-Square Tests of Association on Race of Driver and Result of Traffic Stop for Traffic Violations and Equipment Violations

| Race of Driver | Outcome of Stop (Traffic Violations) | | | | Outcome of Stop (Equipment Violations) | | | |
|---|---|---|---|---|---|---|---|---|
| | Arrest | Summons/Citation | Warning | Total | Arrest | Summons/Citation | Warning | Total |
| Black | 62 | 318 | 698 | 1078 | 56 | 62 | 632 | 750 |
| | {5.75} | {29.50} | {64.75} | {100} | {7.47} | {8.27} | {84.27} | {100} |
| White | 9 | 102 | 134 | 245 | 2 | 14 | 82 | 98 |
| | {3.67} | {41.63} | {54.69} | {100} | {2.04} | {14.29} | {83.67} | {100} |
| Total | 71 | 420 | 832 | | 58 | 76 | 714 | |
| | {5.37} | {31.75} | {62.89} | | {6.84} | {8.96} | {84.20} | |
| | Chi-square (2, N=1323) = 14.07, p < .01 | | | | Chi-square (2, N=848) = 7.24, p = .02 | | | |
| | Cramer's V = .10 | | | | Cramer's V = .09 | | | |

Note: Counts are provided with row percentages in {}

In regard to the spatial analysis, the map of the individual stops that occurred during the time period under investigation by the Richmond police department is presented in Figure 1, with each dot indicating an individual stop.

JA0360

Figure 1. Map of Individual Stops by Race of Driver



First, stops were clustered by race to generate an overall picture of the geographic distribution of stops by race of driver, with each cluster representing 5 or more stops in geographic proximity to one another. As the majority of stops by the Richmond police department are of Black drivers, most clusters are also of Black drivers, while White drivers are distributed throughout the city and less likely to show as clusters. This can be seen in Figure 2. Note- this data does include drivers of all races, however, clustering only appears for Black and White drivers due to the small number of stops of other racial groups.

Figure 2. Clusters of Stops by Race of Driver



Next, a heat map was produced for both Black drivers (Figure 3) and White drivers (Figure 4). Heat maps display the density of stops for each group. Based on comparison of these two maps,

there are a greater number of high density locations for stops of Black drivers in comparison to White drivers.

Figure 3. Heat Map of Traffic Stops of Black Drivers



Figure 4. Heat Map of Traffic Stops of White Drivers



Finally, the heat map of stops of Black drivers is presented as an overlay onto the most recent (2015-2019) racial demographics from the American Community Survey, which maps the most prevalent racial demographic living in an area. When examining this map, we see that there are several areas of high density traffic stops of Black drivers in predominantly White areas of Richmond, as well as numerous areas of high density stops of Black Drivers along areas in areas

where racial demographics are in transition, specifically those areas in which predominantly White and predominantly Black neighborhoods border one another.

Figure 5. Overlap of Richmond City Racial Demographics and Traffic Stops of Black Drivers



## Conclusion

The statistical significance of these findings across multiple analyses highlights how pervasive the racial disparities in police stops by the Richmond Police Department are. Throughout almost every step of a traffic stop, from the likelihood that a driver is pulled over, to the actions taken during the stop, to the eventual outcome of that stop, Black drivers are at a significant disadvantage compared to White drivers. Though the effect is somewhat weak, this is still an important substantive effect. Race should have no bearing on whether an individual is stopped, whether they are searched, or whether they are arrested during a traffic stop. But in each of these analyses, there is a significant but weak effect. The cumulative impact of these weak effects is that Black drivers face substantially different outcomes as the result of traffic stops as compared to White drivers. This is perhaps most evident when looking at differences in stops for equipment violations for Black and White drivers; while only 2% of White drivers are arrested after being pulled over for an equipment violation, roughly 7.5% of Black drivers are. Given that stops for equipment violations are often considered pretextual stops with greater potential for discretion and bias to impact the incident, these arrests are of particular concern; however, lack of additional data doesn't allow for investigation of these incidents in more detail in this report.

The spatial analyses of the data suggest are also striking. When stops are clustered, it becomes clear that almost all concentrations of stops are of Black drivers. We also see that these clusters are distributed throughout the city, and not contained within predominantly Black neighborhoods. In looking at the clusters of White drivers, the few clusters that exist only occur in neighborhoods that are predominantly White to begin with. This indicates that Black drivers are pulled over in areas where they are both the majority and the minority. The heat map of stops of Black drivers paired with the racial demographic overlay also suggests that enforcement of

traffic stops occurs along lines of gentrification, where predominant racial groups may be in transition and racial boundaries may be especially salient. Along both racial boundaries and in primarily White areas, who does and does not belong may be more noticeable, thus implicating race as a factor in traffic stops specifically in those areas.

While this report cannot say whether a specific traffic stop was the result of racial bias or racial profiling, this report does conclude that race is a significant factor in the decision to stop a driver, whether a person or vehicle is searched, the outcome of a stop, and the location where stops occur.

**References**

Baumgartner, F. R., Christiani, L., Epp, D. A., Roach, K., & Shoub, K. (2017). Racial Disparities in Traffic Stop Outcomes. *Duke Forum for Law and Social Change, 9*, 21-54.

Carroll, L., & Gonzalez, M. L. (2014). Out of place: Racial stereotypes and the ecology of frisks and searches following traffic stops. *Journal of Research in Crime and Delinquency, 51*(5), 559–584.

Cliff, N., & Charlin, V. (1991). Variances and covariances of Kendall's tau and their estimation. *Multivariate Behavioral Research, 26*(4), 693-707.

Daniel, W. W. (1978). Applied nonparametric statistics. Houghton Mifflin.

Dunn, R. A. (2009). Measuring racial disparities in traffic ticketing within large urban jurisdictions. *Public Performance & Management Review*, *32*(4), 537-561.

Engel, R. S., & Calnon, J. M. (2004). Examining the influence of drivers' characteristics during traffic stops with police: Results from a national survey. Justice Quarterly, 21(1), 49-90.

Fredrickson, D. D., & Siljander, R. P. (2002). *Racial profiling: Eliminating the confusion between racial and criminal profiling and clarifying what constitutes unfair discrimination and persecution*. Charles C Thomas Publisher.

Glaser, J. (2015). Suspect race: Causes and consequences of racial profiling. Oxford University Press, USA.

Harris, D. A. (1999). Driving While Black: Racial Profiling On Our Nation's Highways. American Civil Liberties Union. New York, NY.

Harvey, T. B. (2019). Debtors' Prisons and Discriminatory Policing: The New Tools of Racial Segregation. In The Dream Revisited (pp. 70-72). Columbia University Press.

Healey, J. (2014). Statistics: A tool for social research. Boston, MA: Cengage Learning.

Higgins, G. E., Vito, G. F., & Walsh, W. F. (2008). Searches: An understudied area of racial profiling. *Journal of Ethnicity in Criminal Justice, 6*(1), 23-39.

Johnson, K. R. (2010). How Racial Profiling in America Became the Law of the Land: United States v. Brignoni-Ponce and Whren v. United States and the Need for Truly Rebellious Lawyering. Georgetown Law Journal, 98(4), 1005-1078.

Kahn, K. B., & Martin, K. D. (2016). Policing and race: Disparate treatment, perceptions, and policy responses. *Social Issues and Policy Review*, *10*(1), 82-121.

Langan, P. A. (2001). *Contacts between police and the public: Findings from the 1999 national survey*. US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Lange, J. E., Blackman, K. B., & Johnson, M. E. (2001). Speed survey of the New Jersey Turnpike: Final report. Calverton, MD: Public Services Research Institute.

Levinson, J. D., Bennett, M. W., & Hioki, K. (2017). Judging Implicit Bias: A National Empirical Study of Judicial Sterotypes. *Fla. L. Rev., 69*, 63.

Lundman, R. J., & Kowalski, B. R. (2009). Speeding while black? Assessing the generalizability of Lange et al.'s (2001, 2005) New Jersey turnpike speeding survey findings. *Justice Quarterly, 26*(3), 504-527.

Makofske, M. (2020): *Pretextual Traffic Stops and Racial Disparities in their Use.*

McHugh, M. L. (2013). The chi-square test of independence. *Biochemia Medica, 23*(2), 143–149.

Norton, J. M., Fung, L., & Stayton, C. (2021). Self-Reported Speeding Among New York City Adult Drivers, 2015–2016. *Journal of community health, 46*(3), 626-634.

Pierson, E., Simoiu, C., Overgoor, J., Corbett-Davies, S., Jenson, D., Shoemaker, A., Ramachandran, V., Barghouty, P., Phillips, C., Shroff, R. & Goel, S. (2020). A large-scale analysis of racial disparities in police stops across the United States. *Nature human behaviour, 4*(7), 736-745.

Rachlinski, J. J., Johnson, S. L., Wistrich, A. J., & Guthrie, C. (2008). Does unconscious racial bias affect trial judges. *Notre Dame L. Rev., 84*, 1195.

Richmond Transparency and Accountability Project. (2019). Our Streets, Our Say: Policing in Richmond. Richmond, VA. https://www.richmondvatap.org/docs/RTAPREPORT_FINAL.pdf

Ridgeway, G. (2009). Cincinnati Police Department Traffic Stops: Applying RAND's Framework to Analyze Racial Disparities (Vol. 914). Rand Corporation.

Roh, S., & Robinson, M. (2009). A Geographic Approach to Racial Profiling: The Microanalysis and Macroanalysis of Racial Disparity in Traffic Stops. *Police Quarterly*, *12*(2), 137–169.

Sharpe, D. (2015). Your chi-square test is statistically significant: Now what? *Practical Assessment, Research & Evaluation, 20.*

Scott, L. M., & Janikas, M. V. (2010). Spatial statistics in ArcGIS. In Handbook of applied spatial analysis (pp. 27-41). Springer, Berlin, Heidelberg.

Smith, R. J., & Levinson, J. D. (2011). The impact of implicit racial bias on the exercise of prosecutorial discretion. *Seattle UL Rev., 35,* 795.

Sweeney, L. T., & Haney, C. (1992). The influence of race on sentencing: A meta analytic review of experimental studies. *Behavioral Sciences & the Law, 10*(2), 179-195.

DEFENDANT'S
EXHIBIT
B
3/8/2022

...00042-JAG   Document 66-2   Filed 03/09/22   Page 1 of 12 PageID# 413

020-0858-1



nature
human behaviour

Check for updates

# A large-scale analysis of racial disparities in police stops across the United States

Emma Pierson[1], Camelia Simoiu[2], Jan Overgoor[2], Sam Corbett-Davies[1], Daniel Jenson[2], Amy Shoemaker [2], Vignesh Ramachandran[2], Phoebe Barghouty[2], Cheryl Phillips[3], Ravi Shroff[4] and Sharad Goel [2] ✉

We assessed racial disparities in policing in the United States by compiling and analysing a dataset detailing nearly 100 million traffic stops conducted across the country. We found that black drivers were less likely to be stopped after sunset, when a 'veil of darkness' masks one's race, suggesting bias in stop decisions. Furthermore, by examining the rate at which stopped drivers were searched and the likelihood that searches turned up contraband, we found evidence that the bar for searching black and Hispanic drivers was lower than that for searching white drivers. Finally, we found that legalization of recreational marijuana reduced the number of searches of white, black and Hispanic drivers—but the bar for searching black and Hispanic drivers was still lower than that for white drivers post-legalization. Our results indicate that police stops and search decisions suffer from persistent racial bias and point to the value of policy interventions to mitigate these disparities.

More than 20 million Americans are stopped each year for traffic violations, making this one of the most common ways in which the public interacts with the police[1–4]. Due to the decentralized nature of policing in the United States—and a corresponding lack of comprehensive and standardized data—it is difficult to rigorously assess the manner and extent to which race plays a role in traffic stops[5]. The most widely cited national statistics come from the Police–Public Contact Survey (PPCS)[1], which is based on a nationally representative sample of approximately 50,000 people who report having been recently stopped by the police. In addition to such survey data, some local and state agencies have released periodic reports on traffic stops in their jurisdictions, and have also made their data available to outside researchers for analysis[6–20]. While useful, these datasets provide only a partial picture. For example, there is concern that the PPCS, like nearly all surveys, suffers from selection bias and recall errors. Data released directly by police departments are potentially more complete but are available only for select agencies, are typically limited in what is reported and are inconsistent across jurisdictions.

To address these challenges, we compiled and analysed a dataset detailing nearly 100 million traffic stops carried out by 21 state patrol agencies and 35 municipal police departments over almost a decade. This dataset was built through a series of public records requests filed in all 50 states. To facilitate future analysis, we have redistributed these records in a standardized form.

Our statistical analysis of these records proceeds in three steps. First, we assess potential bias in stop decisions by applying the 'veil of darkness' test developed by Grogger and Ridgeway[21]. This test is based on a simple observation: because the sun sets at different times throughout the year, one can examine the racial composition of stopped drivers as a function of sunlight while controlling for time of day. In particular, we use the discontinuity created by the start (and end) of daylight-saving time (DST), comparing the racial distribution of drivers stopped in the evenings immediately before

DST begins, when it is dark, to the distribution after DST begins, when it is light at the same time of day. If black drivers comprise a smaller share of stopped drivers when it is dark and accordingly difficult to determine a driver's race, that suggests black drivers were stopped during daylight hours in part because of their race. In both state patrol and municipal police stops, we find that black drivers comprise a smaller proportion of drivers stopped after sunset, suggestive of discrimination in stop decisions.

Second, we investigate potential bias in the post-stop decision to search drivers for contraband. To do so, we apply the threshold test recently developed by Simoiu et al.[7] and refined by Pierson et al.[22]. The threshold test incorporates both the rate at which searches occur, as well as the success rate of those searches, to infer the standard of evidence applied when determining whom to search. This approach builds on traditional outcome analysis[23,24], in which a lower search success rate for one group relative to another is seen as evidence of bias against that group, as it suggests that a lower evidentiary bar was applied when making search decisions. Applied to our data, the threshold test indicates that black and Hispanic drivers were searched on the basis of less evidence than white drivers, both on the subset of searches carried out by state patrol agencies and on those carried out by municipal police departments.

Finally, we examine the effects of drug policy on racial disparities in traffic stop outcomes. We specifically compare patterns of policing in Colorado and Washington—two states that legalized recreational marijuana at the end of 2012—to those in 12 states in which recreational marijuana remained illegal. Using a difference-in-differences strategy, we find that legalization reduced both search rates and misdemeanour rates for drug offences for white, black and Hispanic drivers—though a gap in search thresholds persists.

In the process of collecting and analysing millions of traffic stop records across the country, we encountered many logistical and statistical challenges. Based on these experiences, we conclude by offering suggestions to improve data collection, analysis and reporting

[1]Computer Science, Stanford University, Stanford, CA, USA. [2]Management Science & Engineering, Stanford University, Stanford, CA, USA. [3]Communication, Stanford University, Stanford, CA, USA. [4]Applied Statistics, Social Science, and Humanities, New York University, New York, NY, USA. ✉e-mail: scgoel@stanford.edu

JA0367

**NATURE HUMAN BEHAVIOUR** | ARTICLES



**Fig. 1 | Geographic coverage of compiled traffic stop data.** We analysed data on approximately 95 million stops from 21 state patrol agencies (blue) and 35 municipal police departments (red) across the country.

by law enforcement agencies. Looking forward, we hope this work provides a road map for measuring racial disparities in policing, and facilitates future empirical research into police practices.

## Results

**Compiling a national database of traffic stops.** To assemble a national dataset of traffic stops, we filed public records requests with all 50 state patrol agencies and over 100 municipal police departments. The municipal police departments include those that serve the largest 100 cities in the nation; to achieve geographic coverage, we also included departments that serve some of the largest cities in each state.

To date, we have collected (and released) data on approximately 221 million stops carried out by 33 state patrol agencies, and 34 million stops carried out by 56 municipal police departments, for a total of 255 million records. In many cases, however, the data we received were insufficient to assess racial disparities (for example, the race of the stopped driver was not regularly recorded, or only a non-representative subset of stops was provided). For consistency in our analysis, we further restrict to stops occurring in 2011–2018, as many jurisdictions did not provide data on earlier stops. Finally, we limit our analysis to drivers classified as white, black or Hispanic, as there were relatively few recorded stops of drivers in other race groups. Our primary dataset thus consists of approximately 95 million stops from 21 state patrol agencies and 35 municipal police departments, as shown in Fig. 1 and described in more detail in Supplementary Table 2.

Because each jurisdiction provided stop data in idiosyncratic formats with varying levels of specificity, we used a variety of automated and manual procedures to create the final dataset. For each recorded stop, we attempted to extract and normalize the date and time of the stop; the county (for state patrol agencies) or police subdivision (for example, beat, precinct or zone, for municipal police departments) in which the stop took place; the race, gender and age of the driver; the stop reason (for example, speeding); whether a search was conducted; the legal justification for the search (for example, 'probable cause' or 'consent'); whether contraband was found during a search; and the stop outcome (for example, a citation or an arrest). As indicated in Supplementary Table 2, the information we received varies markedly across states. We therefore restricted each of our specific analyses to the corresponding subset of jurisdictions for which we have the required fields. Our complete data-cleaning pipeline is extensive and required subjective decisions, which we describe in more detail in Methods. For transparency and reproducibility, we have released the raw data, the standardized data and code to clean and analyse the records at https://openpolicing.stanford.edu.

**Assessing bias in traffic stop decisions.** Relative to their share of the residential population, we found that black drivers were, on average,

stopped more often than white drivers. In particular, among state patrol stops, the annual per-capita stop rate for black drivers was 0.10 compared to 0.07 for white drivers; and among municipal police stops, the annual per-capita stop rate for black drivers was 0.20 compared to 0.14 for white drivers. For Hispanic drivers, however, we found that stop rates were lower than for white drivers: 0.05 for stops conducted by state patrol (compared to 0.07 for white drivers) and 0.09 for those conducted by municipal police departments (compared to 0.14 for white drivers). In all cases, these numbers are the unweighted average annual per-capita stop rates across the states and cities we analysed, and all estimates have corresponding 95% confidence intervals (CIs) with radius <0.001. We note that these results are consistent with self-reported stop rates by white, black and Hispanic drivers who participated in the national PPCS[1].

These numbers are a starting point for understanding racial disparities in traffic stops, but they do not, per se, provide strong evidence of racially disparate treatment. In particular, per-capita stop rates do not account for possible race-specific differences in driving behaviour, including amount of time spent on the road and adherence to traffic laws. For example, if black drivers, hypothetically, spend more time on the road than white drivers, that could explain the higher stop rates we see for the former, even in the absence of discrimination. Moreover, drivers may not live in the jurisdictions where they were stopped, further complicating the interpretation of population benchmarks.

Quantifying potential bias in stop decisions is a statistically challenging problem, in large part because one cannot readily measure the racial distribution of those who actually violated traffic laws because the data contain information only on those stopped for such offences. To mitigate this benchmarking problem, Grogger and Ridgeway[21] proposed a statistical approach known as the veil-of-darkness test. Their method starts from the idea that officers who engage in racial profiling are less able to identify a driver's race after dark than during the day. As a result, if officers are discriminating against black drivers—all else being equal—one would expect black drivers to comprise a smaller share of stopped drivers at night, when a veil-of-darkness masks their race. To account for patterns of driving and police deployment that may vary throughout the day, the test leverages the fact that the sun sets at different times during the year. For example, although it is typically dark at 19:00 during the winter months, it is often light at that time during the summer.

To illustrate the intuition behind this method, in Fig. 2 we examine the demographic composition of drivers stopped by the Texas State Patrol at various times of day. Each panel in the plot shows stops occurring in a specific 15-min window (for example, 19:00–19:15), and the horizontal axis indicates minutes since dusk. We restrict to white and black drivers—because the ethnicity of Hispanic drivers is not always apparent, even during daylight hours—and, following Grogger and Ridgeway, we filter out stops that occurred in the ~30-min period between sunset and dusk, when it is neither 'light' nor 'dark.' For each time period, the plot shows a marked drop in the proportion of drivers stopped after dusk who are black, suggestive of discrimination in stop decisions.

In this basic form, darkness—after adjusting for time of day—is a function of the date. As such, to the extent that driver behaviour changes throughout the year, and that these changes are correlated with race, the test can suggest discrimination where there is none. To account for these potential seasonal effects, we applied a more robust variant of the veil-of-darkness test that restricts to two 60-day windows centred on the beginning and end of DST[25]. On this subset of the data, we fit the following logistic regression model:

$$\Pr(\text{black} | t, g, p, d, s, c) = \text{logit}^{-1}\left(\alpha_s \times s \times d + \alpha_c \times c \times d + \beta^T \times \text{ns}_6(t) + \gamma[g] + \delta[p]\right),$$

where $\Pr(\text{black} | t, g, p, d, s, c)$ is the probability that a stopped driver is black at a certain time $t$, location $g$ and period $p$ (with two periods

JA0368

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 383 of 496

# ARTICLES

**NATURE HUMAN BEHAVIOUR**



**Fig. 2 | An illustration of the veil-of-darkness test for stops occurring in three short time windows in a single state, Texas.** For each window (19:00–19:15, 19:15–19:30 and 19:30–19:45), we compute the percentage of stops that involved black drivers for a series of 10-min periods before and after dusk. The figure is based on 112,938 stops of black and white drivers (35,270 during 19:00–19:15, 38,726 during 19:15–19:30 and 38,942 during 19:30–19:45), with points sized according to the total number of stops in each bin. The vertical line at $t = 0$ indicates dusk, at which point it is generally considered 'dark'; we remove stops in the -30-min period between sunset (indicated by the left-most vertical line in each panel) and dusk, as this period is neither 'light' nor 'dark'. The dashed horizontal lines show the overall proportion of stops involving black drivers before and after dark, with 95% CI. For all three depicted time windows, black drivers comprise a smaller share of stopped drivers after dark, when a veil of darkness masks their race, suggestive of racial profiling.

per year, corresponding to the start and end of DST, with darkness status $d \in \{0, 1\}$ indicating whether a stop occurred after dusk ($d = 1$) or before sunset ($d = 0$), and with the enforcement agency being either state patrol, $s \in \{0, 1\}$ or city police department, $c \in \{0, 1\}$. In this model, $ns_g(t)$ is a natural spline over time with six degrees of freedom, $\gamma[g]$ is a fixed effect for location $g$ and $\delta[p]$ is a fixed effect for period $p$. The location $g[i]$ for stop $i$ corresponds to either the county (for state patrol stops) or city (for municipal police department stops), with $\gamma[g[i]]$ the corresponding coefficient. Finally, $p[i]$ captures whether stop $i$ occurred in the spring (within a month of beginning DST) or the fall (within a month of ending DST) of each year, and $\delta[p[i]]$ is the corresponding coefficient for this period. For computational efficiency, we rounded time to the nearest 5-min interval when fitting the model.

The main terms of interest in our model are $\alpha_s$ and $\alpha_c$, which describe differences in the composition of stopped drivers between daylight and dark, after adjusting for time and location, with $\alpha_s$, $\alpha_c < 0$ suggesting discrimination against black drivers for state patrols and city departments, respectively. We find $\alpha_s = -0.033$ (95% CI [−0.039, −0.027], $P < 0.001$) and $\alpha_c = -0.039$ (95% CI [−0.045, −0.033], $P < 0.001$), suggesting discrimination among both state patrols and municipal police departments. To gauge the robustness of our results, we fit multiple variations of the veil-of-darkness model described above (for example, using different degrees for the natural spline). In all cases, we found qualitatively similarly results that are suggestive of bias against black drivers in stop decisions, as described in Methods and Supplementary Table 1.

The veil-of-darkness test is a popular technique for assessing disparate treatment but, like all statistical methods, it comes with caveats. Results could be skewed if race-specific driving behaviour is related more to lighting than time of day, leading the test to suggest discrimination where there is none. Conversely, artificial lighting (for example, from street lamps) can weaken the relationship between sunlight and visibility, and so the method may underestimate the extent to which stops are predicated on perceived race. Finally, if violation type is related to lighting, the test could give an inaccurate measure of discrimination. For example, broken tail lights are more likely to be detected at night and could potentially be more common among black drivers[17], which could in turn mask

discrimination. To address this last limitation, one could exclude stops prompted by such violations but our data, unfortunately, do not consistently indicate stop reasons. Despite these shortcomings, we believe the veil-of-darkness test provides a useful, if imperfect, measure of bias in stop decisions.

**Assessing bias in search decisions.** After stopping a driver, officers may carry out a search of the driver or vehicle if they suspect more serious criminal activity. We next investigate potential bias in these search decisions. Among stopped drivers, we found that black and Hispanic individuals were, on average, searched more often than white individuals. However, as with differences in stop rates, the disparities we see in search rates are not necessarily the product of discrimination. Black and Hispanic drivers might, hypothetically, carry contraband at higher rates than white drivers, and so elevated search rates may result from routine police work even if no racial bias were present. To measure the role of race in search decisions, we apply two statistical strategies: outcome analysis and threshold analysis. To do so, we limit to the eight state patrol agencies and six municipal police departments for which we have sufficient data on the location of stops, whether a search occurred and whether those searches yielded contraband. We specifically consider state patrol agencies in Connecticut, Illinois, North Carolina, Rhode Island, South Carolina, Texas, Washington and Wisconsin; and municipal police departments in Nashville, TN, New Orleans, LA, Philadelphia, PA, Plano, TX, San Diego, CA and San Francisco, CA. We defer to each department's characterization of 'contraband' when carrying out this analysis.

In the eight state patrol agencies we consider, search rates were 4.3% (95% CI 4.2–4.4%) for black drivers, 4.1% (95% CI 4.0–4.1%) for Hispanic drivers and 1.9% (95% CI 1.9–1.9%) for white drivers. In particular, the gap in search rates between black and white drivers was 2.4% (95% CI 2.3–2.5%, $P < 0.001$) and the gap in search rates between Hispanic and white drivers was 2.2% (95% CI 2.1–2.2%, $P < 0.001$). Similarly, in the six municipal police departments we consider, the search rates were 9.5% (95% CI 9.4–9.6%) for black drivers, 7.2% (95% CI 7.0–7.3%) for Hispanic drivers and 3.9% (95% CI 3.8–3.9%) for white drivers. The gap in municipal search rates between black and white drivers was 5.6% (95% CI

JA0369

5.5–5.7%, $P<0.001$) and the gap in search rates between Hispanic and white drivers was 3.3% (95% CI 3.1–3.5%, $P<0.001$). As above, these numbers are unweighted average search rates across our states and cities, respectively.

In these jurisdictions, stopped black and Hispanic drivers were searched about twice as often as stopped white drivers. To assess whether this gap resulted from biased decision-making, we apply the outcome test, originally proposed by Becker[23,24], to circumvent omitted variable bias in traditional tests of discrimination. The outcome test is based not on the search rate but on the 'hit rate': the proportion of searches that successfully turn up contraband. Becker argued that even if minority drivers are more likely to carry contraband, in the absence of discrimination, searched minorities should still be found to have contraband at the same rate as searched whites. If searches of minorities are successful less often than searches of whites, it suggests that officers are applying a double standard, searching minorities on the basis of less evidence. Implicit in this test is the assumption that officers exercise discretion in whom to search; therefore, when possible, we exclude non-discretionary searches, such as vehicle impound searches and searches incident to arrest, as those are often required as a matter of procedure, even in the absence of individualized suspicion. We note that outcome tests gauge discrimination only at one specific point in the decision-making process—in this case, the decision to search a driver who has been stopped. In particular, this type of analysis does not capture bias in the stop decision itself.

In Fig. 3 (top row), we plot hit rates by race and location for the states (left) and for the cities (right) for which we have the necessary information. Across jurisdictions, we consistently found that searches of Hispanic drivers were less successful than those of white drivers. However, searches of white and black drivers had more comparable hit rates. The outcome test thus indicates that search decisions may be biased against Hispanic drivers, but the evidence is more ambiguous for black drivers. Aggregating across state patrol stops, contraband was found in 32.0% (95% CI 31.6–32.4%) of searches of white drivers compared to 24.3% (95% CI 23.5–25.2%) of searches of Hispanic drivers and 29.4% (95% CI 28.7–30.0%) of searches of black drivers. In particular, the gap in hit rates between white and Hispanic drivers was 7.6% (95% CI 6.7–8.6%, $P<0.001$), and the gap in hit rates between white and black drivers was 2.6% (95% CI 1.9–3.4%, $P<0.001$). Similarly, aggregating across municipal police departments, contraband was found in 18.2% (95% CI 17.8–18.7%) of searches of white drivers compared to 11.0% (95% CI 10.6–11.5%) of searches of Hispanic drivers and 13.9% (95% CI 13.7–14.2%) of searches of black drivers. In this case, the gap in hit rates between white and Hispanic drivers was 7.2% (95% CI 6.6–7.8%, $P<0.001$) and the gap in hit rates between white and black drivers was 4.3% (95% CI 3.8–4.8%, $P<0.001$). These numbers all indicate unweighted averages across our cities and states, respectively.

The outcome test is intuitively appealing, but it is an imperfect barometer of bias; in particular, it suffers from the problem of infra-marginality[8,26,27]. To illustrate this shortcoming, suppose that there are two, easily distinguishable, types of white driver: those who have a 5% chance of carrying contraband and those who have a 75% chance of carrying contraband. Likewise assume that black drivers have either a 5 or 50% chance of carrying contraband. If officers search drivers who are at least 10% likely to be carrying contraband, then searches of white drivers will be successful 75% of the time whereas searches of black drivers will be successful only 50% of the time. Thus, although the search criterion is applied in a race-neutral manner, the hit rate for black drivers is lower than that for white drivers and the outcome test would (incorrectly) conclude that searches are biased against black drivers. The outcome test can similarly fail to detect discrimination when it is present.

Addressing this possibility, Knowles et al.[27] suggested an economic model of behaviour—known as the KPT model—in which drivers balance their utility for carrying contraband with the risk of getting caught, while officers balance their utility of finding contraband with the cost of searching. Under equilibrium behaviour in this model, the hit rate of searches is identical to the search threshold and so one can reliably detect discrimination with the standard outcome test. However, Engel and Tillyer[28] argue that the KPT model of behaviour requires strong assumptions, including that drivers and officers are rational actors and that every driver has perfect knowledge of the likelihood that he or she will be searched.

To mitigate the limitations of outcome tests (as well as limitations of the KPT model), the threshold test has been proposed as a more robust means for detecting discrimination[7,22]. This test aims to estimate race-specific probability thresholds above which officers search drivers—for example, the 10% threshold in the hypothetical situation above. Even if two race groups have the same observed hit rate, the threshold test may find that one group is searched on the basis of less evidence, indicative of discrimination. To accomplish this task, the test uses a Bayesian model to simultaneously estimate race-specific search thresholds and risk distributions that are consistent with the observed search and hit rates across all jurisdictions. The threshold test can thus be seen as a hybrid between outcome and benchmark analysis, as detailed in Methods.

As shown in Fig. 3 (bottom row), the threshold test indicates that the bar for searching black and Hispanic drivers is generally lower than that for searching white drivers across the municipal police departments and states we consider. In aggregate across cities, the inferred threshold for white drivers is 10.0% compared to 5.0 and 4.6% for black and Hispanic drivers, respectively. The estimated gaps in search thresholds between white and non-white drivers are large and statistically significant: the 95% credible interval for the Hispanic–white difference is (−6.4, −4.4%) and the corresponding interval for the black–white difference is (−6.1, −4.0%). Similarly across states, the inferred threshold for white drivers is 20.9% compared to 16.0% for black drivers and 13.9% for Hispanic drivers. These differences are again large and statistically significant: the 95% credible interval for the Hispanic–white gap is (−8.4, −5.6%); and the analogous interval for the black–white gap is (−6.5%, −3.1%). As with our outcome results, aggregate thresholds are computed by taking an unweighted average of the city- and state-specific thresholds, respectively.

Compared to by-location hit rates, the threshold test more strongly suggests discrimination against black drivers, particularly for municipal stops. Consistent with past work[7], this difference appears to be driven by a small but disproportionate number of black drivers who have a high inferred likelihood of carrying contraband. Thus, even though the threshold test finds that the bar for searching black drivers is lower than that for white drivers, these groups have more similar hit rates.

The threshold test provides evidence of racial bias in search decisions. However, as with all tests of discrimination, it is important to acknowledge limits in what one can conclude from such statistical analysis per se. For example, if search policies differ not only across, but also within, the geographic subdivisions we consider, then the threshold test might mistakenly indicate discrimination where there is none. Additionally, if officers disproportionately suspect more serious criminal activity when searching black and Hispanic drivers compared to white drivers (for example, possession of larger quantities of contraband), then lower observed thresholds may stem from non-discriminatory police practices. Finally, we note that thresholds cannot be identified by the observed data alone[7], and so inferences are dependent on the specific functional form of the underlying Bayesian model, including the prior distributions. (In Methods, however, we show that our main results are robust to relatively large changes to prior distributions).

