IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4201

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, District Judge*

CORRECTED JOINT APPENDIX
VOLUME II OF VI (PAGES 483–970)

| | |
|---|---|
| Geremy C. Kamens | Jessica D. Aber |
| Federal Public Defender | United States Attorney |
| | |
| Patrick L. Bryant | Jacqueline R. Bechara |
| Assistant Federal Public Defender | Assistant United States Attorney |
| 1650 King Street, Suite 500 | 2100 Jamieson Avenue |
| Alexandria, Virginia 22314 | Alexandria, Virginia 22314 |
| (703) 600-0800 | (703) 299-3700 |
| | |
| *Counsel for Keith Moore (continued)* | *Counsel for the United States (continued)* |

Amy L. Austin
Laura J. Koenig
Assistant Federal Public Defenders
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
(804) 565-0880

*Additional Counsel for Keith Moore*

Shea M. Gibbons
Erik S. Siebert
Assistant United States Attorneys
919 East Main Street
Suite 1900
Richmond, Virginia 23219
(804) 819-5400

*Additional Counsel for the United States*

# Table of Contents

**Description** **Page**

## Volume I

District Court Docket Sheet (as of Aug. 23, 2024)......................................................1

Indictment (May 4, 2021, Doc. No. 3)....................................................................16

Moore's Motion to Suppress Evidence and Statements
(June 21, 2021, Doc. No. 17) ..........................................................................18

Government's Opposition to Motion to Suppress Evidence and Statements
(July 6, 2021, Doc. No. 22)................................................................................25

Moore's Reply to Government's Response to Motion to Suppress Evidence
and Statements (July 13, 2021, Doc. No. 28) ....................................................40

Transcript of Motion Hearing (July 26, 2021, Doc. No. 33)..................................45

Testimony of Dominic Collombo:

Direct Examination by Mr. Elliker....................................................................50
Cross Examination by Ms. Koenig ...................................................................64

Testimony of Keegan Mills:

Direct Examination by Mr. Elliker....................................................................91
Cross Examination by Ms. Koenig ...................................................................100

Testimony of Jakob Torres:

Direct Examination by Mr. Elliker....................................................................136
Cross Examination by Ms. Koenig ...................................................................143

Testimony of Nakia Williams:

    Direct Examination by Mr. Elliker ......................................................145
    Cross Examination by Ms. Koenig .....................................................156

Testimony of Michael Spinos:

    Direct Examination by Mr. Elliker......................................................176
    Cross Examination by Ms. Koenig .....................................................182

Testimony of John Gilbert:

    Direct Examination by Mr. Elliker......................................................188
    Cross Examination by Ms. Koenig .....................................................198

Testimony of Lee Hush:

    Direct Examination by Ms. Koenig .....................................................201

Selected Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 3, Photograph of Moore's car, dated Dec. 5, 2020...................221

    Gov. Exhibit 6, Photograph of firearm seized from Moore's car .................222

    Gov. Exhibit 10, Moore's license plate..........................................223

Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit A, Hanover Traffic Ticket, dated Oct. 9, 2020 ........................224

    Def. Exhibit C, 0485 Map ...............................................................228

    Def. Exhibit I, Richmond Police Department
    Incident/Investigation Report, dated Dec. 5, 2020.........................................229

Def. Exhibit J, 0485 Net Viewer Event Information ....................................238

Def. Exhibit K, 0497 Net Viewer Event Information ...................................242

Def. Exhibit L, 0502 Net Viewer Event Information ...................................248

Def. Exhibit N, 0571 Net Viewer Event Information ...................................253

Def. Exhibit O, 0574 Net Viewer Event Information ...................................257

Def. Exhibit P, 0579 Net Viewer Event Information....................................262

Def. Exhibit Q, Axon Report for Keegan Mills ............................................265

Def. Exhibit R1, University of Virginia Dot Map of Richmond ..................267

Def. Exhibit R2, University of Virginia Dot Map of Richmond ..................268

Def. Exhibit W, 0579 Net Viewer Event Unit ..............................................269

Def. Exhibit X1, Boundaries of Richmond Police Precinct 1 .......................276

Def. Exhibit X2, Boundaries of Richmond Police Precinct 2 .......................277

Def. Exhibit X3, Boundaries of Richmond Police Precinct 3 .......................278

Def. Exhibit X4, Boundaries of Richmond Police Precinct 4 .......................279

Def. Exhibit Y1, Screen Capture of Richmond Police Department
Stops by Race and Stops by Ethnicity ...........................................................280

Def. Exhibit Y2, Screen Capture of Richmond Police Department
Stops by Gender and Vehicles Searched during a stop..................................281

Order (July 27, 2021, Doc. No. 31) ..............................................................282

Supplement to Moore's Motion to Suppress Evidence and Statements
(Aug. 3, 2021, Doc. No. 32)..................................................................283

Government's Supplemental Response to Motion to Suppress
Evidence and Statements (Aug. 12, 2021, Doc. No. 36) ...............................297

Transcript of Motion Hearing (Sept. 15, 2021, Doc. No. 137) ...........................317

Order (Sept. 15, 2021, Doc. No. 44)........................................................339

Moore's Second Supplement to Motion to Suppress Evidence and Statements
(Mar. 9, 2022, Doc. No. 66)..................................................................340

    Def. Exhibit A, Dr. Eli Coston, Traffic Stops by the Richmond Police
        Department: July 1, 2020 – December 6, 2020.......................................353

    Def. Exhibit B, Emma Pierson et al., A large-scale analysis of racial
        disparities in police stops across the United States,
        dated July 2020.............................................................................367

    Def. Exhibit C, McGuire Woods,
        Zoning and Segregation in Virginia: Part 1 ...........................................379

    Def. Exhibit D, Why is Richmond still segregated?,
        Richmond Times Dispatch, dated May 3, 2015.....................................387

    Def. Exhibit E, Mark Bowes, Traffic Arrest Pattern; In Chesterfield,
        29% Are Black and Almost 69% Are White, dated July 15, 2001 ........403

    Def. Exhibit F, Richmond Transparency and Accountability Project,
        Our Streets, Our Say: Policing in Richmond, dated June 2019 ............408

Government's Motion to Exclude Defense Expert
    (Apr. 8, 2022, Doc. No. 70) ............................................................................424

    Gov. Exhibit A, Dr. Michael R. Smith, Expert Report ...................................446

    Gov. Exhibit B, Richmond Police Department General Order 1-2,
        dated Feb. 11, 2019, and General Order 1-4, dated Feb. 13, 2018 ........457

Government's Response to Moore's Second Supplement to Motion to
    Suppress Evidence and Statements (Apr. 8, 2022, Doc. No. 71) ................471

## Volume II

Moore's Response to Motion to Exclude Defense Expert
(Apr. 22, 2022, Doc. No. 72) .......................................................................483

Def. Exhibit G, Virginia Department of Criminal Justice Services,
Report on Analysis of Traffic Stop Data Collected Under
Virginia's Community Policing Act, dated July 1, 2021 ......................499

Def. Exhibit H, Michael R. Smith & Matthew Petrocelli,
Racial Profiling? A Multivariate Analysis of Police
Traffic Stop Data, dated Mar. 2001 ........................................................572

Def. Exhibit I, An act to amend and re-enact section 46 of the Code of
Virginia, dated Mar. 20, 1924 .................................................................596

Def. Exhibit J, Joseph Ferrandino, Minority Threat Hypothesis and
NYPD Stop and Frisk Policy, dated 2015 ..............................................597

Def. Exhibit K, Sunghoon Roh & Matthew Robinson, A Geographic
Approach to Racial Profiling: The Microanalysis and Macroanalysis of
Racial Disparity in Traffic Stops, dated June 2009 ...............................618

Def. Exhibit L, Prabhaker Mishra et al., Selection of Appropriate
Statistical Methods for Data Analysis, dated Sept. 2019 ......................671

Def. Exhibit M, Steven J. Briggs & Kelsey A. Keimig,
The Impact of Police Deployment on Racial Disparities in
Discretionary Searches, dated 2017 .......................................................676

Moore's Reply to Government's Response to Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 23, 2022, Doc. No. 73) ...............696

Government's Motion to Exclude Defense Expert
(June 20, 2022, Doc. No. 82) ..........................................................707

Gov. Exhibit A, Moore's Expert Notice, dated June 16, 2022 ....................714

Moore's Response to Motion to Exclude Second Defense Expert
(July 6, 2022, Doc. No. 86) ............................................................716

Def. Exhibit N, Curriculum Vitae for Dr. Marvin T. Chiles ........................724

Def. Exhibit O, Virginia Freedom of Information Act Request,
dated Feb. 1, 2022 ....................................................................729

Def. Exhibit P, Moore's Ex Parte Motion to Enforce Subpoena
Duces Tecum, dated May 20, 2022 ........................................................731

Def. Exhibit Q, Letter Regarding Ex Parte Subpoena Duces Tecum,
dated May 27, 2022 ....................................................................741

Def. Exhibit R, Marvin T. Chiles, "Here We Go Again": Race and
Redevelopment in Downtown Richmond, Virginia,
1977–Present, dated 2021..........................................................747

Def. Exhibit S, Marvin T. Chiles, Richmond's urban crisis: Racial transition
during the Civil Rights Era, 1960–1977, dated May 2016 ...................774

Def. Exhibit T, Marvin T. Chiles, "Tough on Conduct:" Punitive
Leadership in Urban Public Schools, A Case Study of
*Angry Principal* Dr. Roy A. West, 1986–1991, dated 2020 .................903

Def. Exhibit U, Marvin T. Chiles, "A Period of Misunderstanding,"
dated 2021................................................................................935

## Volume III

Def. Exhibit V, Louis Bernard Cei, Law Enforcement in Richmond:
A History of Police-Community Relations, 1737–1974,
dated June 1975 ........................................................................971

Government's Reply in Support of Motion to Exclude Defense Expert
(July 11, 2022, Doc. No. 89).........................................................1246

**Volume IV**

Transcript of Motion Hearing, Day I (July 18, 2022, Doc. No. 100) .................1252

    Testimony of Dr. Eli Coston:

        Direct Examination by Ms. Koenig ............................................................1268
        Cross Examination by Mr. Gibbons............................................................1351

Transcript of Motion Hearing, Day II (July 19, 2022, Doc. No. 101) ...............1404

    Testimony of Dr. Michael Smith:

        Direct Examination by Mr. Gibbons ..........................................................1415
        Cross Examination by Ms. Koenig ............................................................1477

    Testimony of Keon Turner:

        Direct Examination by Mr. Siebert .............................................................1510
        Cross Examination by Ms. Austin ..............................................................1525

    Testimony of James McDonough:

        Direct Examination by Mr. Siebert .............................................................1535
        Cross Examination by Ms. Austin ..............................................................1562

    Testimony of Josh Valot:

        Direct Examination by Mr. Gibbons ..........................................................1573
        Cross Examination by Ms. Koenig .............................................................1582

    Testimony of Dr. Eli Coston, resumed:

        Direct Examination by Ms. Koenig ............................................................1586
        Cross Examination by Mr. Gibbons............................................................1590

Order (July 19, 2022, Doc. No. 99) ....................................................1599

Moore's Notice of Expert Report and Curriculum Vitae
(Aug. 5, 2022, Doc. No. 102).......................................................1601

Attachment 1, Report to the Eastern District Court of Virginia .................1603

Government's Renewed Motion to Exclude Defense Expert
(Aug. 22, 2022, Doc. No. 103).....................................................1615

Gov. Exhibit A, City of Richmond Neighborhood Statistics
(1980 Census), dated Nov. 1985 .........................................1625

Moore's Response to Government's Renewed Motion to Exclude
Second Defense Expert (Sept. 9, 2022, Doc. No. 107)...............................1629

Government's Reply in Support of Renewed Motion to Exclude Defense Expert
(Sept. 16, 2022, Doc. No. 108) ....................................................1639

**Volume V**

Transcript of Motion Hearing, continued (Oct. 28, 2022, Doc. No. 110) ..........1644

    Testimony of Dr. Marvin Chiles:

        Direct Examination by Ms. Koenig .............................................................1650
        Cross Examination by Mr. Gibbons.............................................................1720

Opinion (Nov. 13, 2023, Doc. No. 124) .............................................................1781

Opinion (Feb. 12, 2024, Doc. No. 126) .............................................................1792

Final Order (Feb. 12, 2024, Doc. No. 127).........................................................1817

Government's Motion to Reconsider and Memorandum in Support
    (Feb. 16, 2024, Doc. No. 128).......................................................................1818

Moore's Opposition to Government's Motion to Reconsider
    the Court's Final Order (Feb. 26, 2024, Doc. No. 130)...............................1824

Government's Reply to Motion to Reconsider
    (Feb. 29, 2024, Doc. No. 131).......................................................................1834

Memorandum Order (Mar. 11, 2024, Doc. No. 132) .........................................1840

Notice of Appeal (Apr. 8, 2024, Doc. No. 134) .................................................1844

    Attachment 1, Certification for Appeal........................................................1846

**Volume VI (Digital Media)**

Additional Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 4.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Gov. Exhibit 5.mp4, Body-Camera Footage, dated Dec. 6, 2020

    Gov. Exhibit 12.mp4, Body-Camera Footage, dated Dec. 6, 2020

Additional Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit U3.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Def. Exhibit U4.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Def. Exhibit V3.mp4, Body-Camera Footage, dated Dec. 5, 2020

These files were confirmed virus-free through virus scan by Trellix Endpoint Security.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 3:21cr42** |
| ) | |
| **KEITH RODNEY MOORE,** ) | |
| **Defendant** ) | |

### MR. MOORE'S RESPONSE TO MOTION TO EXCLUDE DEFENSE EXPERT

Keith Moore, through counsel, responds as follows to the government's motion to exclude the defense's expert, Dr. Eli Coston, *see* ECF No. 70:

> **I.** **The government's motion is essentially a preview of its cross-examination of Dr. Coston rather than a meritorious *Daubert* challenge.**

In responding to the defense's supplemental brief in support of Mr. Moore's equal protection challenge, the government has confused its critiques of Dr. Coston's analysis and conclusions with a *Daubert* challenge. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), reevaluated the prior standard governing admissibility of expert evidence in federal court—the theory of general acceptance. In rejecting that standard, the Supreme Court made several observations relevant to the Court's analysis of the government's motion *in limine* to exclude Dr. Coston's report:

> The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific*, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto*." (Emphasis added.) The subject of an expert's testimony must be "scientific . . . knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific

1

**JA0483**

testimony must be "known" to a certainty; arguably, there are no certainties in science. *See, e.g.,* Brief for Nicolaas Bloembergen et al. as *Amici Curiae* ("Indeed, scientists do not assert that they know what is immutably 'true'—they are committed to searching for new, temporary, theories to explain, as best they can, phenomena"); Brief for American Association for the Advancement of Science et al. as *Amici Curiae* 7–8 ("Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" (emphasis in original)). But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.*, "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

509 U.S. at 589-90.  An opposing party is certainly not without recourse to challenge expert evidence.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.  "To summarize: . . . the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  Pertinent evidence based on scientifically valid principles will satisfy those demands." *Id.* at 597.

As further explained below, Dr. Coston's report is based on the well-founded scientific principles best applicable to the dataset at hand.  The government's arguments are, of course, well-suited for cross-examination, and Dr. Coston will be happy to further elucidate their reasons in choosing specific, scientifically validated analytical tools to apply to the dataset available in this case.  To be sure, it is expected that the government does not like or agree with Dr. Coston's analysis and conclusions, but the question of evidentiary reliability is not the same as whether the opposing party views the expert evidence as correct.  *See, e.g.*, *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (observing that proponents of expert evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their

2

**JA0484**

experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness."); *Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."); *United States v. Perocier*, 269 F.R.D. 103, 114 (D.P.R. 2009) ("While defendants' arguments raise concerns of 'reliability' as to the underlying data and evidence on which Klein's conclusions are based, those issues are not the ones with which Rule 702 is concerned.  Reliability under Rule 702 is a question concerning the expert's methods, not the method of obtaining the underlying data by non-experts.").

The Court should deny the motion.

## II.    The government's critiques of the quality and accuracy of the data that Dr. Coston relied on ignores the reality that datasets are almost always imperfect.

The government critiques the data that Dr. Coston relied to generate their expert report in two ways: 1) the quality of the data, and 2) the accuracy of the data.  To review, the data that Dr. Coston analyzed came directly from the law enforcement agency that is a part of the prosecution team in this case, the Richmond Police Department.  On September 30, 2021, the defense sought and the Court ordered the Richmond Police Department to produce police department records associated with each traffic stop that the Richmond Police Department conducted from July 1, 2020, through December 5, 2020.

In response to this subpoena, on October 18, 2021, counsel for the Richmond Police Department contacted undersigned counsel and reported that she estimated that to comply with the subpoena, the Richmond Police Department would have to produce an estimated 9,000 to 15,000 responsive documents and that it was not feasible to produce that information to the defense in any sort of timely fashion.  During subsequent phone calls with counsel for the Richmond Police

**JA0485**

Department, counsel for the Richmond Police Department further indicated that the Department would fight compliance with the subpoena if the defense continued to pursue production of all 9,000 to 15,000 responsive documents. But, counsel for the Richmond Police Department reported that the Department could provide the raw data submitted to the Virginia State Police in compliance with Virginia's Community Policing Act, *see* Va. Code § 52-30.2, from the time period of July 1, 2020, through December 5, 2020. On October 21, 2021, counsel for the Richmond Police Department then provided several spreadsheets of data containing the Richmond Police Department's information collected pursuant to the Virginia Community Policing Act from July 1, 2020, through July 31, 2021, to defense counsel. It is this data from the Richmond Police Department (limited to the timeframe of July 1, 2020—the time that the Richmond Police Department began collecting data pursuant to the Virginia Community Policing Act—and December 5, 2020—the date of Mr. Moore's traffic stop) that Dr. Coston analyzed.

### a. The quality of the data analyzed is limited to the quality of the data provided.

One of the government's critiques of Dr. Coston's analysis is that Dr. Coston did not collect additional data to perform a veil of darkness survey or a "Richmond-specific traffic accident estimate[]." *See* ECF No. 70 at 14. It is true that information that would enable the defense to perform a veil of darkness survey or a Richmond-specific traffic accident estimate would be of great interest to the defense in this case. As described above, however, the Richmond Police Department refused to provide the individual reports of the individual traffic stops showing when these traffic stops occurred. Thus, the defense could not conduct a veil of darkness survey on the data provided. Similarly, no Richmond-specific traffic accident data exists that defense counsel are aware of.

**JA0486**

Another of the government's critiques is of the Richmond Police Department's apparently poor compliance with Virginia's Community Policing Act from July 1, 2020, to December 5, 2020. The express purpose of the Community Policing Act is to collect and analyze data "to determine the existence and prevalence of the practice of bias-based profiling and the prevalence of complaints alleging the use of excessive force." *See* Virginia's Legislative Information System, *2020 Session: HB 1250 Virginia Community Policing Act; data collection and reporting requirement*, https://lis.virginia.gov/cgi-bin/legp604.exe?201+sum+HB1250 (last visited Apr. 22, 2022); *see also* Va. Code § 9.1-191(A). In addition to requiring community police departments to collect the required data, Virginia's Community Policing Act also requires Virginia's Department of Criminal Justice Services to produce periodic reports analyzing the data collected. *See* Va. Code § 9.1-191.

In the Department of Criminal Justice Services's first report[1] analyzing the first batch of Community Policing Data reports that Dr. Coston's analysis is not only correct as it relates to the data that the Richmond Police Department submitted, but also displays the racial profiling law enforcement agencies throughout Virginia are conducting on black drivers in Virginia. Figure 14 of that report paints a stark picture showing that Richmond (and nearly every other jurisdiction in Virginia) police officers do not disproportionately stop white drivers. But, Richmond (and nearly every other jurisdiction in Virginia) police officers do disproportionately stop black drivers.

---

[1] The government's motion in ECF No. 70 mentions but does not link or attach this report. The defense does both here. *See* Virginia Dep't Crim. Just. Servs., *Report on Analysis of Traffic Stop Data Collected Under Virginia's Community Policing Act* (July 1, 2021), https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/report-analysis-traffic-stop-data.pdf ; *see also* Ex. G. To remain consistent with exhibit labeling in the supplemental briefing stage, the defense has continued its alphabetical labeling here where it left off in ECF No. 66.



*See* Ex. A at 61.  As Dr. Coston found, the Department of Criminal Justice Services report the government argues constitutes a better analysis finds that Richmond police officers disproportionately search and arrest black drivers but do not disproportionately search and arrest white drivers.  *Id.* at 62-63; *see also United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996) (finding persuasive in evaluating *Daubert* challenge government's own actions in the case; "Indeed, common sense suggests that the Government would not have gone to the expense of taking private property and erecting a levee for the purpose of 'flood control in Yazoo River Basin' were the possibility of flooding in the area

6

**JA0488**

mere 'speculation and conjecture.'"). One can presume that Virginia would not have enacted the Community Policing Act but for a valid concern regarding racial profiling in Virginia.

Another critique that the government levels at the quality of the data Dr. Coston relied on is that the data was collected during the early phases of the COVID-19 pandemic, when "law enforcement agencies were losing personnel, addressing civil unrest, and navigating surges in infections." *See* ECF No. 70 at 5. That is all true. But, what the government does not address is that evidence shows a long history of racial profiling by the Richmond Police Department. From January 2017 to October 2018, seventy-five percent of all of the people the Richmond Police Department arrested during traffic stops were black. *See* ECF No. 66-6 (Ex. F) at 11. That percentage indicated that black drivers in Richmond were 30.7% more likely to be arrested during a traffic stop than white drivers. *Id.* In six weeks of data from February 14, 2000, to March 31, 2000, that the government's expert analyzed, Dr. Smith found that 64.2% of all of the drivers that the Richmond Police Department stopped for traffic offenses were black. At the time, black drivers comprised 50.6% of the driving population in Richmond. *See* Ex. H.

Interestingly, Dr. Smith's 2001 study analyzed data captured by all Richmond Police Department officers entering required information into mobile data computers in their police cars. *Id.* at 5. During the timeframe that Dr. Smith studied, officers with the Richmond Police Department made 110 traffic stops using motorcycles or rental cars or some other car that could not be fitted with a mobile data computer. *Id.* at 6. Also during that timeframe, officers complied with entering the requested data in only 64% of the traffic stops the officers conducted. *Id.* Dr. Smith noted that "[g]iven the sensitive nature[2] of the study and the number of traffic stops made daily, a 64% response rate was somewhat higher than expected." *Id.* Rather than rendering his

---

[2] The purpose of the study was specifically to determine whether Richmond Police Department officers were disproportionately stopping, searching, and arresting minority citizens.

analysis unreliable, Dr. Smith simply cautioned that his analysis must be viewed with the understanding that the data did not represent every traffic stop that the Richmond Police Department conducted. *Id*. Of note, the Richmond Police Department Chief "was less than pleased with [Dr. Smith's] results. [The police chief] viewed the study as flawed and based on incomplete data," *see* ECF No. 66-5 at 2—a position identical to that which the government takes here.

As Dr. Smith did in 2001, the Court should conclude that while the data does in this case does not represent all aspects of every traffic stop the Richmond Police Department conducted, the data itself is reliable. Likely never will there be a perfect data set to analyze in any given situation. As Dr. Coston noted in their report, additional data would of course allow for additional analysis. Because this is a criminal case that the government brought in this Court six months after the traffic stop in this case, the defense could not create its own dataset that could possibly have been more illuminating and yet also relevant in time to the traffic stop at hand. Rather, the best data available for this analysis is the data that the state of Virginia requires all police departments to keep under the Virginia Community Policing Act. But just because a data set is imperfect—as most are—does not mean that the analysis itself is unreliable.

### b. The accuracy of the data is in large part determined by the Richmond Police Department officers who recorded the data.

One of the government's critiques of the accuracy of the data is that the officers had no guidance from the Virginia State Police in how to determine an individual's race. *See* ECF No. 70 at 6. As a purely human-created social construct, race is, of course, subject to some interpretation. But, the idea that a police officer's visual assessment of the race of another individual renders the data in this case so inaccurate that it is unreliable does not comport with the law or commonsense. *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 287 (2004) ("But a person's

**JA0490**

politics is rarely as readily discernible—and never as permanently discernible—as a person's race."); *compare* ECF No. 70 at 6 (arguing that officers cannot make reliable determinations of another individual's race) *with* ECF No. 70 at 14 and ECF No. 70-1 at 2 (advocating that better method is to collect data to use "veil of darkness" technique so as to limit officer's visual determination of race in decision to conduct traffic stop).

That critique borders on resemblance of Virginia's historical "one-drop rule," enacted in the Racial Integrity Act of 1924. The Racial Integrity Act of 1924 classified people as white only if they had "no trace whatsoever of any blood other than Caucasian" or one-sixteenth or less of Native American blood and "no other non-Caucasic blood . . . ." *See* Ex. I. It did not matter then whether the person appeared white. Rather, what mattered was whether the person had any non-Caucasian (or Native American) ancestor. That mode of thinking belies the purpose of colleting racial profiling statistics. If a person's race is so indistinguishable from that of "white," presumably an officer would report the person's race as white. Thus, there would be no racial profiling.

Another of the government's critiques of Dr. Coston's report is their use of mapping tools. First, the government takes issue with Dr. Coston and the defense's use of the geocoding program Geocodio. Geocodio is:

> a geocoding service that has been used to obtain geographic coordinates in other point pattern analyses. Geocodio's forward geocoding matches addresses provided by the user with data from over 1600 data sources, including the US Census Bureau, the US Postal Service, and city, county, and state datasets.

*See* Ex. J. Geocodio has been used by other academics in published articles who conduct geospatial analyses. *Id.* at 3, 13. Geocodio reports that results indicating a less than .6 accuracy warrant further review and potential correction. *See* Geocodio, *Accuracy Types and Scores*, https://www.geocod.io/guides/accuracy-types-scores/ (last visited Apr. 22, 2022). And like the

**JA0491**

researcher in Exhibit J, the defense individually reviewed and corrected all locations with an accuracy score of less than .6.  *See* ECF No. 66-1 at 4.

The government has pointed to three out of 2,582 traffic stops in which Geocodio incorrectly[3] mapped the location of the traffic stop.  *See* ECF No. 70 at 11.  Dr. Coston excluded each[4] of these stops from the analysis because the mapping information indicated that they were clearly outside of the Richmond Police Department's jurisdiction.  *See* ECF No. 66-1 at 3.   It is important to note (and the government appears to be unaware) that whether a particular location is outside of the Richmond Police Department's jurisdiction is a different question than whether a stop occurs outside the city limits of Richmond.  Richmond Police Department officers, as well as other police officers in Virginia, are allowed to make traffic stops and arrests for defined distances beyond the boundaries of Richmond or to continue a pursuit begun in city limits.  *See, e.g.*, Va. Code §§ 19.2-249; 19.2-250; 19.2-77; *see also Breitbach v. Commonwealth*, 546 S.E.2d 764 (Va. Ct. App. 2001) (applying Va. Code § 19.2-250's extension of officer's jurisdiction to Virginia's traffic laws).  The government has not provided any control numbers in its briefing or attachments to identify the stops it believes Dr. Coston wrongfully included in their analysis, but without more, it is reasonable to assume that the stops it has identified beyond the city limits are ones conducted within these authorized extensions of the Richmond Police Department's jurisdiction.  Otherwise,

---

[3] The dataset the Richmond Police Department provided often reported locations in a very general manner, such as an intersection or general vicinity of an area rather than an exact address.

[4] Before performing any geocoding, the defense assigned each traffic stop a "control number" so as to help facilitate later comparisons.  The government has not identified the relevant control numbers it takes issue with, but the control numbers for the three stops the government discusses appear to be 376 (black male stopped for driving with a suspended license and given a citation), 1703 (black female stopped for having an altered or forged license plate and given a warning), and 2116 (white male stopped for making a faulty turn and given a warning).  Had the government found other discrepancies in the remaining 2,579 stops, one anticipates it would have pointed those out in its motion.

such stops would evidence Richmond Police Department officers routinely disregarding the law governing their jurisdiction.

Ultimately, there is nothing about the government's critiques of the accuracy or quality of the data the Richmond Police Department captured and supplied to the defense that undermines Dr. Coston's findings that race plays a statistically significant role in the Richmond Police Department's traffic stops, searches, and arrests. Rather, Dr. Coston's findings comport with the findings of the Department of Criminal Justice Services, which analyzed the same data.

### III.    The government's critique of the analytical tools Dr. Coston used is misplaced.

#### a.    Dr. Coston's use of United States Census Bureau data as the benchmark for the racial composition of the city of Richmond is accepted within the academic field and scientifically reliable.

The government has faulted Dr. Coston for using United States Census Bureau data (Dr. Coston refers to this data in specifically referencing the American Community Survey data from 2015-2019) as the benchmark for the racial composition of the city of Richmond. *See* ECF No. 70 at 13-18. The government's expert reported that "census-based benchmarking is no longer accepted as a scientifically valid technique for comparing against police traffic stop data." *See* ECF No. 70-1 at 2. The government asserts that "the improper use of census data alone is sufficient to strike Dr. Coston's report because using census data as a benchmark falls far outside scientific norms." *See* ECF No. 70 at 13.

As the Virginia Department of Criminal Justice Services has observed:

The overriding challenge to empirically determining to what extent bias-based profiling may be contributing to these disparities is what is referred to as the "benchmark problem." To help determine if bias is a factor in driver stops, one would need to be able to compare the proportion of stops made for each racial/ethnic group to the appropriate benchmark: the number of drivers in each racial/ethnic group who are actually driving on the road and subject to being stopped. No one has yet found an accurate way to do this.

11

**JA0493**

*See* Ex. G at 65.  And so, just as discussed above with regard to the quality of the data available, there is no perfect benchmark.  Rather, there are various benchmarks that can be used.  But, the only benchmark available here given the data available is a census-based benchmark.   The government's expert points to the "veil of darkness" technique, which:

> makes use of the natural variation in daylight that occurs across the year and with changes in daylight savings time to compare the proportion of drivers stopped at night to those stopped during the day by racial group. Theoretically, if more minority drivers are stopped during daylight hours when police can more easily ascertain their race, then this provides evidence of possible racial bias, particularly if there are no differences in the rates at which White drivers are stopped during the day compared to at night.

*See* ECF No. 70-1 at 2.  As explained above, the defense sought data that would have allowed the defense to conduct a "veil of darkness" analysis.  The Richmond Police Department, however, refused to provide such information because of the amount of time it would take the Department to provide the responsive documents.  As the government notes, there is no Richmond-specific traffic crash benchmark data available.  *See* ECF No. 70 at 14.  And so, the only choice of benchmark given the available data is a census-based benchmark.

That is exactly what the Department of Criminal Justice Services used to conduct its own analysis of the Virginia Community Policing Act data.  *See* Ex. G at 22 ("Population figures used in this report are from The National Center for Health Statistics (NCHS) vintage 2019 post-Census estimates of the resident population of the United States (April 1, 2010, July 1, 2010–July 1, 2019)").  Other scientific studies of racial profiling have done the same.  For example, in addition to Dr. Smith's report in Exhibit H which relied on census benchmarks in 2001, in Exhibit K, three researchers used census benchmarks to study the likelihood of racial profiling in Houston, Texas in 2009 based on data collected in 2003.  *See* Ex. K at 13-14.  In 2015, a researcher reviewed hundreds of thousands of stops in New York City for racial profiling using a census benchmark.

**JA0494**

*See* Ex. J at 1-3.  Thus, it is inaccurate to say that the "use of census data alone is sufficient to strike Dr. Coston's report because using census data as a benchmark falls far outside scientific norms."  *See* ECF No. 70 at 13.

The government cannot have it both ways by condoning the Richmond Police Department's refusal to provide more detailed information on the traffic stops at issue while criticizing the defense for using the only benchmark available.  That the Department of Criminal Justice Services relied on census benchmarks too in its analysis of the Virginia Community Policing Act data, which yielded **the same results** as Dr. Coston's analysis, is not only telling but should end the Court's entertainment of the government's motion to exclude Dr. Coston's report.

> ### b.  *The statistical methods that Dr. Coston used to analyze the data were the most appropriate given the data available.*

Lastly, the government has critiqued the statistical tools that Dr. Coston used in analyzing the data.  First, the government attacks Dr. Coston's report because it does not use a regression analysis.  "Selection of appropriate statistical method depends on the following three things: Aim and objective of the study, Type and distribution of the data used, and Nature of the observations (paired/unpaired)."  *See* Ex. L[5] at 1.  A regression analysis is one that involves multiple independent variables.  And it can be used in appropriate circumstances to infer—by itself— causation.  The data available here, however, does not lend itself to regression analysis.  Rather, the data here is subject to proportional analysis, which is why Dr. Coston chose to analyze the data using chi-square tests, Cramer's V, and Kendall's Tau.

Similarly, the government critiques Dr. Coston for using geospatial information and heat clusters.  That information clearly shows that the Richmond Police Department is stopping black

---

[5] While Exhibit L discusses biomedical research, it correctly and succinctly illustrates how the analysis conducted must be consistent with the data provided.

**JA0495**

drivers disproportionately to white drivers in not only the black parts of Richmond, but the racially

segregated white section of Richmond falling neatly within the third precinct. *See* ECF No. 66-1

at 8-11. Academics have used such geospatial analysis and heatmapping numerous times in

studying racial profiling. *See, e.g.*, Ex. K; *see also* Ex. M. In Exhibit M, the researchers tested a

"deployment hypothesis":

> The deployment hypothesis proposes that racial disparities in searches result from
> departments responding to concentrated offending by focusing traffic stops and
> searches in and around hot spots of crime. While this clustering of interactions
> increases the risk that drivers in and around crime hot spots will be stopped and
> searched, this risk is expected to be race neutral where drivers of various racial
> groups are treated similarly. In other words, traffic stops occurring in similar
> proximities to hot spots of crime should contain similar levels of officer
> assertiveness regardless of the characteristics of the stopped drivers. Racial
> disparities are an expected product of uneven risk for proactive, investigatory
> contacts driven by spatial variation in the distribution of reported offending rather
> than variation in the exercise of discretionary authority across drivers of varying
> demographic characteristics.

*See* Ex. M at 4 (internal citations omitted). In other words, when you send police out to investigate

crime, one can expect to see more traffic stops. Thus, deployment of police to high crime areas

where minorities live will have the impact of overpolicing racial minorities. *See, e.g.*, Ex. K at 28

("Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony

because they are more likely to drive in high crime areas where they reside and more vigorous law

enforcement is a common practice.").

Thus, it is critical to understand that the history of racial segregation in a place contributes

to the overpolicing of minority neighborhoods. In a city like Richmond that has a history

inextricably intertwined with racial segregation, the Richmond Police Department's decision to

have three police precincts devoted to the black parts of town is expected to generate overpolicing

of black neighborhoods. But, what is particularly disturbing is how the deployment hypothesis

may be playing out in Richmond. Not only were black drivers pulled over disproportionately in

**JA0496**

black neighborhoods, black drivers were also disproportionately stopped in the white part of Richmond, particularly along the borders of the white parts of town. *See* ECF No. 66-1 at 10-11. The government would like very much to ignore the role that the long history of racial segregation plays in the Court's analysis in this case, but the law does not so allow. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279-80 (1979) (discussing statutory history); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 (1977) ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."). The government's avoidance of this history makes it even more critical for the Court to hear evidence regarding the creation and maintenance of the police precincts in Richmond.

The main issue with the government's argument is that the government perhaps misunderstands that Dr. Coston's report itself does not and does not purport to determine "whether a specific traffic stop was the result of racial bias or racial profiling[. Rather] this report does conclude that race is a significant factor in the decision to stop a driver, whether a person or vehicle is searched, the outcome of a stop, and the location where stops occur." *See* ECF No. 66-1 at 12. What Dr. Coston has found is that there is statistical significance to the role that race plays in traffic stops that the Richmond Police Department conducts. And that is exactly what the Court ordered the defense to determine by hiring a statistician. *See* ECF No. 44 (directing the defense to "consult with an expert regarding the statistical significance of the evidence presented in support of the defendant's motion to dismiss the indictment and to consider additional evidence in support of the motion").

**Conclusion**

15

**JA0497**

The Court should deny the government's motion. Dr. Coston's report aligns with the Department of Criminal Justice Service's own report, which found that "statewide, Black and Hispanic drivers in Virginia were disproportionately stopped by law enforcement when compared to other drivers between July 1, 2020, and March 31, 2021, based on the number of drivers stopped relative to their numbers in Virginia's driving-age population. This type of disparity was seen among traffic stops made by many individual law-enforcement agencies for which disparity measures could be calculated. Stops of Black and Hispanic drivers were also more likely to result in a search or an arrest than stops of drivers from other racial groups. This finding is consistent with traffic stop research conducted in other states." *See* Ex. G at 8.

Respectfully submitted,
KEITH RODNEY MOORE

By:    _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

16

**JA0498**



# REPORT ON ANALYSIS OF TRAFFIC STOP DATA COLLECTED UNDER VIRGINIA'S COMMUNITY POLICING ACT

## JULY 1, 2021

**Virginia Department of Criminal Justice Services**
1100 Bank Street,  Richmond, Virginia 23219

www.dcjs.virginia.gov

JA0499

# Table of Contents

Table of Contents ...................................................................................................................... i

**Executive Summary** ................................................................................................................. 1
  Background ............................................................................................................................. 1
  Key Findings ........................................................................................................................... 2
  Analysis of Traffic Stops: Statewide ....................................................................................... 3
    Overview of Statewide Traffic Stops .................................................................................... 3
    Driver Racial/Ethnicity Analysis of Statewide Traffic Stops ................................................ 3
  Analysis of Traffic Stops: Agency-Level ................................................................................. 4
    Preliminary Analysis Tables ................................................................................................. 5
  Data on Complaints Alleging Excessive Use of Force ............................................................ 7
  Conclusions and Recommendations ....................................................................................... 8
    Considerations and Recommendations for Additional Data Collection ................................. 9

**Authority for Report** .............................................................................................................. 11

**Introduction** .......................................................................................................................... 12
  The "Bias-Based Profiling" Issue .......................................................................................... 12
  Virginia Legislation .............................................................................................................. 12

**How the Data Was Collected and Reported** ......................................................................... 15
  Virginia State Police (VSP) Data Collection System .............................................................. 15
    Summary of VSP Traffic Stop Reporting Process ............................................................... 15
    How Law-Enforcement Agencies Reported to VSP ............................................................ 15
    VSP Quality Checks and Assistance to Reporting Agencies ................................................ 15
    VSP Data Dissemination .................................................................................................... 16
  Data on Complaints Alleging Use of Excessive Force ........................................................... 16

**How the Data Was Analyzed** ................................................................................................. 17
  Selection of Data to Analyze ................................................................................................ 17
  Analysis Approach ................................................................................................................ 18

**Findings from Analysis of Statewide Traffic Stop Data** ........................................................ 20
  Overview of Statewide Data—All Driver Racial/Ethnic Groups Combined ........................... 20
    Reasons for Traffic Stops .................................................................................................. 20
    Person and Vehicle Searches ............................................................................................. 21
    Outcomes of Stops ............................................................................................................ 21
    Demographics of Drivers Stopped ..................................................................................... 22
      Reason for Traffic Stops, by Driver Race/Ethnicity ........................................................ 23
      Searches Made During Traffic Stops, by Driver Race/Ethnicity ..................................... 23
      Outcome of Traffic Stops, by Driver Race/Ethnicity ...................................................... 24
      Driver Gender, by Race/Ethnicity .................................................................................. 25
      Driver Age, by Driver Race/Ethnicity ............................................................................ 25
  Statewide Disparity Index (DI) .............................................................................................. 26
  Summary of Statewide Race/Ethnicity Analysis .................................................................... 29

**Findings from Analysis of Agency-Level Data** ................................................................. **30**
  Virginia State Police Traffic Stop Analysis ........................................................................ 30
    *Geographic Presentation of VSP Driver Stop Disparity Indexes (DIs)* ....................... 31
      Geographic Presentation of VSP Search DIs ......................................................... 33
      Geographic Presentation of VSP Driver Arrest DIs ............................................... 34
  City and County Agency Traffic Stop Analysis .................................................................. 35
    Driver Stop DIs for City and County Agencies ............................................................. 35
    Driver Stop DIs for Individual Agencies ....................................................................... 36
    Analysis of Events Following Traffic Stops for City and County Agencies .................. 53
      Searches Conducted ................................................................................................ 53
      Driver Arrests ........................................................................................................... 54
  Town Agencies Traffic Stop Analysis .............................................................................. 55
    Driver Racial/Ethnicity Analysis of Traffic Stops for Town Agencies .......................... 55
    Analysis of Events Following Traffic Stops for Town Agencies .................................... 55
      Searches Conducted ................................................................................................ 55
      Driver Arrests ........................................................................................................... 56
  Geographic Presentation of Stop, Search, and Arrest DIs for City, County, and Town Agencies........... 57
  Other Agencies Traffic Stop Analysis .............................................................................. 61
    Traffic Stops for Other Agencies ................................................................................. 61
    Analysis of Events Following Traffic Stops for Other Agencies ................................... 61
      Searches Conducted ................................................................................................ 61
      Driver Arrests ........................................................................................................... 62

**Interpretation of Findings** ............................................................................................. **64**

**Conclusions and Recommendations** ........................................................................... **67**
    Additional Recommendations ...................................................................................... 68

**Appendices** *(available online)* .................................................................................... **70**
  APPENDIX A: Traffic Stop Table for Virginia State Police ................................................ 70
  APPENDIX B: Traffic Stop Tables for Law-Enforcement Agencies Serving Cities and Counties .............. 70
  APPENDIX C: Traffic Stop Tables for Law-Enforcement Agencies Serving Towns ................... 70
  APPENDIX D: Traffic Stop Tables for Other Law-Enforcement Agencies ....................... 70
  APPENDIX E: Law-Enforcement Agencies Not Reporting Traffic Stop Data................... 70
  APPENDIX F: Bias-Based Profiling Legislation (HB 5030) Effective July 1, 2021 ........... 70
  APPENDIX G: VSP Community Policing Data Collection Instructions and Technical Specifications
    (Version 3) .................................................................................................................. 70
  APPENDIX H: Notes on Disparity Index (DI) Calculation Methodology ........................... 70
  APPENDIX I: Use of Force Data ....................................................................................... 70
  APPENDIX J: References ................................................................................................. 70

If you have questions about this report or require additional information, please contact

Jim McDonough, DCJS Criminal Justice Research Center

at jim.mcdonough@dcjs.virginia.gov or (804) 371-0532

**JA0501**

# Executive Summary

## Background

The Community Policing Act of 2020 (HB 1250; "the Act") mandated that the Virginia State Police (VSP) and other state and local law-enforcement agencies, including police departments and sheriff's offices (PDs and SOs), begin collecting and reporting data on traffic stops as of July 1, 2020. State law-enforcement agencies, PDs, and SOs are to collect data on the race, ethnicity, and other characteristics of the drivers stopped, and on other circumstances of the stop such as the reason for the stop, whether any individuals or vehicles were searched, and the outcome of the stop (arrest, citation, warning, etc.). All reporting agencies are to submit this data to the VSP, which will maintain the data in the Community Policing Database.

The Act also mandated that the Virginia Department of Criminal Justice Services (DCJS) periodically obtain data from the Community Policing Database and produce an annual report "*for the purposes of analyzing the data to determine the existence and prevalence of the practice of bias-based profiling and the prevalence of complaints alleging the use of excessive force.*" Such reports shall be produced and published by July 1 of each year.

This is the first of these reports from DCJS. It contains a review of how the data was collected and analyzed as well as preliminary findings of data from 613,483 traffic stops reported in Virginia during the nine-month period between July 1, 2020, and March 31, 2021. This report also presents the findings from analyses of statewide data; aggregated data from the seven VSP Divisions; and data from each individual PD and SO that reported sufficient data to the Community Policing Database.

**The information presented in this report is preliminary and should be interpreted with caution.** This is largely because this was the first year that the Community Policing Act was implemented. As the report notes, many PDs and SOs – especially smaller agencies with limited resources – faced challenges establishing the data collection and reporting required under the Act. The majority of law-enforcement agencies (LEAs) in Virginia (269, or 77%) employ 50 or fewer officers, including 125, or 35% employing 10 or fewer officers. Many of these agencies faced challenges fulfilling all requirements imposed by the state even before the significant increase in reporting responsibilities resulting from the Act. For this reason, some agencies were unable to report complete data responsive to the Community Policing Act for the entire year, and in some cases the quality of the data was limited. Additionally, a substantial number of smaller agencies reported so few traffic stops that it was not possible to interpret data related to driver race/ethnicity. (The state may wish to consider providing additional resources to law-enforcement agencies, particularly smaller agencies, to support their ability to comply with the data-related provisions of the Act, as described in Recommendation 7 of this report.)

Another important limitation to the data and findings presented in this report relates to the race/ethnicity data in the Community Policing Database itself. Because the state lacks a standardized mechanism for reporting the race or ethnicity of a given driver, law-enforcement officers must either make their own determination about a driver's race/ethnicity (which may or may not be accurate) or ask for that information in the course of the traffic stop, which could raise constitutional concerns or escalate the perception of conflict in certain situations. Virginia does not collect and store information about a driver's race/ethnicity, whether in driver-related databases maintained by the Virginia Department of Motor Vehicles or on individual driver's licenses. Whether and to what extent the data related to driver race/ethnicity in the Community Policing Database accurately captures this information cannot be determined without further review.

## JA0502

The factors described above limited the ability of DCJS staff to conduct any complex statistical analysis of the data, or to draw any firm conclusions about the existence and prevalence of the practice of bias-based profiling in a given agency or jurisdiction. It is anticipated that the reporting, analysis, and interpretation of the data will improve in the future as the program matures.

## Key Findings

Despite the limitations noted above, DCJS staff were able to identify differences in traffic stop rates for persons in different racial/ethnic groups. This was done by comparing the percentage of persons in each racial/ethnic group in Virginia's population age 15 and older (generally the legal age to drive in Virginia) to the percentage of persons in each racial/ethnic group among drivers in traffic stops. **The ratio between these two percentages was used to calculate a statewide Disparity Index (DI) for stops for each driver group.** Traffic stop DIs were not calculated for town and "other" agencies (such as airport or campus PDs) because population breakouts by age and race/ethnicity were not available for these areas.

DCJS staff also examined differences in what happens to drivers in different racial/ethnic groups once a stop has occurred, although this analysis was conducted only for those agencies reporting a sufficient number of searches and actions taken toward the driver. This was done by comparing the percentage of drivers stopped in each racial/ethnic group to the percentage in each group for which the stop resulted in a particular outcome such as a search or arrest. **Differences between driver racial/ethnic groups were found regarding the reasons a stop was made, whether a search of individuals or the vehicle occurred, and what action was taken toward the driver (warning, citation, arrest, etc.).**

Calculated DI values were used to assess whether drivers in different racial/ethnic groups were overrepresented (or underrepresented) in their likelihood to be stopped, or in events that occurred after a stop was made, as follows[1]:

- A **DI of 2.0 or higher** indicates there was *high overrepresentation* for a group in how likely it is that a driver will be stopped, or that a particular event (search, arrest, etc.) will occur during the stop.

- A **DI of 1.1 to 1.9** indicates there was *moderate overrepresentation* for a group in how likely it is that a driver will be stopped, or that a particular event (search, arrest, etc.) will occur during the stop.

- A **DI of 1.0 or less** indicates there was *no overrepresentation* (and may be underrepresentation) for a group in how likely it is that a driver will be stopped, or that a particular event (search, arrest, etc.) will occur during the stop.

The DIs calculated for both traffic stops and for events after a stop was made are descriptive and intended only to show relative degrees of disparity; they are not, and should not, be interpreted as measures of statistically significant levels of disparities between driver groups.

---

[1]  In some cases involving very small numbers of traffic stops, Disparity Index (DI) of 3.0 and greater were calculated. However, these should generally be considered unreliable due to the small numbers of stops available for analysis.

**JA0503**

## Analysis of Traffic Stops: Statewide

### Overview of Statewide Traffic Stops

In total, 613,483 traffic stops made in Virginia were analyzed, representing all stops with full data reported by VSP and 304 other PDs and SOs for the nine-month period July 1, 2020 through March 31, 2021.

- The vast majority (96.7% or 593,427) of the traffic stops were made for traffic or motor-vehicle equipment violations.

- Only 3.8% (23,719) of the traffic stops resulted in a search of the driver, a passenger, or the vehicle.

- The most frequent outcome of a traffic stop was issuing a citation or summons (63.3% or 388,833 stops). A warning was issued in another 31% (191,933) of the stops.

- Only 3.7% of the traffic stops resulted in a driver and/or passenger being arrested.

### Driver Racial/Ethnicity Analysis of Statewide Traffic Stops

- Black drivers were stopped at higher rates than White drivers. Although only 19.6% of Virginia's driving-age population in the dataset was Black, 31% of drivers stopped were Black. Black drivers were overrepresented among stopped drivers regardless of the reason that a traffic stop was initiated.

- Black drivers who were stopped were searched at higher rates than White drivers. 5.2% of stopped Black drivers had a search of their person, a passenger, or vehicle conducted, compared to 3.1% of White drivers.

- Black drivers who were stopped were arrested at higher rates than White drivers. 2.4% of Black drivers stopped were arrested, compared to 1.6% of White drivers.

- Hispanic drivers (of any race) were also stopped at higher rates than White drivers, although not as much so as Black drivers. Although Hispanics made up only 8.7% of Virginia's driving-age population in the dataset, they made up 9.5% of drivers stopped during the nine-month period. Hispanic drivers were overrepresented among most, but not all, of the reasons that a traffic stop was initiated.

- Hispanic drivers who were stopped were searched at higher rates than White drivers. 4.7% of stopped Hispanic drivers had a search of their person, a passenger, or vehicle conducted, compared to 3.1% of White drivers.

- Hispanic drivers who were stopped were arrested at higher rates than either White drivers or Black drivers. 3.5% of stopped Hispanic drivers were arrested, compared to 1.6% of White drivers and 2.4% of Black drivers.

- Statewide, White, American Indian/Alaskan Native and Asian/Pacific Islander drivers were stopped at rates below their representation in the driving-age population. This underrepresentation occurred not only for drivers stopped, but also for all related measures including reasons for stops; searches of drivers, passengers, and vehicles; and stop outcomes such as arrests or citations.

JA0504

*Analysis of Traffic Stops: Agency-Level*

DCJS also examined traffic stop data for the VSP as an agency statewide and for 304 other individual PDs and SOs.[2] The degree to which each of the agencies' data could be analyzed depended on the amount of data reported by the agency, and on the amount of resident population data available for the locality served by the agency. Therefore, the findings are presented separately for four different groups of agencies: VSP, agencies serving cities and counties, agencies serving towns, and other agencies.

---

[2] Sixty-three other Virginia agencies were not included in the analysis because they either do not make any traffic stops, do not patrol public roadways, are no longer operational, or did not begin reporting data until after March 31, 2021 due to data collection and reporting implementation challenges.

JA0505

*Preliminary Analysis Tables*

**Preliminary Analysis and Disparity Index (DI) by Law-Enforcement Agency (LEA) Type: Traffic Stops[3]**

| Traffic Stops Conducted by Virginia State Police: | Traffic Stops Conducted by City and County LEAs: | Traffic Stops Conducted by Town LEAs: | Traffic Stops Conducted by "Other" LEAs: |
|---|---|---|---|
| *1 statewide agency (7 VSP Divisions combined) of 305 LEAs in preliminary dataset (0.33%); 20% of analyzed stops* | *152 of 305 LEAs in preliminary dataset (50%); 66.6% of analyzed stops* | *108 of 305 LEAs in preliminary dataset (35%); 11.3% of analyzed stops* | *44 of 305 LEAs in preliminary dataset (14%); 2.1% of analyzed stops* |
| **Summary of preliminary data:** Black drivers had higher VSP traffic stop DIs than other drivers. | **Summary of preliminary data:** Black and Hispanic drivers had higher DIs in terms of traffic stops by city and county LEAs. | **Summary of preliminary data:** The percentages of Black and Hispanic drivers stopped by town LEAs were lower than the percentages of stops for these drivers statewide. | **Summary of preliminary data:** The percentages of White and Black drivers stopped by "other" LEAs (e.g., airports, college or university campuses) were similar to the percentages stopped statewide. |
| **Highlights from preliminary data:**<br>• No driver groups had **high overrepresentation** for traffic stops made by VSP<br>• Black drivers had **moderate overrepresentation** for stops made by VSP. No other driver groups had moderate overrepresentation for stops made by VSP.<br>• VSP had **no overrepresentation** for stops of Hispanic, American Indian, Asian and White drivers stopped. | **Highlights from preliminary data:**<br>• 30.3% of agencies had **high overrepresentation** for stops of Black drivers, and 21.1% of agencies had the same for stops of Hispanic drivers. However, less than one percent of agencies had high overrepresentation for White drivers stopped.<br>• Almost 50% of agencies had **moderate overrepresentation** for stops of Black drivers, and 37.5% of agencies had the same for stops of Hispanic drivers. Only 10.5% of agencies had moderate overrepresentation for White drivers stopped.<br>• Only 17.1% of agencies had **no overrepresentation** for stops of Black drivers, and only 33.6% of agencies had the same for stops of Hispanic drivers. However, nearly 90% of agencies had no overrepresentation for White drivers stopped. | **Highlights from preliminary data:**<br>• While 31% of drivers stopped statewide were Black, 20% of drivers stopped by town agencies were Black.<br>• Hispanic drivers were 9.6% of those stopped statewide and 8.9% of drivers stopped by town agencies.<br>• The percentage of White drivers stopped by town agencies — 66.4% — was higher than the percentage of White drivers stopped statewide (54.8%). | **Highlights from preliminary data:**<br>• The percentages of White and Black drivers stopped by "other" agencies were similar to the percentages stopped statewide; 54.3% of drivers stopped by "other" agencies were White, compared with 54.8% of stops statewide, and 30% of drivers stopped by "other" agencies were Black, compared with 31% of all stops statewide.<br>• The percentage of Hispanic drivers stopped by "other" agencies — 7.9% — was slightly lower than the percentage stopped statewide (9.5%). |

---

[3] Due to data limitations, a DI could not be calculated to indicate whether any driver group was overrepresented in traffic stops by town LEAS and other LEAs.

**JA0506**

**Preliminary Analysis and Disparity Index (DI) by LEA Type: Driver/Passenger/Vehicle Searches**

| Searches Conducted by Virginia State Police: | Searches Conducted by City and County LEAs: | Searches Conducted by Town LEAs: | Searches Conducted by "Other" LEAs: |
|---|---|---|---|
| *1 statewide agency (7 VSP Divisions combined) of 305 LEAs in preliminary dataset (0.33%); 12.9% of analyzed searches* | *152 of 305 LEAs in preliminary dataset (50%); 78.2% of analyzed searches* | *108 of 305 LEAs in preliminary dataset (35%); 7.5% of analyzed searches* | *44 of 305 LEAs in preliminary dataset (14%); 1.3% of analyzed searches* |
| **Summary of preliminary data:** | **Summary of preliminary data:** | **Summary of preliminary data:** | **Summary of preliminary data:** |
| Black and Hispanic drivers had higher DIs than other driver groups in terms of searches conducted by VSP. | Black and Hispanic drivers had higher DIs than other driver groups in terms of searches conducted by city and county LEAs. | Black and Hispanic drivers again had higher DIs than other driver groups in terms of searches conducted by town LEAs. | Black and Hispanic drivers again tended to have higher DIs than other driver groups in terms of searches conducted by "other" LEAs. |
| **Highlights from preliminary data:** | **Highlights from preliminary data:** | **Highlights from preliminary data:** | **Highlights from preliminary data:** |
| • No driver groups had **high overrepresentation** for searches made by VSP.<br>• Black and Hispanic drivers had **moderate overrepresentation** for searches made by VSP. No other driver groups had moderate overrepresentation for VSP searches.<br>• There was **no overrepresentation** for searches of American Indian, Asian and White drivers in searches made by VSP. | • 8.5% of agencies had **high overrepresentation** for searches involving Black drivers, their passengers or vehicle, and 10.5% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. Less than 1% of agencies had high overrepresentation for searches **involving White** drivers, their passengers, or vehicle.<br>• 53.3% of agencies had **moderate overrepresentation** for searches involving Black drivers, their passengers, or vehicle, and 22.4% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. 12.5% of agencies had moderate overrepresentation for searches involving White drivers, their passengers, or vehicle.<br>• 19.7% of agencies had **no overrepresentation** for searches involving Black drivers, their passengers, or vehicle, while 30.3% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. By comparison, 76.3% of agencies had no overrepresentation for searches involving White drivers, their passengers, or vehicle. | • 20.4% of agencies had **high overrepresentation** for searches involving Black drivers, their passengers, or vehicle, and 11.1% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. No agency had the same for searches involving White drivers, their passengers, or vehicle. 27% of agencies had **moderate overrepresentation** for searches involving Black drivers, their passengers, or vehicle, and 13% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. 15.7% of agencies had moderate overrepresentation for searches involving White drivers, their passengers, or vehicle.<br>• Only 12% of agencies had **no overrepresentation** for searches involving Black drivers, their passengers, or vehicle, and only 7.4% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. By comparison, 63% of agencies had no overrepresentation for searches involving White drivers, their passengers, or vehicle. | • 13.6% of agencies had **high overrepresentation** for searches involving Black drivers, their passengers, or vehicle, and 16% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. By comparison, only 2.3% of agencies had high overrepresentation for searches involving White drivers, their passengers, or vehicle.<br>• 23% of agencies had **moderate overrepresentation** for searches involving Black drivers, their passengers, or vehicle, and 2% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. 9% of agencies had moderate overrepresentation for White drivers, their passengers, or vehicle.<br>• Only 9% of agencies had **no overrepresentation** for searches involving Black drivers, their passengers, or vehicle, while 11% of agencies had the same for searches involving Hispanic drivers, their passengers, or vehicle. By comparison, 41% of agencies had no overrepresentation for searches involving White drivers, their passengers, or vehicle. |

**JA0507**

**Preliminary Analysis and Disparity Index (DI) by LEA Type: Driver Arrests**

| Arrests Made by Virginia State Police: | Arrests Made by City and County LEAs: | Arrests Made by Town LEAs: | Arrests Made by "Other" LEAs: |
|---|---|---|---|
| *1 statewide agency (7 VSP Divisions combined) of 305 LEAs in preliminary dataset (0.33%); 11.7% of analyzed* | *152 of 305 LEAs in preliminary dataset (50%); 82.2% of analyzed arrests* | *108 of 305 LEAs in preliminary dataset (35%); 4.8% of analyzed arrests* | *44 of 305 LEAs in preliminary dataset (14%); 1.2% of analyzed arrests* |
| **Summary of preliminary data:** Black and Hispanic drivers had higher DIs than other driver groups in terms of arrests made by VSP. | **Summary of preliminary data:** Black and Hispanic drivers had higher DIs than other driver groups in terms of arrests made by city and county LEAs. | **Summary of preliminary data:** Black and Hispanic drivers again had higher DIs than other driver groups in terms of arrests made by town LEAs. | **Summary of preliminary data:** DIs for arrests of Black and Hispanic drivers by "other" agencies were mixed, with some DIs comparable to those for other drivers. |
| **Highlights from preliminary data:** <br>• No driver groups had **high overrepresentation** for arrests in stops made by VSP.<br>• Black and Hispanic drivers had **moderate overrepresentation** for arrests made by VSP. No other driver groups had moderate overrepresentation for arrests made by VSP<br>• There was **no overrepresentation** for American Indian, Asian and White drivers in arrests made by VSP | **Highlights from preliminary data:** <br>• 13.2% of agencies had **high overrepresentation** for Hispanic drivers arrested, and 11.2% of agencies had the same for Black drivers arrested. No agencies had high overrepresentation for White drivers arrested.<br>• 41.4% of agencies had **moderate overrepresentation** of Black drivers arrested, and 19.1% of agencies had the same for Hispanic drivers arrested. Only 15.1% of agencies had moderate overrepresentation of White drivers arrested.<br>• 17.8% of agencies had no overrepresentation for Black drivers arrested, and 17.1% of agencies also had the same for Hispanic drivers arrested. 64.5% of agencies had no overrepresentation for White drivers arrested. | **Highlights from preliminary data:** <br>• 19.4% of agencies had **high overrepresentation** for Black drivers arrested, and 11.1% of agencies had the same for Hispanic drivers arrested. Less than 1% of agencies had high overrepresentation for White drivers arrested.<br>• 13.9% of agencies had **moderate overrepresentation** for Black drivers arrested, and 4.6% of agencies had the same for Hispanic drivers arrested. 18.5% of agencies had moderate overrepresentation for White drivers arrested.<br>• Only 9.2% of agencies had **no overrepresentation** for Black drivers arrested, and only 1.8% of agencies had the same for Hispanic drivers arrested. 38.8% of agencies had no overrepresentation for White drivers arrested. | **Highlights from preliminary data:** <br>• 4.5% of agencies had **high overrepresentation** for Black and White drivers arrested. 20.4% of agencies had high overrepresentation for Hispanic drivers arrested.<br>• 13.6% of agencies had **moderate overrepresentation** for Black and White drivers arrested. 2.3% of agencies had moderate overrepresentation for Hispanic drivers arrested.<br>• 13.6% of agencies had **no overrepresentation** for Black drivers arrested, and 4.5% of agencies had the same for Hispanic drivers arrested. By comparison, 22.7% of agencies had no overrepresentation for White drivers arrested. |

Disparity Indexes (DIs) for each of the different agency types above are shown in Appendices A through D of the report.

## Data on Complaints Alleging Excessive Use of Force

In addition to analyzing data on traffic stops, the Act also directed DCJS to obtain data from VSP on "*the prevalence of complaints alleging the use of excessive force.*" Use-of-force data is reported to VSP by local LEAs on the VSP SP-335 form. Use-of-force data reporting under HB 1250 began on July 1, 2020. To date, only limited use-of-force data has been collected and reported to VSP. DCJS examined the data that agencies have reported to VSP for the period July 1, 2020 – December 31, 2020. Due to the limited amount of data reported, no analysis of the data is presented in this report. VSP and DCJS are examining future options for reporting use-of-force data. Therefore, the focus of the current report is on the analysis of traffic stop data.

**JA0508**

## Conclusions and Recommendations

The overall finding of this analysis is that, statewide, Black and Hispanic drivers in Virginia were disproportionately stopped by law enforcement when compared to other drivers between July 1, 2020, and March 31, 2021, based on the number of drivers stopped relative to their numbers in Virginia's driving-age population. This type of disparity was seen among traffic stops made by many individual law-enforcement agencies for which disparity measures could be calculated. Stops of Black and Hispanic drivers were also more likely to result in a search or an arrest than stops of drivers from other racial groups. This finding is consistent with traffic stop research conducted in other states.

**Although this analysis identified disparities in traffic stop rates related to race/ethnicity, it does not allow us to determine or measure specific reasons for these disparities.** Most importantly for this study, this analysis does not allow us to determine the extent to which these disparities may be due to bias-based profiling or other factors that can vary depending on race or ethnicity.

Previous research has identified various factors other than bias-based profiling that could help to explain why members of a given racial/ethnic group may be stopped at a higher or lower rate than their presence in the driving-age population would suggest. These include:

- Different driving rates or patterns by different racial groups (perhaps linked to differences in housing or employment locations, in use of public transportation, etc.).

- Different rates of policing in different areas (racial minorities may be more likely to drive in or through higher-crime areas, which are policed more than other areas).

- Different agency practices (some law-enforcement agencies differ on how much discretion they give officers in deciding when to make a stop).

A major limitation of this study is that it used each racial/ethnic group's proportion of the resident driving-age population as a benchmark for measuring traffic stop disparities. This approach provides only a crude measure of each group's exposure to potential traffic stops; in other words, a racial/ethnic group's proportion of the driving-age population in a locality provides only a rough *estimate* of that group's proportion of the *actual* driving population in that locality.

Currently, researchers have no precise measure of how often drivers of a given racial/ethnic group drive in their communities. Within each racial/ethnic group's population in a locality, some individuals do not drive at all; they may be incapable of driving, not have a driver's license or a motor vehicle, or simply choose not to drive even if they can. Others may drive, but rarely, and others still may be more likely to use public transportation than drive. Additionally, many localities have high numbers of drivers from different racial/ethnic groups who are passing through the locality – and subject to being stopped – but who are not residents and therefore are not counted in the localities' resident population figures. These nonresident driver stops can skew measures of traffic stop disparities for such localities.

> **RECOMMENDATION 1:** The percentages and DIs presented in this preliminary report should not be interpreted to indicate that any individual law-enforcement agency is practicing bias-based profiling. Given the limitations noted above, these figures should only be used to identify where the numbers indicate that certain ethnic/racial groups are being disproportionately stopped, which may bear further review to identify why this is occurring and whether any action should be considered to reduce or eliminate it.

Finding an appropriate benchmark to represent the actual driving population for any given racial/ethnic group is a problem that limits all traffic stop research, not just Virginia's efforts. Some researchers have identified methods that can allow for better (but not exact) ways of examining the extent to which bias-based profiling may play a role in driver stops, or can at least help remove some of the confounding factors

**JA0509**

that make it difficult to determine the roles that profiling may play. These methods, described below, could be applied in Virginia's analysis of traffic stop data, but would require additional driver stop information not currently collected under the Community Policing Act. Specific recommendations for additional information to be collected in accordance with the Act are listed below. In addition, as noted in Recommendation 7, the state may wish to consider allocating additional resources to law-enforcement agencies, particularly smaller agencies, to assist with the collection of existing and future data elements required under the Community Policing Act.

***Considerations and Recommendations for Additional Data Collection***

- *Comparing the percentages of traffic stops made for each driver racial/ethnic group during daylight hours to those of drivers stopped during nighttime hours.* This approach assumes that, during nighttime hours, law-enforcement officers would be less likely to discern the race/ethnicity of drivers they decide to stop than during daylight hours. If this is true, disparities based on driver race/ethnicity should occur less frequently in stops made during nighttime hours than in stops made during daylight hours. Research in other states has found evidence that non-White drivers are stopped less often during nighttime hours – when their race/ethnicity is less visible to law-enforcement officers.

    **RECOMMENDATION 2:** Collect data on the time of day at which each traffic stop was made, and add this data to the Virginia Community Policing Act (CPA) database. This data would allow DCJS to analyze traffic stop data by comparing disparities in driver stops made during hours of daylight and nighttime.

- *Comparing the percentage of traffic stops made for drivers in each racial/ethnic group to the percentage of these drivers involved in traffic accidents.* Research has shown that the racial/ethnic makeup of accident-involved drivers provides a better representation of the actual driving population than the racial/ethnic makeup of the resident driving-age population.

    **RECOMMENDATION 3:** Collect data on the race/ethnicity, age, and gender of drivers involved in traffic accidents in each Virginia locality. (It would not be necessary to collect personally identifiable information on the driver, only the demographic data.) How and where this data would be collected and stored would need to be determined, but the data would need to be maintained in a way that would allow DCJS to compare it with traffic stop data for each locality.

- *Comparing how often contraband is found when searches are made involving stopped drivers in each racial/ethnic group.* Research in other states has found that contraband "hit rates" are lower for non-White drivers than for White drivers. This may indicate that officers are making decisions to search non-White drivers based on a lower evidentiary bar than for searches of White drivers, suggesting that racial/ethnic bias may have been a factor when making search decisions.

    **RECOMMENDATION 4:** Collect data on searches made for contraband during traffic stops, and the results of the searches, and add this data to the CPA database.

- *Comparing data on how many drivers in each racial/ethnic group are residents or nonresidents of the locality in which the traffic stop was made.* This would allow DCJS staff to better understand the extent to which the resident driving-age population of a locality represents the actual driving population in the locality.

    **RECOMMENDATION 5:** Collect data on the residence of drivers involved in traffic stops, and add this data to the CPA database. This might be done using data collected from the driver's license.

JA0510

- *Identifying traffic stops in which the role of bias-based profiling may be minimal or nonexistent, so these stops can be eliminated from the DCJS traffic stop analysis when appropriate.* These could include traffic stops made based on checkpoints or roadblocks, or made using electronic devices such as Radar, Laser, Light Detection and Ranging (LIDAR); Visual Average Speed Computer and Recorder (VASCAR); and license plate readers.

  **RECOMMENDATION 6:** Collect data on the method by which the traffic stop was initiated, to distinguish stops in which an officer's observation of the driver's race/ethnicity could have played a role from stops in which it would be less likely to play a role. Add this data to the CPA database.

The state may also wish to explore ways to address other limitations with the preliminary data used to conduct this analysis. Specifically:

**RECOMMENDATION 7:** Virginia should examine the need to provide resources to smaller law-enforcement agencies that had difficulty implementing the CPA data collection and reporting requirements. Assistance could be provided in several ways, such as helping these agencies train staff on reporting requirements and practices, and providing them with more effective data collection tools such as a statewide electronic summons application.

**RECOMMENDATION 8:** Virginia should examine the feasibility of obtaining more accurate data on the race and ethnicity of drivers who are involved in law-enforcement traffic stops. Under the CPA, law-enforcement officers now have two methods for determining and recording the race/ethnicity of a driver: officers must either make their own determination about a driver's race/ethnicity (which may or may not be accurate) or ask for that information in the course of the traffic stop, which could raise constitutional concerns or escalate the perception of conflict in certain situations. Virginia does not collect and store information about a driver's race or ethnicity.

**RECOMMENDATION 9:** Virginia should examine the feasibility of collecting data on the race/ethnicity of the law-enforcement officers making traffic stops, and adding it to the CPA database. This would allow DCJS staff to assess whether there are indications that the race/ethnicity of the officer making a stop is related to racial/ethnic disparities in stops.

**RECOMMENDATION 10:** DCJS staff should conduct additional research on methods for calculating driver racial/ethnic disparities for agencies serving towns. Currently, the resident driving-age population data needed to examine stops by these agencies is limited, and DCJS staff should determine if this data, or other suitable data, is available. Similarly, DCJS staff should examine whether it is feasible to reliably assess traffic stop disparities for "other" agencies that do not have stable, defined resident population figures.

**RECOMMENDATION 11:** DCJS staff should continue to work with VSP to determine how data on complaints of excessive use of force can be collected in a manner that allows for an examination of bias-based profiling in use of excessive force cases.

JA0511

# Authority for Report

In 2020, Virginia policymakers enacted § 52-30.3 of the *Code of Virginia,* which directed the Virginia State Police (VSP) to create a uniform statewide database (the Community Policing Report Database) to collect data on law-enforcement motor vehicle and investigatory stops, and on complaints alleging the use of excessive force. All Virginia state and local law-enforcement agencies were required to report this data to the Virginia State Police.

In 2020, Virginia policymakers also enacted § 9.1-192, which directed the Virginia Department of Criminal Justice Services (DCJS) to obtain data contained in the Community Policing Reporting Database, analyze the data to determine the existence and prevalence of the practice of bias-based profiling and the prevalence of complaints alleging the use of excessive force, and prepare an annual report on the findings of this analysis.

*§ 9.1-192. Community Policing Reporting Database; annual report*

*A. The Department shall periodically access the Community Policing Reporting Database, which is maintained by the Department of State Police in accordance with § 52-30.3, for the purposes of analyzing the data to determine the existence and prevalence of the practice of bias-based profiling and the prevalence of complaints alleging the use of excessive force. The Department shall maintain all records relating to the analysis, validation, and interpretation of such data. The Department may seek assistance in analyzing the data from any accredited public or private institution of higher education in the Commonwealth or from an independent body having the experience, staff expertise, and technical support capability to provide such assistance.*

*B. The Director shall annually report the findings and recommendations resulting from the analysis and interpretation of the data from the Community Policing Reporting Database to the Governor, the General Assembly, and the Attorney General beginning on or before July 1, 2021, and each July 1 thereafter. The report shall also include information regarding state or local law enforcement agencies that have failed or refused to report the required data to the Department of State Police as required by §§ 15.2-1609.10, 15.2-1722.1, and 52-30.2. A copy of the Director's report shall also be provided to each attorney for the Commonwealth of the county or city in which a reporting law-enforcement agency is located.*

*2020, c. 1165, § 9.1-191.*

This report is the first report prepared by DCJS in response to the § 9.1-192 mandate.

DCJS wishes to acknowledge the efforts made by the Virginia State Police, other state law-enforcement agencies, and the numerous large and small local police departments and sheriff's offices that worked to establish the traffic stop data collection and reporting system that made this report possible.

# Introduction

## The "Bias-Based Profiling" Issue

Although recent events such as the killing of George Floyd and Breonna Taylor have dramatically highlighted the need to examine and improve relationships between law enforcement and minority communities, research shows that these relationships have long been strained by the historical unequal treatment of minorities in the United States. As noted in a 1990 report distributed by the U.S. Department of Justice:

> "[T]he history of American police strategies cannot be separated from the history of the Nation as a whole. Unfortunately, our police, and all of our other institutions, must contend with many bitter legacies from that larger history. No paradigm – and no society – can be judged satisfactorily until those legacies have been confronted directly."
> (Williams, H. and Murphy, P, 1990, p. 13).

Traffic stops are perhaps the most frequent encounters between law enforcement and citizens. It is estimated that police stop more than 20 million motorists a year in the United States (Pierson et. al., 2020). Both research and the living experience of citizens have long presented evidence that racial bias can play a role in who is stopped, why they are stopped, and what happens after they are stopped.

Attempts to assess the degree to which race or ethnicity plays a role in traffic stops, including legislatively mandated attempts to do so, are relatively new. Some of the earliest attempts grew out of legal action in the early and middle 1990s alleging that state police in New Jersey and Maryland were aggressively profiling and stopping Black and other minority drivers in efforts to interdict drug traffickers. As a result of these legal findings, data was collected in both states which showed that minority drivers were being stopped at much higher rates than White drivers. (Harris, D. 2020).

Publicity from the Maryland and New Jersey cases was a major impetus for the introduction of the federal Traffic Stops Statistics Act of 1997 (H.R. 118). The Act was intended to address bias-based profiling – law-enforcement officers disproportionately profiling and stopping Black and other minority drivers for traffic infractions as a pretext for investigating suspected other crimes. H.R. 118 passed the U.S House of Representatives, but failed to receive the votes needed to pass the U.S. Senate. Attempts to revive the bill in later years also failed.

Although H.R. 118 failed in the U.S. Congress, the national conversation it spurred led various states to examine the bias-based profiling issue within their own borders, and multiple states to begin pass anti-racial-profiling legislation in the ensuing years.

## Virginia Legislation

To address the issue of bias-based profiling in Virginia, the 2020 General Assembly session passed HB 1250 – The Virginia Community Policing Act ( the "Act" or the CPA). The Act, effective July 1, 2020, defines bias-based profiling, prohibits bias-based profiling by law-enforcement agencies (LEAs), and requires LEAs to collect traffic stop data, including data on the racial/ethnic characteristics of the drivers stopped.

In addition to directing DCJS to publish an annual report analyzing traffic stop data (§ 9.1-192), the Act contained the following provisions:

*§ 52-30.1. Definition.*

*For purposes of this chapter, unless the context requires a different meaning, "bias-based profiling" means actions of a law-enforcement officer that are based solely on the real or perceived race, ethnicity, age, gender, or any combination thereof, or other noncriminal characteristics of an individual, except when such characteristics are used in combination with other identifying factors in seeking to apprehend a suspect who matches a specific description.*

*§ 52-30.2. Prohibited practices; collection of data.*

*A.   No State Police officer shall engage in bias-based profiling in the performance of his official duties.*

*B.   State Police officers shall collect data pertaining to motor vehicle or investigatory stops to be reported into the Community Policing Reporting Database. State Police officers shall submit the data to their commanding officers, who shall forward it to the Superintendent of State Police.*

*C.   Each time a law-enforcement officer or State Police officer stops a Individual or Driver of a motor vehicle, such officer shall collect the following data based on the officer's observation or information provided to the officer by the Individual or Driver: (i) the race, ethnicity, age, and gender of the person stopped; (ii) the reason for the stop; (iii) the location of the stop; (iv) whether a warning, written citation, or summons was issued or whether any person was arrested; (v) if a warning, written citation, or summons was issued or an arrest was made, the warning provided, violation charged, or crime charged; and (vi) whether the vehicle or any person was searched.*

*D.   Each state and local law-enforcement agency shall collect the number of complaints the agency receives alleging the use of excessive force.*

*§ 52-30.3. (Effective until July 1, 2021) Community Policing Reporting Database established.*

*The Department of State Police shall develop and implement a uniform statewide database to collect motor vehicle and investigatory stop records, records of complaints alleging the use of excessive force, and data and information submitted by law-enforcement agencies pursuant to §§ 15.2-1609.10, 15.2-1722.1, and 52-30.2. The Department of State Police shall provide the Department of Criminal Justice Services with secure remote access to the database for the purposes of analyzing such data as required by subsection A of § 9.1-192.*

*§ 52-30.4. Reporting of state and local law-enforcement agencies required.*

*All state and local law-enforcement agencies shall collect the data specified in subsections C and D of § 52-30.2, and any other data as may be specified by the Department of State Police, on forms developed by the Department of State Police.*

*§ 15.2-1609.10. (Effective until July 1, 2021) Prohibited practices; collection of data.*

*A.   No sheriff or deputy sheriff shall engage in bias-based profiling as defined in § 52-30.1 in the performance of his official duties.*

*B.   The sheriff of every locality shall collect data pertaining to motor vehicle or investigative stops pursuant to § 52-30.2 and report such data to the Department of State Police for inclusion in the Community Policing Reporting Database established pursuant to § 52-30.3. The sheriff of the locality shall be responsible for forwarding the data to the Superintendent of State Police.*

*§ 15.2-1722.1. (Effective until July 1, 2021) Prohibited practices; collection of data.*

*A.  No law-enforcement officer shall engage in bias-based profiling as defined in § 52-30.1 in the performance of his official duties.*

*B.  The police force of every locality shall collect data pertaining to motor vehicle or investigatory stops pursuant to § 52-30.2 and report such data to the Department of State Police for inclusion in the Community Policing Reporting Database established pursuant to § 52-30.3. The chief of police of the locality shall be responsible for forwarding the data to the Superintendent of State Police.*

In the summer of 2020, the General Assembly Special Session I added additional provisions to the CPA with SB 5030. Effective July 1, 2021, LEAs must also collect data similar to that above whenever a law-enforcement officer stops and frisks a person based on reasonable suspicion, or temporarily detains a person during any other investigatory stop. For traffic and other investigatory stops, data must be collected on whether the person stopped spoke English, whether the law-enforcement officer used physical force against any person, and whether any person used physical force against any officers (see Appendix F for the SB 5030 language). LEAs were also required to post their traffic stop data on a publicly available website. Because the additional SB 5030 reporting requirements did not become effective until July 1, 2021, the additional data collected under those requirements are not addressed in this report. This data will be analyzed and presented in the July 1, 2022, report prepared by DCJS.

**JA0515**

# How the Data Was Collected and Reported

## Virginia State Police (VSP) Data Collection System

### Summary of VSP Traffic Stop Reporting Process

In May of 2020, the Virginia State Police (VSP) issued to all Virginia Law-Enforcement Agencies (LEAs) *Community Policing Data Collection Instructions and Technical Specifications Version 3* (see Appendix G). This document instructed LEAs on the data required to be reported, defined the data variables and codes to be used in reporting, and provided data file submission specifications.

The variables VSP identified to be reported under the Virginia Community Policing Act (CPA) are shown in Table 1:

| Table 1. Traffic Stop Data Reported Under The Community Policing Act, Effective July 1, 2020 | | |
|---|---|---|
| *Incident Details* | *Driver Details* | *Additional Stop Details* |
| Record ID | Driver race | Persons searched |
| Stop date | Driver ethnicity | Vehicle searched |
| ORI (Originating Agency Identifier) | Driver age | Additional arrest |
| Location | Driver gender | |
| Jurisdiction Code | Action taken | |
| Initial Reason for Stop | Type of violation | |
| | Specific violation | |
| | Virginia Crime Code (optional) | |

### How Law-Enforcement Agencies Reported to VSP

Law-enforcement agencies began collecting data on July 1, 2020. Not all agencies were able to start CPA-mandated data collection and reporting at that time, and some were unable to begin reporting until 2021. Agencies collected and submitted traffic stop data for either a monthly or quarterly period via their computer-aided dispatch/records management systems, or via manual entry using an Excel spreadsheet, to the Criminal Justice Information Services Division's Data Analysis and Reporting Team (DART) within VSP. VSP instructed agencies to submit data at least quarterly on or by the 15th of the following month. Agencies may submit a monthly data file, but not any more frequently than each month.

### VSP Quality Checks and Assistance to Reporting Agencies

Staff of VSP's DART reviewed all data submitted by agencies for correctness and adherence to VSP's technical specifications. When agencies had questions or issues about CPA data collection and reporting, DART staff worked with them to provide assistance to resolve these issues. Through this process, reporting improved over time. One major issue identified by VSP was that smaller LEAs with few resources had difficulty meeting the reporting requirements of the CPA.

JA0516

***VSP Data Dissemination***

Although §§ 15.2-1609.10 and 15.2-1722.1 did not require LEAs to publicly post their traffic stop data until July 1, 2021, some LEAs began to post their data in late 2020 and early 2021. Some agencies posted this data on their own agency websites, or though social media sites such as Facebook or Twitter.

To help agencies meet the public traffic stop data posting requirement, VSP worked with the Library of Virginia to enable agencies to meet their public reporting mandate by having VSP post their data to the Library's Open Data Portal. Through this agreement, VSP was able to begin publishing data for some agencies on the Open Data Portal beginning in May of 2021, and is making this process available to all agencies. This will allow smaller agencies without their own capacity to post website data to meet the public reporting requirement.

The Community Policing Act data can be found at: https://data.virginia.gov/stories/s/rden-cz3h

It should be noted that traffic stop data in this report will not match the data posted on the VSP Open Data Portal website because the numbers in the Portal are constantly updated by VSP. All data used for the analysis in this report was "frozen" on May 26, 2021.

## Data on Complaints Alleging Use of Excessive Force

In addition to directing DCJS to analyze data on traffic stops, § 9.1-192 directed DCJS to obtain data on complaints alleging the use of excessive force by law enforcement, and to analyze this data to examine the prevalence of excessive use of force. Use-of-force data is reported to VSP by local LEAs on VSP's SP-335 form.

Use-of-force data reporting under HB 1250 began on July 1, 2020. To date, only limited data has been collected and reported to VSP. Appendix I provides a summary of the data that agencies have reported to VSP for the period July 1, 2020 – December 31, 2020. Due to the limited amount of data reported, no analysis of the data is presented in this report; only the numbers of complaints reported are shown. VSP and DCJS are examining future options for reporting use-of-force data.

JA0517

# How the Data Was Analyzed

## *Selection of Data to Analyze*

The Virginia Department of Criminal Justice Services (DCJS) began receiving Virginia Community Policing Act data from the Virginia State Police in early 2021 via a secure electronic file transfer process, and eventually received a total of 677,255 traffic stop records for the period July 1, 2020 through May 12, 2021. DCJS and VSP then did additional work to review the records, resolve any data issues identified in the records, and identify any remaining records with issues that could affect the analysis and interpretation of the data.

During this review, some traffic stop records were excluded from the analysis dataset for various reasons. Stops made at checkpoints were eliminated because these stops are not discretionary (all vehicles passing through the checkpoint are stopped). Records were excluded if they were not "reported completely" (that is, if data elements in the record were not reported with valid data values as defined in *VSP Data Collection Instructions and Technical Specifications Version 3)*.

After DCJS reviewed the remaining records, additional records were excluded from the analysis because some of the data variables needed for the analysis had no value coded (null values) or the values coded were outside the bounds of the allowable codes. Records removed for these reasons are listed in Table 2.

| Table 2.  Records Excluded from Traffic Stop Analysis | | | | |
|---|---|---|---|---|
| Data element | Mandatory? | Criteria for DCJS analysis dataset | Number of records null or out of bounds | Total number of records to exclude |
| IncidentDate | Y | Between 7/1/2020 and 3/31/2021 | 1,266 null; 19 invalid entry; 20,207 between 4/1/2021 and 5/12/2021 | 21,492 |
| AgencyORI | Y | Valid and not null; exclude 2 agencies no longer operating | 123 | 123 |
| ReasonForStop | Y | Values "C", "E", "O", "S" or "T"; "P" excluded from analysis dataset | 17,553 null; 1,276="P" | 18,829 |
| Age | Y | 15 or greater | 13,199 age=0 ("Unknown"); 176 age between 1 and 14 | 13,375 |
| Gender | Y | Values "F", "M", "O" | 302 null | 302 |
| ActionTaken | Y | Values "W", "S", "A", "N" | 5,177 null | 5,177 |
| PersonSearchedYN | Y | Values "Y" or "N".  All three are reported for each stop record. | 4,473 one or more values null; 1 record has PersonSearched value="P" | 4,474 |
| VehicleSearchedYN | Y | | | |
| AdditionalArrestYN | Y | | | |
| Total records excluded from analysis | | | | 63,772 |

Based on the records review described above, 63,772 of the original 677,255 records were excluded, leaving a final statewide analysis dataset containing a total of 613,483 records on drivers age 15 and older that were stopped by Virginia LEAs from July 1, 2020 through March 31, 2021. These records were based on the VSP CPA file finalized on May 26, 2021.

In addition to removing problematic traffic stop records from the analysis dataset, DCJS staff elected not to examine several of the variables contained in the remaining traffic stop records for this preliminary report. These variables include: Location, Jurisdiction Code, Violation Type, and Specific Violation.

There is nothing unusual about encountering these types of data issues when a new statewide data collection system is started. VSP had to develop and distribute the data collection forms and instructions to virtually every law-enforcement agency in Virginia, and each of these agencies in turn had to distribute CPA-related forms and instructions to every one of its officers who might make a traffic stop. There are always

startup issues and a considerable learning curve when implementing a data collection and reporting program of this size.

Implementing the first year of traffic stop data collection and reporting was a challenge for Virginia's smaller LEAs, which struggled to provide the staffing, training, and equipment needed for the CPA data collection. This was because many of Virginia's local LEAs have small staffs and limited resources. As seen in Figure 1 below, more than 77% of local LEAs have 50 or fewer officers, and 125 agencies – more than one-third – have 10 or fewer officers.



Figure 1
Number and Percent of Local Law Enforcement Agencies in Virginia
by Number of Officers with Law Enforcement Duties

■ 10 or fewer   ■ 11 to 50   ■ 51 to 100   ■ 100 or more

This report contains a recommendation that Virginia consider providing assistance to local LEAs to help them meet the reporting requirements of the CPA.

## *Analysis Approach*

The primary approach used in this analysis to look for possible evidence of bias-based profiling was as follows:

- For traffic stops, the percentage of drivers stopped in each racial/ethnic group was compared to the percentage of driving-age individuals in each racial/ethnic group. This comparison was made at the state and local level, including by individual law-enforcement agencies when appropriate data was available.

- For events that occurred after a traffic stop was made, such as whether a search was conducted or an arrest was made, the comparison made was the percentage of drivers in each racial/ethnic group stopped for which each event such as a search or arrest occurred. These comparisons were also made at the state and local level, including by individual law-enforcement agencies when appropriate data was available.

- To provide a standardized method for identifying and comparing disparities between different racial/ethnic groups in traffic stops, and in the events that occurred after a stop was made, DCJS calculated a Disparity Index (DI). The DI indicates the degree to which members of any racial/ethnic group were stopped relative to the group's presence in the driving-age population, or the degree to which members of any group were involved in events that occurred after a stop was made. The DI value for each racial/ethnic group indicates whether drivers in that group were *equally or underrepresented,*

*moderately overrepresented, or highly overrepresented* in traffic stops or post-stop events, relative to what would be expected if no disparities existed.

- The percentage comparisons and the DIs described above were calculated using several different methods, depending on the level of geographic area (i.e., statewide or by locality) and the type of law-enforcement agency being examined (VSP, city and county agencies, town agencies, etc.). The calculation method used depended primarily on the amount of information available about the racial/ethnic demographics of the resident populations in each area examined. Details of how the percentages and DIs were calculated are presented in each section of the report, and additional details about the data used and calculations made are presented in Appendix H.

JA0520

# Findings from Analysis of Statewide Traffic Stop Data

## *Overview of Statewide Data—All Driver Racial/Ethnic Groups Combined*

The final statewide analysis dataset contained a total of 613,483 records for drivers age 15 and older that were stopped by all Virginia LEAs reporting usable Virginia Community Policing Act data for the period July 1, 2020 through March 31, 2021. Numbers of traffic stops are anticipated to be greater in future reports because the current report is based on nine months of data; some stop records were deleted due to data quality issues; and traffic volume was considerably lower than average during the period over which data was collected due to shutdowns and restrictions related to the COVID-19 pandemic from March of 2020 through mid-2021.

Of the 613,483 traffic stops in the dataset, 66.6% (408,447) were reported by LEAs that serve cities and counties, 20% (122,797) were reported by VSP, 11.3% (69,206) were reported by agencies serving towns, and 2.2% (13,033) were reported by other types of LEAs.

This section provides an overview of the statewide data (all drivers combined), including the reasons for the stops, numbers of searches made, and outcomes of the stops.

### *Reasons for Traffic Stops*

Table 3 shows a breakout of the reasons for the 613,483 traffic stops statewide.

| Table 3. Reasons for Traffic Stops, Virginia Statewide | | |
|---|---|---|
| | *All Drivers* | |
| *Reason for Stop* | *Number of Stops* | *Percent of Stops* |
| Violation Total | 593,427 | 96.7% |
| Traffic Violation | 523,177 | 85.3% |
| Equipment Violation | 70,250 | 11.5% |
| Investigative Total | 13,188 | 2.1% |
| Other Non-consensual | 10,238 | 1.7% |
| Terry Stop | 2,950 | 0.5% |
| Call for Service | 6,868 | 1.1% |
| Grand Total | 613,483 | 100.0% |

Nearly 97% (593,427) of all stops reported were made for traffic or equipment violations. The vast majority (85.3%) of these were for traffic violations; only 11.5% were for equipment violations. This finding is consistent with traffic stop data from other states, where violations were the majority of the reasons for stops.

Investigative stops made up only 2.1% of all stops. Among the investigative stops, other non-consensual reasons (stops for confirming or dispelling the suspicion of unlawful or unsafe activity or taking enforcement action in response to unlawful activity) made up 1.7% of all stops. Terry stops (stops based on a reasonable suspicion of involvement in criminal activity) made up less than one percent of all stops. Calls for service made up just over one percent of the stops.

JA0521

*Person and Vehicle Searches*

Only 3.8% (23,719) of the 613,483 stops made resulted in law enforcement searching the driver, a passenger, and/or the vehicle. Table 4 shows a breakout of searches made during the stops.

| Table 4. Driver, Passenger and Vehicle Searches, Virginia Statewide | | |
|---|---|---|
| | *All Drivers* | |
| | *Number of Stops* | *Percent of Stops* |
| Driver or passenger searched only | 5,960 | 25.1% |
| Vehicle searched only | 5,298 | 22.3% |
| Driver or passenger and vehicle searched | 12,461 | 52.5% |
| Grand Total | 23,719 | 100.0% |

Cases where the driver and/or passenger was searched (but not the vehicle) made up about one-quarter of the searches (5,960).[4] Instances where only the vehicle was searched comprised 22.3% of all searches. A little over half of all searches involved both the driver or passenger and the vehicle (52.5%, 12,461).

*Outcomes of Stops*

Table 5 provides a breakdown of the outcomes for the 613,483 traffic stops.

| Table 5. Outcome of Driver Stops, Virginia Statewide | | |
|---|---|---|
| | *All Drivers* | |
| | *Number of Stops* | *Percent of Stops* |
| Driver citation/summons issued | 388,833 | 63.4% |
| Warning issued to driver | 191,933 | 31.3% |
| No enforcement action to driver | 20,373 | 3.3% |
| Driver arrested | 12,344 | 2.0% |
| Grand Total | 613,483 | 100.0% |

The most frequent outcome of a stop was issuing a citation or summons (63.4%, or 388,833 stops). A warning was issued in 31.3% (91,933) of the stops. In only 2.0% of the stops was a driver arrested. Passengers were arrested slightly more often than drivers, as 2.1% of stops (12,829) resulted in a passenger arrest. No further analysis of passengers was performed because the race and ethnicity of passengers was not recorded.

---

[4] Driver and passenger stop counts are combined in the reporting, so it is not possible to separate the number of drivers vs. passengers searched.

**JA0522**

***Demographics of Drivers Stopped***

Unless stated otherwise, percentages based on population used in this report refer to the Virginia population age 15 and above (generally the legal driving age in Virginia). A very small number of drivers stopped were below age 15, and these stops were excluded from the analysis as described in the previous section of this report.

Population figures used in this report are from The National Center for Health Statistics (NCHS) vintage 2019 post-Census estimates of the resident population of the United States (April 1, 2010, July 1, 2010 – July 1, 2019). Racial/ethnic categories used in this report are based on legacy U.S. Census definitions of four racial groups. The Black category used in this report includes Black or African American; the American Indian category includes American Indians or Alaskan Native; and the Asian category includes Asian or Other Pacific Islanders. The Hispanic category can include any race with Hispanic origin. More information about the population data used for the calculations in this report can be found in Appendix H.

Table 6 shows a breakdown of the race/ethnicity of the 613,483 drivers stopped by Virginia law enforcement from July 1, 2020 through March 31, 2021.

| Table 6. Race/Ethnicity of Drivers Stopped, Virginia Statewide | | |
|---|---|---|
| *Race/Ethnicity* | *Number* | *Percent* |
| White | 336,123 | 54.79% |
| Black | 190,134 | 30.99% |
| Hispanic (any race) | 58,576 | 9.55% |
| Asian | 12,202 | 1.99% |
| American Indian | 1,539 | 0.25% |
| Unknown | 14,909 | 2.43% |
| Grand Total | 613,483 | 100.00% |

White drivers made up more than one-half (54.8%) of all drivers stopped statewide. Black drivers made up 31%, Hispanic drivers made up 9.5%, Asian drivers made up 2%, and American Indian drivers made up 0.25% of the drivers. Race/ethnicity was unknown for 2.4% of the drivers stopped.

Figure 2 compares the percentage of each racial/ethnic group among drivers stopped to the percentage of each racial/ethnic group in Virginia's driving-age population (age 15+).



Figure 2
Percent of Drivers Stopped vs Percent of Driver-Age Population by Race/Ethnicity
Virginia Statewide

Percentages do not sum to 100% because drivers with unknown race/ethnicity are excluded.

JA0523

As can be seen in Figure 2, although only 19.6% of Virginia's-driving age population is Black, 31% of the drivers stopped by law enforcement were Black. Hispanic drivers were slightly overrepresented relative to their share of the population (9.5% and 8.7%, respectively). White and Asian drivers were stopped at rates lower than their share of the driving-age population.

**Reason for Traffic Stops, by Driver Race/Ethnicity**

Figure 3 presents the reasons for traffic stops, by driver race/ethnicity. American Indian and Asian drivers were excluded from the figure due to the small numbers in each stop category.



Traffic violations were the overwhelming reason for driver stops among all racial/ethnic groups. About 85% of all drivers were stopped for a traffic violation. Black drivers were slightly less likely (83.3%) to be stopped for a traffic violation than White (85.9%) or Hispanic (86%) drivers. On the other hand, Black drivers were more likely (13.5%) to be stopped for equipment violations than White (11%) or Hispanic (9.3%) drivers.

**Searches Made During Traffic Stops, by Driver Race/Ethnicity**

Given that a certain number of drivers are stopped, how likely is it that the stop will subsequently result in a search of the driver and/or a passenger, or of the vehicle? Figure 4 shows the percentage of drivers in each



JA0524

racial/ethnic group for which a search was conducted. "Search" means any person (driver or passenger) and/or the vehicle were searched. Stops of drivers with an unknown race/ethnicity were excluded. No race/ethnicity data on passengers is presented in this report, as demographic data was not collected on passengers.

Overall, searches of drivers and/or passengers, and searches of vehicles, were rare following traffic stops. Only 3.8% of all driver stops resulted in a search. As can be seen, Black and Hispanic drivers who were stopped were searched at higher rates than White drivers. 3.1% (10,358 out of 336,123) of stops of White drivers resulted in a search, whereas 5.2% (9,985 out of 190,134) of stops of Black drivers and 4.7% (2,767 out of 58,576) of Hispanic drivers resulted in a search. American Indian and Asian drivers who were stopped were less likely than White drivers to have a search conducted.

**Outcome of Traffic Stops, by Driver Race/Ethnicity**

Figure 5 presents the outcome of traffic stops, by driver race/ethnicity. Outcomes were coded based on the most serious outcome of the stop, even though more than one outcome was possible for a stop. American Indian and Asian drivers were excluded from the figure due to the small numbers in each stop category.



Figure 5
Outcome of Traffic Stop by Driver Race/Ethnicity
Virginia Statewide

Issuance of a citation or summons was the most likely outcome (more than 60% of the time) of a traffic stop, regardless of driver race/ethnicity. Warnings were the second most likely outcome for all drivers (26% to 33% of the time) across all driver race/ethnicities.

No enforcement action was taken in three to four percent of the stops.

Overall, only about 2% of driver stops resulted in an arrest of the driver. The largest post-stop differences observed were based on race/ethnicity of drivers arrested. Although an arrest occurred in 1.6% of White driver stops, an arrest occurred in 2.4% of Black driver stops and 3.5% of Hispanic driver stops.

**Driver Gender, by Race/Ethnicity**

Table 7 presents the gender of all drivers stopped, by race/ethnicity.

| Table 7. Gender of Drivers Stopped, by Race/Ethnicity, Virginia Statewide | | | | | | |
|---|---|---|---|---|---|---|
| | White | | Black | | Hispanic (any race) | |
| | # of stops | % of stops | # of stops | % of stops | # of stops | % of stops |
| Male | 209,526 | 62.34% | 117,660 | 61.88% | 42,361 | 72.32% |
| Female | 126,396 | 37.60% | 72,292 | 38.02% | 16,169 | 27.60% |
| Other | 201 | 0.06% | 182 | 0.10% | 46 | 0.08% |
| Total | 336,123 | 100.00% | 190,134 | 100.00% | 58,576 | 100.00% |
| | American Indian | | Asian | | Unknown | |
| | # of stops | % of stops | # of stops | % of stops | # of stops | % of stops |
| Male | 1,116 | 72.51% | 7,980 | 65.40% | 10,452 | 70.11% |
| Female | 421 | 27.36% | 4,215 | 34.54% | 4,320 | 28.98% |
| Other | 2 | 0.13% | 7 | 0.06% | 137 | 0.92% |
| Total | 1,539 | 100.00% | 12,202 | 100.00% | 14,909 | 100.00% |

Males made up the majority of drivers stopped, regardless of race/ethnicity. The percentage of male drivers stopped was about equal for both White (62.3%) and Black (61.9%) drivers. Males made up a somewhat higher percentage of Hispanic (72.3%) and American Indian (72.5%) drivers stopped. Males made up 65.4% of Asian drivers stopped.

**Driver Age, by Driver Race/Ethnicity**

Table 8 presents the age of all drivers stopped, by race/ethnicity.

| Table 8. Age of Drivers Stopped, by Race/Ethnicity, Virginia Statewide | | | | | | |
|---|---|---|---|---|---|---|
| | White | | Black | | Hispanic (any race) | |
| | # of stops | % of stops | # of stops | % of stops | # of stops | % of stops |
| 15 to 24 | 82,513 | 24.55% | 49,200 | 25.88% | 16,937 | 28.91% |
| 25 to 34 | 83,049 | 24.71% | 60,201 | 31.66% | 17,477 | 29.84% |
| 35 to 44 | 60,192 | 17.91% | 35,293 | 18.56% | 12,708 | 21.69% |
| 45 to 54 | 49,145 | 14.62% | 23,190 | 12.20% | 7,297 | 12.46% |
| 55 to 64 | 37,954 | 11.29% | 15,587 | 8.20% | 3,185 | 5.44% |
| 65 and older | 23,270 | 6.92% | 6,663 | 3.50% | 972 | 1.66% |
| Total | 336,123 | 100.00% | 190,134 | 100.00% | 58,576 | 100.00% |
| | American Indian | | Asian | | Unknown | |
| | # of stops | % of stops | # of stops | % of stops | # of stops | % of stops |
| 15 to 24 | 263 | 17.09% | 2,644 | 21.67% | 3,774 | 25.31% |
| 25 to 34 | 471 | 30.60% | 3,082 | 25.26% | 4,635 | 31.09% |
| 35 to 44 | 347 | 22.55% | 2,384 | 19.54% | 3,053 | 20.48% |
| 45 to 54 | 279 | 18.13% | 2,072 | 16.98% | 1,925 | 12.91% |
| 55 to 64 | 129 | 8.38% | 1309 | 10.73% | 1078 | 7.23% |
| 65 and older | 50 | 3.25% | 711 | 5.83% | 444 | 2.98% |
| Total | 1,539 | 100.00% | 12,202 | 100.00% | 14,909 | 100.00% |

**JA0526**

Younger drivers (age 15–34) made up 49.3% of White drivers stopped, but 57.5% of Black drivers and 58.7% of Hispanic drivers stopped. Asian drivers had the lowest percentage of younger drivers stopped. White and Asian drivers had a higher percentage of drivers over age 55 stopped.

### Statewide Disparity Index (DI)

To provide a standardized method for comparing disparities between different racial/ethnic groups in traffic stops, DCJS calculated a Disparity Index (DI). For traffic stops, the DI indicates the degree to which members of any racial/ethnic group were stopped relative to the group's prevalence in the driving-age population.

The DI for each racial/ethnic group was calculated as:

$$\frac{\text{Group's percentage of all stops reported by agency}}{\text{Group's percentage of population age 15+ statewide or in locality served by agency}}$$

DIs of with a value of 1.0 or less for a group indicate that stops for that group occurred at a rate that is less than or equal that group's share of the driving-age population. DIs with a value greater than 1.0 indicate that stops for that group occurred at a rate that is higher than that group's share of the driving-age population. The interpretation of different DI levels is shown in Table 9.

| Table 9. Interpretation of Driver Stop DIs | |
|---|---|
| DI Range | Traffic Stop DI Interpretation Used in Report |
| 1.0 or less | Driver group had *no overrepresentation* or is *underrepresented* in stops when compared to its proportion of the population age 15+ |
| 1.1 – 1.9 | Driver group had *moderate overrepresentation* in stops compared to its proportion of the population age 15+ |
| 2.0 or higher | Driver group had *high overrepresentation* in stops compared to its proportion of the population age 15+ |
| Note: The DI descriptors above (under-, moderate-, and high overrepresentation) are not based on tests of statistical significance. They are used merely as descriptors to differentiate between the levels of disparity observed. Some agencies had calculated driver stop DIs of 3.0 and higher, indicating very high overrepresentation for a driver group in stops. These higher DIs should be interpreted cautiously, because they may be skewed by large differences between the group's resident population and the number of stopped drivers in the group who are transient drivers and are not part of the resident population. Also, DIs of 3.0 or higher may be the result of very low population percentages coupled with a very low number of stops. | |

In addition to calculating a DI to indicate the degree to which drivers in different racial/ethnic groups were stopped, DCJS also calculated a separate DI to indicate the degree to which drivers in each group were involved in events following traffic stops, including the reason for stops, whether persons and/or vehicles were searched, and actions taken towards drivers (summons/citation issued, warning given arrest, etc.). The DI for events occurring after the stop is calculated in a different manner than the DI is calculated for the stop itself.

The DI for events occurring after the stop for each racial/ethnic group was calculated as:

$$\frac{\text{Group's percentage for each stop reason, search, or stop outcome}}{\text{Group's percentage of all stops reported by agency}}$$

**JA0527**

DIs for events occurring after the stop, unlike those calculated for whether a stop occurred in the first place, were not calculated using the group's percentage of the resident driving-age population, but were calculated using the percentage of drivers stopped by a given law-enforcement agency in each group.

Statewide DIs for driver stops, and for events following the stop, for each driver racial/ethnic group are displayed in Table 10.

To illustrate how the data is presented in Table 10, the "Driver Stopped" section of Table 10 shows that Black drivers made up 19.58% of Virginia's driving-age population, yet they made up 30.99% of the drivers stopped in Virginia. The comparison of the percentage of Black drivers stopped to the percentage of Virginia's statewide Black driving-age population produces a traffic stop DI of 1.6 for Black drivers statewide (30.99%/19.58% = 1.6).

For another example of how the data in Table 10 is presented, the "Outcome of Stop" section of this report shows that Black drivers made up 30.99% of the drivers stopped in Virginia, but they made up 36.39% of the drivers arrested in Virginia. The comparison of the percentage of Black drivers stopped to the percentage of Black drivers arrested produces an arrest DI of 1.2 for Black drivers statewide (36.39%/30.99%= 1.2).

An unusually high traffic stop DI can occur when a racial or ethnic group comprises a very small percentage of a locality's driving-age population, but also comprises a high percentage of its traffic stops. This is especially true when a local LEA reports a small number of stops to begin with. For example, the Falls Church City Sheriff's Office had an extremely high driver stop DI of 94.6 for American Indian drivers. This group made up only 0.35% of the jurisdiction's total driving-age population, but it made up 33% of the drivers stopped by the LEA. In this case, the LEA reported only 3 traffic stops, 1 of which involved an American Indian driver. The driver stop DI was therefore calculated as:

$$\frac{33\% \text{ (the percentage of all stops that involved American Indian drivers)}}{0.35\% \text{ (the percentage of driving-age population that was American Indian)}} = 94.6$$

33% is disproportionately higher than 0.35%, resulting in the extremely high DI of 94.6. In this particular case, the DI should not be considered meaningful because of the small number of stops involved.

Importantly, the DI does not tell us the reason(s) why members of a particular racial/ethnic group are being stopped at a higher or lower rate than their presence in the population. The DI simply tells us that members of a group are being disproportionately stopped compared to their presence in the population. It cannot tell us the motivations of the officers making the stops. (See the section "Interpretation of Findings" for a further explanation of why disparities in numbers of stops or in the outcomes of traffic stops cannot automatically be assumed to be evidence of bias-based profiling.)

JA0528

Table 10.

**Traffic Stop Report: VIRGINIA STATEWIDE**

Stops Dated July 1, 2020-March 31, 2021

| | Total | White | Black-African American | Hispanic (any race) | American Indian or Alaska Native | Asian-Other Pacific Islander | Race or Ethnicity Unknown |
|---|---|---|---|---|---|---|---|
| **Population Demographics** | | | | | | | |
| Number Age 15+ in CY2019 Population | 6,989,921 | 4,480,087 | 1,368,801 | 605,082 | 21,956 | 513,995 | ~ |
| Percent Age 15+ in CY2019 Population | 100.00% | 64.09% | 19.58% | 8.66% | 0.31% | 7.35% | ~ |
| **Drivers Stopped** | | | | | | | |
| Number of Drivers Age 15+ Stopped | 613,483 | 336,123 | 190,134 | 58,576 | 1,539 | 12,202 | 14,909 |
| Percent of Drivers Age 15+ Stopped | 100.00% | 54.79% | 30.99% | 9.55% | 0.25% | 1.99% | 2.43% |
| Disparity Index | | 0.9 | 1.6 | 1.1 | 0.8 | 0.3 | ~ |
| **Reason for Stop** | | | | | | | |
| Number Stopped for Traffic Violation | 523,177 | 288,606 | 158,352 | 50,401 | 1,362 | 10,900 | 13,556 |
| Percent Stopped for Traffic Violation | 100.00% | 55.16% | 30.27% | 9.63% | 0.26% | 2.08% | 2.59% |
| Disparity Index | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.1 |
| Number Stopped for Equipment Violation | 70,250 | 37,106 | 25,742 | 5,451 | 138 | 924 | 889 |
| Percent Stopped for Equipment Violation | 100.00% | 52.82% | 36.64% | 7.76% | 0.20% | 1.32% | 1.27% |
| Disparity Index | | 1.0 | 1.2 | 0.8 | 0.8 | 0.7 | 0.5 |
| Number Stopped for Call for Service | 6,868 | 3,351 | 1,903 | 1,316 | 15 | 189 | 94 |
| Percent Stopped for Call for Service | 100.00% | 48.79% | 27.71% | 19.16% | 0.22% | 2.75% | 1.37% |
| Disparity Index | | 0.9 | 0.9 | 2.0 | 0.9 | 1.4 | 0.6 |
| Number Stopped for Terry Stop | 2,950 | 1,483 | 916 | 422 | 8 | 78 | 43 |
| Percent Stopped for Terry Stop | 100.00% | 50.27% | 31.05% | 14.31% | 0.27% | 2.64% | 1.46% |
| Disparity Index | | 0.9 | 1.0 | 1.5 | 1.1 | 1.3 | 0.6 |
| Number Stopped for Other Reason | 10,238 | 5,577 | 3,221 | 986 | 16 | 111 | 327 |
| Percent Stopped for Other Reason | 100.00% | 54.47% | 31.46% | 9.63% | 0.16% | 1.08% | 3.19% |
| Disparity Index | | 1.0 | 1.0 | 1.0 | 0.6 | 0.5 | 1.3 |
| **Outcome of Stop** | | | | | | | |
| Number of Stops with Warning Issued | 191,933 | 105,908 | 62,465 | 15,277 | 460 | 4,209 | 3,614 |
| Percent of Stops with Warning Issued | 100.00% | 55.18% | 32.55% | 7.96% | 0.24% | 2.19% | 1.88% |
| Disparity Index | | 1.0 | 1.1 | 0.8 | 1.0 | 1.1 | 0.8 |
| Number of Stops with Citation/Summons Issued | 388,833 | 214,570 | 115,433 | 39,603 | 1,024 | 7,462 | 10,741 |
| Percent of Stops with Citation/Summons Issued | 100.00% | 55.18% | 29.69% | 10.19% | 0.26% | 1.92% | 2.76% |
| Disparity Index | | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.1 |
| Number of Stops with Driver Arrested | 12,344 | 5,437 | 4,492 | 2,030 | 14 | 218 | 153 |
| Percent of Stops with Driver Arrested | 100.00% | 44.05% | 36.39% | 16.45% | 0.11% | 1.77% | 1.24% |
| Disparity Index | | 0.8 | 1.2 | 1.7 | 0.5 | 0.9 | 0.5 |
| Number of Stops with No Enforcement Action | 20,373 | 10,208 | 7,744 | 1,666 | 41 | 313 | 401 |
| Percent of Stops with No Enforcement Action | 100.00% | 50.11% | 38.01% | 8.18% | 0.20% | 1.54% | 1.97% |
| Disparity Index | | 0.9 | 1.2 | 0.9 | 0.8 | 0.8 | 0.8 |
| **Additional Details of Stop** | | | | | | | |
| Number of Stops with No Search or Passenger Arrest | 582,073 | 321,482 | 177,796 | 54,959 | 1,515 | 11,852 | 14,469 |
| Percent of Stops with No Search or Passenger Arrest | 100.00% | 55.23% | 30.55% | 9.44% | 0.26% | 2.04% | 2.49% |
| Disparity Index | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Number of Stops with Search Only | 18,581 | 7,869 | 7,950 | 2,266 | 14 | 232 | 250 |
| Percent of Stops with Search Only | 100.00% | 42.35% | 42.79% | 12.20% | 0.08% | 1.25% | 1.35% |
| Disparity Index | | 0.8 | 1.4 | 1.3 | 0.3 | 0.6 | 0.6 |
| Number of Stops with Passenger Arrest Only | 7,691 | 4,283 | 2,353 | 850 | 4 | 75 | 126 |
| Percent of Stops with Passenger Arrest Only | 100.00% | 55.69% | 30.59% | 11.05% | 0.05% | 0.98% | 1.64% |
| Disparity Index | | 1.0 | 1.0 | 1.2 | 0.2 | 0.5 | 0.7 |
| Number of Stops with Search and Passenger Arrest | 5,138 | 2,489 | 2,035 | 501 | 6 | 43 | 64 |
| Percent of Stops with Search and Passenger Arrest | 100.00% | 48.44% | 39.61% | 9.75% | 0.12% | 0.84% | 1.25% |
| Disparity Index | | 0.9 | 1.3 | 1.0 | 0.5 | 0.4 | 0.5 |

Data sources:

Community Policing Data Collection, Virginia Department of State Police, May 2021.

Vintage 2019 postcensal estimates of the resident population of the United States (April 1, 2010, July 1, 2010-July 1, 2019), by year, county, single-year of age, bridged race, Hispanic origin, and sex. Available from: http://www.cdc.gov/nchs/nvss/bridged_race.htm as of July 9 2020.

Prepared by: Virginia Department of Criminal Justice Services Research Center, June 2021.

Search can involve passenger, driver, vehicle, or some combination of the three.

The disparity index for small numbers of stops and small populations should be interpreted with caution because of the small numbers involved.

**JA0529**

## Summary of Statewide Race/Ethnicity Analysis

A review of the statewide data shows that Black and Hispanic drivers were disproportionately stopped, and tended to have higher rates of search and arrest when they were stopped, compared to White or Asian drivers in Virginia.

- Black drivers were stopped at higher rates than White drivers. Although only 19.6% of Virginia's driving-age population was Black, 31% of drivers stopped were Black. Black drivers were overrepresented among stopped drivers regardless of the reason that a traffic stop was initiated.

- Black drivers who were stopped were searched at higher rates than White drivers. 5.2% of stopped Black drivers had a search of their person, a passenger or vehicle conducted, compared to 3.1% of White drivers.

- Black drivers who were stopped were arrested at higher rates than White drivers. 2.4% of Black drivers stopped were arrested, compared to 1.6% of White drivers.

- Hispanic drivers (of any race) were also stopped at higher rates than White drivers, although not as much so as Black drivers. Although Hispanics made up only 8.7% of Virginia's driving-age population, they made up 9.5% of drivers stopped. Hispanic drivers were overrepresented among most, but not all, of the reasons that a traffic stop was initiated.

- Hispanic drivers who were stopped were searched at higher rates than White drivers. 4.7% of stopped Hispanic drivers had a search of their person, a passenger or vehicle conducted, as compared to 3.1% of White drivers.

- Hispanic drivers who were stopped were arrested at higher rates than White drivers or Black drivers. 3.5% of stopped Hispanic drivers were arrested, compared to 1.6% of White drivers and 2.4% of Black drivers.

- Statewide, White, American Indian, and Asian drivers were stopped at rates below their representation in the driving-age population. This underrepresentation occurred not just for drivers stopped, but also for all related measures including reasons for stops, searches of drivers, passengers and vehicles, and stop outcomes such as arrests or citations.

- Male drivers made up similar percentages of both White (62.3%) and Black (61.9%) drivers stopped. Males made up a somewhat higher percentage of Hispanic (72.3%) and American Indian (72.5%) drivers stopped. Males made up 65.4% of Asian drivers stopped.

JA0530

# Findings from Analysis of Agency-Level Data

The analysis of statewide driver stop data showed that Black and Hispanic drivers were disproportionately stopped, and experienced more serious outcomes during those stops, than other drivers. This section provides a summary of the findings from the analysis of traffic stop data for individual Law-Enforcement Agencies (LEAs) in Virginia. Tables providing stop details for each individual agency are provided in Appendices A through D.

First, data is presented showing how likely drivers in each racial/ethnic group were to be stopped by LEAs. Second, data is presented on the events that occurred after each stop was made (searches made, stop outcome) for each driver racial/ethnic group.

The VSP provided DCJS with a list of 368 LEAs in Virginia. However, only 305 of these agencies were included in the traffic stop analysis. 63 agencies were not included (see Appendix E) for reasons such as:

- The agencies are no longer operational.
- The agencies did not begin reporting traffic stop data to VSP until after March 31, 2021.
- The agencies have no primary law-enforcement duties (typically a sheriff's office that provides staff and security for jails and courthouses).
- The agencies' jurisdictions do not include public roadways (typically agencies serving some colleges or universities or commercial properties).

The traffic stop analyses for these 305 agencies are presented separately for four different types of LEAs, depending upon the amount of driver traffic stop and driver demographic data available for the areas they serve. The four agency types are: Virginia State Police, local agencies serving cities and counties, local agencies serving towns, and other state, local, and private agencies.

## *Virginia State Police Traffic Stop Analysis*

VSP provides traffic enforcement on state roadways and interstate highways throughout Virginia. Due to Virginia's geography and size, these enforcement duties are divided among seven VSP divisions, with each division including multiple counties, cities, and towns. Traffic stop data was provided for stops made by VSP officers in each VSP division, and the data was combined for analysis and presented here statewide. A Disparity Index (DI) was calculated for each group of drivers who were stopped by VSP statewide, and for the events following the stop. Statewide driving age population age 15 and older by race and ethnic group was used to calculate DIs for VSP driver stops, searches, and arrests.

Due to limitations in the data, DCJS was unable to accurately calculate DIs for driver stops or post-stop events for each of the seven individual VSP divisions. These data limitations have been corrected, and division-level DIs will be calculated and reported in the next CPA report.

Detailed DI information for VSP traffic stops, as well as for events that occurred after the stops were made, are shown in Appendix A.

**JA0531**

*Geographic Presentation of VSP Driver Stop Disparity Indexes (DIs)*

The maps in Figure 6 illustrate which driver racial/ethnic groups had moderate or no overrepresentation for driver stops conducted by VSP.  Black drivers were the only group moderately overrepresented in VSP driver stops; there was no overrepresentation of any other driver racial/ethnic group among VSP stops.  No driver racial/ethnic group had high overrepresentation in stops conducted by VSP.

Figure 6
VSP Maps for Driver Stops by Driver Race/Ethnicity



**Analysis of Events Following VSP Traffic Stops**

This section examines two major events that can occur once a traffic stop is made: Are there racial/ethnic disparities in how often a driver, passenger, or vehicle is searched, or in how often a driver is arrested? In this section, for any single stop, a search was counted if a search of a person (driver or passenger), vehicle, or any combination of these, occurred. It is considered one search; they are not counted separately. Also, in this section, the analysis of arrests examines only driver arrests. Some data on passenger arrests was also included in the data collection, but is excluded from the analysis because racial/ethnic data was not collected for passengers.

The DIs for events following a traffic stop can be calculated more precisely than the DI regarding whether or not a driver was stopped in the first place. The driver stop DI is based on a comparison of the percentage of drivers in each racial/ethnic group stopped by VSP statewide to the percentage of driving-age individuals in each group in the resident population statewide. As previously stated, knowing the resident population age 15+ for each racial/ethnic group is not the same as knowing the actual number of drivers on the road in each group. It is only an approximation.

However, once a stop occurs, the actual percentage of drivers in each group who were stopped is known, and we know the actual percentage of drivers in each group where a person or vehicle search occurred, and/or the driver was arrested is known.

**JA0533**

**Geographic Presentation of VSP Search DIs**

The maps in Figure 7 illustrate which driver racial/ethnic groups had moderate or no overrepresentation in searches conducted by VSP. Black and Hispanic drivers were moderately overrepresented in searches conducted by VSP. White, American Indian, and Asian drivers were underrepresented in VSP driver and/or vehicle searches. No driver racial/ethnic group had high overrepresentation in VSP searches.

Figure 7
VSP Statewide Maps for Searches by Driver Race/Ethnicity



JA0534

**Geographic Presentation of VSP Driver Arrest DIs**

The maps in Figure 8 illustrate which driver racial/ethnic groups had moderate or no overrepresentation for driver arrests conducted by VSP.  Black and Hispanic drivers were moderately overrepresented in driver arrests conducted by VSP.  White, American Indian, and Asian drivers were underrepresented in VSP driver arrests.  No driver racial/ethnic group had high overrepresentation in driver arrests conducted by VSP.

Figure 8
VSP Statewide Maps for Driver Arrests by Driver Race/Ethnicity



JA0535

## City and County Agency Traffic Stop Analysis

These 152 local agencies serve cities and counties. Racial/ethnic data for the resident population age 15+ was available for localities served by these agencies. A DI was calculated for each group of drivers who were stopped, and for the events following the stop (i.e., reason for stop, whether a search was conducted, and outcomes of the stop).

### Driver Stop DIs for City and County Agencies

Figure 9 shows the percentages of the 152 LEAs with driver stop DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers stopped when compared to the minority resident driving-age population.



Figure 9
Percent of Agencies with High, Moderate, or No Overrepresentation in Driver Stops
by Driver Race/Ethnicity, 152 Virginia Agencies Serving Cities and Counties

The percentages seen in Figure 9 show that, across all 152 agencies:

- 30.3% of city and county agencies had high overrepresentation in stops of Black drivers, 21.1% of agencies had the same for Hispanic drivers, 7.9% of agencies had the same for American Indian drivers, and 11.8% had the same for Asian drivers. Less than 1% of agencies had high overrepresentation for White drivers.

- 49.3% of city and county agencies had moderate overrepresentation in stops of Black drivers, and 37.5% of agencies had the same for Hispanic drivers. 10.5% had the same for American Indian drivers and 13.8% of agencies had the same for Asian drivers. 10.5% of agencies had the same for White drivers.

- Only 17.1% of city and county agencies had no overrepresentation in stops of Black drivers, and only 33.6% of agencies had the same for Hispanic drivers. 39.5% of agencies had the same for American Indian drivers, and 55.3% of agencies had the same for Asian drivers. On the other hand, nearly 90% of agencies had the same for White drivers.

JA0536

City and county agencies with zero stops, and therefore DIs of zero, are not shown in Figure 9. 3.3% of these agencies (5) did not stop any Black drivers, 7.9% of these agencies (12) did not stop any Hispanic drivers, 42.1% (64) of the agencies did not stop any American Indian drivers, and 19.1% (29) of these agencies did not stop any Asian drivers. White drivers were stopped by all 152 city and county agencies.

***Driver Stop DIs for Individual Agencies***

Tables 15a–15d show, for each of the 152 agencies serving cities and counties, the driver stop DI calculated for each driver racial/ethnic group (that is, how many drivers in each group were stopped relative to the group's driving-age representation in the resident population of the locality served by the agency). The number of stops made by each agency for drivers in each group is also shown. The numbers of stops reported by each agency will vary due to traffic volumes in each area, and because different agencies reported data for different periods of time for the nine-month period July 1, 2020 – March 31, 2021 (that is, some agencies with high traffic volumes may have reported fewer stops than agencies with lower traffic volumes because the high-volume agency may have reported only six months of data). The number of days of data reported for each agency ("Number of Traffic Days") is also shown in the tables (273 days = July 1, 2020 – March 31, 2021).

Tables are shown for Black, Hispanic, American Indian, and Asian drivers. No DI table is shown for White drivers because the number of agencies with DIs indicating that White drivers were overrepresented was very small (these DIs can be seen in the detailed agency-level tables in Appendix B).

DIs for the joint agencies York-Poquoson Sheriff's Office and Williamsburg-James City County Sheriff's Office were calculated based on the driving-age resident population figures for the joint localities served by each Sheriff's Office.

Several cautions should be kept in mind when examining the DIs for each agency in the tables that follow:

- Driver stop DIs calculated for agencies with a very small resident population and very small numbers of stops are suspect due to the small numbers involved and should not be considered meaningful. This applies to DIs for all racial/ethnic groups. See the previous section *Statewide Disparity Index (DI)* for more explanation.

- As discussed in the section *Statewide Disparity Index (DI)*, driver stop DIs were calculated using each racial/ethnic group's percentage of the resident driving-age population of the area served by the agency. The resident population percentages do not necessarily represent the percentages of drivers in the area. For example, the Carroll County Sheriff's Office had a high Black driver stop DI of 21.7. An examination of the stops for this agency showed that the vast majority of the stops were made on an interstate highway that runs through Carroll County; therefore, the number of Black drivers subject to being stopped by this agency was much higher than the relatively small percentage of Black residents in the county's resident population. Black drivers were less than 1% of the county's population.

| Table 15a. Agency Driver Stop Disparity Indexes (DIs) for Black Drivers<br>152 Agencies Serving Cities and Counties | | | |
|---|---|---|---|
| Agency | Black Driver DI | Number of Stops | Number of Traffic Days |
| Accomack County Sheriff's Office | 1.8 | 172 | 270 |
| Albemarle County Police Department | 2 | 475 | 273 |
| Albemarle County Sheriff's Office | 1.4 | 5 | 256 |
| Alexandria City Sheriff's Office | 0.7 | 4 | 259 |
| Alexandria Police Department | 1.7 | 3,964 | 273 |
| Alleghany County Sheriff's Office | 2.3 | 74 | 273 |
| Amelia County Sheriff's Office | 1.8 | 189 | 272 |
| Amherst County Sheriff's Office | 1.5 | 582 | 270 |
| Appomattox County Sheriff's Office | 1.4 | 240 | 271 |
| Arlington County Police Department | 3.3 | 3,777 | 183 |
| Arlington County Sheriff's Office | 2.3 | 27 | 257 |
| Augusta County Sheriff's Office | 1.9 | 342 | 273 |
| Bath County Sheriff's Office | 2 | 7 | 264 |
| Bedford County Sheriff's Office | 2.7 | 452 | 273 |
| Bland County Sheriff's Office | 3.4 | 218 | 272 |
| Botetourt County Sheriff's Office | 3.7 | 579 | 273 |
| Bristol Police Department | 1.2 | 99 | 142 |
| Brunswick County Sheriff's Office | 0.9 | 6,505 | 273 |
| Buchanan County Sheriff's Office | 0.2 | 3 | 273 |
| Buckingham County Sheriff's Office | 0.9 | 65 | 270 |
| Buena Vista Police Department | 2 | 64 | 175 |
| Campbell County Sheriff's Office | 1.8 | 201 | 248 |
| Caroline County Sheriff's Office | 1.4 | 335 | 270 |
| Carroll County Sheriff's Office | 21.7 | 674 | 265 |
| Charlotte County Sheriff's Office | 1.3 | 333 | 273 |
| Charlottesville Police Department | 1.6 | 272 | 273 |
| Chesapeake City Sheriff's Office | 1.4 | 18 | 258 |
| Chesapeake Police Department | 1.7 | 9,760 | 273 |
| Chesterfield County Police Department | 1.8 | 11,455 | 273 |
| Chesterfield County Sheriff's Office | 1.7 | 39 | 204 |
| Clarke County Sheriff's Office | 2.4 | 68 | 273 |
| Colonial Heights Police Department | 3.8 | 3,722 | 273 |
| Covington Police Department | 0.7 | 13 | 181 |
| Craig County Sheriff's Office | 2.3 | 8 | 273 |
| Culpeper County Sheriff's Office | 1.3 | 44 | 268 |
| Cumberland County Sheriff's Office | 0.7 | 96 | 271 |

JA0538

| Table 15a. Agency Driver Stop Disparity Indexes (DIs) for Black Drivers<br>152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Black Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Danville Police Department | 1.2 | 2,197 | 273 |
| Dickenson County Sheriff's Office | 1.6 | 3 | 272 |
| Dinwiddie County Sheriff's Office | 1.4 | 2,146 | 273 |
| Emporia City Sheriff's Office | 0.5 | 268 | 272 |
| Emporia Police Department | 0.7 | 2,799 | 253 |
| Essex County Sheriff's Office | 0.8 | 88 | 170 |
| Fairfax City Police | 2.4 | 185 | 273 |
| Fairfax County Police Department | 2.2 | 3,654 | 273 |
| Fairfax County Sheriff's Office | 2.1 | 34 | 273 |
| Falls Church City Sheriff's Office | 0 | 0 | 124 |
| Falls Church Police Department | 3.5 | 107 | 242 |
| Fauquier County Fire Marshal's Office | 0 | 0 | 1 |
| Fauquier County Sheriff's Office | 1.9 | 922 | 272 |
| Floyd County Sheriff's Office | 2 | 51 | 273 |
| Fluvanna County Sheriff's Office | 1.6 | 344 | 272 |
| Franklin County Sheriff's Office | 2 | 126 | 272 |
| Franklin Police Department | 1.3 | 649 | 241 |
| Frederick County Sheriff's Office | 2.5 | 654 | 273 |
| Fredericksburg City Sheriff's Office | 1.8 | 8 | 230 |
| Fredericksburg Police Department | 1.7 | 114 | 57 |
| Galax Police Department | 0.9 | 61 | 273 |
| Giles County Sheriff's Office | 3.4 | 27 | 269 |
| Gloucester County Sheriff's Office | 2.3 | 284 | 273 |
| Goochland County Sheriff's Office | 1.4 | 326 | 272 |
| Grayson County Sheriff's Office | 0.5 | 12 | 272 |
| Greene County Sheriff's Office | 2 | 118 | 267 |
| Greensville County Sheriff's Office | 0.5 | 2,017 | 273 |
| Halifax County Sheriff's Office | 1.2 | 93 | 273 |
| Hampton Police Division | 1.3 | 4,349 | 273 |
| Hanover County Sheriff's Office | 3.7 | 4,855 | 273 |
| Harrisonburg Police Department | 1.7 | 189 | 182 |
| Henrico Police Department | 1.5 | 6,090 | 183 |
| Henry County Sheriff's Office | 1.1 | 455 | 273 |
| Highland County Sheriff's Office | 2.1 | 2 | 242 |
| Hopewell City Sheriff's Office | 1.1 | 1,509 | 273 |
| Hopewell Police Department | 1.3 | 509 | 182 |
| Isle Of Wight County Sheriff's Office | 2.3 | 567 | 182 |
| James City County Police Department | 2.4 | 810 | 273 |
| King And Queen County Sheriff's Office | 1 | 487 | 273 |

**JA0539**

| Table 15a. Agency Driver Stop Disparity Indexes (DIs) for Black Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Black Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| King George County Sheriff's Office | 1.8 | 637 | 273 |
| King William Sheriff's Office | 1.4 | 238 | 273 |
| Lancaster County Sheriff's Office | 1.5 | 170 | 272 |
| Lee County Sheriff's Office | 0 | 0 | 84 |
| Lexington Police Department | 0.8 | 57 | 272 |
| Loudoun County Sheriff's Office | 1.6 | 1,458 | 273 |
| Louisa County Sheriff's Office | 1.4 | 270 | 273 |
| Lunenburg County Sheriff's Office | 1.1 | 64 | 268 |
| Lynchburg City Sheriff's Office | 2.5 | 2 | 47 |
| Lynchburg Police Department | 1.5 | 1,072 | 273 |
| Madison County Sheriff's Office | 1.9 | 114 | 273 |
| Manassas Park Police Department | 1.1 | 555 | 273 |
| Manassas Police Department | 1.4 | 711 | 273 |
| Martinsville Police Department | 1 | 1,341 | 273 |
| Mathews County Sheriff's Office | 1.5 | 79 | 273 |
| Mecklenburg Sheriff's Office | 1.3 | 730 | 183 |
| Middlesex County Sheriff's Office | 1.1 | 92 | 269 |
| Montgomery County Sheriff's Office | 2.9 | 254 | 273 |
| Nelson County Sheriff's Office | 1.4 | 190 | 273 |
| New Kent Sheriff's Office | 1.9 | 791 | 273 |
| Newport News City Sheriff's Office | 1 | 3 | 218 |
| Newport News Police Department | 1.5 | 6,043 | 181 |
| Norfolk Police Department | 1.6 | 2,256 | 153 |
| Northampton County Sheriff's Office | 0.8 | 446 | 202 |
| Northumberland County Sheriff's Office | 1.3 | 81 | 91 |
| Norton Police Department | 0.9 | 37 | 273 |
| Nottoway County Sheriff's Office | 1 | 49 | 264 |
| Orange County Sheriff's Office | 1.7 | 345 | 273 |
| Page County Sheriff's Office | 1.3 | 19 | 273 |
| Patrick County Sheriff's Office | 2.1 | 93 | 257 |
| Petersburg Bureau Of Police | 1 | 681 | 213 |
| Petersburg City Sheriff's Office | 0.7 | 33 | 239 |
| Pittsylvania County Sheriff's Office | 1.4 | 123 | 273 |
| Poquoson Police Department | 11.4 | 45 | 181 |
| Portsmouth City Sheriff's Office | 1.2 | 32 | 80 |
| Portsmouth Police Department | 1.3 | 1,558 | 273 |
| Powhatan Sheriff's Office | 2 | 407 | 273 |
| Prince Edward County Sheriff's Department | 1.1 | 287 | 174 |
| Prince George County Police Department | 1.6 | 1,515 | 273 |

JA0540

| Table 15a. Agency Driver Stop Disparity Indexes (DIs) for Black Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Black Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Prince William County Police Department | 1.3 | 6,050 | 273 |
| Prince William County Sheriff's Office | 1.4 | 28 | 273 |
| Pulaski County Sheriff's Office | 1.9 | 286 | 272 |
| Radford City Police Department | 2 | 314 | 272 |
| Rappahannock County Sheriff's Office | 1.6 | 132 | 273 |
| Richmond County Sheriff's Office | 1.4 | 65 | 175 |
| Richmond Police Department | 1.6 | 1,991 | 238 |
| Roanoke City Police Department | 1.5 | 2,071 | 272 |
| Roanoke County Police Department | 2.3 | 13 | 11 |
| Rockbridge County Sheriff's Office | 4.7 | 418 | 273 |
| Rockingham County Sheriff's Office | 4.2 | 170 | 181 |
| Russell County Sheriff's Office | 2 | 3 | 267 |
| Salem Police Department | 2.4 | 400 | 273 |
| Scott County Sheriff's Office | 1.9 | 6 | 171 |
| Shenandoah County Sheriff's Office | 2.2 | 36 | 212 |
| Smyth County Sheriff's Office | 5.4 | 546 | 183 |
| Southampton County Sheriff's Office | 1.5 | 649 | 271 |
| Spotsylvania County Sheriff's Office | 1.6 | 1,143 | 273 |
| Stafford County Sheriff's Office | 1.6 | 2,418 | 273 |
| Staunton Police Department | 1.2 | 77 | 158 |
| Suffolk City Sheriff's Office | 0.8 | 1 | 126 |
| Suffolk Police Department | 1.4 | 3,942 | 273 |
| Surry County Sheriff's Office | 1 | 145 | 150 |
| Sussex County Sheriff's Office | 0.7 | 1,809 | 273 |
| Tazewell County Sheriff's Office | 0.7 | 24 | 268 |
| Virginia Beach City Sheriff's Office | 2.6 | 3 | 57 |
| Virginia Beach Police Department | 2 | 5,981 | 273 |
| Warren County Sheriff's Office | 1.8 | 310 | 273 |
| Washington County Sheriff's Office | 6.6 | 975 | 272 |
| Waynesboro Police Department | 1.3 | 56 | 135 |
| Westmoreland County Sheriff's Office | 1.2 | 512 | 273 |
| Williamsburg Police Department | 2 | 891 | 273 |
| Williamsburg-James City County Sheriff's Office | 0 | 0 | 35 |
| Winchester City Sheriff's Office | 0 | 0 | 107 |
| Winchester Police Department | 1.4 | 442 | 273 |
| Wise County Sheriff's Office | 0.8 | 41 | 273 |
| Wythe County Sheriff's Office | 4.7 | 596 | 257 |
| York-Poquoson Sheriff's Office | 2.2 | 545 | 181 |

JA0541

| Table 15b. Agency Driver Stop Disparity Indexes (DIs) for Hispanic (any race) Drivers 152 Agencies Serving Cities and Counties | | | |
| --- | --- | --- | --- |
| Agency | Hispanic Driver DI | Number of Stops | Number of Traffic Days |
| Accomack County Sheriff's Office | 1.2 | 28 | 270 |
| Albemarle County Police Department | 1.7 | 211 | 273 |
| Albemarle County Sheriff's Office | 0.6 | 1 | 256 |
| Alexandria City Sheriff's Office | 1.3 | 5 | 259 |
| Alexandria Police Department | 1.2 | 1,919 | 273 |
| Alleghany County Sheriff's Office | 3.5 | 34 | 273 |
| Amelia County Sheriff's Office | 2.4 | 32 | 272 |
| Amherst County Sheriff's Office | 2.3 | 99 | 270 |
| Appomattox County Sheriff's Office | 1 | 18 | 271 |
| Arlington County Police Department | 1.3 | 2,324 | 183 |
| Arlington County Sheriff's Office | 1.3 | 24 | 257 |
| Augusta County Sheriff's Office | 1.5 | 145 | 273 |
| Bath County Sheriff's Office | 0 | 0 | 264 |
| Bedford County Sheriff's Office | 1.2 | 56 | 273 |
| Bland County Sheriff's Office | 2.4 | 33 | 272 |
| Botetourt County Sheriff's Office | 3.5 | 239 | 273 |
| Bristol Police Department | 1.2 | 28 | 142 |
| Brunswick County Sheriff's Office | 3.7 | 1,054 | 273 |
| Buchanan County Sheriff's Office | 0 | 0 | 273 |
| Buckingham County Sheriff's Office | 2.2 | 10 | 270 |
| Buena Vista Police Department | 0.4 | 5 | 175 |
| Campbell County Sheriff's Office | 1.3 | 23 | 248 |
| Caroline County Sheriff's Office | 1.9 | 77 | 270 |
| Carroll County Sheriff's Office | 1.8 | 191 | 265 |
| Charlotte County Sheriff's Office | 3.5 | 56 | 273 |
| Charlottesville Police Department | 1.4 | 69 | 273 |
| Chesapeake City Sheriff's Office | 0 | 0 | 258 |
| Chesapeake Police Department | 0.7 | 737 | 273 |
| Chesterfield County Police Department | 1.5 | 3,135 | 273 |
| Chesterfield County Sheriff's Office | 0.7 | 5 | 204 |
| Clarke County Sheriff's Office | 2.4 | 75 | 273 |
| Colonial Heights Police Department | 0.9 | 314 | 273 |
| Covington Police Department | 0.4 | 1 | 181 |
| Craig County Sheriff's Office | 1.2 | 8 | 273 |
| Culpeper County Sheriff's Office | 1.4 | 32 | 268 |
| Cumberland County Sheriff's Office | 1.2 | 15 | 271 |

| Table 15b. Agency Driver Stop Disparity Indexes (DIs) for Hispanic (any race) Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Hispanic Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Danville Police Department | 1 | 139 | 273 |
| Dickenson County Sheriff's Office | 0.7 | 2 | 272 |
| Dinwiddie County Sheriff's Office | 2.2 | 333 | 273 |
| Emporia City Sheriff's Office | 2 | 98 | 272 |
| Emporia Police Department | 0.4 | 136 | 253 |
| Essex County Sheriff's Office | 2.5 | 27 | 170 |
| Fairfax City Police | 1 | 215 | 273 |
| Fairfax County Police Department | 1.6 | 3,900 | 273 |
| Fairfax County Sheriff's Office | 1.1 | 27 | 273 |
| Falls Church City Sheriff's Office | 0 | 0 | 124 |
| Falls Church Police Department | 2.4 | 147 | 242 |
| Fauquier County Fire Marshal's Office | 0 | 0 | 1 |
| Fauquier County Sheriff's Office | 1.8 | 881 | 272 |
| Floyd County Sheriff's Office | 1.3 | 35 | 273 |
| Fluvanna County Sheriff's Office | 1.6 | 71 | 272 |
| Franklin County Sheriff's Office | 2.2 | 38 | 272 |
| Franklin Police Department | 0.1 | 2 | 241 |
| Frederick County Sheriff's Office | 1.2 | 523 | 273 |
| Fredericksburg City Sheriff's Office | 0.6 | 1 | 230 |
| Fredericksburg Police Department | 1.1 | 28 | 57 |
| Galax Police Department | 0.8 | 96 | 273 |
| Giles County Sheriff's Office | 1.5 | 11 | 269 |
| Gloucester County Sheriff's Office | 0.8 | 39 | 273 |
| Goochland County Sheriff's Office | 2 | 72 | 272 |
| Grayson County Sheriff's Office | 3 | 31 | 272 |
| Greene County Sheriff's Office | 1.8 | 70 | 267 |
| Greensville County Sheriff's Office | 4.1 | 565 | 273 |
| Halifax County Sheriff's Office | 0.7 | 3 | 273 |
| Hampton Police Division | 0.5 | 188 | 273 |
| Hanover County Sheriff's Office | 1.8 | 671 | 273 |
| Harrisonburg Police Department | 1.3 | 312 | 182 |
| Henrico Police Department | 1 | 731 | 183 |
| Henry County Sheriff's Office | 1.2 | 96 | 273 |
| Highland County Sheriff's Office | 2.5 | 2 | 242 |
| Hopewell City Sheriff's Office | 1.2 | 300 | 273 |
| Hopewell Police Department | 0.6 | 45 | 182 |
| Isle Of Wight County Sheriff's Office | 0.6 | 18 | 182 |
| James City County Police Department | 1.3 | 171 | 273 |
| King And Queen County Sheriff's Office | 1.3 | 61 | 273 |

JA0543

| Table 15b. Agency Driver Stop Disparity Indexes (DIs) for Hispanic (any race) Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Hispanic Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| King George County Sheriff's Office | 1.2 | 133 | 273 |
| King William Sheriff's Office | 1.1 | 26 | 273 |
| Lancaster County Sheriff's Office | 1 | 8 | 272 |
| Lee County Sheriff's Office | 0 | 0 | 84 |
| Lexington Police Department | 0.6 | 14 | 272 |
| Loudoun County Sheriff's Office | 1.6 | 2,324 | 273 |
| Louisa County Sheriff's Office | 1.7 | 58 | 273 |
| Lunenburg County Sheriff's Office | 1.8 | 13 | 268 |
| Lynchburg City Sheriff's Office | 0 | 0 | 47 |
| Lynchburg Police Department | 0.4 | 41 | 273 |
| Madison County Sheriff's Office | 3.6 | 67 | 273 |
| Manassas Park Police Department | 1.2 | 1,499 | 273 |
| Manassas Police Department | 1 | 1,214 | 273 |
| Martinsville Police Department | 1.3 | 189 | 273 |
| Mathews County Sheriff's Office | 0.4 | 5 | 273 |
| Mecklenburg Sheriff's Office | 3.4 | 152 | 183 |
| Middlesex County Sheriff's Office | 1.8 | 21 | 269 |
| Montgomery County Sheriff's Office | 1.2 | 76 | 273 |
| Nelson County Sheriff's Office | 1.8 | 74 | 273 |
| New Kent Sheriff's Office | 1.5 | 136 | 273 |
| Newport News City Sheriff's Office | 0 | 0 | 218 |
| Newport News Police Department | 0.3 | 222 | 181 |
| Norfolk Police Department | 0.6 | 170 | 153 |
| Northampton County Sheriff's Office | 1 | 127 | 202 |
| Northumberland County Sheriff's Office | 0.8 | 7 | 91 |
| Norton Police Department | 0.2 | 6 | 273 |
| Nottoway County Sheriff's Office | 1.2 | 6 | 264 |
| Orange County Sheriff's Office | 2.1 | 153 | 273 |
| Page County Sheriff's Office | 1.7 | 18 | 273 |
| Patrick County Sheriff's Office | 1.7 | 36 | 257 |
| Petersburg Bureau Of Police | 0.1 | 5 | 213 |
| Petersburg City Sheriff's Office | 0 | 0 | 239 |
| Pittsylvania County Sheriff's Office | 1.3 | 12 | 273 |
| Poquoson Police Department | 1.2 | 10 | 181 |
| Portsmouth City Sheriff's Office | 0.5 | 1 | 80 |
| Portsmouth Police Department | 0.6 | 55 | 273 |
| Powhatan Sheriff's Office | 2.1 | 85 | 273 |
| Prince Edward County Sheriff's Department | 2 | 44 | 174 |
| Prince George County Police Department | 0.7 | 155 | 273 |

JA0544

| Table 15b. Agency Driver Stop Disparity Indexes (DIs) for Hispanic (any race) Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Hispanic Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Prince William County Police Department | 1.2 | 5,879 | 273 |
| Prince William County Sheriff's Office | 1 | 21 | 273 |
| Pulaski County Sheriff's Office | 3 | 125 | 272 |
| Radford City Police Department | 1 | 43 | 272 |
| Rappahannock County Sheriff's Office | 1.7 | 134 | 273 |
| Richmond County Sheriff's Office | 0.4 | 4 | 175 |
| Richmond Police Department | 1 | 162 | 238 |
| Roanoke City Police Department | 0.9 | 248 | 272 |
| Roanoke County Police Department | 2.5 | 6 | 11 |
| Rockbridge County Sheriff's Office | 3.4 | 150 | 273 |
| Rockingham County Sheriff's Office | 1.7 | 180 | 181 |
| Russell County Sheriff's Office | 0 | 0 | 267 |
| Salem Police Department | 0.9 | 62 | 273 |
| Scott County Sheriff's Office | 0.3 | 1 | 171 |
| Shenandoah County Sheriff's Office | 1.7 | 60 | 212 |
| Smyth County Sheriff's Office | 7.5 | 475 | 183 |
| Southampton County Sheriff's Office | 2.6 | 56 | 271 |
| Spotsylvania County Sheriff's Office | 1 | 375 | 273 |
| Stafford County Sheriff's Office | 1.1 | 1,047 | 273 |
| Staunton Police Department | 1.7 | 27 | 158 |
| Suffolk City Sheriff's Office | 0 | 0 | 126 |
| Suffolk Police Department | 0.7 | 189 | 273 |
| Surry County Sheriff's Office | 2.2 | 16 | 150 |
| Sussex County Sheriff's Office | 4.8 | 641 | 273 |
| Tazewell County Sheriff's Office | 1 | 9 | 268 |
| Virginia Beach City Sheriff's Office | 0 | 0 | 57 |
| Virginia Beach Police Department | 0.6 | 729 | 273 |
| Warren County Sheriff's Office | 1.6 | 260 | 273 |
| Washington County Sheriff's Office | 0.9 | 121 | 272 |
| Waynesboro Police Department | 0.8 | 20 | 135 |
| Westmoreland County Sheriff's Office | 1.2 | 113 | 273 |
| Williamsburg Police Department | 1.1 | 193 | 273 |
| Williamsburg-James City County Sheriff's Office | 6.2 | 1 | 35 |
| Winchester City Sheriff's Office | 1 | 3 | 107 |
| Winchester Police Department | 0.9 | 375 | 273 |
| Wise County Sheriff's Office | 0.7 | 6 | 273 |
| Wythe County Sheriff's Office | 6.3 | 275 | 257 |
| York-Poquoson Sheriff's Office | 0.9 | 100 | 181 |

**JA0545**

| Table 15c. Agency Driver Stop Disparity Indexes (DIs) for American Indian Drivers 152 Agencies Serving Cities and Counties | | | |
|---|---|---|---|
| Agency | American Indian Driver DI | Number of Stops | Number of Traffic Days |
| Accomack County Sheriff's Office | 0 | 0 | 270 |
| Albemarle County Police Department | 0.3 | 1 | 273 |
| Albemarle County Sheriff's Office | 0 | 0 | 256 |
| Alexandria City Sheriff's Office | 0 | 0 | 259 |
| Alexandria Police Department | 1.8 | 46 | 273 |
| Alleghany County Sheriff's Office | 0 | 0 | 273 |
| Amelia County Sheriff's Office | 0.5 | 1 | 272 |
| Amherst County Sheriff's Office | 0.5 | 8 | 270 |
| Appomattox County Sheriff's Office | 0.5 | 1 | 271 |
| Arlington County Police Department | 0.6 | 17 | 183 |
| Arlington County Sheriff's Office | 0 | 0 | 257 |
| Augusta County Sheriff's Office | 1 | 7 | 273 |
| Bath County Sheriff's Office | 0 | 0 | 264 |
| Bedford County Sheriff's Office | 0 | 0 | 273 |
| Bland County Sheriff's Office | 0.9 | 2 | 272 |
| Botetourt County Sheriff's Office | 1.9 | 19 | 273 |
| Bristol Police Department | 0 | 0 | 142 |
| Brunswick County Sheriff's Office | 2.1 | 83 | 273 |
| Buchanan County Sheriff's Office | 0 | 0 | 273 |
| Buckingham County Sheriff's Office | 0 | 0 | 270 |
| Buena Vista Police Department | 0 | 0 | 175 |
| Campbell County Sheriff's Office | 0.4 | 1 | 248 |
| Caroline County Sheriff's Office | 0 | 0 | 270 |
| Carroll County Sheriff's Office | 1.9 | 11 | 265 |
| Charlotte County Sheriff's Office | 0.4 | 1 | 273 |
| Charlottesville Police Department | 0 | 0 | 273 |
| Chesapeake City Sheriff's Office | 0 | 0 | 258 |
| Chesapeake Police Department | 0.2 | 13 | 273 |
| Chesterfield County Police Department | 0.4 | 28 | 273 |
| Chesterfield County Sheriff's Office | 0 | 0 | 204 |
| Clarke County Sheriff's Office | 0 | 0 | 273 |
| Colonial Heights Police Department | 0.1 | 2 | 273 |
| Covington Police Department | 0 | 0 | 181 |
| Craig County Sheriff's Office | 2.1 | 3 | 273 |
| Culpeper County Sheriff's Office | 0 | 0 | 268 |
| Cumberland County Sheriff's Office | 0 | 0 | 271 |

JA0546

| Table 15c. Agency Driver Stop Disparity Indexes (DIs) for American Indian Drivers 152 Agencies Serving Cities and Counties (Continued) | | | |
|---|---|---|---|
| Agency | American Indian Driver DI | Number of Stops | Number of Traffic Days |
| Danville Police Department | 0.2 | 2 | 273 |
| Dickenson County Sheriff's Office | 0 | 0 | 272 |
| Dinwiddie County Sheriff's Office | 2.4 | 35 | 273 |
| Emporia City Sheriff's Office | 0 | 0 | 272 |
| Emporia Police Department | 1.2 | 16 | 253 |
| Essex County Sheriff's Office | 0 | 0 | 170 |
| Fairfax City Police | 1.3 | 5 | 273 |
| Fairfax County Police Department | 1.2 | 36 | 273 |
| Fairfax County Sheriff's Office | 0 | 0 | 273 |
| Falls Church City Sheriff's Office | 94.6 | 1 | 124 |
| Falls Church Police Department | 0.5 | 1 | 242 |
| Fauquier County Fire Marshal's Office | 0 | 0 | 0 |
| Fauquier County Sheriff's Office | 0.1 | 2 | 272 |
| Floyd County Sheriff's Office | 0.5 | 1 | 273 |
| Fluvanna County Sheriff's Office | 0.8 | 3 | 272 |
| Franklin County Sheriff's Office | 1.1 | 2 | 272 |
| Franklin Police Department | 0 | 0 | 241 |
| Frederick County Sheriff's Office | 0.4 | 6 | 273 |
| Fredericksburg City Sheriff's Office | 0 | 0 | 230 |
| Fredericksburg Police Department | 3.8 | 4 | 57 |
| Galax Police Department | 0 | 0 | 273 |
| Giles County Sheriff's Office | 1.3 | 1 | 269 |
| Gloucester County Sheriff's Office | 0.1 | 1 | 273 |
| Goochland County Sheriff's Office | 0.2 | 1 | 272 |
| Grayson County Sheriff's Office | 0 | 0 | 272 |
| Greene County Sheriff's Office | 0.4 | 1 | 267 |
| Greensville County Sheriff's Office | 0.6 | 9 | 273 |
| Halifax County Sheriff's Office | 0 | 0 | 273 |
| Hampton Police Division | 0 | 0 | 273 |
| Hanover County Sheriff's Office | 0.9 | 49 | 273 |
| Harrisonburg Police Department | 1.8 | 6 | 182 |
| Henrico Police Department | 0.1 | 4 | 183 |
| Henry County Sheriff's Office | 0 | 0 | 273 |
| Highland County Sheriff's Office | 0 | 0 | 242 |
| Hopewell City Sheriff's Office | 0.2 | 3 | 273 |
| Hopewell Police Department | 0 | 0 | 182 |
| Isle Of Wight County Sheriff's Office | 0.3 | 1 | 182 |
| James City County Police Department | 0.5 | 4 | 273 |
| King And Queen County Sheriff's Office | 0.1 | 4 | 273 |
| King George County Sheriff's Office | 0.2 | 2 | 273 |

JA0547

| Table 15c. Agency Driver Stop Disparity Indexes (DIs) for American Indian Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| Agency | American Indian Driver DI | Number of Stops | Number of Traffic Days |
| King William Sheriff's Office | 0.3 | 4 | 273 |
| Lancaster County Sheriff's Office | 0 | 0 | 272 |
| Lee County Sheriff's Office | 0 | 0 | 84 |
| Lexington Police Department | 1 | 2 | 272 |
| Loudoun County Sheriff's Office | 9.8 | 202 | 273 |
| Louisa County Sheriff's Office | 0 | 0 | 273 |
| Lunenburg County Sheriff's Office | 0 | 0 | 268 |
| Lynchburg City Sheriff's Office | 0 | 0 | 47 |
| Lynchburg Police Department | 0.4 | 4 | 273 |
| Madison County Sheriff's Office | 2.9 | 4 | 273 |
| Manassas Park Police Department | 2.5 | 25 | 273 |
| Manassas Police Department | 2.1 | 18 | 273 |
| Martinsville Police Department | 0.1 | 1 | 273 |
| Mathews County Sheriff's Office | 0.6 | 1 | 273 |
| Mecklenburg Sheriff's Office | 1.1 | 6 | 183 |
| Middlesex County Sheriff's Office | 0 | 0 | 269 |
| Montgomery County Sheriff's Office | 0.7 | 3 | 273 |
| Nelson County Sheriff's Office | 0.7 | 3 | 273 |
| New Kent Sheriff's Office | 0.2 | 6 | 273 |
| Newport News City Sheriff's Office | 0 | 0 | 218 |
| Newport News Police Department | 0.1 | 4 | 181 |
| Norfolk Police Department | 0.4 | 7 | 153 |
| Northampton County Sheriff's Office | 0 | 0 | 202 |
| Northumberland County Sheriff's Office | 0 | 0 | 91 |
| Norton Police Department | 0 | 0 | 273 |
| Nottoway County Sheriff's Office | 0 | 0 | 264 |
| Orange County Sheriff's Office | 1.1 | 6 | 273 |
| Page County Sheriff's Office | 1.3 | 2 | 273 |
| Patrick County Sheriff's Office | 0 | 0 | 257 |
| Petersburg Bureau Of Police | 0.8 | 3 | 213 |
| Petersburg City Sheriff's Office | 0 | 0 | 239 |
| Pittsylvania County Sheriff's Office | 2 | 2 | 273 |
| Poquoson Police Department | 0 | 0 | 181 |
| Portsmouth City Sheriff's Office | 0 | 0 | 80 |
| Portsmouth Police Department | 0.2 | 2 | 273 |
| Powhatan Sheriff's Office | 0.5 | 4 | 273 |
| Prince Edward County Sheriff's Department | 1.3 | 3 | 174 |
| Prince George County Police Department | 0.1 | 1 | 273 |
| Prince William County Police Department | 0.2 | 11 | 273 |
| Prince William County Sheriff's Office | 0 | 0 | 273 |

JA0548

| Table 15c. Agency Driver Stop Disparity Indexes (DIs) for American Indian Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *American Indian Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Pulaski County Sheriff's Office | 0 | 0 | 272 |
| Radford City Police Department | 0.5 | 2 | 272 |
| Rappahannock County Sheriff's Office | 2.4 | 12 | 273 |
| Richmond County Sheriff's Office | 0 | 0 | 175 |
| Richmond Police Department | 0.7 | 6 | 238 |
| Roanoke City Police Department | 0.3 | 3 | 272 |
| Roanoke County Police Department | 0 | 0 | 11 |
| Rockbridge County Sheriff's Office | 0.3 | 5 | 273 |
| Rockingham County Sheriff's Office | 0 | 0 | 181 |
| Russell County Sheriff's Office | 0 | 0 | 267 |
| Salem Police Department | 0.7 | 4 | 273 |
| Scott County Sheriff's Office | 0 | 0 | 171 |
| Shenandoah County Sheriff's Office | 1.4 | 2 | 212 |
| Smyth County Sheriff's Office | 1.6 | 11 | 183 |
| Southampton County Sheriff's Office | 0.9 | 5 | 271 |
| Spotsylvania County Sheriff's Office | 0.7 | 9 | 273 |
| Stafford County Sheriff's Office | 0.4 | 13 | 273 |
| Staunton Police Department | 0.7 | 1 | 158 |
| Suffolk City Sheriff's Office | 0 | 0 | 126 |
| Suffolk Police Department | 0.6 | 13 | 273 |
| Surry County Sheriff's Office | 0 | 0 | 150 |
| Sussex County Sheriff's Office | 0.8 | 12 | 273 |
| Tazewell County Sheriff's Office | 0 | 0 | 268 |
| Virginia Beach City Sheriff's Office | 0 | 0 | 57 |
| Virginia Beach Police Department | 1.3 | 76 | 273 |
| Warren County Sheriff's Office | 0.2 | 3 | 273 |
| Washington County Sheriff's Office | 0.2 | 3 | 272 |
| Waynesboro Police Department | 0.9 | 1 | 135 |
| Westmoreland County Sheriff's Office | 0 | 0 | 273 |
| Williamsburg Police Department | 0.2 | 2 | 273 |
| Williamsburg-James City County Sheriff's Office | 0 | 0 | 35 |
| Winchester City Sheriff's Office | 0 | 0 | 107 |
| Winchester Police Department | 0.2 | 1 | 273 |
| Wise County Sheriff's Office | 0 | 0 | 273 |
| Wythe County Sheriff's Office | 3.2 | 27 | 257 |
| York-Poquoson Sheriff's Office | 0 | 0 | 181 |

JA0549

| Table 15d. Agency Driver Stop Disparity Indexes (DIs) for Asian Drivers 152 Agencies Serving Cities and Counties | | | |
|---|---|---|---|
| *Agency* | *Asian Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Accomack County Sheriff's Office | 1 | 3 | 270 |
| Albemarle County Police Department | 0.3 | 39 | 273 |
| Albemarle County Sheriff's Office | 0 | 0 | 256 |
| Alexandria City Sheriff's Office | 1 | 2 | 259 |
| Alexandria Police Department | 0.6 | 451 | 273 |
| Alleghany County Sheriff's Office | 4.4 | 11 | 273 |
| Amelia County Sheriff's Office | 0.4 | 1 | 272 |
| Amherst County Sheriff's Office | 0 | 0 | 270 |
| Appomattox County Sheriff's Office | 1.3 | 6 | 271 |
| Arlington County Police Department | 0.5 | 753 | 183 |
| Arlington County Sheriff's Office | 0.9 | 14 | 257 |
| Augusta County Sheriff's Office | 0.5 | 12 | 273 |
| Bath County Sheriff's Office | 5.5 | 2 | 264 |
| Bedford County Sheriff's Office | 0.6 | 19 | 273 |
| Bland County Sheriff's Office | 2.9 | 25 | 272 |
| Botetourt County Sheriff's Office | 1.3 | 45 | 273 |
| Bristol Police Department | 0.2 | 2 | 142 |
| Brunswick County Sheriff's Office | 1.4 | 188 | 273 |
| Buchanan County Sheriff's Office | 0 | 0 | 273 |
| Buckingham County Sheriff's Office | 2.1 | 2 | 270 |
| Buena Vista Police Department | 0.2 | 1 | 175 |
| Campbell County Sheriff's Office | 0.1 | 1 | 248 |
| Caroline County Sheriff's Office | 1.1 | 11 | 270 |
| Carroll County Sheriff's Office | 3 | 25 | 265 |
| Charlotte County Sheriff's Office | 3.6 | 11 | 273 |
| Charlottesville Police Department | 0.3 | 26 | 273 |
| Chesapeake City Sheriff's Office | 0 | 0 | 258 |
| Chesapeake Police Department | 0.3 | 209 | 273 |
| Chesterfield County Police Department | 0.4 | 389 | 273 |
| Chesterfield County Sheriff's Office | 0.3 | 1 | 204 |
| Clarke County Sheriff's Office | 1.1 | 10 | 273 |
| Colonial Heights Police Department | 0.2 | 57 | 273 |
| Covington Police Department | 0 | 0 | 181 |
| Craig County Sheriff's Office | 2.7 | 3 | 273 |
| Culpeper County Sheriff's Office | 0.2 | 1 | 268 |
| Cumberland County Sheriff's Office | 0.8 | 2 | 271 |
| Danville Police Department | 0.2 | 10 | 273 |

JA0550

| Table 15d. Agency Driver Stop Disparity Indexes (DIs) for Asian Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Asian Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Dickenson County Sheriff's Office | 0 | 0 | 272 |
| Dinwiddie County Sheriff's Office | 1.2 | 49 | 273 |
| Emporia City Sheriff's Office | 0.7 | 7 | 272 |
| Emporia Police Department | 0.8 | 58 | 253 |
| Essex County Sheriff's Office | 0 | 0 | 170 |
| Fairfax City Police | 0.8 | 183 | 273 |
| Fairfax County Police Department | 0.3 | 1112 | 273 |
| Fairfax County Sheriff's Office | 0.4 | 15 | 273 |
| Falls Church City Sheriff's Office | 0 | 0 | 124 |
| Falls Church Police Department | 0.8 | 56 | 242 |
| Fauquier County Fire Marshal's Office | 0 | 0 | 1 |
| Fauquier County Sheriff's Office | 1.2 | 149 | 272 |
| Floyd County Sheriff's Office | 0.2 | 1 | 273 |
| Fluvanna County Sheriff's Office | 0.8 | 12 | 272 |
| Franklin County Sheriff's Office | 0.5 | 2 | 272 |
| Franklin Police Department | 0 | 0 | 241 |
| Frederick County Sheriff's Office | 0.5 | 51 | 273 |
| Fredericksburg City Sheriff's Office | 0 | 0 | 230 |
| Fredericksburg Police Department | 0.1 | 1 | 57 |
| Galax Police Department | 0.3 | 3 | 273 |
| Giles County Sheriff's Office | 1.6 | 5 | 269 |
| Gloucester County Sheriff's Office | 0.3 | 6 | 273 |
| Goochland County Sheriff's Office | 0.8 | 20 | 272 |
| Grayson County Sheriff's Office | 1.5 | 1 | 272 |
| Greene County Sheriff's Office | 1.4 | 22 | 267 |
| Greensville County Sheriff's Office | 2.3 | 107 | 273 |
| Halifax County Sheriff's Office | 0 | 0 | 273 |
| Hampton Police Division | 0.3 | 64 | 273 |
| Hanover County Sheriff's Office | 0.5 | 139 | 273 |
| Harrisonburg Police Department | 0.3 | 18 | 182 |
| Henrico Police Department | 0.3 | 353 | 183 |
| Henry County Sheriff's Office | 0.1 | 1 | 273 |
| Highland County Sheriff's Office | 3.8 | 2 | 242 |
| Hopewell City Sheriff's Office | 0.5 | 29 | 273 |
| Hopewell Police Department | 0.1 | 1 | 182 |
| Isle Of Wight County Sheriff's Office | 0.2 | 3 | 182 |
| James City County Police Department | 0.4 | 35 | 273 |
| King And Queen County Sheriff's Office | 0.9 | 9 | 273 |
| King George County Sheriff's Office | 0.6 | 28 | 273 |

JA0551

| Table 15d. Agency Driver Stop Disparity Indexes (DIs) for Asian Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Asian Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| King William Sheriff's Office | 0.2 | 2 | 273 |
| Lancaster County Sheriff's Office | 0.9 | 3 | 272 |
| Lee County Sheriff's Office | 0 | 0 | 84 |
| Lexington Police Department | 0.3 | 8 | 272 |
| Loudoun County Sheriff's Office | 0.3 | 653 | 273 |
| Louisa County Sheriff's Office | 1.2 | 10 | 273 |
| Lunenburg County Sheriff's Office | 0 | 0 | 268 |
| Lynchburg City Sheriff's Office | 0 | 0 | 47 |
| Lynchburg Police Department | 0.4 | 28 | 273 |
| Madison County Sheriff's Office | 7.3 | 32 | 273 |
| Manassas Park Police Department | 0.2 | 103 | 273 |
| Manassas Police Department | 0.5 | 116 | 273 |
| Martinsville Police Department | 0.1 | 4 | 273 |
| Mathews County Sheriff's Office | 0.2 | 1 | 273 |
| Mecklenburg Sheriff's Office | 2 | 30 | 183 |
| Middlesex County Sheriff's Office | 0.7 | 2 | 269 |
| Montgomery County Sheriff's Office | 0.1 | 14 | 273 |
| Nelson County Sheriff's Office | 1.5 | 13 | 273 |
| New Kent Sheriff's Office | 0.6 | 27 | 273 |
| Newport News City Sheriff's Office | 0 | 0 | 218 |
| Newport News Police Department | 0.2 | 75 | 181 |
| Norfolk Police Department | 0.4 | 57 | 153 |
| Northampton County Sheriff's Office | 1.1 | 19 | 202 |
| Northumberland County Sheriff's Office | 3.3 | 5 | 91 |
| Norton Police Department | 0.3 | 3 | 273 |
| Nottoway County Sheriff's Office | 0 | 0 | 264 |
| Orange County Sheriff's Office | 1.1 | 21 | 273 |
| Page County Sheriff's Office | 0.6 | 2 | 273 |
| Patrick County Sheriff's Office | 0 | 0 | 257 |
| Petersburg Bureau Of Police | 0.3 | 3 | 213 |
| Petersburg City Sheriff's Office | 1.3 | 1 | 239 |
| Pittsylvania County Sheriff's Office | 0.4 | 1 | 273 |
| Poquoson Police Department | 0.3 | 3 | 181 |
| Portsmouth City Sheriff's Office | 2.2 | 2 | 80 |
| Portsmouth Police Department | 0.5 | 21 | 273 |
| Powhatan Sheriff's Office | 2.1 | 28 | 273 |
| Prince Edward County Sheriff's Department | 0.6 | 7 | 174 |
| Prince George County Police Department | 0.1 | 9 | 273 |
| Prince William County Police Department | 0.4 | 836 | 273 |

JA0552

| Table 15d. Agency Driver Stop Disparity Indexes (DIs) for Asian Drivers 152 Agencies Serving Cities and Counties *(Continued)* | | | |
|---|---|---|---|
| *Agency* | *Asian Driver DI* | *Number of Stops* | *Number of Traffic Days* |
| Prince William County Sheriff's Office | 0 | 0 | 273 |
| Pulaski County Sheriff's Office | 1.7 | 29 | 272 |
| Radford City Police Department | 0.3 | 12 | 272 |
| Rappahannock County Sheriff's Office | 2 | 42 | 273 |
| Richmond County Sheriff's Office | 0 | 0 | 175 |
| Richmond Police Department | 0.3 | 19 | 238 |
| Roanoke City Police Department | 0.2 | 43 | 272 |
| Roanoke County Police Department | 0 | 0 | 11 |
| Rockbridge County Sheriff's Office | 1.3 | 29 | 273 |
| Rockingham County Sheriff's Office | 0.3 | 5 | 181 |
| Russell County Sheriff's Office | 0 | 0 | 267 |
| Salem Police Department | 0.6 | 27 | 273 |
| Scott County Sheriff's Office | 0 | 0 | 171 |
| Shenandoah County Sheriff's Office | 0.2 | 1 | 212 |
| Smyth County Sheriff's Office | 3.3 | 68 | 183 |
| Southampton County Sheriff's Office | 0.9 | 7 | 271 |
| Spotsylvania County Sheriff's Office | 0.2 | 25 | 273 |
| Stafford County Sheriff's Office | 0.4 | 133 | 273 |
| Staunton Police Department | 0 | 0 | 158 |
| Suffolk City Sheriff's Office | 0 | 0 | 126 |
| Suffolk Police Department | 0.3 | 43 | 273 |
| Surry County Sheriff's Office | 1.1 | 2 | 150 |
| Sussex County Sheriff's Office | 2.2 | 44 | 273 |
| Tazewell County Sheriff's Office | 0 | 0 | 268 |
| Virginia Beach City Sheriff's Office | 0 | 0 | 57 |
| Virginia Beach Police Department | 0.4 | 517 | 273 |
| Warren County Sheriff's Office | 0.6 | 32 | 273 |
| Washington County Sheriff's Office | 1.4 | 72 | 272 |
| Waynesboro Police Department | 0.5 | 3 | 135 |
| Westmoreland County Sheriff's Office | 0 | 0 | 273 |
| Williamsburg Police Department | 0.2 | 51 | 273 |
| Williamsburg-James City County Sheriff's Office | 0 | 0 | 35 |
| Winchester City Sheriff's Office | 1.7 | 1 | 107 |
| Winchester Police Department | 0.4 | 30 | 273 |
| Wise County Sheriff's Office | 1.1 | 4 | 273 |
| Wythe County Sheriff's Office | 2.1 | 52 | 257 |
| York-Poquoson Sheriff's Office | 0.4 | 50 | 181 |

**JA0553**

*Analysis of Events Following Traffic Stops for City and County Agencies*

Once a stop was made, a DI could be calculated to examine racial/ethnic driver overrepresentation for searches and arrests made following the stop. These are discussed below.

**Searches Conducted**

Figure 10 below shows the percentages of the 152 LEAs with driver search DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers where a search occurred when compared to the number of minority drivers stopped.



Figure 10 shows the following:

- Black and Hispanic drivers predominate when there was high or moderate overrepresentation for searches, and White drivers predominate when there was no overrepresentation for searches. Black and Hispanic drivers had consistently higher search DIs than White drivers.
    - 8.5% of city and county agencies had high overrepresentation for searches involving Black drivers, 10.5% of agencies had the same for Hispanic drivers, 3.9% of agencies had the same for American Indian drivers, and 5.3% had the same for Asian drivers. Less than 1% of agencies had the same for White drivers.
    - 53.3% of city and county agencies had moderate overrepresentation for searches involving Black drivers, and 22.3% of agencies had the same for Hispanic drivers. Less than 1% of agencies had the same for American Indian drivers, and 3.3% of agencies had the same for Asian drivers. 12.5% of agencies the same for White drivers.

**JA0554**

– 19.7% of city and county agencies had no overrepresentation for searches involving Black drivers, 30.3% of agencies had the same for Hispanic drivers, 2.6% of agencies had the same for American Indian drivers, and 13.2% of agencies had the same for Asian drivers. By comparison, 76.3% of agencies had the same for White drivers.

City and county agencies with zero searches, and therefore search DIs of zero, are not shown in Figure 10 above. 10.5% of city and county agencies (16) reported no searches involving White drivers, 18.4% agencies (28) reported none involving Black drivers, 36.2% of agencies (56) reported none involving Hispanic drivers, 92.7% of agencies (141) reported none involving American Indian drivers, and 73.3% (119) reported no searches involving Asian drivers.

**Driver Arrests**

Figure 11 shows the percentages of the 152 LEAs with driver arrest DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers arrested when compared to the number of minority drivers stopped.



Figure 11
Percent of Agencies with High, Moderate, or No Overrepresentation in Driver Arrests
by Driver Race/Ethnicity, 152 Virginia Agencies Serving Cities and Counties

Figure 11 above shows the following:

- As was the case for searches, Black and Hispanic drivers predominate when there was high or moderate overrepresentation for arrests and White drivers predominate when there was no overrepresentation for arrests. Black and Hispanic drivers had consistently higher arrest DIs than White drivers.
  - 13.2% of county and city agencies had high overrepresentation of Hispanic drivers arrested, 11.2% of agencies had the same for Black drivers, 2.6% of agencies had the same for American Indian drivers, and 6.6% of agencies had the same for Asian drivers. No agencies had high overrepresentation for White drivers arrested.

JA0555

— 41.4% of county and city agencies had moderate overrepresentation of Black drivers arrested, 19.1% of agencies had the same for Hispanic drivers, 1.3% of agencies had the same for American Indian drivers, and 2.0% of agencies had the same for Asian drivers. 15.1% of agencies had the same for White drivers.

— 17.8% of county and city agencies had no overrepresentation of Black drivers arrested, 17.1% of agencies had the same for Hispanic drivers, less than 1% of agencies had the same for American Indian drivers, and 7.9% of agencies had the same for Asian drivers. 64.5% of agencies had the same for White drivers.

City and county agencies with zero driver arrests, and therefore driver arrest DIs of zero, are not shown in Figure 11 above. 20.4% of these agencies (31) did not arrest any White drivers, 29.6% of these agencies (45) did not arrest any Black drivers, 50.7% of agencies (77) did not arrests any Hispanic drivers, 95.4% of agencies (145) did not arrest any American Indian drivers, and 83.5% of agencies (127) did not arrest any Asian drivers.

DIs for individual agencies serving cities and counties are shown in Appendix B.

## Town Agencies Traffic Stop Analysis

These 108 local PDs serve towns. Racial/ethnic data for the resident population age 15+ was not available for these agencies.

### Driver Racial/Ethnicity Analysis of Traffic Stops for Town Agencies

Because driving-age population data for each racial/ethnic group was not available for the towns served by these PDs, a driver stop DI could not be calculated for these PDs. It was possible to examine the percentage of drivers in each racial/ethnic group among stops made by these PDs and these percentages were compared to the percentages of each group stopped statewide.

The percentages of Black and Hispanic drivers stopped by town agencies were lower than the percentages of stops for these drivers statewide. While 31% of drivers stopped statewide were Black, 20% of drivers stopped by town agencies were Black. Hispanic drivers were 9.6% of those stopped statewide and were 8.9% of drivers stopped by town agencies. The percentage of White drivers stopped by town agencies, 66.4%, was higher than the percentage of White drivers stopped statewide, 54.8%.

DCJS will continue to examine whether there are any measures available that would permit a more meaningful assessment of racial/ethnic disparities in the traffic stops for these town agencies.

### Analysis of Events Following Traffic Stops for Town Agencies

Once a stop was made, a DI could be calculated to examine racial/ethnic driver overrepresentation for searches and arrests made following the stop by a town agency. These are discussed below.

### Searches Conducted

Figure 12 shows the percentages of the 108 LEAs with driver search DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers where a search occurred compared to each group of minority drivers stopped.



- Black and Hispanic drivers again tended to have higher search DIs than other drivers.

  - 20.4% of town agencies had a high overrepresentation for searches involving Black drivers and 11.1% of agencies had the same for searches involving Hispanic drivers. No agency had the same for searches involving White drivers.

  - 26.8% of town agencies had a moderate overrepresentation for searches involving Black drivers and 13% of agencies had the same for searches involving Hispanic drivers. 15.7% of agencies had the same for searches involving White drivers.

  - Only 12% of town agencies had no overrepresentation for searches involving Black drivers and only 7.4% of agencies had the same for searches involving Hispanic drivers. By comparison, 63% of agencies had the same for searches involving White drivers.

  - American Indian and Asian drivers were underrepresented in searches.

Town agencies with zero searches, and therefore search DIs of zero, are not shown in Figure 12 above. 21.3% of these agencies (23) did not conduct any searches involving White drivers, 40.7% (44) reported no searches involving Black drivers, 68.5% (74) reported no searches involving Hispanic drivers, 99.1% (107) reported no searches involving American Indian drivers, and 97.2% (105) reported no searches involving Asian drivers.

**Driver Arrests**

Figure 13 shows the percentages of the 108 LEAs with driver arrest DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers where an arrest occurred, when compared to each group of minority drivers stopped.

**JA0557**



Figure 13
Percent of Agencies with High, Moderate, or No Overrepresentation in Driver Arrests
by Driver Race/Ethnicity, 108 Virginia Agencies Serving Towns

- Black and Hispanic drivers again tended to have consistently higher arrest DIs than other drivers.

  – 19.4% of town agencies had a high overrepresentation for Black drivers arrested and 11.1% of agencies had the same for Hispanic drivers. Less than 1% of town agencies had the same for White drivers.

  – 13.9% of town agencies had a moderate overrepresentation for Black drivers arrested and 4.6% of agencies had the same for Hispanic drivers. 18.5% of agencies had the same for White drivers.

  – 9.2% of town agencies had no overrepresentation for Black drivers arrested and 1.8% of agencies had the same for Hispanic drivers. 38.8% of agencies had the same for White drivers.

  – There was no overrepresentation in arrests of American Indian or Asian drivers.

Town agencies with zero driver arrests, and therefore arrest DIs of zero, are not shown in Figure 13 above. 41.7% of these agencies (45) did not arrest any White drivers, 57.4% (62) reported no arrests of Black drivers, 82.4% (89) did not arrest Hispanic drivers, 99.1% (107) had no arrests of American Indian drivers, and 98.2% (106) had no arrests of Asian drivers.

DIs for individual agencies serving towns are shown in Appendix C

## Geographic Presentation of Stop, Search, and Arrest DIs for City, County, and Town Agencies

The maps in Figures 14–16 illustrate which local areas of Virginia had high, moderate, or no overrepresentation for driver stops, searches, and driver arrests, for each driver racial/ethnic group. The local area boundaries shown on the maps are city and county boundaries. Town boundaries are not shown, but their stop data is included in the DI calculated for their surrounding county. This means that the county DIs used for the maps were calculated differently from the county LEA DIs shown earlier in this report. The county DIs shown previously were based on only stops reported by each LEA that serves the county,

JA0558

whereas the county DIs used for the following maps include stops reported by all agencies that serve the county, as well as stops reported by agencies that serve any town located within the county. The same applies for DIs calculated for searches and arrests (for more details on how the DIs were calculated for the maps, see Appendix H).

**Figure 14**
**Local Area Maps for Driver Stops by Driver Race/Ethnicity**



JA0559

**Figure 15**
**Local Area Maps for Searches by Driver Race/Ethnicity**

A search may have been conducted of the driver only, of a passenger only, of the vehicle only, or of any combination of the three. Since only the driver race/ethnicity was reported, a search is defined here with respect to the driver's race/ethnicity. It does not necessarily mean that the driver was searched.



JA0560

**Figure 16**
**Local Area Maps for Arrests by Driver Race/Ethnicity**





**JA0561**

## *Other Agencies Traffic Stop Analysis*

There were 44 "Other" state, local and private agencies serve locations that have no defined, stable population. Typically these were agencies that serve larger college/university campuses with public roads or locations such as state parks, airports, railroads, or other commercial locations.

### *Traffic Stops for Other Agencies*

Because driving-age population data for each racial/ethnic group was not available for the areas served by these agencies, a driver stop DI could not be calculated for these agencies. It was possible to examine the percentage of drivers in each racial/ethnic group among stops made by these agencies and these percentages were compared to those for each group stopped statewide.

The percentages of White and Black drivers stopped by other agencies was similar to the percentages stopped statewide. 54.3% of drivers stopped by other agencies were White, compared with 54.8% of stops statewide, and 30% of drivers stopped by other agencies were Black, while 31% of all stops statewide were of Black drivers. The percentage of Hispanic drivers stopped by other agencies, 7.9%, was lower than the percentage stopped statewide, 9.5%

For future annual reports, DCJS will continue to examine whether there are any measures available that would permit a more meaningful assessment of racial/ethnic disparities in the traffic stops for these other agencies.

### *Analysis of Events Following Traffic Stops for Other Agencies*

Once a stop was made, a DI could be calculated to examine racial/ethnic driver overrepresentation for searches and arrests made following the stop. These are discussed below.

### Searches Conducted

Figure 17 shows the percentages of the 44 other LEAs with search DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers where a search occurred when compared to each group of minority drivers stopped.



Figure 17
Percent of Agencies with High, Moderate, or No Overrepresentation in Searches
by Driver Race/Ethnicity, 44 Virginia Other Agencies

**JA0562**

- Black and Hispanic drivers again tended to be searched at a higher rate than other driver groups, with mostly higher search DIs than other drivers.

  - 13.6% of other agencies had a high overrepresentation for searches involving Black drivers and 16% of agencies had the same for Hispanic drivers. 2.3% of other agencies had the same for White drivers.

  - 22.7% of other agencies had a moderate overrepresentation for searches involving Black drivers and 2.3% of agencies had the same for Hispanic drivers. Only 9.1% of agencies had the same for White drivers.

  - Only 9.1% of other agencies had no overrepresentation for searches involving Black drivers, while 11.4% of agencies had the same for Hispanic drivers. By comparison, nearly 41% of agencies had the same for White drivers.

  - 4.5% of other agencies had a high overrepresentation for Asian drivers and 2.3% had a moderate overrepresentation. No agencies had an overrepresentation for American Indian drivers.

Other agencies with zero searches, and therefore search DIs of zero, are not shown in Figure 17 above. 70.4% of these agencies (31) did not conduct any searches involving Hispanic drivers, 54.5% (24) reported no searches involving Black drivers, 47.7% (21) reported no searches involving White drivers, and 93.2% (41) had no searches involving Asian drivers. No other agency reported any searches involving American Indian drivers.

**Driver Arrests**

Figure 18 shows the percentages of the 44 other LEAs with driver arrest DIs indicating high overrepresentation (DI of 2.0 or higher), moderate overrepresentation (DI of 1.1 to 1.9), or no overrepresentation (DI of 1.0 or less) for minority drivers arrested, when compared to each group of minority drivers stopped.



Figure 18
Percent of Agencies with High, Moderate, or No Overrepresentation in Driver Arrests
by Driver Race/Ethnicity, 44 Virginia Other Agencies

■ Black  ■ Hispanic  ■ White  □ Asian  ■ American Indian

JA0563

- DIs for arrests of Black and Hispanic drivers by other agencies were mixed, with some DIs comparable to those for other drivers.

  – 4.5% of other agencies had a high overrepresentation for Black and White drivers and 20.4% of agencies had the same for Hispanic drivers.

  – 13.6% of other agencies had a moderate overrepresentation for Black and White drivers arrested. 2.3% of agencies had the same for Hispanic drivers.

  – 13.6% of other agencies had no overrepresentation for Black drivers arrested and 4.5% of agencies had the same for Hispanic drivers. 22.7% of agencies had the same for White drivers.

  – Only about 2% of other agencies had either high or moderate overrepresentation for Asian drivers. No agencies had an overrepresentation for American Indian drivers.

Other agencies with zero driver arrests, and therefore arrest DIs of zero, are not shown in Figure 18 above. 59.1% of these agencies (26) did not arrest any White drivers, 68.2% (30) reported no arrests of Black drivers, 72.7% (32) did not arrest any Hispanic drivers, and 99.4% (42) had no arrests of Asian drivers. No other agency had any arrests of American Indian drivers.

DIs for individual "Other" agencies are shown in Appendix D.

# Interpretation of Findings

The overall finding of this analysis is that, statewide, Black and Hispanic drivers in Virginia were disproportionately stopped by law-enforcement when compared to White drivers based on the number of drivers stopped relative to their numbers in Virginia's driving-age population. This type of disparity was seen among traffic stops made by most of the individual law-enforcement agencies for which disparity measures could be calculated.

The finding that minority drivers are more likely to be stopped by law-enforcement is consistent with traffic stop research conducted in other states. Two recent large-scale studies, one using data from 20 million and another using data from nearly 100 million traffic stops, illustrate this.

In 2018, Baumgartner, Epp, and Shoub published *Suspect Citizens: What 20 Million Traffic Stops Tell Us About Policing and Race.* Their research reviewed statewide traffic stop data from North Carolina and included virtual every locality in the state over the 14-year period 2002–2016. They concluded:

> "We conduct [sic] the most comprehensive analysis to date of traffic stops in a single state, North Carolina.... [P]owerful disparities exist in how police interact with drivers depending on their outward identities: race, gender and age, in particular.... First, there are stark differences. Second, young men of color are clearly targeted for more aggressive treatment. Third, these differences are not fully justified by differences in criminality." (p. 2).

In 2020, Pierson et. al. published *A Large Scale Analysis of Racial Disparities in Police Stops Across the United States.* Their research was based on nearly 100 million traffic stops carried out by 21 state patrol agencies and 35 municipal police departments over nearly a decade. They concluded:

> "Relative to their share of the residential population, we found that black drivers were, on average, stopped more often than white drivers.... Among stopped drivers, we found that black and Hispanic individuals were, on average, searched more often than White individuals.... Our analysis provides evidence that decisions about whom to stop and, subsequently whom to search are biased against black and Hispanic drivers." (pgs. 5-16).

Although this preliminary Virginia traffic stop analysis identified disparities in traffic stop rates related to race/ethnicity, it does not allow us to determine or measure specific reasons for these disparities, nor does it allow us to parse out what may be disparities due to bias-based profiling from other possible factors.

Previous research has identified various factors that could contribute to why members of a racial/ethnic group may be stopped at a higher or lower rate than their presence in the population, including:

- Bias (explicit or implicit) by law-enforcement officers towards a racial/ethnic group.

- Different driving rates or patterns by different racial/ethnic groups (perhaps linked to differences in housing or employment locations, in use of public transportation, etc.).

- Different rates of policing in different areas (minorities may be more likely to drive in or through higher crime areas, which are policed more than other areas).

- Different agency practices (some LEAs differ on how much discretion they give officers in deciding when to make a stop).

The Virginia Department of Criminal Justice Services did not attempt to make a judgement about what Disparity Index (DI) values constitute a "good" or a "bad" degree of overrepresentation. The DI is a way of showing that a disparity existed and, to some extent, the relative degrees of disparity that existed between different LEAs. DCJS also did not attempt to determine what DI values constitute statistically significant values. A DI of 2.5 indicates a greater degree of disparity than a DI of 1.5, but at this preliminary stage in the

**JA0565**

data collection, reporting and analysis, this is a descriptive difference, not a statistically significant difference.

The Community Policing Act directed DCJS to obtain driver traffic stop data "*for the purposes of analyzing the data to determine the existence and prevalence of the practice of bias-based profiling and the prevalence of complaints alleging the use of excessive force.*"

Although the analysis showed that Black and Hispanic drivers were stopped at higher rates than White drivers, and tended to have more negative outcomes once stopped, the current analysis does not tell us *why* these disparities exist. This is not unique to Virginia. A review of research done by other states and by academics shows that identifying the reasons for these disparities is difficult.

The overriding challenge to empirically determining to what extent bias-based profiling may be contributing to these disparities is what is referred to as the "benchmark problem." To help determine if bias is a factor in driver stops, one would need to be able to compare the proportion of stops made for each racial/ethnic group to the appropriate benchmark: the number of drivers in each racial/ethnic group who are actually driving on the road and subject to being stopped. No one has yet found an accurate way to do this.

This analysis, and analyses conducted in other states, used each racial/ethnic group's proportion of the resident population as a benchmark for measuring traffic stop disparities. However, resident population provides, at best, a crude measure of exposure to traffic stops. A given racial/ethnic group's proportion of the resident population age 15+ in a locality is not the same as that group's proportion of the *driving* population in that locality. The driving population for a group is what is exposed to potential traffic stops, not the entire age 15+ residential population. Some residents do not drive at all. They may be incapable of driving, not have a driver's license or a motor vehicle, or simply choose not to drive. Not all residents of a locality drive. Others may drive, but rarely. In some localities, some racial/ethnic groups may be more likely than others to use public transportation rather than drive.

Transient drivers also complicate comparisons of stopped drivers with the demographics of the resident driver-age population. A locality may have a small number of Black residents, but a large number of Black drivers from other localities that regularly drive through or into that locality (for example, someone living in one locality but driving daily into another locality where they work). Therefore, a much higher number of Black drivers could be subject to traffic stops than there are in the Black resident population to which these drivers are compared. This could drastically inflate the calculated disparity rate for the agency serving this locality. Examples of extreme DIs likely due to this issue were pointed out in the report section presenting the analysis of agency-level traffic stop data.

Virginia is not alone in its search for better approaches to using traffic stop data to look for indicators of bias-based profiling. Previous research examining traffic stop data has highlighted that racial/ethnic disparities exist, and found indications that bias-based profiling plays a role in these disparities. The problem is finding a method of determining how much of this disparity may be due to bias and how much may be due to other factors:

> "Our inability to devise a universally acceptable method for measuring racial and ethnic proportions within an ever-changing driving population remains one of the most controversial methodological challenges in racial profiling research…. Racial profiling studies based on poorly constructed benchmarks cause political and public relations problems and sometimes result in ill-fated legislation." (Withrow and Williams, 2015, p.1).

> "Most of the analyses reported show that police traffic stops are not proportional to the racial distribution of that jurisdiction's resident population, but most studies do not conclude that the police are engaged in racial profiling." (McMahon et. al., 2002, p. 1)

JA0566

The U.S. General Accounting Office reviewed available data on bias in traffic stops from Florida, Maryland, New Jersey, and Pennsylvania, and concluded:

> "The quantity and quality of information that these analyses provided varied, and the findings are inconclusive for determining whether racial profiling occurred. Although inconclusive, the cumulative results of the analyses indicate that in relation to the populations to which they were compared, African Americans in particular, and minorities in general, may have been more likely to be stopped on the roadways studied.... These limitations notwithstanding, we believe that in order to account for the disproportion in the reported levels at which minorities and Whites are stopped on the roadways, (1) police officers would have to be substantially more likely to record the race of a driver during motorist stops if the driver was a minority than if the driver was White, and (2) the rate and/or severity of traffic violations committed by minorities would have to be substantially greater than those committed by Whites. We have no reason to expect that either of these circumstances is the case (U.S. General Accounting Office, 2000, pgs. 4, 9).

Some researchers have identified methods that allow for a better understanding of the factors that can confound measures of traffic stop disparities, and these include:

- Comparing the percentages of traffic stops made for each driver racial/ethnic group during daylight hours to those of drivers stopped during nighttime hours.

- Comparing the percentage of traffic stops made for drivers in each racial/ethnic group to the percentage of these drivers involved in traffic accidents.

- Comparing how often contraband is found when searchers are made involving stopped drivers in each racial/ethnic group.

- Comparing data on the how many drivers in each racial/ethnic group are residents or non-residents of the locality in which the traffic stop was made.

- Identifying traffic stops in which the role of bias-based profiling may be minimal or nonexistent.

Virginia could use the methods above to improve its traffic stop data collection, reporting and analysis. How this could be done is discussed in the following Conclusions and Recommendations section.

# Conclusions and Recommendations

The overall finding of this analysis is that, statewide, Black and Hispanic drivers in Virginia were disproportionately stopped by law enforcement when compared to other drivers, based on the number of drivers stopped relative to their numbers in Virginia's population. This type of disparity was seen among traffic stops made by many individual law-enforcement agencies for which disparity measures could be calculated. Stops of Black and Hispanic drivers were also more likely to result in a search or an arrest. This finding is consistent with traffic stop research conducted in other states.

Although this preliminary Virginia traffic stop analysis identified disparities in traffic stop rates related to race/ethnicity, it does not allow us to determine or measure specific reasons for these disparities. Most importantly for this study, it does not allow us to determine the extent to which these disparities may be due to bias-based profiling or due to other factors that can vary depending on race or ethnicity.

To improve Virginia's ability to determine the existence and prevalence of bias-based profiling and the prevalence of complaints alleging the use of excessive force, the Virginia Department of Criminal Justice Services makes the following recommendations:

Currently, researchers have no precise measure of how often drivers of a given racial/ethnic group drive in their communities. Within each racial/ethnic group's population in a locality, some individuals do not drive at all; they may be incapable of driving, not have a driver's license or a motor vehicle, or simply choose not to drive even if they can. Others may drive, but rarely, and others still may be more likely to use public transportation than drive. Additionally, many localities have high numbers of drivers from different racial/ethnic groups who are passing through the locality – and subject to being stopped – but who are not residents and therefore are not counted in the localities' resident population figures. These nonresident driver stops can skew measures of traffic stop disparities for such localities.

> **RECOMMENDATION 1:** The percentages and Disparity Indexes (DIs) presented in this preliminary report should not be interpreted to indicate that any individual law-enforcement agency is practicing bias-based profiling. Given the limitations noted above, these figures should only be used to identify where the numbers indicate that certain ethnic/racial groups are being disproportionately stopped, which may bear further review to identify why this is occurring and whether any action should be considered to reduce or eliminate it.

Finding an appropriate benchmark to represent the actual driving population for any given racial/ethnic group is a problem that limits all traffic stop research, not just Virginia's efforts. Some researchers have identified methods that can allow for better (but not exact) ways of examining the extent to which bias-based profiling may play a role in driver stops, or can at least help remove some of the confounding factors that make it difficult to determine the roles that profiling may play. These methods, described below, could be applied in Virginia's analysis of traffic stop data, but would require additional driver stop information not currently collected under the Community Policing Act. Specific recommendations for additional information to be collected in accordance with the Act are listed below. In addition, as noted in Recommendation 7, the state may wish to consider allocating additional resources to law-enforcement agencies, particularly smaller agencies, to assist with the collection of existing and future data elements required under the Community Policing Act.

- *Comparing the percentages of traffic stops made for each driver racial/ethnic group during daylight hours to those of drivers stopped during nighttime hours.* This approach assumes that, during nighttime hours, law-enforcement officers would be less likely to discern the race/ethnicity of drivers they decide to stop than during daylight hours. If this is true, disparities based on driver race/ethnicity should occur less frequently in stops made during nighttime hours than in stops made during daylight

**JA0568**

hours. Research in other states has found evidence that non-White drivers are stopped less often during nighttime hours—when their race/ethnicity is less visible to law-enforcement officers.

**RECOMMENDATION 2:** Collect data on the time of day at which each traffic stop was made, and add this data to the CPA database. This data would allow DCJS to analyze traffic stop data by comparing disparities in driver stops made during hours of daylight and nighttime.

- *Comparing the percentage of traffic stops made for drivers in each racial/ethnic group to the percentage of these drivers involved in traffic accidents.* Research has shown that the racial/ethnic makeup of accident-involved drivers provides a better representation of the actual driving population than the racial/ethnic makeup of the resident driving-age population.

  **RECOMMENDATION 3:** Collect data on the race/ethnicity, age, and gender of drivers involved in traffic accidents in each Virginia locality. (It would not be necessary to collect personally identifiable information on the driver, only the demographic data.) How and where this data would be collected and stored would need to be determined, but the data would need to be maintained in a way that would allow DCJS to compare it with traffic stop data for each locality.

- *Comparing how often contraband is found when searches are made involving stopped drivers in each racial/ethnic group.* Research in other states has found that contraband "hit rates" are lower for non-White drivers than for White drivers. This may indicate that officers are making decisions to search non-White drivers based on a lower evidentiary bar than for searches of White drivers, *suggesting* that racial/ethnic bias may have been a factor when making search decisions.

  **RECOMMENDATION 4:** Collect data on searches made for contraband during traffic stops, and the results of the searches, and add this data to the CPA database.

- *Comparing data on how many drivers in each racial/ethnic group are residents or nonresidents of the locality in which the traffic stop was made.* This would allow DCJS staff to better understand the extent to which the resident driving-age population of a locality represents the actual driving population in the locality.

  **RECOMMENDATION 5:** Collect data on the residence of drivers involved in traffic stops, and add this data to the CPA database. This might be done using data collected from the driver's license.

- *Identifying traffic stops in which the role of bias-based profiling may be minimal or nonexistent, so these stops can be eliminated from the DCJS traffic stop analysis when appropriate.* These could include traffic stops made based on checkpoints or roadblocks, or made using electronic devices such as Radar, Laser, Light Detection and Ranging (LIDAR); Visual Average Speed Computer and Recorder (VASCAR); and license plate readers.

  **RECOMMENDATION 6:** Collect data on the method by which the traffic stop was initiated, to distinguish stops in which an officer's observation of the driver's race/ethnicity could have played a role from stops in which it would be less likely to play a role. Add this data to the CPA database.

*Additional Recommendations*

**RECOMMENDATION 7:** Virginia should examine the need to provide resources to smaller law-enforcement agencies that had difficulty implementing the CPA data collection and reporting requirements. Assistance could be provided in several ways, such as helping these agencies train staff on reporting requirements and practices, and providing them with more effective data collection tools such as a statewide electronic summons application.

**JA0569**

**RECOMMENDATION 8:** Virginia should examine the feasibility of obtaining more accurate data on the race and ethnicity of drivers who are involved in law-enforcement traffic stops. Under the CPA, law-enforcement officers now have two methods for determining the race/ethnicity of a driver: officers must either make their own determination about a driver's race/ethnicity (which may or may not be accurate) or ask for that information in the course of the traffic stop, which could raise constitutional concerns or escalate the perception of conflict in certain situations. Virginia does not collect and store information about a driver's race or ethnicity.

**RECOMMENDATION 9:** Virginia should examine the feasibility of collecting data on the race/ethnicity of the law-enforcement officers making traffic stops, and adding it to the CPA database. This would allow DCJS staff to assess whether there are indications that the race/ethnicity of the officer making a stop is related to racial/ethnic disparities in stops.

**RECOMMENDATION 10:** DCJS staff should conduct additional research on methods for calculating driver racial/ethnic disparities for agencies serving towns. Currently, the resident driving-age population data needed to examine stops by these agencies is limited, and DCJS staff should determine if this data, or other suitable data, is available. Similarly, DCJS staff should examine whether it is feasible to reliably assess traffic stop disparities for "other" agencies that do not have stable, defined resident population figures.

**RECOMMENDATION 11:** DCJS staff should continue to work with VSP to determine how data on complaints of excessive use of force can be collected in a manner that allows for an examination of bias-based profiling in use of excessive force cases.

# Appendices *(available online)*

APPENDIX A:
*Traffic Stop Table for Virginia State Police*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-A_CombinedVSP_TrafficStopReport.pdf

APPENDIX B:
*Traffic Stop Tables for Law-Enforcement Agencies Serving Cities and Counties*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-B_152CityCounty.pdf

APPENDIX C:
*Traffic Stop Tables for Law-Enforcement Agencies Serving Towns*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-C_108Town.pdf

APPENDIX D:
*Traffic Stop Tables for Other Law-Enforcement Agencies*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-D_44Other.pdf

APPENDIX E:
*Law-Enforcement Agencies Not Reporting Traffic Stop Data*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-E.pdf

APPENDIX F:
*Bias-Based Profiling Legislation (HB 5030) Effective July 1, 2021*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-F.pdf

APPENDIX G:
*VSP Community Policing Data Collection Instructions and Technical Specifications (Version 3)*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-G.pdf

APPENDIX H:
*Notes on Disparity Index (DI) Calculation Methodology*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-H.pdf

APPENDIX I:
*Use of Force Data*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-I.pdf

APPENDIX J:
*References*
https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/cpad-appendices/Appendix-J.pdf

# RACIAL PROFILING?
# A MULTIVARIATE ANALYSIS
# OF POLICE TRAFFIC STOP DATA

**MICHAEL R. SMITH**
*Virginia Commonwealth University*

**MATTHEW PETROCELLI**
*California State University–Hayward*

*Despite the significance of racial profiling as an issue of national concern, little empirical research exists on whether police traffic stop practices disproportionately impact minority drivers. Using data from 2,673 traffic stops conducted by the Richmond, Virginia, Police Department in 2000, this article explores the treatment by police of motorists of different races and ethnic backgrounds. Minority citizens in general, and African Americans in particular, were disproportionately stopped compared with their percentage in the driving-eligible population. However, they were searched no more frequently than Whites; in fact, Whites were significantly more likely than minorities to be the subjects of consent searches. Compared with Whites, and after controlling for variables, minority drivers were more likely to be warned, whereas Whites were more likely to be ticketed or arrested. Examining officer race as a predictor revealed White officers were no more likely than minority officers to stop, search, or arrest minority drivers.*

Racial profiling is one of the most significant issues in American law enforcement today. The question of whether police intentionally target persons because of their race is increasingly being debated by law enforcement officials, civil rights groups, and ordinary citizens. Equally troubling in the eyes of many are aggressive police traffic stop (or stop and frisk) practices that may have a disparate impact on minorities even if they are not intentionally discriminatory. At least 10 states have passed laws requiring their law enforcement agencies to begin collecting data on the racial demographics of

*POLICE QUARTERLY* Vol. 4 No. 1, March 2001   4–27
© 2001 Sage Publications

from the SAGE Social Science Collections  All Rights Reserved

motorists stopped by the police, and similar legislation has been introduced or is pending in a number of other states. Currently, U. S. Representative John Conyers (D-Michigan) is sponsoring the proposed Traffic Stops Statistics Act that would mandate the collection of race-related traffic stops data by all state and local law enforcement agencies.

Beginning in January 2000, the Richmond, Virginia, Police Department began collecting traffic stop data for the purpose of examining whether minorities were being disproportionately stopped, searched, or arrested by the Richmond police. Some of these data now serve as the basis for this article. In the article's first section, we briefly review the literature on the general treatment of minorities by police and on racial profiling specifically. The second section of the article describes in detail the methodology used to collect and analyze the data for this project. The third section presents the results of our analysis, and the article's final section is devoted to a discussion of our findings and of their implications for policy and future research.

## BACKGROUND ON RACIAL PROFILING AND
## ON THE TREATMENT OF MINORITIES BY POLICE

### RACE AND POLICING

Historically, minorities, and particularly African Americans, have had physical force used against them or have been arrested or stopped by police at rates exceeding their percentage in the population. Although the ratio of African Americans to Whites shot by the police has fallen in recent years, Blacks still outnumber Whites as victims of police gunfire by a ratio of 3:1 (Geller & Scott, 1992; Sherman & Cohn, 1986). Worden's (1995) analysis of data from the Police Service's Study found that police officers were most likely to use force against male African American suspects, who were overrepresented among all targets of police use force. However, recent use of force studies have found no correlation between suspect race and the frequency or amount of force used by police (Alpert & Dunham, 1999).

Even though African Americans comprise only 13% of the U.S. population, they accounted for nearly 30% of the total 1998 arrests, along with accounting for nearly one third of all property crime arrests and approximately 40% of all violent crime arrests (Federal Bureau of Investigation, 1998). Hepburn (1978) found that prosecutors were more likely to decline prosecutions involving African Americans than Whites, suggesting that more Blacks than Whites were arrested under conditions that would not

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 106 o

se 3:21-cr-00042-JAG   Document 72-2   Filed 04/22/22   Page 3 of 24 PageID# (

support formal prosecution. Examining data such as these, some have argued that the disparate treatment of minorities is the result of systemic discrimination by the criminal justice system (Mann, 1993). Others have found that race is usually not a factor in criminal justice processing and sentencing when all legal variables are taken into consideration and statistically controlled (Russell, 1998; Tonry, 1995; Wilbanks, 1987).

Long before racial profiling during traffic stops rose to the forefront of public concern, police stop and frisk practices were a consistent source of friction between police and minority communities. As early as 1975, disproportionate stops of minorities were documented in San Diego, California (Boydstun, 1975). In recent years, the Christopher Commission (1991) found that the aggressive stop and frisk practices of the Los Angeles Police Department were a significant contributor to the preriot tensions between police and citizens in Los Angeles.

RESEARCH ON RACIAL PROFILING

Despite the perception among minorities of uneven treatment at the hands of police (Kennedy, 1997; Mann, 1993; "Report of the National Advisory Commission," 1968), empirical research on racial profiling is quite limited. One of the most comprehensive and methodologically sophisticated studies on racial profiling examined the stop and frisk practices of the New York City Police Department (NYPD) from January 1998 through March 1999 (New York Attorney General's Office, 1999). Researchers in this study found that although Blacks comprised only 25.6% of New York City's population, they accounted for 50.6% of all persons stopped by the NYPD. Hispanics were also overrepresented among persons stopped (23.7% of the population; 33% of persons stopped), whereas Whites were significantly underrepresented (43.4% of the population; 12.9% of persons stopped). Using Poisson regression, the researchers controlled for the different rates at which minorities commit criminal offenses (as measured by arrests) and still found that Blacks (23% more) and Hispanics (39% more) were stopped more frequently than Whites across all crime categories. Interestingly, minorities were stopped more often than Whites on suspicion of committing a violent crime and less frequently than Whites on suspicion of committing a property crime.

In December 1999, the San Jose (California) Police Department released the results of an analysis that it conducted of traffic stops in San Jose from July through September 1999. In San Jose, Hispanics make up 31% of the

city's population and accounted for 43% of the persons stopped by police during the study period. Blacks were stopped at slightly higher rates than their population would suggest (4.5% of the population; 7% of persons stopped), whereas Whites (43% of the population; 29% of persons stopped) and Asians (21% of the population; 16% of persons stopped) were under-represented among motorists stopped. The San Jose Police Department accounted for the higher stop percentages among Blacks and Hispanics by pointing out that more police officers are assigned on a per capita basis to minority areas of the city (because of a greater volume of calls for service) as compared with predominantly White areas of the city (San Jose Police Department, 1999).

As the result of litigation over the discriminatory traffic stop practices of New Jersey State Troopers, the State of New Jersey undertook a study of the stop and search activities of troopers in two state police districts. Examining the stops that occurred from April 1997 through February 1999, and including most of 1996 and a few months from 1994, a New Jersey Attorney General's team found that 627 of the 87,489 traffic stops involved a vehicle search. Of those searches, 77.2% involved Black or Hispanic motorists. During a similar time period, only 33.9% of the total traffic stops made in the two districts were of Blacks and Hispanics ("Interim Report of the State Police Review Team," 1999).

Similar search disparities were found by Lamberth (1997) in his study of the stop and search practices of the Maryland and New Jersey State Police. In a visual survey of traffic violators along the I-95 corridor through Maryland, Lamberth found that 17.5% of the speeding violators were Black, whereas 74.7% of the violators were White. However, of the 823 motorists searched along I-95 from January 1995 through September 1996, 600, or 72.9%, were Black. In other words, Blacks were being stopped and searched far more frequently than the rate at which they were speeding along the interstate.

Using municipal court records from Akron, Dayton, Toledo, and Columbus, Ohio, Harris (1999) examined racial profiling among police in those jurisdictions. Comparing the court record violator rates of Blacks and Whites with their percentage in the Ohio driving population, Harris found that Blacks were at least twice as likely as non-Blacks to be ticketed by police. However, in a recent report released by the Florida Highway Patrol, Florida troopers were found to have stopped Whites, Blacks, and Hispanics in the State of Florida at rates roughly equivalent to their percentages in the population. During the first 4 months of 2000, Blacks constituted 15.7% of

persons stopped and represented 13.6% of the Florida population. Hispanics were somewhat overrepresented among persons stopped, accounting for 17.9% of the stops but only 12% of the population. Whites were stopped at rates nearly identical to their overall percentage in the population (Florida Highway Patrol, 2000).

Most recently, a Vehicle Stop Study from the San Diego (California) Police Department has become available (San Diego Police Department, 2000). Using census data for comparison purposes, the researchers in that study found that both African Americans and Hispanics were overrepresented among persons stopped, searched, and arrested by the San Diego Police. They point out, however, that because of San Diego's proximity to Mexico, census data on the driving-eligible population may not be accurate and may significantly underrepresent the percentage of Hispanic drivers in San Diego.

With the exception of the New York study, most of the existing research on racial profiling has been descriptive in nature and has been conducted by law enforcement agencies or interest groups. This research has not been subjected to peer review, nor has it been published in academic or scholarly journals. In addition, none of the prior studies on racial profiling located during this literature review examined officer race as a predictor variable. Although to varying degrees all of the studies found that minorities were stopped or searched in percentages greater than their population or involvement in crime or traffic violations would warrant, none of the studies was able to determine whether these differential stop and search rates were the result of differential treatment of minority citizens by White officers. Some of the analyses in this article correct for this shortcoming by taking into account officer race as a potentially explanatory variable in traffic stop situations.

## DATA, METHODS, AND LIMITATIONS

Traffic stop data collection began in Richmond on January 17, 2000. All officers equipped with mobile data computers (MDCs) in their automobiles were required to enter preselected traffic stop data directly into their laptop computers. These data were captured by the city's Department of Information Technology, and ultimately, 6 weeks' worth of data (February 14 to March 31, 2000) were made available for analysis.[1] Below is a list of the fields that were captured during the data collection effort (see Table 1). A complete description of the data fields can be found in the appendix. For

Smith, Petrocelli / RACIAL PROFILING? AN ANALYSIS                    9

**TABLE 1.   Traffic Stop Data Fields Collected by Richmond, Virginia, Police From February 14 to March 31, 2000**

| Driver Fields | Event Fields | Officer Fields |
|---|---|---|
| Age | Time of stop | Age |
| Race | Reason for stop | Race |
| Gender | Location of stop | Gender |
| | Disposition of stop | Years of service |
| | Search conducted? | |
| | Type of search | |

officers, age and years of service were captured on an ordinal scale. This was done to further assure the anonymity of individual officers. In addition to the below-listed case-based information, census tract–level data also were collected that included the population racial demographics and reported crime for each of the city's 70 census tracts. These data served as the basis for several analyses, the results of which appear below.

With the exception of specialty vehicles such as motorcycles or rental cars, all Richmond police cars were equipped with MDCs. The city estimates that no more than 110 out of the 4,329 traffic stops made during the 6-week period for which data were provided involved non-MDC equipped police vehicles. Furthermore, a comparison of the city's computer-aided dispatch (CAD) records with the officer-initiated data entries showed that officers complied with the data collection protocol in approximately 64% of the traffic stops made during the 6-week period for which data were obtained. For the remaining 36% of traffic stops that were conducted during the February 14 through March 31, 2000, time period, no profiling data were entered by the officers.

Given the sensitive nature of the study and the number of traffic stops made daily, a 64% response rate was somewhat higher than expected. Nonetheless, the missing data represent a potentially different pool of traffic stops, and so our findings should be interpreted with caution. As racial profiling continues to be the focus of public debate, more research will hopefully become available against which to compare the findings from this study.

The city's driving-eligible population (age 16 and over) served as the main comparison group for our analysis. Because this study analyzed traffic stop data, an obvious population against which to make demographic comparisons would have been the city's population of licensed drivers.

**JA0577**

However, demographic information was not available from the Virginia Department of Motor Vehicles for this population. Instead, U.S. census data on the city's population of persons 16 years of age and older was used as a proxy because persons must be at least 16 years old in Virginia to obtain a driver's license. According to the 1990 census, the Richmond Police Department serves a city whose population of persons 16 years of age and older is 51% Black, 48% White, and 1% persons of other races.

Of course, the 1990 census is now 10 years old and soon will be replaced by the 2000 census. Nevertheless, it was the most readily available data on which to base the analyses contained in this article. Although Richmond has not appeared to have undergone any large-scale demographic or economic shifts in the past 10 years, it is possible that the racial make-up of the city may have changed since 1990. If previous trends hold true, the city's current population has likely become slightly smaller and is composed of a greater percentage of minorities (predominantly African Americans) as compared with 1990. Because minority groups other than African Americans comprise such a small percentage of the city's population (less than 3,000 people), they were sometimes combined for analytical purposes with the African American population into a category labeled "All Minorities."

Several additional limitations to the data should be acknowledged. To begin with, the duration of the period for which data were provided for analysis was fairly short (6 weeks). Although we have no reason to believe that the data are unrepresentative, a longer data collection period would have been preferable and would have accounted for potential seasonal variations in traffic stop practices. Second, the data analyzed for this article were obtained from officer self-reports. Although self-reports are a common source of information in criminal justice and police research (Garner, Buchanan, Schade, & Hepburn, 1996; Garner & Maxwell, 1999; Snyder & Sickmund, 1999), the sensitive nature of these data heightens concern over their validity.

As a result, subject reactivity (Neuman, 1997) remains a distinct threat to the validity of our findings. Given the publicity surrounding the issue of racial profiling, police officers will likely be suspicious of any traffic stop data collection effort that requires them to record information on driver race. However, because we know of no practical method for surreptitiously collecting traffic stop profiling data, agency-generated records will continue to be the only viable source of data for profiling research. In this case, the Richmond Police Department made a good faith effort to assure officers that the information reported would not be used against them for

disciplinary purposes. In fact, the chief of police and a department attorney met with all of the patrol roll calls before the study began to explain its purpose and to allay any fears that the data collected would be used to target individuals for punishment. These efforts were specifically designed to increase compliance with the data collection protocol and to improve the accuracy of the information gathered.

More important, our analyses do not include baseline data on the percentage of minority and White motorists actually driving within the city of Richmond or on the percentage of traffic violations committed by persons of the various races. Instead, we compare stop percentages of racial groups with their prevalence in the 16-and-over population. Although it is possible that minorities commit more traffic violations per capita than Whites, thus helping to explain a higher minority stop rate, this possibility appears unlikely.

To begin with, Lamberth's (1997) racial profiling studies in New Jersey and Maryland, which used field observation to catalogue driver and violator race on I-95, found that Blacks and Whites violated traffic laws (speeding) at the same rates (Harris, 1999). Furthermore, self-report measures have consistently shown that minorities commit minor crimes and delinquent acts at approximately the same rates as Whites (McNeely & Pope, 1981; Snyder & Sickmund, 1999). Given that traffic violations are perhaps the most minor of offenses, the available evidence suggests that total traffic infractions will be distributed among minorities and Whites in approximately the same proportions as these racial groups are constituted within a given population.

Whether Blacks and Whites actually drive in proportion to their populations within the city of Richmond is an open question and cannot be answered with the available data. However, absent the availability of accurate, baseline operator and traffic violator data by race, the driver's license-eligible population within Richmond appears to be a logical group against which to compare the demographics of those stopped by the Richmond police.

In fact, comparisons using census data will likely continue to be the norm in racial profiling research. Establishing baseline operator and violator data is time consuming, expensive, and may be no more accurate than using census data. Lamberth (1997), for example, used "rolling" surveys to identify the race of operators and speeding violators along a defined stretch of I-95. However, establishing these figures for one portion of the interstate does not mean that other stretches of the same or a different interstate within the same state will yield the same results.

TABLE 2.  **Racial Breakdown of Traffic Stops and Driving-Eligible Population in Richmond, Virginia, From February 14 to March 31, 2000**

|  | No. of Stops | Percentage of Total Stops | Percentage of Driving Population | Difference |
|---|---|---|---|---|
| Whites | 859 | 32.1 | 48.0 | −15.9 |
| Blacks | 1,717 | 64.2 | 50.6 | 13.6 |
| All minorities[a] | 1,814 | 67.9 | 51.9 | 16.0 |

a. Includes Blacks, Hispanics, Asians, Native Americans, and Middle Easterners.

Moreover, establishing baseline rates for a large county or municipality is even more difficult due to the extreme variations in racial composition between different geographic areas or neighborhoods within the same political subdivision. Unlike an interstate highway, cities are not defined areas of physical space with limited and controlled access. In addition, observational strategies, such as the one used by Lamberth (1997), are suspect. Driver race can only be observed during daylight hours, and even then, the accuracy of such observations is questionable. Physical differences between persons of different racial or ethnic groups are not always easily discernible, particularly when the person being observed is driving by in an automobile. How does a researcher distinguish between a person of Italian versus Hispanic descent, or a dark-skinned person of Arab descent from an African American? Because of the difficulties in gathering accurate baseline data, researchers will likely continue to use census data as a proxy for actual operator and violator data.

ANALYSIS

RACE AND THE DECISION TO STOP

Table 2 shows the racial breakdown by percentages of the 2,673 traffic stops included within the sample. Both Blacks and minorities in general (including Blacks) were stopped more frequently by the Richmond police than their relative percentages in the population. Blacks comprise 51% of the city's 16-and-over population but accounted for 64.2% of the motorists stopped. The city's combined minority population 16 and older is 52%, but minorities made up more than two thirds of the stopped motorists. Across all census tracts, the average Black stop rate of 57 stops per 1,000 Black

**JA0580**

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 113 o

citizens was 46% higher than the average White stop rate of 39 stops per 1,000 White citizens.

As in most of the previous studies on race and traffic stops by police, the available data (with their limitations) indicate that minority citizens in Richmond are stopped more frequently on a per capita basis than White citizens. The San Jose Police Department (1999) argued that minorities were over-represented among persons stopped because more police officers were assigned to minority areas than White areas, thus increasing the likelihood of police-citizen encounters. A greater police presence in minority neighborhoods is needed, according to the San Jose report, because of the higher volume of calls received from such neighborhoods.

The question of whether a higher concentration of police in minority neighborhoods explains the disparity in White and minority stop percentages in Richmond is difficult to answer. Patrol personnel are deployed throughout the city of Richmond according to beat assignment. Police beats frequently cut across census tract boundaries and often encompass all or parts of several census tracts. Determining whether more patrol officers are assigned to predominantly minority areas of Richmond than to predominantly White areas would require accurate demographic data at the police beat level. Unfortunately, these data do not exist.

However, an examination of the available census tract data reveals that neither the number of overall stops (Pearson's $r = .177$, $p = .142$) nor stop rates (Pearson's $r = -.113$, $p = .353$) is correlated with the percentage of African Americans living within the 70 census tracts. Although beat-level demographics may be different, census tract data show no increase in traffic stops as the Black population increases, as one would expect if more Richmond police officers were deployed in heavily minority neighborhoods compared with predominantly White neighborhoods. Again, definitive conclusions about the effect, if any, of police deployment practices on racial stop percentages cannot be drawn without beat-level demographic data.

One of the most troubling aspects of racial profiling is the singling out of minorities for stops based solely on their suspected involvement in criminal activity. Implicit in this alleged practice is the disproportionate involvement of White officers in stopping minority drivers. Table 3 presents a logistic regression analysis of the salient variables that might potentially predict the race of a stopped motorist. Variables in the model include the time of the stop, whether the stop was for investigatory purposes (based on "suspicion"), the Part I crime rate (per 1,000 population) of the census tract where

TABLE 3.   Factors Predicting Stopped Driver's Race in Richmond, Virginia, From February 14
to March 31, 2000 ($N = 2,673$)

| | Driver Race [a] | | |
| --- | --- | --- | --- |
| | B | Significance | Odds Ratio |
| Time of stop | −.017** | .006 | 0.983 |
| Investigatory stop | −.306 | .181 | 0.736 |
| Crime rate | .000 | .392 | 1.000 |
| Officer gender [b] | −.493** | .004 | 0.611 |
| Officer age | .252** | .000 | 1.287 |
| Officer years of service | .041 | .437 | 1.042 |
| Officer race [a] | .189 | .091 | 1.207 |

Note: Model chi-square = 117.812, $p < .01$. Nagelkerke R-square = .066.
a. 0 = minority, 1 = White.
b. 0 = female, 1 = male.
**$p < .01$.

the stop occurred, and the race, age, gender, and years of service of the offi-
cers making the stops.

Significant predictors in the model included the time of the stop, officer
gender, and officer age. The time at which the stop occurred was negligibly
associated with the race of the motorist stopped. In contrast, officer gender
was much more strongly associated with motorist race. Overall, female offi-
cers stopped 104 minority drivers and 71 White drivers, yielding a minority-
to-White stop ratio of 1.46:1. In contrast, the minority-to-White stop ratio
among male officers was significantly higher at 2.17:1 (1,710 minority driv-
ers stopped vs. 788 Whites). The odds ratio from Table 3 illustrates this dif-
ference. All things being equal, a stop made by a male officer decreased the
likelihood that the driver would be White by 39%.

Officer age was positively correlated with driver race. The distribution of
stops among the various officer age groupings shows a clear pattern of older
officers stopping more White drivers relative to younger officers. For exam-
ple, officers in the 46 to 50 age group stopped more White drivers than
minority drivers (116 Whites, 72 minorities). This pattern was reversed
among officers in the 26 to 30 age group who stopped more than 3 times as
many minority motorists as White motorists (838 minorities, 275 Whites).
Thus, the logit model in Table 3 indicates that as officer age increased, the
odds that the driver stopped would be White also increased by 28.7%.

As with the disparity between Black and White stop percentages, police
deployment patterns may explain the differences found between male and

female officers and between younger and older officers. It is not uncommon for younger, male officers to be assigned to a city's high-crime areas (Walker, 1999). Historically, female officers have been viewed as physically and emotionally weaker than their male counterparts and thus unable to handle the rigors of uniformed patrol (Martin, 1980). For the same reasons, older officers also may be assigned to beats that are viewed as quieter and less demanding.

In Richmond, the average Part I crime rate (per 1,000 population) is 45% higher in majority African American census tracts compared with majority White census tracts. If Richmond police deployment practices reflect the considerations discussed above, then one would expect to find female and older officers disproportionately assigned to areas of the city that are populated by relatively fewer minorities because such areas are thought to have less crime and produce fewer calls for service. Such deployment practices would explain the differences seen in the logistic regression analysis between older officers and younger officers and between male and female officers. More research is needed to further explore these differences.

Significantly, neither officer race nor whether the stop was made for investigatory purposes predicted the race of the stopped motorist. Thus, the data offer no support for the proposition that minorities were disproportionately targeted for suspicion-based stops by the Richmond police, as for example, occurred in New York City (New York Attorney General's Office, 1999). The significance level for the officer race variable was well above the accepted cutoff level in the social sciences of .05. Even if it were closer to the .05 level, the direction of the association between officer and driver race was positive, indicating that the involvement of a White officer actually increased the odds that the driver also would be White rather than a minority. Although these findings provide an interesting contrast with previous studies, they should be regarded as preliminary until further research with better data controls can be undertaken.

RACE AND THE DECISION TO SEARCH

Out of the 2,673 traffic stops recorded during the 6-week data collection period, officers reported conducting searches in 211, or 7.9%, of stops. Minorities were searched 8.3% of the time when stopped, which was not significantly different (chi-square = 1.093) than the percentage of Whites who were searched (7.1%). Given the findings from New Jersey and Maryland that minorities in those states were searched at rates far exceeding the

**TABLE 4.  Type of Search by Driver Race in Richmond, Virginia, From February 14 to March 31, 2000**

|  | Driver Race | | |
|---|---|---|---|
|  | White | Minority | Totals |
| Consent | 42 (68.9%) | 70 (46.7%) | 112 |
| Incident to arrest | 14 (23.0%) | 61 (40.7%) | 75 |
| Inventory | 0 | 10 (6.7%) | 10 |
| Pat-down | 5 (8.2%) | 9 (6.0%) | 14 |
| Totals | 100% | 100% | 211 |

rates at which they were stopped, it is important to note that the percentage of searches involving minorities in Richmond (71.1% of all searches conducted) was only slightly higher than the percentage of minorities stopped (67.9%).

Another important racial profiling issue is whether minorities are subjected to different kinds of searches compared with Whites. Specifically, were police more likely to perform consent searches on minorities for the alleged purpose of uncovering drugs or weapons? As the descriptive data from Table 4 indicate, Whites were more likely than minorities to be the subjects of consent searches and were also more likely to the subjects of pat-down searches. Minorities, on the other hand, were more likely than Whites to be searched incident to arrest or to have their vehicles inventoried.

The higher percentage of minority searches incident to arrest (compared with Whites) may be accounted for by the higher percentage of minorities subjected to criminal arrest. Minority citizens comprised 78.5% of the total number of criminal arrests ($n = 555$) made during the data collection period. Viewed another way, minorities accounted for 77.9% ($n = 352$) of the 452 traffic stops that produced at least one criminal arrest. Thus, they were far more likely than Whites to be criminally arrested and therefore potentially subjected to searches incident to arrest.[2]

Table 5 is a logistic regression model of factors predictive of consent searches. Consent searches made up approximately one half of all searches conducted by the Richmond police ($n = 112$). The type of violation (moving vs. nonmoving) and driver race were the only significant predictors of whether a consent search was conducted. Drivers stopped for a moving violation were almost 80% more likely to be the subjects of consent searches than drivers stopped for vehicle defects or for investigatory purposes. This finding is consistent with police profiling practices that use minor moving

Smith, Petrocelli / RACIAL PROFILING? AN ANALYSIS                                    17

**TABLE 5.   Logistic Regression Model of Factors Predicting a Consent Search in Richmond, Virginia, From February 14 to March 31, 2000 ($n = 211$)**

|  | Consent Search[a] | | |
|---|---|---|---|
|  | B | Significance | Odds Ratio |
| Moving violation[b] | .583* | .046 | 1.792 |
| Officer gender[c] | −.087 | .898 | 0.917 |
| Officer age | .139 | .390 | 1.149 |
| Officer years of service | −.388 | .111 | 0.678 |
| Officer race[d] | −.130 | .717 | 0.878 |
| Driver year of birth | −.015 | .229 | 0.985 |
| Driver gender[c] | −.169 | .660 | 0.844 |
| Driver race[d] | .878** | .009 | 2.406 |

*Note:* Model chi-square = 18.079, $p < .05$. Nagelkerke R-square = .110.
a. 0 = search other than consent, 1 = consent.
b. 0 = no, 1 = yes.
c. 0 = female, 1 = male.
d. 0 = minority, 1 = White.
*$p < .05$. **$p < .01$.

violations as a pretext to stop motorists and seek consent to search their automobiles (*Whren v. United States*, 1996).

However, if moving violations were used as the means for seeking consent to search, minority drivers were not the likely subjects of these searches. In fact, White drivers were almost 2½ times more likely than minority drivers to be the subjects of consent searches by the Richmond police. Officer race was not a significant predictor of a consent search.

Cultural differences between minorities and Whites, including lack of trust in the police, may explain why minorities were significantly less likely than Whites to be the subjects of consent searches. Minorities generally view the police less favorably than Whites, are less confident in the police than Whites, and are less likely than Whites to sanction police use of force (Flanagan & Vaughn, 1995). Because of these cultural differences, minority motorists in Richmond may simply have been less likely than Whites to grant consent to the police to search their automobiles.

Another potential explanation may lie in the nature of Richmond's street-level drug market. As in many cities, street-level drug dealing in Richmond is disproportionately concentrated in minority neighborhoods. White drug purchasers, many of whom drive to minority neighborhoods to obtain drugs, easily draw police attention. Patrol officers who work in these neighborhoods soon learn to be suspicious of White persons cruising the

streets of Black neighborhoods, particularly after dark. Traffic stops of such persons are common and are often accompanied by requests to search the stopped automobiles.

RACE AND THE DECISION TO ARREST

Overall, minority drivers made up 62.9% ($n = 995$) of all persons ticketed or criminally arrested during the 6-week[1] data collection period. This was slightly less than the percentage at which they were stopped (67.9%) and considerably less than the percentage at which they were arrested citywide in 1999 (81.2% of all arrests). White drivers comprised 37.1% of those ticketed or arrested during the data collection period, compared with 32.1% of persons stopped.

The ratio of stops to arrests was higher among minorities than it was for Whites. The Richmond police stopped 1.8 minorities for every ticket issued or arrest made compared with 1.5 Whites. Examining the ratio of arrests/ summonses to warnings for the various racial groups indicates that minorities were significantly more likely than Whites to be warned rather than arrested or issued a summons. Among minorities, police made 1.2 traffic or criminal arrests for every warning given, whereas among Whites the ratio was 1.95:1.

Table 6 presents a logistic regression analysis to further examine this issue. In this model, a stop was coded as 1 if any of the three possible recorded dispositions involved an arrest or a summons ($n = 1,445$).[3] A stop was coded as 0 if at least one of the dispositions was a warning and none of the other dispositions involved an arrest or summons ($n = 976$). Stops that involved neither an arrest nor a warning were coded as missing and played no role in the analysis ($n = 252$). Consequently, this model examines the 2,421 traffic stops in which officers decided between invoking a legal sanction or issuing a warning.

Significant predictors in the model included the Part I crime rate of the area where the stop occurred, officer years of service, driver year of birth, and driver race. Again, officer race was not a significant predictor of a punitive outcome. Although area crime rate and driver year of birth were statistically significant, their effect on increasing or decreasing the odds of a legal sanction was negligible at .1% and 1.1%, respectively. On the other hand, a single unit change in officer years of service increased the odds of a legal sanction by approximately 37%. Thus, more experienced officers were

**JA0586**

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 119 o

e 3:21-cr-00042-JAG   Document 72-2   Filed 04/22/22   Page 16 of 24 PageID#

**TABLE 6.  Factors Predicting Legal Sanctions or Warnings From Stops Made in Richmond, Virginia, From February 14 to March 31, 2000 ($n = 2,421$)**

|  | *Legal Sanction Versus Warning*[a] | | |
|---|---|---|---|
|  | *B* | *Significance* | *Odds Ratio* |
| Crime rate of stop location | −.001** | .001 | 0.999 |
| Officer's gender[b] | .066 | .705 | 1.068 |
| Officer's age | .032 | .439 | 1.032 |
| Officer years of service | .318** | .000 | 1.374 |
| Officer's race[c] | .031 | .768 | 1.032 |
| Driver year of birth | .011** | .001 | 1.011 |
| Driver gender[b] | −.053 | .548 | 0.948 |
| Driver race[d] | −.410** | .000 | 0.664 |

*Note:* Model chi-square = 139.986, $p < .01$. Nagelkerke R-square = .076.
a. 0 = warning, 1 = arrest/summons.
b. 0 = female, 1 = male.
c. 0 = minority, 1 = White.
d. 0 = White, 1 = minority.
**$p < .01$.

more likely than less experienced officers to write summonses or make arrests.

Previous research has found that more older, more experienced officers do less work and are generally less aggressive than younger officers with fewer years of service (Sherman, 1980). This finding suggests that as a means of workload management, more experienced officers might be less likely to write tickets or make arrests than less experienced officers. However, early work by McNamara (1967) and Niederhoffer (1967) found that cynicism among officers increases as they gain more experience. Higher levels of cynicism among experienced officers, which manifest themselves in "hard-nosed attitudes" toward the public, might account for the greater probability of a punitive disposition among more experienced officers.

The strongest correlate with a punitive disposition was driver race. A minority driver as a variable decreased the odds of a punitive disposition occurring by a third. Put another way, minority drivers were 50% more likely than White drivers to receive a warning rather than be subjected to a legal sanction.

The finding that minorities in Richmond were more likely than Whites to be warned rather than legally sanctioned is capable of several interpretations. For example, this finding may indicate that Richmond officers altered

their behavior because of the research study. Such subject reactivity (Neuman, 1997) might also explain why White officers were no more likely than Black officers to stop Black motorists. In other words, it is possible that officers "cleaned up their act" while the research was under way.

An alternative explanation for the finding that minorities were more likely than Whites to be warned by the police is that minorities may have been stopped more frequently than Whites based on weak (or nonexistent) evidence. Consistent with racial profiling practices, Richmond officers may use minor traffic infractions as a pretext to stop minority motorists; once their suspicions are dispelled, they may send those minority drivers on their way with only warnings to show for the experience. This explanation is consistent with Hepburn's (1978) conclusion that minorities were more likely than Whites to be arrested under conditions that would not support the bringing of formal charges. Similarly, Richmond officers may be more likely to stop minorities than Whites for reasons that will not support the issuance of a traffic summons.

## COMMENTARY AND SUGGESTIONS FOR FUTURE RESEARCH

Throughout this article we have acknowledged the limitations of the data used in the foregoing analyses and have cautioned that our findings must be considered preliminary. Although our findings may change with the availability of more and better data, the current data show that minority motorists in Richmond were more likely than Whites to be stopped on a per capita basis. However, after controlling for other relevant variables, officer race did not predict the race of a stopped motorist. White officers did not disproportionately stop minority drivers, nor were minorities disproportionately targeted for investigatory or suspicion-based stops. Officer age and gender were statistically significant predictors of a stopped driver's race, with younger and male officers more likely to stop minorities than older and female officers. Police deployment practices that place younger, male officers in high-crime areas heavily populated by minorities may help to explain this finding (Walker, 1999).

The data show that once stopped, minorities were no more likely than Whites to be searched by police. However, White drivers were almost 2½ times more likely than minority drivers to be the subjects of consent searches, which are frequently used by police in an attempt to locate drugs and other contraband in automobiles. Greater levels of police distrust may explain why minorities were less likely than Whites to be the subject of

consent searches (which quite obviously require consent) (Flanagan & Vaughn, 1995), as might the common practice of stopping and searching White motorists whom police suspect of purchasing drugs in minority neighborhoods.

Consistent with Niederhoffer's (1967) and McNamara's (1967) findings of higher levels of cynicism among experienced officers, Richmond officers with more years of service were more likely than less experienced officers to act punitively toward motorists. Finally, Whites were significantly more likely than minorities to be arrested or issued a ticket, whereas minorities were more likely than Whites to be let go with a warning. One explanation for this finding consistent with previous research (Hepburn, 1978) may be that minorities were more likely than Whites to be stopped for reasons that would not support issuing a summons or making an arrest.

Although the disparities in treatment between Whites and minorities were not as extreme in Richmond as in other jurisdictions, (e.g., New Jersey and Maryland), one conclusion to be drawn from the present analyses is that minorities are being disproportionately targeted for traffic stops by the Richmond police. The absence of officer race as a predictor variable in any police decision analyzed, however, suggests that if inappropriate racial profiling is occurring, then discrimination in Richmond has transcended racial boundaries and has truly become a problem for all police officers regardless of their race.

An alternative explanation for the disproportionate percentage of minority stops and warnings in Richmond is that police traffic stop practices may understandably reflect the environment in which Richmond police officers function. In 1999, African American suspects made up 89% of Richmond's 38 homicide arrests. They also accounted for 86% of the aggravated assault arrests and 90% of all robbery arrests. At least among these categories of serious violent crimes, arrest figures closely track self-report and victimization data and thus provide a reasonably accurate approximation of offending rates among racial groups (Hindelang, Hirschi, & Weiss, 1979; Menard, 1987; Osgood, O'Malley, Bachman, & Johnston, 1989; Reiss, Roth, & Miczek, 1994; Tonry, 1995).

As disturbing as these arrest figures may be, their significance is surely not lost on the average Richmond patrol officer. Experience teaches Richmond officers that most of the persons whom they arrest will be African American. Moreover, sociological explanations of minority involvement in crime such as poverty, racism, or lack of educational opportunities are largely irrelevant in the everyday working life of the cop on the street. As

Bittner (1991) pointed out, even the most completely impartial police officer "will feel reasonably justified in being more suspicious of the young-poor-Black than of the old-rich-White" (p. 38).

Under these conditions, observers of the Richmond police should not be surprised that a disproportionate percentage of the traffic stops that officers conducted during the data collection period were of African Americans. Although no reasonable person would sanction the stopping of motorists based solely on their race, the dilemma faced by communities such as Richmond is whether to condemn police officers for taking race into account among other variables when race may be a salient predictor of criminal involvement.

As discussed in the methodology section, one limitation of this study is that we did not have baseline traffic violation data available as means for comparison. The National Institute of Justice is currently funding a racial profiling study of the North Carolina State Highway Patrol that is attempting to gather traffic violator information (driver race) through systematic observation of driving behavior (Zingraff, Smith, & Tomaskovic-Devey, 2000). Such baseline data may prove useful for comparison purposes, particularly if there is a close linkage between the reason for the stop and the comparison violation data. In other words, baseline violation data would be most useful for comparison purposes if the violators who made up the study sample had committed the same traffic infraction as those who comprised the comparison population. Comparing the racial characteristics of speeders in the study sample with speeders in the comparison population would be appropriate; comparing red light violators with speeders would be less defensible.

Future researchers interested in racial profiling should also give some consideration to data-gathering techniques that do not involve agency-generated records of traffic stops. As discussed above, racial profiling is such a sensitive issue, both for individual officers and for law enforcement agencies, that the threat of reactivity and bias from official traffic stop records is perhaps an even greater concern than with other kinds of police-generated data. Comparing official traffic stop records to field observations by independent researchers might be a useful strategy in identifying discrepancies, if any, between actual practice and agency-provided data.

APPENDIX
Variables Captured in a Study of
Traffic Stop Records in Richmond, Virginia,
From February 14 to March 31, 2000

| | *Scale* |
|---|---|
| Driver variables | |
|   Age (year of birth) | interval |
|   Gender | nominal |
|   Race | nominal |
|     Asian | |
|     Black | |
|     Hispanic | |
|     Native American | |
|     Middle Eastern descent | |
|     White (Caucasian) | |
| Officer variables | |
|   Race | nominal |
|     Asian | |
|     Black | |
|     Hispanic | |
|     Native American | |
|     Middle Eastern descent | |
|     White (Caucasian) | |
|   Gender | nominal |
|   Age | ordinal |
|     1 = 21-25 | |
|     2 = 26-30 | |
|     3 = 31-35 | |
|     4 = 36-40 | |
|     5 = 41-45 | |
|     6 = 46-50 | |
|     7 = 51-plus | |
|   Length of service | ordinal |
|     1 = 0-5 years | |
|     2 = 6-10 years | |
|     3 = 11-15 years | |
|     4 = 16-20 years | |
|     5 = 21-25 years | |
|     6 = 26-plus years | |
|   Shift (day, evening, power) | nominal |

| | *Scale* |
|---|---|
| Event variables | |
| Census tract of stop | nominal |
| Reason for stop | nominal |
| Defects (no city decal, equipment, expired registration or inspection) | |
| Investigation | |
| Moving violation | |
| Disposition of stop (up to three possible) | nominal |
| Advised (warning) | |
| On-view felony arrest | |
| On-view misdemeanor arrest | |
| Summons issued | |
| Warrant served | |
| Mental detention order | |
| Parking/city decal citation | |
| DUI arrest | |
| Offense report | |
| Miscellaneous report | |
| Juvenile violation report | |
| Other report | |
| Suspension notification issued | |
| Vehicle towed | |
| Vehicle searched | |
| Information received | |
| Stolen vehicle recovered | |
| Property found or seized | |
| Guns/weapons found or seized | |
| Search conducted (yes or no) | nominal |
| Type of search conducted | nominal |
| Consent | |
| Incident to arrest | |
| Inventory | |
| Pat-down | |

*Note:* DUI = driving under the influence.

## NOTES

1. After this article was written, an additional 4 weeks worth of data (January 17 to February 13) were made available by the city. These data are analyzed in a subsequent article that will be presented at the April 2001 meeting of the Academy of Criminal Justice Sciences (Smith, Petrocelli, & Piquero, 2001).

**JA0592**

2. Although criminal arrests for each racial group were captured in the data set, it is impossible to determine from the data how many persons were actually taken into custody. It is likely that some of the criminal arrests resulted in suspects' being released on summonses rather than being taken into custody. In those cases, officers would not normally search suspects (or their vehicles) incident to arrest (*Knowles v. Iowa*, 1998).

3. The data collection protocol allowed officers to enter up to three dispositions. For example, one stop may have produced two traffic summonses (two moving violations) and one warning (a vehicle defect). Such a stop would have been coded as 1 because it involved at least one arrest or summons.

## REFERENCES

Alpert, G., & Dunham, R. (1999). The force factor: Measuring and assessing police use of force and suspect resistance. *Use of force by police: An overview of national and local data* (pp. 45-60). Washington, DC: National Institute of Justice.

Bittner, E. (1991). The functions of police in modern society. In C. Klockars & S. Mastrofski (Eds.), *Thinking about police* (2nd ed., pp. 35-51). New York: McGraw-Hill.

Boydstun, J. (1975). *San Diego field interrogation: Final report.* Washington, DC: Police Foundation.

Christopher Commission. (1991). *Report of the independent commission on the Los Angeles Police Department.* Los Angeles: Author.

Federal Bureau of Investigation. (1998). *Uniform crime reports.* Washington, DC: Author.

Flanagan, T., & Vaughn, M. (1995). Public opinion about police abuse of force. In W. Geller & H. Toch (Eds.), *And justice for all: Understanding and controlling police abuse of force* (pp. 113-131). Washington, DC: Police Executive Research Forum.

Florida Highway Patrol. (2000). Race study of the Florida Highway Patrol [Online]. Available: www.fhp.state.fl.us/html

Garner, J., Buchanan, J., Schade, T., & Hepburn, J. (1996). *Understanding the use of force by and against the police.* Washington, DC: National Institute of Justice.

Garner, J., & Maxwell, C. (1999). Measuring the amount of force used by and against the police in six jurisdictions. *Use of force by police: An overview of national and local data* (pp. 25-44). Washington, DC: National Institute of Justice.

Geller, W., & Scott, M. (1992). *Deadly force: What we know.* Washington, DC: Police Executive Research Forum.

Harris, D. (1999). The stories, the statistics, and the law: Why "driving while black" matters. *Minnesota Law Review, 84,* 265-326.

Hepburn, J. (1978). Race and the decision to arrest: An analysis of warrants issued. *Journal of Research in Crime and Delinquency, 15,* 54-73.

Hindelang, M., Hirschi, T., & Weiss, J. (1979). Correlates of delinquency: The illusion of discrepancy between self-report and official measures. *American Sociological Review, 44,* 995-1014.

Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling. (1999). Trenton, NJ: Office of the Attorney General.

Kennedy, R. (1997). *Race, crime, and the law.* New York: Pantheon.

Knowles v. Iowa, 525 U.S. 113 (1998).

**JA0593**

Lamberth, J. D. (1997). Report of John Lamberth, Ph.D. *American Civil Liberties Union* [Online]. Available: www.aclu.org/court/lamberth.html

Mann, C. R. (1993). *Unequal justice—A question of color.* Bloomington, IN: Indiana University Press.

Martin, S. (1980). *Breaking and entering.* Berkeley, CA: University of California Press.

McNamara, J. (1967). Uncertainties in police work: The relevance of police recruits' backgrounds and training. In D. Bordua (Ed.), *The police: Six sociological essays* (pp. 163-252). New York: John Wiley.

McNeely, R., & Pope, C. (1981). Socio-economic and racial issues in the measurement of criminal involvement. In R. McNeely & C. Pope (Eds.), *Race, crime and criminal justice* (pp. 31-47). Beverly Hills, CA: Sage.

Menard, S. (1987). Short-term trends in crime and delinquency: A comparison of UCR, NCS, and self-report data. *Justice Quarterly, 4,* 455-474.

Neuman, L. W. (1997). *Social research methods: Qualitative and quantitative approaches.* Boston: Allyn & Bacon.

New York Attorney General's Office. (1999). *The New York City Police Department's "stop & frisk" practices.* New York: Author.

Niederhoffer, A. (1967). *Behind the shield.* Garden City, NY: Anchor.

Osgood, D. W., O'Malley, P., Bachman, J., & Johnston, L. (1989). Time trends and age trends in arrests and self-reported illegal behavior. *Criminology, 27,* 389-417.

Reiss, A., Roth, J., & Miczek, K. (1994). *Understanding and preventing violence.* Washington, DC: National Academy Press.

Report of the National Advisory Commission on Civil Disorders. (1968). New York: E. P. Dutton.

Russell, K. (1998). *The color of crime.* New York: New York University Press.

San Diego Police Department. (2000). *Vehicle stop study: Mid-year report.* San Diego, CA: Author.

San Jose Police Department. (1999). *Vehicle stop demographic study.* San Jose, CA: Author.

Sherman, L. (1980). Causes of police behavior—The current state of quantitative research. *Journal of Research in Crime and Delinquency, 17*(1), 69-100.

Sherman, L., & Cohn, E. (1986). *Citizens killed by big city police.* Washington, DC: Crime Control Institute.

Smith, M., Petrocelli, M., & Piquero, A. (2001). *Conflict theory and racial profiling: An empirical analysis of police traffic stop data.* Unpublished manuscript.

Snyder, H., & Sickmund, M. (1999). *Juvenile offenders and victims: 1999 national report.* Washington, DC: National Center for Juvenile Justice.

Tonry, M. (1995). *Malign neglect.* New York: Oxford University Press.

Walker, S. (1999). *The police in America: An introduction.* New York: McGraw-Hill.

Whren v. United States, 517 U.S. 806 (1996).

Wilbanks, W. (1987). *The myth of a racist criminal justice system.* Monterey, CA: Brooks/Cole.

Worden, R. (1995). The "causes" of police brutality: Theory and evidence on police use of force. In W. Geller & H. Toch (Eds.), *And justice for all: Understanding and controlling police abuse of force* (pp. 31-60). Washington, DC: Police Executive Research Forum.

Zingraff, M., Smith, W., & Tomaskovic-Devey, D. (2000). North Carolina highway traffic and patrol study: "Driving while black." *Criminologist, 25*(3), 1-4.

*Michael R. Smith is an associate professor in the Department of Criminal Justice at Virginia Commonwealth University. He holds a J.D. from the University of South Carolina and a Ph.D. in Justice Studies from Arizona State University. He is a former police officer and has conducted a variety of police-related research and evaluation projects. His primary areas of interest include police use of force and civil rights. Recent publications have appeared in* Police Quarterly, Policing: An International Journal of Police Strategies & Management, *and* Crime & Delinquency.

*Matthew Petrocelli is an assistant professor in the Department of Criminal Justice Administration at California State University, Hayward. His academic credentials include a B.S. from the United Stated Military Academy at West Point, an M.C.J. from the Graduate School of Public Affairs at the University of Colorado, Denver, and a Ph.D. from the School of Justice Studies at Arizona State University. A former Army officer, his research interests center around law enforcement and the police subculture.*

1924.]                    ACTS OF ASSEMBLY.                    535

hold the granting of the license until satisfactory proof is produced that both applicants are "white persons" as provided for in this act.

The clerk or deputy clerk shall use the same care to assure himself that both applicants are colored, when that fact is claimed.

5.  It shall hereafter be unlawful for any white person in this State to marry any save a white person, or a person with no other admixture of blood than white and American Indian.  For the purpose of this act, the term "white person" shall apply only to the person who has no trace whatsoever of any blood other than Caucasian; but persons who have one-sixteenth or less of the blood of the American Indian and have no other non-Caucasic blood shall be deemed to be white persons.  All laws heretofore passed and now in effect regarding the intermarriage of white and colored persons shall apply to marriages prohibited by this act.

6.  For carrying out the purposes of this act and to provide the necessary clerical assistance, postage and other expenses of the State registrar of vital statistics, twenty per cent of the fees received by local registrars under this act shall be paid to the State bureau of vital statistics, which may be expended by the said bureau for the purposes of this act.

7.  All acts or parts of acts inconsistent with this act are, to the extent of such inconsistency, hereby repealed.

————————

CHAP. 372.—An ACT to amend and re-enact section 46 of the Code of Virginia, which is in chapter 7 of said Code relating to church property, benevolent associations and objects.                                        [S B 322]

Approved March 20, 1924.

1.  Be it enacted by the general assembly of Virginia, That section forty-six of the Code of Virginia, be amended and re-enacted so as to read as follows:

Section 46.  Proceeding by trustees for similar purposes.—The trustees of such congregation, or church or religious denomination, or society or branch or division thereof, in whom is vested the legal title to such land held for any of the purposes mentioned in section thirty-eight, may file their petition in the circuit court of the county or the circuit or corporation court of the city wherein the land, or the greater part thereof held by them as trustees, lies, or before the judge of said court in vacation asking leave to sell, encumber, or exchange the said land, or a part thereof; and upon evidence being produced before the court, or the judge thereof in vacation, that it is the wish of said congregation, or church or religious denomination or society, or branch or division thereof, or the constituted authorities thereof having jurisdiction in the premises, to sell, exchange, or encumber the said property, the court, or the judge thereof in vacation, shall make such order as may be proper, providing for the sale of such land, or a part, or that the same may be exchanged or encumbered, and in case of sale, for the proper investment of the proceeds.  When any such religious congregation has become extinct or has ceased to occupy said property as a place of worship, so that it may be regarded as abandoned property, the petition may be prescribed either by the surviving trustee or trustees,

Courtesy of Paul Lombardo, Ph.D., J.D.  Noncommercial, educational use only.



Check for updates

*Article*

Criminal Justice Review
2015, Vol. 40(2) 209-229
© 2014 Georgia State University
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0734016814564989
cjr.sagepub.com
SSAGE

# Minority Threat Hypothesis and NYPD Stop and Frisk Policy

## Joseph Ferrandino[1]

**Abstract**
This study analyzes New York Police Department (NYPD) stop and frisk policy using a minority and Black threat framework. Using Blacks in White-dominated neighborhoods as the reference group, this study compares four distinct police actions (frisks, searches, sanctions, and force used) during 481,027 stops in 2012 in 297 geographic information system (GIS)-defined New York City (NYC) neighborhoods. Descriptive analysis reveals the scope of isolation between Whites and Blacks as well as the ratios of police action for each group within each neighborhood type, with Blacks in White-dominated and nondominated high White neighborhoods exceeding their population proportion and crime propensity ratios across all four police actions, consistent with the Black threat hypothesis. Logistic regression results provide further support for the application of Black threat hypothesis to NYPD stops and frisks. When controlling for other factors, race/neighborhood factors remain significant though the odds ratios are far below the population proportion and crime propensity benchmarks. These results are placed in the context of previous research findings and the implications of minority threat hypothesis are discussed in light of the specific Black threat in NYC. In the aggregate, the findings also include limited support for the "out of place" and defended neighborhood perspectives though much less for the criminogenic perspective relative to Blacks in White-dominated and other race/neighborhood categories.

**Keywords**
NYPD, stop and frisk, minority threat hypothesis, GIS

## Introduction

The stop and frisk policies of the New York Police Department (NYPD) have been one of the most controversial and debated criminal justice topics in recent years as the NYPD made 4,628,936 stops and conducted 2,400,903 frisks between 2004 and 2012 (NYPD, n.d.). The policy has been researched mainly through arguments of inequity based upon the racial disparities in stops and frisks (Civilian Complaint Review Board, 2001; Gelman, Fagan, & Kiss, 2007; *Floyd v. New York,* 2013; Jones-Brown, Gill, & Trone, 2010; Center for Constitutional Rights, 2009; Office of the

[1] Indiana University-Northwest, Gary, IN, USA

**Corresponding Author:**
Joseph Ferrandino, Indiana University-Northwest, 3400 Broadway, Gary, IN 46408, USA.
Email: joferran@iun.edu

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 130 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 2 of 21 PageID# 653

New York State Attorney General, 2013; Ridgeway, 2007; Spitzer, 1999). Largely, this body of research has focused on the race of those stopped or on geographical units of analysis such as census tracts or precincts. The interaction between the race of the offender and racial composition of the neighborhood where the stop takes place has been noted but remains largely understudied.

This study adds to the stop and frisk literature through the first known application of minority threat hypothesis with police actions during stops and frisks. More precisely, an NYC specific Black threat theory is built to guide the analysis. Next, the GIS process utilized to integrate census, stop and frisk, and other data into the creation of 297 distinct NYC neighborhoods, a feature that further distinguishes this study from the previous literature, is discussed. A comprehensive descriptive approach is then undertaken to create benchmarks of police action to inform of relative differences for each category of offender race and neighborhood race structure, focusing specifically on the stops of Blacks in White-dominated neighborhoods. The Black threat framework for four police actions (frisks, sanctions, searches, and use of force) during stops is evaluated through logistic regression modeling. The study concludes with a discussion of Black threat, defended neighborhoods, criminogenic explanations, and the out of place hypothesis, adding to our growing sociological understanding of the racial aspects of stops and frisks in the nation's largest city.

## Literature Review of the Racial/Ethnic Aspects of NYPD Stop and Frisk Policy

Most research into NYPD stop and frisk policies focuses on the racial disparities in aggregate stops and frisks relative to residential population representation at varying units of analysis. This perspective endures and persists due to the historically poor relationship between the NYPD and NYC's communities of color (see Lardner & Reppetto, 2000; Solis, Portillos, & Brunson, 2009) in conjunction with more recent crime control efforts focused on high minority neighborhoods (Bass, 2001). The first major report quantifying this racial disparity analyzed 175,000 stops between January 1998 and March 1999. Blacks and Hispanics comprised 49.3% of the population at that time yet accounted for 83.6% of stops; by contrast, Whites comprised 43.4% of the population but only 12.9% of stops (Spitzer, 1999). While stops of minorities were most abundant in high minority precincts, a disparate number of minority stops were observed in largely White precincts (defined as greater than 50% White population). The report further determined that variability in precinct-level crime rates alone did not account for the racial disparities in these stops (Spitzer, 1999).

A subsequent report focused on fully investigated citizen complaints resulting from a police stop and/or frisk, finding that 51% of fully investigated complaints from January 1997 through March 1999 were filed by Black subjects while 24% were Latino and 11% were White (Civilian Complaint Review Board, 2001). Of these complaints, physical force was alleged in 76% of stops involving Latinos and 74% of stops involving Blacks compared to 48% of stops involving White suspects. Moreover, a significantly higher percentage of Blacks were stopped by an officer brandishing a firearm (29%) than Hispanic (13%) or White suspects (6%). Thus, racial disparities are important in the context of police actions during a stop, not only the initial stop decision.

Gelman, Fagan, and Kiss (2007) also examined whether race-specific stop rates were a function of race-specific arrest rates or precinct-level variability. The results confirmed the assertion in the Spitzer (1999) report that significant racial disparity in stops were not explained by precinct-level crime or prior year race-specific arrest rate variability. The authors concluded that less rigorous constitutional standards were applied to stops of minorities, making these stops less efficient than those of Whites do. Most pertinent to this study is the finding of "racially incongruent stops" or stops of minorities in predominantly White precincts or Whites in predominantly minority precincts, each of which is a sign of "race-based selection of citizens for crime interdiction." Thus, including the stop

location is crucial to understanding the full racial context of stop and frisk of both White and non-White subjects.

New York's Attorney General recently analyzed stop and frisk arrests between 2009 and 2012 through disposition and sentencing (Office of the New York State Attorney General, 2013). The report found that just half of the 6% of stops that result in arrest led to a conviction, and the racial disparities of NYPD stop and frisk policy continue through the court process. The most pronounced finding was for marijuana possession arrests in which Whites were 50% more likely to receive adjournments in contemplation of dismissal[1] than Black or Hispanic defendants. Other research finds the NYPD's application of quality-of-life crime enforcement focuses mainly on marijuana possession, falling heavily on minorities as Blacks and Hispanics were more likely to be detained than Whites (2.7 times and 1.8 times more likely, respectively) and face harsher criminal sanctions accounting for other factors (Johnson, Golub, Dunlap, & Sifaneck, 2008). These findings culminated in a recent court decision in *Floyd v. New York* (2013), in which the stop and frisk practices of the NYPD were ruled racially discriminatory based on the following four key points (1) even with other factors held constant the NYPD stops more Blacks and Hispanics than Whites, (2) these stops are more likely within certain precincts and census tracts, controlling for other factors, (3) more force is used against Blacks and Hispanics than Whites, controlling for other factors, and (4) the stops of Blacks and Hispanics are often undertaken with less justification than stops of Whites (p. 183).

There is some evidence that NYPD stop and frisk racial disparities are not as pronounced as the previously literature suggests. Ridgeway (2007) analyzed over 500,000 stops from 2006 and focused on three separate areas: external benchmarks, internal benchmarks, and outcomes. The three external benchmarks were crime description percentages (comparing suspect descriptions with stopped suspects), arrest percentages (racial distribution of 2006 stops compared to 2005 arrests) and residential census percentages (residential demographics with those of stopped suspects). Residential census benchmarks—the method often used to produce the earlier results of profound disparities—produced the widest racial disparities but were considered the least valid method. Arrest data yielded less disparity, as Blacks were stopped in 2006 in nearly equal proportion to their 2005 arrest percentage while Hispanics had a 6% greater 2006 stop than 2005 arrest percentage. When suspect descriptions are used as the benchmark, the results suggest that Blacks are greatly under-stopped by police (i.e., Blacks accounted for 69% of the crime descriptions received by police but comprised 53% of the stops), while Whites and Hispanics are overstopped using this metric.

Ridgeway's internal benchmark process relied on analyzing stops by officers that had conducted at least 50 stops ($n = 2,756$ officers) through matching their stops to other officers in the same locations, under the same conditions, to detect racial outliers. These officers represented 7% of the department but 54% of stops in 2006, leaving a large amount of stop variability unaccounted for. Just 5 officers significantly overstopped Blacks, 10 overstopped Hispanics, and 9 understopped non-Whites. In terms of outcomes, Ridgeway studied the aggregate difference in post-stop police actions (frisks, searches, use of force, and arrests) of similarly situated suspects, finding similar yet narrower racial disparities. For example, similarly situated Whites were frisked slightly less than non-Whites (29% to 33%, respectively) or Blacks (42% to 46%, respectively). Similarly situated Whites were more likely to possess contraband (6.4% compared to 5.7% of Blacks and 5.4% of Hispanics), more likely to be issued summons, equally likely to be searched but less likely to have force used upon them or be arrested. Though more narrow in scope and depth, the previous findings of racial disparity persisted, a necessary condition for the application of the minority threat hypothesis framework.

## Minority Threat Hypothesis, Policing and NYC

Minority threat hypothesis derives from Hubert Blalock's *Toward a Theory of Minority-Group Relations* (1967) which focuses almost exclusively on the macro and micro power differential

between Whites and Blacks and how that power is enforced, perpetuated, challenged, and/or changed. Blalock proffers two branches of the minority threat theory, which is essentially Black threat theory from the onset: economic and power theory. Succinctly, the economic branch is instrumental and is a means to an end of mobility amid competition, while the power branch focuses more on the social aspects of attaining and retaining power as an end in itself. Both spring from an inevitable competition that result from a minority population growing, seeking more resources and mobilizing to attain those resources and power from the dominant group in society, which is the White population in America. In turn, Whites react along a continuum of behaviors to maintain their power, fracture mobilization, and consolidate resources. Relative to the power theory branch, Blalock proposed that minority discrimination would increase with threat-oriented beliefs and control mechanisms (#88c, p. 188) that are more likely when a high degree of the White population endorses stereotypes stressing threatening minority characteristics (#89a, p. 188), resulting in punishment power being applied. Over time, the view of minority criminality and its threat has become more institutionalized, widespread, and reinforced through a variety of media (see, e.g., Chiricos & Eschholz, 2002; Kooistra, Mahoney, & Westervelt, 1998; B. W. Smith & Holmes, 2014), perpetuating the minority threat belief and justifying targeted police policies such as stop and frisk designed to control minorities, especially Blacks.

Minority threat theory has recently emerged in the criminal justice literature as the country heads toward having a minority–majority and racial disparities in the system become more exacerbated, both at the enforcement and punishment points. As a branch of conflict criminology, the theory helps to understand and explain criminal justice institutional responses to crime, mainly through a focus on minorities and minority communities, as part of a struggle to retain the status quo of dominant groups in society. This perspective views minorities, especially emerging populations in urban environments, as a threat to existing White power structures, leading to disparities in policing and unequal, inequitable law enforcement (Cureton, 2000; Holmes, 2000; Kent & Jacobs, 2005; King, 2007; King & Wheelock, 2007; Ruddell & Urbina, 2004; Sampson & Lauritsen, 1997; B. W. Smith & Holmes, 2003; Stults & Baumer, 2007; Wang & Mears, 2010). In the policing literature, minority threat theory has largely been applied to the allocation of police resources based on Black and/or Hispanic populations (see Bernard, Snipes, & Gerould, 2010; Jackson, 1989; Kane, 2003; Kent & Jacobs, 2005; Stucky, 2005; Stults & Baumer, 2007), cross-racial arrest differences (Cureton, 2000; Eitle, D'Alessio, & Stolzenberg, 2002; Parker, Stults, & Rice, 2005; Stolzenberg, D'Alessio, & Eitle, 2004), and use of force (Holmes, 2000; B. W. Smith & Holmes, 2014). To date, the theory has not been applied to the study of NYPD stop and frisk policy, despite the focus on racial disparities in most previous research.

Police represent the concentration and monopoly of state power (Bittner, 1970) and the profession has been White male dominated throughout its history (Sklansky, 2006). Congruent with the time period in which Blalock introduced his theory, the White police power structure was challenged as the notion of having police forces comprised of similar racial/ethnic proportions, as the communities they served began to take hold (Fridell, Lunney, Diamond, & Kubu, 2001; Lasley, 1994; Walker & Shelley, 1999). This policy perspective, or goal, coincided with deep mistrust of the police and race riots that occurred in many major cities during the same time period (Deslippe, 2004; Perez, Berg, & Myers, 2003), conflating the growing divide between White police forces, as agents of state power, and increasingly isolated minority communities in many cities that were largely Black. Bass (2001) posits that police bias against Blacks is not a by-product of overt individual officer racism, but rather the result of institutional bias as policing developed within discriminatory social and political environments that shaped the fundamental fabric of the organizational field, that is, its culture and history (see Bittner, 1970; Wilson, 1968 as foundations). While White officers are expected to use more force and make more arrests against minorities until White cities or neighborhoods transition to a minority tipping point (Deslippe, 2004; B. W. Smith & Holmes, 2014; Stults & Baumer,

**JA0600**

USCA4 Appeal: 24-4201     Doc: 22-2     Filed: 09/04/2024     Pg: 133 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 5 of 21 PageID# 656

2007), non-White officers also experience systemic influences that impact their behaviors toward minorities. In theory, as departments diversify, newer non-White officers would assimilate to the wider institutional system biases shaped by White power structures, and racially disparate police actions would persist rather than lessen.

Some evidence from NYC supports this perspective. The NYPD has become more diverse in recent years. In 2010, the NYPD was 53% White and 47% minority but for the first time in its history became majority–minority on patrol with 53% of patrolmen minorities and 47% White (El Ghobashy, 2011). However, the upper levels of the police command structure are still largely White, and Whites remain overrepresented on the force relative to the White city population (53% to 33%, respectively). Despite increased diversity and the passage of 15 years since the Spitzer (1999) report, 84.3% of stopped subjects in 2012 were Black or Hispanic with their population percentage increasing to 50% (they were 83.6% of stops and 49.3% of the population in 1999); Whites comprised 9.4% of stops while accounting for 33% of the population (they were 12.9% of stops and 43.4% of the population in 1999). Thus, a more diverse police department and city made little impact on stop and frisk demographics, consistent with institutional bias being a critical driver of police action that perpetuates the general minority and specific Black threat frameworks despite diversification.

Differential police treatment also impacts how minorities view police compared to Whites. Research has established that minorities hold less positive views of the police than Whites (Hurwitz & Peffley, 2005; Rice & Piquero, 2005; Solis et al., 2009; Weitzer & Tuch, 2005) and Blacks are less likely than Whites to view the criminal justice system as fair (Hurwitz & Peffley, 2005). However, research also suggests that Hispanics hold views of police that are less favorable than Whites but more favorable than Blacks, making minority views nonmonolithic (Tuch & Weitzer, 1997). Blacks in NYC are 3 times more likely than non-Blacks to believe that racially based policing was pervasive, not justified, and experienced more often personally (Rice & Piquero, 2005). Other research finds Hispanic youths in NYC believe aggressive police tactics are aimed at restricting their presence in public spaces (Solis et al., 2009), bridging the views of the two races relative to police action in the city.

NYC is also highly segregated (Flores & Lobo, 2013). Over the past four decades, Flores and Lobo (2013) found that White-dominated neighborhoods (those with more than 70% White population with other groups comprising less than 10% each) declined significantly with the integration that followed the decline in the White population including Asians and Hispanics but not Blacks. As such, Whites and Blacks are even more isolated in NYC with Whites more integrated with Asians and Hispanics and Blacks less integrated with the other groups (Flores & Lobo, 2013). The data calculated in Table 1 for this study support this view as well as a specific focus on Black threat in NYC.

A micro-level theory that emerged from the macro minority threat framework in conjunction with the tenets of human ecology (invasion, domination, and succession) is the defended neighborhood hypothesis, or "White fight" before "White flight." The minority threat in NYC, especially the Black threat, is firmly established. As a result, Whites further isolate themselves from Blacks and defend the remaining neighborhoods they dominate, as the overall White population in the city dwindles. Rather than resources, they are fighting for space, distance, and to keep power within their neighborhood. Recent research has found support for the defended neighborhood hypothesis as a greater motivator than economic threat (see Eitle et al., 2002; Green, Strolovitch, & Wong, 1998). Even if the motivation is more economical than public safety related, King and Wheelock (2007) report that Whites hold more punitive views toward Blacks when faced with growing rather than static Black populations. These results, when aggregated, suggest that Whites, especially those defending their neighborhoods from real or perceived in-migration of non-Whites, are more supportive of the police and police action against minorities in general and Blacks specifically.

The population trends and lack of Black integration with Whites is a critical element of defended neighborhood hypothesis in NYC and could theoretically lead to fierce neighborhood defense of

**Table 1.** The Percentage of Population Within and Between Each Race Group in Each Neighborhood Type.

| Type | Population | White Population | Percentage White WG | Percentage White BG | Black Population | Percentage Black WG | Percentage Black BG | Hispanic Population | Percentage Hispanic WG | Percentage Hispanic BG |
|---|---|---|---|---|---|---|---|---|---|---|
| DB | 1,433,817 | 98,670 | 0.04 | .07 | 1,050,727 | 0.56 | 0.73 | 213,234 | 0.09 | 0.15 |
| DH | 1,607,813 | 133,868 | 0.05 | .08 | 276,891 | 0.15 | 0.17 | 1,014,208 | 0.44 | 0.63 |
| DW | 2,678,857 | 1,858,037 | 0.68 | .69 | 99,100 | 0.05 | 0.04 | 340,994 | 0.15 | 0.13 |
| NDHW | 1,523,579 | 547,358 | 0.20 | .36 | 190,014 | 0.10 | 0.12 | 419,625 | 0.18 | 0.28 |
| NDLW | 869,118 | 78,100 | 0.03 | .09 | 254,488 | 0.14 | 0.29 | 319,012 | 0.14 | 0.37 |

*Note.* DB = dominant Black; DH = dominant Hispanic; DW = dominant White; NDHW = nondominant high White neighborhoods; NDLW = nondominant low White neighborhoods; WG = within-group population distribution for each race by each neighborhood category. For example, 68% of the White population in New York City lives in White-dominated neighborhoods. BG = between-group population distribution for the total population of each race that lives within each neighborhood category. For example, 69% of the population in White-dominated neighborhoods is White.

**JA0602**

USCA4 Appeal: 24-4201      Doc: 22-2        Filed: 09/04/2024      Pg: 135 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 7 of 21 PageID# 658

remaining White-dominated neighborhoods. Skogan (1995) found that Whites living in closer proximity to Blacks, especially in urban areas, were more fearful of crime despite registering lower prejudice scores than more distant Whites. As Whites are more likely to separate themselves from Blacks, this Black isolation may lead to an increase in the fear of Black crime by Whites (Parker et al., 2005), thus exacerbating rather than relieving the racial threat. As a result, the most threatening person would be Black in a White-dominated or high White population neighborhood as a result of either the larger macro minority threat or the more immediate micro-level defended neighborhood hypothesis, requiring police actions such as liberal stop and frisk policies toward Blacks in these neighborhoods.

There are two theoretical frameworks that potentially mitigate the minority threat hypothesis relative to stop and frisk policy in NYC: the criminogenic perspective and the out of place hypothesis. Weitzer and Tuch (2005), using a national sample, found that many Whites find face validity in police targeting minorities or minority neighborhoods as areas of high crime and criminality. Consistent with this finding, Harris (2003) posits that many people support "racial profiling" not based on race, but since Blacks and Latinos are more likely to be criminals they should legitimately receive disproportionate police attention and action. This view, focused mainly on Blacks, dates back well over a 100 years (Bass, 2001) and includes law-abiding Black citizens, as Wilson (1968, p. 412) noted almost 50 years ago:

> Violent crime and disorder are pre dominantly (though not exclusively) lower class phenomena; Negroes are disproportionately (though far from exclusively) lower class; a black skin, therefore, will continue to be a statistically defensible (though individually unjust) cue that triggers an officer's suspicion. Among the consequences of this generalization will be continued police suspicion of blacks and continued Negro antagonism toward the police.

Consistent with the dominant social view of crime and criminality as emanating from minorities, former NYPD Commissioner Howard Safir responded to the Spitzer report by claiming that any racial disparity in stops and frisks was reflective of the racial makeup of crime offender descriptions and arrestees in the city, not racial bias (Cooper, 1999). Complementing this view is data from the U.S. Census Bureau (American Community Survey, 2007–2011) which include Riker's Island, the city's main jail, as a distinct census block group. The Riker's census block group had the largest population of any in the city (10,453) and was 93% non-White (56% Black and 35% Hispanic). Comparatively, of the 532,881 stops recorded by the NYPD in 2012, 53% were Black while 31% were Hispanic, representing similar proportions to their Riker's Island population. From this perspective, stop and frisk is not racially biased but based on criminogenic factors that are more greatly exhibited by Blacks and Hispanics, potentially negating and/or countering the population-based perspective assuming equal crime propensity and police focus. However, Jones-Brown, Gill, and Trone (2010), using data from 2008, found that while minorities are more frequently stopped and frisked, Whites are as likely to be arrested (5.5% to 6.1%) and were more likely to have contraband or weapons except guns. These results suggest the criminogenic argument for overstopping minorities may be weaker than believed.

Finally, the segregated populations of NYC provide for citizens to be "out of place" and thus suspicious. As Bass (2001) notes, Blacks have historically been segregated to their neighborhoods within cities and policed differently, often "subject to harassment for having the temerity to circulate out of their place." However, more dated research found the opposite: More coercion is used against Black suspects in Black neighborhoods (D. A. Smith, 1986) which belies the tenets of the defended neighborhood hypothesis. The out of place hypothesis can also be gleaned from Gelman et al. (2007) observations of "racial incongruities" in which a certain percentage of minority stops occurred in predominantly White districts as well as a number of identifiable stops of Whites occurring in

largely Black/Hispanic areas. Thus, one driver of stop and frisk is simply being "out of place," regardless of race or criminality.

## Data, Variables, and Methods

The data derive from several separate sources integrated through ArcGIS software. First, all stop and frisk data are taken directly from the NYPD 2012 Stop, Question, and Frisk Database (NYPD, n.d.), a publicly available aggregated database of all recorded stop and frisk encounters for the NYPD for each calendar year. Each officer who initiates a stop and/or frisk that meets departmental guidelines is required to submit a completed UF-250 form that is about four pages in length. The form has detailed information about the stop, including, but not limited to, time, date, location (in both street and XY coordinates), and reason for stop, whether a frisk or search was conducted, whether force was used and what type, the crime suspected, whether a sanction was given, whether the officers was in uniform, whether the call was proactive or from a radio run, whether a weapon was recovered and what type and characteristics about the offender (race, age, gender, and physical attributes). The public version is unfortunately "scrubbed" of officer characteristics such as race.

Race, social, and economic data were compiled through the American Community Survey (2007–2011) population characteristics shapefile that was entered into ArcGIS to create neighborhood-level data from census block group centroids. To create neighborhoods, multiple shapefiles from the Bytes of the Big Apple (n.d.) website were utilized. The neighborhood centroid file was used to aggregate census block groups into the 297 distinct neighborhoods identified by the city through joining the census block group polygon to the nearest neighborhood centroid. To match each stop in the NYPD Stop Question Frisk (SQF) data set with its respective neighborhood, stops were mapped using their XY coordinates, and this point file was joined by the census block group in which it occurred, which was previously joined to the neighborhood file. The resulting point file had the neighborhood and census block group identifier added to each stop to aggregate stops by the type of neighborhood in which they occurred. Neighborhood data were aggregated by census block group when the two files were joined in ArcGIS. Finally, each joined file was exported as .txt files and opened in SPSS that was used to conduct the analyses that follow.

There are four dependent variables in the analysis. Frisks ($0 = $ *not frisked*, $1 = $ *frisked*) and searches are measured dichotomously ($0 = $ *not searched*, $1 = $ *searched*). Sanctions are measured as to whether a summons was issued or an arrest was made or if no sanction was enforced and is measured dichotomously ($0 = $ *neither occurred*, $1 = $ *one of the two sanctions was applied*). The UF-250 form lists nine types of force: hands, placing a suspect on the ground, placing a suspect against a wall, drawing a weapon, pointing a weapon, using a baton, using handcuffs, using pepper spray, and other force. Of the 481,031 final stops from 2012 included in the analysis, 17.5% (84,070) involved at least one level of force of which 76.5% (64,353) were hands. When a frisk was performed, force was used in 34% of the incidents. In the stop data set, more than one level of force was reported in just 2.6% of the stops while 4.4% of the frisk stops resulted in more than one level of force being utilized. Based on the fact that so many incidents involved no use of force, the force variable was measured dichotomously ($0 = $ *no level of force used*, $1 = $ *at least one level of force used*). The search and sanctions models include only stops in which a frisk occurred while the frisk and force models use all stops.[2]

The independent variable utilized for each model is categorical and created through combining a stopped person's race with the type of neighborhood in which the stop occurred. Race is operationalized in a similar fashion as previous NYPD stop and frisk research, despite the limitations inherent in this approach. White and Black subjects are identified as such in the NYPD SQF database. Hispanic subjects are operationalized by combining White Hispanics and Black Hispanics into one category. Other races/ethnicities are excluded from the analysis. The analysis employs

**JA0604**

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 137 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 9 of 21 PageID# 660

five categorical neighborhood measures, consistent conceptually with Flores and Lobo (2013) while using a different statistical approach. Neighborhoods are operationalized as dominant if their White (W), Black (B), or Hispanic (H) population exceeds 58% and neither of the other two groups exceeds 30%, making dominance more conservative at a 2:1 ratio where Flores and Lobo used a ratio of 7:1 in deciding group dominance at the tract level. These three categories are operationalized as DW (dominant White), DB (dominant Black), and DH (dominant Hispanic). Non-dominant neighborhoods are operationalized relative to their overall and White populations. Nondominant low White neighborhoods (NDLW) are those in which no population dominates (<55%), there is not more than a 20% difference between Blacks and Hispanics and Whites comprise less than 20% of the population. Nondominant high White neighborhoods (NDHW) have non-White populations of at least 47% and White populations between 21% and 53% of the total population. These categories are combined to create nine blended categories to specifically test minority threat relative to NYC. The first six categories are race and neighborhood exclusive: B/DW, W/DW, H/DW, W/NDHW, B/NDHW, and H/NDHW. The remaining three categories combine either race or neighborhood based upon the theoretical framework: W/NDLW, DH, DB (all three neighborhood types combined); NW/NDLW (non-White combines Black and Hispanics together); and NW/DB, DH.

There are several control variables utilized to normalize the stop based upon external characteristics. Ridgeway (2007) used several variables to "match" stops by officers to compare them directly against one another, including whether or not the officer was in uniform, the borough where the stop occurred, whether the stop was inside or outside, and whether the stop was a result of a radio run or initiated by the officer. This approach "normalized" available external factors to allow direct comparison of racial differences in stops between officers based on similar situations. All of these variables could impact the actions taken by the officer and are controlled for to better isolate the offender and neighborhood from other factors.

The first control variable, whether or not the stop occurred inside or outside (1 = *inside*, 2 = *outside*), is used to control for the physical space an officer has during the stop. Stops in more confined areas such as hallways of an apartment building may impact officer decision making as opposed to a stop in a public park, which may be a less threatening environment. A second control variable is whether the officer was in uniform (1 = *no*, 2 = *yes*), as many past abuses of stop and frisk decisions were made by the Street Crimes Unit, which was plainclothed. Furthermore, these two officer types have different missions that could impact their application of stops, frisks, and searches and decisions during an encounter and they could be responded to differently by citizens as well. For example, subjects may be more likely to run from or resist someone in plainclothes than they would an officer in full uniform, a possibility that could change the overall behaviors and outcomes of a stop encounter. A third control is whether the call originated from a radio run (1 = *no*, 2 = *yes*) which is a measure of proactivity that could impact officer decision making. A call from a radio run implies reaction to an incident or suspect description while a nonradio run stop would be more proactive in nature based upon officer observation or intuition. It is conceivable that calls from a radio run could result in different behavior on the part of the police (more formal justification) than a stop originating from a suspect they see without provocation that may have a "bulge," be wearing clothing that are out of season or exhibit "furtive movements" all of which are far more subjective criteria and stop reason choices on the UF-250 form.

Another situational factor that is controlled for is whether others were present during the stop (1 = *no*, 2 = *yes*), as this could impact both officer decision making and suspect behavior during the stop. A citizen that is alone may be less likely to be frisked for the purposes of officer safety than if there are three or more subjects stopped at once, where a frisk could be justified simply for officer safety apart from other accepted or stated reasons. A contextual factor controlled for is whether or not the stop occurred in a high crime area (1 = *no*, 2 = *yes*), as this distinction could

also impact the decision making of the officer prior to or during a stop. It would be expected that stops in known high crime areas would be more likely to result in a frisk and perhaps more use of force by police in that area.

Organizationally and environmentally, the borough in which the stop occurred ($1 = Bronx$, $2 = Brooklyn$, $3 = Queens$, $4 = Manhattan$, and $5 = Staten Island$) controls for command and environmental differences during a stop which could also impact officer decision making. Ridgeway (2007) did find discrepancies in by borough, further supporting the inclusion of this variable. Finally, the age category of the person stopped ($1 = lower\ risk$ [0–14, 26, or older], $2 = higher\ risk$ [15–25]) is controlled for, as police officers may approach higher risk-aged offenders differently than they would older or younger suspects. Thus, these control variables provide a range of environmental, situational, organizational, and offender characteristics to help isolate race/neighborhood variables from these factors relative to the four police actions.

Several descriptive analyses are included to place the race/neighborhood relationship in context. First, racial disparities across four police actions (frisks, searches, sanctions, and the use of force) are explored relative to population proportion. To create these scores, the total number of police actions for each group within each neighborhood type is divided by the total number of police actions that occurred within that neighborhood type and then divided by the group's population proportion within the neighborhood type. This statistic provides a ratio of the police action relative to the population of the group within this neighborhood type for all three racial groups. A score of 1 indicates that the group faces that event in equal proportion to its population within that neighborhood type; a score of less than 1 indicates a group is less likely to face that police action relative to its population; and a ratio greater than 1 signifies a specific racial group is more likely to face a police action in a proportion greater than its population representation. This statistic represents the equity view of racial disparity that many have used in prior NYPD stop and frisk research that have found racial disparities.

Weighted crime propensity for each group is also calculated to compare to both the population proportions and logistic regression results. The racial makeup of Rikers Island was used as a proxy measure to weight crime propensity between the three groups. As Ridgeway (2007) noted, each comparative measure of racial benchmarking (census data, arrestees, or crime suspect descriptions) has pitfalls relative to the stops and frisks of citizens. The demographic composition of the Riker's Island population extends beyond the arrest rate, which is a largely police-driven measure, to account for other parts of the criminal justice system including the courts. While this measure may be skewed for a number of established reasons, it serves as an available population proxy for criminality proportion and is used descriptively here to create a racial benchmark that reflects those being officially sanctioned within the NYC correctional system as of the 2010 census. Whites comprise 7% of the Riker's population, with Blacks comprising 58% and Hispanics comprising 35%, which is similar to the crime suspect percentages used by the NYPD to justify stop and frisk disparities fifteen years ago. The Black to White crime propensity ratio is 8.79, the Hispanic to White ratio is 5.37, and the Black to Hispanic ratio is 1.64. To create this measure, the ratio between the two earlier disparity percentages is taken (Black/White, Hispanic/White, and Black/Hispanic) and compared to the Riker's benchmark. For example, based upon this weighted crime propensity measure, the Black ratio for being stopped should be 8.79 times the White ratio in a White-dominated neighborhood and the Hispanic ratio should be 5.37 times greater.

Logistic regression is utilized to determine the relative difference in odds ratios (OR) of frisks, searches, sanctions applied, and the use of force between Blacks in White-dominated areas and the other combinations of suspect/neighborhood types. This approach is consistent with the dichotomous data reported by the NYPD, minority threat hypothesis, and the descriptive benchmarks created. Each model controls for the same variables in sequential modeling to isolate the impacts of race/neighborhood type on the four police actions.

## Results

As expected (see Table 2), Blacks were the racial group most stopped ($n = 284,229$ or 53.3% of stops), frisked ($n = 163,281$ or 55% of frisks), searched ($n = 22,683$ or 51.3% of searches), sanctioned ($n = 29,957$ or 50.1% of incidents with at least one sanction), and likely to have some level of force used against them during a stop ($n = 49,018$ or 53.2% of force used incidents). The most stops occurred in DB neighborhoods (29%), followed by DH (23%), DW (17%), NDLW (16%), and NDHW (15%). While frisks were nearly even within DB and DH neighborhoods, more searches, sanctions, and incidents where forced was used occurred in DH neighborhoods. With the exception of DH neighborhoods, Blacks were the most stopped, frisked, searched, sanctioned, and forcefully treated group in each remaining neighborhood (DW, DB, NDHW, and NDLW), consistent with the Black crime threat hypothesis.

Interesting results emerge when weighted relative population/crime propensity ratios are included to analyze stop, frisk, sanctioning, and use of force incidents (see Table 2). For example, Blacks comprise 4% of the population in DW neighborhoods yet comprise 35.7% of the stops, which is a ratio of 8.94, showing a clear disparity. Conversely, Blacks comprise 73% of the DB neighborhood population and account for 83.7% of the stops in those neighborhood for a ratio of 1.15. Using this approach, Blacks had ratios greater than 1 in every neighborhood type (DW = 8.94, DB = 1.15, DH = 2.01, NDHW = 3.64, and NDLW = 1.94) with their ratios greatest, as expected by the minority threat hypothesis, in both DW and NDHW neighborhoods. By contrast, Whites had ratios less than 1 in every neighborhood type for every type of police action (stops, frisks, searches, sanctions, and use of force). Hispanics, as expected based upon their greater social integration across the city and the minority threat hypothesis, only had ratios greater than 1 for all five police action measures in DW neighborhoods (all ratios > 2) and NDHW areas (all ratios greater than 1 but less than 1.3). These findings are consistent with Blacks and Hispanics being more of a threat in White-dominated or NDHW areas, and hold true across all three racial groups in all five neighborhood types.

To include the criminogenic viewpoint, the previous statistic was enhanced to account for and weight crime differences across the three groups. While Blacks are 8.94 times more likely to be stopped relative to their population in White-dominated areas, Whites are only .44 likely to be stopped relative to their population. The ratio (8.94/.44) creates a weighted score of 20.34, which exceeds the criminogenic threshold. In White-dominated areas, Hispanics also exceed their proportional stop benchmark (2.06) but do not exceed their weighted crime propensity benchmark relative to Whites (4.06, which is lower than 5.37). When compared with Hispanics in White-dominated neighborhoods, Blacks exceed the weighted crime propensity (4.33, which is greater than 1.64) as well. These findings suggest that Blacks are seen as a greater threat in White-dominated areas than Whites or Hispanics, especially when accounting for their weighted criminal propensities, making Black stop totals even more disparate. For Blacks, these findings are consistent across all four police action categories in White-dominated (frisks = 22.3, searches = 21.6, sanctions = 21.2, and force used = 32.2) and NDHW neighborhoods (frisks = 11.5, searches = 9.2, sanctions = 9, and force used = 12.6). Thus, while still disparate beyond weighted crime propensity score, the disparity lessens between White-dominate and NDHW neighborhoods and then decreases below expected levels in the other three neighborhood types. By contrast, Hispanics are below their expected weighted crime propensity in all neighborhood types and all police actions except for force used in White-dominated neighborhoods which is slightly elevated (6.00). These results all follow the NYC-specific Black threat framework: Blacks are treated differently by police in White-dominated and NDHW neighborhoods, beyond their population proportion and weighted crime propensities, while Hispanics are generally treated differently by police in regard to their population proportion but in lesser volume than their weighted crime propensities.

**Table 2.** Stop, Po ce Act on, and Outcome Informat on, 2012, By Race/Ne ghborhood Type, and Race.

| Category | Stops | Population Ratio | Crime Propensity Ratio | Frisks | Population Ratio | Crime Propensity Ratio | Searches | Population Ratio | Crime Propensity Ratio | Sanctions | Population Ratio | Crime Propensity Ratio | Force Used | Population Ratio | Crime Propensity Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| White/DW | 26,700 | 0.44 | | 0.920 | 0.42 | 22.26 | 2,285 | 0.42 | 21.61 | 2,890 | 0.4 | 21.2 | 3,225 | 0.34 | 32.1 |
| B ack/DW | 3,477 | 8.94 | 20.34 | 4.09 | 9.30 | | 2,862 | 9.02 | | 3,547 | 8.77 | | 6,007 | .02 | 6.00 |
| Hispanic/DW | 23,6.8 | 2.06 | 4.70 | 0.6.4 | 2.5 | 5..6 | 2,307 | 2.24 | 5.36 | 2,923 | 2.22 | 5.37 | 3,644 | 2.06 | |
| White/DB | 3,344 | 0.32 | | .336 | 0.23 | | 206 | 0.54 | | 348 | 0.37 | | 355 | 0.25 | |
| B ack/DB | 23,266 | .5 | 3.53 | 69,657 | .7 | 5.00 | 8,006 | .6 | 2..3 | .20 | .3 | 3.09 | 7..80 | .7 | 4.64 |
| Hispanic/DB | 5,5.0 | 0.70 | 2..6 | 7,673 | 0.63 | 2.68 | 92 | 0.65 | .9 | .543 | 0.76 | 2.07 | .978 | 0.66 | 2.60 |
| White/DH | 4,004 | 0.42 | | 2,.35 | 0.33 | | 329 | 0.39 | | 496 | 0.43 | | 698 | 0.28 | |
| B ack/DH | 4,.06 | 2.0 | 4.83 | 28,676 | 2..0 | 6.32 | 3,83 | 2.4 | 5.48 | 4,828 | .98 | 4.58 | .503 | 2..8 | 7.76 |
| Hispanic/DH | 68,645 | 0.9 | 2..8 | 45,75 | 0.90 | 2.72 | 5,868 | 0.88 | 2.26 | 8,324 | 0.92 | 2..3 | 7,500 | 0.89 | 3..8 |
| White/NDHW | 0.635 | 0.38 | | 5,.39 | 0.33 | | .047 | 0.39 | | .36 | 0.40 | | .262 | 0.32 | |
| B ack/NDHW | 33,82 | 3.64 | 9.54 | 9.77 | 3.85 | 11.54 | 3,.93 | 3.6 | 9.15 | 4,063 | 3.59 | 8.96 | 5,302 | 4.08 | 12.6 |
| Hispanic/NDHW | 26,562 | .23 | 3.2 | 4,820 | .24 | 3.7 | 2,585 | .25 | 3.7 | 3,243 | .23 | 3.06 | 3,463 | .4 | 3.53 |
| White/NDLW | 2,987 | 0.4 | | .398 | 0.35 | | 303 | 0.46 | | .468 | 0.52 | | 445 | 0.37 | |
| B ack/NDLW | 45,.04 | .94 | 4.69 | 25,786 | 2.00 | 5.72 | 4,038 | .89 | 4.07 | 5,3.4 | .83 | 3.52 | 7,430 | .94 | 5..8 |
| Hispanic/NDLW | 24,293 | 0.82 | .98 | 3.394 | 0.82 | 2.33 | 2,.89 | 0.82 | .76 | 3,.86 | 0.86 | .66 | 4,078 | 0.83 | 2.23 |
| DW | 88,028 | | | 37,896 | | | 7,93 | | | 0,.4 | | | 3,63 | | |
| DB | 47,268 | | | 8,.285 | | | 9,482 | | | 3,576 | | | 20,..0 | | |
| DH | 20,008 | | | 80,359 | | | 0,536 | | | 4,336 | | | 3,.048 | | |
| NDHW | 77,332 | | | 42,79 | | | 7,378 | | | 9,42 | | | 0,823 | | |
| NDLW | 80,.59 | | | 44,4.3 | | | 7,252 | | | 0,006 | | | 3,237 | | |
| BLACK | 284,229 | | | 63,28 | | | 22,683 | | | 29,957 | | | 49,0.8 | | |
| Hispanic | 65,.40 | | | 95,67 | | | 4,432 | | | 20,026 | | | 3,.77 | | |
| Other | 33,.76 | | | 6,207 | | | 2,7.0 | | | 3,879 | | | 4,976 | | |
| White | 50,366 | | | 22,085 | | | 4,423 | | | 5,892 | | | 6,308 | | |

*Note:* B = B ack; DB = dominant B ack; DH = dominant Hispanic; W = White; DW = dominant White; LL = og inear; NDHW = nondominant high White neighborhoods; NDLW = nondominant ow White neighborhoods; Bo dface indicates va ues that exceed the weighted crime propensity for that group re ative to the White propensity.

**JA0608**

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 141 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 13 of 21 PageID# 664

The logistic regression models look at the same relationships—four police actions across specific offender race within distinct neighborhood types—through a different lens. The first level of police action during a stop is the decision to frisk (see Table 3). This model improved on its ability to properly classify frisk decisions from Block 0 (56.4%) to Block 2 (63.7%), but the race/neighborhood categories contributed just 0.4% of this improvement. The Cox/Snell and Nagelkerke $R^2$ values increased from 8.7% and 11.7%, respectively, in Block 1 to 9.9% and 13.3%, respectively, meaning the race/neighborhood categories explained between 1.2% and 1.6% of the variance in the frisk decision. After controlling for other factors, Whites (OR = .73, $p < .001$) and Hispanics (OR = .95, $p < .01$) in DW neighborhoods were significantly less likely to be frisked than Blacks. In NDHW areas, Whites were also significantly less likely to be frisked (OR = .90, $p < .001$) than Blacks in DW neighborhoods. However, Blacks (OR = 1.5, $p < .001$) and Hispanics (OR = 1.2, $p < .001$) were significantly more likely to be frisked in NDHW than Blacks in DW neighborhoods. Moreover, Whites in NDLW, DH, or DB neighborhoods are as likely (OR = 1.0, $p > .05$) as Blacks in DW neighborhoods to be frisked. Rather than level the racial equity playing field, this finding shows support for the idea of "out of place" stops in which Whites in these areas are seen as suspicious as Blacks in White-dominated areas. Only 12% of Whites live in these three neighborhood types, but 26% of White stops occur in these neighborhoods. In contrast to Blacks in DW neighborhoods, non-Whites (OR = 1.76, $p < .001$) in their own dominant neighborhoods (DB or DH) are significantly more likely to be frisked, as are non-Whites in NDLW neighborhoods (OR = 1.46, $p > .001$), supporting the criminogenic perspective.

The search model (see Table 3) adds to these findings. Whites (OR = 1.2, $p < .001$) and Hispanics (OR = 1.2, $p < .001$) in DW neighborhoods are significantly more likely than Blacks in the same neighborhoods to be searched, despite being significantly less likely to be frisked. Whites in NDHW neighborhoods were also significantly more likely than Blacks in DW neighborhoods to be searched (OR = 1.21, $p < .001$). By contrast, Blacks in NDHW neighborhoods were significantly less likely (OR = .93, $p < .05$) to be searched than Blacks in DW neighborhoods, while Hispanics in these areas were equally likely to be searched (OR = .99, $p > .05$). As in the frisk model, Whites in NDLW, DB, or DH neighborhoods are as likely as Blacks in DW neighborhoods to be searched (OR = .95, $p > .05$), once again raising questions as to whether this is crime related or contextual. Finally, non-Whites in DB or DH (OR = .70, $p < .001$) and NDLW (OR = .83, $p < .001$) are significantly less likely than Blacks in DW neighborhoods to be searched during a stop that includes a frisk. This model was able to successfully predict 85.9% of searches, but this percentage was not improved by the inclusion of the control variables nor the race/neighborhood categories. Furthermore, the race/neighborhood categories only helped to explain between .3% and .7% of the decision to search (full model $R^2$ 1.9–2.6%).

The sanction model analyzes the relative likelihood that a frisk ended in either an arrest or a summons to place the frisk and search decisions in context of the outcomes produced (see Table 4). Compared to Blacks in DW neighborhoods, Whites (OR = 1.23, $p < .001$) and Hispanics (OR = 1.26, $p < .001$) in these neighborhoods are significantly more likely to be sanctioned, as are Whites (OR = 1.38, $p < .001$) and Hispanics (OR = 1.1, $p < .01$) in NDHW neighborhoods. Blacks in NDHW neighborhoods are statistically as likely to be sanctioned as those in DW neighborhoods (OR = .98, $p > .05$). Consistent with previous research (Gelman et al., 2007) Whites in DB, DH, and NDLW neighborhoods are more likely to be sanctioned (OR = 1.21, $p < .01$) than Blacks frisked in DW neighborhoods. Further, compared to Blacks in DW neighborhoods, non-Whites in DB or DH (OR = .83, $p < .001$) and NDLW (OR = .91, $p < .01$) neighborhoods are significantly less likely to be sanctioned during a frisk. This suggests that although Blacks in DW neighborhoods are less likely than Whites or Hispanics to be sanctioned, they are more likely than their non-White counterparts in DH, DB, or NDLW neighborhoods to face sanction during a frisk. As with the search model, the race/neighborhood categories explain very little of the variance in sanction decision (.2% to .4%,

**Table 3.** Logistic Regression on Final Model Results for Frisk and Search Decisions.

| Final model | Frisk Decision (N = 481,027) | | | | Search Decision (N = 271,161) | | | |
|---|---|---|---|---|---|---|---|---|
| | b | SE | Wald | Exp(B) | b | SE | Wald | Exp(B) |
| Stop outside | .625 | .008 | 6835.281 | 1.868*** | −.332 | .014 | 535.683 | .718*** |
| Others present—Yes | .103 | .008 | 159.025 | 1.108*** | .036 | .014 | 6.459 | 1.037* |
| Officer in uniform | −1.001 | .008 | 15413.131 | .368*** | −.172 | .013 | 187.732 | .842*** |
| Radio run—Yes | −.185 | .007 | 612.773 | .831*** | −.001 | .015 | .009 | .999 |
| High crime area—Yes | −.052 | .006 | 66.582 | .950*** | −.152 | .011 | 177.931 | .859** |
| Borough | | | 7542.981 | | | | 701.491 | |
| Brooklyn | −.614 | .009 | 4694.030 | .541*** | −.322 | .016 | 396.288 | .724* |
| Queens | −.120 | .011 | 124.865 | .887*** | .030 | .018 | 2.933 | 1.030 |
| Manhattan | −.651 | .011 | 3588.356 | .522*** | .004 | .019 | .052 | 1.004 |
| Staten Island | −.692 | .018 | 1450.656 | .500*** | −.060 | .033 | 3.295 | .942 |
| High risk age | .364 | .006 | 3452.109 | 1.439*** | −.224 | .011 | 391.496 | .800*** |
| Race/neighborhood | | | 6257.397 | | | | 1002.327 | |
| W/DW | −.310 | .018 | 292.222 | .733*** | .200 | .033 | 35.783 | 1.222*** |
| H/DW | −.055 | .018 | 8.996 | .947** | .196 | .033 | 35.965 | 1.216*** |
| W/NDHW | −.111 | .024 | 21.179 | .895*** | .187 | .043 | 19.242 | 1.205*** |
| B/NDHW | .402 | .017 | 538.760 | 1.495*** | −.075 | .031 | 5.888 | .928* |
| H/NDHW | .188 | .018 | 105.014 | 1.207*** | −.009 | .033 | .070 | .991 |
| W/NDLW, DH, DB | −.005 | .024 | .044 | .995 | −.050 | .045 | 1.228 | .951 |
| NW/DB, DH | .565 | .014 | 1676.863 | 1.760*** | −.362 | .025 | 203.675 | .696*** |
| NW/NDLW | .380 | .015 | 660.372 | 1.462*** | −.183 | .027 | 46.700 | .833*** |
| Constant | .468 | .017 | 753.662 | 1.598*** | −.921 | .030 | 938.826 | .398*** |

| FULL model | Block 0 | Block 1 | Block 2 | | Block 0 | Block 1 | Block 2 | |
|---|---|---|---|---|---|---|---|---|
| −2LL | 659013.2 | 615072.2 | 608712.6 | | 225348.3 | 217492.8 | 216513.5 | |
| Hosmer and Lemeshow χ² | | 547.8*** | 663.4*** | | | 65.6*** | 31.2*** | |
| Cox/Snell $R^2$ | | .087 | .099 | | | .011 | .014 | |
| Nagelkerke $R^2$ | | .117 | .133 | | | .019 | .026 | |
| Percentage correct | 56.4 | 63.3 | 63.7 | | 85.9 | 85.9 | 85.9 | |

Note. B = Black; DB = dominant Black; DH = dominant Hispanic; W = White; DW = dominant White; LL = log linear; NDHW = nondominant high White neighborhoods; NDLW = nondominant ow White neighborhoods; Reference groups: stop inside; others present—no; officer not in uniform; radio run—no; high crime area—no; Bronx; ow risk age (0–4, 26, or older); Black in White-dominated neighborhood (B/DW).
***p < .001. **p < .01. *p < .05.

222

**JA0610**

**Table 4.** Logistic Regression on Final Model Results for Sanction and Use of Force Outcomes.

| Final model | Sanction Given (N = 271,161) | | | | Was Any Force Used (N = 481,027) | | | |
|---|---|---|---|---|---|---|---|---|
| | b | SE | Wald | Exp(B) | b | SE | Wald | Exp(B) |
| Stop outside | −.395 | .014 | 808.285 | .674*** | .154 | .010 | 244.928 | 1.167*** |
| Others present—Yes | .007 | .014 | .257 | 1.007 | .228 | .010 | 546.642 | 1.257*** |
| Officer in uniform | .384 | .013 | 820.719 | 1.468*** | −.382 | .009 | 1,717.637 | .683*** |
| Radio run—Yes | −.004 | .014 | .085 | .996 | .093 | .010 | 88.910 | 1.097*** |
| High crime area—Yes | −.193 | .011 | 292.284 | .824*** | −.156 | .008 | 390.979 | .855*** |
| Borough | | | 1,443.007 | | | | 11,435.198 | |
| Brooklyn | −.382 | .016 | 567.482 | .683*** | −1.140 | .011 | 10,845.616 | .320*** |
| Queens | −.007 | .017 | .155 | .993 | −.390 | .012 | 1,074.536 | .677*** |
| Manhattan | .232 | .018 | 159.237 | 1.261*** | −.403 | .013 | 1,022.918 | .668*** |
| Staten Island | .120 | .033 | 13.074 | 1.127*** | −.738 | .025 | 882.449 | .478*** |
| High risk age | −.312 | .011 | 775.829 | .732*** | .110 | .008 | 194.266 | 1.116*** |
| Race/neighborhood | | | 580.579 | | | | 2,036.732 | |
| W/DW | .207 | .035 | 35.550 | 1.230*** | −.445 | .024 | 330.261 | .641*** |
| H/DW | .230 | .034 | 46.907 | 1.259*** | −.230 | .023 | 97.131 | .794*** |
| W/NDHW | .319 | .044 | 53.232 | 1.376*** | −.522 | .034 | 230.139 | .593*** |
| B/NDHW | −.019 | .032 | .345 | .982 | −.114 | .022 | 26.855 | .892*** |
| H/NDHW | .092 | .033 | 7.479 | 1.096** | −.429 | .025 | 303.876 | .651*** |
| W/NDLW, DH, DB | .189 | .044 | 18.110 | 1.208*** | −.293 | .032 | 81.596 | .746*** |
| NW/DB, DH | −.182 | .026 | 49.480 | .834*** | .085 | .017 | 24.583 | 1.089*** |
| NW/NDLW | −.091 | .027 | 11.337 | .913** | −.261 | .018 | 200.739 | .770*** |
| Constant | −1.313 | .030 | 1,859.161 | .269*** | −.813 | .021 | 1,552.410 | .443*** |
| Full model | Block 0 | Block 1 | Block 2 | | Block 0 | Block 1 | Block 2 | |
| −2LL | 227,971.9 | 218,021.9 | 217,459.2 | | 450,410.6 | 430,115.3 | 428,001.2 | |
| Hosmer and Lemeshow $\chi^2$ | | 60.16*** | 120.53*** | | | 886.44*** | 505.25*** | |
| Cox/Snell $R^2$ | | .019 | .021 | | | .032 | .036 | |
| Nagelkerke $R^2$ | | .034 | .038 | | | .053 | .060 | |
| Percentage Correct | 85.6 | 85.6 | 85.6 | | 82.5 | 82.5 | 82.5 | |

Note. B = Black; DB = dominant Black; DH = dominant Hispanic; W = White; DW = dominant White; LL = log linear; NDHW = nondominant high White neighborhoods; NDLW = nondominant, low White neighborhoods; Reference groups: Stop inside; Others present—No; Officer not in uniform; Radio run—No; High crime area—No; Bronx; low risk age (0—4, 26, or older); Back in White-Dominated neighborhood (B/DW).
***$p < .00$ . **$p < .0$ . *$p < .05$.

223

respectively) and do not improve the overall prediction ability of the model that remained at 85.6% from Block 0 through Block 1.

The final model analyzes differences in the use of any type of force used during a stop. As expected, when compared to Blacks in DW neighborhoods, Whites (OR = .64, $p < .001$) and Hispanics (OR = .79, $p < .001$) were significantly less likely to have force used on them during a police stop, as were Whites (OR = .59, $p < .001$) and Hispanics (OR = .65, $p < .001$) in NDHW neighborhoods (see Table 4). Blacks in NDHW areas were significantly less likely (OR = .89) than Blacks in DW neighborhoods to have force used, but this OR exceeded the lower odds for similarly situated Whites and Hispanics. Whites in NDLW, DB, or DH neighborhoods (OR = .75, $p < .001$) were significantly less likely to have force used despite being equally likely to be frisked and significantly more likely to be searched and sanctioned. Non-Whites were significantly more likely to have force used during a stop (OR = 1.09, $p < .001$) in their own dominant neighborhoods than Blacks in DW neighborhoods, but were less likely to have this occur in NDLW areas (OR = .77, $p < .001$). As with the sanction model, the variables added to the model did not improve the ability to correctly classify use of force and the race/neighborhood categories explain just .4–.7% of the variance in force being used during a police stop.

## Limitations

There are several limitations to address before the results are discussed in the context of minority threat hypothesis. The first is the integrated methods used to geographically create neighborhoods, integrate census data, and combine them with the stop and frisk data in order to test the specific hypothesis. This analytical approach resulted in the loss of 51,854 stops from the data set (9.7% of the 532,881 recorded stops) but was essential to combine the stop with its social context at the neighborhood level in a manner that included census data at the block group level. Some stops were removed because they did not have XY coordinates to be able to map and join them accurately to a neighborhood. Other stops occurred in places that were not populated or assigned to a specific neighborhood (e.g., a large park). Others were eliminated due to the fact that the offender did not align with the three major racial or ethnic categories being studied. These stops were removed as part of the analytical process, and no single stop was chosen for elimination. Still, it is a limitation that needs to be conveyed.

Another limitation is conceptual and operational and that is the measure of neighborhood dominance and/or the high White/low White designation. The measures used here are less conservative than that of Flores and Lobo (2013) who used 70% majority of one group concurrent with other groups comprising 10% or less of the population. As with any categorical classification, the cut points used can impact the results. This limitation is mitigated by the segregation of NYC's population and future research can clarify or improve on these measures, which were objectively determined prior to any analysis being conducted. Furthermore, the collapsing of White and Black Hispanics into one category is a limitation but one that follows prior analyses on the same topic. It is impossible to discern what race the officers thought a suspect was when they decided to make the stop, and it is plausible that White Hispanics could be viewed as White and Black Hispanics could be viewed as Black.

Another limitation is the availability of wider data beyond the stop and frisk data set, such as the inclusion of crime suspect descriptions. As such, a proxy measure for racial crime propensity was used here—the relative demographic composition of Riker's Island inmates—which may be skewed against minorities as well. This statistic is used descriptively to create comparative racial benchmarks and not inferentially, mitigating this limitation. It would not have been possible to create a recent crime propensity measure without these data, but it is an important limitation to note. Relative to the control variables, there were far more available within the SQF data set than were selected in the current models. These were selected prior to the analysis based upon the Ridgeway (2007) study as well as variables that could be categorized properly.

**JA0612**

USCA4 Appeal: 24-4201    Doc: 22-2        Filed: 09/04/2024    Pg: 145 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 17 of 21 PageID# 668

The inferential methods employed also have limitations. Logistic regression modeling was utilized based upon the theoretical framework of Black threat in dominant and high White neighborhoods and to create OR that compare the population proportion and crime propensity ratios created. This approach is taken at the expense of a wider inquiry into the main effects of each racial group and neighborhood type or their potential interactions that are extremely important but beyond the scope of the present inquiry.

## Discussion and Conclusion

NYC provides an environment of diminishing, segregated White populations amid a minority–majority city with a major police policy described as racially motivated, characteristics particularly suited to a specific test of the minority threat hypothesis. Population distributions by race and neighborhood type revealed Whites to be very isolated from Blacks and Hispanics to be more integrated throughout the city, consistent with prior research and supportive of the theoretical framework that predicts unequal police action against Blacks and, to a lesser degree, Hispanics. Descriptive analyses revealed differences in stop, frisk, search, sanction, and use of force disparities between Blacks and Hispanics consistent with prior research in general and in NYC specifically. When taking crime propensity into account, disparities across all five measures exceeded the benchmark for Blacks in just two types of neighborhoods—White dominated and NDHW—consistent with the Black crime threat hypothesis as well as the defended neighborhood hypothesis (see Eitle et al., 2002). The fact that Hispanics did not exceed their crime propensity figures in these two neighborhood types suggests that a more general minority threat framework is less applicable in NYC. Descriptively, these results reveal differential treatment of Blacks relative to White dominance, consistent with prior research that posits these disparities are driven more by race than other factors (*Floyd v. New York,* 2013; Gelman et al., 2007; Spitzer, 1999).

The four logistic regression models, when integrated, provide support for the minority and Black threat hypotheses and to a lesser degree the "out of place," defended neighborhoods and criminogenic perspectives. However, none of the OR, when controlling for other factors, reach the disparity levels found in the descriptive analyses that have driven many of the studies which have been critical of the racial equity of NYPD stop and frisk policy. However, even significant results between the reference group (Blacks in dominant White neighborhoods) and the other categories must be discussed with the caveat that the race/neighborhood categories explain a small portion of the overall variance in any of the four police actions.

The Black threat hypothesis is more salient in NYC than a general minority threat framework. Blacks in dominant White neighborhoods are significantly more likely to experience some level of police use of force than in any other neighborhood type except those dominated by Blacks or Hispanics in which they are more likely to experience policing using some level of force. As Bittner (1970) notes, this is the single greatest measure of the coercive power of police, and the more general minority threat framework is mitigated by the fact that Hispanics in dominant White and NDHW neighborhoods are less likely to have force used against them than Blacks in dominant White neighborhoods (though the OR are closer to 1 than for Whites). Blacks in dominant White neighborhoods are also more likely to be frisked than either Whites or Hispanics, but less likely to be searched or sanctioned, greatly minimizing the criminogenic theory as an explanation for the frisk and use of force differences. Blacks are handled as a threat on the lowest end (frisk) and highest end (use of force) of the four police actions and seen as more of a perceived threat than Hispanics in the same neighborhood type.

The comparative results in NDHW neighborhoods provide some support for the defended neighborhood hypothesis within the context of minority threat. Compared to Blacks in dominant White neighborhoods, Blacks and Hispanics in these neighborhoods are more likely to be frisked

while Whites are less likely. Once again, Whites are more likely to be searched and sanctioned, suggesting the Black threat in NDHW neighborhoods is more perceived than real. Despite being as likely to be searched and less likely to experience use of police force, Hispanics are again more likely in this type neighborhood to be sanctioned than Blacks in dominant White neighborhoods. In the aggregate, these findings reveal disparities in police actions against Blacks depending on the type of neighborhood in which the stop occurs, and the evidence suggests many Black stops are not criminally related in White-dominated or high White neighborhoods, consistent with the Black threat hypothesis. Thus, Blacks are significantly more likely to be frisked and treated more forcefully, but less likely to be searched or sanctioned, casting doubt on purely criminogenic arguments. However, it must be cautioned that defended neighborhoods need to be studied more in depth from a longitudinal perspective, so the support found here is limited.

These models also find support for "out of place" stops (Bass, 2001; Gelman et al., 2007) that somewhat mitigate the minority and Black threat hypotheses. The frisk model suggests that Blacks in dominant White neighborhoods are seen as more threatening than other groups, but Blacks and Hispanics are more likely to be frisked in NDLW and dominant Black/Hispanic neighborhoods, suggesting that many Black stops in dominant White areas may not be related to criminal behavior or even a wider power struggle for dominance but simply because they are "out of place." This view is supported by the finding that Whites in NDLW and dominant Black/Hispanic neighborhoods are equally likely than Blacks in dominant White neighborhoods to be frisked despite their likelihood of criminality being far less and the racial threat not being applicable: They are also "out of place." Once again, the search model found no significant difference in Whites in non-White neighborhoods and Blacks in high White neighborhoods, supporting the "out of place" theory as an equal indicator of searches, consistent with a "race based selection of citizens for crime interdiction" (Gelman et al., 2007) being applicable to both Whites and Blacks. However, the "out of place" results apply to Whites relative to frisks and searches, but not sanctions or force. In fact, Whites in NDLW and dominant Black/Hispanic neighborhoods were more likely to be sanctioned but treated less forcefully than Blacks in dominant White neighborhoods, at odds with the criminogenic perspective but somewhat supportive of the differences expected by minority threat relative to the treatment of Blacks. As opposed to the segregation and concentration of the Black and White populations, the integration throughout the city of Hispanics means they are less apt to be "out of place" in many neighborhoods.

Less support was found for the criminogenic perspective, which is the main supporting argument from the NYPD. Descriptive statistics revealed that Blacks face all four police actions in dominant White and NDHW neighborhoods that greatly exceed their criminogenic ratios. When controlling for other factors, Blacks in dominant White neighborhoods were less likely to be frisked than non-Whites in NDLW and dominant Black/Hispanic neighborhoods, which supports the criminality argument in those areas. Furthermore, the only group that experienced more uses of police force than Blacks in White-dominated neighborhoods were non-Whites in minority-dominated neighborhoods, consistent with more dated research (D. A. Smith, 1986). However, non-Whites were significantly less likely to be searched or sanctioned in these minority-dominated neighborhoods and in NDLW they were less likely to experience the use of force. In essence, Black search and sanction outcomes in dominant White neighborhoods were significantly lower than those of Whites and Hispanics, casting doubt on the Black criminogenic argument for which weak support was found.

Though the findings of this study generally support the Black threat, defended neighborhood and out of place hypotheses more so than the criminogenic perspective, it must be noted that the findings are similar to Ridgeway (2007) who found that racial disparities were greatly reduced when control variables were introduced. The descriptive approach here found ratios for Blacks in dominant White and NDHW neighborhoods which greatly exceeded the criminogenic expectations. However, the regression models, when controlling for other factors, found no coefficients that exceeded the Riker's Island crime propensity weights or the general population proportionalities. This suggests the minority

threat hypothesis, which is clearly more pertinent to Blacks than Hispanics in NYC, is tepidly supported but not at exceedingly high levels based on OR and low pseudo $R^2$ contributions in Block 2 of both models. In the aggregate, this framework is found to be valid in the examination of police stop and frisks in NYC but clearly more research is needed to supplement and enhance the results presented here, to more fully reflect the many complexities of threat theories as they continue to emerge in the policing and criminal justice literature.

### Declaration of Conflicting Interests

The author declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author received no financial support for the research, authorship, and/or publication of this article.

### Notes

1. An adjournment in contemplation of dismissal is a legal sanction used in lieu of formal probation or super vision mechanisms relative to minor crimes. Similar conceptually to pretrial diversion, the offender has adjudication withheld and as long as they are not arrested for new crimes within a specified time frame, the original charges are dismissed.
2. The search and sanctions model uses frisks only as they are more likely to precede a search or sanction than a mere stop. It must be noted that the New York Police Department makes far more arrests, searches and sanctions each year than are represented in the Stop Question Frisk (SQF) data, so the smaller sample was used for specificity relative to SQF incidents. A search or sanction is seen here as more likely when a frisk has been performed than a stop in which no frisk occurred.

### References

American Community Survey. (2007 2011). *US census bureau block group shapefiles*. New York, NY. Retrieved from http://www.census.gov/geo/maps data/data/tiger data.html

Bass, S. (2001). Policing space, policing race: Social control imperatives and police discretionary decisions. *Social Justice, 28*, 156 176.

Bernard, T. J., Snipes, J. B., & Gerould, A. L. (2010). *Vold's theoretical criminology* (6th ed.). New York, NY: Oxford University Press.

Bittner, E. (1970). *The functions of the police in modern society: A review of background factors, current practices and possible role models*. Washington, DC: U.S. Department of Justice.

Blalock, H. (1967). *Toward a theory of minority group relations*. New York, NY: John Wiley.

Bytes of the Big Apple. (n.d.). New York city department of city planning. Retrieved from http://www.nyc.gov/html/dcp/html/bytes/applbyte.shtml

Center for Constitutional Rights. (2009). Racial disparities in NYPD stop and frisks: The center for constitutional rights preliminary report on UF 250 data from 2005 through June 2008. Retrieved from http://ccrjustice.org/files/Report CCR NYPD Stop and Frisk.pdf

Chiricos, T., & Eschholz, S. (2002). The racial and ethnic typification of crime and the criminal typification of race and ethnicity in local television news. *Journal of Research in Crime and Delinquency, 39*, 400 420.

Civilian Complaint Review Board. (2001). Street stop encounter report: Analysis of CCRB complaints resulting from the New York police department "Stop & Frisk" practices. Retrieved from http://www.nyc.gov/html/ccrb/pdf/stop.pdf

Cooper, M. (1999). Safir may use data on frisks to back unit. *New York Times Archive*. Retrieved from http://www.nytimes.com/1999/04/19/nyregion/safir may use data on frisks to back unit.html

Cureton, S. R. (2000). Justifiable arrests or discretionary justice: Predictors of racial arrest differentials. *Journal of Black Studies, 30*, 703 719.

**JA0615**

Deslippe, D. A. (2004). "Do whites have rights?": White Detroit policemen and "reverse discrimination" protests in the 1970's. *The Journal of American History*, *91*, 932 960.

Eitle, D., D'Alessio, S., & Stolzenberg, L. (2002). Racial threat and social control: A test of the political, economic, and threat of black crime hypotheses. *Social Forces*, *81*, 557 576.

El Ghobashy, T. (2011). Minorities gain in NYPD ranks. *Wall Street Journal*. Retrieved from http://online. wsj.com/news/articles/SB10001424052748704415104576066302323002420?mg=reno64wsj&url=http %3A%2F%2Fonline.wsj.com%2Farticle%2FSB10001424052748704415104576066302323002420.html

Flores, R. J. O., & Lobo, A. P. (2013). The reassertion of a black/non black color line: The rise in integrated neighborhoods without blacks in New York City, 1970 2010. *Journal of Urban Affairs*, *35*, 255 282.

*Floyd v. New York*. (2013). Decision. 08 Civ. 1034 (SAS).

Fridell, L., Lunney, R., Diamond, D., & Kubu, B. (2001). *Racially biased policing: A principled response*. US Department of Justice and Police Executive Research Forum. Retrieved from http://www.cops.usdoj.gov/ Publications/RaciallyBiasedPolicing.pdf

Gelman, A., Fagan, J., & Kiss, A. (2007). An analysis of the New York city police department's "Stop and frisk" policy in the context of claims of racial bias. *Journal of the American Statistical Association*, *102*, 813 823.

Green, D. P., Strolovich, D. Z., & Wong, J. S. (1998). Defended neighborhoods, integration and racially motivated crime. *American Journal of Sociology*, *104*, 372 403.

Harris, D. A. (2003). The reality of racial disparity in criminal justice: The significance of data collection. *Law and Contemporary Problems*, *66*, 71 98.

Holmes, M. D. (2000). Minority threat and police brutality: Determinants of civil rights criminal complaints in U.S. municipalities. *Criminology*, *38*, 343 367.

Hurwitz, J., & Peffley, M. (2005). Explaining the great racial divide: Perceptions of fairness in the US criminal justice system. *The Journal of Politics*, *67*, 762 783.

Jackson, P. I. (1989). *Minority group threat, crime and policing: Social context and social control*. New York, NY: Praeger.

Johnson, B. D., Golub, A., Dunlap, E., & Sifaneck, S. J. (2008). An analysis of alternatives to New York City's current marijuana arrest and detention policy. *Policing: An International Journal of Police Strategies and Management*, *31*, 226 250.

Jones Brown, D., Gill, J., & Trone, J. (2010). *Stop, question and frisk policing practices in New York city: A primer*. New York, NY: Center on Race, Crime and Justice, John J. College of Criminal Justice. Retrieved from http://www.jjay.cuny.edu/web images/PRIMER electronic version.pdf

Kane, R. J. (2003). Social control in the metropolis: A community level examination of the minority group threat hypothesis. *Justice Quarterly*, *20*, 265 295.

Kent, S. L., & Jacobs, D. (2005). Minority threat and police strength from 1980 2000: A fixed effects analysis of non linear and interactive effects in large U.S. cities. *Criminology*, *43*, 731 760.

King, R. D. (2007). The context of minority group threat: Race, institutions and complying with hate crime law. *Law and Society Review*, *41*, 189 224.

King, R. D., & Wheelock, D. (2007). Group threat and social control: Race, perceptions of minorities and the desire to punish. *Social Forces*, *85*, 1255 1280.

Kooistra, Paul G., Mahoney, John S., & Westervelt, Saundra D. (1998). The world of crime according to cops. In Mark Fishman & Gray Cavender (Eds.), *Entertaining crime: Television reality programs* (Chap. 8, pp. 141 158). New York, NY: Aldine de Gruyter.

Lardner, J., & Reppetto, T. (2000). *NYPD: A city and its police*. New York, NY: Henry Holt.

Lasley, J. R. (1994). Ethnicity, gender and police community relations. *Social Science Quarterly*, *75*, 85 97.

New York Police Department. (n.d.). 2012 stop, question and frisk database. Retrieved from http://www.nyc. gov/html/nypd/html/analysis and planning/stop question and frisk report.shtml

Office of the New York State Attorney General. (2013). *A report on arrests arising from the New York City Police Department's stop and frisk practices*. Retrieved from http://www.ag.ny.gov/pdfs/OAG REPORT ON SQF PRACTICES NOV 2013.pdf

JA0616

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 149 of 502

Case 3:21-cr-00042-JAG   Document 72-4   Filed 04/22/22   Page 21 of 21 PageID# 672

Parker, K. F., Stults, B. J., & Rice, S. K. (2005). Racially threat, concentrated disadvantage and social control: Considering the macro level sources of variation in arrest. *Criminology*, *43*, 1111 1134.

Perez, A. D., Berg, K. M., & Myers, D. J. (2003). Police and riots, 1967 1969. *Journal of Black Studies*, *34*, 153 182.

Rice, S. K., & Piquero, A. R. (2005). Perceptions of discrimination and justice in New York City. *Policing: An International Journal of Police Strategies and Management*, *28*, 98 117.

Ridgeway, G. (2007). *Analysis of racial disparities in the New York police department's stop, question and frisk practices*. Santa Monica, CA: RAND Corporation. Retrieved from http://www.rand.org/content/dam/rand/pubs/technical reports/2007/RAND TR534.pdf

Ruddell, R., & Urbina, M. G. (2004). Minority threat and punishment: A cross national analysis. *Justice Quarterly*, *21*, 903 931.

Sampson, R. J., & Lauritsen, J. L. (1997). Racial and ethnic disparities in crime and criminal justice in the United States. *Crime and Justice*, *21*, 311 374.

Sklansky, D. A. (2006). Not your father's police department: Making sense of the new demographics of law enforcement. *The Journal of Criminal Law and Criminology*, *96*, 1209 1243.

Skogan, W. G. (1995). Crime and racial fears of white Americans. *Annals of the American Academy of Political and Social Science*, *539*, 59 71.

Smith, B. W., & Holmes, M. D. (2003). Community accountability, minority threat and police brutality: An analysis of civil right criminal complaints. *Criminology*, *41*, 1035 1063.

Smith, B. W., & Holmes, M. D. (2014). Police use of force in minority communities: A test of minority threat, place and community accountability hypotheses. *Social Problems*, *61*, 83 104.

Smith, D. A. (1986). The neighborhood context of police behavior. *Crime and Justice*, *8*, 313 341.

Solis, C., Portillos, E. L., & Brunson, R. K. (2009). Latino youths' experiences with and perceptions of involuntary police encounters. *Annals of the American Academy of Political and Social Science*, *623*, 39 51.

Spitzer, E. (1999). *The New York City police department's stop and frisk practices: A report to the people of the state of New York from the office of the attorney general*. New York, NY: Civil Rights Bureau. Retrieved from http://nysl.nysed.gov/uhtbin/cgisirsi/NuH44D7DA0/NYSL/19730017/523/14695

Stolzenberg, L., D'Alessio, S. J., & Eitle, D. (2004). A multilevel test of racial threat theory. *Criminology*, *42*, 673 698.

Stucky, T. D. (2005). Local politics and police strength. *Justice Quarterly*, *22*, 139 169.

Stults, B. J., & Baumer, E. P. (2007). Racial context and police force size: Evaluating the empirical validity of the minority threat perspective. *American Journal of Sociology*, *113*, 507 546.

Tuch, S. A., & Weitzer, R. (1997). Trends, racial differences in attitudes toward the police. *The Public Opinion Quarterly*, *61*, 642 663.

Walker, S., & Shelley, T. O. (1999). Affirmative action, diversity and law enforcement. In D. J. Kenney & R. P. McNamara (Eds.), *Police and policing: Contemporary issues* (2nd ed., pp. 187 199). Westport, CT: Praeger.

Wang, X., & Mears, D. P. (2010). A multilevel test of minority threat effects on sentencing. *Journal of Quantitative Criminology*, *26*, 191 215.

Weitzer, R., & Tuch, S. A. (2005). Racially biased policing: Determinants of citizen perceptions. *Social Forces*, *83*, 1009 1030.

Wilson, J, Q. (1968). Dilemmas of police administration. *Public Administration Review*, *28*, 407 417.

## Author Biography

**Joseph Ferrandino**, Ph.D. is an Assistant Professor of Criminal Justice in the School of Public and Environmental Affairs (SPEA) at Indiana University Northwest. His research interests include the efficiency and performance of police departments and the intersection of new governance with criminal justice systems.

Roh, Sunghoon, and Matthew B. Robinson (2009). A Geographic Approach to Racial Profiling: The Microanalysis and Macroanalysis of Racial Disparity in Traffic Stops. **Police Quarterly** 12(2): 137-169. [June 2009] Sage - ISSN: 1098-6111

# A Geographic Approach to Racial Profiling: The Microanalysis and Macroanalysis of Racial Disparity in Traffic Stops

## Sunghoon Roh and Matthew Robinson

### ABSTRACT

Despite numerous studies explaining racial disparity in traffic stops, the effects of spatial characteristics in patrolling areas have not been widely examined. In this article, the authors analyzed traffic stop data at both micro- and macro- levels. The micro-level analysis of individual stops confirmed racial disparity in the frequency of traffic stops as well as in subsequent police treatments. Blacks were overrepresented and other racial/ethnic groups were underrepresented in traffic stops, with a greater disparity in investigatory stops. The macro-level analysis found that the likelihood of being stopped and being subjected to unfavorable police treatment (e.g. arrest, search, and felony charge) was greater in beats where more blacks or Hispanics resided and/or more police force was deployed, consistent with the "racial threat" or "minority threat" hypothesis. These findings imply that racial disparity at the level of individual stops may be substantially explained by differential policing strategies adopted for different areas based on who resides in those areas.

### ARTICLE

Racial profiling is one of the most discussed issues in policing (Weitzer and Tuch, 2006). Racial profiling occurs when "a person is treated as a suspect because of his or her race, ethnicity, nationality or religion" (American Civil Liberties Union, 2007). It can occur when police officers stop, question, search, investigate, arrest, and/or use some degree of force against a person based on race rather than suspicious or criminal behavior (Harris, 1997; Weitzer and Tuch, 2002). A

well-known form of racial profiling is referred to as "driving while black" or "driving while brown" (DWB).[1]

Most American citizens believe racial profiling not only exists but is widespread. For example, a 2003 Gallup Poll showed that 59% of Americans thought police profiling was widespread, including 85% of blacks (Ludwig, 2003). Historical analyses (Skolnick, 2007) and scholarly reviews of the literature (del Carmen, 2007) verify the realities of racial profiling by some police, at some times, in some places. Discrimination that occurs in some places and some time periods is referred to as "contextual discrimination" (Walker, Spohn, and Delone, 2006).

The American Civil Liberties Union (ACLU) has documented evidence of racial profiling in several states, including Arizona, California, New York, Ohio, and Rhode Island. It also has led efforts to file complaints against police departments in cities in other states (ACLU, 2007). Amnesty International also has investigated racial profiling (Amnesty International, 2007). According to Amnesty, 32 million Americans "report they have already been victims of racial profiling." Further, about 87 million Americans "are at a high risk of being subjected to future racial profiling during their lifetime."

When it occurs, racial profiling has dramatic negative effects on those targeted, including emotions such as fear, frustration, depression, and anger (Birzer and Smith-Mahdi, 2006; Hart et al., 2003). Further, racial profiling hurts law enforcement efforts since it hinders trust between the police and community. Racial profiling has also been shown to be largely ineffective with regard to the wars on crime, drugs, and terrorism (Robinson, 2005).

The current study examines traffic stop data at both micro- and macro- levels in order to assess the likelihood of racial profiling in Houston, Texas. At the micro-level, we analyze racial discrepancies in traffic stops in terms of the likelihood of being stopped and the types of police

treatments after stops. At the macro-level, we examine the spatial distribution of traffic stops and stop outcomes, especially focusing on how racial disparities in traffic stops are associated with characteristics of police beats.

The macro-level of analysis is important to fully understand racial profiling because police agencies do not utilize the same crime control strategies in different areas within their jurisdictions; deployment of police force varies geographically depending upon the demand for patrol resources. In general, more patrols are allotted to communities that generate a greater number of calls for service and host higher rates of reported crime (Doerner, 1997). Differential crime control approaches, supported by problem-oriented policing strategies and "hot spot" analyses, are considered by police administrators as appropriate means to utilize limited police resources (Paulsen and Robinson, 2004). Further, the macro-level is also important because police officers tend to be disproportionately assigned to minority communities, a phenomenon supposedly owing itself to a perceived threat posed by members of certain racial minority groups (Holmes, 2000; Parker, Stults, and Rice, 2005; Stolzenberg, D"Alessio, and Eitle, 2004; Stults and Baumer, 2007).

## LITERATURE REVIEW

In this review, we outline the many studies that have found evidence of racial profiling. We also discuss those studies that have not found evidence of racial profiling. The goal is to provide some context for our study of racial profiling in Houston, Texas.

Typically, studies of racial profiling illustrate that blacks and other racial minorities are more likely than whites to be stopped; that they are especially more likely to be stopped for minor traffic violations as well as for non-driving traffic violations such as vehicle defects, license/registration checks, and other traffic offenses; that they are more likely to be searched

after being stopped; and in some cases they are more likely to be ticketed and/or arrested (Barlow and Barlow, 2002; Batton and Kadleck, 2004; Bostaph, 2007; Buerger and Farrell, 2002; Engel and Calnon, 2004; Gross and Barnes, 2002; Harris, 1999; Lamberth, 1997; Langan et al., 2001; Lundman, 2004; Meehan and Ponder, 2002; Peruche and Plant, 2006; Petrocelli, Piquero, and Smith, 2003; Romero, 2006; Schafer et al., 2006; Tomaskovic-Devey et al., 2006; Warren et al., 2006).

However, other studies have not found evidence of racial profiling (Novak, 2004; Smith and Petrocelli, 2001). Further, some studies raise the possibility that minorities may be more involved in criminality (Gaines, 2006), some drug crimes (Lichtenberg, 2006), and speeding offenses (Lange, Johnson, and Voas, 2005), thereby justifying higher stop and arrest rates by police of some groups.

Among the most well known studies to find evidence of racial profiling include studies of the New Jersey Turnpike in 1996 by Lamberth Consulting and a follow-up study in 2000. The 1996 study found that blacks accounted for 73% of stops in spite of making up less than 14% of road users. The 2000 study showed that although blacks and Hispanics made up 78% of those searched by officers, contraband was found on whites more than blacks and Hispanics (25%, 13%, and 5%, respectively) (ACLU, 2007). However, a study of New Jersey by Lange Johnson, and Voas (2005) found that one significant reason blacks were more likely to be stopped in the state was because they were overrepresented among speeders. The authors noted, however, that the study did not disprove the racial profiling hypothesis.

A study by the New York State Attorney General in 1999 of the New York City Police Department's "stop and frisk" practices of pedestrians found further evidence suggestive of racial profiling. It found that, although blacks make up just 26% of the population, they accounted for

51% of all the stops during the period of the study. Hispanics, who made up 24% of the

population, accounted for 33% of all the stops. Whites, who made up 43% of the population,

accounted for only 13% of all stops.

Blacks also were overrepresented among stops by the city's aggressive Street Crime Unit

(SCU), as they accounted for 63% of all stops by the SCU. Most telling, even in precincts where

blacks and Hispanics made up less than 10% of the population, they accounted for more than

half of the total stops in these areas (Office of the New York State Attorney General, 1999).

A study in the state of Massachusetts by the Institute on Race and Justice at Northeastern

University also found evidence of possible racial profiling. It determined that across 366

agencies, racial disparities were above average in 141 communities (38% of Massachusetts

jurisdictions) (Farrell et al., 2004: 25). After attempting to control for percentages of drivers of

each race on the roads, the authors found racial disparities that were above average in 201

communities (56% of jurisdictions) (Farrell et al., 2004: 25-26).

With regard to police searches, the study found that across Massachusetts, white drivers

were less likely to be searched than non-white drivers (1.3% versus 1.8%, respectively), and

"racial disparity in searches was observed in 208 jurisdictions throughout the state" (Farrell et al.,

2004: 26). With regard to citations and warnings the authors found that white drivers were less

likely than non-white drivers to receive a citation (66% versus 72%, respectively). According to

the authors, "in some communities in Massachusetts officers may be more likely to use their

discretion to give written warnings to white drivers rather than to non-white drivers. In fact out

of … 142 communities … non-white drivers were significantly more likely to receive a citation

in 58% or 83 of the communities. While all drivers may be more likely to be cited for egregious

violations of the law, differential behavior patterns do not appear to explain away racial

differences in citation and warning rates" (Farrell et al., 2004: 28).

The Illinois Traffic Stop Study, which used a unique methodology, found evidence consistent with racial profiling as well (Weiss and Grumet-Morris, 2006). The authors of the study constructed a ratio based on estimates of the minority driving population compared with the percentage of stops of minorities by agencies. According to the authors, the overall ratio in the state of Illinois was 1.12, meaning minorities were being disproportionately stopped (Weiss and Grumet-Morris, 2006: 3).

The authors found that whites were more likely than minorities to be stopped for moving violations (73% versus 68%, respectively) and that minorities were more likely than whites to be stopped for non-moving violations (32% versus 27%, respectively ). According to the authors: "This difference manifests itself more clearly when we observe the distribution of stops for license/registration violations, a non-moving violation. This class of offenses is instructive because law enforcement officers can generally exercise significant discretion in deciding whether to initiate these contacts" (Weiss and Grumet-Morris, 2006: 5).

Clear differences were also found for consent searches. Minorities were nearly 3 times more likely than whites to be subject to a consent search. In 2005, blacks were 3.3 times more likely to be subjected to consent searches than whites and Hispanics were 2.7 times more likely (Weiss and Grumet-Morris, 2006: 6). Finally, minorities were more likely than whites to be cited (68% versus 60%, respectively) (Weiss and Grumet-Morris, 2006: 6).

The Rhode Island Traffic Stop Report found further evidence consistent with racial profiling (Farrell and McDevitt, 2006). Among its key findings were that, after being stopped, non-white drivers were more likely than white drivers to be subjected to a discretionary search (5.9% versus 2.9%, respectively). Further, in "22 of the 39 agencies studied, non-whites [were]

significantly more likely than whites to be subjected to a discretionary search. Statewide, the odds of a non-white motorists being searched [were] roughly twice that of a white driver being searched" (Weiss and Grumet-Morris, 2006: 2). Importantly, in this study, people of color were less likely to be found with contraband than whites.

Studies have also been conducted in numerous other states, as well as specific cities and even within individual police agencies. These include, but are not limited to, Ann Arbor, Michigan, Charlotte, North Carolina, Eugene, Oregon; San Diego, California, Oakland, California; Riverside, California; Sacramento, California; Denver, Colorado; Iowa City, Iowa, Wichita, Kansas; Saint Paul, Minnesota; and the states of Connecticut, Kansas, Missouri, North Carolina, Pennsylvania, Texas, and Washington.[2]

Perhaps the strongest evidence of racial profiling in policing comes from a 2005 Bureau of Justice (BJS) study. The BJS study showed clear evidence of racial profiling nationally, based on the finding that blacks and Hispanics were more likely to be searched following a stop yet no more likely to be found in possession of contraband. While whites only had their cars searched 3.5% of the time, blacks and Hispanics had their cars searched 10.2% and 11.4% of the time, respectively (Bureau of Justice Statistics, 2005).

Allegedly, Lawrence Greenfeld, head of the Bureau of Justice Statistics, refused to follow orders from the Justice Department to downplay the study's conclusions in a news release (Lichtblau, 2005). As such, he was released from his position. According to the Leadership Conference on Civil Rights (2005), the BJS report confirms that "profiling by federal, state, and local law enforcement agencies is widespread, and that, despite the efforts of some states and local law enforcement agencies to address this problem, federal legislation is necessary."[3]

Studies of individual cities, such as Oakland, California, find similar results. For example,

Ridgeway (2006) found that black drivers were twice as likely as white drivers to be searched after being stopped, and only 18% of the searches led to an arrest. Further, the duration of the stop was longer for blacks than whites. A study in Miami found that minorities were not more likely to be stopped but were treated differently after being stopped (Alpert, Dunham, and Smith, 2007).

In spite of such seemingly consistent findings, other studies have found less or no evidence of racial profiling (Skolnick, 2007). For example, the North Carolina Highway Traffic Study found "considerable variation in the racial distribution" of citations and written warnings "across the types of behaviors that were likely to have resulted in the citation or written warning incident (such as speeding or unsafe vehicular movement)" (Smith et al, 2004: 4). The authors acknowledged that "[d]ata on stops, citations, and written warnings that allow for a simple statistical summary for the state as a whole show evidence of racial disparity against African Americans." For example, African Americans made up only 20% of state drivers but nearly 25% of all those cited for speeding (Smith et al. 2004: 238). Yet, without measures of racial composition of highway drivers or violation rates by race, the researchers were unable to definitively say racial profiling is a problem on the state's highways.

Further, according to these authors, "objectively measured indicators of violating behaviors in citations" more often involved black drivers, which is suggestive of "the possible importance of variations in driver's behavior as a primary determinant of whether or not someone is cited" (Smith et al. 2004: 4). That is, driver behavior (including speeding) rather than race could be the determinant of police stops, something that has been confirmed in other studies (Lange, Johnson, and Voas, 2005). The authors conclude that "one can neither rule out the possibility that racial bias explains some of the variation in racial disparity, nor assert that it is

unequivocally present in any geographic area or in the workings of any specific trooper. Put simply, the current level of science is inadequate to the determination of whether disparity can be explained by bias or by one or the other of the rival hypotheses" (Smith et al, 2004: 242).

The authors reason that if a racial bias does operate, it occurs at the local level and is probably at the unconscious "cognitive" level (Smith et al, 2004: 9). Warren et al (2006: 731) suggest that in North Carolina, factors such as race may continue to influence local police behavior. This would be consistent with the claim by some of an "innocent bias" that plagues American policing (Robinson, 2005), which is created in part by an officer's life experiences including interactions with people of color (Peruche and Plant, 2006).

The variation of findings of studies on racial profiling is likely attributable in part due to different locations studied (e.g., New Jersey versus North Carolina), the level of law enforcement studied (e.g., local versus state police), and may also be due to how data are collected, how key variables are operationalized, and whether certain control variables are introduced (Engel, Calnon, and Bernard, 2002; Gold, 2003; Harris, 2003; Parker et al., 2004; Walker, 2001; Warren et al. 2006; West, 2003). For example, many studies do not explicitly consider those "tremendous number of factors other than bias (that) can legitimately influence police decisions to stop drivers" (Fridell, 2004: 3).

At a minimum, studies should control for the *quantity factor* (i.e., some groups of people drive more than other groups of people), the *quality factor* (i.e., some groups of people violate traffic laws more than other groups of people), and the *location factor* (some people drive more in areas where police make more stops than others) due to higher police presence and/or the employment of more aggressive policing techniques. Typically, while some studies of racial profiling attempt to control for the quantity and quality factors, either directly or indirectly, they

**JA0626**

tend to ignore the location factor, or spatial elements of law enforcement outcomes as they relate to racial profiling.

One study did take into consideration the "type of the community" based on racial composition (Meehan and Ponder, 2002). Focusing on police officers" conception of place, rather than on differentiated law enforcement by police agency, the authors proposed that black drivers are more likely to be subject to disproportionate surveillance and traffic stops by the police when they drive in white communities; this is because police officers tend to suspect that a driver might be engaged in criminal activities when the driver"s race does not match the racial composition of a particular area. The authors concluded that "profiling significantly increases as African Americans move farther from stereotypically „black" communities and into wealthier, whiter areas; a phenomenon we call the *race-and-place* effect." In other words, "(b)eing an African American driver in a whiter area has more negative consequences than being an African American driver in a blacker area of the same community" (p. 401).

One problem with the study is that it simplified racial profiling as a matter of an individual officer"s behavioral pattern derived from the conception of place, and did not take into account a systemic intervention by organizations in patrol assignments dependent on types of areas. Further, racial difference in police treatments was not investigated in the study. The authors of the study did assume that a "commonsense geography" occurs among police whereby officers know the racial composition of places where drivers are located and that they utilize a "cognitive schema" that identifies suspicious behavior by African Americans, especially in whiter areas. The authors conclude that "racial profiling is inextricably tied not only to race, but to officers"conceptions of place of what *should* typically occur in an area and *who belongs* as well as *where they belong*" (p. 402).

This finding can be tied to the "racial threat" (Parker, Stults, and Rice, 2005; Stolzenberg, D"Alessio, and Eitle, 2004) or "minority threat" (Holmes, 2000; Stults and Baumer, 2007) hypothesis suggesting that police are assigned in higher numbers to certain areas of a community where minority residence is higher. The war on drugs is one reason there is intensive deployment in minority communities (Robinson and Scherlen, 2007). Given that the police conceive minority communities as places where drug use and trafficking occur in open markets, more aggressive crackdowns in these areas are accepted as an effective utilization of limited police resources. However, it is clear from national studies of drug use such as the National Survey on Drug Use and Health (NSDUH) that rates of drug use for blacks are not significantly higher than for whites. The 2007 NSDUH found past–month drug use rates of 9.5% for blacks versus 8.2% for whites, but the 2001 survey found nearly identical rates for blacks and whites (6.9% versus 6.8%, respectively) (Robinson and Scherlen, 2007).

A recent study of Seattle drug arrests found that nearly two-thirds of arrestees were black even though the only drug for which blacks made up a majority of dealers was crack cocaine; the majority of those involved in dealing methamphetamine, ecstasy, powder cocaine, and heroin were white (Beckett, Nyrop, and Pfingst, 2006). The authors attribute the disparity to three organizational factors: 1) an explicit focus by police on crack offenders; 2) an explicit focus by police on outdoor drug activity; and 3) racially diverse outdoor drug markets received more attention by police than predominantly white outdoor drug markets. The authors concluded that "the geographic concentration of law enforcement resources is a significant cause of racial disparity" (p. 129).

Ecological studies of policing have shown for years that policing efforts vary widely by community characteristics (Sherman, 1986). For example, a study of sixty neighborhoods in

three large US cities showed that assistance offered to citizens and contact with suspicious persons by police were higher in racially heterogeneous neighborhoods (Smith, 1986). Further, suspects encountered in poor areas were three times as likely to be arrested as those encountered in higher income neighborhoods, "regardless of type of crime, race of offender, offender demeanor, and victim preference for criminal arrest" (p. 313). In the study, racial composition of the neighborhood rather than the race of individuals encountered by police seemed to account for use of coercive authority by police.

Some studies do find that, when stopped by police officers, blacks are more likely to be found in possession in larger amounts of some drugs than whites, even when they are no more likely overall to be in possession of drugs (e.g., Lichtenberg, 2006). Another study in New York City found significant evidence of racial disparities for drug offenses such as smoking marijuana in public as part of the department's quality-of-life, zero-tolerance program (Golub, Johnson, and Dunlap, 2007).

If people of color are more involved in certain crimes, or are expected to be in possession of larger amounts of drugs, it would be logical to assume that a higher frequency of traffic stops for blacks and Hispanics will result from more assignments of patrol in minority residential areas. Similarly, more aggressive law enforcement in minority communities may be the primary reason why black and Hispanic drivers are treated differently by police officers. Racial disparity on the level of individual stops may thus be explained by racial disparities at the level of police beats. That is, minority drivers may be disproportionately stopped and differently treated after stops because they are stopped more often in minority areas where greater numbers of stops are made and where a more intensive policing style is utilized. Focusing on both the micro- and macro- levels potentially allows one to better understand the issue of police profiling.

The current study assumes that the frequency of traffic stops and types of police treatments after stops are dependent upon areas characterized by the deployment density of the police and the proportion of blacks in the population. Given that each area of study has different racial proportions, differentiated police deployment in terms of frequency and intensity will affect the total disparate frequency of stops and police treatments among racial groups. The primary focus in this study is on the extent and the direction that two location-related variables affect the racial difference in traffic stops.

## METHOD

DATA

Traffic stop data were collected from January through December 2003 by the Houston Police Department, Texas. The data collection was conducted in compliance with Senate Bill 1074, which mandates every police agency to compile data about race or ethnicity whenever traffic and pedestrian stops are made. The police department utilizes a computer-based data compilation system whereby officers are required to select an appropriate option regarding race and gender of the person stopped, the reason for the stop, the disposition of the stop, the type of search involved, whether contraband was discovered, and the type of charge as a result of the stop.

In this study, 333,760 traffic stops in 121 beats were analyzed. Only included were the traffic stops in which the driver's race/ethnicity was white, black or Hispanic. The baseline for comparing the frequencies of traffic stops among different racial/ethnic groups was the racial/ethnic proportion of population 15 years and above based on the American Community Survey 2003.[4] Without available data on the actual driving population and the racial/ethnic proportion of drivers, we chose the driving age population as a proxy of the driving population. Despite the potential problem of non-representativeness, this threshold population has been

commonly used in previous racial profiling studies (for review of the baseline issues, see Batton & Kadleck, 2004; Engel, Calnon, & Bernard, 2002). The expected number of traffic stops for each racial/ethnic group was estimated based on the proportion of the driving age population by race/ethnicity.

At the macro-level, we utilized the geographic files in the 2000 U.S. Census data and a beat map file to estimate populations and racial proportions in the police beats. Using a GIS program (ArcGIS 9.0), TIGER/Line files downloaded from the U.S. Census website were overlaid with the beat map in the police department. Then, the U.S. Census demographic data layer was plotted over those maps, aggregating demographic information on the census block level into that of the beat level. Finally, patrol deployment data on the police department were used to estimate the distribution of police force over the beats. The data contain patrol assignments by beats from January through December 2003.

MODELING STRATEGIES

In the macro-level analyses, we attempt to investigate how the spatial characteristics of the policing areas are associated with the various aspects of the racial profiling contention. A simple approach would be computing the OLS regression to predict the dependant variables with the predictors. The OLS method, however, may not be appropriate with a geographic unit of analysis, especially when the value of a variable at one area is conditioned by adjacent areas, which is called "spatial autocorrelation" or "spatial dependence." If neighboring areas show a similar value because of the geographical proximity, it will lead to underestimated standard errors, resulting in an inflation of values $t$ or $F$ and therefore committing a Type $I$ error (Martin 2002).

First, we conduct an Exploratory Spatial Data Analysis (ESDA) to examine the spatial

JA0631

autocorrelation of the dependent and independent variables. Moran's I statistic is applied to test the null hypothesis that values on a variable are not geographically related, meaning distributed randomly over the study area. A significant coefficient rejects the null hypothesis, indicating "positive spatial autocorrelation" of traffic stops and adverse stop outcomes (Anselin, 2003). In addition to testing spatial autocorrelation globally, we apply a spatial clustering analysis to identify the areas where traffic stops and adverse stop outcomes are significantly concentrated. And the identified clusters can be compared to the residential distribution by race/ethnicity and the geographic distribution of police resource. Residential segregation by race/ethnicity especially in a metropolitan city has been consistently reported in numerous sociology studies. While some sociologists explain the uneven residential distribution by race/ethnicity as a simple result of a natural market competition (Massey, 1985), others argue that it results from intentional efforts to segregate people of different race/ethnicity (Logan, Alba, & Leung, 1996a; South & Crowler, 1997). No matter what the reason is, each racial/ethnic group tends to form a residential cluster in a different area. Police resource also is more likely to be clustered than evenly dispersed. Police agencies assign more patrol to high crime areas. More police force is demanded from particular areas than others mainly through calls for service.

The similarity or dissimilarity among near locales is determined by the Local Moran LISA statistics at $p < .05$, and displayed by LISA Cluster Maps, which show four different types of spatial autocorrelation (Anselin, 2003). Positive spatial autocorrelation is indicated by high-high locations (i.e., clustering of similar beats with high values) and low-low locations (i.e., clustering of similar beats with low values). Negative spatial autocorrelation is displayed by high-low locations (i.e., beats with high values adjacent with those with low values) and low-high locations (i.e., beats with low values adjacent with those with high values). In the current study,

neighboring beats are determined by "queen contiguity," whereby any beats sharing either boundaries or vertices are regarded as neighbors (Anselin, 2003).

Assuming that significant spatial autocorrelation is detected, to avoid the aforementioned Type $I$ error, the proper model needs to take into account a level of spatial dependence, the degree to which the value of a variable among adjacent areas is correlated. In the previous research, two different models have been applied to deal with the spatial dependence issue: a spatial lag model and a spatial error model. The former assumes that events in one area have an influence on the likelihood of the same events in adjacent areas (Baller et al., 2001). This model corresponds to the spill-over effect or the diffusion process of crime which posit that high crime rates in one area increase crime rates in nearby areas simply due to the geographic adjacency. In the spatial lag model, included is an additional variable into the regression specification. The variable is called "a spatially lagged dependent variable" or "a spatial lag" (Anselin, 2006). A spatial lag amounts to the averaged value of a variable in the neighboring areas. The spatial lag model is written as:

$$y = \rho Wy + X\beta + u,$$

where $\rho$ is the spatial autoregressive coefficient, Wy is the spatially lagged dependent variable for an n x n spatial weights matrix W, $\beta$ is the regression coefficient, and u is the error term (Anselin, 2006).

While the spatial lag model controls for the spatial autocorrelation by entering a lagged dependent variable, the spatial error model incorporates the spatial autocorrelation in the regression error term (Baller et al., 2001). In the spatial error model, the spatial dependence is treated as a result of the influence of unmeasured independent variables. The assumption is that certain variables not included in the model exert influence over the adjacent areas, resulting in

spatially correlated errors (Anselin, 2006). The spatial error function is written as:

$$y = X\beta + \lambda W\varepsilon + u,$$

where $\lambda$ is the spatial autoregressive coefficient for the error lag $W\varepsilon$, and $W$ is an n x n spatial

weight matrix (Anselin, 2006).

The current study applies both models based on the assumption that the spatial

autocorrelation of traffic stops and adverse stop outcomes may result from the spill-over effect or

the influence by unmeasured predictors. First, a large number of traffic stops in one area may

increase the likelihood of traffic stops in the neighbors. Given that no area is isolated like an isle

but it is surrounded by other areas, police activities in one area will increase the amount of police

patrol (or police passing at least) in the adjacent areas, leading to a greater chance of police

detection. Second, the spatial dependence of an unmeasured variable such as high drug offense

rates may cause the spatial autocorrelation of traffic stops. The previous hot spot studies have

found that high crime areas tend to be concentrated spatially. Thus, it is logical to assume that the

spatial clustering of crime coincides with the concentration of police activities.

MEASURES

Table 1 describes the variables included in the micro-level analysis. Under the data

compilation system in the department, race/ethnicity is divided into five categories: white, black,

Hispanic, Asian, and Native American. The current study included only the traffic stops in which

the driver's race/ethnicity was white, black or Hispanic.

[Insert Table 1 about here]

For the police stop variables, we followed the classification in the traffic stop data. Stop

reasons included non-moving traffic violation (e.g. child restraint violation), moving-traffic

violation (e.g. speeding), and investigation. Investigatory stops are justified as long as the facts

**JA0634**

and the circumstances sufficiently support that the driver is engaged in a criminal activity. Stops culminate in one of three outcomes. First, the driver is released if no law violation is found or the officer exercises discretion in favor of the driver. Second, the officer can issue a ticket for a law violation – especially traffic laws. Finally, the driver may be arrested if the driver is found to have committed more serious offenses like drug possession. A police officer may conduct a search of the driver, passengers, and/or the vehicle (e.g. trunks and glove compartments) without a search warrant. However, the police officer is required either to obtain consent from the driver or to establish probable cause that the driver has committed or is about to commit a crime (e.g. observing or smelling drugs in the car). In most cases, police searches target contraband such as drugs and guns. The rate of successful searches (i.e. the ratio of contraband findings to searches) is called a "hit rate." During the final stage of a police stop, the driver is charged with a traffic offense, misdemeanor, or felony depending on the type of offense accused.

[Insert Table 2 about here]

Table 2 shows the variables included in the macro-level analysis. We chose a variety of dependent variables that indicate racial disparity in traffic stops. The percentage of investigatory stops represents the likelihood to be stopped for the purpose of investigation, wherein the officer may exercise greater discretion than in moving or non-moving traffic stops to decide to stop a vehicle. Adverse stop outcomes were measured by the percentages of arrests, searches, felony charges, and contraband detection.

The next group of dependent variables measures the ratio of one stop outcome variable to the other. According to racial profiling claims, minority drivers are the primary target of investigatory police stops, which are often made without sufficient legal grounds. If this claim is accurate, it is predicted that many minority drivers stopped for investigation are more likely to

ultimately be released because of a lack of evidence to charge them. This variable is measured by dividing the number of releases by the number of investigatory stops. Next, the "pretexual stop" contention posits that police utilize minor traffic violations as opportunities to investigate other criminal offenses (e.g. drug offenses). And the pretextual stop tactic is used disproportionately and adversely against minority drivers. Following the argument, a police officer may be more likely to conduct a search of the driver (if the driver is a minority) after moving or non-moving traffic stops. The pretextual stop variables include the ratio of searches to non-moving stops and the ratio of searches to moving stops. Finally, if more police searches are conducted of minority drivers – not because of legal factors, but because of extralegal factors (i.e. race and ethnicity) – the "hit rate" must be lower for minority drivers. The hit rate is measured by dividing the number of contraband findings by the number of searches.

The independent variables are characteristics of police beats, consisting of the percentage of black residents, the percentage of Hispanic residents, police resource commitment, and the total population. Police resource commitment, a measure of the concentration level of patrol assignments, is calculated by dividing the number of police-initiated deployments in each beat by the total number of shifts for one year. Given three shifts in a day, the annual total number of shifts is the total number of days (365) times three, which equals 1,095. The outcome figure represents the average number of patrol units deployed per shift during the year of 2003 in a particular beat.

In the macro-level analysis, 15 beats out of the total 121 are excluded for several reasons. Eleven beats are disqualified because no information is available on the amount of deployment. Three beats with population below 1,000 are excluded because the rates of stops in these beats are extraordinarily high, which is called a "small area problem." Estimates based on a small

**JA0636**

population often constitute outliers, not because of characteristics on issue, but because of the small population at risk. Another outlier beat is disqualified because of an extremely low number of stops (7) compared to the population size (13,556). After the clean-up, the total 106 beats are left for the analysis.

**FINDINGS**

RACIAL DISPARITY IN TRAFFIC STOPS AT THE MICRO-LEVEL OF ANALYSIS

In our study, black drivers were stopped more often than any other racial/ethnic groups. More than half of the stops were investigatory stops, followed by moving traffic offense stops. The majority of drivers were released and not subject to a search. When officers conducted warrantless searches, they justified them based on probable cause rather than consent from the driver. Only a small number of traffic stops (1.5%) ended up finding contraband. About a quarter of drivers were charged with traffic offenses and felony charges accounted for only 3% of all stops (see Table 1).

[Insert Table 3 about here]

The first analysis compares racial disparity in the number of traffic stops among three different stop reasons. As shown in Table 3, the expected numbers of stops in the table were estimated by population 15 and above of each racial/ethnic group within the police department's jurisdiction. Blacks were the only racial/ethnic group that was disproportionately stopped regardless of stop reasons. While black drivers were stopped 13.9% more often for non-moving traffic reasons and 7.6% more often for moving-traffic reasons than expected, both whites and Hispanics were less stopped than expected. Investigatory stops followed a similar distribution, with more stops for blacks and less stops for the other groups. The greatest overrepresentation of blacks was found in investigatory stops with 17.3% more stops than expected. Despite the

statistically significant chi-square values for all the comparisons, the differences between observed and expected investigatory stops were much greater than those for the other stop reasons. These results show that racial discrepancy is greater in investigatory stops for which police officers rely on more discretionary determinants such as a probable cause, than in moving or non-moving traffic stops, which require manifest traffic violation. In this sense, these findings are consistent with the racial profiling claim that police officers exercise greater discretion unfavorably for black drivers.

[Insert Table 4 about here]

Table 4 shows racial disparity in various outcomes after traffic stops. Hispanics and blacks were more likely than whites to be arrested after stops, whereas white drivers were more likely to be released. Police conducted searches more frequently of black and Hispanic drivers. While about 15% of black or Hispanic drivers were searched based on probable cause, only 8.5% of white drivers were searched. In spite of the similar pattern, the racial difference in consent searches was not as severe as in probable cause searches: 2.1%, 3.9%, and 3.0% for whites, blacks, and Hispanics, respectively. The findings show that when officers stopped black or Hispanic drivers, they were more likely not only to conduct a search, but also to resort to probable cause rather than the driver's consent. The greater reliance upon probable cause may be related with the finding that more black or Hispanic drivers were stopped for an investigation purpose. When a police officer stops a vehicle to investigate a criminal offense, he/she is required to establish probable cause that the driver has engaged in a criminal activity based on the totality of circumstances. Once the police officer stops the vehicle, probable cause for a vehicle search can be developed through an observation (e.g., the driver is trembling and appears to be extremely nervous) or plain view (e.g., a bag of marijuana on the floor). Given the

existence of a suspicion prior to a stop, one or more suspicious elements can easily advance the situation to a searchable one. Thus, police officers may not need to obtain consent from the driver.

The odds to discover contraband were highest when blacks were stopped; 2.2% of traffic stops for black drivers resulted in contraband whereas about 1% of stops led to contraband for whites or Hispanics. This discrepancy may be a result of the greater amount of searches conducted against black drivers. This reasoning, however, does not appear to be valid if we take into account Hispanic drivers. Although Hispanics also were subject to a disproportionate level of police searches, contraband was not found in their searches as much as in searches of black drivers. Thus, it is likely that black drivers actually possessed contraband more often than their racial/ethnic counterparts. We recognize, however, that this simple conclusion may be myopic without taking into account the organizational factors in police agencies. Law enforcement activities in black communities place more emphasis on narcotic crackdowns because of higher perceived rates of drug offenses. The police initiative to enforce drug offenses in drug hot spots, which are more likely to be located in black communities, may lead to a higher probability of contraband for black drivers.

Finally, while whites were more likely to be released without being charged, the risk of being charged with a felony was highest for blacks. Hispanics were overrepresented in the categories of traffic charges and misdemeanor charges. The greater felony charges for blacks may be a subsequent outcome of the higher likelihood to find contraband.

SPATIAL ASPECTS OF TRAFFIC STOPS AT THE MACRO-LEVEL OF ANALYSIS

To test spatial autocorrelation of the variables, we conducted the ESDA using GeoDa 0.9.5i, a spatial statistical software package developed by Luc Anselin (2003). First, an estimation of a

global spatial autocorrelation was performed to test the strength and significance of spatial autocorrelation for the variables. The test results are displayed in Table 5, showing that the null hypothesis of spatial randomness is rejected for all the independent and dependent variables. Although the coefficients of Moran's I statistics are positive and statistically significant for all the variables, they are greater than others for the percent of blacks, Hispanics, investigatory stops, arrests, and felony charges.

[Insert Table 5 about here]

Next, a spatial clustering analysis was conducted to identify the areas with significant spatial autocorrelation. Figure 1 shows spatial clustering of the independent variables: the percentage of blacks, the percentage of Hispanics, and resource commitment. The first two maps reveal apparent racial segregation in the jurisdiction of the police department. Black communities are concentrated in the north and the south of the downtown area of the city, and non-black communities are spread out westward. Hispanic communities also are clustered in the north and the south, but are not spatially overlapped with the black communities. The resource commitment map appears to follow the spatial pattern of the two minority population maps. More patrol is deployed in black or Hispanic areas, generating hot spots of police force.

[Insert Figure 1 about here]

Figure 2 shows LISA cluster maps of the dependent variables: the number of total traffic stops, the percentage of investigatory stops, arrests, consent searches, probable cause searches, contraband findings, and felony charges. In general, unfavorable stop outcomes are significantly clustered in black and/or Hispanic residential areas and hot spots of police force. Significant high-high LISA clusters of arrests, probable cause searches, consent searches, contraband detections, and felony charges are located in areas where blacks and Hispanics are concentrated

and more patrol is deployed

However, the LISA clusters for the number of traffic stops and the rate of investigatory stops do not match the spatial concentrations of the independent variables. Most of the high-high clusters are located outside the black or Hispanic residential areas or the police resource concentration areas. Interestingly, drivers are more likely to be stopped for investigation in areas where patrol is less concentrated. This finding is opposite to our expectation that more patrol will be assigned to the areas which are more vulnerable to crime, and police officers will make stops to investigate criminal activities rather than enforce traffic laws.

[Insert Figure 2 about here]

Given the significant spatial autocorrelation detected, we estimated spatial regression models instead of an OLS model to take into account the effects of spatial dependence. Table 5 shows the results of spatial lag models. In areas with a greater black population, drivers are more frequently stopped, subjected to consent searches, found in possession of contraband, and charged with a felony. However, the percentages of investigatory stops, arrests, and probable cause searches are not significantly related with the percentage of blacks. The ratio of releases to investigatory stops is not significantly higher in black neighborhoods, which is not compatible with the racial profiling claim that more unnecessary and groundless stops are conducted in black communities targeting black drivers. Drivers in black communities are more likely to be searched after both non-moving and moving traffic stops. The magnitude of the effect is relatively stronger when it comes to the likelihood of search after a moving traffic stop. According to these results, "pretextual stops," in which police take advantage of traffic violations to investigate more serious offenses, appears to be more prevalent in black communities. This is suggestive of racial profiling. Yet, the hit rate to detect contraband over searches is found higher

in black communities. This finding is inconsistent with the racial profiling contention that unnecessary and groundless searches, which tend to end up with finding no contraband, are more prevalent in black communities. That is, the higher hit rate in black communities may indicate that more drivers are in possession of contraband in those areas, warranting greater police vigilance, which may justify more intensive law enforcement.

[Insert Table 5 about here]

The percentage of Hispanic residents is positively related only with the percentages of arrests and consent searches. Thus, drivers are more likely to be arrested and be searched by consent in Hispanic communities. Resource commitment is positively related with the number of stops, the percentages of arrests, probable cause searches, contraband detections, and felony charges. These results indicate that more intensive law enforcement, through more frequent stops and more adverse outcomes, is conducted in the areas with greater police force. Furthermore, drivers who are stopped for investigation in these areas are less likely to be released. In other words, drivers are more likely to be either ticketed or arrested after investigatory stops. This finding may indicate that police officers rely on legal factors in their decision to make an investigatory stop, which reduces the risk of futile stops. An alternative interpretation is that the finding may simply show more punitive attitude among police officers working in these areas. The hit rate to detect contraband after a search is higher in the areas where greater police resource is committed. This finding may indicate that either drivers in these areas are more likely to possess contraband or police searches successfully target rightful suspects.

Table 5 also shows positive and significant effects of the spatial lags of investigatory stops, arrests, probable-cause searches, contraband detection, felony charges, the ratio of release over investigatory stops, the ratio of search for moving traffic stops and the hit rate. However, the

JA0642

findings do not support the diffusion process for the number of traffic stops. That is, the influence of a large number of traffics stops in one area upon the neighbors cannot be explained by an increase in police detection in the neighboring areas due to the simple geographic proximity.

[Insert Table 6 about here]

The results of the spatial error models are shown in Table 6. The effects of black population and Hispanic population upon traffic stops and stop outcomes are similar as shown by the spatial lag models. However, the effect of resource commitment is significant only for the number of stops and the percent of arrest. Unlike the spatial lag model, resource commitment in the spatial error model is not significantly associated with probable-cause search, contraband detection, felony charge, the ratio release over investigatory stop, and the hit rate of contraband. Such differences between the two models may be due to the different magnitude in the effect of spatial lags and spatial errors upon those variables; the effects of spatial errors are substantially stronger than spatial lags. Hence, the variances of the independent variables in the spatial error models are mostly accounted for by the spatial errors, leaving no room for resource commitment to explain.

These findings also indicate that resource commitment may be significantly related to the spatial errors, or unmeasured variables. The most plausible unmeasured variables include drug offense rates. Following the policy suggestions by problem-oriented policing and hot spot policing, police resources, instead of being spread evenly over the police jurisdiction, are more committed to a few drug "hot spots," which coincide with areas where the police are more likely to conduct probable cause searches, retrieve contraband, charge an offender with a felony, make an investigatory stop, and generate a higher hit rate for contraband detection. Thus, the introduction of the spatial errors into the regression models substantially diminished or negated

JA0643

the effect of resource commitment upon the dependent variables.

The results also show that the spatial error is significantly related with the number of stops, indicating that the spatial autocorrelation of the number of traffic stops results from unmeasured variables such as drug offense rates, rather than a diffusion process. The spatial error models provide a better fit than the spatial lag models for most of the dependent variables. Improvement of a model fit is most noticeable for investigatory stop, felony charge, the ratio of release over investigatory stop, and the hit rate for contraband detection.

## DISCUSSION

Prior to discussing the findings, we should acknowledge that some methodological limitations warrant cautious interpretation of the results. First, this study cannot overcome the Modifiable Areal Unit Problem (MAUP) like many other studies using geographic units. With a police beat as the unit of analysis, the visual representations of the hot spots on the LISA Cluster maps are affected by the size, shape and orientation of the geographic areas (Chainey & Ratcliffe, 2005). Furthermore, the estimations of the variables (e.g. the number of traffic stops) are restrained by the geographic boundary, which is created for the administrative or governmental purpose in an arbitrary way. Second, reliability can be an issue in measuring Hispanics because it is relatively hard to distinguish Hispanic ethnicity by one's appearance. Thus, chances are that some people who were classified as Hispanics in the traffic stop data might be counted as members of the other racial groups in the U.S. Census. It this is the case, the number of Hispanic drivers may be overestimated in the traffic stop data. Finally, the current study relies only upon the amount of police resources as a measure of police resource commitment. However, law enforcement initiatives, which may be relevant to discriminatory policing practices, include not only the quantity, but also the quality or the kinds of police resources. For example, a special

crime control unit, such as a narcotic enforcement task force, is disproportionately assigned to disadvantaged minority communities. This issue of unmeasured variables was handled in an indirect way through the introduction of the spatial errors into the regression models.

Despite the aforementioned limitations, the findings of the current study reveal noteworthy aspects in the spatial distributions of policing practices and their associations with the community context. The primary purpose of this study was to examine the spatial association between the characteristics of patrol areas and the patterns of traffic stops. Specifically, this study assumed that more traffic stops are conducted and more adverse outcomes are generated in the areas where minority people are concentrated and more police resource is committed. This assumption is supported by the empirical findings that these areas often spatially coincide with high crime neighborhoods in which more intensive law enforcement is performed. Although this study could not provide clear evidence that racial disparity in individual traffic stops is contingent upon the disparity in traffic stops at the community level, the findings in this study suggest that these two facts may be associated. Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony because they are more likely to drive in high crime areas where they reside and more vigorous law enforcement is a common practice.

The micro-level analysis of individual stops confirmed the existence of a racial disparity in the number of traffic stops and subsequent outcomes. Blacks were overrepresented and the other racial/ethnic groups were underrepresented in traffic stops. Furthermore, blacks were found to be disproportionately involved with traffic stops in situations where officer discretion played a greater role in decisions to stop. The racial disparity was greater in investigatory and non-moving traffic stops than in moving traffic stops. In terms of stop outcomes, black and Hispanic drivers, once stopped, were more likely to be arrested and searched than white counterparts. More blacks

than any other racial/ethnic group were found to possess contraband and were eventually charged with felonies.

The spatial analysis at the macro-level found that the areas with more frequent traffic stops and more adverse stop outcomes were spatially clustered rather than dispersed, and the majority of the clusters spatially coincided with minority residential areas and/or police resource concentration areas. The multiple regression analysis, affirming the exploratory findings of the cluster map analysis, found statistically significant associations between the characteristics of patrol areas and the traffic stop patterns; a greater number of stops were made and more adverse stop outcomes were followed as more minorities live and/or more patrol is assigned in the community.

Not only are traffic stops concentrated on particular racial or ethnic groups at the micro level, but also they vary by place. That is, there are certain places (e.g. beats or streets) that traffic stops are more likely to occur and drivers are more likely to be searched or arrested. Greater police force and more intensive law enforcement are applied to "hot spots" where more crimes occur. The demand for police service also tends to cluster in certain areas, heightening the likelihood of traffic stops. While selective law enforcement based on race/ethnicity is often disapproved as racially discriminatory, differentiated policing by place is supported in most police agencies as an effective crime control strategy. Insofar as the different treatment by place is grounded upon legal factors (e.g. crime rates), greater police force along with more intensive enforcement for particular areas does not bring up a discrimination issue.

A great deal of research during the last decade provided police departments with a valid justification for a geographically differentiated policing strategy. Since the groundbreaking work by Sherman and his associates (1989), a number of studies have searched for hot spots of various

JA0646

types of crime in different areas. In the study conducted in Minneapolis, Sherman and his associates identified hot spots that produced over 50% of calls to police but accounted for only 3% of all addresses and intersections.

Hot spots have been identified for different types of crimes, including gang violence (Block and Block, 1993), drug offenses (Block and Block, 1995), burglary (Hirschfield et al., 1995), car theft (Fleming, 1994), gun violence (Sherman and Rogan 1995), among others. Thus, if the occurrence of crime is geographically concentrated and the hot spots are predictable, police agencies may prevent crimes or at least reduce crime rates by concentrating police force in these locations. The hot spot studies provide an empirical basis for implementing "problem-oriented policing." Unlike traditional policing that attempts to deal with general crime or social disorder, the problem-oriented approach targets more specific problems or specific types of crime (Goldstein, 1977). Under the problem-oriented approach, the police are expected to analyze specific problems in a neighborhood, and then respond to the problems with most appropriate strategies.

Many evaluation studies reveal that problem-solving strategies based on hot spot analysis are effective in reducing crime rates and disorder problems. For example, Sherman and Weisburd (1995), in the experimental study conducted in Minneapolis, found a substantial decrease in crime rates and disorder in hot spots when they doubled the amount of patrol. Similar crime reductions were also reported for different types of crimes, including residential burglary (Eck and Spelman, 1987), prostitution (Matthews, 1997), drug selling (Hope, 1994), as well as others.

Numerous studies also found that high crime rates – especially street crimes – are associated with neighborhoods with high rates of poverty and economic deprivation and a high proportion of non-whites (Robinson, 2004). Macro-level studies analyzed this as a structural

problem in poor, non-white communities, which failed to develop an effective social control mechanism. As crime is spatially concentrated in particular areas, residences are also spatially segregated by different racial groups. The uneven distribution of residences may be determined either by the principle of market rules based on economic affordability (Massey, 1985), or by whites" willingness to maintain racial homogeneity in their neighborhoods (Logan et al., 1996a, 1996b; Massey and Denton, 1988; South and Crowler, 1997).

No matter what the reason is, there exist racially/ethnically minority communities where social problems are concentrated. And these communities often constitute hot spots of crime and disorder, which draw greater attention from police agencies, and consequently invite more intensive law enforcement activities. The problem-oriented policing strategy, accompanied by scientific analyses (e.g. a hot spot analysis and crime mapping with the Geographic Information System), is widely understood as a legitimate effort by police administrators to maneuver police resource more efficiently and effectively. This study found that more police resource was committed to minority communities, and in these communities, more traffic stops and more adverse outcomes occurred. If the disparity in traffic stops by geographic areas could explain a substantial amount of racial disparity at the individual level, the racial profiling argument may be seriously weakened because the police practice that is seemingly race-based (i.e. more minority drivers stopped and arrested) may be a mere consequence of legitimate policing strategies at the department level. However, it will be premature to conclude as such because of the following issues.

This study showed a likelihood of such an interaction between racial disparity at the macro level and at the micro level. However, the findings in this study must be regarded as suggestive rather than conclusive. Despite the significant effects of beat characteristics on the

number of traffic stops and the types of subsequent outcomes, we don't know yet how much of the racial difference on the individual level can be accounted for by the beat characteristics. Future research is recommended to conduct a multi-level analysis, which includes both macro-level and micro-level factors in the model to examine the role of a driver's race/ethnicity in a traffic stop situation, controlling for relevant factors at the macro level

Furthermore, it is still questionable if the area-specific policing strategies at the department level could neutralize completely the racial profiling claim. When police officers exercise discretion in traffic stops, decision-making is often influenced by subjective perception or knowledge of the patrol area, which is developed through previous experiences or information from fellow officers. Thus, police officers'reactions to similar situations may vary depending on the characteristics of the community. For example, police officers may overreact simply because of their exaggerated perceived risk working in a certain community. If this is the case, the community may experience undue policing, not because of legitimate crime control efforts at the agency level, but because of abuse of discretion at the individual level.

The findings of the current study suggest important policy implications for police agencies. Granted that racial disparity in traffic stops at the individual level is substantially attributed to the disproportionate commitment of police resources at the community level, police agencies still need to consider if such policing strategies, often named problem-oriented policing or hot spot policing, resonate well with the ideal of democratic policing, the imperative for the American police. Democratic policing is often understood as the antonym of inequality, seeking an equal distribution of police service or police control over the public. Thus, unequal amount or different types of police recourses that are devoted to different communities may appear undemocratic. People living in disadvantaged minority communities may perceive that policing

JA0649

unduly targets their communities, if not minority individuals. Responding to such a complaint, the police may justify that their policing strategies are race-neutral and legitimate, singling out crime hot spots through sophisticated analyses of crime data. This argument could be challenged for two reasons.

First, the validity of official crime data, upon which most police agencies rely to develop policing strategies, has long been questioned. It has been argued that official crime data may be a measure of "official reactions to crime" rather than an actual measure of crime (Warner and Pierce, 1993:494). In this sense, a high concentration of crime in particular areas may simply represent a strong willingness for social control by the police. Thus, crime control policies based upon such data may be criticized as tautological in nature.

Second, it is also questionable if police agencies are entitled to impose policing practices that the community does not want. Another important ethos of democratic policing, especially under participatory or deliberative democracy, is community control of the police through community empowerment and community participation (Sklansky, 2008). A community's status should not be limited as the consumer of police service, but the community, as a co-producer of police service, must play a key role in the producing process. A community should be entitled to determine the amount and the types of police service. In this sense, unequal treatments by the police, notwithstanding the seemingly race-neutral nature, may be perceived as anti-democratic insofar as the community does not grant them.

One may ask these questions. What if the community wants unequal distribution of police resources to control crime? Should the police simply comply with the demand from the community? What about the other communities that will be under-policed because of the unequal distribution of police resources? As the current study shows, disparities in policing practices at

the community level lead to racial disparities at the individual level. More effective police practices at the community level (e.g. a higher hit rate to detect contraband) may be juxtaposed with a greater likelihood of becoming subject to more frequent and more intensive police practices at the individual level (e.g. more stops and more searches). Thus, it is important that members of a community be informed and fully aware of the potential impact of "over-policing" on individuals. In developing policing strategies, police agencies must take into account the community's needs and demands as well as crime data. Police agencies also should strive for community support before implementing policing strategies that may arouse a sentiment among the community members that they (their community) are treated in an unequal way.

## REFERENCES

Alpert, G. P., Dunham, R. G., & Smith, M. R. (2007). Investigating racial profiling by the

Miami-Dade Police Department: A multimethod approach. *Criminology & Public Policy,* 6,

25-55.

American Civil Liberties Union (2007). *Racial profiling: Old and new*. Retrieved January 5,

2007 from http://www.aclu.org/racialjustice/racialprofiling/index.html

Amnesty International (2007). *Threat and humiliation: Racial profiling, national security,*

*and human rights in the United States*. Retrieved January 6, 2007 from

http://www.amnestyusa.org/racial_profiling/report/index.html

Anselin, L. (2003). *An introduction to spatial autocorrelation analysis with GeoDa*, Urbana:

Spatial Analysis Laboratory, Department of Agricultural and Consumer Economics,

University of Illinois, Urbana-Champaign and Center for Spatially Integrated Social Science.

Anselin, L. (2006). *Spatial regression*, Urbana: Spatial Analysis Laboratory, Department of

Agricultural and Consumer Economics, University of Illinois, Urbana-Champaign and

Center for Spatially Integrated Social Science.

Baller, R. D., Anselin, L., Messner, S. F., Deane, G., & Hawkins, D. F. (2001). Structural

covariates of U.S. county homicide rates: Incorporating spatial effects. *Criminology*, 39,

561-588.

Barlow, D. E., & Barlow, M. H. (2002). Racial profiling: A survey of African American police

officers. *Police Quarterly*, *5*, 334-358.

Batton, C., & Kadleck, C. (2004). Theoretical and methodological issues in racial profiling

research. *Justice Quarterly*, 7, 30-64.

Beckett, K., Nyrop, K., & Pfingst, L. (2006). Race, drugs, and policing: Understanding

disparities in drug delivery arrests. *Criminology*, 44, 105-137.

Birzer, M., & Smith-Mahdi, J. (2006). Does race matter? The phenomenology of discrimination experienced among African Americans. *Journal of African American Studies*, 10, 22-37.

Block, R. L., & Block, C. R. (1995). Space, place and crime: Hot spots areas and hot places of liquor-related crime. In J. E. Eck & D. L. Weisburd (Eds.), *Crime prevention studies: Crime and place*. (pp. 145-184). Monsey, NY: Willow Tree Press.

Block, C. R., & Block, R. L. (1993). *Street gang crime in Chicago: Research in Brief*, National Institute of Justice. Washington, D.C.: U.S. Department of Justice.

Bostaph, L. (2007). Race and repeats: The impact of officer performance on racially biased policing. *Journal of Criminal Justice,* 35, 405-417.

Buerger, M., & Farrell, A. (2002). The evidence of racial profiling: Interpreting documented and unofficial sources. *Police Quarterly*, 5, 272-305.

Bureau of Justice Statistics (2005). *Contacts between police and the public*. US Department of Justice, Office of Justice Programs, April 2005.

Chainey, S. & Ratcliffe, J. (2005). *GIS and crime mapping*. West Sussex, England: John Wiley & Sons Ltd.

del Carmen, A. (2007). *Racial profiling in America*. Upper Saddle River, NJ: Prentice Hall.

Doerner, W. (1997). *An introduction to law enforcement: An insider's view*. New York: Butterworth-Heinemann.

Eck, J. E. & Spelman, W. (1987). *Problem-solving: Problem-oriented policing in Newport News*. Washington, D.C.: National Institute of Justice.

Engel, R. S. & Calnon, J. M. (2004). Examining the influence of drivers" characteristics during traffic stops with police: Results from a national survey. *Justice Quarterly*, 21, 49-90.

Engel, R. S., Calnon, J. M., & Bernard, T. J. (2002). Theory and racial profiling: Shortcomings and future directions in research. *Justice Quarterly*, 19, 249-273.

Farrell, A., & McDevitt, J. (2006). *Rhode Island traffic stop statistics 2004-2005 final report*. Retrieved January 6, 2007 from

http://www.rijustice.ri.gov/sac/Executive%20Summary%202004-2005.pdf

Farrell, A., McDevitt, J., Bailey, L., Andresen, C., & Pierce, E. (2004). *Massachusetts racial and gender profiling study*. Retrieved January 7, 2007 from

http://www.racialprofilinganalysis.neu.edu/IRJsite_docs/finalreport.pdf

Fleming, M. (1994). Exploring auto theft in British Columbia. In R.V. Clarke (Ed.), *Crime prevention studies: Vol. 3* (pp. 47-90). Monsey, NY: Criminal Justice Press.

Fridell, L. (2004). By the numbers: A guide for analyzing race data from vehicle stops. Washington, DC: Police Executive Research Forum.

Gaines, L. (2006). An analysis of traffic stop data in Riverside, California. *Police Quarterly*, *9*, 210-233.

Gold, A. (2003). Media hype, racial profiling, and good science. *Canadian Journal of Criminology & Criminal Justice*, *45*, 391-399.

Goldstein, H. (1977). *Policing in a free society*. Cambridge, MA: Ballinger.

Golub, A., Johnson, B., & Dunlap, E. (2007). The race/ethnicity disparity in misdemeanor marijuana arrests in New York City. *Criminology & Public Policy 6*, 131-164.

Gross, S., & Barnes, K. (2002). Road word: Racial profiling and drug interdiction on the highways. *Michigan Law Review*, *101*, 651-754.

Harris, D. A. (1997). "Driving while in Black" and all other traffic offenses: The Supreme Court and pretextual traffic stops. *The Journal of Criminal Law and Criminology*, 87, 544-582.

**JA0654**

Harris, D. A. (1999). The stories, the statistics, and the law: Why "driving while black" matters. *Minnesota Law Review*, 84, 265-326.

Harris, D. (2003). The reality of racial disparity in criminal justice: The significance of data collections. *Law & Contemporary Problems*, *66*, 71-98.

Hart, J., Larsen, A., Litton, K., & Sullivan, L. (2003). Racial profiling: At what price?. *Journal of Forensic Psychology Practice*, *3*, 79-88.

Hirschfield, A. F. G, Bowers, K. J., & Brown, P. J. B. (1995). Exploring relations between crime and disadvantage on Merseyside. *European Journal on Criminal Policy and Research,* 3, 93-112.

Holmes, M. (2000). Minority threat and police brutality: Determinants of civil rights complaints in US municipalities. *Criminology*, 38, 343-368.

Hope, T. (1994). Problem-oriented policing and drug market locations: Three case studies. In R.V. Clarke (Ed.), *Crime prevention studies*: Vol. 2 (pp. 5-31). Monsey, NY: Criminal Justice Press.

Institute on Race and Justice at Northeastern University (2007). Racial profiling data collection research center. Retrieved January 7, 2007 from http://www.racialprofilinganalysis.neu.edu

International Association of Chiefs of Police (2006). Protecting civil rights: A leadership guide for state, local, and tribal law enforcement. Retrieved January 4, 2007 from http://www.theiacp.org/documents/index.cfm?fuseaction=document&document_id=862

Lamberth, J.D. (1997). *Report of John Lamberth, Ph.D*. American Civil Liberties Union. Retrieved May 5, 2006 from http://www.aclu.org/court/lamberth.html

Langan, P.A., Greenfeld, L.A., Smith, S. K., Durose, M.R., and Levin, D.J. (2001). *Contacts between the police and the public: Findings from the 1999 National Survey* (No.

**JA0655**

NCJ184957). Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Lange, J., Johnson, M., & Voas, R. (2005). Testing the racial profiling hypothesis for seemingly disparate traffic stops on the New Jersey Turnpike. *Justice Quarterly*, *22*, 193-223.

Leadership Conference on Civil Rights (2005). Leadership conference on civil rights' letter to Attorney General Gonzales expressing concern about the suppression of a Bureau of Justice Statistics report on racial profiling. Retrieved January 6, 2007 from http://www.aclu.org/racialjustice/racialprofiling/20091leg20050830.html

Lichtblau, E. (2005). Profiling report leads to a demotion. *The New York Times*, August 24.

Lichtenberg, I. (2006). Driving while black (DWB): Examining race as a tool in the war on drugs. *Police Practice & Research*, *7*, 49-60.

Logan, J. R., Alba, R. D. and Leung, S. (1996a). Minority access to white suburbs: A multi-region comparison. *Social Forces*, 74, 851-81.

Logan, J. R., Alba, R. D., McNulty, T., and Fisher, B. (1996b). Making a place in the metropolis: Locational attainment in cities and suburbs. *Demography,* 33, 443-453.

Ludwig, J. (2003). Americans see racial profiling as widespread. Gallup Poll. May 13, 2003. Retrieved January 4, 2007 from http://www.gallup.org

Lundman, R.J. (2004). Driver race, ethnicity, and gender and citizen reports of vehicle searches by police and vehicle search hits: Towards a triangulated scholarly understanding. *The Journal of Criminal Law & Criminology*, 94, 309-349.

Martin, D. (2002). Spatial patterns in residential burglary. *Journal of Contemporary Criminal Justice*, 18, 132-146.

Massey, D. S. (1985). Ethnic residential segregation: A theoretical synthesis and empirical review. *Sociology and Social Science Research*, 69, 315-350.

**JA0656**

Massy, D. & Denton, N. (1988). Suburbanization and segregation in U.S. metropolitan areas. *American Journal of Sociology*, 94, 592-626.

Matthews, R. (1997). Developing more effective strategies for curbing prostitutions. In R. Clarke (Ed.), *Situational Crime Prevention: Successful Case Studies* (2nd ed.). Guilderland, N.Y.: Harrow and Heston.

Meehan A.J. & Ponder, M.C. (2002). Race and place: The ecology of racial profiling African American motorists. *Justice Quarterly*, 19, 399-430.

Novak, K.J. (2004). Disparity and racial profiling in traffic enforcement. *Police Quarterly*, 7, 65-96.

Office of the New York State Attorney General (1999). *The New York City Police Department's "stop and frisk" practices: A report to the people of the state of New York*. Retrieved January 6, 2007 from http://www.oag.state.ny.us/press/reports/stop_frisk/stop_frisk.html

Parker, K., Stults, B., & Rice, S. (2005). Racial threat, concentrated disadvantage and social control: Considering the macro-level sources of variation in arrests. *Criminology*, 43, 1111-1134.

Parker, K., MacDonald, J., Alpert, G., Smith, M., & Piquero, A. (2004). A contextual study of racial profiling: Assessing the theoretical rationale for the study of racial profiling at the local level. *American Behavioral Scientist*, *47*, 943-962.

Paulsen, D., & Robinson, M. (2004). *Spatial aspects of crime: Theory and practice*. Boston, MA: Allyn & Bacon.

Peruche, B. M., & Plant, E. A. (2006). The correlates of law enforcement officers' automatic and controlled race-based responses to criminal suspects. *Basic & Applied Social Psychology*, *28*, 193-199.

Petrocelli, M., Piquero, A., & Smith, M. (2003). Conflict theory and racial profiling: An empirical analysis of police traffic stop data. *Journal of Criminal Justice*, *31*, 1-11.

Ridgeway, G. (2006). Assessing the effect of race bias in post-traffic stop outcomes using propensity scores. *Journal of Quantitative Criminology, 27*, 1-29.

Robinson, M. (2005). *Justice blind? Ideals and realities of American criminal justice*. 2nd Edition. Upper Saddle River, NJ: Prentice Hall.

Robinson, M. (2004). *Why crime? An integrated systems theory of antisocial behavior*. Upper Saddle River, NJ: Prentice Hall.

Robinson, M., & Scherlen, R. (2007). *Lies, damned lies and drug war statistics: A critical analysis of claims made by the Office of National Drug Control Policy*. Albany, NY: State University of New York Press.

Romero, M. (2006). Racial profiling and immigration law enforcement: Rounding up of usual suspects in the Latino community. *Critical Sociology*, *32*, 447-473.

Schafer, J., Carter, D., Katz-Bannister, A., & Wells, W. (2006). Decision making in traffic stop encounters: A multivariate analysis of police behavior. *Police Quarterly*, *9*, 184-209.

Sherman, L.W. (1986). Policing communities: What works? In A. Reiss and M. Tonry (Eds.), *Communities and crime* (pp. 342-386). Chicago, IL: University of Chicago Press.

Sherman, L. W. (1995). Hot spots of crime and criminal careers of places. In J. E. Eck and D. Weisburd (Eds.), *Crime prevention studies: Crime and place* (pp. 35-52). Monsey, NY: Willow Tree Press.

Sherman, L. W., Gartin, P. R., & Buerger, M. E. (1989). Hot spots of predatory crime: Routine activities and criminology of place. *Criminology*, 27, 27-55.

Sherman, L. W. & Rogan, D. P. (1995). Effects of gun seizures on gun violence: Hot spots patrol

in Kansas City. *Justice Quarterly*, 12, 27-56.

Sherman, L.W. and Weisburd, D. (1995). General deterrent effects of police patrol in crime "hot

       spots": A randomized, controlled trial. *Justice Quarterly*, 12, 625-648.

Skolnick, J. (2007). Racial profiling – Then and now. *Criminology & Public Policy, 6*, 65-70.

Sklansky, D.A. (2008). *Democracy and the police*, Stanford, CA: Stanford University Press.

Smith, D. (1986). The neighborhood context of police behavior. In A. Reiss and M. Tonry (Eds.),

       *Communities and crime* (pp. 313-341). Chicago, IL: University of Chicago Press.

Smith, M. R. & Petrocelli, M. (2001). Racial profiling?: A multivariate analysis of police traffic

       stop data. *Justice Quarterly*, 4, 4-27.

Smith, W., Tomaskovic-Devey, D., Zingraff, M., Mason, M., Warren, P., Wright, C., McMurray,

       H., & Fenlon, R. (2004). *The North Carolina highway traffic study, final report to the*

       *National Institute of Justice*, US Department of Justice. Retrieved January 7, 2007 from

       http://www.ncjrs.gov/pdffiles1/nij/grants/204021.pdf

Stolzenberg, L., D"Alessio, & Eitle, D. (2004). A multilevel test of racial threat theory.

       *Criminology*, 42, 673-698.

Stults, B., & Baumer, E. (2007). Racial context and police force size: Evaluating the empirical

       validity of the minority threat population. *American Journal of Sociology*, 113, 507-546.

South, S. J. and Crowder. K. D. (1997). Escaping distressed neighborhoods: Individual,

       community, and metropolitan influences. *American Journal of Sociology*, 102, 1040-1084.

Tomaskovic-Devey, D., Wright, C., Czaja, R., & Miller, K. (2006). Self-reports of police

       speeding stops by race: Results from the North Carolina reverse record check survey.

       *Journal of Quantitative Criminology*, *22*, 279-297.

Walker, S., Spohn, C., & Delone, M. (2006). *The color of justice: Race, ethnicity and crime in*

*America*. Belmont, CA: Wadsworth.

Walker, S. (2001). Searching for the denominator: Problems with police traffic stop data and an early warning system solution. *Justice Research and Policy*, 3, 63-95.

Warren, P., Tomaskovic-Devey, D., Smith, W., Zingraff, M., & Mason, M. (2006). Driving while black: Bias processes and racial disparity in police stops. *Criminology*, *44*, 709-738.

Warner, B. D. & Pierce, G. L. (1993). Reexamining social disorganization theory using calls to the police as a measure of crime. *Criminology*, 31, 493-516.

Weiss, A., & Grumet-Morris, V. (2006). *Illinois traffic stops statistics study, 2005 annual report*. Retrieved January 6, 2007 from http://www.dot.state.il.us/trafficstop/2005annualreport.pdf

Weisburd, D., Mastrofski, S. D., & Greenspan, R. (2001). *Compstat and organizational change.* Washington, D.C.: Police Foundation.

Weitzer, R., & Tuch, S. (2006). *Race and policing in America: conflict and reform.* New York: Cambridge University Press.

Weitzer, R., & Tuch, S. (2002). Perceptions of racial profiling: race, class, and personal experience. *Criminology*, 40, 435-456.

West, A. (2003). Chicken little, three blind men and an elephant, and "racial profiling": A commentary on the collection, analysis, and interpretation of traffic stop data. *Journal of Forensic Psychology Practice*, *3*, 63-77.

JA0660

TABLE 1. Description of Variables in Micro-level Analysis

| Variables | N | % |
|---|---|---|
| *Independent Variable* | | |
| Race | | |
|     White | 91720 | 27.5 |
|     Black | 131395 | 39.4 |
|     Hispanic | 110645 | 33.2 |
| *Dependent Variable* | | |
| Stop Reasons | | |
|     Non-Moving Traffic | 40171 | 12.0 |
|     Moving Traffic | 110854 | 33.2 |
|     Investigation | 182735 | 54.8 |
| Disposition | | |
|     Released | 187255 | 56.1 |
|     Ticketed | 86059 | 25.8 |
|     Arrested | 60446 | 18.1 |
| Search | | |
|     No Search | 279048 | 83.6 |
|     Consent Search | 10362 | 3.1 |
|     Probable Cause Search | 44350 | 13.3 |
| Contraband | | |
|     Yes | 4960 | 1.5 |
|     No | 328800 | 98.5 |
| Charge | | |
|     No Charges | 187255 | 56.1 |
|     Traffic | 88151 | 26.4 |
|     Misdemeanor | 48120 | 14.4 |
|     Felony | 10234 | 3.1 |
| Total | 333760 | 100 |

TABLE 2. Description of Variables in Macro-level Analysis

| Variables | N | MIN | MAX | Mean | S.D. |
|---|---|---|---|---|---|
| *Dependent variables* | | | | | |
| Number of stops | 106 | 113 | 8682 | 3159.47 | 1650.82 |
| % Investigatory stops | 106 | 15.33 | 84.72 | 54.23 | 16.69 |
| % Arrests | 106 | 3.25 | 32.80 | 17.61 | 7.24 |
| % Consent searches | 106 | .42 | 10.26 | 2.90 | 1.96 |
| % Probable cause searches | 106 | 2.21 | 26.85 | 12.82 | 6.28 |
| % Felonies | 106 | .00 | 10.47 | 2.95 | 2.03 |
| %Contraband | 106 | .00 | 7.10 | 1.37 | 1.18 |
| Ratio of releases to investigatory stops | 106 | 38.30 | 90.10 | 64.76 | 11.34 |
| Ratio of searches to non-moving stops | 106 | .00 | 13.81 | 2.22 | 2.31 |
| Ratio of searches to moving stops | 106 | .00 | 13.82 | 1.66 | 2.21 |
| Ratio of contraband findings to searches | 106 | .00 | 37.55 | 8.13 | 4.75 |
| *Independent variables* | | | | | |
| % Black population | 106 | .94 | 91.71 | 25.75 | 26.58 |
| % Hispanic population | 106 | 4.94 | 92.21 | 35.49 | 23.90 |
| Resource Commitment | 106 | .00 | 4.49 | 1.13 | .79 |
| Population | 106 | 1205 | 57992 | 22172.31 | 11937.19 |

**JA0662**

TABLE 3. Racial Differences in the Observed and Expected Number of Stops by Reasons for Stops.

| Stop Reasons | | Observed | Expected | Residual |
|---|---|---|---|---|
| Non-moving traffic | White | 23.1% (9280) | 34.8% (13979.5) | -11.7% (-4699.5) |
| | Black | 39.6% (15891) | 25.7% (10340.0) | 13.9% (5551.0) |
| | Hispanic | 37.3% (15000) | 39.5% (15851.5) | -2.2% (-851.5) |
| | Total | 40171 | | |
| $\chi^2$ | | | | 4605.59** |
| Moving traffic | White | 33.6% (37275) | 34.8% (38577.2) | - 1.2% (-1302.2) |
| | Black | 33.3% (36878) | 25.7% (28533.8) | 7.6% (8344.2) |
| | Hispanic | 33.1% (36701) | 39.5% (43743.0) | -6.4% (-7042.0) |
| | Total | 110854 | | |
| $\chi^2$ | | | | 3617.7** |
| Investigation | White | 24.7% (45165) | 34.8% (63591.8) | -10.1% (-18426.8) |
| | Black | 43.0% (78626) | 25.7% (47036.0) | 17.3% (31590.0) |
| | Hispanic | 32.3% (58944) | 39.5% (72107.2) | -7.2% (-13163.2) |
| | Total | 182735 | | |
| $\chi^2$ | | | | 28958.7** |

* $p < .05$ (two-tailed); ** $p < .01$ (two-tailed)

**JA0663**

TABLE 4. Racial Differences in Stop Outcomes.

| Stop Outcomes | White | Black | Hispanic |
|---|---|---|---|
| **Disposition** | | | |
| Released | 61.1% | 58.3% | 49.3% |
| | (56023) | (76663) | (54569) |
| Ticketed | 25.8% | 21.9% | 30.4% |
| | (23677) | (28790) | (33590) |
| Arrested | 13.1% | 19.7% | 20.3% |
| | (12020) | (25941) | (22484) |
| $\chi^2$ | | | 4854.2** |
| **Search** | | | |
| No Search | 89.4% | 80.7% | 82.2% |
| | (82029) | (106078) | (90939) |
| Consent Search | 2.1% | 3.9% | 3.0% |
| | (1917) | (5177) | (3268) |
| Probable Cause Search | 8.5% | 15.3% | 14.9% |
| | (7774) | (20139) | (16436) |
| $\chi^2$ | | | 3350.7** |
| **Contraband** | | | |
| No | 99.0% | 97.8% | 98.9% |
| | (90837) | (128541) | (109419) |
| Yes | 1.0% | 2.2% | 1.1% |
| | (883) | (2853) | (1224) |
| $\chi^2$ | | | 702.1** |
| **Charge** | | | |
| No Charges | 61.1% | 58.3% | 49.3% |
| | (56023) | (76663) | (54569) |
| Traffic | 25.5% | 22.6% | 31.7% |
| | (23365) | (29659) | (35126) |
| Misdemeanor | 11.6% | 14.5% | 16.7% |
| | (10678) | (19000) | (18440) |
| Felony | 1.8% | 4.6% | 2.3% |
| | (1654) | (6072) | (2508) |
| $\chi^2$ | | | 6009.3** |

* $p < .05$ (two-tailed); ** $p < .01$ (two-tailed)

TABLE 5. Spatial Autocorrelation of the Macro-Level Variables

| Variables | Moran's I |
|---|---|
| *Independent variables* | |
| % Black population | .52** |
| % Hispanic population | .48** |
| Resource Commitment | .30** |
| Population | .30** |
| *Independent variables* | |
| Number of stops | .17** |
| % Investigatory stops | .49** |
| % Arrests | .45** |
| % Consent searches | .18** |
| % Probable cause searches | .39** |
| %Contraband | .41** |
| % Felonies | .47** |
| Ratio of releases to investigatory stops | .32** |
| Ratio of searches to non-moving stops | .13* |
| Ratio of searches to moving stops | .17* |
| Ratio of contraband findings to searches | .30** |

* $p < .05$ (two-tailed); ** $p < .01$ (two-tailed)

TABLE 5. Spatial Lag Models for Traffic Stops

| Independent Variables | STOP # | INVST | ARRST | CONST | PROB | CONTR | FELON | RELS /INVST | SRCH /N_MOV | SRCH /MOV | CONTR /SRCH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| % Blacks | 2.21* | .01 | .00 | .15** | .01 | .01** | .01** | .01 | .01* | .02*** | .01* |
| | [4.93] | [1.74] | [.46] | [3.07] | [1.63] | [2.83] | [2.64] | [1.23] | [2.08] | [3.56] | [2.55] |
| | (1.00) | (.01) | (.00) | (.05) | (.01) | (.00) | (.00) | (.01) | (.00) | (.00) | (.00) |
| % Hispanics | 7.77 | .00 | .05 | .68* | .05 | .00 | .02 | -.09 | -.02 | .05 | -.02 |
| | [1.31] | [.01] | [1.96] | [2.32] | [1.49] | [.20] | [1.01] | [-1.78] | [-.68] | [1.92] | [-.50] |
| | (5.92) | (.05) | (.03) | (.29) | (.04) | (.02) | (.02) | (.05) | (.03) | (.03) | (.03) |
| Resource commitment | 13.85*** | -.01 | .04** | .26 | .06** | .02** | .03** | -.06* | -.01 | .02 | .04* |
| | [4.00] | [-.28] | [2.82] | [1.56] | [2.66] | [2.60] | [2.79] | [-2.16] | [-.67] | [1.19] | [2.08] |
| | (3.46) | (.03) | (.01) | (.17) | (.02) | (.01) | (.01) | (.03) | (.02) | (.02) | (.02) |
| Population | .09*** | .00* | .00** | .00 | .00 | .00 | .00 | -.00* | .00 | .00 | .00 |
| | [3.30] | [2.37] | [2.80] | [1.46] | [1.42] | [1.68] | [1.19] | [-2.37] | [1.81] | [.79] | [.94] |
| | (.03) | (.03) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) |
| Spatial lag | -.12 | .40*** | .59*** | .08 | .39*** | .56*** | .60*** | .28*** | .12 | .22* | .33*** |
| | [-1.30] | [5.57] | [7.78] | [1.00] | [4.65] | [7.02] | [8.36] | [3.68] | [.97] | [2.00] | [3.55] |
| | (.10) | (.07) | (.07) | (.08) | (.08) | (.08) | (.07) | (.08) | (.12) | (.11) | (.09) |
| Constant | 34.21*** | .39*** | -.04 | -4.06*** | .11** | .02 | .02 | .67*** | .12*** | .06* | .16*** |
| | (6.04) | (.07) | (.02) | (.41) | (.04) | (.02) | (.02) | (.07) | (.04) | (.03) | (.04) |
| $R^2$ | 0.35 | 0.35 | 0.52 | 0.23 | 0.39 | 0.50 | 0.55 | 0.29 | 0.09 | 0.27 | 0.27 |

*Note*: Standardized regression coefficients and standard errors are reported in brackets and parentheses respectively; STOP# = number of stops, INVST = % of investigatory stops, ARRST = % of arrests, CONST = % of consent searches, PROB = % of probable cause searches, FELON = % of felony charges, RELS/INVST = ratio of releases to investigatory stops, SRCH/N_MOV = ratio of searches to non-moving traffic stops, SRCH/MOV = ratio of searches to moving traffic stops, CONTR/SRCH = ratio of contraband findings to searches.; STOP#, INVST, PROB, CONTR, FELON, SRCH/N_MOV, SRCH/MOV, CONTR/SRCH, % Hispanics, resource commitment, and population are square-rooted; CONST and % blacks are natural-logged.
* $p < .05$ (two-tailed); ** $p < .01$ (two-tailed); *** $p < .001$ (two-tailed)

TABLE 6. Spatial Error Models for Traffic Stops

| Independent Variables | STOP # | INVST | ARRST | CONST | PROB | CONTR | FELON | RELS /INVST | SRCH /N_MOV | SRCH /MOV | CONTR /SRCH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| % Blacks | 1.95* | .01 | -.00 | .15** | .01 | .01* | .01* | .01 | .01* | .02*** | .02** |
| | [1.61] | [.78] | [-.43] | [2.70] | [.88] | [2.47] | [2.23] | [.76] | [2.09] | [3.70] | [2.89] |
| | (1.21) | (.01) | (.01) | (.05) | (.01) | (.00) | (.00) | (.01) | (.01) | (.00) | (.01) |
| % Hispanics | 5.08 | -.05 | .06 | .72* | .04 | .02 | .04 | -.10 | -.02 | .07* | .03 |
| | [.74] | [-.74] | [1.71] | [2.26] | [.99] | [.87] | [1.56] | [-1.68] | [-.64] | [2.20] | [.70] |
| | (6.83) | (.06) | (.03) | (.32) | (.05) | (.02) | (.02) | (.06) | (.04) | (.03) | (.04) |
| Resource commitment | 14.90*** | -.02 | .05** | .25 | .03 | .01 | .02 | -.06 | -.01 | .02 | .01 |
| | [3.76] | [-.52] | [2.62] | [1.34] | [1.33] | [.97] | [1.61] | [-1.92] | [-.74] | [.97] | [.61] |
| | (3.96) | (.04) | (.02) | (.19) | (.03) | (.01) | (.01) | (.03) | (.02) | (.02) | (.02) |
| Population | .09** | .00 | .00* | .00 | .00 | .00** | .00 | -.00* | .00 | .00 | .00* |
| | [2.85] | [1.73] | [2.47] | [.95] | [1.80] | [2.59] | [2.43] | [-2.05] | [1.89] | [.67] | [2.07] |
| | (.03) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) | (.00) |
| Spatial error | .39*** | .67*** | .73*** | .24 | .56*** | .70*** | .81*** | .55*** | .09 | .23 | .56*** |
| | [3.45] | [8.72] | [11.09] | [1.94] | [6.11] | [9.66] | [15.68] | [5.79] | [.71] | [1.85] | [6.14] |
| | (.11) | (.08) | (.07) | (.12) | (.09) | (.07) | (.05) | (.09) | (.13) | (.12) | (.09) |
| Constant | 28.83*** | 0.70*** | -.02 | -4.30*** | 0.24*** | 0.06 | 0.08 | 0.86*** | 0.14*** | 0.08** | 0.23*** |
| | (5.76) | (.05) | (.03) | (.28) | (.04) | (.02) | (.02) | (.05) | (.03) | (.03) | (.03) |
| $R^2$ | 0.40 | 0.42 | 0.56 | 0.25 | 0.40 | 0.53 | 0.63 | 0.36 | 0.09 | 0.26 | 0.34 |

*Note*: Standardized regression coefficients and standard errors are reported in brackets and parentheses respectively; STOP# = number of stops, INVST = % of investigatory stops, ARRST = % of arrests, CONST = % of consent searches, PROB = % of probable cause searches, FELON = % of felony charges, RELS/INVST = ratio of releases to investigatory stops, SRCH/N_MOV = ratio of searches to non-moving traffic stops, SRCH/MOV = ratio of searches to moving traffic stops, CONTR/SRCH = ratio of contraband findings to searches.; STOP#, INVST, PROB, CONTR, FELON, SRCH/N_MOV, SRCH/MOV,CONTR/SRCH, % Hispanics, resource commitment, and population are square-rooted; CONST and % blacks are natural-logged.
* $p < .05$ (two-tailed); ** $p < .01$ (two-tailed); *** $p < .001$ (two-tailed)

JA0667



Figure 1. LISA Cluster Maps of Beat Characteristics.



Figure 2. LISA Cluster Maps of Traffic Stops and Stop Outcomes.

──────────────────────────────

[1] For other scholarly definitions of racial profiling, see Racial Profiling Data Collection Resource Center at Northeastern University (2007). Library and Archive, Glossary of Terms, at http://www.racialprofilinganalysis.neu.edu/library/glossary.php

[2] For a list of studies by year, see Racial Profiling Data Collection Resource Center at Northeastern University (2007).   Library and Archives, Reports, http://www.racialprofilinganalysis.neu.edu/library/index.php

[3] Nationwide, use of force is greater against minorities than whites, in part because of different behaviors by minority suspects and citizens in police interactions. However, differences in suspect and citizen behavior cannot explain the vast disparity in use of force by race (Robinson, 2005).

[4] Although the driving age in Texas is 16 years old, the 15-year old population is included because the American Community Survey data lump 15 and 16 year-old populations into one age group.

## Original Article

# Selection of Appropriate Statistical Methods for Data Analysis

**Abstract**

In biostatistics, for each of the specific situation, statistical methods are available for analysis and interpretation of the data. To select the appropriate statistical method, one need to know the assumption and conditions of the statistical methods, so that proper statistical method can be selected for data analysis. Two main statistical methods are used in data analysis: descriptive statistics, which summarizes data using indexes such as mean and median and another is inferential statistics, which draw conclusions from data using statistical tests such as student's t-test. Selection of appropriate statistical method depends on the following three things: Aim and objective of the study, Type and distribution of the data used, and Nature of the observations (paired/unpaired). All type of statistical methods that are used to compare the means are called parametric while statistical methods used to compare other than means (ex-median/mean ranks/proportions) are called nonparametric methods. In the present article, we have discussed the parametric and non-parametric methods, their assumptions, and how to select appropriate statistical methods for analysis and interpretation of the biomedical data.

**Keywords:** *Diagnostic accuracy, parametric and nonparametric methods, regression analysis, statistical method, survival analysis*

**Prabhaker Mishra, Chandra Mani Pandey, Uttam Singh, Amit Keshri[1], Mayilvaganan Sabaretnam[2]**

*Departments of Biostatistics and Health Informatics, [1]Neuro-otology and [2]Endocrine Surgery, Sanjay Gandhi Post Graduate Institute of Medical Sciences, Lucknow, Uttar Pradesh, India*

## Introduction

Selection of appropriate statistical method is very important step in analysis of biomedical data. A wrong selection of the statistical method not only creates some serious problem during the interpretation of the findings but also affects the conclusion of the study. In statistics, for each specific situation, statistical methods are available to analysis and interpretation of the data. To select the appropriate statistical method, one need to know the assumption and conditions of the statistical methods, so that proper statistical method can be selected for data analysis.[1] Other than knowledge of the statistical methods, another very important aspect is nature and type of the data collected and objective of the study because as per objective, corresponding statistical methods are selected which are suitable on given data. Practice of wrong or inappropriate statistical method is a common phenomenon in the published articles in biomedical research. Incorrect statistical methods can be seen in many conditions like use of unpaired t-test on paired data or use of parametric test for the data which does not follow the normal distribution, etc., At present, many statistical software like SPSS, R, Stata, and SAS are available and using these softwares, one can easily perform the statistical analysis but selection of appropriate statistical test is still a difficult task for the biomedical researchers especially those with nonstatistical background.[2] Two main statistical methods are used in data analysis: descriptive statistics, which summarizes data using indexes such as mean, median, standard deviation and another is inferential statistics, which draws conclusions from data using statistical tests such as student's t-test, ANOVA test, etc.[3]

## Factors Influencing Selection of Statistical Methods

Selection of appropriate statistical method depends on the following three things: Aim and objective of the study, Type and distribution of the data used, and Nature of the observations (paired/unpaired).

### Aim and objective of the study

Selection of statistical test depends upon our aim and objective of the study. Suppose our objective is to find out the predictors of the outcome variable, then regression

*Address for correspondence:*
*Dr. Prabhaker Mishra,*
*Department of Biostatistics and Health Informatics, Sanjay Gandhi Post Graduate Institute of Medical Sciences, Lucknow, Uttar Pradesh, India.*
*E-mail mishrapk79@gmail.com*

**Access this article online**

Website: www.annals.in

DOI: 10.4103/aca.ACA_248_18

Quick Response Code:



This is an open access journal, and articles are distributed under the terms of the Creative Commons Attribution-NonCommercial-ShareAlike 4.0 License, which allows others to remix, tweak, and build upon the work non-commercially, as long as appropriate credit is given and the new creations are licensed under the identical terms.

For reprints contact: reprints@medknow.com

**How to cite this article:** Mishra P, Pandey CM, Singh U, Keshri A, Sabaretnam M. Selection of appropriate statistical methods for data analysis. Ann Card Anaesth 2019;22:297-301.

JA0671

Mishra, *et al*.: Statistical methods for data analysis

analysis is used while to compare the means between two independent samples, unpaired samples t-test is used.

**Type and distribution of the data used**

For the same objective, selection of the statistical test is varying as per data types. For the nominal, ordinal, discrete data, we use nonparametric methods while for continuous data, parametric methods as well as nonparametric methods are used.[4] For example, in the regression analysis, when our outcome variable is categorical, logistic regression while for the continuous variable, linear regression model is used. The choice of the most appropriate representative measure for continuous variable is dependent on how the values are distributed. If continuous variable follows normal distribution, mean is the representative measure while for non-normal data, median is considered as the most appropriate representative measure of the data set. Similarly in the categorical data, proportion (percentage) while for the ranking/ordinal data, mean ranks are our representative measure. In the inferential statistics, hypothesis is constructed using these measures and further in the hypothesis testing, these measures are used to compare between/among the groups to calculate significance level. Suppose we want to compare the diastolic blood pressure (DBP) between three age groups (years) (<30, 30--50, >50). If our DBP variable is normally distributed, mean value is our representative measure and null hypothesis stated that mean DB*P* values of the three age groups are statistically equal. In case of non-normal DBP variable, median value is our representative measure and null hypothesis stated that distribution of the DB*P* values among three age groups are statistically equal. In above example, one-way ANOVA test is used to compare the means when DBP follows normal distribution while Kruskal--Wallis H tests/median tests are used to compare the distribution of DBP among three age groups when DBP follows non-normal distribution. Similarly, suppose we want to compare the mean arterial pressure (MAP) between treatment and control groups, if our MAP variable follows normal distribution, independent samples t-test while in case follow non-normal distribution, Mann--Whitney U test are used to compare the MAP between the treatment and control groups.

**Observations are paired or unpaired**

Another important point in selection of the statistical test is to assess whether data is paired (same subjects are measures at different time points or using different methods) or unpaired (each group have different subject). For example, to compare the means between two groups, when data is paired, paired samples t-test while for unpaired (independent) data, independent samples t-test is used.

## Concept of Parametric and Nonparametric Methods

Inferential statistical methods fall into two possible categorizations: parametric and nonparametric. All type of statistical methods those are used to compare the means are

called parametric while statistical methods used to compare other than means (ex-median/mean ranks/proportions) are called nonparametric methods. Parametric tests rely on the assumption that the variable is continuous and follow approximate normally distributed. When data is continuous with non-normal distribution or any other types of data other than continuous variable, nonparametric methods are used. Fortunately, the most frequently used parametric methods have nonparametric counterparts. This can be useful when the assumptions of a parametric test are violated and we can choose the nonparametric alternative as a backup analysis.[3]

## Selection between Parametric and Nonparametric Methods

All type of the *t*-test, *F* test are considered parametric test. Student's *t*-test (one sample *t*-test, independent samples *t*-test, paired samples *t*-test) is used to compare the means between two groups while *F* test (one-way ANOVA, repeated measures ANOVA, etc.) which is the extension of the student's *t*-test are used to compare the means among three or more groups. Similarly, Pearson correlation coefficient, linear regression is also considered parametric methods, is used to calculate using mean and standard deviation of the data. For above parametric methods, counterpart nonparametric methods are also available. For example, Mann--Whitney U test and Wilcoxon test are used for student's *t*-test while Kruskal--Wallis H test, median test, and Friedman test are alternative methods of the *F* test (ANOVA). Similarly, Spearman rank correlation coefficient and log linear regression are used as nonparametric method of the Pearson correlation and linear regression, respectively. [3,5-8] Parametric and their counterpart nonparametric methods are given in Table 1.

## Statistical Methods to Compare the Proportions

The statistical methods used to compare the proportions are considered nonparametric methods and these methods have no alternative parametric methods. Pearson Chi-square test and Fisher exact test is used to compare the proportions between two or more independent groups. To test the change in proportions between two paired groups, McNemar test is used while Cochran Q test is used for the same objective among three or more paired groups. Z test for proportions is used to compare the proportions between two groups for independent as well as dependent groups.[6-8] [Table 2].

## Other Statistical Methods

Intraclass correlation coefficient is calculated when both pre-post data are in continuous scale. Unweighted and weighted Kappa statistics are used to test the absolute agreement between two methods measured on the same subjects (pre-post) for nominal and ordinal data, respectively. There

**JA0672**

Mishra, *et al.*: Statistical methods for data analysis

**Table 1: Parametric and their Alternative Nonparametric Methods**

| Description | Parametric Methods | Nonparametric Methods |
|---|---|---|
| Descriptive statistics | Mean, Standard deviation | Median, Interquartile range |
| Sample with population (or hypothetical value) | One sample *t*-test ($n <30$) and One sample Z-test ($n \geq 30$) | One sample Wilcoxon signed rank test |
| Two unpaired groups | Independent samples *t*-test (Unpaired samples *t*-test) | Mann Whitney U test/Wilcoxon rank sum test |
| Two paired groups | Paired samples *t*-test | Related samples Wilcoxon signed-rank test |
| Three or more unpaired groups | One-way ANOVA | Kruskal-Wallis H test |
| Three or more paired groups | Repeated measures ANOVA | Friedman Test |
| Degree of linear relationship between two variables | Pearson's correlation coefficient | Spearman rank correlation coefficient |
| Predict one outcome variable by at least one independent variable | Linear regression model | Nonlinear regression model/Log linear regression model on log normal data |

**Table 2: Statistical Methods to Compare the Proportions**

| Description | Statistical Methods | Data Type |
|---|---|---|
| Test the association between two categorical variables (Independent groups) | Pearson Chi-square test/Fisher exact test | Variable has $\geq 2$ categories |
| Test the change in proportions between 2/3 groups (paired groups) | McNemar test/Cochrane Q test | Variable has 2 categories |
| Comparisons between proportions | Z test for proportions | Variable has 2 categories |

are some methods those are either semiparametric or nonparametric and these methods, counterpart parametric methods, are not available. Methods are logistic regression analysis, survival analysis, and receiver operating characteristics curve.[9] Logistic regression analysis is used to predict the categorical outcome variable using independent variable(s). Survival analysis is used to calculate the survival time/survival probability, comparison of the survival time between the groups (Kaplan--Meier method) as well as to identify the predictors of the survival time of the subjects/patients (Cox regression analysis). Receiver operating characteristics (ROC) curve is used to calculate area under curve (AUC) and cutoff values for given continuous variable with corresponding diagnostic accuracy using categorical outcome variable. Diagnostic accuracy of the test method is calculated as compared with another method (usually as compared with gold standard method). Sensitivity (proportion of the detected disease cases from the actual disease cases), specificity (proportion of the detected non-disease subjects from the actual non-disease subjects), overall accuracy (proportion of agreement between test and gold standard methods to correctly detect the disease and non-disease subjects) are the key measures used to assess the diagnostic accuracy of the test method. Other measures like false negative rate (1-sensitivity), false-positive rate (1-specificity), likelihood ratio positive (sensitivity/false-positive rate), likelihood ratio negative (false-negative rate/Specificity), positive predictive value (proportion of correctly detected disease cases by the test variable out of total detected disease cases by the itself), and negative predictive value (proportion of correctly detected non-disease subjects by test variable out of total non-disease subjects detected by the itself) are also used to calculate the diagnostic accuracy of the test method.[3,6,10] [Table 3].

## Advantage and Disadvantages of Nonparametric Methods over Parametric Methods and Sample Size Issues

Parametric methods are stronger test to detect the difference between the groups as compared with its counterpart nonparametric methods, although due to some strict assumptions, including normality of the data and sample size, we cannot use parametric test in every situation and resultant its alternative nonparametric methods are used. As mean is used to compare parametric method, which is severally affected by the outliers while in nonparametric method, median/mean rank is our representative measures which do not affect from the outliers.[11]

In parametric methods like student's *t*-test and ANOVA test, significance level is calculated using mean and standard deviation, and to calculate standard deviation in each group, at least two observations are required. If every group did not have at least two observations, its alternative nonparametric method to be selected works through comparisons of the mean ranks of the data.

For small sample size (average $\leq 15$ observations per group), normality testing methods are less sensitive about non-normality and there is chance to detect normality despite having non-normal data. It is recommended that when sample size is small, only on highly normally distributed data, parametric method should be used otherwise corresponding nonparametric methods should be preferred. Similarly on sufficient or large sample size (average >15 observations per group), most of the statistical methods are highly sensitive about non-normality and there is chance to wrongly detect non-normality, despite having normal data. It is recommended that when sample size is

JA0673

Mishra, *et al.*: Statistical methods for data analysis

**Table 3: Semi-parametric and non-parametric methods**

| Description | Statistical methods | Data type |
|---|---|---|
| To predict the outcome variable using independent variables | Binary Logistic regression analysis | Outcome variable (two categories), Independent variable (s): Categorical ($\geq 2$ categories) or Continuous variables or both |
| To predict the outcome variable using independent variables | Multinomial Logistic regression analysis | Outcome variable ($\geq 3$ categories), Independent variable (s): Categorical ($\geq 2$ categories) or continuous variables or both |
| Area under Curve and cutoff values in the continuous variable | Receiver operating characteristics (ROC) curve | Outcome variable (two categories), Test variable : Continuous |
| To predict the survival probability of the subjects for the given equal intervals | Life table analysis | Outcome variable (two categories), Follow-up time : Continuous variable |
| To compare the survival time in $\geq 2$ groups with $P$ | Kaplan--Meier curve | Outcome variable (two categories), Follow-up time : Continuous variable, One categorical group variable |
| To assess the predictors those influencing the survival probability | Cox regression analysis | Outcome variable (two categories), Follow-up time : Continuous variable, Independent variable(s): Categorical variable(s) ($\geq 2$ categories) or continuous variable(s) or both |
| To predict the diagnostic accuracy of the test variable as compared to gold standard method | Diagnostic accuracy (Sensitivity, Specificity etc.) | Both variables (gold standard method and test method) should be categorical ($2 \times 2$ table) |
| Absolute Agreement between two diagnostic methods | Unweighted and weighted Kappa statistics/Intra class correlation | Between two Nominal variables (unweighted Kappa), Two Ordinal variables (Weighted kappa), Two Continuous variables (Intraclass correlation) |

sufficient, only on highly non-normal data, nonparametric method should be used otherwise corresponding parametric methods should be preferred.[12]

**Minimum Sample Size Required for Statistical Methods**

To detect the significant difference between the means/medians/mean ranks/proportions, at minimum level of confidence (usually 95%) and power of the test (usually 80%), how many individuals/subjects (sample size) are required depends on the detected effect size. The effect size and corresponding required sample size are inversely proportional to each other, that is, on the same level of confidence and power of the test, when effect size is increasing, required sample size is decreasing. Summary is, no minimum or maximum sample size is fix for any particular statistical method and it is subject to estimate based on the given inputs including effect size, level of confidence, power of the study, etc., Only on the sufficient sample size, we can detect the difference significantly. In case lack of the sample size than actual required, our study will be under power to detect the given difference as well as result would be statistically insignificant.

**Impact of Wrong Selection of the Statistical Methods**

As for each and every situation, there are specific statistical methods. Failing to select appropriate statistical method, our significance level as well as their conclusion is affected.[13] For example in a study, systolic blood pressure (mean ± SD) of the control ($126.45 \pm 8.85$, $n_1 = 20$) and treatment ($121.85 \pm 5.96$, $n_2 = 20$) group was compared using Independent samples t-test (correct practice). Result showed that mean difference between two groups was statistically insignificant ($P = 0.061$) while on the same data, paired samples t-test (incorrect practice) indicated that

mean difference was statistically significant ($P = 0.011$). Due to incorrect practice, we detected the statistically significant difference between the groups although actually difference did not exist.

**Conclusions**

Selection of the appropriate statistical methods is very important for the quality research. It is important that a researcher knows the basic concepts of the statistical methods used to conduct research study that produce a valid and reliable results. There are various statistical methods that can be used in different situations. Each test makes particular assumptions about the data. These assumptions should be taken into consideration when deciding which the most appropriate test is. Wrong or inappropriate use of statistical methods may lead to defective conclusions, finally would harm the evidence-based practices. Hence, an adequate knowledge of statistics and the appropriate use of statistical tests are important for improving and producing quality biomedical research. However, it is extremely difficult for a biomedical researchers or academician to learn the entire statistical methods. Therefore, at least basic knowledge is very important so that appropriate selection of the statistical methods can decide as well as correct/incorrect practices can be recognized in the published research. There are many softwares available online as well as offline for analyzing the data, although it is fact that which set of statistical tests are appropriate for the given data and study objective is still very difficult for the researchers to understand. Therefore, since planning of the study to data collection, analysis and finally in the review process, proper consultation from statistical experts may be an alternative option and can reduce the burden from the clinicians to go in depth of statistics which required lots of time and effort and ultimately affect their

JA0674

Mishra, *et al.*: Statistical methods for data analysis

clinical works. These practices not only ensure the correct and appropriate use of the biostatistical methods in the research but also ensure the highest quality of statistical reporting in the research and journals.[14]

## Acknowledgements

Authors would like to express their deep and sincere gratitude to Dr. Prabhat Tiwari, Professor, Department of Anaesthesiology, Sanjay Gandhi Postgraduate Institute of Medical Sciences, Lucknow, for his encouragement to write this article. His critical reviews and suggestions were very useful for improvement in the article.

## Financial support and sponsorship

Nil.

## Conflicts of interest

There are no conflicts of interest.

## References

1. Nayak BK, Hazra A. How to choose the right statistical test?. Indian J Ophthalmol 2011;59:85-6.
2. Karan J. How to select appropriate statistical test?. J Pharm Negative Results 2010;1:61-3.
3. Mishra P, Mayilvaganan S, Agarwal A. Statistical methods in endocrine surgery journal club. World J Endoc Surg 2015;7:21-3.
4. Mishra P, Pandey CM, Singh U, Gupta A. Scales of measurement and presentation of statistical data. Ann Card Anaesth 2018;21:419-22.
5. Campbell MJ, Swinscow TDV. Statistics at Square One 11th ed. Wiley-Blackwell: BMJ Books; 2009.
6. Sundaram KR, Dwivedi SN, Sreenivas V. Medical Statistics: Principles And Methods. Anshan; 2010.
7. Altman DG. Practical Statistics For Medical Research. CRC Press; 1990.
8. Barton B, Peat J. Medical Statistics: A Guide to SPSS, Data Analysis and Clinical Appraisal. 2nd ed. Wiley Blackwell, BMJ Books; 2014.
9. Peat J, Barton B. Medical Statistics: A Guide to Data Analysis and Critical Appraisal. John Wiley & Sons; 2008.
10. Armitage P, Berry G, Matthews JNS. Statistical Methods In Medical Research. John Wiley & Sons; 2008.
11. Kim HY. Statistical notes for clinical researchers: Assessing normal distribution (2) using skewness and kurtosis. Open lecture on statistics. Restor Dent Endod 2013;38:52-4.
12. Ghasemi A, Zahediasl S. Normality Tests for Statistical Analysis: A Guide for Non-Statisticians. Int J Endocrinol Metab 2012;10:486-9.
13. Strasak AM, Zaman Q, Pfeiffer KP, Göbel G, Ulmer H. Statistical errors in medical research: A review of common pitfalls. Swiss Med Wkly 2007;137:44-9.
14. Bajwa SJ. Basics, common errors and essentials of statistical tools and techniques in anesthesiology research. J Anesthesiol Clin Pharmacol 2015;31:547-53.

JA0675



*Article*

Race and Justice
2017, Vol. 7(3) 256-275
© The Author(s) 2016
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/2153368716646163
journals.sagepub.com/home/raj

# The Impact of Police Deployment on Racial Disparities in Discretionary Searches

**Steven J. Briggs[1] and Kelsey A. Keimig[1]**

## Abstract

A large and growing body of research finds racial disparities in discretionary searches of drivers during traffic stops with Black drivers disproportionately involved in these investigations. Among the explanations for these disparities is the deployment hypothesis which suggests that as police departments increasingly adopt hot spots policing strategies, proactive traffic stops and discretionary searches may spatially cluster around crime hot spots contributing to racial disparities. The present study builds on the existing research literature by identifying hot spots using reported crime data from a police department and examining whether these crime hot spots function as a mediating factor to the relationship between driver race and discretionary searches. Findings provide partial support for the deployment hypothesis. While nearly half of all traffic stops transpired within one quarter mile of hot spots and more frequently involved Black drivers, stops involving Black drivers remained more likely to include discretionary searches and increased concomitantly with distance from the nearest hot spot.

## Keywords

racial profiling, race and policing, traffic stops, driving while black, directed patrol, hot spots

[1] Department of Criminal Justice and Political Science, North Dakota State University, Fargo, ND, USA

**Corresponding Author:**
Steven J. Briggs, Department of Criminal Justice and Political Science, North Dakota State University, 1616 12th Avenue North, Fargo, ND 58108-6050, USA.
Email: steven.briggs@ndsu.edu

## Introduction

When survey participants are asked whether local police vary decision-making based on race, including whether officers are more likely to stop some drivers using more minor violations, robust racial disparities emerge with Black survey respondents more frequently perceiving discriminatory treatment (Weitzer & Tuch, 1999; Wu, Lake, & Cao, 2013). While members of the public may inform their opinions regarding police decisions from a variety of sources including vicarious experiences of friends and family members or through exposure to media, previous interactions are a particularly salient factor when explaining these disparities (Weitzer & Tuch, 2005). Among the types of interactions with which members of the public may inform their opinions, the most common source of contacts is traffic stops, accounting for over 40% of police–public contacts (Langton & Durose, 2013), with interactions containing discretionary searches particularly damaging to police legitimacy due to the implication of criminal suspicion (Gau, 2012). Given the potential contribution to racial disparities in police legitimacy resulting from these contacts (Kirk, Papachristos, Fagan, & Tyler, 2012; Tyler, 2004; Weitzer & Tuch, 2005), a growing body of research focuses on the decision by officers to search drivers and vehicles (Petrocelli, Piquero, & Smith, 2003; Renauer, 2012; Schafer, Carter, Katz-Bannister, & Wells, 2006). Although there are exceptions (Smith & Petrocelli, 2001; Tillyer, Klahm, & Engel, 2012), much of the existing research identifies associations between driver race and searches, with Black drivers more frequently subject to these investigations than similarly situated White drivers (Briggs & Crew, 2013; Engel & Calnon, 2004).

In order to better understand the origins of racial disparities in traffic stop decisions, research has begun incorporating contextual factors into analyses. In particular, given the uneven distribution of reported crimes to police, one explanation given for racial disparities centers around the deployment of police resources (Engel, Smith, & Cullen, 2012; Parker, MacDonald, Alpert, Smith, & Piquero, 2004). With promising evaluations also demonstrated crime prevention benefits of directing police resources to crime "hot spots" typically comprised of intersections, blocks, or block faces (Braga & Weisburd, 2010; Sherman, Gartin, & Buerger, 1989; Sherman & Weisburd, 1995), combined with organizational changes encouraging officers to increase proactive activities in and near these hot spots (Silverman, 1999), the deployment hypothesis argues spatial variation in risk of stops and searches may differentially impact racial and ethnic groups when these locations are disproportionately identified within neighborhoods with higher proportions of racial and ethnic minority residents (Roncek & Maier, 1991; Tomaskovic-Devey, Mason, & Zingraff, 2004). Officers directing time and effort to crime hot spots may be more assertive in initiating traffic stops and investigating drivers and vehicles closer to hot spots of crime. Where hot spots are disproportionately situated in areas with higher proportions of racial and ethnic minority drivers, analyses of stop and search data are likely to identify associations between driver race and discretionary decision outcomes.

Although a handful of published research papers examining the relationship between driver race and decisions in the context of traffic stops include measures of

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 210 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 3 of 20 PageID# 733

context including police deployment, these analyses rely on data aggregated to neighborhoods or beats. The current study builds on this research by more directly testing the deployment hypothesis. Specifically, hot spots of crime are identified using police reports from a large police department and are used to explore whether the location of traffic stops relative to hot spots of crime functions as a mediating factor to the relationship between driver characteristics and the decision to search. Before describing the data, analysis, and findings of the present study, the article begins with a description of the deployment hypothesis and a review of research examining deployment of police resources as a mediating factor to the relationship between driver characteristics and discretionary searches.

## The Deployment Hypothesis

Under the deployment hypothesis, racial disparities identified in analyses of traffic stop data collected by agencies policing urban areas are the product of variation in risk for police-initiated contacts and searches driven by organizational responses to uneven distributions of criminal offending. While examining the spatial distribution of crime has been a focal point of criminological research since the 1940s, for decades this research, along with the accompanying distribution of police resources, was organized around neighborhoods (Vold, Bernard, & Snipes, 2002). Police departments organized spatially by employing beats, or area assignments for patrol officers, that encompass anywhere between several blocks and several dozen square miles (Novak & Chamlin, 2012). Densities of patrols were typically based on the distribution of crime within jurisdictions where higher crime beats or neighborhoods received higher concentrations of patrols in an effort to dissuade potential offenders and respond more quickly to reported offenses (National Research Council, 2004).

With technological developments enabling the widespread adoption of crime mapping and analysis, the focus on spatial distribution of crime began including smaller units of analysis such as blocks, street segments, and intersections. One such analysis involved mapping of calls for service down to addresses in Minneapolis (Sherman et al., 1989). Findings indicated that roughly half of calls for service originated from just 3% of addresses, suggesting that police administrators seeking to prevent crime could concentrate efforts to these locations. Significantly, it was also noted that, even within the most troubled neighborhoods, most addresses did not record a call for service during the study period (Sherman et al., 1989). With previous research finding limited impacts from increasing the density of patrols in neighborhoods on reducing rates of offending (Kelling, Pate, Dieckman, & Brown, 1974), the findings from the Minneapolis study suggested alternative crime prevention strategies including targeting patrol resources at hot spots of crime. Using a randomized controlled trial testing the directing of patrols to troubled places, Sherman and Weisburd (1995) found increasing police presence within crime hot spots lead to substantial reductions in crime and disorder. While some police departments continue disproportionately deploying patrols to entire neighborhoods in an effort to deter potential offenders, a national survey of police agencies found over half (58%) of

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 211 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 4 of 20 PageID# 734

departments with jurisdiction populations of 50,000 or greater use crime mapping software to identify hot spots (Reaves, 2010).

Along with the changes in understanding regarding the utility of patrol strategies as a crime prevention approach, many police departments also began adopting organizational changes first implemented by the New York City police department in the early 1990s (Silverman, 1999; Weisburd, Mastrofski, McNally, Greenspan, & Willis, 2003) and often referred to as Compstat, in order to formalize systematic reviews of reported offenses and department responses using existing internal data during recurring meetings among police managers. As an organizational change, it provides incentives and accountability for officers to focus resources on problems, particularly crime hot spots. While police should arguably focus on responses that address conditions creating opportunities for offending (Kochel, 2011), a common response by departments is to direct officers to increase patrol and proactively address order maintenance issues, often solely relying on traditional law enforcement responses such as increasing contacts, becoming more assertive in conducting searches, and increasingly issuing citations and arrests in and around hot spots (Braga et al., 1999; Taylor, Koper, & Woods, 2011).

The deployment hypothesis proposes that racial disparities in searches result from departments responding to concentrated offending by focusing traffic stops and searches in and around hot spots of crime (Tomaskovic-Devey et al., 2004). While this clustering of interactions increases the risk that drivers in and around crime hot spots will be stopped and searched, this risk is expected to be race neutral where drivers of various racial groups are treated similarly (Engel et al., 2012; Tomaskovic-Devey et al., 2004). In other words, traffic stops occurring in similar proximities to hot spots of crime should contain similar levels of officer assertiveness regardless of the characteristics of the stopped drivers. Racial disparities are an expected product of uneven risk for proactive, investigatory contacts driven by spatial variation in the distribution of reported offending rather than variation in the exercise of discretionary authority across drivers of varying demographic characteristics.

## Police Deployment on Racial Disparities in Stops and Searches

With analyses of the decision to conduct searches usually relying upon the population of stopped drivers (Briggs & Crew, 2013), it is noteworthy that examinations focusing on the deployment of police resources often identify a positive relationship with distributions of traffic stops (Renauer, 2012; for an exception, see Novak & Chamlin, 2012). For example, using data from Richmond, VA, Petrocelli, Piquero, and Smith (2003) find a positive association between the reported crime rate within neighborhoods and the rate of stops per neighborhood resident. Similarly, using data collected in Houston, TX, Roh and Robinson (2009) find positive a relationship between the number of officers assigned to patrol beats and the number of traffic stops recorded within beats.

Turning to the question of whether variation in patterns of police deployment contributes to racial disparities in searches, the likelihood or rate of searches is expected to be positively related to measures of police deployment rather than with driver race or ethnicity (Tomaskovic-Devey et al., 2004). This review and the analyses that follow focus specifically on discretionary searches which are officer-initiated investigations based on officer judgment (Walker, 2005). In contrast, nondiscretionary searches are typically mandatory for officers and are required by department policies (Kochel, 2011; Tillyer, 2014). While some researchers have used reasons given for initiating contacts or the dispositions of traffic stops to identify discretionary searches (Engel & Calnon, 2004; Lundman, 2004; Smith & Petrocelli, 2001), the most common technique uses the reasons provided by officers for conducting searches. Discretionary searches include consent searches, where permission is sought and received by police officers, and so-called Terry searches, named for the U.S. Supreme Court ruling giving officers the authority to conduct cursory searches of drivers and/or vehicles in order to identify potential weapons (Ridgeway, 2006; Schafer et al., 2006). Nondiscretionary searches include those conducted incident to arrest, including inventory searches performed on vehicles as part of a seizure (Alpert, Dunham, & Smith, 2008; Schafer et al., 2006).

Previous research examining whether variation in deployment mitigates the relationship between driver race and discretionary searches provides mixed support for the deployment hypothesis. After accounting for violent crime arrest rates within neighborhoods, Alpert, Dunham, and Smith (2008) find that neither driver race nor driver ethnicity to be a significant predictor of the likelihood of searches. Alternatively, after accounting for greater likelihoods of stops in neighborhoods with greater amounts of crime, the rates at which drivers are searched are higher for Black drivers than White drivers for some types of discretionary searches (i.e., Terry searches) though not others (Ridgeway, 2006). Moreover, Novak and Chamlin (2012) identify a positive relationship between a measure of police workload and the rate at which traffic stops involve searches for Black drivers. However, a similar pattern is not identified for White drivers.

Presently, the research testing whether the deployment hypothesis explains racial disparities in discretionary searches suffers from several limitations including relying on outcome measures that fail to distinguish between discretionary and nondiscretionary searches (Alpert et al., 2008; Novak & Chamlin, 2012). In addition, previous analyses of the deployment hypothesis have relied on aggregated, neighborhood, or beat-level measures of police deployment. Given that neighborhoods can be spatially large (Novak & Chamlin, 2012), have wide variation in levels of offending within them (Sherman et al., 1989), and with many larger police departments implementing hot spots policing strategies (Reaves, 2010), variation in the exercise of police discretion within neighborhoods may be lost in such analyses. The current study seeks to build on the previous research with data collected by a department using mapping to identify hot spots of crime and encouraging officers to dedicate time and effort to these areas through internal accountability mechanisms. Specifically, the current study examines whether the location of traffic stops relative to hot spots of crime mediates the relationship between driver race and the likelihood of discretionary searches.

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 213 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 6 of 20 PageID# 736

## Current Study

The deployment hypothesis proposes that traffic stops and discretionary search are expected to be concentrated around hot spots of crime with all drivers of having similar likelihoods of discretionary searches regardless of race. To test this expectation using data from a large, urban police department, the current study identifies the distance of individual traffic stops to the nearest crime hot spot, categorizes traffic stops based on these distances, and examines whether Black, Hispanic, and White drivers within each distance category have relatively similar probabilities of discretionary searches.

### Study Setting

Data for the current study were collected in Minneapolis, MN. At the time of data collection, the police department was using crime mapping and Compstat processes that encouraged officers to direct time and contacts in and around hot spots of crime (Willis, Mastrofski, & Weisburd, 2004). At the start of shifts, officers were provided crime maps and ordered to "use their uncommitted time for directed patrol and to focus on making arrests for even minor breaches of the law in order to reduce serious crime" (Willis et al., 2004, p. 12). Given the widespread adoption of using crime mapping to identify hot spots of crime by departments combined with frequent use of internal accountability mechanisms such as Compstat for monitoring crime levels and deployment of department resources (Reaves, 2010), the study setting is representative of current, common crime prevention strategies.

### Data Collection Procedures

Data on individual traffic stops were recorded by officers using computers mounted in patrol cars for all proactive traffic stops taking place between January 1, 2002, and December 31, 2002, and were provided to the researchers by the Institute on Race and Poverty at the University of Minnesota School of Law. In order to collect data, a system was established where the data collection instrument would appear on mobile data terminals in every instance where officers reported the initiation of traffic stops to dispatchers (Institute on Race & Poverty, 2003). Officers could not clear the instrument from their mobile data terminals until it was completed. In extraordinary situations, such as officers being dispatched to another location, dispatchers could temporarily clear the data collection instrument and officers were asked later to complete them (Institute on Race & Poverty, 2003).

The current study focuses on cases where traffic stops were initiated by officers for moving, equipment, or registration violations and the data collection instrument was completed.[1] The study is limited to contacts involving White, Black, and Hispanic drivers while traffic stops involving Native American ($n = 813$) and Asian or Pacific Islander drivers ($n = 1,802$) are excluded due to insufficient number of contacts for analysis. Finally, with the current analysis focusing on

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 214 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 7 of 20 PageID# 737

how the location of police–public contacts relative to hot spots of crime impacts racial and ethnic disparities in discretionary searches, interactions involving non-discretionary searches were excluded from analyses.[2] The sample of contacts in the current analysis includes 39,547 stops involving 1,324 discretionary searches.

### Distance to Crime Hot Spots

To identify hot spots of crime, the Minneapolis Police Department provided locations, either by address or by street intersections, for 76,915 reported crimes in calendar year 2002 based on incident reports completed by officers. Reported crimes consist of both Uniform Crime Report (UCR) Part I violent and property crimes and other offenses including reports of drug offenses, vandalism, disorder, and loitering.[3] Using ArcGIS 10, these reports were geocoded with a 98.5% match rate. Unfortunately, neither the hot spots identified by the crime analysis unit at the Minneapolis Police Department nor the methods of identifying hot spots at the time that the traffic stop data were collected could be determined by the authors.[4] As a result, a series of decisions regarding the techniques used to identify crime hot spots were required. The reasoning behind the decisions that follow was based on two criteria. First, previous research finds that about 3% of locations accounted for between one quarter and one half of all of reported offenses (Braga & Bond, 2008; Sherman et al., 1989). Second and more importantly, previous experiments in directed patrol conducted in collaboration between researchers and police practitioners have reported caution among commanding officers in assigning too many hot spots for increased police activity. For example, in a randomized controlled trial of directed patrol in Minneapolis, it was noted that ''the department could not handle 100 target hot spots . . . and asked [the researchers] to reduce the experimental group to 50'' (Sherman & Weisburd, 1995, p. 632).[5] Similarly, an evaluation of directed patrol strategies compared to problem-oriented policing strategies in Jacksonville, FL, targeted 43 hot spots (Taylor et al., 2011).

Hot spots were identified using the Nearest Neighbor Hierarchical Spatial Clustering tool in Crimestat 3.2a. This technique was selected as it works in conjunction with mapping software, ArcGIS, that is commonly used by crime analysts, it is easily adjustable to in producing results that fit the criteria for identifying outlined above, and the output includes maps that contain ellipses that are common in Compstat presentations. Under the goals outlined above, the minimum points per cluster were set to 200 with a single standard deviation for the ellipses. The identified hot spots contain 6.1% of the city and 34% of all reported crimes.[6] The number of hot spots per district ranged from 7 to 15 with a total of 61 hot spots across the five department districts. The distance from each individual traffic stop to the center of the nearest hot spot was linear and identified in feet. Using the distances to the center of the nearest hot spots, traffic stops were then categorized as taking place within a quarter of a mile of a hot spot, between a quarter and half of a mile, between half of a mile and a mile, and greater than a mile.

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 215 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 8 of 20 PageID# 738

### Study Design

To examine whether the possible concentration of traffic stops and discretionary searches around hot spots of crime explains racial disparities in discretionary searches, the current study first presents the frequency of traffic stops by driver race in various categorical distances. Although these data do not inform whether the population of stopped drivers is biased from selection processes (Walker, 2001), it functions as the baseline for comparison against the population of drivers whose interactions include discretionary searches. More direct to the deployment hypothesis as an explanation of racial disparities in discretionary searches, these frequencies enable the exploration of whether discretionary searches are also more concentrated around crime hot spots. Finally, using multivariate regression models, the relationship between driver race and discretionary searches is examined among stops occurring within similar categorical distances from crime hot spots.[7]

*Dependent variable.* When officers indicated that searches of drivers, passengers, and/or vehicles were conducted in the course of traffic stops, they were asked to select from several discretionary reasons for searches, including consent to search form, driver gave verbal permission, and officer safety, or nondiscretionary reasons such as incident to arrest and contraband observed. Categorization into discretionary and nondiscretionary searches replicates previous research (see Schafer et al., 2006) and is based on whether searches are conducted based on officer selection or are required by department policies. Traffic stops with discretionary searches were coded 1 and all other traffic stops were coded 0.

*Independent variables.* In addition to whether a search was conducted and the reason for the search, officers were asked to collect information regarding driver and situational characteristics for each traffic stop. Driver characteristics included the age, gender, and race or ethnicity of each stopped driver. Previously published research focusing on whether the race or ethnicity of drivers contributed to discretionary decisions in traffic stops has noted the importance of identifying how officers perceive the drivers rather than how the drivers identify themselves (Batton & Kadleck, 2004; Ramirez, McDevitt, & Farrell, 2000). Racial and ethnic characteristics of drivers were likely based on officer perception. Indeed, driver's licenses in the state of Minnesota have never included information regarding the race or ethnicity of the licensee.[8] The data collection instrument limited officers to categorizing drivers into a single race or ethnicity.[9] Officer classifications of driver race and ethnicity were coded into the series of dummy variables *Black, Hispanic,* and *White* with *White* functioning as the reference category in multivariate models. Age is measured using a series of dummy variables, *15–18, 19–29, 30–39,* and *40 and up,* replicating those used by Ridgeway (2006). In multivariate analyses, *15–18* functions as the reference category. Similarly, the driver gender variable male was coded 1 for when officers categorized drivers as male and 0 when female.

Several situational characteristics may also influence the likelihood of discretionary searches in traffic stops including the initial reason for the stop and the time of

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 216 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 9 of 20 PageID# 739



**Figure 1.** Traffic stops by race and distance to nearest crime hot spot.

the interaction. Some have argued police may use less serious traffic violations as a reason to initiate traffic stops in order to further investigate drivers, often referred to as pretextual stops (Harris, 2002). In the current study, the initial reasons for stops are categorized in the variable *equip/reg* with stops for equipment and registration violations coded 1 and stops initiated for moving violations such as *speeding* coded 0. Similarly, to account for the time of each traffic stop, a series of variables were created using 4-hr increments, *12 a.m.–4 a.m.*, *4 a.m.–8 a.m.*, *8 a.m.–12 p.m.*, *12 p.m.–4 p.m.*, *4 p.m.–8 p.m.*, *8 p.m.–12 a.m.*, replicating previous research (see Ridgeway, 2006), with *12 a.m.–4 a.m.* as the reference category in multivariate models.

## Results

Under the deployment hypothesis, stops are expected to cluster near hot spots of crime. Based on the results presented in Figure 1 where just over half (51.7%) of all traffic stops taking place within one quarter mile of crime hot spot, this expectation is supported. Without appropriate baselines for comparison, it is unknown whether the racial proportions of drivers stopped are representative of the offending populations in these areas of the community (Walker, 2001). However, the findings presented in Figure 1 are significant. As noted above, the identification of hot spots used in the analyses that follow was identified by the authors rather than using hot spots identified within the department at the time the traffic stop data were collected. The results in Figure 1 indicate that proactive contacts were highly concentrated within and near the hot spots identified by the authors. Moreover, the volume to traffic stops drops concomitantly with distance from hot spots. If the location of hot spots was misidentified, one would not expect to find the distribution of stops presented here.

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 217 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 10 of 20 PageID# 740



**Figure 2.** Percentage of stops resulting in discretionary searches by race and distance to nearest crime hot spot.

With traffic stops typically functioning as the baseline for examinations of discretionary searches, one noteworthy result of Figure 1 is that more White drivers were stopped than Black or Hispanic drivers across each of distance to the nearest crime hot spot category. Conversely, compared to the volumes of stops across the remainder of the community, greater proportions of Black (8,556 of 14,921 or 57.3%) and Hispanic (2,581 of 3,949 or 65.4%) drivers are stopped closer to hot spots of crime than White drivers (9,331 of 20,667 or 45.0%).

With the focus of this article on testing whether the deployment hypothesis explains racial disparities in discretionary searches, Figure 2 presents that rates at which drivers are searched by race and by distance to the nearest hot spot of crime. Under the deployment hypothesis, racial disparities are the expected result of concentrations of discretionary searches near hot spots of crime with similarly situated drivers searched at the same rate. The results in Figure 2 do not suggest that traffic stops taking place closer to hot spots more frequently involve discretionary searches. Rather, the rates of traffic stops including discretionary searches increases as distance to nearest hot spots increases up to 1 mile before the rate of searches declines. Furthermore, results in Figure 2 suggest that minority drivers, particularly Black drivers, are disproportionally involved in this type of interaction. Moreover, racial disparities in search rates appear to increase concomitantly with distance from the nearest crime hot spot up to 1 mile in distance and then decrease.

In addition to location, there are a variety of other factors, including the time of traffic stops and reasons for which stops are initiated, possibly contributing to disparities in discretionary searches. Table 1 provides descriptive statistics for each of the variables in the multivariate models.

As previously noted, the proportion of traffic stops including discretionary searches varies based on the distance from the nearest crime hot spot. In traffic stops closest to hot spots of crime, about 3% of stops include discretionary searches. Previous research focusing on discretionary searches typically reports search rates between 3% and 6%

**Table 1.** Descriptive Statistics.

| Distance to Nearest Crime Hot Spot | Under ¼ Mile | | ¼ to ½ Mile | | ½ to 1 Mile | | Greater Than 1 Mile | |
|---|---|---|---|---|---|---|---|---|
| | Mean | SD | Mean | SD | Mean | SD | Mean | SD |
| Discretionary search | .03 | .17 | .04 | .19 | .04 | .20 | .02 | .14 |
| Equip/reg | .38 | .48 | .34 | .47 | .34 | .47 | .28 | .45 |
| Black | .42 | .49 | .38 | .48 | .35 | .48 | .20 | .40 |
| Hispanic | .13 | .33 | .08 | .28 | .06 | .24 | .06 | .23 |
| White (reference category) | .46 | .50 | .54 | .50 | .59 | .49 | .75 | .44 |
| 15–18 (reference category) | .03 | .17 | .35 | .18 | .05 | .21 | .06 | .24 |
| 19–29 | .47 | .50 | .46 | .50 | .44 | .50 | .40 | .49 |
| 30–39 | .27 | .44 | .26 | .44 | .25 | .44 | .24 | .43 |
| 40 and above | .23 | .42 | .24 | .43 | .26 | .44 | .30 | .46 |
| Male | .75 | .43 | .72 | .45 | .70 | .46 | .68 | .47 |
| 12 a.m.–4 a.m. (reference category) | .20 | .40 | .18 | .39 | .17 | .38 | .16 | .37 |
| 4 a.m.–8 a.m. | .04 | .20 | .04 | .20 | .04 | .20 | .04 | .19 |
| 8 a.m.–12 p.m. | .11 | .31 | .11 | .31 | .10 | .30 | .12 | .33 |
| 12 p.m.–4 p.m. | .10 | .30 | .12 | .32 | .11 | .31 | .12 | .33 |
| 4 p.m.–8 p.m. | .20 | .40 | .22 | .41 | .23 | .42 | .20 | .40 |
| 8 p.m.–12 a.m. | .35 | .48 | .33 | .47 | .35 | .48 | .35 | .48 |
| *n* cases | 20,448 | | 9,295 | | 5,893 | | 3,911 | |

*Note.* Equip/reg = equipment/registration.

of traffic stops (Fallik & Novak, 2012; Ridgeway, 2006; Tillyer & Klahm, 2015). The rate of traffic stops including discretionary searches increases to 4.3% for stops occurring between one half and one mile distance from the nearest hot spot before declining to 2% of interactions occurring at 1 mile or greater. In contrast, the rate of stops initiated for equipment and registration violations is highest near crime hot spots and declines, though not a perfect linear fashion, as distance increases.

With a dichotomous dependent variable, a series of logistic regressions are used to examine the relationship between driver race and the likelihood of discretionary searches. A separate model is run for each distance increment. Results of these logistic regressions are presented in Table 2 where individual models were run using data from all stops within the categorical distance.

The results in Table 2 are mixed regarding support for the deployment hypothesis. Results associated with the variable *Hispanic* indicate that stops involving Hispanic drivers have a similar likelihood to White drivers of involving discretionary searches, a finding supportive of the deployment hypothesis. In contrast, results also indicate traffic stops with Black drivers are consistently more likely than similarly situated White drivers to include discretionary searches and that these disparities increase with distances from hot spots up to 1 mile before decreasing slightly, though disparities remain beyond 1 mile. This finding does not support deployment hypothesis.

In addition to racial disparities, findings in Table 2 also indicate stops with younger drivers and male drivers also disproportionately included discretionary searches.[10]

**JA0686**

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 219 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 12 of 20 PageID# 742

**Table 2.** Logistic Regressions of Discretionary Searches.

| Distance to Nearest Crime Hot Spot | Model 1: Under ¼ Mile | | | Model 2: ¼ to ½ Mile | | | Model 3: ½ to 1 Mile | | | Model 4: Greater Than 1 Mile | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Variables | Coefficient | SE | Odds Ratio | Coefficient | SE | Odds Ratio | Coefficient | SE | Odds Ratio | Coefficient | SE | Odds Ratio |
| Intercept | -3.776*** | 0.231 | 0.023 | -3.251 | 0.270 | 0.039 | -3.250*** | 0.306 | 0.039 | -3.515*** | 0.470 | 0.030 |
| Equip/reg | -0.56 | 0.084 | 0.945 | 0.233* | 0.112 | 1.263 | 0.102 | 0.135 | 1.108 | -0.046 | 0.251 | 0.955 |
| Black | 0.918*** | 0.093 | 2.504 | 1.080*** | 0.123 | 2.943 | 1.118*** | 0.141 | 3.059 | 0.707*** | 0.250 | 2.027 |
| Hispanic | -0.048 | 0.161 | 0.953 | 0.183 | 0.230 | 1.201 | 0.068 | 0.318 | 1.070 | 0.288 | 0.450 | 1.334 |
| 19–29 | -0.483* | 0.190 | 0.617 | -0.686** | 0.212 | 0.504 | -0.673** | 0.229 | 0.510 | -0.265 | 0.375 | 0.767 |
| 30–39 | -0.699*** | 0.198 | 0.497 | -1.136*** | 0.232 | 0.321 | -1.333*** | 0.263 | 0.264 | -1.214* | 0.461 | 0.297 |
| 40 and up | -0.814*** | 0.204 | 0.443 | -1.422*** | 0.251 | 0.241 | -1.441*** | 0.273 | 0.237 | -1.508* | 0.482 | 0.221 |
| Male | 0.760*** | 0.121 | 2.139 | 0.684*** | 0.150 | 1.982 | 0.745*** | 0.179 | 2.106 | 0.388 | 0.283 | 1.475 |
| 4 a.m.–8 a.m. | 0.089 | 0.202 | 1.093 | -0.806* | 0.400 | 0.447 | 0.471 | 0.308 | 1.602 | -17.278*** | 3176.210 | 0.000 |
| 8 a.m.–12 p.m. | -0.368* | 0.164 | 0.692 | -0.581* | 0.233 | 0.560 | -0.876* | 0.369 | 0.417 | -0.784 | 0.565 | 0.457 |
| 12 p.m.–4 p.m. | -0.375* | 0.165 | 0.687 | -0.787** | 0.236 | 0.455 | -0.696* | 0.310 | 0.499 | -0.752 | 0.515 | 0.471 |
| 4 p.m.–8 p.m. | -0.362** | 0.132 | 0.696 | -0.335* | 0.167 | 0.715 | -0.106 | 0.204 | 0.899 | 0.033 | 0.344 | 1.034 |
| 8 p.m.–12 a.m. | -0.070 | 0.105 | 0.932 | -0.131 | 0.140 | 0.877 | 0.057 | 0.176 | 1.059 | -0.029 | 0.299 | 0.971 |
| Model $\chi^2$ | 223.367*** | | | 208.630*** | | | 170.742*** | | | 50.930*** | | |
| Psuedo-$R^2$ | .045 | | | .080 | | | .095 | | | .013 | | |

Note. Equip/reg = equipment/registration.
*$p < .05$. **$p < .01$. ***$p < .001$.

267

JA0687

**Table 3.** Predicted Probabilities of Discretionary Searches.

| | Under ¼ Mile | ¼ to ½ Mile | ½ to 1 Mile | Greater Than 1 Mile |
|---|---|---|---|---|
| Noon to 4 p.m. | | | | |
| White[a] | 1.9% | 4.2% | 4.3% | 1.9% |
| Hispanic | 1.8 | 5.0 | 4.6 | 2.6 |
| Black | 4.6 | 11.5 | 12.1 | 3.9 |
| Midnight to 4 a.m. | | | | |
| White | 2.7 | 8.8 | 8.3 | 4.0 |
| Hispanic | 2.6 | 10.4 | 8.8 | 5.3 |
| Black | 6.5 | 22.2 | 22.0 | 7.8 |

[a]Male drivers under age 18 stopped for equipment/registration violations.

Likewise, though less consistent, stops during daylight hours (between 8:00 a.m. and 8 p.m.) were often less likely to include discretionary searches. In contrast, the reason given for initiating traffic stops was often not related to whether officers pursued this type of additional investigation.

To further examine the racial disparities in discretionary searches presented in Table 2, using the results from the logistic regression models, probabilities of traffic stops including this type of search were calculated and are presented in Table 3. Each column in this table represents distances from the traffic stops to the nearest crime hot spots. Probabilities are calculated for White and Black male drivers under the age of 18 for stops initiated for equipment or registration violations occurring either during early afternoon hours (between noon and 4:00 p.m.) or at night (between 12:00 a.m. and 4:00 a.m.).

The predicted probabilities in Table 3 more clearly indicate three patterns: the likelihood that a stop includes a discretionary search increases concomitantly with distance from hot spots, there is generally a tiered effect with Black drivers more likely to be searched than Hispanic drivers and Hispanic drivers more likely than White drivers, and that racial disparities in this decision are not simply the result of patterns in police deployment. As can be seen in Table 3, the likelihood that a stop involving a young Black male driver stopped for an equipment or registration violation included a discretionary search increased from 6.5% for stops occurring within one quarter of a mile from a crime hot spot up to 22% for stops occurring between one half and one mile from the nearest hot spot. While similar increases in the likelihood of searches with distance is also present for Hispanic and White drivers, there is also generally a tiered effect with predicted probabilities of Hispanic drivers being searched usually falling between White and Black drivers, though more closely to White drivers. Finally, racial disparities in predicted probabilities of discretionary searches are present in traffic stops occurring near hot spots and also slightly increase with distance up to 1 mile before diminishing. For example, for traffic stops occurring closest to hot spots, young Black drivers are 2.4 times more likely to have a traffic stop include a discretionary search than similarly situated White drivers. For traffic stops occurring between one half mile and one mile from hot spots, young Black drivers are

predicted to be searched at 2.8 and 2.6 times the rate of similarly situated White drivers in the afternoon and at night, respectively. For stops taking place 1 or more miles from crime hot spots, disparities in search rates persist, though the difference is slightly diminished with young Black drivers searched at about twice the rate of young White drivers.

## Discussion

Given the proactive nature of traffic stops and limited guidance from department policies or court decisions regarding the selection of drivers for searches (Walker, 2005), police officers often have a great deal of discretion in this decision (Reiss, 1971). Research focusing on how this authority is exercised usually finds stops of Black drivers are more likely to include discretionary searches (Briggs & Crew, 2013; Tillyer, 2014). The deployment hypothesis proposes that these disparities are the result of greater police presence and proactivity in conducting searches within higher crime areas when those areas are disproportionately traversed by racial and ethnic minority drivers. Specifically, with experiments finding that the directing of police patrols, stops, and searches may reduce criminal offending (Sherman & Rogan, 1995; Sherman & Weisburd, 1995; Sorg, Haberman, Ratcliffe, & Groff, 2013), racial disparities in discretionary searches may result when crime hot spots are disproportionately located in areas of communities with greater proportions of racial and ethnic minority residents and drivers (Roncek & Maier, 1991; Sherman et al., 1989). Where racial disparities in discretionary searches are identified, they are expected to result from higher concentrations of stops and searches that are selected in a racially neutral manner (Parker et al., 2004).

The current study provides limited support for the deployment hypothesis. Under the expectation that traffic stops will be concentrated near crime hot spots, the current study finds that just over half of all stops occurred within one quarter mile of a hot spot. This finding is similar to previous research based on neighborhoods which also find positive associations between crime rates and rates of stops (Petrocelli et al., 2003; Renauer, 2012; Roh & Robinson, 2009) and is supportive of the deployment hypothesis. In addition, traffic stops occurring during nighttime hours, particularly between midnight and 4 a.m., were about twice as likely to include discretionary searches as similar stops occurring in the 4-hr time period following noon and replicating a finding found in other analyses using traffic stops as the unit of analysis (Fallik & Novak, 2012; Tillyer & Klahm, 2015). This could be the result of officers with less experience, who may also be more assertive in conducting discretionary searches, disproportionately assigned to nighttime shifts (Tillyer & Klahm, 2015). In regard to the deployment hypothesis, this finding also suggests an important temporal element.

Evidence from the current study is not supportive of the expectations that stops taking place closer to hot spots of crime are more likely to include discretionary searches and that this decision is race neutral. Rather, the findings in the current study indicate the likelihood of a stop including a discretionary search increases with

distance from the nearest hot spot up to 1 mile before diminishing and that stops involving Black drivers are more likely to include discretionary searches. The finding regarding the likelihood of searches increasing with distance from crime hot spots contradicts previous research focusing on the relationship between the deployment of police resources and rates of searches per stops (Petrocelli et al., 2003; Roh & Robinson, 2009; for an exception see Novak & Chamlin, 2012). One possible reason for the incongruity in findings lies in variation of the unit of analysis used across studies. Whereas the current analyses centered on more closely measuring the distance from each contact to areas of concentrated offending, previous research on this topic has relied on neighborhoods as the unit of analysis. As previously noted, neighborhoods can range in size up to several dozen square miles (Novak & Chamlin, 2012). Analyses conducted with larger areas may suffer from aggregation bias resulting in different findings from those presented here.

Few other studies examine whether patterns of police deployment contribute to racial disparities in discretionary searches. These studies have produced mixed results with some supporting the deployment hypothesis by finding the selection of drivers for searches to be race neutral after accounting for neighborhood crime rates (Alpert et al., 2008). Other researchers have reached different conclusions. Namely, some have found that Black drivers are more likely to be searched, including in higher crime areas (Novak & Chamlin, 2012; Ridgeway, 2006). The current study adds to the literature by using a more spatially refined measure of locations of stops that is more reflective of the common crime prevention practice of directed patrol (Reaves, 2010) and finds that racial disparities in discretionary searches are present within and immediately around crime hot spots. Moreover, these disparities increase with distance up to 1 mile from hot spots before diminishing. Together, these findings are not supportive of the idea within the deployment hypothesis that racial disparities in poststop outcomes, such as discretionary searches, can be mitigated by measures of deployment.

Alternatively, a growing body of research indicates that disparities in poststop outcomes, such as discretionary searches, may be the result of social conditioning (Tillyer et al., 2012). Given the uneven size of disparities identified in the current study, we suggest future research more closely examine how measures of implicit bias, including through the exericise of discretionary authority of conducting searches within traffic stops, are conditioned by situational characteristics of interactions including measures of police deployment. The finding that likelihoods of discretionary searches increase with distance from crime hot spots may also indicate variation in working group expectations or available time to officers to expend on these type of investigations (Klinger, 1997). Similarly, additional stop-level factors, such as criminal histories (Ridgeway, 2006; Tillyer, 2014), may also contribute to the decision by officers to conduct this type of search. Due to limitations of the data collection instrument, these additional stop-level factors could not be included within the current analyses. Future examinations of the deployment hypothesis would benefit by including these additional measures.

The traffic stop data used in this current study contain valuable geographic identifiers, making these analyses possible but were not without limitations. The reason for

*Briggs and Keimig*                                                              271

the search is a measure of both the decision to exercise discretionary authority by officers and compliance by drivers whereby officers must request a search and drivers must consent to the request. Traffic stops where officers placed requests for searches with drivers who were not granted by drivers were not identified. In addition, the findings presented here are from a single jurisdiction. At a minimum, caution should be noted when generalizing to other communities. Furthermore, we did not use hot spots identified by the police department to provide officers direction to spend their time and efforts. Rather, the current study relied upon police reports provided by the department to the researchers to identify hot spots of crime. While it is possible that this method misidentified where officers were directed, it is noteworthy that over half of all traffic stops within the jurisdiction occurred within one quarter mile of the hot spots identified by the researchers.

The current study was conducted with data from a department whose management was actively engaged in identifying hot spots and encouraging officers to direct time and attention to these areas (Willis et al., 2004). Among the concerns that have been raised regarding the directing of police resources to crime hot spots, one of the more consistent criticisms is that these types of strategies contribute to disparate treatment (Kochel, 2011; Rosenbaum, 2006). While additional research is needed to examine the breadth of concerns, our findings suggest that the deployment strategies by police did not contribute to disparities in discretionary searches in a manner hypothesized under the deployment hypothesis. Future research would benefit from examining stop and search patterns over time within a jurisdiction to see how various crime prevention strategies, such as directed patrol, impact disparities in discretionary searches.

### Acknowledgments

We thank the Institute on Race and Poverty at the University of Minnesota and the Minneapolis Police Department. Without the cooperation of these entities in sharing their valuable data, this study would not have been possible.

### Declaration of Conflicting Interests

The authors declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The authors received no financial support for the research, authorship, and/or publication of this article.

### Notes

1. Reactive contacts were removed due to variation in available discretion based on the presence and preference of members of the public involved in such contacts. Officers were also given a categorical response of "other" where they then prompted to provide additional information. Responses that clearly fit proactive traffic stops were recoded and included in analyses. The remaining cases were too varied to categorize and too heterogeneous for interpretation to include in analyses.

2.  The data collection instrument allowed for officers to indicate only one reason for up to three searches (driver, vehicle, and passenger). Without indicators of timing or data on variation in reasoning, the data in this analysis cannot be used to determine whether discretionary searches lead to additional nondiscretionary searches.

3.  At the time the traffic stop data were collected, observers noted that the crime analysis unit generated maps that "generally included a range of Part I violent and property offenses" (Willis et al., 2004, p. 49). Given the uncertainty as to what other offenses may have also been included combined with inefficient communication of this information to patrol officers noted below, a more inclusive selection criteria were employed in identifying crime hot spots for the analyses that follow.

4.  Results of a review of procedures and processes undertaken at the time that the traffic stop data were collected raise doubts regarding how precise of direction patrol officers were given. The review notes that even though hot spot maps were featured prominently in department operations, "district commanders limited their analysis to the time and location of individual crime incidents . . . based upon examination of these clusters, they implemented their response" (Willis et al., 2004, p. 55). In addition, the review found "that the data component of Compstat had not 'filtered' or 'trickled' down to the street level" (Willis et al., 2004, p. 57).

5.  Ultimately, the experiment involved directed patrols to 55 crime hot spots.

6.  With targets for spatial proportion of the community and proportion of reported crimes that should be contained within identified hot spots based on previous research as well as numbers of hot spots per precinct that police policy makers have stated can be reasonably addressed, several points per cluster specifications were initially tested. Two hundred points per cluster was selected, as it returned the closest fit to the parameters outlined above.

7.  One concern with analyses examining whether neighborhood characteristics are associated with outcomes is spatial autocorrelation where the likelihood of a phenomenon occurring is not independent of the frequency in adjoining neighborhoods. Although there are a variety of techniques available for diagnosing and adjusting for this problem, these techniques are limited to area data (Paynich & Hill, 2010). The focus of the current study centers on individual contacts, or point data, where such diagnostic tests or adjustments are not available with a dichotomous outcome variable (e.g., see Ingram, 2007).

8.  Personal communication between authors and state agency responsible for issuing driver's licenses.

9.  Driver race and ethnicity were combined in the data collection instrument. Officers were to select from the following categories: American Indian/Native American, Asian or Pacific Islander, Black, Latino, and White.

10. Each model was also run with age as a continuous variable which produced results substantially similar to what is presented in Table 2. Results of these analyses are available upon request.

## References

Alpert, G. P., Dunham, R. G., & Smith, M. R. (2008). Investigating racial profiling by the Miami–Dade Police Department: A multimethod approach. *Criminology & Public Policy*, *6*, 25–55.

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 225 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 18 of 20 PageID# 748

Batton, C., & Kadleck, C. (2004). Theoretical and methodological issues in racial profiling research. *Police Quarterly*, *7*, 30–64.

Braga, A. A., & Bond, B. J. (2008). Policing crime and disorder hot spots: A randomized controlled trial. *Criminology*, *46*, 577–607.

Braga, A. A., & Weisburd, D. L. (2010). *Policing problem places: Crime hot spots and effective prevention*. New York, NY: Oxford University Press.

Braga, A. A., Weisburd, D. L., Waring, E. J., Mazerolle, L. G., Spelman, W., & Gajewski, F. (1999). Problem-oriented policing in violent crime places: A randomized controlled experiment. *Criminology*, *37*, 541–580.

Briggs, S. J., & Crew, B. K. (2013). The impact of population selection on examinations of discretionary searches in traffic stops. *Journal of Ethnicity in Criminal Justice*, *11*, 133–149.

Engel, R. S., & Calnon, J. M. (2004). Examining the influence of drivers' characteristics during traffic stops with police: Results from a national survey. *Justice Quarterly*, *21*, 49–90.

Engel, R. S., Smith, M. R., & Cullen, F. T. (2012). Race, place, and drug enforcement: Reconsidering the impact of citizen complaints and crime rates on drug arrests. *Criminology & Public Policy*, *11*, 603–635.

Fallik, S. W., & Novak, K. J. (2012). The decision to search: Is race or ethnicity important? *Journal of Contemporary Criminal Justice*, *28*, 146–165.

Gau, J. M. (2012). Consent searches as a threat to procedural justice and police legitimacy: An analysis of consent requests during traffic stops. *Criminal Justice Policy Review*, *24*, 759–777.

Harris, D. A. (2002). *Profiles in injustice: Why racial profiling cannot work*. New York, NY: The New Press.

Ingram, J. (2007). The effect of neighborhood characteristics on traffic citation practices of the police. *Police Quarterly*, *10*, 371–393.

Institute on Race & Poverty. (2003). *Minnesota statewide racial profiling report: All participating jurisdictions*. Minneapolis: University of Minnesota.

Kelling, G. L., Pate, T., Dieckman, D., & Brown, C. E. (1974). *The Kansas City preventive patrol experiment: A summary report*. Washington, DC: Police Foundation.

Kirk, D. S., Papachristos, A. V., Fagan, J., & Tyler, T. R. (2012). The paradox of law enforcement in immigrant communities: Does tough immigration enforcement undermine public safety? *The Annals of the American Academy of Political and Social Science*, *341*, 79–98.

Klinger, D. A. (1997). Negotiating order in patrol work: An ecological theory of police response to deviance. *Criminology*, *35*, 227–306.

Kochel, T. R. (2011). Constructing hot spots policing: Unexamined consequences for disadvantaged populations and for police legitimacy. *Criminal Justice Policy Review*, *22*, 350–374.

Langton, L., & Durose, M. (2013). *Police behavior during traffic and street stops, 2011*. Washington, DC: U.S. Department of Justice.

Lundman, R. J. (2004). Driver race, ethnicity, and gender and citizen reports of vehicle searches by police and vehicle search hits: Toward a triangulated scholarly understanding. *Journal of Criminal Law and Criminology*, *94*, 309–350.

National Research Council. (2004). *Fairness and effectiveness in policing: The evidence*. Washington, DC: The National Academies Press.

**JA0693**

Novak, K. J., & Chamlin, M. B. (2012). Racial threat, suspicion, and police behavior: The impact of race and place in traffic enforcement. *Crime & Delinquency*, *58*, 275–300.

Parker, K. F., MacDonald, J. M., Alpert, G. P., Smith, M. R., & Piquero, A. R. (2004). A contextual study of racial profiling: Assessing the theoretical rationale for the study of racial profiling at the local level. *American Behavioral Scientist*, *47*, 943–962.

Paynich, R., & Hill, B. (2010). *Fundamentals of crime mapping*. Sudbury, MA: Jones and Bartlett Publishers.

Petrocelli, M., Piquero, A. R., & Smith, M. R. (2003). Conflict theory and racial profiling: An empirical analysis of police traffic stop data. *Journal of Criminal Justice*, *31*, 1–11.

Ramirez, D., McDevitt, J., & Farrell, A. (2000). *A resource guide on racial profiling data collection systems*. Washington, DC: U.S. Department of Justice.

Reaves, B. A. (2010). *Local police departments, 2007*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Reiss, A. J. (1971). *The police and the public*. New Haven, CT: Yale University Press.

Renauer, B. C. (2012). Neighborhood variation in police stops and searches: A test of consensus and conflict perspectives. *Police Quarterly*, *15*, 219–240.

Ridgeway, G. (2006). Aseessing the effect of race bias in post-traffic stop outcomes using propensity scores. *Journal of Quantitative Criminology*, *22*, 1–29.

Roh, S., & Robinson, M. (2009). A geographic approach to racial profiling: The microanalysis and macroanalysis of racial disparity in traffic stops. *Police Quarterly*, *12*, 137–169.

Roncek, D. W., & Maier, P. A. (1991). Bars, blocks, and crimes revisited: Linking the theory of routine activities to the empiricism of "hot spots". *Criminology*, *29*, 725–753.

Rosenbaum, D. P. (2006). The limits of hot spots policing. In D. Weisburd & A. A. Braga (Eds.), *Police innovation: Contrasting perspectives* (pp. 245–263). Cambridge, MA: Cambridge University Press.

Schafer, J. A., Carter, D. L., Katz-Bannister, A. J., & Wells, W. M. (2006). Decision making in traffic stop encounters: A multivariate analysis of police behavior. *Police Quarterly*, *9*, 84–209.

Sherman, L. W., Gartin, P. R., & Buerger, M. E. (1989). Hot spots of predatory crime: Routine activities and the criminology of place. *Criminology*, *27*, 27–56.

Sherman, L. W., & Rogan, D. P. (1995). The effects of gun seizures on gun violence: 'Hot spots' patrol in Kansas City. *Justice Quarterly*, *12*, 673–693.

Sherman, L. W., & Weisburd, D. A. (1995). General deterrent effects of police patrol in crime 'hot spots': A randomized controlled trial. *Justice Quarterly*, *12*, 625–648.

Silverman, E. B. (1999). *NYPD battles crime: Innovative strategies in policing*. Boston, MA: Northeastern University Press.

Smith, M. R., & Petrocelli, M. (2001). Racial profiling? A multivariate analysis of police traffic stop data. *Police Quarterly*, *4*, 4–27.

Sorg, E. T., Haberman, C. P., Ratcliffe, J. H., & Groff, E. R. (2013). Foot patrol in violent crime hot spots: The longitudinal impact of deterrence and posttreatment effects of displacement. *Criminology*, *51*, 65–102.

Taylor, B., Koper, C. S., & Woods, D. J. (2011). A randomized controlled trial of different policing strategies at hot spots of violent crime. *Journal of Experimental Criminology*, *7*, 149–181.

**JA0694**

USCA4 Appeal: 24-4201     Doc: 22-2        Filed: 09/04/2024       Pg: 227 of 502

Case 3:21-cr-00042-JAG   Document 72-7   Filed 04/22/22   Page 20 of 20 PageID# 750

Tillyer, R. (2014). Opening the black box of officer decision-making: An examination of race, criminal history, and discretionary searches. *Justice Quarterly*, *31*, 961–985.

Tillyer, R., & Klahm, C. F. (2015). Discretionary searches, the impact of passengers, and the implications for police-minority encounters. *Criminal Justice Review*, *40*, 378–396.

Tillyer, R., Klahm, C. F., & Engel, R. S. (2012). The discretion to search: A multilevel examination of driver characteristics and officer characteristics. *Journal of Contemporary Criminal Justice*, *28*, 184–205.

Tomaskovic-Devey, D., Mason, M., & Zingraff, M. (2004). Looking for the driving while black phenomena: Conceptualizing racial bias processes and their associated distributions. *Police Quarterly*, *7*, 3–29.

Tyler, T. R. (2004). Enhancing police legitimacy. *The Annals of the American Academy of Political and Social Sciences*, *593*, 84–99.

Vold, G. B., Bernard, T. J., & Snipes, J. B. (2002). *Theoretical criminology*. New York, NY: Oxford University Press.

Walker, S. (2001). Searching for the denominator: Problems with police traffic stop data and an early warning system solution. *Justice Research and Policy*, *3*, 63–95.

Walker, S. (2005). *The new world of police accountability*. Thousand Oaks, CA: Sage.

Weisburd, D., Mastrofski, S. D., McNally, A. M., Greenspan, R., & Willis, J. J. (2003). Reforming to preserve: COMPSTAT and strategic problem solving in American policing. *Criminology & Public Policy*, *2*, 421–456.

Weitzer, R., & Tuch, S. A. (1999). Race, class, and perceptions of discrimination by the police. *Crime & Delinquency*, *45*, 494–507.

Weitzer, R., & Tuch, S. A. (2005). Racially biased policing: Determinants of citizen perceptions. *Social Forces*, *83*, 1009–1030.

Willis, J. J., Mastrofski, S. D., & Weisburd, D. (2004). *Compstat in practice: An in-depth analysis of three cities*. Washington, DC: Police Foundation.

Wu, Y., Lake, R., & Cao, L. (2013). Race, social bonds, and juvenile attitudes toward the police. *Justice Quarterly*, *32*, 445–470.

## Author Biographies

**Steven J. Briggs** is an assistant professor in the Department of Criminal Justice and Political Science at North Dakota State University. His primary research interests center around police effectiveness, police discretion, and the social ecology of crime. His recent work has been published in *Criminal Justice Review*, *Journal of Ethnicity in Criminal Justice*, and *Criminal Justice Studies: A Critical Journal of Crime, Law, and Society*.

**Kelsey A. Keimig** is the assistant director of Sexual Assault Prevention and Advocacy at North Dakota State University. Her research interests include decision-making within the criminal justice system and crime prevention.

JA0695

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:21cr42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| Defendant | ) | |

**MR. MOORE'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS SECOND SUPPLEMENT TO HIS MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Keith Moore, through counsel, replies as follows to the government's response, *see* ECF No. 71, to his second supplement to his motion to suppress evidence, *see* ECF No. 66:

> I.    **The Fourth Circuit has never addressed the argument that Mr. Moore makes here—that selective enforcement claims are materially different than selective prosecution claims, and thus should be reviewed under the traditional preponderance of the evidence standard applicable to equal protection claims.**

In general, a challenger must prove an equal protection claim by a preponderance of the evidence. *See generally Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016) (using "more probable than not" standard for equal protection redistricting claim); *Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (observing that "plaintiffs must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor"). Likewise, in numerous other contexts in criminal law, the court makes relevant determinations by a preponderance of the evidence. *See, e.g., Johnson v. California*, 545 U.S. 162, 170 (2005) (observing at final step of *Batson* inquiry, judge must decide "whether it was more likely than not that the challenge was improperly motivated"); *Franks v. Delaware*, 438 U.S. 154, 156 (1978) (observing that if "perjury or reckless disregard is established by the defendant by a preponderance

1

**JA0696**

of the evidence, and . . . the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded. . . .").

While the Supreme Court has made clear that a challenger must prove claims of selective prosecution by "clear evidence," *see United States v. Armstrong*, 517 U.S. 456 (1996), such claims are inherently distinct from selective enforcement claims and thus, not subject to the same standard of proof. *See, e.g.*, *Conley v. United States*, 5 F.4th 781, 789-96 (7th Cir. 2021); *United States v. Washington*, 869 F.3d 193, 219 (3d Cir. 2017) ("[T]he special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *United States v. Armstrong* . . . does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity."); *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) ("Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.").

While the Fourth Circuit has discussed selective enforcement claims generally in the context of the *Armstrong* standard, it has never held after pointed consideration that a challenger must prove selective enforcement by "clear evidence." *See, e.g.*, *United States v. Mason*, 774 F.3d 824 (4th Cir. 2014). Rather, the Fourth Circuit in passing has cited *Armstrong* in a handful of selective enforcement cases[1] without ever analyzing the argument presented here, *see* ECF No. 71 at 2[2]: that prosecutors enjoy "a powerful privilege" and are "covered by a presumption of

---

[1] Note that the government's reference to *United States v. Venable*, 666 F.3d 893 (4th Cir. 2012), is inapt. That case involved only a selective prosecution claim and not a selective enforcement claim.

[2] The cases the government cites stem entirely from *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996). In that case, the Fourth Circuit mentioned *Armstrong* in passing twice without giving any consideration to any distinction between a selective prosecution claim and a selective enforcement claim. The *Bullock* court neither discussed nor considered whether the "clear evidence" standard in *Armstrong* should govern selective enforcement claims when such claims do not involve the same executive-functioning privileges

**JA0697**

constitutional behavior," *Conley*, 5 F.4th at 791; police officers, on the other hand, "are regularly called before courts to justify their tactics" and thus, selective enforcement claims do not warrant the heightened evidentiary standard applicable to selective prosecution claims. *Id. See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned."). Dicta are "statement[s] in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Pittston Co. v. United States*, 199 F.3d 694 (4th Cir.1999). As such, dicta are not binding. *See Bouchat v. Baltimore Ravens*, 241 F.3d 350, 364 n.9 (4th Cir.2001).

Even if, however, this Court finds that it must apply the "clear evidence" standard in *Armstrong*, Mr. Moore's evidence meets that standard.

## II. Mr. Moore has clearly demonstrated the Richmond Police Department's selective enforcement of Virginia's traffic laws has a discriminatory effect on black drivers.

To begin, Dr. Coston and the government's expert, Dr. Smith, have both recognized that evidence demonstrates that black and white drivers commit traffic crimes in roughly equal numbers. *See* ECF No. 66-1 at 1-2 (Coston report in this case); *see also* ECF No. 72-2 at 8. Specifically, in his 2001 study finding that Richmond Police Department officers disproportionately stopped black drivers in 2000, Dr. Smith observed:

> Although it is possible that minorities commit more traffic violations per capita than Whites, thus helping to explain a higher minority stop rate, this possibility appears unlikely. To begin with, Lamberth's (1997) racial profiling studies in New Jersey and Maryland, which used field observation to catalogue driver and violator race on 1-95, found that Blacks and Whites violated traffic laws (speeding) at the same rates (Harris, 1999). Furthermore, self-report measures have consistently

---

that selective prosecution claims do. Thus, the Fourth Circuit has never considered the merits of the argument presented here. This Court, however, must.

**JA0698**

> shown that minorities commit minor crimes and delinquent acts at approximately the same rates as Whites (McNeely & Pope, 1981; Snyder & Sickmund, 1999). Given that traffic violations are perhaps the most minor of offenses, the available evidence suggests that total traffic infractions will be distributed among minorities and Whites in approximately the same proportions as these racial groups are constituted within a given population.

*See* ECF No. 72-2 at 8.  Both experts thus agree using similar evidence that white drivers are equally as likely to commit traffic infractions as black drivers.

Yet, blunt evidence shows that Richmond Police Department officers disproportionately pull over black drivers in Richmond.  In 2000, Richmond Police Department officers reported pulling over black drivers 64.2% of the time and white drivers 32.1% of the time.  *Id.* at 9.  At that time, black people in Richmond comprised 51% of the drivers in Richmond.  *Id.* at 9.  In 2020, Richmond Police Department officers reported pulling over black drivers 77% of the time and white drivers 14.5% of the time.  *See* ECF No. 66 at 5.  Hence, not only have Richmond Police Department officers continued to disproportionately pull over black drivers in Richmond, they have increasingly done so.

Such findings mirror what the Department of Criminal Justice Services has found analyzing the same data for the Richmond Police Department that Dr. Coston reviewed.  *See* ECF No. 72-1.  Statewide, the Department of Criminal Justice Services found:

***Driver Racial/Ethnicity Analysis of Statewide Traffic Stops***

- Black drivers were stopped at higher rates than White drivers. Although only 19.6% of Virginia's driving-age population in the dataset was Black, 31% of drivers stopped were Black. Black drivers were overrepresented among stopped drivers regardless of the reason that a traffic stop was initiated.

- Black drivers who were stopped were searched at higher rates than White drivers. 5.2% of stopped Black drivers had a search of their person, a passenger, or vehicle conducted, compared to 3.1% of White drivers.

- Black drivers who were stopped were arrested at higher rates than White drivers. 2.4% of Black drivers stopped were arrested, compared to 1.6% of White drivers.

**JA0699**

*Id.* at 3. For the Richmond Police Department specifically, the Department of Criminal Justice Services found that the Richmond Police Department disproportionately stopped black drivers as opposed to white drivers. *Id.* at 40. Richmond Police Department officers also disproportionately searched black drivers as opposed to white drivers:



*Id.* at 59. And Richmond Police Department officers disproportionately arrested black drivers as opposed to white drivers:

JA0700



Figure 16
Local Area Maps for Arrests by Driver Race/Ethnicity

*Id.* at 60. That the Department of Criminal Justice Services produces the same statistical analysis as Dr. Coston on these points is not a fluke. Rather, it is statistically significant evidence demonstrating that race is a significant factor that Richmond Police Department officers consider in conducting traffic stops.

Unlike some other cases where courts have faulted small data samples, *see, e.g.*, *United States v. Hare*, 820 F.3d 93, 97, 99-101 (2016) (reporting that sample size of eight prosecutions involving thirty-two defendants and with no comparisons to non-minority population insufficient to show evidence of selective prosecution), and *Conley*, 5 F.4th at 798 (finding that total of 32 defendants prosecuted in stash-house sting operations was "such a small sample" that it would be nearly "impossible to conduct a reliable statistical analysis" that could support an inference of

JA0701

racial discrimination), Dr. Coston analyzed a total of 2,279 traffic stops of black and white drivers
after controlling for traffic stops that either mapped well outside of the Richmond Police
Department's jurisdiction or involved other minorities, none of whom were stopped, searched, or
arrested at statistically significant rates. *See* ECF No. 66-1 at 3-4. Based on the data presented,
just at the Department of Criminal Justice Services was able to do, Dr. Coston was able to run
bivariate analyses to determine relevant information about proportionality.

That disproportionality is crucial here. Unlike cases that point only to evidence of one race
being targeted, the evidence here indicates that white and black drivers commit traffic offenses at
even rates. Both races are roughly equally represented in the city of Richmond. And yet, the
Richmond Police Department officers pull over, search, and arrest black drivers at statistically
significant rates compared to white drivers who are known to commit the same types of traffic
offenses at the same rates. Such comparative evidence establishes a stark discriminatory effect.
*See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding that a San Francisco ordinance
banning the operation of laundries in wooden buildings was discriminatorily applied to Chinese
launderers where the city denied the petitions of some two hundred Chinese applicants who applied
for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese
launderers who applied); *see also Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (finding that
the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7
times more likely than disenfranchisement of whites was "indisputable evidence that the state law
had a discriminatory effect on blacks as compared to similarly situated whites"). In selective
enforcement claims, statistical evidence of racial disparity can be sufficient to show a
discriminatory effect. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 661 (S.D.N.Y.
2013) (finding that evidence showed that the New York Police Department stopped more black

**JA0702**

and Hispanic residents, were more likely to stop blacks and Hispanics than whites within defined geographical areas, were more likely to use force against blacks and Hispanics than whites, and stopped blacks and Hispanics with less justification than whites).

### III.   Mr. Moore has submitted clear evidence demonstrating discriminatory intent.

As to the first prong of the selective enforcement test—discriminatory purpose, a defendant must prove that there was a discriminatory purpose behind the course of action.  The defendant need not, however, prove that the "challenged action rested solely on racially discriminatory purposes." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (stating that "an additional purpose . . . would not render nugatory the purpose to discriminate against all Blacks"); *Feeney*, 442 U.S. at 277 ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not.").  A showing of discriminatory intent need not be made with direct evidence, but can be shown through circumstantial evidence.  *See Avery*, 137 F.3d at 355 ("[o]ften it is difficult to prove directly the invidious use of race," so "'an invidious discriminatory purpose may often be inferred from the totality of the relevant facts'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  In some cases, blunt statistical evidence of a racially disparate impact may be sufficient to prove the discriminatory intent element of an equal protection claim.  *See, e.g., Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination."); *United States*

8

**JA0703**

*v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing that, if severe enough, statistical evidence of discriminatory effect can raise an inference of discriminatory intent).

Recognizing that discriminatory intent is rarely explicit, the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), requires an expansive inquiry and permits courts to consider cumulatively different kinds of evidence—direct and circumstantial, statistical and anecdotal, as well as historical and contemporaneous evidence. Determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the legislature's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. 429 U.S. at 266¬68. Thus, contrary to the government's assertion in ECF No. 71 at 9-10, the historical evidence that Mr. Moore has presented is relevant to this Court's analysis.

**IV.** **The government's parade of horribles regarding a defense win in this case is not worthy of this Court's consideration.**

Lastly, the government resorts to a parade of horribles in an attempt to persuade the Court to ignore what the evidence in this case clearly indicates—that the Richmond Police Department selectively enforces Virginia's traffic laws against black drivers in the city of Richmond. *See* ECF No. 71 at 11. The government fears that it will never be able to enforce traffic laws against anyone in Richmond or respond to victim requests for help (which is presumably **not** what police officers are doing when they are pulling someone over for having a false temporary tag) if the Court grants Mr. Moore's motion. *Id.* And yet, the government shows no concern for the thousands of citizens

in the city of Richmond who are routinely pulled over, harassed, searched, and sometimes arrested because the city's police officers target them because of their race. The government shows no concern for black fathers and mothers who feel an obligation to teach their children that they will likely not have any benefit of the doubt during a traffic stop simply because of the color of their skin. The government shows no concern for the severe erosion of trust that black citizens in Richmond have in the Richmond Police Department. Black citizens in Richmond **are the victims** of decades of racial discrimination by the Richmond Police Department. They have the right to be recognized and treated as such. Moreover, the Constitution of the United States of America says that they are entitled to and deserving of equal protection of the laws. Because the Richmond Police Department, and the Fourth Precinct Focus Mission Team in particular, has ignored this protection, the Court must suppress the evidence seized and dismiss the indictment in this case.

**CONCLUSION**

As explained above and in ECF Nos. 17, 28, 32, and 66, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and dismiss this case.

Respectfully submitted,
KEITH RODNEY MOORE

By:    _____ /s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

10

**JA0705**

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

**JA0706**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal No. 3:21-cr-42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
| | ) |
| Defendant. | ) |

## UNITED STATES' MOTION TO EXCLUDE DEFENSE EXPERT

The United States of America respectfully files this Motion to Exclude Defense Expert Dr. Marvin Chiles. The untimely disclosed expert testimony, apparently about the history of Richmond, is inadmissible under Federal Rule of Evidence 702 because it will not help the Court understand the evidence or determine a fact at issue. *McCleskey v. Kemp,* 481 U.S. 279, 298 n.20 (1987) ("unless historical evidence is reasonably contemporaneous with a challenged decision, it has little probative value."). Further, the defendant's expert notice fails to comply with Federal Rule of Criminal Procedure 16. The defendant's extremely limited disclosure not only fails to demonstrate why the testimony would be helpful, but also significantly prejudices the government's ability to provide a fair response to the evidence. "[T]he case law is clear that it is not an abuse of discretion for a trial court to disallow expert testimony where a late proffer of evidence by the defense substantially prejudices the government in its ability to find its own expert and conduct similar testing." *United States v. Dorsey*, 45 F.3d 809, 816 (4th Cir. 1995); *see also United States v. Holmes*, 670 F.3d 586, 597-98 (4th Cir. 2012). For these reasons, the United States respectfully requests that the Court preclude the defendant's proffered expert witness from testifying at the upcoming hearing. In the alternative, if the Court does permit Dr. Chiles to testify, the Court should schedule his testimony at a later date to reduce prejudice to the United States.

1

**JA0707**

I.    **PROCEDURAL BACKGROUND**

Defendant Keith Moore was indicted on May 4, 2021 for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). In accordance with Fed. R. Crim. P. 12(b)(3)(A)(iv), (C) and the Court's scheduling order (ECF 15), which set the deadlines for motions related to both "selective or vindictive prosecution" and "suppression of evidence," these motions were due on June 21, 2021. The defendant timely filed his motion for suppression of evidence on June 21, 2021. ECF 17. The Court held an evidentiary hearing on the suppression motion on July 26, 2021, after which defense counsel asked the Court "for an opportunity to submit a *supplemental motion to suppress evidence* based on the evidence as was given." Tr. 171:6–9. In the supplemental brief, filed on August 3, 2021, the defendant argued for the first time that the Court should *dismiss* the indictment based on an alleged equal protection violation. ECF 32 at 12.

The Court held a hearing on September 15, 2021 and allowed the defendant to retain a statistical expert regarding his equal protection claims. ECF 43. The defendant's expert report was due on December 31, 2021, *id.*, and the defendant's supplemental brief was filed on March 9, 2022. ECF 66. The United States filed a separate *Daubert* motion on April 8, 2022 and responded to the supplemental brief, ECF 70 and 71, and the defendant responded and replied on April 22 and 23, 2022. ECF 72 and 73. On May 15, 2022, the Court scheduled a hearing for June 27, 2022.

On June 16, 2022, eleven days before the evidentiary hearing, the defendant disclosed another expert. The defendant's new expert is Dr. Marvin Chiles, a history professor that will purportedly testify "about the history of policing in Richmond, and specifically the history of the Richmond Police Department. Dr. Chiles will testify about the political history of Richmond and how that history influenced policing in Richmond. Dr. Chiles will also testify about the history of racial segregation and racial politics in Richmond and how that history has shaped the current racial segregation of residents in Richmond." Defendant's Expert Disclosure, dated June 16, 2022

2

**JA0708**

(attached as Exhibit A). The defendant also disclosed 540 pages of new material pertaining to Dr. Chiles' testimony.

## II.  LEGAL AUTHORITY

Federal Rule of Evidence 702, which sets forth the requirements for an expert to testify, allows the introduction of expert testimony if, in relevant part, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a); *see also United States v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003) (outlining the elements of Rule 702 and citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)).

Federal Rule of Criminal Procedure 16(b)(1)(C) requires that parties provide "a written summary of any testimony that the defendant intends to use under Rules 702, 703, and 705," including a description of "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."

## III.  ARGUMENT

### A.  The Proffered Testimony is of "Little Probative Value"

The defendant is apparently attempting to satisfy his heavy burden of proving discriminatory effect and purpose—or "clear and intentional discrimination" by "clear evidence"[1]—by claiming that Richmond's political history is relevant to a traffic stop based on a fake temporary tag in 2020. For example, among the materials just produced to the United States is a dissertation entitled *Law Enforcement in Richmond: A History of Police-Community Relations, 1737-1974,*[2] Richmond crime statistics from 1985 to 1989, and a show cause response from the

---

[1] *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016); *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014).

[2] Louis Bernard Cei, Dissertation, *Law Enforcement in Richmond: A History of Police-Community Relations, 1737-1974*, Florida State University (1975).

3

**JA0709**

City of Richmond concerning an ex parte subpoena the defendant sent on March 14, 2022.[3] The relevance of these materials, particularly the history of Richmond covering nearly 250 years but not the last nearly 50 years, is left unexplained. There is no indication how this history relates to the attempted traffic stop of the defendant in the Fourth Precinct on December 5, 2020. As the Supreme Court has cautioned, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." *McCleskey*, 481 U.S. at 298 n.20.[4] Expert testimony is inadmissible when "there is simply too great an analytical gap between the data and the opinion offered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). There is simply no indication that Dr. Chiles' historical evidence is "reasonably contemporaneous" with the stop on December 5, 2020; indeed, a history professor would hardly be necessary to testify about events that occurred less than two years ago. Thus, there is no reason to permit Dr. Chiles to testify absent a defense demonstration that he has relevant and probative evidence showing discriminatory effect or purpose on behalf of the officers who attempted to stop the defendant on December 5, 2020.

---

[3] The United States was surprised to hear about this subpoena because it is unaware of a finding approving the defendant's discovery pursuits, consistent with Fourth Circuit precedent. "The standard for obtaining discovery in support of a selective prosecution claim is only 'slightly lower' than for proving the claim itself." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (citing *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012)). "[T]he standard for obtaining discovery is 'correspondingly rigorous' and 'should itself be a significant barrier to the litigation of insubstantial claims.'" *Id.* (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Obtaining evidence without the appropriate finding is improper because that finding is itself an important portion of the *Armstrong* test the Fourth Circuit has adopted.

[4] *Watkins v. Angelone*, 133 F.3d 920 (4th Cir. 1998) ("Watkins also proffers historical evidence for the proposition that juries in Danville act with racist intent. Among the facts cited by Watkins was that Danville was the capital of the Confederacy in the waning days of the Civil War, that many black citizens were assaulted in an effort by the Democrat Party to defeat the Readjuster-Republican coalition in the 1883 election, and that civil rights activists suffered at the hands of local officials in the 1960s. This history cannot support a challenge to a 1988 jury: 'unless historical evidence is reasonably contemporaneous with a challenged decision, it has little probative value.' *McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20 (1987).")

**JA0710**

### B.  The Proffered Testimony is Untimely

The defendant's belated disclosure of Dr. Chiles as an expert occurred just eleven days before the evidentiary hearing on an equal protection argument that was first raised over ten months ago and that was fully briefed nearly two months ago.[5] By delaying the disclosure of Dr. Chiles until the eleventh hour, there is no expert report, no opportunity for the United States to even evaluate whether it needs its own historical expert, no potential for briefing about the impact of his testimony, and limited opportunity to prepare for his testimony by examining the 540 pages of newly produced documents. These 540 pages significantly exceed the page count of the combined briefing and exhibits on the defendant's equal protection argument, and thus more than double the material to be reviewed in advance of next week's evidentiary hearing.

Whatever the reason for defendant's delay, his belated disclosure significantly prejudices the United States for the reasons stated above.

### C.  The Defendant's Disclosure Does Not Begin to Comply with Rule 16

The defendant's expert notice only describes in abbreviated fashion the broad outlines of the expert's proposed testimony, which is violative of the spirit and intent of the Federal Rules of Criminal Procedure. Under Rule 16(b)(1)(C), the defendant's written summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."

The failure to comply with Rule 16 is apparent because the disclosure is long on descriptions of the *topics* about which he will testify but no actual opinion is discernible from the summary. Instead of testifying *that* a specific opinion is true, by the defendant's telling Dr. Chiles

---

[5] The defendant indicated in a supplemental filing on March 9, 2022 that he wished to present additional evidence at the evidentiary hearing but did not specify what the new evidence was. ECF 66 at 12. In its filing, the United States noted the defendant's pattern of springing additional evidence and legal claims on the United States past proper deadlines, and requested the Court "prohibit the defendant from providing 'additional evidence' at the eleventh hour, nearly a year after the motion deadline." ECF 71 at 11. Between April 8 and June 16, the United States requested reciprocal discovery from the defendant's counsel on multiple occasions, but nothing was produced until eleven days before the hearing.

**JA0711**

will testify "*about* the history of policing in Richmond," "*about* the political history of Richmond," and "*about* the history of racial segregation and racial politics in Richmond." Exhibit A at 1. There are no opinions expressed in the defendant's summary, a clear violation of Rule 16, making it difficult to determine what specific opinions Dr. Chiles holds and will testify to in this case. Additionally, there are no identified "bases or reasons" for his opinions, so the United States has no idea what factual support Dr. Chiles claims for his opinions outside of parsing the provided 540 pages on short notice. The lack of specificity in the defendant's summary makes it very difficult to understand and prepare for Dr. Chiles' prospective testimony.[6]

The United States likely will have many additional objections to Dr. Chiles' testimony, but because of the belated disclosure of his proposed testimony, and the extremely limited disclosure of what he will say, the United States is prejudiced in its ability to test fully the reliability of his testimony.

### D.  In the Alternative, if the Court Allows Dr. Chiles to Testify, His Testimony Should be Delayed

The United States firmly believes, based on the defendant's arguments thus far and the threadbare expert disclosure, that Dr. Chiles' testimony is of extremely limited evidentiary value, if any. *See, e.g.*, *McCleskey*, 481 U.S. at 298 n.20. Further, this equal protection argument was initially raised in a reply brief has been pending for nearly eleven months, and there is simply no reason that Dr. Chiles' testimony could not have been raised earlier, if at all. Nevertheless, if the Court is inclined to allow the testimony of Dr. Chiles, the United States at the very least requests that Dr. Chiles not be included among the initial witnesses for the upcoming evidentiary hearing and that the Court require the defendant to provide an adequate expert report. Postponing his

---

[6] Should the defendant cure this Rule 16 defect, the United States reserves the right to file a supplemental pleading addressing the admissibility of the witness's testimony at that time.

**JA0712**

testimony will reduce the prejudice to the United States, even if it will not address the defendant's

unjustified approach of belatedly expanding his arguments and evidence. But at a minimum, the

United States should receive a compliant Rule 16 disclosure, an expert report, and enough time to

evaluate whether it needs to hire its own historical expert and address the substance of his opinions

in writing.

<u>**Conclusion**</u>

The Court should exclude the testimony of Dr. Chiles because, in the words of the Supreme

Court, historical evidence is likely of "little probative value." There is no indication it is probative

of the decision of Fourth Precinct officers to attempt a traffic stop on December 5, 2020, and the

defendant's delay in disclosing this testimony is prejudicial to the United States, depriving it of

even the opportunity to explore retaining its own historical expert. The disclosure itself also

violates the requirements of Rule 16. For these reasons, the Court should exclude the untimely

disclosed testimony of Dr. Chiles. Alternatively, the Court should postpone Dr. Chiles' testimony

to reduce prejudice to the United States.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:  _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

**JA0713**

# FEDERAL PUBLIC DEFENDER
## EASTERN DISTRICT OF VIRGINIA
**701 E. BROAD STREET, SUITE 3600**
**RICHMOND, VIRGINIA 23219**
**(804) 343-0800**
**FAX: (804) 648-5033**

**Geremy C. Kamens**                                                         **Laura J. Koenig**
**Federal Public Defender**          DIRECT: (804) 565-0881    **Assistant Federal Public Defender**

Erik Siebert, Assistant United States Attorney
Shea Gibbons, Assistant United States Attorney
United States Attorney's Office (Richmond)
Truist Building
919 East Main Street, Suite 1900
Richmond, VA 23219
804-819-5400

VIA EMAIL ONLY: erik.s.siebert@usdoj.gov; shea.gibbons@usdoj.gov

RE:    *United States v. Moore*, 3:21cr42

Dear Erik and Shea,                                                                  June 16, 2022

This letter is to notify you that in addition to Dr. Eli Coston—whose report and
Curriculum Vitae and the data underlying Dr. Coston's report and related articles
and materials the defense has already provided to you, the defense intends to call an
expert historian at the hearing on the pending motions in this case scheduled to begin
on June 27, 2022.

Dr. Marvin Chiles is an Assistant Professor of African American History at Old
Dominion University in Norfolk, Virginia.  Dr. Chiles has specific expertise in the
history of policing, politics, and racial segregation in Richmond, Virginia.  He has
published several peer-reviewed journal articles on these topics.  Dr. Chiles will
testify about the history of policing in Richmond, and specifically the history of the
Richmond Police Department.  Dr. Chiles will testify about the political history of
Richmond and how that history influenced policing in Richmond.  Dr. Chiles will
also testify about the history of racial segregation and racial politics in Richmond and
how that history has shaped the current racial segregation of residents in Richmond.

The defense engaged Dr. Chiles only last week.  We will be providing materials
related to his testimony by providing you access to a folder on box.com entitled
"United States v. Moore—government."  If you do not already have a free box.com
account, please use your email addresses listed above to create one at
https://account.box.com/signup/personal?tc=annual.   We will notify you if we upload
any additional materials to that box.com folder beyond the materials currently loaded

**JA0714**

there.

We believe these disclosures comply with our disclosure obligations pursuant to Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 702 et seq.   If you believe there is additional information to which you are entitled, please let us know at your earliest convenience.

Sincerely,

Laura J. Koenig
Assistant Federal Public Defender
701 E Broad St, Suite 3600
Richmond, VA 23219
804.565.0881 (o)
804.648.5033 (f)
laura_koenig@fd.org

Cc: Amy Austin, amy_austin@fd.org

**JA0715**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Case No. 3:21cr42** |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| Defendant | ) | |

**MR. MOORE'S RESPONSE TO MOTION TO EXCLUDE**
**SECOND DEFENSE EXPERT**

Keith Moore, through counsel, responds as follows to the government's motion to exclude the defense's expert, Dr. Marvin Chiles, *see* ECF No. 82:

**I.    Dr. Chiles's testimony is relevant under Federal Rule of Evidence 401 and admissible under Federal Rule of Evidence 702.**

The government has moved to exclude Dr. Marvin Chiles, an Assistant Professor of African American history at Old Dominion University with specialized knowledge in the history of racialized policing and residential segregation in Richmond, Virginia—*see* Ex. N, from testifying in this case, *see* ECF No. 82.  The government first argues that Dr. Chiles's testimony is not admissible under Federal Rule of Evidence 702.

The challenge that Mr. Moore has brought in this case is to the Richmond Police Department's selective enforcement of Virginia's traffic laws against black drivers in Richmond, Virginia—which violates the Equal Protection Clause.  *See* ECF Nos. 32, 66, 72, and 73.  As the parties and the Court have discussed before, the fact that the first, second, and fourth police precincts line up almost exactly with the black neighborhoods in Richmond, while the third police precinct lines up almost exactly with the white neighborhoods in Richmond is relevant to Mr. Moore's equal protection challenge.  *See, e.g.*, ECF No. 72 at 13-14.  That the city of Richmond

feels it needs to devote three quarters of its police precincts to policing the black neighborhoods of Richmond is highly relevant to the Richmond Police Department's selective enforcement of the traffic laws of Virginia against black drivers. As Mr. Moore set forth in ECF No. 72, "when you send police out to investigate crime, one can expect to see more traffic stops. Thus, deployment of police to high crime areas where minorities live will have the impact of overpolicing racial minorities. *See, e.g.*, Ex. K at 28 ("Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony because they are more likely to drive in high crime areas where they reside and more vigorous law enforcement is a common practice.")." ECF No. 72 at 14.

During its work investigating the Richmond Police Department's selective enforcement of the traffic laws in Virginia against black drivers, the defense discovered that the Richmond Police Department decentralized its patrol functions and instituted a "Neighborhood Precinct Plan" in 1977. *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). Thus, on February 1, 2022, the defense submitted a FOIA request to the Richmond Police Department asking for:

"1) all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;

2) a copy of the Neighborhood Precinct Plan from 1977; and

3) any amendments or modifications of the Neighborhood Precinct Plan from 1977."

*See* Ex. O. It was only when the Richmond Police Department failed to respond to this FOIA request—even to ask for more time to respond to the FOIA request—that the defense sought a

**JA0717**

subpoena from the Court for the same materials.  *See, e.g.*, Ex. P (ex parte motion to enforce subpoena duces tecum[1]).

On May 27, 2022, in response to the Court's Order that the Richmond Police Department comply with the subpoena and file a document explaining why the Court should not hold Ms. Peters in contempt for failing to comply with the subpoena, the Richmond Police Department's Senior Assistant Attorney wrote a letter to the Court.  The defense has provided a copy of this letter to the government.  In the letter, the Senior Assistant reported that the Richmond Police Department does not have any documents responsive to the subpoena.  *See* Ex. Q.  The police department did not maintain a copy of the Neighborhood Precinct Plan from 1977, any amendments or modifications thereto, or any planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department.  *Id.*  Rather, what the police department had were maps of the current police precincts that the defense has already submitted as evidence in this case, *see* 7/26/21 Exs. X-1, X-2, X-3, and X-4, and a history of the police department that includes a reference to the creation of the police precincts in 1977.  The defense has also provided these documents to the government.

It was after learning that the Richmond Police Department had not kept any records that would assist the Court in more directly understanding the relationship between the racial

---

[1] The government's comment implying that the defense did not have the right to seek these public documents through investigative tools at its disposal such as a FOIA request or a subpoena duces tecum simply because it sought to obtain those documents to use in this case is without merit.  *See* ECF No. 82 at 4 n.3.  The documents that the defense sought in both the FOIA request and the subpoena are documents of public record.  They are not the sort of discovery—such as prosecutorial reports or investigative work materials—that require Mr. Moore to demonstrate any sort of heightened threshold to obtain.  *See, e.g., United States v. Hare*, 820 F.3d 93, 98 (4th Cir. 2016) (identifying discovery sought as "discovery concerning the methodology employed by ATF in these cases, their selection criteria for targets, their use of informants, and any efforts to ensure law enforcement did not ensnare the otherwise innocent and those lacking predisposition").  To prohibit Mr. Moore from obtaining public documents that happen to be relevant to a selective enforcement claim through compulsory process would directly impinge on Mr. Moore's Sixth Amendment right to compulsory process.  *See* U.S. Const. amend.VI.

segregation of Richmond's neighborhoods and the location of the police precincts that the defense contacted Dr. Chiles.

Undersigned counsel first spoke substantively with Dr. Chiles on Monday, June 6, 2022. At that time, undersigned counsel talked briefly with Dr. Chiles about his knowledge of the history of policing in Richmond and the history of segregation—particularly residential segregation in Richmond—and to determine whether Dr. Chiles was willing to be engaged by the defense to testify in this case. Dr. Chiles then underwent the process to be retained by the defense in this case. Undersigned counsel next spoke substantively with Dr. Chiles on June 15, 2022, to discuss more details of his knowledge regarding the history of policing in Richmond and the history of segregation—particularly residential segregation in Richmond. The defense then provided notice of Dr. Chiles' anticipated testimony, Dr. Chiles's prior published articles, and relevant background materials to the government on June 16, 2022. *See* ECF No. 82-1; *see also* Exs. R-V.

The defense has engaged Dr. Chiles specifically because of his specialized knowledge about the history of policing in Richmond and the history of residential segregation in Richmond. The defense has not engaged Dr. Chiles to offer opinion testimony on any ultimate issue in the case. *See, e.g.*, Fed. R. Evid. 704. Rather, as the defense notified the government pursuant to Federal Rule of Criminal Procedure 16, the defense has engaged Dr. Chiles to share with the Court his specialized knowledge of the history of policing in Richmond—particularly Richmond's history of policing black persons—and the history of residential segregation in Richmond. The defense is in a position to have to call Dr. Chiles as an expert historian precisely because the Richmond Police Department has not kept the relevant source documents that the defense tried to obtain via FOIA and then subpoena. Thus, rather than present direct evidence of why the police precincts in Richmond line up directly with the white and black parts of town, because the

4

**JA0719**

Richmond Police Department did not maintain the relevant documents, the defense must present more circumstantial evidence of the same.

As to the legal relevance of Dr. Chiles's testimony, as the defense has stated before and as the Supreme Court has made quite clear, because discriminatory intent is rarely explicit, evaluating whether discriminatory intent exists requires an expansive inquiry and permits courts to consider cumulatively different kinds of evidence—direct and circumstantial, statistical and anecdotal, as well as historical and contemporaneous evidence. Determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the legislature's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. 429 U.S. at 266¬68; *United States v. Fordice*, 505 U.S. 717, 728 (1992) ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation."); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976) (discussing historical cases involving laws enacted with the purpose of racial discrimination); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1400-01 (2020) (discussing broader history of racially discriminatory law in constitutional challenge). Dr. Chiles's testimony is thus relevant.

**JA0720**

The Court is, of course, free to determine what weight to assign to Dr. Chiles's testimony[2]. But, the Court should do so keeping in mind that the reason that we do not have the most direct evidence of how the police precincts came to be how they currently are is because the Richmond Police Department did not keep that information. Thus, the defense has to present more circumstantial evidence to demonstrate its point. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 486 (1984) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."); *Arlington Heights*, 429 U.S. at 266 (observing that determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent **as may be available**") (emphasis added).

## II. The defense has complied with its disclosure obligations under Federal Rule of Criminal Procedure 16.

The government next argues that the defense has not complied with Federal Rule of Criminal Procedure 16. As set forth above, the defense provided disclosure of a summary of Dr. Chiles's testimony, prior published articles, and relevant background materials to the government as soon as it could have. Further, as set forth above, the government's complaint that the defense has withheld information about what ultimate opinions Dr. Chiles will share with the Court is unfounded. Dr. Chiles is an historian. As such, the specialized knowledge that he has to share with the Court about racialized policing in Richmond and the history of residential segregation in

---

[2] The government has tried to make much of a footnote in *McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987). In that footnote, the Supreme Court observed: "Of course, the 'historical background of the decision is one evidentiary source' for proof of intentional discrimination. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S., at 267, 97 S.Ct., at 564. But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." What the government appears perhaps to not appreciate is that the evidence Dr. Chiles has through his careful study of the history of the Richmond Police Department and the history of residential segregation in Richmond is the only evidence undersigned counsel is aware of since the police department did not keep the relevant records. This loss of evidence thus makes Dr. Chiles's circumstantial evidence much more probative than it might otherwise be.

## JA0721

Richmond comes from his careful study of source materials, interviews, and other historical investigation. *See* Fed. R. Evid. 702 (providing that a qualified expert may testify about "other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). The defense does not expect to elicit opinion testimony from Dr. Chiles. Rather, as the defense notified the government, the defense intends to elicit the following:

> Dr. Chiles will testify about the history of policing in Richmond, and specifically the history of the Richmond Police Department. Dr. Chiles will testify about the political history of Richmond and how that history influenced policing in Richmond. Dr. Chiles will also testify about the history of racial segregation and racial politics in Richmond and how that history has shaped the current racial segregation of residents in Richmond.

*See* ECF No. 82. The defense notice and the materials the defense provided to the government suffice to satisfy the requirements of Rule 16.

To the extent that the government's complaint under Rule 16 is the timing of the disclosure to the government, as set forth above, the timing of the disclosure is directly connected with the Richmond Police Department's extremely delayed notice to the defense that it did not have any materials responsive to the defense's subpoena. Additionally, the Court's continuance of the hearing to allow the parties to brief the government's motion in ECF No. 82 has minimized any prejudice the government could have suffered due to the timing of the defense disclosure.

## Conclusion

The Court should deny the government's motion. Dr. Chiles's testimony is the best evidence available, albeit circumstantial, of the relationship between the city of Richmond's history of racialized policing and the existing police precinct locations. It is relevant and must be considered by the Court in evaluating Mr. Moore's selective enforcement challenge.

Respectfully submitted,
KEITH RODNEY MOORE

7

**JA0722**

By:               /s/_____

Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

8

**JA0723**

# Curriculum Vitae

**Personal:-**
- Marvin T. Chiles, PhD: mchiles@odu.edu, 804-502-2934.

**Education:-**
- The University of Georgia: Ph.D. (2020)
- James Madison University: M.A. (2016)
- Liberty University: B.S. (2014)

**Academic Posts**:-
- Old Dominion University (2020-Present)
  - Assistant Professor of African American History, Tenure-Track

**Selected Publications:-**
- <u>Books</u>
  - *The Courage to Change: Race and the Politics of Reconciliation in Modern Richmond*, (under review by the *University of Virginia Press*).
- <u>Peer-Reviewed Articles:</u>
  1. "Our Metropolitan Separations: The Case for Metropolitan Public Schools in the Commonwealth of Virginia," Consortium for Research on Race, Diversity, and Policy: *Journal of Race and Policy*, Vol. 16, No.1, (date forthcoming)
  2. "Re-Envisioning Richmond's Past: Race, Reconciliation, and Public History in the Modern South, 1990 to the Present," Southern Historical Association: *Journal of Southern History*, (date forthcoming).
  3. "Ending Mass Incarceration in America," University of Richmond: *New Ideas in American History*, (date forthcoming).
  4. "Historian of Black Virginia: Luther Porter Jackson, An Appraisal," Indiana University Press: *Spectrum: A Journal on Black Men*, Vol. 9, No.2, (Fall 2022): 135-57.
  5. "A Period of Misunderstanding: Reforming Jim Crow in Richmond, Virginia, 1930-1954," Virginia Historical Society: *Virginia Magazine of History and Biography*, Vol. 129, No.3, (Fall 2021): 244-78. <u>Winner of the Virginia Historical Society's William M.E. Rachal Award (2021)</u>.
  6. "Here We Go Again: Race and Redevelopment in Downtown Richmond, Virginia, 1977-Present," *Journal of Urban History*, Vol 1, No.1, Online Edition, (Winter 2021): 1-27.
  7. "Tough on Conduct: Punitive Leadership in Urban Public Schools, A Case Study of Angry Principal Dr. Roy A. West, 1986-1991," Indiana University Press: *Spectrum: A Journal on Black Men*, Vol. 8, No.1 (Fall 2020): 55-81.

8. "Down Where the South Begins: Black Richmond Activism Before the Modern Civil Rights Movement, 1899-1930," University of Chicago Press: *Journal of African American History*, Vol. 105, No.1, (Winter 2020): 56-82.

- Co-Authored Works:
  - Hawkins, J.E., Hoglund, L., Martin, J.M., Chiles, M.T., & Adams Tufts, K. "Antiracism and Health: An Action Plan for Mitigating Racism in Healthcare. In K. Johnson, A. Meca, S. Tarver & N. Sparkman-Key (Eds). *Developing Anti-racist Practices in The Helping Professions: Inclusion Theory, Pedagogy, and Application*. Palgrave MacMillan. (in press).
  - "Black Elites" and "Black Middle Class," in Steven A. Reich, *World of Jim Crow: A Daily Life Encyclopedia*. [2 Volumes]. Greenwood Press. June 2019. Vol. 1. 235-9 and 332-6.

**Reviews and Edits:-**
- Book Review:
  - Brown, Lawrence T. *The Black Butterfly: The Harmful Politics of Race and Space in America*, *New Ideas in American History*, (May 11, 2021), https://medium.com/new-american-history/ending-urban-apartheid-d8c36022124.
  - Haywood, D'Weston. *Let Us Make Men: The Twentieth-Century Black Press and a Manly Vision for Racial Advancement*. *Journal of Mississippi History*, Vol. LXXXII, No.1 and 2, (Spring/Summer 2020), 87-8.
  - Dunn, Marvin. *Black Miami in the Twentieth Century*. University of Florida Press. 2016. *Journal of African American History*, Vol. 103, (Winter/Spring 2018), 239-41.
  - Heinrich, Robert and Deborah Harding. *From Slave to Statesman: The Life of Educator, Editor, and Civil Rights Activist William M. Carter of Virginia*. Louisiana State University Press. 2016. *Journal of African American History*, Vol. 103, No.4, (Fall 2018), 717.
  - Emberton, Carole and Bruce E. Baker, eds., *Remember Reconstruction: Struggles Over The Meaning and America's Most Turbulent Era*. 2017. *Virginia Magazine of History and Biography*, Vol. 125, No.4, (Winter 2017), 397-8.

**Teaching Experience:-**
- Old Dominion University
  - History 104: Interpreting the American Past
  - History 361: African American History Before 1865
  - History 362: African American History Since 1865

- History 695 (Graduate): African American History; Southern History

**Selected Awards and Grants:-**
- William M.E. Rachal Award For Best Article in *Virginia Magazine of History and Biography* (2021)
- NEH Landmarks Program Selection Committee Consultant (2021)
- African American Studies Institute Lee B. Giles Encouragement Award (2020)
- Greg and Amanda Gregory Dissertation Completion Award (2019)
- Andrew W. Mellon Research Fellowship, Virginia Museum of History and Culture (2019)

**Memberships:-**
- Board of Director for the Virginia Forum (2022)
- Virginia Museum of History and Culture (2019)
- Southern Historical Association (2017)

**Presentations:-**
- "A Different Vision for Richmond: Urban Revitalization, Public History, and the Reimagining of Space and Race in Richmond, Virginia, 1978-Present," paper given at the Virginia Forum, April 8, 2022.
- "Virginia Union University's Dream Team:" Leaders in Intersectional and Intercollegiate Basketball, presentation for Black History Month Program Speaker Series at Randolph Macon College, February 24, 2022.
- Teaching Students in Virginia About Black History, Osher Lifelong Learning Institute at George Mason University, February 10, 2022.
- Interview in the *How the Monuments Came Down*, documentary for Central Virginia PBS, aired July, 1, 2021.
- Keynote Speaker for the Teaching Black History Conference, sponsored by the African American History Education Commission at the Virginia Department of Education, June 15, 2021.
- Panel Speaker for the Reimagining Monument Avenue Collective at the John Kerr Branch Mansion Museum in Richmond, Virginia, May 29, 2021.
- "Healing Our City" Research Colloquium held at the Virginia Museum of History and Culture, July 24, 2019.

**In The News:-**
- "Don't Emphasize the Oppression," Faculty Spotlight in *Monarch: Old Dominion University Magazine*, (Winter 2022): 40.

JA0726

- "Here's A Look At Some New and Notable Laws That Take Effect July Virginia," CBS News 6, June 28, 2021.
- "Declaring Racism as a Public Health Crisis," *WVEC*, February 24, 2021. https://www.13newsnow.com/article/news/local/virginia/virginia-one-step-closer-declaring-racism-as-a-public-health-crisis/291-ba06c8bd-32b9-429b-84a2-6c372caa0565.
- "Norfolk 17: Patricia Turner Looks Back To Move," *WVEC*, February 17, 2021.https://www.13newsnow.com/article/news/local/black-history/norfolk-17-patricia-turner-odu-history-panel/291-09e08001-383c-4177-a7ad-9b4c8a9d62cd.
- Dr. Narketta Sparkman-Key's Make It Plain Podcast, Episode 11: African American History in the Public Sphere, October 1, 2020. Published in the Samuel Dewitt Proctor Institute for Leadership, Equity, and Justice at Rutgers University, May 16, 2021. https://thedrkey.com/podcast/.

**University Service:-**
- "Productively Publishing as Early Career Career, Pre-Tenure Faculty," speech given at the ODU Summer Writing Retreat, held by the Office of Faculty and Diversity and Faculty Development, May 25, 2022.
- Contributor of 80 Documents to the ODU and Hampton Roads COVID-19 Archive, Spring 2021.
- Panelist for Assessing the Verdict of *Minnesota v. Chauvin*: A Collective Discussion of the Broader Implications, Institute for the Study of Race and Ethnicity, April 27, 2021.
- Guest speaker for the talk on Racism in College and Universities, hosted by the ODU Library System on April 23, 2021.
- Black Excellence: A Journey Through Healing and Resilience panelist for the ODU Office of Faculty Diversity and Retention, February 22, 2021.
- Guest speaker for After Selma: The Current Reality of Voter Suppression, hosted by Department of Sociology and Criminal Justice, Office of Intercultural Relations, February 18, 2021.
- Norfolk 17 Commemoration Panelist for the College of Education, February 17, 2021.
- CommUNITY Conversation Facilitator for the Office of Institutional Equity and Diversity, October 15, 2020.
- "The Professor Is In," Guest Speaker for the Department of History and the Center for Faculty Development, September 29, 2020.

- "Racism in Academia," Keynote Speaker at the Diverse Conversation held by the Office of Diversity and Retention at Old Dominion University, September 1, 2020.

**Departmental Service:-**
- Search Committee for Native American Historian for Academic Year 2022-2023.
- Advisory Council, Academic Year 2021-2022.
- Library Committee, Academic Year 2020-2021.

**Public Service:-**
- Guest Speaker for the Journeys in Justice: Virginia History During the Civil Rights Movement, General Education and Center for Excellence at Pacific Oaks College, Pasadena, California, April 26, 2021.
- Contributor for the Cape Henry Collegiate Civil War History Project, Spring 2021.

**Academic Service:-**
- Peer Reviewer for the *Virginia Magazine of History and Biography.*
- Peer Reviewer for the *Journal of Race and Policy.*
- Peer Reviewer for the *Spectrum: A Journal on Black Men.*
- Steering Committee Member and Board of Directors for the Virginia Forum

**Mentorship:-**
- MA Thesis Committee Member for Andrew Hoffman, expected graduation date of Spring 2022.
- Jhyl'lis Rhodes: Intern with the Federal Bureau of Investigation, Summer 2021.
- Noah Fort: Student Representative to the ODU Board of Visitors, Fall 2021 and Spring 2022.
- Davona C. Johnson: MA Candidate and Merit Scholarship Recipient at American University School of Public Policy, Fall 2021.
- Benjamin Clary Coffie (University of Georgia Student): Honor Student and Fellow at Oxford University in Law, Ethics, and Philosophy, Spring 2021.

**References/Mentors:-**
- Dr. Robert A. Pratt: rapratt@uga.edu/ PhD Advisor and Mentor
- Dr. Brain J. Daugherity:bjdaugherity@vcu.edu/ Dissertation Committee Member and Mentor
- Dr. Julian Maxwell Hayter: jhayter@richmond.edu/Associate Professor of Leadership at the University of Richmond/ Mentor
- Dr. Scott R. Nelson: srnelson@uga.edu/Dissertation Committee Member
- Dr. Timothy Cleaveland tcleave@uga.edu/Dissertation Committee Member
- Dr. Steven A. Reich: reichsa@jmu.edu/ MA Advisor and Mentor

# FEDERAL PUBLIC DEFENDER
## EASTERN DISTRICT OF VIRGINIA
**701 E. BROAD STREET, SUITE 3600**
**RICHMOND, VIRGINIA 23219**
**(804) 343-0800**
**FAX: (804) 648-5033**

| | |
|---|---|
| **Geremy C. Kamens** | **Laura J. Koenig** |
| **Federal Public Defender**    DIRECT: (804) 565-0881 | **Assistant Federal Public Defender** |

Karla Peters
Project Management Analyst
Office of General Counsel
Richmond Police Department
200 W Grace St
Richmond, VA 23220
804.646.6700 (o)
804.646.3974 (f)
Karla.peters@richmondgov.com

Dear Ms. Peters,                                         February 1, 2022

Under the Virginia Freedom of Information Act, §2.2-3700 et seq., I am writing to
request a copy of:

1) all proposed maps and planning and implementation documents relating to the
   designation of the boundaries for the four police precincts within the Richmond
   Police Department;

2) a copy of the Neighborhood Precinct Plan from 1977; and

3) any amendments or modifications of the Neighborhood Precinct Plan from
   1977.

Because I make this request on behalf of a federal government agency as a part of
our work representing indigent members of the public, I request a waiver of all fees
related to this request. If for any reason you cannot waive all fees related to this
request, please contact me before complying with this request to provide anticipated
costs associated with this request. This information is not being sought for
commercial purposes. We can receive copies of these records digitally at the email
address or fax number below or paper copies or as files on a computer disc mailed to
the address below.

The Virginia Freedom of Information Act requires a response to this request be made
within five business days. If access to the records I am requesting will take longer
than this amount of time, please contact me with information about when I might

**JA0729**

expect copies of the requested records.

If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law.

Thank you for your assistance.

Sincerely,

Laura J. Koenig
Assistant Federal Public Defender
701 E Broad St, Suite 3600
Richmond, VA 23219
804.565.0881 (o)
804.648.5033 (f)
laura_koenig@fd.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal Number: 3:21CR42** |
| | ) | **Hon. John A. Gibney** |
| KEITH RODNEY MOORE, | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MR. MOORE'S EX PARTE MOTION TO ENFORCE SUBPOENA DUCES TECUM

The Richmond Police Department has not responded to a court-approved subpoena requiring production of documents necessary for Mr. Moore's pending equal protection motion. Mr. Moore therefore requests the assistance of the Court in obtaining the documents under subpoena. The particular resolution of this motion is within the discretion of the Court and can range from an informal request for a response to an order to show cause.

### I.    Facts

Mr. Moore is facing a charge of unlawful possession of a firearm by a felon. *See* ECF No. 3 (Indictment). The discovery of the firearm arose from a traffic stop the Richmond Police Department initiated at Brookland Park Boulevard and Third Avenue in Richmond. *See* ECF No. 17 (Motion to Suppress) ("MTS"). Mr. Moore moved to suppress the fruits of the stop under the Fourth Amendment; after a hearing, the Court set a schedule for post-hearing briefing regarding Equal Protection issues. *See* ECF No. 31. Mr. Moore filed supplemental briefing and also moved to dismiss the indictment on the grounds of selective enforcement. *See* ECF No. 32. After a further hearing, the Court directed the defense to consult an expert regarding the significance of statistical information presented. *See* ECF No. 44. The parties retained respective experts, and both the

1

**JA0731**

motion to dismiss and a government motion to exclude the defense expert witness are pending. *See* ECF Nos. 70-73.

The selective enforcement claim necessarily involves whether law enforcement's actions were motivated, alone or in part, by a "racially discriminatory purpose[.]"  *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).  This expansive inquiry, in turn, involves (as factors the Supreme Court explicitly enumerated) the historical background of racially motivated vehicle stops and the relevant legislative or administrative history.  *Id.* at 266-68.

As Mr. Moore argued in his briefing, it appears that the Richmond Police Department's 1977 Neighborhood Precinct Plan divided patrol functions into four precincts; and it drew those lines directly around black neighborhoods.  *See* ECF No. 66 at 6.  This is, of course, "circumstantial" evidence of discriminatory enforcement intent; but only the historical records surrounding the establishment of the race-based boundaries could provide (stronger) "direct evidence of intent" through "administrative history," which the Supreme Court has characterized as "highly relevant." *Arlington Heights*, 429 U.S. at 266.

Therefore, Mr. Moore sought to obtain this information from the Richmond Police Department.  After an unsuccessful[1] attempt in February 2022 to obtain the documents by FOIA request, Mr. Moore requested a subpoena for that same information from the Court.  In particular, the motion requested, and the court-approved, a subpoena order to:

---

[1] It's not that the Richmond Police Department refused to answer the FOIA request.  Rather, the Richmond Police Department simply never responded to the FOIA request despite repeated inquiries from the Federal Public Defender Office.

**JA0732**

Karla Peters
Project Manager Analyst
Office of General Counsel
City of Richmond Police Department
Office of General Counsel
200 W. Grace Street
Richmond, VA 23220

to produce:

1) all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;

2) a copy of the Neighborhood Precinct Plan from 1977; and

3) any amendments or modifications of the Neighborhood Precinct Plan from 1977.

*See* ECF No. 68. As requested in the motion, the subpoena directed production at the clerk's office "on or before Monday, March 28, 2022, at 12:00 noon." *Id.*

An investigator from the Office of the Federal Public Defender personally served the subpoena on March 14, 2022. *See* Ex. A. On April 4, 2022, the defense contacted the clerk's office and determined that no response to the subpoena had been produced. The defense called and left a voicemail for Karla Peters the same day. On April 20, counsel for Mr. Moore discussed the matter with General Counsel for the Richmond Police Department, Victoria Pearson. Ms. Pearson offered to produce data from later time periods, but declined to produce data regarding the creation of the racially segregated precinct boundaries, and indicated that she intended to file a motion to quash the subpoena. No such motion has, to counsel's knowledge, been filed; and the defense has received no further information from Ms. Pearson, Ms. Peters, or the Richmond Police Department.

**JA0733**

**II.      The Richmond Police Department is in breach of its obligations under the subpoena.**

The recipient of a properly served subpoena may not simply ignore or decline to obey it. The proper response is either compliance or a motion to quash.  Mr. Moore respectfully requests the Court's assistance in obtaining this "highly relevant" information central to his equal protection challenge.

> **a.      The Richmond Police Department must either produce the documents under subpoena or move to quash; it cannot ignore the subpoena.**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor[.]"  This guarantee is implemented in specifics by Federal Rule of Criminal Procedure 17, which dictates the form of subpoenas, and Local Criminal Rule 17, which requires court approval for subpoenas duces tecum (for documents).  Mr. Moore has complied with the procedural requirements; he requested, obtained (through Court order) the subpoena, and properly served it.  The lack of any response, either the data or a motion to quash, places the Richmond Police Department in violation of the Court's order.

The stringency of this principle was demonstrated in *Walker v. City of Birmingham*, 388 U.S. 307 (1967).  In *Walker*, civil rights organizers including Dr. Martin Luther King, Jr. and Rev. Fred Shuttlesworth, planned peaceful marches and demonstrations in Birmingham, Alabama on Good Friday and Easter Sunday of 1963.[2]  City Commissioner Bull Connor obtained an (obviously unconstitutional) injunction prohibiting any marches or demonstrations without prior notice to the

---

[2] Neither the caption nor the opinion mention petitioners by name.  For historical background, *see* https://www.scotusblog.com/2013/08/the-good-friday-parade-birmingham-april-12-1963/.

**JA0734**

march's organizers. *Id.* at 309. The organizers received copies of the injunction Thursday morning, but, undeterred, still marched on Good Friday. *Id.* at 310-311. They were arrested and convicted of contempt for violating the injunction.[3]

When they attempted to defend against contempt by arguing that the injunctions violated the First Amendment, the state courts and then the Supreme Court refused even to hear the merits. This was because the collateral bar rule forbids those who violate court orders from challenging their validity collaterally in contempt proceedings when they had an opportunity and failed to challenge it before violating. "[T]he way to raise that question [of the constitutionality of the injunction] was to apply to the Alabama courts to have the injunction modified or dissolved." *Id.* at 317. It would have been different, the Court held, "if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts[.]" *Id.* at 318. In other words, one cannot "bypass orderly judicial review of the injunction before disobeying it." *Id.* at 320. Here, the Richmond Police Department has neither moved to quash the subpoena, nor complied with it.

   **b.      Remedies**

Legal mechanisms for enforcement of subpoenas are, generally, an order to show cause and the possibility of contempt sanctions. Counsel for Mr. Moore does not advocate for contempt sanctions if less harsh measures will produce the information; but issuance of an order to show cause seems a proper vehicle by which to bring the parties before the Court to resolve the matter civilly. Absent that, he requests that the Court set a hearing on the status of the subpoena, and

---

[3] It was during this period in jail in Birmingham that Dr. King wrote his "Letter from a Birmingham Jail." *Id.*

**JA0735**

issue a notice of hearing and order to attend to the General Counsel for the Richmond Police Department.

In evaluating which remedy is appropriate, and the amount of time to afford the Richmond Police Department, the following are relevant:

Title 18, Section 401 provides:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> . . . **(3)** Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

In addition to that statute, courts have inherent power under Article III of the Constitution of the United States of America to enforce their orders through contempt proceedings. *See Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 793 (1987) ("[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders."). The Fourth Circuit confronted and rejected arguments that delays beyond court ordered deadlines excused a subpoena recipient from civil contempt. In *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189 (4th Cir. 2010), corporations were under subpoena to produce documents.

> Instead of immediately beginning production with a goal of completing it by May 4, appellants produced only a handful of materials before asking for an extension. Nor was the extension request supported by evidence that appellants were making all possible efforts to comply but simply did not have enough time to respond. Appellants later did argue the volume of documents was too large, but they could point to no significant efforts to comply in the preceding two days. Arguments that complete compliance was impossible in the time allotted do not excuse failure even to attempt compliance.

*Id.* at 202.

Moreover, Mr. Moore asks that the Court make clear that, with regard to any advice Ms. Peters (the person to whom the subpoena was directed because she is the custodian of the records

6

**JA0736**

at issue) received from Victoria Pearson (General Counsel for Richmond Police Department), the Fourth Circuit has held in an unpublished opinion that even "good faith reliance on counsel's advice not to appear as ordered" does not constitute a defense to contempt liability. *United States v. Meyers*, 302 F. App'x 201, 205 (4th Cir. 2008).

## III.    Conclusion

Although the courts in the above cited cases have been fairly harsh with those who fail to obey their orders, Mr. Moore is not requesting, at this point, any sanctions; the matter hopefully can be resolved with a lighter touch. But given the delays and lack of response, he requests the Court's assistance in enforcing its subpoena: either a status hearing with notice to the Richmond Police Department's General Counsel to appear; or an order directly from the Court to produce documents; or an order to show cause and a summons.

Respectfully Submitted,
KEITH RODNEY MOORE

By:    _____/s/_____
Laura Koenig
Va. Bar No. 86840
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0881
Fax (804) 648-5033
Laura_koenig@fd.org

7

**JA0737**

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system and served a copy of this pleading on the Richmond Police Department by emailing a copy to Victoria Pearson at <u>Victoria.Pearson@richmondgov.com</u> and also mailing a copy of the pleading to Ms. Pearson at:

    Victoria Pearson
    Office of General Counsel
    City of Richmond Police Department
    Office of General Counsel
    200 W. Grace Street
    Richmond, VA 23220


                                        _____/s/_____
                                        Laura Koenig
                                        Va. Bar No. 86840
                                        Counsel for Defendant
                                        Office of the Federal Public Defender
                                        701 E Broad Street, Suite 3600
                                        Richmond, VA 23219-1884
                                        Ph. (804) 565-0881
                                        Fax (804) 648-5033
                                        laura_koenig@fd.org

8

**JA0738**

Pg: 271 of 502    Filed: 09/04/2024    Doc: 22-2    USCA4 Appeal: 24-4201

AO89 (Rev. 7/95) Subpoena in a Criminal Case

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA |
|---|---|---|

| UNITED STATES OF AMERICA | **SUBPOENA IN A** |
| v. | **CRIMINAL CASE** |
| KEITH R. MOORE | Case Number: 3:21CR42 |

TO:    **KARLA PETERS**
       **PROJECT MANAGER ANALYST**
       **CITY OF RICHMOND POLICE DEPARTMENT**
       **OFFICE OF GENERAL COUNSEL**
       **200 W. GRACE STREET**
       **RICHMOND, VA 23220**

*EX PARTE*

X   YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below, or any subsequent place, date and time set by the court, to testify in the above referenced case. This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE | COURTROOM |
|---|---|
| UNITED STATES DISTRICT COURT | JUDGE JOHN A. GIBNEY, JR. |
| SPOTTSWOOD W. ROBINSON III & ROBERT R. MERHIGE, JR., COURTHOUSE | |
| 701 EAST BROAD STREET, 6th Floor | **DATE AND TIME** |
| RICHMOND, VIRGINIA 23219 | **March 28, 2022, at 12:00 p.m.** |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

*In lieu of appearing at the hearing of this matter, you may produce the requested documents at the Office of the Clerk, United States District Court, 3rd Floor, Richmond, Virginia 23219, on or before Monday, March 28, 2022 by 12:00 p.m.*

1)  all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;

2)  a copy of the Neighborhood Precinct Plan from 1977; and

3)  any amendments or modifications of the Neighborhood Precinct Plan from 1977.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| **FERNANDO GALINDO** | |
| (By) Deputy Clerk | March 14, 2022 |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:
Laura J. Koenig, Assistant Federal Public Defender/Danielle S. McCowan-Lewis, Paralegal
701 East Broad Street, Suite 3600
Richmond, VA 23219-1884
(804) 343-0800

## JA0739

AO89 (Rev. 7/95) Subpoena in a Criminal Case (Reverse)

| PROOF OF SERVICE | | | |
|---|---|---|---|
| RECEIVED BY SERVER | DATE 3/14/2022 | PLACE Office of Federal Public Defender | |
| SERVED | DATE 3/14/2022 | PLACE Richmond Police H.Q. 200 W. Grace St, Richmond, VA | |
| SERVED ON (PRINT NAME) Karla Peters | | FEES AND MILEAGE TENDERED TO WITNESS ☐ YES ☐ NO AMOUNT $ _____ ☐ YES ☐ NO | |
| SERVED BY (PRINT NAME) Lee Hush | | TITLE Investigator - FPD | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on  3/14/2022
_____
DATE

SIGNATURE OF SERVER
701 E. Broad St, Suite 3600
Richmond, VA 23219
ADDRESS OF SERVER

ADDITIONAL INFORMATION

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 272 of 502



**CITY OF RICHMOND**
OFFICE OF THE CITY ATTORNEY
900 EAST BROAD STREET, SUITE 400
RICHMOND, VIRGINIA 23219

TELEPHONE  804-646-7940
TELECOPIER 804-646-7939

HASKELL C. BROWN, III
INTERIM CITY ATTORNEY

WIRT P. MARKS
SENIOR ASSISTANT CITY ATTORNEY

May 27, 2022

**HAND DELIVERED**
Clerk of Court
Attn: Fernando Galindo
Spottswood W. Robinson III and Robert R. Merhige, Jr., Federal Courthouse
701 East Broad Street, Suite 3000
Richmond, VA 23219

RE:   Ex Parte Subpoena *Duces Tecum*
      United States of America v. Keith R. Moore
      Case No. 3:21CR42

Dear Mr. Galindo,

Enclosed for processing pursuant to Judge Gibney's attached Order is a letter on behalf of Ms. Karla Peters.

Thanks you for your assistance.

Very Truly Yours,

Wirt P. Marks
Senior Assistant City Attorney

WPM/vjv

cc:  Honorable Judge John A. Gibney, Jr.
     Laura Koenig (via email)

Pg: 273 of 502    Filed: 09/04/2024    Doc: 22-2    USCA4 Appeal: 24-4201

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:21cr42
                                                      **EX PARTE**

KEITH RODNEY MOORE,
                    Defendant.

### EX PARTE ORDER

This matter comes before the Court on the defendant's ex parte motion to enforce a subpoena duces tecum. (ECF No. 79.) On March 14, 2022, the Court granted the defendant's motion for issuance of a subpoena duces tecum for Karla Peters, Project Manager Analyst, City of Richmond Police Department, to produce certain documents. (ECF No. 68.) The defendant served the subpoena on March 14, 2022. (ECF No. 79-1.) As of May 20, 2022, Ms. Peters had not produced any of the requested documents. (ECF No. 79, at 3.)

Upon due consideration, the Court ORDERS Ms. Peters to comply with the defendant's subpoena on or before **May 30, 2022**. The Court further ORDERS Ms. Peters to file a document with the Court to SHOW CAUSE as to why the Court should not hold her in contempt for failing to comply with the subpoena. Ms. Peters may mail or deliver the show cause filing to the Clerk's Office at the following address:

> Clerk of Court
> Attn: Fernando Galindo
> Spottswood W. Robinson III and Robert R. Merhige, Jr., Federal Courthouse
> 701 East Broad Street, Suite 3000
> Richmond, VA 23219

Upon submission of Ms. Peters' ex parte filing, the Court DIRECTS the Clerk's Office to docket the filing and to send a copy to the defendant.

**JA0742**

It is so ORDERED.

Let the Clerk send a copy of this Order to counsel for the defendant.

Date: 23 May 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

Pg: 275 of 502   Filed: 09/04/2024   Doc: 22-2   USCA4 Appeal: 24-4201

JA0743



**CITY OF RICHMOND**
OFFICE OF THE CITY ATTORNEY
900 EAST BROAD STREET, SUITE 400
RICHMOND, VIRGINIA 23219

TELEPHONE  804-646-7940
TELECOPIER 804-646-7939

HASKELL C. BROWN, III
INTERIM CITY ATTORNEY

WIRT P. MARKS
SENIOR ASSISTANT CITY ATTORNEY

May 27, 2022

**HAND DELIVERED**
Clerk of Court
Attn: Fernando Galindo
Spottswood W. Robinson III and Robert R. Merhige, Jr., Federal Courthouse
701 East Broad Street, Suite 3000
Richmond, VA 23219

        RE:    Ex Parte Subpoena *Duces Tecum*
               United States of America v. Keith R. Moore
               Case No. 3:21CR42

Dear Judge Gibney,

       I am writing on behalf of Karla Peters in response to your Ex Parte Order of May 23, 2022 directing Karla Peters to produce the requested documents and to file a document with the Court to SHOW CAUSE why the Court should not hold her in contempt.

       On March 14, 2022, an Ex Parte subpoena *duces tecum* (subpoena) was issued requesting historical documents related to the planning and implementation of boundaries for the police precincts within the Richmond Police Department ("RPD"). (*See* Exhibit A). The subpoena *duces tecum* at issue is the third subpoena *duces tecum* served on the RPD in this matter.  Deputy Chief Victoria Pearson, who is an attorney, worked with defense counsel, Ms. Koening, to produce the documents requested in those prior subpoenas.

       As background, the subpoena at issue was accepted by RPD employee Grace Massenburg, who was covering multiple vacancies within RPD, and unfortunately did not provide the subpoena *duces tecum*, at that time, to Ms. Peters or Deputy Chief Pearson.  Deputy Chief Pearson received the file on April 20, 2022, and notified the undersigned counsel that she was working on the request, but that the subpoena appeared very broad on its face and that RPD might need to file a motion to quash. Deputy Chief Pearson called Ms. Koenig's office on April 20, 2022 to discuss the subpoena. She left a voicemail and spoke with paralegal Daniel McCowan.  Deputy Chief Pearson also spoke with Ms. Koenig at a later date.  Deputy Chief Pearson asked counsel whether she could narrow the request as it requested records covering a forty five (45) year period dating back to 1977. Ms. Koenig informed Deputy Chief Pearson that she could not.

Pg: 276 of 502    Filed: 09/04/2024    Doc: 22-2    USCA4 Appeal: 24-4201

Deputy Chief Pearson has worked to determine whether the requested documents exist as the requested documents are not kept in the normal course of business. Deputy Chief Pearson contacted several departments within RPD to determine, if the requested records existed, where they would be located. After exercising due diligence, she has determined that RPD does not have documents responsive to the subpoena *duces tecum*. Deputy Chief Pearson did find a historical chronology and agency history referencing the establishment of the precinct system which has been provided to counsel, along with a current copy of the precinct map that is available to the public online. Deputy Chief Pearson and the undersigned were under the impression from Ms. Koening that there would be another conversation concerning the status of the request before any motions were filed. RPD apologizes to the Court and Ms. Keonig for the delay and respectfully requests that the Court not hold Ms. Peters in contempt. Ms. Peters does not handle subpoenas for RPD and the subpoena was not served on her personally.

Very Truly Yours,

Wirt P. Marks
Senior Assistant City Attorney

WPM/vjv

cc: Honorable Judge John  A. Gibney, Jr.
    Laura Koenig (via email)

AO89 (Rev. 7/95) Subpoena in a Criminal Case

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA |
|---|---|---|

| UNITED STATES OF AMERICA | **SUBPOENA IN A** |
|---|---|
| v. | **CRIMINAL CASE** |
| KEITH R. MOORE | Case Number:   3:21CR42 |

TO:   **KARLA PETERS**
       **PROJECT MANAGER ANALYST**
       **CITY OF RICHMOND POLICE DEPARTMENT**
       **OFFICE OF GENERAL COUNSEL**
       **200 W. GRACE STREET**
       **RICHMOND, VA  23220**

*EX PARTE*

X   YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below, or any subsequent place, date and time set by the court, to testify in the above referenced case.  This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE | COURTROOM |
|---|---|
| UNITED STATES DISTRICT COURT | JUDGE JOHN A. GIBNEY, JR. |
| SPOTTSWOOD W. ROBINSON III & ROBERT R. MERHIGE, JR., COURTHOUSE | |
| 701 EAST BROAD STREET, 6th Floor | DATE AND TIME |
| RICHMOND, VIRGINIA 23219 | March 28, 2022, at 12:00 p.m. |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

*In lieu of appearing at the hearing of this matter, you may produce the requested documents at the Office of the Clerk, United States District Court, 3rd Floor, Richmond, Virginia 23219, on or before Monday, March 28, 2022 by 12:00 p.m.*

1) all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;

2) a copy of the Neighborhood Precinct Plan from 1977; and

3) any amendments or modifications of the Neighborhood Precinct Plan from 1977.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| **FERNANDO GALINDO** | |
| (By) Deputy Clerk | March 14, 2022 |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:
Laura J. Koenig, Assistant Federal Public Defender/Danielle S. McCowan-Lewis, Paralegal
701 East Broad Street, Suite 3600
Richmond, VA 23219-1884
(804) 343-0800

**EXHIBIT**

tobias

A

Pg: 278 of 502     Filed: 09/04/2024     Doc: 22-2     USCA4 Appeal: 24-4201

Check for updates

*Original Research Article*

# "Here We Go Again": Race and Redevelopment in Downtown Richmond, Virginia, 1977-Present

Journal of Urban History
1–27
© The Author(s) 2021
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/0096144221992374
journals.sagepub.com/home/juh

**⑤SAGE**

## Marvin T. Chiles[1] 🄳

## Abstract

This article examines newspapers, archival collections, interviews, and personal papers to place Richmond, Virginia, at the center of the national debate about public–private revitalization projects. Since World War II, America's urban leaders, led by interracial coalitions of black politicians and white business elites, have used racial capitalism to promise that tax-funded redevelopment projects would enrich their cities, provide better public services, and reconcile the legacy of racist urban planning. Richmond's issues with Project One and the Sixth Street Marketplace in the 1980s, as well as recent issues with the Navy Hill Project, reveals the continuum of political and economic peril that comes with using such plans. Because urban revitalization is supremely profit-driven and shaped by the economic thinking that created disparate levels of white corporate wealth and black urban poverty, it is bound to exacerbate systemic racism.

## Keywords

race, revitalization, redevelopment, Richmond, Project One, Sixth Street Marketplace

Richmond is more than the former capital of the Confederacy: it is a city seeking to end its complicity with American racism. The spirit of reconciliation has compelled residents and leadership to form nationally recognized interracial civic groups, celebrate its Civil Rights heroes, and answer the call to remove historical monuments dedicated to the defense of slavery and Jim Crow.[1] Yet, nothing encapsulates Richmond's urge for racial modernity, and more so its troublesome identity, better than the complicated history of urban redevelopment/revitalization.[2] Like other cities around the country, Richmond is currently entrenched in a debate over a highly controversial redevelopment plan that commodifies its troubled history with racism.[3] Richmond's Navy Hill Project, in particular, involves progressive black political and white economic leaders who wish to use tax-subsidies to construct mixed-use downtown facilities in a former black neighborhood that was destroyed by urban renewal. They argue that the new development will help reconcile the evils of urban renewal by bridging the gulf between the growing economy (stemming largely from a prior decade of gentrification) and the struggling public programs which disproportionately serves black people. This article examines newspapers, archival collections, interviews, and personal papers to place two 1980s projects at the center of the current

---

[1]Old Dominion University, Norfolk, VA, USA

**Corresponding Author:**
Marvin T. Chiles, Old Dominion University, 8014 Batten Arts & Letters, Norfolk, VA 23529, USA.
Email: mchiles@odu.edu

JA0747

debate about Navy Hill. By doing so, it argues that the Navy Hill Project, like similar efforts around the nation, is informed by decades-old paternalistic logic where elites of both races use race relations as a ploy to convert tax revenue—and in some cases debt—into new corporate infrastructure for profit. Furthermore, this article uses Richmond to further the argument that redevelopment projects perpetuate the systemic divide between white wealth and black poverty that has defined inner cities since World War II.

This article fits within two streams of an accomplished literature about the nature and function of local governments between World War II and the early 2000s, a time defined by the Modern Civil Rights Movement, suburban flight, and the political and social de-centering of American urban life. Some of the earliest scholarship on the subject, such as *The Unheavenly City Revisited* (1974) and *City Limits* (1981), argues that modern American cities operated primarily as class-centered seats of technological innovation and economic growth that ignored racial issues within policy making.[4] This article sides with monographs such as *Downtown, Inc.* (1989), *Between Justice and Beauty* (1995), *Redevelopment and Race* (1997), *Camden After the Fall* (2009), *Civitas by Design* (2010), and *Bootstrap New Urbanism* (2014) in arguing that cities were racialized entities where the increase in black participatory politics—both voting and officeholding—since the 1960s ensured that economics could not always be the driving factor of policy making. This article separates, however, from the prevailing literature's stance that urban revitalization was a positive, but flawed, response to suburban flight and urban decay in the 1980s.[5] Using a Southern lens to examine a topic mostly associated with Northern and Midwestern cities, this article aligns with seminal works such as *Making the Second Ghetto* (1983) and *Origins of the Urban Crisis* (1996) in seeing urban revitalization plans as reinforcers of the racial division and inequality they were supposed to combat.[6]

The second historiographic stream discusses the use of racial capitalism by the interracial coalitions formed between black politicians and white business elites. Economic flight to the suburbs compelled interracial coalitions to commodify their cities' racial tolerance as inclusive identities that could be sold to business interests, suburbanites, and residents for profit.[7] *Regime Politics* (1989) and *Charleston in Black and White* (2015) argue that interracial coalitions, or as they are called in *Regime Politics*, "urban regimes," were "effective" in their use of racial capitalism because they "excel[ed] in getting strategically positioned people to act together" in the uncomfortable demise of Jim Crow.[8] *Why Don't American Cities Burn?* (2012), *A World More Concrete* (2014), *From #BlackLivesMatter to Black Liberation* (2016), and *Legend of the Black Mecca* (2017) take the opposing position that interracial coalitions and racial capitalism functioned as corrupt bargains that stymied the social unrest of the 1960s at the expense of diverting resources from city coffers to private interests. Some, such as *From #BlackLivesMatter to Black Liberation*, go even further in suggesting that interracial coalitions and racial capitalism were offensive mechanisms "designed to exploit and oppress" the black poor.[9] Driving home their point is the reality that in spite of the increased prosperity and stability of the urban black middle class between the 1970s and early 2000s, cities have yet to drag its low-income minority residents out of abject poverty. To the latter half of scholars, this failure is not as much by accident as it was by design.

Resting in the slim middle ground between these divergent trends in urban scholarship, this article uses Richmond to make a larger claim that interracial coalitions, and the racial capitalism they generate, create more racial animus and distrust by ensuring the failure of redistributive urban development plans. Yet, interracial coalitions should not be viewed as the mere vehicle for black leaders to generate power, white leaders to retain power, and capitalists to siphon money from desperate cities looking to chase ghosts and recapture their economic glory. The Richmond story shows that interracial coalitions are like the cities they control: they are contested terrains where economic policies are shaped by misguided people with flawed rationale, such as the axiom that economic prosperity requires public investment into corporate



**Figure 1.** Image of Henry L. Marsh, III, being sworn into the Richmond City Council, courtesy of the Valentine Museum. Photo: Al Cothran Studio.

profitability, and that social harmony will become the inevitable result of the often one-sided public–private partnerships.

## "Build People and Not Things"

Since English merchant William Byrd I acquired the rural hinterland that became Richmond in the seventeenth century, changes to the landscape reflected the oppression of black people. Centuries of black slavery turned the dense forest once inhabited by Monacan and Powhatan tribes into the tobacco and iron hub of the Antebellum South. After Union troops burned Richmond to the ground on April 3, 1865, industrial elites replaced the slavocracy and rebuilt their city by accepting the promise of the New South. Disenfranchised and segregated black labor built Richmond's newer railroads, factories, municipal buildings, and upscale neighborhoods.[10] White city leaders even hired black hands to erect Confederate monuments, reminding them that while slavery was gone, their inferior classification would remain.[11] While the reality of inequality betrayed freedom's promise, blacks created a separate city within Richmond that housed some of the most vibrant black business, religious, and fraternal communities in America.[12] Still, Richmond remained the physical representation of black suppression, an issue best explained by a longtime Southern historian: "The whole maze of restrictions and limitations revolves itself to a simple formula: the Negro has a place, and *he must stay in it*."[13]

The World War II era generated irreversible changes to the Richmond area. Whereas the city long languished as an oversized sleepy Southern town of around 180,000 people, the influx of war industries helped Richmond grow to around 250,000 at its height in 1970, a mark that the city has yet to reach again. The Richmond area, however, grew to around half a million, with most of that growth happening in the suburbs of Henrico and Chesterfield Counties. The counties combined population of 80,000 in 1950 swelled to around 220,000 by 1970. This suburban growth came from the mass production of automobiles, post–World War II industrial growth, and white migration to larger, more affordable housing in the crabgrass frontier. These factors ensured that the once hyper-rural and overwhelmingly white suburban counties bled Richmond of its white

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 282 of 502

Case 3:21-cr-00042-JAG   Document 86-5   Filed 07/06/22   Page 4 of 27 PageID# 836



**Figure 2.** Image of Andrew Brent discussing Project One with the city council and press, courtesy of the Valentine Museum. Photo: Gary Burns.

middle class from the early 1950s until the early 2010s. At the same time, Richmond's black population more than doubled from 50,000 (130,000 white) just before World War II to 105,000 by 1970 (143,000 white).[14]

As whites fled to the suburbs, and blacks, who were looking for work and cheaper housing in the growing industrial sector, migrated toward the inner city, white Richmond officials acted in the "national interest to encourage and promote the development of transportation systems" through black inner-city neighborhoods.[15] The long-term goal was to infrastructurally connect the inner city to the growing suburbs with the hopes of forming a city–county merger, something that Southern white leaders in Nashville, Jacksonville, Miami, and Baton Rouge accomplished, while whites in Richmond failed to do.[16] Blacks represented more than 97 percent of Richmond's displaced families during the urban renewal movements of the 1950s and 1960s.[17] Even worse, local white banks, landlords, and real estate firms refused them housing outside of designated neighborhoods.[18] In the midst of these trying times, black Richmonders found a hero in local Civil Rights attorney Henry Levander Marsh, III. After winning one of the nine contested city council seats in 1966, he vowed to change the anti-black renewal agenda by promising to "build people and not things."[19]

Marsh's electoral victory resulted from larger shifts in both urban and Civil Rights history. Ironically born in December 1933 in a single-family home that would eventually be demolished to construct the Richmond Coliseum, the Howard Law School graduate helped bring the full brunt of the Modern Civil Rights Movement to Richmond.[20] Marsh aided several blacks in burdening the local, state, and federal court systems with desegregation cases, ranging from criminal trespassing—lunch counter sit-ins—to lawsuits that implemented the recently decided *Brown v. Board of Education* decision.[21] Marsh admittedly grew tired of exclusively conducting his Civil Rights work as an attorney, so he capitalized on the Voting Rights Act of 1965 (VRA) by running for city council.[22] Becoming a policy maker, Marsh felt, would help him better reengineer Richmond from a citadel of arch-conservatism to an organ of racial equity. He ran for office in the right city, as Richmond had a strong middle-class voting machine that had worked since the 1940s to convert their growing black populations into powerful voting blocs. It was not until after the passage of the VRA, however, that the voting and population demographics allowed blacks in Richmond and elsewhere to vote their own into public offices. Marsh's strong record on Civil Rights compelled black Richmonders to elect him to the city council in June 1966.[23]

JA0750

*Chiles*                                                                    5



**Figure 3.** Image of the youthful Clarence Townes, courtesy of the Virginia Commonwealth University Special Collections.

Shortly after entering City Hall, Marsh froze more than $95 million in local, state, and federal funding by mobilizing hundreds of black Richmonders against highway construction.[24] His advocacy included increasing the city spending on social services and public education, proving that "the downtrodden and exploited people of the poverty stricken areas of Richmond have a real champion" in Henry Marsh, a white political insider once said.[25] Marsh's anti-urban renewal campaign cemented his place in Richmond's mostly white and arch-conservative political power structure. This place was key as school desegregation accelerated white suburban flight in the early 1970s, compelling the majority white city council to illegally annex twenty-three square miles of the neighboring Chesterfield County suburb to maintain the fleeting white voting and population majority. A black man named Curtis Holt sued the city council over the 1970 annexation on the grounds that it violated Section V of the VRA, which required any land deals (annexations and consolidations) that altered minority voting power to be vetted and pre-approved by the U.S. Justice Department. After five years of litigation, the federal courts, at the behest of the Justice Department, ruled in his favor.[26]

The federal courts allowed Richmond to keep the illegally annexed territory; however, they ordered the city council to change their local election format from at-large to ward-style voting. The acceleration of white suburban flight during the annexation case (1970-1975) ensured that, as Marsh told the *Richmond Afro-American* newspaper in 1976, "we could elect five blacks to the city council."[27] Marsh's optimism was met with the reality that after two decades of political maneuvering, white elites ended their attempts to maintain a majority white Richmond and political power structure. Rather, they decided to use their economic weight to influence future political decisions from outside of the city council chambers. This symbolic retreat resulted in white officials transferring the ranks of leadership to blacks in the form of political appointments to the school board, fire department, housing authority, and other citywide departments between 1975 and 1976. The 1977 local elections capped this era of racial transition, as five black candidates



**Figure 4.** Image of T. Justin Moore, courtesy of the Richmond Chamber of Commerce Collection, Valentine Museum.

ran and won controlling interest in the nine-member city council, giving Richmond its first black majority council in history.[28]

By spring 1977, blacks were, for the first time ever, the city's population (around 220,000 people and 52% black) and voting majority while also holding controlling interest in city government. A local white minister said after blacks gained power in City Hall that "We live in a divided city. Two very different points of view. Two very different experiences. Two very different attitudes. And these differences split most deeply along racial lines."[29] Black leaders used their political power to hire more black city workers and increase public services to black areas. White leaders and their constituents adversely wanted to neuter the newly black city government by cutting public spending on everything but capital improvements. In response to black leaders' agenda, white leaders "perceive[d] blacks to be anti-business [and] anti-compromise . . . injecting [the] consciousness of race into everything," an internal memo stated.[30] As the Civil Rights Era succumbed to the age of Modern Conservatism, it was clear to all that Richmond remained a racially divided city. A bipartisan study about local race relations revealed that "What happens here [in City Hall] generally reflects tension throughout the city and, at the same time, contributes to the racial division of the city."[31]

## "It Is People, Not Concrete and Steel that Makes a City Viable"

The late 1970s, otherwise known as "the era of a new relationship between the South and the rest of the nation" by the *Atlanta Constitution*, disrupted race relations in Richmond.[32] This new relationship was built on the understanding that Southern cities, behind coalitions of black political leaders and white business elites, would allow Northern and Western firms to connect the

*Chiles*                                                                                    7



**Figure 5.** Image of the Sixth Street Marketplace grand opening, courtesy of Virginia Commonwealth University Special Collections. Photo: Lindy Keast Rodman.

long-struggling region to global trade markets. These efforts were successful as by the late 1970s, the South, for the first time in American history, exported more poor people than they imported, holding half of America's largest cities and a mostly metropolitan population.[33] While the region as a whole benefited from the corporate flight to the South, cities such as Atlanta, Memphis, Nashville, Charleston, Charlotte, and Birmingham competed heavily against one another to improve their own economic standing.[34] Richmond—the nation's leader in tobacco and synthetic fiber production—tried to grow with the region by attracting the likes of Figgie International, CSX Corporation, and ten other Fortune 500 companies to share space with Philip Morris (tobacco), James River Corporation (paper), Reynolds Metal (aluminum), and DuPont (chemical).



**Figure 6.** Image of the speech given by James Rouse at the Sixth Street Marketplace grand opening, courtesy of the Valentine Museum. Photo: Masaaki Okada.

The corporate flight to Richmond, like other Southern cities, came in large part from black political and white business elites engaging in racial capitalism: commodifying and selling their racial identities for social and economic gain. While Southern urban centers long existed as entities that limited the freedom of racial minorities, city fathers, during the Jim Crow era, recruited outside business interests and high-income residents by promoting the illusion that economic growth came from the interracial harmony created by segregation.[35] The best example of this is the region's flagship City of Atlanta, who, while being viciously segregated, long marketed itself as "The City too Busy to Hate." After the Modern Civil Rights Movement, however, Southern cities assumed the responsibility of changing the region's racist image by selling their acquiescence to desegregation as America's newly paved road to economic prosperity.[36] Under this guise, racial tolerance at the highest levels of urban government equaled racial harmony throughout the region. Black faces in high places ensured that social inequality did not result in riots, and white leaders held the purse strings to keep newly elected black politicians from enacting regulatory and redistributive policies that cut into corporate profit margins. Richmond was no stranger to this activity as the unusual site of black men and women walking into the newly built, glass-plated City Hall building along East Broad Street was, according to *Ebony Magazine*, "A sign of the changing times." They continued that "Out in Hollywood Cemetery, Confederate President Jefferson Davis must be turning over in his grave."[37]

Less discussed among sharp critics of interracial coalitions, and their use of racial capitalism, was the collective desire among black and white leaders to make racial harmony more fact than fiction.[38] Just months after becoming Richmond's first black mayor, Marsh vowed to "bridging barriers between [black and white] people" with public–private revitalization projects.[39] In an interview about race relations in 1980s Richmond, a white minister and former black politician noted that Marsh was but one of the bevy of black leaders looking to mend their relationship with whites by creating plans for economic growth.[40] They were in luck because the white business community also wanted "to get to know and trust responsible individuals in the black community."[41] Driven by the disdain of white flight, which cost the city more than 3,000 residents per year since 1975, white business leader Andrew J. Brent, Jr., wanted to use redevelopment—a tactic formerly used to reinforce white supremacy—as a mechanism for racial and economic healing. Brent descended from an upper-class family, practiced commerce law, chaired many local organizations, and started Downtown Development Unlimited (DDU): a nonprofit

*Chiles*          9



**Figure 7.** Image of T. Justin Moore (right) riding with Richmond Mayor Roy A. West under the Bridge of Unity, courtesy of the Valentine Museum. Photo: Masaaki Okada.

organization designed to bring investments, businesses, and middle-class people back to Richmond.[42] DDU partnered with the Richmond City Council and became one of many public–private coalitions across the country designed to spur economic development in decaying inner cities.[43] With a commitment to racial harmony from white leadership, Marsh touted that "our city can be and ought to be a model for the nation."[44]

The target of revitalization was downtown Richmond. For most of American history, downtowns were the centers of urban life. After World War II, they became business outposts for global markets and retail centers for white suburbia.[45] Downtown Richmond fit well within this mold as "there was a time when, not so long ago, if one were a member of the white collar community in Richmond, downtown was THE [*sic*] place to be." Between the 1960s and 1970s, suburban flight reduced downtown's economic contribution to Richmond from 25 to 10 percent.[46] Thus, Marsh and Brent agreed to revitalize the area with Project One: the construction of a new business building, convention center, and hotel complex along downtown's main artery of East Broad Street. While there was no sophisticated redistributive system articulated at its inception, Project One was to be the beginning of several revitalization plans designed to generate enough rent and retail dollars to provide the overwhelmingly black working and underclass with sufficient public services.

Project One was a part of a national urban revitalization movement in the late 1970s and early 1980s. Unlike urban renewal in the 1950s and 1960s, city leaders designed revitalization projects to repopulate cities with corporate chains and turn white suburban shoppers into potential urban residents. President Jimmy Carter dedicated billions in block grants to help bring the 250 projects into fruition; the largest recipients being Newark, New York City, Detroit, Philadelphia, Cleveland, and other non-Southern cities.[47] Richmond's Project One was unique in that it did not receive any of the $10 billion in federal subsidies spent on revitalization projects, nor did it receive any funding from the Virginia Legislature.[48] With the moratorium on annexations and consolidations which protected "urban" counties in 1971, the Virginia Legislature compelled its struggling majority black cities to look toward the federal government and corporate partnerships to improve their revenue.[49] In essence, the Virginia Legislature treated their majority black cities as businesses that were not worth meaningful investment. Richmond's black and white leadership, still, took it upon themselves to make Project One a reality. It was a lower-budget operation ($35 million), meagerly funded by local corporations and taxpayers. By December 1977, Brent

secured almost $100,000 in initial investments, found a developer (Gerald D. Hines from Houston, Texas) with a core hotel chain (Hilton Corporation), and worked with Marsh and the city council to bond Richmond's $32.2 million debt and sell it to shareholders.[50]

This show of interracial solidarity from city leaders was not met with tremendous support by residents at-large. Black Richmonders clamored for better city services and the political success of their newly elected city councilmembers. However, they did not believe that shoveling thinly stretched tax dollars to white developers satisfied those desires.[51] While few black organizations vocally opposed Project One, grassroots resistance came mostly from the Richmond Independent Taxpayer Association (RITA). This marginal group was "born out of opposition to the downtown office, convention center and hotel development," said the *Richmond Times-Dispatch*.[52] While the mostly white middle-class property/business owners, who "have felt cut out of power for decades by the white Establishment," organized in 1975, it was not until 1978 that they petitioned the local and state courts to end Project One.[53] The litigious RITA even met with Marsh and Brent to convince them that, "It is people not concrete and steel that makes a city viable."[54] RITA was not unique in that other grassroots organizations rose in opposition to revitalization in Northern and Midwestern cities such as Boston, Philadelphia, Providence, New York City, Chicago, Detroit, Pittsburgh, Newark, and Cleveland.[55] Southern city leaders in Charleston, Atlanta, and D.C. also battled with taxpayers on using public funds to build new mixed-use facilities.[56]

City leaders saw development projects as an inherent societal good that would beautify the landscape, strengthen the economy, and attract newer middle-class (white) residents.[57] RITA, and other groups like them around the nation, saw these projects as wasteful because spending on infrastructure, welfare, and capital improvements, they believed, would accomplish the same task with less long-term financial risk.[58] RITA's issues with Project One mirrored current residents' issues with Navy Hill. Both the older and newer Richmonders believed that the divide between corporate wealth and improvements to city life rested with a public investment into the places people fled, such as decaying neighborhoods and failing schools. Newer convention centers and hotels could not hide that fact, and the national press agreed. While "cities of all sizes are turning hopefully to convention centers to bring in the tourists and jingle the cash registers," said the *Washington Post*, "there is very little data current enough to say that an urban revival is taking place," the like-minded *Businessweek Magazine* concluded.[59]

Interracial coalitions were very suspectable to fracture, especially when confronted with unexpected gridlock. RITA's opposition compelled Gerald D. Hines and the Hilton Hotel Corporation "to withdraw from participation in [the] project" on Friday, November 10, 1978, about one year after the plan was announced. They generously allowed Brent to control the public narrative by refusing to speak with the press regarding their withdrawal. While Brent informed the press that he dropped Hines and Hilton from Project One because of a disagreement over the lease agreements, it was widely known that "the withdrawal was prompted because of the delay of more than a year resulting from the litigation instituted by the Richmond Independent Taxpayer Association." With the developer and hotel chain gone, and the city bonds unsold due to pending litigation, "it seems to me that the Project is now in real jeopardy," Brent wrote to Marsh.[60] The mayor never responded to Brent's letter. He instead told reporters that Project One was "strong enough to stand on its own" without a developer or hotel partnership. Fearing that these kinds of comments would scare off other partners, Brent told the mayor that, "If this is to be the method of operating, then we [DDU] do not want to be a partner or held responsible for the decisions in which we do not participate."[61]

## "A Dividing Line Separating Whites and Blacks"

When Hines and Hilton backed out of Project One, Richmond leaders had to watch other competing cities land hotel deals. In the summer of 1981, Hilton announced the opening of their new

*Chiles*                                                                                               11

$70 million, 825-room grand hotel equipped with restaurants, spas, luxury penthouses, and conference rooms. Months before, the rival Marriott Company announced the grand opening of two 2,000-room luxury hotels with similar accommodations.[62] Neither ribbon cutting ceremony happened in Richmond, a 52 percent black city with 220,000 residents.[63] Both ceremonies reflected, however, the hotel landgrab that the city was endanger of missing out on, and the pheromone of optimism for downtown revitalization that local leadership was so desperately attracted to.[64] In the early 1980s, cities across the nation had black politicians, white business elites, and developers align to construct mid-size multi-use arenas to infiltrate the growing conference and convention tourism market. Southern-born hotel chains such as Hilton (Texas) and Marriott (Virginia) expanded at this time by agreeing to anchor these revitalization projects.[65] They, like hotels would years later, exploited the opportunities created by urban leaders by negotiating for generous public subsidies, placing the bills of their expansion at the foot of taxpayers.[66] Then and now, large, glass-plated downtown hotels were visible signs of economic progress that city leaders desperately desired to represent and facilitate their revitalization projects. Thus, this section will show that the need among Richmond black and white leaders to attract and locate a core hotel unveiled the racial and political tensions that ultimately ruined Project One and the illusion of racial progress it stood for.

RITA's legal opposition to Project One ended in January 1980, when the Virginia Supreme Court refused to hear their cases any further. Although city leaders successfully alienated the dissent lying beneath them, they learned that conquering it among themselves remained the hardest task. After the city council sold its bonded debt and began constructing Project One, Marsh and Brent courted Marriott in hopes that they would become the project's core hotel.[67] The fastest growing hotel chain in the world was interested in adding Richmond to its empire, but they were not "interested in Project One."[68] Brent wanted to entertain other offers to lure Marriott into a favorable deal; Marsh, on the contrary, did not. Feeling that the reputation of their interracial coalition, and more so black leadership, depended on Project One's success, Marsh brokered a fifty-year lease agreement with Marriott for a 400-room hotel with an 89,000 person capacity convention center, an 80,000 square-foot hall, and the promise to allocate up to $9 million in tax revenue to cover Marriott's debt if they could not turn a profit after nine years in operation.[69] Brent was disappointed with Marsh as he once again excluded white leadership from a project designed to bring the races together. When the news broke, Brent had little to say, stating that "I think Henry Marsh is an ambitious rascal."[70]

The lingering issues with race and geography reflected that interracial coalitions were not always held together by a collective desire for power. In fact, black and white leadership, while uniting for the cause of racial harmony, splintered on exactly what that reality should look like. Marsh and the black city councilmembers (five of them in total) wanted the core hotel located north of Broad Street—"a euphemism for that side of the central city that is predominantly black," said the *New York Times*.[71] Conversely, the four white city councilmen wanted the hotel south of Broad Street because, in the words of a local political scientist, "No respectable white person would dare sleep north of Broad Street."[72] Even out-of-towners knew that "when North was north and South was south, Broad Street divided the black and white sections of Richmond. And there are still some blonde-haired ladies in tennis shoes who won't walk on the northside of Broad."[73] North of Broad Street were the city's well-known black enclaves such as Jackson Ward, Navy Hill, Battery Park, and Barton Heights. South of Broad were the pillars of white Richmond power—St. Paul's Episcopal Church, Capitol Square, The Jefferson Hotel, Thalheimer's Department Store, Miller and Rhodes, The First Bank of Virginia, and other key brokerage and law firms.[74] Broad Street displayed that almost a decade after the Modern Civil Rights Movement, racial segregation was alive and well in Richmond. Thus, city leaders' efforts to minimize this fact while recruiting outside businesses, like Project One itself, succumbed to debates about the core hotel's location.

The hotel controversy revealed that in spite of the racial capitalist propaganda and planning, race relations had not significantly improved since Marsh's inauguration on May 8, 1977. After being sworn in, Marsh and his fellow black councilmembers broke with tradition by hiring full-time assistants and occupying offices in City Hall.[75] The racial divide on the council widened when Marsh and his four black colleagues voted to fire City Manager William J. Leidinger, the white hold over from a previous administration. A year after Leidinger's dismissal, the white and black councilmembers disagreed over black councilmembers redrawing the voting districts to increase their majority on the city council. White councilmembers conducted secret investigations with the hopes of ousting their black colleagues from office. While their efforts failed to unseat a single black councilmember, they helped further the racial divide at one of the most critical times in city history.[76]

The hotel controversy made Project One a part of the city's racialized political turmoil. Marsh's stance confirmed to white leaders what they long felt to be true: "The black majority on the city council is incompetent, and that the mayor is arrogant."[77] White councilmembers froze the city budget, halted Project One construction, and threatened to remove their businesses from downtown.[78] "The white majority wanted Project one to fail as long as Henry L. Marsh 3d was Mayor," a black councilmember once said.[79] Others were more pessimistic, feeling that "There are some people who'd rather see this city run into the ground than under black leadership."[80] In the midst of this disagreement, the Hilton Corporation re-entered the fray by purchasing a plot of land directly across the street from the Marriott site. There was widespread speculation that white leaders facilitated the purchase to ruin Project One; however, there is little documentary evidence to support it.

Marsh reached out to the Hilton developer with the hopes of convincing them to build elsewhere.[81] They responded by inviting Marsh to the hotel's public announcement. Marsh did not attend "for reasons which I am sure you will understand," he wrote to Hilton.[82] With Project One's centerpiece compromised, Marsh and the black members of city council passed Resolution 81-R132-125, forcing Hilton to pay the city for operating near the Project One site.[83] Hilton sued the city soon after. The mounting cost of appeals forced the city council to settle out of court and foot $5 million in restitution.[84] As Richmond erected Project One alongside of the Hilton hotel, the *New York Times* optimistically saw it as "a new attempt at cooperation between blacks and whites in a city with a history of racial acrimony and nearly consistent interracial bickering on its city council."[85] Yet, Richmond leaders learned that converting urban revitalization—a longtime tool of division—into a mechanism of unity would not be easy given that two separate hotels emerged from the desire to build only one.[86]

## A Bridge of Unity

The reconciliatory promise, and ultimate political demise, of Project One did not end interracial coalitions, or the use of racial capitalism in post–Civil Rights Richmond. In fact, it generated discussions between black and white leaders about ways to prevent future revitalization plans from going awry. These discussions began with elite black and white women in the basement of churches, ballrooms of country clubs, and living rooms of lavish Far West End homes. These wives came to a consensus that the issues with urban revitalization evolved from a sociopolitical divide where "the movers and shakers, the people with power, tend to isolate themselves with their own kind."[87] While elite white and black women worked together within civic organizations and charity groups, their husbands, and the city at-large, maintained de facto racial segregation in neighborhoods, churches and schools, leaving "few opportunities for forming friendships between blacks and whites."[88] This segregation was detrimental to Richmond leadership in particular because, as a white minister lamented, the seeking of "sameness through private clubs and private schools" gridlocked city politics in ways it did not

elsewhere. Before blacks gained a majority in City Hall, white elites made major decisions around tee time, over dinner, at lunch, in backyard barbeques, and at sporting events where blacks were not in attendance.[89] This practice became a liability when blacks gained controlling interest in city government. Still, both races maintained de facto segregation between themselves after March 1977, hardening the ideological and political divisions that led to Project One's demise.

In the twilight of Project One negotiations, a few well-to-do white and black women organized secret "gatherings of members of the black and white power structure." These women—most of whom remain unnamed in the documentary evidence—greased the wheels of interracialism by organizing stimulating lectures with high-priced champagne, seafood hors d'oeuvres, and steak dinners, turning their husbands—historical enemies—into acquaintances and friends.[90] These gatherings helped white and black elites build a collective identity on the paternalistic notion that they—the elite of both races—should dictate Richmond's future by bridging the gap between them that centuries of racism had created. This was the same paternalism that facilitated Project One. Little did they know that the fulfillment of this attitude would ultimately undermine their future revitalization project. "Only a Richmonder could fully appreciate the unique quality of the evening in a city where people tend to revolve in their own social circles," a white attendee once said.[91] Emerging from these secret meetings in spring 1982 was a second revitalization project to bridge the physical and psychological gap between black and white Richmond; something that these gatherings did, and that Project One had failed to do.[92] Fulfilling this promise would be the interracial, nonprofit revitalization group ran by thirty black and thirty white members (sixty in total) named Richmond Renaissance Incorporated.[93]

Representing Richmond Renaissance were two men: one black and one white. Clarence L. Townes, Jr., was born to a black middle-class family, graduated from the all-black Armstrong High School and Virginia Union University, owned a successful insurance firm and charter bus company, served on the Richmond City Republican Committee, became the first black Virginia delegate at the Republican National Convention in the twentieth century, and joined several Republican committees in D.C. to help the Party of Lincoln retain and recruit black voters.[94] T. Justin Moore, Jr., descended from an white upper middle-class family; graduated from Princeton University and the University of Virginia Law School; practiced law in Richmond; and served as the chief executive officer of the Virginia Electric and Power Company (now Dominion Energy).[95] Both men—one representing the black political establishment and the other representing the white business elite—convinced enough residents that Richmond Renaissance could capitalize on the "economic progress of Project One" while not perpetuating the same distrust and tension between white and black leadership.[96] Their formation received almost no immediate backlash from the grassroots. Interracial support for Townes and Moore was so strong that corporations around the city flooded the Richmond Renaissance bank account with almost a half of million dollars in donations to bring their first project into fruition.[97] Like Project One, this newer revitalization plan relied almost exclusively on local funding.

Richmond Renaissance pledged to raise more than $2 million to begin constructing the Sixth Street Marketplace, a downtown mall that would sit next to the Project One hotel site. The Marketplace would be one of the already 22,000 malls decorating American urban spaces, such as Upper Darby in Philadelphia, Highland Park in Dallas, J. C. Nichols Country Club Plaza in Kansas City, Park Forest in Illinois, and the most famous Levittown on Long Island, New York.[98] Its centerpiece would be a "glass covered pedestrian bridge across Broad Street" called the Bridge of Unity. This bridge would not only "link a black populated area of the city to the [white] downtown business, commercial, and shopping center," it was to be the architectural handshake between the races, symbolizing a city's desire to capitalize off of their racial tolerance: the ultimate expression of racial capitalism.[99] More so than Project One, city leaders felt that the Marketplace would become the social engineering project to turn their racial tolerance into a climate where economic prosperity facilitated reconciliation. As Townes once told a potential investor,

> Richmond public officials, business and civic leaders perceive this project as a Bridge of Unity that will bring widely differing sectors of the community together . . . [and] affect how blacks and whites live and interact with one another.[100]

Still, selling downtown revitalization to Richmonders relied on success stories. Fortunately, they all seemed to come from James Rouse, a socially conscious urban planner who has generated considerable scholarly attention.

The youngest of a well-to-do white Baltimore family, Rouse started his own mortgage firm in 1937 and worked with more than fifty-three city governments to construct downtown shopping malls; the most notable were in Philadelphia (Gallery at Market East), Detroit (Renaissance Center), Boston (Faneuil Hall), Atlanta (Peachtree Station), Baltimore (Harborplace), and Norfolk, Virginia (Waterside).[101] Each project required Rouse to overcome issues with suburban flight, federal and state funding shortages, and racial division.[102] That success compelled Rouse to accept an offer from T. Justin Moore and Clarence Townes to develop and manage the Marketplace in spring 1982.[103] Rouse quickly learned that in spite of the interracial goodwill surrounding the Marketplace, Richmond remained a racially segregated, majority black city of around 220,000 residents, surrounded by two nearly all-white suburban counties with a combined total of around 250,000 people. Rouse, Townes, and Moore conducted surveys to identify the fixable issues that perpetuated segregation. They found that whites vocally disliked the physical decay and high crime rates in black-dominated areas.[104] The most hated was Jackson Ward, a neighborhood located one block north of the Marketplace site. This eight-block wide downtown community was founded in the late-eighteenth century by free mulattoes and gained national prominence as home to America's oldest black-owned banks, insurance companies, fraternal organizations, and self-help enterprises. By 1982, however, centuries of red-lining and poor public services turned Richmond's black mecca into a dilapidated, crime-filled neighborhood.[105]

The Jackson Ward dilemma unveiled Richmond Renaissance's attempt to coax the nastier sides of racial capitalism as an inclusive function of economic progress. Rouse, Townes, and Moore successfully pitched a Jackson Ward redevelopment plan to Richmond Renaissance.[106] While the initial intent was to work with Jackson Ward residents to improve their property values and beautify the area, the actual plans reinforced the racialist redevelopment agendas of the past. Like the urban renewal movements of the 1950s and 1960s, Richmond Renaissance desired to ensure the Marketplace's vitality by "improving" the image of Jackson Ward. The best way to do that was to simply remove black residents from the area.[107] They articulated their efforts with the language of "inclusion," as Richmond Renaissance members approached some Jackson Ward business owners about selling their properties and entering the marketplace as vendors. The idea was that the Marketplace would absorb the viable black businesses that anchored Jackson Ward, shed the rest, as well as break the black property ownership monopoly that existed, opening the area to more revitalization and white ownership. Some were willing to sell their buildings and relocate; however, the offers were well-below market value.[108] "It is clear that even as middle-class blacks, we do not have the necessary financial clout to build a three million dollar development individually," a black business owner told his neighbors. Thus, they organized a united front against the ethnic cleansing of their beloved Ward.[109] Negotiations eventually fell apart and the city's elite looked for and successfully found "alternative sites to do business."[110]

Less than a month after construction began, Jackson Ward residents noticed that a large brick wall separated them from the Marketplace. This was no protective barrier from construction: it was a design separation between Jackson Ward and the growing Marketplace. The wall was later torn down after discussions between Jackson Ward residents and Richmond Renaissance. Yet the construction of it, and efforts to have it removed, symbolized the divide between political and

social progress. Even when the white power structure included well-meaning black leaders, revitalization and redevelopment policies remained heavily profit-driven and systemically racist against black residents, a point hammered home in N. D. B. Connolly's assessment of interracial coalitions and racial capitalism in South Florida.[111] Black Richmond residents learned this lesson quite well as, in the words of one Jackson Ward resident after the wall was removed: "I don't think we're going to be totally satisfied. But I think it is something that we're going to have to accept rather than fight further."[112]

On September 18, 1985, more than 50,000 people (around 20,000 residents) witnessed T. Justin Moore, Clarence Townes, and other city leaders give impassioned speeches about how the Marketplace and Unity Bridge would connect the races across the Broad Street dividing line. This unveiling preceded more than $1 billion in other investments to build the Richmond Braves Stadium and renovate the Main Street Train Station.[113] At the time, Project One's Marriott hotel, which was built on "the historic wrong side" of Broad Street, even operated at 85 percent capacity. Prospects were high for Richmond, but those closest to the project remained grounded. The new corporations who relocated to Richmond in the late 1970s helped the metropolitan area (a combination of Richmond, Henrico, and Chesterfield Counties) grow by the late 1980s (from just under 500,000 people to a little under a million). However, the suburbs absorbed the majority of middle-class residents and retail dollars. As the buildings in downtown went up, the metropolitan areas' economic and social life sprawled further and further outward.[114] Hence, Clarence Townes answered *Minorities and Women in Business Magazine* honestly when he was asked "will it [the Marketplace] work." He said, "I think it will," but "the jury is still out, and ultimately only time will tell if the Sixth Street Marketplace will be more than just a symbol."[115]

## "It Has Become a Symbol of Failure and It Must Come Down"

By the late 1980s, the "jury" had rendered its verdict: the Sixth Street Marketplace was a failure and the Bridge of Unity was its gilded relic. While blacks patronized the downtown mall, whites mostly refused to because "they think they'll get mugged or raped," a black Marketplace vendor sadly told reporters.[116] This fear was largely unjustified as "walking beat patrols, the canine corps, horse troops, plainclothesmen, and cruise cars in large numbers" were around the Marketplace "before any other section of the city," Townes once touted.[117] Still, the Marketplace was erected in a city where "[white] people were still leaving," a longtime resident remembered.[118] Richmond Renaissance ignored this reality because they were, as one city planner suggests, "[too] captured by the idea of building a bridge between the black and white communities." He later assessed that, "Despite the efforts to bridge the black and white communities, the effects of racial segregation were still evident . . . [and] the magnitude of change generated by the marketplace was simply not enough to make a difference."[119]

In the next decade, Richmond—a city whose population sank to around 200,000 people (88,000 white and 112,000 black)—transitioned toward a "knowledge-based technology economy" anchored by Motorola, Siemens, and Capital One. This economic shift, along with the irony of spending millions in tax money on maintaining a mall designed to generate tax revenue, closed the door on the Marketplace and its architectural handshake.[120] Just days after the Marketplace's seventeenth anniversary, the Richmond City Council announced its demolition, citing that the Bridge of Unity "has become a symbol of failure and it must come down."[121] While the council promoted the obvious slum-clearance project as the beginning of a series of downtown renovations, one business owner bluntly told the local press that the Marketplace and the Bridge of Unity was being demolished because, "Who shops here? It's not white people. It's black people."[122] This demolition reflected more than decades of economic failure: it was city government's acknowledgment that interracial coalitions, and their use of racial capitalism, was not nearly enough to overcome the social and economic burdens of racial division, a lesson that cities around the nation also learned.[123]

## "Here We Go Again"

Today, Richmond is a city where local elites, both white and black, are embracing the newer yields of America's urban demographic destiny. While the metropolitan area still hovers around 1,000,000 people in total, and the majority black Richmond still holds the least amount of residents (around 230,000), the race and class composition has drastically shifted in favor of Richmond.[124] Suburban sprawl during the 1980s and 1990s created cheaper, and more plentiful housing in the suburbs. At the same time, Richmond's urban revitalization efforts birthed immature pockets of gentrification, which is now developing past its pubescent stages.[125] Like cities around the country, Richmond's population growth is trending whiter and more affluent, while the once growing suburbs are becoming less white and affluent.[126]

This demographic shift has not benefited the majority of the city's 47 percent black population. As whites move in, they cluster in pockets and increase property values in once low-income areas, such as the downtown Jackson Ward neighborhood, and the East End area of Church Hill. The increased white population, while growing the service and real estate economy, has not lifted the struggling city services beyond their meager functionary capacities. While black residents have long complained about this trend, it was not until liberal white residents in the academic communities at Virginia Commonwealth University and the University of Richmond publicly addressed it that local leaders enacted another revitalization plan. Although more structurally redistributive, the newer plan wreaks of the patterns of past failures, proving that current city leaders are not students of history or wiser than their predecessors.[127]

In December 2018, black and white leadership announced the Navy Hill Project. They formed this downtown redevelopment agenda in response to local desires for rebranding the city away from its racist legacy, and the grassroots outcry to uplift the black underclass along with the recent influx of affluent, gentrifying whites.[128] The majority black Mayor Levar M. Stoney administration agreed in-principle with a white-owned, nonprofit development firm to revitalize the formerly black Navy Hill neighborhood.[129] Navy Hill *was* a majority black middle-class area at the dawn of the twentieth century. By the mid-century, white leadership demolished it to construct Interstate-95. The memory of forced removal was exacerbated by gentrification as the Altria Center for Research Technology moved into the area in 2011 and removed the historic marker. Seven years later, the mayor and the white business community became a part of this troubling continuum.[130]

The Navy Hill Project was to be a $1.5 billion multi-use facility equipped with 790,000 square footage of office space, 275,000 square feet for retail stores and restaurants, 17,500 seat arena, 3,000 apartments (680 apartments reserved as low income), 527-room high-rise Hyatt Hotel, $10 million in updates to the historic Blues Armory, and a transfer plaza for the newly expanded public bus system. The mayor's office touted that the majority black city would generate more than 12,000 jobs (9,000 permanent) from this venture. Minority vendors would also have exclusive access to $330 million in public and private construction contracts. In sum, the Navy Hill Project would generate $500 million in annual revenue and add more than $1 billion to the capital improvement budget over the next thirty years.[131] Built within the Navy Hill Project was a redistributive plan to create permanent under-skilled employment for the city's largely black underclass, and fund the majority black and embarrassingly impoverished school system that has gone financially unsupported by city leadership for decades.[132] In spite of the propagated benefits, the mayor's office remained silent about who would pay for this venture, its likelihood of success, and would taxpayers suffer if the project went belly up. As 2018 succumbed to 2019, these key questions remained unanswered, transitioning the inquisitive voices into dissenting opposition.

"Here we go again . . . the ghosts of Richmond's past failures haunt us," a renowned journalist wrote.[133] He and many like him remembered when black politicians and white businessmen

promised residents that urban decay was a monetary issue that could be fixed with interracial cooperation on costly private–public projects. Richmond residents sued the mayor's office to gather more details on the project in spring 2019. They learned that the wealthiest capitalists in Virginia crafted the Navy Hill Project and sold it to the majority black city council. Like Project One and the Sixth Street Marketplace, the council promised to allocate current (an undisclosed portion of the around $800 million in capital improvement surplus) and future tax revenue (an estimated $476 million) to sustain the "financing district" until it turned a profit. If the project took the full thirty years to become solvent, the city would owe at least $600 million to its bondholders.[134] Even worse, the projected revenue for the city would be less than the amount spent on maintaining the project over the next twenty years.

This revelation compelled residents to channel the spirit of RITA and petition the local courts (although unsuccessfully) for a referendum vote to end the project.[135] The public-relations disaster drove the city council to create a community-led commission to educate residents on the benefits of urban revitalization.[136] They followed this effort with a slew of crisp, millennial-infused ads for the Navy Hill Project in the local press. Still, many residents felt that these efforts left "more questions than answers."[137] Only time will tell if the Navy Hill Project, and others like it, is different from Project One and the Sixth Street Marketplace. Judging from the legacy of failed revitalization projects, this author assumes that Navy Hill fits well within the continuum of racialist redevelopment policies. Richmond is like other cities that have received significant tax revenue from past decades of gentrification. Instead of investing in its majority black (97%) and impoverished public school system, leaders in Richmond and elsewhere continue to court white corporations who have done next to nothing to improve the cemented patters of racial segregation and disparate levels of poverty.[138]

It seems problematic that current urban leadership continues to try and correct the seemingly reliant structures of white wealth and black poverty with solutions that have been proven ineffective, such as tax-subsidies for concrete buildings that reinforce the wedded bond between public services and personal property taxes, as well as tax structures that do not convert corporate profits into societal benefits. American cities have suffered too long from corporate-centered tax policies that ensure economic elites beautified downtown islands surrounded by a sea of crumbling minority-occupied areas. Special projects designed to funnel some of the financial benefits of economic growth to black urban communities have, and most likely will, turn tax gains into long-term debt that many white businesses and residents can simply flee from. In sum, they are poorly designed band-aids that will infect the wounds they are designed to cover. While Richmond is not a major city, it is reflective of the American problem that often-implemented, tax-funded redevelopment plans rarely benefit racial minorities, even if a select few are involved in the decision-making process. Some residents in Richmond are optimistic that "this [Navy Hill Project] is no Sixth Street Marketplace," and that the promises of Navy Hill will materialize into the economic stimulus it is designed to be. Let's hope for Richmond's sake that this is correct because, "If Richmond doesn't acknowledge its history . . . in a meaningful way, it's bound to keep repeating it."[139]

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## ORCID iD

Marvin T. Chiles  ID  https://orcid.org/0000-0002-1003-0460

## Notes

1. Rob Corcoran, *Trustbuilding: An Honest Conversation on Race, Reconciliation, and Responsibility* (University of Virginia Press, 2010), 128; Elizabeth L. O'Leary, *The Carillon Neighborhood: A History* (Richmond, Virginia: Carillon Civic Association, 2013), 1-29; Resolution 2007-R057-38, "To Recognize the Historic Significance of the Richmond Slavery Reconciliation Statue Unveiling," March 12, 2007; Resolution 2010-R171-180, "To Support the Erection of a Statue Honoring Maggie L. Walker," November 22, 2010 (City Hall Archives, Richmond, Virginia); Remarks by Mayor Levar M. Stoney, June 22, 2017, https://www.monumentavenuecommission.org/in-the-news/remarks/, 34-9 (Monument Avenue Commission Collection, previously archived online but copies of sources are in the possession of the author); and "Mayor Stoney Announces Commission on Confederate Statues for Monument Avenue," *RVA Magazine*, June 22, 2017, 1.

2. This article will use "revitalization" and "redevelopment" interchangeably. Urban leaders in the 1980s and contemporary scholars used both terms to define infrastructural changes made to attract industry, retail, and residents back to inner cities.

3. Sabine U. O'Hara, "Urban Development Revisited: The Role of Neighborhood Needs and Local Participation in Urban Revitalization," *Review of Social Economy* 59, no. 1 (March 2001): 23-43; Larry Ford, Florinda Klevisser, and Francesca Carli, "Ethnic Neighborhoods and Urban Revitalization: Can Europe Use the American Model," *Geographic Review* 98, no. 1 (January 2008): 82-21; Fayth A. Ruffin, "Collaborative Network Management for Urban Revitalization: The Business Improvement District Model," *Public Performance Management Review* 3, no. 3 (March 2010): 459-87; "Scott Markley and Madhuri Sharma, "Keeping Knoxville Scruffy? Urban Entrepreneurialism, Creativity, and Gentrification Down the Urban Hierarchy," *Southeastern Geographer* 56, no. 4 (Winter 2016): 384-408; "In 2019, Houston Faces Tough Challenges, Big Opportunities," Rice-Kinder Institute for Urban Research, January 8, 2019, https://kinder.rice.edu/urbanedge/2019/01/08/2019-houston-faces-tough-challenges; "New Building Phase Begins at Baltimore $5B Renewal Project," *US News World Report*, May 13, 2019, https://www.usnews.com/news/us/articles/2019-05-13/new-building-phase-begins-at-baltimore-5b-renewal-project; Ely Portillo, "Charlotte Is Planning a New Vision for Center City. How'd We Do on the Last One," *UNC Charlotte Urban Institute*, August 13, 2019, https://ui.uncc.edu/story/charlotte-planning-new-vision-center-city-how'd-we-do-last-one; "Hundreds of New Housing Units Open in South City Development," *WREG Memphis*, https://wreg.com/news/hundreds-of-new-housing-units-open-in-south-city-development/; and "Raleigh Approves 1 Million sq. ft. Development Near Dix park," *Triangle Business Journal*, https://www.bizjournals.com/triangle/news/2019/12/04/commercial-gateway-into-southern-raleigh-takes.html.

4. Edward C. Banfield, *The Unheavenly City Revisited* (Boston: Little, Brown, 1974); and Paul E. Peterson, *City Limits* (Chicago: The University of Chicago Press, 1981).

5. Howard Gillette, *Between Justice and Beauty: Race, Planning, and the Failure of Urban Policy in Washington, D.C.* (Johns Hopkins University Press, 1995), xi; Howard Gillette, Jr., *Camden After the Fall: Decline and Renewal in a Post-industrial City* (University of Pennsylvania Press, 2009), 8-19; Howard Gillette, Jr., *Civitas by Design, Building Better Communities, from the Garden City to the New Urbanism* (University of Pennsylvania Press, 2010), 4 and 78-84; June Manning Thomas, *Redevelopment and Race: Planning a Finer City in Postwar Detroit* (Detroit: Wayne State University Press, 2013), xiii and 149-56; Joseph A. Rodriguez, *Bootstrap New Urbanism: Design, Race, and Redevelopment in Milwaukee* (Lanham, Maryland: Lexington Books, 2014), 11-5; and Bernard Frieden and Lynne Sagalyn, *Downtown, Inc.: How America Rebuilds Its Cities* (Harvard University Press, 1989).

6. Arnold R. Hirsch, *Making the Second Ghetto: Race and Housing in Chicago, 1940-1960* (University of Chicago Press, 1983), 10-20; Thomas Sugrue, *Origins of the Urban Crisis: Race and Inequality in Postwar Detroit* (Princeton University Press, 1996); Terrence McDonald, *The Parameters of Urban Fiscal Policy: Socioeconomic Change and Political Culture in San Francisco, 1860-1906* (University of California Press, 1986); Jon C. Teaford, *The Rough Road to Renaissance: Urban Revitalization in America, 1940-1985* (Johns Hopkins University Press, 1990); Maurice J. Hobson, *The Legend of the Black Mecca: Politics and Class in the Making of Modern Atlanta* (University of North Carolina Press, 2017), 50-87; Aaron Cowan, *A Nice Place to Visit: Tourism and Urban Revitalization in the Postwar Rustbelt, Urban Life, Landscape, and Policy* (Temple University Press, 2016); and William Graves

**JA0764**

and Heather A. Smith, eds., *Charlotte, NC: The Global Evolution of a New South City* (University of Georgia Press, 2012).

7.  Cedric Robinson, *Black Marxism: The Making of the Black Radical Tradition* (Chapel Hill: University of North Carolina Press, 1983); Nancy Leong, "Racial Capitalism," *Harvard Law Review* 126, no. 8 (June 2013): 2151-226; and Jodi Melamed, "Racial Capitalism," *Critical Ethnic Studies* 1, no. 1 (Spring 2015): 76-85.

8.  Clarence N. Stone, *Regime Politics: Governing Atlanta, 1946-1988* (Lawrence: University of Kansas Press, 1989), x-xi; Steven Estes, *Charleston in Black and White: Race and Power in the South After the Civil Rights Movement* (Chapel Hill: University of North Carolina Press, 2015), 3-5 and 60.

9.  Michael B. Katz, *Why Don't American Cities Burn*? (Philadelphia: University of Pennsylvania Press, 2012); N. D. B. Connolly, *A World More Concrete: Real Estate and the Remaking of Jim Crow Florida* (Chicago: University of Chicago Press, 2014), 5; Hobson, *Legend of the Black Mecca*, 1-3; and Keenaga-Yamahatta Taylor, *From #BlackLivesMatter to Black Liberation* (Chicago: Haymarket Books, 2016), 79.

10. James K. Sanford, ed., *Richmond: Her Triumphs, Tragedies, and Growth* (Metropolitan Richmond Chamber of Commerce, 1975), 22-43, and 92; Steven J. Hoffman, *Race, Class, and Power in the Building of Richmond, 1870-1920* (Jefferson, North Carolina: McFarland & Company, Inc., 2004), 6; Sarah Shields Driggs, Richard Guy Wilson, and Robert P. Winthrop, *Richmond's Monument Avenue* (University of North Carolina Press, 2001), 13-35 and 97-138; and Testimonies of Election Fraud 1889, Box 193 (William Mahone Papers, Duke University, Durham, North Carolina).

11. C. R. Wilson, *Baptized in Blood: The Religion of the Lost Cause* (University of Georgia Press, 1980), 29; Matthew Mace Barbee, *Race and Masculinity in Southern Memory: A History of Richmond, Virginia's Monument Avenue* (Lanham, Maryland: Lexington Books. 2014), 19-36; Johnathan Lieb, "The Witting Autobiography of Richmond, Virginia: Arthur Ashe, the Civil War, and Monument Avenue's Racialized Landscape," in *Landscape and Race in the United States*, ed. Richard H. Schein (New York: Routledge, 2006), 187-207; and Marvin T. Chiles, "Black Richmond Activism Before the Modern Civil Rights Movement," *Journal of African American History* 105, no. 1 (Winter 2020).

12. Raymond Gavins, "Urbanization and Segregation: Black Leadership Patterns in Richmond, Virginia, 1900-1920," *South Atlantic Quarterly* 79, no. 3 (Duke University Press, 1980), 258-61.

13. Ann Field Alexander, *Race Man: The Rise and Fall of the "Fighting Editor," John Mitchell, Jr.* (University of Virginia Press, 2002), 80-92; Arthur Raper, "The South Strains Toward Decency," *The North American Review*, Spring, 1937, 106; and Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, and Race* (University of Tennessee Press, 1984), 9-11 and 27-32.

14. Silver, *Twentieth-Century Richmond*, 122; John Moeser and Rutledge B. Dennis, *The Politics of Annexation: Oligarchic Power in a Southern City* (Cambridge, MA: Schenkman Pub. Co, 1982), 29-30; and Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2019, U.S. Census Bureau, https://data.census.gov/cedsci/table?q=Richmond%20virginia&tid=PEPPOP2019. PEPANNRES&hidePreview=true.

15. Urban Renewal in Richmond, May 26, 1962, Congressional Memo found in Box 6, M246 (*Horace H. Edward Papers*, Virginia Commonwealth University, Richmond, Virginia); Ed Grimsley, "Downtown Virginia," *The Commonwealth Magazine, The Magazine of Virginia, Virginia Chamber of Commerce*, Vol. XXXIV, No. 5, May, 1967, 23-9; and "Continuous Transportation Planning Process Richmond Regional Area," Mss1 W5603b FA2, Series 1 Expressways (1 of 2) (James C. Wheat Papers, Virginia Museum of History and Culture, Richmond, Virginia).

16. David G. Temple, *Merger Politics: Local Government Consolidation in Tidewater Virginia* (Charlottesville: University of Virginia Press 1966), 1; A Bill to provide for the Merger of the City of Richmond and the County of Henrico and to Create a Commission to be known as the Richmond-Henrico Merger Commission: providing Composition, Terms, Powers, and Duties, and to Appropriate Funds, February 1968, Senate Bill No. 441.

17. Dawn S. Bowen, "The Transformation of Richmond's Historic African American Commercial Corridor," *Southeastern Geographer* VXXXIII, no. 2 (November 2003), 260-78.

18. Interview with Reverend Dr. Benjamin Campbell, March 14, 2019, longtime activist, civic leader, and minister; University of Richmond Digital Scholarship Lab Unveils New Mapping Project Focusing on Urban Renewal, Family Displacements, Race, *Targeted News Service* (TNS), 2017; and Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, March 1980, Box 20,

M258 (Richmond Urban Institute Papers, Virginia Commonwealth University, Richmond, Virginia).

19. "Endorsement Seen a Big Vote Boost," *Richmond Afro-American*, May 14, 1966, 1-2.

20. Certificate of Birth for Henry Levander Marsh, III, December 10, 1933, Virginia Department of Health; Richmond, Virginia; Virginia, Births, 1864-2016; and Richmond City Directory, 1933, U.S. City Directories, 1822-1995 (ancestry.com); and Marsh, Stubbs, Wingfield-Smith, *Memoirs of Honorable Henry L. Marsh, III*, 19.

21. "34 Are Arrested in Sitdowns Here," *Richmond Times-Dispatch*, February 23, 1960, 1; "Hill Blast Va. State Legislature," *Richmond Afro-American*, March 5, 1960, 1-2; "Who Is Now Defying the Law," *Richmond Times-Dispatch*, February 24, 1960, 14; "Store Is Picketed; Negroes Ask Boycott," *Richmond Times-Dispatch*, February 25, 1960, 1 and 3; "Negroes to Spread Boycott," *Richmond Times-Dispatch*, February 25, 1 and 4; "Anti-Trespass Laws Signed to Meet Sit-Down Protests," *Richmond Times-Dispatch*, February 26, 1960, 1; "Whites, Negroes Confer on Protests," *Richmond Times-Dispatch*, February 27, 1960, 2; "Judge Says 'This Is No Race Issue,'" *Richmond Afro-American*, March 12, 1960, 1; "Va. U. Students to Appeal Fines," *Richmond Afro-American*, March 12, 1960, 19; "Students Fined $20 Each," *Richmond Afro-American*, March 19, 1960, 1 and 16; "Sit-In Case Conviction Is Upheld," *Richmond Times-Dispatch*, April 25, 1961, 1 and 3; "34 Students in Sit-Ins Plan Appeal," *Richmond Times-Dispatch*, April 26, 1961, 8; and *Bradley v. The School Board of Richmond City, Virginia*. U.S. Court of Appeals, Fourth Circuit 317 F 2d 429. 41.

22. Julian Bond Interview with Henry Marsh, Explorations in Black Leadership Online Archive (University of Virginia Institute for Public History), August 31, 2000.

23. Julian Maxwell Hayter, *The Dream Is Lost: Voting Rights and the Politics of Race in Richmond, Virginia* (University of Kentucky Press, 2017), 40; "Marsh to Run for Council," *Richmond Afro-American*, April 16, 1966, 1-2; "Cephas, Marsh, Mundle Win," *Richmond Afro-American*, June 18, 1966, 1-2; and "Another Big Win for Councilman-Elect Marsh" and "A Real Big Day," *Richmond Afro-American*, June 25, 1966, 1.

24. Resolution No. 66-R99, Mss1 W5603b FA2, Series 1, Housing Committee (James C. Wheat Papers); "Marsh Will Press Expressway Plea," *Richmond Times-Dispatch*, November 27, 1966, 1 and 25; "Expressway View Restated by Marsh," *Richmond Times-Dispatch*, November 28, 1966, 2; "Marsh Says Expressway Plan Anti-Colored," *Richmond Afro-American*, November 12, 1966, 1; "Idlewood Ave. Residents Urged to Pack City Hall" and "Marsh Leads Drive to Save Homes," *Richmond Afro-American*, November 19, 1966, 1, 2, and 18; "City Council Sidesteps Marsh's Resolution," *Richmond Times-Dispatch*, November 29, 1966, 1-2; "RF Block Sinks Marsh's Effort to Save Homes," *Richmond Afro-American*, December 3, 1966, 1-2; and "Picket Lines Loom as Bulldozers Zero in on Homeowners," *Richmond Afro-American*, December 10, 1966, 1-2.

25. Resolution No. 66-R90, October 25, 1966, "City Council Minutes 1966-1967" (*Richmond City Journal*, Library of Virginia, Richmond, Virginia), 88-9; and Howard Carwile, "Henry Marsh Refuses to Sin by Silence," Editorial to the *Richmond Afro-American*, November 12, 1966, 3.

26. Moeser and Dennis, *Politics of Annexation*.

27. "Marsh Wants Fair Shot for City Hopefuls," *Richmond Afro-American*, October 16, 1976, 1-2.

28. "Thornton Appointment Makes Job Outlook Brighter in City," *Richmond Afro-American*, March 4, 1972, 1 and 5; "Holt Case Before Supreme Court," *Richmond Afro-American*, May 13, 1972, 1 and 26; "Intern in City Manager's Office Sees Pressure as Key to Progress," *Richmond Afro-American*, May 27, 1972, 6; "Whites Keep Edge on School Board but Blacks Seen Becoming Its Head," *Richmond Afro-American*, June 10, 1972, 3; "Rev. Jones Heads Richmond Schools," *Richmond Afro-American*, July 29, 1972, 1-2; "Blacks in Running for 6 Top Positions," *Richmond Afro-American*, June 2, 1973, 1-2; "Mrs. Dell Continues to Gain Support," *Richmond Afro-American*, June 23, 1973, 6; "Richmond's First Chief of Welfare Bares Plans," *Richmond Afro-American*, January 5, 1974, 3; "Push for Full-Time Black Judge Sparks Political Moves," *Richmond Afro-American*, January 12, 1974, 7; "RRHA Has Another Chance to Pick Black for Position," *Richmond Afro-American*, January 26, 1974, 8; "Morris, Wilder Scored Big Triumph in the Making of First Black Judge," *Richmond Afro-American*, February 9, 1974, 1-2; "The Sheffield Appointment: A Significant Breakthrough," *Richmond Afro-American*, October 12, 1974, 1-2; and "New City School Chief Given a Big Sendoff," *Richmond Afro-American*, February 14, 1976, 12; "The Meaning of Our 5-4 Victory," *Richmond Afro-American*, March 5, 1977, 1; and "Richmond: Former Confederate Capital Finally Falls to Blacks," *Ebony Magazine*, June 1980, 44-6.

29. Notes for Talk to Richmond First Club, February 26, 1981, Race Relations in Richmond, 1980-1984, Box 11, M240 (George Stevenson Kemp Papers, Virginia Commonwealth University, Richmond, Virginia).

30. Tensions in the Richmond Community, Drafts, Questionnaires, 1980-1981, Box 1 and 16, M258 (Richmond Urban Institute Papers).

31. "Council Shares Blame for Racial Strife, Panel Says," *Richmond News Leader*, April 28, 1981, found in clipping form; and Notes for Talk to Richmond First Club, February 26, 1981, Race Relations in Richmond, 1980-1984, Box 11, M240 (George Stevenson Kemp Papers).

32. "Faith in South Proved to Be Right," *The Atlanta Constitution*, January 9, 1977, 19A.

33. "Sunbelt and Suburbia Still Strong Magnets for Migrating Americans during Decade," *Wall Street Journal*, July 2, 1980, 17.

34. Peterson, *City Limits*, 22; Hobson, *Black Mecca*, 61; and Estes, *Charleston in Black and White*, 55-8.

35. Edward L. Ayers, *The Promise of the New South: Life After Reconstruction* (New York: Oxford University Press, 1992), 136-46; and Michael E. McGerr, A Fiery Discontent: *The Rise and Fall of the Progressive Movement in America, 1870-1920* (New York: Oxford University Press, 2003).

36. Matthew D. Lassiter, *The Silent Majority: Suburban Politics in the Sunbelt South* (Princeton: Princeton University Press, 2006), 36.

37. "Richmond: Former Confederate Capital Finally Falls to Blacks," *Ebony Magazine*, June 1980, 34-9; "Sleepy Richmond Wakes Up, and Now Struggles to Adjust," *Wall Street Journal*, December 22, 1981, 23; and *Richmond Surroundings New City Magazines*, Fall 1980-July-August 1988.

38. Taylor, *From #BlackLivesMatter to Black Liberation*; and Leong, "Racial Capitalism."

39. "Richmond—A Model City?," *New World News*, January 7, 1978, 1-7, Richmond 1977-1991, File Cabinet #1 (Initiatives of Change Archives, Richmond Virginia).

40. Interview with Reverend Benjamin Campbell, May 14, 2019; and Interview with Viola Baskerville, June 28, 2019.

41. Joint Letter to the Honorable Henry L. Marsh, III, Mayor of the City of Richmond, Virginia, March 14, 1977, Richmond 1977-1991, File Cabinet #1 (Initiatives of Change Archives); and Interview with Reverend Benjamin Campbell, March 12, 2019.

42. Ibid; and "Richmond—A Model City?," *New World News*, January 7, 1978, 1-7.

43. Kevin Fox Gotham, "A City without Slums: Urban Renewal, Public Housing, and Downtown Revitalization in Kansas City, Missouri," *American Journal of Economics & Sociology* 60, no. 1 (January 2001), 285-8.

44. "Richmond—A Model City?," *New World News*, January 7, 1978, 1-7.

45. Carl Abbott, "Five Downtown Strategies: Policy Discourse and Downtown Planning Since 1945," *Journal of Policy History* 5, no. 1 (1993): 8 and 19.

46. "To Be or Not to Be Downtown," *Surroundings: Guide for Working in Downtown Richmond*, Winter 1982, 45-8.

47. "Notes on Realty," *The Washington Post*, February 19, 1977, E10; "Freshman Year on the Job: Rough Lessons for Carter," *U.S. News & World Report*, December 26, 1977, 22; "Newark—$19.8 Million to Improve Downtown," *The New York Times*, February 6, 1977, 2; "With Spring, Downtown Starts to Stir: Springtime, and Downtown Starts to Stir," *The New York Times*, March 20, 1977, 264; "Detroiters Lift Sights from Mire: Renaissance Center: High Hopes—and Risk," *The Christian Science Monitor*, April 14, 1977, 4; "U.S. Downtowns Get Back on Their Feet: Diverse Groups Joined," *The Christian Science Monitor*, December 21, 1977, 11; "Atlanta in Midst of Retrenchment After a Decade of Rapid Expansion: Atlanta Retrenches After Decade of Rapid Growth," *The New York Times*, January 9, 1977, 1; "Business Said Key to Cities," *The Atlanta Constitution*, June 17, 1977, 11A; and "Future Role of Cities Outlined," *The Atlanta Constitution*, September 20, 1977, 9 C.

48. Gillette, Jr., *Camden After the Fall*, 122-44; "U.S. Giving Cities $150 Million for Redevelopment Projects," *The Washington Post*, April 7, 1978, 1; and Minutes of Regular Meeting of the Executive Committee of the Board of Directors of Downtown Development Unlimited Held on April 22, 1977, Downtown Development Unlimited General and Correspondences 1977, Box 1:18, M281 (A. J. Brent Papers, Virginia Commonwealth University, Richmond, Virginia).

49. Andrew V. Sorrel and Bruce A. Vlk, "Virginia's Never-Ending Moratorium on City-County Annexations," *The Virginia Newsletter* 88, no. 1 (2012), 1-9.

**JA0767**

50.  Informal Meeting of The Council of the City of Richmond, Project One, October 18, 1977, Downtown Development Unlimited General and Correspondences 1977; Office Memorandum, Downtown Development Unlimited Hotel Meeting on December 7, 1977; A. J. Brent to Mr. B. A. Soyars, Vice President of Philip Morris, Incorporated, November 28, 1977; Lee F. Davis, Jr., to Mr. Benjamin A. Soyars, Vice President of Philip Morris, Incorporated, December 9, 1977; and Agreement Between DDU, A Virginia Non-stock Corporation, and Gerald D. Hines Interests, February 28, 1977, Box 1:18, M281 (A. J. Brent Papers).

51.  Interview with Viola Baskerville, June 28, 2019; Interview with Rutledge B. Dennis, July 26, 2019; Interview with William Mason, July 23, 2019; and Interview with Terry Drumheller, July 23, 2019.

52.  "Ruling May Aid Project Backers," *Richmond Times-Dispatch*, March 15, 1978, B1; and Public Hearing Comments on Richmond Independent Taxpayer Association, undated; and A Report on Eight Propositions to Amend Richmond's City Charter Scheduled for Referendum on January 22, 1980, Box 11 and 12, M240 (George Stevenson Kemp Papers).

53.  Emerging Sources of Tension, Undated 1981, Tensions in the Richmond Community, Drafts, Questionnaires, 1980-1981, Box 16, M258 (Richmond Urban Institute Papers); Public Hearing Comments on Richmond Independent Taxpayer Association, undated; A Report on Eight Propositions to Amend Richmond's City Charter Scheduled for Referendum on January 22, 1980, Box 11 and 12, M240 (George Stevenson Kemp Papers); and "The Authority of Municipal Bonds, 1978," *The Daily Bond Buyer*, Downtown Development Unlimited General and Correspondences 1978, Box 1:19, M281 (A. J. Brent Papers).

54.  "Downtown Procedure Is Reversed," *Richmond Times-Dispatch*, October 15, 1978, copy sent to Brent by RITA on October 23, 1978, found in Downtown Development Unlimited General and Correspondences 1978, Box 1:19, M281 (A. J. Brent Papers); Interview with Reverend Benjamin Campbell, May 12, 2019; and Interview with Dr. Ed Peeples, June 24, 2019, recently deceased professor and longtime activist.

55.  "A City Revival?" *Newsweek*, January 15, 1979, 28; and "Pittsburgh 'Renaissance' Meets Modern Resistance: 30-Year Changes in Society Landmark Designation Moved Court Opinion Displayed One Veteran Remains Pushing Is Harder Now Delays Termed Murderous," *The New York Times*, June 13, 1980, A12.

56.  "The Charleston Flap: Historic Heartache over a Convention Center," *The Washington Post*, March 3, 1979, B1; and "Urban Rebirth May Be Myth, Studies Show," *The Atlanta Constitution*, June 15, 1980, 1B.

57.  "U.S. Giving Cities $150 Million for Redevelopment Projects," *The Washington Post*, April 7, 1978, 1 and 4; and "Manking on the Inner City: Charlotte, N.C., Renewal Is Bank's New Business," *The Washington Post*, April 29, 1978, E11.

58.  "Southwest Residents Seek Faster Metro Cleanup at Waterside Mall," *The Washington Post*, May 12, 1977, DC1; "Study Says Old Cities Continue to Decline Despite Rejuvenation," *The New York Times*, July 7, 1980, A1; "Revitalization' Held to Be Spotty: Revitalization Spotty," The *New York Times*, June 1, 1980, R1; and "Neighborhood Movement Seeking Clout, Strategy," *The Washington Post*, June 24, 1978, E25.

59.  "A Dim View of Convention Centers," *The Washington Post*, October 21, 1978; and "A Towering Rise in Downtown Construction," *Business Week Magazine*, March 5, 1979, Clippings found in Downtown Development Unlimited General and Correspondences, 1979, Box 1:18 M281 (A. J. Brent Papers).

60.  A. J. Brent to Honorable Henry L. Marsh, III, April 18, 1979, Downtown Development Unlimited General and Correspondences, 1979, Box 1:18 M281 (A. J. Brent Papers).

61.  A. J. Brent to Honorable Manuel Deese, January 11, 1979; and Memo to Members of the Executive Committee Downtown Development Unlimited, January 18, 1979, Downtown Development Unlimited General and Correspondences, 1979, Box 1:18 M281 (A. J. Brent Papers).

62.  "Marriott Opening Was Quite a Bash," *The Atlanta Constitution*, February 19, 1981, 6 F; and "New Marriott Seeking to Blend Convention Trade, Island Grace," *The Atlanta Constitution*, August 9, 1981, 4G.

63.  General Population Characteristics for the 1980 U.S. Census, Vol. 1 Part 48, Virginia PC80-1-B48, August 1982, https://www2.census.gov/prod2/decennial/documents/1980/1980censusofpopu80148 uns_bw.pdf.

64. "New Hotel in NYC Has Unusual Site," *The Atlanta Constitution*, July 19, 1981, 8G.

65. "Richmond Hotel Owners Returning Federal Grant," *The Washington Post*, August 22, 1981, E26; "The Great Quest for Hotel Guests," *The New York Times*, April 28, 1985, SM28; "Major Portion of Mayflower Project Done," *The Washington Post*, November 1, 1982, WB13; "Renovation Planned to Restore Former Glory of Imperial Hotel," *The Atlanta Constitution*, June 18, 1982, 1D; and Cowan, *A Nice Place to Visit*, 77-88.

66. Susan G. Mason and Kenneth P. Thomas, "Exploring Patterns of Tax Increment Financing Use and Structural Explanations in Missouri's Major Metropolitan Regions," *Cityscape* 20, no. 2 (2018): 209-13; and "L.A. has Okd $1 billion in tax incentives to developers since 2005. That assistance needs more scrutiny says," *The Los Angeles Times*, August 10, 2018, https://www.latimes.com/local/lanow/la-me-ln-hotel-subsidy-report-20180810-story.html.

67. "Green Light for Project One Given by State Supreme Court," *Richmond Times-Dispatch*, January 12, 1980; "City Council Sets First Bond Sales in over Two Years," *Richmond News Leader*, March 4, 1980 (Valentine Museum Press Clippings); Memorandum for Mr. Brent from Lee F. Davis, Jr., July 28, 1980, Downtown Development Unlimited: General and Correspondences, 1980; and Memorandum for File from Lee F. Davis, Jr., Downtown Development Unlimited Project One Hotel, March 1, 1982, Downtown Development Unlimited: General and Correspondences, 1982 (A. J. Brent Papers).

68. "Marriott Hotels Come Home: Corporate and Labor Hoopla to Mark Marriott Hotel Opening in D.C.," *The Washington Post*, March 9, 1981, WB1; and Memorandum for File from Lee F. Davis, Jr., Downtown Development Unlimited Project One Hotel, March 1, 1982, Downtown Development Unlimited: General and Correspondences, 1982 (A. J. Brent Papers).

69. "Racial Tensions in Richmond," Richmond First Club Bulletin, February 26, 1981, Race Relations in Richmond, 1980-1984, Box 11, M240 (George Stevenson Kemp Papers).

70. Personal Memorandum to Mr. Brent, November 10, 1978; Press Release Project One, January 26, 1979; A. J. Brent to Honorable Henry L. Marsh, III, April 18, 1979; and Memo to Members of the Executive Committee Downtown Development Unlimited, January 18, 1979, Downtown Development Unlimited General and Correspondences, 1979, Box 1:18 M281 (A. J. Brent Papers).

71. "Richmond Project May Heal Black-White Rift," *The New York Times*, October 24, 1982, 25. The Richmond City Council held nine members including the mayor. At this time, there were five black and four white councilmembers.

72. Interview with Dr. John Moeser, March 11, 2019, longtime academic, professor, and activist; Tensions in the Richmond Community, August 1980, Tensions in the Richmond Community, Drafts, Questionnaires, 1980-1981, Box 1 and 16, M258 (*Richmond Urban Institute Papers*); and Interview with Reverend Benjamin Campbell, March 12, 2019.

73. "Market May Boost Richmond Harmony," *The Washington Post*, July 6, 1985, F3.

74. Organizational History of the Richmond Renaissance, Inc., Sixth Street Marketplace Project, undated, A New Cooperative Spirit, Notes and Revisions, Box 21, M293 (Clarence L. Townes, Jr., Papers, Virginia Commonwealth University Special Collections, Richmond, Virginia).

75. Interview with Reverend Benjamin Campbell, March 12, 2019; and Interview with Dr. John Moeser, March 11, 2019. The hiring of full-time assistants and occupying offices was controversial because it signaled that the council would be an activist agency. White councilmembers never occupied offices or hired assistants because they assumed the city council to be a part-time job where important decisions were made by wealthy businessmen before entering City Hall.

76. "U.S. Backs Richmond Ward Setup: U.S. Rejects Challenge to Richmond Districts," *The Washington Post*, September 1, 1981, C1.

77. Tensions in the Richmond Community, August 1980, Tensions in the Richmond Community, Drafts, Questionnaires, 1980-1981, Box 1 and 16, M258 (Richmond Urban Institute Papers).

78. Interview with Reverend Benjamin Campbell, March 12, 2019; and Julian Maxwell Hayter, *The Dream Is Lost: Voting Rights and the Politics of Race in Richmond, Virginia* (University of Kentucky Press, 2017), 170-4.

79. "Richmond Project May Heal Black-White Rift," *The New York Times*, October 24, 1982, 25.

80. "U.S. Backs Richmond Ward Setup: U.S. Rejects Challenge to Richmond Districts," *The Washington Post*, September 1, 1981, C1.

81. "Virginia National Plans New Hotel for Richmond," *The Washington Post*, July 27, 1981, WB9; and Honorable Henry L. Marsh, III to James C. Barstow, reprinted in the *Richmond Times-Dispatch*, August 1, 1981, 1.
82. "Marsh Fears New Hotel Is Peril to Project One," *Richmond Times-Dispatch*, August 1, 1981, 1.
83. "Richmond Settles Suit Blocking Hilton Hotel Project," *The Washington Post*, June 6, 1983, WB22.
84. "Efforts to Build Richmond Hilton Set Back in Court," *The Washington Post*, January 18, 1982, 5.
85. "Richmond Project May Heal Black-White Rift," *The New York Times*, October 24, 1982, 25.
86. "Marsh Drops Developer of Hotel for Project I," *Richmond News Leader*, August 26, 1981; and Resolution 81-R132-125, November 9, 1981 (Minutes of The City Council of The City of Richmond, Virginia, October 8, 1979 to June 3, 1982, City Hall Archives, Richmond, Virginia), 452.
87. Meeting Notes of the Richmond Black and White Club, February 18, 1981, Richmond Urban Forum, 1981-1982, Box 37, M302 (Mary Tyler Cheek McClenahan Papers, Virginia Commonwealth University, Richmond, Virginia).
88. Undated and Untitled Meeting Notes of the Richmond Black and White Club, February 18, 1981, Richmond Urban Forum, 1981-1982, Box 37, M302, Mary Tyler Cheek McClenahan Papers.
89. Ibid; and "Sleepy Richmond Wakes Up, and Now Struggles to Adjust," *Wall Street Journal*, December 22, 1981, 23.
90. Forum Committee Meeting, April 2, 1981; Suggested Names for Forum Members, undated; T. S. Ellis, III, to Benjamin Campbell, April 23, 1981; Meeting of Richmond Urban Forum, May 14, 1981; and Edgar J. Diermeier to A. C. Epps, June 26, 1981, Richmond Urban Forum, 1981-1982, Box 37, M302 (McClenahan Papers).
91. Untitled and Unauthored Letter to Rob Corcoran, November 26, 1984, Richmond 1977-1991, File Cabinet #1 (Initiatives of Change Archives).
92. Additions to Forum Dinner List, undated, Richmond Urban Forum, 1982-1983, Box 37, M302 (McClenahan Papers).
93. Office of the City Manager to Mr. Clarence Townes, September 25, 1981, Richmond Renaissance: Capital City Government Commission, 1981, Box 16; Richmond Renaissance Organizational History, Folder entitled "A New Cooperative Spirit," Box 21, M283 (Clarence Townes Papers); "The Renaissance Story," Richmond Renaissance Festival Marketplace, undated brochure, HT, 168. R5 R55 1900z (Virginia Museum of History and Culture); and Interview with Bill Martin, July 23, 2019.
94. "Townes Gets New GOP Post, Gives Formula," *Richmond Afro-American*, March 5, 1966, 1; "Proud to Be Black," Editorial in the *Richmond Afro-American*, March 12, 1966, 8; and "There's Good News," *Richmond Afro-American*, October 19-23, 1976, 3.
95. "Memorial Thomas Justin Moore Jr. '46," Princeton Alumni Weekly, Undated, https://paw.princeton.edu/memorial/thomas-justin-moore-jr-%E2%80%9946; and "T. Justin Moore, Jr., 74, ExChief of the Virginia Power Company," *The New York Times*, May 3, 1999, https://www.nytimes.com/1999/05/03/business/t-justin-moore-jr-74-ex-chief-of-the-virginia-power-company.html.
96. T. Justin Moore to Clarence L. Townes, March 19, 1982; Honorable Henry L. Marsh III, Mayor of Richmond, Virginia, Draft of Speech, April 14, 1982; and "Issues Involved in Establishment of 'Renaissance': A Public Private Partnership," Richmond Renaissance, Inc., Correspondences, Notes, Misc., March to April 1982, Box 17, M283 (Clarence Townes Papers).
97. Remarks of T. Justin Moore, Jr., Chairman of the Board, Virginia Electric and Power Company Before The Richmond First Club, April 8, 1982; and Mayor Henry Marsh, III, to T. Justin Moore, April 9, 1982, Richmond Renaissance Correspondences, Notes, and Misc., March-April of 1982, Box 17, M283 (Clarence Townes Papers).
98. Gillette, *Civitas by Design*, 78-84.
99. Ibid, 80-90; and "Richmond Conference for Unity in Diversity," *New World News*, December 22, 1984, Richmond 1977-1991, File Cabinet #1 (Initiatives of Change Archives).
100. Richmond Renaissance Newsletter to Potential Tenants, April 11, 1982, Richmond Renaissance Correspondences, Notes, and Misc., March-April of 1982, Box 17, M283 (Clarence Townes Papers).
101. "How James Rouse Shapes Cities," *The Christian Science Monitor*, August 31, 1984, 18; Joshua Olsen, *Better Places, Better Lives: A Biography of James Rouse* (Urban Land Institute, 2003); "James Rouse Sets Talk on Social Responsibility," *The Washington Post*, May 20, 1978, E19; "It's Hard for Wealthy to Aid Poor-Rouse," *The Washington Post*, June 3, 1978, E27; "Rouse in Business Hall of Fame," *The Washington Post*, March 16, 1981, WB30; "New Rouse Firm to Aid Low-Income

**JA0770**

Housing: Rouse Announces New Firm to Aid Low-Income Housing," *The Washington Post*, April 8, 1981, D7; and "Welcoming Waterfront," *The Washington Post*, July 5, 1980, B1.

102. "How James Rouse Shapes Cities," *The Christian Science Monitor*, August 31, 1984, 18; Governor Charles Robb to William B. Thalhiemer, Jr., and Philip H. Hawley, undated letter found in Richmond Renaissance Correspondences Memo from Moore to Deane and Townes regarding Jim Rouse's Ideas on Richmond Renaissance's Executive Director, 1982, Box 17, M283 (Clarence Townes Papers); and Kirsten Hoffman, "Waterfront Redevelopment as an Urban Revitalization Tool: Boston's Waterfront Redevelopment Plan," *Harvard Environmental Law Review*, 1999.

103. "Marketplace Bet Is $23 Million," *Richmond Times-Dispatch*, undated press-clipping found in (City Planning 6th Street Market File, Valentine Museum).

104. Southeastern Institute of Research, Inc., Market and Opinion Research, "City-Wide Survey of Attitudes and Opinions Regarding Downtown," May 31, 1983, Research Prepared for Richmond Renaissance, Richmond, Virginia.

105. "Jackson Ward," Paper Presented at the Liaison Committee of Richmond Renaissance, Box 16, M283 (Clarence Townes Papers); and Jackson Ward, Summary Tape File 3G, The Neighborhood Revitalization Division of the Department of Planning and Community Development, City of Richmond Neighborhood Statistics, November 1985, Box 5, M303 (Richmond Renaissance Papers). For more on crime and perceptions of crime in Jackson Ward, see Table 1, Reported Offenses: 1976-1980, Second Street Study Area Richmond, Virginia, 1980, Economic and Market Analysis, 1-10.

106. A Commercial Revitalization Plan for the Second Street Commercial Area, 3-7, 2nd Street Commercial Revitalization, 1981; and Economic and Market Analysis, 1-10; and A Commercial Revitalization Plan for the Second Street Commercial Area, 3-7, 2nd Street Commercial Revitalization, 1981, Box 4, M303 (Richmond Renaissance Papers).

107. Fraser, James C, and Edward L Kick. "Governing Urban Restructuring with City-Building Nonprofits," *Environment and Planning* A 46, no. 6 (June 1, 2014): 1445-61; J. R. Wolch, *The Shadow State: Government and Voluntary Sector in Transition* (Foundation Center, New York, 1990); Report to the Executive Committee, February through May of 1984; Richmond Renaissance Inc., Annual Meeting of the Board of Directors, September 12, 1983; and RR Inc., Annual Meeting of the Board of Directors, September 27, 1984, Richmond Renaissance: Board of Directors, Executive Committee Minutes and Agendas, 1984, Box 16, M283 (Clarence Townes Papers).

108. Clarence L. Townes to Laurie Naismith, June 25, 1982, Annual Meeting of the Board of Directors, September 12, 1983; and Richmond Renaissance Incorporate Minutes of the Executive Committee, January 21, 1983, Richmond Renaissance: Board of Directors, Executive Committee, Liaison Committee, Minutes and Agenda, 1983, Box 16 and 17, M283 (Clarence Townes Papers).

109. Diane P. Hayes, Third Street Project: Developing Our Own Feature, January 1982, 48, Third Street Project, 1982; A Revitalization Plan for the Second Street Business District Area, Richmond, Virginia, Prepared by Albert G. Dobbins, III, December 1983, Box 4, M303 (Richmond Renaissance Papers); and Richmond Renaissance Incorporate Minutes of the Executive Committee, January 21, 1983, Richmond Renaissance: Board of Directors, Executive Committee, Liaison Committee, Minutes and Agenda, 1983, Box 16 and 17, M283 (Clarence Townes Papers).

110. Richmond Renaissance Inc., Annual Meeting of the Board of Directors, September 27, 1984; and Richmond Renaissance Minutes of the Executive Committee, April 20 and May 4, 1984, Box 16, M283 (Clarence Townes Papers).

111. Connolly, *World More Concrete*.

112. "New Side Design Gets Mixed Reviews," *Richmond News Leader*, June 19, 1984; and "Redesign Settles Dispute over Marketplace Access," *Richmond News Leader*, July 31, 1984 (Valentine Museum Press Clippings); Manuel Deese, City Manager of the City of Richmond to Mr. T. Justin Moore, Jr., Chairman of the Board Richmond Renaissance, April 9, 1984; and Impacts on Black Community Interests, March 15, 1984, Box 10, M303 (Richmond Renaissance Papers).

113. "Old Confederate Capital Builds Racial Harmony," *The New York Times*, November 18, 1985, A16.

114. "The Development of Henrico: Growth into the 80's" *Richmond Surroundings Magazine* (Spring 1982); "The Development of a County: Chesterfield's Past Present, & Future," *Richmond Surroundings Magazine* (Fall 1982); and State of the City Report, Richmond, Virginia, Department of Community Development Division of Comprehensive Planning, 1989, found in Second Street Business District Revitalization, 1983, Box 4, M303, Richmond Renaissance Papers.

115. "Black Business in Richmond Get Major Piece of Downtown Rebuilding Action," *Minorities and Women in Business*, January-December 1985, Box 21, M283 (Clarence Townes Papers).

116. "A Tale of Two Marketplaces," *The Urban Reporter*, June 15-27, 1986, Box 21, M283 (Clarence Townes Papers).

117. Clarence L. Townes to Mr. Jeff Nowakowski, November 13, 1984, Media-Negative TV Reporting, 1984, Box 13, M303 (Richmond Renaissance Papers).

118. Interview with Reverend Dr. Benjamin Campbell, March 14, 2019; "The Development of Henrico: Growth into the 80's" *Richmond Surroundings Magazine* (Spring 1982); "The Development of a County: Chesterfield's Past Present, & Future," *Richmond Surroundings Magazine* (Fall 1982); and State of the City Report, Richmond, Virginia, Department of Community Development Division of Comprehensive Planning, 1989, found in Second Street Business District Revitalization, 1983, Box 4, M303 (Richmond Renaissance Papers).

119. Ronald Wilson, "Richmond's 6th Street Marketplace Assessment of a Failed Festival Market" (Master's thesis, Massachusetts Institute of Technology, September 1989), RR 6th Street Marketplace Assessment, September 1989, Box 37, M308 (McClenahan Papers); Thomas C. Boushall to Mr. Andrew J. Brent, May 4, 1981, Box 1:18, M281 (A. J. Brent Papers); Interview with Robert Corcoran, March 11, 2019; and Interview with Terry Drumheller, July 23, 2019, longtime resident and attorney.

120. Table 54, Age and Sex by Race and Hispanic Origin in Richmond City, in 1990 General Population Characteristics in Virginia, U.S. Census Bureau, p. 168; "Where's the Party—Tenth Anniversary of 6th Street Marketplace Goes Uncelebrated," *Richmond Times-Dispatch*, September 18, 1995, D16; and Dr. Eugene P. Trani, "Richmond at the Crossroads: The Greater Richmond Metropolitan Area and the Knowledge Based Technology Economy of the 21st Century," Report delivered at St. John's College, Cambridge, England, Easter Term, 1998 (Eugene P. Trani Papers, Virginia Commonwealth University, Richmond, Virginia); and Virginia Biotechnology Research Park Project Overview & Current Status, June 1993, Virginia Technology Research Park, 1992-1994, Box 108, M302 (McClenahan Papers).

121. "Council Endorses Downtown Hotel Project," *Richmond Times-Dispatch*, September 25, 2001; and "Remaking Downtown: Farewell to Marketplace," *Richmond Times-Dispatch*, September 26, 2001 (Valentine Museum Press Clippings).

122. "Marketplace Plan Saddens Tenants," *Richmond Times-Dispatch*, September 27, 2001; and "City Offers $30,000 to Stores: Hopes They Would Remain Downtown," *Richmond Times-Dispatch*, October 18, 2002 (Valentine Museum Press Clippings).

123. "Marketplace Plan Saddens Tenants," *Richmond Times-Dispatch*, September 27, 2001; and "City Offers $30,000 to Stores: Hopes They Would Remain Downtown," *Richmond Times-Dispatch*, October 18, 2002 (Valentine Museum Press Clippings).

124. QuickFacts for Henrico County, Virginia; Chesterfield County, Virginia; Richmond City, Virginia, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/henricocountyvirginia,chesterfiel dcountyvirginia,richmondcityvirginia/PST045219.

125. John T. Kneebone and Eugene P. Trani, *Fulfilling the Promise: Virginia Commonwealth University and the City of Richmond, 1968-2009* (Charlottesville, VA: University of Virginia Press, 2020), 133; "The New City Dwellers," *Richmond Times-Dispatch*, February 22, 1981, H1 and H9; "Gentrification Exacts Toll, Speaker Says," *Richmond Times-Dispatch*, September 25, 1986, C14; "Clay Street Projects Splits City Planners," *Richmond Times-Dispatch*, June 4, 1985, B1 and B3; "Group Success Rate Is Study in Contrasts," *Richmond Times-Dispatch*, May 13, 1986, A1 and A7; "Marketplace Is Ripple Effect Is Regard as Slights So Far," *Richmond Times-Dispatch*, June 29, 1986, G1 and G5; Preddy D. Ray, Task Force for Historic Preservation and Minority Taskforce, Editorial to the *Richmond Times-Dispatch*, January 23, 1984, 10; and "Battle of Historic Status Turns Racial in Richmond," *The Washington Post*, October 22, 1990, D5.

126. Unpacking the Census, PowerPoint Presentation Part 3, 2010 (https://www.slideshare.net/jzur/unpacking-the2010-census-part-3?next_slideshow=1)

127. "How Can We Best Meet RVA's Needs?," *Richmond Times-Dispatch*, April 7, 2019, E-1 and E-3.

128. Unpacking the Census PowerPoint Presentation, 2010 (https://www.slideshare.net/jzur/unpacking-the-2010-census-part-1); "Poverty in Richmond, How Long Must We Wait," *Richmond Times-Dispatch*, July 1, 2012 (https://www.richmond.com/news/article_11888344-dc1f-59b1-941a-5f5959ec007d.html); Unpacking the Census 5 Years Later, 2016 (https://pdfs.semanticscholar.org/e361/b559ac4e-b7ae0e6882eacb76d253175f9df2.pdf); and Monument Avenue Commission New Monuments Working Group Meeting Notes, August 2, 2017 (Monument Avenue Commission Collection).

129. Ibid; Michael Rao, "Navy Hill Would Be Transformative for All," Editorial to the *Richmond Times-Dispatch*, January 7, 2019, A7; and Jack Berry, "Navy Hill Proposal Many Possibilities to City," Editorial to the *Richmond Times-Dispatch*, April 8, 2019, A8.

130. Ordinance of the City Council of Richmond, Virginia, No. 2018-297, December 17, 2018 (Richmond City Hall Legistar Database); and "Who Is Behind the Coliseum Proposal," *Richmond Times-Dispatch*, June 27, 2019, A1 and A4.

131. The known entities supporting this venture are Lighthouse Labs, Startup Virginia, Biotech Park, Dominion Energy, Altria Group Inc., the Virginia Division of Consolidated Laboratory Services, United Network for Organ Sharing, and companies as far west as Los Angeles are also invested in the project.

132. Eliminated Positions and Displaced Employees Who Required Notice, Minutes of the Richmond School Board, January 3, 1989-June 26, 1990, 26-7; and Interview with Sherman Curl, longtime administrator in Richmond Public Schools, December 20, 2019. For more information regarding the drastic cuts to public school spending since the busing failures of the early 1970s, see the bound Minutes of the Richmond School Board, 1980-2000 (Richmond Public School Archives, Richmond City Hall, 8th Floor, Richmond, Virginia).

133. Michale Dickenson, "Fix Schools, Clean Up City, then Talk About Area," Editorial to the *Richmond Times-Dispatch*, August 12, 2019, A6; and Michael Paul Williams, "Navy Hill?: The River Is Downtown's Best Plan," Editorial to the *Richmond Times-Dispatch*, August 17, 2019, A9.

134. "Who Is Behind the Coliseum Proposal," *Richmond Times-Dispatch*, June 27, 2019, A1 and A4; and "Coliseum Proposal in Hand, Council Eager to Start Review," *Richmond Times-Dispatch*, August 6, 2019, A1.

135. Ordinance of the City Council of Richmond, Virginia, No. 2018-297, April 23, 2019; Ordinance of the City Council of Richmond, Virginia, No. 2019-212, September 14, 2019; Resolution of the City Council of Richmond, Virginia, No. 2019-R047, September 9, 2019; Resolution of the City Council of Richmond, Virginia, No. 2019-R047, September 9, 2019 (RVA Legistar); "Richmond City Council Names Leaders of Panel to Review Coliseum Plan," *Richmond Times-Dispatch*, July 24, 2019, A4; and "Goldman Appeals Registrar's Decision on Referendum Bill," *Richmond Times-Dispatch*, August 31, 2019, A1 and A5.

136. "Richmond City Council to Hold Second Special Meeting on Area Referendum," *Richmond Times-Dispatch*, August 14, 2019, A2.

137. Ad for the Navy Hill Project, found in the *Richmond Times-Dispatch*, August 5, 2019, A3; and Pamela Stallsmith and Robin Beres, "Downtown Redevelopment: Time for Review," Editorial to the *Richmond Times-Dispatch*, August 2, 2019, A8.

138. "How Can We Best Meet RVA's Needs?," *Richmond Times-Dispatch*, April 7, 2019, E-1 and E-3; Interview with Dr. Rutledge Dennis, former Virginia Commonwealth University professor and long-time Richmond resident, July 26, 2019; Interview with Sherman Curl, longtime administrator in Richmond Public Schools, December 20, 2019; 39 Interview with Reverend Dr. Benjamin Campbell, March 10, 2019; Interview with Sylvester Turner, March 13, 2019, longtime minister and black community activist; Interview with Dr. Edward Peeples, June 24, 2019; and Interview with Robert Corcoran, March 11, 2019, longtime community organizer.

139. Geoffrey Usher, "Navy Hill Development Would Help City Flourish," Editorial to the *Richmond Times-Dispatch*, August 14, 2019, A8; Michael Paul Williams, "Black Portland Is Learning from It's Tragic Past," *Richmond Times-Dispatch*, April 7, 2019, E-1; and "Navy Hill Progress Check," *Richmond Magazine*, November 8, 2019, 1.

## Author Biography

**Marvin T. Chiles** is an assistant professor of African American History at Old Dominion University in Norfolk, Virginia. His current research focuses on racial reconciliation in the modern South, with specific emphasis on Richmond, Virginia, from the *Brown v. Board of Education* decision to the present. To date, he has published peer-reviewed articles in the *Journal of African American History* and *Spectrum: Journal on Black Men*. He also has articles that will debut in the *Virginia Magazine of History and Biography* and *Spectrum* in 2021. This essay is but one of the revised dissertation chapters that has been prepared for academic journals. The dissertation, in its entirety, is being revised into a manuscript for a university press.

**James Madison University**
## JMU Scholarly Commons

Masters Theses                                                         The Graduate School

Spring 2016

# Richmond's urban crisis: Racial transition during the Civil Rights Era, 1960-1977

Marvin T. Chiles
*James Madison University*

Follow this and additional works at: https://commons.lib.jmu.edu/master201019

 Part of the Political History Commons, and the United States History Commons

Recommended Citation
Chiles, Marvin T., "Richmond's urban crisis: Racial transition during the Civil Rights Era, 1960-1977" (2016). *Masters Theses*. 122.
https://commons.lib.jmu.edu/master201019/122

This Thesis is brought to you for free and open access by the The Graduate School at JMU Scholarly Commons. It has been accepted for inclusion in Masters Theses by an authorized administrator of JMU Scholarly Commons. For more information, please contact dc_admin@jmu.edu.

Richmond's Urban Crisis: Racial Transition during the Civil Rights Era

1960-1977

M.T. Chiles


A thesis submitted to the Graduate Faculty of

JAMES MADISON UNIVERSITY

In

Partial Fulfillment of the Requirements

for the degree of

Master of Arts


American History


May 2016

---

FACULTY COMMITTEE:

Committee Chair: Dr. Steven Reich

Committee Members/ Readers:

Dr. Evan Friss

Dr. Lamont King

Dr. Steven Guerrier


**JA0775**

## Acknowledgments

In no particular order, I give thanks to my entire Thesis Committee, as well as my Graduate Advisor. While serving as my Thesis Director, mentor, and friend, Dr. Steven Reich continuously challenged my analytical thinking by helping me make historical connections that my sources illuminated, but my narrow focus ignored. It is under his tutelage that my thesis transformed from a collection of facts into an analytical work with historical value. As for Dr. Evan Friss, our personal interactions helped me understand what it means to be a historian. Historians are critically thinking storytellers who give meaning to the world once removed. No one understands this dynamic better than Dr. Friss. Dr. Steven Guerrier's contribution to this work is much appreciated because he not only supported my topic choice, but he reassured me that a compelling story could explain how majority white cities turned black. Last, but certainly not least, Dr. P. David Dillard was the anchor that kept my ship afloat from day one. My first semester not only convinced me that I did not deserve admission into James Madison University, but that a masters thesis was far removed from my intellectual capabilities. While I gave up on myself, Dr. Dillard never gave up on me. His words of encouragement helped me grow into the thinker I am today. This thesis is a result of the last two years of encouragement and belief Dr. Dillard invested into me as an M.A. Candidate and as a person. Without one of the four men listed above, I can honestly admit that this work would not have come to fruition.

ii

**JA0776**

# Table of Contents

Acknowledgments…………………………………………………………….......ii

Abstract……………………………………………………………………...iv

I.  Introduction………………………………………………………………1

II. Chapter I………………………………………………………………15

      Electoral Politics……………………………………………………16

      School Desegregation………………………………………………33

      Annexation Crisis……………………………………………….....43

      Conclusion………………………………………………………....53

III. Chapter II……………………………………………………………55

      Urban Redevelopment………………………………………………55

      1968 Election………………………………………………………61

      1969 Annexation……………………………………………………66

      1970 Election………………………………………………………74

      Busing…………………………………………………………….....78

      Conclusion……………………………………………............86

IV. Chapter III……………………………………………………………88

      Bradley……………………………………………………….....89

      Holt…………………………………………..............98

      Conclusion…………………………………………..........109

Epilogue………………………………………………………………...111

Bibliography…………………………………………………………121

**JA0777**

# Abstract

Between 1960 and 1977, Richmond, Virginia, experienced a tremendous racial shift in its overall population. The shift from majority white to majority black brought about the city's first black majority city council, black mayor, and majority black school district with a black superintendent. How and why this racial transition happened is the focus of this work. Richmond's racial transition was a part of Civil Rights legislation destabilizing the sociopolitical landscape. As federal Civil Rights legislation was intended to create a post-racial America, in Richmond, blacks and whites ensured the opposite. Both races combined class interest, past racial norms, and future racial aspirations to recreate a Richmond that suited their interest. This complicated political, racial, and class-centered drama broke a perceived racial solidarity and created interracial political agents that would have never existed under Jim Crow. For example, working-class whites and blacks politically aligned against their racial elite's efforts to desegregate public school and annex suburban counties. Likewise, the same middle-class black elite who politically opposed affluent whites in the early 1960s supported affluent white desegregation and annexation efforts. In all, Richmond's urban crisis was a story encompassing how politics, race, class, and space cosmically shifted the racial dynamics of the former Confederate capital. As Richmond looked drastically different in 1977 than in 1960, Civil Rights Era racial, political, educational, and spatial changes best explain Richmond's racial transition.

**JA0778**

## Introduction

On the eve of the Civil Rights Movement, Richmond's white elite dominated the city council while maintaining segregated public schools. Yet, by 1977, the once capital of the Confederacy, became had a black majority city council, black mayor, and integrated public school system. This racial shift in the city's power structure was the culmination of several events that destabilized the urban political arena. Through urban elections, school desegregation, and annexation, Richmond transitioned out of Jim Crow Era and into the Civil Rights Era. As Jim Crow laws were removed by Civil Rights legislation, urban blacks exercised their political power through urban elections and school desegregation. While blacks garnered municipal control, through internal class conflict, middle-class whites fled Richmond for the neighboring suburbs of Chesterfield and Henrico. Black political gains and white flight slowly removed white elites from municipal power. So, affluent whites combatted urban blacks and suburban whites with annexation, hoping to maintain their political control over Richmond. While race appeared to be the cause of Richmond's urban crisis, it was because of various political agendas that class centered racial groups all vied for political power during the Civil Rights Era.

In this thesis, I explore how the Civil Rights Era did not inspire a post-racial Richmond; rather, Civil Rights legislation, annexation, school desegregation, and destabilized urban politics and caused Richmond's political power to shift from affluent whites to black professionals. Before 1960, Richmond was a majority white segregated city. Residentially, whites dominated three of the city's four corridors: Northside, Southside, and West End. Blacks primarily lived in the city's core and East End. Jim Crow Era white elites used their racial majority to control the channels of municipal power by creating white privilege while simultaneously disenfranchising black political and

educational development. After the removal of Jim Crow laws, various white and black political groups vied for control of the city. After 1960, the apparent white-black dichotomy diversified into four major groups, all looking to recreate Richmond in their own image. Civil Rights Era Richmond was unique because it allowed self-serving class-centered groups to make alliances, sometimes across racial lines, to control the city that Civil Rights created in the Confederate capital.

There were two racial divides and four social classes that sought to control Civil Rights Era Richmond. Richmond's two biggest racial castes were whites and blacks. Although mixed-race people, Jews, and Asians lived within the city, this is a story about the sociopolitical conflict between Richmond's largest racial groups. Therefore, the black-white dichotomy resonates throughout my analysis. As for social classes, each race had upper-class, middle-class, and working-class poor. The class monoliths I use for white Richmonders are the wealthy and middle-class. Although poor whites were politically active, they were not as instrumental in white efforts to deter black political gains. The black professional class and working class politically defined black Richmond. Despite being labeled middle-class, black professionals were their race's elite. Therefore, terms like black middle-class or middle class blacks refers to Richmond's black elite.

Primary sources opened my analysis to the nuances of Civil Rights Richmond. My two primary source categories were the "official" and the "unofficial" record. Official records, which consisted of newspapers, official correspondences, and federal court cases, retold the story from an archival perspective. Racial breakdowns in archival sources, through the repeated use of words like *Negro* and *white*, led me to believe that race dominated the story. Although race rose to the surface of the official record, the events, as

well as the ways they unfolded with strange interracial political alliances, convinced me that the former Confederate capital's Civil Rights history could not be explained exclusively in terms of racially motivated white economic, political, and residential flight.

The unofficial record addressed my suspicions about the complexity surrounding Civil Rights Era Richmond. The unofficial record consisted of multiple face-to-face conversations with black and white Richmonders who declined to be formally interviewed, as well as seven oral histories. The interviewees, either lived in Richmond during the seventeen years that framed this study, or knew important figures intimately enough to provide context for their past actions. Not one interviewee adhered to the monolithic concept of black and white. Instead, they referred to class differences between the races by where they lived within the city. After cross examining personal letters from citizens and city officials with my oral histories, it became clear that race was the outward appearance of what was a class-centered racial conflict between different factions vying for political control of a destabilized Richmond. Overall, the primary sources introduced how seemingly simplified racial conflicts were complicated political struggles for supremacy during the death of Jim Crow.

Four secondary works examined Civil Rights Era Richmond. Robert Pratt's *The Color of Their Skin: Education and Race in Richmond, Virginia, 1954-89* racially examined Richmond after the *Brown* decision. It was Richmond's Jim Crow society, according to Pratt, that brought about "a shameful legacy" of token school integration in 1960 and re-segregation by 1977. Christopher Silver and John V. Moeser's *The Separate City: Black Communities in the Urban South, 1940-1968* discussed how white elites used Jim Crow laws to create racial segregation that was physically, politically, and socially evident. It was this almost 100-year tradition of physical, economic, and politically racial separation that created a Civil Rights Era racial battle over municipal power. Christopher Silver's *Twentieth-Century Richmond: Planning Politics' and Race* used spatial analysis to uncover Richmond's long history of structural racism. Urban planning was nothing short of elite white attempts to maintain control over Richmond's changing racial dynamics by limiting black residential and economic mobility. John V. Moeser and Rutledge M. Dennis's *The Politics of Annexation: Oligarchic Power in a Southern City* analyzed how Richmond's annexation drama exposed how race and space became ground zero for urban and suburban white political conflict. Through state and federal intervention, urban and suburban whites brokered a land deal that suited both interests. Although these four works defined Civil Rights Era Richmond as a racial conflict, my thesis will explain why race alone limits the understanding of this era. Although whites and blacks had racial division, class interest and political uncertainty combined with race to define Civil Rights Era Richmond by its revolutionary shift from majority white to majority black.[1]

---

[1] Robert A. Pratt, *The Color Of Their Skin: Education And Race In Richmond, Virginia, 1954-89* (Charlottesville: University Press of Virginia, 1992), 5-15; Christopher Silver and John V. Moeser, *The Separate City: Black Communities In The Urban South, 1940-1968* (Lexington, Ky: University Press of Kentucky, 1995), 32; John V. Moeser and Rutledge M. Dennis, *The Politics Of Annexation: Oligarchic*

My thesis examines Richmond through a lens each of the four secondary works did not. While Pratt, Silver, Dennis, and Moeser separated school desegregation, councilmanic politics, and annexation, I combine the three to cultivate a better understanding of Civil Rights Era Richmond. One cannot fully assess the revolutionary impact of Civil Rights Era Richmond without studying school desegregation, urban politics, and annexation together. Each of the three issues intimately connected in ways that were not understood by Pratt, Silver, Dennis, and Moeser. The racial migration, political discourse, and social conflict that defined Civil Rights Era Richmond were caused by the complex social climate school desegregation, urban politics, and annexation created simultaneously. Separating the three categories hides the nuanced sociopolitical tension Richmond residents and power brokers engaged in between 1960 and 1977. Furthermore, this thesis is but a step into using these three categories to understand how the former Confederate capital experienced its first ever municipal power shift from white to black in just seventeen years.

Post-World War II urban crises have been linked to economic decline, racist agendas, and suburban class consciousness. Civil Rights Richmond fits within post-World War II urban historiography, more specifically, the distinctiveness of the non-northern urban centers. The three most influential works dealing with post-World War II non-northern urban centers were done by Robert Self, Kevin Kruse, and Matthew Lassiter. Each historian used different lenses to examine the complex social realities of postwar America. Economically, post-war urban racial shifts resulted from deindustrialization and economic flight to the suburbs. Racially, post-war white flight covertly reinstituted Jim Crow-style segregation. From a class perspective, post-war society cultivated a new white collar

---

*Power In A Southern City* (Cambridge, MA: Schenkman Pub. Co., 1982), 17; and Virginius Dabney, *Richmond: The Story Of A City* (Charlottesville: University Press of Virginia, 1990), 105.

middle-class class, who opposed overt racism and radical integrationalist policies. Nevertheless, all three interpretations uniquely tied class, race, and economics into an overall understanding of how the suburban-urban dichotomy facilitated post-war urban race relations.

Robert Self understood post-World War II urban crises as the result of economic decline. In *American Babylon: Race and the Struggle for Post-War Oakland*, Robert Self tied the origins of black grassroots politics to industrial flight from inner cities. Many high salaried middle-class white industrial and white collar workers followed economic flight to the suburbs. Industrial flight was economically driven, yet it had racist overtones. This mass migration was known as white flight because of the disproportionate amount of whites who were able to relocate to the suburbs when blacks were not economically able to do so. The Federal Housing Authority did not insure private mortgages to many well-qualified blacks, leaving them in poverty-stricken inner-city neighborhoods. Despite the racist actions of the FHA, Self argued that white flight was the product of homeownership's lure on middle-class whites, not a need to re-segregate from urban blacks. Educational and workplace discrimination created the white middle class, making middle-class suburban flight appear racially motivated.[2]

The allocation of resources heightened the racially charged climate between urban blacks and the newly suburban white middle class. Self identified that black grassroots politics gained traction when urban tax revenue was redistributed to suburban business interest. New highways, property tax breaks and suburban land development resulted from urban blacks having little-to-no influence over the use of public funds. This prevented

---

[2] Robert O. Self, *American Babylon: Race And The Struggle For Postwar Oakland* (Princeton, N.J. Princeton University Press, 2003).

blacks from obtaining high-paying municipal jobs and receiving quality public services such as transportation, welfare, and public schooling.[3]

Kevin M. Kruse described post-World War II urban crises as the byproduct of racist whites seeking protection from the Civil Rights movement. Kruse's *White Flight: Atlanta and the Making of Modern Conservatism* illuminated that white flight, consumer rights platforms, and economic relocation systematically reinstituted Jim Crow Era white supremacy in Atlanta. White capitalists and city planners put their disdain into action by using social class, space, and municipal politics to create geographic separation from liberal minded blacks wishing to use Civil Rights legislation to establish municipal control over their built environment. Because white Atlantans resisted Civil Rights change, they challenged federal authority by creating "modern conservatism." This conservatism protected their race-centered agendas under the guise of economic rights. These economic rights allowed whites to separate from integration through financial exclusion. Instead of integrating public schools, for example, white Atlantans would relocate to newly developed areas where housing markets prevented most blacks from infiltrating. Since Jim Crow laws legislated blacks to poverty, modern conservatives reinstituted Jim Crow by setting financial limitations on newly enfranchised black Atlantans.[4]

In Kruse's Atlanta, white racial solidarity was shattered when one social faction secured enough political currency to avoid federal Civil Rights legislation. The white working class, who supported Jim Crow Era white supremacy in the workplace, public schools, and civil society, were betrayed by their elites who used housing markets,

---

[3] Self, *American Babylon,* 136.
[4] Kevin Michael Kruse, *White Flight: Atlanta And The Making Of Modern Conservatism* (Princeton, N.J: Princeton University Press, 2005).

preparatory schools, and zoning ordinances to separate from federal integration policies. As blacks filled the urban arena, Jim Crow policies and procedures waned, forcing whites who could not relocate to deal with integration by sharing municipal power and resources with black residents. Kruse's political and racial analysis lacked perspective on one of the most important municipal services white and black Atlantans had to share: public education. Matthew Lassiter came along three years later and used class to analyze Atlanta's racial strife over public education.[5]

Matthew Lassiter described post-World War II urban crises as class-centered movements resulting from the deindustrialized economy creating middle-class, white racial innocence. *The Silent Majority: Suburban Politics in the Sunbelt South* distanced the field from Kruse's racial view of the post-war urban South. Rather, Lassiter used school desegregation to highlight how the white-collar economy created the "silent majority;" or moderate whites who used suburbia to escape the economic and racial problems of the inner city. To Lassiter, the silent majority chose the middle ground between black activists and racist white elites. The middle ground correlated with their position in the emerging deindustrialized white-collar economy. Middle-class whites were not blue collar workers; neither were they corporate elites. They were their own separate social class who wished to keep their economic and social rights at the expense of the blacks that the New Deal liberalism forgot. White middle-class economic development created a class identity that required a matching political platform. This economic and identifiably white social class

---

[5] Kruse, *White Flight,* 8.

resisted the radicalism of liberal reformers and staunch racism from conservatives, as both threatened the stability of the white, middle-class silent majority.[6]

Middle-class moderates believed in both economic segregation and racial integration. Although Lassiter alluded to this position being disingenuous, suburban whites wished to see the end of racial segregation. Instead, they believed economics should have been the standard to achieve the liberal policies of integration. This position ignored that structural racism prevented many blacks from ever becoming middle class. Nevertheless, school desegregation violated the economic protection that they believed was colorblind. However, moderates disapproved of legalized racial segregation. The overt racism of the past pushed them to the center, as many suburbanites were New Deal liberals who disagreed with conservative opposition to liberal economic policies that created middle-class suburbia. Middle-class whites believed economics to be the determining factor in social policy, not extremism on both sides of the aisle.[7]

My thesis contributes to post-World War II urban historiography because it illuminates how both race and class created the urban crisis in Richmond, Virginia. While economics played a pivotal role in the federal court proceedings that facilitated the urban crisis, ultimately, race and class conflict dominated the racial shift. Similar to Kruse's Atlanta, white oligarchs used space and politics to maintain their Jim Crow-style racial order over Richmond. Similar to Lassiter's Charlotte, class consciousness divided segregation era elites and suburban moderates over how the post-war urban political arena should operate. However, Richmond's race and class structures add complexity to Kruse

---

[6] Matthew D. Lassiter, *The Silent Majority: Suburban Politics In The Sunbelt South* (Princeton, N.J: Princeton University Press, 2006).
[7] Lassiter, *The Silent Majority,* 120.

and Lassiter's examples because whites and blacks were not united on racial or class interests. Rather, Richmond had four factions, segregation era white elites, black professionals, working-class blacks, and suburban whites, all vying to remake the post-Jim Crow Richmond according to their class interests. Civil Rights legislation forced each side to make allies with the other race out of convenience, refuting the narrative of urban politics having stanched racial division.

Chapter 1 focuses on the origins of Richmond's black political emergence between 1960 and 1966. In just six years, Richmond's public school system and population shifted from majority white to majority black, with three black councilmen serving at once. This shift resulted from two NAACP lawsuits against the Richmond City School Board and the mobilization of black voters in city council elections. The two school desegregation lawsuits forced city officials to begin integration in 1960. Political mobilization came from black professionals engaging working-class blacks into municipal politics. This created racial solidarity at the polls, as working-class blacks politically empower their professional leadership. Black voting power increased in stages. Black voters went from controling the political careers of white politicians to voting segregation-era black elites into office. In just four elections, black Richmonders quickly ascended from an underrepresented voting constituency to one of the most important voting constituencies in city elections.

Chapter 2, the Middle Years (1967-1970), details how white class division, and the changing nature of black politics, complicated Richmond's racial transition. By 1967, young energetic black politican Henry Marsh III used urban redevelopment to remove segregation era black leadership from power, all while heading black Richmond's liberal regime. As black politics reached new heights under Marsh, white politics experienced

class breakdowns. Urban and suburban whites disagreed on how to deal with black political advancement. Suburban whites wanted exclusion from Civil Rights Richmond, as they recreated racial segregation in surrounding counties. Since white flight and black politics loosened elite white political control, annexation surfaced as a central issue. Urban and suburban whites clashed because neither side wished to compromise its original position. Although a land deal was eventually brokered, annexation conflict weakened white racial solidarity. Disagreements over the minutia, political impact, and aftermath of the 1969 annexation set up two federal Civil Rights cases that captivated the city throughout the 1970s.

Both urban and suburban whites worked to create their differing visions of the metropolitan area. Councilmen Phil Bagley, James Wheat, and City Manager Alan Kiepper worked with suburban officials Irvin Horner, Frederick F. Dietsch, and Melvin Burnet to broker an annexation that served both parties' interests. The land deal maintained a white majority city council and urban population while furthering the geographic gap between the suburbs and the city. This deal not only created Civil Rights issues within urban voting, it sparked controversy within school desegregation. As federal forces, under Judge Robert Merhige, progressively desegregated city schools by 1970, suburbanites confronted the same Civil Rights education reform that white flight and municipal borders previously excluded them from.

Chapter 3 uses two landmark federal cases to complete this study. First, the aftermath of grassroots suburban resistance to busing and annexation inspired the *Bradley v. Richmond School Board* case. The goal was to place black professionals in charge of a fully integrated public school system. However, *Bradley* evolved into a complete

consolidation of urban and suburban public schools. This put middle-class blacks in opposition to suburban whites. Strange political alliances arose as urban whites and black elites favored consolidation. School consolidation allowed white elites to politically control suburbia while black elites controlled the public school system. Suburban white and working-class black opposition united them against the consolidation. Both sides had little to no interest in racially mixing their schools across municipal boundaries. In the end, suburban whites and working-class blacks victoriously prevented the school consolidation, but Richmond's public schools experienced full city-wide busing in 1974.

Second, the *Holt v City of Richmond, Virginia* case, exposed how class identity broke previously perceived racial solidarity. Working-class black leader Curtis Holt Sr., sued the city council for violating the Voting Rights Act of 1965 through the 1969 annexation. The Civil Rights movement caused dissent among black Richmonders over which class should control the city's power structure. To Holt, the annexation, which was supported by black professionals, prevented him and working-class blacks from infiltrating the city's power structure. Black elites and white elites partnered to bring about the demise of the *Holt* case. Stopping Holt removed federal attention from elite white efforts to control the city council. To black professionals, Holt was a tool of the working-class who overstepped his bounds by trying to usurp the politically powerful black elite.

The strange alliances did not stop with white and black elites siding against Curtis Holt. Holt received financial support from suburban white organizations like the Broad Rock Council of Civil Associations and lawyer Cabell Venable. Both suburbanites and Venable wished to de-annex the 44,000 white suburbanites back into the class-centered white suburbs of Chesterfield County. In the end, Richmond kept the annexed land, but the

case facilitated white flight. *Bradley* and *Holt* finished the racial transition started in 1960. Richmond's population, public school system, and municipal power structure shifted from white to black. The diversity of black political interest changed greatly, as the Civil Rights Era presented blacks with the political opportunity to break ranks with each other. However, what remained unchanged was that black elites retained control of black politics in Richmond, despite Holt's lawsuit being one of two major events to complete the white transition out of the city. As black elites gained control of the power structure, they became less responsive to the constituency that ignited their political ascendancy in 1960.

Today, Richmond residents' intertwine race and class because Civil Rights legislation did not remove race from Richmond's political fabric. Geographic titles or defined space carry race and class connotations, more now than they ever have throughout the Richmond metropolitan area. Growing up in Chesterfield County, I noticed how black and white suburban parents used race and class epitaphs to make sense of their racial uncertainties. Terms like *ghetto*, *urban*, *inner-city*, *unsafe*, and *sketchy* were used to classify urban spaces as black. When my friends and I heard these words from adults, we understood the race and class connotations they alluded to. If the area, such as Richmond city, was majority black, it was usually poor and unsafe; thus, it should be avoided by children of privilege.

Conversely, my parents conditioned me to never classify or be classified with majority black spaces, while always identifying with white identified space. In modern-day Richmond, both races understand black as poverty stricken, violent, and uneducated, while seeing white as wealthy, safe, and pleasant to be around. Ideas about race and class being intimately connected through defined space resulted from the Civil Rights

movement's failure to create a post-racial Richmond. Richmonders found new ways to express their deepest insecurities about racial differences. My thesis describes how the Richmond metropolitan area I grew up in during the 1990s and early 2000s, came directly from the racial uncertainties of the 1960s and 1970s. My childhood interaction with suburban race and class concepts was not abnormal, as my friends from college, who came from metropolitan areas throughout the South, shared with me their similar interactions with race and class being staunchly defined by space. Thus, our experiences should be studied, through Richmond's urban crisis, to understand how the connection between race, class, and space came about and is still prevalent in post-Civil Rights America.

## Chapter 1: 1960-1966

In the Civil Rights Era, the former Confederate capital experienced a cosmic racial shift in its power structure: city council and public schools. Starting with *Brown v. Board of Education of Topeka, Kansas* and ending with the Fair Housing Act of 1968, Civil Rights was not just a movement, but as Gavin Wright said, it was a revolution because it radically changed how Americans understood and dealt with the political implications of race. Although the Civil Rights legislation should have created a post-racial Richmond, whites and blacks ensured the opposite. As race transitioned from overtly codified to covert political currency, both whites and blacks continuously used racial politics to achieve their vision for Civil Rights Richmond. The three categories that best explain Civil Rights Era Richmond are electoral politics, school desegregation, and annexation attempts. Between 1960 and 1966, the city transitioned from a 68% white populated city, with an all-white city council and majority white public school system, to a 50/50 white-black population, three black city councilmen, and a majority black public school student population. This racial shift came at the helm of urban blacks using Civil Rights Era electoral advances and school desegregation to rebuild their political and educational landscape while whites saw Civil Rights changes as the means to either retain urban power or reinstitute racial separation via white flight.[8]

---

[8] Gavin Wright, *Sharing the Prize*: *The Economics of the Civil Rights Revolution in the American South* (Harvard University Press, 2013), 4; Benjamin Campbell, *Richmond's Unhealed History* (Brandylane Publishers, Inc, 2012), 159-169; and Peter K. Eisinger, *The Politics of Displacement: Racial and Ethnic Transition in Three American Cities*, (Academic Press, London, 1980), 5. I am defining Richmond's Civil Rights Era as the years between 1960 and 1977.

**Electoral Politics**

Why electoral politics and what does it tell us about Civil Rights Era Richmond? The racial shift in Richmond's city council campaigns illuminate, more than the administrations that were elected, the social impact of black electoral increases, as well as the class complexities that only post-Jim Crow America could expose. Pre-1960 elections centered on white voters electing prominent conservative white businessmen to the city council every two years. Post-1960 Richmond consisted of black voters helping elect blacks and liberal whites to the city council. This happened at the behest of middle and working-class blacks creating a new political landscape. However, this race-based partnership had limits, as Civil Rights change meant different things to both sides. As blacks carved their niche in electoral politics, professional and working-class black racial ties were tested by internal and external forces, culminating in black professionals changing their leadership methods to maintain their racialized voting bloc, which gave them political power.

Civil Rights changes in Richmond began, not with *Brown*, but with local electoral politics. The most evident aspect of Richmond's power shift was the city council elections between 1960 and 1966. Prior to 1960, affluent whites dominated the city council. Blacks had minimal impact on the city council as well as council elections. There had been only one post-Reconstruction black city councilman elected prior to 1960. This was in large part due to state-sponsored measures and the Byrd Machine keeping black voting below thirty percent. However, in 1960, this trend changed. As Virginia's Jim Crow Era conservative power structure was challenged by the liberal-minded Young Turks in the early 1960s, Richmond's white power structure came under attack as well. The black population and its

voter participation rose above thrity percent between 1960 and 1966, enabling blacks to use citywide voting to help elect three black councilmen, with one becoming the Vice Mayor.[9]

Racial solidarity, through urban redevelopment, politically mobilized black Richmond by 1960. The first issue was housing displacement. In 1955 and 1957, Richmond experienced physical redevelopment through the construction of the Richmond-Petersburg Turnpike and Interstate 95. These projects were purposefully and masterfully designed to displace over 30,000 citizens, transforming downtown Richmond into a major shopping district. Black homeowners made up 20,000 of the 30,000 displaced residents, most coming from Jackson Ward, Richmond's oldest and most prominent black neighborhood. There was a vacant valley located four blocks north of Jackson Ward that could have "better" supported the highway. However, the 1955 city council led by future Mayor Phil Bagley and the City Planning Commission built the interstate and turnpike through Jackson Ward. Despite opposition from the Carver Displacement League, headed by black Mortician Oliver P. Chiles, the construction was approved by the Richmond Redevelopment and Housing Authority. Since most blacks could not purchase new homes in the city's highly

---

[9] J. Harvey Wilkerson III, *Harry Byrd and the Changing Face of Virginia Politics* (University of Virginia Press, 1968), 20-61. Harry Byrd was a Winchester aristocrat who owned a majority of Virginia's media outlets, including the *Richmond News Leader*. Byrd used political ties called "The Byrd Machine," which was a collection of local, state, and national politicians, to maintain conservative white supremacist control over Virginia politics. His influence was felt more in Virginia's Southside and Valley regions, controlling who ran and won local, statewide, and national offices. However, as urban areas like Richmond gained more importance through economic expansion and federal investment, Byrd suppressed attempts to remove power from affluent whites within his circle. The Young Turks were college educated liberal politicians who challenged the conservative Byrd Machine for political supremacy in Virginia during the 1950s and 60s. Most were University of Virginia trained lawyers and politicians from the Richmond and Roanoke area. See Wilkerson 263-97, for more information on the statewide power struggle and how it resonated during Civil Rights Era Richmond.

racist and competitive real estate market, many became public housing residents in the city's East End corridor.

Segregation became an issue that united black Richmonders. Urban blacks were dissatisfied with white-owned downtown businesses charging similar prices for dissimilar services. This frustration resulted in the Thalhimer's Department store boycott from April until Christmas of 1960. To Virginia Union professor Dr. Raymond Pierre Hylton, the boycott was meant to economically and socially "send repercussions throughout the South." Black Richmonders were not as concerned with bankrupting downtown business, as they were about establishing "human dignity" in their changing environment. Residential displacement and segregation stripped blacks of their dignity because it perpetuated generational black disenfranchisement. Housing displacement and segregation not only inspired Richmond blacks to become politically active on the local level, it gave them a cause to politically mobilize around.[10]

The partnership between black religious and political leadership created the foundation for a political coalition between the professional and working classes. Although men like Dr. Hylton and the Thalhimers' boycott foot soldiers shared the same race, class separated them. Black electoral ascendancy came when blacks worked together across class boundaries; however, this was done by the only other commonality black

---

[10] Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, and Race* (Knoxville: University of Tennessee Press, 1984), 217-230; Curt Aurty, "Civil Rights Movement Hits Richmond Room at Thalhimers;" *World Now*, (February 22, 2010); and Zack Brown, "The Sit-In Effect." Mapping American History, Seminar at the University of Richmond. Silver charted the beginning of white flight to Chesterfield and Henrico Counties during the urban redevelopment late 1950's. Middle-class white residents were displaced in large numbers, as the council organized Richmond to fit industrial flight to Southern cities. Most of Jackson Ward was labeled a *slum* by the Richmond Redevelopment Housing Authority, thus it was fair game for redevelopment. John V. Moeser suggested that local banks refused to extend redevelopment loans to Jackson Ward residents. This led to exterior deterioration, giving city officials the ammunition to demolish it for Interstate 95, which is still there today.

Richmonders collectively shared: religion. Virginia Union professor William Thornton began the Richmond Civic Council in 1958 later renamed the Crusade for Voters in 1960. This voter organization operated under the leadership of lawyers, businessmen, academics, and doctors like George A. Pannell and Milton Randolph. The Crusade connected with the working-class majority through the Baptist Ministers Conference of Greater Richmond and Vicinity. The "black Baptist leadership," under Dr. Robert Taylor, worked side-by-side with the Crusade to electorally mobilize working-class black voters. For black Richmonders, the Baptist church was "dominant in the community." Any political agenda or leader who wished to capitalize on black numerical strength did so through the church. Organized funding through First Baptist Church, Fourth Baptist Church, Sixth Baptist Church, Baker PTA, and the Fairmount Teachers Club helped the Crusade pay voter registration fees. Collectively, the church cemented the bonds that class separated. Both sides did not necessarily like each other, however, in the face of racial discrimination, politicians and church leadership partnered to control the outlook of Civil Rights Richmond through city council elections. For professional blacks, this meant being political leaders, and for working-class blacks, this meant supporting black leadership in the face of urban redevelopment and economic inequality.[11]

The Crusade increased black electoral strength by changing the nature of black voting. Crusade leadership switched black voting from the single-shot method to a full-slate approach. Single-shot allowed voting organizations to allocate all its votes to just one candidate. This ensured the candidacy of one councilman while neglecting other

---

[11] *Crusade for Voters Papers*, list of "Individual Contributors" and "Contributors from Organizations;" "Open Letter" 1960-1961 *Richmond Crusade for Voters Archives*, M 306 Box 1, James Branch Cabell Library, Virginia Commonwealth University; and Interview with Reverend Benjamin Campbell, January 6, 2016.

candidates. Full-slate voting allowed the organization to nominate up to nine candidates at once. Utilizing the full-slate method gave the Crusade the best chance at controlling the overall outcome of the election. Instead of electing one councilman, the organization could elect as many councilmen as its voting numbers allowed. The full-slate approach showed that the Crusade was priming to impact all nine available seats, not just one.[12]

The Crusade's work did not go unnoticed by white politicians. By June of 1960, the Crusade registered over 14,000 black voters for the upcoming election. This was the most black voters Richmond had for a municipal election to date, not to mention it represented over half of the overall voting population. The Crusade's success in registering 14,000 black voters allowed them to issue all twenty-two white candidates a questionnaire about how each of them would serve the expanded black voting bloc. Normally, white candidates hesitated to solicit black support in fear of losing white voters. However, the Crusade's 14,000 voters could potentially swing the election in any candidate's favor. All but one candidate responded to the questionnaire by supporting open communication between the burgeoning black electorate and its councilmanic candidates. Biracial partnership over city affairs was to be "fairly and intelligently" split between the black

---

[12] *Richmond News Leader*, May 13, 1960; *Richmond Times Dispatch*, April 27, 1964; *Richmond African American*, June 11, 1960; and John V. Moeser and Rutledge B. Dennis, *The Politics of Annexation*: *Oligarchic Power in a Southern City* (Boston: Schenkman Publishing Co., 1982), 17. The city council consisted of nine members who were elected in an at-large format, serving a two-year term. The mayor was elected by the nine council members from amongst themselves. The pre-1948 city charter had ward-style council voting and a separate at-large mayoral election. I speculate the charter was changed for a few reasons. First being the election of black councilman Oliver Hill in 1948. Second, the city's black population grew every year after 1945. With ward-style voting, blacks could grow to control various urban wards and elect more black councilmen and even a black mayor. However, the black voting population never exceeded the white voting population because urban whites lived in the West End and Southside, two areas that were constantly expanding, while black communities were confined within redline downtown and East End real estate borders. Because of residential restrictions, red-lining, poll taxes and literacy test, blacks voting was minimized by at-large voting. Changing councilmanic elections to at-large voting, while maintaining a white voting majority that had no Jim Crow voting restrictions, allowed white Richmonders to control the city council elections. This white controlled council had the power to elect the mayor from amongst themselves, establishing what Moeser called an oligarchical white power structure over municipal politics.

community and the white city council, said one candidate. This open line of communication illuminated how the twilight of Jim Crow caused a shift in urban affairs. Black Richmonders removed whites from the center of local politics. Although it was not an even playing field, blacks had more electoral influence than ever before.[13]

The Crusade's 14,000 black voters impacted the outcome of the election. On June 14, 1960, Crusade voters helped elect seven candidates to the city council. With only 27, 853 Richmond voters, blacks comprised 50.2% of the overall electorate. This allowed black voters, for the first time since 1948, to make a significant impact in at-large urban elections. Black voter turnout was at an all-time high, as it coincided with a 20% Southern urban black voter increase since 1950. Black voter increase was more visible because more than 90,000 white citizens had fled to surrounding suburban counties between 1950 and 1960. From this moment on, white Richmonders would not have a monopoly on who ran city government. Again, Civil Rights Richmond did not begin with *Brown* in 1954, but it began in 1960 when blacks broke the white monopoly over city council elections.[14]

Crusade leaders were well aware of the social implications resulting from the recent election. Crusade president George A. Pannell mentioned, in an open letter, that electoral politics made black voters a "potent force" in Richmond's post-Jim Crow landscape. Increased black voter presence was not "a step in the direction of harmony," as Pannell

---

[13] *Richmond Times Dispatch*, April 27, 1964; Donna Cooper Hamilton and Charles Hamilton, *The Duel Agenda: Race and Social Welfare Policies of Civil Rights Organizations* (Columbia University Press), 1997; Virginius Dabney, *Richmond: The Story of a City* (Charlottesville: University Press of Virginia) 1990, 335; and Timothy Van Schaick, *The Sun Do Move, But Who Moves The Highway? : Urban Renewal, Community Activism, and The Preservation Of Richmond's Sixth Mount Zion Baptist Church* (MA Thesis, James Madison University, 2008), 85-88. The name was changed to Crusade for Voters by middle-class blacks who sought to add school desegregation to the voting platform after the seventeen Massive Resistance bills voted into law by the Virginia General Assembly.

[14] *Richmond Afro American*, June 25, 1960; and David R. Goldfield, *Black, White and Southern Race Relations and Southern Culture 1940 to Present* (Lousiana State University Press), 47.

suggested. Rather, it was a step towards remaking urban politics fit within the middle-class led black community paradigm. The Crusade furthered its Civil Rights platform by mentioning that blacks of both professional and working classes were not "divided in our aims for first-class citizenship." Both groups sought social equality through electoral politics however, it was the goal of professionals like Pannell to ensure working-class blacks were content with middle-class leadership. In closing, Pannell issued a warning to future white candidates. "The colored voters of today will not be long fooled by anyone" into thinking that dividing black leadership best serves the entire race. This open letter was a clear message to white Richmonders that the black electoral influence was united along racial lines and would not be divided by class differences.[15]

Black Richmonders used their strong 1960 performance to establish a controversial 1962 electoral platform. The Crusade registered 11,000 more black voters than in the 1960 election. To gain the Crusade's endorsement, candidates had to support the removal of the city's Pupil Assignment Plan, a school attendance ordinance, a wage increase for municipal workers to $1.15 per hour, and a proposal for ward-style voting. All of these issues were Civil Rights measures designed to destabilize Jim Crow. School attendance ordinances and removal of Harry Byrd's Pupil Assignment Plan targeted the city's refusal to racially desegregate public schools. Support for ward-style voting increased black voting strength, given that blacks had the most populated ward districts throughout the city. The municipal workers salary increase placed more purchasing power in the hands of black city workers

---

[15] *Richmond Afro American*, June 25, 1960.

**JA0800**

and the black community. This platform, which benefitted working and middle-class blacks, resulted from the newfound political agency the 1960 election provided them.[16]

The Crusade platform exposed Richmond's racial rigidity. The city was for all intents and purposes racially segregated in 1962. Whites and blacks lived in separate neighborhoods, shopped at separate malls, and worked in separate venues. Segregation was not as much forced as it was accepted. Despite the black voter increase, whites still held a 56% majority. It was not until 1964 that Richmond got its second post-Reconstruction black councilman. Richmond's white majority was, like most white Virginians, largely conservative and wanted nothing to do with liberal or black leadership. Any white candidate who openly supported the Crusade platform risked losing a council seat. Since the Crusade had to allocate its votes to white candidates, as historians John V. Moeser and Rutledge M. Dennis suggested, white politicians secretly negotiated with Crusade leaders for black votes. Crusade support came in the form of an endorsement and news articles about the white candidate being a friend to the black community. Since many white candidates engaged in this activity, they would often accuse "the other of making secret deals with Negro political leaders" to secure the dwindling white voter base in the upcoming election.[17]

---

[16] *Richmond News Leader*, May 24, 1962." Removing Pupil Placement and implementing mandatory school attendance would grease the wheels of school integration, causing further white flight to the suburbs. Senator Byrd implemented this following the *Brown* decision to ensure that Virginia's public schools remained segregated in what was called "Massive Resistance." For more, see Wilkerson's *Harry Byrd and the Changing Face of Virginia Politics,* 113 and see Robert Pratt's *The Color of Their Skin*, 1-21. Also, increasing municipal workers wages, which was a national NAACP goal, would put more purchasing power in the pockets of Richmond blacks. This wage increase would help to create more middle-class blacks who would again continue to disrupt the city's already shifting social order. For more information on NAACP labor activity, see Paul Frymer's *Black and Blue: African Americans, and the Labor Movement, and the Decline of the Democratic Party,* 46-60.
[17] *Richmond Times Dispatch*, May 18, 1962, May 6, 1962, and April 16, 1962; and Moeser and Dennis, *The Politics of Annexation*, 47-49.

24

The Fair Employment Practices Ordinance, passed just weeks before the election, provides a possible example of secret Crusade deals with white candidates. The Crusade's platform included a measure that not only increased municipal workers salaries, but removed racial discrimination from salaried city employment. According to historian and attorney Dwight Carter Holton, grandson of eventual Virginia Governor Linwood Holton, seventy-five percent of black municipal workers were non-salaried and had less job security than their white counterparts. This ordinance was passed during the election season and at the height of speculation about secret deals between incumbent councilmen like Robert C. Throckmorton, Eleanor P. Sheppard, and Crusade leaders. Although no foul play was ever proven, Throckmorton, Sheppard, and three other councilmen gained Crusade support immediately following the passage of the ordinance in May of 1962.[18]

The outcome of the 1962 election confirmed what the 1960 election suggested. Seven of nine Crusade supported candidates won council seats. Despite five of the seven Crusade sponsored candidates being endorsed by the wealthy white voter organization, Richmond Civic Association (RCA), two councilmen were solely endorsed by the Crusade, while only one councilman was elected with a lone RCA endorsement. The one RCA endorsed councilman, future mayor Phil Bagley, finished fifth, receiving only 9,772 votes. Whereas, the two Crusade sponsored candidates finished first and eighth, one receiving 9,200 votes and the other receiving 11,348 votes. Even with a radical platform and endorsing two losing black candidates against a white majority, the Crusade repeated its results from the 1960 election. These results read not of plateauing, but of growth between

---

[18] Dwight Carter Holton, "The Richmond Black Community Prior to 1956 and the Birth of the Richmond Crusade for Voters" (M.A. Thesis, Virginia Commonwealth University) *Richmond Crusade for Voters Archives*, M 306 Box 1, James Branch Cabell Library, Virginia Commonwealth University.

the two elections. In 1960, the Crusade had no organized platform and competed with two white voter organizations. In 1962, the Crusade had a solidified platform and rivaled a unified white voter organization. As the Crusade increased its difficulty, the results remained the same. This clearly illustrates that the further Richmond moved into the Civil Rights Era, the more influence its blacks exerted in city council elections.[19]

White voter organizations solidified themselves against the Crusade in the 1964 election. The RCA, along with other white voter organizations, formed Richmond Forward which comprised of old money conservatives like James Wheat, as well as new money liberals like Henry Miller. Their agenda was to secure and further Richmond's white business interest during the Civil Rights Era and white economic flight. Richmond Forward's candidates supported urban redevelopment and annexation, both of which extended Jim Crow Era politics by disenfranchising black electoral, economic, and residential potential. Richmond Forward garnered a reputation for "political manipulation" because its candidates were all Crusade rivals who set aside their differences for what appeared to be a continuation of white councilmanic control. They are a bunch of "string pullers who think Richmond begins and ends at Sixth and Broad," exclaimed Phil Bagley in a *Times-Dispatch* interview. This coalition stopped at nothing to ensure that Richmond's councilmanic control did not slip into Crusade hands in 1964 and future elections.[20]

The Crusade faced problems of its own in this election. One of the problems came in the form of a white liberal named Howard Carwile. The son of a wealthy Charlotte County tobacco farmer, Carwile, was a lifelong liberal politician who championed "poor

---

[19] *Richmond Afro American*, June 16, 1962; and "Councilmanic Election Results" June 12, 1962. The candidates with the most votes were co-sponsored by the RCA and Crusade. However, the top candidate was solely sponsored by the Crusade.
[20] *Richmond Times Dispatch*, April 7, 1964.

white people and the poor negro people, the small white businessman and the small negro businessman [to] abandon their prejudice, work together and vote together" in urban politics. Despite his popularity with working-class blacks, Carwile lost every state and local election he competed in for the last eighteen years. His recent councilmanic failures, according to him, came largely from the absence of the "heavy colored vote" controlled by the Crusade. Black Richmonders rarely broke rank in urban elections during the 1960s, even for Carwile who helped save the historically black Fulton and Idlewood neighborhoods from redevelopment.[21]

Carwile's open criticism of the Crusade exposed the class-centered flaws in black electoral leadership. Carwile criticized the Crusade's tendency to "consistently endorse those candidates who apparently are sure winners." More specifically, Carwile targeted the Crusade's support for B.A. Cephas (a black conservative) and Phil Bagley (a white conservative), both of whom were highly favored to win council seats. The nominations of Bagley and "Mr. Cephas indicates conclusively a working alliance between the aristocracy of far West End and Negro intelligencia around [Virginia] Union University." Carwile's criticism suggested that black professionals worked alongside elite whites to control the councilmanic outcome. This is why a man like Carwile, who fancied himself a champion of racial equality and political pragmatism, could lose black support to "a rabid segregationist" and supporter of gentrification, whom the Crusade did not endorse just two years prior. Despite his open criticism, Carwile lost again as an independent candidate in

---

[21] "Letters To The Forum: Mr. Carwile Comments on Councilmanic Election," *Richmond News Leader*, June 18, 1964.

1964. However, garnering twenty-six percent of the urban vote as an independent forced the Crusade to endorse Carwile in 1966.[22]

As blacks gained a foothold in electoral politics, they became less solidified than in previous elections. The 1960 and 1962 racial solidarity was in danger by 1964, due to working-class blacks wanting their own political leadership. Only three black candidates ran in 1964, but two, Ronald Charity and Neverett Eggleston Jr., were endorsed by the working-class organization The Voter's Voice. Other dissenting black voter organizations included the West End Council of Leagues, Leagues of the 19th and 24th precincts, and the West End Improvement League. Reasons varied for the rise of multiple black voter organizations. Some blacks believed Howard Carwile and were convinced the Crusade was "working hand-in-glove with the R[ichmond] F[orward]." Working-class blacks suspected that Crusade leadership developed more than just "a corresponding relationship with white elites." Rather, black elites exchanged political favors that benefited only the black middle-class. The Crusade rarely endorsed black candidates, but the most notable one, B.A. Cephas, served on the pro-redevelopment City Housing Committee following the 1962 election. That was the same election that featured public speculation about white councilmen disbursing municipal appointments to Crusade professionals for electoral support. Coincidentally, Richmond Forward supported Cephas' 1964 campaign. Nevertheless, black electoral growth allowed urban blacks to be less electorally united than in years past.[23]

---

[22] *Richmond News Leader*, June 18, 1964. Phil Bagley was on the City Planning Commission, along with B.A. Cephas. Both men supported what Bagley called the "white elephant" in the room. That elephant tearing down black slum housing for new highways, upscale apartments, and new office buildings. For more information on urban redevelopment's impact on urban elections, see Silver, *Twentieth-Century Richmond,* 275-283.
[23] *Richmond News Leader*, June 12, 1964; and *Richmond Afro American*, June 13, 1964.

The Crusade reminded black Richmonders that electoral camaraderie, not internal division, fully utilized the black vote. The Crusade pled with black Richmonders to "keep our vote solid" because "this is the only way we can have political influence." Crusade leaders used terms like "we" and "our" to place race above the seemingly obvious class differences between themselves and its working-class voting bloc. To the Jim Crow Era Crusade leadership, a diversified black vote ensured political suicide. Political survival came through unitary support for black leaders, who were coincidentally middle-class Crusade professionals. Crusade leaders wanted to maintain their monopoly on Civil Rights Era electoral change. Racial "solidarity is more important than one election or any candidate." With a solid black vote "we can always vote out a bad candidate, but we cannot do this if we don't keep our solidarity."[24]

Black electoral influence reached historic heights in the 1964 election. The Crusade's appeal paid off as eight of its nine candidates won council seats. This was the most candidates that blacks helped elect into office in city history. One of the eight was affluent black real estate broker B.A. Cephas Jr., making him the second post-Reconstruction black councilman elected since Oliver Hill in 1948. With Richmond Forward and the Crusade combining to elect seven of the nine councilmen, the local media recognized that "better to do white business community centered in the West End and the Negro Leadership "controlled the electoral "balance of power." In just four years, black Richmonders had a considerable share of electoral influence. This was during the era of poll taxes and literacy tests, which significantly hindered black voting potential. As America received a shift in codified racial norms with the 1964 Civil Rights Act, Richmond

---

[24] *Richmond Afro American*, June 6, 1964.

experienced a clear transition in the racial makeup of its urban elections councilmanic leadership.[25]

Special circumstances dictated the terms of the 1966 election. For the first time in city history, Richmond's population was forty-eight percent black, an increase from forty-six percent in 1964. Black voter registration increased by sixty-five percent from 1964, making the grand total of 29,970. Increased black voter registration came from the Voting Rights Act (VRA) being signed into law on August 6, 1965. The VRA prohibited state and local mandated tactics, such as literacy tests, from registering black voters in local, regional, and national elections. As black voter registration increased, white registration increased also, but their increase was only 13% going from 52,172 to 58,827. This was Richmond's first election in which the black voting numbers closely resembled their actual growing population. The numerical increase, and the passage of the VRA, forced the Crusade to change the way it handled the black vote going forward, in that it took on more of a working-class black image. [26]

Both the Crusade and Richmond Forward chose black candidates who could secure the expanded working-class black vote. According to historian James Oliver Perry, previous electoral success, increased black population, and the VRA, caused trouble for middle-class run black voter organizations. Before the VRA, the Crusade was the sole avenue for many working-class blacks to enter electoral politics. By 1966, the VRA allowed blacks to enter electoral politics on their own terms. With the removal of racial

---

[25] *Richmond Afro American*, June 13, 1964; *Richmond News Leader*, June 5, 1964; and *Richmond News Leader*, June 12, 1964.

[26] *The Advocate* 1 (July 1973) 1; *Harper v. Virginia State Board of Electors*, 383 U.S. (1966); *City of Richmond v. United States of America*, No. 74-201, U.S. Supreme Court (1974) Appendix, volume I, p.61; and Allan Statton Hammock, "The Leadership Factor in Black Politics: The Case of Richmond, Virginia" (Ph.D. diss., University of Virginia), 1972.

discrimination from voting, which black professionals used to consolidate political power, the Crusade nominated black candidates, hoping that white liberals and black faces would keep the expanded working-class black vote. The Crusade supported NAACP lawyer Henry Marsh III, black realtor B.A. Cephas, Howard Carwile, and affluent black businessman, Winfred Mundle. Similarly, Richmond Forward endorsed B.A. Cephas and Winfred Mundle, both of whom supported annexation and urban redevelopment. Nominating black candidates, in the face of a near 50% black population and electorate, meant securing the important working-class black vote for both sides.[27]

The Crusade's selection process caused internal rift within its leadership. In June of 1965, George Pannell resigned as Crusade president. Although white and black media outlets reported the event with no significant details, Howard Carwile saw it differently. Pannell's resignation, according to the Crusade, exposed inherent racial and political flaws within the Crusade's nomination process. It was rumored that Pannell did not support William Thornton's nomination of Cephas and Mundle because they did not fit the "Crusade agenda" against annexation and urban redevelopment. The resignation only confirmed that the Crusade was a "color-based organization" that used race to consolidate electoral power from blacks whom racism actually affected. This resignation led some, mainly critics like Carwile, to speculate that the Crusade was nominating black candidates to maintain control over the open voter registration process created by the VRA.[28]

---

[27] James Oliver Perry, "An Analysis of the Negro Influence in Richmond's 1966 Councilmanic Election" (M.A. Thesis, University of Richmond, 1968) 13. The two main issues were annexation and changes to the city charter that increased the term years for councilmen with majority votes. For more information, see *Richmond Times Dispatch* May-July 1966.
[28] Letters To The Forum: "Pannell's Quitting Confirms Suspicions, Carwile Says;" *Richmond News Leader* July, 2, 1965.

Richmond Forward aggressively campaigned to the expanded black voter base and used the *Richmond Times-Dispatch* to portray the Crusade as race hustlers using working-class black votes to further their political careers. On June 9, 1966, the *Times-Dispatch* produced the editorial "A Message to the Negro Voters of Richmond." The *Times-Dispatch* praised the "public-spirited, responsible leadership of Richmond Forward" candidates against the "private-regarding, autocratically controlled Crusade for Voters." The editorial implied that black electoral power unjustly belonged to the Crusade. Black leadership wants "[you] not to use your own intelligence in deciding how to vote…not to give any thought to the subject. Simply vote as they tell you to." As an alternative to racially autocratic voting, Richmond Forward was "publically identified… [and] work for the best interest of the community… people who give time…people who provide significant support for the Urban League and other community agencies…they are the people to whom leaders in your community turn when they want assistance in raising funds for predominantly negro institutions of higher learning."[29]

The Crusade went on the offensive to secure working-class black votes from conservative white politicians. The Crusade responded to Richmond Forward and the *Times-Dispatch* with an open letter titled "Who are the Richmond Newspapers?" "They are the champions of segregation," said the Crusade. "They cried No, No, Never to the U.S. Supreme Court Decision of 1954. They banned a Pogo Comic strip that ridiculed segregation…[they] have repeatedly attacked every organization that has fought for and gained Negro rights…They attacked the NAACP; They attacked Martin Luther King…now they are attacking the Richmond Crusade for Voters… Long before any other

---

[29] Editorial, "A Message to the Negro Voters of Richmond," *Richmond Times Dispatch*, June 9, 1966.

group cared, the Crusade fought alone for Negro political rights in Richmond." Since the media and white politicians saw the potential of working-class black votes by 1966, the Crusade adamantly reminded the 48% minority that whites wanted not to serve the black constituency, but use them "because you have gained a measure of political power" from past elections and the VRA.[30]

The Crusade survived the impact of the VRA and George Pannell's resignation. On June 14, 1966, the Crusade helped elect five councilmen to office. Although three fewer Crusade candidates won in 1966 than in 1964, this election featured a post-Reconstruction high three black councilmen. The Crusade achieved a new level of independence, in that the election proved the Crusade could get unpopular candidates elected. This was applied to no other than Henry Marsh III and Howard Carwile. Marsh III headed local school desegregation cases and was a thorn in the side of many white conservatives. Carwile, while finishing last amongst his colleagues, made very few friends in opposing urban redevelopment. The VRA altered Richmond's electoral landscape by removing Jim Crow Era politicians, like the Crusade, from gatekeeping black votes. The election results clearly shows how the landscape change forced the Crusade to expand its measures of maintaining the working-class vote by nominating black and white liberals.[31]

White Richmonders understood the implications of the black electoral evolution in just seven years. The *Norfolk Virginia-Pilot* article predicted that "June 1968 deadline is…the point, according to computations by experts on population shifts, when Richmond comes face to face with the possibility that Negroes could take over control of the City Council." White fears were amplified with the possibility of a black city council in

---

[30] Milton Randolph and Franklin Gayles, "*Letter to the Richmond Times Dispatch*," April 12, 1966.
[31] Peter K Eisinger, *The Politics of Displacement*, 71; and *Richmond News Leader* July, 2, 1965.

Richmond. This white fear stemmed from population growth, the VRA, and voter steering from the black professional class. Although electoral gains were important, by no means did it alone cause Richmond's racial transition. School desegregation and the annexation crisis combined with electoral changes to racially transition the city from its 70% pre-1960 white population to its 50/50 racial split by December of 1966.[32]

**School Desegregation**

The black middle-class used school desegregation, similar to electoral politics, as a tool to capture urban power from white elites in the midst of nationwide Civil Rights changes. On May 17, 1954, the U.S. Supreme Court gave black politicians the political currency to remake public education with the *Brown* decision. This judicial mandate attacked racially segregated public education, a white supremacist and oligarchical foundation of power. Segregated education allowed whites to disenfranchise blacks through limited access to social mobility. Segregated and inferior education ensured that color and condition remained fixed. Poverty, economically, socially, and legally, remained black. Like most southern cities, Richmond City Public Schools remained segregated after *Brown*. Through various court battles between 1960 and 1966, black professionals thrusted the city into the Civil Rights Era by constantly redefining how the school board complied with *Brown*. Equal access to public schools removed black education from the periphery and placed it at the core of political and social life. This reinvention of how black education operated, like electoral politics, pushed Richmond into the national Civil Rights movement, and more specifically, into racial transition.[33]

---

[32] *The Norfolk Virginia-Pilot*, November 1966.
[33] Campbell, *Richmond's Unhealed History.*

Richmond's educational segregation reflected a deeper legacy of physical separation, or as historian Christopher Silver suggest, a "Separate City." Blacks and whites lived separate lives in the same city. There were few places that blacks and whites had intimate interaction. Public schools reinforced societal segregation. According to Silver, state and local white elites used Jim Crow laws to ensure both whites and blacks to live separated by racialized class-defined spaces. On a national level, Federal Housing Authority lending practices, urban redevelopment, white flight, and redlining, strengthened racial segregation by placing it within the economy through real estate practices. Public schools did not develop into racially segregated entities, they were created as racialy segregated institutions, used to indoctrinate young whites and blacks that racial separation was not only normal, but an essential facet of life. Although many places began destabilizing segregationist school systems in the late 1950s, it was not until 1960 that Richmonders broke their societal legacy of limited black-white adolescent interaction.[34]

The desegregation snowball began in 1958, with middle-class blacks challenging the limits of Massive Resistance. Local blacks began Richmond's educational reform through the *Warden v. Richmond School Board* case in 1958. The suit was filed by the parents of Lorna R. Warden. The Pupil Placement Board, a Massive Resistance agency put into place by Senator Harry Byrd to ensure that Virginia schools remained segregated,

---

[34] Robert Pratt, The *Color of Their Skin: Education and Race in Richmon, Virginia. 1954-89* (Charlottesville: University of Virginia Press, 1992); Lizabeth Cohen, *A Consumers' Republic: The Politics of Massive Consumption in Postwar Americ*a (New York: Vintage Books, 2004), 224; Silver and Moser, *Separate City, 12*; and Matthew Lassiter, *The Silent Majority: Suburban Politics in the Sunbelt South* (Princeton University Press, 2006), 8. Author Benjamin Campbell discussed how Richmond's separate city mentality came from generational white fears of personal interactions with blacks without codified rules of engagement. As long as local, state, and national law dictated the terms of white-black engagement, with blacks being socially and economically inferior, whites embraced close interracial interaction. Jim Crow recreated plantation-style rules of engagement, yet it was through forced unequal separation. For more about how this culture resonated throughout Richmond well into the twenty-first century, see Benjamin Campbell's *Richmond's Unhealed History*, 100-52.

rejected six black children from admission into an all-white neighborhood school. Realizing that every white child in their neighborhood was assigned to the all-white school, Warden's attorneys sued the city for violating *Brown*. This suit, like others that followed, was a part of a larger movement to remove racial disenfranchisement from public education. The plaintiffs asked the court to include all black Richmond children in the lawsuit, given that they fell victim to the Pupil Placement Board's purposeful design to illegally maintain racial segregation. In an effort of temporary appeasement, in 1961, the Virginia Supreme Court and the Placement Board allowed Lorna Renee Warden to attend the all-white neighborhood school; however, the other five plaintiffs, as well as black Richmond students en masse were not admitted into any white public school. Nevertheless, local middle-class black pressure forced Richmond's public school officials to do what *Brown* itself could not: integrate.[35]

Immediately after the *Warden* case hit the docket in 1960, Richmond's white power structure attempted to control the imminent desegregation process. If handled incorrectly, school desegregation could place political power in the hands of local black professionals, who were eager to garner political power in the middle of the Civil Rights Era power vacuum. Many urban whites, like Attorney General J. Lindsay, lamented that "integration of the races in the school system will set education back" because "[Richmond] will close schools rather than permit them to be operated with Negro and white pupils in the same classroom." Although some felt that Richmond's racial divide was so deep that school closures would replace segregated schools, state and local legislators knew better. The fact that Richmond was the financial and cultural center of Virginia made its public school

---

[35] Memorandum, *Warden v. Richmond School Board*, 6 Race Relations Law Reporter 1025 (ED Va. 1961).

system vital to the regional and national image of the state. Despite Charlottesville, Norfolk, Warren County, and Prince Edward County schools closing, for Richmond, closure was not an option. [36]

After cleaning house, white officials tokenly desegregated public schools, to keep their control over urban affairs. On February 24, 1960, Richmond Pupil Placement Board's Andrew A. Fairley, Beverly H. Randolph Jr., and Hugh V. White issued their letters of resignation. All three agreed that the threat of federal closure would legislators to integrate Richmond Public Schools, something their collective conscience did not permit them to do. One of the three men issued his disappointment with city officials not "fight[ing] with every legal and honorable means of mixing the races in the public schools." The newly appointed Pupil Placement Board members, University of Virginia Professor Earnest J. Oglesby, State Department Coordinator Alfred L. Wingo, and Department of Education Assistant Supervisor of Rehabilitation Edward T. Justis, met on August 15, 1960, to begin Richmond's in-house desegregation. This effort resulted in only two black children being placed into white schools. However, on September 6, 1960, Richmond's public schools were officially integrated. Richmond's token integration coincided with a statewide effort to place enough black students into white schools to prevent any major NAACP lawsuit forcing federal judges to desegregate public schools. By September of 1960, there were

---

[36] *Richmond Times Dispatch*, May 18, 1954; and *Southern School News*, July 1960. Norfolk, Charlottesville, Warren County, and Prince Edward schools closed as a refusal to integrate. The Pupil Placement Board was a department that every public school system was assigned by the state during the Massive Resistance years of the late 1950s. The goal was to ensure public school system did not integrate by creating a state body in each locality that handled school assignments. For more, see Sara K Eskridge "Virginia's Pupil Placement Board and the Practical Applications of Massive Resistance, 1956-1966" *Virginia Magazine Of History & Biography* 118, no. 3 (June 2010), 246.

over 200,000 black students throughout the state and less than 170 of them were enrolled in traditional white schools.[37]

Professional blacks pushed harder for desegregation by testing the limits of token integration. In 1961, Wallace Reid Calloway, son of prominent black physician and local Civil Rights advocates William C. and Alice Calloway, was denied placement into a white neighborhood school (Chandler Middle School). The Calloways lived in one of Richmond's few interracial neighborhoods, in which black and white children were placed in racially identifiable schools. The Calloways challenge the Placement Board's placement, forcing the board to review its initial placement. The Calloway controversy, like the *Warden* case, was strategic because the Calloways understood Richmond's school desegregation was a part of an elaborate token regime. In fact, Calloways later argued, in court, that the Placement Board allegedly reached its unofficial black quota for the city's white public schools, thus their son was denied. Although the local NAACP threatened to file a class action lawsuit against the city, Richmond's Pupil Placement Board reaffirmed the original decision. The board had a legal leg to stand on because a black school was geographically closer (only by twelve feet) to the Calloways' home.[38]

Despite the unfavorable ruling, the Calloway case brought unwanted attention to the Richmond's Pupil Placement Board practices. The Calloway controversy allowed Civil Rights attorneys and local NAACP members Henry Marsh III and Oliver Hill to expose the Placement Board's usage of racial criteria in public school placements, as well as the

---

[37] *Southern School News,* September 1960; Pratt, *Color of Their Skin*, 25.

[38] Pratt, *Color of Their Skin*, 26-27. The Calloway's living arrangement was a byproduct of white flight leaving previously all-white neighborhoods open to black middle-class settlement. For context on how white flight created interracial middle-class neighborhoods, see Andrew Wiese, "The House I Live In: Race, Class, and African American Suburban Dreams in the Post-WWII United States," *African American Urban History Since WWII*, Kenneth L. Kusmer and Joe W. Trotter, ed. (University of Chicago Press 2009), 160-78.

lengths white city officials went to maintain racial segregation. Despite the Calloway loss, the public attention it drew, according to school desegregation historian Robert Pratt, allowed the local NAACP to openly "demand speedier compliance with *Brown*." The demand was followed by the placement of thirty-seven black students into white schools in the 1961-1962 school year. The Pupil Placement Board's segregationist placements caused the Crusade for Voters to run their 1962 campaign on the abolishment of the Placement Board and a mandatory school attendance ordinance, forcing white children in black dominated areas to attend similar schools. Not receiving any reprisal from city councilmen about placement practices, NAACP member Minerva Bradley, her attorneys Samuel Tucker and Henry Marsh III, and ten other black parents filed the *Bradley v. Richmond School Board* lawsuit. This suit, like the *Warden* case, was a part of a concerted effort to completely desegregate city schools and use Civil Rights legislation to remove educational disenfranchisement from Richmond's public schools. [39]

*Bradley* attorneys furthered *Warden*'s cause by turning school desegregation into political power for the black middle class. "Virginia has the largest and most effective token integration plan in the county," however Virginian blacks were not satisfied "with even the best tokenism," said Roy Wilkins at the NAACP's Virginia Convention. Wilkins foreshadowed his NAACP colleagues attempt to use *Brown* for political influence through education reform. While asking the court to "[require] the defendants to transfer the pupils from Negro public schools to white public schools," attorneys Henry Marsh III and Samuel Tucker requested the city "be enjoined from operating racially segregated schools and be required to submit to the District Court a plan of desegregation." To better their chances

---

[39] *Bradley v. Richmond School Board,* 416 U.S. 696-99 (1962); and  Pratt, *Color of Their Skin*, 31.

for a dismissal, the Pupil Placement Board assigned "90 additional Negro pupils" to white schools the following school year. The increase of black placements to white schools, in the midst of *Bradley*, illuminated how middle-class blacks used *Brown* to renegotiate urban power. Just as white elites controlled Richmond through segregating public schools, black professionals used desegregation to relinquish power from white elites. Segregated schooling was built on white leaders not sharing power with black leadership; therefore the black elites ensured that desegregated schooling came with white elites negotiating power with them in a way that Jim Crow prevented, through integration.[40]

*Bradley* put Richmond public schools in a state of disarray. On March 10, 1963, the Fourth Circuit Court of Appeals ruled in favor of the *Bradley* plaintiffs, finding Richmond City Public Schools in violation of *Brown* for maintaining racially segregated schools. The sociopolitical implications were astounding. The court ruled that Richmond had to work with the *Bradley* attorneys to construct "adequate" desegregation plans. This was the first time the federal government required white city officials to share power with black leaders. This, also, marked the first time blacks inspired actual white concern over how Richmond's public education should racially function. If public schools were to continue their existence, it would be at the discretion of federal compliance to white and black leaders negotiating the racial makeup of public schools.[41]

The *Bradley* ruling illuminated how white supremacy forged the connection between school segregation and city politics. "Had we attempted to integrate the schools in the early years," said School Board President and eventual Supreme Court Justice Lewis

---

[40] Roy Wilkins Interview, *Southern School News*, 1963; and *Bradley v. The School Board of Richmond City, Virginia*. U.S. Court of Appeals, Forth Circuit 317 F 2d 429.
[41] *Bradley*, F. 2d 438, March 10, 1963.

F. Powell Jr., it "would have resulted in closing the schools." Many knew that the city council "provided funds to operate the public schools," however, many councilmen were "stridently opposed to any integration," personally and professionally. Court ordered biracial cooperation seemed impossible because "both Richmond newspapers opposed integration, as did Virginia governors, and the majority of the Virginia Assembly." The original Pupil Placement Board members who resigned on June 1, 1960 were not outliers in their personal and professional opposition to integrated schools. Rather, they were a part of generational obstruction to any level of educational equality between blacks and whites.[42]

Biracial cooperation pushed Richmond's school desegregation crisis away from tokenism and towards its second stage: Freedom of Choice. On March 19, 1963, the Richmond School Board formulated, the city council agreed, and the court approved the Freedom of Choice Plan. Freedom of Choice allowed families of both races to choose their children's schools system. However, the Placement Board approved or denied the request based on factors such as "adequate" transportation, competency compared to his or her peers, and overall fit. Federal Judge John Butzner, NAACP lawyers Henry Marsh III and Samuel Tucker, Superintendent Henry I. Willet, and School Board Vice-Chairman Frank S. Calkins felt considerably "happy" with the Freedom of Choice Plan. Although Marsh and Tucker had reservations about Pupil Placement remaining the gatekeepers of integration, the biracial coalition made history by slowly removing Jim Crow from

---

[42] Lewis Powell Jr., "*Reflections*," *The Virginia Magazine of History and Biography* 96 (1988): 332; and *Bradley*, 317 F. 2d 438 (1963). Powell's interview was recorded in 1988, in which Justice Powell recounted his days as the President of Richmond School Board. Although he did not clarify his position on desegregation in the early 1960s, he ensured that opposition to desegregation was very strong amongst white local, state and national politicians. The only issue was how to navigate around it.

Richmond public schools. Marsh later challenged Freedom of Choice in the Supreme Court

he discovered that the color-blind driving factor of personal choice perpetuated racial

segregation in public schools.[43]

Freedom of Choice's inability to desegregate schools forced federal authorities to

investigate Richmond's public school system. In 1964, the U.S. Department of Health,

Education, and Welfare (HEW) placed Richmond Public School System under

investigation. HEW's investigation began after Henry Marsh's request to remove the Pupil

Placement Board from Richmond Public Schools was denied. Richmond bureaucrats were

not alone in opposing school desegregation, as school systems across Virginia refused to

adhere to *Brown*. The General Assembly's most effective measure was releasing state

funds to school systems refusing to integrate, while cutting off state funds to any integrated

school system. The Civil Rights Act of 1964 gave HEW authority to remove federal funds

from any school system found in violation of *Brown*, regardless of state and local law.

Therefore, the U.S. Commissioner of Education Dr. Woodrow Wilkerson charged

Virginia's State Board of Education Deputy Superintendent Harry R. Elmore with ensuring

Virginia's public school systems adhered to both *Brown* and the Civil Rights Act. Any

school system refusing to comply with Elmore's regional meetings and interracial

consolidation plans were barred from receiving federal funds and would be sued by the

Justice Department in federal court.[44]

With federal attention on Virginia's public schools, black professionals used *Brown*

to test the limits of their political power. "Federal control was very evident" as on January

---

[43] *Richmond Times Dispatch*, March 19, 1963; *Bradley*, 416, U.S. 696-99 (1962); *Bradley*, 345 F. 2d 310 (1965); and Lassiter, *The Silent Majority*, 123.

[44] *Memorandum* to the *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 9, Muse Law Library, University of Richmond; and Civil Rights Act of 1964, Title I-IV, Section 407(a).

22, 1965, U.S. Commissioner of Education Dr. Woodrow Wilkerson assured Superintendent Willet, School Board President Powell and Mayor Phil Bagley that federal funds would be removed if they did not create a desegregation plan that conformed to Title VI of the Civil Rights Act. This threat came on the heels of Henry Marsh III's and Samuel Tucker's victory in the U.S. Supreme Court. Marsh and Tucker won an appeal overruling Judge Butzner's Freedom of Choice Plan for Richmond. Freedom of Choice was used in many desegregating southern school districts; however, Richmond's Freedom of Choice plan maintained de facto segregation. Not one white child attended a black school, and few black children attended white schools. "You could feel a political change," as black professionals, for the second time, used Civil Rights law to gain more authority in the outlook of public education.[45]

By 1966, professional black political gains in education inspired negative racial tension. During the 1965-66 academic school year, Richmond's white population fell three percent from the previous year, putting it at about fifty percent. As the white population dwindled, the white student population followed. Richmond hosted a 64% black student majority, with whites being at a staggering 36% and declining. While many white families fled to suburban public and private schools, urban race relations worsened. In Richmond, both blacks and whites used Freedom of Choice to stay in segregated schools. White families refused to send their children to schools that were "identifiably black in any way," according to Pratt. Black families were haunted with stories about persecution by white students "when there was no teacher supervision." This behavior only reassured black

---

[45] *Bradley v. Richmond School Board*, 152-170; and *Richmond Times Dispatch*, January 21, 1965. Majority of Virginia's urban school systems did not receive federal funds in 1965. Hampton City was the only Virginia school system in compliance with Brown in 1965. For more information regarding Virginia school desegregation, see Memorandum to *Bradley v. Richmond School Board*.

families not to send their children "where they were not welcomed." Using Freedom of Choice to attend white schools had economic implications on the black household. "Blacks were threatened and were actually fired for expressing their support for desegregation." "Rather courageous" were the blacks who sent their children to white schools, a risk many refused to take. These challenges rendered Richmond's Freedom of Choice useless in achieving integration. However, Richmond continued this program until it was federally removed in 1968.[46]

Between 1960 and 1966, Civil Rights Era Richmond was bolstered by school desegregation. Alone, electoral politics did not shift municipal power to the black elite. Education reform, through the removal of racial segregation and the political uncertainty that followed, forced white politicians to negotiate political power with the black professional class. The shift of overt segregation into more covert means retaining Jim Crow, via tokenism and Freedom of Choice, and black electoral gains caused white city council members to reach across the aisle to suburban leadership for help maintaining a white majority in the heart of the former Confederacy. Racial solidarity had its class-centered limits. For whites, racial limits were tested when class interests collided over the economic and racial importance of Richmond during the Civil Rights Era.

**Annexation Crisis**

For white leadership, electoral politics and school desegregation demolished their Jim Crow-style power structure over Richmond. The shifting electoral demographic and school desegregation greased the wheels of Richmond's racial transition from a majority white to majority black city. "Whites wanted to maintain control of the city of Richmond,"

---

[46] *School Desegregation in Southern and Border States*, September 1966; Pratt, *Color of Their Skin*, 42-43; and *Richmond Times Dispatch*, November 16, 1966.

amidst Civil Rights Era changes. "So how do you do it, that was the question" white city and state officials were obsessed with according to historian John V. Moeser. The answer was annexation. However, as suburban leaders gained political power through industrial and white middle-class migration, they became enemies to urban white officials. Suburbanites saw the fall of Jim Crow as the means to segregate themselves from Civil Rights changes in Richmond. Between 1960 and 1966, suburban whites gained and used their political identity to prevent their affluent white neighbors from annexing their Chesterfield and Henrico County suburbs. As city officials endlessly searched for solutions, they were repeatedly blocked by the middle-class whites, ultimately forcing the General Assembly to intervene as the city went from 70% to 50% white between 1950 and 1966.[47]

Before annexation, Richmond's white politicians wished to offset white flight by maintaining Richmond's white majority through a simple merger. The Richmond City Council's six member Richmond-Henrico Consolidation Committee proposed a merger that would consolidate Henrico County with Richmond City. The merger would make over 105,000 middle-class white suburbanites Richmond residents by January 1, 1962. The consolidated city would have five boroughs, four in the old Henrico borders and one in "the old city." Although white city officials were willing to share territory with suburban leaders, they were not so willing to share political power. The merger would include eleven councilmen with four coming from Richmond, one from the four boroughs in Henrico, and three being elected at-large from the consolidated city. Richmond outnumbered Henrico by over 100,000 people and by more than 22,000 white voters. Therefore, the three at-large

---

[47] Interview with John V. Moeser, January 5, 2016; and *Charter of the City of Richmond, Virginia*, Section 7.02.

council seats would undoubtedly have been inhabited by Richmond politicians, giving the city a regular seven-to-four councilmanic advantage over their suburban neighbors.[48]

The reasons for the merger were, as Moeser and Silver alluded too, racially coded. White flight and its economic implications led to the 1961 city council proposing the Henrico merger. The 1960 election, which mobilized 14,000 black voters, and the *Warren* case, forcing school officials to desegregate public schools, signaled the beginning of the end of what many saw coming up to ten years prior. Richmond was getting blacker. The breakdown of segregation between the forty-two percent black population and over sixty percent black public school population sent white residents to surrounding suburban counties. Although recuperating the lost tax base financially incentivized the merger, what that tax base socially represented remained racially coded. "Race remained at the heart of the controversy over the merger," said Silver. The civility from which white Richmonders spoke about white flight illuminated racial fears about the former capital of the Confederacy hosting a black majority. Metropolitan residents understood "the city tax base is automatically lowered when the black population increases." However, the reasons behind this well-known fact remained undiscussed publicly. Metropolitan whites "feared being in the minority" because blacks reminded them of the inequality Jim Crow produced and the economic and social privilege white Richmonders enjoyed at the expense of black residents.[49]

---

[48] David R Goldfield, *Black, White and Southern Race Relations and Southern Culture 1940 to Present*, 75; "Annexation Suit Time Predicted," *Richmond Times Dispatch*, December 15, 1961; U.S. Bureau of the Census, Henrico County, Virginia 1960; Code of Virginia, Section 10-145.1; and *Merger Opposition Reporter*, Henrico County Periodical December 1960, *Richmond Annexation Files*, M 183 Box 7 James Cabell Library, Virginia Commonwealth University.

[49] Moeser and Dennis, *Politics of Annexation*, 36-40; Interview with John V. Moeser, January 5, 2016; and Interview with Reverend Benjamin Campbell, January 6, 2016.

Henrico suburbanites made it clear that they would not voluntarily cede their land and white citizenry to the council. Henrico residents voted against the merger on December 12, 1961, with a sixty-five percent majority. Voters in one Henrico District (Tuckahoe) supported the merger. Despite Henrico's Board of Supervisors president S.A. Burnette noting that the county was "wide open so far as any cooperation in support of the metropolitan area is concerned," it was clear that Henrico residents were unwilling to help the city council keep Richmond majority white. Richmond City Manager Horace H. Edwards felt suburbanites voted "with their hearts instead of their heads." Their hearts were consumed with the racially identifiable class-centered suburban lifestyle. Yet, their heads represented the "one mind" or prejudice they shared with urban whites about "a black takeover of Richmond." Desperation forced city officials to become politically aggressive; therefore, on December 26, 1961, the council announced its intentions to file an annexation ordinance with the Commonwealth of Virginia against Henrico and Chesterfield Counties.[50]

The city council began its hostile takeover of the suburban white majority in 1962. On January 1, the council officially filed an annexation suit against Henrico and Chesterfield Counties within each respective circuit courts. The council, along with City

---

[50] *Richmond Times-Dispatch*, December 14, 1961; "Annexation Will Meet Resistance," *Richmond Times Dispatch*, December 14, 1961; Cohen, *Consumers' Republic*, 222; David G. Temple *Merger Politics: Local Government Consolidation in Tidewater Virginia* (Charlottesville: University of Virginia 1972), 1; Christopher Silver, "Impediment to Greatness: The Failure of City County Consolidation in the 1960s" (Ph.D. diss, University of North Carolina at Chapel Hill, 1981), 8; and Chester W. Bain, *A Body Incorporate: The Evolution of City-County Separation in Virginia* (Charlottesville: University of Virginia, 1967), 26. On that same day, Richmond voted in favor of the merger by a count of 15,051 to 6,700. Both black and mixed voting districts rejected the merger, while ninety-six percent of white districts supported the merger. The voting tallies show that neither urban blacks nor suburban whites wanted the merger. The history of Virginia's political conflict between cities and counties dates farther back into the late nineteenth century. City and county leadership have a long history of not working together in mergers and annexations. Both black and mixed voting districts rejected the merger, while ninety-six percent of white districts supported the merger. The voting tallies show that neither urban blacks nor suburban whites wanted the merger.

Manager Edwards, requested 152 square miles and 115,000 residents from Henrico, as well as 51 square miles from Chesterfield, which included more than 40,000 residents. Both Henrico and Chesterfield populations were majority middle-class and at least 92% white. Annexations were powerful. They had the potential to give Virginian cities larger economies. However, they sparked long political battles between urban white elites and suburban residents over the vitality of cities in metropolitian areas. Uniquely, Virginia was and is the only state to have independent cities and counties. So cooperation between urban and suburban leaders was key to achieve any mutually beneficial end. However, Henrico and Chesterfield inspired Matthew Lassiter's "Silent Majority" suburban analysis, in that they used their social class to create an identity that separated them from politically allying with elite whites on exclusively racial terms.[51]

Richmond newspapers promoted the annexations as a shared interest between urban and suburban whites. The annexations were supposed to save, not just Richmond, but the entire metropolitan area from the physical and economic urban decay seen in Detroit, Newark, and Washington D.C. The *Times-Dispatch* warned county residents that "Richmond must either expand or decline." Only a "political union" between urban and suburban whites will keep black leaders from the city council. "New opportunities for community progress" only came if Richmond remained majority white. Although suburban

---

[51] "Annexation Suit Time Predicted," *Richmond Times Dispatch*, December 15, 1961; "Last City-County Annexation," *Richmond News Leader*, June 10, 1959; Population of Richmond, Henrico, and Chesterfield, Virginia 1930-1975, *U.S. Census Bureau*; *Richmond News Leader*, January 1, 1962; and Lassiter, *Silent Majority*, 120. Virginia is the only state with independent cities and counties. This was put into place after the Civil War to ensure that shared municipal services did not cause political corruption or tie the economic fate of one locality to its failing or thriving neighbor. Multiple amendments were proposed to reverse this system, yet the Byrd Machine ensured counties and cities maintained their independence. This city-county structure is a staple of Virginia's long history of conservative "pay as you go" politics, reducing the reliance on federal or state financial aid. For more information, see Wilkerson, 285 and Andrew W. Sorrell and Bruce A. Vlk, "Virginia's Never-Ending Moratorium on City-County Annexations," *The Virgninia News Letter* (Vol 88 no.1) January 2012.

residents lived outside the city, most of their daily lives were spent downtown. The media wished Henrico/Chesterfield leadership and residents understood that rejecting annexation meant rendering Richmond to a dilapidated slum. Saving Richmond was as much economic, as it was racial. In the eyes of the media and urban white leaders, class interest should not render race and its economic implications useless.[52]

Media propaganda favoring annexation was as realistic as it was ideologically driven. The *Times-Dispatch* contended that both counties could not provide municipal services fitting a growing metropolitan area. Both counties could not provide ample sewage, local employment, recreational services, postal services, public libraries, museums, hospitals, electricity, and public schools to the spread out towns and sprawling subdivisions located with their borders. The *Times-Dispatch* insisted that if suburbanites reconnected with the city, public services would improve. Increased citizenry would "make no substantial contribution to the cost of providing the municipal services and the management and administrative function." Although the Richmond media advertised how the metropolitan area benefited from the annexation, county leaders and suburban residents risked losing their political power. Independent counties were not politically tied to cities, thus annexation permanently removed land and tax revenue from suburbna counties, with little chance of future return. Therefore, suburban leadership were hesitant to negotiate annexations with city officials.[53]

The Virginia Assembly's legislative support ensured that Richmond's annexation suits would be heard. Both Henrico and Chesterfield Boards of Supervisors filed appeals

---

[52] "Precedent Challenged by Annexation Move," *Richmond Times Dispatch*, December 24, 1961.
[53]*Richmond Times Dispatch*, December 27, 1961. Richmond leaders also discussed the issue of unused county land that the city could use to further incorporate into expanding the city.

for dismissal to the Virginia Supreme Court. State support for the city council ran deep, as the Assembly passed legislation ensuring that any anti-annexation bill passed would not impact the current suits with either county, regardless of the length of the outcome. "The General Assembly was obsessed with maintaining racial segregation. In fact, that's all they did" during the 1960s according to Moeser. The Assembly's pro-annexation sentiment caused both appeals to be denied almost immediately. As black Richmonders gained political power in urban politics, keeping black leadership out of the city council became a state interest. Blacks gaining political control of the capital city could bring about a regime change to Virginia's affluent white oligarchical power structure. Therefore, if Henrico and Chesterfield's leadership wished to end annexation talks, they had to defeat city leaders in court.[54]

Despite state support, the annexation court limited Richmond's territorial growth. On the eve of the 1964 councilmanic election, the city council lost its annexation battle against Henrico. Richmond's land proposals were "insufficient" and did not justify the request for over fifty-one square miles from Henrico according to the annexation court. Instead, the court awarded the city seventeen square miles and 45,000 residents, of which 99% were white. The seventeen square miles was the closest parcel of land to the city; however, it was undeveloped and would cost 55 million dollars to purchase and even more to develop for residential and commercial use. The rejection had political implications. According to state law, a lost annexation suit prevented Richmond from attempting to annex Henrico for the next five years. Adversely, accepting or deny the reward legitimized

---

[54] *Richmond Times Dispatch*, February 25, 1962; *Richmond Times Dispatch*, June 10, 1962; *Richmond Times Dispatch*, June 12, 1962; and Interview with Reverend Benjamin Campbell, January 6, 2016.

the annexation court's ruling, closing the door on any future annexation of Henrico County.[55]

The council used the Henrico misfortune to double-down on Chesterfield. After the failed annexation appeal in Henrico, the Virginia Supreme Court upheld the annexation ruling on January 20, 1965. This forced city officials to either accept or decline the award. Either way, Henrico could not be annexed for five years. Although former city councilmen Wayland Rennie lamented that city officials made the wrong decision, the city council declined the award. The decline was a gamble. Thinking that a 55 million dollar bill for just seventeen square miles significantly hindered potential gains in the Chesterfield suit, the council temporarily saved the city budget to fight Chesterfield officials in court. It was clear that Richmond had to expand, yet the council's refusal to take peanuts from Henrico signified that Chesterfield suburbanites were facing an even hungrier and more aggressive giant, who would not rest until its suburban neighbors cooperated.[56]

Both Richmond and Chesterfield County officials understood the racial implications of the annexation suit. White flight, the failed 1961 merger, and the rejected 1964 Henrico annexation left Richmond with a fifty one percent white majority by January 1, 1965. Between February and October of 1965, Richmond lawyer Andrew J. Bent, Mayor Morrill M. Crowe, and City Manager Horace Edwards conducted secret meetings with

---

[55] *Richmond News Leader*, April 27, 1964; *City of Richmond, Virginia v. United States of America*, No. 74-201; U.S. Supreme Court (1974) Appendix 1, p.16; and *Richmond News Leader*, November 2, 1964.

[56] *Richmond Times Dispatch*, January 21, 1965; *Richmond Times Dispatch*, January 23, 1965; *Code of Virginia Section* 15.1-1044; *Richmond Times Dispatch*, February 16, 1965; and *Charter of the City of Richmond, Virginia*, Section 7.02. The city council had to decide whether to accept, deny, or appeal the Henrico decision. Accepting the reward meant that Richmond could not annex or attempt to annex Henrico for five years. The council was not pressed to accept the seventeen square miles given that it wanted one-hundred and fifty one sqaure miles, and not the seventeen square miles of land was undeveloped. City officials admitted, during the *Holt* trial, that racially diluting the city was number one on the city's list in 1965. Another issue was the Richmond City Charter, which prohibited the city from borrowing money to annex adjacent land.

Chesterfield Board of Supervisors Chairman Irving G. Horner, and Chesterfield Board Executive Secretary Melvin W. Burnett. The topic was Richmond's territorial expansion, however, the category was race. "It was common knowledge that the City of Richmond was going black…we realized it… They claimed they had to have people from Chesterfield to offset the growing black race in the city… This was the basis of their negotiations," according to Burnett. Richmond officials had a different perspective on the negotiations. "You would have a right to say that race entered into it," said Mayor Crowe during the Curtis Holt Sr. City of Richmond case six years later. However, evidence suggest race never entered a discussion because it was the discussion. Since both sides understood that "the General Assembly will not allow the Capital City to be eternally thwarted in its efforts to procure room to grow," both urban and suburban leadership willingly negotiated a land and citizen settlement according to *News-Leader* reporter Charles Houston. Suburban leadership's willingness to negotiate was not a willingness to settle because city officials had a track record of losing annexation suits.[57]

City officials went 0 for 2 against its suburban neighbors. Although both sides understood the racial implications of not annexing, constituency interest prevented an out-of-court settlement. Chesterfield leadership, headed by Board Supervisor Irvin Horner, refused to relinquish 45,000 white citizens and ¾ of Northern Chesterfield to Mayor Crowe and City Manager Edwards. Suburban leadership was only willing to help Richmond's white elite if the suburbs were not annexed in the near future. Because city officials refused to relinquish future annexation rights against Chesterfield, the case went to trial. On

---

[57] *Bradley v. Richmond School Board*, 152; Charles Houston, "9 Members Unanimous in Decision," *Richmond News Leader*, February 11, 1965; *Curtis Holt, Sr. v. City of Richmond*, No. 151-71 R, U.S. District Court of the Eastern District of Virginia, September 20, 1971, 94; and Moeser and Dennis, *Politics of Annexation*, 81.

November 27, 1965, Judge William Old of Chesterfield County and Judge Vincent L. Sexton Jr. of Bluefield County voted to dismiss the case 2 to 1 over Judge Elliot Marshall of Front Royal. This time, there was no award from the court. This left Richmond at the mercy of the state, so Richmond officials appealed, leaving the city's racial fate up to the 1966 General Assembly.[58]

Richmond officials' inability to racially dilute the state capital ignited the General Assembly to intervene in the annexation crisis. Because, as Virginia Delegate T. Coleman Andrews Jr. stated, "antiquated annexation laws," deterred "the logical expansion of Virginia's cities," the Virginia Supreme Court dismissed the annexation case and ensured it was "stricken from the court docket." Since Richmond never officially lost the annexation case, city officials could resume the suit the following year. Maintaining Richmond's white majority was just as much a state interest, as it was an urban interest. Richmond's racial transition "worried the General Assembly," as they became as obsessed with annexation as Richmond's white leadership according to author Benjamin Campbell. The General Assembly issued a Blue Ribbon Commission, on April 4, 1966, that provided Assembly members with a "feasible" plan for annexation. Although the Commission did not report its findings until 1967, the state made it clear that city officials' inability to control Civil Rights changes threatened more than the metropolitan area. Never before had the former Confederate capital been unable to control the population and political growth of its black residents. If Civil Rights changes allowed blacks to politically control the state

---

[58] *Richmond Times Dispatch*, November 28, 1965.

capital, this trend could spread to other majority black Virginian cities. White fear of racial uncertainty was very real and it penetrated even the highest forms of political power.[59]

White fears surrounding annexation heightened after the 1966 election. Only a week after three black councilmen won city council seats, the six white councilmen secretly negotiated with Chesterfield's Board of Supervisors over territorial expansion. If "present political trends continue in Richmond," forwarned the Norfolk-Virginia Pilot, "[black] voters will grow steadily stronger, and within a very few years they may be able to elect a majority of Richmond's nine councilmen." Councilman James Wheat asked Chesterfield Board Member Irvin Horner for "44,000 affluent white people," to offset the city's 50% black population. These fears even penetrated the protected Henrico County. "There's no sense in kidding ourselves," said one anonymous Henrico official in the *Times-Dispatch* article "Vote May Spur Merger Attempt." Annexation talks between Chesterfield and Richmond officials "would indicate to anyone that it is the result of the large Negro vote." Although neither side ceded to the other on their terms for annexation, it became blatantly obvious that Richmond's six-year racial transition from a majority white to a racially split city destabilized metropolitan politics going into 1967.[60]

## Conclusion

Richmond was not the same city in 1966 as it was in 1960. The city went from a white majority city with a segregated school system and all-white city council to a racially split population, integrated schools, and three black councilmen. This rapid change brought Richmond closer to a racial shift in the city's power structure. The question is "what

---

[59] *Richmond News Leader*, November 7, 1965; *Richmond Times Dispatch*, January 5, 1966; and Interview with Reverend Benjamin Campbell, January 6, 2016.
[60] *Richmond Times-Dispatch*, June 19, 1966; and *Holt v. City of Richmond*, 1140.

inspired this drastic racial transition?" Civil Rights Era advances and the destabilization of Jim Crow brought about the beginning of this complicated saga. Councilmanic politics, school desegregation, and annexation only amplified the foreign political terrain urban blacks, affluent whites, and suburbanites had to navigate. Just as urban blacks used unfamiliar (Civil Rights legislation) tactics to alter the political landscape of a Jim Crow city, affluent whites reciprocated with an  annexation deal with suburban leadership. This, along with Henry Marsh III's campaign against urban redevelopment and Judge Robert Merhige's school consolidation, added to Richmond's Civil Rights Era political instability. Furthermore, as 1967 approached, race and class differences heightened, further complicating Richmond's shift from a white to a black majority city.

## Chapter 2: 1967-1970 The Middle Years

The years between 1960 and 1966 characterized black Civil Rights Era gains; however, the four years between 1967 and 1970 highlight the repeal of those gains. The city began 1967 with a 50/50 white-black population, however, it ended 1970 with a 58% white majority. The reversal in Richmond's racial shift came from five major events: Henry Marsh III's fight against urban redevelopment, the 1968 city council election, the 1969 annexation, the 1970 city council election, and the 1970 busing scheme. These five events prevented the former Confederate capital and its city council from becoming majority black at the twilight of the Civil Rights Era. However, the annexation quick-fix set the stage for black and white class conflict ultimately resulting in federal involvement through two landmark lawsuits: *Bradley v. Richmond School Board* and *Holt v. City of Richmond, Virginia*. The results of these post-1970 cases completed Richmond's power shift as the city received its majority black councilmanic leadership.

**Urban Redevelopment**

Previous electoral gains allowed black leadership to challenge white leaders on the Richmond's most controversial issue: urban redevelopment. White city councilmen, headed by Phil Bagley, devised urban redevelopment strategies that replaced almost 10,000 black residents from the city's core with new expressways to the suburbs. Councilman Henry Marsh III, along with the black working-class, fought the redevelopment strategy throughout Marsh's first two terms. White city leaders sequestered support from suburban leadership; however, suburban class interest prevented any urban-suburban white coalition sidestepping Marsh's anti-redevelopment agenda. Marsh successful opposition prevented working-class neighborhoods from turning into mall parking lots. Without Marsh's

successful opposition, the 1967 redevelopment strategy would have mirrored the I-95 project. White leadership's inability to redevelop Richmond not only made the 1968 election the most important election in city history, it ensured annexation as the only measure to continue white leadership over a white majority Richmond.

Between 1967 and 1970, urban white leadership attempted to physically redevelop Richmond for the second time. Like the I-95 project, this slum clearance plan would "take poor people, Negro people from their homes and property and let them vegetate for the rest of their lives in cinder block [public] housing," according Councilman Howard Carwile. With physical decay and decreased tax revenue, the city council assigned the Richmond Redevelopment Housing Authority (RRHA) and the Richmond Metropolitan Authority (RMA) to "construct a downtown expressway linking the city's core with mushrooming suburbs to the southwest." This strategy provided Chesterfield residents with immediate access to the inner city, while creating physical barriers between East End housing projects and "middle-class white neighborhoods to the West" End. Later called "The City's Biggest Disgrace" by historian Christopher Silver, this plan would have alleviated the housing displacement that I-95 started in 1957. Blacks would have been residentially relocated from the city's core, leaving it open for white businesses and Virginia Commonwealth University expansion.[61]

---

[61] Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, And Race*, (The University of Tennessee Press, 1984), 286-312; and *Richmond Times Dispatch* February 26, 1968. Five of the six RMA members were Richmond Forward councilmen, and a part of Richmond's affluent white leadership. Civil Rights Era Richmond included its core being physically transitioned into major shopping, business, and school district (Virginia Commonwealth University). This redevelopment agenda targeted old black and working-class white neighborhoods throughout the city's core. Local banks refused to invest into core neighborhoods like Oregon Hill, Idlewood, Jackson Ward, and Navy Hill, creating physical decay and "dilapidated" housing. More than a war on black housing, it was a war on the lower-class. City leader's inability to expand city boundaries in the 1940's began the middle-class flight to the suburbs, bankrupting the city's tax budget. For more information on the financial aspect of urban redevelopment, and how race took the face of what was a complex class-race dynamic, see Silver, 256-265.

Henry Marsh III allied with white liberal Howard Carwile to challenge urban redevelopment. The first RMA and RRHA plans were to demolish Idlewood and Fulton. Both neighborhoods had "cracked and crumbling houses," and many within white leadership thought these were "the worst section[s] of the city;" making both "sites for light industry" and redevelopment said former Councilwoman Eleanor P. Sheppard in *Times-Dispatch* interview. Fulton's redevelopment would have displaced more than 2,400 homeowners from "their humble hovels" and threw them into "racial ghettoes… [for] the remainder of their natural lives." So Carwile mobilized Fulton residents, into the Fulton Improvement Association (FIA), which drew its own rehabilitation plans that "allow[ed] homeowners to keep their homes." After two years of FIA and city council negotiations, the Fulton neighborhood was partial rehabilitated and not completely redeveloped. As for Marsh and Idlewood, redevelopment would have displaced over 900 black working-class families. Marsh wanted to "delay the execution…on the Idlewood corridor," so he asked and received a stay on the project. This delay along with Carwile's Fulton situation not only froze over two million dollars' worth of federal and local funding, it created tensions within the city council.[62]

Marsh's opposition to urban redevelopment created a rivalry between himself and Councilman Phil Bagley. During council meetings about redevelopment, both Marsh and Bagley headed their respective constituencies. Bagley represented urban white business elites while Marsh represented potentially displaced blacks. Marsh went on record saying

---

[62] *Richmond Times Dispatch*, November 12, 1966, January 8, 1967, December 19, 1967, February 24, 1968, and March 1, 1969. FIA infighting began when the Fulton resident William O. Henderson started a splinter group of residents who were dissatisfied with FIA leadership negotiating redevelopment and relocation into lower-income housing. This three-way political battle between the council, FIA, and Henderson resulted in an approved "Fulton Plan" to redevelop half of Fulton, while commercially developing the other.

that Bagley and Richmond Forward's (RF) support of redevelopment "jeopardize[ed] efforts to provide more housing in the city." There were "human problems involved in the displacement of persons." To Bagley, Marsh was turning redevelopment into "political capital," using it to exploit the displacement aspect of redevelopment to maintain working-class constituency throughout the city. Black political gains allowed Marsh III to oppose white leadership in ways former black councilmen Oliver Hill and B.A. Cephas could not. His opposition to Bagley, the face of urban redevelopment, encouraged working-class black residents voicing their dissatisfaction with white leaders.[63]

Black Richmonders resisted redevelopment plans for Jackson Ward. Marsh's Idlewood opposition was defeated in the council 5-4 in late November 1966. With this slim victory, white councilmen proposed another expressway plan through Jackson Ward, as the residential rate suffered from the aftermath of I-95. Members of the City Housing Committee Winfred Mundle, B.A. Cephas, and James Wheat were tasked with consolidating displaced blacks in the city's East End housing projects. Harold H. Bradley, head of Jackson Ward's voting district, organized sixty residents in a "boycott of downtown merchants as a means of forcing a rerouting of the downtown corridor…the $95 million expressway is being built for downtown [business] interest" at the expense of working-class black homeowners said, Bradley. Since downtown businesses benefited from the expressway, according to Bradley, "we are going to leave downtown Richmond alone for a little while…and see how they get along." Likewise, Reverend E.E. Smith encouraged blacks to boycott downtown businesses and "battle Richmond Forward at the polls" if Jackson Ward was to be redeveloped. [64]

---

[63] *Richmond Times Dispatch*, November 26, 1966.
[64] *Richmond Times Dispatch*, May 24, 1967.

Black Richmonders increased their mobilized efforts to save Jackson Ward. Black residents "packed the council chambers" on the warm spring night of April 25, 1967, hoping to convince the five pro-redevelopment council members to reconsider the urban renewal plans. "Do not displace our neighborhood; do not put the people out of their houses who have no place to go…do not displace our people," exclaimed neighborhood representative Henry Clarke. Councilman Howard Carwile supported the cause by criticizing what he called "Jim Crow housing proposals." After the emotional pleas convinced the pro-redevelopment sector of the council to reject the expressway plan, Carwile congratulated black residents "for initiating demonstrations against the expressway." Black neighborhood activism, electoral gains, and councilmanic leadership, prevented white leadership from displacing black residents. Black redevelopment opposition forced white leaders to sequester support from suburban leadership to relocate blacks from the city's core by investing "more than $1 million in South Richmond" for public housing.[65]

White leadership ran into suburban opposition while trying to relocate blacks from the city's core to South Richmond. With core redevelopment temporarily suspended, the city council proposed public housing construction near the Richmond-Chesterfield border. Support from suburban leadership would have ensured the project, given that Chesterfield property values were directly affected by the construction taking place on its border. However, suburban leader Chesterfield Board of Supervisors Member Frederick T. Grey opposed the construction when city councilmen approached the Board during January of 1968. According to Grey, suburbanites only supported "luxury-type apartment buildings"

---

[65] *Richmond Times Dispatch*, February 13, 1968.

near their border, not low-income housing projects. Grey made it very clear that urban political problems should stay within city borders. Housing projects, according to Grey, caused a huge "disturbance of a stable community…let's not overcrowd South Richmond, let us not build ourselves a ghetto;" was the sentiment Grey represented in his objection. Grey's objection caused the city council to veto its own proposed measure. The fear of black neighbors, along with Richmond's political drama sitting on suburban borders, prevented suburban leadership from helping the city council with the redevelopment problem that Marsh, Carwile, and the working-class blacks created within the city.[66]

As redevelopment woes intensified, black leadership, headed by Marsh, rehabilitated Richmond's East End. The city was, by 1969, forty square miles, yet it had the sixth most concentrated public housing tract in America. East End was five percent of Richmond's land mass and held more than fifty percent of its poverty. "When I think of Church Hill," a black East End neighborhood, "I think of the people who need many more services from the city than they are getting," said Marsh. As he pushed for housing codes that protected black neighborhoods from dilapidation and redevelopment, black councilmen B.A. Cephas and Vice Mayor Winfred Mundle supported Marsh's campaign. "The level of frustration and hopelessness is growing rapidly in the city," as white leaders opposed Marsh III in every way. To Councilman Bagley, Richmond was a "77 million dollar cooperation." The only problem was that Marsh's rehabilitation plan ensured "this corporation spends 77 million," guaranteeing "it doesn't earn it" back. Black leaders fought redevelopment plans until the council applied for and received a $450,000 federal housing grant. The grant went exclusively to "making Church Hill a model neighborhood" for

---

[66] "City Council Vetoes Two Big Projects for Apartments," *Richmond News Leader* January 23, 1968.

rehabilitation, not redevelopment. This plan, along with their collective support against urban renewal, allowed Richmond blacks "to participate in planning their own future," one that excluded white leadership from disenfranchising blacks through urban space.[67]

Before Marsh's rookie term, black Richmonders never successfully opposed urban redevelopment. The black working class, led by Henry Marsh, had more say in urban politics. Marsh was the third post-Reconstruction black councilman, yet he was the most aggressive in shaping urban policy. Oliver Hill in 1948 and B.A. Cephas in 1964 had neither the Civil Rights Era circumstances nor the electorate to become serious forces in urban affairs. The mobilization against urban redevelopment and black increases in electoral politics allowed Marsh to aggressively battle white leadership, whereas Oliver Hill and B.A. Cephas could not. Marsh's first two terms illuminated the transition from urban blacks having electoral power to possessing councilmanic power. Richmond's racial dynamic, and Marsh's ability to capitalize on it, set the stage for Richmond's most important election in city history.

**1968 Election**

The 1968 election was the most polarized election of Richmond's seventeen-year power shift. White leaders used the local media to secure the city council in the 1968 election. White leadership used racial fears to remind whites of the possibility of black leadership controlling the city. The same white leadership used race to convince working-class blacks that their professionals were no more than slum lords, using race to secure

---

[67] *Richmond News Leader*, May 15, 1968; *Richmond News Leader* May 23, 1968; Nathaniel Bacon School PTA, President Ralph W. Palmer to Virginia Crockford, March 16, 1970 (*Virginia Crockford Papers*, Box 1-4 Folder 3 James Cabell Branch Library, Virginia Commonwealth University); *Richmond Times-Dispatch*, April 11, 1968; *Richmond News Leader,* May 5, 1967; and Interview with Reverend Benjamin Campbell, January 6, 2016.

political power through racialized voting solidarity. The results of this election reassured white leadership that annexation was the only solution to prevent black leadership from controlling City Hall. In the end, the election results not only produced the 1969 annexation, it became the lynchpin of the 1970 busing crisis.

This election experienced more voter participation and media attention than ever before. By late May, the Crusade helped increase black voter registration by ten percent from 1966, increasing the black vote to forty-four percent of the anticipated turnout. These numbers confirmed white fears that this election was going to deliver a black majority city council. In response, the affluent white voter organization Richmond Forward revitalized voting registration in white districts. Using public schools and community centers, Richmond Forward helped intensify white voter registration. The goal was to increase white voter turnout from thrity percenty to eighty percent of the overall white population. The *News Leader* tracked Richmond Forward's campaigning and noted that "the R[ichmond] F[orward] efforts have been intensified…since the circulation began in the Negro community two weeks ago" that blacks could take the city council. Richmond Forward and Crusade efforts were so visible that they reached "proportions seldom, if ever, undertaken in a Richmond political campaign" Both white and black leaders understood that whichever side best mobilized its base would win a majority on the council.[68]

The white media used coded race language to secure biracial support against black Crusade candidates. Election Day was "one of the most important days in the history of Richmond," according to the *Times-Dispatch*. If Richmond was to remain an "All-American City," its voters would have to ensure the "irresponsible and inexperienced"

---

[68] *Richmond News Leader*, May 30, 1968.

Crusade candidates were not elected. To the *News-Leader*, if Crusade candidates won, "Richmond will become a permanent black ghetto, a happy hunting ground for ambitious political opportunists." Both media outlets portrayed Crusade leaders as urban slum lords, using social change to place themselves at the helm of urban politics. The Crusade was running a "cruel hoax on the disadvantaged citizens of" Richmond," using race leadership to garner political power in the increasingly black city. To hide the racial coding with economics, the *News Leader* concluded by alarming white and black voters that "the normal exodus to the suburbs will accelerate…leav[ing] a lower tax base for the disadvantaged in a time of increased need," if black leaders becomes the councilmanic majority.[69]

The black media used race and class to combat the white media's criticism of black leadership. The *Richmond Afro-American*, a known Crusade mouthpiece, responded to the *News Leader* slum lord claims by reminding Richmonders that the Crusade represented the poor it did not exploit them. While adopting Martin Luther King's Poor Peoples Ticket, championing economic rights through jobs and housing for working-class blacks, the *Afro-American* illuminated Richmonf Forward's ties with white business interest. "Richmond Forward [is] backed and controlled by the city's big money czars."

The *Afro-American* went on to say that Richmond Forward:

"Has been so devoted to pushing its individual and corporate pursuits that it has grossly neglected the needs of the people, particularly the city's working man and disadvantaged. RF record would have been impressive in the 40's. But this is 1968 when identity with 'safe' colored folk, interracial cocktail parties and mushy smiles by the mayor

---

[69] *Richmond News Leader*, June 7, 1968; and *Richmond Times Dispatch*, June 11, 1968. All American City comment reminded citizens of the All American City award Richmond won from the National Civic League in 1966. Cities won this award by having the best community cooperation between citizens and councilmanic leadership. The aesthetic beauty of the city was also a standard for the award. The assumption was that black leadership was incapable of maintaining the communal or physical interest of the city. This was another, of many, instances of coded race language used by the Richmond media.

don't get it. Today, what is needed is men with guts to take effective action to eradicate racism and injustices which are about to destroy not only Richmond but the country…Richmond Forward has been unwilling to act against oppression…the record shows that it has sometimes tended to promote it. All one needs to do is recall Richmond Forward's race baiting tactics on open housing and annexation."[70]

Richmond Forward selected its candidates with the growing black working-class voting base in mind. While supporting eight candidates, Richmond Forward left one spot open for Richmond's favorite councilman: Henry Marsh. Richmond Forward implemented the eight-man nomination strategy to ensure the two voting blocs they needed to win: whites and working-class blacks. Richmond Forward could not endorse Marsh because conservative and business friendly whites hated his opposition to urban redevelopment. However, Marsh had a strong white liberal following in the city's Southside. This was in part to Marsh being the "the only black guy they heard of," as well as his strong ties to the liberal faction of the Democratic Party. Marsh's rookie term provided him much support city-wide, making a direct campaign for or against him political suicide for Richmond Forward.[71]

The Crusade's candidate selection process reflected its stance against white business interests, along with fears of white voter backlash. The Crusade shifted away from a heavy black slate, in favor of a bi-racial slate. Questions about supporting blacks who did not fit the agenda led to the Crusade removing support from incumbent black councilmen B.A. Cephas and Winfred Mundle. Both Cephas and Mundle not only supported urban redevelopment, they served on housing committees that refused to provide adequate housing for black residents. Traditionally seen as go-betweens for white and black leaders, Cephas and Mundle's fates were sealed without Crusade support. Their political success

---

[70] *Richmond African American*, June 8, 1968.
[71] *Richmond News Leader*, May 30, 1968; and Interview with John V. Moeser, January 5, 2016.

centered on being the black faces of white politicians. Without black support, white politicians had no use for Cephas and Mundle in the council.  For the Crusade, rejecting Cephas and Mundle, as historian Allan Hammock suggested, proved "blacks could reject black candidates who were well-known incumbents and vote for Crusade endorsed white candidates," two being Reverend James Carpenter and Howard Carwile. Moreover, it legitimized their claim to work for the poor, given that white and black poverty plagued Richmond. Black professionals ensured that their political ascension appeared as socially centered ideals involving race and not race based social change. Therefore, liberal whites replaced conservative blacks on the Crusade ticket.[72]

The highly anticipated 1968 election did not bring about the results the white media predicted. On Election Day, July 14, 1968, Richmond did not have anything close to a majority black city council. Henry Marsh was the only one of the three incumbent black councilmen to win reelection. This had much to do with Richmond Forward not campaigning against him, Crusade support for him, and his increased popularity amongst white liberals. The white liberal presence was felt more by the return of Howard Carwile to the council, winning first place with over fifty-six percent of the electorate. Marsh and Carwile were accompanied by a white Reverend of a black church James Carpenter.[73]

The white media wrongly assessed the implications of the election results. The *News Leader* assured white residents that Crusade electoral advances were coming to an end because two of the three black incumbents lost their reelection bids. While focusing on race, the *News Leader* neglected to mention that Cephas and Mundle were elected out

---

[72] Allan Staton Hammock, "The Leadership Factor in Black Politics: The Case of Richmond, Virginia," (Dissertation, University of Virginia, 1972) 66.
[73] "Crusade Shows Power, But Is It a Victory?" *Richmond News Leader*, June 12, 1968; and Councilmanic Election Results, June 10, 1968.

of office by the same urban blacks who elected them in 1966. Even the *Times-Dispatch* post-election report suggested that Cephas and Mundle's support of urban redevelopment cost them black support. Rather, Marsh had two allies, Carwile and Carpenter, who were going to vote his way on almost every measure. This was actually the Crusade's strongest election to date. Black leadership secured three seats for councilmen, guaranteed white liberal voters, and had three councilmen who were solely interested in opposing elite white councilmanic interests.[74]

While the 1968 election featured less black councilmen than the 1966 election, urban blacks possessed more electoral power than in years past. Black leadership, through its bi-racial slate, helped elect enough councilmen to stop proposals by Richmond Forward councilmen, giving black leadership its first ever veto power in the city council. Although the *Times-Dispatch* reported the removal of two black incumbents as "the death of the Richmond Crusade for Voters as a major power in the city political structure," black leadership once again increased its political power through electoral gains. The realization of what the Crusade accomplished in the 1968 election forced white leaders to broker a land and citizen deal with suburban leadership, hoping to thwart the increasing professional black influence in city politics.[75]

**1969 Annexation**

The 1969 annexation culminated the efforts of urban and suburban white leaders using their various political agendas to ensure Richmond and its city council remained

---

[74] *Richmond News Leader*, June 12, 1968. The city charter allows three dissenting votes to veto any councilmanic proposed measure. Instead of getting a majority, all the dissenting councilman needed was two supporting votes. This did not apply to non-councilmanic proposed measures, which needed only a majority to pass.
[75] *Richmond Times-Dispatch*, June 11, 1968; *Richmond Times Dispatch*, June 14, 1968; John Ritchie, Jr. "An Analysis of the Voting in the Councilmanic Election, June 11, 1968;" and *Richmond Times Dispatch*, June 12, 1968.

white. Once completed, the annexation made 44,000 white Chesterfield suburbanites Richmond residents at the stroke of midnight on January 1, 1970. This acquisition had social and political ramifications. Socially, the annexation sparked suburban unrest, as newly-made Richmond residents opposed their new residential status through petitions to the Virginia Supreme Court. Suburban unrest was followed by urban unrest between law enforcement and black residents, who were the new voting minority. Politically, annexation reduced Richmond's black citizenry from fifty-two percent  to forty-two percent , ensuring a white majority city council in the 1970 election. Disdain over the racial results of the 1969 annexation, as well as the city council it created afterward, played out in education reform, leading to the final stage of Richmond's racial shift in 1977.

Urban white leaders made efforts to work with suburban leaders on annexation. City Manager Alan Kiepper and Chesterfield Board Member Melvin Burnett met eight times between July 16 and September 12, 1968. Despite Kiepper asking for "50,000 affluent white" people to offset the growing black populace, the subject of the meeting was not as important as the places they met. Burnett and Kiepper met in donut shops, houses of mutual friends, and small diners, all located in what would be the annexed territory. These locations suggest a shifting class relationship between urban and suburban white leadership. Traditionally, urban white leadership conducted business in venues like the Country Club of Virginia, which excluded blacks and non-elite whites. However, urban leaders stepping away from the traditional haven for racial politics illuminated how important it was that suburban leadership worked with them to make, according to John

Moeser, the "one mind" they both shared into a reality. That reality was the assurance that blacks did not control the urban center of the metropolitan area. [76]

Negotiations became complicated when more city and county officials entered the discussion. Kiepper and Burnett could not reach a compromise because both sides refused to compromise on the number of annexed residents. So, Richmond Mayor Phil J. Bagley and Chesterfield Board Member Frederick F. Dietsch entered the annexation discussions. Both Dietsch and Bagley represented the extremes of suburban and urban leadership. To Dietsch, any annexation of over 30,000 residents "was out of the question." If Chesterfield's leadership would cede Richmond the 50,000 white residents the council wanted, "the court would have to order it." Mayor Phil Bagley was determined to annex 50,000 white suburbanites to prevent "the city from going to the niggers," politically and demographically. Bagley foreshadowed the future annexation by proclaiming that "as long as I am the Mayor of the City of Richmond, the niggers won't take over this town…[because] niggers are not qualified to run the city." Dietsch's and Bagley's stances only complicated discussions between the two sides, forcing the state's hand in doing what they both could not: maintain a white majority in Richmond.[77]

Fed up with the annexation stalemate, state powers intervened to force an urban-suburban solution. The annexation trial resumed on September 24, 1968, with both sides farther away from a solution. After Chesterfield Attorney Frederick T. Grey and Richmond Planning Director A. Howe Todd finished 1968 in a stalemated court battle, Governor Mills

---

[76] Plaintiff's Exhibit 32-Melvin W. Burnett Notes, *City of Richmond, Virginia v. United States of America*, No. 74-201, U.S. Supreme Court (1974), Appendix, Vol I, pp. 142-149; Interview with Wayland Rennie; and Interview with John V. Moeser, January 5, 2016.

[77] *Curtis Holt, Sr., v. City of Richmond*, September 20, 1971, pp. 154-156; and Phil J. Bagley, Jr., "Response to Civil Rights Commission Regarding Richmond-Chesterfield Annexation," in U.S. Civil Rights Commission, *The Voting Rights Act: Ten Years After*, January, 1975, 454.

E. Godwin called a special General Assembly session in April of 1969. In this special session, the Assembly proposed and passed an amendment to expand city borders to the Assembly's liking in any direction it saw fit, effective January 1, 1970. The bill was only voided if a land deal was brokered before the January 1 deadline. Godwin's measure took political power away from both urban and suburban leaders. Now the state decided if and how Richmond should grow, as well as Chesterfield's sociopolitical aftermath.[78]

Suburban leadership was convinced Godwin's bill was a racially motivated measure to maintain white leadership in Richmond. The General Assembly, as well as "the City of Richmond is only interested in one thing, white votes," said Chesterfield Delegate George Jones. Instead of the state handling Richmond's affairs, Jones argued suburbanites should "appoint the city council if they cannot manage the City of Richmond and they need help from us." Jones finished his speech on the House floor by mentioning "there is a group in Richmond that would like to continue the stranglehold control that they have over the city." This group was the city's affluent white class, and its stranglehold was reassured through "keep[ing] more registered white voters than Negro voters." Despite stating the obvious, Governor Godwin, with Assembly members, put both Richmond and Chesterfield leadership on notice that either they ensure Richmond remained white or the state would do it for them.[79]

Urban and suburban leadership responded to Godwin's bill by settling on the city's territorial expansion. On May 15, 1969, Mayor Phil Bagley and County Board Member Irvin Horner met and agreed to Chesterfield relinquishing twenty-three square miles of its

---

[78] *Richmond News Leader*, September 30, 1968; *Richmond Times Dispatch*, October 3, 1968; and State of Virginia, General Assembly, Proceedings and Debates of the Virginia House of Delegates pertaining to Amendment of the Constitution, Extra Session 1969, 517-520.
[79] *Proceedings and Debates* (House), 528.

northeast border to Richmond, which included 44,000 residents (43,781 white), for $34 million. Despite dissenting votes from Richmond's Henry Marsh III, Howard Carwile, James Carpenter, and two Chesterfield Board Members, both groups agreed to what would be called the Horner-Bagley line. This agreement ensured that the annexation was effective on January 1, 1970, nullifying the General Assembly's annexation amendment.[80]

Black opposition to the effects of annexation came in the form of welfare protest. The annexation price put public programs under financial strain. The city charter forbade the council from borrowing money to annex land, therefore, the $34 million came directly out of the city budget. One of the departments impacted most by city-wide cutbacks was the welfare office. On October 1, 1969, the city enacted its welfare department budget cut, which was planned almost a year prior to accommodate a future annexation purchase. Included in the budget cut was the council's vote to "not increase welfare payments for clothes, food, and furniture," all of which became more expensive as downtown businesses relocated to the suburbs. The budget cut not only slashed entitlement payment almost in half, it reduced the number of residents who could enroll and stay on the program. With annexation, "the city bank account was under a strain," forcing the council to save money wherever they could.[81]

Black residents contested the council's handling of welfare within the city budget. After being told by Welfare Chief Herbert G. Ross that the council's "instructions were to cut costs in his department by $1 million…and that he could not accede to another

---

[80] *Curtis Holt, Sr., v. City of Richmond*, 141-142; State of Virginia, General Assembly, Proceedings and Debates of the Senate of Virginia pertaining to Amendment of the Constitution, Extra Session 1969, 318; *Richmond Times Dispatch,* February 12, 1969; and *Richmond Times Dispatch*, June 17, 1969. Although there were three votes against the annexation, the annexation was proposed by the city manager and city attorney. Therefore, a majority was only needed to pass the measure. Only council-sponsored legislation could be voted down with three dissenting votes.

[81] "Welfare Chief Repeats Ruling," *Richmond News Leader*, October 14, 1969.

demand," black mothers, led by Miss Louretta Johnson and the National Welfare Rights Organization, gathered outside of City Hall and the Safety, Health, and Welfare office in protest. That night, black residents "packed out" the city council meeting over the welfare issue. "Uniformed and plain clothes policemen stood to enforce Mayor Phil Bagley's rule against applause," as tensions were high between black residents and white leaders. After councilmen Marsh, Carwile, and Carpenter requested putting city welfare program under federal compliance for grant purposes was denied by all six Richmond Forward councilmen, loud "rumbles of discontent" sprang "from the predominantly Negro crowd." One spectator encouraged Mayor Bagley to "sleep well," knowing his administration was arguably the most disfavored by black Richmonders in city history. Black discontent with white leadership spilled out of City Hall and into the community, as law enforcement had trouble policing black Richmond.[82]

Negative police-black encounters following the annexation reflected annexation hostility between urban blacks and white leaders. Reports of violent encounters between white police officers and black citizens became more frequent as the January 1, deadline approached. One hundred and twenty black Richmonders went to City Hall in late October to support twenty-one blacks who testified against the Richmond Police Department. Residents used an incident, in which a black man was detained by white officers for no legal reason, as a forum to publicize their complaints. Citizens claimed the police regularly displayed "discourtesy, indifference" to "pickpocketing money from them." White officers responded to urban black complaints with violent threats. Statements like "I'll blow your brains out" reminded blacks that questioning the large police precence in their

---

[82] *Richmond Times Dispatch*, October 14, 1969.

neighborhood could be fatal. Councilman Carwile believed this trend was a "city problem," as complaints dominated city council discussions. "A big handle of red-necked, unreconstructed Dixiecrats and bigots" consistently punished anyone from the "majority community," who would become the minority soon enough. The excessive police force appeared to be a physical reminder that whites were taking their city back on January 1, 1970. "The atmosphere is so built up" from the annexation that it was very difficult for "the victim of police brutality to have anybody on their side."[83]

White leadership minimized the obvious community-council problems that arose from the annexation. City manager Alan Kiepper addressed Carwile and urban blacks by proposing an increase in police patrol over black neighborhoods. Carwile's "civilian police review" board request "discredit[ed] the police," according to City Manager Kiepper. City Manager Alan Kiepper begged the council to release funds for police overtime hours. Since Richmond's street crime "mostly involves blacks," increased patrol made sense, as police-black encounters worsened. The measure was passed with three dissenting votes from the usual suspects, Marsh, Carwile, and Carpenter. This increased surveillance ensured that newly annexed Chesterfield suburbanites felt safe knowing that black neighborhoods were "properly" patrolled and controlled by white law enforcement. White control extended to law enforcement, as black residents continued to show discontent over the recent annexation decision.[84]

---

[83] *Richmond Times Dispatch*, September 11, 1969.
[84] *Richmond Times Dispatch*, October 1, 1969; *Richmond Times Dispatch*, September 24, 1969; and *Richmond Times-Dispatch*, September 30, 1969. Because Alan Kiepper was the City Manager and not a councilman, his proposal, like the annexation, needed a majority vote to pass. The Crusade minority with Marsh, Carwile, and Carpenter could only vote down council proposed measures.

Like working-class blacks, the annexation caused suburbanites much discomfort. Chesterfield residents petitioned to appeal the annexation, as it was a point of dissension between suburban residents and their leadership. While suburban leaders were interested in maintaining Richmond's white majority, the truth is most suburbanites could not care less because real estate markets and county lines protected them from Civil Rights Era race problems. Chesterfield residents, under the leadership of dissenting Board Member L. Paul Byrne, encouraged Crusade president Wilmer Wilson, to sue the city council for violating Section V of the Voting Rights Act of 1965 (VRA), given that the annexation switched the black voting majority to a minority. Black leaders refused to support any litigation based on the VRA because the white influx stabilized the urban economy. After receiving no support from Richmond's black leadership, Chesterfield residents petitioned the Virginia Supreme Court of Appeals on their own. The appeal was heard on November 20, 1969, and cartupuled the annexation. Chesterfield residents filed one more appeal on December 19, 1969, but the Virginia Supreme Court rejected it once again. As the year 1969 drew to a close, it was clear that the annexed residents were going to be Richmond residents on January 1, 1970.[85]

The 1969 annexation allowed white city planners to temporarily control black Civil Rights Era gains in electoral politics and urban policy. Marsh and Carwile's urban redevelopment opposition, along with the 1968 election, confirmed that urban and suburban leaders needed to control the political destabilization caused by the breakdown

---

[85] *Richmond News Leader*, September 16, 1969; Supreme Court of Appeals, *Dearborn Civic and Recreation Association, v. City of Richmond*, Petition for Appeal, November 7, 1969; *Richmond Times Dispatch*, December 20, 1969; and *Richmond News Leader*, November 26, 1969. Section V of the VRA specifically prohibited any annexation that racially changed the voting majority of the annexing locality. This was the basis for the Holt lawsuits in 1971-77.

of Jim Crow. Although Richmond and Chesterfield experienced backlash over the annexation, its true effects would be felt in the 1970 election and the subsequent school desegregation crisis.

**1970 Election**

The 1969 North Chesterfield annexation, which took effect on January 1, 1970, complicated urban politics. Overnight, Richmond not only expanded its southwestern border by twenty-three square miles, its white population increased from 108,398 to 143,857, now fifty-two pecent. Although white politicians saw the annexation as the means to retain urban political power, the annexed residents had different political objectives, making them a wild card in the 1970 election. White elites, black elites, and annexed suburban leaders, all had interconnected interests that complicated their political dealing with each other. Despite establishing their own political platform, the annexed suburban electorate largely aligned with Richmond's white leadership. However, the results of this election created conflict in the school desegregation saga, which amplified when annexed suburbanites came face-to-face with the Civil Rights Era changes Chesterfield County previously protected them from, which was school desegregation.[86]

The annexed citizens wasted no time in politically mobilizing for the 1970 councilmanic election. Instead of supporting Richmond Forward, suburbanites formed their own political organization called the Team of Progress (TOP). Under the leadership of George Jones and Robert Tuttle, both of whom represented Chesterfield in the Virginia House Delegates and were in the unique position of competing within urban politics for

---

[86] U.S. Bureau of the Census, Richmond and Chesterfield, Virginia, 1970 .

the first time, the TOP began 1970 by seeking alliances, hoping to get an upper hand on Richmond's established white and black political power structures.[87]

Suburban leadership's first round of negotiations began with the possibility of a biracial political alliance. On January 23 1970, TOP members Robert T. Fitzgerald, Roger Griffin, and Ronald Livingston, met with Crusade founder Dr. William Thornton about forming a political coalition in the upcoming election. The proposed alliance would combine the newly annexed white and urban black voting minorities. The coalition could have possibly unseated annexation leaders like Councilman James Wheat Jr., Mayor Phil Bagley, Councilman Thomas Bliley, Councilman Nathan Forb, Councilwoman Nell B. Pusey, and Councilman Morrill Crowe. After a few hours of discussion, Dr. Thornton rejected the alliance because he felt the Crusade would not "benefit from a formal alliance" with the TOP. Some suspected the proposed alliance would reduced the role black professionals had in electoral politics, given that "the Crusade…was seldom on equal footing" with white leaders, even within the city council. This proposed alliance was not about two powers coming together, but about one power (annexed leadership) attempting to use the other power (black professionals) to establish themselves as urban political figures.[88]

With no intentions of fighting a three-way electoral battle, TOP leaders sought an alliance with Richmond Forward. After failing to see eye-to-eye with Dr. Thornton, TOP leadership met with current Richmond Forward councilmen Nathan Forbes and Thomas

---

[87] Plaintiff Exhibit #33, *Curtis Holt, Sr., v. City of Richmond*.
[88] Exhibit #33, *Curtis Holt, Sr., v. City of Richmond*; and Moeser and Dennis, *Politics of Annexation*, 134-140. The testimony included details about a Richmond Forward merger with the Crusade however, Crusade leadership felt both that making the three-sided political affair two-sided, via a formal alliance, would result in black professionals losing their grip on urban political influence. Once white leaders garnered black leadership's official support, it was hard to remove it.

Bliley, offering to electorally achieve what the annexation sought out do: to keep Richmond's city council majority white. "I don't want to see Richmond become an all-black city…fear of the city going black relates very much to the present school crisis we have," said future councilman and RF candidate Henry L. Valentine to TOP leaders. After various meetings, the TOP split into two factions. Those who felt Richmond Forward intended to use annexed votes to retain power, while not excluding them from the economic and race issues the city faced, formed Richmond United (RU). Others who saw Richmond Forward as the only means of obtaining political influence joined the TOP/Richmond Forward coalition under the TOP umbrella.[89]

This was the first election since 1962 that featured two white voter organizations with conflicting electoral interests. RU represented suburban annexed whites who endorsed any candidate that opposed the 1969 annexation. Its support ranged from Crusade incumbents Henry Marsh III, James Carpenter, and Howard Carwile, to new candidates like Robert Shiro and Oats McCullen. TOP encompassed two groups: suburban whites who supported urban white leadership and wealthy whites from Richmond Forward. TOP endorsed pro-annexation leadership like Thomas Bliley and Nathan Forb, as well as "the new white guys" such as Metropolitan National Bank President William Daniel and real estate developer and chemical engineer Dr. Wayland Rennie.[90]

The Crusade used the split white vote to nominate another biracial slate, while introducing new working-class community leaders to the councilmanic platform. While endorsing the incumbent trifecta of Marsh, Carwile, and Carpenter, the Crusade nominated

---

[89] Exhibit #33, *Curtis Holt, Sr., v. City of Richmond*. TOP also met with William Daniel, president of National Bank. He was a huge political patron in the city and a supporter of the former Richmond Forward.
[90] Interview with Wayland Rennie, July 17, 2015; and *Richmond Times Dispatch*, April 30 and April 12, 1970.

black working-class leaders like Walter T. Kenny and Curtis Holt. Postal worker and national vice-president of the American Postal Workers Union, Kenny ran his campaign on improving public schools and the black community's involvement in urban politics. Head of the Creighton Court Civic Association (voter registration), Curtis Holt was an East End community organizer who worked with Crusade leadership throughout the 1960s to keep their electoral connection with the working poor. Neither Kenny or Holt won council seats, however Holt's defeat germinated with the 1969 annexation to bring about 1977 majority black city council.[91]

The 1970 election proved that the diverse interests, derived from the 1969 annexation, prevented black and suburban leadership from gaining control over the city council. TOP helped elect six of the nine councilmen with the fifty-eight percent white majority. None of the annexed citizens' candidates, as well as the Crusade's working-class black candidates, won a council seat. The Crusade and RU helped reelect the same three councilmen in 1970 that the Crusade did alone in 1968: Carwile, Marsh, and Carpenter. Despite "many whites in the newly annexed area show[ing] their resentment having been acquired by the city" through not allying with Richmond Forward, they did not have nearly enough votes to secure their own councilmanic majority. The RU-Crusade support for Marsh, Carwile, and Carpenter resonated in all three receiving the highest overall votes. If a suburban white-urban black political partnership happened on January 23, 1970, the annexed citizens and black leadership would have controlled the 1970 city council.

---

[91] *Richmond News Leader*, May 27, 1970.

However, RU and the Crusade's inability to ally resulted in affluent whites securing a sizable councilmanic majority once again, thanks in part to the 1969 annexation.[92]

The stunted urban black political growth set the stage for Richmond's school desegregation crisis. Annexed residents did not enter the city as neutral observers in councilmanic politics or social life. Like urban blacks, annexed suburbanites had their own vision of post-Jim Crow Richmond. Suburbanites wanted protective municipal separation from the growing black population. Hence, they formed their own voter organization, only supporting leaders who wished to de-annex them back into the suburbs. After losing their bid for political influence, annexed suburbanites sought to make Civil Rights Era Richmond  difficult for white leaders to control. Suburban resistance to the annexation culminated in their own form of "Massive Resistance" to school desegregation, which sped up urban black ascendancy to the city council.

**Busing**

Prior to the 1970 busing decree, three events complicated the political drama caused by Richmond's unstable post-Jim Crow political environment. First, segregationist Judge John Butzner stepped down, and was replaced with Judge Robert Merhige. Second, the Supreme Court ruled Freedom of Choice, or de facto segregation, unconstitutional. Third, the annexation of 1969 placed over 10,000 suburban white students within Richmond City Public Schools. White suburban and black urban resistance to busing was a piece in the metropolitan areas' multifaceted relationship with race and space. The fulfillment of *Brown*, by 1970, shattered the remnants of Richmond's "Separate City" model. Judge Merhige ensured Richmond's generational physically segregated public school system

---

[92] Councilmanic Election, June 10, 1970, New City Results; *Richmond Times Dispatch*, June 10, 1970; and *Richmond Afro American*, June 13, 1970.

ended. This Jim Crow breakdown caused upheaval, as neither majority (working-class blacks and suburban whites) wished to participate in redefining their relationship to each other through education reform. The educational drama between 1968 and 1970 complicated Richmond's racial transition because annexed white dissenters fought school desegregation with school re-segregation, forcing Judge Merhige to consolidate metropolitan politics into a unitary body through its school system by 1971.

Judge Robert Mehrige's history with forced integration all but guaranteed that white and black students would be forcibly integrated. Federal Judge John Butzner, the man who ruled Freedom of Choice constitutional, stepped down and was replaced with Judge Robert Merhige in 1968. Because Judge Merhige spent much of 1967 and 1968 desegregating Southern Virginia school systems, most notably using busing and city-county consolidation in Emporia City, many saw him as a liberal judge. However, unlike some of his contemporaries, Merhige "was not one to be interested in deeply theoretical notions about statutory interpretation or constitutional interpretation;" however he encountered the law with "a sense of human dignity" according to law professor Mary Tate. To law professor and former collegue Ron Bacigal, Merhige often saw "what was right and was what the law as one in the same," when it came to Civil Rights legislation. Therefore, when Merhige enforced *Brown* through busing, he did so with the understanding that it was not only lawful, but that it was also what he felt was morally right.[93]

The defeat of Freedom of Choice put Judge Robert Merhige into contact with Richmond's public schools. The last leg of legal de facto segregation died thirty miles

---

[93] Ronald J. Bacigal, *May It Please The Court*: *A Biography of Judge Robert Merhige Jr* (University Press of America: Lanham, Maryland,1992), 52-56; Interview with Mary Tate, May 16, 2015; and Interview with Ron Bacigal, May 15, 2015.

southeast of Richmond. On May 15, 1968, the Supreme Court ruled all Freedom of Choice plans to be in violation of *Brown* in the *Green v. County School Board of New Kent* case. In New Kent County, similar to Richmond, the majority of whites and blacks used Freedom of Choice to stay in segregated schools. Therefore, resident NAACP member Charles C. Green used the County's Freedom of Choice Plan to prove that its offspring, de facto segregation, was in violation of *Brown* because it produced a racially identifiable school system. Serving as the Federal Judge in Richmond, Judge Mehrige helped to create another desegregation plan for city schools. Having earned an unfavorable reputation in the famous Greenville County School consolidation, Judge Merhige received threatening, sympathetic, and desperate letters from whites hoping he would not use busing or consolidation to racially balance Richmond's public schools.[94]

White Richmonders' hate letters revealed their collective fear of Judge Merhige removing yet another remnant of the city's Jim Crow culture: racially segregated public schools. Hate mail, later named "Kook Files," often revolved around the harm of bi-racial contact between white and black students. Most of the harm stemmed from sex. One mother begged Judge Merhige to spare Richmond public school system from desegregation because she feared "the type of Negro" children who came from parents who refused "to get married" and "keep having children with every Dick and Jane that comes along." The white mother's criticism of the black family structure and sexual promiscuity reflected her deeply rooted notion of blacks being too uncivilized to share the same classrooms with white students. Some whites took their dehumanizing sexual stereotypes to the extreme by

---

[94] *Green v. School Board of New Kent County*, 390 U.S. 430; Bacigal, *May It Please The Court*, 54; and J.W. Davenport to Judge Robert Mehrige, April 3, 1968 Kook Files *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 10, Muse Law Library, University of Richmond.

calling black boys "wired-haired cannibals" who loved nothing more than to rape young white women. Another parent went as far as to accuse Judge Merhige and his wife of having sexual relations with "niggers." While most letters warranted the name Kook Files, some parents expressed general concern for their children's wellbeing. One mother claimed she was forced to pick up a second job to pay for private school because she feared her children being mistreated by the black students who hated white people. Through these letters and many more received by School Board President Virginia Crockford, white Richmonders revealed their deeply rooted fears and hatred associated with the breakdown of Jim Crow. These racial fears were tested when they were faced with forced integration.[95]

Seeing Freedom of Choice as the last leg of Richmond's school segregation, the local NAACP struck what looked like the final blow against school segregation: *Bradley v. Richmond School Board*. The timing for this lawsuit was key to its longevity and impact. Had this lawsuit been filed before 1968, chances are it would have not been as effective. Not until after the annexation took place, which added over 10,000 white students to the sixty-eight percent black school district, did the NAACP reopen the 1962 lawsuit on March 10, 1970. The appointment of Judge Merhige, the illegality of Freedom of Choice, and the increased white student body, made the *Bradley v. Richmond City School Board* suit more likely to achieve racial integration in public schools.[96]

Political issues made this version of *Bradley* more powerful than the 1962 suit. The council's white majority understood that they could not successfully fight integration any

---

[95] Aldia S. Carter to Judge Robert Mehrige, May 13, 1969; Anonymous Parent to Judge Robert Mehrige, March 2, 1969; Mrs. Evelyn Field Griffin to Judge Robert Mehrige, May 2, 1969; William C. Lenio to Judge Robert Merhige, August 1, 1970; Black & White Gazelle to Judge Robert Merhige, Oct 3, 1970, *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 10, Muse Law Library, University of Richmond.
[96] *Bradley v. Richmond School Board*, 462 F. 2d. 1. Caroline Bradley and ten other parents sued the Richmond School Board for maintaining racially identifiable schools.

longer. The 1962 *Bradley* suit came before Freedom of Choice, when statewide tokenism was at its strongest. The 1970 *Bradley* suit came during intensified political drama over the annexation and the council's inability to institute Freedom of Choice. Financially, the council could not afford another lengthy fight against school desegregation. The over one million dollars in legal debt from the annexation, and Crusade councilmen Marsh, Carpenter, and Carwile blocking all council proposed measures to borrow money, kept the city's legal budget to a minimum. If public schools were to survive, they needed federal funding which hinged upon federal compliance with desegregation. With city council approval, the Richmond School Board asked the U.S. Department of Health, Education, and Welfare (HEW) to devise desegregation plans that not only brought the city in compliance with *Brown*, but enable the Richmond Public School systems to receive much needed federal funds.[97]

It was clear to Judge Merhige that ending school segregation meant breaking the geographic barrier that sustained it: space. By the summer of 1970, the biggest obstacle preventing Richmond public schools from federal compliance was segregated housing. So, Judge Mehrige allowed the HEW and the Urban Team to present methods for school desegregation. The Urban Team and HEW decided that Richmond's public schools would never be in compliance unless the white suburbs were forced to participate in a metropolitan busing scheme. Public schools resided within neighborhood boundaries, most of which were racially segregated. This made mobility the issue, as blacks who wished to send their children to white schools could not access public or private transportation to white neighborhoods. White families, even those who lived in predominantly black areas,

---

[97] *Richmond Times Dispatch*, June 20, June 28, and July 10, 1970.

refused to send their children to schools with predominately black students and black faculty. To Merhige, the solution was simple. Removing spatial barriers meant utilizing busing.[98]

Judge Merhige refused to accept any desegregation plan that did not fully utilize mass transportation to break the spatial barrier Jim Crow created. Distance and cost both factored into the equation. Most black residents lived in Richmond's East End and Northside. Urban whites lived in the West End and Southside of the city. This meant any approved busing scheme had to be implemented across the sixty-three square mile city. HEW's desegregation proposal, Plan I, included busing in all neighborhoods except the all-black East End and all-white suburban annexed Southside. Since Plan I left two huge sectors of the city untouched, providing residential safe zones, Judge Merhige rejected Plan I. Plan II, devised by the city council and school board, allowed for complete cross-town busing of every neighborhood, yet it relied exclusively on federal funds. Judge Merhige rejected Plan II because it levied no financial responsibly on the same city that blatantly disobeyed the law. As a compromise, Judge Merhige accepted Plan III on August 7, 1970. It was a temporary plan that bused mainly East End and Northside blacks to Southside schools.[99]

Suburban whites felt victimized and protested what they felt was a violation of their consumer rights. Annexed residents formed the Citizens Against Busing (CAB) coalition

---

[98] Urban Team Study on Northside Schools, "Richmond School Board Grant Proposal" to the U.S. Department of Health, Education, and Welfare, June 1970, *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 9, Muse Law Library, University of Richmond. Plan III was approved only because Judge Merhige wanted to integrate city schools before the 1970-71 school year. He gave HEW and the school board six months to develop an "adequate" plan, yet each plan either cost the city too much money, or did not integrate city schools to Judge Merhige's liking. For more information, see *Bradley v. Richmond School Board*, 380.

[99] *Bradley v. Richmond School Board*, 462 F. 2d. 23; and Christopher Silver and John V. Moser, *Separate City*, 9.

under the leadership of Chesterfield preacher John Book. CAB petitioned Governor Linwood Holt to issue a state ordinance repealing Judge Merhige's busing plan. However, state and local support for busing was evident as Governor Holt and TOP councilman Mayor Thomas J. Bliley, who both vehemently opposed busing, asked annexed citizens to "obey the law and cooperate." The CAB organized drive-ins around Capital Square and Richmond Arena, protesting the "the combining of all races by force" in public schools. Annexed residents' victimization was best explained by one mother who mentioned that "before I was occupied by the City of Richmond, I was relatively happy and had no serious problems." Suburbanites "flee to the suburbs and so avoid the problems" of the city. "The Problems" being Jim Crow's demise. CAB's message was clear.  Annexed suburbanites wanted residential, political, and educational separation from Richmond's white elites and black residents. The annexation and Judge Merhige's busing ruling violated their Civil Rights Era agenda, making suburbanites "second-class citizens" to the same blacks who were just a few years before, legally second-class citizens.[100]

Suburban protest turned into massive resistance at the beginning of the 1970-71 school year. On the first day of school, suburban parents illegally withheld over 5,000 children from Richmond's Public Schools' busing plan. Few white dissenters, mostly in the West End, legally removed their children from Richmond Public Schools, like Judge Merhige who reassigned his own son to preparatory school. As historian Matthew Lassiter noted, the majority of white dissention came from the annexed Southside. Stories of Southside families renting additional apartments and using fake addresses in Chesterfield

---

[100] Mary Pantele to Virginia Crockford, April 23, 1970; Paul T. Bassett to L.D. Adams Sept. 10, 1970; and T. Stevens Daugherty to Thomas  J. Bliley, Aug. 20, 1970, *Virginia Crockford Papers*, Box 2, James Cabell Branch Library, Virginia Commonwealth University*; and *Richmond Times Dispatch*, Sept. 14, 1970.

and Henrico to avoid busing ran rampant throughout the local media. The protest impacted Richmond Public Schools, as by November of 1970, the fifty-eight percent black student majority expanded to seventy percent in half of a semester.[101]

Working-class blacks resisted citywide busing as well. Black Richmonders withheld 800 children from public schools in defiance of the busing order. "We want neighborhood schools the same as white folk" said black parent and *News Leader* reporter Al Johnson. Black mother Mrs. Shirley Martin told the *Wall Street Journal* that black Richmonders accepted busing, "but we don't like it." Mrs. Martin later raised the question of "why can't my kids go to school near my house?" Many of the busing assignments put black students in white schools, instead of the other way around. Urban blacks did not want their children "to be bused all over the place" to protect white students from going into black neighborhood schools. Although the school board and the city council saw forced busing as in "the mutual interest of the entire metropolitan area," on this and the annexation, urban blacks aligned with suburban whites in opposition. This working-class black and suburban white resistance was bigger than race. Rather, as historian Robert Pratt alluded to, their defiance highlighted a "natural fear of the unknown" world Civil Rights Era changes were creating. The breakdown of Jim Crow scared the working-class black and suburban white majority, forcing them to react in utter defiance.[102]

Because of white and black defiance, Judge Merhige consolidated Richmond's race-centered political crisis through education. By December of 1970, busing became

---

[101] *Richmond News Leader*, September 2, 1970; and *Richmond News Leader*, November 21, 1970.
[102] *Wall Street Journal*, Tuesday November 23, 1971; A. Prescott Rowe to Virginia Crockford, Mayor Thomas Bliley and Howard Carwile, November 19, 1970, *Virginia Crockford Papers*, Box 4, James Cabell Branch Library, Virginia Commonwealth University; and Robert Pratt, *The Color of Their Skin*: *Education and Race in Richmond, Virginia*, 1954-89 (Charlottesville: Unversity of Virginia Press, 1992), 63.

socially and economically unfeasible. Judge Merhige's busing order left a $600,000 transportation bill on the city budget, along with the outstanding legal fees from the annexation trial. In light of the recent failure, the local NAACP, headed by Henry Marsh, encouraged the *Bradley* plaintiffs to request a consolidated school system with Henrico and Chesterfield County. Since Chesterfield and Henrico served as safe zones against Judge Merhige's busing order, including both localities in *Bradley* would bring about the fullest execution of *Brown*. After the *Bradley* plaintiffs requested it on December 14, 1970, the Richmond School Board and City Council asked that both Henrico and Chesterfield be brought into the *Bradley* suit, which Judge Merhige granted..[103]

The aftermath of the busing failure, in light of the 1969 annexation, set the stage for two federal court battles that entrenched the city's sociopolitical stability throughout the 1970s. Failed cross-town busing did not end Civil Rights Era changes in Richmond. Rather, it encouraged Judge Merhige to further complicate Richmond's political landscape. Richmond's past sins of delaying *Brown* haunted the newly annexed suburbanites, who had no intentions of helping the *Bradley* plaintiffs bring about the fulfillment of Civil Rights education reform. The educational battle encompassed the city's overall political battle about the outlook of Richmond as the racially separate city became destabilized.

---

[103] Interview with Wayland Rennie; "Motion for Joinder," Nov. 4, 1970, 90a-98a, "Amended Complaint," Dec. 14, 1970; *Bradley v. Richmond School Board*, Motion to Rescue: box 18, folder 9 Muse Law Library: University of Richmond Special Collections *Robert Merhige, Jr. Papers*; and Pratt, *Color of Their Skin*, 90-97. The Richmond area experienced a massive private school movement during the school desegregation period. In surrounding counties, private school tuition dropped as more white families sent their children to them. In many cases, there were waiting lists for enrollment. Emporia residents raised over $250,000 to form a private school to defy Judge Merhige's consolidation order in 1970. Brunswick County actively recruited white families to fill older private schools, or start new ones. Some of the private school children received state tuition grants to attend these private schools. For more information on this, see *Richmond Times Dispatch*, "School Plans Progressing in Dinwiddie" and "Brunswick Academy Announces New Student Enrolment Period;" Claude S. Fox to Judge Robert Mehrige, Jan, 1968; "Richmond, Norfolk Troubled Over New Issue Of Busing," *Richmond Associated Press*: *Danville Bee* (July 9, 1970); and James L. Doherty to *Richmond Times Dispatch*, August 6, 1970.

**Conclusion**

Black leadership's 1960-66 political strength was minimized during the Middle Years of 1967-70. However, urban white leadership's thwarting of black political power only complicated Richmond's political landscape. The city's racial transition originally encompassed white and black leadership vying for control over post-Jim Crow Richmond. After the 1969 annexation, Richmond's political battle became the metropolitan areas' war over the racial and political outlook of the capital city. As annexed residents were dragged into Richmond's urban crisis, they maintained their own agenda of suburban separation apart from white and black leadership. The final stage of this transition represented the end of elite white control over city politics. Working-class black and suburban white attacks on white leaders inevitably forced affluent whites to vacate any chance of preventing Richmond from becoming a black city council.

## Chapter 3: The Beginning of the End 1971-1977

The final stage of Richmond's Civil Rights Era racial transition happened between 1971 and 1977. The *Bradley* and *Holt* trials ended elite white control of the city council and public education. During these years, elite white control of the city became more susceptible to challenges from urban blacks and suburban whites. Every political group, whether it be middle-class blacks, working-class blacks, or middle-class whites, had varying interpretations for how Civil Rights Era Richmond should operate. Circumstances created strange political bedfellows that ultimately eroded the political power away from urban white leaders by the end of both *Bradley* in 1974 and *Holt* in 1977.[104]

Although Richmond received a black majority city council by 1977, black politics were far from monolithic. Through *Bradley* and *Holt*, both working and middle-class black leaders fought separate issues for separate reasons, bringing about a similar outcome: a black-majority city, majority black council, and a black mayor. While black professionals supported *Bradley* and school desegregation, working-class black leadership supported *Holt* and de-annexation. Both black constituencies had their own visions for Civil Rights Richmond, and their separate fights placed them at odds with each other, as suburban and elite white interests used this black class breakdown for their own agendas as well. Although the city was about "ninety percent divided," in that "there were few social organizations that were integrated," social conflict over school desegregation and the 1969

---

[104] Interview with Benjamin Campbell, January 6, 2016; and Interview with Isaiah Hilliard, May 16, 2015.

JA0866

annexation integrated Richmond's political environment so much that white elites followed suburbanites by politically vacating Richmond by 1977, creating the black majority city.[105]

**Bradley**

Judge Merhige's busing experiment furthered the city's racial divide. By January of 1971, just six months after city-wide busing was approved, the black public school population rose to seventy percent after being lowered below sixy percent by the annexation. White and black urban residents separately opposed integrated schools. Black parents withheld their children from integrated schools, while white parents relocated to the suburbs. An anonymous black women noted, in an interview with Robert Pratt, that by Christmas of 1970, her West End neighborhood switched from 90% white to 90% black once busing was approved in August of 1970. School Board president Virginia Crockford mentioned that once Judge Merhige's busing order was implemented, white families fled the Richmond PTA's and neighborhoods in "droves." White flight ranged from black students victimizing white children on school buses, to the disapproval of the school board's support for busing. The defiance, by both sides, illuminated that the majority of Richmonders were not willing or ready to defy the Jim Crow culture they grew up in.[106]

The hypocrisy shown by black and white leadership may have fueled much of the defiance to busing. Despite Governor Linwood Holton sending his children to desegregated public schools, some black and white professionals, with the financial means, sent their children to private schools the minute busing was adopted. "The upper-class black kids left instantly when those children came in," according to former Councilman Wayland Rennie.

---

[105] Interview with Wayland Rennie, July 15, 2015.
[106] Robert A. Pratt, *The Color Of Their Skin: Education And Race In Richmond, Virginia, 1954-89* (Charlottesville: University Press of Virginia, 1992), 63-64.

"Even the Urban League president [Randolph C. Kendell] sent his children to private school "the minute those children came in." Those children being "the [black] children from the [East End] housing projects." Although some white Richmonders "wished [they] had a realistic sense to do it," before busing took place, many within white leadership enrolled their children in private school afterward. Most white councilmen sent their children to private schools while working almost every day on peacefully implementing public school integration. This hypocrisy did not go unquestioned as Judge Merhige had to answer to the public about sending his son, Mark Merhige, to St. Christopher's, an all-white preparatory school. "When I'm on the bench, I'm on the bench… and when I'm at home, I'm just a father. Mark attends a private school because that's where I think he can get a better education, and I make no apologies for it." While it is tough to sufficiently assess the complete social impact of black and white leadership's private school choices, busing protest surely had more to do with hypocrisy from urban leadership, as many of their children never experienced public school integration.[107]

Judge Merhige and urban white leaders agreed on using suburbanites to achieve their separate agendas, thus they developed *Bradley* by including Henrico and Chesterfield into the suit. All things considered, the recent cross-town busing failure had less to do with black and white leadership sending their children to private school and more to do with municipal borders undermining Judge Merhige's order. Judge Merhige proposed a metropolitan consolidation back in June of 1970, given his familiarity with it in Greenville and Brunswick Counties. In Richmond, "bus-dodging and white flight to the suburbs…[left] consolidation as the only course for true integration." Thinking similarly

---

[107] Interview with Wayland Rennie, July 17, 2015; and Ronald J. Bacigal, *May It Please The Court*: *A Biography of Judge Robert Merhige Jr* (University Press of America: Lanham, Maryland,1992), 68.

to Judge Merhige, the Richmond School Board and city council blamed suburbanites for the busing disaster. "School division boundaries created and maintained by the cooperative efforts of local and central state officials" create[d] racially identifiable schools and Richmond's biracial community, according to city attorneys. Richmond's white leaders and Judge Merhige shared a similar taste for involving suburbanites into urban politics. While Judge Merhige cared about desegregating schools, white leadership used *Bradley*, like the 1961 merger, 1964 annexation attempt, and 1969 annexation to convert suburbanites into controllable political currency that benefited elite white control over Richmond.[108]

Suburban leadership immediately recognized the quasi-partnership between affluent whites and Judge Merhige. After Judge Merhige included both Henrico and Chesterfield in the *Bradley* case, both counties filed requests for the removal of Judge Merhige. Both county attorneys reasoned that Judge Merhige included the suburbs in Richmond's busing crisis because of "a personal bias or pre-justice either against" suburban leaders. Judge Merhige's dislike for suburbanites became clear, according to the removal request, when he wrote: "if free citizens exercised their right to move from a troubled community to one that offers peace, then the trouble they fled should be packed up and sent to them." The partnership conspiracy became apparent when Judge Merhige wrote a letter to the *Bradley* attorneys "in which he suggested that it might be appropriate for the defendant school board to discuss with the appropriate officer the contiguous counties as to the feasibility or possibility of consolidation of school districts," according to Chesterfield attorneys. This letter was twofold, because it suggested Judge Merhige's

---

[108] *Bradley v. Richmond School Board*, 324 F. Supp. 396, 401 E.D. Va. 1971; Bacigal, *May It Please the Court*, 66; and *Bradley v. Richmond School Board* 400, 840-850.

**JA0869**

sympathy with urban leaders, while suggesting a partnership between the plaintiffs and himself. Despite the evidence, the removal request was denied, forcing suburban leadership to fight the very real Merhige-*Bradley* attorney coalition that appeared before their very eyes.[109]

Suburban leadership's inability to remove Judge Merhige or themselves from the lawsuit allowed the council and Judge Merhige to use suburban resistence for political gains. Judge Merhige approved the unitary school system in April of 1971, and on January 5, 1972, he approved an inter-jurisdictional busing plan effective for the 1972-1973 academic school year. Judge Merhige single-handedly broke "the product of private racism" which were the municipal boundaries that allowed suburban whites to disobey his busing order. This consolidation cemented Judge Merhige's legacy, as Matthew Lassiter suggested, because successfully removing Jim Crow from the Confederate capital's school systems made *Bradley* "the most important school desegregation landmark since *Brown*." Simultaneously, suburban leaders were ordered to "establish a cooperative school operation with Richmond." Richmond's white leadership successfully linked the suburbs and city through Judge Merhige's order, as according to the ruling, Chesterfield and Henrico leaders were required to cooperate with Richmond leadership politically, instead of merely negotiating with them.[110]

The national media weighed in on Judge Merhige's decision. *U.S. World News* supported Judge Merhige's decision. With consolidation, "there is no point of whites moving out of the city," said William L. Taylor Director of the Center for National Policy

---

[109] Matthew D. Lassiter, *The Silent Majority: Suburban Politics In The Sunbelt South* (Princeton, N.J: Princeton University Press, 2006), 120; *Bradley v. Richmond School Board*.
[110] *Bradley v. Richmond School Board*, 834-875, 338, 61.

Review at Catholic University. He, along with NAACP Legal Defense Councilor Jack Greenburg, supported Judge Merhige's landmark decision because consolidation went "far beyond the desegregation of a large city school system," it established the judicial precedent of de facto segregation being unconstitutional. To Taylor and Greenburg, the "predominantly white school system[s] in…surrounding counties [were] the result of discriminatory actions by both the state and local governments" of Jim Crow Virginia. Thus, they supported Judge Merhige's consolidation, as it was the only way to implement *Brown* in the Confederate capital.[111]

Judge Merhige gained support from the most unlikely of Richmond residents. There were three categories of local support for consolidation: those who believed in the vitality of public schools, those wished to prevent white flight, and those who wished to fix Richmond's longstanding racial divide. Public school advocates, or the Citizens for Exceptional Public Schools (CEPS), endorsed the "smooth transition" from separate to unitary school districts because they believed in public education. Enemies of white flight backed consolidation because they belived it would protect their "wonderful capital city from becoming a ghetto city [because of] white citizens rush[ing] to the counties to avoid desegregation." The minority of Judge Merhige supporters saw the larger implications of the unitary school district. Robert Benzia used his hometown of Princeton, New Jersey, to shed light on school consolidation. "We still have our social problems" in Princeton, but it is because of school consolidation that "people no longer think in terms of segregated schools." Judge Merhige's supporters were not united on much besides the consolidation results. Unifying the school districts kept schools open, deterred white flight, and ensured

---

[111] "Mixing City, Suburban Schools: Key Ruling by a U.S. Court," *U.S. News World Report*, January 24, 1972, 29.

that racial conflict did not result in racial separation. Perhaps the disjointedness of Judge Merhige's supporters, as Lassiter noted, ensured that local support "struggled to gain traction." Nevertheless, Judge Merhige's decision united the most unlikely of people, all of whom felt that political consolidation was the only way to achieve their various visions for Civil Rights Era Richmond.[112]

Support for consolidation did not outweigh the majority of opposition from fear. The Citizens Against Busing (CAB), West End Concerned Parents and Friends, and the East End PTA, openly opposed metropolitan consolidated busing. Some referred to Judge Merhige's ruling as communism and a violation of civil rights, while others lamented that neighborhood schools protected their "different socioeconomic values" from the blacks who would be bused into their neighborhood. "I'll go to jail if I have to; I'll move to the Alganies if I have to; I'll move to South Africa, I'm tired of living by minority rule," declaired one Chesterfield father. One Henrico mother claimed that busing enabled "group[s] of young hoodlums… [who were] roving bands of non-students and dropouts" from black neighborhoods to victimize white children. White opposition, regardless of location, was very real and it prevented any legitimate chance of Judge Merhige implementing his January ruling.[113]

---

[112] "Miracle Worker Campaign Report," March 7, 1971; CEPS Newsletter; Mrs. Murray Lowenstein to Crockford, Nov. 18, 1970; Fred Batmen, "Spotlight on Social Studies," Office of the Supervisor of History at Richmond Public Schools, Vol III, No. 9 May 1971; and Robert Benzia to Richard T. Schartzchild, Jan. 14th 1972, *Virginia Crockford Papers*, Box 4 Folder 3 James Cabell Branch Library, Virginia Commonwealth University; and Lassiter, *Silent Majority*, 123.

[113] *Richmond Times Dispatch*, July 17, 18, and 16, 1970-1971; *Richmond News Leader*, November 21, 1970; John A. Gunn to Transportation Selection School Board Offices City of Richmond, Virginia Crockford, and J.D. Adams, October 14, 1970; Raymond M. Richeson to Virginia Crockford, May 6, 1970, *Virginia Crockford Papers*, Box 2 Folder 7 James Cabell Branch Library, Virginia Commonwealth University; and Lassiter, *Silent Majority*, 150.

White opposition materialized into legal and illegal acts of resistance. Suburban and urban white dissenters held a 108 mile motorcade, of over 4,000 people, to Washington DC in protest of the recent federal ruling. Urban and suburban whites shouted "Save Our Freedom" at acting Attorney General Richard G. Kleindienst to reverse the order of "two-thirds-black city school system to merge with two largely white suburban county systems, through more busing." Chesterfield Board of Supervisors Irvin Horner led several rallies in the annexed suburb under the moniker "The Peoples Revolt." "Richmond can rot in hell" said one Henrico resident while supporting the anti-busing rally. County residents did not stop at civil protest. Judge Mehrige's life was repeatedly threatened through phone calls and residential vandalism. Threats increased so much that Judge Merhige sent his family away while federal marshals surveillanced his home twenty four hours a day.[114]

Law Professor Philip B. Kurland white resentment to argue against the merits of Judge Merhige's consolidation in the U.S. Court of Appeals. On April 10, 1972, the United States Court of Appeals, headed by Judge Clement F. Haynsworth, Jr., heard Chesterfield and Henrico's case against Judge Mehrige's assessment that Henrico's and Chesterfield's borders were "newly drawn" and "racially motivated," creating racially segregated schooling. Special Counselor Philip B. Kurland, who represented both Chesterfield and Henrico Counties, argued that Judge Merhige's ruling was a "logical fallacy," as county lines were established well before public schools. Despite private property owners

---

[114] *Richmond News Leader*, January 19, 1972; Kook Files, University of Richmond Special Collections; Merhige Collection Series, Box18 Folder 6, US Dist. Court, East VA (Rich) MISC School Desegregation Interview with Professor Mary Tate, May 20, 2015; "Busing Protest," *Richmond Associated Press*: *Danville Bee* (February 19, 1972), James Madison University Newspaper Archives; 4; and "Anti-Busing Test First," *Richmond Associated Press*: *Danville Bee* (March 29, 1972), James Madison University Newspaper Archives 4A. The Judge's dog was shot and killed. People threatened him that his son would not make it to adulthood if he did not reverse the ruling. For more information on the severity of the death threats he received, see the Kook Files at the University of Richmond Law Library.

instituting de facto segregation, the counties themselves had no racist policies limiting the influx of black citizens. Kurland argued that Judge Merhige's consolidation was in fact institutionalized racism. Labeled "white supremacy in the classroom," Kurkland maintained that Judge Mehrige's ruling assumed that "black children are to excel academically" only in the presence of a white majority. Instead of attacking the overall significance of Judge Merhige's ruling, that being the removal of racially segregated education through suburban-urban cooperation, Kurkland used racist notions of black inferiority to oppose the legality of consolidation.[115]

The Appeals Court agreed with suburban leadership. The U.S. Court of Appeals overturned the consolidation with a vote of five to one on June 5, 1972. According to the court, Judge Merhige had no legal justification for "realistically plac[ing] on the counties the responsibility for the effect that inner city decay has had on the public schools of Richmond." The "little action, if any, the counties may have seen to have taken to keep blacks out," was not enough to force them to form an unwanted union with Richmond city. The court suggested that if Judge Merhige wanted to reverse Richmond's long history of segregation, he should use something other than schooling. "A school case, like a vehicle, can carry only a limited amount of baggage," in that there were real limits to Civil Rights social change, and Judge Merhige's ruling exceeded them. Using unitary schools to break "the cycle of poverty and the policy of containing blacks within urban ghettos" would not be done through forcing urban and suburban leadership to share similar school systems.[116]

---

[115] *Bradley v. Richmond*, 59, 462 (1972).
[116] *Richmond Times-Dispatch*, August 25, 1972; and *Bradley v. Richmond School Board*, 324 F. Supp. 1058, 1066 (4th Cir. 1973).

Judge Merhige and the *Bradley* attorneys' last hopes for an urban/suburban unified school system were ravished by the Supreme Court.  The *Bradley* attorneys appealed the Court of Appeals decision, only to have the Supreme Court not levy a ruling on the consolidation. The four-to-four stalemate was caused by former School Board President, Supreme Court Justice Lewis F. Powell, Jr., recusing himself from the case. Many suggested, like Reverend Benjamin Campbell, that "it wouldn't have mattered if he had not excused himself." Justice Powell, Jr.'s record as the School Board President, and his personal racial bias, did not lead any to suggest that he would have ruled in favor of the *Bradley* plaintiffs. Although the stalemate upheld the Fourth Circuit Court of Appeals decision, *Bradley* did not die in Richmond, it died in Detroit. *Milliken v. Bradley*, which resembled *Bradley v. Richmond*, struck down any constitutional justification for federal city-suburb school consolidation. Justice Powell, Jr. did not recuse himself from this case, as he levied the deciding vote making it five-to-four against consolidation. With the Supreme Court removing constitutional protection from Judge Merhige's ruling, Richmond schools continued cross-town busing, which did little more than send black children to black schools until 1986.[117]

After the Supreme Court secured suburban borders from any forced political coalition with the city, white residents and their school-aged children, poured out of Richmond. Between 1970 and 1974, Richmond's white school population dropped from thirty-five percent to just twenty-five percent, reflecting a 7,782 white student decrease in just eight semesters. The integration process black professionals started in 1960, came to fruition by 1974; however, it did not look necessarily as they envisioned it. Although there

---

[117] *Bradley v. Richmond School Board*, 889; and *Milliken v. Bradley*, 418 U.S. 717 94 S Ct. 300.

were three black school board members, and by 1976 Richmond's first black superintendent Richard C. Hunter assumed office, the school system was devoid of any real racial integration. From 1970 to 1986, when cross-town busing was removed, Richmond's white student population dwindled to just thirteen percent of the overall population. The black middle-class effort, beginning in 1960, did not reform urban education, as much as it forced whites to covertly seek other means of separation. While some affluent blacks sent their children to private and suburban public schools, most had to deal with the de facto segregated school system that *Warren* and both *Bradley* cases created.[118]

**Holt**

The results of *Curtis Holt v. City of Richmond* marked the end of the Civil Rights Era in Richmond. This seven-year case produced strange political bedfellows, who made alliances across racial boundaries, seeking similar results for different reasons. Working-class black leader Curtis Holt wanted to infiltrate the city council, something previously reserved for black professionals. However, the annexation, he believed, prevented him and other working-class leadership from winning the 1970 councilmanic election. Holt's attempt to infiltrate urban leadership, highlighted long-standing class issues within black Richmond. Middle-class blacks wanted electoral support from men like Curtis Holt; however, black professionals blocked Holt from traditional channels of political power because he was mildly educated, he was a man of little financial means, and for some "he wasn't in the right church" according to author Benjamin Hill.

---

[118] Table, "An Educational and Socioeconomic Comparison of Students in Richmond, Henrico, Chesterfield" and "Racial Composition of Richmond Public Schools," Pratt, *Color of Their Skin*, 92-93.

Like *Bradley*, *Holt* v. *City of Richmond* began with Curtis Holt's discontent over the 1969 annexation. Most Crusade candidates had little chance at electoral success in the 1970 election. The most doubtful of the Crusade nominees was Curtis Holt. Unlike fellow candidate Walter T. Kenny, working-class black postal worker with middle-class and Democratic Party ties, Curtis Holt was mildly educated, unemployed, and had few political connections to white or black leadership. Out of all the 1970 candidates, Holt finished seventeenth out of twenty-eight. From the perspective of black leaders, white leaders, or annexed residents, Holt's campaign was a failure from the beginning. His lack of formal education showed as he often "said peoples instead of people…black leadership was embarrassed of Holt." Even historian John Moeser suggested that removing the 47,000 annexed white votes, all eight of the additional candidates, and distributing the remaining votes among the twenty one remaining candidates, "it is highly doubtful that Holt would have been among the top nine candidates." However, Curtis Holt believed the 1969 annexation ruined his councilmanic bid, thus he attacked it in court.[119]

Curtis Holt's ability to serve both working and middle-class black agendas began his political ascendancy. Despite low economic and educational status, Holt was a conduit between black leadership and their working-class voters. After a construction accident rendered him permanently disabled, Holt became a resident of the Creighton Court Housing Projects in the 1950s. After his accident, Holt entered politics by gaining the trust of both black middle and working classes. For working-class blacks, Holt appeared as the man of the people. After the city council refused to put a traffic light in front of Creighton Court Housing Projects, on Nine Mile Road, Curtis Holt spent every weekday afternoon

---

[119] 1970 Councilmanic Election Results; Moeser and Dennis, *Politics of Annexation*, 143; and Interview with John Moeser, January 5, 2016.

directing traffic so black children could safely get off the school bus. Holt used his display of communal leadership to unite working-class blacks into the Grassroots Coalition. In this coalition, Holt helped register East End black voters for the Crusade to use throughout the 1960s. In one election, his organization helped register over 3,000 voters alone. Holt's community efforts, and mobilization tactics, made him an important man in the black community by 1970.[120]

The class differences illuminated by the 1969 annexation, forced Holt to split from black leaders. Holt wished to sue the city council immediately following the 1970 council election however, the local NAACP refused to take up his case. "They gave me the runaround…they're all so busy…some didn't even return my phone calls," said Holt. This only affirmed his and other blacks' suspicions that "the power structure is only using middle-class blacks to continue to isolate the grassroots blacks in order to keep the city running in the hands of the power structure." Holt's opposition to annexation brought out the class disparities that the Crusade was able to bypass in the mid-1960s. Moreover, working-class blacks supported Holt, as the lawsuit separated him from Crusade leadership. "What I can't understand is what makes a black politician think that once he is elected to office, all he has to do is just sit back and wait until his people elect him again and again," argued one Holt supporter. She highlighted how opposition to annexation made black class relations complex because "some of them [middle-class blacks], a poor black person cannot even present a problem to, because if they have ever had their problem they don't have it now." Because Holt refused to drop his case against the city, for what he felt

---

[120] Interview with Reverend Benjamin Campbell, January 6, 2016. Holt also started the Creighton Court Civic Association in 1958, which organized the grievances of public housing tenants into petitions for the Richmond Redevelopment Authority to address. This, along with his community service, made him a well-know, but not well-liked, community leader in Richmond.

was an illegal annexation, he and black leadership grew apart. This alianed Holt from the same black leadership he helped gain power throughout the 1960s.[121]

Holt's split from Crusade leadership exposed deeper divides in Richmond's black community. Richmond's black community often "imitated white class divisions, but with "greater anxiety," according to author Benjamin Hill. Richmond, more than any other city in Virginia, had rigid class systems. Poor and middle-class whites in Richmond's Southside and wealthy West End whites had little to nothing in common, other than being white. Richmond's black community had class issues however, Jim Crow Era racism united them because middle-class blacks lived amongst their working-class counterparts. As Jim Crow fell, through voting rights and school desegregation, class disparity became more visible. Black professionals were able to buy homes during urban redevelopment, whereas poor blacks could not. Middle-class blacks attended white public and private schools, whereas working-class black children did not. As the black middle-class gained urban leadership positions, such as Urban League President, City Councilman, Housing Committee Member, Vice Mayor, and State Senator, its racial connection to the working-class became weaker and more vulnerable to class division.[122]

Rejection from black leadership, forced working-class leader Curtis Holt to align with annexed whites. In late 1970, Curtis Holt brought his case to Cabell Venable. The young white lawyer, who successfully defended the KKK just a few months prior, agreed to take the case to trial because this landmark case could, and ultimately did, propel his

---

[121] Frankel, Glenn, "Curtis Holt: Working Class Hero," *The Richmond Mercury* 2 (June 5, 1974), 10; and Jeroline E. Russell, Editorial "She Cites Reasons For Backing Holt," *Richmond Times Dispatch* June 2, 1970.
[122] Interview with John Moeser, January 5, 2016; Campbell, *Richmond Unhealed History*, (Brandylane Publishers, Inc., 2011), 130; and Interview with Benjamin Campbell, January 6, 2016. The Urban League President I am referring to is Randolph C. Kenny. Henry Marsh, Oliver Hill, Winfred Mundle, and B.A. Cephas were all middle-class blacks who were city councilmen. Both Marsh and Mundle served as Vice Mayor in the late 1960s, with attorney Douglass Wilder serving as a state senator in 1969.

legal career. Both Holt and annexed suburbanites shared similar interests. While Holt saw de-annexation as the means to acquire a city council seat, annexed residents saw de-annexation as the means to return to Chesterfield. Because helping Holt could ultimately bring about a mutually beneficial result, suburban neighborhood organizations paid Holt's legal fees. "We recognize the expense of litigation and are prepared to underwrite the cost…stating on behalf of the Councils, we want de-annexation," declaired Arthur R. Cloey, head of two South Richmond suburban civic associations. Cabell and the suburban patrons supporting Holt's case represented a political union between annexed whites and the black working-class leader. It was this strange partnership that fought tooth and nail to reverse the 1969 annexation.[123]

Curtis Holt used Civil Rights legislation as a tool against the city council's annexation. On February 24, 1971, Curtis Holt sued Richmond City in federal court over the 1969 annexation. Using *Perkins v. Matthews* as a precedent, Holt's attorney requested the annulment of the 1969 annexation, an immediate election following the ruling, and the removal of Richmond's right to annex. To Holt, the annexation's influx of 47,000 white voters violated his Fourteenth and Fifteenth amendment rights protected under Section I of both amendments. Holt's use of recent Civil Rights legislation illuminated his vision for post-Jim Crow Richmond. To Holt, post-Jim Crow Richmond was to have a black majority with working-class leadership within the council. No longer was power to be held by

---

[123] *Richmond Times Dispatch*, May 12, 1976; *Richmond Times-Dispatch,* October 18, 1972; *Richmond News Leader*, May 4, 1971; and Moeser and Dennis, *Politics of Annexation*, 149. It was discovered, during the federal testimonies in 1976 that Cabell's legal fees were paid by the Broad Rock Council of Civic Associations.

affluent whites or black professional leadership. Rather, men such as he should assume leadership in a majority black city.[124]

Holt's case brought about a complex hybrid legal battle within two different locations. Because *Holt* included possible civil rights violations, the annexation was discussed on two fronts. In Washington, DC, the United States District Court of the District of Columbia was given the authority, under the VRA, to federally approve any annexation that placed the previous racial voting majority into the voting minority. Because the city council never submitted the annexation to the Washington Court for federal approval, the Justice Department, headed by Acting Assistant Attorney General David L. Normal, was charged with investigating the annexation and rendering its opinion to the Washington court. In Richmond, Judge Robert Merhige headed the *Holt* case. Judge Merhige was to rule on *Holt* based on the federal approval or disapproval of the 1969 annexation. Although Holt's case was being argued in Richmond, the Justice Department's assessment, and the Washington court's annexation decision, determined whether Curtis Holt won or lost his class-action suit.[125]

The Justice Department's initial reaction to the annexation empowered Curtis Holt's case against the city. On May 7, 1971, Assistant U.S. Attorney General David L. Norman objected to the 1969 annexation because the city council neglected to seek federal

---

[124] 1965 Voting Rights Act, Section 5, sec. 42 USC sec 1973C; *Perkins v. Matthews*, 400 U.S. 379, 380-394; *Perking v. Matthews* (1970) was a Supreme Court that places all municipal annexations under the Voting Rights Act of 1965. Every annexation had to be approved by the Justice Department to ensure that the previous voting racial majority was not turned into a voting minority by the annexation.

[125] The Justice Department headed all Civil Rights cases dealing with municipal governments. Section V of the Voting Rights Act of 1965 brought all annexations that removed previous majorities to the minority voting constituency under federal jurisdiction. Richmond's city council never sought federal approval for the annexation. Therefore, the Justice Department decided whether it should stand or not. Holt's case was technically being fought in Richmond, however, much of what happened in Richmond was being decided in DC.

approval in 1969. Despite City Attorney Conrad B. Maddox Jr. requesting federal approval for the annexation based on its economic benefits, Holt's attorney and annexed leaders Ronald Livingston and Roger Griffin argued that the annexation was used by the city council to disenfranchise urban blacks. Norman's disapproval should have come as no surprise, given that Norman, unlike most President Richard Nixon supporters, was known for his sympathies for Civil Rights violations. This initial decision changed the game in Richmond. Holt's case like his 1970 councilmanic candidacy, was seen originally as a failure waiting to happen. However, Norman's federal objection to the annexation breathed life into Holt's case, because federal disapproval could have led to Judge Merhige ruling in Curtis Holt's favor.[126]

Both the Justice Department and Judge Robert Merhige aided black and white leadership interest by refusing to de-annex the suburbs. After the city council voted seven-to-two on implementing ward-style voting, the Justice Department found "no basis for withdrawing" their original objection. However, the annexation objection focused on voting, in that the new ward plans did not negate the obvious voting change the 1969 annexation caused. Norman's second objection did not mean the Washington Court would de-annex South Richmond, because Norman and the Washington Court favored "nonracially drawn councilmanic districts" not de-annexation. Similarly, on November 23, 1971, Judge Merhige ruled in favor of Holt by acknowledging the annexation violated his Fourteenth and Fifteenth amendment rights. However, Judge Merhige, like Norman, refused to de-annex South Richmond. Both Curtis Holt and city officials received half of

---

[126] *Holt v. City of Richmond*, 286-288; *Richmond Times Dispatch*, May 14, 1971; and *Richmond Times Dispatch*, June 2, 1971.

what they wanted. Curtis Holt's attorney proved city officials used their authority to strip working-class blacks of their civil rights as city officials kept annexed territories.[127]

The U.S. District Court of the District of Columbia's ruling on Petersburg, Virginia's, annexation case foreshadowed its decision on Richmond. On October 18, 1972, the Washington Court approved Petersburg City's annexation of Prince George County if "a ward system of electing its city councilmen" was implemented to reverse the new white majority from diluting the previous black majority vote. Like Richmond, Petersburg's white leadership annexed a small portion of Prince George County, bringing in over nine thousand white voters to dilute the black vote from fifty-six percent to forty-seven percent. This ruling set the precedent for Richmond's city council, as the Washington Court made it clear that Richmond's annexation, for that matter any race-based annexation could stand if the voting style was changed. As Richmond's case was moved up the docket, City Attorney Conrad Mattox and *Holt* Attorney Cabell Venable, as well as suburban leader Melvin Burnett understood that the continuous refusal to de-annex meant the annexation was more than likely going to stand.[128]

Seeing Petersburg's case as the example, Curtis Holt and his attorney believed city official's proactive voting changes hurt the possibility for de-annexation. After much

---

[127] *Richmond News Leader*, July 9, 1971; and Bart Barnes, "David L. Norman Dies at 70," February 8, 1995. Apart of Judge Merhige's ruling was that the city council host special elections in January of 1972, however that portion of the ruling was appealed by city officials and upheld by the appeals court and the Supreme Court in December on December 6, 1971. Both Holt and the city council appealed Judge Merhige's decision in the court of appeals, which deadlocked the *Holt* case. Curtis Holt appealed the refusal to de-annex based upon the annexation violating civil rights, and city officials appealed Judge Merhige's findings that the annexation was racially motivated, which could have allowed the Washington court to de-annex South Richmond. Also, city council elections were suspended by the Supreme Court until Holt and the annexation case was officially resolved. Therefore, the 1970 council remained in office until 1977. For more information, see *Holt v. City of Richmond*, 877.

[128] *Richmond Times Dispatch*, September 29, 1971; *Richmond Times-Dispatch*, November 23, 1971; and *City of Petersburg v. United States. 345 F. Supp. 1344 1021 (1972)*.

infighting about the minutia of the ward proposals, on August 25, 1973, the city council, with Justice Department and Washington Court's Chief Justice Skelly Wright's approval, changed to ward-style voting. Richmond was divided into nine wards: four black wards (East End and Northside), four white wards (West End and Southside), and one swing vote or mixed ward (core). Holt and annexed residents lividly rejected the voting change as they believed the council was "us[ing] blacks as absolute fools." Changing the voting strategy put city official's one step closer to receiving federal approval on annexation. Rather, Curtis Holt and his attorney called for "black-white cooperation in the de-annexation case" because the "the voting rights of black citizens" were only restored if they were the city's majority. Despite Holt and Venable's opposition, the measure was passed and helped signal the end of Holt's case against the city.[129]

Despite the short gains made by the city council, *Holt* and the annexation wore down Richmond's white leadership. After U.S. Magistrate Lawrence Margolis recommended the Washington and Richmond Court's de-annex the suburbs, the Washington court issued a "no decision" on the annexation's constitutionality, and Holt's attorney filed two subsequent lawsuits against the city in the local court; three city councilmen resigned. The three exiting councilmen, William Daniel, Howard Carwile, and James Carpenter, all felt the city's legal troubles were too much to handle, while running their own day-to-day affairs. Many believed that if the six remaining councilmen selected Curtis Holt, the city's legal issues would end. Despite strong evidence supporting this suggestion, not one councilman placed his name into consideration. Instead, they chose two Team of Progress (TOP) supporters, Julius Johnson and Raymond Royall, along with

---

[129] *Richmond News Leader*, October 26, 1973; *Richmond Times-Dispatch*, August 24, 1973; Interview with Wayland Rennie; and "The Crusade Decision," *Richmond Afro-American*, 1973.

Crusade supporter Willie Dell. This move reflected the collective efforts of middle-class black and white elites to oppose Holt and his suburban patrons.[130]

With the resignation of three councilmen, white leadership began a series of strategies preparing Richmond for its impending black leadership. The end was so close "they could smell it," as white leaders systematically removed themselves and their business interest to the suburbs. First, the council allowed Amtrak to move to Henrico County. Although "federal legislation said it had to stay in town," the council allowed Amtrak to build a suburban station on Staples Mill Road, signaling its transition to the suburbs. This removed income from city coffers. The city council set up the Marymount Park Foundation to allocate tax revenue to pay for its upkeep because they felt whenever "the black folks took over, they wouldn't know how to take care of it." The white council, through the Downtown Development Unlimited, set up a "bond reserve fund of about nine million a year out of its operating budget" to pay the city's bond holders for infrastructural upkeep. White councilmen approved the creation of magnet schools that worked with Virginia Commonwealth University, University of Richmond, and Virginia Union University, to stimulate Richmond's failing public education system. These measures were only a few in a series of ventures taken by white leadership to prepare the city for life without them.[131]

In the midst of white leadership's transition out of the city, the Washington Court affirmed the legitimacy of the annexation. After the Supreme Court heard and ruled in favor of City Attorney Mattox's appeal to Margolis's de-annexation recommendation, in

---

[130] *Richmond Times-Dispatch* February 4, 1974; *Richmond News Leader*, February 4, 1974; and *City of Richmond v. United States, United States District Court of District of Columbia.*
[131] Pratt, *Color of Their Skin*, 94; and Interview with Benjamin Campbell, January 6, 2016.

October of 1975, the Washington Court allowed city officials to retain the annexation if they could show "verifiable economic or administrative benefits" from the acquisition. City officials argued that Holt's solution would financially bankrupt the city. De-annexation meant "rendering Richmond a vast ghetto…giving up $435 million worth of taxable property." Likewise, the Crusade submitted an editorial to convince black residents that de-annexation only benefitted "white citizens in the annexed area…If black voters can obtain significant power in an expanded city, they will be able to direct city government so as to benefit both blacks and whites," removing the financial troubles "within its old boundaries." Holt's attorney addressed the black and white elite partnership in the Washington Court. Cabell noted that urban blacks felt the financial burden of allocating public services to the suburbs. Venable also used race to argue that annexation support was "merely a second line defense of white supremacy and a first line defense of personally motivated black political bosses who insulate themselves in pocket boroughs." Venable reasoned that the annexation was nothing more than black and white elites trying to prevent working-class "men like Curtis Holt from obtaining office." Venable's class and race-centered argument against the annexation failed, as the federal court approved the annexation on August 9, 1976.[132]

The federal ruling solidified black and white urban leadership political victory over Holt and the annexed suburbanites. Despite Venable's objection to the federal court ruling, the annexation was rock solid by August 9, 1976. The publicity of Holt's class-action suit was not enough to reverse the secret deal made by Phil Bagley and Irvin Horner in May of

---

[132] Moeser and Dennis, *Politics of Annexation*, 177; *City of Richmond v. United States*, 334 Supp 1030; Interview with Wayland Rennie; "Closed Council Meet Irks Carwile and Holt," *Richmond Afro-American* July 11, 1970; and *City of Richmond v. United States*, 95 S Ct. 2298. *City of Richmond v. United States*, 95 S Ct. 1770.

1969. Curtis Holt and the annexed residents' Civil Rights Era political coalition ended in defeat. Both agendas aligned on de-annexation and both agendas died on de-annexation. Despite the new ward system and notoriety he gained from opposing urban leadership, Holt never became a city councilman. Although annexed residents went as far as not paying local taxes during the trials, their residency remained within city limits.[133]

Coming off of the *Holt* trials, Richmond was ripe for a racial shift in the city council. The first phase of Richmond's post-*Holt* black political takeover was done through education. In 1976, Richard C. Hunter became Richmond's first black school superintendent. With the 1977 election season heating up in December of 1976, it was a forgone conclusion that at least four blacks were winning council seats. The Justice Department forced the white city council to change from at-large to ward-style voting. Because blacks were the voting majority prior to the 1969 annexation, the new ward system placed more voting wards in black dominated districts. Four of the new nine districts were majority black, while one the swing district was over fifty percent black as well. After the Justice Department removed the ban on citywide elections on March 1, 1977, seven days later, Richmond elected its first majority black city council consisting of Crusade endorsees Henry Marsh III, Walter T. Kenney, Claudette McDaniel, Willie J. Dell, and "Bad Luck" Henry (Chuck) Richardson. The majority black council's first action, signaling the racial shift the city and its council experienced in the last seventeen years, was their election of Henry Marsh III as Richmond's first black mayor.

**Conclusion**

---

[133] *Richmond News Leader*, May 30, 1976.

The 1969 annexation, along with *Bradley* and *Holt*, simultaneously created political partnerships that would have never been dreamed of before 1970. While urban white officials worked with *Bradley* attorneys to desegregate city schools, annexed suburbanites and working-class blacks partnered in their objection to integrated schools. Likewise, black and white leadership collectively opposed Curtis Holt's bid for urban power, while suburbanites, with attorney Cabell Venable, financially supported Holt's political agenda to get their neighborhoods de-annexed from the city. The annexation, which tied both *Bradley* and *Holt* together, illuminated why race alone cannot explain Civil Rights Era Richmond. Complex political battles, secret dealings, and class-centered interest all influenced constituencies within both races to make allies where they could to achieve their desired result. A man like Curtis Holt, who was "shrewd and intelligent" was little more than an "embarrassment" to black leadership, yet he gained political support for his case across racial lines. White leadership, who wanted to maintain power over Richmond, aligned with black leaders, whom the opposed in urban elections, when challenged by their suburban neighbors. Race can not alone explain Richmond's Civil Rights Era urban politics.

The truth is race, class, and geography culminated to create this complex Civil Rights Era drama. The use of race, class, and geography as political currency had limits however understanding how those limits intersect to create uncommon alliances, dictated the framework for understanding Civil Rights Era Richmond. Furthermore, as school desegregation and urban politics created Richmond's black identity, the complex, agonizing, and controversial issues raised in the process will forever be the legacy left by Richmond's Civil Rights Era.

## Epilogue: Post-Civil Rights Richmond

In the first two weeks after the 1977 councilmanic election, Marsh redefined the office of mayor. Marsh wanted to be the face of the city, rather than the figurehead elected by his friends on the city council. To establish his mayoral presence, Marsh removed the white city manager and replaced him with lesser known black bureaucrat Manual Deese. Before the 1977 election, the white majority council selected William J. Leidinger as city manager, hoping he would maintain affluent white business interest in City Hall. Marsh's first course of action was requesting that City Manager Leidinger resign immediately. After the Richmond Business Community threatened to pull its support from Marsh, he and the four black councilmen all voted to remove Leidinger from office. This move by Marsh not only, as Moeser suggested, cemented the councilmanic power shift, it created a whole new battle between black councilmanic leadership and white business interest, a battle that black leaders ultimately lost.[134]

**The 1980s: Richmond Goes Broke**

First on council's agenda was rebuilding Richmond's economy. After the council removed Leidinger from his duties, the five black councilmen focused on easing white anxiety over the power shift. Henry Marsh III, like other black councilmen, received numerous death threats to his office and home. White hostility to the black council made every day "a battle" that was "just downright cut-throat." The best way to ease white discontent was through redevelopment, something white residents and leadership favored throughout the 1960s and 70s. This redevelopment, however, included a revival of large retail stores in the downtown shopping district. The idea depended on large local retail

---

[134] *Richmond News Leader*, August 15, 1978.

chains, Thalhimer's and Miller & Rhodes, to anchor retail flight back to downtown Richmond. This plan, called Project One, was approved by the black majority council and former mayor Thomas Bliley, who represented what was left of Richmond's white business leaders.[135]

The black council's economic redevelopment strategy failed. Although Phillip Morris, the city's largest private sector employer, created 1,800 new jobs by 1980, many white business leaders refused to work with the black council. In 1981, the Hilton Corporation announced its plans to build a new hotel in the same business zone as Project One. If the hotel was built, it spelled the end of Project One's biggest projected moneymakers, the hotel. To thwart The Hilton Corporation's clear attempt to derail the black council's version of urban redevelopment, the council developed and "passed a specific ordinance" preventing Hilton's hotel construction. Eventually, the city council was sued and settled out of court, allowing Hilton to build its hotel. This move created a storm that the council could not control. Not only did it expose how the black council would use its power to achieve a self-serving end, it reminded residents that blacks controlled the council, but whites controlled the economic fate of the city.[136]

The Hilton controversy highlighted the rivalry between black and white leaders. Despite Justin Moore, head of Richmond's only electric company (VEPCO) helping to fund the Sixth Street Marketplace in 1985, affluent white leaders relocated their businesses to the suburbs. Men like Miller & Rhoads Department Store owner Thomas P. Bryan Jr., Universal Leaf Tobacco president Howard Cone, and head of First and Merchants National Bank Bruce Nolte all moved their business interests into Henrico and Chesterfield or sold

---

[135] Campbell, *Richmond's Unhealed History*, (Brandylane Publishers, Inc., 2011), 177-178.
[136] Campbell, *Richmond's Unhealed History*, 180.

their businesses on the open market. In the midst of relocating, all of the men, with former City Manager William Leidinger, fought every zoning proposal and land deal with Henrico and Chesterfield Marsh and fellow council members suggested. While it appeared as political strife between former and new urban leadership, it is clear that post-Civil Rights Era political strife brought out Jim Crow Era racial tensions. Oliver Hill, former black city councilmen, suggested that "the real issue" was that "the Richmond newspapers and white citizens generally," have "unending resistance" to the reality of Richmond's black controlled city council.[137]

Race and space defined Richmond's black leaders' poor working relationship with suburban leaders. Just as affluent whites battled with suburban leaders in the 1960s and 1970s, post-Civil Rights Era black leaders fell victim to the same city-county political dichotomy. In the 1980s, suburbia attracted yet another constituency away from the city's tax base: the black middle-class. Racial and class unity had limits, as middle-class blacks fled the city in search of the same suburban class-centred suburban lifestyle the silent majority chased throughout the 1960s and 1970s. As the urban housing market sunk and city schools became more impoverished, black porfesionals it "became about where you can buy a house or what school district you could afford to live in," according to author Benjamin Campbell. It became clear that the black middle-class exacerbated its economic, political, and social potential in Richmond. As Chesterfield and Henrico gained a stronge black tax base, both leaderships refused to work with urban leadership on cooperative public projects like rebuilding schools, shared roads, maintaining public parks, and creating consolidated prison systems. In all, the urban-suburban political strife only intensified

---

[137] *Richmond Times Dispatch,* June 24, 1981.

when black leadership assumed the city council, as suburban economic power incentivized its leaders to not cooperate with black city officials.[138]

State and federal powers ensured Richmond remained poverty-stricken under black leadership. By 1985, annexation laws, business relocation, and middle-class (black and white) flight depleted city coffers. City debt tripled that of Chesterfield and Henrico, as both counties were in their second stage of deindustrialized economic growth. Decreased revenue prevented city councilmen from obtaining bonding capacity to rebuild dated infrastructure and maintain municipal jobs. Although the city had a bond reserve fund of about nine million dollars, it was not enough to take out new loans and pay bondholders from the 1969 annexation, redevelopment projects from the mid-1960s, and the Sixth Street Marketplace in 1985. After the General Assembly refused to help, City Manager Manual Deese secured private funding for new bonding capacity however, bondholders only released funds to pay the city's previous bond holders. This created a cycle of long-term debt, preventing any chance of economic stability. Adding insult to injury, the General Assembly and the Federal Highway Administration co-funded circumvential highways around Richmond. These highways, I-295 and Virginia State Route 288 cost over 1.1 billion dollars and eliminated "the center city as a necessity" for suburbanites and corporate business interest. As state and federal powers hindered Richmond's economic development, the city fell deeper into economic poverty.[139]

**The 1990s: Drugs and City Hall**

---

[138] Interview with Benjamin Campbell, January 6, 2016; Matthew Lassiter, *Silent Majortiy*: *Suburban Politics in the Subelt South* (Princeton University Press: 2006), 294; Campbell, *Richmond's Unhealed History*, 180; Robert Pratt, The *Color of Their Skin: Education and Rce in Richmond, Virginia, 1954-89* (Charlottesville: University of Virginia Press, 1992), 94-95.
[139] John V. Moeser and Rutledhge M. Dennis, *The Politics of Annexation: Oligarchic Power in a Southern City (Shenckman Publishing Co.: 1982)*, 187-188; Interview with John Moeser, January 5, 2016; Campbell, *Richmond's Unhealed History*, 195; and Interview with Benjamin Campbell, January 6, 2016.

Throughout the 1990s, political corruption became the hallmark of Richmond's city council. Henry (Chuck) Richardson, resigned in 1995 after being convicted of running an elaborate heroin operation out of the city council. Although Richardson fancied himself a "public relations consultant and real estate agent," FBI investigations proved he was a lifelong heroin dealer and user who became a prominent member Richmond's black elite without having a legal occupation. Richardson used his council seat to give municipal contracts to fellow drug dealers who laundered money through legitimate businesses. What made this resignation peculiar was the support Richardson received from the same community who knew of his illegal activities. Not only was Richardson a known heroin dealer, he was reelected four times after having "annual brushes with the law" over cocaine, heroin, and drunken driving charges. "He was our Robin Hood…they won't let a good man serve us" said thirty-year-old single mother Karen Williams who, like many black Richmonders, saw Richardson as a man of the people, rather than the urban slum lord the 1960s white media predicted would come to fruition with black leadership. Despite publicly swearing off drugs, after a 1988 cocaine incident landed him in drug rehab, Richardson landed back in jail several times, all while having the longest tenure on the council by 1996.[140]

Richardson's reputation and antics only tarnished the legacy of the 1977 power shift. Throughout the 1990s, Councilman Richardson earned the name "Bad Luck Chuck," as his run-ins with law enforcement placed a negative image upon himself and the black city council. Richardson's last straw came on April 8, 2004, when police sergeant Anthony Franklin uncovered a marijuana lab, crack cocaine, and boxes of syringes at Richardson's

---

[140] "Richmond Official Quits After Drug Charges," *New York Times*, September 19, 1995.

home during a drug sweep. Although Richardson was acquitted because his son, Karl Richardson, confessed to running the marijuana and crack cocaine business, Chuck's checkered past suggest he was always the brains of the operation. Chuck's life was defined by drugs. Whether selling or using, Chuck was known throughout the city for his leadership over Richmond's criminal underworld. As the council's influence spiraled into obscurity, Chuck Richardson's reputation became the symbol of corruption under which the black city council was remembered.[141]

Many believed that Chuck Richardson's demise, along with the image of black councilmanic leaderships, was no coincidence. Men like Henry Marsh, Howard Carwile, James Carpenter, and Walter T. Kenny, all left urban politics for state politics, national politics, or retirement by 1992. Although these men were remembered as Civil Rights Era leaders, they relied on men like Chuck Richardson to mobilize the working-class black voters that the black intelligencia lost touch with. As Civil Rights Era leaders transcended urban politics, some believe Richardson became expendable. Urban blacks believe Chuck's misfortune was "revenge by the establishment" who had no use for a man with his checkered past. White and black leaders knew who Chuck was before his 1980s and 1990s legal troubles, however, it was not until after his allies left city politics did he become a constant target by police. This could be speculation, yet the mood amongst thirty-to-sixty-year-old blacks who remember Chuck is that he "stepped into a trap" once black politicians did not need neighborhood crime bosses to mobilize black voters anymore.[142]

**The 2000s: Public School Failure**

---

[141] "Bad Luck Chuck," *Style Weekly*, October 30, 2012.
[142] "Richmond Official Quits After Drug Charges," *New York Times*, September 19, 1995.

The early 2000s were defined by economic and racial re-segregation impacting public education. Public schools reflected how economic flight, black middle-class flight, and non-cooperation from surrounding counties impacted Richmond. After 1986, the city council removed cross-town busing and implemented school zones. This allowed West End whites to attend public school without fearing black influx. To keep the brightest black pupils from attending private schools, the council invested in charter schools, such as Open High School, Richmond Community, and Franklin Military Academy. Although these helped retain the brightest of the plus eighty-five percent black public school population, by 2010, state financial aid decreased due to low state test scores labeling Richmond schools as "failing" institutions not worth investment.  This resonated in Governor Robert McDonell 2011 removal of more than 5 million dollars from the city's public school budget, making Richmond 10% of the state's public education budget cut.[143]

**Today: My Experiences**

Just as Virginia Union University (VUU) inspired Richmond white-to-black transition in the 1960s, Virginia Commonwealth University (VCU) is the backbone of black-to-white gentrification. In the 1960s, VUU affiliates like Dr. William Thornton, Raymond Hilton, and Henry Marsh inspired the social unrest leading to Richmond's black powershift. Today, VCU is undoing the Civil Rights Era racial transition through structural gentrification. As new libraries, educational buildings, condos, downtown businesses, athletic centers, and shopping malls are replacing old black business and residential districts. This gentrification is increasing Richmond's white population. As of 2014, whites made up 44% of city residents. This rise from below 15% in the 90s came undoubtedly

---

[143] Aid for Public Education: 2011-2012, *Summary of Governor's Proposed Amendments* to the 2011-2012 Budget.

from increased VCU enrollment and the capital investment VCU expansion inspired. Once the hotbed for white flight, Richmond is becoming one of the most sought after residential and business destinations for whites in the metropolitan area.[144]

Growing up in the Richmond metropolitan area gave me a nuanced understanding of the racial system the transition created. Richmond's racism is structural: with education and economics ensuring blacks have limited access to upward social mobility. While structural and systematic, race has its limits. Middle and upper-class black Richmonders survive structural racism by understanding and navigating around the racially coded barriers that blur the sources of black poverty. For example, high test scores in all-black public schools, or attending majority white private schools gives blacks access to universities, connections, job skills, and occupations that are not otherwise available. Blacks who access these tools understand that working with whites is the only way to convert their skills into wealth. Black business owners run their day-to-day affairs in black neighborhoods, yet the majority live in white suburbs and send their children to white private or public schools. The black community cannot create its own collective wealth because their middle-class professionals nor municipal government will invest into them as a whole. Rather, whoever can ascend from poverty, usually does so at the expense of the blacks surrounding them.

Race is more of an issue now than it has ever been in the metropolitan area because it highlights insecurities over the results of the Civil Rights Era. Race in the metropolitian area cannot be addressed by either blacks or whites because racial discrimination was never resolved by Jim Crows' demise. Despite VCU, the Virginia Historical Society, and the

[144] U.S. Bureau of the Census, City of Richmond, Virginia, 2014.

University of Richmond (UR) numerous efforts to make race a part of the metropolitan history, most whites rather not discuss the topic. Parents of West End Richmond's Glenn Allen High School complained that lessons about race are nothing more than using "white guilt" as a divisive topic. Race can only be divisive if it illuminates an active problem, yet this is accepted by white residents. Matthew Lassiter's assessment of white collar racial innocence and suburban exclusion from race issues still exist today in the metropolitan area. It is difficult for whites to accept that their middle and upper-class lives exist at the expense of the blacks who were economically trapped in a decrepit inner-city just over fifty years ago.[145]

In all, the Civil Rights Era hindered Richmond's social growth. With Civil Rights legislation, Richmond had the potential to send shockwaves throughout the nation by being the first southern city to remove racial discrimination and discourse. The only way for the post-racial society to exist was through blacks and whites refusing to use race in the political, economic, educational, and social arena. Instead, both blacks and whites used race to obtain political power in the post-Jim Crow world. My own family refuse to let go of race when they were some of the middle-class blacks to flee to Chesterfield after the 1977 election. Why didn't the Civil Rights Era produce a racially blind Richmond? Because blacks and whites retained Jim Crow Era racial norms where the Civil Rights movement was felt the most. This created one of the most racially charged times in city history, as economics, education, and politics all centered on racial uncertainty. Nevertheless, blacks gained municipal control in Richmond, but it drove racial fears and

---

[145] "Henrico County's Censorship: Kids, it's OK to be Ignorant," *Shout Out JMU*, February 17, 2016.

uncertainty past the point of reconciliation. This is why the Civil Rights Era failed to bring about a post-racial society in Richmond, Virginia.

Bibliography

**Primary**

*Bradley v. Richmond School Board*. 416 U.S. 696-99 (1962).

*Bradley v. Richmond School Board*. 325 F. Supp. 834 (ED Va.. 1972).

*City of Petersburg v. United States*. 345 F. Supp. 1344 1021 (1972).

*City of Richmond, Virginia v. United States of America. 95 S. Ct. 2296 (1975).*

*Charter of the City of Richmond, Virginia*, Section 7.02.

*Code of Virginia* Section 15.1-1044.

*Curtis Holt, Sr. v. City of Richmond*, No. 151-71 R. (U.S. District Court of the Eastern District of Virginia) 1971.

*Green v. County School Board of New Kent,* 391 U.S. 430 (1968).

Howard H. Carwile Papers (1940-1979), M 294 Box 1-12, James Branch Cabell Library, Virginia Commonwealth University.

Interview with Benjamin Campbell, January 6, 2016

Interview with Isaiah Hilliard, May 18, 2015.

Interview with John Moeser, January 5, 2016.

Interview with Leroy Chiles, May 18, 2015.

Interview with Mary Tate, May 15, 2015.

Interview with Ron Bacigal, May 12, 2015.

Interview Wayland Rennie, June 18, 2015.

*Richmond Afro American* 1960-77.

*Richmond News Leader* 1960-78.

*Richmond Times-Dispatch* 1960-81.

State of Virginia, General Assembly, *Proceedings and Debates of the Virginia House of Delegates pertaining to Amendment of the Constitution*, Extra Session 1969.

Richmond Annexation Files, August 27, 1983, M 183 Box 1-14 James Cabell Library, Virginia Commonwealth University.

Richmond Crusade for Voters Archives, M 306 Box 1 James Branch Cabell Library, Virginia Commonwealth University.

Richmond First Archives, M238 Box 1-5, James Branch Cabell Library, Virginia Commonwealth University.

U.S. Bureau of the Census, Richmond, Virginia, Chesterfield County, Virginia, and Henrico County, Virginia 1950-1980.

U.S. Civil Rights Commission, *The Voting Rights Act: Ten Years After*, January, 1975.

Virginia Crockford Papers, Box 1-4, James Cabell Branch Library, Virginia Commonwealth University.

*Warden v. Richmond School Board* 6 Race Relations Law Reporter 1025 (ED Va. 1961).

**Secondary:**

Kusmer, Kenneth L, and Joe W. Trotter, ed. *African American Urban History Since WWII*. University of Chicago Press, 2009.

Bacigal, Ronald J. *May It Please The Court*: *A Biography of Judge Robert Merhige Jr*. Lanham, Maryland: University Press of America, 1992.

Bain, Chester W. *A Body Incorporate: The Evolution of City-County Separation in Virginia* Charlottesville: University of Virginia, 1967, 26.

Barnes, Bart. "David L. Norman Dies at 70," *Washington Post*. February 8, 1995.

Barnes, Annie S. *The Black Middle Class Family: A Study Of Black Subsociety, Neighborhood, And Home In Interaction*. Bristol, Indiania: Wyndham Hall Press, 1985.

Campbell, Benjamin. *Richmond Unhealed History*. Brandylane Publishers, Inc., 2011.

Cashin, Sheryll. *Place Not Race: A New Vision of Opportunity in America*. Boston, Mass: Beacon Press, 2014.

Cohen, Lizabeth. A Consumers' Republic: *The Politics of Massive Consumption in Postwar America*, New York: Vintage Books, 2004.

Cowie, Jefferson R., and Joseph Heathcott. *Beyond The Ruins: The Meanings Of Deindustrialization*. Ithaca: ILR Press, 2003.

Dabney, Virginius. *Richmond: The Story of a City*. New York: Doubleday, 1967.

Darden, Joe T., Richard Child Hill, June Thomas, and Richard Thomas. *Detroit: Race and Uneven Development*. Temple University Press, 1987.

Dennis, Rutledge. "Socialization and Racism: The White Experience," Benjamin P. Bowser and Raymond G. Hunt, *The Impact of Racism on White Americans.* Beverly Hills: Sage Publications, 1981.

Dickinson, A.J. "Myth and Manipulation: The Story of the Crusade for Voters in Richmond Virginia," *Scholar of the House Paper*, Yale University, 1967.

Holton, Dwight Carter. "The Richmond Black Community Prior to 1956 and the Birth of the Richmond Crusade for Voters," M.A. Thesis, Virginia Commonwealth University.

Eisinger, Peter K. *The Politics of Displacement: Racial and Ethnic Transition in Three American Cities*. London, Academic Press, 1980.

Formisano, Ronald P. *Boston Against Busing: Race, Class, And Ethnicity In The 1960s And 1970s*. Chapel Hill: University of North Carolina Press, 2004.

Frymer, Paul. *Black and Blue: African Americans, the Labor Movement, and the Decline of the Democratic Party*. Princeton University Press, 2008.

Green, Laurie B. *Battling the Plantation Mentality: Memphis and the Black Freedom Struggle*. University of North Carolina Press, 2007.

Goldfield, David R. *Black, White and Southern Race Relations and Southern Culture 1940 to Present*. Baton Rouge:Louisiana State University Press, 1989.

Goldschmid, Marcel L. *Black Americans and White Racism*: *Theory and Racism*, New York: Holt, 1970.

Hammock, Allan Statton. "The Leadership Factor in Black Politics: The Case of Richmond, Virginia," Ph.D. Dissertation, University of Virginia, 1972.

Hamilton, Donna Cooper, and Charles Hamilton. *The Duel Agenda: Race and Social Welfare Policies of Civil Rights Organizations*. Columbia University Press, 1997.

Hornsby, Alton. *Black Power In Dixie: A Political History Of African Americans In Atlanta*. Gainesville: University Press of Florida, 2009.

Sartain, James A. and R.M. Dennis. "Richmond, Virginia: Massive Resistance without Violence," *Community Politics and Educational Change*, ed. Charles V. Willie and Susan L. Greenblatt. New York: Longman Publishers, 1981.

Wilkerson III, J. Harvie, *Harry Byrd and the Changing Face of Virginia Politics, 1945-1966*. Charlottesville: University of Virginia Press, 1968.

Trotter Jr., Joe William. *Coal, Class, and Color: Black in Southern West Virginia 1915-32*. University of Illinois Press, 1990.

Kruse, Kevin M, and Thomas J. Sugrue, *The New Suburban History*. University of Chicago Press, 2005.

Kruse, Kevin Michael. *White Flight: Atlanta And The Making Of Modern Conservatism*: Princeton, N.J: Princeton University Press, 2005.

Lassiter, Matthew D. *The Silent Majority: Suburban Politics In The Sunbelt South*. Princeton University Press, 2006.

Leinwand, Gerald. *The Negro In The City*. New York: Washington Square Press, 1968.

Metlaf, George R. *From Little Rock To Boston: The History of School Desegregation*. Westport, Connecticut, 1983.

Moeser, John V., and Rutledge M. Dennis. *The Politics Of Annexation: Oligarchic Power In A Southern City*. Cambridge, MA: Schenkman Pub. Co., 1982.

Mumford, Kevin. *Newark*: *A History of Race, Rights, and Riots in America*. NYU Press, 2007.

Jones, Murel M. Jr. "The Impact of Annexation-Related City Council Reappointment on Black Political Influence: The Cities of Richmond and Petersburg," Ph.D. Dissertation, Howard University, 1977.

Perry, James Oliver. "An Analysis of the Negro Influence in Richmond's 1966 Councilmanic Election," M.A. Thesis, University of Richmond, 1968.

Roland, Charles P. *The Improbable Era*. Lexington: The University Press of Kentucky, 1975.

**JA0901**

Silver, Christopher. "Impediment to Greatness: The Failure of City County Consolidation in the 1960s," Ph.D. Dissertation, University of North Carolina at Chapel Hill, 1981.

Silver, Christopher. "The Planning Function and the Politics of Reform: Richmond, Virginia's Charter Revision of 1918 and 1948," M.A. Thesis, Virginia Commonwealth University, 1980.

Stein, Judith. *Pivotal Decade: How The United States Traded Factories For Finance In The Seventies*. New Haven: Yale University Press, 2010.

Sugrue, Thomas J. *The Origins of the Urban Crisis: Race and Inequality In Post War Detroit*. Princeton University Press, 2005.

Teaford, John C. *The American Suburb: The Basics*. New York:  Routledge, 2008.

Temple, David, G. *Merger Politics: Local Government Consolidation in Tidewater Virginia*. Charlottesville: University of Virginia 1972, 1.

Pratt, Robert A. *The Color of Their Skin: Education and Race in Richmond, Virginia 1954-89*. Charlottesville: University Press of Virginia, 1992.

V.O. Key, Jr. *Southern Politics*. New York: Vintage Books, 1959.

Watras, Joseph. *Politics, Race and Schools: Racial Integration. 1954-1994*. New York: Garland Publishing, 1997.

Wright, Gavin. *Sharing the Prize: The Economics of the Civil Rights Revolution in the American South*. Harvard University Press, 2013.

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 435 of 502



**INDIANA UNIVERSITY PRESS**

"Tough on Conduct:" Punitive Leadership in Urban Public Schools, A Case Study of Angry Principal Dr. Roy A. West, 1986—1991

Author(s): Marvin T. Chiles

Source: *Spectrum: A Journal on Black Men* , Fall 2020, Vol. 8, No. 1 (Fall 2020), pp. 55–85

Published by: Indiana University Press

Stable URL: https://www.jstor.org/stable/10.2979/spectrum.8.1.04

**REFERENCES**
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/10.2979/spectrum.8.1.04?seq=1&cid=pdf-
reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Indiana University Press* is collaborating with JSTOR to digitize, preserve and extend access to *Spectrum: A Journal on Black Men*

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

**JA0903**

# "Tough on Conduct:" Punitive Leadership in Urban Public Schools, A Case Study of *Angry Principal* Dr. Roy A. West, 1986–1991

### Marvin T. Chiles

ABSTRACT: This article examines the troubled career of Black inner-city principal Dr. Roy Alexander West from Richmond, Virginia. In conjunction with recently organized school board minutes, personal interviews, newspapers accounts, court cases, and archival collections, the article argues that Black public school administrators struggled among themselves over the use of proactive, tough-on-crime discipline during the 1980s; a time when urban schools shifted their focus from integration to educational reform. This article challenges the scholarly consensus by Hinton (2016), Sudler (2017), Simmons (2017), and Agyapong (2018) that the school-to-prison pipeline evolved into a fixed network where underfunded public schools worked hand-in-hand with police, courts, and legislators to criminalize and incarcerate Black children. The urban Black educational crisis in the 1980s should be studied by urban, African American, and education scholars because it reflects how punishing Black children became a vital part of America's response to the poverty, crime, and de facto segregation caused by the failures of the modern Civil Rights Movement.

*Spectrum*, 8(1), 55–85. Copyright © 2020 Trustees of Indiana University and The Ohio State University. doi: 10.2979/spectrum.8.1.04

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Between 1982 and 1989, Dr. Roy Alexander West was both the Mayor of Richmond, Virginia, and a principal in Richmond Public Schools (RPS). The conservative, punitively minded educator spent most of his career blurring the lines between education and politics to improve the quality of RPS's overwhelmingly Black and underperforming school district. West's main tactic was bestowing power in the principal's office and implementing tough-on-crime policies to curb delinquent behavior. This effort landed him in court in 1987 and later out of a job in 1991. West's story should be remembered because it sheds light on the conundrum Black educators faced back then, and now, with providing Black youth with quality schooling as *Brown v. Board* and forced busing failed to provide educational equality between Blacks and Whites.

In telling the story of Roy West's battles with RPS, this article informs the growing scholarship about the school-to-prison pipeline after the modern Civil Rights Movement (1954–1968). Historians Fortner (2015) and Foreman (2017) argue that middle-class Blacks and Whites championed punitive anti-crime legislation to clean up urban areas after the violent civil rights protests of the 1960s. The unintended consequence was, as argued by Simmons (2017), the Black prison diaspora: a legal system that evolved from slavery and Jim Crow to pipeline Black children into local jails, private prisons, and state penitentiaries. In spite of their different approaches, historians who study mass incarceration agree that the politics of punishment defined Black urban life in the 1980s. In the process, they portray the school-to-prison pipeline as a fixed network where underfunded public schools worked hand-in-hand with police, the courts, and legislators to criminalize Black children (Gottschalk, 2006, 2014; McLennan, 2008; Agyapong, 2018; Sudler, 2017; Hinton, 2016; Alexander, 2010; Simmons, 2017).

West's story shows that the transformation of majority Black urban schools from "particularly chaotic, if not themselves crime producing," to anti-crime institutions was contested (Arum, 2003, p. 2). While there was a tough on crime consensus among legislators, judges, police, and middle America in the 1980s, urban public-school administrators were unsure about how to implement punitive disciplinary measures. This unsureness came from the growing politicization and bureaucratization of urban school districts, which made meaningful reform nearly impossible. Black leaders like Roy West believed principals had the moral authority to uplift Black youth through punitive anti-crime measures. West's agenda ran afoul with the very litigious students' right movement—a multiracial, loose coalition of students, parents, and lawyers who sued school districts to ensure that students maintained their most basic Constitutional rights while being punished. West's unsuccessful case against six Black students in 1987 compelled the all-Black school board in Richmond, like those elsewhere, to minimize the disciplinary powers of

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

principals by the early 1990s. While scholastic underachievement and crime persisted, Black educational leadership turned discipline policy into a holistic mechanism to keep Black children in school instead of kicking them out and criminalizing them.

### "AN IMPORTANT HISTORICAL FIGURE IN RICHMOND'S HISTORY"

Upon his death, Roy Alexander West was heralded by a political rival to be "an important historical figure in Richmond's history" (Lohmann, 2019). However, no one could have predicted that upon his birth on January 15, 1930. He and his younger brother Ira (who later became a successful mathematician for the federal government) were raised in Richmond's under-class Washington Park neighborhood (R. West, 1930, 1950). West's father Leroy Alexander was a janitor who, with the exception of witnessing his sons be married in 1950 and 1957, was not present in his children's lives (R. West, 1950; Lohmann, 2019). West was always reluctant to recount his upbringing; chances are that was because of his father (Lohmann, 2019). There is reason to suspect that Leroy may have been physically and or emotionally abusive to his family. However, the documentary record is not definitive on this matter. What is known is that West's mother, Blanche Estelle Melton, was so eager to leave her husband that she deserted him for 16 years, and upon being divorced, she refused to accept alimony and child support. Melton instead transitioned from housewife to domestic laborer and worked multiple unskilled jobs to support her sons (L. West, 1943).

West grew up in Jim Crow Richmond: a time when every facet of life was divided along an unyielding color line. Public schools were, since their founding, separate and unequal (Vaughn, 1974; Barkley, 1994; Moore, 1975; Heinemann, 2007; Wallerstein, 2007). The labor and housing market was, like the schools, separate and unequal as well (Chiles, 2020). West's home in Washington Park did not have running water or electricity, as was the case for many poor Black Richmond households before the 1950s (Silver, 1984). However, West never let poverty suppress his talent, an attribute he developed at the behest of his mother (Lohmann, 2019). Two years after graduating high school, West married Helen Louise Hubbard—the wife he would have until her death in 1998—and moved her into the two-bedroom, one-bathroom home he shared with his mother and brother. They later had two children, Debra and Malone, while West worked as a postal clerk to pay his way through Virginia Union University. Upon obtaining a bachelor's degree in 1956, West became an RPS teacher and moved his family into a nicer four-bedroom house in the middle-class Ginter Park area (R. West, 1951).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

He taught at the all-Black Armstrong High School for ten years (1959–1969) before completing his master's degree at New York University in 1963. Shortly after, RPS promoted West to the head of their food services. He also taught night classes at Union until he earned a doctorate in education from George Washington University in 1976. Upon receiving his final degree, West was promoted again; but this time to a highly sought-after principalship at John Marshall High School. At the time, John Marshall was Richmond's recently desegregated flagship institution, nicknamed "The People's University" because its "prestige was unequaled by any other public high school in the state" (Calihan, 1992, pp. 126–128; Miller, 1976; Lazarus, 2019).

West may have seen his new job, and the position of principal more broadly, as a pillar of stability. However, as documented in Rousmaniere (2013), the principal-ship is a rank, title, and responsibility that has been remade by societal changes out-side of schools. Principals in the early American Republic autonomously led public schools with the support of local communities who valued learning for learning's sake. As the nation entered the late nineteenth and early twentieth century, social reformers—otherwise known as Progressives—changed public schools according to parental "demands for individual, economic, and social development of students" (Fenske, 1997, p. 8). This change meant that principals were no longer the chief arbiters of student learning: they were administrative officers who managed teach-ers and students. As school systems grew by the mid-twentieth century, principals became, according to Rousmaniere, "the most complex and contradictory figure in the pantheon of educational leadership" (p. 2). While managing teachers and stu-dents, they were also building managers; advocates for change who buttressed the educational establishment; employees who acted as employers; politicians outside of school; and judges, juries, and executioners inside of school. Those who occu-pied this enigmatic position "led from the middle" by accommodating communal demands and implementing top-down curricular agendas.

West assumed his post when principals were the middlemen between the school board and teaching faculty. However, West was an "old school" principal that, as Fenske (1997) describes, "adopted an intellectual purpose for education.... [who] conveyed a sense of a pure education, uncorrupted by others, less decorous, purposes" (p. 7). West focused on implementing a system where, as he later stated, "quality education would derive from hard work." This meant curbing grade infla-tion, implementing a "comprehensive curriculum, with stipulated standards of mas-tery," strengthening the gifted programs, and closely supervising the "teaching and learning process" ("Interview with Roy West," 1989). In spite of the changes within the profession, West believed that a principal was, first and foremost, in charge of learning. This rebellion was a part of a tradition where Black principals possessed

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

more autonomy than their White counterparts because of Jim Crow segregation and general White apathy for Black education.

Some Black principals used their autonomy to convert the learning process into an act of resistance against racial discrimination, as was the case with Ethel Overby. In 1933, when West was three years old, RPS hired Overby to be Richmond's first Black principal. Overby was like West in that she was born into poverty. Her father was a janitor who had been born a slave and her mother was a domestic servant (Randolph, 2010). Overby (1975) also admired her mother, whom she often lauded for industriousness: "She worked—oh, how she worked! I do not know what would have become of us if she had not worked," Overby once reminisced (pp. 11–35). As an elementary school principal for over 50 years, Overby made civics the foundation of her school's curriculum. She also extended this agenda beyond the schoolhouse by cofounding a voting organization and teaching voter registration classes to help elect Black Richmond leaders to political office throughout the 1960s and 1970s (Overby, n.d.).

West's bright career took an unexpected turn in June 1980 when he publicly criticized the most powerful Black man in Richmond, Mayor Henry Marsh, III (Campbell, 1980). Marsh was Richmond's first Black chief executive, a nationally known civil rights attorney, longtime city councilman, NAACP member, and head of the city's Black political establishment (Harris, 1980). Throughout his 14-year tenure in city hall, Marsh ushered Black political rule into Richmond by helping to appoint several Blacks to key positions of power. As principal of the city's newly integrated flagship school, West undoubtedly benefited from such patronage. Marsh's accomplishments came with tremendous White resistance. In response, Black leaders created and obeyed an unwritten code to never make their disagreements available for public consumption (Dr. Rutledge Dennis, interview, July 26, 2019). In 1979, West ignored the unspoken race rules and publicly criticized Marsh's plan to consolidate Richmond's seven high schools onto three campuses. This decision cost him the highly coveted job at John Marshall. While his tenure protected him from being fired, the school board demoted West to the principalship of Albert Hill Middle School. West later lamented his decision because it strengthened the bridge between public education and the nastier sides of city politics ("Interview with Roy West," 1989). In speaking with several Richmonders for this project, it was clear that West was not alone in disagreeing with Marsh on the direction of urban education. Nevertheless, West's very public demotion reflected the realities of the day: principals were both educators and bureaucrats. The demotion also foreshadowed West's complicated relationship with fellow Black leaders and his struggles to be an autonomous figure within a hierarchical public-school system.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2     Filed: 09/04/2024     Pg: 441 of

se 3:21-cr-00042-JAG   Document 86-7   Filed 07/06/22   Page 7 of 32 PageID# 9

West may have expected some protection from his superintendent, Dr. Richard C. Hunter. Superintendent was, and still is, the highest appointed office in RPS. The school board hired superintendents for a five-year term with the option for renewal. Prior to Hunter's tenure, RPS renewed most superintendent contracts regardless of their performance. Only 11 people—all White males—served as RPS superintendents between 1869 and 1976 (Calihan, 1992). Almost all of them outlasted the school boards that appointed them, making the superintendent position the most stable job in RPS history. Richard Hunter was the first Black person to ever hold the position in Richmond, thanks to Henry Marsh (Reverend Dr. Benjamin Campbell, interview, March 10, 2019). Hunter carried out Marsh's will by recommending the demotion of West. That political reality did not make West feel any better about the move. "[Hunter] did me wrong, and I will never forget and forgive him for that," West later said in an interview (Lohmann, 2019). His refusal to forgive and forget turned into political savvy. West won a city council seat and the mayorship from Marsh two years after his demotion (Squires, 1982a). Although he levied no public threats, West used back channels to inform Hunter—a man he believed to be a mere pawn in the chess game against him—that he had no place in RPS's future. "I'm not vindictive. I just get even, that's all, so you don't do it again. I'm just protecting my flanks. I think that's par for the course," West said after Hunter resigned from his post (Lohmann, 2019).

## "LACK OF DISCIPLINE IN OUR SCHOOLS"

Roy West was in a peculiar situation upon entering City Hall in 1982. As mayor, he worked from 5PM until 8PM every day to manage a city of about 200,000 people—almost 50% Black and 50% White—that had been in the throes of an urban crisis for the last two decades (Reverend Benjamin Campbell, interview, May 12, 2019; Squires, 1982b; "A Policy of Economic and Human Resources," 1967). While Richmond never experienced the urban riots of the 1960s, suburban sprawl to surrounding Chesterfield and Henrico counties made basic city services (infrastructure and schools) too costly; a fate that befell several localities nationwide (Cyna, 2019; "Uneasy Peace," 1966; "Black Power," 1966; "Cleveland, N.Y.," 1966; "Dr. Thomas H. Henderson to Mr. J. C. Wheat," 1967; "Family Income," 1968; "Increase in welfare costs," 1968; "Foster care & aid," 1968; "Changes in Richmond's Population," 1968; "Table 4," 1968; "Family Income by Race," 1968). Even worse, race relations inside the city had not improved very much since the removal of de jure segregation. A local White minister once said of 1980s Richmond: "We live in a divided city. Two very different points of view. Two very different experiences. Two very different attitudes. And these differences split most deeply along racial lines" ("Notes for Talk," 1981).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Chiles / "Tough on Conduct"    61

Race relations in Richmond were, by all estimations, at an all-time low in the early 1980s. The dismantling of Jim Crow exacerbated racial segregation on all fronts, exposing that Richmonders were deeply divided in body and mind. White and Black Richmonders wanted racial harmony. However, issues involving the city's limited resources sharpened the color line in neighborhoods, schools, churches, and social clubs. In general, White Richmonders wanted to cut taxes and divest and decenter city politics from everyday life. This meant cutting the citywide budget and defunding city services, public education being one of them (Moeser & Rutledge, 1982; Drake & Holsworth, 1996; Randolph & Tate, 2003; Hayter, 2017; "Taxpayers' Group Proposals Seen Harmful"). Black leaders and residents saw a strong city government as essential to fixing the city's past, shaping its present, and preparing for its future. The Black community encouraged city government to increase taxes and the salaries of city workers, improve public services, and add newer programs to local schools ("Tensions in the Richmond Community," 1981; "Racism/Racial Polarization Program," 1981; "Tensions in the Richmond Community, Announcements," 1981; "Racial Tensions Workshops," 1981; Miller, 1976, 1981; Harris, 1980).

The divide between White and Black often played out in the debate between big government and small government. "Whites perceive blacks to be anti-business [and] anti-compromise," an internal city government survey said. The survey further concluded that Whites felt that Blacks were uncritically "injecting [the] consciousness of race into everything." The Black community did not completely disagree with this criticism. They believed that a strong city government would undo policies and practices that made racial discrimination part of everyday Richmond life. Blacks did not inject race into anything: they wanted to fix how race operated within everything. The Black and White divide over city government perpetuated, as a local urban studies professor claimed in 1981, "the growing distrust between blacks and whites in the city of Richmond." He went on to accurately assess that, "What happens here generally reflects tension throughout the city and, at the same time, contributes to the racial division of the city" ("Tensions in the Richmond Community," 1980; "Council Shares Blame for Racial Strife," 1981; "Notes for Talk," 1981). While the racial divide about city government was largely ideological, the racial divide in general came from the clear understanding that "some of the [White] attitudes and mindsets were not in step with the law," a longtime Black minister once said austerely about 1980s Richmond (Sylvester Turner, interview, March 13, 2019).

White flight during the previous decade lied at the heart of racial tensions. As Black leadership entered city hall, White people fled Richmond and traded their urban identity for a suburban one, personifying the Richmond Realty Company

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

advertisement that, "We are as proud of the fact as we are of the city that we're named for. But over 25 years, things change" (Smith, 2004; Moore, 1982; "The Model Code for the School Community," 1983). That change was drastic, as Chesterfield and Henrico provided White Richmonders with things they could not have in the inner city: safe distance from the Black urban poor, affordable housing with spacious yards, shopping centers only accessible by those with private forms of transportation, uncongested streets, numerous parks and playgrounds, and the illusion that everyone around them shared similar socioeconomic values ("Business Directory," 1980; "The Development of a County," 1982; "Why Brandermill Is the Best Community," 1983). The counties had smaller populations than Richmond individually. But combined, they almost equaled Richmond's population and more than doubled its economic wealth ("State of the City Report," 1983). In terms of race, both the anecdotal and documentary evidence shows that 1980s Richmond was defined by Whites physically, economically, and psychologically distancing themselves from the Black inner city (Reverend Dr. Benjamin Campbell, interview, March 14, 2019).

In searching for the American dream, Whites left Richmond in an urban nightmare. Many within the White business community all but abandoned the inner city. As Richmond transitioned into a municipality of the Black poor, and its violent and drug crime rates rose to alarming heights (Squires, 1982a; Federal Bureau of Investigation, 1980–1989). With the exception of a handful of middle- and upper-class neighborhoods, Richmond was a city where, as one business owner regrettably said, "They [White people] think they'll get mugged or raped" ("A Tale of Two Marketplaces," 1986). Even a prominent Black leader complained that it was hard to conduct business downtown when "little old [White] ladies see [Black] street people waiting for lunch and think all those street people are lustful criminals" ("S. Buford Scott to Clarence L. Townes, Jr.," 1983). Many empty downtown storefronts and surrounding residential areas became open-air drug, prostitution, and gambling markets run by local kingpins Euguene, Reginald, and Herbert "Huck" Johnson and Carlton, Leonidas, Rodney, and Ronalyn "Mug" Brown ("Table 1, Reported Offenses: 1976–1980," 1980). The open racketeering left one visiting minister lamenting that, "Many of these communities have become dumping grounds for drugs, alcohol, and every conceivable crime" since he last visited Richmond a decade prior ("Dr. Leon Sullivan," 1984). Protecting the very aboveground underworld were coldhearted hitmen named Russell "Block" Gray and Lindwood, James, and Anthony Briley. They killed so many people in public and private that their names—still to this day—generate tragic memories for many life-long residents (Grim, 1980; "Judge Convicts James Briley," 1980; Sundquist, 1985; J. Williams, 1990a, 1990b). Upon entering City Hall, Roy West did not inherit a

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 444 of

se 3:21-cr-00042-JAG    Document 86-7    Filed 07/06/22    Page 10 of 32 PageID# !

Chiles / "Tough on Conduct"    63

sleepy southern town like those before him. He got "Crime City"—a place that led the state and nation in almost every vital crime category from the 1980s until the early 2000s (Uniform Crime Statistics, 1980–2000).

Mayor West was not shy about his stance on urban crime. "We have declared war [on crime].… in the City of Richmond," he responded in a CSPAN interview about the city having America's third highest murder rate (R. West, 1985). During West's mayoral tenure (1982–1988), he opposed fellow Black leaders and expanded Richmond's police force into various anti-crime task forces, targeting housing projects and other areas known for Black-on-Black violence (Minutes of the City Council of the City of Richmond, 1985–1987, p. 399; "Report of the Department of Corrections," 1987). West often professed he wanted "longer sentences without parole, less plea bargaining, and expanding the type of crimes for which the death penalty may be given" This stance made him unpopular with many local Blacks, leading one dissenter to tell the media that, "West's statements were not representative of the [Black] community." In front of many of those dissenters, West once retorted emphatically: "We cannot rationalize or explain it away. The issue is not capital punishment. It is black-on-black genocide" ("Mayor West," 1985). While his tough on crime stance alienated him from the Black political establishment, some of whom openly participated in the criminal underworld, West lobbied the Virginia Legislature to pass punitive laws that, by the mid-1990s, made Virginia one of the largest carceral states in America (Wilder, 1989, 1992; "Final Report of the 1989 Commission," 1990).

West was more than a mayor: he was a principal who worked from 7:30AM to 3:30PM Monday through Friday to fix the fractured schools that were around 90% Black and, as one historian noted, "almost as poor as they are black" (Pratt, 1992 p. 90). Officials in states such as North Carolina and New Jersey became outliers in working to consolidate urban and suburban schools throughout the 1980s and 1990s. Virginians did no such thing and remained within the American mainstream (Cyna, 2019). By the time West became Albert Hill's principal, about 75% of RPS's children qualified for free and reduced lunch. This percentage crept up into the 90s by the middle of the decade. Student poverty was coupled with the fact that RPS struggled to keep schools open during the 1980s. RPS consolidated some schools (mainly high schools) while others that were 100% White during the days of legal segregation became 100% Black decades later (Ryan, 2010).

Underachievement defined RPS's Black students. "We have accepted the fact that our enrollment is predominantly black, but they are still students, and they can learn," a former RPS administrator once said about the 1980s (Pratt, 1992, p. 91). RPS students could learn, and they did; just at a slower pace than their suburban and private school counterparts who scored higher in math, reading, and the hard

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2     Filed: 09/04/2024     Pg: 445 of

sciences. This paralleled a national trend. Education scholars noted in the late 1980s that suburban sprawl created two school systems: one poor and one rich. Poor school systems "communicate low expectations and aspirations for their students … putting us at risk of creating a permanent [urban] underclass" (Clark & Picard, 1989, p. 5; Cyna, 2019, pp. 37–40). This was even more true in Richmond, where the legacy of Jim Crow, Massive Resistance, court-ordered busing, and segregationist academies—who openly touted their educational superiority—facilitated the demise of RPS. Richmond's public-school population shrunk from almost 50,000 in 1970 to about 27,000 (3,500 White) by 1990 (Calihan, 1992). More importantly, the counties had exclusive private and highly ranked public schools whose resources all but ensured their students' admission to top-ranked local and out-of-state colleges and universities. While private school figures are not accessible to researchers, Chesterfield's (34,000) and Henrico's (36,000) public school populations swelled to around 70,000 during the 1980s ("The Development of a County," 1982). These developments proved beyond a shadow of doubt that, in the words of a headmaster of a local preparatory school, "schools do reflect society" (Cramer, 1981). Richmond area schools then, and many would argue now, reflected that White Richmonders would never support racially equitable schooling.

White Richmond's abandonment of inner-city schools was a part of a national re-segregation of public schools by legislators, the courts, and everyday people during the 1980s (Kruse, 2007; Nelson, 2007; Walsh, 2018; Lassiter, 2007; Amsterdam, 2017; K'Meyer, 2013). However, Black Richmond's response was everything but typical. On one end, leaders, like Blacks throughout the nation, filled faculty and administrative roles with the confidence that they could fix city schools without White oversight (Cecelski, 1994; Rasmussen, 2017; Danns, 2003; Anderson & Pickering, 1986; Ralph, 1993; Perlstein, 2004; Countryman, 2006). RPS's successful campaign to end the same court-ordered busing plans that Black leaders of the previous generation had asked for—as was done just one-hour east in the majority Black city of Norfolk, Virginia—reflected this sentiment (Eaton & Meldrum, 1997). On the other hand, Black school officers optimistically planned to reform RPS for White migration back to the inner city (Dougherity, 2004). Roy West worked closely with the RPS school board on recruiting White families back in spite of nearly 1,000 students (mostly White and middle-class Black) fleeing the district every year since 1970 (Pratt, 1992). They first allowed Black and White parents to opt out of cross-town busing. This did little to slow down the exodus. Next, they conducted a series of studies to see how they could generate an inward migration of middle-class and affluent White students. While academic performance was important, parents told RPS bureaucrats both privately and publicly that, "Among the top concerns of the public is lack of discipline in our schools" ("Interview with

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Roy West," 1989). This made sense given that RPS outpaced its suburban neighbors in discipline issues (ranging from simple demerits to expulsions) throughout the 1980s (Pratt, 1992).

An internal investigation confirmed initial speculation that "the greatest concerns about the student population are their level of academic achievement and student discipline" (Richmond School Board, 1985–1986). The consultant went on to say that, "The poorest composite ranking of all RPS characteristics was given to the public image of the school division…. The major concern over the next five years is…. anxiety over the potential for reduced funding as a result of white flight [and]…. serious problems, according to the community, are perceived discipline problems" (Richmond School Board, 1985–1986, p. 327). The "perceived discipline problems" stemmed largely from the failures of school integration a decade prior. Fights between Black and White students were so frequent that White families who originally refused to abandon RPS left anyway (Dr. Edward Peeples, interview, June 24, 2019; Robert Corcoran, interview, March 11, 2019; Reverend Benjamin Campbell, interview, March 12, 2019; University of Richmond, 2019). Other White families, through word of mouth, heard about the level of violence in RPS from fellow White teachers and administrators. Quantifying the accuracy of such rumors is difficult because the Federal Educational Rights and Privacy Act of 1974 protects students' records from public inquiry. Student discipline only becomes public knowledge through published reports by the school board, an appeal of punishment by guardians, or a lawsuit. Still, student names and offenses are often kept secret. Nevertheless, White perceptions were RPS's realities. Or as West stated, "The lack of discipline is a problem in Richmond, just as it is in all public schools today" ("Interview with Roy West," August 28, 1989).

The perception, and in many cases reality, of discipline issues became a call to action for RPS officials. From 1983 to 1985, they published "The Model Code for the School Community Students Rights and Responsibilities" in local newspapers and magazines to show the school board's dedication to making RPS a better place to learn ("The Model Code," 1983). West used his platform as mayor to make the school discipline issue a citywide anti-crime initiative. His "two-pronged approach" was to "be tough on those who commit the crimes by imposing serious sentences and install better programs in the schools that will challenge youths and steer them away from crime…. We can do it. We (the school system) are not committed enough. We don't have enough vision," he said in an interview (Cummings, 1988). To West, it was clear that school discipline was crucial to maintaining social order. As a principal and the mayor, West compelled the school board to include him in "deal[ing] firmly and effectively with the small percentage of students who create discipline problems" in the upcoming 1986–1987 school year (Richmond School

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Board, 1985–1986, p. 53). While this was done to improve the schools' functionality, RPS's image was always the most important goal. As West stated: "The respect of the public for a particular school depends, to a large extent, on the maintenance of an orderly environment" ("Interview with Roy West," 1989).

The student discipline issue in Richmond was a part of the national discussion on education reform. Since most teaching colleges did not instruct school officials on how to handle student misconduct prior to the 1980s, teachers, principals, and parents often worked together to dole out discipline on a school-by-school basis (Deitz & Hummel, 1978; Arum, 2003; Duke & Meckel, 1980; Blacker, 2000; Hampel, 1986; Kafka, 2009; Weinig, 2000). However, West's willingness to work with the RPS school board showed a national shift toward top-down, bureaucratic discipline mandated by school districts and carried out by principals. This change came largely from a landmark education report called "A Nation at Risk: The Imperative for Educational Reform," published by President Ronald Reagan's Secretary of Education, Terrel H. Bell. This report used the growing achievement gaps between American schools and their international counterparts to call for a national reinvestment and restructuring of public education (Shanker, 1985). The tragic tale of this report, as later discussed by the *Washington Post* (2018) and NPR (2018), was not what the report said and advocated for, rather, it was Reagan-era America's response to data that validated beliefs about Black inner-city schools blighting the reputation of American public education.

At the heart of "A Nation at Risk" was an indictment on the current methods of student discipline, the only issue taken up by the Reagan administration (Educational Research Service, 1984). In a separate report called "Disorder in Our Public Schools," the White House excoriated public school teachers and administrators across the country for their inability to curb student violence in their hallways and classrooms. Much of the criticism was levied at "schools serving students from disadvantaged neighborhoods," as "victimization rates are high in schools located in areas characterized by poverty, unemployment, and a high proportion of female-headed families; or in schools where large portions of the students are black" (Educational Research Service, 1984, p. 78). In fact, Black inner-city students represented almost 50% of all public-school suspensions by 1984. Many urban school districts took more control of student discipline, and some principals, like Roy West, had little issue with transition (Fenske, 1997). Some parents also supported stiffer penalties, as "people tend to believe that teachers have lost control over their students," an educational psychologist said after a Gallup Poll showed that Americans generally saw urban schools as cesspools of drugs and crime (Hollingsworth, Lufler, & Clune, 1984; Mirga, 1981). Inner-city school administrators even sought, and received, judicial authority to clean up their schools. With

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 448 of

e 3:21-cr-00042-JAG   Document 86-7   Filed 07/06/22   Page 14 of 32 PageID# 1

the *New Jersey v. T.L.O* decision (1985), the federal courts empowered administrators (primarily principals) to implement school-wide searches and seizures. This decision reaffirmed the *Tinker v. Des Moines* (1969) case, which stripped students of many constitutional rights the minute they entered school property. While some parents and students expressed dismay over the decision, "Officials of teachers' and administrators' organizations said that the decision would give support to teachers and help guarantee a safe and orderly learning environment in schools," *Education Week* reported weeks after the 1985 decision (Currence, 1985).

On July 24, 1986, the Richmond School Board entered the boardroom on city hall's 17th floor—a room that is still used by school officials and researchers to this day—and crafted the Standards of Student Conduct. Dress code violators (students wearing lewd or provocative clothing), truants, profane speakers, gamblers, pornography connoisseurs, tobacco smokers, liquor drinkers, vandals, thieves, and cheaters would receive demerits and suspensions. Drug possessors and brawlers would be automatically expelled and escorted off of school premises by law enforcement. Roy West's influence is revealed in the clause that gave principals the right to implement "his-her own initiative" when executing searches and doling out punishment on school property (Richmond School Board, 1985–1986, pp. 82–86). Later, the school board told parents in a written statement that they uniformly "support the intent of legislation to strengthen present sanctions provided by law for those who violate any statues related to alcohol and drug abuse" (Richmond School Board, 1985–1986, pp. 147–154). In fact, West convinced school officials to lobby the Virginia Legislature to strengthen its anti-crime laws as it related to public schools. The new conduct policy represented a new day in RPS when the school board, led by the mayor/principal, became "Tough on Conduct" ("School Boards Gets Tough," 1986).

West took full advantage of the new rules at Albert Hill. Equipped with a new student conduct code and school board support, the tall, slender, and balding principal dictatorially patrolled the halls to root out what he called "The terrible Ds—disrespect, defiance, and disruptive conduct" ("Interview with Roy West," 1989). West orchestrated routine school-wide dress code checks and personal property searches. Student violators almost always received demerits at best and suspensions at worst (Richmond School Board, 1987–1988). Sometimes, West used the intercom system to humiliate the students he caught breaking the rules. When asked by the media if he ever issued lenient punishment, West retorted, "I always take the maximum…. If a child violates my prohibition … then I'm going to deal with them very firmly." He later added that this policy came from his belief that "a failure of discipline usually results in an uncontrollable school" ("Interview with Roy West," 1989).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Parents of the punished students asked for "an impartial investigation into school activities at Albert Hill School because the Mayor [sic] is not beyond the rules and regulations of the School Board" (Richmond School Board, 1987–1988, p. 177). However, there is no record that the board investigated West. This led many to suspect that "the school board is controlled by the mayor" (Richmond School Board, 1987–1988, p. 177). West did answer to the media for his supposed "reign of terror" at Albert Hill. "I'm very tight and firm, but fair. Friendly occasionally in dealing with students," but "there are three things that I come down on a child very hard on and that is defiance, disruption and disrespect." He even claimed that a Black parent removed their child from a renowned private school and enrolled them at Albert Hill because "she said she liked my style of organization, academics and discipline." West reasoned that his antics were needed in urban, Black school systems. "These kids are very street smart. They will know when you are trying to bend in their favor. Word then gets around that you are a softy." Most importantly, West felt that principals should ensure Black students left public school fully prepared to enter the wider world. When faced with Black parental resistance, he rhetorically asked them if they wanted him "to let your [Black] kids slip through the system undisciplined and untaught" while knowing that broader "society will not accept a black kid with an aberrant behavior" (Young, 1987a, p. B-2).

## "THE EDUCATIONAL ESTABLISHMENT CONTINUALLY DOES BATTLE WITH US"

Roy West's administrative style made him the most polarizing figure in Richmond during the 1980s. On one end, he confidently told the local media that "not a day passes that four or five people don't say that they think the city needs more principals like me" (Cummings, 1988). On the other hand, West was voted the most hated public official in Richmond ("Best and Worst Elected Official," 1988). This duality resembled that of famed angry principal and contemporary Dr. Joe Louis Clark from Patterson, New Jersey. The administrator had been a Patterson City Public School teacher and principal for over 20 years before reluctantly accepting the principalship at Eastside High School in May 1982. Before his arrival, the overwhelmingly Black and Latino school was, as he later states in his book about inner-city schools around the nation, "constant Bedlam. There are fights every day. There is widespread incompetence, wanton destruction of property, and constant vile language. Prostitution is rampant. Violence is extolled. Weapons are prized, and used. Drugs are king. The major role model for inner-city youth is the rich drug dealer. The main point of drug distribution is the school" (Clark & Picard, 1989, pp. 8–18). Eastside embodied this description. A reporter who once covered the heap

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Chiles / "Tough on Conduct"    69

of criminal activity in Patterson schools stated that Eastside "was called a cauldron of terror and violence. Students carried guns and knives, and were routinely shot and stabbed. Drug deals were conducted in hallways. Teachers were threatened in the classrooms. Couples took turns making out in the restrooms, to the point of having sexual intercourse" (Rimer, 1988).

Upon arriving at Eastside, Clark carried a bullhorn and baseball bat to command students' respect. He hired straight-edged faculty and staff to enforce a dress code, assign tons of homework, suspend students for minor behavioral infractions, chain the doors to keep out neighborhood drug pushers, and dare anyone to leave—that included teachers—who did not like it. Clark's most famous tactic was mass suspensions and expulsions. During his first week in office, over 300 delinquent students who showed little academic promise were given first-class tickets out of Eastside (Page, 1988.) Clark's tenure improved students' test scores and drastically reduced the violence, sexual misconduct, and drug activity that Eastside was infamous for. Some Black parents and students who fled the Patterson school system eventually trickled back in because of Clark's work. However, Clark's reign at Eastside attracted criticism from faculty, parents, and educational specialists. They felt that Clark was well-meaning at best. At worst, he was a tyrant that would not be tolerated "if the students were not poor black children" (Mueller, 2007). Clark defied the school board's orders to ease the rules. When the school board tried to dismiss him, hundreds of supporting parents, students, and media outlets around the nation rallied to his defense. After almost a decade of investigations and lawsuits, Clarke resigned from his post, stating: "Either I go around constantly in fear of those vermin, which would render me ineffective, or I will go about my merry way" (Ferraro, 1987).

Although they did not know each other personally, Roy West's and Joe Clark's fates were linked by a tidal wave of resistance to autonomous principals who ruled with an iron fist. Both men gained the initial support of school officials. However, public pressure and a litany of students' rights lawsuits eventually took that away. Like Clark, West had a knack for turning novices into potential allies; and potential allies into certain enemies. An example of this was West's implementation of a rigorous admission policy to Albert Hill's chapter of the National Honor Society. He required students to pay higher than normal admission fees. Male students had to wear blue suits while female students needed pastel-colored dresses (Young, 1987b). Some parents approached West and suggested that he make his standards optional. After West rebuffed them, the disgruntled Black parents complained to the national headquarters and the school board that the "mandatory fees and dress requirements … are a hardship for some [Black] parents" (Richmond School Board, 1987–1988, p. 177). The National Honor Society headquarters demanded

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

JA0918

West to end his rogue policies or RPS would lose its charter, a fate that no one in the struggling school system wanted.

West refused to abolish his rules. Dissenting parents asked the school board to fire West, "so that no child will again suffer because of one man's dogmatic, inflexible rules" (Richmond School Board, 1987–1988, p. 177). The school board, headed by a key West supporter, refused to punish or publicly criticize him. However, the new superintendent, Dr. Lois Harrison-Jones—the first Black woman to hold the office—compelled West to think about the best interest of the entire school system. She later told the local media during a phone interview that West would comply with the national headquarters (Campbell, 1987a). West originally called the news of the meeting "misinformation," but he complied with the original order and placed Albert Hill's chapter of the National Honor Society back in line with the rest of the nation (Campbell, 1987b).

West may have been pragmatic about the National Honor Society issue because he and his supporters faced an important lawsuit. On July 2, 1987, six Albert Hill students sued West, Superintendent Harrison-Jones, and other school officials for violating their civil rights with improper search and seizures during the 1986–1987 school year (*Burnham v. West*, 1987; Goode, 1987). Although mini-searches took place throughout the year, three school-wide searches in December 1986 and January and February 1987 were the crux of the lawsuit. During each search, West ordered teachers to rummage through students' backpacks, lockers, and other personal items. The goal of the searches was to find marijuana, markers used for graffiti, and other banned items that would allow West to punish the suspected students. The culprits (all six in the lawsuit) received suspensions, and they were not allowed to contest the evidence found in their possession (Richmond School Board, 1987–1988).

This lawsuit came amid a periphery movement for students' rights that became more mainstream by the mid-1980s (Arum, 2003). While school districts made student discipline more bureaucratic and more interpersonal, students and their families responded in-kind with systematic litigious attacks (Zirkel & Richardson, 1997). Historians chart the movement for students' rights back to the 1940s and 1950s when around 4,004 students sued their school districts for violating their civil rights with punishments ranging from suspensions to expulsion. This "legal entitlement" among school-aged students "produced skepticism about the legitimacy of school disciplinary practices," in the words of Arum (2003, pp. 6–20). Thanks in part to the modern Civil Rights Movement, the litigiousness increased in the 1960s, as 3,413 students filed similar suits in that decade alone. The nadir of the student's rights movement came in 1969, however, with the infamous *Tinker v. Des Moines* decision. This controversial rollback inspired school districts

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 452 of

e 3:21-cr-00042-JAG   Document 86-7   Filed 07/06/22   Page 18 of 32 PageID# 1

to stiffen penalties for suspected lawbreakers and, adversely, a flood of successful litigation (around 12,000 cases) in the 1970s and 1980s (Tyack, James, & Benavot, 1987). During that time, public-interest law firms (backed by the Ford Foundation, Carnegie Corporation, Field Foundation, and Rockefeller Brothers Fund) began funding various legal attacks to ensure that students' rights were not compromised in the quest to reform public education (Arum, 2013; *Goss v. Lopez*, 1975; *Wood v. Strickland*, 1975; *Carey v. Piphus*, 1978; *Board of Education v. McCluskey*, 1982).

Richmond city attorneys warned the school board in October 1986 that the *Standards of Student Conduct* had "serious due process ramifications" because "what is stated as an appeal for the student is not an appeal but a review of the record" (Richmond School Board, 1985–1986, p. 122). One local attorney also warned the school board in December 1986 that his client would sue West if the "series of unlawful searches" continued. Parents of the suspended children later asked Superintendent Harrison-Jones to "set guidelines to ensure that searches at Hill are handled fairly, uniformly, and only under extreme circumstances" (Richmond School Board, 1987–1988, p. 177). The newly appointed bureaucrat refused to investigate West because, as the school board recorded, "She is impressed with the school's administrative leadership and believes that the majority of parents want the principal to remain there for his overall positive influence." The assessment was validated by over 100 parents named "Parents on West's Side" petitioning on his behalf because of his "standards of excellence and achievement for Albert Hill students" (Richmond School Board, 1987–1988, p. 203). As the lawsuit against West entered the federal courts, a politically connected parent "requested the immediate dismissal of the principal [West] or that he not be allowed to influence children in the school system until this matter is completely resolved" (Richmond School Board, 1987–1988, pp. 187–188). This request, too, was denied by Harrison-Jones (Young, 1987c).

As Harrison-Jones and other high-ranking school board officials stood at the center of a federal lawsuit, they removed their support from Roy West. They overturned his suspensions, and at Harrison-Jones's request, they transferred West from the Black middle-class Albert Hill Middle School to the Black underclass Mosby Middle School (now Martin Luther King Middle School) in Church Hill (Richmond School Board, 1987–1988; Kelly, 1987). On more than one occasion, the school board considered rotating principals (mainly West) every five years to cut down on parent complaints (Richmond School Board, 1987–1988). Rumors even swirled about Harrison-Jones planning to give West an administrative job in city hall and removing him as a principal altogether. This development compelled the six students to drop their suit against Harrison-Jones and other school RPS officers. West and a few supporting teachers refused to budge. They fought the case, and

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 453 of

e 3:21-cr-00042-JAG   Document 86-7   Filed 07/06/22   Page 19 of 32 PageID# 1

the federal courts found them in violation of the Fourteenth Amendment, resulting in them paying the aggrieved party around $40,000 in legal fees (Campbell, 1987c; Goode, 1988a). The court decision reaffirmed the federal courts' new commitment to protecting the individual rights of students (Arum, 2003; Simmons, 2017; *Fishel v. Frederick County School Board*, 1988). West was not found at fault in disciplining the students. However, he did not conduct the searches in a constitutional manner, subjecting him to pay restitution to the aggrieved parties. This loss of support and the court decision became another watershed moment in RPS history; when the school board stripped principals of their autonomy in disciplining students. To West, this shift "contributed heavily to the demise of public education in Richmond" ("Interview with Roy West," 1989).

The school board's shift away from West came as the nation shifted away from punitive school discipline (Rubenstein, 1986; Henderson, 1985). After reviewing the recent spike in suspensions, expulsions, and lawsuits, educators saw, as one scholar states, "the need for a new conception of schooling that embodies a more appropriate curriculum, a greater emphasis on pastoral care and counseling, and a fundamental change of outlook in the way some teachers view their relationship to pupils, particularly with working-class adolescents" (Glasser, 1986, p. 36; Docking, 1987, pp. ix, 154). Theorists and supporting administrators helped mainstream the idea that strong teacher-student relationships should replace the *traditional* reliance on harsh discipline to create safe learning environments. Urban school administrators, many facing lawsuits and rising drop-out rates, began to listen and cut suspension and expulsion rates in half by 1989 (McDaniel, 1986). While West may not have known it at the time, this paradigm shift contributed to his demise in the courts and among his RPS colleagues. When asked about the vote of no-confidence from the school board and superintendent, West responded: "No comment … there's no need to contest anything in Richmond City Schools anymore" (McAllister, 1987). He later took to a local media outlet and criticized Albert Hill after his departure. "Just go to Hill now. I'll say no more. Go to Hill now. I don't want to criticize my colleagues, but just go and find out for yourself." His comments were in response to a news article about RPS's "image problem" after drugs and guns were regularly being found on school campuses (Epes & Cummings, 1988b; Richmond School Board, 1987–1988, p. 307).

After West's transfer, the school board took more control of student conduct issues. They granted most of the appealed suspensions and expulsions (around 50 in the 1987–1988 school year alone) that made their way to the 17th floor of city hall. The school board later revised the student conduct code. Principals had very little say in this more transparent process that made suspensions and expulsions very difficult to execute (Richmond School Board, 1989–1990). The appellants

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Chiles / "Tough on Conduct"     73

were regularly readmitted or reassigned to other/alternative schools instead of being removed from RPS altogether (Richmond School Board, 1987–1988). While many saw this change as a direct attack against Roy West, Superintendent Harrison-Jones claimed, "It's important that the public realize the [school] board must assess all the circumstances surrounding a child's behavior—his background, his family situation, any handicaps or emotional deficits…. The board has to do what it feels is right, and I believe the board did the right thing" (Richmond School Board, 1987–1988). This new policy did not change RPS's reputation, as the local media continued reporting on the uptick in criminal activity on school campuses (Epes & Cummings, 1988a). This policy did, however, change how West ran his school.

Upon arriving at a middle school known for gun violence (with windows often riddled with bullet holes) and drug use, West fired teachers he deemed to be uncaring and incompetent, chained the doors to keep out drug pushers, and issued mass suspensions; a tactic that was no longer employed by principals and school districts across the nation (Duke & Meckel, 1980; Farmer, 1989a). The most notable mass suspension involved 40 frequently tardy students. To his dismay, and that of the few vocal Mosby parents, West's terminations and student punishments were overturned by the school board and Superintendent Harrison-Jones ("West Suspends," 1987; Goode, 1988b). "Those of us who pride ourselves on our success as school administrators take no pleasure in the fact that the educational establishment continually does battle with us," West told the local media in response. He was later angered when the school board denied his recommendation to expel two students for attacking a teacher with a knife ("Interview with Roy West," 1989). "I'm as angry as I can get," West said at what he called a "bleeding-heart approach" to urban education. "If we're not going to follow our own code (of conduct), then we might as well throw that book in the furnace." West continued: "To say to your teachers and principals that we are going to protect you and seek the severest penalty, and then not do it, doesn't make sense. If you strike a teacher, I think you've lost the right to attend Richmond Public Schools…. A kid who hits a teacher or waves a weapon in a threatening manner should be expelled." West, an often-seen participant in student conduct hearings, refused to attend anymore because, as he stated, "the [school] board is going soft" (Epes & Cummings, 1987).

Undoubtedly angry about the recent turn of events, West used his political clout to get even with yet another superintendent whom he felt betrayed him. First, West used his post as mayor to demand that Harrison-Jones resign ("Superintendent of Schools," 1987). She publicly retorted that "any school official who would [publicly] disagree with the board through the media is a disloyal administrator" (Young, 1987d). As West continued his criticism, the Black community supported

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Harrison-Jones by opposing West for, once again, publicly disparaging Black leadership. This did not matter, as the public turmoil over student discipline compelled Harrison-Jones to reject her contract renewal in July 1988. "Education is not among the city's highest priorities…. You can't build a system that is plagued with constant controversy and upheaval and strife," she said (M. P. Williams, 1988). Her criticism resonated with parents who felt that the "reasons for her decision to leave" were the "insubordination of employees"; namely Roy West (Richmond School Board, 1987–1988, p. 338).

Harrison-Jones's resignation, while being a clear response to West, also spoke to the fiscal status of RPS. Not only were 1,000 middle and high school children annually fleeing the school system, but the city council began slashing the education budget (Epes & Cummings, 1988c). In May 1988, the school board warned the council that budget cuts "places [sic] all school programs and services at serious risk" (Richmond School Board, 1987–1988, p. 313). They were right. Under the new city budget, RPS would operate on nearly $12 million less than the previous year, causing hiring freezes, layoffs, and students to pay numerous athletic and academic fees that they could not afford (Richmond School Board, 1987–1988, pp. 322–323, 1989–1990). West went further in attacking the school board by supporting these cuts. He justified this advocacy, as he did with punitive discipline, by claiming that RPS's issues were moral and ethical, not fiscal (Winslow, 1988). "The notion here [in Richmond] is that such students need extra resources to bridge the education gap. That may be the case, but we can never simply fund excellence," he infamously said in support of the new budget ("Interview with Roy West," 1989). He went on to say that:

> The Richmond public schools have always had minority and economically disadvantaged students. What we have not always had, however, is the current dismal and shameful level of academic achievement. In contrast to the social babbling by social engineers who promenade in our midst, I do not hold to the contention that such facts—poverty and low-achievement—are synonymous. ("Interview with Roy West," 1989)

Parents and administrators were outraged by West's stance, as it appeared that he okayed White city leaders—whose children attended private school—turning their backs on RPS. As a Black mother told the board, "The black community must understand that Roy West, under white racist control, would be a total disaster for the effective education of black youth" ("Principal Appointed in King and Queen," 1988).

After Harrison-Jones left office, a new, more aggressive superintendent took her place. Dr. Albert Jones, Jr., assumed the office on a temporary basis in July 1989.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Two days after accepting the post, he informed Roy West, who was no longer mayor but still a city councilman, that his days in RPS were numbered ("A West Magnet," 1989). All he needed was an incident; and he found it less than a week after the 1989–1990 school year began. West violated the new student conduct code by firing a teacher who refused to chain the doors at Mosby Middle School (Farmer, 1989b). Jones delightedly called West in to his office and told him that, "You acted inappropriately in connection with the matter…. This was not the first instance in which you have been found to have exhibited poor judgment and unprofessional conduct." Jones further informed West that the fired teacher would be reinstated and that he would be transferred to an administrative job at the downtown magnet school. This appointment was quite sinister because Richmond had no downtown magnet schools. West's new post, which was not covered by tenure, was created before the new magnet school ever came into fruition. So, West could have been laid off or terminated without receiving his pension. West opposed Jones by mobilizing the few Mosby parents and media outlets on his side. The opinion editorials and public meetings saved his pension, but not his job (Farmer, 1989c; Richmond School Board, 1989–1990). On September 1, 1989, RPS officially removed West from his post and gave him a thankless desk position in city hall under the watchful eyes of the school board he disliked (Richmond School Board, 1989–1990).

### "HOW TO RUIN PUBLIC EDUCATION"

Just two years after Albert Jones reassigned Roy West, he was under investigation—and eventually fired—for using RPS money to support his private business ventures. Not surprisingly, West led the investigation after receiving confidential information about Jones's nefarious dealings. When asked about his role in taking down Jones, he responded: "I don't want to say anything at this time to upset the possibility and probability of Dr. Jones's leaving Richmond." The 61-year-old former principal did, later in that interview, announce his retirement after 32 years of service (Bradley, 1991). "While there are many valleys from which Richmond Public Schools must extricate itself, I am confident that, in spite of frustration and demoralization of our career educators in Richmond, we will not totally self-destruct," he pessimistically told the media in a written statement. West also retired from public life three years later. He spent his golden years writing editorials to the *Richmond Times-Dispatch* newspaper about the "wasteful and inept" RPS leadership turning city schools into what he called an "intellectual Sahara," where many Black students left without being fit for citizenship. Before his death in May 2019, West was rumored to have been writing a comprehensive account of his days in RPS entitled: "How to Ruin Public Education" (Stallsmith, 2019).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

West never finished what this author assumes would have been an interesting tale about RPS. However, his pessimism about RPS's future was totally justified. Almost 100 jobs were lost to layoffs during the 1992–1993 school year. This number continued to climb until the early 2000s. Currently, 73% of school-aged children in Richmond (mostly working- and underclass Blacks and Latinos) attend RPS. Only 19 of the available 44 schools are accredited. Teacher and administrative turnover has reached an all-time high. The graduation and college attendance rates have sunk to an all-time low. Even lower is the morale among faculty and students. A recent retiree of RPS vividly recounts how the current state of affairs compelled him to forgo a hefty administrative salary and leave public education for good. He stated:

> This was just a couple of years ago, because I retired in [20]17. When I walked back into that building, after thirty or so years earlier, starting in there, recognizing what the atmosphere was like then and what it had turned to, I was so depressed. I was so depressed that I retired as soon as I could. What I had experienced when I first went into there—the light, the energy—it was, it was gone. (Sherman Curl, interview, December 20, 2019)

He went on to describe an atmosphere where students, almost exclusively Black and impoverished, used profanity against each other and teachers on a daily basis. "If you corrected a kid for the language they were using, you pretty much have to [physically] fight the child," he said. Although this administrator admires his former contemporary Roy West, he does not subscribe to West's pathology that RPS suffered at the hands of inept leadership. Rather, he blamed generational poverty for what he calls a "complete culture shift" in RPS. Many students do not care to learn, and their teachers, due to apathy or hopelessness, do not want to teach them. Some just bide their time until they have enough experience to apply for teaching jobs in Chesterfield and Henrico County. "The whole facility was a depressing experience for me. So I would just stay in my office because I don't like to see people dying. Those children were slowly dying. I didn't want to contribute to that. I didn't get into education for that. I got into education to give life, and what I saw [in RPS] was death" (Sherman Curl, interview, December 20, 2019). No one—from residents to the mayor himself—denies that RPS is a shell of its pre-*Brown v. Board* self; and given its position in the capital, it is easily the worst school system in the Commonwealth of Virginia (Stoney, 2019).

Today, most Richmonders have no clue who Roy West was. However, they live with his efforts to use discipline as a foundation of educational reform. The current *Student Code of Responsible Ethics* balances punishment and mercy, systematizing a shared responsibility between students, parents, and faculty to make RPS

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

a safe place to learn (Richmond Public Schools, 2019–2020). Punishment is used to reform the student and recycle them back into the school system and not to isolate them. These policies are a part of a national consensus that discipline should be less punitive and hierarchically administrative and more communal and nurturing (Blad, 2019). One would be hard-pressed to find an inner-city school system that seeks to weed-out troubled students. While discipline issues have not greatly improved since the 1980s, recycling students into alternative schools is more commonly used than long-term suspensions and expulsions.

If this article has done nothing else, it shows that men like Roy West, the tough on crime era, and the students' rights movement needs more scholarly inquiry by urban, educational, and African American historians. This article began as an inquiry about an interesting man who, as a principal and mayor, lived an interesting life during an interesting time. As the research evolved, I found that this story was bigger than RPS and Roy West. It illuminates a nation in the trenches of an existential crisis in the decades following civil rights protests. Leaders like West provided a solution that challenged the contemporary thought about how school systems should function and influence civil society. In the end, West, like many of his contemporaries who have yet to be written about, met his demise while trying to make urban education a beacon of light in the dimmest of times.

## REFERENCES

Agyapong, T. E. (2018). *The criminalization of Black children: Race, gender, and delinquency in Chicago's juvenile justice system, 1899–1945*. University of North Carolina Press.

Alexander, M. (2010). *The new Jim Crow: Mass incarceration in the age of colorblindness*. The New Press.

Amsterdam, D. (2017). Toward the resegregation of southern schools: African American suburbanization and historical erasure in *Freeman v. Pitts*. *History of Education Quarterly, 57*(4), 451–479.

Anderson, A. B., & Pickering, G. W. (1986). *Confronting the color line: The broken promise of the civil rights movement*. University of Georgia Press.

A policy of economic and human resources. (1967, July 31). Speech delivered at the Annual Convention of National League Cities in Boston, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41, James C. Wheat, Jr., Papers. Virginia Museum of History and Culture.

Arum, R. (2003). *Judging school discipline: The crisis of moral authority*. Harvard University Press.

A Tale of Two Marketplaces. (1986, June 15–27). *The Urban Reporter*, Box 21, M283, Clarence L. Townes Papers, Virginia Commonwealth University.

A West magnet. (1989, August 14). *Richmond Times-Dispatch*, A14.

Barkley, E. B. (1994). *Uncle Ned's children: Negotiating community and freedom in post-emancipation Richmond, Virginia* [Unpublished doctoral dissertation]. Kent State University.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Best and worst elected official. (1988, July–August). *Richmond Surroundings Magazine*, 28–34.

Blacker, D. (2000). Proceduralism and the Orthodox backlash against students' rights. *American Journal of Education, 108*(4), 318–355.

Black Power: What the term means to Richmonders. (1966, July 30). *Richmond Afro-American*, 1–2.

Blad, E. (2019, May 8). Student discipline: Discipline in schools. *Education Week, 32*, 4.

Board of Education v. McCluskey, 458 U.S. 966. (1982).

Bradley, Paul. (1991, March 2). Dr. West's post might be eliminated, sources say. *Richmond Times-Dispatch*, 17.

Business directory for Henrico and Chesterfield County. (1980). *Richmond Surroundings Magazine*, 5–90.

Callihan, S. L. (1992). *A mini history of the Richmond Public Schools, 1869–1992*.

Campbell, T. (1980, June 19). Opponents of West's transfer to seek board hearing today. *Richmond Times-Dispatch*, 30.

Campbell, T. (1987a, June 4). Superintendent says West must follow rules. *Richmond Times-Dispatch*, B1.

Campbell, T. (1987b, June 5). West to yield on honor society induction rules. *Richmond Times-Dispatch*, B1.

Campbell, T. (1987c, December 29). U.S. judge rules that two searches West ordered at school—were illegal. *Richmond Times-Dispatch*, A1.

Carey v. Piphus, 435 U.S. 247. (1978).

Cecelski, D. S. (1994). *Along freedom road: Hyde County, North Carolina, and the fate of Black schools in the South*. University of North Carolina Press.

Changes in Richmond's Population, 1950–1967. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Chiles, M. T. (2020). "Down where the South begins": Black activism before the modern civil rights movement, 1899–1930. *Journal of African American History, 105*(1), 56–82.

Clarence L. Townes, Jr., Papers, M 293, Box 21. Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University.

Cleveland, N.Y. hardest hit by wave of wave of violent unrest. (1966, July 30). *Richmond Afro-American*, 1–2.

Council shares blame for racial strife, panel says. (1981, April 28). *Richmond News Leader*, found in clipping form, Box 11, M240, George Stevenson Kemp Papers, Virginia Commonwealth University.

Countryman, M. (2006). *Up South: Civil rights and Black power in Philadelphia*. University of Pennsylvania Press.

Cramer, Paul. (1981). A view of education today. *Richmond Surroundings Magazine*, 11.

Cummings, J. (1988, June 5). West, Law have dealt with issues, not egos … so far. *Richmond Times-Dispatch*, 17.

Currence, C. (1985, January 23). Court upholds "reasonable" searches of students. *Education Week*. https://www.edweek.org/ew/articles/1985/01/23/05070036.h04.html

Cyna, E. (2019). Equalizing resources vs. retaining Black political power: Paradoxes of an urban-suburban school district merger in Durham, North Carolina, 1958–1996. *History of Education Quarterly, 59*(1), 35–64.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Danns, D. (2003). *Something better for our children: Black organizing in Chicago public schools, 1963–1971*. Routledge.

Deitz, S. M., & Hummel, J. (1978). *Discipline in the schools: A guide to reducing misbehavior*. Educational Technology Publications.

The development of a county: Chesterfield's Past Present, & Future. (1982). *Richmond Surroundings Magazine*, 93.

Docking, J. W. (1987). *Control and discipline in schools: Perspectives and approaches*. Harper & Row.

Doulas L. Wilder Papers. (1984–1994). Box 21. Series XI. Virginia Union University.

Dr. Leon Sullivan, Opening Speech at the Moral Re-Armament Conference Unity in Diversity. (1984, November 16–18). Folder 1984, File Cabinet #1, Initiative of Change Archives.

Dr. Thomas H. Henderson to Mr. J. C. Wheat. (1967, August 11). Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), Box 41, James C. Wheat, Jr., Papers. Virginia Museum of History and Culture.

Drake, W. A., & Holsworth, R. D. (1996). *Affirmative action and the stalled quest for Black progress*. University of Illinois Press.

Duke, D. L., & Meckel, A. M. (1980). *Managing student behavior problems*. Teachers College, Columbia University Press.

Eaton, S., & Meldrum, C. (1997). Broken promises: Resegregation in Norfolk, Virginia. In G. Orfield (Ed.), *Dismantling desegregation: The quiet reversal of Brown V. Board of Education* (pp. 115–142). New Press.

Epes, C., & Cummings, J. (1987, November 5). School board action in discipline cases questioned. *Richmond Timed-Dispatch*, 21.

Epes, C., & Cummings, J. (1988a, March 2). Board affirms policy on weapons in city schools. *Richmond Times-Dispatch*, 13.

Epes, C., & Cummings, J. (1988b, May 4). West's quotes rankle parents. *Richmond Times-Dispatch*, 17.

Epes, C., & Cummings, J. (1988c, October 5). City student count continues. *Richmond Times-Dispatch*, 26.

Family income by race in city of Richmond (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Family income comparison for Richmond City-Henrico County. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Farmer, R. (1989a, April 13). Board won't scold West about doors. *Richmond Times-Dispatch*, B1.

Farmer, R. (1989b, August 2). School board reproves West. *Richmond Times-Dispatch*, B1.

Farmer, R. (1989c, August 28). West defends actions as hearing on fate nears. *Richmond Times-Dispatch*, A1.

Federal Bureau of Investigation. (1980–1989). Crime data explorer. https://crime-data-explorer.fr.cloud.gov

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Fenske, N. R. (1997). *A history of American public high schools, 1890–1990*. Edwin Mellon Press.

Ferraro, T. (1987, December 27). Tough N.J. principal who saved school from "thugs" balks at school restraints. Los Angeles Times, 1.

Final Report of the 1989 Commission on Prison and Jail Overcrowding. (1990). House Document no. 46, Regular Session of the General assembly of Virginia, p. 1.

Fishel v. Frederick County School Board, 11 Va. Cir. 283. (1988).

Foster care & aid to dependent children, number served and cost 1960 & 1967. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

General Assembly of the Commonwealth of Virginia Archives, Richmond, Virginia.

Glasser, W. (1986). Discipline is not the problem: Control theory in the classroom. *The Education Digest, 51*(9), 241–246.

Grim, M. (1980, January 13). Lindwood Briley convicted, gets 5 life terms. *Richmond Times-Dispatch*, A1–A2.

Goode, R. (1987, September 29). Plaintiffs must give full names in West lawsuit. *Richmond Times-Dispatch*, A1.

Goode, R. (1988a, April 5). Ex-pupils awarded legal fees in West search case. *Richmond Times-Dispatch*, A13.

Goode, R. (1988b, May 26). Substitute teacher says dress led to firing by West. *Richmond Times-Dispatch*, 17.

Goss v. Lopez, 419 U.S. 565. (1975).

Gottschalk, M. (2006). *The prison and the gallows: The politics of mass incarceration in America*. Cambridge University Press.

Gottschalk, M. (2014). *The prison state and the lockdown of American politics*. Princeton University Press.

Gregory, S. (1998). *Black corona: Race and the politics of place in an urban community*. Princeton University Press.

Hampel, R. (1986). *The last little citadel: American high schools since 1940*. Houghton Mifflin Company.

Harris, R. (1980, June). Richmond: Former Confederate capital finally falls to Blacks. *Ebony Magazine*, 44–53.

Hayter, J. M. (2017). *The dream is lost: Voting rights and the politics of race in Richmond, Virginia*. University of Kentucky Press.

Heinemann, R. L. (2007). *Old Dominion, New commonwealth: A history of Virginia, 1607–2007*. University of Virginia Press.

Henderson, D. H. (1985, July). The Constitutional rights of probationary teachers: Improper assessment may be costly to school boards. *Journal of Law and Education, 14*(3), 510–13.

Hirsch, A. R. (1983). *Making the second ghetto: Race and housing in Chicago, 1940–1960*. University of Chicago Press.

Hinton, E. (2016). *From the war on poverty to the war on crime: The making of mass incarceration in America*. Harvard University Press.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

**JA0929**

Hollingsworth, E. J., Lufler, H. S., Jr., & Clune, W. H., III. (1984). *School discipline: Order and autonomy*. Praeger Publishers.

Hurwitz, H. L. (1988). *The last angry principal*. Halcyon House.

Increase in welfare costs city of Richmond, 1950–1968. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Interview with Roy West—"I make no apology for my no-nonsense approach." (1989, August 28) *Richmond Times-Dispatch*, A11.

Judge Convicts James Briley. (1980, October 29). *Richmond Times-Dispatch*, B4.

Kafka, J. (2009). Shifting authority: Teachers' role in the bureaucratization of school discipline in postwar Los Angeles. *History of Education Quarterly, 49*(3), 323–346.

Kelly, D. (1987, August 19). Harrison-Jones transfers West to Mosby school. *Richmond Times-Dispatch*, A1.

K'Meyer, T. E. (2013). *From Brown to Meredith: The long struggle for school desegregation in Louisville, Kentucky, 1954–2007*. University of North Carolina Press.

Kruse, K. M. (2007). *White flight: Atlanta and the making of modern conservatism*. Princeton University Press.

Lassiter, M. D. (2007). *The silent majority: Suburban politics in the sunbelt South*. Princeton University Press.

Lazarus, J. M. (2019, May 31). Dr. Roy A. West, former Richmond mayor, educator, dies at 89. *Richmond Free Press*. http://richmondfreepress.com/news/2019/may/31/dr-roy-west-former-richmond-mayor-educator-dies-89/

Leroy A. West. Virginia Department of Health; Richmond, Virginia; Virginia Divorce Records, 1918–2014. Certificate no. 1943005634. Ancestry.com.

Lewis, E. (1993). *In their own interests: Race, class and power in twentieth-century Norfolk, Virginia*. University of California Press.

Lohmann, B. (2019, May 26). Roy A. West, an outspoken figure who rose from childhood poverty to be mayor of Richmond, has died. *Richmond Times-Dispatch*, 11Z.

Mayor West wants more use of electric chair. (1985, August 3). *Richmond Afro-American*, 1.

McAllister, R. (1987, August 19). Immune from suit, West, others say. *Richmond Times-Dispatch*, A3.

McDaniel, T. R. (1986). A primer on classroom discipline: Principles old and new. *Phi Delta Kappan, 68*(1), 63–67.

McLennan, R. (2008). *The crisis of imprisonment: Protest, politics, and the making of the American penal state, 1776–1941*. Cambridge University Press.

Miller, B. (1976, June 18). School board clears personnel shifts. *Richmond Times-Dispatch*, 1, 7.

Miller, B. (1981, September 21). Political clout seen as start. *Richmond Times-Dispatch*, A1, A6.

Mirga, T. (1981, October 26). Discipline: Is it really as serious a problem as the public thinks? *Education Week*. https://www.edweek.org/ew/articles/1981/10/26/01080017.h01.html

The model code for the school community rights and responsibilities. (1983). *Richmond Surroundings Magazine*, 23.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Moeser, J. V., & Dennis, R. B. (1982). *Politics of annexation: Oligarchic power in a southern city*. Schenkman Publishing Company.

Moore, J. T. (1975). Black militancy in readjuster Virginia, 1879–1883. *Journal of Southern History, 41*(2), 167–186.

Moore, S. (1982). The development of Henrico: Growth into the 1980s. *Richmond Surroundings Magazine*.

Nelson, A. R. (2005). *The elusive ideal: Equal educational opportunity and the federal role in Boston's public schools, 1950–1985*. University of Chicago Press.

Notes for talk to Richmond First Club (1981, February 26). Race Relations in Richmond, 1980–1984, Box 11, M240, George Stevenson Kemp Papers, Virginia Commonwealth University, Richmond, Virginia.

Overby, E. T. (n.d.). The crusade for voters in retrospect: An organizational history. Richmond Crusade for Voter collection, Collection # M 306, Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University, Richmond, Virginia.

Overby, E. T. (1975). *It is better to light a candle than to curse the darkness: The autobiographical notes of Ethel T. Overby*. n.p.

Page, C. (1988, January 5). A drill sergeant in the hallways. *Chicago Tribune*, 5.

Perlstein, D. (2004). *Justice, justice: School politics and the eclipse of liberalism*. Peter Lang.

Pratt, R. A. (1992). *The color of their skin: Education and race in Richmond, Virginia, 1954–89*. University of Virginia Press.

Principal appointed in King and Queen. (1988, July 20). *Richmond Times-Dispatch*, A1.

Racial tensions workshops, researching and publishing housing patterns in Richmond. (1979). Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Racism/Racial polarization program. (1982, January 25). Annual Meeting of the Richmond Urban Institute, January 25, 1982, Annual/Semi-Annual Meetings, 1980–1983, 1985. Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Ralph, J. R. (1993). *Northern protest: Martin Luther King, Jr., Chicago, and the civil rights movement*. Harvard University Press.

Randolph, A. L. W. (2010). It is better to light a candle than to curse the darkness: Ethel Thompson Overby and democratic schooling in Richmond, Virginia, 1910–1958. *Educational Studies, 48*(3), 220–243.

Randolph, L. A., & Tate, G. T. (2003). *Rights for a season: The politics of race, class, and gender in Richmond, Virginia*. University of Tennessee Press.

Rasmussen, C. (2017). Creating segregation in the era of integration: School consolidation and local control in New Brunswick, New Jersey, 1965–1976. *History of Education Quarterly, 57*(4), 480–514.

Report of the Department of Corrections: Studying the use of wiretaps in the Virginia Correctional System. (1987). Senate Document No. 10, Regular Session of the General Assembly of Virginia, p. 1.

Richmond Annexation Files. M 183. Box 3. Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University Richmond, Virginia.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

JA0931

Richmond Public Schools. (2019–2020). *Student code of responsible ethics*. https://www.rvaschools.net/site/handlers/filedownload.ashx?moduleinstanceid=1269&dataid=26629&FileName=SCORE%202019-2020%20-%20ENGLISH.pdf

Richmond School Board. (1985–1986). Meeting minutes.

Richmond School Board. (1987–1988). Meeting minutes.

Richmond School Board. (1989–1990). Meeting minutes.

Richmond Renaissance Inc. Archives. M 303. Box 4. Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University.

Rimer, S. (1988, January 14). Patterson principal: A man of extreme. *New York Times*, B1.

Rubinstein, R. E. (1986). Do schools discipline students too much? *The Phi Delta Kappan, 67*(8), 614–615.

Ryan, J. (2010). *Five miles away, a world apart: One city, two schools, and the story of educational opportunity in modern America*. Oxford University Press.

Rousmaniere, K. (2013). *The principal's office: A social history of the American school principal*. State University of New York Press.

S. Buford Scott to Clarence L. Townes, Jr. (1983, January 13). Richmond Renaissance: Correspondences, Notes, Misc, Box 16, M283, Clarence Townes Papers, Virginia Commonwealth University.

School board gets tough on conduct. (1986, August 2). *Richmond Afro-American*, 1–2.

Shanker, A. (1985). The reform reports: Reactions from the front lines. *Education and Urban Society*, *17*(2), 215–222.

Silver, C. (1984). *Twentieth-Century Richmond: Planning, politics, and race*. University of Tennessee Press.

Simmons, L. (2017). *The prison school: Educational inequality and school discipline in the age of mass incarceration*. University of California Press.

Smith, S. S. (2004). *Boom for whom?: Education, desegregation, and development in Charlotte*. State University of New York Press.

Squires, P. C. (1982a, June 5). Mrs. Ritchie top spender. *Richmond Times-Dispatch*, B1.

Squires, P. C. (1982b, July 8). West foresees no problem holding down two jobs. *Richmond Times-Dispatch*, B1, B7.

Stallsmith. P. (2019, May 29). Editorial: Roy A. West, eternal correspondent. *Richmond Times-Dispatch*, 10A.

State of the city report. (1983). Richmond, Virginia, Department of Community Development Division of Comprehensive Planning, found in Second Street Business District Revitalization, Box 4, M303, Richmond Renaissance Papers, Virginia Commonwealth University.

Stoney, Levar. (2019, April 7). How can we best meet RVA's needs. *Richmond Times-Dispatch*, E1.

Sudler, C. (2017). *Presumed criminal: Black youth and the justice system in postwar New York City*. New York University Press.

Sugrue, T. (1996). *Origins of the urban crisis: Race and inequality in postwar Detroit*. Princeton University Press.

Sundquist, E. (1985, April 19). Night of brutality ended Briley gang's spree. *Richmond Times-Dispatch*, A6.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Superintendent of schools transfers West, he in turn calls for her resignation. (1987, August 29). *Richmond Afro-American*, 1.

Table 1, Reported offenses: 1976–1980, Second Street study area Richmond, Virginia, 1980, Economic and market analysis, 1–10, 2nd Street commercial revitalization, 1981, Box 4, M303, Richmond Renaissance Papers, Virginia Commonwealth University.

Table 4—Family income for Richmond City, Metropolitan area less Richmond, and Metropolitan area. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Taxpayers' group proposals seen harmful. (1981, October 16). *Richmond News Leader*, article found in clipping form in Richmond Independent Taxpayers Association, Second Referendum, 1979–1981, Box 12, M240, George Stevenson Kemp Papers. Virginia Commonwealth University, Richmond, Virginia.

Tensions in the Richmond community. (1980, August). Tensions in the Richmond community, drafts, questionnaires, 1980–1981, Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Tensions in the Richmond communities, announcements. (1982–1983). Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Thomas, J. M. (2013). *Redevelopment and race: Planning a finer city in postwar Detroit*. Wayne State University Press.

Thompson, H. A. (2003). Making a second urban history. *Journal of Urban History, 29*(3), 291–297.

Trotter, J. (2007). *Black Milwaukee: The making of an industrial proletariat, 1915–45*. University of Illinois Press

Tyack, D., James, T., & Benavot, A. (1987). *Law and the shaping of public education, 1785–1954*. University of Wisconsin Press.

Uneasy peace grips six ghettos. (1966, July 30). *Richmond Afro-American*, 1–2.

University of Richmond. (2019). *Growing up in civil rights Richmond: A community remembers*. https://museums.richmond.edu/_KP4_assets/actions/get/calendar/print.php?eventid=15570&informationid=casDataMuseumExhibition%2Cstartdate%3A2019-02-21%2Cenddate%3A2019-05-10&ssl=true&

Vaughn, W. P. (1974). *Schools for all: The Blacks and public education in the South, 1865–1877*. Lexington.

Wallerstein, P. (2007). *Cradle of America: A history of Virginia*. University of Kansas Press.

Walsh, C. (2018). *Racial taxation: Schools, segregation, and taxpayer citizenship, 1869–1973*. University of North Carolina Press.

Weinig, K. (2000, June 14). The 10 worst educational disasters of the twentieth century: A traditionalist's list. *Education Week*, 31.

West, R. A. (1930, January 15). Birth certificate. Virginia Department of Health; Richmond, Virginia; Virginia, Births, 1864–2016. Ancestry.com.

West, R. A. (1950, November 21). Marriage certificate. Virginia Department of Health; Richmond, Virginia; Virginia, Marriages, 1936–2014; Roll: 101168923. Ancestry.com.

West, R. A. (1951). Richmond, Virginia, City directory, 1951. Online database. Ancestry.com.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

**JA0933**

West, R. A. (1985, October 21). Interview with Carl Rutan. *CSPAN*. https://www.c-span.org/video/?49805-1/crime-statistics

West suspends 40 pupils at Mosby for tardiness. (1987, November 18). *Richmond Times-Dispatch*, 17.

When Trinity says "college preparatory," we are not just talking. (1982). *Richmond Surroundings Magazine*, 8.

Why Brandermill is the best community in America, from a child's point of view. (1983). Brandermill Realty Ad, *Richmond Surroundings Magazine*, 10.

Williams, J. (1990a, April 13). Freedom sweet, Gray declares—sweatsuit replaces prison-issue clothes. *Richmond Times-Dispatch*, A1.

Williams, J. (1990b, August 30). Gray comes full circle, is convicted. *Richmond Times-Dispatch*, A1.

Williams, M. P. (1988, July 11). Superintendent couldn't win fight with board, she thought. *Richmond Times-Dispatch*, A1.

Winslow, O. (1988, August 1). 650 discuss crisis in schools. *Richmond Times-Dispatch*, A1.

Wood v. Strickland, 420 U.S. 308. (1975).

Young, M. R. (1987a, May 17). West defends his policies at school as "fair, firm." *Richmond Times-Dispatch*, B1–B2.

Young, M. R. (1987b, May 23). West has till Tuesday on honor society stand. *Richmond Times-Dispatch*, B-1.

Young, M. R. (1987c, June 18). West controversy dealt with, Hassell says. *Richmond Times-Dispatch*, B7.

Young, M. R. (1987d, November 6). Criticism by West held inappropriate. *Richmond Times-Dispatch*, A1.

Zirkel, P. A., & Richardson, S. (1997, January). The "explosion" in educational litigation: An update. *Education Law Reporter*, 341–351.

MARVIN T. CHILES (mchiles@odu.edu) is an Assistant Professor of African American History at Old Dominion University in Norfolk, Virginia. His research focuses on racial reconciliation in the Modern South, with specific interest on Richmond, Virginia. Chiles holds a PhD in American History from the University of Georgia.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms



"A Period of Misunderstanding"

Author(s): MARVIN T. CHILES

Source: *The Virginia Magazine of History and Biography*, 2021, Vol. 129, No. 3 (2021), pp. 244–278

Published by: Virginia Historical Society

Stable URL: https://www.jstor.org/stable/10.2307/27041492

**REFERENCES**
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/10.2307/27041492?seq=1&cid=pdf-
reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Virginia Historical Society* is collaborating with JSTOR to digitize, preserve and extend access to *The Virginia Magazine of History and Biography*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms



This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

JA0936

MARVIN T. CHILES

# "A Period of Misunderstanding"

## Reforming Jim Crow in Richmond, Virginia, 1930–1954

On Sunday, 23 May 1954, attorney Oliver Hill and dentist Jesse Tinsley spent most of their day in a crowded Atlanta airport. It was not until 1:30 a.m. that they were allowed to board a plane back home to Richmond, Virginia. The two-hour trip gave them something that they had not had in weeks, a chance to rest and anticipate what would confront them after weeks of travel. Hours after landing, Virginia governor Thomas Stanley summoned both men to the Executive Mansion. He praised them for helping overturn *Plessy* v. *Ferguson* less than a week before. However, Governor Stanley followed his half-hearted congratulations by commanding both men to "just let it ride" and not pursue school desegregation in Richmond. Their rejection represented the black South's final answer to the century-long race question. From this moment forward, black leaders worked exclusively to end racial inequality and not ally with white liberals to reform its most blatant indignities.[1]

A wise man named Dr. Gordon Blaine Hancock predicted that this would happen; not the meeting, but the end of interracial efforts to reform Jim Crow. The esteemed minister, theologian, and race leader used an opinion-editorial to explain that following World War I, optimistic black and white leaders formed interracial committees to help "the white man understand the Negro and the Negro understand the white man." But in the process, both sides created "a period of misunderstanding" where "the Negro misunderstood the southern white man in that he proposed that full citizenship was just around the corner." Southern white leaders also assumed that "the Negro would be indefinitely satisfied in a situation where he was rushed to the front in times of war and to the rear in times of peace."[2]

*Marvin T. Chiles is Assistant Professor of African American History at Old Dominion University.*

VIRGINIA MAGAZINE OF HISTORY & BIOGRAPHY          VOL. 129  NO. 3

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

246 • Virginia Magazine

The "Gloomy Dean," as Hancock was often called for his pessimism, rightfully predicted that this misunderstanding would come crashing down, and indeed it did after the *Brown* v. *Board of Education* decision. "The white man [now] understands the Negro and the Negro understands the white man," he wrote. Black Americans knew that when whites said "not now" on racial equality, it "was a smooth way of saying no, never." Whites also knew that "the Negro cannot be bullied into abject submission to second class citizenship" with limited reform efforts. Hancock, a black conservative who long believed that black and white southerners could fix their race problem without outside interference, pondered if black people were willing to pay the steep price for this understanding, given that "matters may have to become worse in order to become better" in the years following the unanimous 9-0 decision.[3]

Hancock was a child of Jim Crow, a time defined by scholars as the seventy-five-year period of codified racial segregation, political disenfranchisement, and the societal othering of black southerners between the 1880s and 1950s. Like some of Jim Crow's children, Hancock dared to understand and reform this peculiar institution. The forgotten alternatives of Reconstruction predated him. The social movements of the 1960s were, as a biographer later surmised, too radical for him. Hancock was like many southern reformers in that he had limited perceptions of racial progress. The color line was all he knew. Hence, Hancock and other southern liberals worked within the confines of racial segregation to perfect Jim Crow—a system they would later learn to be imperfectible.

Historians disagree on whether Jim Crow reforms aided or hindered the successive modern civil rights movement (1954–68). Some see the improvements in black education and political mobilization as critical turning points in southern history. These improvements helped future reformers clamor for a South without racial discrimination, leading to the eventual repeal of Jim Crow laws. Others judge the era by its limitations, seeing white liberal support for racial segregation—a system that was inherently unequal and shrouded in white supremacy—as a hindrance to the region's social progress. Historians mostly agree, however, that Jim Crow was a watershed moment for southern political thought, and not just the crystallization of white supremacy. Efforts to perfect race relations during Jim Crow showed the sys-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

tem's fluidity, ultimately creating an internal war to end segregation. The modern civil rights movement did not end a solid political and social system. It emerged from an unstable institution that consistently succumbed to its most flagrant contradictions.[4]

This article shows that mid-twentieth century Richmond contributes to the voluminous literature on Jim Crow's internal demise. In the process, it argues that the struggle to reform Jim Crow between the Great Depression and the *Brown* decision ultimately compelled white and black reformers in Richmond to abandon interracial cooperation and, with it, Jim Crow altogether. Richmond's struggles with civil rights reform after *Brown* are linked to its longer history of managed race relations between 1930 and 1954. These relations are critical to Virginia's civil rights historiography, which is largely written in resistance to the black freedom struggle—before the 1990s—being relegated to the outskirts of the commonwealth's history. Recent scholars have meticulously closed that gap in the last three decades, arguing that Virginia was in line with the white South's struggle to maintain racial inequality during the mid-twentieth century. This article contributes to this flowering field as well by connecting the political and legal difficulties of Virginia's modern civil rights movement to failed reform efforts in Jim Crow Richmond.[5]

At the dawn of the twentieth century, Richmond culturally and economically transitioned to a New South city. Although Atlanta, Memphis, and Birmingham led the region's economic recovery after the Civil War, Richmond, too, saw economic prosperity in industry, banking, real estate, and retail. At the foundation of this growth was a conscious effort to place black southerners back in the social doldrums created by slavery and removed by the Civil War and Reconstruction. This new social system—created by city government and the business community and backed by the state legislature—was Jim Crow, a stream of laws to enforce the custom of racial segregation and political disenfranchisement. Forced separation and black political impotence had become so integral to New South Richmond that a black minister once coined the former Confederate capital as "Down Where The South Begins." This reality compelled black business leaders to become activists. In 1904, former city councilman and *Richmond Planet* edi-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 472 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 6 of 36 PageID# 1026

tor John Mitchell, Jr., led an unpopular and unsuccessful boycott against segregated streetcars. Six years later, Mitchell challenged residential segregation by relocating his bank to a white middle-class neighborhood. The editor even ran for governor on an all-black slate after Republicans lily-whited their state convention. These failed efforts compelled the editor to fund an interracial legal committee to challenge the constitutionality of Jim Crow laws. After eighteen years of trial and error, the committee partnered with the NAACP national office in New York City and won two cases that weakened the legal foundation of disenfranchisement and segregation in Richmond and the South by the fall of 1930.[6]

Mitchell was dead almost six years by the time his initial investment paid off. However, progress was halted by the legal committee's refusal to work with the NAACP any further. The committee felt that the national office—staffed with highly trained esquires from the northeast—disrespected lesser-trained southern attorneys. Evidence of the national office's perceived arrogance was often seen in its press releases. After one case, for example, the NAACP claimed that it was because of it that "Negroes in Richmond have been saved from being forced by law to live in Ghettoes." This separation was magnified by the Richmond NAACP's inability to maintain steady membership in the 1920s. Less than a month after the federal courts invalidated Richmond's Democratic Party ban on black primary voting, the national office sent its field secretary from Baltimore to awaken the Richmond branch from its "apathetic state." According to the field secretary, "National officers have several times offered to come to Richmond, but these visits have been declined." The rejections came after he contacted fifty-five civic organizations and more than 100 black middle-class residents for help. One black pastor reluctantly facilitated the secretary's membership drive in October 1930. After a week of recruiting, he only enlisted forty-seven new members to the local and national branches. Before departing for Norfolk, the secretary told the *Planet* that unless black Richmond found new energetic leaders, the activist spirit would "live awhile and die awhile as had been the case in the past."[7]

Dr. Gordon Blaine Hancock may have taken offense to that proclamation. By the fall of 1930, he was a renowned minister, scholar, and black race leader living in Richmond. Hancock was also one of the black Richmonders

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

who refused to help the NAACP secretary. The South Carolina native had come to Richmond nine years before to accept a professorship at Virginia Union College (now Virginia Union University) and a pastorship at Moore Street Baptist Church. His arrival was part of a wave of academics infiltrating southern universities and urban areas to expand their intellectual life. Colleges once dedicated to industrial training, agriculture, and divinity were transforming into universities specializing in the liberal arts. This intellectual growth was not equally shared between the races. Southern state governments and northern philanthropic foundations ensured that historically black colleges and universities lagged financially behind their white counterparts. White public and private universities had better-trained faculty, more research money, larger departments, and closer access to political power brokers. This disparity helped white universities and scholars maintain their educational supremacy. However, it also allowed black academics like Hancock to convert their investigation of black life and race relations into a unique form of activism that did not fall in line with the NAACP's agenda.[8]

In short, Hancock did not assist the NAACP secretary because he was doing race work of his own. As a pastor and academic, he represented black Richmond on the Commission on Interracial Cooperation. This group of about 7,000 white and black reformers (mainly ministers, academics, and social workers spread throughout the South) operated on the intellectual fringe of American liberalism. They had grown leery of the region's reputation for violence, political corruption, and racism. Therefore, the commission openly denounced lynching, spoke against blatant political corruption, and promoted interracial harmony. However, it did not seek to end racial segregation. The commission's southern white members believed the South needed forced separation to maintain racial harmony. But that separation should be controlled by whites who would, with black support, gradually improve black social, economic, and political conditions. Southern black reformers like Gordon Hancock were realists who operated within this continuum. To improve the black condition under Jim Crow, they advocated for self-reliance and white paternalism. Hancock often espoused that black southerners ought to make themselves "worthy" of equality through education, economics, sobriety, and cultural refinement. In the process, he

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2      Filed: 09/04/2024     Pg: 474 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 8 of 36 PageID# 1028

appealed to white liberal egos by compelling them to uphold—as much as they were willing—the equal portion of *separate but equal*.[9]

Weeks after meeting with the NAACP field secretary, Hancock helped organize an interracial meeting at Richmond's St. Paul's Episcopal Church, known at the time as the "Cathedral of the Confederacy." He selected Tuskegee Institute president and Booker T. Washington's heir Dr. Robert Moton as the keynote speaker. Hancock saw the Tuskegee men broadly, and Moton in particular, as exemplars of black southern leadership. Their alliance with white liberals and conservatives alike "rendered the race and the nation a great service," he once opined. At the interracial meeting, Moton espoused the southern black accommodationist stance: "The law requires that the Negro shall receive separate, but equal accommodations." Moton, a man that Hancock once praised for gaining "the respect of both the right and left wings of Negro thought," was scolded by the pro-NAACP *Planet*. "The Interracial Commission keeps but little company with the NAACP," an opinion-editorial stated, criticizing Moton and Hancock. Moton's speech and subsequent backlash in the black community revealed the emerging dichotomy in southern black political thought. Because NAACP court victories helped black southerners see the prospect of racial integration, men like Hancock were under tremendous pressure to reform Jim Crow.[10]

The NAACP field secretary from Baltimore also contacted a dentist named Dr. Jesse M. Tinsley. The Martinsville, Virginia, native came to Richmond in 1930 after completing his training at Meharry Medical College. Tinsley's activism started a year later when he became the NAACP's Richmond branch president. Chances are that seminars at the Francis J. Torrance School of Race Relations sparked his interest in race politics. Started at Virginia Union University by Gordon Hancock, the Torrance School was the first in the nation dedicated solely to creating "better race relations." Hence, the social sciences courses were opened to all, not just Virginia Union students. Other black and white southern universities later replicated this school's structure and purpose. Hancock taught that as members of "the race furthest down" on the social ladder, blacks had to work with white liberals to obtain racial equality within the confines of segregation. This message was sometimes usurped by more radical sentiments. A white liberal donor, and Hancock's close friend, Lucy Randolph Mason

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2          Filed: 09/04/2024     Pg: 475 of 502

Case 3:21-cr-00042-JAG   Document 86-8    Filed 07/06/22   Page 9 of 36 PageID# 1029

often spoke at Torrance School gatherings. "I do not agree that the Negro race is the one farthest down," Mason once said in opposition to Hancock. She, like a few others, believed that full equality between the races should not be hindered by segregation.[11]

Hancock also undermined his own message by popularizing the "Double-Duty-Dollar" concept in 1933. During the darkest days of the Great Depression, Hancock told his Torrance School pupils they should not spend money at establishments that refused to hire or equally serve black patrons. Tinsley and more than 100 of his newest branch members (mostly Virginia Union students) converted Hancock's message into a movement against Jim Crow employment in Richmond. On 10 March 1934, they protested and boycotted the Atlantic & Pacific Department Store (A&P) for accepting black clientele while refusing to hire black clerks. From morning until night, black protesters chanted Hancock's message: "Don't Buy Where You Can't Work, This Store Does Not Employ Colored Clerks." The man who championed this cause neither envisioned, nor condoned, blacks protesting in the streets. "If every one of our protests were heeded, our lack of unity would still unfit us for the full estate of citizenship," Hancock once said critically. He separated from Tinsley by holding symposiums to end the protests and work toward "more and better segregation." To Hancock's disappointment, Tinsley continued following orders from the national NAACP office by putting Richmond in line with branches in Washington, D.C., Baltimore, Newark, Chicago, and Harlem who protested their respective A&Ps as well.[12]

Tinsley quickly learned the limitations of direct-action protest. Throughout the spring and summer of 1934, the *Planet* reported that there was "no weakening of the picket lines." However, Tinsley recounted that many black Richmonders "have not stop[ped] going in [to A&P] and will never." This was because A&P was one of the only downtown department stores to accept black clientele. Protest apathy also came from department store owners firing black employees who were known boycott supporters. One mass firing resulted in fifty black women (mostly cooks) losing their jobs on the same day. Tinsley responded by calling for a boycott of the department stores that fired black workers. However, black Richmonders, many of whom were middle class, refused to stop patronizing downtown

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

businesses. It became clear to Tinsley that black Richmonders "had gotten tired" of protesting by the end of the summer. "Richmond is the hardest place to get your people to do anything," the disappointed branch president told the national office secretary. Empathizing with Tinsley, the secretary contacted his liberal white friends in the A&P corporate offices in New York. Because of the overreliance on white southern dollars, A&P's corporate officers refused to intervene on behalf of black workers.[13]

The boycott ultimately failed to integrate the clerking staff at A&P. It did, however, further reveal black Richmond's political dichotomy. The Richmond branch of the NAACP and the Commission on Interracial Cooperation, more specifically Jesse Tinsley and Gordon Hancock, headed ideologically opposed movements to reform the peculiar institution of their generation. If one were to ask Hancock about the "the great[est] barrier to the Negro's further advance," he would have not mentioned Jim Crow. Rather, he saw that it "is in his [black people's] lack of internal cohesion." This black political division was valuable, however, because it assured that Richmond's activist spirit—a collective energy harnessed by the efforts of John Mitchell decades before—would not, as the NAACP field secretary previously warned, "live a while and die a while as had been the case in the past."[14]

THE FAILED BOYCOTT DID NOT STOP TINSLEY'S ACTIVISM. In fact, he was just getting started. Tinsley registered more than 2,000 members to the Richmond branch of the NAACP by October 1934. The next year, he helped create the Virginia State Conference of the NAACP. This collection of local NAACP chapters was designed to keep black activism alive and well throughout the Old Dominion. Tinsley's efforts resembled that of the late John Mitchell. The "Fighting Editor" never joined the NAACP because he felt that southern black leaders were largely responsible for fighting Jim Crow. His sense of regional independence was largely informed by his upbringing during Reconstruction, a time when southern black men used office-holding and economic separation to build their race. Mitchell was reared in a Jim Crowing South while Tinsley grew up in the Jim Crowed South. The dentist saw the NAACP's legal victories in Richmond and elsewhere as a sign that they could lead the next wave of the black freedom

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

JA0944

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 477 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 11 of 36 PageID# 1031

struggle. However, Tinsley, in keeping with black Richmond's political tradition, remained largely independent of the NAACP national office, and events in the next decade widened that gap.[15]

Under Tinsley, the Richmond branch fell less in line with the national office's agenda for the Great Depression. The national NAACP lobbied for federal anti-lynching legislation and increasing black employment within New Deal programs. Black Richmonders, however, focused more on equalizing segregated education. To do this, they targeted the Richmond School Board, an all-white group that cared very little about black education. In February 1935, black parents requested the board build a new black secondary school. The old one—named after white Civil War general Samuel C. Armstrong—was built only thirteen years before. In fact, it was the first black high school built by the city. By 1935, more than 2,300 students crammed into the dilapidated building designed to hold 1,400. The school board insisted that it could not finance any large-scale building projects. This was a well-known falsehood, given that both all-white Albert Hill Middle School and John Marshall High School received elaborate front-door murals and new athletic fields in 1933 and 1934. Even the fiscally conservative mayor's office approved these multi-million-dollar renovation projects. Against the advice of local whites who sympathized with black people, black parents insisted that they receive a new secondary school. This insistence prompted J. H. Binford—school superintendent—to protect Richmond's separate and unequal education system through genteel reform. He ignored the school board's rejection and formally requested $400,000 in building funds from the mayor's office. Binford's wording was urgent, telling the mayor that he needed to help "relieve the congestion in several of the public schools . . . provided for Negro students." Unpersuaded by black Richmonders' concerns, the mayor rejected Binford's proposal within days of receiving it.[16]

"We have decided to take legal steps for a Junior High School," Tinsley later told the national office of the NAACP. The "we" were a small group of parents who wanted to use Armstrong as a test case for attacking Jim Crow schooling in the South. The "legal steps" were raising enough money to fund a federal lawsuit. Unfortunately for Tinsley, the national office did not feel that it was possible "to force the authorities to establish a junior high school

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2     Filed: 09/04/2024     Pg: 478 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 12 of 36 PageID# 1032



This photograph of the Moore Street School "Open Air" Class in 1916 displays some of the school conditions that black Richmond parents and educators protested against in the 1930s, one being the lack of insulation in facilities under the school board's authority. (*Courtesy of The Valentine*)

by legal action." The office made it clear that it appreciated Tinsley's organizational skills and enthusiasm. However, the NAACP was in no position to aid his cause. In 1935, the national office attacked Jim Crow schooling by petitioning against budgetary discrepancies. More specifically, it focused on equalizing salaries between white and black teachers. The national office referred Tinsley to the *Crisis* magazine exposé about fighting school segregation and told him, "If you follow this procedure and organize your political strength, you will get the high school and everything else you want."[17]

Luckily for the black parents, local white businessmen and the white press had gotten wind of a possible lawsuit. They felt that a federal judge might rule in the black parents' favor, given the severe dilapidation of black public school buildings. Binford worked with the business community to

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 479 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 13 of 36 PageID# 1033

help alleviate the situation. They decided to use underdeveloped commercial property to build a new high school. The city council followed by allocating $135,000 in Federal Emergency Administration of Public Works (FEAPW) funds to renovate other black schools. The stream of white support compelled the mayor's office to request $250,000 from the Works Progress Administration (WPA) and commission the building of a new black high school. Fellow Democrat and U.S. senator Harry Byrd not only supported Binford's efforts, but he also personally informed him of the WPA's approval. In November 1936, the board named the completed three-story red-brick and limestone building after the late Maggie Lena Walker, a nationally renowned black bank owner and race leader in Richmond.[18]

Even after the erection of Maggie Walker High School, the board faced tremendous difficulty with managing Jim Crow education. The next issue was not with parents, but with disgruntled black teachers who were fed up with receiving an average of 40 percent less salary than their white counterparts. Taking cues from the national office, Jesse Tinsley organized the teachers, many of whom were NAACP members, into the Richmond Teachers' Association (RTA) in November 1940. This group mimicked the existing Virginia Teachers Association, a group of black teachers (and some white) throughout the state who advocated for improvements to Virginia's sparsely funded, separate and unequal public school system. The bulk of these improvements involved facility maintenance/upgrades and general funding. In spite of the laundry list of requests that could have been made, RTA only petitioned the board to equalize salaries between white and black teachers with similar qualifications. The board, well aware of the budgetary discrepancies, ignored the initial petition.[19]

This rejection compelled Tinsley to hire local attorney and NAACP member Oliver White Hill to represent the RTA. Although born in Richmond in 1907, Hill attended primary and secondary school about four hours west in Roanoke, Virginia. After high school, he matriculated at Howard University, starred in two sports, and focused more on good times than good grades. By 1930, Hill secured admission to the newly expanded Howard Law School. The admittedly mediocre undergraduate finished second in his class at Howard and passed the Virginia bar exam. Hill moved back to Roanoke and became an NAACP operative by helping Jesse Tinsley

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 480 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 14 of 36 PageID# 1034

organize the mostly rural southwest region into the Virginia State Conference of the NAACP. Meager legal work in Roanoke, however, forced Hill to relocate to Richmond permanently. In the spring of 1941, Hill negotiated with Binford to help remedy the pay discrepancy issue out of court. Binford acted in good faith by helping Hill and Tinsley gain an audience with the board. The uncompromising board still rejected the petition. They reasoned that equalized salaries would lower the pay of white teachers instead of raising the pay of black teachers, something that no Richmonder, Virginian, or southerner would ever consider doing.[20]

The school board's rejection highlighted the difference between Tinsley and Hill, which was microcosmic black political thought at the time. Hill believed in compromising with the board, while Tinsley did not. RTA members were also split, not evenly, along this same line. Against Tinsley's wishes, the more conservative-minded RTA members voted to have Hill offer a five-year plan to equalize the salaries in June 1941. The board rejected it and counteroffered with an eight-to-twelve-year equalization plan. In the fall, Hill and the RTA offered the five-year plan one last time before the board refused to negotiate any further. The rejection forced the RTA to follow Tinsley and its more radical faction. On 25 November 1941, the RTA drafted another petition. This time, it was on behalf of Antoinette E. Bowler, a teacher at Dunbar School. She came from a prominent and well-respected black Richmond family. Her father was J. Andrew Bowler, the minister and educator who helped create the city's first black-controlled schools after the Civil War. J. Andrew was so revered by local whites that seven years after this controversy, the city council erected a school in his honor. His daughter Antoinette must have felt secure about her family's favored status among local whites. Knowing that her job would undoubtedly be on the line, she volunteered to be the petitioner and instructed Hill and Tinsley to tell Binford that if the board refused to accept her petition, she would file it in federal court.[21]

The RTA had tremendous liberal white support. The most notable was *Richmond News Leader* editor Douglas Southall Freeman. The famous author and local oligarch not only kept in contact with the NAACP national office throughout the controversy, but he also published strong editorials in the RTA's favor. "Pay ought to be equalized. That is law and that is equali-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 481 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 15 of 36 PageID# 1035

ty," he once stated bluntly. Like Binford, Freeman understood the legal nightmare of maintaining Jim Crow laws. He told Binford that "Richmond will lose the case quickly" if they opposed the petition. He was no integrationist. However, Freeman, like Binford, felt that segregation must be maintained through paternal relations between black and white leadership. The board did not keep with Virginia's tradition of genteel paternalism. On 13 December 1941, it flatly refused to acknowledge the petition. Bowler and Hill wasted little time filing the *Bowler* v. *Richmond* petition in federal court a week later. They also asked the NAACP national office to help litigate the case. The week before Christmas, Binford organized the board for a special session. Within a matter of minutes, it voted to adopt the RTA's original five-year equalization plan. The board stipulated, however, that Bowler had to withdraw her petition from the federal court.[22]

Two days before New Year's Eve, Binford urged Bowler, Hill, and Tinsley to withdraw the petition. "The plan adopted by the board is identical with the plan which was acceptable to your organization prior to the filing of the suit," he said. Binford knew that black progress in Richmond relied on the friendly relationship between its black and the white citizens who would deal with them. "In your campaign for equalization you had the active help of an influential group of Richmond's leading [white] citizens—men who on many occasions have shown their interest in your problem," Binford reminded them. Thus, he opined, "These men, in my opinion, are anxious for you to settle the case out of court." The national office felt the same way. Bowler recounted in a personal letter to Tinsley that the national office told her "the white papers would not support us" and "it would create bad race relations" if she did not drop the petition. This suggestion was justified by legal rationale. After learning that the school board's current deal was previously submitted by the RTA, the national office refused to litigate the case, arguing that it would "appear to be unreasonable" to any federal judge to ask for immediate equalization.[23]

Bowler—a woman who had risked her career and family reputation—was, like other RTA members, disappointed with the national office's decision. "The longer I wait the more disgusted I have become," Bowler wrote to Tinsley. Even the branch president acknowledged the damage that had been done between black Richmond and the NAACP. "I believe it is an

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2     Filed: 09/04/2024     Pg: 482 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 16 of 36 PageID# 1036

unwarranted compromise on the part of the legal staff and it will forever be scored as a black mark against the NAACP in Richmond," he told the national office. Hill reluctantly agreed with the national office and convinced Bowler and Tinsley to drop the petition. On 13 May 1942, city attorneys submitted a decree to implement a five-year equalization plan without contest from Bowler or the RTA. The success of Maggie Walker High School, the failed promise of *Bowler*, and the refusal of the national office to help litigate them both showed the limitations of black resistance during the Great Depression. Black leaders and white liberals reformed some Jim Crow educational customs. Yet, even the most "radical" reformers had to work with white liberals and accept gradual over immediate change.[24]

As America mobilized for World War II, Jim Crow became its most pressing domestic issue. Black and white citizens both experienced the harsh economic conditions of the Great Depression. They did not, however, share the spoils of the war that followed. "The greatest problems seemed to be in finding enough workers to fill the available jobs" during the war, said the Richmond Chamber of Commerce. This was partly true. Virginia's economy boomed from defense industries flooding cities where Richmond's economic and cultural influence was felt the most: Roanoke, Danville, and Lynchburg to the west, Fredericksburg to the north, and Newport News to the east. As men went to these cities in search of work, white contractors refused to hire skilled black labor. These men, like the parents and teachers in Richmond, needed someone to press the issue. They found that someone in the "Dean of the Negro Press," newspaper editor Plummer Bernard Young.[25]

He was born in 1884 to a newspaper editor and a schoolteacher. In 1910, Young moved to Norfolk from Littleton, North Carolina, to follow in his father's footsteps and publish *The Norfolk Journal and Guide*. During his fifty-year career, the *Journal and Guide* became one of the most influential black media outlets in the South. It featured numerous opinion-editorials on race matters, many of which Gordon Hancock contributed. Together, Young and Hancock served on the Commission on Interracial Cooperation. Young alone served on the board of visitors at several black universities, including Howard University in 1934, Virginia State College in 1935, and

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms



These photographs show the C. F. Sauers Company's Christmas party in 1939 (above) and New Year's Eve Party in 1940 (below). Both images display Richmond's inconsistent use of the color line in the mid-twentieth century. Although employees of both races were given separate parties, some blacks attended the white party as servants. Though this inconsistency reinforced the racial caste system, black Richmond activists used flexibility like this to undo Jim Crow segregation. (*Virginia Museum of History & Culture, 1999.250.102* [above] *and 1999.250.101* [below])



This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

JA0951

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 484 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 18 of 36 PageID# 1038

Hampton Institute in 1940. By 1942, however, the longtime black accommodationist had grown weary of Jim Crow. "Negroes feel—and they have the right to feel—that this is no time to surrender their legal rights as American citizens." Therefore, when other black accommodationists told their brethren to leave civil rights out of the war, Young blasted them as "misleaders and false prophets." He believed, "It is worse to try to conceal facts and to preach false doctrines to people on the assumption that they will be fooled into acting normally in the face of abnormal conditions."[26]

Young took it upon himself to go "all out in specifying by irrefutable facts and figures the special discriminations" blacks experienced in labor yards. His editorials often had surveys about the disparity between black and white employment. He once reported, "Hundreds of carpenters, bricklayers, roofers, and other skilled members of the building trades are at work on the



Plummer Bernard Young, Sr. (*New Journal and Guide*)

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

JA0952

USCA4 Appeal: 24-4201　　　Doc: 22-2　　　Filed: 09/04/2024　　　Pg: 485 of 502

Case 3:21-cr-00042-JAG　Document 86-8　Filed 07/06/22　Page 19 of 36 PageID# 1039

construction . . . but there is understood to be only one Negro among them." In many cities where black labor was in abundance, Virginia's Employment Office paid whites to travel from other states to work. Young used his newspaper to help black laborers protest this practice. Even with Young's editorial support, their concerns went largely unaddressed.[27]

"The [*Richmond*] *Times-Dispatch* has been delaying further comment on the discrimination practiced on defense projects in Virginia against skilled Negroes," Young said. The target of his criticism was fellow editor and southern white liberal Virginius Dabney, a man whose lineage is as well known in Virginia as his personal legacy. The Charlottesville, Virginia, native descended from a prominent family (filled with planters, professors, and doctors) who accepted their racial and economic privilege while criticizing its negative impact on those less fortunate. Upon becoming a journalist in the 1920s, Dabney opposed poll taxes and supported federal anti-lynching legislation. He even backed free speech rights for communists and collective bargaining rights for skilled and unskilled workers. However, the Virginia oligarch remained loyal to the color line. Although known for his sympathy toward black Americans, Dabney believed that segregation was foundational to southern society. Hence, even the most radical reform efforts, he believed, should uphold the hypocrisy of *separate but equal*.[28]

Dabney's reluctance to oppose "the complete wiping out of racial differentiation overnight," as he called it, should not have surprised anyone. It did, however, leave outspoken southern black leaders like Plummer Young disenchanted with southern white liberals. Black criticism eventually compelled Dabney to support publicly equal pay for black labor. Still, his reluctance to support equal employment opportunities for both black and white citizens exemplified that southern white liberals were the blind leading the sighted. As Young most eloquently stated about Dabney, "We are still in the wilderness of social, political, and economic maladjustment; and our friends in the majority race—for whom Mr. Dabney is a frank and truthful spokesman—do not know how we are coming out."[29]

Black accommodationists felt the glass ceiling that white reformers like Virginius Dabney refused to acknowledge. "We can depend upon them [white liberals] up to a certain point," Young once told his readers. That point was racial equality; a point of no return, a line they would not cross.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

262 • Virginia Magazine



Gordon Blaine Hancock. (*Virginia Union University Archives and Special Collections Library*)

Young's friend Gordon Hancock was ready to make a similar ideological leap. On 3 July 1942, Hancock received a copy of an editorial that would later be published in the *Planet*-turned-*Richmond Afro-American*. In it, a black Richmonder spoke against Hancock for not criticizing "Virginius Dabney of the *Richmond Times-Dispatch*, who says that colored people must remain inferior during the war and after it is over." This was one of many letters Hancock received about his affiliation with white liberals. However, it was these types of criticism, at this time, that compelled Hancock to make an uncomfortable choice that forever changed race politics in the South.[30]

Hancock ended black accommodationism in its traditional sense. He got "a few representative Negroes [to] come together and formulate a statement setting forth what they wanted in the postwar South." Most of the invitees, even W. E. B. DuBois, came to Virginia Union's campus for the secret

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

meeting in the fall of 1942. After electing Hancock as director and Young as the chairman of this all-black conference, they drafted the Articles of Cooperation: a set of resolutions declaring that black southern leaders would not support any policies that did not promote full racial equality in the post-war years. These articles included equalizing public school spending, skilled and unskilled wages, farmers' subsidies, and all public services between the races. "The Negro has paid the full price of citizenship in the South and nation, and the Negro wants to enjoy the full access of his citizenship, no more no less," Hancock later stated firmly. A few weeks later, hundreds of black leaders joined the Richmond group 150 miles south for the official announcement in Durham, North Carolina. Hancock told the conference, "Should our demands be denied by the white South, we can still appeal to the conscious of the nation; and failing here, we can appeal to the Supreme Court of History, the Great White Throne of the Future." It was here where southern black leaders—many of whom normally disagreed with the NAACP's legal methods—proclaimed that if white liberals did not work toward equality, they would use the legal system to their advantage. Racial equality now became the center, and not the periphery, of interracial cooperation in the South. Hancock made what later became the *Southern Manifesto* in the Bull City. However, he perfected it in Richmond, a place he once stated, "Where the South began."[31]

In the days following Hancock's seminal address, Young told him, "Our Manifesto seems to be turning out to be another shot at Concord that was heard around the world. You really started something, brother." On 8 April 1943, Dabney and other southern white reformers organized a similar all-white conference in Atlanta. "Their statement is so frank and courageous . . . we gladly agree to cooperate," one of them told a fellow southern black leader. Most southern white liberals, however, wanted to dismiss the *Manifesto* and interracial cooperation entirely. One privately complained, "Not one of the earlier leaders that were considered liberal is willing to go along" with equalizing segregation. Dabney used editorials to gain grassroots support for Hancock. Privately, he told his acquaintances something to the effect of, "There was a real crisis. . . . Whatever else we may have to neglect, I think this is one cause we must not desert." Dabney believed that southern white liberals needed to "get along with the Negro leadership of this best

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 488 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 22 of 36 PageID# 1042

type" before black sentiments shifted heavily toward more radical voices. On the day of the Atlanta Conference, white liberal leaders, regardless of where they stood on the issue, came to a consensus and supported Hancock's *Manifesto*.[32]

A month later, the Durham and Atlanta conferences met in Richmond to complete the race conference trinity. The affair produced *The Richmond Statement*, a biracial agreement that, as Dabney told the audience, "urge[d] the general adaptation of the Durham statement" throughout the South. "We should not permit the Interracial Commission to take us over, by any means," Young later told Hancock. He left this celebratory event unconvinced that white leaders intended to push for racial equality. Rather, he felt that they were stalling, keeping black southerners from going to the federal courts. Other black delegates disagreed with Young. The Richmond meeting ended with the dismantling of the Commission on Interracial Cooperation and the creation of the Southern Council on Race Relations, headquartered in Atlanta. The symbolism behind the move to Atlanta—the home of the all-white conference—foreshadowed white leaders further stalling black freedom movements. Understanding this to be the case, Young warned his colleagues that if they were to work with white liberals, they "ought not go to Atlanta as we went to Richmond."[33]

BLACK LEADERS AND WHITE LIBERALS were not the only ones remaking southern race relations. Two black women named Sarah Pettaway and Lavinia Wilder did their part as well. This was not what they wanted to do, however. They just wanted to go shopping in downtown Richmond. As the two women left their homes and approached a segregated trolley car, they noticed that the black section was filled to capacity. They looked for open seats, yet there were none to be had. Both women became restless and sat in the whites-only section. "What are you trying to pull!" the white conductor aggressively exclaimed. His stern voice, as well as the glaring white passengers, compelled Pettaway and Wilder to walk to the back of the trolley without hesitation. As they openly voiced their displeasure with moving, a nearby police officer arrested them both for disorderly conduct. This incident was one of the first tests for white leaders after *The Richmond Statement*. The same thing happened a few years later with black attorney and NAACP

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201    Doc: 22-2    Filed: 09/04/2024    Pg: 489 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 23 of 36 PageID# 1043

member Samuel W. Tucker. He, like Pettaway and Wilder, forced white Richmonders to maintain the delicate balance between racial harmony and the law and order of Jim Crow—a task that Circuit Court judge Carleton Jewett had mastered. In 1943, he fined both women only $2.50 for disorderly conduct. Although Tucker had federal law on his side with the *Morgan* v. *Virginia* decision of 1946, Judge Jewett levied a similar petty fine against him for the same reason.[34]

As attitudes about race changed from the 1930s to the 1940s, Richmond's white leaders readdressed the race question. Their answer was not full equality, but rather more of the same: root out "unnecessary" inequalities. Virginius Dabney led this mission by compelling the Richmond School Board to hold interracial seminars and encourage the combination of black and white parent/teacher associations. White churches also joined this new era of cooperation. Grace Covenant and St. Paul's desegregated their congregations, allowing white ministers to preach sermons that were open to "all races, colors, and creeds." White and black YWCA leaders hosted integrated charity dinners and youth conferences at Richmond's two largest segregated high schools. Even the city library opened its doors to both black and white patrons without segregating its services. Racial harmony hit an all-time high in the former Confederate capital, leading a black college president to see Richmond as proof that the city, state, and region was "on the edge of democracy."[35]

The next two years proved that the president was partially correct. Richmond, like other southern cities, had a long history of black disenfranchisement. Even those who could, and sometimes did, navigate the compulsory taxes and literacy requirements had "no interest in playing a political game which they stood no chance of winning." By 1943, less than 4,000 of Virginia's 33,406 black voters bothered to fill out a ballot. About 1,000 of them lived in Richmond. Both Oliver Hill and Jesse Tinsley understood that they could use this more progressive white liberal sentiment to their advantage. So, in the spring of 1947, they mobilized the "Get Out the Vote" campaign to register black voters. They marketed the drive as a biracial effort to help white liberals replace Richmond's forty-eight-member bicameral council with a more efficient nine-member unicameral council system. The city charter vote, along with Hill's failed campaign for the General Assembly

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2     Filed: 09/04/2024     Pg: 490 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 24 of 36 PageID# 1044

in August 1947, increased Richmond's black vote from 6,347 to more than 11,000 by June 1948. For his efforts with the charter change, white power brokers rallied at least 3,000 white voters to help Hill become a part of the inaugural nine-member group in City Hall. In the process, he also became the South's first black city councilman in the twentieth century.[36]

In a front-page article entitled, "Meet Richmond's New City Fathers After Hours," the *Times-Dispatch* showed Hill and the other councilmen socializing with their families at home. Although Hill was the only black councilman, his image differed very little from his white colleagues. This portrayal of black leadership being equal to white leadership reflected the climax of Jim Crow reform. Richmond was seminal in that whites used



From left to right: Photograph of Calvin Hopkins, Lester Banks, and "Puss" Owens of the "Getting out the Vote" campaign of 1947. (*Virginia Union University Archives and Special Collections Library*)

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

JA0958

the black ballot to promote interracial harmony and political progress in an effort to maintain Jim Crow. This development compelled outsiders to take notice. The *Times-Dispatch* reprinted the *Norfolk-Virginian Pilot*'s assessment of the "evolutionary development in southern politics. . . . The overcoming of this [racial] barrier in Richmond by a highly-qualified representative of the Negro people (necessary with strong white support) . . . should be welcomed. . . . What has happened in Richmond will make it easier for the same thing to happen in . . . other cities."[37]

OLIVER HILL'S PATH TO RICHMOND CITY HALL should have sparked a wave of southern blacks winning elected offices. After all, he proved that the new form of biracialism, although used by whites to maintain the status quo, could yield tangible progress toward ending racial discrimination. However, national developments assured that Hill remained the lone beneficiary of this peculiar period. In 1948, President Harry S. Truman issued Executive Orders 9980 and 9981, ending legally segregated federal workforces and armed services. Truman went further by becoming the first president to support civil rights legislation openly at the federal level. The backlash from southern legislators and white liberal newspaper editors prompted a long-overdue break between black leaders and white liberals. *Afro-American* editor Carl Murphy echoed Gordon Hancock's *Manifesto*, saying that if southern white liberals resisted federal civil rights legislation, "We colored people can get along with it too, until we can, through the courts, compel the states to desist from every form of race discrimination." Black leaders understood that in spite of the progress white liberals made, paternalism was still baked into the southern political body. "You boast about the fact that the southern press has favored the equality of teachers' salaries in Virginia." Yet, "whenever colored people have earned decisions in the courts guaranteeing them" civil rights, they came primarily "through fights which we ourselves have initiated," said Murphy. The editor's words illuminated something that white liberals could not deny. The postwar years would not be defined by the races working toward equality, as promised in *The Richmond Statement* five years earlier. Rather, the twilight years of Jim Crow, or the "period of misunderstanding," was nearing its abrupt end.[38]

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

268 • Virginia Magazine

Murphy and Dabney both edited Richmond's largest black and white newspapers. However, Dabney did not directly address Murphy's criticisms. Instead, Dabney responded to longtime acquaintance Gordon Hancock's assessment that white liberals displayed "a very discouraging outlook for the Negroes who have made much of interracialism such as I have through many years." Days after Dabney published an anti-Truman opinion-editorial, Hancock responded in the *Negro Associated Press*. Dabney argued that federal civil rights legislation infringed upon states' rights. Hancock retorted, "Aside from the right to eternally subjugate Negroes, the states' rights fight has no meaning, absolutely none." He further pointed out that white liberals opposed Truman "for no other apparent reason than that he advocated civil rights for Negroes." Dabney admitted to being "considerably hurt" by Hancock's words. He asked Hancock "if you really mean the things you say in your letter. . . . It is difficult for me to believe so." Dabney's warm letter received a cold response from Hancock. He noted that because white liberals "utterly refused to say that they would do themselves what they refused to let Truman do for them," he and other black leaders remained unconvinced that interracialism would survive much longer.[39]

The pro/anti-Truman debate exposed the birth of the modern civil rights era. It was now, after years of calculated gradual reforms, that black Americans in general saw the federal government as, in the words of Gordon Hancock, the "Great White Throne of the Future." Oliver Hill was still in office during this turmoil. He remembered, "After I got elected there was a whole lot of 8-1 or 7-2 votes" in the city council. During his brief two-year stint, he was outvoted on most, if not all, of his initiatives to desegregate or equalize public facilities. Truman's stance hurt black politics in Virginia and the South more broadly. Although black voter registration increased significantly after 1948, and black candidates ran for several local and statewide offices, none were elected. In many cases, the margin of defeat grew with every subsequent election. This convinced Hill that, as he would later state about his electoral chances after *Brown* v. *Board of Education*, "I could not, for the next decade, have been elected dog catcher." Upon his defeat in the 1950 city council election, Hill redirected his energies toward a larger, more impactful project. Before accepting a position on President Truman's Committee on Government Contracts Compliance, he helped the NAACP

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

JA0960

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 493 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 27 of 36 PageID# 1047



NAACP lawyer and Richmond City Councilman Oliver White Hill (at left) speaking with fellow councilmen, John Davenport and J. Randolph Ruffin, in April 1949. (*Richmond Times-Dispatch Collection, The Valentine*)

national office form a multistate class action lawsuit against school segregation, the famous *Brown* v. *Board of Education* case.[40]

As *Brown* entered its final stages, Tinsley aided Hill by making it a vital part of black Richmond's political future. Tinsley wanted to raise $50,000 from the Virginia State Conference of the NAACP for the Legal Defense Fund. As the epicenter for Virginia's NAACP activity, Tinsley wanted the Richmond branch to raise more than $10,000 alone. At one fundraiser aptly named the Freedom Fund Cabaret Dance, he helped raise $1,783. Tinsley also worked with the *Afro-American* to increase NAACP fundraising advertisements. Almost every edition of the *Afro-American* between October 1953 and May 1954 used the slogan "Dollar or More to Open the Door" in con-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201      Doc: 22-2      Filed: 09/04/2024      Pg: 494 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 28 of 36 PageID# 1048

junction with articles detailing where the donations could be sent and how other branches out-performed Richmond in their support for *Brown*. Tinsley also organized outside of bourgeois institutions. He went to various housing projects and reminded the black underclass that desegregated schools would provide their children with a quality education. In spite of these efforts, Tinsley fell well short of his initial goal. On 12 December 1953, he presented Oliver Hill with a check for $5,100—which was the most raised by any individual branch in Virginia—at the NAACP conference in Fredericksburg, Virginia. Wherever black Richmonders were, whatever they did, and regardless of their social standing, Tinsley did all he could to assure the fight for school integration became an intimate part of their future as city residents.[41]

White liberals greeted this newer political wave with preemptive policies. While Tinsley was mobilizing black Richmond in favor of school integration, a more moderate Richmond School Board selected black businessman Booker T. Bradshaw to be the first black board member since Reconstruction. This selection was all the more special because Bradshaw succeeded his great-grandfather, who last served from 1882 until 1884. The board continued this token appeasement by securing Bradshaw's "special advisement" on building a new Armstrong High School in September 1953. Bradshaw also oversaw $11,000 worth of improvements to the all-black Navy Hill Middle School in 1954. According to the superintendent, the board orchestrated these changes to improve "the quality of human relationships" in light of the pending *Brown* decision. Gordon Hancock, however, read "between the lines," as was the name of his widely read editorials. "The segregationist is a shrewd manipulator, resourceful and ingenious," he told his readers. What many saw as steps toward racial progress were, in Hancock's opinion, another form of acidic accommodation. He believed that the board relocated Armstrong High School outside of the city's core to begin an intricate "zoning system" and prevent school integration after *Brown*. Recent scholars who study school desegregation in Virginia later proved Hancock's assertion—at the time a borderline conspiracy theory—to be correct. To the aging Hancock, the board confirmed what he had learned in his many years of race work: southern white liberals were only interested in reforms that maintained racial discrimination.[42]

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

USCA4 Appeal: 24-4201     Doc: 22-2          Filed: 09/04/2024     Pg: 495 of 502

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 29 of 36 PageID# 1049

The white media did not share the board's sense of urgency. Richmonders who looked to the *News-Leader* or the *Times-Dispatch* for coverage of the *Brown* case were disappointed. Although the *Afro-American* covered it step by step until the decision, neither white newspaper focused on it until May 1954. In the 1 January 1954 edition of the *News-Leader*, editor James Kilpatrick—the infamous bullhorn of Massive Resistance—listed a series of events entitled, "Predictions of Things to Come Here at Home and Abroad." Of all of the issues he addressed, school desegregation was not one of them. Kilpatrick's actions suggest the majority of white Richmond did not know or care about black Richmond's support for *Brown*. This benign neglect came to a screeching halt on 17 May 1954, when the Supreme Court ruled unanimously that segregated schools were unconstitutional. Although the *Times-Dispatch* and the *News-Leader* pondered about how state leaders would deal with integration in Virginia's predominantly black counties, they seldom mentioned how it would impact Richmond. As historians have noted, white Richmonders were more than prepared for the legal loopholing needed to stall school desegregation than other places. This preparation came not from Massive Resistance, but from a two-generation-long tradition of gradual changes to Jim Crow. Post-1954 Richmond is defined by the city's ability to maintain its separate and unequal school system despite judicial mandates. This legacy can be seen largely in the city's currently underfunded and overwhelmingly black public schools. If this article has done nothing else, it shows that the issues Richmond and the region faced after *Brown* came from decades of corrosive reform efforts. Therefore, when Governor Thomas Stanley issued his "calls for cool heads" in May 1954, he did not need to mention Richmond. Here, the heads were the coolest of them all.[43]

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

272 • Virginia Magazine

## NOTES

1.  Oliver W. Hill, *The Big Bang: Brown vs. Board of Education and Beyond: The Autobiography of Oliver W. Hill, Sr.* (Winter Park, Fla., 2000), 170.

2.  "Interracial Tensions Interpreted," Clipping and Writings, Race Relations, box 2, Gordon Blaine Hancock Papers, Duke University, Durham, North Carolina (cited hereafter as Hancock Papers); "The Interracial Commission Comes of Age," Commission of Interracial Cooperation history, Southern Regional Council, 1938–1943, Hancock Papers; J. Douglas Smith, *Managing White Supremacy: Race, Politics, and Citizenship in Jim Crow Virginia* (Chapel Hill, 2002), 46.

3.  "Interracial Tensions Interpreted," Hancock Papers.

4.  "The Tragedy of Interracial Understanding," Clippings and Writings, Race Relations, box 2, Hancock Papers; Smith, *Managing White Supremacy*, 8–9, 17; Clayton McClure Brooks, *The Uplift Generation: Cooperation Across the Color Line in Early Twentieth Century Virginia* (Charlottesville, 2017); Morton Sosna, *In Search of the Silent South: Southern Liberals and the Race Issue* (New York, 1977); John Egerton, *Speak Now Against the Day: The Generation Before the Civil Rights Movement in the South* (Chapel Hill, 1994); David L. Chappell, *Inside Agitators: White Southerners in the Civil Rights Movement* (Baltimore, 1994); Peter Wallenstein, *Blue Laws and Black Codes: Conflict, Courts, and Change in Twentieth-Century Virginia* (Charlottesville, 2004); Kimberley Johnson, *Reforming Jim Crow: Southern Politics and State in the Age Before Brown* (New York, 2010); Mark Ellis, *Race Harmony and Black Progress: Jack Woofter and the Interracial Cooperation Movement* (Bloomington, Ind., 2013); Leslie Brown, *Upbuilding Black Durham: Gender, Class and Black Community in the Jim Crow South* (Chapel Hill, 2008), 310–30; Elizabeth Gritter, *River of Hope: Black Politics and The Memphis Freedom Movement, 1865–1964* (Lexington, Ky., 2014), 5–10. This article agrees with J. Douglas Smith's assertion that Jim Crow laws did not settle the race question in Virginia after World War I.

5.  Robert A. Pratt, *The Color of Their Skin: Race and Education in Richmond, Virginia, 1954–89* (Charlottesville, 1993); Matthew Lassiter and Andrew B. Lewis, *The Moderate's Dilemma: Massive Resistance to School Desegregation in Virginia* (Charlottesville, 1998); Wallenstein, *Blue Laws and Black Codes*; Jason Ward, "A Richmond Institution: Earnest Sevier Cox, Racial Propaganda, and White Resistance to the Civil Rights Movement," *Virginia Magazine of History and Biography* 116 (2008): 262–93; Jill Ogline Titus, *Brown's Battleground: Segregationists and the Struggle for Justice in Prince Edward County, Virginia* (Chapel Hill, 2011), 63–130; William P. Hustwit, *James J. Kilpatrick: Salesman for Segregation* (Chapel Hill, 2013); Edward H. Peeples, *Scalawag: A White Southerner's Journey through Segregation to Human Rights Activism* (Charlottesville, 2014); Brian J. Daugherity, *Keep On Keeping On: The NAACP and the Implementation of Brown v. Board of Education in Virginia* (Charlottesville, 2016); Julian Maxwell Hayter, *The Dream is Lost: Voting Rights and the Politics of Race in Richmond, Virginia* (Lexington, Ky., 2017); Margaret Edds, *We Faced the Dawn: Oliver Hill, Spottswood Robinson, and the Legal Team That Dismantled Jim Crow* (Charlottesville, 2018).

6.  Marvin Chiles, "Down Where the South Begins: Black Richmond Activism Before the Modern Civil Rights Movement, 1899–1930," *Journal of African American History* 105 (2020): 56–82; "John Mitchell, Jr., Laid Down His Pen, December 3, 1929," *Richmond Planet*, 4 Jan. 1930, 4; Ann Field Alexander, *Race Man: The Rise and Fall of the "Fighting Editor," John*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

*Mitchell, Jr.* (Charlottesville, 2002); "Charter Application for Richmond, Virginia," 25 Feb. 1917, folder 1, box I:D68, National Association for the Advancement of Colored People Papers, Library of Congress, Washington, D.C. (cited hereafter as NAACP Papers); *West* v. *Bliley*, District Court, Eastern District of Virginia, 83 F. (2d) 177 No. 795, 5 June 1929; *City of Richmond* v. *J. B. Deans*, Circuit Court of Appeals Fourth Circuit, 14 Jan. 1930, No. 2900.

7.   William Pickens to Maud E. Mundin, 4 Nov. 1927, folder 14, box I:G201, NAACP Papers; List of Organizations in Richmond, Va., and "The NAACP Comes of Age," Ad to Richmond Organizations, 4 Apr. 1930, folder 14, box I:G210, NAACP Papers; Richmond Negro Physicians, Attorneys, Community and Civic Employees, Bankers, Post Office Clerks, Fraternalists and Associations, Tailors, Miscellaneous Business, Real Estate Dealers, and Insurance, Address List of Richmond Teachers, Funeral Directors, and Barbers, Richmond Negro Clergymen, 4–9 Oct. 1930, folder 17, box I:G210, NAACP Papers; "William Pickens To Speak Here," *Richmond Planet*, 11 Oct. 1930, 1; "NAACP Organized In Response to Pickens' Speech," *Richmond Planet*, 16 Oct. 1930, 1, 4. For a complete list of the hundreds of black Richmond professionals Pickens reached out to, see folder 17, box 1:G210, NAACP Papers.

8.   "Who's Who in Colored America," 236, Informational Folder, Correspondences, 1929–1969, box 1, Hancock Papers; Johnson, *Reforming Jim Crow*, 34–36; "A Century of Service to Education and Religion, Virginia Union University, 1865–1965," *Virginia Union Bulletin*, Continental Issue, vol. LXV, no. 5, June 1965, 1–107; Miles Mark Fisher, *Virginia Union University and Some of Her Achievements* (Richmond, 1924).

9.   Raymond Gavins, "Gordon Blaine Hancock: An Appraisal," *New South*, Autumn 1970, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers; Johnson, *Reforming Jim Crow*, 21–62.

10.   "Race Relation Session to be Held Tuesday," *Richmond Times-Dispatch*, 24 Oct. 1930, 1; "Dr. Robert Russa Moton," *Norfolk Journal and Guide*, 5 May 1934; "To Address Race Relations Body," *Richmond Planet*, 25 Oct. 1930, 1; Smith, *Managing White Supremacy*, 46; "Negro Leader Says Race Well Treated in U.S.," *Richmond Times-Dispatch*, 29 Oct. 1930, 1; "Noted Leader Says White People Unfair To Negroes in U.S.," *Richmond Planet*, 1 Nov. 1930, 1; "A Humane Trinity For Negro Welfare," *Richmond Planet*, 1 Nov. 1930, 4.

11.   1910 U.S. Census, Baltimore Ward 9, Baltimore (Independent City), Md., ED 0125, National Archives; 1930 U.S. Census, Richmond (Independent City), Va., ED 0060, National Archives; Jesse Monroe Tinsley, "World War I Draft Registration Card, 1917–1918," Records of the Selective Service, National Archives; Jesse Monroe Tinsley, "World War II Draft Registration Cards, 1942," Records of the Selective Service System, 1926–1975, National Archives; Edds, *We Face the Dawn*, 26–80; Andrew Buni, *Negro in Virginia Politics, 1902–1965* (Charlottesville, 1967), 122–23; Gavins, "Gordon Blaine Hancock: An Appraisal," 39; "Annual Catalog 1930–31," Virginia Union University, 52, https://www.google.com/books/edition/Annual_Catalogue/ArJGAQAAMAAJ?hl=en&gbpv=1&dq=Annual+Catalog+1931+virginia+union&pg=RA5-PP3&printsec=frontcover (accessed 25 May 2021); Hancock Speech at the Francis J. Torrance School of Race Relations in Virginia Union University, Richmond, Virginia, 27 Jan. 1932, box 1, Hancock Papers; Gordon B. Hancock to Lucy R. Mason, 2 July 1932, box 1, Hancock Papers; Lucy R. Mason to Gordon B. Hancock, 6 Mar. 1932, box 1, Hancock Papers.

12.   Gilbert Ware, "The New Negro Alliance: Don't Buy Where You Can't Work," *Negro History*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

274 • Virginia Magazine

*Bulletin* 49 (Fall 1986): 3–8; "500 Pickets Pledge Years' Vigil, Picket Chain Stores in Snowstorm; Race Refuses to Buy From A&P," *Richmond Planet*, 17 Mar. 1934, 1; Karen Jane Ferguson, *Black Politics in New Deal Atlanta* (Chapel Hill, 2002), 143–44; "Protest Plus," opinion-editorial by Gordon Blaine Hancock, *Norfolk Journal and Guide*, 14 Apr. 1934, box 2, Hancock Papers; "Profs Hancock and Moore Talk on Segregation," *Richmond Planet*, 29 Apr. 1934, 1.

13.  Roy Wilkins to Dr. J. M. Tinsley, 20 Apr. 1934; Dr. J. M. Tinsley to Roy Wilkins, 25 Apr. 1934; Roy Wilkins to Dr. J. M. Tinsley, 27 Apr. 1934; Rosa E. Walton to John A. Hartford, 18 May 1934; Dr. J. M. Tinsley to Walter White, 8 June 1934; Walter White to John A. Hartford, 21 June 1934; Walter White to Dr. J. M. Tinsley, 21 June 1934; Walter White to Dr. J. M. Tinsley, 27 June 1934; and John A. Hartford to Walter White, 22 June 1934, all in folder 1, Richmond, Va., January to June 1934, box I:G211, NAACP Papers.

14.  "Local Pickets Gain Confidence as A&P Places Colored Clerks in Newark Stores," *Richmond Planet*, 24 Mar. 1934, 1; "Many Boys and Girls Secure Jobs," ibid., 24 Mar. 1934, 1; "Dr. C. C. Scott's Great Sermon Before 2,000 Gives New Energy To Campaign For A&P Clerks," ibid., 14 Apr. 1934, 1; "Baltimore Promotes Colored A&P Clerks," ibid., 14 Apr. 1934, 3; "Mass Meetings Muster New Strength For A&P 'Clerks' Picket Lines," ibid., 21 Apr. 1934, 1; "Profs Hancock and Moore Talk on Segregation," ibid., 29 Apr. 1934, 1; "Campaign for Colored Clerk Jobs in Chain Grows," ibid., 29 Apr. 1934, 1; "New Moves Underway In A&P Battle," ibid., 5 May 1934, 1; "Pickets to Stay In 'Clerks' Fight," ibid., 12 May 1934, 1; "State's Stand on Colored Clerks Heartens Pickets," ibid., 19 May 1934, 1; "Torchlight Parade and Mass Meeting For 'Buy Where You Can Work' Drive," ibid., 23 June 1934, 1; "Parade Meet Feature 'Buy Work' Drive," ibid., 30 June 1934, 1; "Greatest Ever! Verdicts For 'Buy-Work' Parade Here," ibid., 7 July 1934, 1. The protests continued until 1935. For more media coverage, see the *Richmond Planet*, July through December 1934.

15.  "Branch News," *The Crisis*, 19 Feb. 1939, 56–57; Walter White to Dr. J. M. Tinsley, 8 Nov. 1934; Dr. J. M. Tinsley to Walter White, 10 Nov. 1934; and Membership Report, Branch Richmond, 2 Nov. 1934, all in folder 2, Richmond, Va., September–December 1934, box I:G211, NAACP Papers.

16.  "Contribution to the Anti-Lynching Fund, Richmond, Va., Branch," 1 Dec. 1934; Dr. J. M. Tinsley to Roy Wilkins, 15 Apr. 1935, both in folder 3, Richmond, Va., January–December 1935, box I:G211, NAACP Papers; "Armstrong PTA Meets Tuesday," *Richmond Planet*, 5 Jan. 1935, 1; "School Board Not Moved By Armstrong Congestion," *Richmond Planet*, 16 Feb. 1935, 1; Minutes of the Richmond City School Board, 21 Feb. 1935, 265–75, Richmond City Public School Archives, Richmond. For more on the NAACP's agenda for the 1930s, see folders 1–10, box I:G211, NAACP Papers.

17.  Dr. J. M. Tinsley to Dr. Charles H. Houston, 2 Jan. 1936; Dr. J. M. Tinsley to Dr. Charles H. Houston, 14 Jan. 1936; and Special Counsel to Dr. J. M. Tinsley, 7 Feb. 1936, all in folder 4, Richmond Va., January–September 1936, box I:G211, NAACP Papers. Although Tinsley and the national office both used the term "Junior High School," they were both referring to what is currently considered to be a high school.

18.  "Endorse Supt. Binford's Plan For Public School Improvement," *Richmond Planet*, 1 June 1935, 1; Letter from Jones & Robbins, Inc., "Offering Imperial Tobacco Co. Property for Site of New Negro High School"; Letter from E. M. Furman, "Requesting Location of the New Negro

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

High School on Church Hill," both in Minutes of the Richmond School Board, 13 Oct. 1936, 280–81; A Joint Resolution: Accepting the Offer of the United States of America to the City of Richmond to Aid By Way of Grant in Financing the Construction of an Addition to George Mason School in the City of Richmond, *Ordinances and Resolution of the City Council of the City of Richmond*, 18 Oct. 1935, 173–75, Richmond City Public School Archives; Maggie L. Walker Application for the National Register of Historic Places, 13 Aug. 1998, 3–13, National Archives; "Supt. Binford Pushes High School Loan," *Richmond Planet*, 22 Aug. 1936, 1; "Opening of Building Honors Great Race Leader," *Richmond Times-Dispatch*, 4 Sept. 1938, 1, 12; "Mayor, School Heads Dedicate Maggie L. Walker High School," *Richmond Times-Dispatch*, 9 Sept. 1938, 1; "Naming The High School," *Richmond Planet*, 21 Nov. 1936, 4; Minutes of the Richmond School Board, 9 June–30 Aug. 1935, 201–39; *Joint Resolution*, "Mayor of the City of Richmond Applies for Grant for Construction and Equipment of Negro High School," Minutes of the City Council of Richmond, *Journal of the Board of Aldermen*, 24 July 1936, both in Richmond City Public School Archives. For more on white business leaders offering to sell their vacant property at a discounted rate to supply the city with a building site for the new high school, see Minutes of the Richmond School Board, August 1935–December 1936, Richmond City Public School Archives.

19.  Dr. J. M. Tinsley to Thurgood Marshall, 23 Oct. 1941; Summary of Bowler Petition and Events Leading Up to It, enclosed in a letter from Thurgood Marshall to "Peanuts" [Oliver W. Hill], 19 Dec. 1941, both in folder 7, Box I:B208, NAACP Papers; Alfred K. Talbot, "The Virginia Teachers Association: Establishment and Background," *Journal of Negro History Bulletin*, vol. 45, no. 1, January–February–March 1982, 8–10.

20.  Edds, *We Face the Dawn*, 17–72; Summary of Bowler Petition and Events Leading Up to It, enclosed in a letter from Thurgood Marshall to "Peanuts" [Oliver W. Hill], 19 Dec. 1941.

21.  Oliver Hill to Dr. Leon Ransom and Thurgood Marshall, 30 Aug. 1941; Dr. J. M. Tinsley to Thurgood Marshall, 18 Oct. 1941; and Thurgood Marshall to "Peanuts" [Oliver W. Hill], 19 Dec. 1941, all in folder 7, box I:B208, NAACP Papers; "Antoinette E. Bowler," 1930 U.S. Census, Richmond (Independent City), ED:0057; Memorandum to The Legal Committee Richmond Branch NAACP, 14 Nov. 1941, folder 7, box I:B208, NAACP Papers.

22.  Walter White to Douglas S. Freeman, 3 Dec. 1941, folder 7, box I:B208, NAACP Papers; "Negroes Plea for Salary Rises Turned Down by School board Over Opposition Woman," *Richmond Times-Dispatch*, 7 Nov. 1941, folder 7, box I:B208, NAACP Papers; "Negro Teachers Will Sue," *Richmond News Leader*, 26 Nov. 1941, folder 7, box I:B208, NAACP Papers; Douglas S. Freeman to Mr. Walter White, 6 Dec. 1941, folder 7, box I:B208, NAACP Papers; Oliver W. Hill to Thurgood Marshall, 26 Dec. 1941, folder 7, box I:B208, NAACP Papers; "Copy of The December 27th Vote To Approve 5-Year Plan," enclosed in a letter from Charles E. Bentley to J. H. Binford, 12 Jan. 1942, folder 7, box I:B208, NAACP Papers.

23.  J. H. Binford to Richmond Teachers' Association, 29 Dec. 1941; Oliver Hill to Leon A. Ransom, 30 Dec. 1941; Oliver W. Hill to Thurgood Marshall and Leon Ransom, 5 Jan. 1942; and Thurgood Marshall to Dr. J. M. Tinsley, enclosed in a Memo from Thurgood Marshall to Walter White and Roy Wilkins 17 Feb. 1942, all in folder 7, box I:B208, NAACP Papers.

24.  Thurgood Marshall to *Richmond Afro-American*, 16 Feb. 1942; Antoinette E. Bowler to Walter White, 20 Feb. 1942; Milton L. Randolph to Walter White, 23 Feb. 1941; Dr. J. M.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

276 • Virginia Magazine

Tinsley to Walter White, 11 May 1942; John P. McGuire, Jr., to Oliver W. Hill, 30 Mar. 1942; and Final Judgement of *Bowler* v. *Richmond*, 13 May 1942, all in folder 7, box I:B208, NAACP Papers.

25.  James K. Sanford, ed., *Richmond: Her Triumphs, Tragedies, and Growth* (Richmond, 1975), 175; Plummer B. Young, Sr., Biographical Sketch, 1962, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers.

26.  Plummer B. Young, Sr., Biographical Sketch, 1962, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers; Smith, *Managing White Supremacy*, 63; "Misleaders and False Prophets," *Norfolk Journal and Guide*, 2 May 1942, box 2, Hancock Papers.

27.  "Negroes and Our Defenses II," 22 Mar. 1941, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers.

28.  Howard F. McMains, "Richard Heath Dabney: A Virginian in Indiana, 1886–1889," *Indiana Magazine of History* 82 (1986): 334–57; Erika J. Pribanic-Smith, "Turning Right or Standing Still? Virginius Dabney and the New Deal in Virginia, 1930–1942," *American Journalism* 28 (Winter 2011): 97–123; Egerton, *Speak Against the Day*, 137–39; Sosna, *In Search of the Silent South*, 122–31.

29.  "Negroes and Our Defenses," *Norfolk Journal and Guide*, 25 Jan. 1941; "Negroes And Our Defenses III," ibid., 22 Mar. 1941; "The Negroes and the War," *Richmond Times-Dispatch*, 26 Apr. 1942; Smith, *Managing White Supremacy*, 275; Nancy Armstrong, "The Study of an Attempt Made in 1943 to Abolish Segregation of the Races on Common Carriers in the State of Virginia," *Phelps-Stokes Fellowship Papers* 17 (1950), 51–71; "Negroes and the War," *Norfolk Journal and Guide*, 9 May 1942; "A Book About the New South," *Norfolk Journal and Guide*, 28 Mar. 1942; "Clouds Over The South," *Norfolk Journal and Guide*, 15 Aug. 1942.

30.  *Norfolk Journal and Guide*, 28 Mar. 1942; "Is Hancock A Stooge for Etheredge and Dabney," letter from the *Richmond Afro-American* to Dr. Gordon Blaine Hancock, 4 June 1942, box 2, Hancock Papers.

31.  Dr. Gordon Blaine Hancock to Dr. W. E. B. DuBois, 12 Sept. 1942, Southern Regional Council, 1938–1943, Hancock Papers; "Statement of Purpose," Southern Conference on Race Relations, 20 Oct. 1942, Southern Regional Council, 1938–1943, box 1, Hancock Papers.

32.  Dr. Gordon Blaine Hancock to Jessie Daniel Ames, 24 Oct. 1942; Jackson Davis to Dr. Gordon Blaine Hancock, 18 Dec. 1942; Plummer B. Young to Dr. Gordon Blaine Hancock, 18 Dec. 1942; Jessie Daniel Ames to Dr. Gordon Blaine Hancock, 27 Oct. 1942; Plummer Young to Civilian Aide to the Secretary of War, 6 Jan. 1943; Plummer Young to Dr. Gordon Blaine Hancock, 2 Mar. 1943; Virginius Dabney to Dr. Gordon Blaine Hancock, 15 May 1943; Howard Odum to Dr. Jackson Davis, 19 June 1943; and Howard Odum to Dr. Gordon Blaine Hancock, 22 June 1943, all in box 2, Hancock Papers; Armstrong, "The Study of an Attempt Made in 1943 to Abolish Segregation of the Races," 53. Sociologist Howard Odum was, like Dabney, fascinated with the race question in the South. In the midst of Dr. Hancock's call for southern blacks to lead interracial cooperatives, Odum published *Race and Rumors of Race: Challenge to American Crisis*. This was a sociological analysis of white perceptions about black activism during the interwar period. He concludes that southern whites, both liberal and conservative, feared an outbreak of violence by "bad niggers" who were fed up with segregation.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

**JA0968**

33.  *The Richmond Statement*, 16 June 1943, The Commission on Interracial Cooperation, Inc., Southern Regional Council, 1938–1943; and Plummer Young to Dr. Gordon Blaine Hancock, 30 June 1943, both in box 2, Hancock Papers.

34.  "Plan Appeal on Jim Crow Fines," *Richmond Afro-American*, 6 Mar. 1943, 3; "Supreme Court to Review Va. Bus Segregation Case," ibid., 26 Jan. 1946, 1, 21; "Trailways Bus Company Denied Right to Seat Passengers in Violation of Law," ibid., 25 Jan. 1947, 1, 4.

35.  "Willet to Meet Geo. Mason P-TA," *Richmond Afro-American*, 11 Jan. 1947, 1; "Teachers' Pay Raised, Principals Equalized," ibid., 1 Feb. 1947, 1–2; "Interracial Services Set for Word Day of Prayer," ibid., 22 Feb. 1947, 2; Armstrong, "The Study of an Attempt Made in 1943 to Abolish Segregation of the Races," 51–53; "Races Dine Together In The Capital Of The Confederacy," ibid., 22 Mar. 1947, 13; "City Library Opens Its Doors to All Citizens," ibid., 31 May 1947, 1–2; Smith, *Managing White Supremacy*, 8.

36.  Gloster B. Current to Dr. J. M. Tinsley, 25 Sept. 1947, folder 3, box I:C209, NAACP Papers; "Council Meets On Tuesday," *Richmond Afro-American*, 12 Apr. 1947, 20; "Leaders, Citizens Back Unicameral Council," ibid., 8 Mar. 1947, 1, 3; "More Power to Vote Drive," ibid., 31 May 1947, 3; "Civic Council Drive Adds Thousands to Voting Lists," ibid., 10 May 1947, 1–12; "More Power to Vote Drive" and "Tax Blitz Adds 3,000: 6,230 In Richmond Set to Vote Next Election," ibid., 31 May 1947, 3; "Citizens Association Sets Tuesday For Annual Parley," ibid., 21 Feb. 1948, 7; Buni, *Negro in Virginia Politics*, 88–147.

37.  "Oliver W. Hill Elected to Council by 9,097 Votes," *Richmond Afro-American*, 12 June 1948, 1-2; "He's Richmond's First Councilman in Sixty Long Years," ibid., 19 June 1948, 1–2; Buni, *Negro in Virginia Politics*, 158; Hill, *Big Bang*, 219–30; Gritter, *River of Hope*, 184; John V. Moeser and Rutledge M. Dennis, *The Politics of Annexation: Oligarchic Power in a Southern City* (Cambridge, Mass., 1982), 33; "Meet Richmond's New City Fathers After Hours," *Richmond Times-Dispatch*, 14 June 1948, 1; "Richmond Makes History," *Richmond Times-Dispatch*, 14 June 1948, 8.

38.  "An Open Letter to Mr. Dabney," *Richmond Afro-American*, 22 May 1948, 2.

39.  "Probable Results of The Truman Sweep," *Richmond Times-Dispatch*, 4 Nov. 1948; Virginius Dabney to Dr. Gordon Blaine Hancock, 9 Nov. 1948; Dr. Gordon Blaine Hancock to Virginius Dabney, 15 Nov. 1948, Southern Regional Council, 1945–1970, both Hancock Papers.

40.  Hill, *Big Bang*, 148–53; Buni, *Negro in Virginia Politics*, 165–68.

41.  "School Cases Postponed," *Richmond Afro-American*, 8 Aug. 1953, 1–2; "Virginia NAACP Seeks $50,000," ibid., 8 Aug. 1953, 11; "NAACP Plans Meet in Creighton Court," ibid., 29 Aug. 1953, 1; "Freedom Fund Cabaret Dance at Mosque Oct.17," ibid., 19 Sept. 1953; "Where to Send Your NAACP Contribution," ibid., 19 Sept. 1953; "Panel Member Says Too Many Uncle Toms Leading Race," ibid., 19 Sept. 1953; "From Virginia Conference: NAACP Legal Fund Gets $5,100 Check," ibid., 12 Dec. 1953, 19; "City Council Is Stunned: Lawyer Asks Repeal of Segregation Laws," ibid., 13 Feb. 1954, 1. For more on Tinsley's fundraising activities, see folder 4, box I:C209, NAACP Papers.

42.  "Bradshaw Ok'd for School Board Post," *Richmond Afro-American*, 22 Aug. 1954; "Mrs. E. Bradshaw's Ancestor Last Man on School Board," ibid., 22 Aug. 1954; Resolution No. 53-R51-44, Minutes of the Richmond School Board, 31 Aug. 1953; Minutes of the Richmond School

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

278 • *Virginia Magazine*

Board, 28 June 1954; "Teachers Hold Joint Meeting," *Richmond Afro-American*, 5 Sept. 1953, 6; "Willet Meets with Bradshaw," *Richmond Afro-American*, 29 Aug. 1953, 1; Robert A. Pratt, *Color of Their Skin: School Desegregation in Richmond, Virginia, 1954–89* (Charlottesville, 1992), xi; Dr. Gordon Blaine Hancock, "Segregation's Two Allies," a Between the Lines Editorial for the *Associated Negro Press*, 15 Nov. 1953, Clipping and Other Writing, Hancock Papers.

43.　"The South Awaits Supreme Court's Decision," *Richmond Afro-American*, 16 Jan. 1954, 1; "Predictions of Things to Come Here at Home and Abroad," *Richmond News-Leader*, 2 Jan. 1954, 8; *Richmond Times-Dispatch*, January to 18 May 1954; Buni, *Negro in Virginia Politics*, 176; *Richmond Times-Dispatch*, 18 May 1954. For more black Richmond media coverage of *Brown*, see the *Richmond Afro-American* from January 1953 to May 1954.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms