IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

No. 24-4201

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, District Judge*

————————————

CORRECTED JOINT APPENDIX
VOLUME III OF VI (PAGES 971–1251)

————————————

| | |
|---|---|
| Geremy C. Kamens<br>Federal Public Defender | Jessica D. Aber<br>United States Attorney |
| Patrick L. Bryant<br>Assistant Federal Public Defender<br>1650 King Street, Suite 500<br>Alexandria, Virginia 22314<br>(703) 600-0800 | Jacqueline R. Bechara<br>Assistant United States Attorney<br>2100 Jamieson Avenue<br>Alexandria, Virginia 22314<br>(703) 299-3700 |
| *Counsel for Keith Moore (continued)* | *Counsel for the United States (continued)* |

Amy L. Austin
Laura J. Koenig
Assistant Federal Public Defenders
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
(804) 565-0880

*Additional Counsel for Keith Moore*

Shea M. Gibbons
Erik S. Siebert
Assistant United States Attorneys
919 East Main Street
Suite 1900
Richmond, Virginia 23219
(804) 819-5400

*Additional Counsel for the United States*

# Table of Contents

**Description**                                                                **Page**

## Volume I

District Court Docket Sheet (as of Aug. 23, 2024)......................................................1

Indictment (May 4, 2021, Doc. No. 3)........................................................................16

Moore's Motion to Suppress Evidence and Statements
    (June 21, 2021, Doc. No. 17) .............................................................................18

Government's Opposition to Motion to Suppress Evidence and Statements
    (July 6, 2021, Doc. No. 22)................................................................................25

Moore's Reply to Government's Response to Motion to Suppress Evidence
    and Statements (July 13, 2021, Doc. No. 28) ....................................................40

Transcript of Motion Hearing (July 26, 2021, Doc. No. 33)....................................45

    Testimony of Dominic Collombo:

    Direct Examination by Mr. Elliker....................................................................50
    Cross Examination by Ms. Koenig ...................................................................64

    Testimony of Keegan Mills:

    Direct Examination by Mr. Elliker....................................................................91
    Cross Examination by Ms. Koenig .................................................................100

    Testimony of Jakob Torres:

    Direct Examination by Mr. Elliker..................................................................136
    Cross Examination by Ms. Koenig .................................................................143

i

Testimony of Nakia Williams:

    Direct Examination by Mr. Elliker ...................................................145
    Cross Examination by Ms. Koenig ..................................................156

Testimony of Michael Spinos:

    Direct Examination by Mr. Elliker...................................................176
    Cross Examination by Ms. Koenig ..................................................182

Testimony of John Gilbert:

    Direct Examination by Mr. Elliker...................................................188
    Cross Examination by Ms. Koenig ..................................................198

Testimony of Lee Hush:

    Direct Examination by Ms. Koenig .................................................201

Selected Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 3, Photograph of Moore's car, dated Dec. 5, 2020...................221

    Gov. Exhibit 6, Photograph of firearm seized from Moore's car .................222

    Gov. Exhibit 10, Moore's license plate...........................................223

Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit A, Hanover Traffic Ticket, dated Oct. 9, 2020 ........................224

    Def. Exhibit C, 0485 Map ........................................................228

    Def. Exhibit I, Richmond Police Department
    Incident/Investigation Report, dated Dec. 5, 2020.........................229

Def. Exhibit J, 0485 Net Viewer Event Information ....................................238

Def. Exhibit K, 0497 Net Viewer Event Information ...................................242

Def. Exhibit L, 0502 Net Viewer Event Information ...................................248

Def. Exhibit N, 0571 Net Viewer Event Information ...................................253

Def. Exhibit O, 0574 Net Viewer Event Information ...................................257

Def. Exhibit P, 0579 Net Viewer Event Information ....................................262

Def. Exhibit Q, Axon Report for Keegan Mills .............................................265

Def. Exhibit R1, University of Virginia Dot Map of Richmond ..................267

Def. Exhibit R2, University of Virginia Dot Map of Richmond ..................268

Def. Exhibit W, 0579 Net Viewer Event Unit ...............................................269

Def. Exhibit X1, Boundaries of Richmond Police Precinct 1.......................276

Def. Exhibit X2, Boundaries of Richmond Police Precinct 2.......................277

Def. Exhibit X3, Boundaries of Richmond Police Precinct 3.......................278

Def. Exhibit X4, Boundaries of Richmond Police Precinct 4.......................279

Def. Exhibit Y1, Screen Capture of Richmond Police Department
Stops by Race and Stops by Ethnicity ...........................................................280

Def. Exhibit Y2, Screen Capture of Richmond Police Department
Stops by Gender and Vehicles Searched during a stop.................................281

Order (July 27, 2021, Doc. No. 31) .........................................................282

Supplement to Moore's Motion to Suppress Evidence and Statements
(Aug. 3, 2021, Doc. No. 32)............................................................283

Government's Supplemental Response to Motion to Suppress
Evidence and Statements (Aug. 12, 2021, Doc. No. 36) ..............................297

Transcript of Motion Hearing (Sept. 15, 2021, Doc. No. 137) ............................317

Order (Sept. 15, 2021, Doc. No. 44)........................................................339

Moore's Second Supplement to Motion to Suppress Evidence and Statements
(Mar. 9, 2022, Doc. No. 66)............................................................340

Def. Exhibit A, Dr. Eli Coston, Traffic Stops by the Richmond Police
Department: July 1, 2020 – December 6, 2020......................................353

Def. Exhibit B, Emma Pierson et al., A large-scale analysis of racial
disparities in police stops across the United States,
dated July 2020.........................................................................367

Def. Exhibit C, McGuire Woods,
Zoning and Segregation in Virginia: Part 1 ..........................................379

Def. Exhibit D, Why is Richmond still segregated?,
Richmond Times Dispatch, dated May 3, 2015....................................387

Def. Exhibit E, Mark Bowes, Traffic Arrest Pattern; In Chesterfield,
29% Are Black and Almost 69% Are White, dated July 15, 2001 ........403

Def. Exhibit F, Richmond Transparency and Accountability Project,
Our Streets, Our Say: Policing in Richmond, dated June 2019 ............408

iv

Government's Motion to Exclude Defense Expert
  (Apr. 8, 2022, Doc. No. 70) ..........................................................................424

  Gov. Exhibit A, Dr. Michael R. Smith, Expert Report ..................................446

  Gov. Exhibit B, Richmond Police Department General Order 1-2,
     dated Feb. 11, 2019, and General Order 1-4, dated Feb. 13, 2018 ........457

Government's Response to Moore's Second Supplement to Motion to
  Suppress Evidence and Statements (Apr. 8, 2022, Doc. No. 71) ................471

## Volume II

Moore's Response to Motion to Exclude Defense Expert
(Apr. 22, 2022, Doc. No. 72) ........................................................................483

Def. Exhibit G, Virginia Department of Criminal Justice Services,
Report on Analysis of Traffic Stop Data Collected Under
Virginia's Community Policing Act, dated July 1, 2021 ......................499

Def. Exhibit H, Michael R. Smith & Matthew Petrocelli,
Racial Profiling? A Multivariate Analysis of Police
Traffic Stop Data, dated Mar. 2001 ........................................................572

Def. Exhibit I, An act to amend and re-enact section 46 of the Code of
Virginia, dated Mar. 20, 1924 ................................................................596

Def. Exhibit J, Joseph Ferrandino, Minority Threat Hypothesis and
NYPD Stop and Frisk Policy, dated 2015 .............................................597

Def. Exhibit K, Sunghoon Roh & Matthew Robinson, A Geographic
Approach to Racial Profiling: The Microanalysis and Macroanalysis of
Racial Disparity in Traffic Stops, dated June 2009 ...............................618

Def. Exhibit L, Prabhaker Mishra et al., Selection of Appropriate
Statistical Methods for Data Analysis, dated Sept. 2019 ......................671

Def. Exhibit M, Steven J. Briggs & Kelsey A. Keimig,
The Impact of Police Deployment on Racial Disparities in
Discretionary Searches, dated 2017 .......................................................676

Moore's Reply to Government's Response to Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 23, 2022, Doc. No. 73) ...............696

Government's Motion to Exclude Defense Expert
(June 20, 2022, Doc. No. 82) ..........................................................707

Gov. Exhibit A, Moore's Expert Notice, dated June 16, 2022 ....................714

Moore's Response to Motion to Exclude Second Defense Expert
(July 6, 2022, Doc. No. 86) ............................................................716

Def. Exhibit N, Curriculum Vitae for Dr. Marvin T. Chiles .........................724

Def. Exhibit O, Virginia Freedom of Information Act Request,
dated Feb. 1, 2022 ....................................................................729

Def. Exhibit P, Moore's Ex Parte Motion to Enforce Subpoena
Duces Tecum, dated May 20, 2022 ........................................................731

Def. Exhibit Q, Letter Regarding Ex Parte Subpoena Duces Tecum,
dated May 27, 2022 ...................................................................741

Def. Exhibit R, Marvin T. Chiles, "Here We Go Again": Race and
Redevelopment in Downtown Richmond, Virginia,
1977–Present, dated 2021...............................................................747

Def. Exhibit S, Marvin T. Chiles, Richmond's urban crisis: Racial transition
during the Civil Rights Era, 1960–1977, dated May 2016 ...................774

Def. Exhibit T, Marvin T. Chiles, "Tough on Conduct:" Punitive
Leadership in Urban Public Schools, A Case Study of
*Angry Principal* Dr. Roy A. West, 1986–1991, dated 2020 .................903

Def. Exhibit U, Marvin T. Chiles, "A Period of Misunderstanding,"
dated 2021............................................................................935

## Volume III

Def. Exhibit V, Louis Bernard Cei, Law Enforcement in Richmond:
A History of Police-Community Relations, 1737–1974,
dated June 1975 ......................................................................971

Government's Reply in Support of Motion to Exclude Defense Expert
(July 11, 2022, Doc. No. 89).........................................................1246

**Volume IV**

Transcript of Motion Hearing, Day I (July 18, 2022, Doc. No. 100) ................1252

    Testimony of Dr. Eli Coston:

        Direct Examination by Ms. Koenig ............................................................1268
        Cross Examination by Mr. Gibbons............................................................1351

Transcript of Motion Hearing, Day II (July 19, 2022, Doc. No. 101) ...............1404

    Testimony of Dr. Michael Smith:

        Direct Examination by Mr. Gibbons ...........................................................1415
        Cross Examination by Ms. Koenig ............................................................1477

    Testimony of Keon Turner:

        Direct Examination by Mr. Siebert ............................................................1510
        Cross Examination by Ms. Austin .............................................................1525

    Testimony of James McDonough:

        Direct Examination by Mr. Siebert ............................................................1535
        Cross Examination by Ms. Austin .............................................................1562

    Testimony of Josh Valot:

        Direct Examination by Mr. Gibbons ...........................................................1573
        Cross Examination by Ms. Koenig ............................................................1582

    Testimony of Dr. Eli Coston, resumed:

        Direct Examination by Ms. Koenig ............................................................1586
        Cross Examination by Mr. Gibbons............................................................1590

Order (July 19, 2022, Doc. No. 99) ....................................................1599

Moore's Notice of Expert Report and Curriculum Vitae
(Aug. 5, 2022, Doc. No. 102)........................................................1601

Attachment 1, Report to the Eastern District Court of Virginia .................1603

Government's Renewed Motion to Exclude Defense Expert
(Aug. 22, 2022, Doc. No. 103)......................................................1615

Gov. Exhibit A, City of Richmond Neighborhood Statistics
(1980 Census), dated Nov. 1985 ...........................................1625

Moore's Response to Government's Renewed Motion to Exclude
Second Defense Expert (Sept. 9, 2022, Doc. No. 107)..............................1629

Government's Reply in Support of Renewed Motion to Exclude Defense Expert
(Sept. 16, 2022, Doc. No. 108) ....................................................1639

**Volume V**

Transcript of Motion Hearing, continued (Oct. 28, 2022, Doc. No. 110) ..........1644

    Testimony of Dr. Marvin Chiles:

        Direct Examination by Ms. Koenig ............................................................1650
        Cross Examination by Mr. Gibbons............................................................1720

Opinion (Nov. 13, 2023, Doc. No. 124) ............................................................1781

Opinion (Feb. 12, 2024, Doc. No. 126) ............................................................1792

Final Order (Feb. 12, 2024, Doc. No. 127)........................................................1817

Government's Motion to Reconsider and Memorandum in Support
    (Feb. 16, 2024, Doc. No. 128)........................................................................1818

Moore's Opposition to Government's Motion to Reconsider
    the Court's Final Order (Feb. 26, 2024, Doc. No. 130)..............................1824

Government's Reply to Motion to Reconsider
    (Feb. 29, 2024, Doc. No. 131)........................................................................1834

Memorandum Order (Mar. 11, 2024, Doc. No. 132) .........................................1840

Notice of Appeal (Apr. 8, 2024, Doc. No. 134) .................................................1844

    Attachment 1, Certification for Appeal........................................................1846

**Volume VI (Digital Media)**

Additional Government Exhibits to July 26, 2021, Motion Hearing

Gov. Exhibit 4.mp4, Body-Camera Footage, dated Dec. 5, 2020

Gov. Exhibit 5.mp4, Body-Camera Footage, dated Dec. 6, 2020

Gov. Exhibit 12.mp4, Body-Camera Footage, dated Dec. 6, 2020

Additional Defense Exhibits to July 26, 2021, Motion Hearing

Def. Exhibit U3.mp4, Body-Camera Footage, dated Dec. 5, 2020

Def. Exhibit U4.mp4, Body-Camera Footage, dated Dec. 5, 2020

Def. Exhibit V3.mp4, Body-Camera Footage, dated Dec. 5, 2020

These files were confirmed virus-free through virus scan by Trellix Endpoint Security.



Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA0971

## INFORMATION TO USERS

This material was produced from a microfilm copy of the original document. While the most advanced technological means to photograph and reproduce this document have been used, the quality is heavily dependent upon the quality of the original submitted.

The following explanation of techniques is provided to help you understand markings or patterns which may appear on this reproduction.

1. The sign or "target" for pages apparently lacking from the document photographed is "Missing Page(s)". If it was possible to obtain the missing page(s) or section, they are spliced into the film along with adjacent pages. This may have necessitated cutting thru an image and duplicating adjacent pages to insure you complete continuity.

2. When an image on the film is obliterated with a large round black mark, it is an indication that the photographer suspected that the copy may have moved during exposure and thus cause a blurred image. You will find a good image of the page in the adjacent frame.

3. When a map, drawing cr chart, etc., was part of the material being photographed the photographer followed a definite method in "sectioning" the material. It is customary to begin photoing at the upper left hand corner of a large sheet and to continue photoing from left to right in equal sections with a small overlap. If necessary, sectioning is continued again — beginning below the first row and continuing on until complete.

4. The majority of users indicate that the textual content is of greatest value, however, a somewhat higher quality reproduction could be made from "photographs" if essential to the understanding of the dissertation. Silver prints of "photographs" may be ordered at additional charge by writing the Order Department, giving the catalog number, title, author and specific pages you wish reproduced.

5. PLEASE NOTE: Some pages may have indistinct print. Filmed as received.

**Xerox University Microfilms**
300 North Zeeb Road
Ann Arbor, Michigan 48106

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## JA0972

75-26,759

CEI, Louis Bernard, 1947-
   LAW ENFORCEMENT IN RICHMOND: A HISTORY
OF POLICE-COMMUNITY RELATIONS, 1737-1974.

The Florida State University, Ph.D., 1975
History, modern

**Xerox University Microfilms,** Ann Arbor, Michigan 48106

© 1975

LOUIS BERNARD CEI

ALL RIGHTS RESERVED

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA0973

THE FLORIDA STATE UNIVERSITY

COLLEGE OF ARTS AND SCIENCES


LAW ENFORCEMENT IN RICHMOND:

A HISTORY OF POLICE-COMMUNITY RELATIONS, 1737-1974


by

LOUIS BERNARD CEI


A Dissertation submitted to
the Department of History
in partial fulfillment of the
requirements for the degree of
Doctor of Philosophy


Approved:

Copyright © 1975 by
Louis Bernard Cei.
All rights reserved.

June, 1975

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA0974

TABLE OF CONTENTS

|        | Introduction ................................................ | i |
|--------|-----|-----|
| I. | The Origins of the Richmond Police, 1737–1840 ................ | 1 |
| II. | The Politics of Law and Order, 1840–1860 ..................... | 23 |
| III. | The Police and the Civil War, 1860–1865 ..................... | 44 |
| IV. | The Loil Perlice, 1865–1870 ................................. | 60 |
| V. | The Police Board, 1870–1877 ................................. | 83 |
| VI. | John Poe and the Board of Police Commissioners, 1877–1895 ....103 |
| VII. | The Decline of the Richmond Police, 1895–1912 ...............126 |
| VIII. | "Turn on the Light" Police Investigation, 1912–1919 .........143 |
| IX. | National Prohibition, 1919–1932 ............................164 |
| X. | Friction Between Police and Community, 1932–1945 ............186 |
| XI. | Police Probes, 1946–1961 ...................................211 |
| XII. | Police and Urban Unrest, 1962–1974 .........................233 |
|  | Conclusion .................................................255 |
|  | Bibliography ...............................................261 |

ii

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA0975

## INTRODUCTION

Observers have examined the police from various perspectives. Sociologists and criminologists have theorized about contemporary and future problems but have generally ignored the realities of past trends and events. Historians, by contrast, have examined segments of the police past, but have failed to study the complete development of a police force and its influence on the present. This dissertation attempts to examine the historical record of the police in one city—Richmond, Virginia—and to provide understanding and perspective on today's perplexing dilemmas of police—race relations, crime prevention, and protection of civil liberties.

The paper's major theme centers on the evolution of the police in Richmond and its relations with the community. No single conclusion emerges from these pages as the history of the Richmond force presents too varied and complex a story for a one-factor analysis. Rather, the work examined the external and internal pressures that have shaped the department's evolution such as the influence of race relations, crime, prohibition, politics, and the press. Aside from the concerns of pre-serving order and protecting property, the police reflect the actual values of a community. The patrolman's real "beat" is the thin line between anarchy and freedom.

iii

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA0976

Many have questioned why the police force in Richmond, Virginia is worthy of study. Richmond had served as an important colonial city and had become the intellectual and political center of the south during the Civil War era. From the post war years until World War I, the "city on the James" emerged as a symbol of the new south, and observers viewed the political and social development of Richmond as an indication of the trends and attitudes of the entire south. The city's influence declined after World War I, but by 1960 Richmond had regained its prominence as a leading southern city.

As the Beatles would say, "I got by with a little help from my friends," in completing this dissertation. The staff of the Virginia State Library in Richmond offered untold help and encouragement. The Richmond Public Library, Virginia Commonwealth University, and the University of Virginia cooperated fully. The Richmond Bureau of Police and the City Clerk's Office provided the essential documents and a perfect atmosphere in which to work. Professors Dan Jordan and James T. Moore of Virginia Commonwealth University and Professor Dolph Grundman of Virginia Union University read the manuscript and gave invaluable critiques. Neil Betten, my professor, was always positive and patient while being critical. His kindness to me and enthusiasm for the project can never be adequately repaid. Janet Rowe typed the draft in a cheery and precise way that made those "last few yards" bearable. My mother never lost faith and encouraged me through it all. Finally, my wife Nancy gave me the time and emotional support to successfully complete the project.

iv

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

CHAPTER I

THE ORIGINS OF THE RICHMOND POLICE, 1737-1840

By focusing on the Richmond police, historians gain a unique per-
spective of southern urban colonial society. Commentators do not have
a clear picture of social life in early national southern towns be-
cause of a lack of sources. However an examination of police activities
and organization provides detailed information on the growth and
problems of city life. The roots of the Richmond police, thus, are best
understood within the context of the city's overall development.

Richmond's location on the James River proved exceedingly signif-
icant to the city and to the police. In 1737 William Byrd had organized
the town and it quickly became the center of the inland tobacco and
agriculture trade as settlers brought their products to the city's
markets and stored their goods in the town's warehouses. After the
day's business, farmers and merchants drank ale and discussed politics
in the local taverns. By 1742 the village had 250 inhabitants, a
respectful size in this predominantly rural state.[1]

---

[1]
    Wirt A. Cate, A History of Richmond, 1607-1861 (Unpublished man-
uscript at the Valentine Museum: Richmond, Va., 1943), pp. 18, 21, 31,
39; W. Asbury Christian, Richmond, Her Past and Present (Richmond: H.
Jenkins, 1912), pp. 3-5; William W. Hening, The Statutes At Large:
Being a Collection of All The Laws of Virginia From The First Session
of the Legislature In The Year 1619 (Richmond: Franklin Press, 1819),
IV, 234-239.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

2

The Richmond police evolved both from the local county sheriff's office and the city night watch. The governor appointed the sheriff for a period of one year and he served as the town's chief law enforcer. The sheriff executed the county court's legal writs and processes, captured law breakers, suppressed unlawful meetings of slaves, and collected public rents. For all these duties he received a wage plus fees and rewards. Nonetheless the sheriff's position appeared unpopular for a 1752 ordinance stipulated, "That no person shall be compelled to serve as sheriff longer than one year only." In addition, the statute provided for a stiff fine of three pounds of tobacco for every failure to carry out a court order.[2]

The city police also developed from the night watch. In 1742, the city leaders employed watchmen who essentially protected property and alerted citizens to fires. These early policemen possessed no authority to arrest a citizen nor did the community expect the night watchmen to seek out criminal activity.[3]

Indeed, existing records indicated that Richmond did not experience pronounced crime problems in the pre-Revolution era. Documents showed that in reality the sheriff performed minimal duties such as inspecting chimneys to prevent fires, and keeping goats and hogs off city streets. Local court records indicated that between 1752 and 1755 the court heard an average of three trespassing cases per year and only one assault and battery case in that same time span. This trend

---

[2] Hening, Statutes, V, 515-523.
[3] Cate, A History of Richmond, p. 30.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

.3

continued throughout the 1760's and evidently in the 1770's, although court proceedings do not exist for the years 1768-1790.[4]

Direct evidence from newspapers or manuscripts hardly explained this absence of crime and disorder.  Apparently the town's population of only about 1,000 persons reduced the chances of serious law break-ing.  Additionally, no large unemployed laboring class existed that might commit crime because of desperation or frustration.  Perhaps most important, officials did not keep any records of arrests.

Richmond followed the pattern of urban developments in New York, Boston, and Philadelphia except on a smaller scale.  Richmond possessed the area's fairs, churches, and schools.  As county seat, the city served as a center for political leadership.  However prior to 1752, no city government existed, as the county exercised jurisdiction, but in the aforementioned year the state general assembly authorized trustees to govern the town.  Establishment of the Richmond watch also paralleled the development of law enforcement in the other 18th century American cities.  The northern seaports each organized small watches to protect

_____

[4]
        Henrico County, Hustings Court, <u>Minutes</u>, 1752-1755; 1763
(Virginia State Library.)

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

4

property and to sound the fire alarm.[5]

The American Revolution transformed Richmond. Political leaders decided to move the state capitol from Williamsburg to Richmond in 1780 because of Williamsburg's vulnerability to bombardment by ship. As a result of the shift the state courts and commissions were transferred to the new capitol, and the city increased in population to about 2,000. All the important revolutionary leaders such as George Washington, Thomas Jefferson, and Patric Henry stayed in the town at various times, and along with the presence of numerous lawyers and journalists, Richmond became Virginia's political and social center.[6]

During the war, military authorities assumed responsibility for law enforcement. They diligently tried to control disorder but the enlarged population and the ravages of war caused frequent outbrakes of lawlessness. In 1780 one citizen wrote, "Richmond in the greatest confusion", and " 'plunderers of our own have been very mischevious.' " A year later, after the English invasion of the city, an Army officer observed that he "was obliged to see valuable public property of all

---

5

    Raymond A. Mohl, "The Preindustrial American City," in The Urban Experience:  Themes in Urban History edited by Raymond A. Mohl and James Richardson (Belmont, Cal.:  Wadsworth, 1973) pp. 2-3; A. Theodore Brown and Charles Glaab, A History of Urban America, (New York:  Mac Millan, 1967), p. 3; Cate, A History of Richmond, p. 52; Ordinances of the Corporation of the City of Richmond and Acts of the Assembly (Richmond: John Warrock, 1831), p. 15.  James Richardson, "The Police in the City: A History," in the Urban Experience, pp. 165-166; William J. Bopp and Donald O. Schultz, A Short History of American Law Enforcement (Springfield, Ill.: Thomas, 1972), pp. 15-31.  James Richardson, The New York Police (New York: Oxford, 1970),  pp. 8-10; Roger Lane, Policing The City: Boston, 1822-1885 (Cambridge: Harvard University Press, 1967), pp. 7-9.
        6
    Cate, A History of Richmond, pp. 77,87; Hening, Statutes, V,152,309.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

5

kinds going fast to destruction. . . ."[7]

After the war, city leaders formed a municipal government to re-
place the trustees who had governed the city since 1752.  In May, 1782
the state granted a charter providing for a mayor, a recorder, four
aldermen, and six common councilmen to serve the town's 300 families.
The mayor and council consisted of merchants and professionals rather
than full-time politicians.  An 18th century commentator wrote that the
community only named men with established reputations as candidates for
office.  Dr. William Foushee, the first mayor, typified the Richmond
political elite since he served as surgeon in the Revolution, and as a
member of the House of Delegates throughout the 1780's.[8]

Establishing a law enforcement agency became the town's first
order of business.  On August 29, 1782 the mayor and council appointed
four constables to supervise an eight man watch.  City authorities gave
the night watch the primary responsibility of arresting criminals.  For
forty shillings per month and exemption from paying taxes, the night
patrol also removed sick people from the city, controlled fires, and
repaired streets.  The early force wore no uniforms and had the option
of carrying a weapon.[9]

Unlike in pre-revolutionary Richmond, crime control as well as

_____

[7]
    Calendar of State Papers, (Virginia State Library), January 7,
1780,  January 7, 1781.
[8]
    Hening, Statutes, XI,47; Christian, Richmond, pp. 21023, 18;
Cate, A History of Richmond, PP. 220-304.
[9]
    City of Richmond Common Hall Record Book (hereafter noted as
CHRB) August 29, 1782, p. 234; October 11, 1782, pp. 314-315; Hening,
Statutes, XI, 47.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

6

property protection concerned city leaders. The mayor admitted that intolerable conditions of vice developed around the city jail. Moreover a grand jury report stated that an excessive number of vagrants "plunder the inhabitants" and cause a "decline in morals." Theft and horse stealing constituted frequent crimes. Illustrating the extent of disorder, Mayor Foushee himself was assaulted and one of his eyes gouged out in October, 1785.[10]

Statistics based on cases heard in the Hustings Court also revealed a noticeable increase in crime from 1786 to 1792. Robert Saunders' analysis determined a crime rate of about 700 (based on population of 100,000) in 1790, dropped to 200 in 1791, but rose to 600 in 1792. Crimes against persons jumped from the 30th percentile to 138th percentile between 1791 and 1793. Similarly crime rates against property totaled 600 in 1790, 115 in 1791, and 500 in 1792.[11]

Apparently because of the growth in crime, the mayor, in May of 1792, authorized the city militia's commanding officer to form a patrol of sixteen privates and necessary officers to serve as the city watch. Five years later the patrol increased to thirty-two privates with a captain in charge. However neither newspapers, or manuscripts commented on any activities of the patrol.[12]

---

[10]
     Cate, A History of Richmond, pp. 202, 309; Virginia Gazette, November 12, 1785; CHRB, April 13, 1789, p. 421.

[11]
     Robert A. Saunders, "Crime and Punishment in Early National America: Richmond, Va., 1784-1820." pp. 3, 7.

[12]
     Illustrated Richmond Police and Fire Department Directory (Richmond: West, 1899), p. 9; Henrico County Militia Records, 1782-1829 (Virginia State Library).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

7

The militia patrol seemed to aid in reducing crime. Total crime steadily decreased until 1800, and crimes against persons and property declined as well. However in 1798 and 1799 the city recorded an unusual crime increase, but again sources offered no direct explanations.[13]

Part of the reason for the watch's shortcomings stemmed from low pay and lack of organization. The Richmond watch, as in other city watches, essentially represented a desire of the business community to protect its property, rather than a crime fighting unit. The council minutes demonstrated the point when the city legislature agreed that the Rocketts section of town would get the watch "upon their signifying to them /the council/ by Letter that they are willing to pay according to their stock on hand or similar principles with the Merchants in Richmond." This marked the only written source of explanation for the direction of the city's law enforcement policy in the eighteenth century.[14]

Until 1800, therefore, property protection fundamentally conditioned the behavior of the early Richmond police. However another factor that profoundly influenced the force's attitude and development was the presence of the Negro.

No single event molded the history of the Richmond police as much as Gabriel's revolt in August, 1800. Prior to that year Richmond's whites, who needed Negroes as slave artisans and mill hands,

---

13
  Saunders, "Crime...Richmond," pp. 3, 7.
14
  CHRB, February 9, 1784, p. 54; January 3, 1801, pp. 134-135.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

8

did not enormously fear the city's blacks. But the rebellion caused most Richmonders to view blacks as pariahs. On August 30, 1800 about one thousand armed blacks led by a Negro slave named Gabriel, planned to attack Richmond, kill the white inhabitants, and then take control of the commonwealth. However, the revolt failed. Some slaves, not involved in the insurrection, had alerted the whites to the scheme, and a thunderstorm washed out the bridge the rebels had hoped to use for their assault.[15]

The rebellion itself caused the Richmond community to cooperate with the police as never before. The governor called out the state militia to aid the city's law enforcement organization. Meanwhile the city reestablished the watch under the direction of a captain of the night watch. The council also instructed the force to suppress unlawful assemblies, which city leaders defined as gatherings of five or more Negroes for any purpose whatsoever without the permission of the mayor. Moreover the city passed taxes in 1802, 1803, and 1804 to secure funds to pay for the watch.[16]

According to one study, court records showed that the insurrection affected criminal activity. Prior to 1800 the Hustings Court heard more cases involving white males than black males. After

---

15
    Herbert Aptheker, American Negro Slave Revolts (New York: Columbia University Press, 1942), pp. 220-224; Raymond Pinchbeck, The Virginia Negro Artisan and Tradesman (Richmond: William Byrd Press, 1936)
    16
    CHRB, April 13, 1803, p. 146; April 10, 1802, p. 148; February 7, 1803, p. 163; February 29, 1804, p. 167.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA0985

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 30 of 295

9

Gabriel's Revolt, the court heard more black cases than white cases.[17]

Therefore the community measured police success largely by how well the force could guarantee security against black rebellion. One important statistic can demonstrate the importance placed in controlling Negroes. In 1804 and 1805 the crime rate markedly increased, yet neither citizens nor politicians voiced a complaint. Thus racial tension had a definite and substantial impact on the city's response to law enforcement. Immediately after Gabriel's revolt, then most white citizens gave the police the political and financial support needed to insure an effective force.[18]

Police life was far from serene however. Council paid close attention to watch expenditures as the captain of the night watch had to pay half of the watch's salaries since he could not account for funds spent. Complaints continued such as that of 1802: "As it is the watch is probably asleep. Let them cry out the hour and we will know they are about." Thus in the early nineteenth century the police cried out the hour with the familiar phrase "All is well." Duelling also created tension between the watch and the community. Usually the participants were wealthy, and in stopping the duel the policeman feared for his job; in frustrating the observing crowd he feared for his life.[19]

---

17
  Saunders, "Crime. . .Richmond," p. 7.
18
  Ibid., pp. 4-9
19
  CHRB, November 21, 1808; Virginia Gazette, August 28, 1802; Christian, Richmond, p. 52.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

10

Such close scrutiny along with a salary of only $300 per year caused constant turnover in the captain's office as five men held the post between 1802 and 1807. Finally in 1807 the council appointed William Richardson master of police to direct both the day patrol and the night watch.[20]

Richardson brought stability to the force serving as master of police until 1816. He had commanded the Richmond Blues, a local militia unit, and therefore had military and organizational experience. He was reasonably prosperous for he paid $5.22 in taxes, $100.00 a year in rents, and owned three slaves.[21]

On the other hand, most ordinary watchmen had little wealth. Only one night watchman owned enough land to pay taxes which totaled $1.56. The captain of the night watch, Robert Priddy, owned one slave and paid personal holdings tax of .44. Consequently early policemen came from the city's lowest income bracket and possessed little social prestige.[22]

In the years before the war of 1812, the police remained most concerned about controlling blacks. In 1808 the council ordered the force to take a census of all Negroes as well as offer any suggestions "to preserve order and good conduct among that description." The city government also instructed the police "to prevent the introduction and promote the removal of those who did not have a residence" or who are

---

20
   Illustrated. . .Directory, p. 9.
21
   Ibid.; Land Property Book, 1807 (Virginia State Library); Personal Property Book, 1807 (Virginia State Library).
22
   Land Property Book, 1807; Personal Property Book, 1807.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

11

"dangerous to the peace and good order. . . ."  In 1811 the council noted that the police should "take cognizance of black law breakers." The next year it ordered that the force watch "especially the names and occupations of all free persons of color and all slaves that may come into the city."[23]

Although police harrassment existed, the urban environment mitigated some of the hostility between Negroes and watchmen.  Blacks did have to obtain permission for public meetings, but the mayor generally approved.  An article in the _Richmond Enquirer_ noted that the anti-congregating laws "so much at variance with the feelings of our citizens that. . .they are merely a dead letter."  Police simply ignored an 1806 ordinance which required that all manumitted slaves leave the state within twelve months of their freedom.[24]

Meanwhile, Richmond itself developed into a stable small town by 1812, possessing a population of about 10,000 and supporting three newspapers.  The city "was regarded as a lively place, well known for its diversions of racing, drinking, and frolicing."  J. K. Paulding, a nineteenth century observer, described the society "as a race of most ancient and respectable planters, having estates in the country who chose it for their residence for the sake of social enjoyment. . .a

---

23
    _CHRB_, December 28, 1808, p. 36; November 14, 1811.
24
    _Illustrated_. . ._Directory_, p. 14; _Richmond Enquirer_, October 8, 1805.  (Henceforth all newspapers will be considered from Richmond unless otherwise stated.)  Pinchbeck, _Virginia Negro Artisans_, p. 66; Gerald Mullin, _Flight and Rebellion_ (New York: Oxford, 1972), p. 83; Richard Wade, _Slavery in the Cities_ (New York: Oxford, 1964), pp. 244-245.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

12

society of liberal education, liberal habits of thinking and acting."[25]

City government spending was, however, hardly liberal. Richmond's political leaders believed that municipal government, just as private businesses, could only authorize expenditures which produced revenues. Therefore, mayors tried to balance the budget while providing services such as street paving, police and fire protection, and poor relief.[26]

As in the Revolutionary War, the War of 1812 generated both changes in the city and in the police. The war produced mutual cooperation as virtually the whole community involved itself in the city defense. The conflict also caused economic problems for in 1813 mayor Robert Greenhow regulated prices since the poor could not afford food.[27]

The council monitored the force's activity during the war. In 1813 the council or common hall dismissed five officers for negligence including the captain of the night watch, Robert Priddy, as well as reprimanding two officers for "poor duty." In 1815 the city legislature criticized: "The frequent robberies which of late have been committed on the citizens of this place have proved the inadequacy of the present system of police." They then called a committee to find more effective

---

25
    Cate, A History of Richmond, p. 241; Alexander Weddell, "Samuel Mordecai, Chronicler of Richmond, 1786-1865," Virginia Magazine of History and Biography, LIII (1945), p. 269-270.
    26
    CHRB, 1308-1812; Mrs. Nable Goodrich, "The Mayors of Richmond," (unpublished article, Virginia Library, 1937); Christian, Richmond, p. 70.
    27
    "Richmond During the War of 1812," VMHB, VII (January, 1900), p. 226; Goodrich, "Mayors," p. 21; CHRB, March 15, 1812, p. 262.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

13

police methods, but city records did not report its activities.[28]

Saunders' article revealed that crime did not appreciably rise during the war years, but had risen in 1810-1811.  Consequently the city's preoccupation with law enforcement seemed intended to prevent unnecessary criminal activity rather than directly related to a rise in crime during the war years.[29]

In addition the war produced a period of prosperity in Richmond as well as in the rest of the United States.  Investments increased and the city's tobacco factories expanded.  In December, 1817, Richmond merchants petitioned the general assembly to incorporate the Richmond East India Company which thus indicated unusual confidence in overseas trade.[30]

The war generated some positive gain for the force too.  The city government decided to raise the pay of the night watch, and form a volunteer cavalry to assist the police.  The council also passed an ordinance calling for a centrally located, comfortable room for the watchmen's use.[31]

The War of 1812 also indirectly aided the black community.  Common hall minutes revealed few demands for suppressing Negroes.  The police concentrated on preserving security, controlling the majority whites, and had little time to supervise the blacks.  Jobs expanded in

---

[28]
CHRB, June 9, 1813, p. 283; July 21, 1815, p. 109.
[29]
Saunders, "Crime. . .Richmond," p. 4.
[30]
Cate, Richmond, p. 1294.
[31]
CHRB, February 16, 1812, pp. 256-257; January 1, 1816, p. 138.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

14

the tobacco factories and flour mills, and advertisements for crafts-
men appeared more frequently in the papers.  The Gallego Flour Mills,
to give one illustration, advertised to pay "well" for eight or ten
Negro workers.[32]

Between 1817 and 1819 the police situation improved largely
through the work of master of police Joseph Price.  Holding office from
1817 to 1825, Price continued to give stability to the department.  Al-
though no records existed revealing Price's background, he had a mod-
erate economic status owning three slaves, one horse, and paying $2.28
in taxes.  In 1818 the city increased the salary of the master of
police to $1600 per year, but Price complained that his deputies' pay
was too low.  Common hall then raised the deputies' salary to $50 per
year.  Moreover he convinced the council to hire three policemen spe-
cifically to enforce Sunday closing laws.  Common hall also allocated
funds to Price in connection with a legal suit.  A citizen complained
that Price injured him during an arrest,but Price claimed that he had
taken appropriate action to enforce the law.  In 1810 the city appro-
priated $200 to the police to use as they thought best to stop rob-
beries.  Even the newspaper gave the watch some attention as for six
months the Daily Compiler printed a notice from the master of police
warning citizens that the watch planned to enforce ordinances concern-
ing discarding of trash on the streets.[33]

---

32
    Pinchbeck, Virginia Negro Artisans, p. 69.
33
    CHRB, March 16, 1818, pp. 160-161; February 25, 1817, p. 57;
April 5, 1819, p. 302; Daily Compiler, November 27, 1819; Illustrated.
. .Directory, p. 9; Personal Property Book, 1818.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

15

The Depression of 1819 abruptly halted the economic gains of Richmond as well as the rest of the nation. With trade no longer disrupted by war, English manufacturers recaptured the American market. This resulted in the collapse of embryonic American industry and a general economic downturn for the young country. The cities felt the effect directly as the war had forced many American businesses to start their own manufacturing in the light of Britain's blockade. However with well made and less expensive British goods on the market, layoffs and bankruptcy became common in New York, Philadelphia, and Baltimore.[34]

In Richmond, the economic decline created problems for the police. In November, 1819 a "bread war" developed as the town's bakers wanted to raise their prices, or reduce the size of their loaf of bread. The bakers and sundry citizens exchanged heated arguments in the newspapers and the situation had the potential for mob disturbances. Eventually however the bakers received their price increase and the tension subsided.[35]

The depression cut revenues and the city government decided to reduce police expenditures. In 1820 the council lowered the salaries of the night watch, abolished the deputies' office, and failed by a few votes to abolish the office of the master of police. In 1825, the

---

[34] Glaab and Brown, Urban America, p. 37.
[35] Cate, A History of Richmond, p. 306; Daily Compiler, December 8, 9, 11, 1819; June 14, 1820.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

16

council did eliminate the office of master of police, and evidently
the mayor assumed control of the night watch.[36]

Some citizens expressed displeasure at the common hall's actions.
An article in the Daily Compiler related the story of a visitor asking
a Richmonder if the city authorities strictly enforced the laws. The
newspaper commented, "This question put the Richmonder to blush for he
was obliged to acknowledge that there were few, if any Towns so shame-
fully neglected." Another citizen complained that the "city government
should try more diligently to stop vandals from painting curse words on
public buildings." The resident criticized the city government; not
the police.[37]

Conversely, some citizens complained about police behavior. In
1822 the Mercantile Advertiser described the police as buffons since the
only thing they seemed to do consisted of telling merchants to keep
their sidewalks clear of merchandise. In 1824 the council reprimanded
the police master for ordering a copy of the Daily Compiler, and charg-
ing it to the city. Also advertisements in the newspapers indicated
that tavern owners and store keepers offered rewards to those who would
sound the alert if a fire occurred, and thereby indicated their lack of
confidence in the night watch.[38]

Another reason the common hall felt that it could reduce the

---

[36] CHRB, April 14, 1819, p. 234; June 20, 1820, pp. 83-84; March
16, 1825, p. 153; April 12, 1824, p. 88.
[37] Daily Compiler, June 15, 1820; May 9, 1821.
[38] Enquirer, April 17, 1821; Mercantile Advertiser, November 10,
1822; Daily Compiler, 1820-1828.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

17

number and salary of the police concerned the decline of the Negro threat. Mill owners needed slaves to work in the city flour and tobacco factories. In 1821, a tobacconist offered to hire "thirty Negro boys accustomed to working in a tobacco factory; also three experienced pressmen." Another tobacconist, B. F. Hilliard, offered to hire five or six "First rate stemmers and twisters." In 1824, police master Price granted a black request for a church and stated that he had examined the names of the congregation and found "no objections to their moral character." Prior to the mid 1820's such petitions were commonly rejected because of fear that blacks would use church services to plan a rebellion or at least for gambling and drinking.[39]

Nonetheless city life presented difficulties for Negroes. Police frequently harassed blacks and used unnecessary force in dealing with them. One writer described officer Clement White as the "terror. . . of the darky." Policemen usually arrested blacks for stealing fruit and small items of clothing, but officers rarely jailed whites for these petty crimes. A foreign observer commented that Richmond exemplified "constant dread that the Southern People suffer under from apprehension of their slaves." In brief, the depression years hardly mitigated social discrimination.[40]

Although revenues declined during the economic downturn, the city made some improvements. John Adams presided over Richmond as mayor

---

[39] _Daily Compiler_, December 25, 1821; _Whig_, February 21, 1825; Wade, _Slavery in the Cities_, p. 166.

[40] Uno P. Hennessy, editor _The Aristocratic Journey_ (New York: Peters, 1831), pp. 196-198; Wade, _Slavery in the Cities_, p. 188; _Republican_, July 15, 1825; _Illustrated. . .Directory_, p. 13.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

18

from 1819 to 1825, and he advocated grading of streets and improving shipping facilities. Adams also encouraged a further democratization of city politics by urging council to amend the charter permitting the mayor to succeed himself, and to allow any citizen to serve as the city's chief executive.[41]

Joseph Tate succeeded Adams in 1826 and turned from civic improvements to police reorganization. Tate supported a council proposal for a regular day and night police and aided in an investigation of the city watch to determine methods to better it. However no records exist of these discussions and council never actually reformed the watch. On the other hand common hall made physical improvements such as the building of a sturdy jail and repairing the watchroom roof.[42]

Richmond recovered from the depression in the late 1820's, but the city's economy did not prosper. The town did not possess the market nor the transportation facilities of such cities as New York, Philadelphia, or Pittsburg, and evidently financiers did not view Richmond as a profitable investment. One citizen, speaking of the city, commented, "My pride has been humbled by her decline and I could weep for her fallen greatness."[43]

Racial tension, however, again awakened Richmond to the necessity of an efficient force. In August, 1831, Nat Turner led an armed black

---

41
    Cate, A History of Richmond, p. 143; Goodrich, "Mayors," p. 22.
42
    CHRB, April 3, 1828, p. 6; December 26, 1828, p. 85; March 8, 1830, p. 200.
43
    Cate, A History of Richmond, p. 1295; Enquirer, May 16, 1828.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

19

insurrection in Southampton County, Virginia near the North Carolina border. Turner and his followers killed about sixty whites in that area before being suppressed. Fear gripped Richmond and the council immediately strengthened the police by adding an extra guard and enrolled men to increase the night patrol. After the revolt, the city continued to buttress the police. In 1833, for instance, council added two more policemen which brought the total to nineteen patrolmen, and city leaders placed two officers under the mayor's control to observe the town's black population. Furthermore Richmond established a citizen committee, the Anti-Elopment Society, to aid the police in controlling runaways. Finally in 1835 the council strengthened the force because of the growing abolitionist threat.[44]

Police records indicated that most police activity concerned runaway slaves between 1834-1840. In 1834, for instance, the Police Day Book showed sixty-eight runaway reports and only twenty-four robbery reports. The police, therefore, spent twice as much time investigating runaways as robberies.[45]

The cholera plague of 1832-33 produced havoc in the city, and illustrated the need for a well paid force. During the plague, the police aided in quarantining and general management of the public. As a result of the police performance a group of citizens convinced city

---

44
    CHRB, September 20, 1833, p. 501; September 18, 1833, p. 222;
H. Aptheker, Nat Turner's Rebellion (New York: Humanities Press, 1966),
pp. 46-47.
    45
    Richmond Police Day Book, 1834-1843 (Tracy W. McGregor Library,
University of Virginia.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

20

government to appropriate higher pay to the night watch.[46]

While the city leaders gave more support and pay to the police, they also increased the force's responsibilities. In 1835, the council passed a resolution calling for more police to stop robberies and incendiaryism. Consequently the watch's records indicated police checking for unlocked doors and detecting fires. On May 11, 1839, for example, officer Bowles found a harness factory door unfastened, but reported that "nothing taken out no violence to the door."[47]

Meanwhile urban America was beginning to experience a dramatic industrial revolution. New York became the nation's leading city as manufacturing replaced commerce as the principle form of business activity. Other northern towns also witnessed the development of factories and mills. Transportation changes facilitated the growth of the city, and by the 1830's canals and railroads connected urban centers and made manufacturing more profitable.[48]

These economic changes produced social changes as well. In the manufacturing city, crime and disorder grew in relation to population increases. Housing shortages occurred, and schools and churches lost considerable ability to control the youth. Finally violent rioting broke out in New York and Boston in 1834 and in Philadelphia four years

---

46
  Christian, Richmond, pp. 118-119; CHRB, September 18, 1833, p. 231.
47
  Police Day Book, 1834-1839.
48
  Mohl, "The Preindustrial American City," in The Urban Experience, p. 7; Brown and Glaab, Urban America, p. 27.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

21

later.[49]

The mid and late 1830's also saw Richmond undergo industrial changes. Tobacco factories expanded and flour mills flourished. Iron works prospered as a result of the railroad industry, and the Bell-Isle and Tredegar Iron Works became two of the wealthiest companies in the city. By 1840 Richmond emerged as one of the foremost industrial towns in the South.[50]

But unlike in Northern industrial towns, crime and disorder did not appear in Richmond during the 1830's. Again no written documents or sources offered satisfactory explanations for this phenomena, but one can speculate that the relatively small size of the laboring force and the presence of Negro slaves reduced the threat of labor unrest.

In sum, the Richmond police initially developed as most city forces since the police served to guarantee the town against robbery and fire. However the black revolts of 1800 and 1831 caused political leaders to use the force to supress a believed Negro threat. The police in turn realized that the city generally supported the force only when blacks threatened Richmond. Since policemen received low pay and had little social standing, hostility toward Negroes easily became a predominant trait. To be sure, the police occasionally treated blacks fairly and frequently ignored enforcing some slave laws. Nevertheless the economic and political pressures caused the police to develop an anti-Negro attitude.

---

[49] Mohl, "The Preindustrial American City," in The Urban Experience, pp. 8-9; Brown and Glaab, Urban America, pp. 19, 86; Bopp and Schultz, A Short History of American Law Enforcement, pp. 35-36.
[50] Cate, A History of Richmond, pp. 1395, 1314, 1317, 1378-1381, 1341.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

22

## MAJOR CRIMES PER 100,000, 1784-1820



Sources: City of Richmond, Hustings Court, Order Books and Minutes, 1784-1820, compiled by
Robert A. Saunders in "Crime and Punishment in Early National America: Richmond,
Virginia, 1784-1820."

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

CHAPTER II

THE POLITICS OF LAW AND ORDER, 1840-1860

Partisan political considerations influenced police affairs in Richmond between 1840 and 1853, as the Whigs and the Democrats waged bitter battles over municipal matters. Because of the large number of robberies and arsons, crime also became a central issue in city politics. However in the mid-1850's, the slavery crisis caused the Richmond community to fear a black uprising, and once again the police's exclusive role became to supress the city's black population.

In 1840, Richmond ranked among the twenty largest cities in the nation. Her population totaled 25,000, an increase of 10,000 from 1830. Whites showed a gain of about 3,000 while the blacks added only about a hundred persons--a fact that reassured racially apprehensive whites. Confidence and pride characterized the town's mood, and one writer stated, "She is going ahead with accumulating velocity," which he thought unusual in contrast to the "lethargic condition so characteristic of Southern cities in the same period."

---

1

    Christian, Richmond, p. 140; Census, 1840 (Washington: U. S. Government Printing, 1841) p. 207; Richmond Daily Whig, September 20, 1840; Richmond Enquirer, July 30, 1839.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 45 of 295

24

The city had successfully plunged into the industrial revolution, as Richmond's manufacturing output amounted to about 1.4 million dollars. Tobacco production led with sales of $629,340, and employed 981.  The city's twenty-one flour mills generated $300,000 in sales and employed 60 men.  The statistics compared favorably with other larger cities: New York manufactured 11 million dollars worth of goods, and Baltimore manufactured 4 million worth of goods.  In the south, Richmond ranked second to New Orleans as the Louisiana port city recorded 11 million dollars in commerce, but only $1.8 million in manufactures.[2]

The town had its intellectual side as well:  a number of impressive churches with varied architecture, a distinctive theater second only to the New York stage, and the Southern Literary Messenger, a fiction magazine, ranked as one of the finest in the nation.  From time to time Edgar Alien Poe resided in the city and he contributed to the Messenger for over a year.  A nineteenth century Richmonder, "Virginius" complained that the town did "nothing but think, write, and talk."[3]

Richmonders wrote, thought, and talked politics.  The Whig party dominated city government, and in national elections the Whigs registered substantial majorities.  Historians have not adequately explained this fact, but apparently a large number of property holders and wealthy merchants caused the Whigs to achieve such consistent triumphs.  One author asserted that the city's property owners and banking interests

---

[2] Statistics of the United States, 1840 (Washington:  Blair and Rives, 1841), pp. 230-231.

[3] Cate, A History of Richmond, pp. 570-636, 721; Enquirer, November 22, 1836.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

25

exerted considerable influence in municipal politics.  But Richmond was a relatively small Whig stronghold in an overwhelmingly Democratic state.  Rural Virginia identified with the agrarian aspects of the Democrats,and opposed the centralizing programs of the Whigs.  The Enquirer spelled out the Democratic position as opposition to "the efforts of Whigs to fasten upon us a National bank, a general distribution, an increased tariff, a National debt, a national script, and a greater or less assumption of the state debts."[4]

The implacably partisan city press continually fought editorial battles over political affairs in the nation , the state, and the city. The Enquirer and the Compiler served as the voice of the Democrats, while the Whig fulfilled the same function for its party.  The Enquirer described the Whig as the "most virulent, unscrupulous, intolerant, and contradictory print."  The Whig reciprocated.[5]

The city's government presented an unusual situation.  The mayor and the council were Whigs, but the twenty-four man police force consisted totally of Democrats.  Captain Burril Jinkins stated that when he assumed duties as the head of the night watch in 1839 that "there were 20 watchmen all Democrats not one Whig."  No other police force in the nation had such an arrangement, for in other cities when the mayor's office changed parties much of the police force lost their jobs.[6]

---

[4] Henry Simms, The Rise of the Whigs in Virginia (Richmond:  Byrd Press, 1929), p. 164; Enquirer, April 9, 1841.

[5] Enquirer, April 5, 1850; Whig, March 31, 1850.

[6] Compiler, March 8, 1843; April 24, 1843; Bopp and Schultz, A Short History of American Law Enforcement, p. 35.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

26

This peculiar lack of the spoils system in Richmond existed for a number of reasons. Until 1840, bipartisanship had characterized Richmond city politics. One writer commented, "Our charter elections have always been free from party excitement, and the consequence has been that we have had councilmen and magistrates of all parties." Also the well organized state Democratic party evidently weilded enough power in the city to cause the Whigs to avoid partisan appeal.[7]

Nonetheless, the Whig government apparently distrusted the Democratic police force and virtually ignored the need for improving the department's conditions. In January, 1841, a council committee reported that the jail needed renovation and an editorial by the Compiler called for council to appropriate funds for its repair. The city legislature promptly allocated funds for the jail. Yet in the early 1840's the council constantly threatened to reduce the salary of the police because many councilmen felt them unnecessary.[8]

The low paid city policemen ranked at the bottom of the economic scale. Few watchmen paid personal holding tax, and no policeman owned enough land to pay the property tax. Only one police member owned a slave, yet city tax records indicated that almost fifty percent of the city owned at least one slave. The day police, under the separate control of the mayor, fared better. Three of the four paid personal holding tax, two paid property tax, and three of the four owned slaves. Thus there existed a degree of upward mobility for the Richmond police-

---

[7] Enquirer, April 7, 1843.

[8] Compiler, January 13, 14, 1841; City Council Minutes, May 22, 1843, pp.146-148. City Council Minutes hereafter noted as CCM.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

27

man.[9]

Besides economic problems, the mayor and the police also faced difficulty in connection with the 1843 municipal elction. The mayor received criticism because of his inability to control the police, and to reduce the crime rate. "A Citizen" attacked Lambert because he did not know his legal duties, and had to rely on the police for instruction and advice. The same author asserted that Lambert had made numerous legal errors as judge of the mayor's court. The critic concluded that, "his unanimously conceded incapacity to discharge the duties of his station" had caused the police to lack respect for the mayor. Another critic, "Richmonder," asserted that the rise in crime among the lower class citizens occurred "unquestionably to the inefficiency of the police. And who is responsible for that inefficiency? Beyond doubt, the head of that body, by whom its movements are directed and controlled, /the Mayor/." Another writer charged that "the number of burglaries and incendiary /arson/ attempts has afforded frequent and just cause of complaint on the want and promptitude in our night watch."[10]

Other citizens defended the mayor and the police. One attorney pointed out that Lambert was a lawyer, and in his experience the mayor had acted correctly in court. Moreover the writer stated that economic difficulties and unemployment caused the growth of crime. Finally he siggested that if one did not believe that the police did do their job, then these critics should check the city's overcrowded jails. Another

---

[9]
    Personal Property Book, (Virginia State Library), 1844; Land Property Book, (Virginia State Library), 1844.
     [10]
    Compiler, March 3, 8, 17, 1843.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1004

28

writer.  "Justice," asserted that neither the mayor nor the police were
to blame for the increase in robberies and arson.  He said, that "it
would be impossible to guard against them without you can endow the
night watch with ubiquity, or furnish them, Argus-like, with a hundred
eyes."[11]

The most helpful evidence in Lambert's favor came from statistics
reported by clerk of the Hustings Court.  Before Lambert took office
(1837-1840) the records indicated that the police arrested three persons
for incendiaryism, but the courts acquitted each one.  Since Lambert
took office (1840), the police jailed six arsonists, and the court had
only convicted one.  Furthermore, the clerk said that the court had not
rejected even one of the mayor's warrants for legal error, and that the
higher courts had reversed few appeals of Lambert's decisions.  That
same day two lawyers wrote to the newspaper testifying to the mayor's
legal competence.[12]

Also during the campaign of 1843, numerous writers claimed that
crime had increased.  One observer commented.  "The peculiar population
which gives especial trouble to the police, has been greatly extended
by the public works and other undertakings in the city."  Another writer
offered a more sophisticated analysis.  Crime increased due to "the
pecuniary embarrassment of the times. . .the growth of the city, throw-
ing upon the community a greater number of reprobates and dissolutes,
the facility of intercommunication with northern cities, introducing a

---

[11]  Compiler, March 14, 22, 1843.
[12]  Ibid.,   April 3, 1843.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

29

gang of more adroit and practiced villans and the neglect to increase the police in ratio."[13]

The press frequently referred to the numerous break-ins at the flour and tobacco mills as well as at the railroad yards. In addition, the newspapers constantly complained of rowdyness and thievery in the market square. From the newspaper accounts, the city suffered from considerable disorder. However available statistics showed a decline in crime from 1840 to 1843. The Police Day Book indicated that the primary police responsibility of capturing runaway slaves dropped from ninety-six in 1840 to eighty-five in 1843. Robbery reports totaled twenty-one in 1840, but only six in 1843. During the same three year span, arson cases declined from twenty-one to twelve. Naturally one should use statistics cautiously but they represented a trend that belied the newspaper comments of a crime wave.[14]

To further discredit the journalistic critics, Lambert ran unopposed in the election of 1843. The election returns showed that the Whigs triumphed in all but one councilmanic race, and the party newspaper proclaimed that the council was "thoroughly Whig." The mayor overcame his attackers partly because of the strong Whig party in Richmond, and partly because of his letters of support which demonstrated his legal competence, and defended his law and order record.[15]

---

[13] *Compiler*, March 8, 14, 1843.

[14] *Compiler*, May-June, 1842, March 1843; *Enquirer*, July-August, 1842; *Police Day Book*, 1840-1843.

[15] W. Dean Burnham, *Presidential Ballots* (Baltimore: John Hopkins, 1955), pp. 834-835; *Whig*, April 7, 1843.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

30

Immediately after the election the Whig attacked Captain Jinkins
of the night watch.  The newspaper asserted that Jinkins hired only
"Locos Focos," a Democratic faction.  "It is a well known fact," said
the Whig, "That for years, the almost entire police of the city has not
only been Loco Foco but active and brawling partisans."  Moreover the
Whig charged him with "bigotry" apparently meaning he was a racist.
Jinkins conceded that the Democrats composed the entire watch in 1840,
but by 1843 he stated that the night watch consisted of 18 Democrats
and two Whigs.  As for the bigotry charge, he tacitly admitted the alle-
gation and stated that he would "keep his political convictions rather
than be a hypocrite. . .I will run the risk of starving and die an
honest man."[16]

To be sure, much of the Whig charges can be dismissed as mere
rhetoric in retaliation for the Compiler's assertions against Lambert.
No written evidence existed to support the claim that the police behaved
as "brawling partisans."  Jinkins did hold the typically racist view of
Negro inferiority, but the Whig was just as opposed to black peoples'
rights as most white southerners.

Other American cities also experienced political influence in the
police department.  Joseph Richardson illustrated that in the New York
police department, appointments "were regarded as patronage plums. . .
The political parties. . .considered the police and the watch legitimate
spoils. . ."  In Philadelphia, a merit and performance system had re-
placed the patronage methods in 1835, but shortly thereafter, political

---

16
    Whig, April 7, 1843; Compiler, April 24, 1843.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

31

pressure caused the re-introduction of the spoils system.[17]

Despite the partisan nature of the police in the 1840's, the east-
ern cities established new forces which replaced the old watch-ward
system. Philadelphia, Boston, and New York centralized the day and
night police and gave the force responsibility for the prevention as
well as detection of crime. However, the Richmond police still separa-
ted the day and night force, and largely the police concentrated on
arresting law breakers after the crime occurred.[18]

Because the police did not focus on crime prevention, writers con-
tinued criticizing Lambert on police matters during the mid-1840's.
Detractors claimed that the city paid the night watch $12,000 a year,
but that it "did little good." After the council turned down a pro-
posal to illuminate the city with gas lights some citizens voiced their
displeasure partly because of their fear of crime: "Let us have light,
now we are compelled to grope in darkness through our rugged and danger-
ous streets." In 1846, city residents chastized the mayor for not
arresting John H. Pleasants, editor of the Whig, and Thomas Ritchie,
editor of the Enquirer, before they dueled. The mayor replied that he
had alerted the police, but that no direct evidence existed to support
an arrest. Nonetheless no citizen voiced opposition to the council's
refusal to establish a larger unified police. Apparently the Whig
councilmen still lacked confidence in the Democratically controlled

---

17
    Richardson, The New York Police, pp. 30-31; Bopp and Schultz, A
Short History of American Law Enforcement, p. 35.
18
    Ibid, p. 47; Lane, Policing the City, p.35; Bopp and Schultz, A
Short History of American Law Enforcement, pp. 38-39.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

32

force.[19]

Meanwhile a decline in the Negro threat further weakened the importance of the police in the skeptical eye of the public. In the 1840's, no Negro riots occurred, nor did the city press dwell on black crime. Negroes worked in the mills, and compared to other slave employment, prospered. Newspaper advertisements revealed considerable demand for black bondsmen, such as N. B. Hill, owner of the Bell Tavern offered jobs for nineteen slaves, and Tredegar Iron Works issued frequent calls for hired slaves. One observer wrote in 1845 that he was sickened by the sight of numerous blacks in the trade shops "crowded with Negro apprentices and Negro workmen." In 1847 workers at the Tredegar Iron Works struck and subsequently lost their jobs rather than have to work with a large number of blacks.[20]

Statistical evidence also indicated a lessening of black crime. As mentioned earlier, between 1840 and 1843 the Police Day Book indicated runaway slave reports declined. In 1847 Hustings Court Minutes showed that more whites than blacks appeared before the judge. In addition the court charged blacks primarily with slave code violations, but whites faced the court mainly on robbery charges.[21]

Thus the 1840's marked a relatively "prosperous" time for the blacks and a correspondingly acrimonious time for the police. Since

---

19
    Christian, Richmond, pp. 153-154; Enquirer, March 17, 1846; Whig, June 14, 1847.
20
    Russell, Free Negro in Virginia, p. 149; Times and Compiler, May 28, 1847; Wade, Slavery in the Cities, pp. 34-35; Enquirer, July 11, 1845.
21
City of Richmond, Hustings Court Minute Book, 1847.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

33

Richmonders felt less threatened by the Negro, the city's white resi-
dents, and especially city council, became more willing to find fault
with the police.

The council and press criticized the police for everything except
dishonesty. Although most major cities experienced numerous police
scandals involving bribery and misconduct, corruption rarely existed on
the Richmond force. A number of factors explained the lack of graft.
First the department instituted a small fee system which rewarded
honesty and augmented the watchman's salary. Next, policing offered a
relatively stable position to men from the lower end of the economic
scale. Finally the Richmond policeman himself generally had integrity
and devotion to duty, for his job offered little pay and little
prestige.[22]

Despite police honesty, generally the public ignored police mat-
ters, and many citizens turned to other remedies to curtail law break-
ing. Prohibition served as an answer to crime control, and Richmond had
a strong anti-liquor movement. In 1845 and 1846, John B. Gaugh, a cele-
brated prohibitionist, lectured to large audiences at the city churches
on the evil of alcohol. Also the state temperance society had perma-
nent offices in Richmond, and in 1847 petitioned the state legislature
to allow a vote on prohibition.[23]

The police returned to public importance again in 1846 as a result

---

[22] Bopp and Schultz, _A Short History of American Law Enforcement_,
p. 41; Richardson, _The New York Police_, pp. 23-50.

[23] _Times and Compiler_, March 7, 11, 1845; _Enquirer_, February 28,
1845; _Whig_, February 12, 1846; Petition A, 9, 712, _Legislative Petitions_
(Virginia State Library), January 10, 1848.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

34

of the political settlement in connection with the Mexican War. The conflict with Mexico provoked northern congressmen to pass the Wilmot Proviso which prohibited slavery in the newly acquired territories and brought the racial issue to the front of political life. Although the Compromise of 1850 resolved slavery tensions for a decade, many political leaders tried to avoid the slavery issue. Most Richmonders did not avoid it, as they denounced the Wilmot Proviso and guardedly supported the 1850 compromise. Slavery protection and political union summed up most Richmonders' feelings in 1850.[24]

In keeping with the growing concern over the slavery question, the early 1850's witnessed an improvement in police relations with the council. In addition in 1851, the force first utilized detailed record keeping which permitted the police better accountability of time and money, and therefore could prove to council the necessity of a larger and better paid force. Consequently complaints about police inefficiency disappeared. In addition two years later the urban legislature approved a police room in New Shockoe Market in order to offer comfort to the patrol and to insure their vigilance.[25]

Newspaper editorial comment altered its bellicosity as well. In 1852, the Dispatch, a moderate Democratic newspaper, praised the police for chasing outlaws who had held up a city bank: "We were sorry that the exertion of those faithful and zealous officers was not rewarded with that success which. . .justice demands." In that same year, the

---

[24] Christian, Richmond, p. 157.
[25] CCM, August 11, 1851, p. 516; Dispatch, February 19, 1853; Cate, A History of Richmond, p. 421.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

35

Dispatch noted that most other city policemen carried pistols, but that the Richmond force only carried a club, and the newspaper urged the city to arm the force. The newspaper praised officer John Yarrington for his arrest of a man overcharging customers for public carriage service, and commented that Yarrington deserved "full credit for the thorough manner in which he is carrying out this ordinance." Later an appreciative resident presented Yarrington with a cane for his courteous attitude. Ironically enough, Lambert did not recommend this outstanding officer for reappointment to the force in 1853, and he subsequently left the force.[26]

Other police actions in the early 1850's indicated their growing ability to handle urban problems skillfully and thus gain public confidence. In May, 1852, the police effectively controlled a mob which threatened a black man who had killed his overseer. In that same year several policemen assiduously pursued six prisoners who escaped from the city jail. The force also apparently succeded in controlling prostitution. The first mention of commercial vice occurred in May, 1852 when the Dispatch noted that prostitutes plagued "Butchertown," a poor section of town. A few months later the police raided and closed a house of ill-fame, and a year later deputies jailed four women on prostitution charges.[27]

---

[26] Richmond Dispatch, January 21, 1852, April 22, 1852, September 9, 1852; Richmond Times, June 3, 1852; Enquirer, June 3, 1852.

[27] Dispatch, May 14, 1856, August 27, 1853; Richmond Republican, August 20, 1852; Dispatch, May 10, 1852; CCM, May 10, 1852, p. 650; Republican, February 6, 1852.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 57 of 295

36

Most important, between 1847 and 1851 the number of blacks before the Hustings court increased. The largest offense still consisted of slave code violations which increased from eighteen in 1847 to twenty-one in 1851. Almost more Negroes than whites appeared before the Hustings court on robbery charges in 1851 than in 1847.[28]

Thus public hostility against the police decreased in proportion to an improvement in police conduct, and an apparent increase in black crime. Additionally political partisanship virtually ended as the press issued no charges of political favoritism against the police department. In 1855 the Whig urged bipartisanship in city elections and stated, "No matter how these elections may terminate we shall in no sense regard them as any test of the relative strength of parties in the city."[29]

General Lambert died in March, 1853 and Whig Joseph Mayo succeeded to the mayor's office. Mayo assumed office under the new charter of 1851 in which the people rather than the council elected the mayor. Mayo, the city's most experienced politician, had served in the Hustings court from 1822 to 1852, and held a seat on city council for thirteen years. Thus, he possessed the political skill and the potential to govern.[30]

The new mayor appeared friendly to the police. Mayo established a sunrise court so that the evening watch could go to bed after duty,

---

[28] Hustings Court Minutes, 1847, 1851.

[29] Whig, March 31, 1855.

[30] Christian, Richmond, pp. 174-178; Emory Thomas, The Confederate State of Richmond (Austin: University of Texas, 1971), pp. 19-20.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 58 of 295

rather than having their sleep interrupted by a daytime court appear-
ance.  He insisted on rotating beats so that a new officer always
walked with an experienced one.  In 1854 Mayo diplomatically "reminded"
the policemen that they had failed to fulfill the ordinance which re-
quired each ward to have a resident watchman.[31]

In the 1850's, Mayo adroitly handled the problem of police brut-
ality.  In 1854 one Richmonder preferred charges against Captain Clement
White for abusive conduct and use of unnecessary force.  Mayo admonished
White that "his temper was rather impetuous and often times impelled
him to say and do what was not decent or proper."  The mayor then
stated his view of individual rights relating to the police:  "If a
citizen should resist them in lawful arrest, they had a right to use
sufficient force to compel him to go. . .In doing this, however, they
should avoid giving offense and should rather exhaust all courteous
persuasion before resorting to harsh or violent means."[32]

Mayo's statement was especially noteworthy because few people in
American cities concerned themselves with an individual's rights against
abusive police action.  As historian, Roger Lane observed in pre-Civil
War Massachusetts:  "No vocal group was concerned with the kind of
liberties the police might violate."[33]

Nonetheless, the police usually proved themselves innocent of

----

[31]
  *Illustrated Police and Fire Department Directory*, pp. 14, 19;
*CCM*, February 13, 1854, pp. 230-231; *Whig*, April 7, 1854.
[32]
  *Whig*, March 17, 1854.
[33]
  Lane, *Policing The City*, p. 35.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

38

other misconduct charges. In November, 1854, a resident charged an officer with dereliction of duty for failing to clear an obstruction after the citizen told the officer of the situation, but an investigation exonorated the policeman. In 1856 one policeman avoided even the allegation of malfeasence when he arrested a slave immediately after the Negro offered him a bribe.[34]

Aside from controlling blacks, property protection became a priority of the police during the mid 1850's. The press constantly urged the force to try to curb robbery and arson. In September, 1854, the Whig declared, "We earnestly hope that efforts of the police to ferret out the perpetrators of the frequent burglaries which have occurred of late, and bring them to the punishment they so richly deserve may be successful." Two years later the same newspaper asserted, "The numerous acts of robbery lately perpetrated in Richmond call for strictest vigilance on the part of the police."[35]

Arson plagued the city, and the press grew impatient with departmental activities to curtail the difficulty. Although the force supervised crowd control and participated in fire fighting, the newspaper editors still complained. The Dispatch stated, "It is time that an efficient plan should be devised to detect and bring to justice the perpetrators of these crimes, and to give some security to citizens against such midnight perils." The Whig added, "Until some salutory example is set by rigorous exercise of the law in reference to offenses of this

---

[34] Whig, November 7, 1854, September 9, 1856.

[35] Ibid. May 2, 1856, September 15, 1854.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

39

character, it will be impossible to stay this crying evil of incendi-
aryism."[36]

Besides these duties, the city assigned the police other munici-
pal details.  The night watch lighted the public gas lamps throughout
the city, and the police supervised the cleaning of streets and side-
walks.  The Dispatch commented,  "We are gratified to perceive that the
police of the city are steadily at work searching out nuisances
/cluttered sidewalks/. . . ."[37]

The police also controlled lawlessness in working class neighbor-
hoods.  Richmond did not experience extensive labor rioting such as in
New York in the 1830's, but the unskilled laborers often reacted vio-
lently to their poverty.  One newspaper described "Pink Alley" as
notorious in the police annals of Richmond as are the Five Points in
those of New York."  According to Whig, "Butchertown may well be set
down as the St. Giles of Richmond.  If an officer enters there to bring
the parties to condign they spin him right out."  Then the Whig related
a story about a watchman who brought in a man from Butchertown:  "He
succeeded in bringing him in to the cage after a hard struggle.  The
watchman's clothes were torn to flitters."  In 1859, the police quelled a
riot in "Screamersville", a poor working class area on the outskirts of

---

36
    Whig, May 19, 1854; Dispatch, July 24, 1855.
37
    Christian, Richmond, p. 179; Dispatch, August 8, 1855.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

40

38
town.

The slums helped foster juvenile delinquency.  In 1852 the
Dispatch complained about "young rogues" pilfering and fighting.  Three
years later the residents of the Church Hill section of the city became
annoyed after a group called the "Cash Corner Crowd" robbed and assault-
ed a boy.  The Dispatch described these delinquents as "blowing tin
horns, beating tin pans, throwing stones, singing indecent songs, swear-
ing worse than Turks,and attacking such boys as they may catch on the
high ways."  Mayo specifically instructed the police to be more vigilant
in seeking out these vandals.[39]

Clearly the force needed more men to control crime and fulfill
their other functions.  The council then passed a resolution allowing
the city to accept the service of volunteer watchmen, yet surprisingly
the Whig criticized the move.  One newspaper commented, "such a body of
men would feel themselves altogether free from responsibility and under
no obligation to attend their posts."  While the Whig's reaspning might
seem prudent, the newspaper simply believed that the police had little
influence on crime control as law breaking found its roots in "diversity
of race, feelings and sympathies. . .The social convulsions and domestic
feuds which are everyday recorded, can easily be traced to these
causes."[40]

Evidently the Whig expressed the fellings of many Richmonders

---

38
Dispatch, August 29, 1855, September 17, 1859; Whig, July 25,
1854.
39
Dispatch, February 3, 1852, May 17, 1852, May 17, 1855; Whig,
May 18, 1855.
40
Whig, June 2, 1854.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

41

concerning the police, for the force did not receive a pay increase un-
til February, 1857. The council debate illustrated that many residents
took the police for granted. Councilman Morris opposed a higher pay
scale because the city was too heavily indebted. He stated that an in-
crease in the city debt would cause an increase in taxes and thus a
decrease in population resulting in a further loss of taxable income.
On the other hand, another councilman favored the pay raise because
policemen only earned $530 per year, and the "Police of Richmond. . . .
were as faithful to their trusts and duties as any similar organization."
But Mr. Morris rejoined that other private watchmen received less pay
than the city police and that if all the policemen resigned "there would
be a hundred applicants for their posts."[41]

Perhaps even more significant, the council increased the pay be-
cause of the growing anti-slavery movement. In December, 1857, the
city passed its most restrictive laws against blacks. The ordinance
required slaves to have passes to walk on sidewalks, and to get out of
white peoples' path on the streets. The 1857 code forbade slaves walk-
ing on public grounds and riding carriages without their owner. More-
over the ordinance prohibited blacks from smoking tobacco in public or
carrying a cane. Emory Thomas asserted, "Motivation for these regula-
tions went beyond concern for good order and discipline among Richmond's
chattel population. At the heart of the matter was the lingering fear
of slave insurrection."[42]

---

[41] Whig, February 6, 1857.
[42] Thomas, Confederate State, p. 28; Richmond City, Ordinance,
1857, (Virginia State Library).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

42

In 1859, Council expanded the force from thirty to forty men and the larger force generated favorable comment. A Boston visitor wrote, "It is a very orderly city. With a population of forty thousand. . . . they have only four day policemen. . .During our visit we saw no brawling or drunkeness." When the <u>Richmond Morning News</u>, a short-lived daily paper, criticized the night police, even the <u>Whig</u> quickly defended the force: "We are sure that fewer fires have occurred, and less burglaries have been committed in the past months than we have ever known in the city for the same length of time."[43]

Given such new restrictions, the late 1850's, of course, witnessed an increase in black arrests and this also impelled council to expand and strengthen the force. However, most Negro arrests derived from slavery laws which did not apply to white men. Free blacks, for example, violated the law if they stayed in a city or county without proper registration. The <u>Dispatch</u> noted that the "police are very busy bringing to justice the scores of Negroes in the city who have no right to remain here." Moreover the police hounded blacks on charges such as unlawful assembly, and constantly investigated them for harboring runaways. Typically in August, 1858, about ninety blacks were jailed for holding a Sabbath school without a white person present.[44]

Besides being arrested for slave code violations, a number of

---

[43] <u>Whig</u>, June 3, August 19, 1859; <u>Enquirer</u>, November 19, 1857; "Police", <u>Richmond City Code</u> (Richmond: Ellyson's Steam Presses, 1859), pp. 149-152.

[44] <u>Dispatch</u>, February 8, 1859; <u>Enquirer</u>, February 3, August 26, 1853; Wade, <u>Slavery in the Cities</u>, p. 218; <u>Enquirer</u>, July 19, 1853; <u>Dispatch</u>, September 20, 1853, August 24, 1853.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

43

blacks found themselves before the Hustings Court for stealing.  In 1859, the court records revealed police jailed a total of nine blacks for robbery, but only four for assault.  The Enquirer noted that stealing "is a habit very extensively practised by Negroes."  Even a sympathetic scholar such as Richard Wade concedes that at black meetings sometimes "stolen goods changed hands. . .and petty crime even violence was common." Nonetheless whites before the court equalled the number of Negroes in front of the bar of justice for such serious crimes as murder, assault, and robbery.  Thus the fear of Negro rebellion rather than Negro law breaking caused the press to grow hostile to the black and become less hostile to the police.[45]

Although politics strongly conditioned police matters in the 1840's, the growing abolitionist threat caused the Richmond community to view the police as protectors of their institutions.  No matter how important crime control appeared, the true mission of the force revolved around suppressing the city's Negro population.  Thus fear of social disorder rather than police behavior caused the community to extend support and cooperation to the city police.

-----

[45]
    Enquirer, August 17, 1859; Wade, Slavery in the Cities, p. 88; City of Richmond, Hustings Court Minutes, 1859.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1020

CHAPTER III

THE POLICE AND THE CIVIL WAR, 1860-1865

No city organization experienced as many difficulties as the Richmond police during the Civil War. Crime and disorder rose dramatic-ally; robbery, fighting, gambling, and prostitution grew at such a rate that even the city force bolstered by the military police could not suppress law breaking.

Capable men governed the city. Joseph Mayo, mayor since 1853, continued in that office for the war's duration. Historian Emory Thomas stated. "Despite his seventy-six years, Mayo administered the city well." Council consisted of eighteen men, and Thomas commented, "As a group the members of city council were solid citizens and successful men. . ./who/ gave promise of rising to the challenges that war and being the Confederate capital could bring." Veteran policeman Archibald Wilkinson served as the night watch captain, and four day-policemen patrolled as well.[1]

As the session crisis emerged, Richmond public opinion gradually shifted their support to the Confederacy. In the election of 1860, the city voted for the Constitutional Union party which advocated political union as well as slave protection. Therefore the city refused extreme measures even when emotions were inflamed. Only after city leaders

---

[1] Thomas, Confederate State, p. 19-20.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

45

exhausted every other alternative, did Richmond finally agree to
secession.  Upon Virginia's withdrawal from the Union in April, 1861,
Richmond then became the center of military activities and eventually
the capital of the Confederate States of America.[2]

Richmond's population grew from about 38,000 in 1861 to about
100,000 in less than a year.  Even under the best conditions one would
expect crime to increase, but the influx of soldiers brought disorder
on a level never before seen in the "City on the James."  A woman resi-
dent stated, "Thieving, garroting, and murdering were the nightly
employments of the villians who prowled around the city."  Richmond
historian W. A. Christian commented,"gambling was rife, and night after
night the police would break up faro banks and other gambling dens."
Emory Thomas added, "Drunkeness and rowdiness, too, increased with the
influx of Richmond's defenders.  Fights, knifings, and shootings
alarmed the once quiet city."[3]

The city government fully cooperated with the police in trying to
cope with the disorder.  The council armed the police with revolvers
and muskets, and in December, 1861, expanded the force as eleven men
patrolled the day beats and seventy-two walked the streets at night.
The city legislative body passed a salary increase to encourage vigil-
ance, and ordered a special patrol for the market area in which most
theft occurred.  Finally the city fathers provided a new sturdy

---

[2]
  Thomas, Confederate State, p. 17.
[3]
  Sallie B. Putnam, Richmond During the War:  Four Years of
Personal Observation (New York:  G. W. Carleton and Co., 1867), p. 76;
Thomas, Confederate State, p. 128; Examiner, May-June, 1861; Christian,
Richmond, p.220; Whig, December 30, 1863.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

46

jail.[4]

Nonetheless, law breaking persisted.  Between July and September, 1861, arrests averaged about 200 a month.  The increase in fighting, drunkeness, and rowdyness prompted the city council to pass an ordinance closing the bars at 10:00 p.m. during the week, and all day on Sunday. The Dispatch commented that "drunken soldiers and quarrelling women jammed the court rooms."  The Whig added, "Events of recent occurrence show that our city is infested by a gang of daring ruffians.  The safety of life and property demands that a patrol should be organized without delay, to cooperate with the night watch."  Christian said that "thefts, hold-ups, burglaries, incendiaryism and even murder was of fairly and almost hourly occurrence."[5]

Gambling houses also expanded at alarming proportions.  One observer wrote, "So in Richmond, high and low gambled-some dashing and brilliantly- a few sullenly and doggedly going for gain."  In November and December, 1861, law officers made seven gambling raids, and in December of that year,the police publicly burned the captured gambling paraphernalia.  Besides being illegal in itself, gambling led to numerous fights and occasional murder.[6]

An enormous growth in prostitution embarrassed this community.

---

4
    Illustrated. . .Directory, p. 30; Thomas, Confederate, p. 69: CCM, November 12, 1862, p. 630, July 13, 1863, p. 84.
5
    Dispatch, July 31, 1861; Examiner, May-June, 1861; Dispatch, September 30, 1861; Christian, Richmond, p. 238; Whig, September 14, 1861.
6
    T. C. DeLeon, Four Years in Rebel Capitals:  An Inside View of Life in the Southern Confederacy from Birth to Death (Mobile, Alabama: Gossip Printing Co., 1890), p. 239; Whig, November 11, 25, December 23, 28, 1861; CCM, December 16, 1861, Whig, December 9, 11, 1861.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

47

In The Life of Johnny Reb, Bell Wiley called Richmond, "the true mecca of prostitutes" and asserted that professionally promiscuous women numbered in the hundreds. The lawmen perhaps diligently tried to stop the prostitution, but had little success. On June 6, 1861, the night watch closed Mary Wilson's and Mary Walker's house. After the mayor fined the women, they returned to their business; and on July 20, patrollers again closed them down. Two days later Mayor Mayo fined the women $200 and sent them to jail. Mayo also imprisoned Margaret Lynch because he had fined her so many times that the mayor said, "Apparently financial punishment means nothing to you." Emory Thomas commented, "Despite the best efforts of the military and civil authorities, prostitution flourished in Richmond throughout the Confederate period."[7]

The war contributed to juvenile delinquency as well since the presence of unruly soldiers implicitly encouraged fighting and disorder among the city's youth. Vandalism, larceny, and fighting grew, and in September, 1861, President Jefferson Davis himself unsuccessfully tried to break up a fight between two rival juvenile gangs.[8]

Additionally the police assumed new responsibilities. Council added sedition as a crime and ordered citizens to report to the police

---

[7] Examiner, June 8, 11, 1861, January 25, 1862; Whig, July 22, 1861; Thomas, Confederate State, p. 39; Bob Waite, "A Kinsey Report on the Civil War" (unpublished article, 1965), p. 7; Bell I. Wiley, The Life of Johnny Reb: The Common Soldiers of the Confederacy (New York: The Bobbs-Merrill Co., 1943), p. 53.

[8] Varina H. Davis, Jefferson Davis, Ex-President of the Confederate States of America: A Memoir By His Wife. II (New York: Belford, 1890), 198-199; Whig, September 10, 18, 1861.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201      Doc: 22-3      Filed: 09/04/2024      Pg: 69 of 295

persons holding disloyal views.  In May, 1861, the Dispatch reported that peace officers arrested one John Frost on sedition charges, and a few months later they jailed a man named Raun for stating that he supported Lincoln.  Moreover the force patrolled for deserters, and conscripted free Negroes as laborers for work on Richmond fortifications.[9]

The North also used their city police to arrest deserters, and the New York city government used lawmen to suppress disloyalty.  However, some residents protested as the New York *Times* charged that the police had restricted free speech and that they had given credence to informers.  No evidence existed to explain the reason for Richmond's failure to protest the city's violation of freedom of speech but probably the homogeneity of the population and the widespread support of the Confederacy caused the citizens to sacrifice a degree of civil liberty.[10]

Nonetheless, the Richmond police did receive some criticism.  In September, 1861, one soldier, William McDonough, had three other soldiers arrested for stealing his watch.  A group of the three soldiers' friends attacked McDonough and exchanged shots.  Upon the mayor's request, the governor ordered out the militia and restored calm.  But a number of citizens claimed that the police could have avoided the disturbance, if the law officers had come to the scene when some residents

---

[9]
   *CCM*, April 22, 1861, p. 216; *Dispatch*, May 7, 8, 10, 1861; *Whig*, August 2, 1861; *CCM*, July 8, 1861.
[10]
      Richardson, *The New York Police*, p. 124-127; Lane, *Policing The City*, p. 126.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

49

had asked them. The mayor investigated the incident and Captain
Wilkinson said he did send men to investigate the fracas. Wilkinson
admitted that a citizen had ordered him to call out all the police, but
he replied that he did not have authority over the day force. The
mayor then informed the night watch that in case of a serious matter,
they could order additional policemen to the scene. Another complaint
against the force concerned the police closing of the First Division
Station House during the day and thus preventing citizens from jailing
felons they, the citizens, had arrested. Consequently, if a resident
caught a law breaker during the day, he would have to free him because
no place existed to detain him.[11]

Exasperated with the surge in crime, prostitution, and disorder,
President Davis declared martial law in Richmond in March, 1862, and
appointed General John H. Winder as head of the military police. City
leaders welcomed the army's assistance and the council fully endorsed
the action. One councilman who had served on the police committed
stated he himself had planned to suggest that the president institute
martial law. The police still functioned independently, and the civil
courts operated, but it was hoped that the additional manpower might re-
store order.[12]

Winder aggressively tried to bring law and order. The General
first arrested twenty-eight men and eight women for disloyalty. Next he
forbade liquor sales in the city and required all citizens to surrender

---

[11]
Whig, September 14, 16, 1861; Examiner, October 25, 1862.
[12]
Christian, Richmond, p. 229; Thomas, Confederate State of Rich-
mond, p. 81.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

50

their firearms.  Additionally he attempted to enforce laws against
people entering or leaving the city without a pass.[13]

   The city press generally approved of Winder's administration of
martial law.  The Dispatch commented, "Men, women and children now sleep
in security. . .The streets are morning, noon, and night being patrolled
by guards, who arrest all loiterers, vagabonds and suspicious looking
characters. . .and the consequences are peace, security, respect for
life and property."  The Examiner stated, "We sincerely hope that the
law will continue to control the thousand and one drinking saloons in
Richmond."[14]

   Winder organized a detective platoon to investigate crime, but
these special agents received stinging criticism.  Many Richmonders
called the detectives "Plug Uglies" because of their condescending atti-
tude toward the populace.  One citizen complained, "They crook a finger
and the best carriages in the street pause, turn around, and are subject
to their will.  They loll and roll in glory."  Public skepticism of the
Winder police appeared well founded, for in October, 1862, the General
dismissed all but one of his "detectives" for malfeasance and bribery.
The Examiner commented that, "the public can congratulate themselves on
their relief from imported rowdy rule," and the newspaper issued a call
for a thorough reorganization of the city police.  The Examiner

---

   13
      Dispatch, April 3, 1862; James D. Richardson, Ed., A Compilation
of The Messages and Papers of the Confederacy Including the Diplomatic
Correspondence, 1861-1865 (Nashville:  United States Printing Co., 1905),
2 Vols. p.
   14
      Dispatch, April 4, 1862; Examiner, September 17, 1862.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 72 of 295

51

continued: "The police givernment of this city seems, of late, to have entirely gone to pieces," and recommended "a district police organization, the men to be governed by commissioners, to be disciplined after a military fashion, and to be uniformed." To replace the detectives, Winder announced that armed soldiers would accompany each of the city's night watchmen.[15]

Crime, however, continued unabated with robbery the most troublesome offense. The Hustings Court heard eighty-seven robbery cases in 1862, and these thefts became so numerous that the now usually friendly council admonished the police to devise a plan to curtail such wrongdoing. The robbery of General Winder's home in 1863 demonstrated the pervasiveness of burglary. Besides robbery, the city newspapers noted the rise in gambling, and one policeman stated that gamblers had friends "from the slums to the pulpit." However the Hustings Court only heard seven gambling cases. Thus gaming tables proved too widespread and mobile for even the military police to contain.[16]

In addition, difficulties with the army developed. Soldiers crowded the bars, gambled, and fought. The Examiner blamed the troopers from outside Virginia: "The exercise of crime in this city is not due to the demoralization of our citizens but to the idlers of foreigners. . .of the one hundred and seventy-six prisoners now confined in the city jail

---

[15] J. B. Jones, A Rebel War Clerk's Diary at the Confederate States Capital; Howard Swiggert ed. 2 Vols. (New York: Old Hickory Bookshop, 1935, I, 91, 141, 309, 120, 123; Jones, A Rebel. . .Diary, I, 178; Enquirer, October 31, 1862; Dispatch, October 31, 1862; Examiner, October 30, 1862.

[16] Illustrated. . .Directory, p. 19; CCM, January 18, 1864; Christian, Richmond, pp. 244, 254-255; Whig, November 21, 1863; August 1, 1863; Hustings Court, Minutes, 1862.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

52

. . .only six of them are Virginians."[17]

Moreover, the military provided ample customers for city prosti-
tutes.  By late 1862, brothels so flourished that Mayo despaired of
ever really irradicating them; he wished only to contain them.  In an
editorial, the Examiner lamented the large number of "painted ladies" on
city streets, and criticized the mayor:  "If the Mayor of Richmond
lacks any incentive to stimulate. . .breaking up the resorts of ill-fame
in the city, let him visit military hospitals,where sick and disabled
soldiers are received for treatment. . .wrecked upon the treacherous
shoals of vice and passion which encounters the soldier at the corner of
every street, lane, and alley of the city."  A few days later, the same
paper asked the police to close a brothel and move it to "the lanes and
byways of the city, where surrounding associations will harmonize with
the corruption within it.[18]

Prostitutes became security risks as well as criminal problems
since many of them served as spies for the Union.  Some prostitutes
opposed slavery for economic reasons because slave owners forced slave
women to provide free sex.  Therefore the white prostitutes reasoned
that an end to slavery would put these Negro women into the free labor
market, and allow them to charge for illicit sexual relations.  These
suspected union spies often accompanied Confederate soldiers in Richmond
which, of course, irritated Mayor Mayo and the police.[19]

---

17
    Examiner, December 11, 1862.
18
    Whig, August 15, 1864; Examiner, September 4, 1862; December 5,
1862; April 27, 1863; Enquirer, August 22, 1864.
19
    Bob Waite, "Kinsey Report," p. 7.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

53

In all fairness, Winder faced an awesome task.  While the military police had its weaknesses, it still kept crime within reasonable bounds.  Even the usually critical Examiner stated in November, 1862 that, "the extinguisher put upon garroters, footpads, and house breakers. . .by the exercise of additional and more stringent police regulations. . .has demonstrated the efficacy of the laws."[20]

Besides individual acts of law breaking, the city experienced mob disorder.  The War's economic pressures caused the Richmond "Bread Riot" to erupt in April, 1863.  Because political leaders had sensed that inflation had generated unrest, in February, 1863, the Virginia general assembly authorized the city council to arm the police and take whatever steps necessary to "suppress riots and unlawful assemblies."  By the spring of 1863, Richmond had indeed experienced inflation and acute food shortages.  On the morning of April 2, a number of city women and children marched through town protesting the cost of food.  On their march they broke merchants windows and stole food supplies as well as luxury items.  Shortly thereafter the crowd marched to the capitol to demonstrate before President Davis.  At the Confederate White House the President appealed to the mob to disperse.  He threatened to order the public guard to fire on the crowd.  After a few tense minutes the unruly group broke and ran.[21]

---

20
    Examiner, November 21, 1862.
21
    Virginia General Assembly, Acts of the General Assembly of the State of Virginia, Passed at the Adjourned Session, 1863 in the Eighty-Seventh Year of the Commonwealth (Richmond, 1863), Chapter 74; Christian, Richmond, p. 240-241; Douglas Tice, "Bread or Blood! The Richmond Bread Riot," Civil War Times Illustrated (February, 1974), pp. 12-19.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

54

On April 3, another crowd gathered, but the militia placed a cannon in the mob's path which evidently discouraged continuation of violence. Less than a week later, however, the mayor feared a new round of disorder. He requested troops, and this show of force avoided further demonstrations.[22]

The disturbances developed totally from economic conditions. The *Dispatch* noted that the cost of feeding a family rose from $6.55 per month in 1860 to $68.25 per month in 1863. One observer wrote, "We are on the eve of starvation and unless the wages are opened up shortly, we will be laid low." Another official referred to economic conditions finding "a manifest uneasiness in the public mind different from any-thing I have noticed heretofore." No evidence existed to indicate that the riots developed from a Union conspiracy.[23]

Richmond politicians indignantly criticized the rioters. Council-man David Saunders called the riot "disgraceful." The city council adopted resolutions which asserted the riot occurred "ostensibly for want of provisions, but in reality instigated by devilish and selfish motives." Assistant Adjutant General John Withers appealed to the news-papers not to refer to the disturbance. The city press cooperated;

---

[22] Judith McGuire, *Diary of a Southern Refugee During the War* (New York: E. J. Hale and Son, 1867), p. 203; Mary S. Estill. ed. "The Diary of Confederate Congressmen, 1862-1863." *Southwestern Historical Quarterly*, XXXVII (April, 1935): 270-301; XXXIX (July, 1935), 33-35.
[23] *Dispatch*, January 29, 1963; Tice, "Bread or Blood!", pp. 12-19; Edward Young ed., *Inside the Confederate Government. The Diary of Robert Barlish Hill Kean, Head of the Bureau of War.* (New York: Oxford University Press, 1957), p. 45.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

55

However, the Whig argued that for those suffering "there is an appeal to the law and an appeal to the people of the South.  Violence. . .will not be tolerated."[24]

Despite the council's criticism, it realized that remedies were needed to avoid future riots.  On April, the city legislative body appropriated twenty thousand dollars for free-food stations in the city, and a committee gave tickets to the poor to exchange at the food outlets.  Thomas believed that "this expedient removed any cause for further disturbance."[25]

Anti-semitism also occurred in the war years.  The Southern Punch, a satirical magazine, attacked Jews for charging high prices on merchandise, and in September, 1863, three boys threw rocks at a Richmond synagogue window apparently protesting alleged profiteering by Jewish merchants.  Scholar Douglas Tice claimed "the middlemen merchants known to the locals as speculators and extortioners unflinchingly doubled and tripled their own cost sale."  Many of these merchants were Jewish and consequently some of the community felt resentment against them.[26]

In the midst of this turmoil, the police still managed to enforce departmental discipline.  In January, 1864, the mayor suspended officer John Perrin for using unnecessary force in arresting two white citizens.

---

24
   CCM, April 2, 1863, p. 311; Whig, April 4, 1863; Thomas, Confederate State, pp. 121-122.
25
   CCM, April 9, 1863; Whig, April 9, 1863; Thomas, Confederate State, p. 122.
26
   Tice, "Bread or Blood!," p. 12; Dispatch, January 29, 1863; Examiner, September 19, 1863; Southern Punch, October 10, 1863.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

56

In the same year, Mayo removed Captain John Pleasants from the night watch for misconduct. Many citizens disagreed with Pleasants' dismissal and petitioned for his re-instatement as well as an ordinance providing for the election of the night watch captain. Mayor Mayo flatly rejected the petition, and his actions seemed to be motivated more by pride than by sound judgment.[27]

In spite of the rise in crime, gambling, and prostitution, the police remained free of corruption charges. Winder had dismissed his detectives for misconduct, and in New York and in Boston, a number of citizens and officials alleged profiteering and misconduct against the police during the war. The populace made no such charges against the Richmond police and clearly the force exhibited unusual integrity and devotion to duty in the most challenging circumstances.[28]

Because crime occupied so much of the police's time, the city's black community did not receive the usually harsh attention they had received in other years. Hustings Court records during the Civil War showed that police arrested whites far more than blacks. In 1862, twenty-five blacks appeared in court on robbery charges while sixty-seven whites appeared for the same offense. In theory, the police strictly controlled the Negroes; in practice they did not. In 1863, for example, the police committee drew up ordinances to prevent free Negroes from coming to Richmond for any reason, but they travelled to the city

---

27
     CCM, January 11, 1864, p. 135, January 13, 1864, pp. 178-179, July 11, 1864, p. 185.
28
     Richardson, New York Police, p. 126; Lane, Policing the City, pp. 122-123.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

57

despite the law.[29]

Moreover, the police frequently protected Negroes' rights.  In August, 1862, peace officers arrested a white man for beating a Negro man, and in February and March of that year, the police jailed a number of whites on assault charges against blacks.  In one case, the Hustings Court ordered that a white man receive twenty-five lashes for assaulting a Negro.[30]

Although the Union essentially fought the war over the slavery issue, the city's blacks rendered important service to the Confederacy by working in the southern mills and industries.  In 1864, white graveyard workers went on strike and city officials hired blacks.  Thoroughly embarrassed, the white laborers eventually returned to work.  Thus in the War's last years, the blacks remained relatively law abiding in the face of the South's defeat and in light of the unfair treatment that they had received.[31]

Although in the War years, black crime did not inordinately rise in Richmond, a number of incidents caused the white population to fear Negro residents.  In May, 1861, a slave woman attempted to murder a white child entrusted to her care, and in September, 1863, another female slave killed her master and his family.  Thomas added that "Richmond's captive population would become manifestly restive during

---

[29]  City of Richmond, Hustings Court Minutes, 1862-1864; CCM, June 27, 1863; Thomas, Confederate State, pp. 156-157.
[30]  City of Richmond, Hustings Court Minutes, 1862.
[31]  Thomas, Confederate State, pp. 156-157; Richmond Times, May 2, 9, 1865.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1034

58

the Confederate period." But restiveness did not turn into rebellion.[32]

On the war front, Grant's armies captured Richmond in April, 1865. As the Confederate military evacuated the city, many citizens looted and vandalized local businesses. Upon entering the city, Union authorities established martial law, but a general breakdown of law and order transpired. Although robbery and assault frequently occurred, even a Richmond partisan such as writer A. W. Christian admitted that the Federal troops satisfactorily kept order. The Richmond *Times* stated on May 18, 1865, that because of the efforts of the Federal mounted police "greater security was felt by parties who were going about either on business or for pleasure."[33]

Throughout 1865, Richmond gradually rebuilt and reestablished her own police force. In June, Federal authorities permitted Mayor Mayo to form a police organization, and in December provisional Mayor David Saunders established a unified day and night force.[34]

The new police faced an extremely delicate problem as the populace was unaccustomed to the large number of free blacks in the city. In addition Federal troops, stationed near Richmond, could intervene on behalf of the Negro if the police treated blacks unfairly. Until 1865, Negro subjugation had served as the main reason for the existence of the Richmond police, and the prospect of treating blacks impartially created

---

[32] *Examiner*, May 25, 1861, September 10, 1863; Thomas, *Confederate State*, p. 28.

[33] Christian, *Richmond*, pp. 261, 266-269; Richmond *Times*, May 18,

[34] Christian, *Richmond*, pp. 271-272; *Illustrated. . .Directory*, p. 21.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

59

an unparalleled quandry.  While the community might politely, yet
resentfully, go its way, the police force had to deal with the blacks
in the sensitive public arena——an interaction which would test the tact
of even the most skillful men.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHAPTER IV

"THE LOIL PERLICE", 1865–1870.

The Reconstruction era brought continued controversy and tumult
for the Richmond police. Between 1865 and 1870 the police department
experienced difficulty both with Mayor Mayo and with Federal officials
which resulted in a series of bloody disorders lasting over a week.
During the disorders, most of the city Negroes supported the Republi-
cans, and consequently race relations deteriorated in the years follow-
ing the Civil War.

To Richmonders in 1866, the police symbolized pride and a degree
of self-determination. Her armies defeated, her economy destroyed, and
her society disrupted, city residents looked on the police force as one
institution which remained unchanged and over which they had control.
Public opinion rejoiced when General John Turner, military commander of
Richmond, informed provisional Mayor David Saunders that the civil
government could assume control of the police in December, 1865. The
Dispatch interpreted this action as "a matter of congratulations to our
citizens that we at last have a police force. . ."[1]

The community actively supported the police. The Whig requested
the courts to sustain the police rather than to "halt, hesitate,

---

[1]
    CCM, October 25, 1865, p. 211; Turner to Saunders, November 26,
1865, Record Group 393: Military Department of Virginia. Volume 72;
Dispatch, December 28, 1865; Richmond Times, November 30, 1865.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

61

higgle, and finally acquit, or inflict inadequate punishment." In
addition, the newspaper constantly urged raising the pay of privates
from their meager $2 per day. When the city discovered that most peace
officers could not afford to pay a tailor $25 for a uniform, many
Richmond women volunteered to make uniforms.[2]

Although the citizens gave support to the police, the public still
demanded a superior force. The Richmond *Times* urged the council to
appoint "numerous, intelligent, sober, honest, brave, moral, and vigi-
lant" peace officers whom the city would select without "fear, favor, or
affection." The council fulfilled the *Times* request when the city
legislative body unanimously elected John H. Claiborne to the post of
police chief. The *Times* described Claiborne as a man of the "highest
social standing, eminently efficient," and "celebrated in courage and
firmness." The council felt satisfied that in Claiborne and his 72
subordinates Richmond had "as good officers as any city in the Union."
One scholar observed that the shortage of jobs and scarcity of money had
led many citizens of "character, education, and intelligence to join the
force."[3]

The city press generally approved of police actions. The *Whig*
offered a number of sagacious comments in an editorial entitled "How to
Repress Crime and Vice in this City." According to the newspaper,

_____

[2] *Whig*, December 12, 1865, January 5, 6, 1866.

[3] Richmond *Times*, November 30, 1865; *CCM*, December 8, 1865, p. 420;
Richmond *Times*, December 9, 14, 21, 1865; L. Winston Smith, "Presidential
Reconstruction in Richmond, 1865-1867 (Unpublished Ph.D. Dissertation,
University of Virginia), p. 200.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

62

criminal activity had occurred in Richmond due to the "influx of various people, the war, and both armies' soldiers," and not police inefficiency. The Whig believed that the force emerged as the key to controlling disorder but, "The chief difficulty was in raising an adequate revenue. Thus far they /the police/ have acted admirably. They have exhibited vigilance, courage, and fidelity." But to stay effective the Whig asserted that the police needed citizen support, and furthermore the newspaper recommended that the courts provide quick trials and appropriate sentences.[4]

The Dispatch echoed the Whig. On February 1, 1866, the paper stated "The city still remains orderly, and police items are very scarce." The following day the Dispatch commented, "The city is now quieter and in better order than we recollect to have seen it for many a long day. . .This is gratifying to our citizens and speaks well of our police. . . ." In May, the newspaper said, "So great has been the confidence inspired by the restless energy of the Chief, and zeal and integrity of his officers. . . ."[5]

Nevertheless, the city press refused to overlook police shortcomings. The Examiner blamed the force for allowing gambling in the city and in an editorial pointed out that it was "not the first time, nor the second, we have reminded the Chief of Police of his duty and urged him to the discharge of his obligations of his oath." A month

---

[4] Whig, January 6, 1866.
[5] Dispatch, February 1, 2, May 9, 1866.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1039

63

later the Examiner noted that Chief Claiborne asked the newspaper to
"keep quiet for a little while," but still games of chance remained in
the city.  When Claiborne finally did raid a gambling hall, he merely
issued a warning to the proprietor.  The Examiner derided the action,
and described the police as "seedy and shuffling."  The Whig complained
that lawmen who went "in couples" left every second beat unguarded.
The journal also noted that patrolmen who smoked cigars and lounged
against walls failed to serve as deterrents to law breakers.[6]

Claiborne defended his men by reminding the critics that the
city seemed "overrun by all classes of offenders" and his men had
proved "vigilant in detecting and arresting them."  The chief stated
that citizens should not "needlessly complain and grumble" because the
new men surpassed the old force's efficiency.  According to Claiborne,
the real problem did not lie in their "sense of duty, honor, and
responsibility," but that the majority were "novices" at police work.[7]

In retrospect one cannot fault Claiborne's record.  The force
totaled 1,246 arrests between December, 1865, and March, 1866, which
compared favorably to the number of arrests that Federal authorities
had made.  L. W. Smith added in his detailed study of Richmond in
Reconstruction, "Generally. . .comment about the police was more favor-
able than unfavorable."[8]

─────────────
[6]
    Examiner, February 11, 1866; Whig, January 13, 20, 22, 24, 27,
1866.
[7]
    CCM, January 29, 1866, p. 313; Whig, February 1, 3, 1866.
[8]
    L. W. Smith, "Presidential Reconstruction in Richmond, 1865-1867",
p. 200, p. 105 of footnote volume; CCM, April 6, 1866, p. 42.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

64

But despite the quality of the Richmond law officers, the police
still enforced laws prejudicial to the Negro, and therefore Federal
authorities mistrusted the city police department.  As in other southern
states, Virginia's newly elected state legislature seemed bent on virtu-
ally re-establishing slavery.  In January, 1866, the Virginia assembly
passed a vagrancy law which established a type of compulsory employment
for those labeled vagrants.  In the legislature's second session, the
assembly rejected the Fourteenth Amendment which gave the Negro the
right to vote.  Although the state's leaders claimed they accepted the
Negroes' freedom before the law, Federal officials such as General
Alfred N. Terry, military commander of Virginia (1866-67) protested the
"large numbers" of freedmen being jailed "on frivolous or groundless
charges."  Indeed police records showed that between December, 1865, and
March, 1866, blacks outnumbered whites arrested, and apprehensions would
have totaled even more except that General Terry declared the vagrancy
law null and void in late January, 1866.[9]

Because of this unfair treatment toward the city's Negroes, Union
leaders warily observed the occupant of the mayor's office.  The
Federals apparently reasoned that a politically moderate mayor might
curb police excesses.  Consequently in July, 1865, they pressured newly
elected Mayor N. A. Sturdavant "to decline to serve."  However Union
authorities allowed David Saunders to become mayor and he served from

---

[9]
    Terry to Turner, January 10, 1866, Record Group 393:  Military
Department of Virginia, Volume 14; Virginius Dabney, Virginia:  The New
Dominion (New York:  Doubleday, 1971), pp. 360-363; Richard Morton, The
Negro in Virginia Politics, 1865-1902 (Charlottsville:  University of
Virginia Press, 1919),pp. 18-21; Smith, "Presidential Reconstruction in
Richmond", p. 106 of footnote volume.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

65

July, 1865, to April, 1866.  In April, Union officials accepted the election of former Mayor Joseph Mayo as the city's highest office holder.[10]

Although the military threatened city officials with intervention if blacks received unfair treatment, the city's 23,110 Negroes found themselves frequently arrested.  Official statistics lacked complete-ness, but from newspaper accounts it appeared that city lawmen jailed more blacks than whites between March, 1866, and March, 1867.  Because or the large number of seemingly unjust arrests, occasionally Negroes prevented policemen from jailing blacks by attacking the arresting patrolman.[11]

Most black offenses consisted of petty larceny such as stealing sheets or shoes.  In addition city patrollers jailed Negroes for taking pieces of fruit or even string, but the police rarely arrested whites for such crimes.  Pro-black historian A. A. Taylor conceded that "Negroes on a smaller scale,of course, committed some of the graver offenses of theft."  However, serious wrong-doing existed too, as shootings, assaults, and infanticide, frequently occurred.  Moreover, in January, 1867, police and militia quelled a riot which resulted from a policeman wounding three blacks while suppressing a disorder.[12]

_____

10
    Goodrich, "The Mayors," p. 25.
11
    Christian, Richmond, p. 270; A. A. Taylor, The Negro in the Reconstruction of Virginia (Washington, D. C., The Association for the Study of Negro Life and History, 1926), pp. 47-48; Enquirer, November 23, 1866; May 10, September 5, October 2, 1867; December 23, 1868.
12
    Dispatch, April 14, March 5, 9, 1866; January 28, 1867; A. A. Taylor, The Negro in the Reconstruction of Virginia, p. 47-49.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

66

Economic conditions also explained the large number of black arrests. Most of Richmond's Negroes had no trade or skill and, therefore, worked for low wages. Because of the destruction of the war, many proprietors frequently could not pay the Negroes that did work. Nineteenth century writer George Rose described the city's Negro situation: "Squalor and rags are their almost universal condition." Historian A. A. Taylor comments, "Urban Negroes. . .commonly lived in a segregated section of cities in poor, squalid-looking structures.......
Often laborers in the cities were restricted to the use of coarser food than they had eaten as slaves." Even the inflexibly anti-Negro Enquirer stated that blacks had "insufficient clothing and unwholesome food, /and/ unhealthy habitations."[13]

Critics on the whole ignored the blacks' plight and blamed Negro irresponsibility for the large number of arrests. Christian stated that "many blacks did not know how to use their freedom, taking it for license to commit crime. . ." The Enquirer added "the disgraceful riots and murders. . .are making our city hell. . .we are daily compelled to chronicle some new outrage against law and order...."[14]

Federal Circuit Court Judge John Underwood reacted strongly to Richmond's excesses against blacks. He assiduously defended Negro constitutional rights and courageously dismissed cases against blacks because of legal errors. Unfortunately he responded to Negro mistreatment by exaggerated emotional statements, and he continually castigated

---

[13] Taylor, The Negro in the Reconstruction of Virginia, pp. 16, 35, 38; George Rose, The Great Country or Impressions of America (London: n.p., 1868), p. 150; Enquirer, November 22, 1867.
[14] Christian, Richmond, p. 279; Enquirer, July 7, 1867.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 88 of 295

67

Richmond as a city where "the slave trade so long held high carnival, where the press has the lowest depth of profligacy, where licentiousness has ruled until probably a majority of births were illegitimate.."[15]

Scholar A. A. Taylor also defended the Negroes regarding their crime problem.  Commenting on the large number of black arrests, he said, "The records however do not show any crime wave. . .In most cases. . . . these Negroes were not guilty of serious infractions of the law."  As for the frequent disorder and drunkeness, Taylor said, "It requires time to develop self-restraint."  Concerning the large amount of stealing and petty larceny, he stated, "These freedmen had to eat and had to have something to wear."[16]

Besides the dire economic and social milieu, police hostility also contributed to the number of blacks jailed.  The nature of the arrests and the overwhelming number of Negroes arrested indicated animosity on the police's part.  Unfortunately, Negroes did not edit their own newspaper nor write books to document cases of police misconduct.  In short, both the hostility of the force and the behavior of the blacks generated friction between the Negroes and the police.[17]

Although the city police showed animosity toward the Negro accused of crimes, the force acted impartially in fulfilling its other municipal duties.  The peace officers rescued victims of fires regardless of color.  When a cholera epidemic broke out in Richmond in August, 1866, the

---

[15] Christian, Richmond, pp. 282-297.

[16] A. A. Taylor, The Negro in the Reconstruction of Virginia, pp. 47-48.

[17] Ibid., p. 49.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

68

council delegated the police to prevent "the disposal of all material which may be carried into the river." All observers agreed that the police enforced the sanitation laws equally for both races.[18]

Despite the cooperation between the police and the city on the cholera problem, internal dissension developed between Mayor Mayo and Chief Claiborne. In March, 1866, the council amended the city charter to allow the mayor to hire and fire police sergeants and privates. In August, 1866, Claiborne vigorously objected to the mayor's order that city law officers living outside Richmond move to the city by August 10 or face dismissal. The Whig urged the council to reinstate any officer dismissed because of the "totally inadequate pay," the difficulty of renting in the city, and the fact that living "a few yards" outside the city could hardly affect their behavior.[19]

The Dispatch used the dispute as an opportunity to review the entire police situation. The newspaper claimed that Mayo's ultimatum "seems highly unjust." Moreover the newspaper asserted that many policemen could not afford houses in the city. The home he could afford "is at this time especially in demand by Negroes. A party of eight or ten Negroes can club together and pay the rent. . .but policemen cannot do that." Also the Dispatch urged that council decide on ultimate authority over the force: the mayor or the chief. The newspaper supported Claiborne who "has certainly shown himself worthy of our trust. . .and if he is not hampered. . .the peace of the city will, if possible, be

---

[18] Dispatch, January 1, February 21, September 20, 1866, February 12, 1867; CCM, February 11, 1867, p. 55; CCM, November 2, 1866, p. 2
[19] Whig, August 9, 1866.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

69

preserved."[20]

By the fall of 1866, Claiborne evidently decided to challenge the mayor's power to hire and fire law officers. The chief petitioned council to assign that function to a "police committee", whose members, drawn from each ward, could ascertain complete information on the qualifications of prospective patrolmen. The committee, in turn, would act "under the recommendation of the chief." On November 12, 1866, Council determined that the mayor, alone, had the right to dismiss officers. Claiborne viewed the question of the creation of a police committee as a "vote of confidence" and when the council rejected his plan, the chief resigned.[21]

The press lamented Claiborne's resignation. When rumors first appeared of the chief's intention to leave office, the Whig urged the "whole city" to rise up and "forbid it." After Claiborne's announcement, the Dispatch characterized him as "a strictly faithful, conscientious, and consistent public officer. . .it would be hard to fill his place." By early February, the matter seemed closed.[22]

However, in mid-February, Claiborne responded in the newspaper to statements attributed to Mayor Mayo concerning the former chief. Claiborne explained in the Whig that his major reason for resigning was the appointive "power placed in the hands of the mayor." He considered this situation "prejudicial in the extreme to the force's discipline and

---

20
  Dispatch, August 9, 1866.
21
  CCM, October 8, 1866, p. 343, November 12, 1866, p. 16.
22
  Whig, February 2, 1867; Dispatch, February 4, 1867.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

70

to the interests of the city." Claiborne asserted as "utterly without foundation" Mayo's contention that the mayor had only "made appointments" recommended by the ex-chief. Mayo did not respond to the charges publicly. Claiborne and Mayo, then, disagreed on ultimate authority to control the force. In sum, Claiborne's tenure as police chief ranked as one of the least effective in the city's history. His crime control record proved unexceptional and his treatment of blacks caused censure by the Federal authorities. While he did face complex problems, his approach lacked discretion and tact and he needlessly provoked a confrontation with the mayor over the administration of the police force.[23]

Although one can fault Claiborne's handling of the control of the department, the question of new methods of police administration occurred throughout the United States. During the 1850's, police boards directed many city police departments such as in New York, Cincinnati, and New Orleans. But the boards failed in achieving efficiency and eliminating corruption, and in the 1860's many state legislatures controlled city police forces. In A Short History of American Law Enforcement, the authors concluded, ". . .the system of multiple control soon proved faulty. The boards, whether appointed or elected were partisan in nature, meaning that they still reflected the views of the party in power." Claiborne's demand for a police committee was unwarranted. The Richmond police had not suffered from corruption, and the force performed satisfactorily. Moreover, the usually critical Richmond press issued no

---

[23]
    Whig, February 16, 18, 19, 1867, March 2, 1867; CCM, February 18, 1867, p. 57.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 92 of 295

71

demands for any administrative changes.  Claiborne's dispute with Mayo concerned personal competition for power, rather than a desire for better efficiency.[24]

John Poe succeeded Claiborne as police chief in February, 1867. Poe attained the position against formidable competition as the other applicants included General Francis H. Smith, superintendent of Virginia Military Institute, Colonel Briscoe G. Baldwin, and Colonel Walter Harrison.  Although the men possessed military and administrative experience, the council chose Poe because he presently was serving on the force and the city fathers felt he knew and understood Richmond's problems better than an outsider.  The Dispatch considered his choice a "favorable one", and the Whig stated that he would have "little trouble" with the police since he was "intelligent and genteel."[25]

Poe spent much of his first year dealing with city council.  In April, 1867, a number of citizens petitioned the council to pay the policemen adequate fees when they aided in returning stolen goods, and Poe established a satisfactory fee scale.  Although the new chief managed to obtain a pay increase for the police, the council rejected a plea for additional sergeants.  However the city legislature did create detective positions and Poe had responsibility for supervising their

---

[24] Bopp and Schultz, A Short History of American Law Enforcement, pp. 42-43.

[25] CCM, February 18, 1867, p. 67; Dispatch, February 19, 1867; Whig, February 16, 18, 1867.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1048

72

duties.  Finally in December, 1867, Poe cooperated with council in an investigation of the police department concerning a few patrolmen who had submitted "illegal bills" to the city.  The inquiry found two officers guilty of fraud, and the city dismissed them.[26]

While Richmond reorganized its city government, reconstruction politics dominated national and state government.  In March, 1867, Congress instituted the Reconstruction Acts which authorized the military to organize biracial state constitutional conventions to ratify the Fourteenth Amendment.  At Virginia's convention in December, 1867, the radical republicans wrote the voting laws to disenfranchise virtually all state and local office holders.  In keeping with these provisions, General Schefield removed Mayor Mayo in April, 1868, and appointed George Chahoon as mayor.[27]

Few men had served the city as well as Joseph Mayo.  His tact and skill through Civil War and post war years made him one of the outstanding urban leaders in the nation's history.  Mayo always befriended the police department and his supervision largely explained their freedom from corruption.  The city press naturally praised Mayo.  The _Whig_ called him a man who had "faithfully. . .performed the duties of mayor," and few Richmonders "will not regret that another is to fill his place." The _Dispatch_ added, "He carries with him the good wishes that always

---

[26] _CCM_, April 22, 1867, p. 108; November 11, 1867, p. 26; August 12, 1867, p. 146; April 20, 1868, p. 255.

[27] Christian, _Richmond_, p. 300; Dabney, _Virginia_, p. 361; Morton, _The Negro in Virginia Politics_, p. 20; Jack Maddes. _The Virginia Conservatives, 1867-1869: A Study In Reconstruction Politics_ (Chapel Hill: University of North Carolina Press, 1970), p. 45.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

73

attend a faithful servant of the people."[28]

Newly appointed Mayor George Chahoon, 28, was born in New York but shortly moved to Virginia.  When the War started, he went North and found employment in the Treasury Department.  He moved to Norfolk in 1864 where he practiced law, and a year later, he moved to Elizabeth City County and gained election as Commonwealth's Attorney.  He came to Richmond in 1866 and was appointed United States Commissioner in June 1867.[29]

In June, 1868, Chahoon embarked on a purge of "disloyal" city employees, as he removed city policemen for "military necessity."  The new mayor's action prompted a council investigation.  Poe testified that political considerations motivated the dismissals, and he demanded that the council re-instate the men, or at least provide them with another municipal job.  However, the council refused to discuss the matter; apparently they feared invoking the military's displeasure.[30]

The city newspapers attacked Chahoon for replacing efficient men to obtain a "loil perlice."  The Examiner stated, "If the present force shall be disturbed either as regards the chief or members /and/. . . if the commanding general refuses to reinstate the removed policemen. . .he will act in direct opposition to the wishes of our entire population."  The Dispatch claimed that Mayor Chahoon removed the men for political

---

[28] Whig, May 5, 1868; Dispatch, May 5, 1868.

[29] Whig, Dispatch, May 5, 1968.

[30] Enquirer, April 20, 1868; CCM, June 8, 1868, p. 271; CCM, July 7, 1868, p. 292; Examiner, June 11, 1868.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1050

74

reasons and that most of "these men are known to us personally as efficient officers, against whom no objection can be raised." In July, the Examiner asserted that the "little radical" (Chahoon) had dismissed "ten of the best and most efficient members of the police force. In their place he had substituted a lot of scalawags and other unknown celebrities. . .the caprice of one. . .has more weight than the urgent voices of our most wealthy and prominent citizens."[31]

Cahoon, equally direct, stated that the men displayed avowed sympathy with the secessionist cause, and therefore violated the new constitution. In addition, these policemen "were old" and their dismissal would not imperil personal or property safety.[32]

Throughout the summer of 1868, the newspapers continued their attack on Chahoon. The Dispatch, for example, argued that some "of Mayor Chahoon's appointees are disgracing themselves and the force, as might have been expected." The paper stated that Chahoon himself had suspended one captain for laying drunk in a gutter, and he had fined another policeman for threatening a citizen's life. In August, the mayor discharged an officer for beating a citizen, and the incident caused the Examiner to remark, "There should be some means by which prisoners can be protected when in the hands of the police." In September, the Dispatch favorably viewed the acquittal of three white men on charges of assaulting a police officer.[33]

---

31   Examiner, June 10, 1868; July 2, 1868; Dispatch, July 2, 1868.
32   Ibid., June 11, 1868.
33   Dispatch, August 20, September 22, 1868; Examiner, August 19, 1868.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 96 of 295

Case 3:21-cr-00042-JAG   Document 86-9   Filed 07/06/22   Page 82 of 275 PageID# 1138

After the 1868 Presidential election, Poe became the target of ouster attempts. On November 12, 1868, one alderman motioned for Poe's removal on a morals charge. In March, 1869, another councilman recommended that the city discharge Poe for intoxication and assault. Because of the timing and nature of the allegations, political factors appeared to motivate the charges. The courts dismissed both accusations.[34]

Finally in March, 1869, military authorities simply dismissed Poe apparently under the disenfranchising clause of the Virginia Constitution of 1868, and Colonel John Egbert replaced Poe as chief of police. The Dispatch gracefully accepted the decision, and commented, "We trust that General Stoneman has been able to fill the great bulk of the offices with men of ability. It would be anything but a source of gratification to learn that he had not."[35]

In March, 1869, Chahoon asked military authorities for the right to appoint a black policeman, and they agreed to the proposal as long as he fulfilled standard qualifications. The Dispatch led the predictable Richmond reaction. Blacks lacked "trust. . .vigilance. . .and discretion." Also the mayor violated the "laws of Virginia" to allow Negroes to serve as policemen. Finally, the "introduction of Negroes would be a dangerous experiment-one that would excite so much anxiety." The following day the Dispatch noted that the officers had arrested a black applicant to the police department for stealing 500 pounds of bacon.

---

34
    Dispatch, November 12, 1868; CCM, March 8, 1869, p. 401.
35
    Dispatch, Examiner, Whig, March 23, 1869.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

76

The newspaper entitled the story "A Model Policeman." This pressure caused Chahoon to refrain from hiring a black policeman.[36]

Chahoon's administration did not appreciably change the character of law enforcement. In 1868, arrests totaled 4,528 which marked a slight increase from 1867. The acerbic Richmond press wrote no editorials charging the force with inefficiency or favoring blacks. Even Chahoon's lawmen spent most of their time jailing Negroes for petty larceny, drunkeness, and disorder. Nonetheless the Dispatch did complain that "thievry and stealing is carried on in our city at this time with greater fervor than ever before." Christian added this disparaging word: "On account of constant military interference and general laxity resulting from the condition of Negroes and strangers, crime was rampant in the city." Despite these criticisms, however, Chahoon's patrolmen did keep order.[37]

Nevertheless, the Chahoon administration did witness a few changes in racial attitudes. Prior to 1869, Negroes rarely had a charge of resisting arrest dismissed, but Henry Page, a black politician, managed to obtain acquittal in such a case. Blacks occasionally assaulted whites, but never for obvious partisan political reasons. But in 1869, Negroes attached a supporter of an anti-Republican gubernatorial candidate. "It is very apparent to all that there is amongst us a part of the Negroes of this city a growing disposition toward tumult and

---

36
    Christian, Richmond, p.303; Dispatch, March 24, 25, 26, 1869.
37
    Dispatch, January 1, 1869, July 28, 1868, November 16, 1868;
Christian, Richmond, p. 302.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201　　Doc: 22-3　　　Filed: 09/04/2024　　Pg: 98 of 295

offensiveness," commented the <u>Dispatch</u>.[38]

The Negro situation was further enhanced in July, 1869, when Virginians voted on the constitution of 1868.  The electorate ratified the document except for the disenfranchisement clause and accepted the Fourteenth Amendment which brought Virginia back into the Union.  In January, 1870, the new legislature passed an Enabling Act which appeared to prescribe that government officials appointed by the military would be replaced by popularly elected public servants.  Accordingly, the people elected a new council in the spring of 1870 and the council, in turn, picked Henry Ellyson as mayor.  Ellyson edited and owned the <u>Dispatch</u> and had served in the House of Delegates from 1854 to 1865. The new mayor, tied closely to business interests, held the directorship of both the First National Bank and the Petersburg-Richmond Railroad.[39]

Ellyson's election touched off the most pronounced display of violence and bloodshed in the city's history.  On March 17, 1870, Chahoon received news of Ellyson's election, but he refused to comply with the voters' decision because he viewed the Enabling Act as uncon- stitutional.  Undaunted by Chahoon's reaction, Ellyson re-appointed John Poe as police chief, and Poe ordered all city policemen to report to him at once.  Chahoon objected to Poe's actions and forbade the policemen to obey Poe, but 54 of 80 law officers followed Poe's instruc- tions.  Chahoon, then, swore in a number of blacks and armed them with

---

[38]
　<u>Dispatch</u>, March 31, 1869; June 30, 1869; June 17, 1869.
[39]
　<u>Ibid.</u>,　　March 17, 1870; <u>Enquirer</u>, March 17, 1870; Goodrich, "Mayors," pp. 26-27.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

78

muskets; Poe, in turn, swore in additional men of his own. Chahoon
then barricaded himself in the old Market Hall. Ellyson surrounded the
building and cut off food and water. Chahoon wrote Governor Gilbert
Walker asking for troops to protect himself, but the Governor rejected
his request. In the Governor's view, council had legally elected
Ellyson, and Chahoon should acquiesce.[40]

The two police forces caused confusion as to who represented
legitimate authority. On March 17, federal commissioners requested to
see the beseiged Chahoon, but Poe denied them access. The commissioners,
in response, swore out warrants for Ellyson and Poe. That same day a
Poe policeman killed a Negro, Daniel Henderson, because he refused to
move when ordered to do so and drew a revolver on the policeman. On
March 18, General Edmund R. Canby of the U. S. Army Headquarters in
Richmond, heard of the disorder and sent a telegram to Ellyson announc-
ing that he planned to send troops to prevent more violence, and he
requested a meeting with Chahoon and Ellyson to solve their difficul-
ties. Although the Dispatch stated that Canby had "acceeded his author-
ity" the newspaper did praise the General because it appeared he wished
to avoid further violence.[41]

As a result of this meeting, Ellyson agreed to lift the seige and
abide by a court decision to solve the question of the city's legal
mayor. Canby's troops entered the city, and Poe withdrew his police from

---

40
    Dispatch, March 18, 1870: Christian, Richmond, pp. 314-315;
Chahoon-Walker correspondence quoted in the Whig, March 18, 1870 (Walker's
papers lost for this period); New York Times, March 18, 1870.
    41
        Dispatch, March 18, 19, 1870; Whig, March 18, 19, 1870; New York
Times, March 18, 19, 1870.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

79

Chahoon's headquarters.  However while withdrawing, Negroes attacked
and wounded a number of Poe's men and, thus, Canby's troops appeared to
support Chahoon.[42]

The next few days witnessed more violence and disorder.  On March
19, Ellyson's police arrested a number of Chahoon's men for illegally
wearing the city uniform.  That same morning another contingent of
Ellyson's men attacked and captured the First District Police Station.
The following evening a skirmish broke out between the two factions and
one of Poe's patrolmen was killed.  At this point both sides decided to
wait for the court's decision on the matter.[43]

Press reaction to the events of March almost unanimously condemned
Chahoon.  The New York Herald stated that the radical republican should
not have taken the law into his own hands and declared, "There cannot
be anything more dangerous to this republic than contempt for the laws."
The Albany Evening Journal, a republican newspaper, said that the matter
had been "conducted with very little regard to law on both sides."  The
Richmond papers villified Chahoon's actions as "disgraceful, impudent,
and treasonable," and referred to the mayor as "the little trickster."
The Whig commented, "Chahoon and Egbert are rebels against lawful
authority and disturbers of the public peace."  However the New York
Times' Richmond correspondent defended the republicans and stated,
"Chahoon has done nothing but act in self-defense. . .the illegality of
the movement against him is. . .flagrant."[44]

_____

[42] Dispatch, March 19, 1870; Whig, March 19, 1870; New York Times,
March 19, 1870.
[43] Dispatch, Whig, New York Times, March 20-23, 1870.
[44] New York Herald, March 19, 1870; Dispatch, March-April, 1870;

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## JA1056

In reality, both sides acted illegally and imprudently. Chahoon and Ellyson should have immediately asked the courts to settle the matter instead of waiting until bloodshed occurred. But the tensions of Reconstruction politics prevented either man from backing down.

Because of the violence, Canby's decision also generated much attention. Governor Walker reprimanded the General for acting illegally, and accused him of plotting to aid Chahoon. Canby denied a conspiracy but he conceded that he had no constitutional grounds to support his decision. He justified his action, however, on his instructions from the secretary of war to intervene in exceptional circumstances, and Canby did agree to wire the secretary for further instructions.[45]

The press offered different evaluations of Canby's actions. The _Dispatch_ blamed Canby alone for the city's disorder: "He /Canby/ is, in a word, the author of all our troubles, the fomentor of all the strife and the shedder of all the blood. . . ." The Whig characterized Canby's actions as "the wrong side," and the New York _Times_ called his interference "a mistake." But the usually reliable _Nation_ commented, "We do not well see how General Canby is censurable for an honest and impartial attempt to save the city from riot and bloodshed." Canby did act to restore order, but he failed to restrain Chahoon or the city's Negroes. While Ellyson's men behaved reprehensibly, Canby's soldiers

_Whig_, March 18, 1870; Albany _Evening Journal_, March 24, 1870 quoted in the _Whig_, March 26, 1870; New York _Times_, March 22, 1870.

    45

    Walker-Canby correspondence quoted in the _Whig_, March 22, 1870; New York _Times_, March 20, 22, 1870.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

81

gave the impression of supporting Chahoon.[46]

Judge John Underwood heard the case on March 23. On technical grounds involving the question of the general assembly's jurisdiction to create the Enabling Act, Underwood decided in favor of Chahoon. Ellyson rejected the decision, and kept his police on duty. Chahoon's police tried to remove Ellyson from City Hall forceably, but Poe's lawmen repelled the attack. Finally both sides agreed to submit the case to the Virginia Court of Appeals.[47]

The Ellyson-Chahoon dispute produced further tragedy when the courthouse floor collapsed on the very day of the verdict. The accident killed fifty-eight people and convinced the populace of the necessity for a speedy resolution to the long controversy. Finally, on April 29, the court ruled in favor of Ellyson and Poe. Chahoon then announced his candidacy for mayor in the May municipal election.[48]

This election solved nothing. Apparently Chahoon won the election, but the messenger carrying the returns from the heavily Republican ward was attacked and the ballots stolen. The court declared Ellyson the winner, but Chahoon convinced the judges to hold another election in November. In this contest conservative Democrat Anthony M. Keiley won election as mayor.[49]

The Ellyson-Chahoon affair symbolized the tensions of the postwar years. First, the city virtually seethed with resentment against

---

[46] Dispatch, March 22, 1870; Whig, March 22, 1870; New York Times March 23, 1870; Nation, March 24, 1870, p. 185.

[47] Christian, Richmond, p. 316; Dispatch, March 24-28, 1870.

[48] Ibid

[49] Maddex, The Virginia Conservatives, p. 90; Enquirer, November 8,

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 103 of 295

82

reconstruction politics. In the opinion of Richmonders, the republicans had used their position of power to exploit political advantages instead of reuniting the nation. In addition, the city realized that the police force signified more than mere protection of property and life, but the force embodied self-determination and independence. Finally Richmonders harbored a deep resentment against blacks for the affair as A. A. Taylor stated, "Bitter feeling developed against the Negroes because they cooperated with the party championing their emancipation."[50]

---

1870; _Dispatch_, November 8, 1870; _Whig_, May 27, 1870.

[50] Taylor, _The Negro in the Reconstruction of Virginia_, p. 1.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHAPTER V

THE POLICE BOARD, 1870-1877

Decentralizing urban police administration generated much debate in
the late nineteenth century.  Advocates of police boards and commissions
asserted that multiple control of the force would reduce political influ-
ence and provide a wide range of participation in law enforcement.  On
the other hand, critics stated that administrative boards reduced effic-
iency and increased political influence.  From 1870 to 1877 a three-man
police board governed the Richmond force, and its administration of law
enforcement matters warrants examination.

In May, 1870, the Virginia general assembly passed a new charter
for Richmond which created a police board to supervise the department.
The board consisted of the mayor, the president of the city council, and
the police court judge.  The city press made no comment on the new organ-
ization and assembly records did not include minutes of debates.[1]

A number of factors probably explained the board's establishment.
First, the legislature feared a recurrence of Chahoon's dismissal of
city policemen in 1868 and 1869, and the assembly evidently believed a
board would curb arbitrary removal of peace officers.  Secondly, the
city apparently accepted the change in the hope of avoiding confronta-
tion over authority such as in 1867 between Mayo and Claiborne.  Thirdly,
the size and complexity of Richmond warranted a diversified body to
oversee police affairs.  In addition, in May, 1870, the city had lacked

---

[1]
Whig, May 17-31, 1870; Dispatch, May 17-31, 1870.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 105 of 295

a mayor as a result of the Ellyson-Chahoon dispute, and council com-
mittees virtually had responsibility for governing the city.  Finally, a
nationwide movement had developed to employ multiple control of city
police departments.  New York, Boston, and Cincinnati had regained con-
trol of their city police from the state legislatures in the late 1860's
and initiated boards in an attempt to curb political influence and
corruption.[2]

In November, 1870, A. M. Keiley had assumed office as mayor, and
his victory continued a promising political career.  Keiley had served
as assistant editor of the Petersburg Southside Democrat, and in 1860 he
actively supported Stephen Douglas for President.  He had seen combat
during the Civil War and had been captured.  After the war, he moved to
Richmond and gained community respect by outspoken criticism of federal
authorities.  As mayor he befriended the police and supported their
interests in city government.  Moreover his election signified a vic-
tory for immigrants as he strongly identified with Irish-American
interests.[3]

Immigrants represented a vital segment of voters in Richmond.
With the population standing at 27,000 whites, and 23,000 blacks, city
leaders realized that additional whites would be necessary to insure
Democratic control of the city.  Throughout the late 1860's and 1870's,

---

[2]
    Whig, May 3, 1870; Bopp and Schultz, A Short History of American
Law Enforcement, p. 62.
[3]
    Joseph P. O'Grady, "Politics and Diplomacy:  The Appointment of
A. M. Keiley to Rome in 1885."  Virginia Magazine of History and
Biography (April, 1968), Vol. 76, pp. 191-209.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

85

Richmond leaders made numerous attempts to attract foreign born to the
city, and residents generally viewed the European transfers as law abid-
ing and hard working.  The newly arrived immigrants did not insist on
Sunday drinking or other actions that might cause friction with police
as did the immigrants in New York and Boston.  The Dispatch noted that
Richmonders respected the European arrivals for their "Unflagging energy
and skill."  Keiley's election, then, signified an acceptance of immi-
grants, especially Irish immigrants, into the selective circles of city
power.[4]

Keiley re-appointed John Poe as police chief and the city received
Poe's assignment with unanimous approval.  One city official stated,
"His re-appointment by the board was requested by the largest property
holders and by the many of the principal businessmen of the city as well
as by hundreds in all rank of life in this community, including all the
officers and men of the police force."  No one had publicly objected to
the appointment.[5]

Correctness and formality characterized Poe's relationship with
the police board.  Available documents revealed that he never spoke
either for the board or against it.  Poe cooperated with the board--no
more; no less.

The police board had a noticeable impact on law enforcement mat-
ters.  First, the source of complaints changed.  Before the war, news-
papers mainly criticized the police; however, during the 1870's citizens

---

[4] Christian, Richmond, p. 312; Dispatch, May 31, 1869; Richardson,
The New York Police, p. 56.
[5] Police Board Minutes, November 12, 1870, p. 84.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1062

86

brought charges against the force directly to the police board. In
August, 1871, for example, a black woman accused an officer of drinking
on duty and calling her a "black bitch." The board found him guilty and
fined him three days' pay. Another citizen asserted that a policeman
suggested to a young girl that she become a prostitute but an investi-
gation disproved the charge.[6]

Besides experiencing a shift in the source of complaints, the
board also witnessed a change in the nature of complaints. Citizens
occasionally charged policemen with brutality and misconduct. In
August, 1872, for instance, Edwin Hall lodged a complaint against an
Officer Rodgers for unwarranted use of force and unnecessary imprison-
ment. After an examination of the case, the board fined the officer.
In 1874, the board dismissed Officer John Brook for assaulting and
beating a resident. In 1873 a citizen alleged two officers had assault-
ed him, but the policemen disproved the charges. Such activity prompted
the Whig to defend the police, and the newspaper asserted that patrolmen
should "be protected as far as possible in what they think to be their
duty. . .to protect society."[7]

Because of this new form of popular scrutiny, the police board
closely monitored police discipline. In 1870, the board dismissed
Officer George Paul for sleeping on duty. Two years later the board
investigated charges against Chief Poe that he had illegally kept an

---

[6]
 Police Board Minutes, August 26, 1871, p. 241; November 25, 1875,
p. 91; August 21, 1872, p. 117; June 14, 1873, p. 204; June 1, 1874, p.
16.

[7]
Ibid.,              .  July 10, 1872, p. 117; June 14, 1873, p.
153; June 1, 1874, p. 173; Whig, December 21, 1872.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201      Doc: 22-3      Filed: 09/04/2024      Pg: 108 of 295

officer's pay, but they found him innocent.  In February, 1873, the
board charged a policeman with misconduct, and fined him five days' pay.
In July, 1874, the three-man administrative body fined patrolman Henry
Carter $37.50 for going into a barroom while on duty.  In short, the
city tolerated nothing less than complete honesty and unimpeachable
integrity.[8]

Poe secured the board's cooperation in instituting numerous
changes in the department.  The chief wanted effective use of the
police telegraph system as he planned to expand the telegraph operation
to link the two police stations with every city call box.  Also he re-
quested and received a special police surgeon to examine the men and
insure speedy medical care.  Poe set up strict rules and enforced them.
Policemen, for instance, could not leave the city without permission.
Further, he abolished fees for captures of stolen property.  In addition,
according to Poe, a policeman must know the people on his beat well
enough "as to enable him at once to recognize them."  Finally Poe and
Keiley agreed on periodic inspections and at the first inspection in
late 1870 the mayor remarked that "for good looks, efficiency, and in-
tegrity they cannot be beaten."[9]

Poe demonstrated exceptional ability as an administrator.  In the
early 1870's police quelled a number of mob disturbances with minimum
disruption.  In October, 1870, for example, police arrested former

---

[8]
   Police Board Minutes, July 10, 1872, pp. 119-121; February 25,
1873, p. 141; November 5, 1873. p. 166; Dispatch, July 15, 1874.

[9]
   CCM, July 18, 1870, p. 14; Christian, Richmond, p. 308; Police
Board Minutes, July 21, 1870, pp. 6, 12; December 2, 1870, p. 74.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

88

Mayor George Chahoon for forgery.  The jury found him guilty and the
verdict touched off a large demonstration which the peace officers con-
trolled before any serious damage occurred.  In September, 1871, a mov-
ing locomotive frightened a team of horses which bolted and killed a
citizen.  In response, a crowd blocked the tracks and threatened the
engineer.  The police came and calmed the crowd.  In September, 1873, a
national financial panic developed which brought angry mobs into the
streets, but by the efforts of Keiley and Poe, Richmond averted serious
trouble.[10]

As in the past, council called on the police for various municipal
assignments.  The force continued to assist in fires, manage the city
streets to rid them of garbage and obstructions, and light the city
lamps.  The force had responsibility for special patrols in high crime
areas such as in the vicinity of the Tredegar Iron Works and around the
Exchange Hotel.  Additionally, council assigned the police to close
shops which had opened illegally on Sundays, and also ordered law
officers to curb unnecessary noise at warehouses and at blacksmith
shops.[11]

The police complained with so many duties.  In December, 1872, the
chief had changed the normal shift from eight to twelve hours to in-
crease productivity and efficiency.  However, forty-four policemen
protested this action and sent a request to Poe and the council asking

---

[10]
Dispatch, October 23, 1870; Christian, Richmond, pp. 328, 341.
[11]
CCM, July 22, 1872, p. 556; Police Board Minutes, July 16, 1873,
p. 157; CCM, October 28, 1872; Police Board Minutes, October 25, 1875,
p. 217.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1065

89

for a reduction in shift hours.  A summary report from the police board debate revealed that "the plan now in operation deprived them not only of the means of providing for the actual necessities of their families, but of all means of social enjoyment."  Mayor Keiley offered the resolution which reduced policemen's hours.  The Enquirer commented that the reduction "works well and gives satisfaction to all."[12]

The problem of police sickness occupied the force in the mid-1870's.  In 1874, the city recorded a loss of 1,115 working days due to sickness, and in February, 1875, the police board proposed an ordinance to withhold halfpay from those who missed a day's work because of sickness.  Although the council questioned the proposal's extreme measures, the ordinance passed.  The docking of pay seemed to work as Keiley stated in his report of 1875 that since the department implemented the pay cut ordinance the "health of the force has at once been restored."[13]

One reason for the large amount of sickness concerned the policemen's inability to wear overcoats during winter.  In February, the police board ordered all policemen to purchase blue overcoats at their own expense.  If a law officer did not have a blue winter coat, the department forbade him to wear any overcoat and fined the policeman.  Many members of the force could not afford an overcoat, and were subject to severe weather.  Keiley objected to the regulation as impractical and stated that the board did not have the right to make such a rule because

---

[12]     Police Board Minutes, December 19, 1872, pp. 132-134; Enquirer, December 23, 1872.

[13]     Dispatch, February 9, 1875, February 24, March 16, 1875; City of Richmond, "Fifth Annual Message of the Mayor of Richmond," Annual Report, 1875 (Richmond:  James E. Goode, City Printer, 1875), p. xiv.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

90

the people had not elected the board. As in the question of police
working hours, Keiley took the patrolman's side in the face of arbit-
rary regulations.[14]

The Keiley administration also proposed expansion of the detective
branch. The council fiercely debated the issue as Judge A. B. Guigon
appeared before the city fathers and stated that he opposed detectives
because of their dishonesty, but Councilman William Carrington asserted
that "the detective was the truest man to his employer in all list of
people in this country." Councilman Manly, however, disagreed and said
that detectives lacked integrity. Although the motion to expand the
detectives passed, the debate indicated that some city leaders still
mistrusted the police even in a period of general support for the force.[15]

Despite the long hours, dangerous work, low pay, and additional
duties, the policemen seemed to have a reasonably good opportunity to
advance in the department. Of the eighty-four men on the force in 1870,
forty-one remained in the department in 1877. Of the ten sergeants on
the force in 1870, three became captains by 1877. Of the thirty pri-
vates who stayed on the force until 1877, six advanced to sergeant by
1877.[16]

In addition, the force offered a limited economic mobility.
Stephen Thermstorm in Poverty and Progress: Social Mobility in a Nine-
teenth Century City asserted that from his study of mobility in

---

[14] Dispatch, January 19, February 9, 23, 1875.
[15] Ibid., January 25, 1876.
[16] City of Richmond, Police Report, 1870, 1877; Dispatch, July 15,
1870, May 8, 1870.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

91

Newburyport, Massachusetts: "It is reasonable to anticipate that the level of opportunity in other American communities undergoing urbanization and industrialization in these years resembled the Newburyport pattern." Evidently the Richmond police experience supported Thermstorm's findings that mobility did indeed exist in the nineteenth century. Privates' income, for example, rose from $576 per year in 1870 to $720 in 1877. Also in 1870 only one policeman owned enough land in the city to pay taxes on the property, but in 1877 seven policemen who lived in the city paid land taxes. The total might have been higher, but apparently a number of patrolmen lived outside the city. However, not living in Richmond apparently presented problems for one's social life. Policemen's families could not actively participate in local school and church activities as much as other workers who owned property in the city. Moreover living in a surrounding county prevented them from identifying with the city they served.[17]

While policemen did concern themselves with hours, pay, and working conditions, crime suppression became increasingly important. The 1870's marked the first years of systematic arrest reporting and emphasized the importance which city leaders placed on stopping law breaking. As with all statistics, one must use them carefully, but arrest totals represented the most accurate gauge of criminal activity. The records revealed that crime increased from 5,884 in 1870 to 6,263 in 1874 (see chart). Poe stated that crime increased due to the "extreme fondness of

---

[17] _Land Tax Book_, 1870, 1877 (Virginia State Library); Stephen Thermstorm, _Poverty and Progress: Social Mobility in a Nineteenth Century City_ (Cambridge: Harvard 1964), p. 198.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1068

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 113 of 295

our colored citizens of getting warrants for each other, on the most
frivolous charges, and also the increase of population in our rapidly
growing city." Keiley added that the reason for the increase in crime
was "to be found in culpable facility with which some magistrates issue
warrants, oftentimes confounding felonies with misdemeanors, and still
more frequently using process without justification." Poe's allegation
that the blacks' requested warrants for other blacks appeared to con-
flict with newspaper accounts which seemed to indicate that police
proved unusually aggressive in arresting Negroes. As for Mayor's
assertions, probably legal errors played a role in increasing arrests,
but not a significant one.[18]

In reality, police arrested large numbers of Negroes largly be-
cause of political considerations. In 1870, the General Assembly passed
a law which provided that disenfranchisement resulted when the Hustings
Court found a defendant guilty of a felony or a petty larceny charge.
This law as well as the past history of the police guaranteed an anti-
Negro bias in law enforcement.[19]

In 1875, records showed a decline as arrests dropped from 6,263 in
1874 to 5,472 in 1875. The most notable shift occurred in whites
apprehended, but black arrests dropped also. Keiley proudly noted the

---

[18] _Dispatch_, January 1, 1871, 1872, 1873; City of Richmond, "Report
of the Chief of Police," _Annual Report_, 1874, pp. 415, 425; "Fifth
Annual Message of the Mayor," _Annual Report_, 1874, p. xv.

[19] "Official List of Colored Persons Convicted of Felony or Petty
Larceny in the Hustings Court of the City of Richmond, and thereby Dis-
enfranchised," _Official Lists of Dead, Lunatic Colored Males Who Are
Thereby Disenfranchised_ (Richmond- Virginia, October 24, 1892) n.p.
Pamphlet in McGregor Collection of the University of Virginia.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

93

reduction in black arrests, and stated that Negro arrests declined be-cause of his order to end wholesale arrests of Negroes which he regard-ed as a "flagrant outrage."  Despite an increase in arrests in 1876, the mayor stated at that time that "Richmond relative to its population is the most peaceful, orderly city in the country."  The newspapers seemed to support Keiley as the city press offered few critical remarks about the police.[20]

From the 1870-1877 records, the police spent most of their time securing civic order as drunkeness led in arrests, and disorderly con-duct charges ranked second.  Crime against persons such as assault, attempted assault, and murder came next.  Crimes against property such as burglary and petty larceny ranked third.[21]

Sex related crime rarely occurred, but the newspapers exploited sexual offenses for sensationalism.  In 1871, a policeman arrested a druggist for abortion, and three years later, law officers jailed a man for indecent exposure.  Police arrested no more than five persons per year for rape between 1873 and 1876.[22]

Because crime appeared under control, the 1870's witnessed little criticism of the force from the city press.  The newspapers issued no critical editorials and a number of comments defended the police.  The

--------

20
    City of Richmond, "Annual Report of the Chief of Police," 1874-1877; City of Richmond, "Sixth Message of the Mayor, 1876, p. xxii.
21
    City of Richmond, "Annual Report of the Chief of Police," 1870-1877.
22
    Dispatch, September 8, 1871, June 11, 1874; City of Richmond, "Annual Report of the Chief of Police,"1870-1877.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1070

94

<u>Enquirer</u> stated in 1871 that although disorderly conduct prevailed in
the city, the lawmen "do their duty. . .yet /īt/. . .amounts to so
little when the offenders are so lightly dealt with /by the court̄s/."
In 1875, the same newspaper called the police "vigilant" in trying to
curb robbery, and complained that council compelled the police "to fol-
low a most impractical schedule of time for lighting the street
lamps."[23]

In the 1870's, black Richmonders remained impoverished.  Negroes
obtained only menial labor as prejudice foreclosed opportunity or
advancement.  Blacks hoped that the Republican party might aid them, but
events demonstrated that the party of Lincoln interested themselves more
in obtaining the black's vote than in improving the black's life.  Negro
Republican leaders complained that they suffered "at the hands not only
of the white citizens, but also at the hands of the Republican party."
Historian Charles Wynes added that in the 1870's the Negroes' own
"political party deserted him, and. . .increasingly resorted to using
him."[24]

Even the passage of the Civil Rights Act of 1875 failed to curtail
discrimination.  The bill attempted to protect the Negro from exclusion
from public conveyances, restaurants, hotels, and other public places.
Richmond public opinion unalterably opposed the act as the <u>Whig</u> reminded

---

23
   <u>Enquirer</u>, February 14, 1871, January 21, 1875.
24
   Robert E. Martin, "Negro Disfranchisement in Virginia." <u>Howard
Studies in the Social Sciences</u>, I, (1938), pp. 87-88; Charles Wynes,
<u>Race Relations in Virginia</u>, 1870-1902 (Charlottesville:  University of
Virginia Press, 1961), p. 14.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

95

blacks that the Civil Rights Act did not "give unlimited license to do as they please." Moreover in March, 1875 a John Snelling argued and fought with a "well known" Richmond businessman because the latter had given a Negro tickets to seats in the white section of a local theater.[25]

Unfortunately for the historian, the police did not list arrests by race in the 1870's and therefore it proved impossible to determine the number of Negroes jailed. However, from the newspapers it seemed that a considerable number of black arrests resulted from petty larceny charges. In one instance a policeman jailed a black man for stealing a chicken, and the police arrested another for stealing a dollar's worth of merchandise. Such arrests appeared especially important since petty larceny convictions in the Hustings Court disenfranchised the person. Unquestionably, Negroes committed felonies. Police jailed blacks for assaults virtually every day, and the papers recorded shooting incidents weekly. Newspaper accounts revealed that law officers jailed Negroes for burglary, swindling, and counterfeiting.[26]

Occasionally, Negroes protested police mistreatment. In 1876, blacks protested so strongly that the newspapers asked for an investigation of police misconduct concerning the shooting of a Negro at the State Fair. Some blacks charged that a policeman failed to arrest the alleged murderer after some Negroes identified the assailant. The

_____

25
    Whig, March 4, 1875; Dispatch, March 9, 1875.
26
    City of Richmond, "Annual Report of the Chief of Police," 1870-1877; Dispatch, June 27, 1874, April 20, September 7, October 14, 1875.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

96

inquiry, however, found the policeman innocent. Although investigations based on Negro complaints rarely occurred, they contrasted to the pre-war years when blacks never publicly questioned police behavior.[27]

Despite the opportunity the police board possessed, it did not substantially alter police hostility toward Negroes. Both the nature and the frequency of black arrests indicated police animosity against Negroes. One might argue that statistically it was possible for the police to jail more blacks than whites even though Negroes composed a minority of the population, but both the nature and the frequency of black arrests indicated police animosity. In addition, traditional Southern antipathy to the Negro, and the experiences of the war and of reconstruction, caused the police to treat Negroes harshly. While in a few cases, the police board investigated misconduct charges, the board refused to force the police to adhere to strict standards of impartiality.

In addition, the board bowed to public pressure and refused to name black policemen to the city force. When the Republican Virginia State Journal suggested black lawmen, the Dispatch retorted that "to fill our streets with negro policemen would be to ruin the business of Richmond. . . We should rather see negroes in many other places than to see them police-men. . .because we are confident that whites will not peacefully submit to arrest and detention and trial at their hands. . . ."[28]

In the municipal elections of 1876, the black political threat caused the police to involve themselves in politics more actively than

_____

27
　Dispatch, June 2, 1876; Enquirer, June 5, 1876.
28
　Ibid, May 2, 1872; April 28, 1873.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

97

in previous years.  In April, the police had a barbeque for the candi-
dates and the _Whig_ stated it raised a "handsome sum."  Apparently the
candidates wanted to enlist the policemen's aid in getting out the vote.
After the election, when the police board announced that they had
appointed T. White as second district captain, many patrolmen grumbled.
The discontent developed because of the board's failure to name veteran
Sergeant Reuben Seal to the post, and some peace officers asserted that
Seal did not obtain the post "because he and his friends did not exert
themselves."[29]

    In the Democratic primary for the mayor's position, Councilman
William Carrington defeated A. M. Keiley.  The newspapers did not offer
any explanation for Keiley's defeat, and it appeared that the two men
agreed on policy.  Moreover Keiley supported Carrington in his success-
ful compaign against the Republicans.  Keiley's defeat evidently stemmed
from the same problem as Sergeant Seal:  "his supporters did not exert
enough pressure."[30]

    Keiley's tenure marked a dramatic change from the friction of
Mayor Mayo's last year, and the tumult of Chahoon's administration.
Keiley proved the consumate politician as he gave the city stable govern-
ment, and improved the police organization.  While he failed to make
substantive changes in police behavior towards blacks and he rejected
Negro policemen, he did attempt to reduce some friction between the
police and the black community by ending wholesale arrests of Negroes.

---

29
  _Whig_, April 22, May 18, 1876.
30
  _Dispatch_, _Enquirer_, _Whig_, April, May, 1876.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

98

Mayor Carrington almost immediately ran into difficulty concerning police affairs. In June, 1876, a citizen charged a Private Hicks with unwarranted arrest and operating a livery stable while on duty. The citizen failed to sustain the misconduct allegations, but the police board ordered Hicks to give up his interest in the stable. In September of that same year, the board exonerated a lawman from allegedly improper advances toward a young woman. Two months later, Carrington encountered a most difficult problem in connection with the presidential election of 1876.[31]

The campaign had exhibited bitter partisanship and on election night both sides held rallies awaiting the returns. Although accounts differed, it appeared that a shouting match had started between Democrats and Republicans. The police generally kept order, but some Negroes broke windows in one of the downtown areas. The Whig described the scene as a "near riot," and criticized the police while praising the forebearance of the whites in avoiding a significant disturbance. The Dispatch, conversely, blamed the riot on the blacks and defended the police's actions.[32]

Judge A. B. Guigon, however, bitterly complained that the police did not act properly and described the force's actions as "shameful and a disgrace to the police who draw $80,000 as pay for preserving the peace." Later he wrote that on election night the city had verged on revolution and that the town averted a violent collision only by the

---

[31] Christian, Richmond, p. 355; Police Board Minutes, p. 227, June 7, 1876; September 15, 1875, p. 244.

[32] Whig, Dispatch, November 10, 1876.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

99

forebearance or our citizens and not by the intervention of the
police.[33]

Carrington responded to such criticism by stating that the police-
men did not arrest many wrongdoers because the crowd seemed to disperse
and the police did not want to provoke further violence.  Carrington
pointed out that no "more arrests were made because the force had their
hands full in dispersing the vast crowds, and it was deemed more impor-
tant to prevent bloody collision than to capture a few who had not
succeeded in doing violence."[34]

The police board examined the incident and determined that the
police had acted wisely.  Minor rioting did occur, but not in the down-
town section where Poe had detailed most officers to avoid a full scale
confrontation.  The board exonerated the police and the newspapers did
not question the board's findings.[35]

Although the police board worked effectively, in 1877, the city
replaced the three-man administrative body with a board of police com-
missioners consisting of the mayor and one representative from each of
the six city wards.  On February, 1877, council asked Richmond's dele-
gates to the general assembly to petition for a change in the city
charter to establish a board of commissioners.[36]

---

[33]
    Whig, November 10, 1876; Dispatch, November 10, 1876.
[34]
    Police Board Minutes, December 29, 1876.
[35]
    Dispatch, Whig, Enquirer, December 30, 1876.
[36]
    CCM, February 5, 1877, p. 485; March 5, 1877, p. 512-513; Board
of Aldermen Journal, March 1, 1877, p. 404; March 8, 1877, p. 410.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1076

100

Political considerations explained the reasons for the creation of
a board of police commissioners.  At a Virginia senate committee hear-
ing a number of prominent citizens advocated a police commission.
Councilman Joseph Anderson spoke at length in favor of a commission and
concluded that "the police had too much to do with city politics. . .it
was nearly a unanimous vote of common council, a tie vote of the board
of aldermen, and nearly all the citizens of Richmond that a reformation
was necessary."  Judge Guigon also advocated the amendments and stated,
"the police interfered too much with politics."  He further stated that
"some of the worst men in the city were on the force and had secured
their positions by political influence."[37]

A few spokesmen defended the police board.  Mayor Carrington
opposed the commission plan, called the force "the best in the country,"
but failed to elaborate.  The Richmond correspondent of the Petersburg
Index-Appeal conceded that some "not unobjectionable appointments have
been made," but asserted, ". . .the material composing our force is most
excellent. . .The mass of officers. . .are honest, sober, intelligent. .
and conscious of their duty."[38]

The usually outspoken city press remained cooly detached from the
entire affair.  Only the Republican Virginia State commented, "No one
can doubt the propriety of separating the power to appoint policemen
from officers themselves elected."  However, two citizens wrote letters
to the editor on the matter.  "A Citizen and Tax-Payer" praised the

---

[37] Enquirer, March 16, 1877.
[38] Ibid, March 16, January 28, 1877.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1077

101

charter change and stated that the board of police commissioners "meets with the approval of nine-tenths of the property owners and taxpayers of Richmond." On the other hand "Freeholder" protested the change because it would allow the State legislature to control the police by allowing State judges to appoint the commissioners. He concluded that council adopt another method "before we make humiliating confession to the Legislature that the municipal authorities cannot manage the police force."[39]

The police had actively participated in politics in the mid-1870's especially the municipal elections of 1876, but available evidence did not indicate unwarranted political interference. As for Judge Guigon's remarks deriding the police, no other sources revealed such a low opinion of the force.

One can also speculate that ward politics strongly influenced the decision. Evidently by the mid-1870's each ward wanted to have some power in controlling police affairs as well as some patronage positions on the force. Because the elections of the late nineteenth century resulted in unusually close contests, a strong ward organization proved indispensible. City politicians, then, used policemen as ward organizers.

Finally, by the 1870's other metropolitan areas such as New York, Boston, and Baltimore utilized the police commission to direct city law enforcement. The commissions, ostensibly designed to stop corruption, in reality served as mere political patronage positions to gain election

---

[39] _Virginia State_, February 1, 1877; Dispatch, February 7, 8, 1877.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

102

40
victories.

The Richmond police board system proved itself an effective organ-
ization. Discipline was strict and corruption almost non-existent.
While the board heard a number of complaints, the press did not feel
the force inefficient or guilty of misconduct. Furthermore during the
seven years of the board's existence, crime remained manageable. The
amount of political influence remained difficult to evaluate, but evi-
dently it occurred frequently enough to cause the citizens to accept
the introduction of the board of police commissioners.

---

40
     Bopp and Schultz, A Short History of American Law Enforcement, p.
62.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHAPTER VI

JOHN POE AND THE BOARD OF POLICE COMMISSIONERS, 1877-1895

Between 1877 and 1895, John Poe dominated law enforcement in
Richmond.  Under his leadership the department reasonably handled admin-
istrative problems, criminal activity, race tensions, and labor disorders.
He worked closely with the board of police commissioners to insure dis-
cipline and honesty in an age in which many urban police forces reeked
with corruption.

The newly formed, seven-man police commission handled police organ-
ization and discipline, as well as citizen complaints.  Each year the
board publicly examined the policemen as to their moral and physical fit-
ness, and occassionally refused to "re-elect" a man because of his fail-
ure to meet standards.  Since the commissioners publicly debated such
sensitive matters, they requested private hearings, but the council re-
jected the proposal.[1]

The commissioners heard a number of misconduct cases in the late
1870's and early 1880's.  Citizens complained about policemen drinking on
duty, and in 1878 the Negro newspaper, Virginia State, noted that somehow
the so-called "vigilant" police had failed to arrest two drunken police-
men.  In 1880, Judge John Crutchfield of the police court admonished
Chief Poe to insure that patrolmen enforced liquor control laws.
The board of aldermen criticized the force for allowing barber shops to

--------

[1]

Dispatch, August 1, 1877, June 1, 1878, November 8, 1881.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

remain open on Sunday and implied that the lawmen failed to patrol adequately. Brutality charges occurred, but usually the police could justify use of extreme force. Likewise the commissioners dismissed a majority of accusations against police misbehavior. On the whole the commissioners heard about the same number of complaints as the police board, and police behavior remained satisfactory. However, economic difficulties plagued the department in the Gilded Age.[2]

Richmond's post-war economy exhibited contradictory trends. On the one hand, the city had remarkably recovered from the War's destruction, and by 1877, the town's production had reached pre-war levels. The tobacco industry employed 7,000 persons and recorded $10 million in sales while the iron and flour companies showed an equally impressive growth. Richmond ranked as one of the most prosperous metropolitan areas in the South, and as one of the top thirty productive cities in the nation. Sparked by the commercial success, her population stood at 60,000, an increase of 9,000 from 1870, as whites totaled 33,000 and blacks numbered 25,000.[3]

In addition the "City on the James" advanced its municipal services. Richmond possessed a public-owned cemetery, and a public-controlled water works and gas works. The common council and the board of alderman devoted most of their time to discussion of paving streets and

---

[2] _Dispatch_, March 26, 1880, February 19, 1877, August 3, 1884; _Virginia Star_, May 11, 1878.

[3] _Dispatch_, January 1, 1878; U. S. Government Department of the Interior, _Report of the Manufacturers of the United States at the Tenth Census, 1880_ (Washington: U. S. Government Printing, 1883), p. 380.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

105

constructing public works.  Finally Richmond officials did not forget
the poverty stricken as in 1878 council reorganized and centralized
poor relief.[4]

While the city experienced this seeming prosperity and expansion,
the council reduced municipal employee wages ten percent in 1877.  The
depression of the mid 1870's lessened public revenues just enough to
force the urban legislature to curtail some expenditures.  Throughout
1877 and 1878 the council searched for ways to cut the police budget,
and in the latter year Mayor Carrington vetoed a bill that would pro-
vide $2,000 for a police emergency fund.  Both the police commission and
John Poe acquiesced to council's wishes.[5]

Nonetheless, Poe blocked a council plan to further reduce the
department.  In May, 1878, a number of councilmen offered a proposal
for reorganization of the force which called for the abolition of the
office of captain.  The councilmen felt that removing the captains would
allow extra funds to hire privates.  Although the plan seemed reason-
able, it failed, according to the Dispatch, because of pressure from
"the Chief of Police and other officers who would be most affected by
the change."[6]

Public opinion failed to help the police regain their pay level.
The usually friendly Dispatch merely stated that "the policeman has a

[4]
     City of Richmond, Records of the Board of Aldermen (hereafter
cited as RBA), May 13, 1878, p. 522; City of Richmond, Common Council
Ordinances and Resolutions (hereafter cited as CCOR), November 25, 1878,
p.31.
[5]
     RBA, March 20, 1877, p. 417, 420, 421; CCOR, April 16, 1878, p. 24.
[6]
     Dispatch, May 16, 1878.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

hard service and comparatively poor compensation. . .public approval are all they hope for." In the 1878 municipal elections none of the candidates mentioned police pay as an issue. The police economically survived because prices dropped between 1877 and 1896, and the dollar had considerable purchasing power.[7]

As the city economy improved in the 1880's, the police received additional money for their needs. In 1880, the council allocated $2,100 to buy overcoats for the police. In 1883, the council authorized the police to purchase night sticks, and in the following year the city granted $2,000 for an emergency fund. Nevertheless, the council rejected a citizen petition which requested the return of police pay scales to 1877 levels, and the local newspapers failed to comment on the matter. Poor pay for police in the 1880's and 1890's characterized all major cities. Atlanta paid its patrolmen $2 a day and New York just slightly more. Evidently citizens did not feel civil servants worth the pay of private industry.[8]

Despite the reduction in pay, the city still called on the police to direct various municipal duties. The force continued to supervise fire control and made periodic building inspections for fire hazards. The department had jurisdiction over street and sidewalk conditions, and the patrolmen served as health officers who supervised sanitary affairs.

---

[7] *Dispatch*, January 31, 1878.

[8] *CCOR*, April 12, 1880, p. 340; *CCM*, November 5, 1883, p. 661; *CCOR*, January 11, 1884, p. 163; August 7, 1882, p. 506; William J. Mathais and Stuart Anderson, *Horse to Helicopter*: *The First Century of the Atlanta Police Department* (Atlanta: Georgia State University Press, 1973), p. 20; Richardson, The New York Police, p. 173.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

107

Finally Richmond utilized peace officers as census takers.[9]

Unfortunately politics entered police affairs in connection with the Virginia Readjuster movement of 1879.  The Readjuster question arose as a result of the Democratic party debate over the best method to pay the state's massive pre-Civil War debt.  One faction, the "Funders" wished to pay--even if it meant higher taxes and reduced spending for schools and asylums.  The Funders drew strength from two major sources-- the conservative farmers of eastern Virginia and the commercial classes of the towns, especially Richmond.

The Readjusters, by contrast, called for a downward adjustment of the debt because of the War's damage to Virginia's resources and econo- omy.  These Readjusters drew their support from the fringe elements of Virginia society such as the mountaineers and poor whites, carpetbaggers and Negroes, Grangers, and Greenbackers.  In the 1879 state legislative elections, the Readjusters won a majority of seats in the Virginia house of delegates.[10]

The two factions struggled for political control of Richmond in the May, 1880, municipal elections and the police figured prominently in the campaign.  The readjuster newspaper, the Whig, assailed the conser- vative Democratic funders as a corrupt "ring" who acted for "private interests and not the public welfare."  Furthermore the Whig maintained

---

9
   CCM, 1877-1895.
10
   Wynes, Race Relations in Virginia, pp. 16-17; Dabney, The New Dominion, pp. 376-377; James T. Moore, Two Paths to the New South: Funders, Readjusters, and the Virginia Debt Question, 1870-1883 (Lexing- ton:  University of Kentucky Press, 1974), p. 7-8.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

108

That "malfeasance and misfeasance and insolence marked every department in our city." When a mob of funders apparently attacked a group of readjusters, the _Whig_ complained about city police protection.[11]

The _Dispatch_, voice of the funders, played on race fears since the readjusters had obtained black support. The Dispatch stated. "The Negroes are anxious to achieve a victory over the white men of this city. . .anxious as they are to be policemen. . ." The newspaper praised the force against the _Whig's_ charges of malfeasance and reminded the citizens that a readjuster victory would mean blacks in "all the places on the police." The Dispatch's tactics succeeded as the conservatives retained control of the city. However, four black readjusters won in predominantly Negro Jackson Ward and, evidently, marked the first time Democrats had lost in that ward.[12]

The _Whig's_ charges of police mismanagement lacked credibility and served as mere campaign rhetoric. Even during the height of the campaign the _Whig_ conceded that "we have never found them /the police/ derelect in their duty." The _Dispatch_ also used the black police issue for political ends. The _Dispatch_ editors knew that Negroes could not easily have become law officers since policemen received their appointment from the board of police commissioners. For the readjusters to gain a majority on the police commission would have taken at least three years as well as continual election victories during that time.[13]

---

11
   _Whig_, May 11, 13, 1880.
12
   _Dispatch_, May 14, 15, 22, 27, 1880.
13
   _Whig_, May 17, 1880:

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

109

In 1881, the readjusters named William B. Cameron as their gubernatorial candidate. To gain the Negro vote, the readjusters promised repeal of anti-black measures such as disenfranchisement for petty larceny and for receiving a public whipping. These two measures had prevented about three hundred Negroes from voting since 1876, and in close elections, 300 votes emerged as important indeed.[14]

Once again the police found themselves in the midst of the controversy. The Whig reported that the funders required the police to contribute to their cause, and one policeman said, "We were politely requested to pay the money, but we knew what the result would be if we refused to put up." But despite the campaign's emotion, the police kept order.[15]

The readjusters won the governor's chair in 1881 and instituted sweeping reforms. They abolished the poll tax, outlawed the whipping post, revised the state tax codes, expanded public schools, and opened a mental hospital that served blacks. In 1882, readjuster assemblymen sparked a bitter debate by introducing the Metropolitan Police Bill which would enable the state legislature to appoint the police.[16]

------

[14] "Official List of Colored Persons Convicted of Felony or Petit Larceny in the Hustings Court of the City of Richmond and thereby Disenfranchised." Official Lists of Dead, Lunatic, and Convicted Colored Males Who Are Thereby Disenfranchised (Richmond, Virginia, October 24, 1892), n.p. Pamphlet in the McGregor Collection of the University of Virginia Library; "Official List of Colored Persons. . .in Police Court . . .Richmond and thereby Disenfranchised." Official Lists. . .Disenfranchisement, n.p.

[15] Whig, October 3, 1882; Dispatch, October–November, 1881.

[16] Charles Wynes, Race Relations in Virginia, pp. 22-23, 135; Christian, Richmond, p. 376; Dispatch, January 24, 1882.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1086

110

As in the 1840's, the _Dispatch_ and the Whig vigorously debated
the issue of a state-controlled police. The _Dispatch_ branded the bill
unconstitutional because "the General Assembly power is merely designa-
tory. It can't appoint the city officers itself." The _Dispatch_ feared
that if elected, the readjusters would remove Richmond police officials
as the readjusters had removed Norfolk police commissioners in early
1882. Predictably the _Whig_ favored legislative control as the only
method guaranteeing justice. As for the Norfolk action, the newspaper
claimed that the police commissioners were not city officers and there-
fore were subject to state control.[17]

Despite the readjuster changes, crime trends did not change. (See
chart.) Between 1877 and 1881 crime decreased slightly, and during the
readjuster years (1882-1885) arrests increased marginally. Petty lar-
ceny and other misdemeanors which had previously caused disenfranchise-
ment generally remained the same regardless of which party controlled
the governor's chair. Serious crime did not emerge as a problem as
murder and rape numbered under five per year. Chief Poe stated in 1881
that the city was "remarkably quiet" and the police had solved every
major crime except one murder. In 1885 Mayor Carrington stated, "The
police force was fully competent to all duty necessary to assure a con-
viction. . . ."[18]

A number of factors caused such a small amount of crime to occur.

---

[17] _Dispatch_, January 24, 1882; _Whig_, January 25, 1882.
[18] City of Richmond, "Annual Report of the Chief of Police, 1877-
1885; "Annual Report. . .1886," p. 5; _CCM_, November 9, 1885, p. 333

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

111

First overpopulation did not plague the city and thus reduce the chances of violence. In addition, the city did not have any organized gangs which caused most murders and burglaries in other cities. Finally Richmond's stable tobacco and commercial economy mitigated the economic distresses of the Gilded Age. When violent crime did occur, the police effectively investigated the case and generally caught the offenders. In 1885, for instance, Chief Poe himself diligently investigated the murder of Fannie Madison and eventually apprehended her killer, T. J. Cluverius.[19]

Black crime patterns remained unchanged between 1877 and 1885. The police arrested more blacks than whites, but a majority of Negro wrongdoing consisted of petty theft and drunkeness. As in the past, other black crimes occurred, as the newspapers recorded weekly instances of robbery, stabbings, and assaults. While police surely exhibited racist behavior, the statistical data indicated that the force arrested the same number of Negroes regardless of the political situation. Richmonders usually explained this large amount of Negro crime by ascribing it to the Negro's native inferiority, laziness, and criminal proclivity. The Dispatch described a court scene which implied the black's natural inclination to wrongdoing: "Nappy headed men and un-kempt women. . .familiar with vice — all of them without exception colored."[20]

---

[19] _Dispatch_, March 13, 1885.

[20] "Annual Report", 1877-1885; _Dispatch_, January 16, 1877, April 23, 1886; August 1, 1882.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

112

One might, then, discount the readjuster impact on Virginia politics. Journalist J. B. Harrison wrote in 1882 that the Cameron adminstration did not really aid blacks significantly. Nonetheless the Negroes viewed the reforms as meaningful and the readjusters as staunch allies. The Washington Bee said that the readjusters "made it safe for a man to be a Republican. . ./they/ have been mainly instrumental in compelling. . .a show of justice for all men regardless of color or politics." Historian Charles Wynes stated, "The readjuster movement had indeed restored the Negro to political prominence. . .The readjuster rule meant a greater measure of justice for the Negro."[21]

Unfortunately for black Richmonders, the Democrats effectively reorganized for the campaigns of 1883, 1884 and 1885. Their strategy relied on exploiting race tensions in all the contests. In November, 1882, a few days before the legislative elections, a controversial race riot occurred in Danville, Virginia in which a number of blacks and whites were killed. Richmond closely watched Danville because the re-adjusters had controlled the town council, and blacks served as four of the city's nine policemen. The riot caused many Negroes to avoid the polls in fear of retaliation and as a result the Democrats regained control of the general assembly.[22]

Tension ran high in the Presidential election of 1884 as the Democrats feared that some readjuster election officials might attempt

---

[21]
J. B. Harrison, "Studies in the South," Atlantic Monthly (1882), pp. 102-103; Washington Bee, January 20, 1883; Wynes, Race Relations in Virginia, p. 21.
[22]
Wynes, Race Relations, pp. 29-30.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

113

bribery or other illegal procedures.  However, the election avoided any
violence, and even readjuster Governor Cameron wrote, "No official re-
ports reached me from any source of violence or ill doing during the
late election."  Democrat Grover Cleveland's election brought hope to
white Richmond, but the Dispatch avoided extreme statements and merely
stated that the triumph meant a victory for "the People."[23]

As expected, the conservative Democrats returned to the governor's
mansion in 1885.  The readjusters lacked organization, and a positive
program.  On the other hand, the Democrats possessed confidence, and
championed the white's racial fear, as Fitzhugh Lee, nephew of General
Robert E. Lee, assumed office as governor.[24]

After the political situation stabilized, the prohibition question
occupied public attention.  Prohibition had its roots in pre-Civil War
Richmond and public agitation caused council to allow a referendum on
the temperance question in April, 1886.  In the weeks preceding the
voter's decision, every variety of citizen wrote letters to the news-
papers debating every type of opinion on liquor control.  Many believed
that prohibition would cause a reduction in crime, and in one letter
"Truth" said that "going dry" would curtail lawlessness and "empty the
jails."  Nevertheless the city rejected prohibition.  The powerful
saloons which served as the basic units of ward politics as well as the
poor man's social clubs waged a spirited campaign against liquor control.
After the election the Dispatch urged party unity and warned Democrats

--------

23
    Wynes, p. 41; Dispatch, November 5, 8, 1884.
24
    Ibid., Race Relations, p. 24.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

114

"to forget recent differences among themselves on a local issue and unite solidly on the broad and vital question of maintaining intelligent and conservative government." However, resentment at the Democratic saloons had an impact on labor's rise to power in the city.[25]

Throughout the 1870's and 1880's, American workingmen received low wages, and experienced frequent cycles of heavy unemployment. In July, 1877, a series of pay reductions by the Baltimore and Ohio railroad touched off devastating rioting as serious violence erupted in Baltimore and Pittsburgh. Richmond avoided the labor difficulties, but with a large working class population, the disorder did not go unnoticed. The Dispatch condemned the rioting and declared that the workers were "outlaws" because they had stolen company time and obstructed other men's work. Later the newspaper charged, "The rate of crime owning to social revolution has been more than doubled."[26]

In conjunction with the growth of labor, the new South emerged with its increased industry and commerce. Richmond kept pace with the iron horses of progress as her tobacco, flour and iron industries expanded. Writer Joaquim Miller described the town as "roaring with progress." Another observer wrote, . . "there is a new Richmond, with snap and go, with push and enterprize, with commercial ambition, with industrial purpose, upon development intent." Finally the Dispatch added in 1891; "When the future historian comes to write the history of

---

[25] Dispatch, April 3, 4, 27, 1886.

[26] Ibid., July 26, October 9, 1877; John Commons et al, History of American Labor (New York: MacMillan, 1921), II, 151; Garraty, The New Commonwealth, pp. 130, 135.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

115

the State since the war, he will refer to the ten years just drawing to
a close as the period of Virginia's transformation."  But Richmond had
avoided the rash of labor disorders which had plagued the nation until
early 1886 when violence erupted in Virginia's capital city.[27]

In February, 1886, the city's strong Typographical Union black-
listed a local printing company which allegedly had underbid union
shops.  The Knights of Labor led a strike of the printers and other
striking workingmen and minor disturbances developed.  However, the
police controlled the situation and only one arrest resulted from the
difficulties.  Nonetheless labor distrusted the police after news
reached Richmond of Chicago's Haymarket Affair which resulted in the
killing of both workers and policemen.[28]

Aroused by years of economic frustration and outraged by the Hay-
market Affair, Richmond's labor party campaigned diligently and gained
control of city government as a result of the May 27 municipal elections.
Under the leadership of William H. Mullen, a labor convention met, sub-
mitted nominations for city council, and wrote a moderate labor plat-
form.  The election results gave labor five of six seats on council, and
marked the first victory for anti-conservative Democrats since the 1850's.
Labor gained this triumph due to a number of conditions.  First, the

---

27
    Charles Wynes, "Lewis Harvie Blair," VMHB (1964), p. 7; Allen
Moger, "Industrial and Urban Progress in Virginia from 1880 to 1900,"
VMBH (1958), pp. 322-323; New York Times, January 14, 1887; Dispatch,
March 25, 1891.
        28
        Moger, "Industrial and Urban Progress in Virginia from 1880 to
1900," p. 323; New York Times, January 14, 1887; Dispatch, February 13,
July 22, 1886, February 8, 1887, May 4-11, 1886.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

116

Democratic council had received much criticism because of its failure to build a new City Hall. Moreover the labor ticket gained the support of the blacks, the Republicans, and the Prohibitionists.[29]

Not surprisingly, the labor council proved antagonistic to police interests. In December, 1886, the council rejected a proposal to increase the force as well as install a police telegraph system. On the other hand the conservative, Democrat controlled, board of aldermen passed the motion to increase the force, investigated the use of the telegraph and recommended that council adopt it. Frustrated with the labor council's opposition to police needs, Poe called on council to improve the department. The chief stated in his annual report that the council had not added one additional position to the department in eighteen years. In addition expenses had not markedly increased which contrasted to growing expenditures in other city departments. He pointed out that only the police department "never had the ten per cent restored that was taken off all employees of the city ten years ago."[30]

Poe's criticism was justified. The city had indeed expanded the city limits and crime statistics had increased (see chart). Council's actions evidently served as retaliation because of the police's allegedly anti-labor attitude during the 1886 strike since council had approved raises for other city workers yet could not find the money for additional

_____

29
    Dispatch, May 18, 26, 27, 28, 1886; State, May 28, 1886.
30
    RBA, July 15, 1886, p. 614; CCM, December 24, 1886, p. 597, December 3, 1886, p. 572; May 3, 1886, p. 449; RBA, November 8, 1886, pp. 667-693; "Annual Report, 1887," p. 5.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

117

policemen.

Labor's firm control of city affairs quickly loosened however.  In October. 1886, the national convention of the Knights of Labor met in Richmond, but violence nearly marred the meetings.  Threats of civil disorder occurred when blacks attended the convention and then tried to enter a local theater at night.  Moreover the disclosures of labor radicalism in connection with the Haymarket Affair surfaced in late 1886 and caused public opinion in Richmond to mistrust labor even though the allegations against labor were later proved false.  At the same time the Democratic party needed labor support in the presidential election of 1888.  Thus labor and the conservative Democrats started to compromise their differences.[31]

In March, 1887, both labor and Democrats successfully opposed the state legislature's attempt at changing the police organization.  This challenge from the general assembly resulted from an 1887 Virginia Supreme Court decision which declared unconstitutional the city ordinance stating that police commissioners had to be freeholders.  Subsequently a state assemblyman offered an amendment to the city charter which voided the freehold clause.  Also he advocated that council elect the police commissioners instead of having the board of public interests nominate the men whom council, in turn, elected.  Another general assembly proposal called for direct election of the police commissioners.[32]

---

31
     Moger, "Industrial and Urban Progress in Virginia from 1880-1900," pp. 324-325.
     32
     Dispatch, March 30, 1887.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

118

Both Democrats and labor viewed the change in the city charter as unwarranted state interference in municipal affairs. One councilman demonstrated the narrow conservatism of the city representatives when he stated that the charter should remain intact because "/The writers/ of the charter must have seen some wise purpose in making the election of the police commission by the council."[33]

Democrats and labor further cooperated in naming a new mayor. In the spring of 1888 Mayor Carrington announced his retirement because of ill health. Carrington had presided over a period of growth and expansion and his fiscally conservative administration gave the business community confidence to expand. The mayor amicably cooperated with the police, and served as the force's voice at city council. However he had not appreciably aided labor, and the workingmen's leaders wanted a more sympathetic mayor.

Both factions agreed on J. Taylor Ellyson, a young businessman, and son of former Mayor Henry Ellyson. The Dispatch commented that the party had achieved unity and that the city government emerged as Democratic from "Center to circumference." Later, the same newspaper said, "The 'Reformer' and the 'Primary Democrats' of two years ago are not known at this election. All are Democrats now. . .it is believed that the results will show the party is truly reunited."[34]

The union of conservative Democrats and workingmen Democrats succeeded as Grover Cleveland carried Richmond in the 1888 Presidential

---

[33] Dispatch, March 30, 1887.
[34] Ibid, April 19, 1888, July 3, 1888.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

119

election.  Despite the unified party, the Democrats relied on race
hatred extensively to gain victory.  The Dispatch said, "The issue is
the saving of southern civilization, and no white man of the south can
give reasonable excuse for voting the Republican ticket."  The election
avoided violence, but in one instance police arrested blacks on illegal
voting charges.  Although the Republicans gained the White House,
Richmond felt secure that the Democrats would control the state and the
city.[35]

     After the political situation stabilized, the city continued its
growth and modernization.  By 1890 the metropolitan area population
reached 100,000 and Richmond's use of electric lighting, street cars,
and expanded municipal services gave an air of self assurance despite a
national economic depression from 1890 to 1895.  In an editorial en-
titled "How to Better Richmond" the paper evaluated the city and stated
that the urban area needed better hotels, improved streets and more
public transportation.  As for the police, "The effectiveness of their
work is shown in the comparative rarity of heinous crime, and in the
peace and order which prevail even during the most exciting times."[36]

     In 1888 the new city government showed its unity by quickly approv-
ing a motion for fourteen additional policemen as well as returning
police pay scales to the 1877 level.  Poe felt enough confidence in the
Ellyson administration to request further police modernization by the

---

     35
          Dispatch, November 8, 1888.
     36
          Ibid., September 20, 1884, December 31, 1887, January 1, June 6,
1890; Christian, Richmond, p. 416.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

120

implementation of the telephone and the patrol wagon.[37]

In the early 1890's, "reform" councilmen requested a more demo-
cratic character to the police department.  In 1891, a Councilman
Courtney presented a resolution which required open meetings of the
police and fire commissioners.  Two years later, after lengthy debate,
Councilman W. S. Epps offered a motion to allow the chief of police and
other city officers such as the chief engineer to be popularly elected.[38]

All the city's newspapers opposed the Epps resolution.  The
Dispatch said,". . .The Police and Fire Departments were never so well
managed as they have been managed since they were put under the control
of the Boards."  The State and the Richmond Times opposed it also with
the latter stating that the city would become a "political camp. . .run
by a combination of political rings.  Every policeman would be the
political emissary of the Chief."[39]

The Epps resolution failed, but changes did occur.  In February,
1894 council agreed to put the question of popular election of the
city's police chief on the ballot.  The voters rejected the direct vote
for the chief's office, but did approve popular election for many other
city officials.  Furthermore in 1895 council decided that the chief of
police would be elected by the council instead of from the board of pub-
lic interests.  The Dispatch bitterly opposed this because the concept

---

[37]
    CCM, August 6, 1888, p. 285; CCOR, April 10, 1888, p. 74; City
of Richmond, "Annual Report of the Chief of Police, 1890," p. 5.
[38]
    CCM, November 2, 1891, p 216; November 6, 1893, pp. 679-80.
[39]
    Dispatch, November 8, 1893; State, Richmond Times, November 8,
1893.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 142 of 295

Case 3:21-cr-00042-JAG   Document 86-9   Filed 07/06/22   Page 128 of 275 PageID# 1184

of the board of public interests "was to be a breakwater between
politics and the people," and the newspaper feared that politicians
would use the police to gain office.[40]

The decision to alter the organization of the police was unwise.
The city experienced no demands for reform from average citizens, and
the department proved free of corruption.  The force reasonably con-
trolled crime, and the public records as well as the newspapers indica-
ted relatively few charges of brutality or misconduct.  Writer Peter J.
Burton wrote in 1892. "They /the police/ are active, energetic, and
intelligent men and fearless in their discharge of duty.  They do not
always report all they see, and exercise great discretion in preserving
order. . . ."  One can only surmise, then, that the demand for changes
in the department came from some city councilmen who resented the con-
servative nature of the police organization and who wished the people to
have direct voice in choosing police administrators.[41]

Despite the political controversies, the police kept Richmond law-
abiding during the 1890's.  Arrests generally totaled 5,500, but the
economic downturn of the early and mid 90's probably explained the
slight increase in arrest figures between 1890 and 1895.  The police did
significantly curtail vagrancy, as arrests in that category dropped from
502 in 1891 to 91 in 1895.[42]

---

[40] CCM, February 5, 1894, p. 727; November 4, 1895, p. 477-8; RBA,
November 14, 1895, p. 510; Dispatch, November 16, 1895.

[41] Peter J. Burton, Police Court Pictures At Richmond, Virginia
(Richmond:  C. N. Williams, 1892), p. 21.

[42] City of Richmond, "Annual Report, 1886-1895."

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

122

Despite this respectable record, the Whig complained about the large number of arrests compared to the small number of convictions. The paper pointed out that in one month the court dismissed 600 of 711 arrests.  The Whig realized that the policemen with the highest number of arrests would gain the quickest promotion but the newspaper warned that the force "exercise the great power vested in them with more discretion. . . ."  The Whig's point seemed justified as many times the police had jailed citizens on specious grounds; the most notable examples involved black Richmonders.[43]

In the 1890's Lewis H. Blair, a Richmond businessman attacked Richmond's unfair treatment of blacks.  Blair, a white, and a Democrat, had served in the Confederate Army and managed a prosperous general business firm in the city.  In his book, The Prosperity of the South Dependent Upon the Elevation of the Negro, Blair argued that the black should be given political, economic, social, and educational freedom in order to aid the new industrial order.  Although he did not state that the police had unjustly treated the Negro he clearly implied that blacks received less than impartial justice in the city.  The Richmond public ignored his book, but it received praise throughout the North and West. During the 1890's he also wrote letter after letter to the Dispatch urging racial justice, but the paper angrily called him a "heretic."[44]

Harvie's letters did little to alter the plight of Richmond's blacks.  The 1886 - 1895 years witnessed a continuing decline in their

---

43
    Whig, September 30, 1888.
44
    Wynes, "Lewis Harvie Blair. . . .", pp. 12-13.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1099

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 144 of 295

123

political, economic, and social fortunes.  In 1894 the legislature
passed the Walton Act which created a literacy requirement to vote.
Over half of Virginia's Negroes could not read, and according to Wynes:
"Embarrassed by their ignorance and ashamed to admit it, vast numbers
of the illiterate stayed away from the polls. . . ."  As the depression
of the 1890's grew, blacks experienced unemployment and poverty.  Al-
though the Negroes could expect only minimal justice from the police, at
the death of John Poe in June, 1895, police-Negro relations appeared
sure to decline.[45]

 Poe's death touched off many eulogies.  The Dispatch said that
the chief tried never to obtain newspaper attention and he would rather
settle cases out of court than in the light of publicity.  The newspaper
further commented, "He never sought notoriety.  He might have had his
name in the newspapers a dozen times a day, but it never appeared upon
any motive of his. . ./the people of Richmond/ showed confidence, but
expressed no enthusiasm."  In another editorial the Dispatch asserted
that Poe's greatest asset was his ability to inspire good work and
obtain respect from subordinates.  The State also praised Poe and men-
tioned his dislike of notoriety.  Even the Richmond Planet, the city's
Negro newspaper, described him as "beloved."  Three years after his
death the Illustrated Richmond Police and Fire Directory stated that Poe
had an "unequalled record in that during his entire incumbency no
offense of gravity was committed in this city that the offender was not

---

45
 Wynes, Race Relations, p. 52.
46
 Dispatch, June 19, 29, 1895; State, June 18, 1895; Planet, Jan-
uary 4, 1896; Illustrated Richmond Police and Fire Directory, pp. 25-26.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

124

apprehended directly or indirectly through his efforts."[46]

Few policemen have recorded as distinguished a record as Poe.  He
competently administered the department, and he introduced many techni-
cal innovations to improve police efficiency.  The chief proved himself
a skillful politician by defending his men and his department before the
financially sparing council.  Poe did not exhibit blatant hostility
toward Richmond's blacks, but he certainly did not improve race relat-
ions either.  In short, he served honestly and selflessly, but he could
not transcend his time or his environment.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1101

125



ARRESTS, RICHMOND    1877-1895

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1102

CHAPTER VII

THE DECLINE OF THE RICHMOND POLICE, 1895-1912

By both national and local standards, the Richmond police had
functioned effectively in the Gilded Age.  However, between 1895 and 1912,
conditions arose which caused a decline in the department's performance.
Poor handling of a 1903 labor disorder, and careless enforcing of pro-
hibition laws essentially weakened the force in the public's eyes.

After John Poe's death in 1895, the board of police commissioners
chose Benjamin F. Howard to succeed Poe.  Howard, a thirty-year veteran,
moved from police sergeant to police chief in sixteen days.  As a
patrolman, he had not achieved an unusually distinguished record, but
his long service and his unquestioned loyalty to the Democratic party
evidently won him the position.  The Dispatch and the State reacted with
mild surprise at his appointment, but also confidently stated their
trust in his judgement.[1]

Chief Howard joined with newly elected Mayor Richard Taylor to
sustain the city's conservative leadership.  As with most of his prede-
cessors, Taylor had represented the business community, had served in a
variety of municipal posts, and had consistently supported the Democrat-
ic party.  He mainly directed his attention to continuing expansion

_____

[1]
   Dispatch, June 29, 1895; State, June 29, 1895.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

127

while minimizing expenditures in light of the depression of the 1890's.[2]

The economic instability adversely affected the police as council parsimoniously examined municipal financial requests. The city assembly constantly ordered that the police cut costs, and in 1897 passed a motion reducing expenditures for department equipment. Council's reluctance to establish an adequate pension plan caused the police to organize in 1898 the Police Benevolent Association which aided injured policemen and their families. Since the policeman's life frequently involved danger, and since the public expected him ready for duty twenty-four hours a day, his only method of adequate security rested in the Police Benevolent Union. Nonetheless, the council did approve a five percent pay raise for officers with ten years or more service and allowed the purchase of a patrol wagon. This regretable financial situation probably weakened morale and possibly caused more capable persons to reject police work.[3]

Despite the poor pay scales, the force satisfactorily controlled crime, and between 1895 and 1900 arrest figures showed a general decrease. Part of the reason for the decline stemmed from the Spanish-American War which brought relative prosperity and enabled many vagrants to find employment. Throughout 1897 and 1898, the chief sought to close illegal taverns which most of the community believed contributed to lawlessness. Thus the last years of the nineteenth century witnessed

---

[2]
   Goodrich, "Mayors," p. 29.
[3]
   CCM, June 7, 1895, p. 347, May 4, 1895, p. 316; RBA, May 25, 1897, pp. 20-21; CCM, June 6, 1898, p. 447, May 29, 1897, p. 171.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

128

Richmond as a peaceful urban center.[4]

Although in the 1890's crime decreased, racial problems increased. As usual, black arrests outnumbered white arrests but the last years of the century witnessed Negroes protesting police injustice. The Richmond Planet constantly pointed out law enforcement prejudice. In 1896, for instance, when R. F. Tyler (white) shot and wounded Jack Carr (black) the courts examined the case with minute scrutiny. But, the Planet noted, if a black had shot a white, the Negro "would have been railroaded to the state's prison. . . ." Moreover, in another incident when a white man killed a black man, the Planet believed that the police lacked their usual zeal. Later that same year, an officer killed a seventeen-year-old black because he ran after stealing $5 in merchandise. The Planet stated that the amount of force did not fit the crime and would never have been used against white petty larcenists. In 1898 the Planet condemned the violence against the Negro in both the city and the nation and stated, "We are sick at heart over the butchery of our people. Self-defense should be our watchword."[5]

Community spokesmen responded with strident racism. Christian declared that the city rejected "Anything that savors of social equality," and the Dispatch summed up most white feeling, "Let the Negro be informed he will be protected in all his rights, but that the white man must be boss."[6]

---

[4] City of Richmond, "Annual Report, 1895-1900."

[5] Planet, July 4, August 1, 1896, February 26, 1898.

[6] Christian, Richmond, p. 460; Dispatch, November 2, 1898.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

129

Nonetheless, the _Planet_ accepted some of the assumptions of white society.  When a black man killed a policeman, the _Planet_ regretted the "murder" and complained of the presence of Negro "lawless elements" in Richmond, and that "so many of our young men are idlers and so many of our young women spendthrifts."  However, the _Planet_ noted that the blacks involved in the shooting lived in North Carolina.  A week later the newspaper praised the Richmond community and the police because of its objective investigation of the killing and said, "Had this been a lawless community, no less than six people would have been lynched for a crime committed by two unknown individuals."  Finally in 1900 the _Planet_ urged the Negroes to obey the law and lamented the fact that twice during the summer citizens had to call the police to break up Negro picnics because of rowdyism.[7]

The Planet used white criminal activity as a method to end racism. The newspaper continuously cited stories of heinous law breaking by whites which demonstrated that wrongdoing crossed color lines.  Besides the typical crimes of murder and robbery, the Planet identified a white rapist, and in 1899, reported that a white school superintendent was convicted of incest.[8]

The Planet's news articles did little to end race animosity in Virginia.  In 1902, the Old Dominion revised its constitution, and the new document virtually disenfranchised the Negro through a series of restrictions such as the poll tax and the literacy test.  The 1902

---

[7] _Planet_, April 16, 23, 1898, August 11, 1900.
[8] _Ibid._, July 3, 1897, October 21, 1899.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

130

constitution marked the culmination of a long movement for change in the
state's organic law.  Most citizens had never accepted the Underwood
constitution of 1868 which had given the Negro the right to vote, and
in 1888 and 1897 groups had unsuccessfully organized to rewrite the
state's highest laws.  By 1902 anti-Negro advocates had gained enough
strength to cause political leaders to convene and revise Virginia's
constitution.[9]

The new repressive constitution reflected the pronounced outbreak
of racism occurring throughout the nation.  In books, newspapers, and
magazines white supremacy had gained credibility.  By 1902, even Lewis
H. Blair, former Negro defender, attacked blacks for racial inferiority.
An editorial in the newly formed conservative Richmond paper the Times-
Dispatch emphasized racial fears by stating in January, 1903:  "Every-
time he /the integrationist/ brings the negro into prominence, either
politically or socially he crosses the race instincts of the whites."
Later that year, the newspaper stated, "The Fifteenth Amendment has prov-
en to be a curse rather than a blessing for the negro."  James Hayes, a
black, wrote to the Times-Dispatch that "Negroes are leaving the state
of Virginia because of the treatment they are getting."[10]

The political emasculation of the black did not greatly affect
criminal affairs.  Arrests remained basically stable for whites and
blacks alike.  Although council approved additional positions for the

------------

   9
    Moger, Bourbonism, p. 182; Wynes, Race Relations, pp. 54-56;
Dabney, Virginia, pp. 430-436.
   10
    Wynes, "Lewis H. Blair," pp. 15-16; Times-Dispatch, January 27,
1903, February 21, January 30, 1903.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

131

force, still Chief Howard complained that additional men would be necessary to preserve "our property and the proper enforcement and execution of our laws." The Times-Dispatch agreed and stated, "The streets are not sufficiently patrolled and. . .more policemen would prove a boon in the way of protection."[11]

Despite the police's acceptable control of crime, the violent street car strike of 1903 showed some weaknesses in the department's ability to keep law and order. The street car riot began when the Virginia Passenger and Power Company failed to agree on pay scales with the Richmond Union of Amalgamated Association of Street Railway Employees. Initially the majority of recorded public opinion sympathized with the workers' wish to gain better pay. The Times-Dispatch said, "The men had the right to strike and they are conducting themselves in an orderly manner." The News-Leader added, "The men deserved credit for their conduct so far."[12]

Newspaper opinion generally commended the police handling of the workers' picket lines. When sporadic incidents of window-breaking and rock-throwing occurred, the Times-Dispatch described police behavior as "excellent" and the board fined only one policeman for failing to calm a minor disorder. Later, the newspaper praised the force, denied a

_____

[11]
RBA, October 14, 1901, p. 760; City of Richmond, "Annual Report, 1902," p.7; Times-Dispatch, February 24, 1903.
[12]
Christian, Richmond, p. 489; CCM, June 15, 1903, p. 175; Times-Dispatch, June 18, 19, 1903; News-Leader, June 19, 1903; Thomas J. Headlee, "The Richmond Transit Strike of 1903," (University of Richmond, Master's Thesis, 1960), pp. 49-50.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

132

rumor that the police had sided with the company, and said the "police
are on the side of protection of law and property." The Alexandria
Gazette and Virginia Advertiser stated, "The police protection in the
city is good." The New York Times commented, "Richmond shines by con-
trast with more than one Northern municipality. . .in this respect of
enforcing law and keeping peace." But the News-Leader stated, "The
police were not as astute or as stern as the occasion required."[13]

But on June 23, 1903, serious disorder occurred in which police
and rioters exchanged fire. In addition, some strikers destroyed
electric transformers and lights went out in various parts of the city.
The force could not control the situation and the governor ordered the
militia into Richmond. Although the militia was often called in during
strikes, Richmonders looked at the appearance of the military as a re-
jection of the police's ability to handle the situation. On June 26,
strikers shot and wounded some soldiers and the militia men in turn
killed two citizens. Violence continued during June and early July.[14]

During the rioting, citizens charged a total of five policemen
with misconduct and brutality, but the board of police commissioners
found only one officer guilty and discharged him. On the other hand, the
Alexandria Gazette said that the police sided too strongly with labor,
and the Fredericksburg Free Lance observed that the police "have

_____

13
    Times-Dispatch, June 19, 20, 24, 1903; Alexandria Gazette and
Virginia Advertiser, June 22, 1903; New York Times, June 26, 1903; News-
Leader, June 19, 1903.
    14
    Times-Dispatch, June 23, 24, 25, 26, 1903.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

133

sympathized with the strikers to the extent of allowing disorder with-
out an effort to assert the offenders." In general the Times-Dispatch
and the News-Leader praised the police handling of the most violent
rioting, and to the other papers' criticism, the Times-Dispatch said,
". . .nor are we apoligizing for the police. Some of them undoubtedly
were delinquent." The Opinion, the strikers' own newspaper, revealed
that the police had probably shown some partiality to the workers, as
the Opinion stated,"We have the kindliest feelings for our policemen. .
. .They are good men. They are gentlemen."[15]

The strike slowly lost momentum in the end of July, 1903. On July
22, troops left the city and in late August the union voted to return
to work. As a result of the disorders labor had demonstrated its power,
but it still lacked enough strength to force its demands on management.
Nation summed up the checkmated labor situation in July, 1903: "Labor
unions are stronger than ever. . .Yet they have only called out a strong-
er force on the other."[16]

After the strike, the council realized that the police needed
more men and new equipment. The city increased the patrolmen positions
and provided the department with a new police wagon. The force changed
from a three-district to a two-district organization which permitted the
chief to assign additional officers to the streets. The Times-Dispatch
vigorously supported the change and called for even more policemen for

---

15
    Times-Dispatch, July 16, 18, 25, 30, 1903; News-Leader, July 30,
1903; Richmond Opinion, June 27, 1903.
16
    Times-Dispatch, July 22, August 25, 1903; Nation, July 2, 1903,
p.5.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

134

"our police are now worked hard." A few days later the newspaper asserted, "The crying need in the city is for more men to do patrol."[17]

In retrospect the rioting weakened the police in the eyes of public opinion. Although many observers complimented the policemen, Richmond leaders expected the force to completely control disorder. The force occassionally failed to protect property, and appeared too sympathetic to the workers. Moreover the cases of misconduct indicated lack of training and discipline as the city tolerated no misconduct. While the turbulence provoked the council to assist the police and generally aided relations between the police and the union, the total impact of the disorder indicated that the force lacked the personnel to handle large urban emergencies.

Prohibition also hastened the decline of the Richmond police. Under the leadership of Reverend James Cannon, the "drys" shaped Virginia public life from 1901 to 1933 because of their ability to influence large numbers of rural as well as urban voters. In 1903, for example, the city council urged the Richmond delegates to the state legislature to vote for restriction of saloons. In 1904, prohibition advocates charged Chief Howard with poor enforcement of the liquor laws, and council admonished him to insure that the city complied with the anti-drinking ordinances. Moreover the force constantly raided buildings for liquor and gambling violations in the first decade of the twentieth

---

17
     CCM, November 3, 1903; p. 277; March 7, 1904, p. 396; Times-Dispatch, January 7, 13, 1904.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1111

135

century.[18]

One of the major arguments for liquor restriction concerned the belief that prohibition would reduce crime. However, statistics indicated that while crime generally stayed the same (see chart) drunkenness arrests did, in fact, increase. Nonetheless police reasonably controlled serious wrongdoing as murders never exceeded fifteen, and rape never totaled more than ten.[19]

Despite the satisfactory control of crime, failure to enforce prohibition laws contributed to the department's first scandal in 1904. In January of that year, Chief Howard had charged an Officer Wyatt with dishonesty, but an inquiry by the police commissioners found the officer innocent. Wyatt had a reputation for aggressiveness against gambling and liquor and he had publicly stated that the police had failed to raid many illegal houses, implying that officials had ordered policemen not to raid some crime spots. The board's failure to convict Wyatt appeared as a vote of no confidence for Howard and the city newspapers stated that public opinion and public confidence demanded resignation. Consequently Howard resigned in February, 1904.[20]

No evidence existed of widespread corruption under Howard, but he did lack supervisory skills. The chief failed to cope adequately with the problems of strikes and the pressures of public opinion. Finally

---

[18]　　Moger, Bourbonism, p. 298; CCM, March 2, 1903; Times-Dispatch, March 15, 1903, January 12, 1904; Christian, Richmond, p. 585; Times-Dispatch, January 27, 1903.

[19]　　City of Richmond, "Annual Report, 1901-1905.

[20]　　Times-Dispatch, February 2, 3, 6, 7, 1904; News-Leader, February 2, 1904.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

136

Howard's outlook seemed anachronistic in the "enlightened" progressive years as Howard summed up his attitude in this statement: "To be a good policeman, a man must feel he is on duty all the time, and do whatever is needed to be done." But the police needed more than idealistic state-ments in the first decade of the twentieth century.

Captain Elijah P. Hulce temporarily replaced Howard in July, 1904. As with Howard, Hulce believed in an old style force as he wanted patrolmen to know their beats so as to "ascertain the name, residence, and character of all residents therein." Hulce did a creditable job during his tenure but the Times-Dispatch commented that many police board members felt a desire for a new leadership. With a mayorality election scheduled in September, 1904, most observers felt a change im-pending.[21]

In the 1904 mayorality election, Carlton McCarthy defeated the incumbent, Richard Taylor. McCarthy, a grocer and businessman, had pre-viously served as city accountant. During his campaign he called for a more vigorous city government, but his victory margin came from the prohibition forces. The News-Leader commented, "It ought to be a lesson to the liquor dealers and to every other class in the community, that no class, no special set of men. . .can govern Richmond."[22]

In office, McCarthy condemned the council as petty and refused to discuss common city needs such as improving schools and transportation.

---

[21]
    Times-Dispatch, July 1, 1904; October 18, 1904.
[22]
    Goodrich, "Mayors," p. 30; Times-Dispatch, April 17, 19, 1904; News-Leader, April 27, 1904.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

137

Although considered a reformer, McCarthy did not extend his uncompromising criticism to the police as he apparently wished to put his own man in the department.[23]

In April, 1905, the police commissioners elected Sergeant Louis Werner to replace Chief Hulce for a three-year term. Werner, a veteran police officer, emerged as an innovator as he advocated the creation of the posts of police inspector and police matron as well as requesting an additional officer and police dogs. In all cases the council granted his requests and Mayor McCarthy supported him.[24]

Between 1906 and 1912 Werner adequately controlled crime. Criminal arrests fluctuated, but generally averaged about 9,000 per year. Violent crime infrequently occurred as murder did not exceed twenty per year nor did rape arrests exceed fifteen per annum. Economic prosperity as well as efficient police patrolling kept crime within reasonable bounds. In October, 1907, the News-Leader commented, "Richmond really is a remarkably orderly and peaceful community." By far, liquor control constituted the most controversial and most debated police activity.[25]

Curbing illegal drinking occupied most police time, and indicated the importance of prohibition opinion. Throughout 1906 the force broke up fake "clubs" which served whiskey on the Sabbath. The following year, the police diligently enforced the Umlauf law which closed saloons at

---

23
    Times-Dispatch, March 2, April 2, 1907.
24
    Ibid., April 6, 1905, May 5, 1907; City of Richmond, "Annual Report, 1905-1907; CCM, October 2, 1905, p. 74, March 1, 1909, p. 135, November 12, 1907, p. 9.
25
    City of Richmond, "Annual Reports, 1906-1912;" News-Leader, October 30, 1907.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

138

midnight and required a clear view of the bar's interior from the street. Chief Werner stated, "I cannot recall in my long connection with this force any work that was of greater importance to the moral welfare of this city than the results achieved in this crusade."[26]

Despite much police activity and public concern, drunkenness arrests arose and crime did not decrease. Drunkenness arrests averaged about 1,000 per year and the city press, critics of prohibition, pointed out that the arrest total remained about the same regardless of the number of saloons.[27]

Illegal saloons also sponsored illicit gambling and police arrests for this offense increased from 19 in 1906 to 147 in 1910. In 1908 officers closed numerous "Policy" houses and pharo establishments, and in 1910 patrolmen arrested fifteen blacks who had used a literary club as a cover for a gambling den. In order to control gambling money, and to discourage theft, the council passed a resolution stating that pawn shop owners had to make a written report to the police chief of all jewelry pawned in the previous twenty-four hour period.[28]

In addition the progressive era marked a police campaign against illegal drugs. The first mention of illicit drugs in Richmond concerned arrests for cocaine possession in 1906. Much of the drug traffic

---

26
    City of Richmond,"Annual Report, 1906," p. 5; *Times-Dispatch*, February 3, 1907, October 18, 1909.
27
    *Ibid*.;"1905-1912;" *Times-Dispatch*,August 31, 1908; *News-Leader*, October 30, 1907.
28
    *Times-Dispatch*, September 7, 1908, February 24, 28, 1910; *CCM*, September 5, 1911, p. 699.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 160 of 295

Case 3:21-cr-00042-JAG   Document 86-9   Filed 07/06/22   Page 146 of 275 PageID# 1202

centered in the black neighborhoods, and in 1909 police incarcerated a Negro named Charles White whom police believed controlled local drug traffic. In December, 1910, the department announced two other drug raids in which the police claimed apprehensions of notorious drug dealers.[29]

While the progressive years saw new police activities, the era experienced no change in police-Negro relations. By 1912 segregation characterized Richmond society, as separate racial facilities existed in churches and on public transportation. Even the police had a separate Negro cell. Poverty and political estrangement caused many blacks to turn to crime and not surprisingly then, the police arrested more blacks than whites.[30]

Nonetheless the police demonstrated considerable skill in dealing with some black problems. In May, 1905, the Times-Dispatch praised Werner for protecting Negroes accused of attacking a white girl, and in 1907 an officer stopped a riot between blacks and whites. In November of that same year, both Negro and white neighborhoods formed a vigilance committee to protect their vicinity as a result of a number of assaults on white women by Negroes. However, the mayor and the chief talked the people out of the vigilance group, as Werner pointed out that an over-zealous citizen might harm an innocent person.[31]

---

29
   City of Richmond, "Annual Report, 1906," p. 5; Times-Dispatch,
30
   CCM, November 8, 1906, p. 592; City of Richmond, "Annual Reports,
1906-1912."
31
   Times-Dispatch, May 10, 1905, March 30, November 14, 16, 1907.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

140

The annexation of the city of Manchester, across the James River from Richmond, added to police responsibility. Council authorized more policemen, but the city did not have as much police protection in relation to population as New York, Philadelphia, and Atlanta. In addition dicipline problems increased as accounts of drunkenness and misconduct grew markedly. Therefore in 1910 the board announced strict account-ability concerning police time and activities.[32]

However, the police did have their supporters. The Times-Dispatch praised the force because of its honesty: "With so many American cities scouraged and sucked by this hateful thing /graft/ it is a matter for sincere congratulations that Richmond is mercifully spared it. This city is clean." Frequent heroism during fires gained them favorable comment. In 1907 the Times-Dispatch praised the police department for detective work in stopping a railroad robbery, and stated that "by clever work the detectives and the patrolmen here have landed several crooks who were dangerous to any community." Later that same year two delegates to the Eposcopal Church praised the work of police in handling crowds at the churches' convention. The Times-Dispatch stated, "Our policemen did not put on their good manners for the occasion. Courtesy and consideration is their rule of conduct."[33]

Nonetheless, criticism appeared from various sources. An out-of-town newspaper asserted that "life was cheap in Richmond" as a result of

---

[32] City of Richmond, "Annual Report, 1910", p. t; Times-Dispatch, January 4, February 19, December 2, 1910, September 30, 1909, October 13, 1910.

[33] Times-Dispatch, November 5, 1909, February 25, 1903, January 5, 1904, January 26, 28, October 4, 1907.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

141

a shooting in which a white street car conductor killed a black man be-
cause he tried to leave the vehicle without paying the nickel fare.  In
1910 military authorities complained about police rudeness after a
patrolman arrested a number of soldiers who reportedly fired their
weapons on a street car.  Occasionally citizens charged lawmen with
neglect of duty and drunkenness.  Between 1910 and 1912 complaints against
police rose appreciably.[34]

In October, 1910, the _Times-Dispatch_ presented an analysis of
police life.  The article described the supervisory nature of the police
sergeant's job, and followed him as he checked the patrolmen's appear-
ance and made spot checks on their beats.  However the tone of the
article mocked the policemen and portrayed the police sergeant as main-
ly answering endless petty complaints.  The essay, then, reflected the
low esteem that the community felt toward the police in the early
twentieth century.[35]

Such suspicion occurred throughout the nation as the country's
magazines such as McClures, _Independent_, and North American Review
monthly focused on police misconduct and inefficiency.  One author
aptly summed up the declining status of American police, "To come
squarely at it, the police force of nearly every large American city is
under suspicion."  In the next few years, Richmond proved no exception.[36]

---

[34] _Times-Dispatch_, October 26, September 8, 1910; CCM, June 3, 1903.
[35] _Ibid._; October 17, 1910.
[36] Bopp and Schultz, _A Short History of American Law Enforcement_, p.
65; Franklin Mathews, "The Character of American Police," _Worlds Work_
(December, 1901), p. 1314; see virtually any issue of _McClures_,
_Independent_, _North American Review_, 1900-1912.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

142



ARRESTS, RICHMOND 1895-1912

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHAPTER VIII

"TURN ON THE LIGHT:"  POLICE INVESTIGATIONS, 1912-1918

George Ainslie's election as mayor in 1912 marked a period of
sweeping upheaval in Richmond government.  Virtually every year of his
tenure witnessed a significant change in municipal organization.  Un-
doubtedly stimulated by Woodrow Wilson's progressive victory.  Ainslie
launched on a sweeping program to reform the city police department.

Ainslie succeeded D. C. Richardson (1908-1912) who retired from
the mayor's office to become a judge.  Richardson had continued the con-
servative and passive rule so characteristic of Richmond's mayors.  Con-
versely, Ainslie had gained a reputation as a pronounced reformer, and
most importantly he had received the support of the prohibitionists.
Ainslie practised law and had served on the police commission, and even
the "wet" Richmond newspapers extended their support as the Times-
Dispatch and the News-Leader asserted confidence in this judgement.[1]

The new mayor took office amid a major structural reorganization
of the council.  In August, 1912, the citizens voted to create adminis-
trative boards to replace the inefficient council committees such as
those of health, light, streets, and finance.  The administrative boards

---

[1]
Goodrich, "Mayors," pp. 31-32; Christian, Richmond, pp. 523-545;
Times-Dispatch; News-Leader, September 5, 1912.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

144

received the complete support of the city newspapers, as the Times-Dispatch commented that the new system put the city on a business basis and that municipal government "was pure business and not a matter of individual friendship or political preference. . .Its success. . . . depends. . .upon the same close study, practical knowledge and efficient labor that makes any other commercial undertaking a success." Only former mayor Carlton McCarthy objected as he stated the boards represented "the half-hearted attempt of a council conscious of its own inefficiency. . . ."[2]

With the new council organization arranged, Ainslie turned to law enforcement matters. At first the mayor and the police mutually cooperated. In March, 1914, Ainslie and Werner testified against a general assembly bill which would prohibit harrassing of prisoners during interrogation and would void confessions obtained under duress. Moveover the proposal provided for jail terms for policemen who would violate the proposed law. The mayor opposed such a law because as in the words of one police detective "it would make Richmond a mecca for thieves and the lawless." Later that month Ainslie did not object to chief Werner's protest against a juvenile court policy of withholding offenders' names from the public to spare the teenagers the embarrassment of publicity.[3]

However, as a result of the vice commission investigation of 1914-1916, the mayor began a full scale reform of police affairs. The vice commission inquiry marred the police's reputation, purged the department

-------

2
  Times-Dispatch, August 4, 23, September 9, 1912.
3
  Ibid., March 10, 14, 1914.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1121

145

of corruption, and contributed to the elimination of the board of police
commissioners.  Additionally, the commission's findings inspired city
leaders to examine conditions which fostered crime as well as to initi-
ate programs to reduce law breaking.

The commission convened in 1914 at the mayor's request to study
city vice conditions.  According to the newspapers, in 1905 Mayor
McCarthy, Chief Werner, and the board of police commissioners had agreed
to tolerate a "district" in which prostitution, gambling, and illegal
drinking could discreetly exist.  This arrangement purported to keep
vice in one segregated area and hopefully prevent it from spreading to
residential neighborhoods.  No written records of such an agreement ex-
isted, and neither statistics nor impressionistic evidence indicated the
need for such a district.  Furthermore, rumors persistently claimed that
prostitution indeed had infested residential areas, and Mayor Ainslie
therefore urged an examination of local vice.[4]

In February, 1915, the commission completed its report and handed
a nine-page summary of its findings to the mayor and the council.  Essen-
tially, the commission urged the mayor to end the vice district as the
commission stated that 400 prostitutes operated outside the district and
only 200 within the segregated area.  In addition the commission specifi-
cally recommended that to reduce vice the police chief should have
control over his men instead of allowing the police commissioners to
direct the force.[5]

---

[4]
Times-Dispatch, March 18, 19, 1914.
[5]
Ibid., February 6, 1915; News-Leader, February 11, 12, 1915.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

The report generated considerable press response.  The <u>Times-Dispatch</u> condemned the police department for the vice situation, called for a police investigation, and stated, "Even the meanest intelligence can understand that such houses cannot be operated without the knowledge and acquiescence of the police."  The <u>News-Leader</u> also demanded an investigation and said that in alleging wrongdoing outside the district, "The commission reaches conclusions as surprising to many as they are distressing to all."  But the conservative <u>Evening-Journal</u> stated, "It is unfortunate that circumstances should make such investigations necessary.  They never do a city any good. . .The so-called vice commission attacked the board by innuendo."[6]

The police commissioners proclaimed their innocence in response to the vice inquiry and newspaper allegations.  Police commissioner W. Douglas Gordon stated that most city leaders considered "restriction" an effective way to curtail vice, and commissioner W. H. Parker denied any knowledge of police misconduct involving bordellos.  On February 8, police commissioner Boykin said that since January, 1911, the board had ordered Chief Werner to end prostitution outside the restricted district.[7]

Werner cited technicalities to defend himself.  The chief said he had issued a directive on April 7, 1914, ordering patrolmen to inform their sergeants and captains of disorderly houses before making raids. According to Werner, this procedure followed police rules which stipulated that patrolmen tell their suspicions to their captain and that the

---

[6] <u>Times-Dispatch</u>, February 7, 10, 1915; <u>News-Leader</u>, February 6, 1915; <u>Evening-Journal</u>, February 11, 1915.

[7] <u>Times-Dispatch</u>, February 7, 8, 1915.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

147

higher ranking officers should investigate. However the chief added, if the patrolman had direct evidence of unlawfulness then of course he must immediately arrest the guilty parties. Finally Werner noted that he might have received verbal recommendations concerning vice, but in police procedures, official directives had to be written, and commissioner Boynton had not written the chief any directive.[8]

A newspaper analysis of the commission findings further discredited both the police department and the police commissioners. A Times-Dispatch correspondent who had covered the vice commission first noted that disreputable houses operated with the "full acquiescence of the police, if not with direct protection of those higher up." Secondly, he asserted that the police needed defense against the commissioners because the board hired and fired patrolmen. Policemen, therefore, feared to testify about vice conditions because they might lose their jobs. In light of these comments the Times-Dispatch and News-Leader demanded an investigation to protect police officers willing to testify.[9]

The newspaper pressure provoked Mayor Ainslie to action. On February 16 he ordered an end to the segregated district. The next day he issued an order for a councilmanic investigation of the police. The Times-Dispatch commended the mayor's action and stated, "Certainly the Vice Commission did not mean that efforts at reform should end with the closing of the segregated district. . .Real reform must go a little deeper. . .Honest and efficient police administration is one of its

---

[8]
Times-Dispatch, February 8, 9, 1915.
[9]
Ibid., February 11, 13, 1915; News-Leader, February 13, 1915.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1124

148

essentials. . ."  In addition, the newspaper wanted only one police com-
missioner to direct the department's affairs, and on February 21 declared
that until the investigation reports its findings "there can be no pub-
lic confidence in the rigidity and partiality of the law enforcement. ."[10]

Nonetheless the council and board of aldermen delayed the inquiry
for a month because of their inability to determine specific charges.
The Times-Dispatch, then, unleashed a vitriolic attack on the city legis-
lators.  The newspaper asserted the delay amounted to mere "buck passing"
and urged that the vice commission supply specific evidence against the
police since the joint council could not.  On March 11, the Times-
Dispatch and News-Leader castigated city representatives who preferred
"burial to exposure," but the Evening-Journal stated that the mayor "had
nothing before him but a general and vague statement."[11]

The newspaper pressure evidently caused the council to reconsider,
for on March 19, the aldermen voted for an investigation.  The Times-
Dispatch praised the decision and asked city officials to "Turn on the
light."  On March 31, the council opened hearings amid an overflow crowd.
The city attorney first called Mayor Ainslie who gave a brief background
of the reasons for the vice commission.  Next Ashton Starke, chairman of
the commission, took the stand and provided information on the make-up
and methodology of the investigation.  Starke concluded that Chief
Werner did not stop vice because some police commissioners "interfered

---

[10]
    Times-Dispatch, February 17, 19, 21, 1915.
[11]
    Ibid., February 23, March 7, 8, 10, 11, 1915; News-Leader, March
7-11, 1915; Evening-Journal, March 11, 1915.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1125

149

with him."[12]

The next witness, patrolman Fred Krengel, offered controversial testimony against commissioners Goode, McCarthy, and Cliff Weil. Krengel said some policemen had ignored gambling, and asserted that Goode and McCarthy interfered with arrests and investigations. When asked why he did not arrest prostitutes and "pull" houses he said, "Well if you were working for a man getting pretty good salary you wouldn't want to do anything to displease him." On cross examination Goode's defense attorney proved that Krengel had dealt in stolen goods, and thus, weakened his creditability. Goode's lawyer also cast doubt on Krengel's assertion that commissioner Goode had interfered by demonstrating that Krengel could not specifically show how Goode obstructed police conduct.[13]

Nevertheless other witnesses did directly implicate Goode and Weil. Patrolman Harry Sweet said Goode told him not to investigate a woman living in an apartment above Goode's store. Officer S. T. Goldsby also told of Goode's interference, and officer Duffy claimed commissioner Weil had told him after a raid, "Now see here, if I catch you out there on Second St. d___d if I don't kill you." Dr. J. J. Gravatt, vice commission investigator, testified that the police had not stopped prostitution because they feared the commissioners would fire them if they did try to curtail vice.[14]

---

12
   Times-Dispatch, March 19, 21, 31, 1915.
13
   Ibid., April 2, 1915.
14
   Times-Dispatch, April 7, 10, 1915; May 15, 26, 1915.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

150

The commissioners' defense rested on the contention that many of
their remarks were merely jokes. Mr. Weil stated that he had jested
when he said he would kill officer Duffy if he raided a certain house.
Goode also submitted that he had spoken jokingly when he had told a
policeman not to raid an apartment. In analyzing their defense, the
Times-Dispatch conceded that inconclusiveness characterized most of the
evidence, but the newspaper still voiced skepticism of Goode and Weil's
action. However none of the city press expressed suspicion on the
defense's assertion that Goode and Weil had joked in ordering the police
to refrain from closing certain houses.[15]

On May 29, lawyers summed up their arguments. Attorney Pollard
stated that Weil and Goode's excuses inadequately explained police be-
havior, and that "some malign influence caused the Richmond Police
Department from closing those houses." He concluded by calling for a
"clear light" before the people. On the other hand, the defense stated
that little, if any, direct evidence existed against Goode and Weil and
that the city attorney had attempted to convict the defendants of caus-
ing the vice situation which had its roots in Richmond for sixty years.[16]

As a result of the vice commission hearings, council passed several
decisive resolutions. The city legislature called on commissioner Weil
and Goode to resign, condemned Mayor Ainslie and Chief Werner, and
censured Commissioner McCarthy. Also council recommended an end to the
police commission and its replacement with one police commissioner to

---

15
   Times-Dispatch, April 17, 18, 1915.
16
   Ibid., May 30, 1915.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1127

151

oversee the department.  The Times-Dispatch praised the council action
and agreed with ending the police commission as well as with the dismis-
sal of the two commissioners.  The News-Leader added, "Any effort to
defeat its findings would be ill timed in the extreme."  Finally the
Evening-Journal stated, "The manly, straightforward course is to send in
the resignations promptly."[17]

Ironically, the majority of non-elite opinion as recorded in the
letters to the editor had not favored the investigation or council's
action.  One citizen asked for action specifically against vice rather
than "muck rake" against the police.  Another resident attacked the vice
commission for using professional investigators to spy on local officials.
One perceptive commentator bemoaned the fact that there "was but little
evidence of sound thinking throughout the entire investigation and
little thought given to municipal standards or how Richmond compared to
other cities."  On the other hand, the investigation received its most
favorable comment from intellectuals, and church officials.  Reverend H.
D. C. McClachen blasted the police for the growth of crime, and Reverend
W. Russel Bowers also castigated the citizens for apathy.  Throughout the
hearings, teachers and lawyers praised the idealism and vigor of the
investigation.[18]

Apparently cognizant of non-elite opinion, in August council sof-
tened its criticism of city officials, and weakened its resolutions
against the mayor and the chief.  Bolstered by council's reduced censure

---

[17]
   Times-Dispatch, July 14, 16, 1915; News-Leader, July 14, 1915;
[18]
   Ibid., February 19, April 19, 20, May 5, August 15, 1915.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

152

as well as by the average citizen's response, Goode and Weil announced
that they would not resign.[19]

However in October, 1915, the commissioners eroded further public
confidence by dismissing Fred Krengel ostensibly for selling stolen prop-
erty. This blatant reprisal provoked the community to protest and demon-
strated the need for the removal of Goode and Weil who had voted against
Krengel. Reverend H. D. C. McClachen said that it was "one of the most
dastardly official acts that had occurred in Richmond during my residence
in the city." Another citizen wrote that Krengel's dismissal marked "the
most outrageous thing that has happened in Richmond." The Times-Dispatch
called the move "revengeful," and renewed its pressure for Goode's and
Weil's resignation as well as an end to the board. No letters favored
the police commission's actions.[20]

The demonstration of public opinion brought results. On October
7, the mayor reinstated Krengel, but Ainslie also fined him $50 for
trafficking in stolen goods. On the next day a mass meeting of 1500
citizens called for Goode's and Weil's dismissal and that night Goode
resigned. Finally on November 25, Weil tendered his resignation.

Nevertheless Krengel still faced difficulty. Upon reinstatement
the department offered him two positions, each of which involved reduc-
tion in rank and in salary, and which he could not fill because of an
injured arm paralyzed as a result of a raid on an opium den. Finally
the council passed a resolution calling for Krengel to receive a position

---

19
  Times-Dispatch, August 12, 13, 1915; CCM, August 12, 1915, p. 11.
20
  Ibid., October 2, 4, 1915

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

for which he qualified and to allow him to keep his former rank.[22]

In July, 1916, council voted to dissolve the board of police commissioners, and establish the mayor as the director of the department. The city press as well as Chief Werner hartily approved as he stated in his annual report that "the business of the department is being handled with greater dispatch and the unavoidable friction that existed under the old regime has been eliminated."[23]

In retrospect the board of police commissioners represented an attempt to decentralize police authority in order to prevent corruption and undue political influence. But in Richmond, as in most cities, multiple control fostered misconduct and simply allowed greater diversity of political maneuvering. The board functioned well under the capable and experienced leadership of John Poe, but without a forceful leader some of the commissioners irresponsibly managed the department.

Besides eliminating the cumbersome board, the vice investigation and resultant police hearings stimulated serious thinking about the causes of crime. The formerly conservative Times-Dispatch now emphasized the importance of social and economic conditions in producing criminals. In August, 1915, the newspaper favorably commented on criminologist W. A. Copper's assertions that "the greatest cause of delinquency is no doubt sociological--the influence of the environment--local housing conditions. . .lack of parental authority /and/ economic pressure." In 1916, the Times-Dispatch printed articles arguing for more

---

[22] Times-Dispatch, October 10, 18, November 6, 1916.
[23] City of Richmond, "Annual Report, 1916", p. 4; News-Leader, July 1, 1916; Times-Dispatch, July 1, 1916.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

154

enlightened corrections policy such as one by penologist Frederic
Haskins in which he called for "less punishment and more rehabilitation."[24]

While the city investigated vice, the department curtailed vice.
At the same time of the commission hearings, the police department organ-
ized a special squad to fight prostitution and gambling, and from 1915
to 1918 the squad made numerous raids.  Ironically, the forays generated
a myriad of complaints as citizens felt some of the raids unwarranted and
the squad too aggressive.  Therefore the police themselves in the unenvi-
able position of having the vice commission condemn them for laxity, and
having the average citizens condemn them for overzealousness.[25]

One aspect of police affairs that every vice commission member ig-
nored concerned police pay.  The patrolman received only about $870.00
per year which remained satisfactory during the late nineteenth and early
twentieth century.  But in the inflation of the World War I era police-
men felt the rise in prices especially hard.  The low pay discouraged
honest and competent men from joining the force and consequently caused
corruption to be more likely.

The clamor against vice led the police department to enforce public
morals in new areas.  The police chief screened movies to check for sal-
acious scenes as well as vaudeville acts for bawdy behavior.  Occasion-
ally the police overstepped their bounds in protecting public morals as
in one instance they arbitrarily prohibited a dancer from the Academy of

---

24
    Times-Dispatch, February 6, August 9, 1915, September 28, 1916.
25
    Ibid., February 18, 19, 22, 24, 1915; City of Richmond, "Annual
Report, 1915-1918," pp. 4-5.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

155

Music merely because she was involved in a murder case.[26]

Besides vice, traffic control occupied the police in the progressive years. By 1915, council had ordered the police to direct traffic, supervise auto registration, as well as investigate car theft and auto accidents. The average car owner constantly criticized the police for arresting them for traffic violations, but allowing the Virginia Power and Light Company's street cars violate auto laws. The car occasionally provoked civic disturbances as in 1915, officers had to quell a disorder concerning rerouting of East End railroad tracks because citizens complained of dangers to their vehicles. Finally in 1916 a rash of accidents caused the Times-Dispatch to cavil about police supervision of traffic safety.[27]

The state's decision to enforce statewide prohibition in 1916 naturally increased police activity against illegal drinking. Raids frequently occurred in 1916 and 1917, and arrests soared. The newspapers refrained from any criticism of police prohibition activities, but J. Sidney Peters, the Virginia prohibition commissioner, made complaints as he believed that the police had laxly enforced the law.[28]

The American entry into World War I in April, 1917, increased the number of soldiers at the local military installation, Fort Lee, and contributed to a rise in the city's age old prostitution problem.

-----

[26] Times-Dispatch, January 6, 13, February 11, 1914.

[27] Ibid., April 26, September 4, 1915, September 7, 1916, March 23, 1915.

[28] Times-Dispatch, November 14, 16, 1916; May 20, 1918.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1132

156

Venereal disease increased markedly; in one month Fort Lee reported 801 syphillis cases, presumably derived from Richmond prostitutes.  Throughout the summer of 1918, the patrolmen raided numerous houses and hotel rooms in attempting to stop prostitution, and the usually caustic local press offered no complaints of police negligence.[29]

The community actively responded to this new vice problem.  The Richmond Housewives League formed and passed resolutions urging the council to hire additional women police to help end vice.  In June, 1918, the chamber of commerce sponsored a vice conference and recommended the mayor hire additional personnel to curtail prostitution.  In response, the mayor set up a detention camp to treat diseased women, but the council tabled his recommendation for more policewomen.[30]

In early 1918, Chief Werner died.  Although capable and energetic, he suffered from the constraints of the commissioner system and from the idealistic zeal of the progressives.  Werner did show ability to adopt new police techniques such as police matrons and police inspectors, and while in office, satisfactorily suppressed crime.  But the scandal and his refusal to challenge the authority of the police commissioners severely damaged his record.

R. B. Sowell, an experienced policeman, succeeded Werner, and almost before Sowell could establish an organizational routine, his administration also confronted a scandal.  In May, 1918, Captain C.

---

[29]
City of Richmond, "Annual Report, 1916," p. 5; Times-Dispatch, June 11, 19, 21, 1918.
[30]
Times-Dispatch, June 20, 15, 18, 1918.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1133

157

Sherry forced the resignation of patrolman Harry E. Sweet on charges that Sweet rented out his automobile for illegal purposes.  Sweet claimed that he had the approval of Chief Sowell to use his car for hire, and stated, "The truth of the whole matter is that in the police force there are now factions that might be known as the Sowell and Sherry factions. . . .I was a Sowell man and /Sherry/ was determined to get rid of me."  A few days later a patrolman Bosquett resigned and rumors claimed that Bosquett knew that Sweet had rented a car to bootleggers for transport-ing whiskey.[31]

Other allegations raised questions about Sowell's integrity.  On May 20, officer Frank S. Waller implicated Chief Sowell in the notorious Jacob-Price whiskey ring.  Waller alleged that the chief participated in illegal bootlegging with A. Jacob and H. L. Price.  According to Waller, in early 1918, Jacob and Price disagreed over control of whiskey market territory and Jacob told contacts he would willingly cooperate with the authorities in return for a reduced sentence.  Waller claimed that in February, 1918, Chief Sowell ordered him to "go down and see that damned Jew.  He is getting ready to squeal and you have to hush him up at once."  Waller saw Jacobs and later he and Price paid Jacobs $150 to settle their dispute over control of the whiskey market.  Shocked by these revelations the Times-Dispatch urged a full investigation.[32]

Sowell denied all charges.  The chief admitted that he had met Waller in February, but Sowell claimed that he had told Waller that

---

[31] Times-Dispatch, May 18, 19, 1918.
[32] Ibid., May 20, 21, 1918.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1134

158

captain Zimmer had told him that Waller had transported illegal whiskey around in a city vehicle. Sowell then told Waller that if the allegations proved true, then he would suspend Waller. On May 24, Ainslie replaced Sowell with captain Sherry as the mayor announced that while he personally believed in Sowell's innocence, the chief had shown poor judgement in telling Waller of his suspicions before he had obtained conclusive evidence. All the city press supported Ainslie in dismissing Sowell.[33]

As a result of these disclosures, a grand jury opened another investigation of the police department on June 3, 1918. But after examining the evidence, the jury completely vindicated Sowell. The detailed transcripts of the hearings no longer exist, but the grand jury did release a number of recommendations to the mayor and the press. First the jury castigated the mayor and advised Sherry's removal as well as returning indictments against nine policemen and three private citizens. According to the grand jury report, the mayor lacked "discreet judgment in the management of the Police Department, and Captain Sherry lacks those qualities which are requisite for the management of the Police Department." Moreover Sherry "is under the malign influence of promoters and proprietors of illegal gaming, and his actions contributed greatly to the decline of city morals." The jury also recommended new anti-gambling laws and called for an end to unnecessary trial postponement as these delays hurt police morale. Further the panel urged jail sentences for minor offenses in order to encourage the police to treat misdemeanors

---

[33] *Times-Dispatch*, May 25, 1918; *News-Leader*, *Evening Journal*, May 24, June 3, 1918.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

159

more seriously than at present.  Finally the grand jury condemned the Richmond community for moral indifference.[34]

The city press took a moderate view of the report.  The <u>Times-Dispatch</u> conceded that corruption existed, but malfeasance had arisen in every other city that had instituted prohibition.  Moreover the newspaper strongly denied the assertion that local citizens suffered from moral indifference because the investigation itself indicated concern in re-vitalizing the city.  Three days later the paper stated that the lessons of the scandal all pointed to the need for a centralized municipal gov-ernment to manage Richmond's affairs.  The labor newspaper, <u>Square Deal</u>, asserted support of the police,  "These criticisms on the face seemed to be misplaced and without any real foundation in fact. . .if there have been violations of the law, they have been in spite of the efforts of the mayor and the police force and not because of them."[35]

Ainslie vociferously defended himself against the new attack.  He stated that he neither had the responsibility for tracking bootleggers, nor the responsibility for following law officers.  Ainslie asserted that the people that had testified to the grand jury did not come to him with their complaints, and if they had, he would have taken action.  As for his decision to suspend Sowell, he said the chief's decision to in-form Waller that he had him under suspicion had warranted removal and "every editor had agreed with him."  But even the anti-reform <u>Evening-Journal</u> stated that the mayor's position "was not convincing. . .it be-comes the bounden duty of the mayor to know if the subordinate officers

---

[34] <u>Times-Dispatch</u>, June 25, 1918.

[35] <u>Ibid.</u>, June 26, 29, 1918; <u>Square Deal</u>, June 21, 1918.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1136

160

are capable and trustworthy."[36]

Anxious to completely remove all taint of corruption from the department, Ainslie himself thoroughly investigated the police in July, 1918, and as a result of his findings he forced two officers to resign. Concerning the rest of the questionable officers, the courts exonerated Chief Sherry as the prosecution could not conclusively prove the dire assertions of the grand jury. Finally the courts found all indicted policemen not guilty.[37]

The Times-Dispatch felt satisfied with Ainslie's investigation and the findings of the courts. The newspaper stated, "it is now evident that the troubles were largely caused by jealousies and lack of discipline within the department itself." The newspaper added that the publicity and confusion of the past years had proven worthwhile as the difficulties had resolved problems, and had returned the force to its old efficiency. The News-Leader, Evening-Journal, and Square Deal offered no dissenting editorials.[38]

As a result of the various charges against the police, the council reorganized the structure of city law enforcement as the police department officially became the bureau of police under the control of the director of public safety, William Myers. Moreover the council completely reorganized municipal government. The mayor received more power as the council dissolved all administrative boards including the board of

---

[36] Times-Dispatch, June 30, 1918; Evening-Journal, June 29, 1918.

[37] Ibid., July 18 – August 8, 1918.

[38] Ibid., August 9, 1918.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 182 of 295

161

police commissioners.  All the city newspapers supported the change as
the Times-Dispatch called the new government "a progressive system which
provides the necessary machinery for a more simple, efficient and econo-
mic administration of the city's affairs."[39]

The unified control of city government and especially of the police
department marked a significant improvement over the decentralized
structure of the past.  Efficiency and control could be effectively
exercised, but nonetheless the quality of men rather than the organiza-
tional system would still prove the most important factor in assuring
satisfactory direction of municipal government.

While the whiskey investigation continued, and the city reorganized
its political affairs, labor and the police had difficulties.  In July,
1918, the Railway Express Company and the expressmen union disputed over
wages, and the workers set up picket lines.  During the course of the
strike the union claimed that the police had harrassed them, placed
patrolmen around the railway stations, and accompanied non-union truckers
on trips throughout the city.  The chief replied that he had dispatched
the patrolmen in reaction to a break-in of a railway express office.  How-
ever, the Square-Deal asserted that the police actions "should result in
prompt dismissal from the service of any person charged with the enforce-
ment of the law."  In August, 1918, the Richmond Central Trades and
Labor Council through its police investigation committee filed formal
charges with Ainslie.  The committee alleged that Chief Sherry had
issued orders restraining police arrests of non-union men when they had

---

[39]
    Times-Dispatch, August 9, 1918.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

162

violated city ordinances, and that placing police guards at railway
stations had the sole purpose or intimidating union men.  However
Ainslie dismissed the charges and the other city newspapers did not com-
ment on the matter.[40]

Probably the police had acted unfairly.  The department recalled
the criticism of their allegedly sympathetic behavior towards labor in
1903, and apparently feared criticism of laxity in this matter.  More-
over the mayor, bogged down in the whiskey investigation, evidently did
not want to involve himself in another controversy.

Despite the years of investigation and confusion, arrest statistics
remained constant (see chart).  Apprehensions declined during 1917 as
the war created jobs, and reduced the economic roots of crime.  As in
the past, keeping public order chiefly occupied the force, and drunken-
ness and assault followed next.  Murder and rape occurred infrequently.[41]

The arrest figures for 1917 and 1918 did reveal that for the first
time in Richmond history, white arrests acceded black arrests.  The major
difference appeared in drunkenness arrests as apparently more whites than
blacks refused to obey the prohibition laws.  Unfortunately black econom-
ic and social conditions still lagged far behind white living standards,
and the roots of crime still prevailed in black neighborhoods.[42]

In summary, corruption and misconduct developed in the Richmond

---

[40] *Square Deal*, July 26, August 2, 1918.

[41] City of Richmond, "Annual Report, 1912-1918."

[42] *Ibid.*,Annual Reports, 1917-1918;" Charles L. Knight, Negro
Housing In Certain Virginia Cities (Richmond: Byrd Press, 1927), pp. 36,
137; Writers Project, Negro in Virginia (New York: Hasting House, 1940),
pp. 308-309.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1139

163

police as a result of social and intellectual changes in the city.  The reforming zeal of the progressive era, organizational difficulties, leadership changes, poor pay, and prohibition combined to foster a decline in the quality and integrity of law enforcement.  By 1919, progressivism's influence had declined and police organization streamlined, but leadership problems, poor pay, and prohibition would continue to hamper police effectivness in the 1920's.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1140

CHAPTER IX

NATIONAL PROHIBITION, 1919–1932

National prohibition adversely affected the Richmond police.  Considerable segments of public opinion, especially the Times-Dispatch, blamed the department for the dramatic increase in local lawlessness that occurred during the 1920's.  Many critics asserted that patrolmen spent so much time enforcing anti-liquor laws that they failed to control robbery and murder.

Despite prohibition's unpopularity, Chief Sherry vigorously enforced the law.  Arrest figures for liquor violations averaged about 700 a year between 1919 and 1924, and in the later year the apprehensions totaled 1,385.  In addition the force cooperated with Federal officials in numerous other raids.  By 1924, it appeared that the department spent nearly half its time enforcing the 18th amendment.  Such activity had different meanings for different factions.[1]

The "drys" naturally supported police efforts.  Richmond pastor Reverend W. Bowie said that strong prohibition enforcement would cause less drinking and would encourage many people to spend money on food and clothing instead of wasting dollars on alcohol.  Another local minister stated obedience to the Volstead Act would foster obedience to "all God's

_____

[1] City of Richmond, "Annual Report, 1920-24;" Times-Dispatch, January 8, 1920, March 10, 1923.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

165

laws." Local ministers, Reverend C. A. Jenkins and R. E. Jones, offered
to aid the police in enforcing the anti-liquor regulations. The "wets,"
led by the Times-Dispatch and the News-Leader, opposed prohibition. The
local newspapers viewed arrest statistics as indicating lawlessness and
fostering disrespect for the authority. A 1923 editorial stated that the
"gravest evil arising from the attempt of the government to make this
nation dry is the contempt for all law which this attempt breeds in men."
Moreover the newspaper asserted that good judgment dictated that the law
officer not jail every violator, but rather just the professional boot-
legger.[2]

Such concentration on anti-liquor enforcement gave a considerable
segment of the public the impression that the force had ignored other
crime. In the early 1920's a series of daylight robberies produced un-
rest and fear. In January, 1922, burglaries occurred at City Attorney
Pollard's house and at the home of Henry C. Patton, Vice President of the
Planters National Bank. In 1924, petty larceny reached its highest level
since Richmond police had begun recording local crime, and burglary had
doubled. In September, 1925, Chief Sherry announced that robberies had
declined, but the Times-Dispatch noted that, during a recent weekend,
residents had reported seven robberies and demanded the police pay more
attention to reducing burglary.[3]

The prohibition forces received a setback when city safety director
William M. Myers admitted that prohibition had not decreased criminal

---

[2]
    Times-Dispatch, May 6, 1924, May 1, 1922, September 25, 1922,
September 6, 19, 1923.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

166

activity.  On November 20, 1920, he said that despite the end of saloons and scores of drunkenness arrests, wrongdoing, especially liquor violations, remained about the same as pre-prohibition figures.  Two years later he noted that drunkenness arrests had risen in 1921; throughout the 1920's statistics revealed an upsurge in arrests.[4]

Because of public impatience with the crime situation, the force occasionally used unethical tactics to obtain convictions in serious criminal cases.  In 1923, Joe Enoch, a Richmond resident, alleged police harrassed him to sign a confession admitting he had killed a sixteen-year-old girl.  A Times-Dispatch reporter, W. B. Taylor, supported Enoch's story and a lawsuit resulted.  At the trial the other officers involved in questioning Enoch denied the charge and pointed out that Taylor did not actually witness the interrogation.  However the judge, former Mayor Richardson, said, "I do not see how anybody with an unbiased mind can hear or read that evidence without coming to the conclusion that the accused was compelled by mental and physical exhaustion to give evidence against himself. . . ."[5]

By 1924, the increase in crime and drunkenness provoked prohibitionists to charge police corruption and inefficiency.  In February, 1924, Reverend George W. McDaniel asserted that the police needed "cleaning up."  Nonetheless the Times-Dispatch disputed McDaniel's remarks.  While the newspaper conceded that the police had ignored some crime, the Times-Dispatch said, "Any good policeman would let a crap shooter escape

_____

4
  Times-Dispatch, November 30, 1920, March 14, 1922.
5
  Ibid., November 22, December 1, 3, 5, 1923.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

167

who would turn up a cocaine dealer."[6]

Safety director Myers answered the police critics with requests for more personnel. In 1921 and 1924 he asked for increases in the force, but for financial reasons council refused to grant the additional positions. The city assembly did however add a number of policewomen to handle routine details and to provide counseling for teenage delinquents.[7]

Public opinion favored some police actions in spite of the problems of enforcing the 18th amendment. In 1922 the Lexington Hotel caught fire and Chief Sherry investigated which prompted the Times-Dispatch to comment that "it is grafifying to learn that the Chief of Police is not a victim of apathy." Two years later the newspaper praised police detective work in the capture of a suspected murderer. After Chief Sherry issued his annual report of 1924, the usually critical Times-Dispatch commented that the police had shown "commendable activity and remarkable success."[8]

In the early twenties, then, public opinion criticized the force, although generally the public had confidence in the department. But the mayorality contest of 1924 demonstrated a true measure of citizen sentiment.

The election pitted conservative J. Fulmer Bright against liberal George Ainslie. Bright, a local physician and high-ranking state militia

---

[6]
Times-Dispatch, February 21, 1924.
[7]
Ibid.,February 17, 1921, February 22, 1924; City of Richmond, "Annual Report, 1922," p. 6.
[8]
Times-Dispatch, February 16, 1922, July 1, 1924, March 21, 1924.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

168

officer, centered his campaign on reducing public expenses and lessening

city taxes, but the police became involved as well.  On March 25, 1924,

a Bright supporter claimed that Mayor Ainslie had tried to threaten city

workers into voting for him.  Ainslie said in a letter to a municipal

employee:  "Do as much as you can to insure re-election of the present

administration."  The Bright supporters interpreted the letter as a plea

for the police to "disregard their oath to uphold the law by working for

his re-election."  Clearly, the charge was unwarranted, but apparently

weakened Ainslie in a close election.[9]

Bright won the election for a number of reasons.  The Times-

Dispatch commented, "Dr. Bright conducted his campaign on a platform of

retrenchment and economy."  The News-Leader which supported Ainslie,

stated the Bright victory resulted from "The vote of the women who were

very vigorously for Dr. Bright yesterday."[10]

Bright named new men to head city law enforcement.  The mayor

appointed James Sheppard, a lawyer and military associate of Bright's, as

director of public safety.  Sheppard had no police experience, but the

Times-Dispatch called him a man of "judgement, force, firmness, character,

and horse sense."  The mayor chose Robert B. Jordan as police chief.

Jordan had served on the force, but had resigned in 1922 to enter private

business.  During the 1924 mayoralty campaign, he led the "Flying Squad-

ron," a pro-Bright sidewalk singing group.  Upon taking office, Jordan

vowed an aggressive campaign against liquor and vice.  To achieve his end,

---

9

  Goodrich, "Mayors," p. 33: Times-Dispatch, March 25, 1924.

10

   Times-Dispatch, April 1, 2, 1924; News-Leader, April 2, 1924.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

169

he replaced the individual vice units with a centralized vice squad which the press dubbed the "purity squad."[11]

Jordan's purity squad energetically attacked prohibition violators. In his first two months in office he arrested nearly one hundred persons breaking liquor laws including prominent businessmen. He promised his campaign would end when "every bootlegger had been run from the city." In short, Jordan desired to remove the lax image which had grown as a result of the 1914-1918 scandals and negligent enforcement of the dry laws.[12]

The Times-Dispatch criticized Jordan's actions however. In an editorial the newspaper cautioned Jordan to worry more about burglary and robbery than bootlegging. "The first duty of a policeman is to prevent the commission of crimes which are wrongs in themselves. . .Heretical though it may seem the enforcement of so-called moral laws must be subordinated to. . .laws designed to safeguard lives and property." Moreover the daily journal implied that Jordan's appointment represented political spoils. Mayor Bright, outraged at the Times-Dispatch's "unfounded" criticism claimed that the police waged a ceaseless compaign against murder and robbery. While he realized that some citizens felt the laws objectionable he urged that the people work to change the laws. As for Bright's new appointments, he added, "The city is being run. . . . just like a private business. When a private business changes heads there are many changes, not because of the efficiency of the men but

---

[11] Times-Dispatch, October 1, 1924.
[12] Ibid., October 2, 11, 19, 23, 29, 1924, November 3, 8, 1924.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1146

170

because of the change itself."[13]

The *Times-Dispatch* responded vehemently to the mayor's statement. The newspaper charged that Jordan's appointment had indeed represented political spoils.  The newspaper declared that the problem with special squads such as the vice squad was that while it accomplished its job satisfactorily, the men began "to consider themselves discharged from the duty of enforcing all other laws."  But the *News-Leader* supported Jordan:  "In choosing the officers he has and in placing them where he will be responsible for them. . .is. . .the most gratifying fact that has developed since Mr. Jordan took office."[14]

Throughout late 1924 and early 1925 the *Times-Dispatch* gave front page coverage to Jordan's law and order record.  In October, 1924, the newspaper gave prominent attention to charges by female Negro drug dealer that the police had protected her illegal trade.  In November and December, 1924. the *Times-Dispatch*'s headlines complained of a number of local shootings.  In February, 1925 the journal reported that the police used informers to gain bootleg raid information which implied that the police did little investigation themselves.  While offering no direct editorial comment, the meaning clearly emerged:  the police spent too much time enforcing prohibition and not enough time protecting the public.[15]

The other city newspapers refrained from comment on the *Times-*

---

13
  *Times-Dispatch*, November 17, 18, 1924.
14
  *Ibid.*, November 19, 1924; *News-Leader*, October 24, 1924.
15
  *Ibid.*, October 2, November 20, December 11, December 27, 1924.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

171

<u>Dispatch</u> charges.  However the News-Leader did disapprove of the police use of informers and said, ". . .certainly almost none will go so far as to say that police should overlook the offenses of their pigeons for their pigeon's taletelling on his colleagues."[16]

The newspapers received a total of ten letters on the subject of police administration which represented an extremely large number for any issue of the period, and all supported the chief.  One citizen wrote that Jordan had done a fine job and that "law was law and had to be obeyed."  Another wrote, "The new administration is going after /boot-leggers/ and they have my support. . ."  Finally a note from "One member of the Grand Jury" stated, "Chief Jordan is a fearless and faithful officer determined to do and will do his duty and he has the commendation and backing of the citizens of Richmond."[17]

The council failed to comment on the <u>Times-Dispatch</u> stories.  Only on November 20, 1924, did councilman Edgar B. English propose a return to the commission form of government because the administrative board kept "politics out of city government."  However his suggestion never received serious consideration as the city representatives did not discuss the problem of law enforcement in the mid 1920's.[18]

Since only the <u>Times-Dispatch</u> lodged complaints one would have to conclude that the newspaper's charges lacked substance and that the police did serve the community satisfactorily.  Nonetheless the <u>Times-</u>

---

[16] <u>News-Leader</u>, October, November 24, 1924; <u>Planet</u>, October, November, 1924; <u>Labor Herald</u>, October, November, 1924.

[17] <u>Times-Dispatch</u>, November 19, 20, 1924.

[18] <u>Ibid</u>., November 20, 1924; <u>CCM</u>, November 20, 1924, p. 113.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

172

<u>Dispatch</u>'s comments proved useful as it curbed complacency, and set a high standard of efficiency for the police.

Prussian-like discipline characterized Jordan's administration. The new chief wished to dispel any image of corruption that had developed in the department from the 1914-1918 years.  In October, 1924, he suspended and fined ten patrolmen for conduct unbecoming officers.  In December, he removed two law officers for drunkenness.  The chief then suspended well respected detective Tom Duling because of a bribery charge.[19]

Chief Jordan's handling of patrolman I. L. Martin's case generated much criticism.  In September, 1926, Jordan had forced Martin to resign because Martin allegedly had made disrespectful remarks about the chief. Although Martin denied the charges, the department did not allow him a trial.  The <u>Times-Dispatch</u> issued a scathing editorial against Jordan and safety director Sheppard, and claimed that the Bright administration had violated Section 86 of the city charter which said that the police chief could not arbitrarily dismiss a policeman.  The next day the newspaper called on Jordan to allow a trial, instead of determining the case "in angry tyranny."  But on September 4, Sheppard repeated that the matter was closed.[20]

Pressure from the <u>Times-Dispatch</u> and city council however, forced Mayor Bright to re-examine the Martin question.  On September 5, 1926, councilmen Joseph C. Nunnaly and John Hirshberg planned to bring up the

--------------

[19] <u>Times-Dispatch</u>, November 19, 20, 1924.

[20] <u>Ibid.</u>, September 1, 2, 4, 1926.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

173

Martin case at the next city council meeting, and they threatened to block Sheppard's re-appointment as public safety director. Ten days later, Mayor Bright decided to allow Martin a "captain's court" which provided for three police captains to sit as a jury to pass judgement on Jordan's conduct. The mayor then promised that Jordan would not sit in on the deliberations.[21]

Nevertheless the chief apparently broke the spirit of the agreement by being present at the trial. As a result of the hearing, the board failed to find Jordan's actions inappropriate and therefore did not reinstate Martin. The patrolman told reporters that Jordan wanted him off the force because he said that Martin had joined a faction trying to remove the chief from office, and that in the last election Martin's father had actively campaigned against Jordan.[22]

The Times-Dispatch called the trial proceedings a "comedy," and launched on a tirade against Jordan's direction of the department. The newspaper opposed the chief's "purity squad' because it presented "temptations so fierce that only extraordinary strong men should be expected to resist them." The newspaper opposed the special squad because". . . its existence had destroyed the morale of the police force almost beyond the point of restoration and because its personnel had been exposed to considerable temptation. For evidence they cited the numerous suspensions and dismissals that had occurred since the inception of the purity

---

[21] Times-Dispatch, September 5, 15, 1926.
[22] Ibid., September 15, 1926.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

174

23
squad.

    The <u>News-Leader</u>, on the other hand, supported Jordan.  According
to the <u>News-Leader</u>, Jordan had appeared at the trial to question his
accuser, Martin.  The chief also presided at the trial because each of
the three jury captains had declined to serve as the court's chief
officer.  The newspaper pointed out that all three captains agreed on the
justification of Jordan's dismissal of Martin.  In closing, the <u>News-
Leader</u> stated, "Chief Jordan doubtlessly had his weaknesses. . .But his
integrity, his courage, his diligence and his general competence has not
been called into question."[24]

    Bright simply responded by asking the <u>Times-Dispatch</u> to prefer
charges, and assured that written assertions would produce a police
investigation.  He brusquely pointed out that the chief acted within his
rights to be present at the trial.  As for the criticism of the force,
he merely ignored the newspaper complaints against the purity squad.[25]

    Although Jordan's actions lacked tact in the Martin affair, the
<u>Times-Dispatch</u> allegations appeared unnecessarily harsh.  The purity
squad had not destroyed police morale and had reasonably contained vice
and liquor violations.  Certainly temptation existed but such entice-
ments inherently followed police work.  As for Bright, he appeared tech-
nically correct in requesting specific charges against the police, but
public conficence demanded the mayor condemn Jordan's autocratic behav-
ior in the Martin case.  But a true referendum on Bright and Jordan

-----

    23
      <u>Times-Dispatch</u>, September 8, 15, 1926.
    24
      <u>News-Leader</u>, September 10, 15, 1926.
    25<u>Times-Dispatch</u>, September 16, 17, 1926.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1151

175

would come at the upcoming municipal elections of 1928.

The campaign of 1928 really started in 1926. Councilman John Hirshberg had announced his candidacy early that year, and in October, 1926, the Times-Dispatch announced that Chief Jordan ordered detectives to follow councilman Hirshberg for eight days. Bright deplored and apologized for Jordan's actions, but said he would not dismiss Jordan. The chief claimed that he had learned that Hirshberg had attended an illegal drinking resort, but the Times-Dispatch expressed outrage at this apparent attempt to discredit Hirshberg. Nonetheless neither the other newspapers nor city council discussed the issue.[26]

The Times-Dispatch expressed further disgust with the police department as a result of a rash of violence in early 1928. In January of that year a man attacked a young girl, Nancy Davidson, but police failed to find any evidence. Safety director Sheppard told reporters that witnesses said that the man stood seven feet tall and weighed three hundred pounds while others said he was only five feet six inches and slender build. According to the Times-Dispatch, Sheppard's tone appeared jocular, and he had failed to take the crime as seriously as minor liquor infractions.[27]

Sheppard and the Times-Dispatch continued a bitter public debate throughout 1928. On February 9, Sheppard replied to the critical news-paper editorial and showed letters from citizens stating that they be-lieved he had handled the affair appropriately. The public safety

---

26
   Times-Dispatch, October 22, 1926.
27
   Ibid., January 23, February 6, 1928.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

176

director demanded an apology from the <u>Times-Dispatch</u>.  But the editor re-
fused to apologize and called Sheppard's response to the Davidson case
"crass and inexcusable," and characterized the police as suffering from
"stupidity and laziness."  The editorial concluded:  "In the opinion of
the <u>Times-Dispatch</u> he /$\overline{S}$heppar$\overline{d}$/ is wholly and dangerously incompetent
to hold a position in which incompetence has a direct bearing on the
lives and safety of the people."[28]

On February 28 Sheppard offered an explanation for the past hostil-
ity of the <u>Times-Dispatch</u>.  He said that his "greatest mistake" con-
cerned his refusal to give preferential treatment to arrested employees
of the newspaper.  Sheppard asserted, "Soon after I went into office,
five gentlemen from the Times-Dispatch were arrested and ridden to the
station house in the patrol wagon. . .One of the gentlemen came to my
office the next day and asked what I expected from his paper. . .I told
him we expected to ride reporters in the patrol wagon when they were
arrested /$\overline{sic}$/. . ."  The <u>Times-Dispatch</u> described Sheppard's charges as
"gross absurdity," and claimed that the police had harrassed the news-
paper's employees.  According to the journal, in one instance a man had
simply reported a robbery, but the police had grilled him for ninety
minutes without a stenographic record merely because he worked for the
<u>Times-Dispatch</u>.[29]

In perspective, both the public safety director and the newspaper
showed lack of judgment.  Sheppard demonstrated irresponsibility because

---

28
  <u>Times-Dispatch</u>, February 9, 1928.
29
  <u>Ibid</u>., February 28, 29, 1928.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

177

he publicly alleged misconduct on the newspaper's part instead of resolv-
ing the matter in court or in private.  Concerning the daily paper, it
seemed interested in sensational journalism.  While the police had spent
much time on prohibition enforcement, the <u>Times-Dispatch</u> should have
offered suggestions to improve the situation instead of engaging in
vulgar name calling.  To be sure, crime had increased, and the press had
the obligation to bring the increase to the public's attention, but the
newspaper also had the obligation to do it tactfully.

Although police activities certainly would seem a prime public
issue,strangely enough the three candidates for mayor in 1928, Ainslie,
Hirshberg, and Bright commented little on the law enforcement situation.
During the mayorality campaign Hirshberg, the progressive candidate,
focused on his long public service record, and advocated a new bridge to
the city's south side, as well as reducing gas bills.  He never mentioned
the police.  Former mayor Ainslie, made only one critical reference to
city law enforcement as he stated that the force had spent too much time
chasing bootleggers.  In light of the recent attacks on women he urged
that the police concentrate efforts on protecting people rather than
arresting drunks.  But expanding city government programs formed the
central concern of Ainslie's campaign.  Mayor Bright emphasized conserv-
ative spending as the prime issue.  Although he defended the police
against Ainslie's remark, his political sense told him that centering his
campaign on law and order would only generate controversy with the
<u>Times-Dispatch</u>.[30]

---

[30]
<u>Times-Dispatch</u>, June 21, 1927, March 4, 11, 18, 1928, February
11, 1928.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 199 of 295

178

None of the city newspapers, including the Times-Dispatch criti-
cized the candidates for failing to mention the police issue.  Nor did
their own editorials comment on police activities; in fact, all the news-
papers took a non-partisan stance on the candidates because all the
editors believed that factionalism would harm the city's interests.[31]

The press failed to cavil against the police department because
public opinion generally appeared satisfied with the force.  Most letters
to the editor supported the police and generally expressed suspicion
about changes in the police organization.  While the Times-Dispatch
often pointed out police shortcomings the newspaper could not deny that
the force had reasonably controlled most major crime, and that Jordan had
eliminated police corruption.

Bright decisively won the 1928 mayorality election and as a result
Chief Jordan confidently embarked on a vigorous modernization campaign.
He installed teletype machines and organized a new filing system to
facilitate record keeping.  In addition Jordan initiated use of tear gas
and completely motorized the force.  The chief thus reinforced his be-
lief in the traditional approach to police service which essentially con-
centrated on preventive measures and patrolling the streets.  Jordan
rejected any notion of consciously trying to build better relations with
the public; improved community relations would result from adequate crime
reduction.[32]

------

[31] Times-Dispatch, April 3, 1928; Planet, March – April, 1928, Labor
Herald, March, 1928; News-Leader, April, 1928.

[32] City of Richmond, "Annual Report, 1928," pp. 5-6; "Annual Report,
1930," pp. 2-5.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

179

In keeping with Jordan's emphasis on crime reduction, the chief continued his aggressive campaign against law breaking.  Between 1928 and 1930 drunkenness and prohibition arrests averaged over 2,000 per year and both these violations totaled over ten percent of police apprehensions. The 24,000 arrests of 1929 reached a high of the inter-war years, and Jordan claimed that the force could make many more arrests, but he did not have enough evidence to stand in court.  In those same years the purity squad totaled numerous vice arrests.  Further, Federal narcotic agents and the Richmond police collaborated on frequent raids, and many of these sallies captured large quantities of cocaine.  A former deputy narcotic commissioner of New York asserted before the Virginia Congress of Parents and Teachers that drug abuse had caused much increase in prostitution and murder, and thus encouraged Jordan's drive against drug abuse.  Finally, in the late 1920's he organized a series of raids against gambling in the city.[33]

Nonetheless violent crime continued.  In late 1928 the purity squad failed to find the murderer of a dry goods salesman, and in the spring of 1930 police futilely searched for the killer of Richmond resident Harry Rohm.  Robberies plagued the city as well.  Grocery stores and private homes experienced an epidemic of burglaries in the early 1930's, and in 1931 hold-up men robbed the Southern Bank of $6,600.  This rash of burglaries convinced Jordan to put the police on a twelve-hour working day.  However, the News-Leader stated that proprietors leaving large

---

[33] City of Richmond, "Annual Report, 1928-1930;" Times-Dispatch, March 8, 1928, March 17, 1932, October 15, 1931, May 12, 1932, December 3, 1927, November 28, 1929, September 22, 1927, January 7, 12, 1932.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

180

amounts of money in cash registers had contributed to the increase in hold-ups and not "any special dereliction on the part of the city's police. . . ."[34]

Such lawlessness occurred throughout the nation in the prohibition years. Most metropolitan areas experienced daily gang warfare, and high robbery rates. At a national crime commission meeting one commentator said, "We need to organize public opinion in such a way as to overcome. . . .the maudlin sympathy for the victim, /and/ the police who apprehend the criminal. . . ." But the Times-Dispatch said that the problem of criminal justice did not lay with the laws, but, in large part, with the police: ". . .criminal laws are more laxly administered in the United States than in any other civilized country."[35]

President Hoover recognized the popular unrest with the decline of law and order, and called for a national commission under the direction of George Wickersham to study the nation's crime problems. In January, 1930, the Wickersham commission reported, but failed to reach any conclusion on resolving the prohibition dilemma. The committee also refused to enforce a change in the prohibition laws, and the panel could not agree on any effective liquor control policy. Nonetheless a majority of the commission stated that essentially the police needed more money and more manpower. Since the group reached no consensus on dealing with the liquor problem, the government had no choice but to strengthen existing

---------------

[34] Times-Dispatch, November 28, 1928, May 12, 1930, January 18, 22, 29, 1931; News-Leader, January 29, 1931.
[35] Ibid., February 1, September 16, 1927.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

181

enforcing methods.  Hoover, then, urged Congress to give money to cities
to upgrade police departments.  Also the President shifted national law
enforcement from the Treasury to the Justice Department to bring greater
efficiency than in the past.[36]

The Times-Dispatch agreed with Hoover's moves and asserted that the
inability of the Wickersham commission to achieve a consensus showed the
inappropriateness of prohibition laws.  Colonel Henry W. Anderson, a
Richmond lawyer who served on the commission, stated in an interview,
"Congress can make it illegal to have whiskey.  It can appropriate money
for enforcement.  But the fly in the ointment is that it cannot legislate
men's thirst out of existence."  The News-Leader supported the commission
and stated:  "If prohibition must fail, it should not be until honest and
democratic effort at enforcement has shown that the reason for failure is
not the correctable weakness of the law, but the determination of a con-
siderable element of the population that the law should not deprive them
of alcohol."[37]

Because of the prohibition furor, the press no longer attacked
Richmond's blacks as the chief cause of the city's crime.  In the years
between 1919 and 1933 the police arrested more whites than blacks, and
most of the Negro apprehensions concerned petty theft and larceny which
undoubtedly reflected the poor wages and low incomes of the Negro workers.
Occassionally the police even defended Negro civil liberties such as on
one occasion a street car conductor accused blacks of creating a

---

[36]
    Times-Dispatch, January 11, 14, 21, 1930.
[37]
    Ibid., January 21, 1930; News-Leader, January 14, 1930.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

182

disturbance, but when the conductor failed to identify any of the Negroes, the police freed the blacks.[38]

For the most part, the Negro press reflected this lessening of tension between the police and the blacks. The _Planet_ did not have any exposés on police brutality, nor did they exploit the friction between the _Times-Dispatch_ and the police department. In a January, 1930 editorial, the Planet identified the major problems of Richmond Negroes as recreation, education, and as for police matters, the editor wrote, "We stand first of all for law enforcement. . . ."[39]

Nevertheless the Richmond Negro lived as a second class citizen. The city had segregated schools, churches, and transportation, and a 1929 report on Negro life concluded that the Richmond black lived "in inferior economic status. . . ." While the police did not openly victimize blacks, they did not treat them impartially either. Dr. W. L. Ransome for instance complained that the police treated Negroes with less respect than whites, and the 1929 report denigrated the fact that police jailed slightly more whites than blacks when Negroes constituted only twenty-nine percent of the city population. The study did not directly condemn the police, but blamed the lack of poor recreation and educational facilities for the relatively high Negro crime rate: ". . . the almost lack of such social activities for Negroes in Richmond helps

---

[38] City of Richmond, "Annual Report, 1919-1933."
[39] _Planet_, 1920-1929, January 11, 1930.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

183

to explain the high Negro delinquency rate."[40]

The Times-Dispatch showed a relatively tolerant attitude towards blacks in the 1920's as the newspaper refrained from overt racial attacks.  Furthermore, in 1929, the newspaper even criticized a segregation ordinance passed by city council and asserted that instead of segregation the city should give the blacks the opportunity to "acquire decent homes, properly equipped with modern necessities and conveniences. . . ."[41]

The prohibition issue ended in 1932 as the Democrats and Franklin D. Roosevelt overwhelmingly received a mandate to repeal the Volstead Act.  In October, 1933, Virginia decisively voted to repeal the 18th amendment as newspaper pressure and popular disenchantment with prohibition combined to defeat the "drys."[42]

Prohibition weakened the police somewhat in the eyes of public opinion. The department's concentration on the liquor problem produced less effectiveness in controlling other crimes.  In addition Mayor Bright and Chief  Jordan tactlessly handled prohibition as well as internal police matters, and produced unnecessary animosity between the police and the community.  Nonetheless, arrest statistics revealed an aggressive and diligent force.  Although the community wanted a more efficient department, they realized the police had attained a satisfactory record.

---

[40] Planet, January 31, 1931; The Report of the Negro Welfare Survey Committee, The Negro in Richmond, Virginia (Richmond:  Richmond council of social agencies, 1929), pp. 108, 6.

[41] Times-Dispatch, January 28, 1922, February 1, 1928, February 14, 1929.

[42] James MacGregor Burns, Roosevelt:  The Lion and the Fox (New York: Harcourt, Brace and Company, 1952), pp. 291-337.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

184

Bright's victory during the mayorality election of 1928 signified a vindication for his policies and programs. As for city Negroes, prohibition demonstrated that crime knew no color, and blacks overcame the onus of being considered Richmond's chief source of lawbreaking. In sum, police tactfulness rather than tactics needed improving in the 1920's.

Although prohibition helped Roosevelt's victory, the Depression was the campaign's central issue. Starting in late 1929, the economic collapse saw thousands of industries and banks closed, and unemployment reached 15 million or about one-third of the work force. Initially Richmond was not hit as hard as other cities. A 1930 U. S. Department of Commerce report indicated that the city had 5,539 unemployed or about 3% of the city work force. This rate increased slightly in 1931 but in 1932 the situation grew worse and created problems for the city and the police.[43]

---

[43]　U. S. Department of Commerce, Bureau of Census, _Fifteenth Census, 1930_ (U. S. Government: Washington, 1931), pp. 39, 44.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1161

185



ARRESTS, RICHMOND   1912-1932

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1162

CHAPTER X

FRICTION BETWEEN POLICE AND COMMUNITY, 1932-1945

In the depression era, the police department experienced criticism from virtually every component of the community. Unlike in the 1920's, when only the _Times-Dispatch_ unfavorably viewed police matters, in the 1930's, councilmen as well as average white and black citizens found fault with local law enforcement.

By the spring of 1932, Richmond's economy was faultering. Total production declined 10 percent and unemployment totaled between 15% and 20% of the work force. A city unemployment bureau spokesman stated that the typical wage amounted to 30 cents per hour for whites and 25 cents per hour for blacks. Yet the city's situation compared favorably to such urban centers as Philadelphia, New York and Detroit where unemployment rose to over 30% of the labor force. Thus, it came as no surprise that J. Fulmer Bright easily defeated (4,227 to 494) the Socialist candidate, Herman Ansell, in the mayorality election of June, 1932.

Nonetheless local left-wing organizations tried to alleviate the economic situation, but in so doing created problems with the city government. In 1932, Abe Tompkins founded a chapter of the communist party and organized an "unemployed council" which sought city programs

---

1
_Times-Dispatch_, June 6, 1932, April 8, 1932, June 15, 1932; _Labor-Herald_, June 10, 1932.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

187

to find work for the jobless.  The Bright administration coldly ignored
the council and felt it "unnecessary."  In November, 1932, Tompkins
asked Mayor Bright for a permit to hold demonstrations in support of
national hunger strike marchers.  At first Bright agreed to Tompkins"
plan but then he rescinded his permit.  The unemployed council went to
city hall to present protest resolutions, but Bright ordered the police
to arrest the demonstrators for vagrancy.[2]

City newspapers reacted with hostility.  The Times-Dispatch con-
demned Bright's action and asserted that the suppression of Tompkins
abrogated his free speech rights.  The Labor-Herald called the arrest
"un-American, unwarranted, unconstitutional, and nothing short of czar-
ism."  The press reaction had its impact.  On December 3, the hunger
marchers rode through Richmond without incident, and five days later
authorities released Tompkins for lack of evidence.[3]

Trouble developed again however as a result of other activities of
the unemployment council.  On December 23, Thomas H. Stone, a spokesman
for the unemployment council, wished to see the mayor, but police in-
formed him that the mayor had denied his request.  Stone did not leave
the area immediately, and patrolmen arrested him for disorderly conduct.
Chief Jordan justified his actions by claiming that he had information
that Stone had planned an armed revolt in Richmond; the chief also
asserted that the local newspapers had encouraged the radicals.  On

---

[2] Times-Dispatch, November 29, 1932.
[3] Ibid., November 29, December 3, 8, 1932; Labor-Herald, December 2,
1932.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

188

December 30, the police evicted the unemployed council from its head-
quarters because the police considered the building a fire trap.[4]

The press responded with criticism.  The Times-Dispatch character-
ized Jordan's actions as "arbitrary," and his charges against the Rich-
mond newspapers "ridiculous."  The News-Leader said, "He /Bright/ has no
more right to forbid a communist entering a public building than he would
have to deny such a person the right to walk a public street."[5]

Despite the unanimous condemnation by the press, the police con-
tinued harrassing the leftists.  On December 31, 1932, police officers
closed down Morris Hodor's grocery store.  Hodor's wife had supplied the
bail money for Abe Tompkins and Hodor's arrest evidently marked retalia-
tion for helping the leftists.  Hodor's attorney told newsmen that he
planned to charge six other grocers with the same Sunday closing viola-
tions, and stated that if the police did not arrest the other store
owners he would charge Chief Jordan with malfeasance.  As a result of
the attorney's action,the police fined Hodor $5, and warned other gro-
cers about observing Sunday closing ordinances.[6]

Observers viewed the Hodor arrest as reprehensible.  The Times-
Dispatch issued a scorching editorial which charged that the mayor had
insulted the people, and that Jordan had committed "the greatest piece of
official impudence on record."  The News-Leader described the action as
"clumsy persecution," and one reader called the police "bullies" in their

---

[4]
  Times-Dispatch, December 23, 30, 31, 1932.
[5]
  Ibid., December 30, 1932; News-Leader, December 29, 1932.
[6]
  Ibid., December 31, 1932; January 1, 1933.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

189

handling of the communists.[7]

As a result of press reaction, Mayor Bright and Chief Jordan auda-
ciously severed communications with the press.  Bright barred reporters
from access to warrants or police records as the mayor defended his
action by citing the newspapers' "hostile and destructive attitude."
Jordan said that the newspapers would not receive police news "until
they play fair with the city government. . .Any police news will be
given out by me, if at all."[8]

The press naturally condemned the restrictions.  The Times-Dispatch
commented that the mayor "is striking at the voters of Richmond who put
him into office.  He is cutting them off from his official statements at
the most critical time in the city's history."  As for Jordan, the
journal labeled his action "impudence."  The News-Leader lamented the
press embargo and characterized the decision as from a man with "a
persecution complex."  The Labor-Herald commented that Bright "has given
us an example of. . .tyranny. . ./and/ an attempt to reverse the American
idea of things."[9]

Citizens reacted negatively.  One writer to the News-Leader called
Bright's press embargo "childish and clownish."  Another asked what
happened to the "excellent noble, courageous," police force.  Another
writer described the press restriction as "arrogant."  No letters ex-
pressed support of the mayor.[10]

---

[7] Times-Dispatch, January 3, 5, 1933; News-Leader, December 31, 1932.
[8] Ibid., January 3, 5, 1933; News-Leader, December 31, 1932.
[9] Ibid., January 4, 1933; News-Leader, January 4, 1933; Labor-
Herald, February 10, 1933.
[10] News-Leader, January 5, 1933; Times-Dispatch, July 3, 1933,
March 10, 1934.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

190

On January 14, the courts, however, reversed the actions of Jordan as Judge John L. Ingram issued a writ overturning the chief's closing of police records. The _Times-Dispatch_ stated "Judge Ingram has preserved the reputation of Virginia. . .as a citadel of free speech."[11]

Undaunted by the press, the public, or the courts, the police continued to harrass the leftists throughout 1933. On January 24, lawmen jailed unemployed council leader Stone for using abusive language to a city social service woman; he denied the charges and claimed police harrassment. In February, fifty patrolmen arrested Abe Tompkins for making a speech without a permit. The next month police apprehended six socialists for an unauthorized meeting in a local park. Finally in May, 1933, mayor and council agreed to new, strict disorderly conduct measures, and Bright also asked council for more legal restraints on inflammatory public speeches.[12]

The press continued to attack these infringements of civil liberties. The _Times-Dispatch_ called the police actions against the dissidents unwarranted, and Bright's recommendations which curtailed rights of assembly as "autocratic." The _News-Leader_ commented that "a marked change has come over the people during the prohibition regime. Instead of looking upon the police as friends, entirely too many people are mentally hostile to them."[13]

While the mayor and the police received disapproval from the _Times-_

---

[11] _Times-Dispatch_, January 14, 15, 1933.
[12] _Ibid._, January 24, 1933; February 3, 5; March 5, May 17, 1933.
[13] _Ibid._, May 18, 1933; _News-Leader_, February 3, 1933.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 212 of 295

Case 3:21-cr-00042-JAG   Document 86-9   Filed 07/06/22   Page 198 of 275 PageID# 1254

<u>Dispatch</u> for its response to the unemployment council, the newspaper
launched a new attack on the department's control of crime.  Throughout
April, 1934, the <u>Times-Dispatch</u> published a series of articles critical
of the force's crime solving record.  The newspaper noted that the
police had failed to solve numerous robberies as well as three murders
in the past year.  The stories claimed that the department lagged five
years behind even smaller towns in police equipment, notably the police
radio.[14]

The articles provoked citizen reaction.  A former member of the
force wrote that Richmond had the "fairest, squarest, and most efficient
police department in the United States."  Another resident found fault
with the force because many policemen lived in seeming prosperity yet
received small incomes--thus implying payoffs.  Norman Williams, a
Richmond resident, placed the blame on ". . .our mayor and director of
public safety.  The others /members of the force/ are under them. . ."[15]

Despite their disagreements on administrative matters the <u>Times-</u>
<u>Dispatch</u> and the police agreed on the importance of the police radio,
first used in Richmond in September, 1934.  Chief Jordan felt that the
radio equalled the work of one hundred additional policemen; the <u>Times-</u>
<u>Dispatch</u>, a bit more modest, felt that it had given the force increased
efficiency.  Indeed the radio made the department more mobile and flex-
ible and permitted them to respond to crime more quickly than in the
past.[16]

---

[14] <u>Times-Dispatch</u>, April 30-May 9, 1934.
[15] Ibid., May 10, 15, 1934; <u>News-Leader</u>, May 9, 1934.
[16] Ibid., January 27, 1935, March 12, 1935.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

192

Nonetheless the police radio had serious drawbacks. Radios in police cars caused the patrolmen to lose touch with the people. The typical law officer only interacted with residents in emergencies or when disorder occurred, and therefore the community lacked contact with the policeman; mistrust soon developed. The radio had repercussions in reducing crime as well since the patrolman became a passive agent in searching for criminals. In a syndicated newspaper column, captain Albert Moore of the New York State police declared that the police radio made patrolmen "overweight and passive because they just wait for calls and don't look for crime."[17]

New waves of criticism developed after a bloody jail escape in September, 1934. On September 20 of that year Robert Mais and Walter Legenza, members of the so-called Tri-State gang, escaped from the Richmond city jail and in so doing killed a policeman. Although law officers shortly recaptured both men, statements of reproof came from virtually the entire community. Councilman Wilber J. Griggs criticized the police for allowing two convicts to escape and also blamed Mayor Bright since in refusing to fill department vacancies the city did not have enough policemen to stop such a jail break. The dead policeman's wife condemned Jordan for assigning her elderly husband to guard such notorious criminals. Finally a number of citizens called for a complete review of jail procedures.[18]

Later in October, 1934, a grand jury investigation released its

---

[17]
    *Times-Dispatch*, September 24, 1935.
[18]
    *Ibid.*, October 2, 3, 1934.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

193

findings and generally exonerated the police from responsibility in the
jail break.  The jury recommended that the mayor remove city sergeant
John Saunders and his assistant T. F. O'Connor on grounds of negligence.
The jury censured Judge John Ingram for not taking better security pre-
cautions and the jurors recommended improvements in the prison system
such as physical strengthening, and the placement of dangerous prisoners
in separate cells.  As for the police, they specified no indictment and
commended them for "full cooperation" in the probe.[19]

However further strain between police and community occurred as a
result of the death of safety director James Sheppard in 1934.  In retro-
spect, Sheppard had lacked discretion and had proved deficient, if not
dangerous, in the administration of public safety.  He showed a callous
attitude toward civil liberties, and during his tenure he had demonstra-
ted more loyalty to Mayor Bright than to the pursuit of justice.  Mayor
Bright refused to name a successor to Sheppard because he said the city
lacked funds.  Councilman Griggs disagreed with the mayor and after he
and Bright reached an impasse, Griggs filed a court suit to force the
mayor to name a safety director.  Griggs charged Bright with being a
"dictator" and claimed "that crime had grown, flourished, and become
rampant" because of the absence of a safety director.  On March 22, 1935
the court ordered Bright to name a safety director and he named lawyer

---

19
    Times-Dispatch, October 28, 1934.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1170

194

and fellow military associate John A. Cutchins to the post.[20]

Cutchins' initial problem stemmed from the growing criticism result-
ing from the large number of metropolitan robberies.  The Laburnum Court
Owners Corporation hired armed guards to protect against robberies which
the Times-Dispatch claimed "the police were trying to keep secret."  On
March 2, 1934, two bandits had robbed bank messengers, and on March 9
two men had taken a considerable sum of money from a Federal Reserve
truck and killed the truck driver.  In January, 1935, criminals robbed a
series of grocery stores and one felon killed a grocer.  Finally, through-
out the summer of 1935, robbers had consistently attacked a variety of
local delivery trucks.[21]

The numerous robberies generated considerable criticism.  Indepen-
dent citizens complained about police failure to capture criminals respon-
sible for a number of robberies.  The Times-Dispatch asserted that police
inefficiency made Richmond an easy target for criminals.  Councilman
Griggs again petitioned the mayor for more policemen, but again the
mayor refused, and called Griggs "a menace to the city's financial secur-
ity."  The councilman then informed the mayor that he planned to go to
court to force the administration to hire more peace officers, and on
November 7, 1935, the Hustings Court did order the mayor to fill fourteen

---

20
    The Times-Dispatch graciously commented that while the newspaper
had disagreed with Sheppard they respected his judgement and integrity.
Times-Dispatch, December 15, 1934; March 14, 22, 1935; John A. Cutchins,
Memories of Old Richmond, 1881-1944 (McClure, Va.: Verona, 1973), p. 309.
    21
    Times-Dispatch, May 9, 1933, July 1, 1933, March 9, 1934, January
19, 1935, July 30, 1935.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

195

police vacancies.[22]

Crime statistics indicated that the mid thirties proved more law-less than the early thirties.  Arrests decreased during the early thirties but increased during the mid thirties.  Reckless driving became a major concern of the force, as auto violations took considerable police attention.  Drunkenness, assault and larceny also rose; clearly the city needed the additional policemen to patrol.[23]

With the increased manpower Cutchins could also concentrate on a conscious program to attain better police-community relations.  He had a close relationship with the editor of the News-Leader and secured that journal's support of the police.  Cutchins received a fifteen-minute radio broadcast once a week to facilitate communication with the popu-lace.  He arranged a police and fire day program and invited the public to inspect police operations.  The new public safety director instituted a safety program designed to quell complaints about city traffic prob-lems.  Chief Jordan also cooperated and he organized a "crash squad" to investigate accidents.[24]

Nonetheless police dificulties with the public erupted again when officers stopped students from tearing down the goal post after the Georgetown-Richmond football game on November 3.  According to the Times-Dispatch, the police clubbed many students as well as using unnecessary force, and many citizens protested the police conduct.  One observer

---

22
  Times-Dispatch, April 30, 1934, October 31, November 3, 7, 1935.
23
  City of Richmond, "Annual Report, 1929-1936."
24
  Times-Dispatch, May 1, November 2, 1935; Cutchins, Memories, p. 341.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

196

described the police as brutal and the attack as "one of the most out-
rageous things I've ever witnessed."  Another resident complained that
police would needlessly attack students "while murders and stick-up men
prey at will. . .I sincerely believe it is just about time for drastic
action."  Resident Bernard Jones said, "There was no excuse for such
tactics."  On November 4 a mass citizen rally condemned the police
attack as "Brutal, savage and unwarranted."[25]

Cutchins fully backed police actions.  He stated that two weeks
ago city authorities had prohibited the students from tearing down the
uprights.  Moreover, at the game policemen had surrounded the goal posts
and according to the safety director that should have signaled to the
students to refrain from touching the property.  Cutchins pointed out
that for him to allow the students to tear down the goal posts and not to
support the police would seriously hurt police morale.[26]

Newspaper opinion differed on the matter.  A November 4 Times-
Dispatch editorial characterized the affair as a "police riot," and
claimed that the police went "beserk."  The newspaper said that the
police needed more training and discipline because they handled students
ineffectively.  The News-Leader kept its promise of avoiding unnecessary
criticism as that journal did not comdemn the police.  The newspaper
noted that officials had warned the students not to touch the goal posts,
but the pro-police paper was forced to conclude that "Perhaps two or
three of the police lost their heads."  It, however, rationalized the

---

[25]
    Times-Dispatch, November 1, 3, 4, 6, 1935.
[26]
    Ibid., November 4, 1935; Cutchins, Memories, p. 348.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

197

incident by suggesting that the police behavior was not "surprising. . . when the odds against them were perhaps twenty to one."[27]

In light of public and press criticism, the municipal election of March, 1936, seemed to have ominous forebodings for Mayor Bright. He had filled the city's highest office for twelve years, but acrimony and dissent dominated his tenure. The increase in lawbreaking, and poor police administration appeared to doom the mayor's chances. Three men entered the mayorality race as Councilman B. Roy Dudley and Socialist Herman R. Ansell opposed Bright. Surprisingly the mayor won an unprecedented fourth term as Dudley failed to organize citizen dissent. As for Bright, he once again proved a skillful campaigner and used his power of patronage to gain the victory.[28]

The press viewed the results unfavorably. The <u>Times-Dispatch</u> and the <u>News-Leader</u> characterized the election as dull and called for a rejection of the bicameral municipal government of a council and a board of aldermen. The newspapers urged implementation of the city manager form of government in which the manager rather than council would hire and fire city employees.[29]

Although Bright's victory marked a vote of confidence, Chief Jordan embarked on a policy to improve his public image. In June, 1936, the chief organized public information and free clinics on crime prevention. Jordan initiated a crime prevention unit to reduce juvenile law breaking

---

[27] <u>Times-Dispatch</u>, November 4, 1935; <u>News-Leader</u>, November 4, 1935.
[28] <u>Ibid</u>., February 15, March 24, April 7, 1936.
[29] <u>Ibid</u>., March 31, 1936; News-Leader, March 31, 1936.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

198

and he announced the department would sponsor a junior police force to permit eighteen year olds to fill some department administrative positions. Finally Jordan and Cutchins agreed to a jointly sponsored citizens commission on crime.[30]

Meeting in September, 1936, the crime commission examined all aspects of Richmond's law and order problems. The convention essentially concluded that Richmond should try to curb a person's lawlessness before reaching high school age, and all the speakers agreed that the city should improve local schools and recreation facilities. Henry A. Raab, chairman of the citizens committee on crime observed that supervised dance halls and free legal and psychiatric aid would also curtail law breaking. Another commission member recommended a minimum wage to help reduce the crime rate.[31]

The session on "media and crime" produced an abatement of the tension between the police and the press. John Danna Wise, editor of the Times-Dispatch, asserted that the newspaper should report crime and not sensationalize it. In addition he stated, "To my mind, it is necessary to stick crime under the very noses of good citizens before it smells bad." As a result of the meeting the police changed their view that crime reporting served as criticism of the department. Thus, from the fall of 1936 both the police and the press had less problems than in the past.[32]

---

[30] City of Richmond, "Annual Report, 1937;" Times-Dispatch, June 12 1936.

[31] Times-Dispatch, September 4, 28, 30, 1936.

[32] Ibid., September 30, 1936.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

199

Unfortunately, the public seemed to ignore the meetings as no letters to the newspapers commented on the conference. The _Planet_ viewed the sessions as well meaning but unable to deal with racial discrimination which emerged as the real issue between the police and the blacks. The _Planet_ concluded, "This leads to inevitable conclusion that iniquitious Jim Crow system. . .with its double standards, hyperbole, limitations, discriminations and injustices is solely responsible for the swollen crime rate. . .."[33]

In spite of the conference's failure to solve the Negro's difficulty with the police, the discussions contributed to better police-comunity relations. The press and public did not complain when the department launched anti-drug raids in September, 1936, and local newspapers did not issue broadsides against the police when federal narcotics agents announced that Richmond served as a center for area illegal drugs. The _Times-Dispatch_ suggested that city authorities cooperate to rid the city of the problem, and the _News-Leader_ respectfully urged the police use every method at their disposal to end the illegal drug traffic. Finally, total arrests declined from 34,959 in 1936 to 23,525 in 1940. Since the community measure police effectiveness by the crime rate, the reduction in arrests improved the force's public image.[34]

While Richmond tried to cope with crime, the nation tried to cope with depression. FDR's policies initially brought confidence, and

---

[33] _Times-Dispatch_, October 1 - 10, 1936; _News-Leader_, October 1 - 10 1936; _Planet_, October 10, 1936.

[34] _Times-Dispatch_, September 29, 30, 1936; _News-Leader_, September 30, 1936; City of Richmond, "Annual Report, 1936-1940."

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

200

recovery seemed promising.  However, in 1935, the Supreme Court declared
much of his program unconstitutional and Roosevelt's congressional coop-
eration waned.  Because of the lack of funds, recession returned in 1937,
and the nation endured a series of crippling labor strikes in the late
thirties.[35]

In Richmond, labor troubles occurred in the spring of 1937 as
three strikes simultaneously arose against three different industries.
Although the potential for violence existed, the unions and the police
cooperated to avoid any major disturbances.  Sporadic labor strikes also
developed throughout 1939 and 1940, but again no difficulties with the
police transpired as neither the Labor-Herald nor the city newspapers
registered any grievances against the force.[36]

With the settling of the strikes in the late 1930's, the police
and the white community had assuaged their differences.  In 1938 the
Times-Dispatch respectfully disagreed with Chief Jordan's comment that
inept handling of the parole system primarily caused crime.  The news-
paper noted that "the State has no parole system, its maladministration
cannot possibly be blamed for the high crime rate with which Chief
Jordan has to contend."  In 1939, the police investigated a series of
vandal attacks during Halloween festivities, but again the press did not
issue biting comments against the police.  In short, the police seemed
freed from critical editorials, unfavorable letters, and council

---

[35]
James MacGregor Burnes, Roosevelt:  The Lion and the Fox, pp.
356-421; City of Richmond, Annual Report, 1935-1936, Public Employment
Bureau, no page number.

[36] Times-Dispatch, May 11, 1937; Labor-Herald, May, 1937, 1940;
Planet, 1937-1938.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

probes.[37]

Communication and experience helped to end tension with the white community. The administration, the press, and labor compromised difficulties and truly attempted to seek the best interests of the city. No municipal officials could govern with such a wide spectrum of negative opinion as had existed in the early and mid 1930's.

While crime, press, and labor problems decreased in the late 1930's, the department continued to have poor relations with the black community. The managing editor of the _Planet_, Josephus Simpson analyzed police relations with blacks and charged, "There is rampant in Richmond a brand of social injustice that affects both blacks and whites. . .The most appropriate name. . .is police tyranny." Simpson also stated that "The Richmond police are unusually good at catching Negro murderers /but/ they are reluctant to spend too much time running down clues in an attempt to catch and punish the guilty parties when a Negro has been found dead in an alley." Finally he asserted that the police arrested blacks on disorderly conduct charges, "in order to keep up the average volume of business and to keep the 'record straight.' There is always a 'disorderly' house in which a number of Negroes can be found. . . ."[38]

Other writers wrote to the _Times-Dispatch_ citing injustice to the Negro. John W. Baddy, a Richmond resident, asserted that blacks had tried to avoid crime, but that "it will be difficult indeed for anyone to show that the social and economic conditions here in Richmond afford the

---

[37]
_Times-Dispatch_, October 19, 1938; November 2, 1939.
[38]
_Planet_, April 10, 1937.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

202

colored boy or girl. . .the same opportunities to become useful and
helpful members of society as are afforded white people." In December,
1935, the Planet criticized Chief Jordan and the police for being unable
to cope with crime in Negro east Richmond. After Jordan denied the
charge, Theodore Jones, a frequent letter writer on black matters, said
that unusually high crime existed in Negro neighborhoods and that a
black policeman would help reduce Negro lawbreaking.[39]

Later, at the 1936 crime commission hearings, the question of
black crime arose again. Safety director Cutchins stated that "Negroes
who comprise one-third of Richmond's population, are responsible for one-
half of the city's crime." But Theodore Jones, prominent Negro commen-
tator,also stated that squalor, humiliation, and poverty had produced
the high black crime rate. Local pastor Reverend Joseph T. Hill assert-
ed that ultimate responsibility for Negro crime laid "with the dominant
white race," and he recommended the city hire black policemen.[40]

The question of black police officers proved one of the city's
most controversial issues. In September, 1936 Judge John Ingram recom-
mended that the city assign a black policeman to patrol Negro commun-
ities, and the next month a meeting of Negro clergymen urged the hiring
of Negro patrolmen. However Mayor Bright rejected the proposal because
a Negro policeman would generate racial animosity, and "a policeman
can't arrest only one race but must be able to arrest all persons guilty
of crime." The Planet called Bright's comments typical "race baiting"

_____

39
    Times-Dispatch, December 4, 1935; December 31, 1935, January 9,
1936.
40
    Ibid., September 22, 28, October 14, 1936.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

203

41
and "Jim Crow" policy.

Besides tension over Negro law officers, the late thirties wit-
nessed many charges of police mistreatment of blacks. In January, 1938,
a policeman killed a 17-year-old Negro youth after he escaped from a
stolen car. The Planet felt the act "revolting" because the police
should not shoot a suspect unless he had threatened someone's life. Two
months later the same newspaper claimed that police "manhandled" two
black passengers at a bus terminal because of a violation of segregation
laws. In April, 1938, Chief Jordan recommended an ordinance requiring a
$50 permit for scrap paper collectors because they supposedly committed
a significant amount of petty theivery. The Planet said the $50 tax
created an undue hardship on the low-paid Negro scrapman yet doctors and
lawyers only paid $25 for their permits.[42]

Public opinion unanimously opposed the ordinance. A black teacher
at Virginia Union University, the city's Negro college, described the
$50 tax as "unfortunate" and urged its defeat, and the Times-Dispatch
said the permit would do more harm than good." Consequently city council
defeated the motion.[43]

The race question entered into the heatedly contested mayorality

---

[41] Times-Dispatch, September 29, October 13, 15, 1936; Planet,
October 24, 1936.

[42] Planet, January 29, March 19, April 9, 1938.

[43] Times-Dispatch, April 10, 1938; CCM, April 30, 1938, p. 125. But
blacks condemned not only white conduct, but Negro shortcomings as well.
In November. 1935, Theodore Jones condemned the Negro community for the
large number of Afro-Americans involved in city robberies. Two years
later the Planet decried the large number of Negroes charged in the
Hustings Court: "The police blotter is a disgrace insofar as Negro
Richmond is concerned." Times-Dispatch, November 25, 1935; Planet, Oct-
ober 2, 1937.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

election of 1940.  Gordon B. Ambler, lawyer and long-time Virginia
politician, ran on a ticket of municipal modernization as he recommended
a referendum on the bicameral city legislature.  Bright ran on his suc-
cessful campaign of conservative spending, but he charged that Ambler
planned to appoint black policemen.  Ambler denied the charge, but he
did promise a complete reorganization of the city police bureau.[44]

In the election, Ambler defeated Bright by a comfortable margin.
The Times-Dispatch remarked that the end of the Bright administration
marked the end of "obstructionist" city government, and hoped that Ambler
would bring efficiency and public confidence back to city hall.[45]

In perspective Mayor Bright had adequately administered city gov-
ernment during the depression, but he had ineptly handled police matters
and showed an indifferent attitude toward the civil liberties of dissi-
dents, students, and blacks.  To be sure, the mayor's popularity and
election victories demonstrated that he had the confidence of the major-
ity of the public, but his reaction to the leftists and his restrictions
against the press indicated weaknesses in judgment which have little
place in public life.

Three months after Bright's defeat at the polls, Robert Jordan
died.  The chief's death brought numerous eulogies as Bright said that he
had lost a "beloved friend" and the city had lost a man of "high ideals."
Colonel Cutchins stated, "Richmond has lost one of the most devoted
officials she has ever had in her service."  However the Times-Dispatch

---
44
   Times-Dispatch, March 31, 1940.
45
   Ibid.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

205

46

and the News-Leader refrained from any comment.

No one could doubt Chief Jordan's devotion and personal integrity, but as with many poor administrators his problems arose from execessive zeal rather than cold indifference. Chief Jordan like Mayor Bright had indicated dangerous and irresponsible attitudes toward civil liberties and while the chief satisfactorily controlled crime, he did not achieve an unusually brilliant record. Writing later, Cutchins said of Jordan: "Unfortunately, the chief of police was, in my judgement, unable to handle men. He was a disciplinarian of the wrong kind, but he had been of great help politically to the mayor. . .With few exceptions the police officers disliked him thoroughly."[47]

Mayor Ambler named 22-year veteran E. H. Organ to succeed Jordan as the new administration tried to continue the improvement of the police image. Organ had not attained a particularly notable record, but both the city's progressive and conservative factions approved of him. The chief faced a formidable challenge in controlling public order as the United States entered World War II in December, 1941.[48]

In early 1942, war hysteria resulted in police arrests of persons engaged in any form of anti-patriotic activities. In February of that year patrolmen apprehended two men who had donned German uniforms alleg- edly as a practical joke. Four months later they jailed a man for spreading pro-German propaganda. Moreover the police arrested a number

---

46
  Times-Dispatch, June 5, 1940; News-Leader, June 5, 1940.
47
 Cutchins, Memories, p. 343.
48
  Times-Dispatch, October 1, 1940.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

206

of draft evaders during the war years.[49]

Crime declined in some of the traditionally active catagories in the war-time era. Drunkenness dropped from 8,683 in 1942 to 5,808 in 1944. Major felonies such as assault, rape, and robbery dropped from 5,566 in 1942 to 5,313 in 1945. Writer Francis Lutz, who studied Richmond during these years, commented that "The decline of crime during the war years resulted from the "strong broom of the Army and Navy military police."[50]

The war years, however, saw a rise in the city's murder rate. In 1943 William Christian, editor of the News-Leader released a study of Richmond murders in which he found that most of those convicted of murder consisted of repeat offencers and that the average sentence for murder was only 8 3/4 years. Furthermore Christian asserted that the court was too lenient to blacks who killed other blacks and therefore had not discouraged murder among Negroes.[51]

During World War II, as in each of the previous wars, prostitution again flourished as the "ladies of the evening" serviced the soldiers at nearby Fort Lee. Vice arrests increased from 760 in 1942 to 1,424 in 1945, and one observer commented that "Prostitution, commercial vice, and sex thrived. . . ." Nonetheless police tried to mitigate and control prostitution. In August, 1943, for example, the force carried out a

---

[49] Francis Lutz, Richmond in World War II (Richmond:  William Byrd Press, 1948), pp. 122, 183.
[50] Ibid., pp. 55-56.
[51] News-Leader, August 7, 1943.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

207

campaign against bordellos, and on August 14 of that same year detectives arrested fourteen women on morals charges. In the mid-forties the papers noted numerous police raids on prostitution houses.[52]

Throughout 1944 and 1945 juvenile crime also increased markedly. In February, 1944, police jailed three black youths for stealing $2,480 in diamond rings, and in April, police were called to recapture eleven escaped inmates from the juvenile detention home. Later that month police arrested fourteen teenagers for curfew violations. During the last two war years teenagers frequently vandalized schools and parks.[53]

Besides crime problems, the war years also witnessed a number of labor crises, but the police and the workers amicably cooperated and union leadership did not even hint at police misconduct. In April, 1943, the mayor rejected a proposed wage increase by sanitation workers, and although violence appeared certain, both the force and the workers avoided any disorder. In May and June, 1944, numerous pay disputes occurred but again police and labor refrained from confrontation and no observer charged the department with negligence.[54]

Even police relations with the black community improved as the global conflict gave blacks economic opportunities heretofore denied them. The Urban League, a national Negro rights organization, pressured the federal government to allow representative numbers of blacks on war-

---

52
   Lutz, Richmond in World War II, pp. 55, 271; Times-Dispatch, August 10, 14, 1943.
       53
       Ibid., p. 331; Times-Dispatch, February 18, 1944; April 9, 19, 1944, March, 1945.
       54
       Lutz, Richmond in World War II, p. 218.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

208

related jobs, and in 1942 a court order decreed that the city had to pay
Negro teachers the same amount of money as white teachers.  Later that
same year, a group of black ministers asked for more stringent law en-
forcement in Negro communities, and Wiley Hall of the Richmond Urban
League stated, "Certain Negroes have contempt for the way law is carried
out and that attitude leads to further crime among this class."  In 1943
the council provided for funds to hire a black probation officer, and
later that same month the Times-Dispatch urged the city to employ Negro
policemen.[55]

     In addition, the war years marked improvements in the  policeman's
life.  The council guaranteed that patrolmen would be assured of their
jobs when they returned from the war.  In January, 1942, the council
appropriated an improved pension system for policemen, and a year later
the city approved a resolution that provided for paying police for
attending court.  These long overdue benefits evidently resulted from
the economic prosperity the war had generated.  Richmond's revenues in-
creased and most councilmen realized that the police needed an improved
standard of living.[56]

     The New Deal era began with great friction between the police and
the community, but ended in a new consensus and significant cooperation
largely as a result of World War II.  Misunderstanding and lack of com-
munication and a desire to cooperate ended the friction between police

---

[55]
     Lutz, Richmond In World War II, p. 44; Times-Dispatch, December
5, 1941; News-Leader, February 13, 1942; Times-Dispatch, February 21,
1943; CCM, February 3, 1943, p. 118.
[56]
     Ibid., p. 176; CCM, January 21, 1942, p. 534, September 6, 1943,
p. 189.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

209

and community.  As Richmond turned to revitalization and renewal after the war, it could look on a mature police department which actively responded to the needs of the city's residents.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**JA1186**

210



Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHAPTER XI

POLICE PROBES, 1946-1961

City officials investigated charges of police misconduct in 1952, 1955, and 1960. These probes resulted from difficulties within the department itself as well as changes in the city's political, economic, and social conditions. While initially producing confusion and misunderstanding, the probes of the 1950's provoked far reaching modernization of the Richmond police bureau.

Politically, the city voted 21,000 to 8,000 in November, 1947 to end the bicameral municipal government and replace it with the city-manager organization. Under the new system the manager hired and fired city employees and thus greatly separated council from patronage questions. The city press strongly urged the governmental change as the News-Leader stated that "many methods which seemed satisfactory in 1870 and in 1918 are not fitted for the faster more exacting age."[1]

Change also occurred in economic and social life. The post war years brought expansion, an increase in the standard of living, and many job opportunities. Employment, for instance, rose from 88,000 in 1940 to 102,000 in 1950. World War II also altered social conditions, especially for blacks. Military service shattered many social barriers and ended considerable fear and mistrust of Negroes. Many liberals and a significant number of conservatives believed that the Negro's record

---

[1] Times-Dispatch, November 3, 4, 5, 1947; News-Leader, November 3, 1947.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

212

in the war entitled him to fair treatment on the job market.[2]

Richmond leaders reflected this trend as the city safety director announced in Januray, 1946, that the police department would employ blacks. City officials added that the blacks would patrol Negro neighborhoods and work only with the other newly appointed black policemen. The <u>Times-Dispatch</u> called the decision "long overdue." Police administrators, by contrast, reacted coolly to the announcement as Chief Organ stated the proposed black officers would be "special officers" for the Negro districts. Another police captain made derogatory remarks about the decision to his men at a police formation. Subsequently the chief demoted the captain to patrolman. On June 1, 1946, four blacks became official city policemen. Three years later, the first black women entered the department but the event hardly caused a reaction at all.[3]

Another significant change affecting the police concerned the economic prosperity of the late 1940's, and early 1950's. Because of the department's low pay scale and the higher wages paid locally in industry, the police apparently could not attract the most qualified men. Consequently, misconduct ravaged the department. By October, 1946, Chief Organ either had arrested or had disciplined a number of officers. Detectives had arrested two policemen for rape, Organ had demoted two plain-clothesmen to patrolmen for malfeasance, and the chief had allowed another to resign. Organ declared that henceforth he would enforce even

---

[2] <u>1950 Census of Population</u> (Washington: U. S. Government Printing, 1952.)

[3] <u>Times-Dispatch</u>, January 26, 27, Febriary 12, March 15, June 1, 1946; <u>Afro-American</u>, January 26, 1946; <u>Times-Dispatch</u>, May 5, 1949.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

213

tighter discipline, and guaranteed that the reassignments would curb
irregularities.  Nonetheless an informal News-Leader poll indicated that
only one of seven policemen knew of any such stricter disciplinary order.
The department seemed in confusion and disarray.[4]

The city press questioned these peculiar events.  The Times-
Dispatch, always aware of even the slightest police misconduct, reacted
to Organ's actions with surprise.  The newspaper asked if the chief had
received political pressure to reassign the men.  The Times-Dispatch
also questioned the reasons for the low pay of the force and implied that
misconduct developed because of financial need.  Moreover the newspaper
suggested the establishment of a police legal fund to protect officers
from arbitrary decisions by superiors.[5]

Organ responded to these comments by diligently trying to enforce
equitable discipline during the post war years.  In December, 1946, he
implemented a merit system which awarded points for exceptional duty and
penalized points for rule violations.  In addition he impartially managed
the department as he suspended veteran officers for misconduct.  Nonethe-
less in July, 1947, chief of detectives Orris D. Garton replaced Organ as
police chief.  Public safety director Richard Foster stated he made the
change "because I believe another man can do the job more efficiently and
can run the department in a better manner."  Also city officials desired
a man free of political connections since Mayor Ambler had appointed
Organ.

---

[4]
  Times-Dispatch, October 25, 1946; News-Leader, October 29, 1946.
[5]
  Ibid., October 25, 1946.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

214

Garton had not attained a particularly distinguished record, but he also had no enemies.[6]

Garton satisfactorily administered the department. He enforced discipline as vigorously as his predecessors, and effectively used the merit system. But Garton did not want to overemphasize discipline as Jordan had done. The new chief exhibited flexibility as he instituted a rotating shift which permitted all department members an equal share of the work shifts; prior to 1947 only the older officers worked the daytime hours. Safety director Foster said that the new hours would enable law officers to "'have the opportunity to obtain more well-rounded experience and also have the chance for a more normal home life.'"[7]

Despite Garton's changes, money problems caused discontent. Policemen worked eighty-four hours a week at 61 cents an hour, received little pay for court time, and received no remuneration for extra duty. In October, 1948, Richmond merchant Fred Featherstone put an advertisement in the newspaper complaining about poor police pay and working conditions. Featherstone said he had received two hundred letters and cards in support of better pay for the police, but neither of the city newspapers commented on either the advertisement or the patrolman's plight.[8]

The low salaries caused manpower shortages. Throughout the late

---

[6]
    News-Leader, December 20, 1956, March 7, 1947; Times-Dispatch, March 25, 1947, July 4, 1957.
[7]
    Ibid., April 25, 1947, May 1, 1947, July 15, 1948, August 5, 1948, September 27, 1950.
[8]
    Ibid., October 22, 1948; Times-Dispatch, News-Leader, October, 1948.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

215

1940's the force remained understaffed. The Times-Dispatch frequently
called for more personnel and the news-Leader found that in the period
1950-1951, alone, nine men left the department because of inadequate
wages. Thus the department did not attract the most professional and the
most capable recruits. The Times-Dispatch, in a very revealing comment,
noted that the police profession appealed to "young men of adventurous
nature." Consequently the police consisted of low-paid personnel who
had great responsibility but little reward; this situation inexorably led
to malfeasance and criticism.[9]

Complaints ranged from incompetence to brutality. In September,
1948, Judge Ingram criticized policemen for being absent from trials
without notifying the court. A Times-Dispatch editorial expressed dis-
pleasure about an allegation that patrolmen had failed to give tickets
to fellow officers for parking violations. In 1951, local businessmen
asked for better police protection and recommended the department insti-
tute a walking beat. Most of the brutality charges came from blacks such
as when the Richmond Afro-American, the city's Negro newspaper, demanded
officer J. L. Wormley's dismissal because he unnecessarily assaulted a
Negro.[10]

Despite occasional discipline problems, low pay, and complaints,
The Richmond public expressed surprise when in 1952, local lawyer Howard

---

[9]
   Times-Dispatch, February 9, 1947; News-Leader, June 15, 1949,
October 10, 1951; Times-Dispatch October 26, 1949.
[10]
   News-Leader, September 28, 1948; Times-Dispatch, July 11, 1950,
June 16, 1951, August 21, 1949; News-Leader, May 15, 1951; Richmond
Afro-American, May 19, 1951.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1192

216

Carwile charged the police department with bribery, shakedowns, and
protection of rackets. In response to Carwile's charges, the News-Leader
called on the community to give the allegations a respectful treatment,
and the newspaper stated: "That the numbers racket operates in Richmond,
no one denies—least of all the police. But their view of it seems to
be gentle tolerance."[11]

A special grand jury convened and heard from over forty witnesses
telling of police misconduct of every variety. The key witness, newsman
Tom Mitchell, a reporter with the Afro-American, told the jury that he
knew that criminals had paid off the police to protect gambling dens.
However, upon closer examination the grand jury determined that Mitchell's
testimony as well as the other witnesses' testimony amounted to merely
hearsay evidence. On July 2, the jury filed its report and exonerated
the police. The panel found sufficient testimony to indict only one
policeman on bribery charges, and the jury reported that "most of the
testimony was inconclusive and uncertain. Much of it was pure hearsay."
Nevertheless, the jury did conclude that known law violators gave police-
men presents and recommended that the police refuse all gifts.[12]

The Times-Dispatch concurred with the grand jury. The newspaper
asserted that the charges against the police consisted of little more
than gossip and could hardly be substantiated. Carwile's motive, assert-
ed the Times-Dispatch, centered on an effort to win a seat on city council.
Nonetheless circumstantial evidence did indicate a number of actions that

_____

[11]
   Times-Dispatch, May 20, 1952; News-Leader, May 21, 1952.
[12]
   News-Leader, June 25, 1952, July 2, 1952; Times-Dispatch, May-
June, 1952.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

seemed less than honest.[13]

Although the probe did not uncover any wrongdoing, the inquiry awakened Richmond to some of the department's internal problems which might foster corruption. In 1953, the News-Leader reported that it had determined that one-third of the three-hundred-man police force worked an extra job and that many policemen wore their uniforms on that second job. Later that year Chief Garton announced that policemen would not wear their uniforms on off-duty jobs. The following year, he restricted part-time jobs to those only he had approved. In July, 1954, safety director Foster barred policemen from working off duty at night clubs because of its harm to the police's public image. Besides the extra job question, another problem concerned payment to policemen from lawyers. Police records indicated fifteen officers had received payment from attorneys to appear in court and testify. Lawyers traditionally paid their witnesses, and policemen asserted that they, too, had the right to receive pay. However, city officials quickly banned the practice as it could easily lead to graft.[14]

The Times-Dispatch approved of these changes in restricting police income. In 1953 the newspaper called for higher police wages in order that patrolmen would not have to take questionable part-time jobs. A year later the Times-Dispatch editorially stated that the chief should monitor all sources of officers' income, and again requested council to

_____

13
    Times-Dispatch, July 3, 1952; Afro-American, July 2, 1952.
14
    News-Leader, February 25, 1953; Times-Dispatch, December 10, 1953, June 23, 1954, July 2, 1954; February 20, 21, 1953.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

218

give policemen respectable salaries. But neither the council nor the public responded.[15]

Although the force still could not attract enough men, efficiency seemed satisfactory. Few citizens complained about the force and un-favorable editorials ceased. In December, 1954, Garton had to ask police-men to volunteer for extra duty to stop outbreaks of robberies and bur-glaries during the Christmas season. Forty-nine officers responded to the request and served without extra pay. Unfortunately, neither white nor black press in the city editorially noted this selfless action.[16]

As a result of the 1952 probe and the problems of the following years, city leaders decided to employ a professional consultant, Bruce Smith, to evaluate the force, and throughout 1955 he studied the activ-ities of the Richmond police. In May, he reported his findings to city leaders and concluded that the force's major weakness was poor organiza-tion. Smith wrote that "there are numerous contradictory rules and systems of organization," and recommended the city create a post of assistant chief to handle administrative detail. In addition, he urged great revision of the detective bureau. He suggested eliminating the detective sergeant post and replacing it with a plain detective position "so that patrolmen and detectives could be interchanged at will." Smith also advised that the chief should appoint detectives directly rather than through competitive examinations. Finally he severely criticized

_____

[15] *Times-Dispatch*, June 14, 1953, June 24, 1954.
[16] *Ibid.*, December 14, 15, 17, 1954; *News-Leader*, *Afro*, had no com-ment.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

219

the juvenile division which "has few defined duties nor can anyone be sure just what percentage of its duties are devoted to any one activity." But Smith did state that in general "Richmond is no easy hunting ground for thieves; the citizen or tourist is as safe in Richmond as in any other city with comparable problems."[17]

The city press favorably reacted to Smith's judicious and tactful criticism. The Times-Dispatch called the report "excellent" and "a technical yet common sense analysis." The News-Leader considered the report "sensible" and his recommendations "should prove of great value."[18]

Indeed the Smith report indicated considerable research and objective analysis. However, the report did not even consider the force's relation with the black community, but concentrated on the police department's crime control. By ignoring the social dimension of lawbreaking, Smith doomed his work to a mere examination of the technical workings of the department.

Shortly after the release of the Smith report in October, 1955, a number of members of the League of Women Voters and Councilman Robert Throckmorton demanded a police probe based on accounts of arbitrary discipline procedures as well as malfeasance. Mrs. Marie Dineen, spokeswoman for the League said that she had been informed of a number of cases of police misconduct, and she asserteed that the bureau had failed both to solve many crimes and adequately protect the business districts. Councilman Throckmorton alluded to discipline problems and claimed,

---

[17] Times-Dispatch, May 25, 1955.
[18] Ibid., News-Leader, May 25, 1955.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

220

"There's unrest in the bureau and morale is lower than I've ever seen it."[19]

The press disagreed on the proper action. The Times-Dispatch asserted that no specific evidence existed to justify the charges, and when reporters asked Mrs. Dineen for written evidence, she could not produce any. On the other hand, the News-Leader advocated a councilmanic investigation and added "that some sort of remedial action is clear enough."[20]

Subsequent press investigation indicated that the root of the Throckmorton charges stemmed from an incident in August, 1955, in which chief Garton had charged Sergeant J. M. Hall with dereliction of duty, insubordination, and subsequently demoted him. Hall defended himself by claiming that Inspector J. Spencer Howerton had "picked" on him, and the news of Hall's demotion had touched off protests within the department. On October 18, the city personnel board upheld his reduction in grade, but agreed that he would return to his former rank in December, 1955. One hundred policemen signed a petition calling for his immediate reinstatement.[21]

These actions generated comment in the city press. According to the Times-Dispatch, police morale had practically collapsed because of personality clashes and "intangibles." While the paper conceded that the Smith report had called for tighter discipline, the Times-Dispatch

_____

[19] News-Leader, October 11, 1955.

[20] Times-Dispatch, October 15, 1955; News-Leader, October 17, 1955.

[21] News-Leader, October 18, 1955.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

221

objected to the arbitrary fashion of Hall's demotion. Moreover, the
journal cited other arbitrary actions such as when a superior "stepped
on one man's shoes because he had not shined them," and another case in
which a commander "threw a man's tie clasp on the group because the
clasp failed to meet regulations." But the News-Leader defended the
disciplinary actions: "Police Chief Garton is not himself a severe man.
During the long months of illness that preceded Safety Director Foster's
death, laxities were condoned. The result was that Safety Director
/William/ Groth inherited a loose organization in need of some tighten-
ing up." The News-Leader concluded that "the trouble here seems to be
far more a problem of personalities than procedures."[22]

On October 24, the council decided to investigate the bureau. Al-
though the city representatives permitted all persons to bring either
oral or written statements to the council's attention, only one person
decided to do so. Reporters asked Mrs. Dineen why she had not testified,
and she explained that her attorney advised that she might be sued for
slander since she could not strictly document her allegations. Also Mrs.
Dineen wanted an independent attorney to investigate the police and not
the city council. In the midst of the investigation, the council criti-
cized Chief Garton for circulating a memorandum in January, 1956, forbid-
ding policemen from "gossiping" and demanding that all departmental
complaints be in written form. Vice Mayor Phil Bagley asserted that this
amounted to "intimidation" against policemen cooperating with the probe;

---

[22] News-Leader, October 17, 1955.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

222

but Garton said his directive merely reiterated existing rules.[23]

After four months of the probe, the only positive conclusion the panel reached concerned one case of bribery, and later the courts dismissed even that allegation. Once again unsubstantiated charges and personnel disagreements received great press attention but upon investigation demonstrated that some police procedures appeared in a questionable light and weakened public confidence in the quality of law enforcement.[24]

In September, 1956, the News-Leader assessed the previous year of police upheaval. The newspaper cited many efficient changes in allocation of men and time as the chief directly controlled the vice squad, detectives received a ten percent pay increase, and council had appropriated money for thirty-one additional patrolmen as well as three administrative positions. Finally, discipline and appearance had improved.[25]

Because of the 1956 probe, the police bureau embarked on a public relations campaign. Throughout 1956 and 1957 policemen attended seminars on "unbrutal" arrest methods for handling drunks and the mentally retarded. To attract more men, the department instituted a five-day work week, and in June, 1957, Garton announced that the police examination would emphasize "brains over brawn." That same year the department established

---

[23] News-Leader, January 20, 1956; Resolutions and Ordinances, October 24, 1955, November 14, 1955; Times-Dispatch, December 29, 1955, January 30, 1956.

[24] Times-Dispatch, May 4, 1956.

[25] News-Leader, September 13, 1956; Ordinances and Resolutions, November 28, 1955.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

223

a police lecture series to inform people of police activities.[26]

But the new police image seemed tarnished when safety director
Groth announced in September, 1957, that the department had investigated
ten policemen for allegedly accepting payoffs for protecting gambling.
Commonwealth's Attorney T. Gray Haddon thoroughly examined the evidence,
but concluded that he planned no prosecution because of lack of witnesses.
Once again sensational charges weakened the police image.[27]

Throughout the probes, the department adequately controlled crime
as from 1946 to 1959 arrests rarely exceeded 25,000.  The chief institu-
ted a "phantom squad" which worked the 8 PM to 4 AM shift, which was a
time of intense criminal activity.  In addition, Garton re-instituted
walking beats, and in December, 1959, the chief mobilized virtually the
entire force to curb Christmas season robberies.  An informal Times-
Dispatch survey of businessmen indicated that most industrial represen-
tatives felt the police had done an adequate job; the manager of the
local Sears and Roebuck said, "Our police protection has been excel-
lent."[28]

Nonetheless criticism appeared for failure to stop some crimes.
A jewelry store owner complained that the police had not detected a safe
robbery in his store.  After a large number of robberies, councilman R.
J. Heberle chastized the force.  On December 18, 1959, three armed rob-
beries in ninety minutes caused Groth and Garton to meet and discuss

---

[26] Times-Dispatch, January 26, 1956; February 16, June 21, 1957;
News-Leader, May 27, 1957.

[27] Times-Dispatch, September 26, October 4, 8, 1957.

[28] Times-Dispatch, September 13, 1956, May 1, 1960; News-Leader,
December 19, 1959; Times-Dispatch, February 26, 1959.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

224

additional downtown patrols. After a rape of a white woman in a Negro neighborhood, the Black Civic Association asked for more police protection in the Negro areas.[29]

Nevertheless the public and the press generally viewed the department as improving its protection of life and property as a result of the Smith report and the numerous probes. However, a raid on January 22, 1960, by Federal agents touched off an eighteen-month investigation that questioned virtually every aspect of police affairs in Richmond.

The Federal raid resulted in the arrest of a local merchant, Harry Donovan, on charges of running a large numbers racket. The Federal agents did not inform the Richmond police of the raid, and the agents told reporters at a press conference that in the month they had observed Donovan's shop, they had noted that quite a few Richmond policemen had frequented the establishment. In reaction to these disclosures, the News-Leader demanded a complete police investigation, and the newspaper expressed special dismay because the police had neither known about Donovan's activities or about the raid. The Times-Dispatch remained uncharacteristically quiet.[30]

In March, 1960, a Federal grand jury met behind closed doors and heard testimony concerning police activities. During the subsequent inquiry many policemen refused to answer questions concerning crime control and police conduct on the grounds that it would be self-incriminating. The jury concluded that they found " 'overwhelming evidence of

---

[29] Times-Dispatch, January 30, 1957; News-Leader, November 4, 1959, April 6, 1957, December 18, 1959.

[30] Times-Dispatch, January 23, 1960; News-Leader, February 5, 1960, January 25, 1960.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

225

appalling and flagrant disregard for law and order.' " Press opinion differed in reaction to the jury's findings. The News-Leader urged a special grand jury to convene and examine the police bureau; the Times-Dispatch cautioned against indicting all policemen but it did want questions answered concerning police and gamblers.[31]

On March 19, city safety director Groth announced that he planned to interview all policemen, and he stated that if they did not come voluntarily to the interviews he would require their presence. Groth also announced that he would neither allow the presence of lawyers or permit transcripts of the proceedings. As a result of Groth's questioning, the safety director removed Chief Garton from head of the department and named him assistant public safety director, a move which the newspapers described as "being kicked upstairs." Also Groth required the retirement of Major Hanna.[32]

The News-Leader viewed the events sympathetically. The newspaper stated that the changes did not reflect poorly on Garton as he had been ill for over a year. Groth intended Hanna's dismissal to allow the new chief complete authority since Hanna had run the department and his presence might cause divided loyalties. The News-Leader concluded that the "Bureau's great need now is for a new chief preferably brought in from outside the Department."[33]

The Times-Dispatch characterized the average patrolman as amazed

---

[31] News-Leader, March 18, 1960; Times-Dispatch, March 9, 1960.
[32] Times-Dispatch, March 19, 1960; News-Leader, March 28, 1960.
[33] News-Leader, March 29, 1960.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1202

226

by the shifts and saddened by the removal of Major Hanna. Moreover the disclosures of police misconduct caused public hostility to many policemen. Some mentioned that their neighbors "were cold" and one officer stated that his landlord asked him to leave his apartment because he worked for the police. Finally one plainclothesman asserted, " 'What we need is new blood. . .We need a new chief. We need a young chief. We need a chief that isn't worried about a policeman who has gravy spots on his tie or a little dirt on his shoes but with an iron fist who takes orders from no one. . .That chief should be an outsider.' "[34]

While the city continued to look for a new chief, the city prosecutors continued to investigate the police department. On May 20 United States District Attorney Joseph Bambacus announced to reporters he had determined that "'the entire vice squad of the Richmond Police Bureau was on Harry Donovan's payroll.'" Shortly thereafter the council's special investigator Robert J. Lumpkins reported to council that "he had obtained circumstantial evidence of police misdeeds." Nonetheless the grand jury continued to hear evidence and most observers, including the city newspapers, suspended judgement until that body reported. Throughout the summer of 1960 almost seventy officers appeared before the grand jury. However of the seventy policemen only three took lie detector tests, and many refused to answer allegations of payoffs.[35]

While the grand jury continued to hear investigations, Lumpkins

---

34
    _Times-Dispatch_, March 29, 1960, April 3, 1960.
35
    _News-Leader_, May 20, 25, 1960; _Times-Dispatch_, June, July, August, 1960.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

227

issued his final report in August, 1960, in which he concluded that "a
pattern of corruption existed in the Richmond Bureau of Police." He
stated that city policemen had received protection payments from opera-
tors, gamblers, and bootleggers. He singled out the vice squad as the
most corrupt because it had collected protection money for many years.
He also criticized police leaders who "have been derelict in failing to
discover it and to initiate an aggressive, all-out investigation to de-
termine its extent." In Lumpkins' judgement "the lack of leadership at
the top had been largely responsible for conditions at the bottom."[36]

Public opinion did not share Lumpkins' denunciation of the police.
The press cautiously praised the Lumpkins report. The News-Leader
approved but said that "it occasionally suffers from an. . .extravagance
of phrase." But the Times-Dispatch praised the work of providing the
"basis for legal and administrative action that can remove corrupt police-
men from the force. . ." Citizens responded weakly to the disclosures as
only five letters commented on Lumpkins' conclusions--two favorable and
three unfavorable.[37]

Lumpkins' report lacked the thoroughness of Smith's study as
Lumpkins made bold assertions yet had little more than hearsay and cir-
cumstantial evidence to support his conclusions; even Lumpkins himself
could only point to a "pattern of corruption." To be sure, Lumpkins'
charges appeared plausible, and police authorities offered little refuta-
tion. Nevertheless they hardly exhibited any substantial findings.

---

[36]
Times-Dispatch, August 19, 1960.
[37]
Ibid., August 20, 29, 1960; News-Leader, August 19, 29, 31, 1960.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

228

As a result of the Lumpkins study, the city took action to revamp the department in the fall of 1960.  On Setptmber 1, public safety direc- tor Groth announced Chief Garton would retire.  City council continued its hearings until September 13 when the city legislators halted the investigations because most officers had plead the fifth amendment.  Con- sequently council passed a resolution which provided for dismissal of policemen who in the future would plead the fifth amendment, but the city personnel board modified the resolution to provide only for "discip- linary action" against those refusing to answer questions of duly constituted bodies in future hearings.[38]

After an exhaustive seven months of investigation and charges, Vice Mayor Phil Bagley urged an end to the inquiry, and characterized the present proceedings as "ludicrous and void of results."  On November 23 the meetings ended, and Groth announced that he had fired four policemen, transferred one patrolman, and suspended three other officers.  Of the fifty remaining officers to which the city made allegations, the safety director announced the investigation had completely exonerated them.  The press seemed satisfied as to the results since they offered no editorial objection.[39]

However, Lumpkins believed that the city had tried to cover up police corruption.  The large number of fifth amendment defenses indica- ted that the policemen had feared something.  Lumpkins stated "'Never in

---

[38]
   Times-Dispatch, September 1, October 21, 1960.
[39]
   Ibid., November 4, 23, 1960.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201     Doc: 22-3     Filed: 09/04/2024     Pg: 250 of 295

the history of any city have its police officers so betrayed their sworn duty.'"[40]

During the closing months of the hearings Bruce Smith, the consultant who conducted the 1955 probe, initiated his own review of the police situation. He concluded that Lumpkins' charges against the police lacked substance and rested only on circumstantial evidence. He also noted that Lumpkins criticized mainly those officers who did not cooperate with his /Lumpkins'/ investigation. Smith charged Lumpkins' investigators with "inexperience" and that they generated "unnecessary antagonism between themselves and members of the police bureau. He concluded that Lumpkins' report does "' appear overstated in view of the demonstrable facts. . . . and though unable to prove a single case of corruption the report alleges a pattern of corruption.'" Lumpkins naturally denied Smith's charges and vigorously called for reopening of the investigation.[41]

To assuage disagreement and resolve the police situation, the Richmond Bar Association examined the entire probe. In March, 1961, they announced that the city disciplinary actions had not "whitewashed" the police problem,and that the city had given justice to the guilty. Furthermore, the Bar Association labelled the Lumpkins report as merely offering allegations from reliable sources. The Bar's lawyers declared that "unless independently supported, /confidential informants/ are valueless to show the veracity of assertions, they are worth no more than an anonymous letter." The Association's study concluded that Richmonders

---

[40]     _Times-Dispatch_, December 21, 1960.

[41]     _Ibid_.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 251 of 295

230
[42]

could have confidence in the police and its city government.

Lumpkins vociferously defended himself.  He categorically denied
that he had used faulty methods or unreliable sources.  He offered a con-
fusing definition of a confidential informant as "a person with under-
world connections who can furnish reliable. . .information and informa-
tion furnished this individual has been established as reliable by inde-
pendent means whether or not such independent means involve legally
admissable evidence."  Apparently, according to Lumpkins a confidential
source was reliable.[43]

Public opinion generally agreed with the Bar's findings.  The
Times-Dispatch supported the Association's report, but stated that no one
could "possibly doubt that there was corruption in the city's police
department," and that the disclosure of large scale unmolested gambling
indicated "serious weaknesses" in the police bureau.   The News-Leader
commented that Lumpkins had exaggerated the police's faults but asserted
that the probe "was bound to contribute in time to a renewed esprit de
corps within the bureau and a restored confidence on the part of the
public."  Most of council concurred with the Bar's findings and three of
of six letters to the press opposed further police investigations.[44]

The long and exhausting probe indicated that mismanagement had
existed, but Lumpkins' charges of cover-up appeared unsubstantiated.

------------------------------

[42]
    Times-Dispatch, March 10, 1961.
[43]
    Ibid., March 20, 1961.
[44]
    Ibid., March 20, 21, 24, 25, 30, 1961; News-Leader, March 15, 20,
21, 30, 1961.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

231

Nonetheless city authorities seemed to want to end the probe in order that corrections be implemented quickly rather than in continuing the investigations. The city authorities acted understandably. A prolonged examination would undermine confidence and police morale. After eighteen months, the only definite conclusions that could be proven concerned eight policemen for malfeasance. Richmond needed a quick reform of its police department--not more allegations.

Director Groth and city council agreed on detective John Wright as the man to clean up the police department. Wright pledged to fight both corruption and crime, and shortly after assuming office he announced the dismissal of two black policemen for misconduct, but after an investigation Wright reinstated them. The new chief implemented an intelligence section in which police dressed as undercover agents and looked for the entrance of professional criminals into the city. In addition, he established a four-man anti-gambling squad to avoid a repetition of the Donovan affair.[45]

While the probes continued, the force still reasonably controlled crime. Arrests averaged 25,000 per year during 1960 and 1961. Chief Wright commented at the end of 1961 that the police had not stopped gambling because many law abiding citizens still gambled regularly. Crime rose in Richmond thirty-six percent between 1950 and 1960, but the city recorded less lawbreaking than the ninety-eight percent increase throughout the rest of the nation.[46]

---

[45] News-Leader, March 14, May 19, 1961; Times-Dispatch, April 11, 28, July 24, 1961.

[46] Times-Dispatch, December 30, 1961

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

232

The probes, in fact, proved less than anticipated. The Richmond police did exhibit some malfeasance and misconduct, but most of the charges failed to be substantiated in court. The 1960 probe and the refusal of many policemen to testify indicated that a considerable segment of the Richmond police had serious weaknesses in their handling of crime. But generally the inquiries demonstrated that most of the force had exhibited honesty and had diligently served the public interest. Clearly one result of the probes concerned the danger of public allegations. In most cases, either citizen charges or grand jury indictments proved inadequate in court and harmed the reputation of the force as well as the careers and good names of many officers. Public confidence, then, demanded discretion from both the citizens and the media.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHAPTER XII

THE POLICE AND URBAN UNREST, 1962-1974

The 1960's and early 1970's marked one of the longest periods of social upheaval in the nation's history. Most of the disorder occurred in the cities and involved confrontation between the police and various dissident groups protesting racial injustice and the Vietnam War. In addition, the police themselves experienced militancy as demands for better pay and better working conditions went unheeded, and therefore many law officers began to unionize to obtain their rights.

Richmond avoided the worst of disorders, but still witnessed considerable urban turmoil. In the 1960's, the city's blacks organized both to gain greater economic advantages as well as to end social injustice, especially injustice at the hands of the police. Also confrontation with youth plagued the department and demonstrated the force's weakness in crowd control. Finally, dissention ravaged the Richmond police as both black and white officers openly disputed with the department's superiors over pay and procedures.

However, the early 1960's gave no indication of coming dilemmas. In those years, the bureau's main attention focused on perfecting traditional methods of crime control. The police used technological innovations to detect more accurately finger prints and tire prints, as well as employing sophisticated ballistic tests. The department also increased educational requirements to include a high school diploma and

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1210

234

a series of specilized courses in criminology.  In 1963 the <u>Times-Dispatch</u> commented, "The day is gone when muscles, brawn, and political friends--and nothing more--could get a young man a policeman's job."  In 1966 the department installed a computer to facilitate record keeping and to catalogue various criminal information.[1]

The Richmond police also recognized that lawbreaking influenced the total community.  Chief Wright stated that "criminal acts are not just a police headache, but rather a community problem."  In 1966 the department embarked on an intensive citizen cooperation program and planned frequent meetings with schools and neighborhood civic groups.  A year later the police instituted a program to educate citizens in ways to help the police stop crime such as by putting house lights on at night and reporting suspicious characters.[2]

The <u>Times-Dispatch</u> editors and columnists commented on these changes.  A 1964 editorial commended the force for building a better public image and stated that the reason for the previous hostility and misunderstanding centered in past police thoughtlessness toward the average citizen.  Columnist and former police reporter Charles Houston also favorably commented on the new bureau attitude, and urged further training in psychology which would advance relations between the force and the citizens.  Houston stated: "The policeman's task is. . .more concerned with persons.  And persons of all degree are supposed. . .to be

---

[1]    <u>News-Leader</u>;July 21, December 16, 1963; <u>Times-Dispatch</u>, July 11, 1963.

[2]    <u>Ibid</u>., December 7, 1964, July 22, 1966; <u>News-Leader</u>, August 10, 1967.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

235

possessed of a dignity that's not to be trifled with. . . ."[3]

A change in leadership accompanied these changes in outlook.  In 1967, Chief Wright died and city leaders agreed on deputy Chief Frank Duling to assume authority.  Wright had done a commendable job as he ended corruption and instituted new programs such as riot training and public relations to modernize the force.  Like most of his predecessors, Duling had not achieved a notable record, but appeared innovative yet conservative.  Duling showed political skill by naming Fred Wright, a relative of Chief Wright, as deputy chief which appeased the admirers of the late chief.[4]

The police's most complex community problems centered on the city's black residents.  Blacks constituted approximately forty percent of Richmond's population in 1962 and over fifty percent by 1974, yet discrimination against blacks existed even in strictly regulated municipal employment.  A Human Rights Commission study noted that eighty percent of the Negroes hired for municipal jobs filled unskilled positions, and another study asserted that "discrimination is a reality. . .in Richmond city government."  This frustration with economic opportunity undoubtedly contributed to crime and social disorder.[5]

Charges of police brutality further accelerated race difficulties.

---

[3]
Times-Dispatch, August 3, 1964; News-Leader, August 12, 1965.
[4]
Ibid., March 19, 20, 1967.
[5]
Carl H. McClenny, "Racial Differentiation in Employment:  A Case Study:  The City of Richmond, Virginia, 1964-1967 (Unpublished M.A. Thesis, University of Virginia, 1968), pp. 69-73; News-Leader, May 16, 1962; Times-Dispatch, March 5, 1970.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

236

In 1962 at a hearing of the National Association for the Advancement of Colored People (NAACP), local Negroes cited instances of police misconduct toward blacks, and the Richmond NAACP president, B. I. Slade concluded,"'Police brutality is on the rise in Richmond.'"  In 1964 the NAACP stated that they had "'documentation to prove that colored people have been victims of police brutality. . .Too many members of the force are steeped in race prejudice which renders them unsuited to deal with colored people.'"  Nonetheless after investigation, the FBI stated that the charges were unwarranted.[6]

Black protest against police brutality as well as general social injustice occurred throughout the nation in the 1960's.  From 1962 to 1964 Negroes undertook nonviolent mass demonstration, but by 1965 violence had erupted in Harlem, Rochester, Philadelphia, and Los Angeles. Many of these confrontations involved charges by blacks of police misconduct,and in response to the allegations, cities such as New York, Philadelphia, and Rochester established police review boards.  In Richmond, controversial councilman Howard Carwile introduced a resolution to create a civilian police review board which would consist of both blacks and whites.  Carwile declared:  "A series of inflammatory incidents between underprivileged citizens and the police prompted the proposal. . . These things have reached a grave and dangerous point. . .and could erupt in race riots in Richmond."[7]

---

[6]
    _News-Leader_, July 11, 1966; _Times-Dispatch_, July 21, 1966, September 27, 1966.

[7]
    _Report of the National Advisory Commission on Civil Disorders_ (New York:  Bantom, 1968), Chapters 1, 5, 11; _Times-Dispatch_, July 11, 1966.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1213

A number of white elites condemned the review board however. One deputy chief absolutely opposed the board because it "would reduce police effectiveness and morale," and of all the sub-divisions of city government, the review board would single out the police for direct civilian supervision. Additionally, because law enforcement demanded split second decisions, it seemed inappropriate to scrutinize those decisions as if they amounted to merely police choices. City councilman Phil J. Bagley, Jr., also spoke against the review board because it would turn the police into "a political football." The Times-Dispatch rejected the notion of a review board because the people could complain to the police chief himself, the courts, the grand jury, or the commonwealth's attorney. Nonetheless the newspaper noted that although the review board vote lost 7-2 at city council, the debate informed people of the various channels open to them to protest police misbehavior.[8]

Nevertheless, the police review board had a number of benefits. Despite the availability of the chief's office, the newspapers and the grand jury, those institutions cannot guarantee direct redress. As for the courts, they are expensive and a successful suit against a public agency is rare. A review board, by contrast, could lift black morale and insure proper police conduct toward Negroes. Moreover, the police review board could introduce more realistic justice to police hearings and thereby add to public confidence in the force's reliability and integrity.

---

8
News-Leader, July 11, 1966; Times-Dispatch, July 21, 1966, September 27, 1966.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 259 of 295

238

At the same time that the police review board had attempted to
monitor police actions, the Supreme Court issued a number of significant
decisions which further secured individual liberty against police mis-
conduct.  In <u>Gideon</u> v. <u>Wainright</u> (1963), the court required the states
to appoint counsel for indigent defendants in both capital and non-capi-
tal cases.  The court held in <u>Escobedo</u> v. <u>Illinois</u> (1964) that when the
police shifted from the investigatory to the accusatory stage, and its
purpose was to seek a confession, the police must allow the subject to
confer with his attorney.  In the land-mark <u>Miranda</u> v. <u>Arizona</u> (1966)
case, the Supreme Court decided that policemen had to advise suspects of
certain constitutional guarantees in order to make a confession admiss-
ible as evidence.[9]

Despite these guarantees, between 1966 and 1968 the nation contin-
ued to experience numerous demonstrations and riots, and a sizeable
number of citizens lodged complaints against police behavior.  The sum-
mer of 1967 witnessed the most widespread disorders and prompted Presi-
dent Lyndon B. Johnson to organize the National Advisory Commission on
Civil Disorders.  But for the most part, Richmond had little difficulty
with protests by anti-war groups or black militants.  The city lacked any
large university community to form the necleus for social movements, and
generally Richmond lawyers and the Richmond press possessed little sym-
pathy for dissent.[10]

---

[9]
Bopp and Schultz, <u>A Short History of American Law Enforcement</u>,
p. 140.

[10]
<u>Ibid.</u>, pp. 150-151.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 260 of 295

Case 3:21-cr-00042-JAG  Document 86-9  Filed 07/06/22  Page 246 of 275 PageID# 1302

Nonetheless after the assassination of Martin Luther King on April 4, 1968, the city underwent two traumatic days of intense rioting and a week of severe racial unrest. On April 7, police and blacks fought in the streets, but no brutality charges arose. On April 8, the council gave Chief Duling wide powers to "regulate, restrict, or prohibit any assembly or persons or the movement of persons and vehicles. . .and to impose a curfew." Press reaction universally commended the police as the usual critical Afro-American said nothing condemning police activities. The News-Leader commented that "by acting calmly they managed to contain a small number of vandals and looters." Ironically, the assassination and disorder generated the most far reaching cooperation between the bureau and the Negro community. Police and black leaders frequently confered and the force acted with restraint and tact despite their sweeping powers.[11]

The police department continued its successful handling of black relations throughout 1968 and 1969. The force avoided confrontation when "The Poor People's March" passed through the city in May, 1968. The "March", led by Dr. Ralph Abernathy, sought economic and social legislation from Congress to curb the causes of Negro riots. Later that year the department organized the "block program" in which each street in a crime area would have a representative to discuss problems with the police. In 1969 the bureau started a "mod squad" based on a popular television show in which young black and white patrolmen tried to work

---

[11] Times-Dispatch, News-Leader, April 4 - 12, 1968.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

240

with Negro juveniles to reduce crime.[12]

By far the most important result of the rioting concerned the expansion of the Police Community Relations Unit (PCRU) which mainly sought to gain communication with Negro residents.  The unit hoped to give Negro dissidents a positive response from the police as well as improve the department's image in the community.  The PCRU met with civic groups and held seminars in schools with the purpose of hearing citizens' complaints and doing something about them.[13]

Nevertheless, in his dissertation, Donald F. Norris criticized the PCRU because he felt the Unit's purpose "was only to 'sell' the police to the public."  Norris pointed out that the PCRU spent most of its time with middle class whites in an attempt to present a pleasing police image.  Moreover the Unit lacked proper training in community relations.  Norris concluded:  "In practice the PCRU engaged primarily in public relations activities.  It had little impact upon overall Bureau policy-making in public or community relations."[14]

Norris did offer the police side of the question.  In one interview a PCRU member stated:  "Really we tried to reach these people in the depressed areas.  You can reach the more affluent through their clubs and civic organizations. . .But there's no such clubs or groups in the

---

[12]
　　News-Leader, May 16, 1968, November 23, 1968, October 3, 1969.
[13]
　　Donald F. Norris, "Police Community Relations in Richmond, Va.: A Case Study of Police Bureaucracy."  (Unpublished Doctoral Dissertation, University of Virginia, 1971), pp. 1, 4.
[14]
　　Norris, "Police-Community Relations," pp. 2, 83.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

241

depressed areas." In spite of these obstacles during the summers of
1968 and 1969 the PCRU sponsored employment activities for Richmond teen-
agers, as well as providing athletic equipment for juveniles living in
high crime areas. Finally the PCRU sponsored a "Ladies for Law Enforce-
ment"which helped black women organize year-round activities for Negro
youths.[15]

The evidence indicated that the PCRU did serve more as a public
relations unit than an organization to facilitate communication and aid
in solving problems between the police and the Negro community. Never-
theless the department did make some progress in reducing friction be-
tween the bureau and the blacks; even Norris does not dispute the
statement that the PCRU members tried to communicate with local Negro
residents. To be sure, the program needs strengthening in furthering
the difficult objective of improving relations with the city's Negroes
which the police have ignored and mistreated for almost two hundred years.

A further indication of the police's weakness in attaining trust
and cooperation with the Negroes concerned councilman Carwile's reintro-
duction of his police review board bill. In September, 1969, Carwile
petitioned council for a review board because he said that the police had
"'a big  handful of rednecked, unreconstructed dixiecrats and bigots in
the Richmond Police Bureau,'" who might touch off a racial disorder.
The council defeated the proposal again, but Carwile charged that a num-
ber of policemen had circulated notices to the public and to the council

---

15
  Norris, "Police-Community Relations," pp. 94-95, 127.
16
  Times-Dispatch, September 11, October 25, 1969.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

USCA4 Appeal: 24-4201    Doc: 22-3    Filed: 09/04/2024    Pg: 263 of 295

to quash his bill.  But an investigation of Carwile's allegations proved them untrue.[16]

In retrospect, the atmosphere in Richmond and across the nation had doomed Carwile's review board.  Richard M. Nixon's victory in the 1968 Presidential election marked a triumph for hard-line law and order forces, and Nixon, both by action and attitude, indicated that he planned to support the police.  He expanded the Law Enforcement Assistance Agency, bolstered the Safe Streets Act bill (1968), and opposed constraints on the police.  Moreover Nixon's pro-police actions received warm support from the Richmond press.

Undaunted by Nixon administration actions, black protest continued throughout the nation as well as in Richmond.  After a "black solidarity" rally in late 1970, young Negro vandals broke windows in downtown Rich-mond but the police failed to arrest any blacks.  Later that same day patrolmen apprehended sixteen Negros after a "black caucus" meeting at Richmond's Virginia Commonwealth University.  But reporters learned that deputy Chief Fred Wright had reprimanded the officers because no patrol-men had received instructions to make arrests without approval by superiors.  The Times-Dispatch expressed displeasure at Wright's "per-missive" actions, and to the newspaper it seemed that Wright had encour-aged blacks to riot in the future.[17]

Wright explained his comments to reporters the next day.  He said that the police had made no arrests after the solidarity rally because

---

16
   Times-Dispatch, September 11, October 25, 1969.
17
   Ibid., November 9, 1970.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

243

detectives could not determine who broke the windows. After the black caucus meeting, patrolmen had arrested sixteen persons for disorderly conduct. The deputy chief had indeed reprimanded these policemen, but not for merely making an arrest, but for not advising superiors of the situation in order for the commanders to obtain enough support to keep things from "really getting out of order." Wright concluded that policemen should not make arrests until superiors had decided on how many policemen would be necessary to contain a civil disorder. City manager Alan Kiepper expanded upon Wright's comments: "Our concern in a situation of this sort is not only enforcing the law, but more importantly maintaining the peace of the community."[18]

Wright and Kiepper's comments generated considerable opposition. The News-Leader stated that "the law must be enforced immediately," and the Times-Dispatch also questioned Wright's arrest policy. Mayor Thomas Bliley also disagreed with Wright and Kiepper's decision, and stated that commanders must give the patrolmen freedom to arrest immediately after a crime is committed. Subsequently Wright and Kiepper did modify their views. The city manager later stated that law officers should exhibit restraint during civil disorders, but when a situation required a routine arrest, policemen must promptly take suspects into custody. Moreover the community expected an officer to make arrests in civil disorder to protect life and property.[19]

Since 1970, Richmond has avoided violent disturbances. Partly this

---

[18] News-Leader, November 10, 16, 1970.
[19] Ibid., November 23, 1970

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

244

has resulted from the lack of sympathy of the Nixon administration toward the Negro desire for social equality. Also the blacks themselves have shown restraint and tact, and Negroes have seen some economic and social progress. Finally the police have tried to cooperate with black leaders to avoid violent confrontation.

Undeniably, the past decade has witnessed the greatest effort in the department's history to attain fair treatment for the city's black residents. Nonetheless most white policemen still harbor anti-black attitudes and occasionally Negroes suffer from police brutality. As Norris asserts, more police effort at communication to Negroes would aid black relations markedly; otherwise future crises and disorder will develop.

Aside from the blacks, the police also experienced difficulty with the city's youth. Virginia Commonwealth University had served as the locus of most of the unrest. Formed in 1968, the state institution gives blacks and urban white students access to a college education. In October, 1970, one thousand VCU students rioted after a poetry reading by leftist Allen Ginsburg. During the disorder, police used restraint, but after rioters had seriously injured a number of law officers the patrolmen's employment of police dogs to control the crowds sparked criticism. Furthermore in April, 1973, students petitioned the bureau requesting them to curtail speeding in the university area because a police car, speeding after a suspect, inadvertently killed a student.[20]

---

20
    News-Leader, October 13, 1970; Times-Dispatch, October 19, 1970; News-Leader, April 19, 1973.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

245

In March, 1974, patrolmen arrested a number of students on "streak-
ing" charges, and the incident provoked a number of complaints against
the police.  Students claimed that some officers had apprehended inno-
cent bystanders, used unnecessary force, and had not worn their badges to
avoid identification.  Later that same week, Chief Duling, and city mana-
ger Leidinger defended the police, and explained that officers had "been
spat upon, cursed at, and had their clothes torn."  But several students
contended that the "crowd was friendly until provoked by the police."
After investigation, city officials did not find any policemen guilty of
misconduct.[21]

The "streaking" incident posed questions about police conduct; a
riot at Richmond's City Stadium clearly illustrated police brutality.
On April 27, 1974, promoters sponsored a rock concert at the local stadi-
um and rumors claimed the concert as "hassle free" which implied that the
police would tolerate the use of drugs.  However, plainclothes detectives
began making drug arrests.  Many in the crowd obstructed police from tak-
ing suspects into custody, and eventually drove the police from the area
with a barrage of beer cans and wine bottles.  Later a larger number of
police re-enforcements moved in and suppressed the riot.  In doing so
some policemen unquestionably used excessive force.[22]

Bill Wasson, experienced and respected News-Leader reporter,
received severe injuries at the disorder.  Wasson recounted in a front

---

21
    Times-Dispatch, March 10-27, 1974; News-Leader, March 19-27,
1974; Mercury, March 27, 1974.
22
    Times-Dispatch, April 28, 1974; Mercury, May 1, 1974.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

246

page article that he saw a policeman clubbing a defenseless youth, and told the patrolman that "he had got his number," and planned to report him. At that point, the policeman clubbed the journalist and knocked him unconscious. Wasson condemned the police actions at the stadium but also condemned "long-haired youths and bra-less girls. . ./and/ hassle free concerts." Surprisingly neither the Times-Dispatch nor the News-Leader commented editorially on the riot, but the liberal Richmond Mercury stated, "Police conduct throughout the afternoon ranged from exemplary to brutal." The Mercury "questioned the wisdom of making petty drug arrests, some of them apparently only misdemeanor violations, in potentially dangerous situations." As of October 1, 1974, the city continued to investigate the matter and had not taken disciplinary action against any policemen who had charges filed against them as a result of the riot.[23]

The stadium riot emerged as the worst display of police conduct since the 1935 police action at the Georgetown-Richmond football game. Clearly the force needed more training in riot and crowd control. Despite the claims by police of equitable treatment toward suspects and the public, the force has not demonstrated to the public effective ability in handling civil disorder.

Although during the 1960's and 1970's the public has insisted on greater emphasis on handling public protests and demonstrations, the police still have the primary responsibility for stopping crime. The Richmond force has reasonably controlled crime as arrests have averaged about 48,000 per year and in that last two years arrest figures have

---

[23]
    News-Leader, April 29, 1974; Mercury, May 1, 1974.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

247

declined. The force has continued to utilize technological advances such as the helicopter and other methods of crime control. Moveover the bureau has used police dogs with foot patrolmen and horses in downtown congested areas to direct traffic.[24]

Nonetheless the police have received criticism for some of their crime control techniques. One consultant's study, released in July, 1973, concluded that the bureau's major deficiency centered on a small number of convictions in relation to arrests. Spokesman for the study, Bill Evans, said that Richmond should "get the police back in the fundamental business of solving crimes." He added: "Parking five minutes overtime will get a motorist a ticket almost everytime. . .But the chance of getting caught for committing a robbery is only one in ten and the chance of being convicted is only one in twenty-five."[25]

The report made wide ranging suggestions. First it called for three new deputy police chiefs, recommended rore police cars, urged more investigative responsibility for patrolmen, and suggested parking meter patrol by non-policemen. Finally the study urged that the department drastically reduce the paperwork since paperwork occupied a considerable amount of police time. Unfortunately, it appeared that the department did not take the consultant's report seriously. The Richmond Mercury interviewed a number of policemen who derided the report, and one malcontent said that "the paperwork the report criticized is still overwhelming. . .and so are the rules and regulations. . .They haven't

---

[24]
    City of Richmond, "Annual Report, 1962, 1966, 1967, 1969, 1972.
[25]
    Times-Dispatch, July 18, 1973.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

248

changed a thing and they won't. . . ."[26]

Few events have dramatized the crime control deficiencies of the Richmond police as much as the shooting of Louis Weinstein. Early in the afternoon of August 20, 1973, two blacks killed Weinstein in his downtown Richmond store. As a result of the killing, virtually all local commentators complained about police crime control techniques; the Broad Street Merchants Association demanded increased downtown protection from the department. The police immediately responded with additional patrols in the business section as police dogs accompanied patrolmen on their beats.[27]

Ironically enough, the dogs generated further controversy. Richmond's black Vice-Mayor Henry Marsh said, "Experience across the country shows that the police dogs are not suitable for crowd control situations," and black councilwoman Willie Dell also said that "most Blacks in Richmond shared her /own/ special fear of the dogs." But a police official rebuted these objections by stating that the department had not used the dogs for crowd control but for downtown crime control. Concerning crowd control, he asserted that the dogs indeed had proved effective: "If a crowd gets out of control the dogs are the quickest method of reducing the problem. An officer can always call a dog off--you can't call a bullet back."[28]

Thus behind the impressive statistics, Richmonders felt uneasy

---

[26] *Times-Dispatch*, July 18, 1973, *Mercury*, May 1, 1974.

[27] *Ibid.*, August 21, 1973; *News-Leader*, August 21, 1973.

[28] *Mercury*, April 17, 1974.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

249

about the force's ability to curtail violent crime.  Both black and white residents agreed that crime must be curbed, but the department seemed less than completely effective in stopping law breaking.

The emergence of police militancy, however, proved as ominous as problems with crime.  Historically, the Richmond force had rarely displayed mass protest.  Nevertheless on June 24, 1968, some police officers threatened work stoppage because of actions by newly appointed police inspector Major Otis Childress.  The officers claimed that Childress demanded that police cars must be locked, and that he would discipline men who would not do so.  But the patrolmen explained that they could not stop to lock their cars during emergencies; also some policemen after having received serious injuries in a disorder could not call for assistance because they had locked the car.  In response to the Childress edict on July 18, seventy-six policemen met and took the unprecedented action of organizing a group to air grievances and push for improved working conditions.  A week later the new group, the Richmond Police Officers Association, planned a "walk" on police headquarters to protest the discipline of a police sergeant as a result of violating Childress' directive.  However, the police cancelled the demonstration because of rumors that "undesirables" planned to walk with the officers.[29]

The protest produced some police response, but not enough for the association.  Childress modified his order stating that policemen would lock their cars in the department parking lot, and officials also promised to investigate charges that the department had not provided

---

[29]
   Times-Dispatch, July 2, 18, 1968.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

250

adequate appeal procedures for minor punishments. Nonetheless the association claimed in February, 1969, that police administrators had done nothing about grievances raised in July, 1968. A spokesman said that if officials continued to ignore rank and file demands "we'll just have to resort to the kind of tactics that get things done for the rest of the people of this nation." He added that the problems did not center on pay, but on working conditions, especially favoritism by superiors toward some officers.[30]

Departmental administrators naturally disapproved of these actions. In September, 1969, deputy Chief Wright suspended a city policeman on a brutality charge, but in protest thirty-two patrolmen held a "sick-in," and refused to report for work. Wright reassigned some of the men involved in that protest, as well as B. L. Gonce, an association leader, who tried to change the grievance procedure. Gonce received a walking beat which he claimed amounted to disciplinary action. But by early 1970, the police administrators had squashed the Association and it shortly disbanded.[31]

However, the city's black policemen exhibited more determination than the white policemen to protest unfair department procedures. Since 1968 black leaders had complained that not enough blacks had held responsible posts on the police force, but city officials explained that the department filled the positions based on the highest departmental exam

---

[30]    *News-Leader*, July 24, 1968, February 28, 1969.

[31]    *Ibid.*, September 6, 8, 17, October 2, 1969; *Times-Dispatch*, September 9, 1969.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

251

scores. Nevertheless on December 23, 1971, city council objected to the
existing promotion criteria as offering "too many opportunities for dis-
crimination." As a result of pressures from both black spokesmen and
city council, the department implemented an achievement system for pro-
motion instead of testing and merit points. Finally in October, 1973,
L. M. Miller became the first black promoted above the rank of sergeant
as he advanced to lieutenant.[32]

But black leaders persisted in pointing out that Negroes comprised
only fifteen percent of the force. Police officials responded by noting
that the department had made considerable progress in recruiting Negroes.
Sergeant J. E. Saunders, head of black recruiting, said in 1973 that
black hostility toward police work had declined: "Some young blacks
felt that becoming a policeman meant giving in to the white power struc-
ture. This feeling has waned considerably." Another officer explained
in 1968: "Do you know /why/ we do not employ more Negroes? They're
scared. Do you know why? I'm confident the reason they don't want to
come into police work is the black movements." Also another officer
noted, "'We have promoted EVERY black officer who ever came in on an
eligible list.'"[33]

Nonetheless, racial animosity flared noticeably throughout 1973
when nine white officers claimed that three black officers had cheated in
a department examination. After a probe, city manager Leidinger asserted

---

[32] _News-Leader_, June 1, 1968, December 4, 1972, October 12, 1973;
_Times-Dispatch_, December 24, 1971.

[33] Norris, "Police-Community Relations," pp. 135, 138; _News-Leader_
October 18, 1973.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

252

that a violation of the police honor code had occurred and ordered a retest. The black officers objected, petitioned the city personnel board to hear their case, and the personnel board ruled that the city could not retest the men. The Negroes then received their promotion to sergeants.[34]

The entire affair exposed racial animosity of both white officers and black officers. Jeroyd X. Green, a militant black Richmond lawyer, defended the black officers and asserted that the white policemen's motivation rested solely in racial hostility. One black patrolman said that most Negro policemen viewed the cheating scandal as a ploy "to keep blacks from being promoted." Another stated: "'to me, it looked like the white brass were saying here comes the blacks; We've got to stop them from taking over else they'll squeeze us out.'"[35]

Police militancy again arose in June, 1974. The department's long standing arbitrary discipline procedures combined with the unprecedented inflationary spiral of 1974 to cause 450 to 525 policemen to agree to allow Teamster Union 592 to represent them in collective bargaining with the city. The officers sought a better retirement plan, more pay for various duties, and better grievance procedures. Most policemen claimed that the city had refused to act on the men's demands and one officer said,"'The union is our last chance, no one will listen to us.'"[36]

Certainly the key powers in the city have not listened. The city manager and city council objected to unionization as a threat to the

---

[34] *Times-Dispatch*, January 21, 1973; *News-Leader*, January 4, 1974.
[35] *Mercury*, May 15, 1974.
[36] *News-Leader*, June 27, 1974; *Mercury*, May 8, 1974.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

253

public interest. The Times-Dispatch and News-Leader have bitterly
opposed the police union, calling it "intolerable." The opponents of
police unionization cite the example of the Baltimore police and the re-
sultant strike which crippled that city after the police unionized. On
July 22, police representatives asked Richmond city council to hear their
grievances in collective bargaining with the teamsters. The council ig-
nored the request.[37]

The police union activities have presented a serious problem for
the department and the community. Nonetheless the union appears as a
reality and eventually the city and police administrators must work out
some accommodation with the police union.

Thus in the 1960's and 1970's the police had faced complex problems
both in the community and in the department. The Richmond bureau respon-
ded by implementing improved race-relations programs, more civil disturb-
ance training, and advanced technology to fight crime. Yet more needs to
be done, especially regarding police unionization. One critic has stated
that the police seemed "independent, faceless, and hard to locate, an
institution that often answers only to itself." In an era of community
involvement, both the police and the public must cooperate to reduce
crime and disorder as well as attain social justice.[38]

---

[37] Times-Dispatch, June 25, July 23, 1974; News-Leader, July 23,
1974.

[38] Mercury, May 1, 1974.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

254



Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CONCLUSION

The history of the Richmond police reveals complex and contradic-
tory developments.  In relation to most urban areas, the force effectiv-
ely policed the city as the department controlled crime and avoided
corruption.  On the other hand, the police mistreated the city's blacks,
its radicals and even its youth.  However, in recent years, the bureau
has made attempts to improve relations with the blacks, the left, and
the young.  In order to insure the success of these attempts to redress
past wrongs, both the police and the public need a clear understanding
of the main trends of the department's historical evolution since 1782.

Nothing conditioned the outlook and attitudes of the Richmond
police as much as race relations.  Prior to 1800, the night watch mainly
protected property, but lacked both sufficient organization and citizen
support.  Gabriel's revolt in 1800 changed the role of the night watch-
men, however, and caused the city to expand the number of watchmen and
impower them to repress the Negro through arrest and harrassment.  Thus
prior to 1860, blacks comprised only 30% fo the city's population, yet
the police arrested Negroes for about 60% of the city's crime.  Since
the poverty stricken white population was not arrested in this percent-
age, the key factor must have been race.

After the Civil War, the police once again demonstrated prejudice
and injustice toward Richmond's blacks.  During the 1870's for example,
arrests disenfranchised offenders, and thus jailing blacks insured the
continued dominance of white Virginia.  The years before World War I

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

256

continued police injustice toward the city's blacks as police arrested a disproportionate number of Negroes. During the Gilded Age, city council and the public supported this racist approach to law and order.

Between 1919 and 1974, the blacks' position has gradually improved. In the 1920's and the 1930's, prohibition and general lawlessness caused white arrests to outnumber Negro arrests and demonstrated that crime crossed color lines. During the late 1950's and through the 1960's and 1970's blacks have protested police mistreatment and discrimination. After much hesitation, the department has altered its methods, changed its attitudes, and sought greater cooperation with the local Negro community. With the constraints imposed by the politicians, the press, the courts, and the television cameras, the police must act within clearly defined limits. Police brutality can still exist, of course, but not as much as before. In perspective, the police and the Negroes must seek greater cooperation and communication to reduce friction and misunderstanding. Additional black policemen in high ranking positions and a biracial police committee could improve communication between the local law enforcement agency and the black community.

Economic factors have ranked second to race relations in shaping the character of the Richmond police. Throughout its history the city government has always poorly paid the policeman. Low salaries have resulted from public indifference to the police, as well as the absence of an adequate tax base to permit higher salaries. Consequently, the department did not attract the most qualified men. Nevertheless, the force has had remarkably few corruption problems and significant misconduct occurred only in the 1914-1918 period and in the 1950's. The

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

257

present unionization program represents the logical outcome of 190 years
of poor pay and low benefits.  In the future, the city and the bureau
will have to reach an acceptable compromise to guarantee living wages
while protecting the public interest.  The police need better pay, but
unionization threatens the common good which the policemen have sworn to
uphold.

Besides economic troubles, department discipline has emerged as a
continuing dilemma.  Originally the police established behavior stand-
ards along military lines which emphasized strict discipline, unquest-
ioning obedience, and a complete absence of due process.  Even today,
the police lack adequate grievance procedures.  While city leaders under-
standably wished a well disciplined and honest department, the authori-
tarian structure contributed to a decline in the quality of men that
joined the department.  It seems obvious, therefore, that the city gov-
ernment must establish discipline policies which safeguard the patrol-
man's rights and dignity.

Although internal problems such as pay and discipline have plagued
the force, external difficulties have also played a role in the depart-
ment's evolution.  Prohibition left a lasting scar on the force.  Be-
cause the city government ordered the police to implement unpopular,
unenforceable laws, the citizens lost respect for both the police and
the law.  Prohibition enforcement took valuable time from other police
duties and added to complaints about the department's efficiency.  Pro-
hibition demonstrated the limits of police power:  unless a public con-
sensus exists on a law, the police can do little to keep public order.

The press represented another external influence on the

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**JA1234**

258

organization's development as the city newspapers have greatly shaped
public opinion regarding the force. Since the beginning of the nine-
teenth century the press had served as staunch police supporters and had
fostered civic pride in the local lawmen. During the twentieth century,
by contrast, the newspapers closely observed and regularly criticized
the department and, as a result of newspaper articles, the city made
numerous investigations of the department. The pendulum of opinion con-
tinued to move, however, as racial and anti-war demonstrations arose in
the mid 1960's and the Times-Dispatch and the News-Leader have emerged
once again as stalwart police defenders.

While the newspaper has molded the bureau's public image, the chief
of police has proven just as important a factor in the force's growth.
The chief has set the tone for race and community relations, department
discipline, and crime fighting. John Poe ranked as the most effective
chief despite the problems posed by racial tensions, low pay, and a
variety of methods of administrative control. Chief Jordan, on the other
hand, recorded one of the weakest terms of office although he possessed
the firm backing of the mayor and access to numerous technological ad-
vances. Jordan exerted a detrimental influence on the department because
of his overbearing discipline and hostility to the press. An effective
police chief, then, must combine technological skill with firmness and
firmness toward the public and toward his men.

The department has generally received the support of the public in
times of social disorder and such periods have witnessed forward steps
for the police. During the Civil War, the department received excellent
treatment from the public, and the city nearly doubled the force. In

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1235

the rioting of 1870 and the labor disorders of 1886 and 1903, the city wholeheartedly supported the police.  In the twentieth century, the force did not experience serious civil disorder until 1968, but the turmoil of that year caused the police and the blacks to reach unprecedented levels of cooperation.  The history of the Richmond police, therefore, has revealed that the public has the best relations with the force in times of pronounced public disorder.

Although large scale lawbreaking has affected the department, reduction of crime did not become a major concern of the police until about 1900.  At the turn of the century, the force began to concentrate on stopping wrong-doing instead of harrassing blacks although most police activity during the first third of the twentieth century concerned prohibition-related offenses.  Nevertheless, with repeal of the 18th amendment, crime reduction became the key index of department effectiveness.  In retrospect, the police have satisfactorily controlled lawbreaking as the city has avoided "crime waves" and prevented the growth of organized crime.

Despite low pay, arbitrary discipline, and the dilemma of prohibition, one of the most unique aspects of the Richmond force concerned its freedom from corruption during the nineteenth century.  The absence of scandal occurred because of a lack of criminal enticements as well as an unusual devotion to duty on the part of the average officer.  The scandal of the 1914-1918 years resulted from the problems of prohibition enforcement as well as poor pay, and in the 1950's corruption again essentially stemmed from poor wages as well as ineffective personnel policies.  Thus, vigilant supervision and better pay will insure that misconduct will not

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

260

become a problem in the future.

Unlike most urban areas, politics played a minor role in police administration.  Prior to the Civil War, the conservative Whig party controlled city government and, after the war, the conservative Democratic party dominated municipal government.  Because of the dominance by one party, politicians did not arbitrarily change police policies and personnel.  Although the force did not exhibit the most efficient organization and management, the department adequately administered justice, and Richmond has emerged as a stable city.

But democratic society requires both stability and justice.  The police serve as the first line of both law enforcement and constitutional liberties, but the attainment of those goals involves skillful judgement, patience, and community cooperation.  For the most part, the Richmond police have succeeded in controlling crime and avoiding corruption, but the police must improve its community relations and its race relations in order to insure a society of both order and justice.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1237

## BIBLIOGRAPHY

Manuscript Collections

     City of Richmond, Land Property Book, 1790-1870. Virginia State
         Library.

                    , Personal Property Book, 1790-1870. Virginia
         State Library.

     Garner, Benjamin. "Political History of Richmond, 1624-1865."
         Virginia Historical Society Manuscript Collection.

     Henley, Bernard. Chronology of Richmond Events From Newspapers.
         Private collection.

     "History of the Richmond Police Department." Valentine Museum
         Papers.

     "Official List of Colored Persons Convicted of Felony or Petty
         Larceny in the Hustings Court of the City of Richmond,
         Disfranchised." Official Lists of Dead, Lunatic, Colored Males
         Who Are Thereby Disfranchised. Richmond, October 24, 1892.
         Tracy McGregor Library, University of Virginia.

     Richmond Police Day Book, 1834-1848, Tracy McGregor Library,
         University of Virginia.

     United States Military Records. Department of Virginia. Volume
         72, Record Group 393.


Government Documents

     Calendar of State Papers, 1760-1800. Virginia State Library.

     City of Richmond. Annual Reports, 1871-1973.

     City of Richmond. Annual Reports. "Police Department, 1871-1973."

                  . Board of Aldermen Journal, 1871-1919.

                  . City Council Minutes, 1865-1973.

                  . Common Hall Record Book, 1782-1865.

                  . Resolutions and Ordinances, 1920-1974.

     Henrico County, Hustings Court Minutes, 1752-1755, 1763-1767.

                  , Militia Records, 1782-1829. Virginia State Library.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

262

National Commission on The Causes and Prevention of Violence.
  _Violence in America_.  New York:  Signet Books, 1969.

_National Commission on Law Observance and Enforcement_.  George
  Wickersham, Chairman.  Washington:  U. S. Government, 1931.

_Ordinances of the Corporation of the City of Richmond and Acts of
  the Assembly_.  Richmond:  John Warnock, 1831.

President's Commission on Law Enforcement and Administration of
  Justice.  _Task Force Report:   The Police_.  Washington:  U. S.
  Government Printing Office, 1967.

_Statistics of the United States_.  _1840_.  Washington:  Blair and
  Rives, 1841.

_The Statutes At Large:  Being A Collection of All The Laws Of
  Virginia From the First Session Of The Legislature In The
  Year 1619_.  William H. Hening.  Richmond:  Franklin, 1819.

_Report of the National Advisory Commission on Civil Disorders_.
  New York:  Bantom, 1968.

The Report of the Negro Welfare Survey Committee.  _The Negro in
  Richmond, Virginia_.  Richmond:  Richmond Council of Social
  Agencies, 1929.

United States Department of Commerce.  _Census, 1790-1970_.
  Washington, D. C.:  Government Printing Office, 1791-1971.

United States Department of Interior.  _Report of the Manufactures
  of the United States At the Tenth Census, 1880_.

Virginia General Assembly.  _Acts of the General Assembly of The
  State of Virginia, Passed At The Adjourned Session, 1863 In
  the Eighty-Seventh Year of the Commonwealth_.  Richmond, 1863.


_Books, Memoirs, Articles_

  Ambler, Charles.  _Thomas Ritchie, A Study In Virginia Politics_.
    Richmond:  Bell Book Stationary Co., 1913.

  Aptheker, Herbert.  _American Negro Slave Revolt_.  New York:
    Columbia University Press, 1942.

  _____.  _Nat Turner's Rebellion_.  New York:  Humanities
    Press, 1966.

  Bopp, William E. and Schultz, Donald O., eds. _A Short History of
    American Law Enforcement_.  Springfield, Illinois:  Thomas, 1972.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

263

Brown, Theodore, and Glaab, Charles.  An Interpretative History
    of Urban America.  New York: Macmillan, 1967.

Burnham W. Dean.  Presidential Ballots.  Baltimore:  Johns Hopkins,

Burton, Peter.  Police Court Pictures at Richmond, Virginia.
    Richmond:  Williams, 1892.

Cappleman, Mary Dudley.  A Brief History of The Fire Department And
    The Police Department of Richmond, Virginia.  Richmond:  The
    Fireman's Mutual Aid Association and the Police Benevolent Assoc-
    iation, 1931.

Cei, Louis.  "An Annotated Bibliography of Police History, 1900-
    1972."  Police Chief, August, 1973, pp. 52-57.

Christian, W. Asbury.  Richmond, Her Past and Present.  Richmond:
    H. Jenkins, 1912.

Commons, John, et al.  History of American Labor.  2 Volumes.  New
    York:  Macmillan, 1921.

Cutchins, John A.  Memoirs of Old Richmond, 1881-1944.  McClure,
    Virginia:  Verona, 1973.

Dabney, Virginius.  Virginia:  The New Dominion.  Garden City, New
    York:  Doubleday, 1971.

Davis, Varina H.  Jefferson Davis, Ex-President Of the Confederate
    States of America:  A Memoir By His Wife.  2 Volumes.  New York:
    Belford, 1890.

De Leon, T. D.  Four Years In Rebel Capitals:  An Inside View Of
    Life In The Southern Confederacy From Birth to Death.  Mobile,
    Alabama, Gossip Printing Co., 1890.

Estill, Mary S. Ed.  "The Diary of Confederate Congressmen, 1862-
    1863."  Southwestern Historical Quarterly, XXXVII (April, 1955),
    270-301; XXXIX (July, 1935), 33-35.

Garraty, John.  The New Commonwealth.  New York:  Harper and Row,
    1968.

Harrison, J. B.  "Studies in the South,"  Atlantic Monthly, August,

Hennessy, Uno, Ed.  The Aristocratic Journey.  New York:  Peters,
    1831.

Illustrated Richmond Police and Fire Department Directory.  Rich-
    mond:  West, 1899.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1240

264

Jones, J. B. _A Rebel War Clerk's Diary At The Confederate State Capitol_. 2 Volumes. Howard Swiggert ed. New York: Old Hickory Bookshop, 1935.

Knight, Charles. _Negro Housing In Certain Virginia Cities_. Richmond: Byrd Press, 1927.

Lane, Roger. _Policing the City: Boston, 1822-1855_. Cambridge: Harvard University Press, 1967.

Lutz, Francis. _Richmond in World War II_. Richmond: Dietz Press, 1933.

Maddex, Jack, Jr. _The Virginia Conservatives, 1867-1879: A Study In Reconstruction Politics_. Chapel Hill: University of North Carolina Press, 1970.

Mathais, William J., and Anderson, Stuart. _Horse to Helicopter: The First Century of the Atlanta Police Department_. Atlanta: Georgia State University Press, 1973.

Martin, Robert E. "Negro Disfranchisement in Virginia." _Howard Studies in Social Sciences_. I (1938), 87-88.

McGuire, Judith. _Diary of a Southern Refugee During The War_. New York: E. J. Hale and Sone, 1867.

Moger, Allen. "Industrial and Urban Progress in Virginia from 1880 to 1900." _Virginia Magazine of History and Bibliography_, LXVI

_____. _Virginia: Bourbonism to Byrd_, 1870-1925. Charlottesville: University of Virginia Press, 1968.

Mohl, Raymond A., and Richardson, James. _The Urban Experience: Themes in Urban History_. Belmont, California: Wadsworth Press, 1973.

Mordecai, Samuel. _Richmond in By-Gone Days_. Richmond: Dietz Press, 1860.

Mullin, Gerald. _Flight and Rebellion_. New York: Oxford, 1972.

Morton, Richard. _The Negro In Virginia Politics_, 1865-1902. Charlottesville: University of Virginia Press, 1919.

O'Grady, Joseph P. "Politics and Diplomacy: The Appointment of A. M. Keiley to Rome in 1885." _Virginia Magazine of History and Biography_, LXXVI (April, 1968), 191-209.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

JA1241

265

Pinchbeck, Raymond. _The Virginia Negro Artisan and Tradesman_.
     Richmond: William Byrd Press, 1936.

Putnam, Sallie B. _Richmond During The Civil War   Four Years of
     Observations_. New York: C. W. Carlton and Co., 1867.

Richardson, James. _The New York Police: Colonial Times to 1901_.
     New York: Oxford University Press, 1970.

"Richmond During the War of 1812." _Virginia Magazine of History
     and Biography_. VII (1900), pp. 39-43.

Rose, George. _The Great Country or Impression of America_. London:
     n.p. 1868.

Rubinstein, Jonathan. _City Police_. New York: Farrar, Straus and
     Giroux, 1973.

"Samuel Mordecai, Chronicler of Richmond, 1786-1865." _Virginia
     Magazine of History and Biography_, LIII (1945), 269-270.

Standard, Mary Newton. _Richmond, Its People and Its Story_. Phila-
     delphia: Lippincott, 1923.

Simms, Henry. _The Rise of the Whigs in Virginia_. Richmond:
     William Byrd Press, 1929.

Thermstorm, Stephen. _Poverty and Progress: Social Mobility in a
     Nineteenth Century City_. Cambridge: Harvard University Press,
     1964.

Thomas, Emory. _The Confederate State of Richmond_. Austin:
     University of Texas Press, 1971.

Tice, Douglas. "Bread or Blood! The Richmond Bread Riot." _Civil
     War Times Illustrated_, February, 1974, pp. 12-19.

Wade, Richard. _Slavery In The Cities_. New York: Oxford, Univer-
     sity Press, 1964.

Wiley, Bell I. _The Life of Johnny Reb: The Common Soldiers of the
     Confederacy_. New York: The Bobbs-Merill Co., 1943.

Writers Project. _The Negro In Virginia_. New York: Hastings House,
     1940.

Wynee, Charles. _Race Relations in Virginia, 1870-1902_. Charlottes-
     ville: University of Virginia Press, 1961.

_____. "Lewis Harvie Blair." _Virginia Magazine of History
     and Biography_, LXXII (1964), p. 3-23.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1242

266

## Unpublished Works

Baer, Tommy.  "A History of the Richmond Bureau of Police."
    Virginia State Library, 1961.

Cate, Wirt.  A History of Richmond.  Unpublished manuscript,
    Valentine Museum, 1943.

Goodrich, Madge.  "The Mayors of Richmond."  Unpublished manu-
    script, Virginia State Library, 1937.

Headlee, Thomas J.  "The Richmond Transit Strike of 1903."
    University of Richmond, M.A. Thesis, 1960.

McClenny, Carl H.  "Racial Differentiation in Employment:  A Case
    Study:  The City of Richmond, Virginia, 1964-1967.  Unpublished
    M.A. Thesis, University of Virginia, 1968.

Norris, Donald.  "Police Community Relations in Richmond, Va.:  A
    case Study of Police Bureaucracy."  Unpublished PhD Disserta-
    tion, University of Virginia, 1971.

Saunders, Robert A.  "Crime and Punishment in Early National
    America:  Richmond, Va., 1784-1820."  Unpublished article, 1974.

Smith, L. Winston.  "Presidential Reconstruction in Richmond, 1865-
    1867."  Unpublished PhD Dissertation, University of Virginia,
    1974.

Waite, Bob.  "A Kinsey Report on the Civil War."  Unpublished
    article, private collection, 1965.


## Newspapers and Magazines

Alexandria Gazette and Virginia Advertiser, 1890-1912.

New York Herald, March, 1870.

New York Times, 1851-1974.

Nation, 1870-1974.

North American Review, 1890-1920.

McClures, 1890-1920.

Richmond Afro-American, 1944-1974.

Richmond Daily Compiler, 1816-1843.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1243

Richmond Dispatch, 1852-1903.

Richmond Evening Journal, 1840-1920.

Richmond Examiner, 1860-1882.

Richmond Enquirer, 1824-1876.

Richmond Labor-Herald, 1915-1954.

Richmond Leader, 1890-1903.

Richmond Mercantile Advertiser, 1808-1826.

Richmond Mercury, 1972-1974.

Richmond Morning News, 1858-1859.

Richmond News, 1889-1903.

Richmond News-Leader, 1903-1974.

Richmond Opinion, 1902-1903.

Richmond Planet, 1890-1940.

Richmond Republicans, 1852-1861.

Richmond Square-Deal, 1916-1920.

Richmond Times, 1852-1903.

Richmond Times-Dispatch, 1903-1974.

Richmond Whig, 1824-1888.

Southern Punch, 1861-1864.

Virginia Gazette, 1770-1802.

Virginia Star, 1878-1880.

Washington Bee, 1870-1900

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.



Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JA1245

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA          )
                                  )
           v.                     )     Criminal No. 3:21-cr-42
                                  )
KEITH RODNEY MOORE,               )
                                  )
                  Defendant.      )

### UNITED STATES' REPLY IN SUPPORT OF
### MOTION TO EXCLUDE DEFENSE EXPERT

The United States of America respectfully files this reply in support of its Motion to Exclude Defense Expert Dr. Marvin Chiles. The Court should grant the motion to exclude the defendant's belatedly disclosed expert because even if his testimony were properly and timely disclosed, and adequately explained, it is not relevant and probative because it lacks a sufficient connection to the stop that occurred on December 5, 2020.

## I.    ARGUMENT

As an initial matter, the defendant's disclosure still does not begin to comply with Rule 16. Under Rule 16(b)(1)(C), the defendant's written summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The disclosure identifies exceedingly broad topics that Dr. Chiles will address, but identifies no opinions or bases for those opinions. The defendant's response tries to wave away this problem by noting that he is a historian and will testify about a broad swath of topics, he will not actually offer any "ultimate opinions" because he is a historian, and his testimony will be consistent with over 500 pages of dense academic writing. [1] ECF 86 at 6-7. But Rule 16 is not so easily thwarted by vague references

---

[1] The defendant's failure to comply with Rule 16 is not excused because Dr. Chiles is not offering any "ultimate opinions." ECF 86 at 6. This distinction between "ultimate" and non-ultimate opinions is not to be found in Rule 16, and claiming an opinion is not ultimate does not excuse compliance with the Rule.

1

## JA1246

to topics about which an expert may testify, and carefully avoiding stating the specifics of the expert testimony. Expert testimony from a historian does not escape the requirement that the testimony be reliable and helpful simply because the expert disclaims any methodology, declines to identify any methodology, or refuses to identify any particular conclusions about the case at issue in advance of testifying. And the United States is frankly at a loss to understand the relevance of some of the provided documents, including an article about the educational policies of a school principal in the 1980s, and what any of this has to do with police officers' decision on December 5, 2020 to conduct a traffic stop when they saw a vehicle tag they absolutely knew could not match all of the vehicles that had displayed it that night. Given the limited relevance and probative value of this historical evidence, the lack of specificity in the disclosure and referring the United States to over 500 pages of material to identify what Dr. Chiles may testify about is even more unhelpful and violative of Rule 16.

The breathtaking breadth of the defendant's decision to challenge the entirety of the operations of the Richmond Police Department presents unique evidentiary issues. Presumably the defense has challenged RPD policies and executive decisionmaking as a whole because there is simply no evidence, *none*, that the officers were motivated by racism when they attempted to conduct a traffic stop on December 5, 2020 for obviously valid reasons. The defendant is attempting to prove that racism has permeated RPD so thoroughly that since 1977 when some of the police precincts were created that every executive decision about how to allocate limited resources is tainted by racism and thus presumably every case in Richmond that results from a traffic stop should be dismissed. The defendant seeks to erase the requirements that he "must show both 'discriminatory effect and that the officer's action was motivated by a discriminatory purpose.'" *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (quoting *United States v.*

2

**JA1247**

*Armstrong*, 517 U.S. 456, 465 (1996); *Wayte v. United States*, 470 U.S. 598, 608 (1985)) (brackets omitted).

To attempt to meet this heavy burden, the defendant reaches back decades, but the Supreme Court has warned courts that this sort of historical evidence, essentially that alleged racism once is racism forever, is of extremely limited evidentiary value. *McCleskey v. Kemp,* 481 U.S. 279, 298 n.20 (1987). The Supreme Court requires a connection to the stop being challenged, *id.* at 292, and that is severely lacking here. The defendant's argument appears to be that because of decisions made in 1977, RPD has engaged in actions that led to overpolicing of areas with a disproportionate minority population, and there are thus racial disparities in policing outcomes. Because there is little to no connection to the present-day, no evidence of overpolicing, no evidence that police deployment patterns are not warranted by factors such as crime rate or calls for service, no consideration of other reasons for any racial disparity, and absolutely no demonstration that but for the alleged overpolicing of certain areas this traffic stop would not have occurred, the defendant's attempt falls far short of meeting the defendant's burden of demonstrating "clear and intentional discrimination." *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (party asserting equal protection violation "must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'") (citing *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995); *Washington v. Davis*, 426 U.S. 229, 239 (1976)). It is simply not enough to show some vague and unexplained racial disparity. *McCleskey*, 481 U.S. at 292 ("to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose"). To qualify as "invidious or in bad faith" the government must "select[] or reaffirm[] a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an

3

**JA1248**

identifiable group." *Wayte,* 470 U.S. at 610. The defendant's abject failure to meet his burden of proof cannot be remedied by a belated[2] and irrelevant addition of evidence.

The defendant repeatedly urges the Court to allow the belated testimony of Dr. Chiles because his testimony is only caused by RPD's inability to produce documents about the history of its precincts, but there are several problems with the defendant's argument. First, there has been no demonstration that the "Neighborhood Precinct Plan" first established in 1977 created precinct boundaries that are still in existence today. Second, the demographics of Richmond have shifted considerably in the last 45 years, so even if it were true that the precinct boundaries currently align with rough clusters of racial groups, there is no demonstration that it was so when the precinct boundaries were created. *See, e.g.*, Dina Weinstein, Richmond Magazine, *Counting Change: The 2020 U.S. Census Reveals Richmond's Growing, Changing Population* (Feb. 7, 2022), richmondmagazine.com/news/features/counting-change/. Further, the defendant's unrelenting focus on Richmond residents again ignores what should be a focus on the *drivers* within Richmond who are subject to being stopped by RPD. *See, e.g.*, ECF 71 at 8. That RPD cannot produce the granular documents the defendant seeks from 45 years ago is not an excuse to allow irrelevant and unhelpful evidence completely lacking any link to the relevant issue before the Court.

The defendant also seeks to excuse the obtaining of discovery without meeting the required evidentiary standards to do so. "The standard for obtaining discovery in support of a selective prosecution claim is only 'slightly lower' than for proving the claim itself."[3] *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016). The defendant seeks to sidestep this requirement to obtain

---

[2] While the defendant goes to great efforts in his response to claim he acted as diligently as possible, and is not to blame for the late disclosure, the simple fact is that he disclosed a new expert nearly 10 months after his motion to dismiss was shoehorned into a motion to suppress and mere days before a hearing.

[3] The standard for a selective enforcement claim is identical. *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014).

discovery by creating out of whole cloth a new category of documents—so-called "public documents"—that are allegedly not covered by the rigorous *Armstrong* test to obtain discovery.[4] This new distinction does not come from the Fourth Circuit or Supreme Court. The standard for obtaining "discovery" on an *Armstrong* claim is intentionally rigorous, *id.*; *Armstrong,* 517 U.S. at 464, 468, and the defendant's end run around the *Armstrong* requirements is further evidence of the complete lack of support for his claim. The Supreme Court's evidentiary threshold of first showing "'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent" before obtaining additional discovery is not unconstitutional, as the defendant claims. *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (citing *Armstrong,* 517 U.S. at 469-70).

## <u>Conclusion</u>

The Court should exclude the testimony of Dr. Chiles because, in the words of the Supreme Court, historical evidence unconnected to the facts at issue is of "little probative value." There is no indication it is probative of the decision of Fourth Precinct officers to attempt a traffic stop on December 5, 2020, and the disclosure still does not begin to comply with Rule 16. The Court should exclude the untimely disclosed testimony of Dr. Chiles.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:  _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057

---

[4] There is no issue with using means accessible to the public, such as FOIA requests or downloading from the public website the Community Policing Act data, to obtain these so-called public documents. But when court processes are used to obtain discovery without the requisite showing, *Armstrong*'s requirements are circumvented. The protracted history of the defendant's equal protection claim demonstrates the wisdom of a preliminary credible showing.

**JA1250**

Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

6

**JA1251**