# ARTICLES                                                        NATURE HUMAN BEHAVIOUR



**Fig. 3 | Hit rates and inferred search thresholds by race and location. a,** Data for state patrol are based on 647,251 searches in eight states, with points corresponding to counties. **b,** Data for municipal police are based on 187,145 searches in six cities, with points corresponding to police precincts. Points are sized by number of searches. The top panels indicate search hit rates, and the bottom panels indicate search thresholds. Across locations, the inferred thresholds for searching black and Hispanic drivers are typically lower than those for searching white drivers, suggestive of bias. Despite these lower inferred search thresholds, hit rates for black drivers are comparable to those for white drivers, ostensibly due to the problem of infra-marginality in outcome tests.

**The effects of legalization of marijuana on stop outcomes.** We conclude our analysis by investigating the effects of legalization of recreational marijuana on racial disparities in stop outcomes. We specifically examine Colorado and Washington, two states in which marijuana was recently legalized and for which we have detailed data before and after legalization. In line with expectations, we find that the proportion of stops that resulted in either a drug-related infraction or misdemeanour fell substantially in both states after marijuana was legalized at the end of 2012 (see Supplementary Fig. 2). Notably, since black drivers were more likely to be charged with such offences previous to legalization, these drivers were also disproportionately impacted by the policy change. This finding is consistent with past work showing that marijuana laws disproportionately affect minorities[29].

Because the policy change decriminalized an entire class of behaviour (that is, possession of small amounts of marijuana), it is not surprising that drug offences correspondingly decreased. However, it is less clear, a priori, how the change might have affected officer behaviour more broadly. Investigating this issue, we found that after the legalization of marijuana the number of searches fell substantially in Colorado and Washington (Fig. 4), ostensibly because the policy change removed a common reason for conducting searches.

Because black and Hispanic drivers were more likely to be searched before legalization, the policy change reduced the absolute gap in search rates between race groups; however, the relative gap persisted, with black and Hispanic drivers still more likely to be searched than white drivers post-legalization. We further note that marijuana legalization had secondary impacts for law-abiding drivers, because fewer searches overall also meant fewer searches of

those without contraband. In the year after legalization in Colorado and Washington, about one-third fewer drivers were searched with no contraband found than in the year before legalization.

As further evidence that the observed drop in search rates in Colorado and Washington was due to marijuana legalization, we note that in the 12 states where marijuana was not legalized—and for which we have the necessary data—search rates did not exhibit sharp drops at the end of 2012 (Fig. 5). To add quantitative detail, we computed a difference-in-differences estimate[30]; our precise model specification and the fitted coefficients are described in Methods. We found that the race-specific coefficients are large and negative for white, black and Hispanic drivers, which again suggests that the observed drop in searches in Colorado and Washington was caused by the legalization of marijuana in those states.

Despite the legalization of marijuana decreasing search rates across race groups, Fig. 4 shows that the relative disparity between whites and minorities remained. We applied the threshold test to assess the extent to which this disparity in search rates may reflect bias. Examining the inferred thresholds (shown in Supplementary Fig. 3), we found that white drivers faced consistently higher search thresholds than minority drivers, both before and after marijuana legalization. The data thus suggest that, although overall search rates dropped in Washington and Colorado, black and Hispanic drivers still faced discrimination in search decisions.

## Discussion

Analysing nearly 100 million traffic stops across the country, we have worked to quantify the often complex relationship between race and policing in the United States. Our analysis provides evidence that decisions about whom to stop and, subsequently, whom to search are

**JA0371**

USCA4 Appeal: 24-4201     Doc: 22-1     Filed: 09/04/2024     Pg: 386 of 496

**NATURE HUMAN BEHAVIOUR**                                        ARTICLES



**Fig. 4 | Percentage of stops that resulted in a search before and after recreational marijuana was legalized in Colorado and Washington at the end of 2012.** After legalization, there was a substantial drop in search rates. The vertical dashed lines indicate the timing of legalization; the other dashed lines show fitted linear trends pre- and post-legalization. The left panel (Colorado) represents 1,674,619 stops; the right panel (Washington) represents 3,985,677 stops. We excluded data for the fourth quarter of 2012, since that period includes stops both before and after legalization. Additionally, in both states, we excluded searches incident to an arrest and other searches that are conducted as a procedural matter, irrespective of any suspicion of drug possession.



**Fig. 5 | Percentage of stops that resulted in a search in 12 states in which recreational marijuana was not legalized.** In the 12 states where marijuana was not legalized—and for which we have the necessary data—search rates did not exhibit sharp declines at the end of 2012, which further suggests that marijuana legalization caused the observed drop in search rates in Colorado and Washington. The plots are based on the following number of stops: 2,038,850 in AZ, 19,012,414 in CA, 3,686,757 in FL, 1,773,546 in MA, 547,115 in MT, 3,500,180 in NC, 4,660,935 in OH, 229,691 in RI, 3,909,950 in SC, 20,494,642 in TX, 250,949 in VT and 741,245 in WI. Dashed lines are as in Fig. 4.

biased against black and Hispanic drivers. Our results, however, also point to the power of policy interventions—specifically, legalization of recreational marijuana—to reduce these racial disparities.

These findings lend insight into patterns of policing, but they only partially capture the wider impacts of law enforcement on communities of colour. If, for example, officers disproportionately patrol black and Hispanic neighbourhoods, the downstream effects can be injurious even if individual stop decisions are not directly affected by the colour of one's skin. Similarly, enforcement of minor traffic violations, like broken tail lights—even if conducted

**JA0372**

# ARTICLES                                            NATURE HUMAN BEHAVIOUR

uniformly and without animus—can place heavy burdens on black and Hispanic drivers without improving public safety[17]. We hope the data we have collected and released are useful for measuring, and in turn addressing, these broader effects.

In the course of carrying out this study, we encountered many challenges working with large-scale policing data. We conclude by offering several recommendations for future data collection, release and analysis. As a minimum, we encourage jurisdictions to collect individual-level stop data that include the date and time of the stop; the location of the stop; the race, gender and age of the driver; the stop reason; whether a search was conducted; the search type (for example, 'probable cause' or 'consent'); whether contraband was found during a search; the stop outcome (for example, a citation or an arrest); and the specific violation with which the driver was charged. Most jurisdictions collect only a subset of this information. There are also variables that are currently rarely collected but would be useful for analysis, such as indicia of criminal behaviour, an officer's rationale for conducting a search and short narratives written by officers describing the incident. New York City's UF-250 form for pedestrian stops is an example of how such information can be efficiently collected[31,32].

Equally important to data collection is ensuring the integrity of the recorded information. We frequently encountered missing values and errors in the data (for example, implausible values for a driver's age and invalid racial categorizations). Automated procedures can be put in place to help detect and correct such problems. For example, the recorded race of the driver is often based on the officer's perception rather than a driver's self-categorization. While there are perhaps sound reasons for this practice, it increases the likelihood of errors. To quantify and correct for this issue, police departments might regularly audit their data, possibly by comparing an officer's perception of race to a third party's judgement based on driver's licence photos for a random sample of stopped drivers.

Despite the existence of public records laws, several jurisdictions failed to respond to our repeated requests for information. We hope that law enforcement agencies consider taking steps to make data more accessible to both external researchers and the public. Connecticut and North Carolina are at the forefront of opening up their data, providing online portals for anyone to download and analyse this information.

We also hope that police departments start to analyse their data regularly and report the results of their findings. Such analyses might include estimates of stop, search and hit rates stratified by race, age, gender and location; distribution of stop reasons by race; and trends over time. More ambitiously, departments could use their data to design statistically informed guidelines that encourage more consistent, efficient and equitable decisions[31,33–35]. Many of these analyses can be automated and rerun regularly with little marginal effort. In conjunction with releasing the data underlying these analyses, we recommend that the analysis code also be released to ensure reproducibility.

Finally, it bears emphasis that the type of large-scale data analysis we have carried out in this paper is but one of many complementary ways to gauge and rectify bias in police interactions with the public. Just as critical, for example, are conversations with both officers and community members, who can often provide more nuance than is possible with our aggregate statistical approach. Collecting, releasing and analysing police data are important steps for increasing the effectiveness and equity of law enforcement practices, and for improving relations with the public through transparency. Ultimately, though, data collection and analysis are not enough. We must act on the results of such efforts if we are to reduce the persistent, discriminatory impacts of policing on communities of colour.

## Methods

**Data collection and standardization.** Our primary dataset includes 94,778,505 stops from 21 state patrol agencies and 35 municipal police departments.

For more detail on all jurisdictions whose data were used in our analyses, Supplementary Table 2 lists the total number of stops and the range of years in which these stops took place. The table also indicates whether each of several important covariates was available in each jurisdiction: the date and time of the stop; more granular geographic information; the race, age and gender of the stopped driver; and whether a search was conducted and, if so, whether contraband was found. Our data-processing pipeline was extensive. Below we describe some of the key steps in this process, and also note that the complete code required to process the data is available at https://openpolicing.stanford.edu.

For each state and city, we requested individual-level records for traffic stops conducted since 2005, under the state's public records law and filed with the agency responsible for traffic stop data collection. The 33 states and 56 cities that complied provided the data in various formats, including raw text files, Microsoft Excel spreadsheets and Microsoft Access databases. We converted all data we received to a standard comma-separated, text-file format. The states and cities varied widely in terms of the availability of the different data fields, the manner and detail of how the data were recorded and in recording consistency from year to year, even within the same location.

We standardized available fields when possible. Often, locations provided dictionaries to map numeric values to human-interpretable ones. Aggregated data—as provided by Missouri, Nebraska and Virginia, for example—were disaggregated by expanding the number of rows for the reported count. For some locations, we had to manually map the provided location data to a county or district value. For example, in Washington, counties were mapped by first computing the latitude and longitude of the highway post that was recorded for the stop, and then those coordinates were mapped to a county using a shapefile. The raw data we received from the states and cities, the processed data we used in this analysis and the code to clean and analyse the data are all available for public inspection and reuse.

In many cases, more than one row in the raw data appeared to refer to the same stop. For example, in several jurisdictions each row in the raw data referred to one violation, not one stop. We detected and reconciled such duplicates by matching on a location-specific set of columns. For example, in Colorado we counted two rows as duplicates if they had the same officer identification code, officer first and last name, driver first and last name, driver birth date, stop location (precise to the milepost marker) and stop date and time. This type of de-duplication was a common procedure that we applied to many states and cities.

The raw data provided to us by state and municipal police agencies often contained clear errors. We ran numerous automated checks to detect and correct these where possible, although some errors probably remain due to the complex nature of the data. For example, after examining the distribution of recorded values in each jurisdiction, we discovered a spurious density of stops in North Carolina listed as occurring at precisely midnight. As the value '00:00' was probably used to indicate missing information, we treated it as such. In Pittsburgh, PA, recorded values for 'sex' and 'gender' did not match 73% of the time in the pedestrian stop data, suggesting data corruption. (Note that we did not include pedestrian stop data in our analysis, but we have released those records for other researchers to use.)

In another example, past work revealed that Texas State Patrol officers incorrectly recorded many Hispanic drivers as white, an error the agency subsequently corrected[36]. To investigate and adjust for this issue, we imputed Hispanic ethnicity from surnames. To carry out this imputation, we used a dataset from the U.S. Census Bureau that estimates the racial and ethnic distribution of people with a given surname for surnames occurring at least 100 times[37]. To increase the matching rate, we performed minor string edits to the names, including removal of punctuation and suffixes (for example, 'Jr.' and 'II'), and considered only the longest word in multi-part surnames. Following previous studies[38,39], we defined a name as 'typically' Hispanic if at least 75% of people w th that name identified as Hispanic, and we note that 90% of those w th typically Hispanic names identified as Hispanic in the 2000 Census.

Among states with typically Hispanic names, the proportion labelled as Hispanic in the raw data was quite low in Texas (37%), corroborating past results. For comparison, we considered Arizona and Colorado, the two other states that included driver name in the raw data. The proportion of drivers with typically Hispanic names labelled as Hispanic in the raw data was 70% in Colorado and 79% in Arizona, much higher than in Texas. Because of this known issue in the Texas data, we re-categorized as 'Hispanic' all drivers in Texas with Hispanic names who were originally labelled 'white' or who had missing race data; this method adds about 1.9 million stops of Hispanic drivers over the period 2011–2015. We did not re-categorize drivers in any other jurisdiction.

**Veil-of-darkness analysis.** In our veil-of-darkness analysis, we compared stop rates before sunset and after dusk—as is common when applying this test. Specifically, sunset is defined as the point in time where the sun dips below the horizon, and dusk (also known as the end of civil twilight) is the time when the sun is six degrees below the horizon and when it is generally considered to be 'dark'. As recommended by Grogger and Ridgeway[21], we further restricted to stops that occurred during the 'inter-twilight period': the range from the earliest to the latest time that dusk occurs in the year. This range is approximately 17:00–22:00, although the precise values differ by location and year. All times in

JA0373

**NATURE HUMAN BEHAVIOUR**                                            **ARTICLES**

the inter-twilight period are, by definition, light at least once in the year and dark at least once in the year. In Supplementary Table 1, we report the results of several variations of our primary veil-of-darkness model (for example, varying the degree of the natural spline from 1 to 6). The results were statistically significant and qualitatively similar in all cases.

**Threshold test.** The threshold test for discrimination was introduced by Simoiu et al.[7] to mitigate the most serious shortcomings of benchmark and outcome analysis. The test is informed by a stylized model of officer behaviour. During each stop, officers observe a myriad of contextual factors—including the age, gender and race of the driver, and behavioural indicators of nervousness or evasiveness. We imagine that officers distil all these complex signals down to a single number, $p$, that represents their subjective estimate of the likelihood that the driver is carrying contraband. Based on these factors, officers are assumed to conduct a search if, and only if, their subjective estimate of finding contraband, $p$, exceeds a fixed, race-specific search threshold for each location (for example, county or district). Treating both the subjective probabilities and the search thresholds as latent, unobserved quantities, our goal is to infer them from data. The threshold test takes a Bayesian approach to estimating the parameters of this process, with the primary goal of inferring race-specific search thresholds for each location.

Under this model of officer behaviour, we interpret lower search thresholds for one group relative to another as evidence of discrimination. If, for example, officers have a lower threshold for searching black drivers than white drivers, that would indicate that they are willing to search black drivers on the basis of less evidence than for white drivers—and we would conclude that black drivers are being discriminated against. In the economics literature, this type of behaviour is often called taste-based discrimination[74] as opposed to statistical discrimination[40,41], in which officers might use a driver's race to improve their estimate that the driver is carrying contraband. Regardless of whether such information increases the efficiency of searches, officers are legally barred from using race to inform search decisions outside of circumscribed situations (for example, when acting on specific and reliable suspect descriptions that include race among other factors). The threshold test, however, aims to capture only taste-based discrimination, as is common in the empirical literature on discrimination.

In our work, we applied a computationally fast variant of the threshold test developed by Pierson et al.[22], which we fit separately on both state patrol stops and municipal police stops. As described below, we modified the Pierson et al. test to include an additional hierarchical component. For example, while the original Pierson et al. model considered one state, and allowed parameters to vary by county (and race) within that state, our state patrol model considers multiple states, allowing parameters to vary by county (and race) within each state. Relevant information is partially pooled across both counties and states. Similarly, our municipal model considers multiple police departments, allowing parameters to vary by police district (and race) within each department.

To run the threshold test, we assume the following information is observed for each stop, $i$:

1.  the race of the driver, $r_i$
2.  the region—state (for the state patrol model) or city (for the municipal police model)—where the stop occurred, $g_i$ (for example, Texas or Nashville)
3.  the specific county (for the state patrol model) or district (for the municipal police model) where the stop occurred, $d_i$ (for example, Harris County, TX or Hermitage Precinct, Nashville)
4.  whether the stop resulted in a search, indicated by $S_i \in \{0, 1\}$, and
5.  whether the stop resulted in contraband recovery, indicated by $H_i \in \{0, 1\}$

To formally describe the threshold test, we need to specify the parametric process of search and recovery, as well as the priors on those parameters. For ease of exposition, we present the model for state patrol stops, where stops occur in counties that are nested within states. The municipal stop model has the same structure, with districts corresponding to counties and cities corresponding to states. We start by describing the latent signal distributions on which officers base their search decisions, which we parameterize by the race and location of drivers. As detailed in Pierson et al.[22], these signal distributions are modelled as homoskedastic discriminant distributions, a class of logit-normal mixture distributions supported on the unit interval [0, 1]. Discriminant distributions can closely approximate beta distributions, but they have properties that are computationally attractive. Each race- and county-specific signal distribution can be described using two parameters, which we denote by $\phi_{r,d}$ and $\delta_{r,d}$. In our setting, $\phi_{r,d} \in (0, 1)$ is the proportion of drivers of race $r$ in county $d$ that carry contraband; and $\delta_{r,d} > 0$ characterizes how difficult it is to identify drivers with contraband[24].

We impose additional structure on the signal distributions by assuming that $\phi_{r,d}$ and $\delta_{r,d}$ can be decomposed into additive race and location terms. Specifically, given parameters $\phi_{r,g}$ for each race group $r$ and state $g$, and parameters $\phi_d$ for each county $d$, we set

$$\phi_{r,d} = \text{logit}^{-1}(\phi_{r,g[d]} + \phi_d)$$

where $g[d]$ denotes the state $g$ in which county $d$ lies. Similarly, for parameters $\delta_{r,g}$ and $\delta_d$, we set

$$\delta_{r,d} = \exp(\delta_{r,g[d]} + \delta_d)$$

Following Pierson et al.[22], we use hierarchical priors[42] on the signal distributions that restrict geographical heterogeneity while allowing for base rates to differ across race groups. This choice substantially accelerates model fitting. In particular, we use the following priors:

$$\mu_\phi, \mu_\delta \sim N(0, 1)$$

$$\phi_d, \delta_d \sim N(0, 0.1^2)$$

$$\phi_{r,g} \sim N(\mu_\phi, 0.1^2)$$

$$\delta_{r,g} \sim N(\mu_\delta, 0.1^2)$$

Next we detail the structure of our search thresholds. In our informal description above, officers search drivers when their estimated likelihood of possessing contraband exceeds a specific race- and county-specific value $t_{r,d} \in (0, 1)$. For computational reasons, we map these thresholds from the unit interval to the real line via a monotonic transformation outlined in Pierson et al.[22]. For simplicity, we continue using the notation $t_{r,d}$ to denote these transformed values. As above, we set a hierarchical prior on the threshold values. Specifically, we

$$t_{r,d} \sim N(t_r, \sigma_t^2)$$

$$t_r \sim N(0, 1),$$

$$\sigma_t \sim N(0, 1)$$

Finally, given this parametric model of signals and thresholds, we describe the underlying data-generating process, which mirrors our informal description above. For each stop $i$, we draw a signal $p_i$ from the associated race- and location-specific discriminant distribution. If the signal $p_i$ exceeds the race- and location-specific threshold $t_{r,d}$, then a search is conducted and $S_i = 1$; otherwise there is no search and $S_i = 0$. If a search is conducted, contraband is found with probability $p_i$, in which case $H_i = 1$; otherwise, $H_i = 0$.

The hierarchical structure we employ allows us to make reasonable inferences even for locations with a relatively small number of stops. However, to ensure more statistically robust estimates, we limit our analysis to counties and districts with at least 50 searches per race group. To gauge the sensitivity of our results, we repeated our analysis with priors having 0.5× and 1.5× s.d. of the priors in our main analysis, and found nearly identical results under these transformations.

For both the state patrol and municipal department model, we perform posterior predictive checks to ensure that the models fit the data well. Specifically, for each county (state patrol model) or district (municipal department model) and race group, we compare the observed search and recovery rates to their expected values under the assumed data-generating process, with parameters drawn from the inferred posterior distribution. Such posterior predictive checks are a common approach for identifying and measuring systematic differences between a fitted Bayesian model and the data[42,43]. Supplementary Fig. 1 shows the results of these posterior predictive checks. For both the state patrol model and the municipal department model, the prediction errors are minimal and similar across race groups.

Given the inferred race- and location-specific thresholds, $\hat{t}_{r,d}$, we define overall race-specific thresholds $\hat{t}_r$ for both states and municipal departments in two steps. First, for each state (municipal department) $g$, we compute an average $\hat{t}_{r,g}$ over all its counties (districts), weighting each threshold $\hat{t}_{r,d}$ by the proportion of stops in location $d$. Next, we calculate $\hat{t}_r$ as the unweighted average of all state thresholds $\hat{t}_{r,g}$ (or municipal thresholds) for race group $r$. In the second step, we take the unweighted average to account for differences in reporting practices across states, although our results are qualitatively similar under alternative averaging schemes.

**Effects of legalization of marijuana.** Measures legalizing recreational marijuana took effect on 9 December 2012 in Washington, and on 10 December 2012 in Colorado. In Colorado, an additional Senate bill was passed on 28 May 2013 ('Inferences for Marijuana and Driving Offenses', HB 13-1325) limiting the amount of tetrahydrocannabinol a person can have in their bloodstream to 5 ng ml⁻¹. Below we describe the data-processing choices we made when examining the effects of marijuana legalization, and then provide additional detail to supplement the analyses reported in Results.

When calculating the proportion of stops that resulted in drug-related offences, we excluded all alcohol-related violations or those relating to drug paraphernalia or drug-related felonies. More specifically, we excluded the following violation

**JA0374**

# ARTICLES

**NATURE HUMAN BEHAVIOUR**

**Table 1 | Effects of legalization of recreational marijuana on search rates, as estimated using a difference-in-difference model. All race groups experienced a large drop in search rates**

| | Coefficient | s.e. | 95% CI | P value |
|---|---|---|---|---|
| Effect of legalization on white drivers | −0.96 | 0.02 | (−1.01, −0.92) | <0.001 |
| Effect of legalization on black drivers | −0.98 | 0.06 | (−1.09, −0.87) | <0.001 |
| Effect of legalization on Hispanic drivers | −0.69 | 0.03 | (−0.76, −0.63) | <0.001 |
| Time (years) | −0.04 | 0.00 | (−0.04, −0.04) | <0.001 |
| Black driver | 0.78 | 0.00 | (0.77, 0.79) | <0.001 |
| Hispanic driver | 0.59 | 0.00 | (0.58, 0.59) | <0.001 |

codes in Washington: 'Drugs paraphernalia—misdemeanor', 'DUI—Drugs W/Test', 'DUI—Drugs No Test', 'Veh Hom—DUI/Drug', 'Veh Assault—DUI/Drug', 'Drugs paraphernalia—felony' and 'Drugs—felony'. And, in Colorado, we excluded the following: 'Drove Vehicle While Under the Influence of Alcohol or Drugs or Both', 'Possession of Drug Paraphernalia' and 'Drove (Motor/Off-highway) Vehicle upon Highway When (License/Privilege to Drive) was Restrained for Express Consent or Alcohol/Drug Related Offense'.

Furthermore, when analysing search rates, we excluded impound, incident to arrest, protective frisk and warrant searches, as these types of search are not usually motivated by drug recovery. In Colorado, this means that we include both consent and probable cause searches. However, in Washington, we note that probable cause searches are barred because the state does not have an automobile exception for warrantless searches. For further context, it is acceptable in most states for police officers to conduct a (limited) warrantless search of a vehicle when officers have probable cause to believe that contraband or other evidence of a crime is in a vehicle, a policy known as the 'automobile exception' to the warrant requirement for searches. Washington, however, does not recognize this exception. Even if an officer has well-founded probable cause to believe that contraband or other evidence of a crime is in a vehicle, the officer still cannot search the vehicle without a warrant and must instead conduct the search pursuant to another exception to the warrant requirement, usually a driver's consent.

As discussed in Results, the proportion of stops resulting in a search fell substantially in both Colorado and Washington, while in 12 states where marijuana was not legalized, search rates did not show sharp drops at the end of 2012. To assess this pattern quantitatively, we fit the following difference-in-differences search model on the set of stops in the 14 states we consider here (Colorado, Washington and the 12 non-legalization states):

$$\Pr(Y_i = 1) = \text{logit}^{-1}\left(\beta_{\ell[i]}^{\text{state}} + \beta_{r[i]}^{\text{race}} + \beta^{\text{time}} t_i + \alpha_{r[i]}^{\text{race}} Z_i\right)$$

where $Y$ indicates whether a search was conducted, $\beta_{\ell[i]}^{\text{state}}$ and $\beta_r^{\text{race}}$ are state and race fixed effects and $\beta^{\text{time}}$ is a time trend, with $t$ a continuous variable in units of years since legalization (for example, $t = 0.5$ means 6 months post-legalization). The $Z$ term indicates 'treatment' status—that is, $Z_i = 1$ in Colorado and Washington for stops carried out during the post-legalization period, and $Z_i = 0$ otherwise. Thus the key parameters of interest are the race-specific coefficients $\alpha_r^{\text{race}}$. Table 1 lists coefficients for the fitted model. We found that $\alpha_r^{\text{race}}$ is large and negative for white, black and Hispanic drivers, suggesting that the observed drop in searches in Colorado and Washington was due to marijuana legalization in those states.

Despite marijuana legalization decreasing search rates for white, black and Hispanic drivers, Fig. 4 shows that the relative disparity between white and non-white drivers remains. In addition, Supplementary Fig. 3 shows that white drivers faced consistently higher search thresholds than black and Hispanic drivers, both before and after marijuana legalization. Supplementary Fig. 3 also shows that the threshold faced by all groups decreases after legalization (although not all drops are statistically significant). There are several possible explanations for this decrease. Officers may not have fully internalized the change of policy, searching people who would have been at risk of carrying contraband before legalization but who were no longer high risk after marijuana became legal. Alternatively, or in addition, officers may have become focused on more serious offences (such as drug trafficking), applying a lower threshold commensurate with the increase in the severity of the suspected crime. Finally, officers may have had more resources after being relieved of the task of policing marijuana possession, freeing them to make searches with a lower chance of finding contraband.

**Reporting Summary.** Further information on research design is available in the Nature Research Reporting Summary linked to this article.

## Data availability
All data to reproduce the findings of this study are available at https://openpolicing.stanford.edu.

## Code availability
All code to reproduce the findings of this study is available at https://openpolicing.stanford.edu.

Received: 23 August 2017; Accepted: 13 March 2020;
Published online: 4 May 2020

## References

1. Davis, E., Whyde, A.& Langton, L. Contacts between Police and the Public, 2015 (Bureau of Justice Statistics, 2018); http://www.bjs.gov/index.cfm?ty=pbdetail&iid=6406
2. Langton, L. & Durose, M. Police Behavior during Traffic and Street Stops, 2011 https://www.bjs.gov/content/pub/pdf/pbtss11.pdf (US Department of Justice, 2013).
3. Baumgartner, F.R., Epp, D.A. & Shoub, K. Suspect Citizens: What 20 Million Traffic Stops Tell Us about Policing and Race (Cambridge Univ. Press, 2018).
4. Glaser, J. Suspect Race: Causes and Consequences of Racial Profiling (Oxford Univ. Press, 2015).
5. Epp, C., Maynard-Moody, S. & Haider-Markel, D. Pulled Over: How Police Stops Define Race and Citizenship (Univ. of Chicago Press, 2014).
6. Antonovics, K. & Knight, B. A new look at racial profiling: evidence from the Boston Police Department. Rev. Econ. Stat. 91, 163–177 (2009).
7. Simoiu, C., Corbett-Davies, S. & Goel, S. The problem of infra-marginal ity in outcome tests for discrimination. Ann. Appl. Stat. 11, 1193–1216 (2017).
8. Anwar, S. & Fang, H. An alternative test of racial prejudice in motor vehicle searches: theory and evidence. Am. Econ. Rev. 96, 127–151 (2006).
9. Ridgeway, G. & MacDonald, J. Doubly robust internal benchmarking and false discovery rates for detecting racial bias in police stops. J. Am. Stat. Assoc. 104, 661–668 (2009).
10. Ridgeway, G. Assessing the effect of race bias in post-traffic stop outcomes using propensity scores. J. Quant. Criminol. 22, 1–29 (2006).
11. Ryan, M. Frisky business: race, gender and police activity during traffic stops. Eur. J. Law Econ. 41, 65–83 (2016).
12. Rojek, J., Rosenfeld, R. & Decker, S. The influence of driver's race on traffic stops in Missouri. Police Q. 7, 126–147 (2004).
13. Sm th, M. & Petrocelli, M. Racial profiling? A multivariate analysis of race traffic stop data. Police Q. 4, 4–27 (2001).
14. Warren, P., Tomaskovic-Devey, D., Smith, W., Zingraff, M. & Mason, M. Driving while black: bias processes and racial disparity in police stops. Criminology 44, 709–738 (2006).
15. Hetey, R., Monin, B., Maitreyi, A. & Eberhardt, J. Data for Change: A Statistical Analysis of Police Stops, Searches, Handcuffings, and Arrests in Oakland, Calif., 2013–2014 (Stanford Univ., SPARQ, 2016); https://sparq.stanford.edu/data-for-change
16. Voigt, R. et al. Language from police body camera footage shows racial disparities in officer respect. Proc. Natl Acad. Sci. USA 114, 6521–6526 (2017).
17. Chohlas-Wood, A., Goel, S., Shoemaker, A. & Shroff, R. An Analysis of the Metropolitan Nashville Police Department's Traffic Stop Practices https://policylab.stanford.edu/media/nashville-traffic-stops.pdf (Stanford Computational Policy Lab, 2018).
18. Gelman, A., Fagan, J. & Kiss, A. An analysis of the New York City Police Department's 'stop-and-frisk' policy in the context of claims of racial bias. J. Am. Stat. Assoc. 102, 813–823 (2007).
19. Baumgartner, F.R., Epp, D. A., Shoub, K. & Love, B. Targeting young men of color for search and arrest during traffic stops: evidence from North Carolina, 2002–2013. Polit. Groups Identities 5, 107–131 (2017).
20. Legewie, J. Racial profiling and use of force in police stops: how local events trigger periods of increased discrimination. Am. J. Sociol. 122, 379–424 (2016).
21. Grogger, J. & Ridgeway, G. Testing for racial profiling in traffic stops from behind a veil of darkness. J. Am. Stat. Assoc. 101, 878–887 (2006).
22. Pierson, E., Corbett-Davies, S. & Goel, S. In International Conference on Artificial Intelligence and Statistics (eds Storkey, A. & Fernando Perez-Cruz, F.) 96–105 (PMLR, 2018).
23. Becker, G. Nobel Lecture: the economic way of looking at behavior. J. Polit. Econ. 101, 385–409 (1993).
24. Becker, G. The Economics of Discrimination (Univ. of Chicago Press, 1957).
25. Ridgeway, G. Cincinnati Police Department Traffic Stops: Applying RAND's Framework to Analyze Racial Disparities (RAND Corporation, 2009); https://www.rand.org/pubs/monographs/MG914.html
26. Ayres, I. Outcome tests of racial disparities in police practices. Justice Res. Policy 4, 131–142 (2002).
27. Knowles, J., Persico, N. & Todd, P. Racial bias in motor vehicle searches: theory and evidence. J. Polit. Econ. 109, 203–229 (2001).

**JA0375**

**NATURE HUMAN BEHAVIOUR**                                                                 **ARTICLES**

28. Engel, R. S. & Tillyer, R. Searching for equilibrium: the tenuous nature of the outcome test. *Justice Q.* **25**, 54–71 (2008).

29. Mitchell, O. & Caudy, M. Examining racial disparities in drug arrests. *Justice Q.* **32**, 288–313 (2015).

30. Angrist, J.D. & Pischke, J.-S. *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton Univ. Press, 2008).

31. Goel, S., Rao, J. & Shroff, R. Precinct or prejudice? Understanding racial dispar ties in New York City's stop-and-frisk policy. *Ann. Appl. Stat.* **10**, 365–394 (2016).

32. Mummolo, J. Modern police tactics, police–citizen interactions, and the prospects for reform. *J. Polit.* **80**, 1–15 (2018).

33. Goel, S., Rao, J. & Shroff, R. Personalized risk assessments in the criminal justice system. *Am. Econ. Rev.* **106**, 119–123 (2016).

34. Jung, J., Concannon, C., Shroff, R., Goel, S. & Goldstein, D.G. Simple rules to guide expert classifications. *J. R. Stat. Soc. Ser. A* (in the press).

35. Corbett-Davies, S., Pierson, E., Feller, A., Goel, S. & Huq, A. Algorithmic decision making and the cost of fairness. In *Proc. 23rd ACM SIGKDD International Conference on Knowledge Discovery and Data Mining* (2017).

36. Friberg, B. et al. *Texas Troopers Ticketing Hispanic Drivers as White* (KXAN, 2015); https://www.kxan.com/investigations/texas-troopers-ticketing-hispanic-drivers-as-wh te/

37. Word, D., Coleman, C., Nunziata, R. & Kominski, R. *Demographic Aspects of Surnames from Census 2000* http://www2.census.gov/topics/genealogy/2000surnames/surnames.pdf (US Census Bureau, 2008).

38. Word, D. & Perkins, C. *Building a Spanish Surname List for the 1990s: A New Approach to an Old Problem* (Population Division, US Census Bureau, 1996).

39. *Melendres v Arpaio* (2009). 598 F. Supp. 2d 1025 (D. Ariz., 2009).

40. Arrow, K. in *Discrimination in Labor Markets* (eds Ashenfelter, O. & Rees, A.) 3–33 (Princeton Univ. Press, 1973).

41. Phelps, E. The statistical theory of racism and sexism. *Am. Econ. Rev.* **62**, 659–661 (1972).

42. Gelman, A., Carlin, J.B., Stern, H.S. & Rubin, D.B. *Bayesian Data Analysis* 2nd edn (Taylor & Francis, 2014).

43. Gelman, A., Meng, X.-L. & Stern, H. Posterior predictive assessment of model fitness via realized discrepancies. *Stat. Sin.* **6**, 733–760 (1996).

## Acknowledgements

We thank B. Bonilla, W. Kim, J. Nudell, S. Robertson and E. Sagara for their assistance throughout this project; we also thank A. Chohlas-Wood and A. Feller for their helpful feedback. This work was supported in part by the John S. and James L. Knight Foundation and by the Hellman Foundation. The funders had no role in study design, data collection and analysis, decision to publish or preparation of the manuscript.

## Author contributions

E.P., C.S., J.O., S.C.-D., D.J., A.S., V.R., P.B., C.P., R.S. and S.G. designed research, performed research, analyzed data, and wrote the paper.

## Competing interests

The authors declare no competing interests.

## Additional information

**Supplementary information** is available for this paper at https://doi.org/10.1038/s41562-020-0858-1.

**Correspondence and requests for materials** should be addressed to S.G.

**Peer review information** Primary handling editor: Aisha Bradshaw

**Reprints and permissions information** is available at www.nature.com/reprints.

**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

© The Author(s), under exclusive licence to Springer Nature Limited 2020

JA0376

# nature research

| | |
|---|---|
| Corresponding author(s): | Sharad Goel |
| Last updated by author(s): | Mar 6, 2020 |

nature research | reporting summary

# Reporting Summary

Nature Research wishes to improve the reproducibility of the work that we publish. This form provides structure for consistency and transparency in reporting. For further information on Nature Research policies, see Authors & Referees and the Editorial Policy Checklist.

## Statistics

For all statistical analyses, confirm that the following items are present in the figure legend, table legend, main text, or Methods section.

| n/a | Confirmed | |
|---|---|---|
| ☐ | ☒ | The exact sample size (*n*) for each experimental group/condition, given as a discrete number and unit of measurement |
| ☐ | ☒ | A statement on whether measurements were taken from distinct samples or whether the same sample was measured repeatedly |
| ☐ | ☒ | The statistical test(s) used AND whether they are one or two sided<br>*Only common tests should be described solely by name; describe more complex techniques in the Methods section.* |
| ☐ | ☒ | A description of all covariates tested |
| ☐ | ☒ | A description of any assumptions or corrections, such as tests of normality and adjustment for multiple comparisons |
| ☐ | ☒ | A full description of the statistical parameters including central tendency (e.g. means) or other basic estimates (e.g. regression coefficient) AND variation (e.g. standard deviation) or associated estimates of uncertainty (e.g. confidence intervals) |
| ☐ | ☒ | For null hypothesis testing, the test statistic (e.g. *F*, *t*, *r*) with confidence intervals, effect sizes, degrees of freedom and *P* value noted<br>*Give P values as exact values whenever suitable.* |
| ☐ | ☒ | For Bayesian analysis, information on the choice of priors and Markov chain Monte Carlo settings |
| ☐ | ☒ | For hierarchical and complex designs, identification of the appropriate level for tests and full reporting of outcomes |
| ☐ | ☒ | Estimates of effect sizes (e.g. Cohen's *d*, Pearson's *r*), indicating how they were calculated |

*Our web collection on statistics for biologists contains articles on many of the points above.*

## Software and code

Policy information about availability of computer code

| Data collection | All code to reproduce the findings of this study is available at:https://openpolicing.stanford.edu. |
|---|---|
| Data analysis | All code to reproduce the findings of this study is available at:https://openpolicing.stanford.edu. |

For manuscripts utilizing custom algorithms or software that are central to the research but not yet described in published literature, software must be made available to editors/reviewers. We strongly encourage code deposition in a community repository (e.g. GitHub). See the Nature Research guidelines for submitting code & software for further information.

## Data

Policy information about availability of data

All manuscripts must include a data availability statement. This statement should provide the following information, where applicable:

- Accession codes, unique identifiers, or web links for publicly available datasets
- A list of figures that have associated raw data
- A description of any restrictions on data availability

| All data to reproduce the findings of this study are available at: https://openpolicing.stanford.edu. |
|---|

# Field-specific reporting

Please select the one below that is the best fit for your research. If you are not sure, read the appropriate sections before making your selection.

☐ Life sciences   ☒ Behavioural & social sciences   ☐ Ecological, evolutionary & environmental sciences

For a reference copy of the document with all sections, see nature.com/documents/nr-reporting-summary-flat.pdf

October 2018

JA0377

# Behavioural & social sciences study design

All studies must disclose on these points even when the disclosure is negative.

| | |
|---|---|
| Study description | A quantitative study of traffic stop data. |
| Research sample | We analyzed data on traffic stops from 21 state patrol agencies and 35 municipal police departments in the United States. |
| Sampling strategy | We used all available data that were sufficiently complete to conduct our analysis. |
| Data collection | We collected the data in digital form through public records requests filed with the appropriate police agencies. |
| Timing | We continually collected data during the period 2014  2019. |
| Data exclusions | We did not exclude any data that were deemed sufficient to conduct our analysis. |
| Non participation | N/A |
| Randomization | N/A |

# Reporting for specific materials, systems and methods

We require information from authors about some types of materials, experimental systems and methods used in many studies. Here, indicate whether each material, system or method listed is relevant to your study. If you are not sure if a list item applies to your research, read the appropriate section before selecting a response.

| Materials & experimental systems | | Methods | |
|---|---|---|---|
| n/a | Involved in the study | n/a | Involved in the study |
| ☒ ☐ | Antibodies | ☒ ☐ | ChIP seq |
| ☒ ☐ | Eukaryotic cell lines | ☒ ☐ | Flow cytometry |
| ☒ ☐ | Palaeontology | ☒ ☐ | MRI based neuroimaging |
| ☒ ☐ | Animals and other organisms | | |
| ☒ ☐ | Human research participants | | |
| ☒ ☐ | Clinical data | | |

nature research | reporting summary

October 2018

2

**JA0378**

DEFENDANT'S EXHIBIT
C
3/8/2022



**McGUIREWOODS**

**McGUIREWOODS CONSULTING**
Public Affairs Solutions

# ZONING AND SEGREGATION IN VIRGINIA: PART 1

Why Virginia Needs a Study of Zoning Laws and Their Connection to Segregation

By the McGuireWoods Zoning and Segregation Work Group[1]



Source:
https://creativecommons.org/licenses/by-nc-sa/4.0/
https://dsl.richmond.edu/panorama/redlining/#loc=12/37.549/-78.538&city=richmond-va&text=about



## Executive Summary

### THE PROBLEM

Achieving racial justice in Virginia requires overcoming housing segregation. In many localities, neighborhoods are more racially segregated today than they were 50 years ago. Housing segregation affects education, job opportunities, family income, health and access to a quality life.

Elected officials throughout the United States, and Virginia lawmakers in particular, used zoning through most of the 20th century as a governmental tool to segregate African Americans. In combination with other discriminatory laws and governmental actions, zoning segregated Virginia communities. Zoning continues to reinforce patterns of segregation today despite the Fair Housing Act of 1968 prohibiting racial discrimination in housing. This historic and current housing segregation results in unequal access to civic resources.

Zoning laws now segregate communities by wealth and income. Because minority households statistically have less wealth as a direct result of segregationist zoning laws and other racially discriminatory policies, they are excluded from large parts of Virginia counties, cities and towns that are set aside for houses on large lots.

### CALL TO ACTION

Zoning and planning laws in Virginia need to be revised to help address the legacy of 20th-century racism. The primary reform should be to increase housing opportunities for all people throughout Virginia's localities. Most of this can be accomplished by changing zoning and planning laws to allow more housing choices. Appropriate reform can occur without diminishing local governments' power to plan and zone. Decades of experience with mixed-use and mixed-density zoning show that housing opportunities can be increased without reducing property values in established neighborhoods.

### THE STUDY

This paper documents the history of zoning and segregation in Virginia and the legacy of systemic racism preserved by zoning. Part 2 of the study will offer specific reforms to address this legacy.

### ABOUT MCGUIREWOODS' ZONING AND SEGREGATION WORK GROUP

We are a group of real estate and zoning lawyers, land use planners and government relations consultants who are concerned about continuing segregation in our communities. We have come together to bring our collective experience to research zoning and segregation and propose reforms to address the legacy of segregation. McGuireWoods' Zoning and Segregation Work Group, along with the firm's Racial Justice Task Force, strategizes with local leaders on how to work together to make racial equality a reality. The firm focuses on achieving long-lasting positive change in communities across the country where we live and work.

1,100 lawyers | 21 offices | www.mcguirewoods.com

**JA0380**

# 1.   Introduction

Zoning segregates. Zoning separates into geographic districts the different uses, different building sizes and, indirectly, people with different levels of wealth and income. A primary purpose of zoning and land use regulation is to protect residential property values from perceived threats. These threats range from the intrusion of industrial or commercial uses, to changes in the ethnic, racial or economic status of neighbors. When zoning began in Virginia 110 years ago, the primary perceived threats were from the mixing of races and the presence of African Americans in white neighborhoods. Although explicit racial zoning ended in 1917, the legacy of systemic racism continues today.

In many Virginia jurisdictions, neighborhoods are more racially segregated today than they were 50 years ago. A recent demographic study concluded: "While the overall percent of black Virginians remained constant from 1970 to 2010, in more than 60% of localities the percent of black residents declined across these 40 years."[2] It further stated: "Across Virginia's three metro areas, residential racial segregation endures at moderate to high levels, and the pattern of segregation noted by scholars at the height of segregation — largely black urban centers surrounded by largely white suburbs — persists."[3]



Charles Jones, chairman of ACCESS (Action Coordinating Committee to End Segregation) displays a map of segregated housing found around area service installations May 12, 1967. (Photo by Tom Kelley/The Washington Post via Getty Images)

Other factors such as redlining, private covenants, urban renewal, tax policies, etc., contributed to segregation during the 20th century,[4]  but zoning remains one of the few governmental actions that perpetuate segregation today.

Comprehensive plans and zoning ordinances throughout Virginia reinforce the division of residential areas by wealth and income. This reinforces racial segregation because of the wealth gap between white and minority populations. More importantly, this results in unequal access to civic resources including schools, parks, libraries, sanitation, transportation and other government services. Numerous studies have shown that, more than other factors, a child's residential ZIP code determines his or her educational and health outcomes.[5]  However, the postal code is just a label for a geographic area. The zoning districts largely determine the characteristics of a zip code by defining who can afford to live there.

Comprehensive plans and zoning ordinances can be changed to help remedy the legacy of racial and economic segregation without disrupting existing neighborhoods, mandating integration or spending public money. Many zoning districts have already evolved to allow mixed uses without harming property values or creating conflicts. The primary remedy for residential segregation is to allow more housing choices. This requires leadership at the state level to encourage and guide localities to make the needed revisions to their comprehensive plans and zoning ordinances.

---

[1] Scott Adams, Sheri Akin, Tracy Baynard, Grace Chae, James Dyke, Lori Greenlief, George Martin, Steven Mikulic, Greg Riegle, Jonathan Rak, Matthew Weinstein, Michael Van Atta.
[2] Michele Claibourn, Blacks in Virginia: Demographic Trends in Historical Context, Weldon Cooper Center for Public Service at p. 4 (2012).
[3] Id. at 6.
[4] Richard Rothstein, The Color of Law: A Forgotten History of How our Government Segregated America (2017).
[5] See Daniel W. Belsky et al., Genetics and the Geography of Health, Behaviour and Attainment (2019).

1,100 lawyers | 21 offices | www.mcguirewoods.com

## 2.    History of Zoning in Virginia

Zoning in Virginia began with racial segregation. The city of Richmond, using its charter powers, adopted the first ordinance dividing the city into separate blocks for white and "colored" in April 1911. Eleven months later, the General Assembly approved legislation enabling all cities and towns in Virginia to adopt segregation districts dividing blocks between white persons and "colored" persons.[6] Norfolk, Ashland, Roanoke, Portsmouth[7] and Falls Church[8] adopted similar residential segregation statutes following Richmond. The Supreme Court of Virginia upheld these segregation districts in *Hopkins v. City of Richmond*, 117 Va. 692, 86 S.E. 139 (1915). Two years later, the U.S. Supreme Court ruled in *Buchanan v. Warley*, 245 U.S. 60 (1917), that explicit racial segregation zoning was unconstitutional.

In the wake of the *Buchanan* decision, racial zoning gave way to the broader notion of a race-based comprehensive planning process and racially informed zoning districts. The first zoning enabling statute, following the 1912 racial zoning statute, passed in 1922 and allowed cities to divide their land into districts to regulate the use of land and of buildings.[9] This power was extended to towns (1926) and counties with higher population densities (1927).[10] The Buchanan decision undermined the use of zoning to segregate explicitly by race but not the use of the planning process in the service of segregation. After 1917, cities preferred to engage professional planners to prepare racial zoning plans and to marshal the entire planning process to create the completely separate Black community.[11] Some early comprehensive plans, such as the 1928 comprehensive city plan for Roanoke, specifically called out "Areas for Colored Population."[12]

Many of the first zoning maps in Virginia applied industrial zoning categories to areas of African American homes while applying residential protections to areas of white homes.[13]  The first zoning map of Alexandria applied industrial zoning to approximately 100 residential structures, the majority of which were occupied by "Negroes,"[14] even though only 20 percent of the population was African American.[15] Residential districts were also divided by minimum lot size and prohibitions on row houses[16] or apartments. The majority of land in most localities was zoned exclusively for "single family" housing. In most cases, a minority household could not afford to purchase a house on a large lot and was forced to live in a concentrated neighborhood of higher density.

Much of the new housing built after World War II was located in large suburban developments funded by federally insured loans. Even after the U.S. Supreme Court banned enforcement of racial clauses in deeds and mutual agreements in 1948, the Federal Housing Administration and other federal agencies continued to deny federal insurance for developments open to racial minorities. Even when a minority household could afford to buy a new suburban home, it was denied that opportunity due to governmental participation in systemic racism.

---

[6] 1912 Va. Acts Chapter 157.
[7] Roger L. Rice, *Residential Segregation by Law: 1910-1917*, 34 J. of Southern Hist., 179 (1968).
[8] https://www.tinnerhill.org/educational-resources/2018/2/15/civil-rights-history-tinner-hill
[9] 1922 Va. Acts Chapter 43.
[10] 1926 Va. Acts Chapter. 197; and 1927 Va. Acts Chapter. 15.
[11] Christopher Silver, *The Racial Origins of Zoning in American Cities*, in Urban Planning and the African American Community: in the Shadows (June Manning Thomas, Marsha Ritzdorf ed., 1997).
[12] Id.at 10.
[13]  See West Brothers Brick Company, Inc. v. Alexandria (1937) 169 Va. 271, 278.
[14]  Compare 1931 Alexandria Zoning Map and Real Property Survey and Low Income Housing Area Survey, Alexandria, Virginia, U.S. Works Progress Administration (1939).
[15] Krystyn R. Moon, *The African American Housing Crisis in Alexandria, Virginia, 1930s-1960s*, 124 Va. Mag. of Hist. and Biography, 28 (2016).
[16] Arlington's Land Use Policy and Zoning p. 3, Bulletin 4 Missing Middle Housing Study (2020).

1,100 lawyers | 21 offices | www.mcguirewoods.com



By the early 1970s, many of the struggles of earlier decades persisted throughout Alexandria and the Washington, D.C., metropolitan region. A 1970 report generated by the Washington Suburban Institute on nearby Fairfax County argued that "institutional racism and land development are tied tightly together. So far they have resulted in excluding blacks from residence in the suburbs, in denying them adequate services when they do already live there, in denying them access to suburban employment centers and in their being feared and ostracized in the neighborhoods where they do live or attempt to live."[17]

Although overt racism has been eliminated from zoning ordinances and comprehensive plans, the legacy of 20th-century racism remains.

## 3.   How Zoning Segregates Economically

Zoning separates people geographically by wealth and income. Although zoning does not directly set the price of housing, it determines the size and characteristics of housing that may be built in a particular area. Zoning is a regulatory tool that defines the permitted use of property and the permitted types and sizes of buildings for specific geographic zones. Most localities have a range of residential zoning districts, each with a maximum permitted housing density expressed as dwelling units per acre and floor area ratio.[18] Residential zoning districts also determine what types of housing are permitted, such as standalone homes (described as "single-family dwellings"), townhouses or apartment and condominium buildings. They prescribe maximum building heights, minimum yard sizes and minimum open space.

The amount of land needed for each house and cost of construction, in turn, largely determine the price. For example, here are the 2020 assessed average home prices in Fairfax County by housing type[19]:

**Single-family detached homes – $692,409**

**Townhouse/duplex properties – $437,346**

**Condominiums – $288,246**

Hall's Hill was one of at least eleven black neighborhoods created in the Civil War era. Hall's Hill is one of only three able to survive as an African American community into the twenty-first century.
Source: http://arlingtonhistoricalsociety.org/wp-content/uploads/2020/02/2015-3-Halls.pdf

Virginia's counties zone most of their land for low-density residential use. Fairfax County, the most populous county, sets aside approximately 79 percent of its land area for single-family housing.[20] Neighborhoods zoned exclusively for single-family detached housing are reserved for large lots and large homes, often with requirements for large yards. These restrictions limit the overall housing stock for large swaths of land, typically in an effort to preserve a rural or suburban character associated with low-density housing. Restricting the density of housing on large portions of a locality drives up housing prices by constraining supply. Consequently, zoning creates regulatory barriers to housing affordability and ultimately separates people by levels of wealth and income through the establishment of low-density residential zoning districts, often referred to as "exclusionary zoning." Exclusionary zoning greatly exacerbates economic segregation by lowering overall housing production and by lowering the percentage of multifamily units in many suburbs.[21]

[17] C. Cunningham, Land Development and Racism in Fairfax County (1970).
[18] Floor area ratio equals building floor area divided by land area.
[19] 2020 Real Estate Assessments Now Available; Average Residential Increase of 2.65%.
[20] Fairfax County Geographic Information System (2020).
[21] Amab Chakraborty et al., The Effects of High-density Zoning on Multifamily Housing Construction in the Suburbs of Six US Metropolitan Areas, 47 Urb. Stud., 43 (2010).

**JA0383**

Segregation of housing by wealth and income perpetuates itself from generation to generation. Especially for lower- and middle-income Americans, home ownership was a primary means of building wealth in the 20th century and remains so today.[22] Families who own their homes through mortgages subsidized by federal tax policy build wealth, which they pass on from generation to generation. Children raised in neighborhoods with high housing prices attend better schools and generally receive disproportionate benefits of "public goods."[23]

Adequate housing is fundamental for individual success, including employment, schooling, childcare and health.[24] At the same time, the extremely high cost of housing is a well-documented issue in Virginia.[25] Most families and individuals spend more on housing than anything else, with average households devoting one-quarter to one-third of income to housing expenditures, while lower-income households commonly devote up to half of their incomes to housing.[26]

The high cost of single-family housing and related effects on certain lower-income populations is further exacerbated by the geography of sprawling suburban neighborhoods.[27] The prevalence in suburbs of large, single-family detached homes that are too expensive and spatially removed for lower-income households to consider not only propagates urban fringe development and sprawl, but also perpetuates disenfranchisement.[28] The potential for accessible employment opportunities, quality education, safety and access to public services are ultimately affected by a home's geography.[29]

## 4.  How Zoning Segregates Racially

Zoning also contributes to racial segregation. As discussed above, zoning was one of the tools of explicit segregation in the 20th century. Today, zoning does not explicitly segregate; however, the legacy of segregation is perpetuated by the preservation of wealth and income segregation discussed above. Richard Rothstein's important book — "The Color of Law: A Forgotten History of How Our Government Segregated America" — provides a comprehensive history of how segregation enforced by federal, state and local laws created a wealth gap. In 2016, the net worth of a typical white family was *nearly 10 times greater* than that of a Black family.[30]

Simply stated, the wealth gap between white and minority populations perpetuates racial segregation. The previously described disparities in generational wealth have disproportionate impacts based on race. Underrepresented households initially precluded from living in single-family neighborhoods were deprived of opportunities to build generational wealth. The legacies of this deprivation of generational wealth continue to impair the ability of marginalized populations to pursue single-family housing as housing prices continue to rise. Single-family zoning districts include the same single-family neighborhoods with restrictive covenants specifically preventing minority residents from moving into the area. It can be said that there is a resulting dual housing market, reinforcing the racial disparities in the free housing market.[31]

[22] Is Homeownership Still an Effective Means of Building Wealth for Low-income and Minority Households? Joint Center for Housing Studies, Harvard University (2013).

[23] Jessica Trounstine, Segregation By Design: Local Politics and Inequality in American Cities (2018).

[24] Sheila Crowley, The Affordable Housing Crisis: Residential Mobility of Poor Families and School Mobility of Poor Children, 72 J. of Negro Educ., 22 (2003).

[25] Wyatt Gordon, Debate around statewide definition of affordable housing belies larger crisis, Virginia Mercury (Sep. 28, 2020), https://www.virginiamercury.com/2020/09/28/debate-around-statewide-definition-of-affordable-housing-belies-larger-crisis/

[26] John M. Quigley and Steven Raphael, Is Housing Unaffordable? Why Isn't It More Affordable? 18 J. of Econ. Perspectives, 191 (2004).

[27] Robert Lang and Paul K. Knox, The New Metropolis: Rethinking Megalopolis, 43 Regional Stud., 789 (2009).

David R. Morgan, and Patrice Mareschal, Central-City / Suburban Inequality and Metropolitan Political Fragmentation, 34 Urb. Aff. Rev, 678 (1999).

[28] Rachel Garshick Kleit and Martha Galvez, The Location Choices of Public Housing Residents Displaced by Redevelopment: Market Constraints, Personal Preferences, or Social Information? 33 J. of Urb. Aff., 375 (2011).

[30] Examining the Black-white wealth gap, Brookings Institution (2020).

[31] Fairfax County, Virginia Analysis of Impediments to Fair Housing Choice 2016-2020, September 2017.

1,100 lawyers | 21 offices | www.mcguirewoods.com



Minority households are confined to poorer neighborhoods as a result of exclusionary zoning, furthering racial segregation and disparities.[33] Simultaneously, aging, ethnic and low-income suburbs often lose the battle for investment resources, generating poor employment access, lower educational achievement and other spatial disparities. These issues perpetuate the wealth gap and restrict the ability of minority households to pursue other housing options.

Conversely, offering a range of housing types, including "missing middle" housing types, provides options to meet demographic changes and promote diversity in communities. Numerous localities across the United States have acknowledged the direct relationship between zoning and racial inequity, and have made legislative and policy changes to provide additional housing options for a broader range of residents, particularly in single-family neighborhoods.[34] Incentivizing missing middle housing in single-family zoning districts in particular can create more affordable housing options, address segregation and inequality, and moderate overall housing costs.[35] Ultimately, housing is a racial justice issue, and exclusionary zoning practices have had a significant impact on wealth and racial inequity. Expanding housing choices is a crucial step to addressing these ingrained inequities.

## 5.    Remedies for Segregation

As noted above, comprehensive plans and zoning ordinances throughout Virginia reinforce the division of residential areas by wealth and income. This type of economic segregation places limits and boundaries on transportation, employment opportunities, decent healthcare and schools. In Part 2 of this report, McGuireWoods' Zoning and Segregation Work Group will offer recommendations to change comprehensive planning and zoning laws to help remedy the legacy of segregation.

## 6.    Conclusion

Zoning and planning laws in Virginia need to be revised to address the legacy of 20th-century racism. The primary reform should be to increase housing opportunities for all people throughout Virginia's localities. Most of this can be accomplished by changing zoning and planning laws to allow private sector developers to finance and construct new housing. Appropriate reform can occur without diminishing local governments' power to plan and zone. Decades of experience with mixed-use and mixed-density zoning show that increased housing opportunities can be provided without reducing property values in established neighborhoods.

*McGuireWoods' Zoning and Segregation Work Group, along with the firm's Racial Justice Task Force, strategizes with local leaders on how to work together to make racial equality a reality. The firm focuses on achieving long-lasting positive change in communities across the country where we live and work.*

[33] John Rennie Short, Bernadette Hanlon, and Thomas Vicino, *The Decline of Inner Suburbs: The New Suburban Gothic in the United States*; 3 Geography Compass, 641 (2007).
[34] The Missing Middle Housing Study, The Montgomery County Planning Department, The Maryland-National Capital Park and Planning Commission, September 2018.
[35] Single-family Zoning in the District of Columbia, District of Columbia Office of Planning, April 2020.

### Key Contacts

**JONATHAN P. RAK**
**PARTNER**
Real Estate & Land Use
jrak@mcguirewoods.com
+1 703 712 5411
Tysons

**JAMES W. DYKE, JR.**
**SENIOR ADVISOR, MWC**
State Government Relations
jdyke@mwcllc.com
+1 703 712 5449
Tysons

1,100 lawyers | 21 offices | www.mcguirewoods.com



DEFENDANT'S EXHIBIT

D

3/8/2022

## *Why is Richmond still segregated?*

Richmond Times Dispatch (Virginia)

May 3, 2015 Sunday

2 Edition

Copyright 2015 Richmond Newspapers, Inc. All Rights Reserved

**Section:** COMMENTARY; Pg. 1E

**Length:** 8081 words

**Byline:** Staff

## Body

The 56th RT-D Public Square drew a standing-room-only crowd for a dynamic discussion that looked back and forward: Why is Richmond so segregated? Held at The Times-Dispatch building on East Franklin Street, the daytime Square ran past its 90-minute deadline, fueled by a deep but civil discussion about one of Richmond's most confounding legacies.

Moderated by Times-Dispatch Publisher Tom Silvestri, the conversation began with presentations from John Moeser, a senior fellow at the Bonner Center for Civic engagement at the University of Richmond and an eminent professor of urban studies, and by Heather Mullins Crislip, president and CEO of Housing Opportunities Made Equal, a Richmond Region nonprofit that advocates for equal access to housing for everyone. Victor Branch, a member of the HOME board and the Richmond market president for Bank of America, spoke, as did Richmond Commonwealth's Attorney Michael Herring and Times-Dispatch columnist Michael Paul Williams. A vigorous session of questions and comments ensued. Today, we present some highlights. You can watch a video of the entire event on Richmond.com.

\*\*\*

Tom Silvestri, publisher: ... We're going to explore, with your help, the issue of modern-day segregation in the region. We coincidentally have picked this topic because April is National Fair Housing Month. ... So in broad strokes today, why is Richmond still segregated? We'll explore the history. We'll understand some answers. We'll take some questions. And we'll explore reasons. We'll start by having a conversation with four speakers. ...

We have a renowned professor of urban studies who's been at this issue for many years. We have an attorney and an advocate for fair housing. We have a banking executive, who's orchestrated programs to reward neighborhood progress. And also with us is probably one of the main reasons you read The Times-Dispatch, a longtime journalist who writes about Richmond from the perspective of being a native Richmonder. ...

JA0387

Why is Richmond still segregated?

So let me introduce our first speaker. ... John Moeser, a senior fellow at the Bonner Center for Civic Engagement at the University of Richmond, and a professor emeritus of urban studies and planning at VCU. ... John will give an overview of what led to Richmond becoming more segregated in the 20th century than it was in the 18th and 19th.

***

John Moeser: ... Today, Richmond is more segregated than it was in the 19th century. Remember, the 19th century was the period that included institutionalized slavery - and led Richmond to become the largest interstate slave market in the South. Yet when you examine 19th century maps that show where African-Americans lived, both free and slave, one is struck that the spatial distribution of race was scattered. Domestic servants lived near the places where they worked. Sometimes in separate quarters of their master's house. Slave owners who had a surplus of slaves - or slaves who otherwise would have been idled after planting and harvesting - would hire out slaves to work in Richmond's factories. Slaves had to find their own houses in the city, and so they often sought out places closest to work. Fundamentally, however, blacks and whites lived in proximity to each other, because for most of the 19th century Richmond was a small, geographically compact, walking city. That didn't change until the last quarter of the century, when, as you know, Richmond acquired the first commercially successful streetcar system.

The reason we're more segregated today is because of what happened in the 20th century. Blacks were no longer slaves, at least in the legal sense. They were hemmed in ... by Jim Crow laws that for many amounted to slavery. Richmond was the second city in the United States to adopt a race-based zoning code. It's interesting that it was a northern city that first adopted a race-based zoning code. It was Baltimore. In 1910, the city of Richmond zoned neighborhoods by race. Neighborhoods for whites, and neighborhoods for blacks. It was not long thereafter that the United States Supreme Court ruled that zoning law unconstitutional. But that ruling did not affect private individuals or private businesses. And that's when you began to see a reliance on private covenants, which I'll talk about in just a moment. In the 1920s, Richmond tried again to zone neighborhoods by race. But instead of referring to people by race, which they couldn't do now under that Supreme Court ruling, the zoning code referred to Virginia's Racial Integrity Law, that forbade interracial marriage. People could not live in neighborhoods whose residents they could not marry because Virginia forbade interracial marriages. Blacks couldn't live in white neighborhoods, or vice versa.

By the 1930s, Richmond neighborhoods were thoroughly segregated. Though the preservation of segregation now fell to local bankers and realtors, since the Supreme Court decisions forbade city government to use its own law-making authority to separate neighborhoods. Restrictive covenants, which I'd mentioned earlier, which had been used for years, proved to be particularly effective. These were restrictions written into the deeds of privately owned homes that prohibited white homeowners from selling their houses to blacks. And in many instances, to Jews. In 1948, the Supreme Court ruled again and nullified the use of these racist covenants. From the 1930s through the early 1960s, one of the major drivers of segregating neighborhoods was none other than the federal government itself. Urban planners were their accomplices. Redlining the construction of public housing and the location of public housing, highway construction, urban renewal, and economic development projects destroyed or bisected Richmond's black neighborhoods, displacing thousands of low income African-Americans, and squeezing them into East End Richmond, where most of the public housing has been located. Today, Richmond is more segregated

Why is Richmond still segregated?

than ever. This time by race, but more particularly by class. And the distances separated wealth and poverty are unprecedented.

***

Silvestri: ... Next up, we welcome Heather Mullins Crislip, who is the president and CEO of Housing Opportunities Made Equal. She'll give an overview ... and a detailed look of what we're talking about from the ground level.

Heather Mullins Crislip: ... I serve as president and CEO of Housing Opportunities Made Equal, also known as HOME. We are one of the oldest and largest private fair housing organizations in the country. And we've made very significant contributions to the national conversation on fair housing and on segregation. ... Segregation isn't an accident of history, or a matter of preference or choice. I hope to illuminate parts of the more modern history that brings this to light, and that afterwards we can discuss how to create a community that offers the same opportunity for housing and wealth creation to everyone. ...

In the wake of the Great Depression, and following a foreclosure crisis just like we experienced recently, the federal government established the Homeowner's Loan Corp., or sometimes known as HOLC. The purpose was to prevent foreclosures and to refinance mortgages. Until that time, mortgages typically were interest-only and culminated in a balloon payment, typically about five years after you purchased the home. And you can imagine how that limited everybody's opportunity for home ownership and wealth-creation, because not very many middle-class or even upper-middle-class families could accept terms like that and be able to manage them. The HOLC provided public underwriting for private mortgages and greatly extended the amortization period: from 15 to 25 years, offering a longer time frame for repayment, and a lower interest rate. The program is credited for saving over 1 million homes during the Great Depression and is the foundation of the 30-year standard mortgage that we come to expect today - and for establishing the home as the wealth-creation mechanism for the middle class.

It also is credited with coining the phrase "redlining." Redlining refers to the practice of denying or charging more for services like banking and insurance in minority neighborhoods. In the case of the HOLC ... in 239 cities used red lines to delineate neighborhoods not fit for investment. So, unfit to receive underwriting for standard mortgage financing. The HOLC graded neighborhoods based in significant part on their racial composition. ...

Areas outlined in red were graded D and were predominantly African-American and found in the inner city. And they therefore were ineligible for government-financed standard loans. Areas labeled type C were classified as working class and contained a larger number of whites. The vast majority of areas graded type A or B were populated solely by whites and were the areas that the HOLC was primarily targeting for mortgage underwriting. The underlying racism of the HOLC grading system, and the resulting lack of private investment in predominantly African-American neighborhoods, set us up with valuation systems for properties that still haunt us today. Neither the income of African-Americans living there nor their social class mattered. ... Jackson Ward, as you know, was considered the black Wall Street of the South. It was home to fabulous housing stock and gainfully employed residents. But it was graded D, and ineligible for public underwriting for mortgages.

Why is Richmond still segregated?

 Redlining spread to the entire mortgage industry, excluding African-Americans from the most legitimate means of obtaining a mortgage - and the wealth creation and stability that home ownership affords. Every single African-American neighborhood in Richmond was graded D. And only two non-African-American neighborhoods were graded that way. ... Redlining paralyzed these communities, because they could no longer be financed. This meant that they would have lower property values. And others feared the loss of property values in their own communities, if their own communities integrated and financing became unavailable. This financial reality fueled fears of integration.

 With plummeting property values in African-American neighborhoods, and private financing not available because it couldn't be underwritten, this is the other half of the U.S. housing policy story in Richmond. ... Instead of privately financed opportunities to create wealth through home ownership, there was the development of public housing. As part of Harry Truman's Fair Deal, the Housing Act of 1949 effectively served to concentrate poverty in the inner city, through the construction of public housing. By and large, public housing units were constructed in neighborhoods receiving a grade D by the HOLC. Since that time, efforts for federal housing subsidies have been relegated largely to the neighborhoods with the greatest poverty rates - in effect, containing poverty to the inner city. ... This focus on providing housing subsidies to residents most in need in receiving them is not misplaced. However, the unintended consequences of prolonged, concentrated poverty, are a serious detriment to the health of the region. ... This concentration is greatly exacerbated by the lack of a regional public transit system, which prevents residents of all income levels from accessing housing opportunities throughout the region. ...

 White flight is the next chapter, following the United States Supreme Court's decision in 1954. Brown v. Board of Education declared state laws which established separate public schools for black and white children unconstitutional. While Richmond wasn't home to the worst of massive resistance, instead white families retreated to Henrico and Chesterfield counties and attempted to resist racial and ethnic integration. ...

 This was a massive, massive shift. Between 1960 and 1970, the white population in Henrico County increased by 29 percent. For the following three decades, until 2000, the white population consistently decreased in Richmond. There are whole neighborhoods, like Highland Park, that turned over nearly 100 percent in 10 years. Blockbusting, a term for the business practice of encouraging whites to sell simply by implying that racial minorities are moving into the neighborhood, was employed. This fear was fueled by the implication of decreased property values, as established by redlining of financial underwriting in the previous decades.

 In the period between 1970 and 1980, the percentage of whites in Chesterfield increased 85 percent. And from 1980 to 1990, the percentage increased by 41 percent. During these same periods, the percentage of whites in Richmond decreased by 27 percent and 16 percent, respectively. As Tom mentioned, April is Fair Housing Month. But there's a story behind that as well. This is because the Fair Housing Act was passed in April of 1968, just one week following the assassination of Martin Luther King Jr. Preventing housing discrimination had been proposed for years, but had not had the votes to pass or be included in the landmark 1964 Civil Rights Act. Martin Luther King had been a big proponent of fair housing, and was conducting testing to demonstrate the rates of housing discrimination, in just the weeks prior to his assassination. And Lyndon Johnson thought that the passing of the act

Why is Richmond still segregated?

was a fitting memorial as the cities rioted. The Fair Housing Act prohibits discrimination in a housing transaction because of your membership in a protected class. And I've listed up there the protected classes. ...

The act made redlining illegal. But the practices continued. And the effects of the decades-long underinvestment left a huge debt in African-American neighborhoods. HOME was founded shortly thereafter, and quickly established itself as an aggressive enforcer of the act. In the 1980s, we won a U.S. Supreme Court case, Havens Realty Corp. v. Coleman, that is largely considered one of the most important fair housing cases in the country. It allows private fair-housing organizations to challenge racial discrimination in court, establishing the private enforcement of the law, which is still the primary way in which the Fair Housing Act is enforced today. And not so long ago, in 1998, HOME also won the only redlining case ever to go to trial in Virginia, against Nationwide Insurance, for redlining African-American neighborhoods in the provision of homeowner's insurance. The jury verdict in that case was the largest award ever in the United States in a fair housing case and was cited for major reforms in the homeowners insurance practice across the country.

I'm going to fast-forward a few decades now, to talk a little bit about the impact in the most recent housing crisis. ... The sub-prime lending spree that precipitated the foreclosure crisis, and the near-collapse of the U.S. economy, had disastrous effects on minority neighborhoods across the country. Touted as a way to expand homeownership opportunities to families that wouldn't qualify for traditional mortgage products, sub-prime lending had the effect of stripping away any remaining wealth in minority neighborhoods. Remember that traditional financing has historically been difficult to obtain in these communities. But now, there is another threat. And that is reverse redlining. Which is the targeting of minority communities for inferior loan products. ...

According to publicly available mortgage data, from 2004 to 2011, 107,000 home mortgages were originated for owner-occupied purchases in the Richmond region. ... Of those 107,000 loans, 12 percent, or about 13,000, were considered subprime. Comparing these loans against the minority composition of the neighborhoods in which they were made reveals startling disparities. Subprime loans accounted for just 5 percent of the total number of loans made in neighborhoods having less than 20 percent minority population. In contrast, subprime loans constituted 31 percent of the total number of loans in neighborhoods having greater than 20 percent minority population.

Not only is it clear that minorities who got loans were more likely to receive a subprime loan than their white counterparts, they were also more likely to be denied outright. In 2006, at the height of the lending frenzy, blacks were denied home purchase loans nearly 19 percent of the time, compared to just 6 percent of whites. Nationally, the Center for Responsible Lending found that even taking into account individual credit scores and other characteristics, Hispanic and African-American borrowers were more than 30 percent more likely to receive a subprime loan, regardless of their credit.

This is the other half of the housing crisis story. With subprime loans, we ended up with large numbers of foreclosures. Subprime mortgages nationally made up for about 60 percent of the foreclosures during the housing crisis. The subprime mortgage lending industry was, by and large, nonselective when it came to originating inferior mortgage products. And the majority of subprime loans made in the region were to whites, because they make up a large majority of the overall mortgage market. However, there are numerous high-profile examples that exist that

Why is Richmond still segregated?

show that subprime lenders purposely targeted minority neighborhoods and communities throughout country. In Richmond, our segregated housing patterns, subprime lending, the collapse of the economy, and the resultant foreclosure epidemic disproportionately impacted African-American neighborhoods in our region. ...

Given the fact that there are three times as many white homeowners in the region as there are African-American, the concentration of foreclosures in predominantly African-American neighborhoods is reason for serious consideration as to the future of wealth-building opportunities provided to minorities in our region. Even if foreclosures represented nothing more than a one-time cost to the families, these findings would be very troubling. But the costs are extensive, multifaceted and long term, extending far beyond individual families to their neighborhoods, their neighbors, communities, the cities and the states. To have this damage concentrated in the same neighborhoods that we have historically underinvested in is devastating.

I hope that what you can see is that we still have two systems in place. One where private and stable, inexpensive financing is available to allow middle-class families to create wealth, and one where we developed public housing without the opportunity for wealth creation, and private financing and wealth creation still fall short. Both systems took public investment. But the opportunities that they've created for citizens are vastly different. And the lingering financial and social costs are huge.

My final observation is this: Public policy on housing established these systems and the very real fears that integration caused property values to drop. The legacy is much lower home ownership rates for African-Americans in the region. The most recent data shows this isn't changing post-housing crisis. In the city of Richmond, where 40 percent of the population is white, whites received 70 percent of the home-purchase and refinanced loans in 2013. The wealth and prosperity of the region depends on creating opportunities for stability and wealth-creation for our families. And for all of our families. And building a housing system that supports that goal is really critical.

***

Silvestri: ... I don't know whether this is a good segue for a bank executive. (LAUGHTER) But you're a brave man, Victor Branch, who has a new job of being the market president for Bank of America, and will share his perspective.

Victor Branch: I am a brave soul to come behind Heather after those sobering statistics. ... I wear two hats today. One as the Bank of America leader in the Richmond region, my paid full-time job. But my other job, full-time job, is serving on the board of Housing Opportunities Made Equal. I have been a part of that organization since the mid-'90s and am so proud of the work that they have produced over these many, many years. ... So I come to you with my passion for fair and equal housing. And I don't carry the whole industry's weight on my shoulders today, given our history in giving those statistics. But I say the future is bright. ... The inspiring thing about realizing that our segregated patterns are the result of policy decisions is that we have the opportunity to change them. We own this, people. There are things that we can do to have a more prosperous and integrated community. Chief among them are the development of more affordable housing in high-opportunity neighborhoods. And for my industry, providing credit and home ownership opportunities to everyone in the community. It makes good business sense. (APPLAUSE). I've been a proud member of the board of Housing Opportunities Made Equal for many years,

JA0392

Why is Richmond still segregated?

because fair housing has the power to transform communities. In addition to their critical work enforcing the fair housing laws, they also provide much-needed services to vulnerable populations in our community. HOME provides home ownership education to about 300 low- and moderate-income individuals annually, and also provides foreclosure prevention services with the support of banks like Bank of America, to those 300 individuals.

 This work is critical to getting to the inequalities we just heard about. Brandeis University released a 25-year study in 2013 that ... demonstrated why lagging home-ownership rates by African-American and lagging property values in African-American neighborhoods matter. They tracked 1,700 individuals for 25 years and found that the total wealth gap between the white and African-American families nearly tripled, increasing from $85,000 in 1974, to $236,000 in 2009. Their key finding was that the biggest cause of those inequities was from the difference in housing. In particular, they cited as the largest factors as having the ability to live in neighborhoods where values are likely to increase, and the number of years ownership. We have to figure out how to take on these issues as a community. And I know that Richmond, happy RVA, has the ability to do this. ...

*** 

 Silvestri: Michael Paul Williams, will you please join me and give your perspective? You've been covering this a long time, and you are the native Richmonder here. ... You're an objective journalist but you have a column. You've seen it on both sides. What's your perspective on this issue?

 Michael Paul Williams, Times-Dispatch columnist: ... I lived in Byrd Park. Back then, we called it the West End. (LAUGHTER) Yeah, the real West End. I lived in a house less than half a block from Fountain Lake in Byrd Park. And a beautiful neighborhood for a kid to grow up in the late 1950s, early 1960s. Totally black neighborhood. And at some point, my Mom told me that when she moved into the neighborhood in the 1950s, as it turns out not coincidentally after Brown, when a lot of these forces were at work, she was the second black homeowner to purchase a house in that neighborhood. This is Maplewood Avenue. And six months later, it was an entirely black community. So, that speaks to the blockbusting that was going on.

 But I didn't know that. I was a kid. I was delighted to live in such close proximity to Byrd Park, Maymont park. I guess probably at one point, I may have wondered, "Why do we have such a great neighborhood? Why would anyone give this up?" So, it was paradise. And I lived this paradise for the first nine or 10 years of my life, and then I was told we were moving. And I was just crestfallen. I mean, for one, I was leaving my friends. But I was also leaving this wonderful environment. And around this time, we just started hearing talk about the expressway. The expressway. They were building the downtown expressway, and it would shave off a good chunk of Byrd Park near the lake, take out blocks of Grayland and Parkwood Avenue. The barbershop that I would go to was on Davis Avenue, between Rosewood and Idlewood. That was gone. Some of the homes were taken out. So our home would have been spared. It was spared. It stays till this day. My Mom's like, "I can't deal with this construction. My nerves are bad. I don't want to be a part of this. We're moving."

 So in October 1967, we moved out to Henrico County, out to Glen Allen. Old Glen Allen. The real Glen Allen. (LAUGHTER) But lest you think that this represented some time where, "Oh, OK, we're close to the Fair Housing

JA0393

Why is Richmond still segregated?

Act, and they're moving out to this integrated (neighborhood)," no. The neighborhood we moved out into in Henrico was every bit as black as the neighborhood we left in the West End. It was off Hungary Road. So, I moved from one neighborhood to the next. And it was a very nice neighborhood. New homes. Some of the most prominent African-Americans in Richmond. Judge (James) Sheffield lived across the street. ... Just kind of a little post note - a few years after we moved out, what would be one of the few really concentrated public housing communities that I would ever see in Henrico was built right behind our neighborhood. Try to imagine that. Our neighborhood at one point in the 1960s was being pointed to as an example of one of the most affluent black neighborhoods in the South. And here we have a public housing community going up right behind it. Which I guess speaks to the kind of investment and disinvestment that was going on.

***

Michael Herring, Richmond commonwealth's attorney: ... The last time I was watching this data (being presented), I have to admit to you, a lightbulb goes off. I'm thinking, "Oh, my gosh. Where have I seen these images before?" And I knew I had seen them through Heather's presentation. But then it occurred to me, I've seen them at intel meetings with the police department. There are two maps (in the booklet that HOME passed out to the Public Square audience). One shows poverty rate and school segregation. The image on page 23 shows what I like to call "opportunity deserts and poverty reservoirs." What's fascinating to me is that the concentration of violent crime, and therefore the disproportionate consumption of taxpayer dollars for crime fighting, is in the same areas where you see the opportunity deserts, and the disparity in income and educational resources.

And so I'm sitting there going, "Oh, my gosh. Oh, my gosh. What is the implication for me?" And what I have come to conclude - and this is probably not going to sit well with a lot of folks in this audience - is that the business that I am in is in a business to nowhere. People grade the effectiveness of law enforcement in several ways. One of them is to eliminate or reduce crime. Another is to eliminate offenders from the community. And the principle way that we do that is to incarcerate them or felonize them.

Felons cost you money. Whether you incarcerate them or support them as second-class citizens down the road, felons are more expensive, because their capacity to yield is significantly diminished as a result of the felony. The felony rate in the opportunity deserts is sky-high. The felony rate in the areas where there's so much disparity in income and educational resources is sky-high. And so I'm really struggling with how to do this. But I've got a feeling that Richmond is going to derive a much higher yield if we felonize as a last resort. Wait a minute, because it's complicated. As opposed to letting felonies be the default.

And you don't have time for me to go on and on about this. But I don't know how to do it yet. Because we don't have systemic alternatives to the crime-fighting model that we have in place.

***

Ted Groves, Richmond: I'm the Kids Count director of Voices for Virginia's Children. ... We monitor the well-being of Virginia's children by each locality over time, on about 100 indicators of child well-being. And we're in the middle of producing a report that looks at the disparity of child economic well-being through a lens of race, place and family

Why is Richmond still segregated?

structure. And if we look at how children are doing in Virginia overall, things look reasonably OK. But when you disaggregate this data by race, place and family structure, we see these huge disparities - in poverty and near-poverty. And those factors kind of interrelated. One of the areas that we see an effect on children is segregation and poverty. And particularly in education. Education's always been the cornerstone of freedom and democracy, and economic security. But our children are hampered by segregated neighborhoods, with locally controlled schools, largely locally funded schools, that are segregated by race and socio-economic status: 71 percent of the black children of Virginia go to predominantly black schools. That's quite a bit of segregation in this day and age. And those schools are largely underfunded. We have seen segregated urban schools with concentrated poverty. Research shows us that children just do not do well in schools with concentrated poverty. The education research ... says that the largest influence for performance of kids is concentrated poverty in the schools, more so than the individual poverty status of kids.

 The children in Virginia, disadvantaged children, have twice the disparity level of children that aren't disadvantaged, in reading at the third-grade level. And we know that reading's important at the third-grade level for long-term success and academic success of kids. To sort of sum it up, ... let me just say that segregated neighborhoods result in segregated schools, which result in segregated outcomes for kids by race and socio-economic status.

   ***

 Walt Pulliam Jr., Henrico: How does regentrification, such as Church Hill or Woodland Heights, play into this issue?

 John Moeser: Gentrification of neighborhoods is contributing to suburban poverty. The increases in rents in many of the neighborhoods as income goes up - income is going up, in many heretofore high-poverty census tracts. Income is going up, poverty is going down in some of those census tracts. And there are only two places where people now can find any supply of affordable housing.

 One place is South Richmond. But most often, and where you have the greatest supply, are the inner suburbs of Henrico and Chesterfield counties. And so what you have is, as the income goes up in the city, and in some cases as poverty begins to go down, it's like squeezing a balloon. The poverty begins to spread out into the suburbs. And in those areas, income just crashes.

 The fortunes now between the city and the suburbs have been completely reversed. But to put a positive note on this, I view, right now, gentrifying neighborhoods as a wonderful opportunity, if we will take advantage of it. Fundamentally, in my view, what we need are mixed-income neighborhoods. No more separation, no more segregation. Where people live in community. People of different incomes. Now, if we very purposely develop affordable housing in those gentrifying census tracts, you can achieve that.

   ***

 Martha Rollins, Richmond: As I look at the history in this - I live in Byrd Park. Same house for 45 years. Belong to the Carillon Civic Association, which has sort of an exciting history in this housing thing. But looking at the history of

JA0395

Why is Richmond still segregated?

our country and our city, so much of where we are today has been intentional, beginning in the 1600s, in money trumping humanity. And I just wonder if it's time for in some way to throw into the mix the question of restitution, in a way that we could not just change policy, but try to make amends for our many, many mistakes.

\*\*\*

David Lindsay, Richmond: I live in Ginter Park. And I'm a graduate of John Marshall High School. I have a scholarship fund in my name that I give every year for education. ... A better solution to this problem, for me, is educating the kids. And by educating your kids, then you're going to get a better person. And with that better person, they may not stay within that region. They may not be trapped within that region, as we call public housing. And through your education, you have a better person. ... So, I wonder if support - more support toward the education field with our kids, to better them, making better people, so they could have better lives, maybe that would be the solution to this housing problem that we have. Because they brought up the fact about low income. And the low income, that's because of lack of education.

Michael Herring: I think Mr. Lindsay has a valid point. My understanding of the amount of money that we spend to educate a child, as compared to the amount of money you spend to incarcerate a person, is that the latter is multiples of the former. That doesn't make a lot of sense to me, because it says you're spending money on the back end, to correct a harm that is almost irreparable if the person's convicted of a felony. Because it has lifetime consequences. So, I think that we're likely to get a much higher yield if we spend the money on the front end in areas of education. But we have to resist the temptation to grab onto catchy sound bites that it are easy to get behind. And so, it's easy to say, "Put more money in education." It's a lot harder to figure out how to spend that money effectively. As my mother used to say to me, you don't throw good money after bad. Right? I think if people had the solution, we'd be implementing it. There aren't many school districts around the country that have figured out how to correct the harm done by under-performing or low-performing districts which happen to be in areas of low resource.

\*\*\*

Thad Williamson, director of the Mayor's Office of Community Wealth Building in Richmond: ... What we've learned through this community process ... is there's not a single strategy. It would be misleading to suggest that. It's a holistic picture. All these things are clearly related, between housing, education, economic opportunity. They all have to be tracked at the same time, tackled at the same time. But it's important to know that your city does have an office. It's implementing a strategic plan to tackle these things at once. It's just important for the community to understand the magnitude of what that means. We all understand, this is a long-term effort. And we in the administration that work on this have a heavy responsibility to get it off to best possible start. Which we're doing our best to do.

But there are five pieces of it, I think each one of which are transformational, especially taken together. So, one, the social enterprise piece that Dr. Moeser just mentioned. Second, the start of a potential regional transportation system. ... Third, my office has done a lot of work with the Richmond Public Schools on developing a better plan for

**JA0396**

Why is Richmond still segregated?

early childhood. Clearly that's a key area from any anti-poverty perspective, where a lot more resources need to go, and a lot more intelligent application of what we do have. So we have a collaboration called Richmond Early Childhood Cabinet, already up and running with the schools. Fourth, ... there's this concept of RVA future, which would be the beginning of our Promise Scholarship Program. So if the budget passes in its current form, starting next year in the high schools there will be dedicated future centers to connect students, starting in ninth grade, and have a conversation every year with every student in those high schools about their life after high school. And understanding that there is life after high school, and you have to begin planning for it now. And understanding, what's the difference between a pipe dream and a realistic plan. And understanding that your choices and performance, even in ninth grade, have long term consequences. Again, RPS has fully been on board with that, so we're very excited about that. And we hope to add a scholarship component to that.

 The fifth piece, the hardest, most complicated, you'll need many forums: public housing transformation. To directly target the topic. How do you actually undo this legacy? Extremely hard. Because there's a development component, and there's a human-being component. And historically, the human-being component has not been done well at all. So if it's going to happen, as the mayor's committed, every piece of it has to be done well, and especially the first time, so it's a model for the future. Again, a big challenge. A lot of challenging issues involved, both from the resource point of view and strategy point of view. We're going to need the entire community behind it and engaged in it.

 ***

 Ray Bryant, Chesterfield: I was raised up in public housing. Thank God for public housing when I was raised up in it. Quite a few people became very successful from public housing. When they were doing what they had to do to guide us and guide the parents to raise us in a way that you attended school and got the education.

 But I came here today is to say, a lot of you in this room caused the problem that we are in. A lot of you in this room is causing the problem that we're going to remain in. Yes, it is intentionally being done as we speak right now. How can you de-concentrate poverty, moving people all the way around on the edge of the city, between Henrico and Chesterfield, and then make the place look like a Hostess Cupcake. Chocolate on the outside, and white all in the middle of it? Why are you doing this type of thing? A lot of your universities are the ones that are training the people that come out and do the planning in your cities. And I talk to you, Mr. John Moeser. That y'all need to do something about the universities. This is where a lot of this stuff is coming from. ... I want you to know that, get into your universities and train those individuals that could have some sympathy for the community that is at large. I came down by the home - the elderly home just recently, on the way here. And half of them were sitting on the outside of the elderly home. You talk about bus transportation. You took the grandmamas, and threw them all out there - took them off of Broad Street. And put them down. I just don't understand it. After all these years, I've come back around to see all this stuff coming back again. It's the same thing.

 ***

Why is Richmond still segregated?

 Lily Estes, Richmond: I'm a community strategist. ... Dr. Moeser and I, we agree on many things. But on de-concentration of poverty, we don't agree. I do believe that there is great effort in trying to correct the harm that was done by intentionally moving of African-American people, poor people, into public housing - and how we correct that going forward.

 I want to applaud all the people in the room here. But I want to also ask you - I don't like the word "challenge" - but I want to ask you to really do your own homework. You have to really look at what's been happening, and how we apply remedies to time-specific issues. We can't run in front of and try to solve something without the current information on the ground now. De-concentration of poverty - in a community where 26 percent (are in poverty), that's what we are talking about for poverty in this city - people cannot afford. It was intentionally done. We have to tell ourselves the truth about what was done. People in different institutions. This is institutional intention, discrimination, generational neglect, over and over. Mutated, disaffected, whatever other kind of metaphor we want to use to describe this.

 And we have to correct it at the fundamental root. ... I worked on trying to get a documentary on the life of Oliver Hill created years ago. And during Massive Resistance, when they closed the schools down in Prince Edward County, we were trying to interview some of the people that were affected by that. But what really struck out with me is that you take somebody who's stopped school in the seventh, eighth, 12th grade. Close the school down for five years, come back, re-open the school. Their life really hasn't been changed that much.

 But when you talk about the irreparable harm of closing a school for five years for a child that's been in kindergarten, and they go back to school in his fifth or sixth grade, they don't have the fundamentals. That's what we're looking at. When you fall off the cliff of trying to educate people and then come back and try to repair their remedy with dysfunctional, functional obsolescence kinds of things, we've got to be truthful about what we are doing. And I hope that we can have more of these town halls to talk about solutions of where we go with solving this realistically. It ain't about the money. You know, we can have all concentrated black communities. I ain't trying to move in your community at all. But I want appropriate resources in my community, among my cultural people, that we deserve. That's sort of reparation.

         ***

 Charles Otey, Richmond: ... I think racism has brought about segregation. I'm not an angry black man. I'm not running around here talking about "white folks this, white folks that." Because that would be unfair to say all white folks are this. If I could say all white folks are something, it would be unfair to say all black folks are something. You can't never say all about anything, because you don't know all.

 But what I do know is that I've been around here 60 years. And because of racism, we have subliminal stuff in back of our mind that brings about segregation. I was raised in the West End, I was raised in Church Hill, in Chimborazo. And when I go over to Church Hill now - (LAUGHTER). But I understand the history, you understand? I understand, because at first white people were predominantly over in Church Hill. Then black folks became predominant over at Church Hill. Now, white folks again. You understand. When I go into 7-Eleven in the morning, I may be one or two

**JA0398**

Why is Richmond still segregated?

or three people that speaks English in 7-Eleven. I think I'm a foreigner in 7-Eleven in the morning, you understand? But I know that racism exists in our society. And I think racism exists here, but I think we are getting better as people. I think when the old heads die off, it'll be a little better. Because the young people ain't getting up here and talking about black, white. They talk about economics and how to live and love each other. We're still stuck. The older people are still stuck into that racism mindset. Segregationist mindset. You know, I love all people, man. Because I think if everybody's afforded the same opportunity, we can prosper. ...

I'm going to close with this: All the black folks left Church Hill. Well, I can't say all, but a whole bunch of them. I would like to know where they've gone. (LAUGHTER) ...

Michael Paul Williams: I might be able to answer part of that. I'm no expert. But there are more black people in the suburbs now than in the city itself. By far. So, that's where they went.

And the question was raised about what one policy I would be in favor of to change things. I don't think you can change things if the structural framework for what got us here is still here. I would blow up this "independent city." I think a lot of what has facilitated what we're talking about is the fact that we have jurisdictions that function like Balkanized nations. There are these artificial walls - and you don't see it in any other state but Virginia. So, I'd blow up the independent-cities thing. Richmond needs to be a part of Henrico. Maybe Southside needs to be part of Chesterfield. But it just doesn't make any sense, and it enables a lot of what we've talked about, in my view.

***

Dale Jones, Richmond: I've lived here in Richmond since 1964. And I have an answer, partially, why is Richmond still segregated. It's very simple. Because the majority of the people want it that way.

Silvestri: Well, what does that mean?

Jones: That means, until you change the heart of the individual - just go out on Sunday morning in Richmond and see where people go to church. They go to segregated churches. And until that's changed, you're not going to change segregation.

***

Winnie Westbrook, Richmond: I have lived in Richmond since '76. And I live in a neighborhood that is primarily white. I think that I want to say this as succinctly as I can. And it comes first from what my pastor has said: that you can put perfume on a pig. You can put flowers on a pig. You can put bows and ribbons on a pig. But the bottom line is that it's still a pig. And the pig, for me, is fear. And fear of race, fear of poverty and fear of felons. Moving into your neighborhood. And my question is to Michael (Herring). There is this "ban the box," which I think is good legislation. How do we get folks beyond the pig of fear, poverty and the felons? To just say, "I'm going to take a chance. I'm going to take a chance, or I'm not fearful. I can hire this person." That would certainly have an impact on education. That would certainly have an impact on housing. ...

Why is Richmond still segregated?

Michael Herring: The point of "ban the box" and similar initiatives is to ensure against discrimination of felons. In other words, to make sure that a person gets a look, notwithstanding a felony conviction. And I think that makes sense, to be honest. But as you have no doubt figured out with me, I don't have many simple answers. And so, far be it for me to impose my value judgment on another agency or institution. I will hire felons in the Commonwealth's Attorney Office, but I know prosecutors around the state who won't. And I can understand why they aren't comfortable doing it.

Culturally, Virginians - and I think Americans - have a misinformed view of felons. We tend to think a felon is a felon is a felon. And that is not the case. So when we come back, or when you all begin to - when you're ready for a real, substantive conversation about your justice system, and more importantly the impact of felonization, I think that's a better time to take up the question of how we overcome the fear, or live with felons.

　　　***

Nichele Carver, Henrico: ... I live in Eastern Henrico, in the Varina area. And I'm in a middle-class suburb that's predominantly African-American. In fact, there's only one family that's not, out of the 300 homes. ... I heard on NPR that just by virtue of my neighborhood being predominantly African-American, our home values are lower. So the same size home in Glen Allen is worth more than my home. My question is: What can we do on a community level, to try to make these assessments more equal, or fair?

Heather Crislip: It's very complicated. The main thing I can do is just confirm that. And I think it's a legacy of inferior financing, and fear. And fear of property values going down. It's very complicated. I think better integration would make a big difference. I think greater awareness of that fact would make a big difference. I think - yeah, we need to change it, and it's true.

　　　***

Mary Atkins, Richmond: I'm a citizen of Richmond as long as I can hold out financially. I'd like to see something addressed more about the powers that be helping people keep their homes, instead of rolling out the red carpet for people to shove them out. Anyone who thinks gentrification is a pleasant thing hasn't experienced it from the inside out. In six years, my house - I moved into cutesy-town, aka Carytown, because it was a mixed neighborhood. And it was beautiful. A working-class neighborhood. Now, it's an open air strip mall. I mean, plastic. The neighbors are not. Why are flip sale artists even - why is that even allowed? I mean, 500 percent in six years. I never had a credit card in my 70 years. I never took out a loan, I never bought anything on time. Now, I'm on welfare. I don't think I can stay in this city. I can see why everybody's leaving it. I want my neighbors back. Even the druggies and the shooters are better than what is coming in around me, with their noses stuck up in the air, acting like I'm something that they ought to scrape off their feet. And I'm sorry to be so direct, but it's painful to be on the wrong side of gentrification. And I think the government needs to address that. ...

　　　***

Page 14 of 16

**JA0400**

Why is Richmond still segregated?

Crislip: I'm so grateful for everyone for coming out and having a passionate conversation about this. I think it needs to be the start of many more. And about purposefully, how we develop housing, and how we pay attention to how housing patterns underlie our education system, what happens with crime. And how if we make great decisions about housing and where we put it, and what opportunities we give people, we can have the best possible region.

## Graphic

Victor Branch, Richmond market president for Bank of America and a HOME board member, spoke about the future during the Public Square at The Times-Dispatch on April 23. DANIEL SANGJIB MIN/RTD Heather Mullins Crislip, president and CEO of Housing Opportunities Made Equal, gave a presentation about housing trends in the Richmond Region. DANIEL SANGJIB MIN/RTD More than 200 people attended the 56th Public Square on April 23 at The Times-Dispatch building downtown. DANIEL SANGJIB MIN/Times-Dispatch Michael Herring, Richmond commonwealth's attorney, discussed the links between crime, poverty, segregation and education. DANIEL SANGJIB MIN/RTD John Moeser of the University of Richmond professor, an urban studies expert, explained the historical origins of racially segregated housing in the Richmond area. DANIEL SANGJIB MIN/RTD Heather Mullins Crislip, president and CEO of Housing Opportunities Made Equal, answers a question from the audience as moderator Tom Silvestri, left, publisher of The Times-Dispatch, and John Moeser of the University of Richmo

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Subject:** HOLDING COMPANIES (91%); COLLEGE & UNIVERSITY PROFESSORS (89%); ETHNIC & CULTURAL STUDIES (89%); WRITERS (89%); HOUSING ASSISTANCE (88%); AFRICAN AMERICANS (78%); HUMAN RIGHTS VIOLATIONS (78%); JOURNALISM (78%); SLAVERY (78%); TEACHER RETIREMENT (75%); EXECUTIVES (74%); LAWYERS (73%)

**Company:** BANK OF AMERICA CORP (56%)

**Organization:** UNIVERSITY OF RICHMOND (57%)

**Industry:** NAICS551111 OFFICES OF BANK HOLDING COMPANIES (56%); NAICS522110 COMMERCIAL

Why is Richmond still segregated?

BANKING (56%); SIC6712 OFFICES OF BANK HOLDING COMPANIES (56%); BANKING & FINANCE (91%); COLLEGE & UNIVERSITY PROFESSORS (89%); WRITERS (89%); RESIDENTIAL PROPERTY (74%); LAWYERS (73%); NEWSPAPER PUBLISHING (73%)

**Geographic:** RICHMOND, VA, USA (92%); VIRGINIA, USA (92%); UNITED STATES (79%)

**Load-Date:** May 4, 2015

---

End of Document

### *TRAFFIC ARREST PATTERN;*

### *IN CHESTERFIELD, 29% ARE BLACK AND ALMOST 69% ARE WHITE*

Richmond Times Dispatch (Virginia)

July 15, 2001 Sunday City Edition

Copyright 2001 *Richmond* Newspapers, Inc.

**Section:** AREA/STATE; Pg. B-3

**Length:** 1410 words

**Byline:** Mark Bowes, Times-Dispatch Staff Writer, Contact Mark Bowes at (804) 649-6450 or
mbowes@timesdispatch.com

## Body

Nearly 29 percent of the drivers arrested for *traffic* offenses last year in Chesterfield County were black and almost 69 percent were white, internal *police* records show.

In an effort to gauge whether Chesterfield *police* officers are engaging in *racial* profiling, or arresting a disproportionate number of minorities, county *police* officials analyzed by *race* the department's *traffic*-stop arrests.

They show that 28.7 percent of the 37,928 people arrested in 2000 for *traffic*-related offenses, including drunken driving, were black. Nearly 69 percent were white.

Chesterfield *police* Chief Carl R. Baker said he's comfortable with those numbers and believes they show his department does not stop and arrest motorists based on their *race*.

"I don't think it will ever be an agency problem here," said Baker, Chesterfield's chief since 1996. "It may be an individual officer problem, but it will never be an agency problem."

Baker said he's not concerned that the *racial* mix of people arrested for *traffic* offenses doesn't mirror the county's *racial* demographics. According to the 2000 census, 76.7 percent of Chesterfield's 259,903 residents are white and 17.8 percent are black.

"That's a horrible assumption - that everybody we stop lives in Chesterfield County," Baker said. "Our daily population is over a million people, so obviously they're not all coming from Chesterfield. Our transient demographics are not the same as our resident demographics."



JA0403

TRAFFIC ARREST PATTERN;IN CHESTERFIELD, 29% ARE BLACK AND ALMOST 69% ARE WHITE

The department's review of *traffic* arrest data may be the closest Chesterfield *police* officials come to conducting a so-called *racial* profiling study. For now, Baker said he has no plans to conduct a formal study of *traffic* stops - unlike several other local law enforcement agencies, including the state *police*.

"I think I can summarize it this way," Baker said. "We get very, very few complaints on biased *policing*. We investigate every complaint. [And] we will continue to monitor our stats as we collect them. But right now, I don't see a problem."

As the issue of *racial* profiling has gathered momentum nationwide, an increasing number of *police* agencies are conducting their own *traffic*-stop studies, requiring officers to record the *race* of all drivers they *pull* over, question and sometimes arrest.

*Richmond police* had such a study done last year with the help of a Virginia Commonwealth University professor, although *Police* Chief Jerry Oliver was less than pleased with its results. He viewed the study as flawed and based on incomplete data. The study showed that 64 percent of the 2,673 drivers stopped during a six-week period were black, compared with 32 percent who were white.

Similarly, Henrico County *police* conducted their own study last year, also with the help of a VCU professor. Chief Henry W. Stanley Jr. said he was comfortable with the results, which showed that 56.3 percent of the 10,345 drivers stopped during the study period were white, while 38.6 percent were black.

At the urging of Del. Roger J. McClure, R-Fairfax, state *police* Superintendent W. Gerald Massengill agreed this year to begin collecting information on the *race* of each driver his troopers stop throughout the state. The department began collecting the information in May and expects to release five or six months worth of data this fall.

During a recent conference on *racial* profiling sponsored by the state *police* and the Virginia attorney general's office, officials with the National Organization of Black Law Enforcement Executives, or NOBLE, urged their law enforcement colleagues to conduct formal *traffic*-stop studies. In their daylong presentation, NOBLE officials said a department's willingness to collect such data has symbolic benefits that can instill public trust and confidence.

"The courage to mandate data collection can improve accountability systems, fortify organizational values, and help 'operationalize' the Law Enforcement Code of Ethics," NOBLE says in its training literature. "Data analysis can be crucial in diagnosing types and levels of bias within an organization, as well as developing systems to remove bias."

The organization believes that "the value of data collection clearly outweighs the associated time or costs," but the group also acknowledges that data collection done poorly or analyzed poorly "can lead to misunderstandings at best and mistaken policies at worst."

Baker said Chesterfield officers do not record the *race* of every driver they stop, but they are required to list the *race* of every driver they arrest - information that is forwarded to the state *police* and then the FBI for crime reporting purposes.

TRAFFIC ARREST PATTERN;IN CHESTERFIELD, 29% ARE BLACK AND ALMOST 69% ARE WHITE

A category for Hispanic drivers does not exist in the crime reporting guidelines. Therefore, officers record an Hispanic driver as "black" if he appears to be Negroid, or "white" if he appears to be Caucasian.

Some law enforcement officials are reluctant to conduct *traffic*-stop studies because no one has developed comprehensive standards in collecting and analyzing the data. Critics believe many of the studies conducted are flawed and meaningless because they compare only the number of minority stops with some crude overall population measure.

Other criteria need to be factored into such studies, critics say, citing population patterns on roads, *racial* demographics of crime, *police* deployment patterns and *racial* driving patterns, among other things.

The Rev. Gerald O. Glenn, pastor of Chesterfield's New Deliverance Evangelistic Church and an activist in county *race* relations, said the *traffic* and criminal arrest numbers gathered by *police* should be used as a springboard to study the issue in more depth.

"I think it would be in the interest of any progressive law enforcement agency to examine this," said Glenn, former director of the Virginia Department of Juvenile Justice. "I can say as an *African*-American and a former *police* officer [that] there historically has been in our community a distrust of *police*, and often times when blacks are stopped, they just intuitively think it was based" on *race*.

"And so, to allay those fears, I think any progressive *police* agency would be well versed in saying, 'Hey, we want to get on the front end of this thing before it happens. We want to let you all know that we're concerned enough about the minorities in our communities that we want to allay anybody's fears.' That's being proactive, not reactive."

Kelly E. Miller, vice chairman of the Chesterfield Board of Supervisors, said he's not convinced a formal study is needed.

"I don't believe in just going out and doing studies for the sake of doing studies," Miller said. "There needs to be some basis for why we would do that. And I would certainly want to coordinate with *police* before I made a statement regarding such a study. But at this point in time, I see no need for it."

"I haven't had any complaints made to me in any form that would indicate that there was a problem in Chesterfield County."

MOTORISTS STOPPED

Here is the *racial* breakdown of motorists stopped for *traffic* offenses in Chesterfield County from January 1999 through May 2001:

In 1999, 68.9 percent of the 35,840 motorists arrested were white, 28.6 percent were black, 1.7 percent were Asian, 0.13 percent were native American and 0.53 percent were of unknown *race*.

In 2000, 68.9 percent of the 37,928 motorists arrested were white, 28.7 percent were black, 1.9 percent were Asian, 0.12 percent were native American and 0.20 percent were unknown.

Page 3 of 5

JA0405

TRAFFIC ARREST PATTERN;IN CHESTERFIELD, 29% ARE BLACK AND ALMOST 69% ARE WHITE

During the first five months of 2001, 68.6 percent were white, 28.8 percent were black, 2 percent were Asian, 0.26 percent were native American and 0.42 percent were unknown.

PEOPLE ARRESTED

Here is the *racial* breakdown of people arrested for criminal offenses in Chesterfield County from January 1999 through May 2001:

In 1999, 64.3 percent of the 20,378 people arrested were white, 35.7 percent were black, 1.4 percent were Asian, 0.19 percent were native American and 0.41 percent were of unknown *race*.

In 2000, 62.9 percent of the 21,321 people arrested were white, 35.4 percent were black, 1.3 percent were Asian, 0.08 percent were native American and 0.25 percent were unknown.

During the first five months of 2001, 61.5 percent of the 9,053 people arrested were white, 36.4 percent were black, 1.5 percent were Asian, 0.08 percent were native American and 0.28 percent were unknown.

Source: Chesterfield County *police*.

Note: Hispanic drivers were lumped into white or black categories, depending on how the officer perceived the driver's *race*.

## Graphic

PHOTO

## Classification

**Language:** ENGLISH

**Subject:** ARRESTS (94%); CRIMINAL OFFENSES (94%); NEGATIVE PERSONAL NEWS (93%); *RACE* & ETHNICITY (92%); VEHICULAR OFFENSES (91%); CRIME, LAW ENFORCEMENT & CORRECTIONS (90%); LAW ENFORCEMENT (90%); *POLICE* FORCES (90%); *RACIAL* PROFILING (90%); DEMOGRAPHIC GROUPS (89%); DRIVING & *TRAFFIC* LAWS (89%); *POLICE* MISCONDUCT (89%); POPULATION & DEMOGRAPHICS (89%); PUBLIC OFFICIALS (89%); MINORITY GROUPS (78%); DRIVING WHILE INTOXICATED (73%); COLLEGE & UNIVERSITY PROFESSORS (60%)

**Industry:** VEHICLE *TRAFFIC* (90%); DRIVING & *TRAFFIC* LAWS (89%); COLLEGE & UNIVERSITY PROFESSORS (60%)

USCA4 Appeal: 24-4201     Doc: 22-1     Filed: 09/04/2024     Pg: 421 of 496

TRAFFIC ARREST PATTERN;IN CHESTERFIELD, 29% ARE BLACK AND ALMOST 69% ARE WHITE

**Geographic:** *RICHMOND*, VA, USA (59%); VIRGINIA, USA (93%)

**Load-Date:** July 20, 2001

---

End of Document

**JA0407**



DEFENDANT'S
EXHIBIT

F

3/8/2022

RICHMOND **TRANSPARENCY AND ACCOUNTABILITY PROJECT (RTAP)**

# OUR STREETS, OUR SAY:

## POLICING IN RICHMOND

**PUBLISHED JUNE 2019**

# Acknowledgements

*RTAP would like to acknowledge the two years of work by its members that led to the public release of the information contained in this report, with special thanks to Dr. Liz Coston and Amanda Hales for the data analysis and visuals that have made it accessible to the broader community. Further thanks to Derek Keaton, Ellie Riegel, and Sean Tenaglia for their assistance in drafting.  Last but not least, RTAP is grateful for all the community members who shared their stories of policing in Richmond because we know institutions of power are not the only keepers of data and truth.*

# Contents

Acknowledgements........................................................................................ 2

Executive Summary....................................................................................... 3

Background .................................................................................................... 4

Why RPD's History Demands Transparency & Accountability........................ 6

    I. RPD Abuses Create Mistrust in Community.......................................... 6

    II. Analysis of  Publicly Released RPD Data.............................................. 8

Moving Forward: RTAP's Core Demands..................................................... 12

**JA0409**

# Executive Summary

The Richmond Transparency and Accountability Project (RTAP) is a coalition of policy analysts, legal experts, and directly-impacted community members striving to build safer, healthier communities by organizing for a more transparent and accountable police department. Despite priding itself as a model of "community policing," the Richmond Police Department (RPD) has a tense history with the Black and Brown communities it's intended to protect. This fractured relationship has recently been highlighted by several high profile incidents of police hostility and violence towards people of color as well as by an ongoing lack of transparency regarding RPD's internal data.

After years of letters, meetings, and public pressure from RTAP, RPD finally began releasing internal data in early 2018 and continuing through 2019 regarding four key areas: citizen complaints, use of force, pedestrian contact, and traffic stops. The data paints a picture of dramatic racial inequality in police contact with civilians, racially disparate use of force, and an ineffective civilian complaint process. To address these issues, increase accountability, and take steps to repair a legacy of mistrust, RTAP demands three core changes to RPD: (1) prioritize the community input needed to capture and share more robust, better quality data; (2) ban predictive policing; and (3) expand civilian oversight.



Executive Summary          3

**JA0410**

# Background

**RTAP'S MEMBERS**

RTAP's coalition members are the Legal Aid Justice Center (LAJC), New Virginia Majority (NVM), Southerners on New Ground (SONG), Dr. Liz Coston with Virginia Commonwealth University, and concerned community members from neighborhoods directly impacted by disparate policing.

The **Richmond Transparency and Accountability Project (RTAP)** strives to build safer, healthier communities by organizing for a more transparent, accountable, and fair police department. RTAP organizes Black and Brown people, legal experts, and policy analysts to achieve policing practices that reduce physical, economic, and emotional trauma on the most policed neighborhoods in the city.

In 2016, New Virginia Majority (NVM) organizers canvassed residents in Blackwell, asking them what needs to be improved in the neighborhood. After hearing from over 700 residents, improved police-community relations emerged as the top issue; NVM decided to organize for community oversight of the police department. RTAP came together when NVM and Southerners on New Ground realized they shared the same goal of increasing police accountability in Richmond.

At organization-led community meetings, people had the opportunity to share their experiences of policing in Richmond and showed support for civilian oversight. Nevertheless, when these stories were shared with former Richmond Police Chief Alfred Durham and some City Council members, their response was that data was needed to "prove" problems with policing practices.[1] RTAP set out to obtain that data using FOIA and community pressure via letters and petitions (*see Fig. 1*).

---

[1] **Tom Nash,** *Requester's Voice: Richmond Transparency and Accountability Project,* (May 15, 2019), https://www.muckrock.com/news/archives/2019/may/15/rv-virginia-rtap/?.

**JA0411**



**RTAP'S PUSH FOR DATA**

The data released between January 2018 and March of 2019 underscores RPD's problematic policing of Richmond in four key areas: civilian complaints, use of force, traffic stops, and pedestrian stops.

**2017**

Community led meetings were held to let people share their experiences of policing in Richmond

Feedback from the community held meeting was presented to former Richmond Police Chief and City Council Members

LAJC sends Freedom of Information Act FOIA request to RPD on September 5, 2017 for the Department's Use of Force and Civilian Complaint policies and Data.

On September 25th RPD initially refused to release internal data requested by RTAP.

**2018**

February 2018, After months of pressure from RTAP, RPD began releasing its data on Use of Force and Civilian Complaints.

June 2018 RTAP continues to push for more information. Coalition members request additional data on pedestrian and traffic stops which RPD refused to release

September 2018 RTAP began to publicly pressure Mayor Stoney by attending town halls and maintaining persistent correspondence with his office.

December 2018 Mayor Stoney joins the conversation by meeting with RTAP and exerting political pressure on RPD. He agrees to release the data without fees.

**2019**

Between January and March the requested pedestrian contact and traffic stop data was released.

FIGURE 1

**JA0412**

# Why RPD's History Demands Transparency & Accountability

## I. RPD Abuses Create Mistrust in Community

**RPD'S TROUBLING TRACK RECORD**

While RPD touts community policing, the negative experiences reported by communities of color, as well as the lack of transparency from the Department, do not align with the goals of a community policing model.

The Richmond Police Department has, for years, prided itself as a model for "community policing," "making use of photo ops, carefully crafting press statements, and stressing the racial diversity of their officers,"[2] but its history tells a different story. Negative experiences reported by communities of color, as well as the lack of transparency from the Department, undermine RPD's claim to be a model of community policing. RPD's fractured relationship with the community, and in turn the community's distrust of those intended to protect them, has come to the forefront in recent years with several high-profile incidents.

### WHEN RPD FAILS, THE COMMUNITY SUFFERS



MARCUS-DAVID PETERS
SOURCE: LEGACY.COM //
2018

Marcus-David Peters - On May 14, 2018, Marcus-David Peters, a 24-year old beloved teacher and honors graduate of VCU, was shot by a Richmond police officer while he was clearly in the middle of a mental health crisis, which the officer acknowledged before shooting Mr. Peters. This incident exposed the failure of police training in responding to mental health emergencies, and highlights the need for a non-law enforcement response to such incidents.

[2] *Poverty, Crisis, and Police Murder in Richmond,* **It's Going Down (June 5, 2018),** https://itsgoingdown.org/poverty-crisis-and-police-murder-in-richmond-virginia/

**JA0413**



**MCKHYL DICKERSON**
**SOURCE: RVA MAG // 2018**

McKhyl Dickerson- On May 9, 2018, Dickerson, a 14 year old Black boy with autism and an auditory processing disorder, was playing with his uncle outside when a hit and run in which they were not involved unfolded. Officers followed McKhyl home, slamming him into his own wall, and then beating and handcuffing him in front of his grandmother. All of this occurred as she begged them to stop, desperately explaining her grandson's inability to comprehend why he was being followed and assaulted.



**MARKIYA SIMONE DICKSON**
**SOURCE: NBC12; FAMILY**
**PHOTO // 2019**

Markiya Simone Dickson- On Sunday May 26, 2019, 9 year old Markiya Dickson was killed by an outbreak of gunfire at a large community cookout in South Richmond's Carter Jones Park. An 11 year old boy was also shot in the incident. When bringing her to the hospital, Dickson's father and another man were unjustly handcuffed by police. Residents expressed their frustration after the shooting, noting how members of the Black community are treated with suspicion by the police, even when trying to save a life in the midst of a senseless tragedy.



**ALBERT HILL MIDDLE SCHOOL**
**FRONT SIGN**
**SOURCE: WTVR // 2019**

Albert Hill Middle School- On March 28, 2019, a Richmond police officer drove up to three Albert Hill students outside of the school building to question them about a comment he thought one of them made. In response to the students' denials the officer replied: "Just wait 'til your asses turn 18. Then it's mine." His remarks were met with backlash from parents and residents concerned about police relations with Black residents, particularly children. The officer apologized in a meeting with the students involved and was removed from his Museum District patrol, but backed out of a planned school assembly to address the Albert Hill student body.

These incidents, along with clashes with protesters and an increasingly militarized force, have only served to heighten a sense of mistrust among community members.[3][4]

## II. Analysis of Publicly Released RPD Data

Furthermore, RPD's resistance to making its data publicly available (*see Fig. 1*) and the flawed data it has released in the face of community pressure, are causes for alarm. Data released by RPD between January 2018 and March 2019 underscores RPD's problematic policing of the Richmond community in four key areas: citizen complaints, use of force, pedestrian contacts, and traffic stops.



CIVILIAN COMPLAINT DATA

**Findings on Complaints Against Officers:** While RPD policy states that complaints against officers should be resolved within 30 days, less than 20% of all complaints are handled in this timeframe. In 2018, it was common for investigations of complaints to take 4 months or more.

**Time to Close Complaints Jan-Aug 2018**

FIGURE 2

---

[3] Mark Bowes, *Police or Soldiers? Agencies Locally and Across Virginia have Weapons of War*, Richmond Times-Dispatch (Aug. 23, 2014), https://www.richmond.com/news/local/police-or-soldiers-agencies-locally-and-across-virginia-have-weapons/article_0d063dce-2b48-11e4-a2ee-0017a43b2370.html

[4] Graham Moomaw & Michael Martz, *Police Detain Five, Charge One Outside Trump's Richmond Rally Friday*, Richmond Times-Dispatch (June 11, 2016), https://www.richmond.com/news/local/city-of-richmond/police-detain-five-charge-one-outside-trump-s-richmond-rally/article_9bb7219a-ab25-5b12-a2b4-94f2298abb2f.html



## USE OF FORCE DATA

**Findings on Use of Force Data:** Data from 2017 and 2018 demonstrates that RPD officers are more likely to use force against Black civilians. While the City of Richmond is 48% Black, more than 75% of all use of force cases involve Black civilians.

Comparison of Use of Force Data to Richmond City Population

■ Population of Richmond
■ 2017
■ 2018 (YTD)

FIGURE 3

## PEDESTRIAN CONTACT DATA

**65% Black**

FIGURE 4

**Total FIRS:** 65% of the 27,432 police contacts documented in RPD's Field Interview Reports (FIRs) between January 2017 and October 2018 involved Black people. That equates to roughly *1 out of every 6 Black people* in Richmond getting stopped during this timeframe.

FIGURE 5

**66% Black**

25% White

FIGURE 6

**Suspicious Activities:** There was a total of 3,539 "Suspicious Activities" Field Interview Reports (FIRs) in the pedestrian stop data sets released by RPD. Black people comprised 66% of all Suspicious Activities FIRs, while white people only accounted for 25%. In other words, Black people were perceived as allegedly engaging in "Suspicious Activities" at a rate that is *2.7x higher* than white people.

Why RPD's History Demands Transparency & Accountability          9

# PEDESTRIAN CONTACT DATA



FIGURE 7

**Suspicious Persons:** There was a total of 4,605 "Suspicious Persons" Field Interview Reports (FIRs) in the pedestrian stop data sets released by the Richmond Police Department. Black people comprised 71% of all Suspicious Persons FIRs, while white people only accounted for 29%. This means Black people were perceived as "Suspicious Persons" at a rate that is *2.7x higher* than white people.



FIGURE 8

**Curfew Violations:** *98*% of all curfew violation Field Interview Reports involved Black youth -- particularly young Black boys. By comparison - according to the National League of Cities: "In 2014, black youth made up around 15 percent of the under 18 population, yet represented almost 50 percent of the curfew arrests in cities across the country."



FIGURE 9

**Truancy Violations:** *82*% of the alleged truancy violation reports involved Black people, particularly young Black boys. Comparatively, white people made up only 12% of the reports in this category. Based on the data, Black people were stopped for alleged truancy violations at a rate *7x higher* higher than white people.

**JA0417**

# TRAFFIC STOP DATA



**Traffic Arrests:** Black people accounted for *75%* of all traffic arrests from January 2017 - October 2018, meaning Black people were *30.7% more likely* to be arrested during a traffic stop than white people. This racial imbalance is on par with national trends which show that Black people are *31% more likely* to be pulled over than white people.

FIGURE 10

### DISPARITIES IN POLICING

An overwhelming majority of community members who come in contact with RPD are Black, even though only 48% of Richmond's population is Black.

This data—analyzed by Dr. Coston and their team at VCU—paints a troubling picture of racially disparate policing in terms of RPD's use of force and pedestrian and traffic stops, as well as and an ineffective civilian complaint process.[5] An overwhelming majority of community members who come in contact with RPD are Black, even though only 48% of Richmond's population is Black.

## *CIVILIAN TAX DOLLARS DESERVE CIVILIAN OVERSIGHT!*

RPD receives the second largest portion of the city's budget of any agency; increased attention and accountability is imperative in the face of well-documented policing failures. Providing for greater civilian oversight and data transparency between RPD and the residents it serves is overdue.

---

[5] Critically, Field Interview Reports do not indicate that any crime has been committed. For example, multiple curfew violation FIRs were for youth actually 18 or over and therefore not subject to the curfew ordinance.

# Moving Forward: RTAP's Core Demands

•••••••••••••••••••••

**THE PROCESS TOWARDS PROGRESS**

RTAP's demands represent important first steps the city can make toward the ultimate goal of promoting racial justice and the safety, health, and well-being of Richmond's Black and Brown residents.

•••••••••••••••••••••

Considering RPD's role in the community, its lack of transparency and no shortage of high profile policing failures, further action is necessary to increase police accountability and take steps to heal feelings of mistrust within the Richmond community. The below RTAP demands represent the first steps the city can take in the long process toward promoting racial justice and the safety, health, and well-being of Richmond's Black and Brown residents. Policing abuses have lasting emotional and economic impacts on community members. This is evident in the lives of those who have shared their stories with RTAP coalition members. The city must act swiftly to end these abuses and implement policies to protect individuals in Richmond from legal violations and racially disparate policing.

RTAP understands that creating healthy and thriving Black and Brown communities requires a solution that combines reforming law enforcement practices with increased investment in community-based solutions that eliminate the need for law enforcement intervention in the first place. This approach is supported by research showing that communities of color favor solutions that "reduce the police role and replace it with empowered communities working to solve their own problems"[6] through public health, educational, employment and affordable housing-focused remedies.[7]

---

[6] Alex S. Vitale, *We Don't Just Need Nicer Cops. We Need Fewer Cops.*, The Nation (Dec. 4, 2014), https://www.thenation.com/article/we-dont-just-need-nicer-cops-we-need-fewer-cops/.

[7] *More Black than Blue: Politics and Power in the 2019 Black Census*, Black Futures Lab, https://blackfutureslab.org/wp-content/uploads/2019/05/More-Black-than-Blue.pdf.

**IMPROVE DATA CAPTURE**

We can only ensure a data system that provides robust, better quality, and publicly available data if the community is involved in shaping that system on the front end.

*1. Prioritize Community Input In Order To Capture & Share More Robust, Better Quality Data -* While RPD's recent data releases serve as a starting point for transparency, they also raise many questions about the methodology and quality of data collection.[8] Questions, such as "How many incidents lead to a search?" or "How many searches lead to an arrest?", remain difficult to answer based on the current data capture practices. RPD's decision to revise its records management system for the first time in over a decade provides an opportunity for a step in the right direction, increasing accountability and transparency. However, we can only ensure a data system that provides robust, better quality, and publicly available data if the community is involved in shaping that system on the front end.

*2. Ban Predictive Policing -* While RTAP advocates for better data, changes should not result in the collection of certain kinds of information that can be harmful and/or biased. RPD's contract with SOMA Global to provide the new records management system raises concern; SOMA Global markets itself as a leading provider of technologies, such as predictive policing and invasive tracking practices, that have proven harmful to minority communities.[9] Predictive policing uses software analysis of data from past police activity to predict potential crime hot spots and offenders. That data frequently reflects biased, and sometimes unconstitutional, policing practices, making it unreliable.[10]

---

[8] For instance, Dr. Coston's review of Use of Force data identified discrepancies in RPD's reporting of officer uses of force, to include the initial omission of Officer Michael Nyantaki's deployment of a taser and discharge of a firearm during his confrontation with Marcus-David Peters.

[9] *The City of Richmond Enters Into an Agreement with SOMA Global to Provide Public Safety Solutions in Virginia,* CISION PRWeb (Jan. 29, 2019), https://bit.ly/2wFlt86

[10] Rashida Richardson, Jason M. Schultz & Kate Crawford, *Dirty Data, Bad Predictions: How Civil Rights Violations Impact Police Data, Predictive Policing Systems, and Justice,* N.Y.U. L.Rev. (May 2019), https://www.nyulawreview.org/wp-content/uploads/2019/04/NYULawReview-94-Richardson-Schultz-Crawford.pdf.

**• • • • • • • • • • • • • • • • • • • •**

**BIAS IN, BIAS OUT:
SAY NO TO
PREDICTIVE
POLICING**

Predictive policing
uses data reflecting
biased, and sometimes
unconstitutional,
policing practices,
making it unreliable.
Moreover, predictive
policing is known to
perpetuate systems of
racially biased and
inaccurate data
collection.

**• • • • • • • • • • • • • • • • • • • •**

Predictive policing can be racially biased and
inaccurate, as demonstrated by discrepancies
between predictive targets and actual estimated
users of illicit drugs in Oakland, CA (*see Fig. 11*).[11]
Black residents of Oakland were targeted at a
significantly higher rate than whites based on
predictive data analysis, but estimates reflect the
opposite reality- whites were significantly more
likely to be users.



**Predictive policing in Oakland vs. actual drug use**
The chart on the left shows the demographic breakdown of people targeted for policing based on a
simulation of PredPol in Oakland. The chart on the right shows actual estimated use of illicit drugs.

source:  National Survey on Drug Use and Health , Human Rights Data Analysis Group    **Mic**
FIGURE 11

At a local town hall meeting, Richmond citizens
overwhelmingly stated that they do not want RPD
to use this technology to police the community.[12]
While RPD should work to gather and analyze
more robust data, they must avoid predictive
policing to continue to build positive relations and
foster transparency with civilians.

[11] **Jack Smith IV,** *(Exclusive) Crime-Prediction Tool PredPol Amplifies Racially
Biased Policing, Study Shows,* **(Oct. 9, 2016),**
https://www.mic.com/articles/156286/crime-prediction-tool-pred-pol-only-
amplifies-racially-biased-policing-study-shows.
[12] Information drawn from RTAP's Townhall Feedback survey

**JA0421**

**ESTABLISH ACCOUNTABILITY MEASURES**

Meaningful civilian oversight would enhance public safety by providing transparency and accountability over RPD.

**QUESTIONS ABOUT THE REPORT?**

Please send all inquires about the report and any information herein to richmondvatap@gmail.com.



**_3. Establish Civilian Oversight_ -** Civilian oversight remains of paramount importance in Richmond, without which RPD will continue to police itself without any meaningful accountability. According to the New York Times, 7 of the 9 cities most similar to Richmond (based on population, employment opportunities, and geographic metrics) have some form of civilian oversight for their police departments.[13] Although there is no one-size-fits-all type of civilian oversight, RTAP advocates for a system which helps to enhance public safety, broadly understood; provides meaningful responses to civilian complaints; and promotes trust through continued transparency and open communication between RPD and the Richmond community.

Civilian oversight would help to hold leaders and officers accountable for their actions and keep community members informed of decisions and policies that affect their neighborhoods. Oversight can be accomplished in multiple ways, from civilian review boards engaging in review of civilian complaints about alleged misconduct to independent auditing offices that have access to the full scope of police data and can solicit community input to make recommendations for improving police practices.[14]

---

[13] Jed Kolko & Josh Katz, _What is your City's Twin?_, New York Times: The Upshot (Apr. 3, 2018), https://www.nytimes.com/interactive/2018/04/03/upshot/what-is-your-citys-twin.html. See also, _National Association for Civilian Oversight of Law Enforcement_, www.nacole.org (last visited Jun. 2019) (Various community oversight models have been put in place across the nation, with Fairfax County, Virginia Beach, and Charlottesville representing three local examples within the Commonwealth).

[14] _Chapter 4: Alternative Models for Police Disciplinary Procedure, Coping with Police Misconduct: Citizen Involvement in Officer Disciplinary Procedures_, https://www.usccr.gov/pubs/sac/wv0104/ch4.htm; Peter Finn, _Citizen Review of Police: Approaches and Implementation_, National Institute of Justice (March 2001), https://www.ncjrs.gov/pdffiles1/nij/184430.pdf.

JA0422

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 437 of 496



IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )  Criminal No. 3:21-cr-42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
| | ) |
| Defendant. | ) |

## UNITED STATES' MOTION TO EXCLUDE DEFENSE EXPERT

The defendant's expert, Dr. Eli Coston, offers opinions that rely on flawed data and use techniques that peer-reviewed research deems unreliable. Dr. Coston's opinions in this case fail to satisfy the standards in Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), standards that both define admissibility and more generally provide a framework for evaluating when expert testimony should be deemed reliable. *See also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (reviewing standards governing expert testimony). Because Dr. Coston's opinions in this case cannot be deemed reliable, those opinions fail to support the defendant's Fourteenth Amendment challenge.

Briefly, Dr. Coston's analysis relies on data from Virginia's Community Policing Act, enacted in 2020, which mandates the collection of traffic stop data. But as law enforcement agencies across the commonwealth have begun implementing that Act, they have needed to refine their data collection, demonstrating that the initial data collected under the Act in its first six months —relied on by Dr. Coston—has serious flaws. Indeed, Virginia's General Assembly amended the Act in 2021 to address problems with the Act.[1] The initial problems with data

---

[1] The General Assembly is also addressing bias-based profiling in other ways. For example, the General Assembly passed another law in 2020 that limited primary traffic offenses that could lead to a traffic stop. Virginia Legislative Information Session, *HB 5058*, https://lis.virginia.gov/cgi-bin/legp604.exe?202+sum+HB5058.

collection under the Act have been understandable but significant. For example, should officers record information about the driver of a vehicle stopped or about a passenger of the vehicle who was arrested? Should officers determine the race of persons stopped by asking them to volunteer their race, a procedure not well calculated to reassure those who have been stopped, or should the officers simply make their best estimate of the race of people stopped? What databases should be used for collecting the data, and how consistently has the data entry been collected during a stop? Because of the problems with the initial implementation of the Act, over 32% of the data that Dr. Coston relies on is incomplete, involves stops occurring outside of Richmond, and involves duplicate counting of the same stop. Collectively, these problems mean that Dr. Coston does not have reliable data about a simple threshold question—what percentage of the drivers (or passengers) stopped in the precinct where the defendant was stopped were African American?

But Dr. Coston's report has other serious flaws. It is of course not enough to know simply what percentage of drivers stopped were African American. The next basic requirement is to find some measure of the race of drivers on the road who could have been stopped (or searched or arrested) to compare with those who were actually stopped (or searched or arrested). Dr. Coston relies on census data to make that comparison. But as a consensus of researchers publishing peer-reviewed research on racial profiling have concluded, census data is not a reliable measure to compare against the racial composition of drivers stopped to identify potential bias. For starters, census data includes many people, like children, who are not even licensed to drive. But beyond that, for a host of reasons, who is driving on roads in a particular region may not mirror who lives in that region.

Worse, after possessing neither a reliable measure of the race of those stopped nor a reliable measure of the race of drivers in the relevant area, Dr. Coston then uses that deficient data to apply

2

**JA0425**

statistical techniques that responsible researchers would regard as at best preliminary and exploratory and would not use to draw the conclusion that officers were committing equal protection violations in enforcing the law. Indeed, the state agency responsible for writing an official report based on the same data that Dr. Coston uses admits that the poor data quality forbids "any firm conclusions" about bias.[2]

## I. Legal Standards Governing Expert Testimony

Federal Rule of Evidence 702 provides that expert testimony must (a) "help the trier of fact . . . determine a fact in issue"; (b) be "based on sufficient facts or data"; (c) be "the product of reliable principles and methods"; and (d) "reliably appl[y] the principles and methods to the facts of the case." Under Rule 702, expert testimony must be reliable and relevant to the issues in a case. *Sardis*, 10 F.4th at 281. The Supreme Court's opinion in *Daubert* "provides four, non-exhaustive 'guideposts' to aid in the required reliability analysis: (1) whether the expert's theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Sardis*, 10 F.4th at 281 (quoting *Daubert*, 509 U.S. at 593–94; *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)). Moreover, even when an expert relies on valid data and uses valid techniques, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

As explained below, Dr. Coston's opinions fail essentially every measure that an expert's opinion must meet to be reliable and relevant. Dr. Coston relies on flawed data that would render

---

[2] Department of Criminal Justice Services, *Report on Analysis of Traffic Stop Data Collected under Virginia's Community Policing Act*, at 2 (July 1, 2021), https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/report-analysis-traffic-stop-data.pdf ("DCJS Report").

3

**JA0426**

meaningless any statistical analysis performed on that data and then uses techniques that are too simplistic to support the conclusions drawn.

Rule 702 applies even though this issue is not submitted to a jury. First, as Rule 702(a) provides, the Rule applies when the expert opinion "will help the trier of fact" to "determine a fact in issue." Here, this Court is the factfinder who must determine the facts in issue. "[D]istrict courts must apply Rule 702 to assess an expert's qualifications, reliability, and fit before weighing the expert's opinions to decide a triable issue." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832–33 (3d Cir. 2020) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."); *see also* Fed. R. Evid. 1101(a) (applying the Federal Rules of Evidence to proceedings before district courts)). But even if Rule 702 did not govern directly, the Rule provides a well-devised framework for assessing the reliability of expert testimony, and here, Dr. Coston's opinion fails to qualify as reliable and should be rejected by the Court.

<u>**Argument**</u>

I.    **The data on which the defendant and his expert relies are unreliable and insufficient.**

   A.  *The initial implementation of the Community Policing Act introduced multiple problems in the data the defendant's expert uses.*

The data on which the defense expert relies has its genesis in the Community Policing Act, signed by the Virginia governor on April 11, 2020, in the early stages of the COVID-19 pandemic.[3] The Act was intended to prohibit "bias-based profiling" in policing and directed law enforcement

---

[3] Virginia Legislative Information Session, *HB 1250*, https://lis.virginia.gov/cgi-bin/legp604.exe?201+sum+HB1250

agencies to collect data to "determine the existence and prevalence" of the practice. *Id.* The Act

required the collection of certain information for every motor vehicle stop by law enforcement:

(i)     the race, ethnicity, age, and gender of the person stopped;
(ii)    the reason for the stop;
(iii)   the location of the stop;
(iv)    whether a warning, written citation, or summons was issued or whether any persons were arrested;
(v)     if a warning, written citation, or summons was issued or an arrest was made, the warning provided, violation charged, or crime charged; and
(vi)    whether the vehicle or any person was searched.

*Id.* Law enforcement agencies then send the data to Virginia State Police (VSP), which is

responsible for assembling the data. *Id.* The data are available publicly.[4] The Virginia Department

for Criminal Justice Services (DCJS) must annually report on the data collected for the Governor,

the General Assembly, and the Attorney General. *Id.*

The Act provided no funding to Virginia's law enforcement agencies to implement the Act,

required data collection to begin less than three months after the Act became law, and took effect

during a pandemic while law enforcement agencies were losing personnel, addressing civil unrest,

and navigating surges in infections. Nor was there statewide training or guidelines on how to

collect and organize the data.

During the early implementation of the Act, some important ambiguities about how to

apply the Act became apparent. For example, the first subsections mandate the collection of only

the driver's information ("the person stopped"), but if "any person" is arrested or searched, then

the law enforcement officer is directed to record information for that person. When the person

arrested or searched was not the driver, how to collect data was unclear. Thus, if a driver was

pulled over for speeding, but law enforcement discovered the passenger had an outstanding

---

[4] Virginia Open Data Portal, *Community Policing Act Data Collection*, https://data.virginia.gov/stories/s/Virginia-Community-Policing-Act-Data-Collection/rden-cz3h/.

5

**JA0428**

warrant for failure to appear and arrested the passenger, the officers were left with a quandary as to whose information to record. The 2020 version of the statute would presumably direct that the biographical information of the driver be recorded with the offense information of the passenger, a result that made the collected data confusing and unilluminating. The 2021 updates to the statute addressed this problem by delegating broad regulatory power to VSP, and on July 1, 2022, VSP will require that law enforcement collect the above data for the driver and all passengers.[5]

The statute also creates obvious problems by directing law enforcement to determine race and ethnicity information by either asking the stopped citizen or by making their own guess. Race and ethnicity information is not collected by the Department of Motor Vehicles, and this information is not reflected on driver's licenses. Many law enforcement officers feel uncomfortable asking stopped and possibly irate citizens about their race and ethnicity, and feel that asking such personal questions will only exacerbate the preexisting tension of the traffic stop, so an officer's subjective determination of race and ethnicity is the only feasible option. Because VSP did not issue guidance or training on making racial and ethnic determinations, individual officers are left on their own to hazard their own subjective and untrained guesses as to race and ethnicity. Due to this, VSP officials have noticed an evolving statewide trend of officers not asking stopped citizens for their race or ethnicity, and thus an abnormally high number of "unknown" races reflected in the data.[6]

---

[5]    The original version of the statute also called for data collection only in cases of motor vehicle stops, i.e., discretionary stops, in an effort to deter "bias-based profiling," Virginia Legislative Information Session, *HB 1250*, https://lis.virginia.gov/cgi-bin/legp604.exe?201+sum+HB1250, but VSP is aware of many instances where law enforcement, especially in the early months, collected data for checkpoints, traffic accidents, stalled vehicles, and calls for service. Indeed, the first training that VSP conducted for law enforcement agencies occurred in January 2022, which undermines the consistency and reliability of the data, especially early in the implementation period.

[6] Officers' identification of race or ethnicity during a stop may also fail to correspond to the identification of individuals' race or ethnicity in the census data that Dr. Coston relied on. As discussed below, Dr. Coston's use of census data also separately creates significant problems because census data fails to capture who is driving on roads within a defined region.

**JA0429**

From the beginning, state officials from VSP and DCJS knew that, as with any new attempt at mass data collection, that the rapid rollout would be bumpy, and it would be at least 3 to 5 years before the data approached reliability. As described in DCJS's official report that covered from July 1, 2020 to June 30, 2021, "**The information presented in this report is preliminary and should be interpreted with caution.** This is largely because this was the first year that the Community Policing Act was implemented. As the report notes, many PDs [police departments] and SOs [sheriff's offices], especially smaller agencies with limited resources, faced challenges establishing the data collection and reporting required under the Act." DCJS Report at 1. DCJS officials have acknowledged that the first few months of data collection, in particular, showed many inconsistencies in the data collected statewide: each law enforcement agency fashioned their own data collection methods given the compressed implementation timeline; the pandemic severely limited the number of personnel working at all or in the office; and civil unrest gripped the state and nation beginning in late May 2020.

The City of Richmond and the Richmond Police Department (RPD) epitomized the struggles that were occurring statewide in implementing the new law. RPD was not immune to the effects of the pandemic, and the protests that began in late May 2020 were particularly an issue in Richmond, ending only in mid-August 2020.[7] During the months-long protests, dozens of vehicles and multiple buildings were burned (including at least one police cruiser and a transit bus that were completely destroyed), countless instances of vandalism occurred, and five heavy statues were toppled, posing the risk of serious injury. These events demanded many hours of police resources, stretching RPD thin. During that time RPD experienced turnover in leadership, having three

---

[7] *See, e.g.*, Autumn Childress, *One Year Later: How George Floyd's Death Impacted Richmond* (May 25, 2021), https://www.wric.com/news/local-news/richmond/one-year-later-how-george-floyds-death-impacted-richmond/.

permanent or acting police chiefs in the three-week period leading up to the effective date of the new law.[8] The effective date of the new law could hardly have come at a worse time for RPD.

In RPD's first attempt to comply with the Community Policing Act requirements, it created a Google Form, a part of the Google Docs suite that allows a user to create an online survey interface that inputs responses into a spreadsheet. RPD placed a link to the Google Form on the desktop of the computer terminals in patrol vehicles, but the frenetic circumstances prevented the training that would have been ideal for the rollout of a new program. Many officers failed to record properly the data required under the new Act, and there was no verification mechanism to identify errors. This flaw in the rollout means that data from the initial period after the Act became effective is incomplete and unreliable.

For example, the data include many instances of duplicates in the RPD data: multiple "stops" that occurred at the same location on the same day, with the same driver age, sex, statutory section violated, and post-stop outcomes. These duplicates could occur if an officer accidentally submitted the same entry multiple times, or if an officer submitted multiple entries for the same driver because the officer had issued the driver multiple summons during a single stop—such as for speeding, a broken taillight, and expired registration.[9]

During the rollout, RPD was late submitting its data for the months of December 2020 and January 2021 and did not submit that data until July 2021. Consequently, that data was not included in the 2021 DCJS report to state officials. During this time, VSP was unable to perform quality checks that would have improved data integrity and instead simply ensured nothing was blank.

---

[8] *Blackwell Resigns as Interim Chief, Stoney Appoints New Police Chief from NC* (June 26, 2020), https://www.nbc12.com/2020/06/26/blackwell-resigns-interim-chief-stoney-asks-deputy-chief-nc-take-over/.

[9] Officers were instructed to record only the most serious statute violated, which explains why multiple entries would have the identical statutory section violated if an officer simply input each summons into the Google Form.

8

**JA0431**

Because of these data integrity issues both in Richmond and across the commonwealth, DCJS does not know how much "noise" or error is in the data from the initial rollout, undermining confidence about conclusions coming from that data. In fact, DCJS believes that a statistically valid analysis is impossible at this point due to poor data quality.

*B. Subsequent improvements after the relevant period of this case demonstrate the shortcomings of the data in the relevant period.*

After a bumpy start, RPD began making significant improvements beginning in February 2021. This was when RPD transitioned away from Google Forms and began integrating data collection for the Community Policing Act into the department's existing records management system, which led to improved data integrity. Leading up to the new requirements effective July 1, 2022, that require data for all vehicle occupants be logged, RPD will further integrate the data collection process into the existing workflow for completing a traffic stop, which should further improve data quality.

VSP has also been making improvements in how it handles data collected under the Act. In early 2021, VSP began requiring that an incident number be added to each data entry to allow linking back to the underlying police record, such as the police report or traffic ticket. This allowed agencies like RPD to cross check and verify Community Policing Act reports to more accurate underlying records that have long been collected. The legislature's grant of regulatory authority to VSP in 2021 has also allowed VSP to promulgate requirements for expanded and consistent data from all jurisdictions, including the requirement effective July 1, 2022, that the data for all vehicle occupants be collected.

9

**JA0432**

II. **Dr. Coston's analysis relies on faulty data, bad benchmarks, and statistical tests that peer-review research deems insufficient.**

A. *Dr. Coston's opinion is not "based on sufficient facts or data" under Fed. R. Evid. 702(b).*

The data on which Dr. Coston relies are riddled with errors, which should not be surprising given the law's accelerated rollout amidst numerous operational challenges, as described above. Over 32% of the Community Policing Act data that underlies the defense expert's report is faulty, and that is merely the known rate of error. The plentiful errors so seriously undermine the quality of the data and the analyses based on the data that Dr. Coston's work does not begin to meet *Daubert* standards. It is also telling that Dr. Coston's report neither examines the integrity of the data on which it relies nor qualifies the report's conclusions as being subject to unexamined flaws in the data.

1. Dr. Coston's report includes data that DCJS excluded for lack of reliability

Dr. Coston's departure from reliable statistical methods is underscored by Dr. Coston's reliance on data that DCJS, the state agency tasked with analyzing the data from the Act for state decisionmakers, excluded because it was unreliable. For example, DCJS excluded all data that were not "reported completely" per VSP's requirements. DCJS Report at 17. This means that a traffic stop was excluded from the analysis if all the data for a stop was not validly completed.

Dr. Coston failed to exclude these data and thus included them in the analysis. The data Dr. Coston used for the defense's analysis contained 147 rows out of 2578 rows where no age was recorded, 6 rows with no gender, 5 rows with no value for action taken as a result of the stop, 2 rows with no value for whether the person was searched, and 266 rows with no value for whether a passenger was arrested. In all, more than 14% of Dr. Coston's data was rejected by DCJS.

10

**JA0433**

2.   Dr. Coston introduced or failed to notice additional errors

Dr. Coston's data also includes 209 instances of stops that are identified as occurring outside of Richmond, including some as far as Ruckersville, Scottsville, and Howardsville—far-flung locations from Richmond. Dr. Coston claimed to use a service called Geocodio to convert the location information into latitude and longitude and that an intern with the Public Defender's Office checked and corrected "all locations with less than a .6 accuracy score." Dkt. 66-1 at 4. Dr. Coston then "verified a random selection of these" (presumably the locations checked by the interns), *id.*, and excluded 82 stops as outside RPD's jurisdiction. But Dr. Coston offers no explanation for including the other 127 stops that are identified as occurring outside Richmond, or how these errors made their way into the analysis in the first place.

The location analysis is a comedy of errors. For example, one of the entries is for a stop that occurred at "Broad / Harrison," but Dr. Coston's latitude and longitude coordinates resolve to Scottsville, a town approximately as far west of Richmond as Charlottesville. Apparently, Geocodio, the FPD interns, or Dr. Coston interpreted an RPD stop occurring at "Broad / Harrison" as having occurred at Bird St. and Harrison St. in Scottsville, nearly 70 miles away. Another stop was recorded at "1800 Oliver hill," but Dr. Coston's coordinates point to Oliver Lane in Ruckersville, north of Charlottesville and over 80 miles away from 1800 Oliver Hill Way in Richmond. One final example is an obvious location error. The data record a stop as having occurred at "9th and E Main St," but the coordinates from Dr. Coston plot to a similar address in Charlottesville—in fact, right on Charlottesville's famous downtown mall.

These data errors are significant. First, Dr. Coston apparently failed to investigate the coordinates that Geocodio listed as having an accuracy score of greater than .6, and Dr. Coston also offers the Court no indication of the accuracy of Geocodio. Given the results above, Dr.

11

**JA0434**

Coston's uncritical and unexplained use of the geomapping tool raises serious questions that undermine the conclusions in Coston's report that rely on location information, such as the maps, clusters, and heat mapping. Dkt. 66-1 at 8-11. Second, Coston reports the number of stops outside RPD's jurisdiction as only 82, but the actual number based on Coston's own latitude and longitude coordinates is 209.

There are further problems with the data—namely, that there are 321 instances of exact duplicates in Coston's data set. These multiple entries with identical information could be the result of several errors. Officers may have submitted the Google Form multiple times or inputted data in the Google Form for every summons given, such as when a driver receives a summons/ticket for speeding, expired registration, and broken taillight during the same stop.

The duplicate data appears difficult to treat as representing separate stops. For example, on November 21, 2020, there are four entries for a 44-year-old black woman pulled over at B1200 Mosby St for illegal use of defective or unsafe equipment. Each of the "four women" were given a warning. It hardly needs to be said that it is very unlikely that four people of the same race, gender, and age committed the same statutory violation and were pulled over at the same location on the same day with identical results. These results should have been noticed, identified, and excluded, but were not.

Dr. Coston either failed to notice the variety of errors in the data described above or failed to inform the Court about those issues. This itself is a violation of *Daubert* principles—it is not generally accepted in the scientific community to use a new data set that is littered with problems and perform little to no quality control. The sum total of these errors leads to the exclusion of more than 32% of the data on which Dr. Coston's analysis rests, and this is only the known error rate. The unknown error rate, including stemming from frontline officers forgetting or failing to comply

with the requirements of the new Act in the first few months of implementation while they certainly had their hands full, could be much more. In short, Dr. Coston's work relies on deficient data that lacks reliability and would undermine any statistical analysis that depends on that data.

3. Even if the traffic stop data were minimally acceptable, *Daubert* would still bar Coston's analysis because census data fails to provide an adequate measure of who is driving on the roads within a given region.

Even if the traffic stop data Dr. Coston used had no problems, Dr. Coston's opinion would still be unreliable due to its reliance on a poor research design. The most egregious problem with Dr. Coston's analysis is the decision to compare general population census data to the stop data to determine if there exists a racial disparity in stops. As explained by Dr. Michael Smith, the United States' retained expert who regularly publishes in peer-reviewed journals on this subject and is one of the nation's leading researchers in racial bias in policing, the improper use of census data alone is sufficient to strike Dr. Coston's report because using census data as a benchmark falls far outside scientific norms:

> Today, census-based benchmarking is no longer accepted as a scientifically valid technique for comparing against police traffic stop data. First generation studies, including our original Richmond study, used census or age-adjusted (aged 15-16 and older) census data to compare against the racial composition of drivers stopped by the police (Smith et al., 2021). Census data is free and readily available and makes a convenient benchmark. Unfortunately, as later comparative studies made clear (see Alpert et al., 2004), the population of persons who *live* in an area often serves as a poor representation of persons who *drive* in an area or who are *at risk* for being stopped by the police. Census benchmarking does not account for out-of-area drivers, differential exposure to the police due to differences in police deployment patterns within a city or state, or differences in driving behavior across racial groups (Ridgeway & MacDonald, 2010; Smith et al., 2019; Tillyer et al., 2010), among other factors. While all benchmarks suffer from certain limitations, census-based benchmarks are so far off the mark as valid estimates of the actual driving and/or traffic violating populations that informed social scientists should no longer use them (Ridgeway & MacDonald; Smith et al., 2021).

Exhibit A, Expert Report of Dr. Michael Smith, Esq., at 2.

Dr. Smith explores several other benchmarking methods in his report, such as direct observation, a "veil of darkness" analysis, or estimating driver race using data from traffic accidents. *Id.* at 2-3. The defendant chose not to pursue direct observation; a veil of darkness analysis is not possible based on the Community Policing Act data because of its poor quality; and the United States is unaware of any Richmond-specific traffic accident estimates, and the defense did not conduct one.

DCJS, the state agency tasked with analyzing the Community Policing Act data, agrees with Dr. Smith that general population census data should not be used and provides an invalid comparison. DCJS also explored the three options Dr. Smith described, but abandoned each in turn because each was infeasible for a statewide analysis statutorily based on the Community Policing Act data. Instead, DCJS used age-adjusted census data, an estimate of the number of residents in a particular area that were eligible to drive, which is, "at best, a crude measure" of the driving population. DCJS Report at 65. This is because only the driving population is "exposed to potential traffic stops," "[s]ome residents do not drive at all" or only rarely drive, and "some racial/ethnic groups may be more likely than others to use public transportation rather than drive." *Id.* Thus, given that an age-adjusted census measure is "at best, a crude measure," it is indefensible for Dr. Coston to use a general population census benchmark that inexplicably includes 0-14 year-olds despite their categorical inability to legally drive. Moreover, if the ratio of different racial and ethnic groups vary for different age groups, the inclusion of age groups that do not drive or seldom drive would further undermine the accuracy of census data for capturing who is driving in a region.

DCJS officials and Dr. Smith are unaware of any scientific literature that supports the use of general census benchmarks. The complete lack of support for Dr. Coston's analysis in the

literature and its non-existent use among those who actually study and publish in the field of police racial profiling further dooms the defense's analysis under *Daubert*.

Another problem that limits all approaches that rely on census data is that they fail to account for non-residents being stopped while driving through a particular area. Drivers are not only stopped or ticketed in their own neighborhoods, but Dr. Coston's approach assumes this to be true, especially when overlaying the stop data over a map of Richmond showing the racial race distribution of the population. Dkt. 66-1 at 8-11. According to DCJS, "[m]any localities have high numbers of drivers from different racial/ethnic groups who are passing through the locality – and subject to being stopped – but who are not residents and therefore are not counted in the localities' resident population figures. These nonresident driver stops can skew measures of traffic stop disparities for such localities." DCJS Report at 8. Richmond sits at the crossroads of I-95 and I-64, is surrounded by suburbs, has numerous businesses within city limits, and contains Virginia Commonwealth University,[10] all of which indicate countless nonresident drivers, but Dr. Coston has no way to account for them.

It is further unrealistic to assume, as Dr. Coston does, that the race of those stopped by police will match the race of the local residents. DCJS and Dr. Smith both agree there are numerous reasons to question this simplistic assumption of Coston's. "*Police typically deploy more officers to neighborhoods with higher crime rates and which generate more calls for service.* Moreover, modern police crime control strategies increasingly rely on the deployment of officers to crime 'hot spots' where crime mapping indicates offenses have recently occurred and are expected or predicted to occur again." Exhibit A, Dr. Smith Report at 3 (citations omitted; emphasis added).

---

[10] VCU's presence within the 4th Precinct further complicates the analysis. VCU is more racially diverse than the rest of the 4th Precinct. Data USA, *Virginia Commonwealth University*, available at https://datausa.io/profile/university/virginia-commonwealth-university (last accessed April 8, 2022). This is yet another important variable that Dr. Coston neglected and left unexamined.

DCJS adds in its report that research indicates some reasons other than bias for disproportionate rates of traffic stops include "[d]ifferent driving rates or patterns by different racial groups, (perhaps linked to differences in housing or employment locations, in use of public transportation, etc.)[;] [d]ifferent rates of policing in different areas (racial minorities may be more likely to drive in or through higher-crime areas, which are policed more than other areas)[; and] [d]ifferent agency practices (some law-enforcement agencies differ on how much discretion they give officers in deciding when to make a stop)." DCJS Report at 8. Thus, crime rates and calls for service create demand for additional law enforcement in an area, which may explain why some areas of any city experience more traffic stops than others. This neutral, commonsense crime prevention strategy is non-discriminatory and eminently reasonable.

Richmond crime rates do in fact vary significantly by precinct, which supports the points raised by both Dr. Smith and DCJS. From July 1 to December 5, 2020 (the date of the relevant stop), crime was not evenly distributed among the precincts but was instead concentrated in Precincts 1, 2, and 4 for violent crimes and focused in Precincts 1 and 4 for all crimes. Richmond Police Department, Crime Incident Information Center, apps.richmondgov.com/applications/CrimeInfo.

| Precinct | Percentage of Violent Crime[11] | Percentage of Total Crime | Percentage of Traffic Stops[12] |
|----------|---------------------------------|---------------------------|---------------------------------|
| 1 | 30.1% | 27.8% | 27.4% |
| 2 | 28.5% | 22.5% | 17.1% |
| 3 | 17.6% | 22.7% | 19.8% |
| 4 | 23.9% | 27.1% | 35.8% |

---

[11] The violent crime category includes homicides, sex offenses, robberies, and assaults.

[12] Of the 2369 stops that occurred within Richmond in Coston's data (excluding the 209 that fall outside Richmond), 649 of the stops occurred in Precinct 1, 404 in Precinct 2, 469 in Precinct 3, and 847 in Precinct 4. Precinct locations for the stops were obtained by inserting Coston's calculated latitude and longitude values (or corrected values, if any) into the Richmond GIS mapping application, which can overlay police precincts. ArcGIS, Richmond GIS, https://www.arcgis.com/home/webmap/viewer.html?panel=gallery&layers=1919069137714e27be683c3247a68fca.

Adding the column for traffic stops from Dr. Coston's data provides an illuminating comparison. The traffic stop percentages, with slight variations, closely track the violent and total crimes percentages. This is revealing because, as the defendant has repeatedly made clear, Precincts 1, 2, and 4 are overwhelmingly African American while Precinct 3 is more white. *See, e.g.*, Dkt. 66 at 6. The percentage of traffic stops hews far more closely to underlying crime rates than to race generally. That traffic stop percentages closely track underlying crime rates is powerful evidence that undercuts Dr. Coston's conclusion that race is a primary reason for traffic stops; instead, it appears crime rates are at least a significant confounding variable.

Dr. Coston's analysis shows at best "only *where* people drive and *who they are* (race) but account for none of the factors that otherwise influence the racial composition of traffic stops or how or why they occur in some areas more than others." Exhibit A, Dr. Smith Report at 3. By failing to account for the myriad reasons for a traffic stop besides race, Coston's report falls far short of the standard required under Rule 702. *Id.* at 4 ("I have never seen an analysis like this in a peer-reviewed scientific publication, and for good reason. The scientific community of scholars who study racial disparities in traffic stops would not accept this type of analysis to support an inference of racial bias in traffic stops."). The traffic stop percentages are a perfect example. Dr. Coston claims race is a key driver of traffic stops, but it also appears that crime rates are a good predictor. The relationship among these variables is unclear: race and crime rates are likely significantly correlated, but the causal relationship is ambiguous. *See* Exhibit A, Dr. Smith Report at 5-7 (discussing the strict requirements to determine causation). There may be other factors that similarly are ingredients in the correlative soup: socioeconomic status, education, average home values, percentage of homeowners versus renters, etc. But Dr. Coston's analysis ignores the

17

**JA0440**

unending complexity of these other variables and simply asserts that race causes an increase in traffic stops because the two variables correlate in an indeterminate way.

Another key weakness of Dr. Coston's analysis design is that they attempt to answer whether officers in the 4th Precinct violated the defendant's rights using citywide data. Whatever the reason for Coston's choice to ignore the precinct locations in her analysis, this decision further weakens the report's value in adjudicating whether an equal protection violation occurred in this case. The officers that initiated the traffic stop of the defendant were members of the 4th Focus Mission Team, were restricted to the 4th Precinct, and had no control over the precinct boundaries. *See, e.g.*, Dkt. 66 at 8 (faulting RPD for the precinct boundaries). The relevant unit of analysis is the 4th Precinct. Expanding the analysis to the rest of the city is unhelpful and fails to identify similarly situated persons for purposes of the Equal Protection Clause. RPD has chosen to exercise its executive prerogative by organizing racially heterogeneous precincts. By mixing together the stop results from the different precincts, Dr. Coston sacrifices accuracy and relevance for the sake of convenience.

    4.   Even apart from the problems with the data Dr. Coston uses, the statistical techniques that Dr. Coston relies on are insufficient.

After all the issues with the data and Dr. Coston's research design extensively noted above, the chosen statistical analysis is also severely lacking and well outside the norm for research in the field of racial profiling. Coston acknowledges that a regression analysis is most commonly used for answering whether race causes disproportionate number of stops, Dkt. 66-1 at 4, and Dr. Smith explains why—regression allows a researcher to statistically "isolate the influence of one variable on the outcome of interest while controlling for other known influences that may themselves be correlated with the outcome." Exhibit A, Dr. Smith Report at 5. That is precisely one of the questions before the Court: is race the cause of traffic stops generally, and in this case, or is it due

18

**JA0441**

to something else? But Dr. Coston chose not to use a regression analysis, and did not control for any other factors that may have contributed to who was stopped or what outcomes they received. Much like a doctor arrives at the proper diagnosis by considering and rejecting alternatives, so too do racial bias researchers attempt to eliminate alternatives by including them as independent variables (police enforcement patterns, background crime rates, race, calls for service, socioeconomic status, etc.) and measuring changes in the dependent variables (stops, arrests, searches, etc.).

Coston ignores the well-established need to account for alternative explanations. Coston chose not to utilize a regression analysis due to alleged "interrelationships among the independent variables," but that point hardly demonstrates the validity of the crude analysis Coston chose to rely on. Researchers have long understood that "police deployment variables often correlate with race and ethnicity in America's urban neighborhoods." Exhibit A, Dr. Smith Report at 3 (citing Tomaskovic-Devey et al. (2004)). The key is remembering that disproportionate police action does not violate equal protection principles merely for being disproportionate, but only if the motivation for the actions causing the disproportionate effect are race-based. *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016). By failing to separate or control for the legitimate reasons for a disparity in stops from the illegitimate, Coston's analysis becomes irrelevant—even setting aside the deep problems with the data used.

There certainly are legitimate reasons for disparities in stops, searches, and arrests that Dr. Coston does not consider or evaluate.[13] For example, Dr. Coston fails to control for the severity of

---

[13] Well-established RPD policies also prohibit the sort of biased policing that the defendant suggests is rampant. Richmond Police Department, General Order on Constitutional Rights at 1 (eff. Feb. 11, 2019) ("All citizens of this country, under the Constitution, are guaranteed certain basic rights. It is the policy of the Richmond Police Department to safeguard these rights without bias . . ."); Richmond Police Department, General Order on Bias Reduction at 1 (eff. Feb. 13, 2018) ("Department employees shall exercise duties, responsibilities, and obligations in a manner that does

the reason for the stop (drivers stopped for a more serious crime are more likely to be subject to further scrutiny, like driving while drunk versus failing to use a turn signal), and low discretion arrests like arrests on outstanding warrants or searches like searches incident to arrest. Dr. Coston's failure to control for these other outcomes and conduct a simple analysis based only on two variables—race and stop data—is "not scientifically supportable" for the reasons described by Dr. Smith. Exhibit A, Dr. Smith Report at 5. In essence, and as anyone who has taken an introductory statistics class can attest, Coston has committed the gravest sin of statistics: mistaking correlation for causation. By showing only correlation and choosing a statistical test that cannot even begin to show causation, Coston's analysis is worthless to the question before the Court.

Contrasting Dr. Coston's work with a recent profiling case from North Carolina highlights the deficiencies of their work. As described more fully by Dr. Smith, *id.* at 6-7, in *United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2013), the federal government sued a county in North Carolina, alleging the county unconstitutionally subjected Hispanic drivers to greater scrutiny and enforcement than other drivers. The government's expert in that case, Dr. John MacDonald, was a respected and "highly qualified criminologist" who utilized a regression analysis that included many independent variables to determine the effect of each one of the dependent variables (stops, arrests, searches, etc.). Exhibit A, Dr. Smith Report at 6-7. The Court rejected Dr. MacDonald's work because, even though he attempted to control for as many variables as possible, he could not control for the seriousness of the driver's conduct, which may have explained the disparate arrest and citation outcomes for the Hispanic drivers. Similarly, for his analysis on searches, the Court rejected his testimony because he could not control for non-discretionary searches. Without

---

not discriminate on the basis of race . . ."); *id.* at 2 ("Officers are strictly prohibited from engaging in bias-based policing/profiling. All complaints of bias-based policing/profiling shall be thoroughly investigated . . ."). Full copies of these policies are attached as Exhibit B.

controlling for these other possible factors, an expert cannot say with any degree of confidence that a similarly situated racial group received a different outcome because of race, or, in other words, that race *caused* the disparate outcomes. Dr. MacDonald's analysis in *Johnson* was rejected for failing to exclude plausible alternative theories. Dr. Coston's report does not even consider alternative theories, and should be rejected entirely.

Indeed, Dr. Coston's report is merely a less sophisticated version of the analysis performed in the 2021 DCJS report, but the authors of the DCJS report—writing under statutory command to provide relevant and accurate information to decisionmakers—were very forthcoming about the limitations of their report and acknowledged its severe limitations in answering the question of whether the disparities they found were due to bias or other factors. DCJS Report at 8-10.

For the myriad reasons explained above, it is no exaggeration to say that Dr. Coston's report fails literally every single *Daubert* factor: "(1) whether the expert's theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Sardis*, 10 F.4th at 281 (citations omitted). Many theories about racial bias in policing have been tested, but Dr. Coston's work falls far outside the norm of generally accepted scientific standards and would be subject to scathing peer review. If the Court looks solely at the data Dr. Coston relied on, the known rate of error is at least 32%, and the unknown rate of error from poor or nonexistent initial Community Policing Act data combined with general population census data further renders Dr. Coston's conclusions plainly unreliable. These data integrity issues, many of them of Dr. Coston's own creation, demonstrate the lack of consistent and reliable standards. Simply put, Dr. Coston's analysis is wholly unreliable and insufficient.

## **Conclusion**

There is no evidence besides Dr. Coston's fatally flawed analysis that police targeted the defendant (or anyone else) for selective enforcement of the law in violation of the Constitution's guarantee of equal protection. Because Dr. Coston's work does not meet the minimum requirements of Daubert and Rule 702, the Court should deny the defendant's late-filed request to dismiss the indictment.

<div style="margin-left:40%">

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

</div>

By:  _____/s/_____
<div style="margin-left:40%">

Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

</div>

22

**JA0445**

## EXPERT REPORT

### Michael R. Smith, J.D, Ph.D.

The conclusions reached by Dr. Eli Coston in their report entitled "Traffic Stops by the Richmond Police Department: July 1, 2020 – December 6, 2020" are unsupported by the data and analysis they conducted and rely upon elementary statistical techniques that no experienced social scientist familiar with racial disparity research in policing would rely on to draw inferences of bias. Below, I will address each of the primary claims that Dr. Coston makes in the concluding section of their report and demonstrate why they cannot and should not make them based on the analyses they conducted:

- Black drivers are at a significant disadvantage compared to White drivers in Richmond
  - Black drivers are more likely to experience arrests than White drivers, particularly after high discretion traffic stops
  - Black drivers are more likely to experience searches than White drivers
- Spatial analyses of stops show patterns "implicating race as a factor in traffic stops"

Below, I discuss each of these claims, but I take them in reverse order. I discuss first the initial decision to stop a driver and why the spatial analyses Dr. Coston conducted cannot be used to draw valid conclusions about racial disparities among Black and White drivers, let alone support an inference of bias. Next, I address the claim of more punitive outcomes (i.e., searches and arrests) allegedly experienced by Black drivers *after* a stop has occurred and why those claims, too, are scientifically invalid.

### The Initial Stop Decision

For more than 20 years, researchers have studied whether the race and/or ethnicity of drivers influences the decisions by police officers to make traffic stops. In 2001, a colleague and I published the first peer-reviewed article to investigate racial disparities in traffic stops and stop outcomes using traffic stop data from Richmond (Smith & Petrocelli, 2001), a paper that has since been cited more than 270 times by other scholars. In those days, there was little scholarship on "racial profiling," and there was no methodological roadmap for scholars to follow. Even then, though, we recognized that examining the raw percentages of drivers stopped by race is meaningless unless, at a minimum, those percentages can be compared against an estimate of the population of *drivers* in the jurisdiction of interest (Alpert et al., 2004; Fridell, 2004; Ridgeway & MacDonald, 2010). In the years following the publication of our paper, a robust literature has developed on racial/ethnic disparities in traffic stops, and science has evolved and improved on the key issue of *benchmarks* (Alpert et al., 2007; Grogger & Ridgeway, 2006; McLean & Rojek, 2016; Ritter, 2017; Smith et al., 2021; Tillyer et al., 2010).

1

## JA0446

Today, census-based benchmarking is no longer accepted as a scientifically valid technique for comparing against police traffic stop data. First generation studies, including our original Richmond study, used census or age-adjusted (aged 15-16 and older) census data to compare against the racial composition of drivers stopped by the police (Smith et al., 2021). Census data is free and readily available and makes a convenient benchmark. Unfortunately, as later comparative studies made clear (see Alpert et al., 2004), the population of persons who *live* in an area often serves as a poor representation of persons who *drive* in an area or who are *at risk* for being stopped by the police. Census benchmarking does not account for out-of-area drivers, differential exposure to the police due to differences in police deployment patterns within a city or state, or differences in driving behavior across racial groups (Ridgeway & MacDonald, 2010; Smith et al., 2019; Tillyer et al., 2010), among other factors. While all benchmarks suffer from certain limitations, census-based benchmarks are so far off the mark as valid estimates of the actual driving and/or traffic violating populations that informed social scientists should no longer use them (Ridgeway & MacDonald; Smith et al., 2021).

Most social scientists who regularly study racial disparities in traffic stops would agree that direct field observation of drivers is the "gold standard" for benchmarking (McLean & Rojek, 2016; Alpert et al., 2004). Unfortunately, field observation is expensive and time-consuming, and due to those limitations, it has been used in only limited areas (e.g. at selected intersections or stretches of highway) and in a relatively few studies (Alpert et al., 2004; Lange et al., 2001; Zingraff et al., 2000). Instead, two alternative benchmarks have emerged that have been tested in multiple cities and now appear regularly in the peer-reviewed literature.

Grogger & Ridgeway (2006) developed a widely used statistical test, which does not rely upon external benchmark data, to compare rates at which minority and White drivers are stopped by the police. Often referred to as the "veil of darkness" (VOD) technique, it makes use of the natural variation in daylight that occurs across the year and with changes in daylight savings time to compare the proportion of drivers stopped at night to those stopped during the day by racial group. Theoretically, if more minority drivers are stopped during daylight hours when police can more easily ascertain their race, then this provides evidence of possible racial bias, particularly if there are no differences in the rates at which White drivers are stopped during the day compared to at night. This technique has been widely replicated and reported in the scientific literature (Channin, et al., 2016; Pierson et al., 2020; Ritter & Bael, 2009; COPS, 2016; Ross et al, 2016; Taniguchi et al., 2016; Vito et al., 2020; Worden et al., 2012).

In addition, Alpert and colleagues (including this author) pioneered a benchmarking technique using not-at-fault drivers in two vehicle crashes as a proxy for the driving population (Alpert et al., 2004; Lovrich et al., 2007). Drawing upon the traffic safety literature that has long-used crash data for an unbiased estimate of risk among subpopulations (usually age and gender-related), Alpert and colleagues theorized that the racial composition of not-at-fault drivers would serve as

an unbiased estimate of persons *driving* (as opposed to residing) in a jurisdiction that could be compared against the percentage of drivers of different races stopped by the police. This technique has since been extended to the use of *at-fault* drivers as a proxy for traffic law *violators* (Withrow, 2015) and was recently tested against VOD in light of recent critiques of both VOD and crash-derived benchmarks (Smith et al., 2021). At the end of the day, while benchmarking is an inexact science, both traffic crash benchmarks and the VOD approach offer significant improvements over census-derived benchmarks, which no longer represent scientifically acceptable estimates of drivers at risk for being stopped by the police.

**Coston's Use of Census-Derived Mapping to Make Inferences of Bias**
Dr. Coston's use of maps to draw qualitative inferences about racial bias in stops made by the Richmond Police Department is scientifically invalid. Mapping in general, and cluster and/or heat mapping in particular, can be a useful technique for visualizing the spatial distribution of events (crimes, arrests, traffic stops) within a city. It cannot be used to draw causal inferences about the influence of race on traffic stops as Dr. Coston attempts to do.

First, the clustering of traffic stops by race can be influenced by a variety of factors. From a motorist perspective, the risk for being stopped by the police includes factors such as:
- Where people drive
- When they drive
- How often they drive
- What they drive (type of vehicle and its condition)
- How they drive (risky or traffic law violating driving behavior)
- Who they are (i.e. race, ethnicity, age, gender, etc.) (Tillyer et al., 2010)

From the police perspective, possible mechanisms that can influence stop disparities include overt bias or racial animus, unconscious or implicit bias, police deployment patterns or a mixture of all three (Tomaskovic-Devey et al., 2004). Police typically deploy more officers to neighborhoods with higher crime rates and which generate more calls for service (Engel, Smith, & Cullen, 2012; Parker, MacDonald, Alpert, Smith, & Piquero, 2004; National Research Council, 2004). Moreover, modern police crime control strategies increasingly rely on the deployment of officers to crime "hot spots" where crime mapping indicates offenses have recently occurred and are expected or predicted to occur again (Braga et al, 2019). As Tomaskovic-Devey et al. (2004) note, police deployment variables often correlate with race and ethnicity in America's urban neighborhoods.

Simple mapping techniques like those used by Dr. Coston show only *where* people drive and *who they are* (race) but account for none of the factors that otherwise influence the racial composition of traffic stops or how or why they occur in some areas more than others. The final heat map overlay of stops of Black drivers over the racial composition of Richmond neighborhoods (Coston, Fig. 5) is merely a rudimentary type of census-based benchmarking and suffers from all of the weaknesses of census benchmarks discussed above. It is rudimentary

3

**JA0448**

because the definition of what constitutes "predominate" populations of various racial or ethnic groups is unspecified, and the resolution of the map and the boundaries between "predominate" racial and ethnic neighborhoods is so diffuse as to be meaningless. Moreover, because residential populations do not reflect *racial driving* patterns or the roadway features, travel patterns, or social and economic factors that may influence who actually *drives* in a jurisdiction, they cannot be used to draw inferences of racial bias simply because clusters of traffic stops involving Black drivers occur in ill-defined transitional areas of the city. One might logically expect, for example, that clusters of stops of Black drivers might occur in such transitional zones as Black drivers commute from where they may live to where they may work along major thoroughfares.

Dr. Coston relies on outmoded and rudimentary analytic techniques to draw invalid inferences about racial bias in traffic stops. Without paying careful methodological attention to the comparison of stops of Black drivers to scientifically-accepted estimates of the racial composition of *drivers* within those transitional zones, no valid inferences about racial bias in traffic stops can be made.

In sum, I have never seen an analysis like this in a peer-reviewed scientific publication, and for good reason. The scientific community of scholars who study racial disparities in traffic stops would not accept this type of analysis to support an inference of racial bias in traffic stops. It is far too imprecise and explicitly makes use of outmoded residential census-based estimates to reach invalid and unsupportable conclusions about the influence of race on the decision by police officers to stop drivers in Richmond, Virginia.

### Post-Stop Outcomes

Like traffic stops themselves, police activities that occur *after or during* a stop have been the subject of a great deal of research over the past 20 years. Outcomes such as citations, warnings, searches, and arrests all have been studied extensively in the literature, and there is some empirical consistency across studies in how driver race/ethnicity can impact those outcomes *after controlling for* other factors also known to correlate with them (Alpert et al., 2006; Alpert et al., 2007; Engel et al., 2012; Ridgeway, 2009; Smith & Petrocelli, 2001; Smith et al., 2017).

Key to understanding the influence of driver race/ethnicity on post-stop outcomes is to appropriately account or statistically control for factors that may confound the relationship between driver race and outcomes such as searches, arrests, or citations. If the question is whether drivers of a certain minority group are arrested more frequently than Whites, then it is important to control for the severity of the violation that led to the stop as well as the seriousness of the offense for which the arrest occurred. For example, intoxicated drivers are more likely to be arrested than speeders. Likewise, drivers who have pre-existing warrants on file with NCIC

**JA0449**

will almost always be arrested, whereas police have greater discretion over on-view arrests based on probable cause developed during the stops themselves (Alpert et al, 2006).

Before valid inferences about bias can be made based on observed disparities in post-stop outcomes, researchers must *control for* the influence of exogenous factors such as pre-existing warrants or the seriousness of the offense on the arrest outcome being modeled. This is typically done using multivariate regression, which is a statistical technique used to isolate the influence of one variable on the outcome of interest while controlling for other known influences that may themselves be correlated with the outcome (Mertler & Reinhart, 2017). For searches, researchers must control for (or eliminate from consideration) *low discretion* arrests by controlling for the reason for the search. Searches incident to arrest or inventory searches are considered low discretion searches and are often required by agency policy or for officer safety reasons. Experienced analysts recognize that valid inferences about the influence of race on searches cannot be made unless the analyst controls for low versus high discretion search rationales (Alpert et al., 2006; Alpert et al., 2007; Smith et al., 2017).

**Coston's Inferences of Bias in Post-Stop Outcomes**

Dr. Coston's conclusions that Black drivers were more likely to experience searches or arrests than Whites based on simple *bivariate* analyses without controlling for other variables known to correlate with those outcomes such as warrants, reasons for the search, offense severity, or driver behavior or demeanor (Engel et al., 2011) are not scientifically supportable. Causal inferences are simply not possible with non-parametric tests like the chi-square statistic and its companion test for relationship strength – Cramer's V. Chi-square can only tell us that two variables are related to one another; it cannot be used to conclude that one variable has any causal effect on the other (Imbens & Rubin, 2015).

In order to infer that one variable (race) *caused* another (search or arrest) to occur, three conditions must be met:
- The variables must be associated or *correlated* with one another
- The cause must have *preceded* the effect in time (it must have come first)
- The effect must not have been caused by some other *unmeasured* factor (non-spuriousness)

In addition, research methodologists note the importance of two other conditions in specifying cause and effect:
- There must be a reasonable *mechanism* to explain how one thing *caused* another to occur
- The *context* of the observed relationship should be specified and accounted for (Bachman & Schutt, 2007)

To help meet the rigorous requirements for *causal inference* social scientists attempt to design research studies that, whenever possible, account for all five of these conditions. In the case of

5

**JA0450**

racial disparity research on police traffic stops and their outcomes, social scientists often turn to multivariate regression (discussed above) to help control for as many relevant factors as possible that might have influenced the observed outcome such as a citation, search, or arrest. In addition to driver race and ethnicity, important factors to take into consideration in a multivariate statistical model include things such as the reason for the stop, the seriousness of the traffic infraction or criminal offense for which the stop was made, the reason for the search, the time and location of the stop, the actions and demeanor of the driver, the condition of the vehicle itself, pre-existing warrants, and the environmental context of the area where the stop occurred, especially its crime rate or the type of roadway where the stop took place.

The literature is replete with studies that carefully measured as many of these variables as possible and controlled for them in multivariate statistical models that far exceeded the explanatory power of the rudimentary statistical techniques used by Dr. Coston (Alpert et al., 2006; Engel et al., 2012; Ridgeway, 2009; Smith & Petrocelli, 2001; Smith et al., 2017). Yet, even in those studies, the authors were careful not to infer *racial bias* as the cause of any observed disparities because of their inability to rule out the influence of other variables unavailable to them in their analyses.

A 2015 case from the Middle District of North Carolina is instructive on the limits of even carefully constructed multivariate regression models in proving racial bias in police traffic stop cases (*United States v. Johnson*, 2015). In *Johnson*, the U.S. government alleged that the sheriff of Alamance County engaged in a pattern or practice of discriminatory law enforcement in violation of the Constitution and the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. § 14141). Specifically, the government alleged that Sheriff Johnson's office (through its deputies) subjected Hispanic motorists to unreasonable searches, arrests, and traffic checkpoints in violation of their constitutional rights.

To help prove its case that Hispanics were discriminated against in searches and arrests in Alamance County, the government retained a highly qualified criminologist from the University of Pennsylvania (Dr. John MacDonald) who carried out a multivariate regression analysis predicting stop outcomes based on ethnicity of the drivers. Dr. MacDonald controlled for the generic reason for the stops available from the official data he analyzed (e.g. "speed limit violation" or "vehicle equipment violation"), but he was unable to control for the *seriousness* of the driver's conduct, which might have accounted for the dissimilar post-stop arrest and citation outcomes found between Hispanic and non-Hispanic drivers. The court concluded that Dr. MacDonald's statistical evidence was insufficient to prove that Hispanics were similarly situated to non-Hispanics with respect to the post-stop outcomes they received because another highly relevant variable – the reason for the arrest or citation – was not included in his analysis.

Similarly, with respect to his search analyses, Dr. MacDonald was unable to control for the *reason for the search* when he found that Hispanic drivers were more likely to be searched but

6

**JA0451**

less likely to be found with contraband compared to non-Hispanic drivers. The court noted the importance of controlling for non-discretionary searches, such as those conducted incident to arrest, and concluded that the government had failed to prove that ethnicity (Hispanic heritage) was the *cause* of the disparate search and hit rates observed among Hispanic drivers.

Thus, even *multivariate regression* models much stronger than the simple bivariate tests used by Dr. Coston often cannot be used to infer causal relationships because they cannot demonstrate that the group receiving the harsher outcome (e.g., search or arrest) was similarly-situated to the group not receiving those outcomes. As a result, careful social scientists do not infer bias based merely on observed differences in the treatment by police of persons from different racial groups. Such differential treatment may have nothing to do with race but instead may reflect *legitimate* differences between racial groups. For example, if one group is more likely than another to have outstanding arrest warrants on file, then members of that group likely would experience higher *arrest rates* than persons from the other group. Likewise, if one group drove recklessly or under the influence of alcohol or drugs more often than another, then this might explain higher observed arrest rates for that group.

Similarly, observed differences in searches between groups might be explained by higher or lower *contraband carry rates*, *higher rates of arrest* (and searches incident to those arrests), or *higher rates of vehicle impoundment* (and any resulting, *non-discretionary* inventory searches) among some racial groups compared to others. Accounting for the underlying *reason* for a search is critical to any search disparity analysis, but Dr. Coston's rudimentary bivariate analysis did not take this critical variable into account. Based on the analysis conducted, Dr. Coston cannot, with legitimate scientific rigor, conclude that the race of drivers in Richmond has a *causal influence* on the whether they are stopped, searched, arrested, or cited by officers from the Richmond Police Department.

## Conclusion

Dr. Coston's statistical and mapping analyses cannot support an inference of racial bias in traffic stops or post-stop outcomes received by Black drivers in Richmond. They fail to account for numerous non-racial factors known in the scientific community to correlate with stops and post-stop outcomes such as searches, arrests, and citations, and they do not meet the scientific threshold for causal inference.

*Michael R. Smith*

Michael R. Smith, J.D., Ph.D.

**JA0452**

**References**

Alpert, G.P., Becker, E., Gustafson, M.A., Meister, A.P., Smith, M.R., Strombom, B.A. (2006, February). *Pedestrian and motor vehicle post-stop data analysis report*. Los Angeles California: Analysis Group. https://www.analysisgroup.com/globalassets/uploadedfiles/content/insights/cases/lapd_data_analysis_report_07-5-06.pdf

Alpert, G.P., Dunham, R., & Smith, M.R.  (2007).  Investigating racial profiling by the Miami-Dade Police Department: A multimethod approach.  *Criminology & Public Policy*, 6(1), 25-56.

Alpert, G. P., Smith, M. R., & Dunham, R. G. (2004). Toward a better benchmark: Assessing the utility of not-at-fault traffic crash data in racial profiling research. *Justice Research and Policy*, *6*(1), 43-69.

Bachman, R. & Schutt, R.K. (2007). *The practice of research in criminology & criminal justice* (3rd ed.). Thousand Oaks, CA: Sage.

Channin, J., Welsh, M., Nurge, D., & Henry, S. (2016). Traffic enforcement in San Diego, California: An analysis of SDPD vehicle stops in 2014 and 2015. San Diego, CA: San Diego State University. https://www.sandiego.gov/sites/default/files/sdpdvehiclestopsfinal.pdf

COPS. (2016). *Collaborative reform initiative: An assessment of the San Francisco police department.* Washington, DC: Office of Community Oriented Policing Services. https://www.sanfranciscopolice.org/sites/default/files/2021-04/DOJ_COPS%20CRI_SFPD%20OCT%202016%20Assessment_0.pdf.

Engel, R. S., Cherkauskas, J. C., Smith, M. R., Clutter, J., & Grothoff, G. (2012) Traffic stop data analysis study: Year 5 (2010) final report. *Institute of Crime Science, University of Cincinnati.*

Engel, R. S., Smith, M. R., & Cullen, F. T. (2012). Race, place, and drug enforcement: Reconsidering the impact of citizen complaints and crime rates on drug arrests. *Criminology & Public Policy, 11*, 603–635.

Engel, R.S., Tillyer, R., Klahm, C., & Frank, J. (2011). From the officer's perspective: A multilevel examination of citizens' demeanor during traffic stops. *Justice Quarterly, 29*, 650-683.

**JA0453**

Fridell, L. A. (2004). *By the numbers: A guide for analyzing race data from vehicle stops*. Washington, D.C.: Police Executive Research Forum.

Grogger, J., & Ridgeway, G. (2006). Testing for racial profiling in traffic stops from behind a veil of darkness. *Journal of the American Statistical Association, 101*, 878-887.

Imbens, G.W. & Rubin, D.B. (2015). *Causal inferences for statistics, social, and biomedical sciences: An introduction.* New York: Cambridge University Press.

Lange, J. E., Blackman, K. O., Johnson, M. B. (2001). *Speed violation survey of the New Jersey Turnpike: Final report*. Calverton, MD: Public Services Research Institute.

Lovrich, N. P., Gaffney, M. J., Mosher, C. C., Pratt, T. C., & Pickerill, M. J. (2007). *Results of the monitoring of WSP traffic stops for biased policing*. Pullman, WA: Division of Governmental Studies and Services, Washington State University.

McLean, K. & Rojek, J. (2016). Traffic stops, race, and measurement. In B.M. Huebner & T.S. Bynum (Eds.), *The handbook of measurement issues in criminology and criminal justice* (pp. 452-472). Hoboken, NJ: Wiley.

Mertler, C.A. & Reinhart, R.V. (2017). *Advanced and multivariate statistical methods* (6th ed.). New York: Routledge.

National Research Council. (2004). *Fairness and effectiveness in policing*. Washington, D.C: National Academies Press.

Parker, K. F., MacDonald, J. M., Alpert, G. P., Smith, M. R., & Piquero, A. R. (2004). A contextual study of racial profiling: Assessing the theoretical rationale for the study of racial profiling at the local level. *American Behavioral Scientist, 47*, 943–962.

Pierson, E., Simoiu, C., Overgoor, J., Corbett-Davies, S., Jenson, D., Shoemaker, A., Ramachandran, V., Barhouty, P., Phillips, C., Shroff, R., & Goel, S. (2020). A large-scale analysis of racial disparities in police stops across the United States. *Nature Human Behavior, 4*, 736-745. https://doi.org/10.1038/s41562-020-0858-1.

Ridgeway, G. (2009). Cincinnati Police Department traffic stops: Applying RAND's framework to analyze racial disparities. RAND: Center on Quality Policing. https://www.rand.org/pubs/monographs/MG914.html.

**JA0454**

Ridgeway, G., & MacDonald, J. (2010). Methods for assessing racially biased policing. S.K. Rice & M.D. White (Eds.), *Race, ethnicity, and policing: New and essential readings*, (pp. 180-204). New York: NYU Press.

Ritter, J.A. (2017). How do police use race in traffics stops and searches? Tests based on observability of race. *Journal of Economic Behavior & Organization*, *135*, 82-98.

Ritter, J. A., & Bael, D. (2009). Detecting racial profiling in Minneapolis traffic stops: A new approach. Minneapolis, MN: University of Minnesota. https://conservancy.umn.edu/bitstream/handle/11299/118720/39-1%262-Issue.pdf?sequence=1&isAllowed=y

Ross, M. B., Fazzalaro, J., Barone, K., & Kalinowski, J. (2016). State of Connecticut traffic stop data analysis and findings, 2014–15. New Britain, CT: Central Connecticut State University. https://imrp.dpp.uconn.edu/wp-content/uploads/sites/3351/2021/09/May-2016.pdf

Smith, M. R. & Petrocelli, M. (2001). Racial profiling?: A multivariate analysis of police traffic stop data. *Police Quarterly*, 4, 4-27.

Smith, M.R., Rojek, J., Tillyer, R., & Lloyd, C. (2017). *San Jose Police Department traffic and pedestrian stop study*. El Paso, TX: University of Texas at El Paso. https://www2.sjpd.org/records/UTEP-SJPD_Traffic-Pedestrian_Stop_Study_2017.pdf

Smith, M.R., Tillyer, R., Lloyd, C., & Petrocelli, M. (2021). Benchmarking disparities in police stops: A comparative application of 2nd and 3rd generation techniques. *Justice Quarterly*, *38,* 513-536. https://doi.org/10.1080/07418825.2019.1660395

Smith, W. R., Tomaskovic-Devey, D., Zingraff, M. T., Mason, M., Warren, P. Y., & Wright, C. P. (2004). The North Carolina highway traffic study. Final report to the National Institute of Justice. https://www.ncjrs.gov/pdffiles1/nij/grants/204021.pdf.

Taniguchi, T., Hendrix, J., Aagaard, B., Strom, K., Levin-Rector, A., & Zimmer, S. (2016). A test of racial disproportionality in traffic stops conducted by the Raleigh Police Department. Triangle Park, NC: RTI International. https://www.rti.org/publication/test-racial-disproportionality-traffic-stops-conducted-raleigh-police-department

Tillyer, R., Engel, R. S., & Cherkauskas, J. C. (2010). Best Practices in Vehicle Stop Data Collection and Analysis. *Policing: Int'l J. Police Strat. & Mgmt., 33*, 69-92.

**JA0455**

Tomaskovic-Devey, D., Mason, M., & Zingraff, M. (2004). Looking for the driving while black phenomena: Conceptualizing racial bias processes and their associated distributions. *Police Quarterly, 7*, 3-29.

*United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2013.

Vito, A.G., Griffin, V.W., Vito, G.F., & Higgins, G.E. (2020). "Does daylight matter"? An examination of racial bias in traffic stops by the police. *Policing: An International Journal, 43*. https://doi.org/10.1108/PIJPSM-04-2020-0055

Withrow, B. L. and Williams H. (2015).  Proposing a benchmark based on vehicle collision data in racial profiling research. *Criminal Justice Review*, 40 (1), 449-469.

Worden, R. E., McLean, S. J., & Wheeler, A. P. (2012). Testing for racial profiling with the veil-of-darkness method. *Police Quarterly*, *15*, 92-111. https://doi.org/10.1177%2F1098611111433027

Zingraff, M. T., Mason, H. M., Smith, W. R., Tomaskovic-Devey, D., Warren, P., McMurray, H. L., & Fenlon, C. R. (2000). Evaluating North Carolina State Highway Patrol data: Citations, warnings, and searches in 1998. Raleigh, NC: North Carolina State University, Center for Crime and Justice Research.

**JA0456**

| RICHMOND POLICE DEPARTMENT<br>GENERAL ORDER | | | | |
|---|---|---|---|---|
| Subject: **CONSTITUTIONAL RIGHTS** | | Chapter<br>1 | Number<br>2 | Pages<br>10 |
| References:<br>CALEA Standards: 1.2.3 | Related Orders: General Order<br>1-6, 6-26, 7-18 | | Effective Date: **02/11/2019**<br>Revised By: **Review**<br>Prv. Rev. Date: 09/02/15 | |
| Chief of Police:<br>*William C. Smith* | | | | |

I.   PURPOSE

The purpose of this directive is to define the authority of officers to arrest with and without a warrant, establish the policy and procedure for receiving admissions and confessions, establish the policy and procedures for safeguarding the constitutional civil rights of each person having contact with the Department without regard to race, creed, national origin, gender, sexual orientation, age or economic status, and to help officers determine when field interviews are necessary and useful and establish procedures for conducting them safely.

II.  ***SUMMARY OF CHANGE***

**There are no revisions for this publication at this time.**

III. POLICY

All citizens of this country, under the Constitution, are guaranteed certain basic rights.  It is the policy of the Richmond Police Department to safeguard these rights without bias, and to follow all laws and Department policies, procedures and regulations to ensure that these safeguards shall not be denied any citizen.  It is also the policy of the Department to ensure the preservation of evidence and protect constitutional rights of arrestees. All Sworn Department Employees shall familiarize themselves with the laws, Department policies, procedures, and regulations pertaining to civil rights.

Short of the application of force, an arrest is the most serious action an officer can undertake. The most important legal question facing an officer at the moment of arrest is the existence of probable cause; without probable cause, the arrest is illegal and the evidence of criminality that was obtained because of the illegal arrest is inadmissible.  Officers shall, accordingly, exercise critical judgment in making arrests.  Critical judgment includes consideration for bystanders, the time, place and location of offenses and the use of force in making the arrests.  Officers shall consider alternatives to arrest consistent with the law enforcement mission.

The Department expects and encourages officers to conduct field interviews.  Field interviews are important contacts with citizens that aid in preventing and investigating crime. Technically, a field interview is a lawful stop of a citizen for investigative purposes.  Officers shall document stops for the purposes of identifying suspects, witnesses <u>or</u> victims for crime prevention, intelligence gathering and community relations.  The Department expects officers

JA0457

to gather such information with proper observance of constitutional safeguards. Field interviews frequently contribute to establishing the reasonable suspicion or probable cause to arrest or conduct a search.                                             *[CALEA 1.2.3]*

III.  <u>ACCOUNTABILITY STATEMENT</u>

All employees are expected to fully comply with the guidelines and timelines set forth in this general order.  Failure to comply will result in appropriate corrective action.  Responsibility rests with the Division Commander to ensure that any violations of policy are investigated and appropriate training, counseling and/or disciplinary action is initiated.

This directive is for internal use only, and does not enlarge an employee's civil liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third party claims. Violation of this directive, if proven, can only form the basis of a complaint by this department, and then only in a non-judicial administrative setting.

IV.  <u>DEFINITIONS</u>

A.  ARREST – An arrest is a seizure of a person.  An arrest must be supported by probable cause.  Generally, according to Fourth Amendment cases, the test of whether an arrest has taken place is whether a reasonable person under the circumstances would have felt free to leave.

B.  FIELD INTERVIEW – A consensual encounter with a person to determine that person's identity and to resolve the suspicions about possible criminal activity.  A field interview resolves an ambiguous situation.  A field interview contrasts with a stop which is based on reasonable suspicion of criminal behavior.  Field interviews require voluntary cooperation of citizens.

C.  ONESOLUTION – The Records Management System (RMS) used by the Department.

D.  PROBABLE CAUSE – According to the U.S. Supreme Court: Probable cause exists when the facts and circumstances within the arresting officer's knowledge and of which the arresting officer had reasonable trustworthy information of, are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed by the suspect.

E.  REASONABLE SUSPICION – Articulable facts which lead an experienced officer to reasonably suspect that a crime has been or is about to be committed.  A well-founded suspicion based on the totality of circumstances and does not exist unless it can be articulated.

F.  STOP – The detention of a subject for a brief period.  To make a stop, the officer must have reasonable suspicion to believe that criminal activity is afoot and that the person to be stopped is involved.  A stop is an investigative detention.  The following characteristics may, under the circumstances, give rise to reasonable suspicion for the stop:

1.  A person fits the description on a wanted notice;

2. A person has exhibited furtive conduct such as fleeing from the presence of an officer or attempting to conceal an object from the officer's view;

3. The appearance, behavior or actions of the suspect suggests that he/she is committing a crime;

4. The time of day or night is inappropriate for the suspect's presence in a particular area;

5. The officer observes a vehicle that is similar to that of a broadcast description for a known offense;

6. A person exhibits unusual behavior such as staggering or appearing to be in need of medical attention;

7. The suspect is in a place proximate in time and location to an alleged crime; and,

8. The suspect is carrying an unusual object or his clothing bulges in a manner consistent with carrying a weapon.

V. __PROCEDURE__

A. Arrest:

All citizens of the United States are guaranteed protection against unlawful arrest.

1. Department members shall uphold these rights by taking a person into custody only when there are reasonable grounds to believe that:

   a) An arrest warrant is confirmed by the issuing jurisdiction for the person being taken into custody; or,

   b) The officer is in compliance with any of the provisions of VA Code §19.2-81, which states generally that:

   "An officer may arrest, without a warrant, any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence."

2. An officer can make an arrest without a warrant of any person at a traffic accident scene or at a hospital or medical facility to which any person involved in such accident has been transported, upon reasonable grounds to believe, based upon personal investigation, including information obtained from eyewitnesses, that a crime has been committed by any person then and there present.

3. An officer may arrest for a misdemeanor, not committed in his/her presence, in the following cases:

   a) Shoplifting;

   b) Carrying a weapon on school property;

    c)    Brandishing a firearm;

    d)    Destruction of property located on business/commercial premises; or,

    e)    Assault and battery.

4.    An officer may arrest without a warrant for:

    a)    Assault and battery against a family or household member;

    b)    Violation of a stalking protective order; or,

    c)    Violation of any provision of a protective order regardless of whether such violation was committed in his/her presence, if such arrest is based on probable cause, upon personal observations, the reasonable complaint of a person who observed the alleged offense or upon personal investigation.

5.    Once a person is arrested, he/she shall be taken, forthwith, before a Magistrate where his/her rights shall be explained.

6.    Department members shall, at all times, be aware of a prisoner's rights and shall:

    a)    Expedite all necessary processing so that the prisoner shall not be detained any longer than necessary;

    b)    Never use force, coercion or other illegal or unethical procedures in seeking admissions of guilt or confessions; and,

    c)    Recognize and respect the prisoner's right to refuse to give evidence against him/herself.  However, there is no encroachment upon a prisoner's rights if he/she voluntarily supplies such information.

    d)    At all times, Department members shall be aware that special circumstances surround juvenile arrestees.  In addition to the above mentioned procedures, the following shall also apply when a juvenile is in a custodial interrogation situation:    *[CALEA 44.2.3]*

    e)    The juvenile shall be afforded the opportunity to confer with his/her parent(s) or guardian(s) at a time deemed appropriate by the officer or detective;    *[CALEA 44.2.3]*

    f)    The duration of any interrogation or interview and the number of officers engaging in the interrogation or interview shall be limited based on reasonableness considering the totality of the circumstances surrounding the interrogation or interview;

    g)    The Department member may need to explain the agency's procedures and the juvenile justice system's procedures to the juvenile(s) being interrogated or interviewed; and,    *[CALEA 44.2.3]*

    h)    For additional information concerning Juvenile Procedures, refer to General Order 07-18, Juvenile, Truancy and Curfew Procedures.

B.   Field Interviews/Stops:

   1.   Making the field interview or stop (general):       [CALEA 1.2.3a]

      a)   An officer may conduct field interviews or stops when he/she reasonably believes that some investigative inquiry is warranted.  The Supreme Court has ruled that an officer "may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest."

      b)   A field interview requires voluntary cooperation from the citizen.  In the absence of probable cause to arrest, the citizen may discontinue the interview at any time and leave.  The citizen may also refuse to produce identification or otherwise identify himself.

        NOTE: A distinction is drawn herein between a field interview and a stop.

      c)   A stop is a brief detention of a person because of suspected criminal behavior.

      d)   An officer must be able to articulate the circumstances that warranted an interview or stop of the citizen.  The circumstances may constitute the officer's reasonable suspicion.  In court—should a field interview or stop result in an arrest—an officer must justify his intrusion by describing "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Articulable circumstances derive from:

        (1)   Firsthand observations;

        (2)   Hearsay, as from reliable informants;

        (3)   "Collective knowledge" or information shared by several officers; and,

        (4)   The totality of facts and circumstances.

   2.   Field interviews and field interview reports serve as:

      a)   A source of information;

      b)   A means of identifying the suspect; and,

      c)   A means of obtaining suspects and/or witnesses.

   3.   Place of the interview:

      a)   As a general rule, field interviews may be conducted anywhere the officer has a right to be, including:

    (1)   City of Richmond-owned or controlled property, normally open to members of the public;

    (2)   Areas intended for public use or normally exposed to public view;

    (3)   Places to which an officer has been admitted with the consent of the person empowered to give such consent;

    (4)   Places where circumstances require an immediate law enforcement presence to protect life, well-being or property;

    (5)   Areas where an officer may be admitted pursuant to a lawful arrest or search warrant; and,

    (6)   Any other area in which an officer may effect a warrantless arrest.

b)   Field contacts shall not be done to coerce a person to leave an area or place where he or she has a legitimate right to be and where no violation of law has occurred.

4.   Conduct of field interviews:

a)   Officers shall clearly identify themselves and, if not in uniform, display identification.

b)   Officers shall be cognizant of the distinction between an interview and a stop and the fact that the distinction depends largely on whether, under the circumstances, the citizen perceives that he or she is free to leave.  Officers shall comply with the following guidelines:

    (1)   Abrupt, short responses that could be misunderstood and requests which could be misinterpreted as commands must be avoided.

    (2)   The duration of the interview should be as brief as possible.

    (3)   During the interview, officers should confine their questions to those concerning the suspect's identity, place of residence and other matters necessary to resolve the officer's suspicions.

    (4)   <u>Miranda</u> warnings are not required during field interviews.  The warnings are not required until custodial questioning takes place.

    (5)   <u>If, during a field interview, a person asks whether he or she must respond or indicates that he or she feels compelled to respond, the officer shall immediately inform him or her of the right to refuse, as well as the right to leave.</u>

5.   Recording the Field Interview:

a)   To achieve the mission of enhancing the capabilities of ONESolution, officers shall be required to use Mobile Field Reporting (MFR) for data

entry of field contact/interview information. In the event that patrol vehicle, precinct(s) and specialized units access to MFR is unavailable or inaccessible for the officer's usage, the following process must be adhered to:

(1)     The officer shall complete a PD-54 (Field Contact Report). Each officer or detective shall deliver his/her PD-54 reports to one of the data entry stations at the end of or during his/her tour of duty.

(2)     Data Entry – Each DPR station within each Precinct shall be responsible for data entry into the ONESolution system of all PD-54 reports. In addition to Precinct DPR stations, Major Crimes Division (MCD), Special Investigations Division (SID), and Special Operations Division (SOD) have designated personnel trained to enter the PD-54 forms into ONESolution. Any of these locations can serve as a drop off for any PD-54 report.

(3)     Once a PD-54 is properly entered into ONESolution, the hard copy shall be shredded. At this time, if a companion photo has been taken it shall be noted on the remarks section of the PD-54 as to where the photo file is stored.

6.     Frisks – see General Order 1-6, Search and Seizure – "Body Searches" for the guidelines on conducting frisks pursuant to Terry v. Ohio (1968).

C.     Admissions/Confessions:

1.     Notification of Rights:                                    [CALEA 1.2.3b]

a)     Any individual in a custodial interrogation, regardless of the severity of the crime, is entitled to the benefit of the procedural safeguards set forth in Miranda vs. Arizona (1966). (Berkemer vs. McCarty, (1984)).

NOTE: The appointment of counsel pursuant to the Fifth Amendment right identified in Miranda is not charge specific. Thus, further police initiated interrogation, on any subject, in the absence of counsel is BARRED once the individual requests counsel.          *[CALEA 1.2.3b]*

b)     By reading the admonition stated on the PD-75 (Notification of Rights Form) to the individual, officers comply with the legal requirements covering on-scene arrests and interrogation procedures.

c)     If the individual's primary language is one other than English, the interrogating officer(s) may use the AT&T language line to ensure understanding. Officers should also be aware that the Spanish interpretation of the PD-75 form is on the Department's server in the PD forms folder.

d)     If the individual is a hearing impaired person, an interpreter shall explain these rights during an interview and/or interrogation prior to the individual's statement as set forth in General Order 6-26, Sign Language

Interpretation for Deaf and Hearing-Impaired Persons. Officers should be aware that the PD-75 is to be used.

2.  Constitutional Rights Advisement:

    a)  The individual has an absolute right to remain silent, and the admonition must be in clear and unequivocal terms.

        (1)  This admonition is to be made because often people are unaware of this privilege, and it assists them in making an intelligent decision as to its exercise.

        (2)  The admonition is an absolute prerequisite to overcome "inherent pressures of the interrogation atmosphere."

        (3)  The admonition must show the accused that the interrogators are prepared to recognize the privilege.

    b)  It must be explained to the individual that anything said can and will be used against the individual in court.

        (1)  This is to make the defendant aware of the privilege or the right to remain silent and the consequence of foregoing it.

        (2)  In addition, this is to make the accused aware that he/she is not in the presence of persons acting solely in their interest.

    c)  The individual must be clearly informed that he/she has a right to consult a lawyer and to have that lawyer with him/her during the interrogation. The accused must be warned not only that he/she has a right to consult with an attorney but also that, if he/she is indigent, a lawyer will be appointed to represent him/her.

    d)  If the individual unambiguously indicates that he/she wishes the assistance of counsel before any interrogation occurs, then the police cannot ignore or deny the request on the basis that the individual does not have or cannot afford to retain an attorney.

    e)  The United States Supreme Court has stated that if an individual unambiguously indicates in any manner at any time prior to or during questioning that he/she wants an attorney, the interrogation must cease immediately. This does not mean that an attorney must be appointed for an indigent person at that time, but it does mean that the interrogation must stop until an attorney is retained or appointed.

    f)  When a person has been arraigned and has had counsel retained or appointed, the arrestee can no longer be questioned by the police without his/her counsel's consent. (Exception: See Maryland v. Shatzer, (2010)) However, if a person has been arrested but not yet arraigned and the person has not clearly and unambiguously invoked his right to counsel, then police may question that individual.

Page 8 of 10 General Order 1-2 (02/11/2019)
CONSTITUTIONAL RIGHTS

g)  A waiver of rights cannot be based on the silence of the accused, but he/she must affirmatively make a voluntary and intelligent waiver. A waiver of these rights shall not be presumed, but the burden rests on the State *to* confirm that the accused knew, and intelligently waived, his/her privilege against self-incrimination, and his/her right to retain or be appointed counsel. Officers shall be familiar with the Rights Waiver Card and maintain in their possession a copy of the Rights Waiver Card. [CALEA 1.2.3c]

h)  When a person has invoked his/her right to counsel under Miranda; they can be re-interrogated for the specific crime in which Miranda was invoked on when there has been a minimum of a 14-day break in custody, between attempts of interrogation. The break in custody shall satisfy "any residual coercive effects of his/her prior custody", after having given Miranda warnings.

i)  The Totality of Circumstances:

   (1)  Determining whether the individual's statements are made voluntarily is based on the totality of the circumstances.

   (2)  To be considered voluntary, the individual's statements must be a product of the individual's own free will and not a result of police coercion or the imposition of an overriding will by the police. In other words, if an innocent person would not have confessed or made statements absent police conduct then the confession or statements are not voluntary.

   (3)  There shall be no threats or cajolery in obtaining the waiver or a confession.

   (4)  Factors to be considered in the totality of the circumstances are as follows:

       (a)  Number of police present;

       (b)  Place of the confession;

       (c)  Age and mentality of the defendant;

       (d)  Educational background of the defendant;

       (e)  Public display of defendant as to radio, television and newspaper releases;

       (f)  Length of the interrogation; or,

       (g)  Other matters that might leave the impression that the confession was not voluntary.

D.  Freedom of Speech and Assembly:

1.  All citizens of the United States are guaranteed the right to seek redress of grievances by:

    a)  Freedom of speech;

    b)  Peaceful assembly;

    c)  Peaceful picketing; and,

    d)  Distribution of handbills, (providing such distribution be not in conflict with the provisions of the Richmond City Code Section 18-196).

2.  The exercise of these rights must not:

    a)  Conflict with the governmental responsibility to keep public streets and public facilities open and available for public use;

    b)  Violate any law or ordinance; or,

    c)  Include the use of inflammatory remarks related to any instance where a clear and present danger of a riot against any person or group of persons exists.

    NOTE:  See also Operational Manual 10-01, Emergency Operations Plan.

E.  Every necessary resource of the Department will be employed to rapidly and decisively enforce statutes and ordinances that provide for the protection of the rights and property of all citizens.  Within reason, the Department shall ensure that adequate manpower, including supervisory personnel, is available to control and maintain order in every instance where crowds have formed or are expected to form.

VI.  <u>FORMS</u>

A.  PD-54, Field Contact Report

B.  PD-75, Notification of Rights Form (English and Spanish languages)

USCA4 Appeal: 24-4201    Doc: 22-1    Filed: 09/04/2024    Pg: 481 of 496



# RICHMOND POLICE DEPARTMENT
# GENERAL ORDER

| Subject: **BIAS REDUCTION** | | Chapter 1 | Number 4 | # Pages 4 |
|---|---|---|---|---|
| CALEA Standards: 1.2.9a, 1.2.9b, 1.2.9c, 1.2.9d | Related General Order: 1-1, 1-2, 1-16, 7-21 | Effective Date: *02/13/18* Revised By: *Annual* Prv. Rev. Date: *03/26/13* | | |
| Chief of Police: | | | | |

## I. PURPOSE

The purpose of this directive is to provide guidance on reducing the presence of bias in law enforcement actions and to reaffirm the Department's commitment to unbiased law enforcement.

## II. *SUMMARY OF CHANGE*

*This revision updates the formatting of the document header, introduces the summary of change paragraph, and amends the accountability statement. The specific changes are noted in bold italicized text throughout the document*.

## III. POLICY

The Richmond Police Department is committed to respecting constitutional rights in the performance of employees' duties. The Department's success is based on the respect its employees show to the community and the respect citizens observe toward law enforcement. To this end, Department employees shall exercise duties, responsibilities, and obligations in a manner that does not discriminate on the basis of race, sexual orientation, gender, national origin, ethnicity, age, religion, or economic status. In law enforcement, the failure to control biases can lead to illegal arrests, searches and detentions, thus thwarting the mission of the Department. Most importantly, actions guided by bias destroy the trust and respect essential for success.

In all enforcement decisions, officers shall be able to articulate specific facts, circumstances, and conclusions, which support probable cause or reasonable suspicion for arrests, searches, seizures, and stops of citizens. Officers shall not stop, detain, arrest, search or attempt to search anyone based solely upon the person's race, sexual orientation, gender, national origin, ethnicity, age, religion, or economic status. (See also General Order 1-2, Constitutional Rights.)

## IV. ACCOUNTABILITY STATEMENT

All employees are expected to fully comply with the guidelines and timelines set forth in this general order. Responsibility rests with the Division Commander to ensure that any violations of policy are investigated and appropriate training, counseling and/or disciplinary action is initiated.

**JA0467**

*This directive is for internal use only, and does not enlarge an employee's civil liability in any way. It should not be construed as the creation of a higher standard of safety or case in an evidentiary sense, with respect to third party claims. Violation of this directive, if proven, can only form the basis of a complaint by this Department, and then only in a non-judicial administrative setting.*

V.  **DEFINITION**

    A.  BIAS – Prejudice or partiality which may be based on preconceived ideas, a person's upbringing, culture, experience, or education.

    B.  BIAS-BASED POLICING/PROFILING – The selection of individual(s) based solely on a trait common to a group for any enforcement action. This includes, but is not limited to race, sexual orientation, gender, national origin, ethnicity, age, religion and economic status.

    C.  PROBABLE CAUSE – According to the U.S. Supreme Court: Probable Cause exists when the facts and circumstances within [the arresting officers'] knowledge and of which the officer had reasonable trustworthy information of, are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed by the suspect.

    D.  LEGITIMATE PROFILE – A legitimate profile, sanctioned by the Department, is a very specific attribute, or cluster of attributes or characteristics, that form the basis for reasonable suspicion of criminality. A profile is only valid for a limited time and under limited circumstances. These attributes or characteristics are established in writing based on considerable training and experience. A legitimate profile will not be based solely on a person's race, sexual orientation, gender, national origin, ethnicity, age, religion, economic status or any other identifiable group.

    E.  REASONABLE SUSPICION – Articulable facts which lead an experienced officer to reasonably suspect that a crime has been or is about to be committed. A well-founded suspicion is based on the totality of the circumstances and does not exist unless it can be articulated. Reasonable suspicion supports a stop of a citizen. Courts require that stops based on reasonable suspicion be "objectively reasonable."

VI.  **PROCEDURE**

    A.  General prohibition:

        Officers are strictly prohibited from engaging in bias-based policing/profiling. All complaints of bias-based policing/profiling shall be thoroughly investigated following complaint procedures set forth in General Order 7-21, Internal Investigations, Citizen Complaints and Integrity Tests.    [CALEA 1.2.9a]

B.    Reporting Violations and Perceived Violations:         [CALEA 1.2.9c]

1.    Officers shall report any violation or perceived violation of this policy or any comment/concern/complaint received from a member of the public concerning bias-based policing/profiling to his/her supervisor.

2.    Supervisors shall report substantiated violations and perceived violations of this policy to the Internal Affairs Division. Supervisors shall report any known comments/concerns/complaints from the public regarding bias-based policing/profiling to the Office of Professional Responsibility for inclusion in its annual review.

3.    The OIC of the Office of Professional Responsibility or designee shall investigate or cause to be investigated any complaint of bias-based policing/profiling following procedures set forth in General Order 7-21, Internal Investigations, Citizen Complaints and Integrity Tests. The OIC of the Office of Professional Responsibility or designee shall also identify employees with substantiated bias-based policing/profiling allegations or other substantiated discrimination complaints filed against them and recommend additional remedial training and/or appropriate disciplinary sanctions pursuant to the Department's Code of Conduct, General Order 1-1 and Disciplinary Procedures, General Order 1-16.

C.    Disciplinary consequences:

Officers who engage in bias-based policing/profiling shall be subject to disciplinary sanctions pursuant to the Department's Code of Conduct, General Order 1-1 and Disciplinary Procedures, General Order 1-16, up to and including termination/dismissal. Officers may also be subject to remedial and/or additional training.

D.    Training:         [CALEA 1.2.9a, 1.2.9b]

The Officer-In-Charge of the Training Division or designee shall ensure that training addressing bias-based policing/profiling (including legal aspects) particularly in the context of field contacts, traffic stops/contacts, searches and asset seizure/forfeiture, cultural diversity, courtesy and interpersonal communications skills shall be conducted for sworn employees as a part of their required initial and in-service training. Additional diversity and sensitivity training may be designated for employees with substantiated bias-based policing/profiling or other substantiated discrimination complaints against them or when otherwise deemed necessary.

E.    Administrative Review:         [CALEA 1.2.9d]

The Officer-In-Charge of the Office of Professional Responsibility or designee shall ensure that an annual review of the Department's practices concerning bias-based policing/profiling is completed no later than February 15th each year and submitted through channels to the Office of General Counsel and to the Chief of Police. At a minimum, this review shall include the following:

1.      An analysis of citizen complaints and comments/concerns that have been received during the year regarding bias-based policing/profiling.

2.      Recommendations, if any, for changes to policies, procedures, practices or training.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21-cr-42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' RESPONSE TO DEFENDANT'S SECOND SUPPLEMENT TO SUPPRESS EVIDENCE AND STATEMENTS

The defendant does not come close to meeting any legal standard to prevail on his equal protection argument, whether that standard is the heightened standard from multiple Supreme Court and published Fourth Circuit cases, or the standard he substitutes to avoid the strict requirements attendant to *Armstrong*, *Hare*, and *Mason*. The main source of evidence for both discriminatory effect and purpose is Dr. Coston's statistical analysis, but because that analysis is riddled with bad data, deficient data modeling, and fails to consider or control for *any* alternative hypotheses, Dr. Coston's analysis is wholly unreliable and unsuitable for reliance. Because the defendant has utterly failed to meet his high burden, the Court should deny the defendant's late-filed request to dismiss the indictment.

## I.  LEGAL AUTHORITY

To prevail on his selective enforcement claim, the defendant must "show *both* discriminatory effect *and* that the officer's action was motivated by a discriminatory purpose." *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (emphasis added) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Generally, that dual showing requires proof (1) "that similarly situated individuals of a different race" were treated differently and (2) that the decision to enforce the law against the defendant "was invidious or in bad faith." *United States v. Hare*, 820

F.3d 93, 99 (4th Cir. 2016); *see also Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (party asserting equal protection violation "must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'") (citing *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995); *Washington v. Davis*, 426 U.S. 229, 239 (1976)). The defendant must prove the two elements of discriminatory purpose and discriminatory effect by "clear evidence"—an intentionally "demanding and rigorous" standard—because "a selective law enforcement claim 'asks a court to exercise judicial power over a special province of the Executive.'" *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464).

The standards from *Armstrong* have long governed selective enforcement claims in the Fourth Circuit. *Hare*, 820 F.3d at 99 ("This Court has adopted *Armstrong's* standard for proving selective prosecution as the standard for proving selective enforcement. *See United States v. Bullock,* 94 F.3d 896, 899 (4th Cir. 1996)"); *Mason*, 774 F.3d at 829 (same); *see also Johnson v. Holmes*, 782 F. App'x 269, 276 (4th Cir. 2019) (same). Hence, the defendant's claims must be proved by "clear evidence." *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464); *Hare*, 820 F.3d at 98.

Likewise, under Fourth Circuit and Supreme Court precedent, a "defendant must show that the law enforcement practice was not enforced against 'similarly situated individuals of a different race.'" *United States v. Suarez*, 321 F. App'x 302, 305 (4th Cir. 2009) (citing *Armstrong*, 517 U.S. at 465; *Bullock,* 94 F.3d at 899); *see also Hare*, 820 F.3d at 99-101 (applying and extensively discussing the similarly situated requirement in selective enforcement case); *Mason*, 774 F.3d at 830 (applying the similarly situated requirement in selective enforcement case) (citing *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)).

2

**JA0472**

The defendant largely ignores this binding precedent.[1] *Mason* is mostly dismissed as a "passing reference" to the applicable standard of proof. Dkt. 66 at 3. *Olvis* is cited just once, and only because *Mason* quotes it. *Id. Hare, Venable,* and *Bullock*—three published and precedential Fourth Circuit opinions on the burden of proof in selective enforcement or prosecution cases—are ignored completely, not even cited once.

Relying on out-of-circuit authority, *Conley v. United States*, 5 F.4th 781, 789-96 (7th Cir. 2021), defendant argues that a selective enforcement case involving the decisions of police officers should be subjected to a less demanding standard of proof than applies to selective prosecution claims addressing charging decisions. *See* Dkt. 66 at 3.[2] But as *Conley* itself notes, the Fourth Circuit has not taken this approach. *Conley*, 5 F.4th at 796 n.4 (citing *Mason*, 774 F.3d at 829–30). This Court is obliged to follow Fourth Circuit precedent. *McMellon v. United States*, 387 F.3d 329, 332–33 (4th Cir. 2004) (published opinions of the Fourth Circuit remain binding "unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court").

Moreover, this is not a case where the differences that the Seventh Circuit invoked between selective prosecution and selective enforcement matter. The distinction defendant draws is academic here. Defendant's claim would readily fail even under Seventh Circuit law.

Mirroring Fourth Circuit law, *Conley* explains that, "[a]s equal protection claims, both selective prosecution and selective enforcement require proof 'that the defendants' actions had a

---

[1] One of the main reasons the defendant offers for sidestepping and distinguishing precedent is that prosecution is one of the "core powers of the Executive Branch." Dkt. 66 at 5. This argument is belied by the defendant's own arguments and requests in this case. The defendant has repeatedly criticized the drawing of RPD precincts and RPD patrolling patterns. *See, e.g.*, Dkt. 66 at 8. Drawing police precincts and allocating scarce law enforcement resources is also a core executive function that the defendant encourages the Court to implicitly overtake.

[2] The defendant also claims there is a burden-shifting component to the analysis, citing three inapposite civil cases. Dkt. 66 at 6. This burden-shifting framework is not part of the *Armstrong* test and has no place in the proper analysis.

discriminatory effect and were motivated by a discriminatory purpose.'" 5 F.4th at 789 (citations omitted). And a party bringing an equal protection claim "must show discriminatory purpose 'in *his* case.'" *Id*. (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)). "[T]he decisionmaker" must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*. (quoting *McCleskey*, 481 U.S. at 298; *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

Even where Seventh and Fourth Circuit precedent departs, the Seventh Circuit continued that, under the preponderance standard that it applies, statistical evidence must still establish that "race can be isolated from other confounding variables." 5 F.4th at 796. "When program-wide statistics are [a party's] sole source of evidence, it can be difficult to infer discrimination in a particular case—especially when there is another legitimate explanation for the government's conduct." *Id*. at 979. "[O]nly in 'rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation.'" *Id*. (quoting *McCleskey*, 481 U.S. at 293 n.12). In keeping with these points, *Conley* rejected a statistical analysis of stash-house stings when that analysis was "based on two assumptions that simply do not apply to Conley's case." *Id*. at 798. The professor who conducted the analysis "acknowledged that correcting for those assumptions would reduce the data to 'such a small sample' that it would be nearly 'impossible to conduct a reliable statistical analysis' that could support an inference of racial discrimination." *Id*. (citation omitted). Defendant's statistical evidence suffers from far greater flaws than those in *Conley*, and defendant does not come close to satisfying even the Seventh Circuit's standards.

4

**JA0474**

<u>**Argument**</u>

**I.     The defendant cannot meet the high *Armstrong* standard**

   **A.     The defendant has failed to show discriminatory effect, or that he was
   treated differently than similarly situated individuals of a different race.**

   To show discriminatory effect under *Armstrong*, the defendant "*must* make a credible

showing that similarly situated individuals of a different race" were treated differently by police.

517 U.S. at 465 (emphasis added). The defendant fails to meet this threshold requirement.

   The circumstances of defendant's arrest undercut that his case involved a discriminatory

effect and that a person with a different race would not have been stopped and arrested. When

officers sought to stop the vehicle in which the defendant was riding, the officers had seen the

same counterfeit temporary vehicle tag that was on defendant's vehicle on two other vehicles in

the same shift. The defendant points to no other non-black citizen who was not stopped when the

police faced circumstances that were similarly suspicious. To posit that the reason for the stop was

the defendant's race and not the extremely suspicious fake tag that kept popping up like a Whac-

a-mole is unpersuasive. To support his claim, defendant relies on a disproved assertion that the

Fourth Precinct Focus Mission Team (FMT) searched every car it stopped that night and an

extremely flawed statistical analysis. The United States has previously demonstrated the falsity of

the defendant's claim that the Fourth FMT searched every car stopped for minor traffic violations

on December 5, 2020. Dkt. 36 at 17-18.

   With the point disproven that the Fourth FMT searched every car that night, the only

evidence that remains to show discriminatory effect is the defendant's flawed statistical analysis,

but the United States demonstrates in its companion filing that the statistical analysis is unreliable

and unworthy of consideration. *See generally* Dkt. 70. In a nutshell, Dr. Coston's analysis uses a

unreliable measure of the race of those stopped and an unreliable measure of the race of drivers in

the relevant area to run a simplistic analysis ill-suited to providing any firm conclusions, let alone answering any questions about causation. Defendant's expert evidence is unreliable and should be discounted entirely, and defendant is still in effectively the same place as he was before he retained the expert: "'absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim.'" *Hare*, 820 F.3d at 99 (quoting *Olvis*, 97 F.3d at 745). The defendant cannot tout "unexplained evidence of racial disparity" to prove "racial animus." *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (internal quotation marks omitted) ("Notably, there is *not* 'a presumption that unexplained statistical evidence of racial disparity proves racial animus.'") (quoting *Olvis*, 97 F.3d at 745); *Johnson*, 782 F. App'x at 281 ("Crucially, in [*Armstrong*, *Hare*, and *Olvis*], the proffered statistics faltered because they said nothing about individuals of other races who committed the same crimes but were treated more favorably").

   Demonstrating some "unexplained evidence of racial disparity," or some indeterminate correlation between two variables, is the most he has done—and the deficiencies in the data he uses undercuts his claims to have demonstrated even that much. *See, e.g.*, *United States v. Raynor*, No. CRIM. 3:13MJ215, 2013 WL 5770529, at *8 (E.D. Va. Oct. 24, 2013) (Novak, M.J.) (rejecting an equal protection challenge in part due to faulty data). Moreover, by choosing to rely on general population census data from the entire city of Richmond to show racial discrimination, defendant lacks a credible showing that a similarly situated individual in the Fourth Precinct was treated differently than him because the census data is an inappropriate benchmark for drivers in the Fourth Precinct committing similar crimes. *Hare*, 820 F.3d at 99 ("Without an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants prove[d] nothing.") (quoting *Olvis*, 97 F.3d at 745).

6

**JA0476**

Further, at best, all the defendant has done is demonstrate some kind of disparity, consistent with analyses in Richmond going back at least 20 years,[3] but the defendant does nothing to control for confounding variables or alternative explanations besides racial discrimination, like the severity of the violation that led to the stop, underlying crime rates, or low discretion stops, arrests, and searches. Indeed, the rudimentary analysis performed by the United States shows that traffic stops correlate closely to crime rates in Richmond's precincts, Dkt. 70 at 16-17, but Dr. Coston never even tried to consider alternatives. The flaws in the statistical analysis extensively detailed in the companion motion result in a failure to show "an appropriate basis for comparison" pursuant to Fourth Circuit precedent, and dooms the defendant's ability to demonstrate discriminatory effect by clear evidence and that similarly situated individuals of a different race were treated differently.

**B.    The defendant has no evidence to show discriminatory purpose.**

The defendant has also completely failed to show discriminatory purpose, either generally or in his own case. "As a general matter, in cases involving discretionary judgments essential to the criminal justice process, statistical evidence of racial disparity is insufficient to infer . . . a discriminatory purpose." *Hare*, 820 F.3d at 100 (quoting *Olvis*, 97 F.3d at 746; *McCleskey*, 481 U.S. at 297) (internal quotations omitted)); *McCleskey*, 481 U.S. at 292 ("to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose"). The defendant repeatedly and wrongly conflates disparity with discrimination.

As an initial matter, the Fourth FMT had abundant cause to pull the defendant over after seeing the identical fake tag on three different vehicles in the same shift. The abundant probable

---

[3] Smith, M. R. & Petrocelli, M. (2001). Racial Profiling?: A Multivariate Analysis of Police Traffic Stop Data. *Police Quarterly*, 4, 4-27.

**JA0477**

cause for the stop dispels doubt that there was a secret discriminatory purpose. Indeed, officers in their position could hardly have *not* stopped the defendant.

As with discriminatory effect, the backbone of the defendant's discriminatory purpose argument is the flawed statistical analysis performed by Dr. Coston. Again, for the reasons described extensively in the United States' companion *Daubert* motion, Dr. Coston's analysis is wholly unreliable. The Department for Criminal Justice Services ran similar analyses on data from the same sources and it readily admits the numerous shortcomings both of the data and the resulting analyses. Simply put, Dr. Coston's report and the defendant's claimed evidence cannot and does not say nearly as much as the defendant claims.

For example, despite the defendant's strained claims about "the Richmond Police Department effectively patrolling the boundaries of the white neighborhoods," Dkt. 66 at 9, the defendant's and Dr. Coston's whole analysis merely assumes that drivers are only stopped in their own neighborhoods. This is flatly contradicted by the literature, even the literature on which the defendant relies. Dkt. 66-2 at 2 ("Moreover, drivers may not live in the jurisdictions where they were stopped, further complicating the interpretation of population benchmarks."); Dkt. 70-1 at 2 ("[T]he population of persons who *live* in an area often serves as a poor representation of persons who *drive* in an area or who are *at risk* for being stopped by the police. . . . While all benchmarks suffer from certain limitations, census-based benchmarks are so far off the mark as valid estimates of the actual driving and/or traffic violating populations that informed social scientists should no longer use them.") (citations omitted). There is no basis for the defendant's assumptions under *Daubert* or under *Armstrong*, and the defendant's statistics do nothing to further his argument that the Fourth FMT discriminated against him.

**JA0478**

At bottom, because defendant offers no evidence of discriminatory purpose in his case, and the facts of his stop do not even suggest a discriminatory animus behind the officers' actions in his case, defendant would have great difficulty establishing that the criminal charges against him should be dismissed simply because of statistical evidence of a racial disparity in traffic stops in Richmond. But defendant's statistical evidence is so deficient that he does not approach proving that anything more than differences in local crime rates, racially neutral decisions on how to deploy police resources, and similar constitutionally permissible factors explain the evidence that he has amassed.

The Supreme Court has clearly stated that it is insufficient to establish an equal protection violation for a government to be aware of a disparate impact. To qualify as "invidious or in bad faith" the government must "select[] or reaffirm[] a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States,* 470 U.S. 598, 610 (1985). This is a burden the defendant cannot meet because he must show not just that the Fourth FMT's job is "to get guns and drugs off the street," Dkt. 66 at 9, or even that the Fourth FMT's actions pulling people over in the overwhelmingly black Fourth Precinct have a significant impact on African Americans. Instead, the defendant must show that the Fourth FMT specifically chose to target him because of his race. There is simply no evidence of that, and without such evidence the defendant cannot show discriminatory purpose. *Wayte,* 470 U.S. at 610.

C.    **The defendant's arguments about historical discrimination are irrelevant.**

The defendant goes all the way back to 1861 to argue that the Richmond Police Department practices racial discrimination in one form or another. To resolve the defendant's case, this Court need not attempt to adjudicate the propriety of more than a century and a half of law enforcement in Richmond, Virginia. *See, e.g., McCleskey*, 481 U.S. at 298 n.20 ("McCleskey relies on

9

**JA0479**

'historical evidence' to support his claim of purposeful discrimination by the State. This evidence focuses on Georgia laws in force during and just after the Civil War. . . . [U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent.").

The only evidence that is even plausibly relevant would be evidence of some unexplained disparity in traffic stops in the last 20 years. Ironically, the defendant cites as evidence of discrimination the exact study performed by the retained expert for the United States, Dr. Michael Smith. Dr. Smith clearly explains in his report the flaw in the defendant's thinking. Many studies, including the 2001 Richmond study conducted by Dr. Smith, have shown some racial disparity in traffic stops using methods that "far exceeded the explanatory power of the rudimentary statistical techniques used by Dr. Coston." Dkt. 70-1 at 6. "Yet, even in those studies, the authors were careful not to infer *racial bias* as the cause of any observed disparities because of their inability to rule out the influence of other variables unavailable to them in their analyses." *Id.* This criticism is particularly apt to Dr. Coston's analysis because Dr. Coston failed to rule out the influence of *any* variable besides race. Simply put, disparity is not discrimination or bias, and the defendant is wrong every time he conflates the two. For the reasons well explained by Dr. Smith, researchers struggle to make causal claims with analyses and models far more accurate than Dr. Coston's, and there is nothing in Dr. Coston's analysis that allows the broad and bold claims that defendant repeatedly makes.

**D.    The Court should not allow the defendant any further "supplements"**

The defendant first raised this equal protection claim after the motions deadline, in a supplemental brief, and shoehorned a motion to dismiss into a motion to suppress. The first evidence of an equal protection claim was presented by surprise at the July 26, 2021 suppression

10

**JA0480**

hearing. The defendant's pattern of litigation surprises continues, with the defendant now claiming he "anticipates presenting additional evidence of discriminatory intent at the evidentiary hearing this Court intends to schedule at the conclusion of this supplemental briefing." Dkt. 66 at 12. The Court should stop the defendant from dragging on the proceedings and constantly surprising opposing counsel and the Court with new evidence. The defendant was indicted on May 4, 2021, Dkt. 3, and the suppression hearing was held nine months ago on July 26, 2021. Dkt. 30. These proceedings have been prolonged, moreover, for defendant to submit thoroughly deficient expert evidence. The Court should prohibit the defendant from providing "additional evidence" at the eleventh hour, nearly a year after the motion deadline.

E.     **Granting the motion to suppress/dismiss could have far-reaching consequences.**

The Court should consider the practical consequences of potentially granting the defendant's motion to dismiss the indictment if the Court were to do so on grounds that there is an unexplained racial disparity in deeply flawed traffic stop data with absolutely no connection to the stop at issue in this case. If such unexplained disparity alone were sufficient cause to dismiss an indictment without evidence of discrimination, law enforcement would be unable to enforce the law at all against anyone unless each type of police action closely matched the racial demographics of the jurisdiction. Such racial quotas for traffic stops, searches, and arrests would be far more violative of equal protection principles. Further, because an increased police presence and thus an increased number of traffic stops is related to crime rates and calls for service, if law enforcement is unable to act unless their action accords with racial demographics, it would deny victims the very police protection they are seeking out in making calls for service.

## Conclusion

The defendant's motion does not come close to meeting *Armstrong*'s high bar. In fact, it

**JA0481**

is telling that at every turn the defendant seeks to lower the bar he must clear by ignoring and mischaracterizing precedent. Because the defendant has not met his burden, the Court should deny the defendant's late-filed request to dismiss the indictment.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

12

**JA0482**