IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4201

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, District Judge*

———————————

CORRECTED JOINT APPENDIX
VOLUME IV OF VI (PAGES 1252–1643)

———————————

| | |
|---|---|
| Geremy C. Kamens | Jessica D. Aber |
| Federal Public Defender | United States Attorney |
| | |
| Patrick L. Bryant | Jacqueline R. Bechara |
| Assistant Federal Public Defender | Assistant United States Attorney |
| 1650 King Street, Suite 500 | 2100 Jamieson Avenue |
| Alexandria, Virginia 22314 | Alexandria, Virginia 22314 |
| (703) 600-0800 | (703) 299-3700 |
| | |
| *Counsel for Keith Moore (continued)* | *Counsel for the United States (continued)* |

Amy L. Austin
Laura J. Koenig
Assistant Federal Public Defenders
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
(804) 565-0880

*Additional Counsel for Keith Moore*

Shea M. Gibbons
Erik S. Siebert
Assistant United States Attorneys
919 East Main Street
Suite 1900
Richmond, Virginia 23219
(804) 819-5400

*Additional Counsel for the United States*

**Table of Contents**

Description                                                                                          **Page**

**Volume I**

District Court Docket Sheet (as of Aug. 23, 2024)......................................................1

Indictment (May 4, 2021, Doc. No. 3).......................................................................16

Moore's Motion to Suppress Evidence and Statements
    (June 21, 2021, Doc. No. 17) ............................................................................18

Government's Opposition to Motion to Suppress Evidence and Statements
    (July 6, 2021, Doc. No. 22)................................................................................25

Moore's Reply to Government's Response to Motion to Suppress Evidence
    and Statements (July 13, 2021, Doc. No. 28) ...................................................40

Transcript of Motion Hearing (July 26, 2021, Doc. No. 33)..................................45

    Testimony of Dominic Collombo:

    Direct Examination by Mr. Elliker.....................................................................50
    Cross Examination by Ms. Koenig .....................................................................64

    Testimony of Keegan Mills:

    Direct Examination by Mr. Elliker.....................................................................91
    Cross Examination by Ms. Koenig ...................................................................100

    Testimony of Jakob Torres:

    Direct Examination by Mr. Elliker...................................................................136
    Cross Examination by Ms. Koenig ...................................................................143

Testimony of Nakia Williams:

    Direct Examination by Mr. Elliker ...................................................145
    Cross Examination by Ms. Koenig ...................................................156

Testimony of Michael Spinos:

    Direct Examination by Mr. Elliker....................................................176
    Cross Examination by Ms. Koenig ...................................................182

Testimony of John Gilbert:

    Direct Examination by Mr. Elliker....................................................188
    Cross Examination by Ms. Koenig ...................................................198

Testimony of Lee Hush:

    Direct Examination by Ms. Koenig ..................................................201

Selected Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 3, Photograph of Moore's car, dated Dec. 5, 2020...................221

    Gov. Exhibit 6, Photograph of firearm seized from Moore's car .................222

    Gov. Exhibit 10, Moore's license plate...........................................223

Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit A, Hanover Traffic Ticket, dated Oct. 9, 2020 ........................224

    Def. Exhibit C, 0485 Map ...............................................................228

    Def. Exhibit I, Richmond Police Department
    Incident/Investigation Report, dated Dec. 5, 2020.........................229

Def. Exhibit J, 0485 Net Viewer Event Information ....................................238

Def. Exhibit K, 0497 Net Viewer Event Information ...................................242

Def. Exhibit L, 0502 Net Viewer Event Information ...................................248

Def. Exhibit N, 0571 Net Viewer Event Information ...................................253

Def. Exhibit O, 0574 Net Viewer Event Information ...................................257

Def. Exhibit P, 0579 Net Viewer Event Information....................................262

Def. Exhibit Q, Axon Report for Keegan Mills ...........................................265

Def. Exhibit R1, University of Virginia Dot Map of Richmond ..................267

Def. Exhibit R2, University of Virginia Dot Map of Richmond ..................268

Def. Exhibit W, 0579 Net Viewer Event Unit .............................................269

Def. Exhibit X1, Boundaries of Richmond Police Precinct 1......................276

Def. Exhibit X2, Boundaries of Richmond Police Precinct 2......................277

Def. Exhibit X3, Boundaries of Richmond Police Precinct 3......................278

Def. Exhibit X4, Boundaries of Richmond Police Precinct 4......................279

Def. Exhibit Y1, Screen Capture of Richmond Police Department
Stops by Race and Stops by Ethnicity .........................................................280

Def. Exhibit Y2, Screen Capture of Richmond Police Department
Stops by Gender and Vehicles Searched during a stop.................................281

Order (July 27, 2021, Doc. No. 31) .............................................................282

Supplement to Moore's Motion to Suppress Evidence and Statements
(Aug. 3, 2021, Doc. No. 32)....................................................................283

Government's Supplemental Response to Motion to Suppress
Evidence and Statements (Aug. 12, 2021, Doc. No. 36) ...............................297

Transcript of Motion Hearing (Sept. 15, 2021, Doc. No. 137) ............................317

Order (Sept. 15, 2021, Doc. No. 44).......................................................339

Moore's Second Supplement to Motion to Suppress Evidence and Statements
(Mar. 9, 2022, Doc. No. 66)....................................................................340

   Def. Exhibit A, Dr. Eli Coston, Traffic Stops by the Richmond Police
         Department: July 1, 2020 – December 6, 2020......................................353

   Def. Exhibit B, Emma Pierson et al., A large-scale analysis of racial
         disparities in police stops across the United States,
         dated July 2020.........................................................................367

   Def. Exhibit C, McGuire Woods,
         Zoning and Segregation in Virginia: Part 1 ..........................................379

   Def. Exhibit D, Why is Richmond still segregated?,
         Richmond Times Dispatch, dated May 3, 2015 ....................................387

   Def. Exhibit E, Mark Bowes, Traffic Arrest Pattern; In Chesterfield,
         29% Are Black and Almost 69% Are White, dated July 15, 2001 ........403

   Def. Exhibit F, Richmond Transparency and Accountability Project,
         Our Streets, Our Say: Policing in Richmond, dated June 2019 ............408

Government's Motion to Exclude Defense Expert
(Apr. 8, 2022, Doc. No. 70) ...........................................................424

Gov. Exhibit A, Dr. Michael R. Smith, Expert Report ..................................446

Gov. Exhibit B, Richmond Police Department General Order 1-2,
dated Feb. 11, 2019, and General Order 1-4, dated Feb. 13, 2018 ........457

Government's Response to Moore's Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 8, 2022, Doc. No. 71) .................471

v

## Volume II

Moore's Response to Motion to Exclude Defense Expert
(Apr. 22, 2022, Doc. No. 72) ........................................................................483

Def. Exhibit G, Virginia Department of Criminal Justice Services,
Report on Analysis of Traffic Stop Data Collected Under
Virginia's Community Policing Act, dated July 1, 2021 ......................499

Def. Exhibit H, Michael R. Smith & Matthew Petrocelli,
Racial Profiling? A Multivariate Analysis of Police
Traffic Stop Data, dated Mar. 2001........................................................572

Def. Exhibit I, An act to amend and re-enact section 46 of the Code of
Virginia, dated Mar. 20, 1924 ................................................................596

Def. Exhibit J, Joseph Ferrandino, Minority Threat Hypothesis and
NYPD Stop and Frisk Policy, dated 2015................................................597

Def. Exhibit K, Sunghoon Roh & Matthew Robinson, A Geographic
Approach to Racial Profiling: The Microanalysis and Macroanalysis of
Racial Disparity in Traffic Stops, dated June 2009................................618

Def. Exhibit L, Prabhaker Mishra et al., Selection of Appropriate
Statistical Methods for Data Analysis, dated Sept. 2019 ......................671

Def. Exhibit M, Steven J. Briggs & Kelsey A. Keimig,
The Impact of Police Deployment on Racial Disparities in
Discretionary Searches, dated 2017 ......................................................676

Moore's Reply to Government's Response to Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 23, 2022, Doc. No. 73) ...............696

Government's Motion to Exclude Defense Expert
(June 20, 2022, Doc. No. 82) .........................................................707

Gov. Exhibit A, Moore's Expert Notice, dated June 16, 2022 ....................714

Moore's Response to Motion to Exclude Second Defense Expert
(July 6, 2022, Doc. No. 86) ...........................................................716

Def. Exhibit N, Curriculum Vitae for Dr. Marvin T. Chiles .........................724

Def. Exhibit O, Virginia Freedom of Information Act Request,
dated Feb. 1, 2022 ....................................................................729

Def. Exhibit P, Moore's Ex Parte Motion to Enforce Subpoena
Duces Tecum, dated May 20, 2022........................................................731

Def. Exhibit Q, Letter Regarding Ex Parte Subpoena Duces Tecum,
dated May 27, 2022 ....................................................................741

Def. Exhibit R, Marvin T. Chiles, "Here We Go Again": Race and
Redevelopment in Downtown Richmond, Virginia,
1977–Present, dated 2021....................................................................747

Def. Exhibit S, Marvin T. Chiles, Richmond's urban crisis: Racial transition
during the Civil Rights Era, 1960–1977, dated May 2016 ...................774

Def. Exhibit T, Marvin T. Chiles, "Tough on Conduct:" Punitive
Leadership in Urban Public Schools, A Case Study of
*Angry Principal* Dr. Roy A. West, 1986–1991, dated 2020 .................903

Def. Exhibit U, Marvin T. Chiles, "A Period of Misunderstanding,"
dated 2021................................................................................935

## Volume III

Def. Exhibit V, Louis Bernard Cei, Law Enforcement in Richmond:
A History of Police-Community Relations, 1737–1974,
dated June 1975 ........................................................................971

Government's Reply in Support of Motion to Exclude Defense Expert
(July 11, 2022, Doc. No. 89).........................................................1246

**Volume IV**

Transcript of Motion Hearing, Day I (July 18, 2022, Doc. No. 100) .................1252

    Testimony of Dr. Eli Coston:

        Direct Examination by Ms. Koenig ............................................................1268
        Cross Examination by Mr. Gibbons............................................................1351

Transcript of Motion Hearing, Day II (July 19, 2022, Doc. No. 101) ...............1404

    Testimony of Dr. Michael Smith:

        Direct Examination by Mr. Gibbons ........................................................1415
        Cross Examination by Ms. Koenig ...........................................................1477

    Testimony of Keon Turner:

        Direct Examination by Mr. Siebert ..........................................................1510
        Cross Examination by Ms. Austin ............................................................1525

    Testimony of James McDonough:

        Direct Examination by Mr. Siebert ..........................................................1535
        Cross Examination by Ms. Austin ............................................................1562

    Testimony of Josh Valot:

        Direct Examination by Mr. Gibbons ........................................................1573
        Cross Examination by Ms. Koenig ...........................................................1582

    Testimony of Dr. Eli Coston, resumed:

        Direct Examination by Ms. Koenig ..........................................................1586
        Cross Examination by Mr. Gibbons...........................................................1590

Order (July 19, 2022, Doc. No. 99) ....................................................1599

Moore's Notice of Expert Report and Curriculum Vitae
(Aug. 5, 2022, Doc. No. 102)......................................................1601

    Attachment 1, Report to the Eastern District Court of Virginia .................1603

Government's Renewed Motion to Exclude Defense Expert
(Aug. 22, 2022, Doc. No. 103).....................................................1615

    Gov. Exhibit A, City of Richmond Neighborhood Statistics
(1980 Census), dated Nov. 1985 .........................................1625

Moore's Response to Government's Renewed Motion to Exclude
Second Defense Expert (Sept. 9, 2022, Doc. No. 107)...............................1629

Government's Reply in Support of Renewed Motion to Exclude Defense Expert
(Sept. 16, 2022, Doc. No. 108) ....................................................1639

**Volume V**

Transcript of Motion Hearing, continued (Oct. 28, 2022, Doc. No. 110) ..........1644

    Testimony of Dr. Marvin Chiles:

        Direct Examination by Ms. Koenig ............................................................1650
        Cross Examination by Mr. Gibbons............................................................1720

Opinion (Nov. 13, 2023, Doc. No. 124) ............................................................1781

Opinion (Feb. 12, 2024, Doc. No. 126) ............................................................1792

Final Order (Feb. 12, 2024, Doc. No. 127)........................................................1817

Government's Motion to Reconsider and Memorandum in Support
    (Feb. 16, 2024, Doc. No. 128)......................................................................1818

Moore's Opposition to Government's Motion to Reconsider
    the Court's Final Order (Feb. 26, 2024, Doc. No. 130)...............................1824

Government's Reply to Motion to Reconsider
    (Feb. 29, 2024, Doc. No. 131)......................................................................1834

Memorandum Order (Mar. 11, 2024, Doc. No. 132) .........................................1840

Notice of Appeal (Apr. 8, 2024, Doc. No. 134) ................................................1844

    Attachment 1, Certification for Appeal........................................................1846

**Volume VI (Digital Media)**

Additional Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 4.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Gov. Exhibit 5.mp4, Body-Camera Footage, dated Dec. 6, 2020

    Gov. Exhibit 12.mp4, Body-Camera Footage, dated Dec. 6, 2020

Additional Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit U3.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Def. Exhibit U4.mp4, Body-Camera Footage, dated Dec. 5, 2020

    Def. Exhibit V3.mp4, Body-Camera Footage, dated Dec. 5, 2020

These files were confirmed virus-free through virus scan by Trellix Endpoint Security.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                                    Plaintiff,

          versus                        3:21 CR 021

KEITH RODNEY MOORE,

                                    Defendant


Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge


Day I (pages 1 - 151)


July 18, 2022

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

**JA1252**

APPEARANCES


Erik Sean Siebert, Esq.
**Shea Matthew Gibbons, Esq**
**Richard Cooke, Esq.**
Assistant United States Attorneys
For the United States




Laura Jill Koenig, Esq.
Amy L. Austin, Esq.
**Assistant Public Defenders**

The Defendant
In his own proper person


**JA1253**

1              THE CLERK:  Case number 3:21 CR 42.

2         United versus Keith Rodney Moore.

3         Mr. Shea Gibbons, Erik Seibert and Richard Cooke

4    represent the United States.

5         Ms Laura Koenig and Amy Austin represent the

6    defendant.

7         Are counsel ready to proceed?

8         MR. GIBBONS:  United States.

9         MS KOENIG:  Defense is ready, Your Honor.

10        THE COURT:  All right.  So we are here today on

11   really I guess two motions in this case.  One is a

12   motion to suppress some evidence.  And I believe I have

13   already heard all the evidence on that.  The other is a

14   motion to dismiss the indictment because of what the

15   defendant alleges is a pattern of, I guess, unlawful

16   enforcement of the traffic laws against

17   African-American drivers.

18        There are -- I have received some briefs on this,

19   and I appreciate that.  Thank you.

20        I have also gotten an exhibit list and witness

21   list for both the government and Mr. Moore.

22        I think on this motion to dismiss Mr. Moore bears

23   the burden of proof, so we will move ahead with his

24   evidence.  But before we do that, there are motions to

25   exclude Mr. Moore's expert testimony.  There are two

4

1    motions.  There is a sort of a standard Daubert motion
2    about Dr. Coston.  Dr. Coston is some sort of expert in
3    social matters at VCU and has done a statistical
4    analysis of traffic stops in the Richmond area from
5    which he appears to conclude that the police over
6    enforce laws against African-American drivers.
7         And the challenge to Dr. Coston is that Dr. Coston
8    does not use proper statistical methods to reach a
9    reliable result about whether the police have
10   unlawfully targeted African-American drivers.  And,
11   candidly, it is all pretty complicated stuff dealing
12   with chi factors and progression analysis and things
13   like that.  I certainly think that the way I need to
14   resolve that is to hear what Dr. Coston says, to hear
15   Dr. Coston's explanation of what Dr. Coston did.  And
16   then to hear I guess Dr. -- the government expert, Dr.
17        MS KOENIG:  Smith.
18        THE COURT:  Dr. Smith.  How could I forget that
19   name?  To hear Dr. Smith's criticism of it.  And I
20   guess Dr. Coston has seen Dr. Smith's criticism.  And I
21   guess probably should be prepared to address those as
22   he goes through his testimony.  And then Dr. Smith, we
23   could have a standard debate like we would have in a
24   civil case about the legitimacy of an expert.
25        So, here is how I think that needs to play out.

1        Since I need to hear the testimony in order to

2    decide whether it is reliable under Daubert, I think it

3    probably makes sense to hear Dr. Coston's testimony and

4    Dr. Smith's testimony in the ordinary course of things.

5    And then your argument at the end, you could tell me

6    whether I ought to toss out the testimony of Dr. Coston

7    because he uses a chi factor or the Cramer V, whatever

8    it is that the government contends is wrong.  And then

9    Ms Koenig and Ms Austin can respond to that.  That is

10   how I propose to address that.

11       There is a different issue with respect to

12   Dr. Chiles.  Dr. Chiles is an expert who is offered

13   because he has knowledge that is useful to The Court.

14   An expert is a witness who is qualified as an expert by

15   knowledge, skill, experience, training and education,

16   Such an expert can testify in the form of an opinion or

17   otherwise.  So I think this is an otherwise.  It is

18   little hard to tell what Dr. Chiles is proposing to say

19   because he characterizes the expert witness disclosure

20   as brief, which is understating.

21       But, I mean, it seems to me there are couple

22   problems with the disclosure of Dr. Chiles in the case.

23   One is that the disclosure was late.  Two is that the

24   disclosure really doesn't say under Rule 16 -- Rule 16

25   requires the defendant offering an expert to disclose a

 1    written summary of any testimony the defendant intends

 2    to use.  Well, that is not what this is.  That rule

 3    exists for two reasons.  One is to sort of limit the

 4    scope of the expert's testimony.  The other is to allow

 5    the government to get ready to cross-examine him.  If I

 6    looked at that thing and if Dr. Chiles got up and

 7    testified today I would have a hard time figuring out

 8    what he was -- in advance -- what he was going to talk

 9    about.  I mean, apparently he is going to say that

10    Richmond has a long history of segregation and racism.

11    And that is -- I probably could probably take judicial

12    notice of that.

13         But, the third question is this.  What does

14    Dr. Chiles -- what does his opinion or his knowledge

15    about things that happened in the distant past have to

16    do with the Richmond City's enforcement of laws today?

17    There was a time -- and it was not all that long ago --

18    pretty much when I first came to Richmond -- that there

19    were hardly any African-American officers and there was

20    a different world then.  But I am not sure we are there

21    now.  We have an African-American police chief, mayor,

22    African-American mayor, majority of City Council for

23    many years.  So I am just a bit flummoxed as to the

24    relevance of it.

25         Do you want to address any of those points?

1           MS KOENIG:  Yes, Your Honor.

2           THE COURT:  Let me just say that if I decide that

3     this guy can testify the government needs an

4     opportunity -- you know, his disclosure was so late in

5     the game the government needs an opportunity to --

6     well, maybe they will tell me they don't want an

7     expert.  But the government deserves an opportunity to

8     some sort of an expert on history of their own.

9           MS KOENIG:  That is fine, Your Honor.  As I said

10    in the -- this is in ECF number 86.  The reason that we

11    are calling Dr. Chiles is that this court knows I tried

12    to get a copy of what the Richmond Police Department

13    holds out as a 1977 police precinct neighborhood plan.

14    And any amendments updates to that plan that would help

15    us and The Court determine why it is that we have three

16    of the four police precincts in the City of Richmond

17    that are devoted to the black parts of town.

18          In response to that subpoena the Richmond Police

19    Department indicated that they don't have a copy of the

20    1977 precinct plan, didn't have any other documents

21    that were responsive, aside from essentially a printout

22    of their Richmond Police Department history that is

23    available on the Richmond Police Department's web site,

24    as well as a year book history which had not much more

25    detail than that.

1          So because of that, the reason that we are calling

2     Dr. Chiles is that this Court remembers on the July 26,

3     2021 hearing --

4          THE COURT:  I remember like it was yesterday.

5          MS KOENIG:  Part of what we introduced at that

6     hearing was the University of Virginia, the public

7     school, the public, Weldon School of Public Service.

8     Has created a racial dot map that plots out according

9     to census data each individual response by race, and

10    the data throughout the country.  But what we submitted

11    on July 26 of 2021 was exhibit R-2, which is the

12    plotting data for the Richmond area.

13         THE COURT:  Shows where, essentially how

14    segregated the community is.

15         MS KOENIG:  Correct.

16         What Dr. Chiles is going to testify about is how

17    it got that way because that was not by happenstance at

18    all.  And the other part of what he will be able to

19    tell us about is that around 1977 there was a concerted

20    effort by the council members in the City of Richmond

21    to start policing the black neighborhoods because the

22    City Council believed that it was very important

23    financially for the City to survive financially after

24    decades of white flight to be able to police the black

25    neighborhoods so that white people felt safe coming

1    back to the community.

2         So those are to the areas that I anticipate he

3    will testify about.

4         I have provided, because Dr. Chiles has written

5    about this extensively, I provided those articles.  As

6    I indicated to The Court in ECF 86, the timing -- I am

7    not -- frank to say it was not a lot of notice for the

8    government, but the timing was, we did not intend to

9    call Dr. Chiles until we knew, or even find Dr. Chiles

10   for that matter, until we knew that the Richmond Police

11   Department did not have any data related to the 1977

12   precinct plan.

13        THE COURT:  It seems a lot of problems in this

14   case come from the fact that the Richmond Police

15   Department doesn't have much data and didn't provide it

16   to you without pulling some teeth.

17        MS KOENIG:  Correct.

18        So to the extent that that explained the timing of

19   our disclosure, I tried to get it out of the government

20   as fast as I could.  And so that is where we are at,

21   Your Honor.

22        THE COURT:  And as I recall, the Arlington Heights

23   case a historical review of things can be relevant in

24   determining whether there is a current -- there is

25   current racial animus.

1          MS KOENIG:  Absolutely, Your Honor.  Because of

2     the -- this case relies on not only the traffic stop

3     data, in terms of how many black people are stopped

4     versus white people are stopped, and how many black

5     people are arrested versus searched, things like that.

6     It relies not only on that data, but also where the

7     stops are happening specifically as it relates to the

8     police precincts.  So this information I think is

9     highly relevant for this Court to consider, and

10    absolutely Arlington Heights does enumerate the history

11    as one factor that The Court explicitly shall consider.

12         Now, The Court obviously after hearing the

13    testimony will decide what weight to give the

14    testimony, or whether Dr. Chiles is credible, et

15    cetera.  But those are factors that determine the

16    significance that The Court places, if any, on the

17    testimony, not admissibility.

18         THE COURT:  Let's hear from whoever is going to

19    talk for the government.

20         Again, you all are welcome to not wear your mask.

21         MR. GIBBONS:  Thank you, Your Honor.  A few points

22    on that, Your Honor.

23         I took --

24         THE COURT:  Here is what I don't want to have

25    happen in this case is to exclude something that is

1    marginally relevant and then at some later stage to

2    have a challenge to the conviction because I didn't

3    give them a chance to put that in.  That is what I am

4    concerned about.

5         MR. GIBBONS:  That is a valid concern, Your Honor.

6    That is a little separate from the issues that are

7    before The Court today.

8         I will tell The Court, I spent the weekend, hardly

9    saw my kids, so I could review all 568 pages that were

10   disclosed in relation to Dr. Chiles.  The simple

11   statement that Ms Koenig just said, in 1977 a decision

12   was made to over enforce black areas to make whites

13   feel safe, that was not apparent in any of the 568

14   pages that I reviewed.  I don't know why that couldn't

15   have been disclosed in the first place.

16        THE COURT:  Well, assuming, I guess he is -- the

17   problem with Dr. Chiles is that they don't really say

18   what he is going to say.  The rule is quite clear that

19   we have to give a summary of the testimony.  And it

20   doesn't say, well, you can go look it up in the library

21   and read all of the things he said were written.  You

22   can do that, but that is not what the rule says.  The

23   rule says you have to give a written summary of what he

24   is going to say.  And that is not what that is.  That

25   is not what that disclosure is.

1          This is how I am going to deal with it.  I hate to

2     do this because I would like to have the case resolved

3     before I die or retire, whichever comes first.  Death

4     probably is coming before I retire.  But I will keep

5     the record open at the end of this hearing.  Dr. Chiles

6     will not testify tody.  Is he here?

7          MS KOENIG:  Yes.

8          THE COURT:  In the room?

9          MS KOENIG:  He is outside in the anteroom.

10         THE COURT:  Well, all right.

11         Bring him in at some point and I will apologize to

12    him about that.  I will take the heat for it.  But,

13    then you will have to, Ms Koenig, you will have to

14    prepare a report that contains a summary of what he is

15    going to say.  He has got to say this is what the

16    summary from Dr. Chiles is going to say.  It's not just

17    enough to say Dr. Chiles is going to say that in 1976

18    to '77 the City was white people coming back to town.

19    You have got to bring in details so that the government

20    can then do two things; one is they can figure out how

21    to cross-examine him, and the other is they can decide

22    whether they need to have an expert of their own.  I

23    mean, as I recall, Ed Ayers at the University of

24    Richmond is quite an expert on Richmond segregation.

25    And he probably has something to shed on this.  I

13

1    remember very well that that was -- I lived here.  I

2    moved here in '76 into an area of the City that had

3    been annexed from Chesterfield County.  And I remember

4    the many, many discussions of that, and it was a pretty

5    fraught political environment then.

6         So, how long will you need to come up with a

7    summary, a true summary, of his testimony?

8         You ought to be pretty much ready for it if you

9    have him ready to testify today.

10        MS KOENIG:  It don't think it would take him long.

11   I just need to know the schedule as to when he has

12   time.

13        THE COURT:  I can't understand you.  What?

14        MS KOENIG:  I don't think it will take him long,

15   but I need to know his schedule about how many days it

16   will take for him to have time in his schedule to write

17   it out.

18        If I could consult with him very briefly I could

19   have an answers for The Court.

20        THE COURT:  Why don't you go out and ask him that,

21   then.  And bring him back in.

22        MR. GIBBONS:  Would you like me to take a seat?

23        THE COURT:  Thank you.

24        MS KOENIG:  Your Honor, Dr. Chiles.

25        THE COURT:  Dr. Chiles, stay right there.

**JA1264**

14

1          MS KOENIG:  Dr. Chiles anticipates being able to

2    prepare such a report by next Wednesday.

3          THE COURT:  Next Wednesday.

4          MS KOENIG:  Yes, Your Honor.

5          THE COURT:  All right.

6          Well, let's give him a little more time than that

7    to do that.

8          Dr. Chiles, unfortunately we have got kind of a

9    procedural problem with your testimony today.  I

10   appreciate you coming up here to testify.  Do you live

11   down in Norfolk?

12         THE WITNESS:  Virginia Beach.

13         THE COURT:  I appreciate you coming up from the

14   Beach to be here.  I hope you will be able to get back

15   before traffic jambs up.  But I want to -- you will

16   need to prepare a summary of your testimony, and you

17   think you can do that in 14 days?

18         THE WITNESS:  Yes.

19         THE COURT:  All right.

20         Do that in 14 days.  And give that to Ms Koenig,

21   and she then will help you get it into proper form.

22         So, I will give you 21 days to file that, Ms

23   Koenig.

24         MS KOENIG:  Yes, Your Honor.

25         THE WITNESS:  So you have 14 days to get it to

1    her, and then she can massage it into correct form.

2    Okay?

3         MS KOENIG:  Thank you.

4         THE COURT:  Thank you very much for coming.  You

5    are a professor at Old Dominion?

6         THE WITNESS:  Yes, sir, I am.

7         THE COURT:  The Monarchs.  What exactly do you

8    teach there?

9         THE WITNESS:  I teach American history,

10   African-American history, and --

11        THE COURT:  Great.  Well, I am glad you do that.

12        I look forward to hearing your testimony at some

13   point in the future.  Thank you very much for coming,

14   sir.

15        THE WITNESS:  Thank you.

16        THE COURT:  You are excused.  You may leave.

17        THE WITNESS:  Okay.

18        Okay.

19        THE COURT:   Now, then Mr. Shea, does that take us

20   to -- today is the 18th.  Her summary under Rule 16 is

21   due on August 8.  Do you think that by August 22 you

22   can review that and decide whether you need to get an

23   expert of your own?

24        MR. GIBBONS:  Yes, Your Honor, that should be

25   fine; yes, sir.

1          THE COURT:  By August 22 your job is to let us

2     know whether you need -- whether you need an expert of

3     your own.  Also you could file a second Daubert motion

4     about him on August 22.  And then we will get together

5     and schedule a time for Dr. Chiles' testimony, and it

6     shouldn't take more than an hour or so, should it?

7          MS KOENIG:  I would think between cross and if the

8     government has an expert, probably no more than two

9     hours.

10         THE COURT:  Okay.  That will be enough time.  All

11    right.  So now let's move on to the meat of things here

12    today.

13         We have the, I have got the -- the Government now

14    has -- so, given that we don't have Mr. Chiles, is

15    Mr. Hush going to need to testify?

16         MS KOENIG:  Your Honor, I would simply designate

17    Mr. Hush as our advisory witness to move to and from

18    the courtroom.  I notified the Government of this. I

19    don't think they have the equivalent of that that they

20    intend to designate, but the Government and I have also

21    agreed that both Dr. Coston and Dr. Smith can be around

22    for each other's testimony.

23         THE COURT:  That is fine.  Are they both in here

24    now?

25         MS KOENIG:  Dr. Coston is not.  Yes.

1          THE COURT:  Which one is he?  There he is.  Okay.

2     Well, go bring Dr. Coston in.

3          MS KOENIG:  Thank you, Your Honor.

4          THE COURT:  And so, my question was a different

5     one.  Is Mr. Hush going to testify?

6          MS KOENIG:  I don't know yet, Your Honor.  Depends

7     on The Court's ruling on a couple different matters

8     that can be introduced through Dr. Coston.

9          THE COURT:  Have a seat, Dr. Coston.

10         Are you going to call Dr. Coston?

11         MS KOENIG:  I call Dr. Coston, Your Honor.

12         THE COURT:  All right.

13         Raise your right hand and face the clerk.

14                          ELI COSTON

15               AFFIRMED AND TESTIFIED AS FOLLOWS:

16                       DIRECT EXAMINATION

17    BY MS KOENIG:

18    Q    Doctor, can you state your name for the record,

19    please?

20    A    Dr. Eli Coston.

21    Q    Can you spell the last name for us?

22    A    C-O-S-T-O-N.

23    Q    How are you employed?

24    A    I am an assistant professor at Virginia

25    Commonwealth University.

1    Q    Do you hold a PhD in sociology from stoney Brook?

2    A    Yes, I do.

3    Q    When did you will get that degree?

4    A    I received that degree in 2017.

5    Q    Before that, do you have two masters of art and a

6    bachelor of arts?

7    A    Yes, I do.

8    Q    Do you have any specialty research area?

9    A    I have specialty research areas in statistics and

10   methodology, race and gender, as well as the criminal

11   legal system.

12   Q    How long have you been studying statistical

13   analysis?

14   A    I have been studying statistical analyses since my

15   undergraduate degree, but primarily during graduate

16   school and subsequently.

17   Q    How long have you been studying research

18   methodology?

19   A    The same amount of time.

20   Q    Have you published articles that require

21   specialized knowledge of statistical analysis and

22   research methodology?

23   A    Yes.

24   Q    I want to turn your attention, if you can look in

25   white binder in front, specifically what has been

Coston - direct                                          19

1   marked defendant's exhibit one.  Do you recognize what

2   is listed in defendant's exhibit one?

3   A    I do.

4   Q    What is that?

5   A    My curriculum vitae.

6   Q    Is that something that you provided to us to

7   demonstrate what it is that you have done in the terms

8   of publication and teaching, et cetera?

9   A    Yes.

10       MS KOENIG:  Your Honor, I move to admit

11  defendant's exhibit one.

12       MR. GIBBONS:  No objection.

13       THE COURT:  All right.  Admitted.

14  BY MS KOENIG:

15  Q    Do some of the articles you have published require

16  specialized knowledge of statistical analysis and

17  research methodology as listed in the C V?

18  A    Yes, they are.

19  Q    Have you given presentations that require

20  specialized knowledge about statistical analysis and

21  research methodology?

22  A    Yes, I have.

23  Q    Are those also listed ted in your C V?

24  A    Yes, they are.

25  Q    Have you taught courses at VCU as well as other

**JA1270**

Coston - direct                          **20**

1    colleges on statistical analysis and research

2    methodology?

3    A    Yes.

4    Q    Do you hold the position as peer reviewer of

5    articles that others publish that require your

6    specialized knowledge of statistical analysis and

7    research methodology?

8    A    Yes.

9    Q    Are some of those listed in your C V as well?

10   A    Yes.

11        MS KOENIG:  I move to qualify Dr. Coston as an

12   expert in the area of statical analysis and research

13   methodology?

14        THE COURT:  All right.

15        Any cross examination.

16        MR. GIBBONS:  No, Your Honor.

17        THE WITNESS:  All right.

18        Do you have any objection?

19        MR. GIBBONS:  No, Your Honor.

20        THE COURT:  All right.  He is recognized as an

21   expert on statistical analysis.

22   BY MS KOENIG:

23   Q    Let's start with the data that you analyzed in

24   this case.  Specifically what entity provided us the

25   data that you analyzed?

1    A      The Virginia Department of State Police.

2    Q      Who had collected that data at first?

3    A      Well, that is compiled by the Virginia Department

4    of State Police from individual localities.  So the

5    Richmond data coming from the Richmond Police

6    Department.

7    Q      Why did the Richmond Police Department collect

8    this data?

9    A      In compliance the Virginia Community Policing Act

10   data is collected about information related to stops,

11   like the characteristics of the driver, race, age,

12   gender, as well as characteristics of the stop itself

13   what occurred during those stops.  So, why the stop

14   occurred.  What the outcome of the stop was.  What

15   particular code section was violated, whether searches

16   or arrests occurred during those stops.

17   Q      You mentioned that Virginia Community Policing Act

18   that you just described?

19   A      Yes.

20          MS KOENIG:  Your Honor, I am asking The Court to

21   take judicial notice of what was submitted in

22   defendant's exhibit 3, which is the Virginia Criminal

23   Code or Criminal -- Virginia code, 52-30.2.

24          THE COURT:  All right.

25          I don't know that I need to take judicial notice

Coston - direct                          22

```
 1   of it, but clearly it is a statute.

 2           MS KOENIG:  Thank you.

 3   BY MS KOENIG:

 4   Q    Under the Community Policing Act, Dr. Coston, do

 5   local --

 6           MR. GIBBONS:  Excuse me, Your Honor.  Could we

 7   clarify that is the 2020 version.

 8           MS KOENIG:  I'm sorry.  It is the 2020 version

 9   Your Honor.

10           THE COURT:  All right.  Exhibit 3 is the 2020

11   version?

12           MS KOENIG:  It is, Your Honor.

13   BY MS KOENIG:

14   Q    Dr. Coston, was there a later change in July of

15   2021 that required police departments moving forward

16   from July of 2021 to collect additional data beyond

17   what you just described?

18   A    Yes, there is.

19   Q    So we were operating on the stats that we were

20   looking at from July of '20 to December 6 of '20; is

21   that right?

22   A    That's correct.

23   Q    Okay.

24           THE COURT:  Is that the date he was stopped?

25           MS KOENIG:  December 5th is the time that the stop
```

JA1273

1   initially occurred and it bled over into the morning

2   hours of the 6th, Your Honor.

3   BY MS KOENIG:

4   Q    Let's turn to the data itself.  We just, I think I

5   just spilled the bag, but what is the date for each of

6   the data you analyzed?

7   A    July 1st to December 6.

8   Q    What year?

9   A    Of 2020.

10       MS KOENIG:  Was the data you analyzed only for

11  traffic stops?

12  A    Yes.

13  Q    How many traffic stops did the Richmond Police

14  Department report conducting during that time period?

15  A    2,578.

16  Q    Before you conducted specific analyses of the data

17  did you omit some of the stops before refining

18  analysis?

19  A    Yes.

20  Q    Specifically did you omit locations that were

21  ultimately outside of the Richmond Police Department's

22  jurisdiction?

23  A    Yes, I did.

24  Q    How did you determine which stops were outside of

25  the jurisdiction?

Coston - direct                           **24**

1    A     So it was a multi-stop process.  Initially what is

2    reported on the data is actual street locations or

3    intersections.  Sometimes, you know, what block of a

4    particular street.  That information was called

5    Geocodio that converts that text data --

6              THE COURT:  Spell that.

7              THE WITNESS:  G-E-O-C-O-D-I-O.

8              THE COURT:  Tell us what Geocodio is.

9              THE WITNESS:  So essentially it takes the street

10   locations.  For example, if you have an individual

11   street address and it converts that into latitude and

12   longitude coordinates.  Then you can later use for

13   mapping in, for example, a graphical information

14   systems program.  Geocodio also provides information

15   about the reliability of the geographic coordinates it

16   provides.  So, ranging from zero to one.  For those

17   that were less than .6, so there was indicated by

18   Geocodio only kind of moderate certainty about the

19   latitude and longitude coordinates provided.

20        Those were checked by an intern at the Public

21   Defender's office and verified and/or corrected.

22   Subsequent to that I also overlaid all of the

23   coordinates, both the corrected coordinates and the

24   original coordinates provide by Geocodio on to a map.

25   That was over laid with the Richmond Police

```
 1    Department's police precincts.

 2            So there were some that still fell outside of

 3    those boundaries, and those I manually recoded in order

 4    to -- because there was sufficient information.  But,

 5    for example, Broad and Harrison.

 6    BY MS KOENIG:

 7    Q    Maybe let's take a minute just for a second.

 8            I want to show you, if we can provide, Ms Tuck,

 9    the witness what is marked defendant's exhibit 14.  I

10    have it up on my screen here.

11            Should be connected.

12            There we go.

13            Dr. Coston, do you recognize what I am showing you

14    on this screen?

15    A    Yes.

16    Q    What is this?

17    A    This is the Excel file that contains the data for

18    the traffic stops.

19    Q    Was this the specific exhibit that is in

20    defendant's exhibit 14, is this your final sample?

21    A    Yes.

22            MS KOENIG:  Your Honor, I move to admit

23    defendant's exhibit 14.

24            MR. GIBBONS:  Your Honor, we have an objection to

25    this.
```

Coston - direct                                    26

1        THE COURT:  All right.  What is that?

2        MR. GIBBONS:  We don't know what version of the

3    RPD stop data is contained in this document.  At what

4    stage of the RPD -- we have done our witness first.

5    There were separate stages to the quality control

6    process.  We are not sure at what stage.

7        THE COURT:  I'm sorry.  Separate stages to the

8    quality control process of what?  Of pulling this

9    information together?

10       MR. GIBBONS:  Yes, Your Honor.

11       THE COURT:  So you don't know whether this is the

12   final information or not.

13       MR. GIBBONS:  That's correct, Your Honor.

14       THE COURT:  What do you say about that?

15       MS KOENIG:  Your Honor, let's maybe, let me talk

16   to Dr. Coston first about something else.

17       Dr. Coston, were you aware that the defense had

18   subpoenaed the Richmond Police Department for

19   information and reports on all traffic stops that

20   happened from July of 2020 to December 6 of 2020?

21       THE WITNESS:  Yes.

22   BY MS KOENIG:

23   Q    And did we discuss that the subpoena was going to

24   ask for individualized police reports for each of those

25   stops?

JA1277

1    A    Yes.

2    Q    I want to show you what has been marked

3    defendant's exhibits 15, which, Your Honor, is ECF 52,

4    which is already in the record.

5         But, the subpoena, Dr. Coston requested copies of

6    net viewer event information, net viewer event unit,

7    and net viewer chronology records for all traffic stops

8    by the Richmond Police Department from July 1st, 2020

9    through December 5 of 2020; is that right?

10   A    Yes.

11   Q    Is that in fact what the Richmond Police

12   Department supplied us?

13   A    No, that is not what I received.

14   Q    Did we receive a series of spreadsheets from the

15   Richmond Police Department that had the columns, the

16   column information that is in defendant's exhibit 14?

17   A    Yes.

18   Q    Did you simply take -- and each spreadsheet was

19   defined by a period of time; is that right?

20   A    That's correct.

21   Q    You received one spreadsheet for three months and

22   then individually separate spreadsheets for October,

23   November, and December?

24   A    The December contained more information than just

25   December, but yes, that is correct.

1    Q    The information that you have in defendant's 14,

2    aside from the columns that have the latitude

3    longitude, accuracy, and corrected, and control number,

4    did the exhibit compilation of what you put into one

5    spreadsheet rather than four?

6    A    The control numbers were initially indicated on

7    this spreadsheets that we received, but the latitude

8    longitude, accuracy, and corrected were added

9    subsequent.

10   Q    By the --

11        THE COURT:  Let me see if this is correct.  You

12   requested information, all sorts of information about

13   the traffic stops from the Richmond Police Department.

14        MS KOENIG:  That is right.

15        THE COURT:  And the Richmond Police Department

16   supplied you with some of that information.

17        MS KOENIG:  Correct.

18        THE COURT:  And the information that you got from

19   the Richmond Police Department was placed in to this

20   spreadsheet?

21        MS KOENIG:  Correct.

22        THE COURT:  Who did that?

23        Did you do that, or did you the Public Defender's

24   Office do that?

25        MS KOENIG:  I will break that down.  I will break

1    it down.

2          So, Dr. Coston, if we can look at defense exhibit

3    14, specifically column B.  Tell us what column B is.

4          THE WITNESS:  Column B is location information

5    that was provided by the Richmond Police Department

6    initially.  In some cases this represents an exact

7    address, and in some cases an intersection.  And in

8    other cases a block of a street.

9    BY MS KOENIG:

10   Q    For example, if we look at entry number two on

11   defendant's exhibit 14 we see that -- what is this

12   intersection?

13   A    Oliver Hill Way and Hospital Street.

14   Q    So what did we work as a defense team to do, to

15   take the location information to generate the latitude

16   and longitude by columns that are just to the right of

17   the location column?

18   A    That location, the initial location is provided by

19   the Richmond Police Department were sent to Geocodio.

20   What they sent back is in the following four columns.

21         THE COURT:  Let's cut to the quick on this.  Rule

22   1006 allows the proponent to use, produce a summary

23   of -- I believe -- the records produced by the Richmond

24   police were voluminous, I take it.

25         MS KOENIG:  They were.

1         THE COURT:  How voluminous were they?

2         MS KOENIG:  There were 2,578 stops from the time

3    period we are looking at.

4         THE COURT:  You got a report on each one?

5         MS KOENIG:  We had this data that is reflected in

6    defendant's exhibit 14.

7         THE COURT:  All right.

8         So, Mr. Shea, do you want to be heard on that?

9         MR. GIBBONS:  We still don't know what version

10   this data came from, the corrected or --

11        THE COURT:  This was produced to you in advance,

12   and you have had an opportunity to examine it.

13        MR. GIBBONS:  There is two issues, Your Honor;

14   there is an authentication issue, which is so far

15   unresolved.  And then there is an issue of what shape

16   the data was in.

17        THE COURT:  Well, if you have questions about

18   whether the data is accurate, that is something that

19   you could have looked at, the charts, information,

20   beforehand and compared it.  And you can cross-examine

21   him about it.  We have -- I am sure you have got an arm

22   full of inaccuracies you are going to point out to me

23   at some point.

24        MR. GIBBONS:  That is true, Your Honor.

25        THE COURT:  Well, all right.

1          MS KOENIG:  Thank you, Your Honor.

2          THE COURT:  Fourteen is admitted.

3     BY MS KOENIG:

4     Q    So, Dr. Coston, once you had taken -- so the

5     latitude longitude you have explained came from

6     Geocodio, is that right?

7     A    That is right.

8     Q    What did you make as the information in the

9     accuracy score that is reflected in column E?

10    A    So the accuracy score ranges from zero,

11    essentially no accuracy; to one, high accuracy.

12         And so scores that had lower accuracy, less than

13    .6 those were validated by an intern in the Public

14    Defender's Office.  And I also engaged in additional

15    verification of the latitude longitude information.

16    Q    When there was a correction noted, was that

17    correction noted in columns G and L for the latitude

18    and longitude?

19    A    Yes, it was.

20    Q    So, the original Geocodio latitude longitude is

21    reflected in column C and D; is that right?

22    A    That's correct.

23    Q    And the corrected latitude longitude is in column

24    G and H?

25    A    That's correct.

Coston - direct                                        32

1    Q    Right.  Some of the information in the corrected

2    columns came from the intern at the Federal Public

3    Defender's Office and some came from you?

4    A    That's correct.

5         THE COURT:  Let me ask you this.

6         Did you rely on this data in forming the opinions

7    you were about to offer us in this case?

8         THE WITNESS:  Yes, I did.

9         THE COURT:  Is this the sort of facts or data that

10   people in your expertise routinely organize in forming

11   an opinion on this kind of subject?

12        THE WITNESS:  This type of data along with other

13   types of data, yes.

14        THE COURT:  I understand there are all kinds of

15   data, but this is acceptable in your field of

16   expertise?

17        THE WITNESS:  Yes.

18        THE COURT:  All right.

19   BY MS KOENIG:

20   Q    Thank you, Your Honor.

21        Dr. Coston, you were talking about the things that

22   you had omitted.  Once you had a corrected sheet, what

23   did you omit from the total number of stops that you

24   analyzed?

25   A    Eighty-one stops were omitted.  And those fell

**JA1283**

Coston - direct                                              33

1    outside of the Richmond Police Department's' precinct

2    boundaries.  Most of those occurred in Chesterfield.

3    Q    When you deleted something, that is something that

4    you yourself manually checked to see if in fact it was

5    not within the City limits; is that right?

6    A    That's correct.  And I verified it with the

7    location that was provided by the Richmond Police

8    Department, as well as the latitude and longitude.

9    Q    When talking about the control numbers here, each

10   one of these stops has a control number assigned to it,

11   right?

12   A    That's correct.

13   Q    Why?

14   A    Control numbers are essentially a record-keeping

15   device.  So that every individual entry is entered one

16   time.

17   Q    Does it also allow for later questioning

18   comparisons so we can look at a particular stop if need

19   be?

20   A    Yes.

21   Q    So did you prepare a spread sheet of the control

22   numbers of the stops that you excluded --

23   A    Yes.

24   Q    -- from this report, or from this spreadsheet?

25   A    Yes.

JA1284

 1   Q    I want to so you show you what has been marked

 2   defendant's exhibits 18.

 3        Can you see exhibit 18?

 4   A    Yes.

 5   Q    Dr. Coston, please tell us what is in this exhibit

 6   18.

 7   A    So this is a list of the control numbers that were

 8   excluded due to being outside of the jurisdictional

 9   boundaries of the Richmond Police Department.

10   Q    Did you prepare this list in response to a report

11   we received on Friday from the government --

12   A    Yes.

13   Q    -- questioning some of the counting or the

14   accuracy of some of the information; is that right?

15   A    Yes.

16   Q    Did you go back and double check these things over

17   the weekend?

18   A    Yes.

19   Q    Did you confirm that there are 81 stops that you

20   still found remember outside of the City limits that

21   you excluded from the analysis?

22   A    Yes, I did.

23   Q    Just because a stop is outside of the City limits

24   does it mean that the Richmond Police Department did

25   not have jurisdiction to do the stop?

Coston - direct                                                35

1   A     No.  Not necessarily.  The police are typically

2   able to pursue outside of their jurisdictional bounds,

3   and for this reason I conducted the analysis both with

4   these stops included and with the stops excluded.  And

5   it didn't change the overall findings of conclusions.

6   The statical significance of results remained the same.

7   Q     Okay.

8         Give us some examples of same of the stops that

9   were excluded?

10  A     Yes.  So as you can see here, for example, many of

11  these stops, stop 582 for example, I believe occurred

12  at the Powhite toll booth, which is just outside of the

13  Richmond Police Department jurisdiction boundary.

14        THE COURT:  What?

15  Q     Powhite Parkway toll booth?

16  A     Yes.

17  Q     That stop --

18        THE COURT:  Downtown here?

19        THE WITNESS:  No.

20        THE COURT:  Over --

21        THE WITNESS:  Farther south.

22        THE COURT:  Over by the Midlothian Turnpike.

23        THE WITNESS:  Yes.

24        THE COURT:  So the Richmond police -- that is over

25  there by Hull Street.

1          THE WITNESS:  This is where, there is where it was

2     noted in terms of the specific location.  This is what

3     the Richmond Police officer wrote.

4          In many of these instances, but, again, that is

5     outside of the jurisdictional boundaries, so I excluded

6     those particular cases.

7     BY MS KOENIG:

8     Q    Because it's -- so it's possible that stops were

9     valid traffic stops in terms of jurisdiction by the

10    Police Department, right?

11    A    That is possible.

12    Q    But because we don't have further details about

13    the stops themselves, who initiated it, where it was

14    initiated, you just chose to exclude it for the

15    validity of the data?

16    A    That's correct.

17    Q    At a particular type of analysis that you

18    conducted, the chi-square analysis that you did, did

19    you exclude --

20         THE COURT:  The what analysis?

21         MS KOENIG:  The chi-square analysis, Your Honor.

22         THE COURT:  All right.

23    BY MS KOENIG:

24    Q    Did you exclude any particular races from the

25    final analytical sample?

Coston - direct                                    37

1    A    Yes.  Asian, native American and drivers of other

2    races were excluded from the final analysis due to

3    there being too few drivers who were stopped during the

4    time period of those races to be able to conduct that

5    type type of statistical analysis.

6         THE COURT:  Do you want to admit exhibit 18?

7         MS KOENIG:  I do, Your Honor.

8         THE COURT:  All right.

9    BY MS KOENIG:

10   Q    Dr. Coston, let's first have you tell us briefly

11   about what a chi-square analysis is.

12   A    So, a chi-square analysis examines the

13   relationships between two variables.

14        THE COURT:  C-H-I?

15        THE WITNESS:  Yes.

16        THE COURT:  A Greek letter.

17        THE WITNESS:  Yes.  Yes.

18        THE COURT:  Okay.  Go ahead.

19        THE WITNESS:  So, chi-square analysis examines the

20   relationship between two variables for statistical

21   significance.

22   BY MS KOENIG:

23   Q    Why was the chi-square analysis the most

24   appropriate statistical test to use on the data set

25   that we have?

**JA1288**

1   A    So, this was the most appropriate analysis for a

2   few reasons.

3        Firstly, these are both -- many of the analyses

4   contains what we call categorial variance.  Meaning

5   that they fall into a category instead of being, for

6   example, on an interval or ratio scale.

7        THE COURT:  What?

8        THE WITNESS:  So, for example, interval level data

9   occurs at regular intervals versus being in a category.

10  So numerical data versus categorical data.

11  BY MS KOENIG:

12  Q    Can you give us an example, Dr. Coston?

13  A    Sure.  So, for example, interval or ratio data

14  might be something that we think of as temperature.

15       THE COURT:  As what?

16       THE WITNESS:  Temperature.  Like the temperature

17  outside, for example.  That would be interval level

18  data.

19       THE COURT:  What the temperature is every hour.

20       THE WITNESS:  Yes.

21       These are merely categories.  Black drivers or

22  white drivers.  Those aren't inherently ordered or

23  numbered.  In terms of analysis they are assigned a

24  number to do that actual statistical analysis, but they

25  are categories themselves.  So a chi-square test is

**JA1289**

1    appropriate for analyzing this type of categorical data

2    to determine the relationship between two different

3    variables.

4    BY MS KOENIG:

5    Q    Tell us in terms of the chi-square analysis why

6    did you ultimately exclude Asian and American Indian

7    drivers with unknown races from the final analytical

8    sample.

9    A    So one of the assumptions or rules that needs to

10   be met when conducting a chi-square analysis is that

11   there needs to be minimum of five expected observations

12   in each cell of the analysis.  So, in a two-by-two

13   table, for example, there are four different cells.

14   And there needs to be a minimum of five observations

15   that we would expect to see in each of those cells.

16        As you expand the number of categories that you

17   are examining, so, for example looking at race and

18   whether the person, whether the individual was arrested

19   or not.  If we are comparing only black and white and

20   arrest, yes and no, that is a two-by-two.  Four cells.

21   And a minimum of 80 percent of those cells need to have

22   five expected observations.

23        If you expand that to include drivers that are

24   Asian, native American, and other races, you know have

25   a two-by-five table.  And that is ten individual cells.

Coston - direct                    **40**

1   You need to have a minimum of five observations in each

2   of those individual cells.  Because of the very small

3   number of Asian, native American, and drivers of other

4   races.

5   Q    But unknown?

6   A    Yes.  Other unknown races.  That criteria wouldn't

7   have been met.  And so drivers who were Asian, native

8   American and other races or unknown races were excluded

9   from the analysis.  Only concerning black and white

10  drivers in terms of that statistical relationship.

11  Q    Is that simply how chi-square analysis works?

12  A    Yes.

13  Q    That is the kind of analysis that you would do in

14  in day-to-day work when you are doing statistical

15  analysis, right?

16  A    Yes.

17       THE COURT:  Okay.

18       I understand why you didn't include the people.

19  What is it you are trying to figure out from chi-square

20  analysis?

21       THE WITNESS:  A chi-square analysis is asking, is

22  there a relationship between these two variables?

23       THE COURT:  What does that mean?

24       THE WITNESS:  In the example that I just gave,

25  black and white drivers and whether an individual was

1    arrested, for example, is there a relationship between

2    the race of the driver and whether they were arrested

3    or not.

4         THE COURT:  So, what I am puzzling with here is

5    what you mean by a relationship.  You mean --

6         THE WITNESS:  Are these two things related --

7         THE COURT:  That is --

8         THE WITNESS:  -- in a statistical sense?

9         THE COURT:  Let's pretend like I am an English

10   major, which is what I was.

11        So, tell me what it means for them to be related

12   to each other.  Does that mean that --

13   BY MS KOENIG:

14   Q    Dr. Coston, for a statistical significance that

15   can be found with this chi-square analysis --

16   A    Yes.

17   Q    -- is there statistical significance, what does

18   that mean?

19   A    It means that what we see occurring in the data is

20   more likely than we would expect to find by chance.

21        THE COURT:  That is what you would call a

22   relationship.

23        THE WITNESS:  Yes.

24        THE COURT:  Or if it was less likely, that would

25   be a relationship, too.

1          THE WITNESS:  Yes.

2          But if it is what we expect to see by chance, then

3     there is no relationship at all.

4          THE COURT:  Like a coin flip.  That would be no

5     relationship.  But if it turned out that all of the

6     people who got stopped were white, or all the people

7     were African-American, then we would have a pretty

8     strong relationship; is that right?

9          THE WITNESS:  Essentially.

10         If we are using a coin flip example it might be

11    better to say that if it is near fifty-fifty then the

12    dice isn't, or the coin isn't loaded, but if we see a

13    strong in one way or the other, then it is loaded.

14         THE COURT:  Okay.  So if it was -- and what does

15    that relationship tell me?

16         THE WITNESS:  In this instance it tells you

17    whether black or white drivers are more likely to be

18    arrested, more likely to be -- have their vehicle

19    searched.  Essentially based on the race of the driver

20    what of these various instances that occurred during

21    stops are more likely.

22         THE COURT:  All right.  Hold on a second while I

23    do this.

24         MS KOENIG:  We are going to go through in more

25    detail as we go through each piece.

 1          THE COURT:  Well, okay.  But let me get to what I

 2    think is an important issue here.  Let's just assume

 3    for a second that you were going down Jefferson Davis

 4    Highway.  I can't remember what it called.  Richmond

 5    Highway.  South Richmond down in Chesterfield County.

 6          And that is an economically disadvantaged part of

 7    Chesterfield County.  Do you know anything about that

 8    area?

 9          THE WITNESS:  I am aware of it.  I haven't spent

10    much time there.

11          THE COURT:  Well, I have spent my time.  And so

12    there are a lot of people driving cars that aren't in

13    very good shape around there.  And it seems to me that

14    like people who drive cars that aren't in very good

15    shape are more likely to be stopped than people who

16    aren't because tail lights go out and cracks in the

17    windshield.

18          So how does this -- how does this chi-square

19    analysis account for things that like that?

20          THE WITNESS:  So the chi-square analysis doesn't

21    simultaneously account for every single factor that

22    could impact a traffic stop.  It is also true that we

23    don't have data on everything that could impact a

24    traffic stop.

25          THE COURT:  And it would be almost impossible to

 1    get.

 2            THE WITNESS:  That's correct.

 3            But one of the things that was included in this

 4    analysis using a chi-square test was to examine reasons

 5    for stops.  So, for example, equipment.  Were people

 6    pulled over for reasons related to having faulty

 7    equipment?  If that was one of the reasons for a stop,

 8    I did look at the outcomes related to those stops.

 9            THE COURT:  So, here is what I think the

10    Government is saying about this.

11            They say there are a lot -- one of the things they

12    say is that there are a lot of reasons why people get

13    stopped.  And one of the ways you can tease out the

14    reasons for a stop is through progression analysis.

15    Candidly -- well, can you tell me why it is you didn't

16    do that here?

17            THE WITNESS:  Because the data provided wasn't

18    appropriate to a regression analysis.

19            THE COURT:  Why is that?

20            THE WITNESS:  So, there are also many rules for,

21    just like there are rules to chi-square, there are

22    rules for conducting regression analyses.  There are a

23    lot of -- there are in fact many more assumptions made

24    about the underlying data in a regression analysis than

25    there are chi-square analysis.  So, for example,

1    assumptions about the normality of the underlying data.

2    That it looks like a bell curve rather than being

3    looking some other way.

4         The assumption that there is not

5    multi-collinearity between --

6         MS KOENIG:  What does that mean?

7         THE WITNESS:  -- variables in the models.  And

8    essentially what that means is that some variables

9    would be related to other variables in the same model.

10   Right.

11        And so given there is also the assumption that

12   there is, that data on most, if not all of those

13   factors involving a stop, are included in the

14   regression model.  And that much of that data was asked

15   for and not supplied.  I chose the chi-square analysis

16   because that was the appropriate statistical test for

17   the level and type of data that was supplied.

18        THE COURT:  So, have you done other studies on

19   statistical studies, on the interaction between police

20   and civilians?

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.

23        In those other studies did you use chi-square

24   analysis?

25        THE WITNESS:  I have used chi-square analysis in

1    some of my published work and regression analysis in

2    others.

3          THE COURT:  Okay.

4    BY MS KOENIG:

5    Q    Dr. Coston, did you do so when the data set that

6    was before you leant itself to a particular type of

7    analysis?

8    A    Yes.

9    Q    In this case was it possible for you to do a

10   regression or multi-varied analysis given the data we

11   had?

12   A    I do not believe regression analysis would have

13   been appropriate for this data, no.

14         THE COURT:  The question was a different one.

15   Was, is it possible?  That is what she asked.

16         THE WITNESS:  So in statistics, is it possible to

17   run those numbers even if they violate the underlying

18   assumptions of a test?  So, you could put those numbers

19   in and you would get a statistic out, but it would not

20   be a reliable test statistic.

21         THE COURT:  Okay.

22   BY MS KOENIG:

23   Q    And that is the follow-up, Dr. Coston, is that,

24   yes, it is possible, but it would not produce reliable

25   data; is that right?

**JA1297**

Coston - direct                                              **47**

```
 1    A     It would not produce reliable results.

 2    Q     Okay.

 3          THE COURT:  Well, let's just sort of in the

 4    reality of this case, let's use my example I gave to

 5    you earlier.  Many of these arrests occurred in areas

 6    that are less wealthy than others.  And that would make

 7    it, it seems to me, possible that there could be cars

 8    there that were maybe -- that would get additional

 9    police attention because they have inspection problems,

10    lights out, but your analysis doesn't tell us whether

11    the police are looking at the race of the driver or

12    whether the tail light is out.

13          THE WITNESS:  Regression analysis also would not

14    tell you that.

15          THE COURT:  Well, whether there is a relationship

16    between the stops and the tail light being out.  So is

17    that, right?  Your analysis wouldn't tell us that.

18          THE WITNESS:  Could you repeat the question?

19          THE COURT:  Well, your analysis wouldn't tell us

20    whether the -- whether there was a relationship between

21    the number of stops and the number of tail lights that

22    were out.

23          You didn't do that.  Didn't run that data.  You

24    couldn't run that data.

25          THE WITNESS:  Right.  Because the police didn't
```

**JA1298**

1    note on their information other than it being an

2    equipment violation or something else.  Other reasons,

3    or a traffic violation.  There were three categories,

4    the reasons for the stop, equipment, traffic or other.

5          THE COURT:  There are a lot of different potential

6    relationships.

7          THE WITNESS:  Yes, there are many potential

8    relationships.

9          THE COURT:  And the existence of a relationship

10   does not tell us why the police do something.  Or does

11   it?

12         THE WITNESS:  Are you asking about an individual

13   officer, why an individual officer does something,

14   or --

15         THE COURT:  Well, I think --

16         THE WITNESS:  -- or more general?

17         THE COURT:  I think the theory in this case is

18   that the Richmond Police stopped black people more than

19   they stopped white people.

20         THE WITNESS:  Well --

21         THE COURT:  And I think the theory is that they do

22   it because they are African-American people.

23         THE WITNESS:  So, what we can do with data, what

24   we attempt to do with statistics is to understand large

25   scale patterns.  We cannot work backwards from those

1    large scale patterns to say this is why one individual

2    person --

3           THE COURT:  You can't say --

4           THE WITNESS:  -- did the thing they did.

5           THE COURT:  -- that Mr. Moore was stopped because

6    he was an African-American.

7           THE WITNESS:  No.

8           THE COURT:  And it just happened to work out that

9    everybody who was stopped was an African-American.

10          THE WITNESS:  So when we look at large scale

11   patterns what we can say is whether or not black people

12   are disproportionately stopped at higher rates,

13   disproportionately experience adverse outcomes when

14   they are stopped.

15          THE COURT:  Okay.  Well, let's take -- let's go

16   into that a little farther.

17          It seems to me that it might be a legitimate thing

18   to do for the police to have more officers or greater

19   presence in areas where there is more crime.  Do you

20   agree with that?  Well, you don't have to agree with

21   that.  That is policing technique.

22          THE WITNESS:  I do understand that, yes, that is a

23   popular deployment strategy for police, yes.

24          THE COURT:  So if they do that wouldn't there be

25   more traffic stops where there are more police driving

1   around?

2         THE WITNESS:  Yes.  That is part of the deployment

3   hypothesis.

4         THE COURT:  If there was more crime in

5   African-American areas of town it would be more police

6   there, right, if that is the strategy they chose.  I

7   mean, they could just ignore it, I guess, but I don't

8   think the Richmond Police do that.

9   BY MS KOENIG:

10  Q    Dr. Coston, do we know if in fact that assumption

11  is a valid one, that black people are committing more

12  crime?

13        THE COURT:  We don't know whether that is valid,

14  but if there is area where there are more calls for

15  police assistance.

16        THE WITNESS:  So what we know from the research on

17  this, is that in areas of town that experience more

18  crime they deploy more officers.  At the same time,

19  when more officers are deployed to those areas they

20  also end up enforcing a greater degree of laws, so what

21  we see is increases for lower level violations when

22  this occurs.  But essentially that creates a feedback

23  loop in which you are sending more officers, because

24  you have more officers observing more crime.  Does this

25  have spillover effects to traffic stops, are there more

1    officers looking for traffic stops when they are in
2    areas that they have been deployed to where they are
3    not finding other types of crime?  Absolutely.
4         THE COURT:  Have you ever read a book called
5    Locking Up Our Own?
6         THE WITNESS:  I have not read that book.
7         THE COURT:  Well, it is about -- it seems to me
8    that there is sort of a -- there are two interests.
9    One is that I think African-American people have a very
10   legitimate interest in not having the police patrol
11   their area like some sort of police state.  Like it
12   is -- like there are cops everywhere picking on them
13   about every little thing they do.  The other interest,
14   however, is that people who live in African-American
15   sections of town -- and if you -- excuse me -- I am
16   assuming what I have observed in 50 years living in
17   Richmond -- which is, that there is housing
18   segregation, de facto segregation.  But the people who
19   live in African-American sections of town also deserve
20   to have the police protect them from crime.  And this
21   case presents to me a conundrum.  If you have more
22   police there, you get more tickets.  But if you have
23   fewer police there, I guess the thought was when they
24   started defunding the police, that you had more, you
25   were not addressing crime.  And Ms Koenig stands before

1    me time and time again and points out to me that the

2    horrible problems caused by adverse childhood

3    experiences.  And among those adverse childhood

4    experiences are living in high crimes area where you

5    get up in the morning and sometimes on the way to

6    school you find syringes or you find dead bodies or

7    whatever.

8         MS KOENIG:  Your Honor, I think we have some

9    interesting things to bring to The Court that will

10   answers The Court's questions.

11        THE COURT:  Well, I ought to let you try the case.

12   You are the lawyer.

13        MS KOENIG:  I appreciate the questioning, Your

14   Honor.

15   BY MS KOENIG:

16   Q    Dr. Coston, I want to turn your attention to

17   defense exhibit number two.  Did you write a report in

18   this case, Dr. Coston?

19   A    Yes, I did.

20   Q    Is that what is depicted in defendant's exhibit

21   two?

22   A    Yes.

23        MS KOENIG:  I move for the admission of

24   defendant's exhibit number two?

25        THE COURT:  Well, that is hearsay.

Coston - direct                                    53

1        MS KOENIG:  It is his own report.

2        THE COURT:  I know it is his report, but it is an

3   out-of-court statement introduced to prove the truth

4   contained in it.

5        MS KOENIG:  I am going to point The Court to

6   Federal Rule of Evidence 803.18 which accepts from

7   hearsay evidence that the expert relies on in direct

8   examination and is reliable, as Dr. Coston is about to

9   testify.

10       THE COURT:  Well, his report is not information he

11  is relying on.

12       MS KOENIG:  If The Court wants to see it, that is

13  fine.

14       THE COURT:  I have already seen it.  It is in the

15  record in the case, and I have read it.

16       MS KOENIG:  Okay.

17       Dr. Coston --

18       THE COURT:  You filed it, right?

19       MS KOENIG:  I did.

20       THE COURT:  Okay.  And we have Dr. Smith's report

21  filed as well.  I read that as well.  I don't think it

22  is technically evidence in the case because it is his

23  out-of-court statement.

24  BY MS KOENIG:

25  Q    All right.  Fair enough.

**JA1304**

1          Dr. Coston, on page one under the area where it
2     says "traffic stop."  What was the purpose of including
3     this information in your analysis of the stop here?
4     Why did you talk about whether or not there is evidence
5     that shows that black or white drivers commit more
6     traffic infarctions than others?
7     A     So there is often a question about whether we are
8     seeing these differences because there are in fact
9     differences in the driving behaviors of black and white
10    drivers.  When we look at many studies they find there
11    are no differences between black and white drivers.
12    New Jersey Turnpike study is a notable exception.  It
13    indicated specifically that young black drivers may be
14    more likely to engage in excessive speeding, over
15    15 miles an hour over.  But, I think that that the
16    notable difference here is that the New Jersey Turnpike
17    is substantially different than most Richmond City
18    streets.  So I don't know that that particular finding
19    extrapolates to traffic data being analyzed, that I
20    analyzed for this case.
21    Q     Meaning that ultimately at the end of the day we
22    do not have data that indicates that black drivers in
23    Richmond are more likely to commit traffic infractions
24    than white drivers, right?
25    A     No, we do not have that data.

1   Q    If we could take my screen down.  Thank you.

2        So let's turn now to your analysis, Dr. Coston.

3   If you need to refer to the report let us know.

4   A    Okay.

5   Q    Let's first look at your summary data.  And I

6   believe you are turning to page six of the report to

7   refresh your recollection; is that right?

8   A    Yes.  My pages aren't numbered, but I believe that

9   is correct.

10  Q    Tell us what you found in terms of whether or not,

11  or did you make any determinations about the frequency

12  with which Richmond Police Department was stopping

13  black drivers?

14  A    Yes, summary data presents accounts by race of

15  driver, and also out of the total number of stops

16  determines what percentage of those stops were

17  particular races, as well as including in that summary

18  table other select variables that were included in

19  later analyses.

20  Q    Let's first talk about the race of the driver.

21  What did you specifically find as it relates to the

22  frequency of black and white drivers being stopped?

23  A    So, 77 percent of the drivers stopped in the data

24  analyzed were black.  And that means that black drivers

25  were 12.67 times more likely to be stopped than white

1   drivers.

2   Q    Go back for that.  I think 12.67 relates to the

3   arrest; is that right?

4   A    I'm sorry.  I was referencing the wrong number

5   there.

6        Yes.  That is for arrests.  35.13 times more

7   likely to be stopped.

8        THE COURT:  So let me just ask you a question,

9   Ms Koenig.  Do you need this report to be in evidence

10  in order to get all these charts into evidence?

11       MS KOENIG:  It would be helpful, Your Honor --

12       THE COURT:  All right.  I will reconsider my

13  ruling and admit it okay.

14       MS KOENIG:  Thank you, Your Honor.  I have no

15  objection --

16       THE COURT:  This report is admitted.

17       MS KOENIG:  -- no objection to Dr. Smith's report,

18  Your Honor.  I mean for the admission, Your Honor.

19       All right.  Let's look at table one then, which is

20  on page six, Dr. Coston.  So if we have 1,925 black

21  drivers that were stopped and 354 white drivers that

22  were stopped, tell us what you were just telling us

23  about what that means about the likelihood that black

24  drivers are going to be stopped more than white drivers

25  in Richmond.

1          THE WITNESS:   Black drivers are 5.13 times more

2     likely to be stopped than white drivers.

3     BY MS KOENIG:

4     Q      Again, the statistics are 77 percent of the

5     drivers that were stopped were black, 14.16 percent of

6     the drives were white; is that right?

7     A      That's correct.

8     Q      Do what can you say about proportionality of the

9     race of the drivers that the Richmond Police Department

10    stopped in our sample?

11    A      There was substantially greater proportion of

12    black driers arrested, or both stopped and arrested.

13    Q      That's pretty easy math.  We don't need a lot of

14    special statistics to figure that out, right?

15    A      Correct.

16    Q      Let's look now at the arrest data, which I believe

17    that you have depicted on page seven and table two; is

18    that right?

19    A      Yes.  Includes all the stops, whether individual

20    received a warning, a summons, or citation, or whether

21    they were arrested.

22    Q      So, if we are looking at arrests in particular,

23    what statistical analysis did do you to determine if

24    race had any effect on the result of the stop?

25    A      I conducted a chi-square analysis with race being

1    one variable, and outcome of the stop being the other

2    variables.

3    Q    What did you determine?

4    A    I determined that this was a statistically

5    significant relationship.  That race was in fact

6    related to the outcome of the stop.

7    Q    Why do we look for whether or not there is

8    statistical significance?  If something is

9    statistically significant, what does that mean?

10   A    So, the statistical significance indicates to us

11   that these results didn't happen just by chance.  That

12   there is a relationship that we wouldn't expect to find

13   by chance.

14        THE COURT:  Hold on for a second.  Tell me first,

15   tell me, what is statistically significant in this

16   table two?

17        THE WITNESS:  So the entire table is statistically

18   significant.  So the relationship within the two

19   variants is what is statistically significant.  And

20   then we can examine the individual cells.

21        THE COURT:  Hold on a second.  Two variables of

22   black drivers and white drivers, right?

23        MS KOENIG:  No, the race of the driver is one?

24        THE WITNESS:  Outcome of the stop is the other.

25        THE COURT:  But there are three parts of the stop.

1       THE WITNESS:  Yes.  But race and outcome are the

2  things that, the two variables that we are discussing.

3  So race and outcome are related.

4  BY MS KOENIG:

5  Q    So, Dr. Coston, did you run a chi-square analysis

6  on the drivers as they were arrested?

7  A    So, when we are looking at this table we actually

8  do is we examine the individual cells.  By that I mean

9  when we look at black drivers and arrests there were

10 152 black drivers arrested.  When we look at black

11 drivers, that is one cell.

12      Black drivers who received a summons or citation,

13 390.  So each of those represents an individual sell.

14      When we look at each of these cells contributes

15 overall to whether the chi-square test is statistically

16 significant.

17 Q    Let's break this down.

18      So, when we are looking at the race of the driver

19 as it relates to whether or not they got an arrest,

20 summons, or citation, and a warning, tell us what you

21 found in terms of percentages for black drivers on each

22 three of those possible outcomes.

23 A    So black drivers were arrested 7.91 percent of the

24 time, received a summons or citation 20.29 percent of

25 the time, and a warning 71.8 percent of the time.

Coston - direct                              60

1  Q     Then tell us the same information for white

2  drivers.

3  A     White drivers received -- were arrested

4  3.39 percent of the time.  They received a summons or

5  citation 33.05 percent of the time.  And a warning

6  63.56 percent of the time.

7  Q     What did the chi-square analysis tell you about --

8  let's start with the arrest data.

9  A     Black drivers were arrested more often than would

10  be expected by chance.

11  Q     So, were you able -- you made a finding that there

12  was a weak to moderate, but substantive effect of race

13  of the driver on the results of the stop; is that

14  right?

15  A     Yes.

16        THE COURT:  On the arrest part of the stop.

17  BY MS KOENIG:

18  Q     Yes.

19  A     The substantive effect is for the relationship

20  between the outcome and the race of driver.

21        THE COURT:  Tell me what that means.

22        THE WITNESS:  Substantive effect means if it is

23  statistically significant and meaningful, but that it

24  is a weak relationship.  So it can range anywhere from

25  very heavily, a very strong relationship between these

1    two things, one and the other are almost entirely

2    related to a weak relationship in which there is a

3    relationship that exists, but not a terribly strong

4    one.

5         THE COURT:  Let me just go back and look at this.

6    It seems to me if -- that there ought to be a strong

7    relationship between the race of the driver and the

8    fact of the stop based on the fact that 77 percent of

9    the people stopped are black and 14 percent are white.

10   BY MS KOENIG:

11   Q    Significant disproportionality; is that right,

12   Dr. Coston?

13   A    I think the question that you are asking, though,

14   is about whether an individual is actually stopped or

15   not, is that correct?

16        THE COURT:  No.  You have got two kinds of data

17   there.  Table one contains in the very top column, this

18   is a list of everybody that got stopped, right?

19        THE WITNESS:  Yes.

20        THE COURT:  So all we are looking at is whether

21   the police pulled them; is that right?

22        THE WITNESS:  In that to the left, yes.

23        THE COURT:  So would you characterize that as a

24   strong substantive relationship between race and being

25   stopped?

1          THE WITNESS:  I would say that there exists a

2     significant -- there exists a large disparity here.

3     With this particular type of data, though, just the

4     frequency and percents we can't determine statistical

5     significance.

6          MS KOENIG:  On that particular question, right?

7          THE COURT:  Why not?

8          THE WITNESS:  On table one?

9          THE COURT:  Yes.  On the first part of table one,

10     the race of the driver that gets stopped.

11          THE WITNESS:  Because we would have to, in that

12     instance we would have to know also what the population

13     of drivers who were not stopped was.  So we don't know

14     how many drivers end up, what races were not stopped.

15          THE COURT:  So, if you had --

16          THE WITNESS:  We would need that in order to

17     actually conduct a statistical test.

18          For that particular item.

19          THE COURT:  So would you need traffic information

20     for a particular -- the traffic count for some part of

21     the road?

22          THE WITNESS:  Well, we would need to know all the

23     drivers that were on the road during the same time that

24     all of these stops occurred.

25          THE COURT:  Right.  So, if we had one of those

Coston - direct                                        63

1    counters the Virginia Department of Transportation puts

2    across the road, a little wire, you could figure out

3    the number of drivers.

4          THE WITNESS:  We wouldn't know the race those

5    drivers.

6          THE COURT:  So you would need to know the drivers

7    and numbers --

8          THE WITNESS:  That's correct.

9          THE COURT:  -- in order to determine that.

10         MS KOENIG:  That the stops themselves are

11   statistically significant, right?

12         THE WITNESS:  Yes.

13         THE COURT:  Well, why isn't it significant that so

14   many more African-American people are stopped than

15   white people?

16         THE WITNESS:  So in terms of statistical

17   significance, that is a very specific statistical term.

18   I do think in the way that the every-day person would

19   use the word "significant" as being larger in the

20   courtroom, yes, that 77 percent is a large disparity

21   and a notable one.

22         THE COURT:  All right.  Go over then to table two.

23         Am I correct then that it looks like

24   African-American people are less likely to get a ticket

25   than white people?

1       THE WITNESS:  Yes.  That's correct in terms of raw

2    percentages.

3       THE COURT:  And more likely to get a warning as

4    opposed to a ticket; is that right?

5       THE WITNESS:  Yes.

6       MS KOENIG:  More likely to get arrested?

7       THE COURT:  And more likely to get arrested.

8       THE WITNESS:  The summons citations portion of

9    data was close enough that that could be due to chance.

10   The difference on both arrests and warnings, though,

11   was significant or was more notable.

12   BY MS KOENIG:

13   Q    Statistically significant?

14   A    Again, overall table is statistically significant,

15   we can't talk about the statistical significance of

16   individual cells.  Only how much they contribute to the

17   overall model.

18   Q    Ultimately what you determined was that black

19   drivers were more likely than white drivers -- or black

20   drivers were arrested more often and white drivers were

21   arrested less often than expected by chance?

22   A    That's correct.

23   Q    Next I want to look at the search data, which is

24   displayed on page eight of the report and table three.

25       So, again, this is relating to searches of persons

1    and searches of vehicle by race, right?

2    A      Correct.

3           THE COURT:  All right.  Let's define what a search

4    is.  I know what a search of a person is.  For purposes

5    of this if an officer looks in your car with a

6    flashlight from outside, is that defined as a search?

7           THE WITNESS:  The police themselves are the ones

8    who classified whether they searched the vehicle when

9    they submitted this data to the Virginia Department of

10   State Police.

11          THE COURT:  So we don't know --

12          THE WITNESS:  This is based on police's own

13   classification as to whether they searched the vehicle

14   or a person.

15          THE COURT:  So we don't know whether this means

16   somebody just looked in through the windows to see what

17   is going on inside, or got inside and tossed around

18   inside the car to see what is in the glove box.

19   BY MS KOENIG:

20   Q      We did not get any definitions; is that right,

21   what police meant when entered the term "search?"

22   A      No, I did not receive definitions.

23   Q      What statistical analysis did you do to determine

24   to if race had any effect on whether Richmond Police

25   Department officers searched a person or a car involved

1    in a traffic stop?

2    A     I conducted chi-square analysis for this as well.

3    Q     What did you determine?

4    A     The results were for both stops of, searches of

5    person and searches of vehicles were statistically

6    significant.

7          THE COURT:  Was it weak or strong significance?

8          THE WITNESS:  So, in regards to a person being

9    searched there was weak effect.  And the same is true

10   for vehicle searches.

11   BY MS KOENIG:

12   Q     Now, Dr. Coston, let's talk about sample sizes

13   versus overall population.  Why do you even do this

14   statistical analysis with a sample?

15   A     Okay.  So, essentially samples we can use to

16   generalize to a larger population of stops.  So,

17   essentially it is virtually impossible -- well not

18   virtually impossible -- very, very difficult to account

19   for an entire population of something.  This is why we

20   only conduct a census every ten years.  And even then

21   we are not able to reach every single person in the

22   United States.

23         So because we don't know every single instance in

24   a larger population we can use statistics to generalize

25   from a particular sample to what occurs in the

1   population.

2       When we talk about statistical significance we are

3   saying that the relationship that exists in our sample

4   also exists in a larger population.

5   Q   Meaning that if something is statistically

6   significant, it has been reliable to extrapolate out to

7   the population itself.

8   A   Yes.

9       THE COURT:  So you would think if something is

10  statistically significant, then if we look over the

11  years we would find that 7.91 percent of

12  African-American people get arrested after car stops.

13      THE WITNESS:  We wouldn't necessarily find that

14  exact percentage, but we would likely find that

15  African-Americans are more likely, still more likely

16  than chance, to be arrested than whites are during

17  traffic stops.

18      THE COURT:  Okay.

19      MS KOENIG:  So let's look now at table four.

20      THE COURT:  Before we get to table four, are you

21  going to discuss Cramer V?

22      MS KOENIG:  Haven't gotten there yet.  Just about.

23      THE COURT:  I thought Cramer V was discussed with

24  respect to a lot of these.

25  Q   Kendall Tau was related to table four.  Can you

1    tell us what Kendall Tau is, Dr. Coston?

2           THE COURT:  About what?

3    BY MS KOENIG:

4    Q     Kendall Tau.  K-E-N-D-A-L-L.  T-A-U, separate

5    word.

6    A     Kendall Tau and Cramer V are both statistics that

7    that are used to calculate strength of a relationship

8    after conducting chi-square test.

9           So the differences are largely based on the number

10   of cells in a table.  But both measure the strength of

11   a relationship.

12   Q     Is Kendall Tau and Cramer V, are those typical

13   tools that you use in your day-to-day professional life

14   of when you conduct statistical analysis?

15   A     When I would conduct a chi-square, yes.  Those

16   measures wouldn't be appropriate go other types of

17   statistics.

18          THE COURT:  Dr. Smith says that chi-square is not

19   an appropriate way to analyze traffic stops.

20          What do you think about that?

21   BY MS KOENIG:

22   Q     You can answer honestly, Dr. Coston.

23   A     I disagree.  I think given the nature of the data

24   here that is incorrect.  I disagree with Dr. Smith's

25   analysis of the data and application of the regression

1    techniques.

2           THE COURT:  Okay.  Is he in your department?

3           THE WITNESS:  No.  But even if he was, I would

4    would still disagree.

5           THE COURT:  Still disagree.

6           If he was chairman of the department would you?

7           THE WITNESS:  Yes, I would.

8           THE COURT:  Okay.

9    BY MS KOENIG:

10   Q    So tell us, Dr. Coston, about what you found in

11   table four.

12   A    So table four looks at the association between

13   race of driver and the result of the stop for both

14   traffic stops.  They are traffic violations and also

15   separately those are equipment violations.

16   Q    So, it is similar to what was depicted in table

17   three, it just breaks down the stops into stops that

18   were based on traffic violations versus stops based on

19   equipment violations?

20   A    That's correct.

21   Q    Okay.  Again, what statistical test or analysis

22   did you do determine if race had any effect on this

23   table?

24   A    Chi-square analysis was conducted.

25   Q    What did you determine?

1   A    That for equipment violations and race of driver

2   that there is a relationship between those two.

3   Q    A statistically significant relationship?

4   A    Yes.

5        THE COURT:  Let's back up a second.  Kendall Tau

6   and Cramer V, are these -- is there a number that is,

7   that is Kendall Tau, like seven or something like

8   that --

9   A    So both of these --

10       THE COURT:  -- or are these techniques you use?

11       THE WITNESS:  No, essentially these are numbers

12  that can range from strength of association, ranges

13  from zero, essentially that would no association

14  whatsoever; to one or negative one, which would mean

15  that there was, that these two were completely aligned

16  with one another.

17       THE COURT:  When up say "association," is that the

18  same as relationship like you said earlier?

19       THE WITNESS:  Yes.

20       THE COURT:  Okay.

21       So, how do you figure out what Kendall Tau is?

22       THE WITNESS:  There is a formula for calculating

23  either Kendall Tau or Cramer V.

24       THE COURT:  You can figure these things out at one

25  point.

1          THE WITNESS:  Yes, they figure these things out.

2     BY MS KOENIG:

3     Q    So, meaning that it was more likely than, that the

4     data released black drivers got arrested on equipment

5     violations at stops more often than white drivers got

6     arrested less often on equipment violation stops than

7     expected by chance; is that right?

8     A    That's correct.

9     Q    Okay.

10         THE COURT:  Are you, we have gone an hour and a

11    half now.  Is this a stopping point?

12         MS KOENIG:  A natural stopping point, Your Honor.

13         THE COURT:  Let's take a ten minute beak.  All

14    right.

15                   (A recess was taken)

16    BY MS KOENIG:

17    Q    Your Honor, I am going to continue with Dr. Coston

18    now.  Let's turn to the mapping visualization you

19    created now.

20         First, start with the cluster map.  What is that?

21    A    Essentially a cluster map groups together stops

22    that occurred in close proximity to one another.  For

23    this particular cluster map I set that threshold to

24    five stops in close proximity.

25    Q    So how did you, and when talking about the cluster

Coston - direct                                        72

1    map, looking specifically at figures one and two on

2    page 89 of the report?

3    A     That's right.  Figure one presents the individual

4    stops.  Figure two presents the clustered stops.

5    Q     Okay.  So let's talk about first, how did you

6    create these maps?

7    A     So the coordinates, the latitude longitude

8    coordinates were imported into R GIF, which is a

9    geographical information system program.  And plotted

10   it onto a map.  The Richmond Police precincts were also

11   overlaid on top of that.  And the precinct maps comes

12   directly from the City of Richmond geo hub.

13   Q     If we can pull defense exhibit two up on to the

14   larger screen.

15         We talked about this, but we have some interesting

16   technology in this courtroom that allows to you touch

17   on screen in front of you.  And to draw on if need be.

18   You talked about overlaying the map first with the

19   precinct data.  When we see on the left hand side the

20   precinct, the blue line, is that what is indicative of

21   the precinct line?

22   A     Yes, it is.

23   Q     So when we see on the left hand side the area that

24   covers Stratford Hills and West Hampton, is that the

25   third precinct for Richmond Police Department?

Coston - direct                                    73

```
 1    A    Yes.

 2    Q    If we go to the right of that moving clockwise,

 3    and see an area that covers Highland Park, not East

 4    Highland Park, but where it is covered in red dots, is

 5    that the fourth precinct?

 6    A    Yes.

 7    Q    And if we keep moving down clockwise we see an

 8    area that says Church Hill.  Is that the first

 9    precinct?

10    A    Yes.

11    Q    If we go one more on the clock we get down to the

12    south side of Richmond; is that the second precinct?

13    A    Yes.

14    Q    And so you overlaid the precinct lines on to the

15    map itself, right?

16    A    Yes, that's correct.

17    Q    Tell us about the dots in figure one.

18    A    The dots represent individual traffic stops.  And

19    these are color coded for the race of the driver.  Red

20    dots indicating black drivers, and blue dots indicating

21    white drivers.  Purple Asian.  And orange, yellow and

22    orange, native American.  And those are also mapped

23    individually.

24    Q    On this map what does the green mean?

25    A    Green is drivers of unknown race.
```

**JA1324**

1    Q    Meaning the data was just not recorded?

2    A    I am not sure.  I believe that the officers could

3    probably record unknown.  There were some instances in

4    which there was, that field was entirely blank, so

5    unknown I believe is the officer recording it was

6    unknown versus just not submitting that data.

7    Q    Okay.  So tell us why you created this map in

8    figure one.

9    A    So, the map in figure one, again, represents

10   individual stops.  It helps us get a sense of the kind

11   of overall spread of those stops and where they

12   occurred in Richmond.

13   Q    And what does this map show us about whether black

14   and white drivers are stopped in Richmond?

15   A    So, I think that is actually a little bit easier

16   to see on the cluster map itself.

17   Q    Okay.

18   A    But essentially this shows the disbursement of

19   drivers of multiple races, and we can see to some

20   degree in this first map that the blue dots are kind of

21   randomly disbursed across the map whereas we do see

22   higher concentrations of red dots.

23   Q    Let's move then to figure two.

24        When you talk about clusters you said you set the

25   threshold for a cluster at five?

1    A    Yes.

2    Q    So any dot we see on figure two does that mean

3    there were at least five stops at that particular race

4    at that area?

5    A    Yes.  And larger dots indicate more stops in close

6    geographic proximity to one another.  So smaller dots

7    would be closer to five, and more dots would be more

8    than that.  Or bigger dots would be more than that.

9    Q    So what does this visualization help us see?

10   A    So I think it illustrated here that we do see

11   clusters of stops of black drivers in all of the

12   precincts, but really only see clusters of white

13   drivers stopped in the third precinct.

14   Q    I want to draw your attention now to what has

15   already been admitted as exhibit R-2 in this case.

16        Are you familiar with the University of Virginia

17   Weldon Copper Center for Public Services racial dot

18   map?

19   A    Yes.

20   Q    Was that program analyzing the census data from

21   2010?

22   A    Yes.

23   Q    Did the Center plot each reported race of the

24   individuals that were counted in the 2010 census and

25   create maples of that effect?

Coston - direct                              **76**

```
 1    A     Yes.

 2    Q     Does so in R-2 we can see here that in this map

 3    white persons are depicted in blue dots, right?

 4    A     That's correct.

 5    Q     And black people are depicted in green dots,

 6    right?

 7    A     Yes.

 8    Q     Okay.

 9          So if we were to look at the left hand side of the

10    map, is that consistent with what we see in the third

11    precinct?

12    A     Yes.

13    Q     Then moving around the fourth, first, and second,

14    we see that we would have more green dots in the, far

15    more green dots in the fourth, second and first

16    precincts; is that correct?

17    A     Yes, that's correct.

18    Q     Okay.

19          THE COURT:  Well, go back to that --

20          MS KOENIG:  Yes, Your Honor?

21          THE COURT:  -- for a second.

22          Does this include only -- is this area in the City

23    of Richmond?

24          MS KOENIG:  This map is not.  Just limited to the

25    precincts.
```

**JA1327**

Coston - direct                                77

1          THE COURT:  That is what I thought.

2    BY MS KOENIG:

3    Q    Is that right, Dr. Coston?

4    A    This is not limited to only the precinct, no.

5    Q    Okay.

6          THE COURT:  Limited only to the City?

7          MS KOENIG:  Correct.

8          THE WITNESS:  Some of this is in Henrico and

9    Chesterfield, looks like.

10         MS KOENIG:  Correct.

11   BY MS KOENIG:

12   Q    So let's go back to figure two.

13         I started, I was interrupting you about what you

14   could tell in terms of the, what this information

15   visually tells us about where people of different races

16   are stopped in the City of Richmond?

17   A    So black drivers are stopped in all precincts.

18   Black drivers are stopped in clusters in predominantly

19   white neighborhoods.  Also in predominantly black

20   neighborhoods.  And predominantly Hispanic.  White

21   drivers cluster only in neighborhoods predominantly

22   white.

23   Q    Meaning precinct neighborhoods?

24   A    Correct.

25   Q    Now, let's turn to figure three.  You have

**JA1328**

1    discussed the heat map.  What is a heat map?

2    A    So heat maps essentially display the density of

3    traffic stops.  So, instead of looking at the

4    individual dots and also not clusters, these heat maps

5    allow us to look at the overall spread as well as the

6    density.  So the bright yellow and red areas indicating

7    higher densities of stops.

8    Q    Okay.

9         THE COURT:  Hold on.  I was writing something down

10   and missed part of that.

11        Ask the question again.

12        THE WITNESS:  So that heat maps allow us to look

13   at both the overall spread of the stops, and also areas

14   of increased density.  So that areas in the bright

15   yellow, oranges and reds are higher density, while the

16   blue areas are lower density.

17   BY MS KOENIG:

18   Q    So if we look at figure three, what does figure

19   three depict for us?

20   A    So the interesting feature of figure three is the

21   areas of high density concentration.  We see one over

22   on the south side.  Kind of close to the James River

23   Park.  We also see one in central Richmond.  And then

24   one just north, slightly north of Church Hill.

25   Q    Figure three is the heat map or the density of

1    traffic stop of black drivers?

2    A    That's correct.

3    Q    And then if we look at figure four, what is figure

4    four showing us?

5    A    That is the heat map of density of stops of white

6    drivers.  And here we really only see one of those very

7    high density points.  Again --

8         THE COURT:  Same place that there is a high

9    density of blank drivers.

10        THE WITNESS:  Those are similar, yes.

11   Q    And so --

12        THE COURT:  Go ahead.

13   Q    What can, what does this visualization tell us

14   about the density of where stops are happening in

15   Richmond of white drivers?

16   A    Well, that particular set of stops, if we look at

17   the map that overlays; this number one occurs in the

18   third district, primarily white district.  Whereas when

19   we compare it to the map of high density stops of black

20   drivers, those occur in multiple precincts.  Relatively

21   white.

22   Q    Is the overall density of white drivers more

23   disperse throughout all parts of Richmond?

24   A    Yes, it is.

25   Q    Let's look now at figure five.  Tell us just how

1    you created figure five.

2    A    So figure five overlays the heat map showing stops

3    of black drivers with the racial demographics of the

4    City from the most recent American Community survey.

5    Q    What is the American Community Survey?

6    A    It is used to supplement census data.  Because we

7    only take census every ten years, population shifts

8    during that ten-year time period.  The American

9    Community Survey includes information that updates much

10   of that information, and also provides additional

11   information above and beyond census takes, because that

12   is limited.  But essentially this provides us with more

13   accurate data about the change in racial composition

14   versus using, for example, the 2010 census information.

15   Q    The data that you pull from American Community

16   Survey, what were the years for that data?

17   A    I believe that is 2015 to 2019.

18   Q    Would looking at your report help refresh your

19   recollection?

20   A    Yes.  Yes.  2015 to 2019.  That is correct.

21   Q    And who conducts the American Community Survey?

22   A    The American Community Survey is conducted --

23   Q    Does the Census Bureau do it, or some other

24   organization do it?

25   A    It is under the Census Bureau, it is a supplement

1   to the census.

2   Q   Okay.

3       Basically you don't want to wait for another ten

4   years to see what is happening in the population.  So

5   they go out and do these smaller samples to get data

6   that they generate, right?

7   A   That's correct.

8   Q   So, when you got the American Community Survey

9   data, what does that show us on figure five?  How did

10   you plot that data?

11   A   So this is a graphical overlay.  The Census Bureau

12   has available maps on R GIF's data hub that are

13   publicly accessible.  So I overlaid their Community

14   Survey racial demographics over the map that also have

15   the heat map.  And precinct map.  So what we see is

16   that the brown sections are predominantly non Hispanic,

17   white; the yellow sections are predominantly black; and

18   the blue sections, which are a little bit harder to see

19   here given the coloring, unfortunately you can't alter

20   much of the coloring because these are thermos; is

21   predominantly Hispanic or Latino.

22   Q   And so when you were looking at this information

23   you have used worry "dominantly," right, in how you

24   phrase this.  When we look at the UVA racial dot map,

25   that shows us it is really more than predominant,

USCA4 Appeal: 24-4201     Doc: 22-4     Filed: 09/04/2024     Pg: 96 of 406

1    right?  That the west end of town in Richmond is almost

2    entirely white families, right?

3    A    That's correct.

4    Q    And the other parts of town almost entirely black

5    with some areas of latino families, right?

6    A    Yes.  And you see it is difficult to see the

7    predominance on the map, the colors are slightly darker

8    for the racial categories when they are more

9    predominant, but, yes, these are largely segregated

10   neighborhoods.

11   Q    Okay.

12        So tell us what we see in terms of the high

13   density areas as it relates at high density area as

14   relates to the south, the south of the river near

15   Janhke Road in the third precinct.

16   A    This is, this is an area of, high area of density

17   for stops.  And what we see is that most of the density

18   occurs in what is a predominantly white area of town,

19   but also overlaps so where a predominantly white and

20   predominantly black area of town butt up against each

21   other.

22   Q    So if we compare the cluster map that you

23   generated in figure two --

24   A    We are looking at this cluster.

25   Q    -- so we see red dot there, right?

1    A    Yes, predominantly red dots, even though that is a

2    higher density area or white drivers there is no

3    corresponding cluster of white drivers there.

4         THE COURT:  Well, there is.

5         THE WITNESS:  Higher density, but there is --

6         THE COURT:  If you look at figure two.

7         MS KOENIG:  Figure four, Your Honor?

8         THE COURT:  Yes, figure four.  There is a cluster

9    there of white drivers as well.

10        THE WITNESS:  It is higher density, but it is not

11   the same, it's not a cluster larger than five.

12        THE COURT:  But it is -- the heat map shows that

13   there is a --

14        THE WITNESS:  The heat map doesn't indicate the

15   number, but the cluster does.

16   BY MS KOENIG:

17   Q    Tell us a little more specifically about that.  We

18   have got --

19        THE COURT:  It's not -- there is not a white

20   cluster.  So where that is is where the Boulevard

21   intersects Jahnke Road, which is an area that is, as

22   you pointed out, area where there is a large black

23   population bordering a white population.

24        THE WITNESS:  Correct.

25   BY MS KOENIG:

Coston - direct                                    **84**

1   Q    So, just to make sure I am clear.  So it is not

2   that there were no white drivers that were stopped in

3   that area, just that it wasn't enough no generate

4   cluster dots, unlike the black drivers that were

5   stopped in that area?

6   A    That's correct.

7   Q    All right.

8        Let's go back to figure five.  Let's look at the

9   high density area of stops that is in the fourth

10  precinct north of downtown.

11       THE COURT:  Can you get that purple thing off

12  that, Wendy?

13       All right.  Thank you.

14  BY MS KOENIG:

15  Q    Circle the area I am talking about, Dr. Coston.

16  A    Could you repeat that?

17  Q    High density area of stops that we see that is in

18  the fourth precinct a little north of downtown.  Tell

19  us about that area.

20  A    So, again, this is area in which we see

21  predominantly black neighborhood butting up against a

22  predominantly white neighborhood.  And both high

23  density of stopped of black drivers as well as cluster

24  of black drivers contained there.

25  Q    So let's compare that area of figure five to the

**JA1335**

1    cluster area in figure two.

2    A    Which would be right here.

3    Q    Circling for the record essentially the lowest

4    large cluster dot in the fourth precinct?

5    A    That is correct.

6    Q    Okay.

7         Do you ever --

8         THE COURT:  Do you know what street that is?

9    Approximately what intersection that is?

10        THE WITNESS:  This would be near the Jackson Ward

11   Leigh Street area.

12        THE COURT:  Okay.

13   BY MS KOENIG:

14   Q    Going back to figure five again, Dr. Coston, do we

15   see that that area of high density of stops of black

16   drivers happened in an area where there is a white

17   neighborhood that abuts a black neighborhood?

18   A    Yes.

19   Q    Dr. Coston, have other academics used similar

20   tools, cluster maps and heat maps to visualize data

21   when studying racial profiling?

22   A    Yes, they have.

23   Q    I am gong to show you if can look in the folder

24   what has been marked defendant's exhibit four.

25        Your Honor, there had been previously submitted in

1    the case as ECF number 72.  Exhibit K.
2          Is this an article, Dr. Coston, in which the
3    accuracy in this article used similar source of
4    mapping?
5    A    Yes.
6    Q    I want to show you what has been marked as exhibit
7    five.  If you could turn to that one in your book.
8    Again, defense exhibit five, which, Your Honor, has
9    already been submitted as ECF number 72, exhibit N.
10         Is that another example of when accuracy used
11   similar source of mapping in similar studies?
12   A    Yes.
13         THE COURT:  All right.  Exhibit four and five are
14   admitted.
15         Do either of these use the chi-square technique?
16         THE WITNESS:  No, that is a separate technique.
17         THE COURT:  Okay.
18   BY MS KOENIG:
19   Q    Dr. Coston, I want to talk to you about, you are
20   not the only person to find disproportionate effects of
21   black drivers in Richmond; is that right?
22   A    That is correct.
23   Q    Let's take a look at a few other analyses of the
24   relationship between race and training stops in
25   Richmond.  First I want to turn your attention to

1    defendant's exhibits exhibit six, which, Your Honor, is

2    I think the same as Government's exhibit one.

3           Dr. Coston, have you specifically learned about

4    Virginia's Department of Criminal Justice Services

5    which analyze similar data was presented to you in this

6    case?

7    A    Yes.

8           THE COURT:  And government has moved for exhibit,

9    or offered exhibit six as an exhibit as well.

10          MS KOENIG:  I think it as Government's exhibit

11   one, Your Honor, that has already been submitted in

12   this case as ECF 72, exhibit G, just to keep things in

13   order.

14   BY MS KOENIG:

15   Q    So the Department of Criminal Justice Services

16   produced a report about the amount they conducted,

17   right?

18   A    Yes.

19   Q    The report was overall state-wide data generally,

20   right?

21   A    Yes.  Census data out by localities as well.

22   Q    Then, as you said, specific information from

23   localities that were submitted, right?

24   A    Yes.

25   Q    So let's take a look at page 58 here.

Coston - direct                                          88

1          THE COURT:  Page 58?

2          MS KOENIG:  Your Honor, I have a different, in

3    order for me to pull it up on the PDF it is a different

4    page, but when you look at the pagination that is

5    native to the document it is page 58.

6          THE COURT:  Okay.  On the map.  Got it.

7    BY MS KOENIG:

8    Q    All right.

9          So, Dr. Coston, what does this information on page

10   58 tell about what the Department found in terms of

11   Richmond and drivers being stopped by the Richmond

12   Police Department?

13   A    So, it showed moderate over-representation of

14   black drivers and no over-representation of white

15   drivers.

16   Q    Let's look at the next page, page 59.  What does

17   this information on native page 59 tell us about what

18   the Department found in terms of Richmond?

19   A    Again, moderate over-representation of black

20   drivers and no over-representation of while drivers.

21   Q    Then look at page 60 of this report.  What did the

22   Department find in terms of Richmond on this page?

23   A    Moderate over-representation of black drivers and

24   no over-representation of white drivers.

25   Q    Okay.

Coston - direct                    **89**

1        Now, on the left hand side of each of those maps

2    where it has the colors that represent the level of

3    over-representation in the parenthesis we see something

4    that says DI, right?

5    A    Yes.

6    Q    Is DI a statistical tool you would use in your

7    normal day-to-day career?

8    A    No.  DI stands for disparity index, and this was

9    something that they created within the Department to

10   represent the level of disparity in terms of

11   representation in the population, essentially.

12   Q    So it wasn't a statistical tool, right, that you

13   would use in your expert analysis?

14   A    No, this is not a tool that I would use.

15   Q    But ultimately what they found, the findings are

16   similar to what you found in terms of your statistical

17   significance analysis?

18   A    Yes, they still found there were disparities.

19   Each of these in terms of arrests of drivers, searches

20   of drivers, and stops of drivers all indicate moderate

21   disparities for black drivers and no

22   over-representation of white drivers.

23   Q    Dr. Coston, you had also helped the Richmond

24   transparency, transparency and accountability project

25   in 2018 analyze data that it had obtained from the

**JA1340**

                            Coston - direct                    **90**

 1    Richmond Police Department, right?

 2    A     That's correct.

 3    Q     That group is commonly referred to as R TAP?

 4    A     Yes.

 5    Q     Did R TAP produce a report about that analysis?

 6    A     Yes, they did.

 7    Q     Look at what has been marked defendant's exhibit

 8    16.

 9          Do you recognize this defendant's exhibit 16 as R

10    TAP report from 2018?

11    A     Yes, I do.

12          MS KOENIG:  Your Honor, I move to admit

13    defendant's exhibit 16.

14          THE COURT:  Admitted.

15    BY MS KOENIG:

16    Q     Specifically let's take a look at page 11 of that

17    report.  In the R TAP analysis did you make any

18    findings about traffic arrests of black people in

19    Richmond?

20    A     Yes.

21          For the time period under investigation,

22    January 2017 to October 2018, black people accounted

23    for 75 percent of all traffic arrests or arrests from

24    traffic stops.

25    Q     So what did that mean in terms of the likelihood

Coston - direct                                91

```
 1    that black people were going to be arrested during the

 2    traffic stop?

 3    A    Black people were 31 percent more likely than

 4    white people.

 5    Q    Now, as part of your work in this case you have

 6    reviewed some materials that Dr. Michael Smith, the

 7    government's expert, prepared, right?

 8    A    That's correct.

 9    Q    I want to first draw your attention to defendant's

10    exhibit seven.  Did Dr. Smith write an article about a

11    traffic study or traffic stop study that he conducted

12    from February 14 of 2000 to March 31 of 2000?

13    A    Yes.

14    Q    Is that what is reflected in exhibit seven?

15    A    Yes.

16         MS KOENIG:  Your Honor, I move for admission.

17         THE COURT:  Admitted.

18    BY MS KOENIG:

19    Q    So, specifically, let's look at page 12 as it is

20    paginated in the article.

21         What did Dr. Smith find in his 2001 article based

22    on the 2000 data in terms of the percentage of traffic

23    strops conducted by race?

24    A    White drivers accounted for 32.1 percent of all

25    stops, and black drivers accounted for 64.2 percent.
```

1   Q    Now, the analysis that Dr. Smith did was of a

2   different set of data than we had access to, right?

3   A    That's correct.

4   Q    And was Dr. Smith's study conducted in conjunction

5   with cooperation with the Richmond Police Department?

6   A    Yes.

7   Q    Meaning that he was able to work with them to set

8   the variables of the data to be collected; is that

9   right?

10  A    I wouldn't be personally privy to the extent of

11  his involvement in that process.

12  Q    Certainly had a larger scope of variables than

13  what we had access to in this case?

14  A    I only had access to what was collected by someone

15  else, yes.  Whereas in a jointly prepared study you

16  would likely have more access or access to decide what

17  variables were included.

18  Q    For example, in this case Dr. Smith had

19  information about the officer's age, or the officer's

20  race, different things like that, right?

21  A    Yes, that is correct.

22  Q    So, Dr. Smith's report discusses using a

23  multivariate regression analysis?

24  A    Yes.

25  Q    We talked about what that is already.  Tell us

1    more about what happened in the regression analysis in

2    this case.   In this study.

3    A    Well, Dr. Smith conducted more than a regression

4    analysis in this study.   So it depends which one you

5    are referring to.

6    Q    Did he do one specifically about -- well, how did

7    he use race of the driver in this case?

8    A    So, in the first regression analysis this

9    presented essentially race was included as the

10   dependent variable rather than one of many independent

11   variables.   So this is part of the reason when you

12   asked whether I agreed with Dr. Smith, race is almost

13   never used as a dependent variable.

14   Q    Why?

15   A    It is almost always used as an independent

16   variable.

17        THE COURT:   Let's pretend I don't know the

18   difference.

19        THE WITNESS:   Sure.   So usually when we are

20   talking about dependent variables we are talking about

21   an outcome.

22        Independent variables are things that are used to

23   predict the particular outcome.

24        Well, race isn't really an outcome that you are

25   trying to predict.   And so, yes, he frames it in terms

Coston - direct                                                    **94**

1    of predicting the race of the driver stopped, but most

2    regression analyses would not do that.  They would

3    include race as an independent variable looking at, for

4    example, what the outcome of the stop was, whether

5    people received a summons or a vio -- a summons or were

6    arrested or a warning similar to the data I looked at.

7    BY MS KOENIG:

8    Q    Well, so because you talked about earlier in your

9    testimony, it was not, you who would not have been able

10   to produce reliable data if you had done a regression

11   analysis, right?

12   A    That's correct.

13   Q    So does that mean in your finding showing various

14   pieces of data that we talked about already are

15   statistically significant, does that mean that your

16   findings are less valid because of that?

17   A    No.  My findings are less valid.

18   Q    Okay.  That is what I mean, because you had to use

19   the chi-square analysis as opposed to the regression

20   analysis?

21   A    So all of these statistical tests are equally

22   valid if they are conducted in accordance with the

23   rules for conducting them.  So, multiple different

24   types of tests actually might be used to come to

25   similar results given different types of data.

**JA1345**

1        So, the validity of a test is really -- what you

2    are asking about is whether it was appropriate to the

3    data and whether when you model that, for example, by

4    choosing what variables go into a regression that you

5    are doing that appropriately.  Just because you can

6    make race the dependent variable doesn't mean you

7    should make race the dependent variable.

8    Q    I want to talk with now about benchmarking.

9         What is benchmarking?

10   A    So, benchmarking is essentially a means of

11   determining, okay, what are we making this in

12   comparison to.  So, for example, are we comparing when

13   looking at drivers, we can't know the entire population

14   of drivers without observing every single driver that

15   has driven in the City of Richmond at any given point

16   in time.  So therefore we have to use benchmarks to

17   infer about the larger population of drivers.

18   Q    And so Dr. Smith has -- what's the benchmark you

19   used again?

20   A    So the benchmark is the American Community Survey

21   data.  That is the supplement to census data.

22   Q    So the census projection data, right?

23   A    Yes.

24   Q    And so Dr. Smith had suggested in his review of

25   your work that you could have done other forms of

1    benchmarking in this case.  For one he suggests you
2    could have done direct field observation.  Is that
3    true?  Could you have done direct field observation at
4    the relevant times in this case?
5    A    No.  Because we can't go back in time to observe
6    all of those stops.
7    Q    And even if you could, are there very many direct
8    field observations that are done in cases like this?
9    A    No.  They tend to be cost prohibitive.
10   Q    Dr. Smith also suggests that you could have done a
11   veil of darkness survey.  What is a veil of darkness
12   analysis?
13   A    So the veil of darkness proposes that when
14   officers can't see the race of a driver, when it is
15   dark outside, the racial disparities would be
16   eliminated because officer bias can't present itself in
17   the equation.  That type of analysis couldn't be done
18   because there was no time stamp data on the data that
19   was provided.
20   Q    Had we received time stamp data, in theory that
21   could have been done, right?
22   A    Yes.
23   Q    But we did not have that data?
24   A    No.
25        THE COURT:  H Low would you get that data?

Coston - direct                              **97**

```
 1   BY MS KOENIG:

 2   Q    Would we have gotten that gotten data if the

 3   Police Department had given us potentially reports for

 4   individual stops?

 5   A    Yes.  I believe that was the data that was

 6   actually requested from them that they declined to

 7   provide.

 8   Q    Dr. Smith also suggests that you could have done a

 9   crash data analysis.  That is a benchmarking tool that

10   he helped create; is that right?  Or form?

11   A    Yes.  That is another type of benchmarking

12   analysis.

13   Q    Did you have crash data to be able to utilize for

14   analysis in this case?

15   A    No.

16   Q    So, ultimately you said you used the American

17   Community Survey data, which is census data as the

18   benchmark; is that right?

19   A    Yes.

20   Q    And --

21   A    And census benchmarking is very common in studies

22   of traffic stops.  In fact, Dr. Smith uses census

23   benchmarking in the 2001 study.

24   Q    So did the Department of Criminal Justice Services

25   in analyzing the Virginity, excuse me, the Virginia
```

Coston - direct         **98**

1   Community Policing Act data in defendant's exhibit six?

2   Right?

3   A    Yes.   The Department of Criminal Justice Services

4   also used census benchmarking.

5   Q    Let's take a look at defendant's exhibit eight.

6       Dr. Coston, do you recognize defendant's exhibit

7   eight as an article where academics were studying the

8   New York City Police Department stop and frisk policy

9   in 2015?

10   A    Yes.

11   Q    Did this, did the -- Your Honor, that has already

12   been submitted as ECF 72, exhibit J, in this case.

13       THE COURT:   All right.   That doesn't put it in

14   evidence.

15   BY MS KOENIG:

16   Q    I do.

17       But the academics in this article, Dr. Coston, did

18   they also use census data as benchmark for their study?

19   A    Yes, they used the American Community Survey

20   projections based on census.

21       THE COURT:   All right, admitted.

22   BY MS KOENIG:

23   Q    Is any benchmark perfect?

24   A    No.

25   Q    And is census data in your experience widely

**JA1349**

1    utilized in academic studies as a benchmark?

2    A    Yes.

3         THE COURT:  Well, I guess it could be a more

4    accurate benchmark in some areas than others, right?

5    Census data doesn't really tell you everything that

6    about who is on the road.  It might tell you everybody

7    about who is living on a particular set of blocks,

8    right?

9         THE WITNESS:  That's correct.  But, the other

10   types of benchmarking we have don't tell us exactly who

11   is on the road --

12        THE COURT:  Well --

13        THE WITNESS:  -- at all times, either.

14        THE COURT:  Well, other than parking a student out

15   there and monitoring all the traffic could tell you

16   that.

17        THE WITNESS:  Right.  But we would also have to be

18   at all of these locations simultaneously, which is why

19   direct observation isn't typically used.

20   BY MS KOENIG:

21   Q    Dr. Coston, at the end of the day did you have an

22   opinion or a finding, did you make findings about what

23   the data showed in this case?

24   A    Yes, I did.

25        Based on the analysis of available data, and the

**JA1350**

1    statistically significant findings about black drivers

2    being disadvantaged across multiple aspects of these

3    stops ranging from arrests to searches, et cetera, in

4    terms of traffic stops there are disparate impacts of

5    policing on black people who are stopped in Richmond.

6         MS KOENIG:  No further questions, Your Honor.

7         The government will probably have some questions

8    for you.

9         THE WITNESS:  Okay.

10        THE COURT:  Probably will.

11        All right.  Cross examination?

12        MR. GIBBONS:  I do have cross examination, yes.

13        THE COURT:  Mr. Shea, let's hear from you.

14        Did you introduce all the exhibits you wanted to?

15                    CROSS EXAMINATION

16        MS KOENIG:  Yes, Your Honor.

17        MR. GIBBONS:  Your Honor, between me and him I am

18   not sure Mr. Seibert understood the statistics well

19   enough to --

20        THE COURT:  Well, Mr. Seibert and I are in the

21   same boat on this.

22        Go ahead, Mr. Shea.

23        MR. GIBBONS:  Let me make one note, Your Honor, so

24   I make sure to come back to it.

25        THE COURT:  How long do you think cross will take?

Coston - cross

1          MR. SIEBERT:  Might take us to 5:00 o'clock, Your

2     Honor.

3          THE COURT:  Okay.  Well, the question I meant to

4     ask -- sorry -- you are not Mr. Shea, you are Mr.

5     Gibbons.  Sorry.

6          That was my fault.

7          Shea is the first name.

8          One question I meant to ask him.  First of all,

9     Dr --

10          THE WITNESS:  Coston.

11          THE COURT:  -- Coston, are you being paid?

12          THE WITNESS:  Yes.

13          THE COURT:  And what is your compensation for

14     testifying?

15          THE WITNESS: $150 per hour.

16          THE COURT:  Is that the same compensation for

17     preparation for testimony?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.

20          How much have you billed so far in the case?

21          THE WITNESS:  I am not certain the exact number.

22     I only submitted a bill for producing the report.

23          THE COURT:  How much did you bill for producing

24     the report?

25          THE WITNESS:  That was 40 hours.

Coston - cross                                    102

1          THE COURT:  So that was roughly $60,000.

2          THE WITNESS:  No, not, 60.  6,000.

3          THE COURT:  Sorry.

4          THE WITNESS:  Yes.

5          THE COURT:  That is why I am not a statistician.

6     6,000 to produce the report.  And then you spent time

7     getting ready for today?

8          And have you testified in the past?

9          THE WITNESS:  No, I have not.

10         THE COURT:  Ever been recognized as an expert

11    before?

12         THE WITNESS:  Yes.  Not by a court.

13         THE COURT:  Okay.

14         THE WITNESS:  I am an expert advisor to the Bureau

15    of Justice Statistics.

16         THE COURT:  What is the Bureau of Justice?

17         THE WITNESS:  Bureau of Justice of Statistics

18    maintains all the statistics for the Bureau of Justice.

19    So, uniform crime reports, national crime victimization

20    survey, national data collection related to issues

21    of --

22         THE COURT:  Is the Bureau of Justice some kind of

23    government agency?

24         THE WITNESS:  Yes.  Federal agency.

25         THE COURT:  Is that like a Department of Justice?

 1          THE WITNESS:  Yes.

 2          THE COURT:  Okay.

 3          THE WITNESS:  Bureau of Justice Statistics is

 4     associated --

 5          THE COURT:  Part of the Justice Department?

 6          THE WITNESS:  Yes.

 7          THE COURT:  And you are what with them?

 8          THE WITNESS:  I am an expert advisor to them of

 9     their statistics and data collection.

10          THE COURT:  Great.  Thank you.

11          Go ahead.

12          So sorry to foul up your name.

13       MR. GIBBONS:  That is quite all right, Your Honor.

14          THE COURT:  Good thing I didn't call you Seibert.

15       MR. GIBBONS:  It would have been an insult, Your

16     Honor?

17          THE COURT:  No, it wouldn't.  He is a terrific

18     lawyer.

19     BY MR. GIBBONS:

20     Q    Dr. Coston, are you aware of the time line from

21     the passage of the Community Policing Act until the

22     effective date of the act?

23     A    I am aware it was a short period of time, yes.

24     Q    About 11 weeks, correct?

25     A    I would say that is about accurate.

Coston - cross                                    **104**

1   Q    So is it fair to say that only having 11 weeks

2   from finding out about a data collection requirement

3   until actually being forced to collect data is not

4   ideal?

5   A    Probably not ideal, but I don't know how the

6   implementation for that program exactly rolled out.

7   Q    Are you aware that data collection under the

8   Community Policing act was an unfunded mandate for RPD?

9   A    Yes.

10  Q    This data collection was mandated in the early

11  days of the COVID 19 panic?

12  A    Yes.

13  Q    During the time that RPD was attempting to comply

14  with this Community Policing Act without any additional

15  money, there was significant civil unrest in Richmond?

16  A    That is, for a portion of that time, yes.

17  Q    RPD went through three police chiefs in three

18  weeks during that time?

19  A    Yes.

20  Q    RPD was stretched particularly thin during the

21  summer of 2020 when the Community Policing Act became

22  effective?

23       THE COURT:  Well, how do you mean that, stretched

24  thin?  Because they were trying to do all of the BLM

25  demonstrations and deal with all that?

Coston - cross                              105

```
 1          MR. GIBBONS:  Yes, Your Honor.
 2          THE COURT:  So you are familiar with the fact that
 3   were BLM demonstrations and the police department had
 4   to respond to those, right?
 5          THE WITNESS:  Yes.  I don't know how I would
 6   qualify spread thin at that point in time compared to
 7   now given that amount of mandatory overtime that police
 8   are still working now.
 9          THE COURT:  All right.
10   BY MR. GIBBONS:
11   Q    I will move on, Your Honor.
12          Have you been involved in large data collection
13   projects?
14   A    Yes.
15   Q    In a new data collection project it would be ideal
16   to have training for collecting data before they start
17   collecting the data?
18   A    It depends on how complicated the data collection
19   is, but generally, yes.
20   Q    Would you classify data collection under the
21   Community Policing Act as complex?
22   A    In this instance, no.
23          The Richmond Police Department was already
24   collecting this type of data for their own internal
25   records prior to this.
```

1   Q     There was nothing different about the Community

2   Police data collection that differed from prior data

3   collection efforts?

4   A     There are some differences, but based on the data

5   that they were collecting, the items of information

6   they were collecting, it was largely similar.  I don't

7   know that retraining would be incrementally difficult

8   even in a short time frame.

9   Q     And you are not aware of any training for those

10  RPD officials that were responsible for data

11  collection?

12  A     I am aware that the Department of Criminal Justice

13  Services provided training to departments at some point

14  in time.  But that wasn't rolled out until after the

15  beginning of data collection.

16  Q     So it was some time after the traffic stop

17  involving Mr. Moore?

18  A     I am not sure exactly when the Richmond Police

19  Department received that training.  I am aware that

20  they didn't roll out training until after data

21  collection began, but I don't know if that training

22  occurred prior to or after the stop in question.

23  Q     One of the benefits of training for those doing

24  data collection is it creates consistency among the

25  data collectors so the data is more reliable.  Is that

1    correct?

2    A    That's correct.

3    Q    And not having consistent data entry procedures

4    can lead to inconsistent data?

5    A    That is possible.

6    Q    And it is a serious problem if not all of the data

7    is collected, if some don't collect data at all?

8    A    I'm sorry.  Could you repeat that?

9    Q    It is a serious problem if some people, some of

10   the data collectors, simply fail to collect any data at

11   all?

12   A    I don't know if I would qualify that as a serious

13   problem.  It depends on the extent of the data that is

14   omitted, what its impact is on the overall quality of

15   the data.

16   Q    So, for example, if officers in the third precinct

17   have a leader that doesn't believe in the validity of

18   the Community Policing Act, for example, and they don't

19   collect data in the third precinct for a portion of the

20   period, then that could skew the results?

21   A    If no one in a particular district collected data

22   for the entire time?  Yes, that would be a problem.

23   Q    Even if they were disproportionate at rates of

24   data collection compliance throughout Richmond?

25   A    It would be beneficial to be able to gauge the

Coston - cross

1    extent of the non compliance.

2    Q    Are you aware for all of 2020 RPD officers were

3    required to log Community Policing Act data in a simple

4    Google document?

5    A    Yes.

6    Q    Filling out this Google document required an extra

7    step in addition to the paper work that was required to

8    complete a police stop, traffic stop, excuse?

9    A    Yes.

10   Q    It could be difficult for somebody to learn a new

11   habit when they have been doing traffic stops for a

12   significant period of time?

13   A    It may be.

14   Q    Talking about the census data, when a citizen

15   identifies their own race on census paperwork, that is

16   a person's self perception of their own racial

17   identity; is that correct?

18   A    That's correct.

19   Q    And when an officer identifies a citizen's race

20   during a traffic stop the officer is left to guess the

21   citizen's racial identity?

22   A    They enter that information based on their

23   perception of the individual's race.

24        THE COURT:  Well, let's stop a second here.

25        Is a police officer's perception of the race of a

**JA1359**

1    person they are dealing with a common point of data

2    that is used in your field?

3              THE WITNESS:  Yes.

4              THE COURT:  Go ahead.

5    BY MR. GIBBONS:

6    Q    But there is a mismatch.  We are comparing apples

7    and oranges when we talk about self perception of race

8    on census forms and the officer's perception of race

9    during a traffic stop; is that correct?

10             THE COURT:  Well, let's see.  Are you aware of any

11   studies that show that people don't know what race they

12   are?

13             THE WITNESS:  No.

14             THE COURT:  Are you aware of any studies that show

15   there is an enormous amount of disparity between what

16   officers perceive as race and what the race is?

17             THE WITNESS:  That data exists for perceptions of

18   ethnicity.  Often officers don't record Hispanic

19   ethnicity for individuals, even when that is a form or

20   a field that they are supposed to fill out, because

21   they are uncertain.  But typically officers do fill out

22   racial information based own perceptions.

23             THE COURT:  Are you aware of any studies that show

24   that officers aren't able to understand which people

25   are African-American and which people aren't?

1        THE WITNESS:  No.  Sometimes they are mistaken,

2   but typically they perceive an individual's race when

3   they encounter them.

4        THE COURT:  Well, is the race ever in racial

5   identification of such a nature you would think that

6   those officers' perception of people's race is not

7   reliable?

8        THE WITNESS:  No.  And I think that the officer's

9   perception is what is most important any way.

10  BY MR. GIBBONS:

11  Q    About eight percent of the Community Policing Act

12  data collected by RPD was classified as "unknown race,"

13  is that right?

14  A    Yes, there might be instances in which officers

15  are uncertain and put "unknown."  But I don't see how

16  that is problematic to the data itself.

17  Q    Unless it is officers have difficulties with cross

18  race, cross racial identification, is that correct?

19  That might skew the numbers from one race to another?

20       THE COURT:  Cross racial identification has

21  several different meanings.  Like cross racial

22  identification, do you mean identification of a culprit

23  or identification of race?

24  BY MR. GIBBONS:

25  Q    Identification of race, Your Honor.

1          Let's say we have a white police officer, isn't it
2     true that research indicates that white police officer
3     would be less good at identifying the race of a black
4     person as compared to another white person?
5          THE COURT:  Do you have evidence that shows this
6     is true?
7          MR. GIBBONS:  I am attempting to demonstrate that
8     a person's --
9          THE COURT:  Do you have same evidence that shows
10    that this is true, or is this just hypothetical cross
11    examination?
12         MR. GIBBONS:  I don't have evidence, Your Honor.
13         THE COURT:  Okay.  Well, move on to that something
14    that is real as opposed to saying police officers don't
15    know what race people are.  Come on.
16    BY MR. GIBBONS:
17    Q    Dr. Coston, the data that you used for your
18    analysis you obtained that data from RPD?
19    A    That was passed to the Federal Public Defender's
20    Office, and I get it from them.
21    Q    So you don't know at what stage analysis or
22    quality control that you received that analysis from?
23    Or that from.
24    A    That data is consistent with data that is in the
25    data of Virginia Community Policing Act.

1    Q    Did you go line by line to confirm it matched data

2    on the online portal?

3    A    I didn't go line by line, but the overall

4    statistics are the same.  When you look at the summary

5    data it is consistent with the data that I was

6    provided.

7    Q    Which summary data did you look at?  What fields?

8    A    The race, the gender, other markers.  This is

9    something that I checked on the web site, and I didn't

10   report one for every single field that I checked.  So,

11   but, there were no major differences between the data I

12   received and the publically accessible data.

13   Q    Were you aware that the RPD Community Policing Act

14   data contained duplicate values?

15        THE COURT:  What do you mean by "duplicate data?"

16        MR. GIBBONS:  Multiple traffic stops that occurred

17   at the same location for a person of the same race of

18   the same age and for the same statutory violation.

19        THE COURT:  Well, you mean if they stopped the

20   same person twice?

21        MR. GIBBONS:  That is what it appears as if it

22   occurred in the data, Your Honor.

23        THE WITNESS:  In the data in some of these

24   instances that you are referencing characteristics of

25   the individual were different.  There was a different

1    reason for the stop indicated.  Or a different code

2    violation noted.  Even age of an individual being

3    different.  So --

4    Q    Just to be clear --

5    A    -- taking about --

6         THE COURT:  Let him finish his answer.

7         MR. GIBBONS:  Yes, Your Honor.

8         THE WITNESS:  So, I cannot conclude for certain

9    whether those are the same stops or different stops

10   because the information about the individuals is

11   different.  The violation is different.  I am not

12   convinced that those are duplicates.

13   BY MR. GIBBONS:

14   Q    What about instances where the information within

15   the traffic stop entry is completely the same for two

16   or three or four traffic stops?

17        Is that a duplicate?

18   A    That may or may not be a duplicate.  Especially if

19   there is other information that is missing.  Without a

20   time stamp it is incredibly difficult to verify that

21   the information is actually duplicate.  For example, an

22   officer might sit in one spot, pull multiple people

23   over for speeding in the same spot.  Those people may

24   be the same race.  It is possible that even those

25   people could be the same age in some of those

1    instances.  Without information such as time stamp that

2    would actually confirm that those are duplicates I am

3    not convinced that they are, the number of duplicates

4    in that data set that has been suggested.

5    Q    So, for example, if there is four instances of

6    someone being stopped at the same location on the same

7    day, and the age, gender, statutory violation and post

8    stop outcomes are identical, that was mostly a

9    duplicate rather than four people with identical

10   demographic markers and traffic violations at the same

11   location on the same day; do you agree?

12   A    Those could potentially be duplicates.

13   Q    You did not address the issue of duplicate values

14   in your report at all?

15   A    I did not.

16   Q    You didn't exclude duplicate values in your

17   analysis?

18   A    I was not able to determine the number of

19   duplicate values based on the information that was

20   provided in the data.

21        MS KOENIG:  Mr. Gibbons, how many duplicate values

22   are there?

23        MR. GIBBONS:  There are 321 traffic stops entries

24   that have a twin or triplet or quadruplet.

25        THE COURT:  Okay.

1          MR. GIBBONS:  That is roughly 11 or 12 percent of

2     the data.

3          THE COURT:  All right.  Go ahead.

4     BY MR. GIBBONS:

5     Q    The majority of the stops in the Community

6     Policing Act data for Richmond were for

7     African-Americans; is that correct?

8     A    That's correct.

9     Q    Because you didn't exclude the duplicate values

10    you included more stops for African-Americans than were

11    actually conducted if those were duplicates?

12    A    I would not say that that is correct.

13         Again, I am not convinced that all 312 of those

14    instances that you have pointed to were duplicates, and

15    this also doesn't exclude the potential of duplicates

16    of white drivers.  So to conclude that it is only

17    African-American drivers that were duplicated in the

18    file, in the absence of evidence that those were

19    duplicates that only impacted African-American drivers

20    would be incorrect.

21    Q    I am not saying that.

22         But if the majority of stops involved

23    African-Americans, then African-Americans would be over

24    represented due to the duplicate values in that data;

25    is that correct?

1          MS KOENIG:  I am going to object about speculation

2     here because we have control numbers on each one of

3     these things.  If Mr. Gibbons has specific ones he

4     wants to go over with Dr. Coston --

5          THE COURT:  I am sure we will hear about that in

6     the future.  Am I right?

7          MR. GIBBONS:  That is right, Your Honor.

8          THE COURT:  All right.

9     BY MR. GIBBONS:

10    Q    We talked about the exclusions that you made in

11    the data.  Are you aware that as part of the quality

12    check process DCJS when they wrote their state wide

13    report they excluded categories of data that were

14    incomplete or unreliable?

15    A    Yes, I am aware they made exclusions.

16    Q    You didn't make any exclusions on the same basis

17    that DCJS did?

18    A    I made exclusions where those were relevant.  So,

19    for example, if that was, if they didn't record race at

20    all I obviously didn't use that data in the analysis

21    that involved race.  If they didn't record whether a

22    search was conducted or not, I didn't use that.  Rather

23    than eliminating the entire incident I eliminated them

24    when the missing information was relevant.  For

25    example, if age is not recorded, but age is not part of

Coston - cross                                    117

1    one of the analyses I conducted, there is no reason to

2    exclude that entire case if the rest of the information

3    is valid.

4    Q     But you didn't -- you said you made exclusions for

5    arrests and searches when you were missing values in

6    those columns; is that correct?

7    A     That's correct.

8          If there is no information recorded in those

9    columns then those can't be included in the analysis.

10   Q     Did you note in the report that you made

11   exclusions a post hoc basis?

12   A     That is not on a pro hoc basis.  That is on the

13   basis of missing data.  And yes, that was noted in the

14   report.

15   Q     You made exclusions for missing data for searches

16   and arrests?

17   A     I mentioned that I made exclusions where there was

18   missing data, and indicated that varied by analysis.

19   For each of those analyses conducted you can find the

20   total number of cases, though, reported in the tables.

21   Q     So --

22   A     This is a common way of reporting statistics and

23   also dealing with missing data.

24   Q     So were you aware in the data you used there were

25   147 rows out of 2,578 where no age was recorded?

1    A    Yes.

2    Q    And six rows with no gender reported?

3    A    That sounds about correct.

4    Q    Five rows with no value for action taken as a

5    result of the stop?

6    A    That also sounds about correct.

7    Q    Two rows no value for whether a person was

8    searched?

9    A    Again, I am not sure of the exact numbers, but

10   yes, that sounds about correct.

11   Q    And 266 rows with no value for whether a person

12   was arrested?

13   A    Again, sounds about right.

14   Q    So, in all, about 14 percent of the data that you

15   used in your analysis would have been excluded by DCJS

16   for data integrity issues?

17        THE COURT:  Wait a second.  He has not examined

18   them.  The integrity of gender is not important, is it?

19        MR. GIBBONS:  We will talk about that I think

20   tomorrow with Mr. McDonough.

21        THE COURT:  Why don't we talk about it now?

22        MR. GIBBONS:  Mr. McDonough would say it is, who

23   works with DCJS.  He is a doctor, Jim McDonough he is

24   the research director for DCJS, who prepared the DCJS.

25        THE COURT:  What has that got to do with race?

1         MR. GIBBONS:  That they need this wholesale

2    exclusions because they determined that an entire

3    traffic stop was more likely to have invalid data if

4    not completely filled out.

5         THE COURT:  Oh.  So the fact that they didn't

6    write down the gender means that it is less likely they

7    were able to identify the race of the driver?

8         MR. GIBBONS:  Or just the data entry in toto was

9    inaccurate or less likely to be accurate.

10        THE COURT:  Okay.  Thank you.

11   BY MR. GIBBONS:

12   Q    Dr. Coston, you also excluded about ten percent of

13   data because the race identified in the data was Asian,

14   native American, or unknown?

15   A    Correct.

16   Q    You excluded that ten percent of the data because

17   your particular statistical test record larger group

18   site; is that correct?

19   A    That's correct.

20   Q    So it was because of your choice of the

21   statistical test that led you to exclude that

22   ten percent of that data?

23   A    That would be a common way of handling that type

24   of data in a chi-square analysis.

25   Q    But if you had chosen a different statistical test

1    you may not have excluded those values?

2    A    I chose the test that was appropriate to the data.

3    Even if that led to the exclusion of some other data.

4    The comparison between white and black drivers is still

5    valid.

6    Q    Did you know in the report that there were 266

7    stops for which there is no data for when a person was

8    arrested?

9    A    I noted that total number of stops analyzed when

10   it included that arrest in the tables.  But that was

11   not specifically noted in the body of the report.

12   Q    Talking about location.  You used a service called

13   Geocodio to convert the location recorded in the CPA

14   data for latitude longitude coordinates?

15   A    That's correct.

16   Q    Geocodio will produce a confidence estimate in its

17   coordinates with an accuracy score?

18   A    That's correct.

19   Q    And then when the accuracy score was less than .6

20   you had interns with the Office of Public Defender

21   double check those locations?

22   A    That's correct.

23   Q    Generally -- you said this before -- the higher

24   the location the better?

25   A    Generally, yes.  But not always.

1   Q    And then, but isn't that what Geocodio explains

2   how their accuracy score works?

3   A    Yes.  Not every score with a high accuracy will be

4   high, though.  For example, the stop that occurred at

5   Broad and Harrison in the data set was noted in another

6   city because there was a Broad and Harrison there.  I

7   corrected those latitude longitude coordinates for

8   Harrison and Broad in Richmond, Virginia.

9   Q    And you verified a random selection of the

10  locations that the interns had checked through manual

11  review?

12  A    That's correct.

13  Q    If the interns noticed -- well, if the interns or

14  you noticed an issue with the location that Geocodio

15  produced, they would insert the correct latitude and

16  longitude, in columns G and H for corrected latitude

17  and longitude?

18  A    That's correct.

19  Q    So we took the corrected latitude and longitude

20  from column G and H and put that into a map, that would

21  produce a stop within Richmond for those stops that you

22  had corrected?

23  A    That's correct.

24  Q    So if the results if the latitude longitude

25  recorded in columns G and H result to a location that

1    was far outside Richmond, how would you explain that?

2    A    I don't believe they do.

3          THE COURT:  Well, that is not the question.

4          Say your question again.

5    BY MR. GIBBONS:

6    Q    If the latitude longitude in column G and the

7    latitude H result in a location that is far outside

8    Richmond, say in Scottsville, how would you explain

9    that?

10   A    I would explain that by saying that potentially

11   one didn't have the latitude longitude correctly.

12   Q    If there were dozens like that, how would you

13   explain that?

14   A    I think you are insinuating that --

15         THE COURT:  No, no.  The question is, how would

16   you explain that?  Try to answer the question.  Okay?

17         THE WITNESS:  I would not have an explanation for

18   how there would be dozens of them.

19   BY MR. GIBBONS:

20   Q    So in your report there were, you did a heat map,

21   or you did a plot mapping.  You plotted some of these

22   locations within Richmond and outside of Richmond; is

23   that correct?

24   A    Yes.

25   Q    And there were some plots on your maps that were

1   outside of Richmond; is that correct?

2   A    Yes.

3        In the proximity of Richmond.

4   Q    You didn't see any plots that were far outside

5   Richmond when you did that plotting?

6   A    No.

7        In the initial I did see items that were far from

8   Richmond.  In Charlottesville.  Again, those are ones

9   that I went back and manually corrected based on the

10  location data provided in the spread sheet by the

11  Richmond Police Department.

12  Q    When you map these stops on pages nine through

13  eleven of your report you didn't notice that hundreds

14  of them were outside Richmond?

15  A    I did not see hundreds of points outside of

16  Richmond in this map, no.

17  Q    So RPD officers can conduct some stops from

18  defined distances outside the City of Richmond?

19  A    That is correct.

20  Q    Did you conduct an analysis to insure that only

21  those stops that occurred within these boundaries were

22  included in your analysis?

23  A    When I conducted the chi-square analyses I ran the

24  analyses for the cases, which is what you would

25  commonly do in statistical modeling to insure those

Coston - cross                                    **124**

1    locations, those stops that occurred just outside the

2    jurisdictional boundaries versus those within didn't

3    have any impact on the overall verdict.

4    Q    When you run tests with or without a variable, for

5    example, either clearly inside Richmond or clearly, or

6    just all of them, you are only testing one type of

7    error at a time; is that correct?

8    A    You are only doing one statistical analysis at a

9    time, yes.

10   Q    If you have multiple sources of statistical error,

11   such as hundreds of instances of unreliable data, or

12   hundreds of stops that occurred outside of Richmond,

13   you wouldn't necessarily see the interaction of that

14   when you included all of that of data in your analysis?

15        THE COURT:  I didn't understand the question.

16   BY MR. GIBBONS:

17   Q    Sorry, Your Honor. I will rephrase.

18        When you run an analysis with or without the

19   location that are outside Richmond, you do that with

20   one source or error at a time; is that correct?

21   A    Yes.  Every test is, has a potential error rate,

22   that is correct.

23   Q    When you combine multiple sources of statistical

24   error, such as the stops that DCJS excluded for

25   unreliability, and the stops that are outside Richmond,

1   and the duplicates, you are testing those one at a time

2   to the extent that you are aware of them; is that

3   correct?

4   A     You are conducting each analysis at once, but,

5   yes, there are multiple sources of statistical error

6   for each statistical test that you run.

7   Q     You weren't aware of the DCJS exclusions when you

8   did your analysis; is that correct?

9   A     That is correct.

10  Q     So you didn't run a test with or without that data

11  to determine if it was the same with or without?

12  A     No, because I wasn't aware of those exclusions,

13  and that is not data that I would have chosen to

14  exclude.

15  Q     And the same with the duplicates.  You weren't

16  aware of that at the time you ran your analysis.  So

17  you didn't even test to see whether your analysis was

18  correct with or without the duplicates?

19  A     I don't believe that there were 312 duplicates.

20  Q     Let's talk about the basis of comparison or what

21  is called the benchmarking problem.

22        Once a researcher identifies the percentage of

23  each range that was actually stopped, the next step is

24  comparing it against the race percentages of those

25  eligible to be stopped; is that correct?

Coston - cross                                            **126**

1    A     That is, yes, that is one method of benchmarking.

2    Q     To do this research one needs to determine the

3    percentage of drivers on the road?

4    A     That is one method of benchmarking.

5    Q     What are other methods of benchmarking?

6    A     For example, it crash data benchmarking.  The

7    benchmarking standards that we reviewed a few minutes

8    prior.

9    Q     But aren't those different methods of analysis to

10   determine who is driving, who is on the road?

11   A     Yes, and that is what benchmarking attempts to

12   capture.

13   Q     That was my question.

14         And there are multiple ways to do the benchmarking

15   like you just alluded to?

16   A     That's correct.

17   Q     And these other methods would have been more

18   reliable than what you ended up doing if you had access

19   to that data?

20   A     It is possible that other benchmarks would produce

21   different results, but I didn't use the benchmarking

22   for the statistical analyses.  Only used the census

23   benchmark to creates the maps.

24   Q     So you only produced raw statistical disparities

25   for your statistical analyses?

1    A      That's correct.

2    Q      And that was the sole basis on which you

3    determined that blacks were more likely to be stopped?

4    A      Yes, using the appropriate statistical test.

5    Q      Didn't do any benchmarking at all when you

6    determined whether blacks were more likely to be

7    stopped?

8    A      The chi-square does not make assumptions about the

9    underlying distribution of the data.

10   Q      So your analysis does not even begin to consider

11   the percentage of drivers on the road?

12          THE COURT:  I think you made clear he didn't look

13   at the number of people on the road because he didn't

14   have that data.  Isn't that right?

15          THE WITNESS:  No.  It didn't have data on the

16   percentage of drivers on the road.

17   BY MR. GIBBONS:

18   Q      But you didn't use census data at all to aid you

19   in your benchmarking analysis?

20   A      No.

21   Q      Which census, which census data did you use in the

22   analysis?

23   A      The American Community Survey, 2016 to 2019

24   supplement.

25   Q      Are you aware that the exhibit R-2 dot map that

Coston - cross                          128

1    was shown to you by the defense is from 2010?

2    A    Yes, I am.  That is census data.

3    Q    But it is old census from ten years ago?

4    A    Yes.

5    Q    And the stop data here is from 2020?

6    A    Yes.

7    Q    When you did your, when you used your census data,

8    you included people that were zero to 14 years old, who

9    were ineligible to drive?

10   A    That's correct.

11   Q    You would include those non drivers in your

12   estimate of the driving population within Richmond?

13   A    I didn't estimate the driving population of

14   Richmond.  And the reason I am using the demographic

15   information from the American Community Survey is

16   really looking at where people are getting pulled over,

17   and in relationship to the racial composition of that

18   particular neighborhood.  Where people drive isn't

19   necessarily where they live, but where people are

20   pulled over is relevant to the demographics of those

21   neighborhoods.

22   Q    So your analysis assumes people are pulled over

23   only in their own neighborhoods?

24   A    No, I actually just said that, not that.  The

25   opposite of that.  People are pulled over in all kinds

JA1379

1    of places.  They don't necessarily live there.  People

2    in Richmond can be pulled over in other cities, other

3    states.  People from other cities and states are pulled

4    over here.  But what I am saying is that the race of

5    the driver is important, as is the area in which they

6    are pulled over, the location that they are pulled

7    over.

8    Q    So when your overlay traffic stop data on to

9    census residential data --

10   A    You are asking the question, pulled over where?

11   Q    You are essentially comparing apples and oranges

12   because where people live is not the same as where they

13   are pulled over.

14   A    I would not say that is true.

15   Q    Why not?

16   A    Where an individual experiences a traffic stop,

17   where an individual is pulled over, where they happen

18   to be in geographic space, whether it is one

19   neighborhood or another isn't important.

20   Q    If somebody can be pulled over somewhere not close

21   to their home, then why did you overlay demographic

22   census data with traffic stop data as you did in figure

23   five of your report?

24   A    To understand where people of different races are

25   being, where people of different races are being pulled

Coston - cross                                                    130

1    over in the City in relation to the racial composition

2    of those neighborhoods.  Black drivers are pulled over

3    in predominantly white neighborhoods.  Black drivers

4    are also pulled over in predominantly black

5    neighborhoods.  White drivers are not pulled over in

6    predominantly black neighborhoods.  Where and how black

7    drivers experience policing when they are stopped for a

8    traffic stop is relevant.

9         That is my argument.

10   Q    Okay.  I will move on.

11        When you ran your statistical analyses, despite

12   the extensive community environment of Richmond your

13   analysis not account for or explain the presence of

14   commuters.

15   A    Again, it is who is pulled over where.  They are

16   still driving in Richmond, it is still possible for

17   them to be pulled over whether they are commuting or

18   not.

19   Q    But people can come in from Henrico or

20   Chesterfield County and get pulled over in Richmond; is

21   that correct?

22   A    Yes.  Absolutely.

23   Q    That wouldn't be accounted for when you use census

24   data from within the City of Richmond and overlay that

25   on to traffic stops that occur within the City of

Coston - cross                                    131

1   Richmond?

2   A     If you are a black person being pulled over in a

3   white neighborhood, you are a black person in a white

4   neighborhood regardless of the neighborhood it is and

5   regardless of where you are driving from.

6   Q     But when you overlay residential census statistics

7   onto traffic stops you don't know whether -- be -- let

8   me try to find a good way to explain this.

9         You are using census data to estimate the racial

10  background of the area in which traffic stops occur; is

11  that correct?

12  A     Yes.

13  Q     But because people don't always get pulled over

14  where they live, you are comparing apples and oranges

15  when you overlay residential census data and traffic

16  stop data.

17  A     That is still -- you are still talking about a

18  relationship between two things, even if it is housing

19  and driver race.  I think that my point still stands.

20  If black people are being pulled over in white

21  neighborhoods, black people are being pulled over in

22  white neighborhoods regardless of whether they are

23  black people that live close by or they live in another

24  state and happen to be driving through.

25  Q     Were you aware of the DCJS report at the time you

**JA1382**

1    completed your report?

2    A    Yes.

3    Q    You didn't include any of the caveats that DCJS

4    included in their report in your report?

5    A    I don't agree with all the caveats in the DCJS

6    report.

7    Q    That is not the -- question's was, the question

8    was, did you include them in your report?

9    A    No, because I don't agree with them.

10   Q    Are you aware of the practice of police deploying

11   more officers to areas in which crime rates and calls

12   for service are higher?

13   A    Yes.

14   Q    And your analysis does not account for that common

15   practice.

16        THE COURT:  Well, his analysis doesn't even

17   consider that, does it?

18        THE WITNESS:  No.

19        THE COURT:  He and I talked about that earlier.

20   BY MR. GIBBONS:

21   Q    Instead your analysis assumes that any statistical

22   disparity is a result of discrimination, correct?

23   A    Of racial disparity policing, yes.

24   Q    So of all the different factors that could cause

25   differential outcomes in traffic stops, you just

1  assumed that race is the cause for that disparity in
2  traffic stops?
3  A    I would say that there are statistically
4  significant findings that race is a factor in traffic
5  stops and their outcomes.
6  Q    So just assume for me, kind create a picture of
7  words here.  We have, trying to determine a
8  relationship between two variables.  Call them A and B.
9  In your analysis determined -- well, it is a bivariate
10  analysis; is that correct?
11  A    That's correct.
12  Q    By a bivariate analysis is just a fancy way of
13  saying determining the relationship between two
14  variables?
15  A    Yes.
16  Q    And your analysis determined that there is some
17  kind of relationship between race and traffic stop; is
18  that right?
19  A    Yes.
20  Q    But you didn't account for differential policing
21  patterns; is that correct?
22  A    Differences in outcome by race are differential
23  policing; but interpretive external factors in
24  differential policing, no.
25  Q    Sure.  So police deployment patterns, you didn't

1    consider that?

2    A    No.  Total number of stops.  Police designated,

3    policing patterns still don't dictate who is stopped.

4    Police are still making the individual unit

5    determinations about who to stop and who not to stop.

6    Q    And your analysis didn't consider the effect of

7    socioeconomic status?

8    A    No, that wasn't a variable in the data set.

9    Q    So you just took the data that you had and

10   performed the best analysis you could based on that?

11   A    That is how statistics work.  We don't always have

12   all possible data.  We take the best data that is

13   available to us, and analyze it in a way that is

14   appropriate to that data.

15   Q    Are you aware DCJS stated that the poor quality of

16   the data prevented drawing any further conclusions

17   about whether traffic stops were caused by bias?

18   A    My understanding is that the data quality differed

19   across jurisdictions.

20        THE COURT:  No.  Please just answer the question.

21   If you do that we will get out of here a lot sooner.

22        The question was, are you aware that DCJS said you

23   can't reach any conclusions about causation from the

24   data that they have?

25        THE WITNESS:  I am not making conclusions about

Coston - cross

1    causation.

2         THE COURT:  Okay.

3         Well, isn't one of the things we have to prove in

4    this case is that race caused this disparity?

5         THE WITNESS:  I am trying drawing conclusions

6    about the large scale patterns and relationships

7    between race and the other variables that were

8    examined, but I can't -- I am not characterizing those

9    as a causal relationship.

10        THE COURT:  Well, isn't that statistical analysis

11   doesn't deal with causation, does it?

12        THE WITNESS:  There are some statisticnal models

13   that deal with causation, but chi-square does not.  And

14   even regression techniques.

15        THE COURT:  Does regression deal with causation?

16        THE WITNESS:  Some people infer causation from

17   regression, but from a typical regression model, no.

18   Advanced regression models sometimes you can use to

19   determine causation.

20        THE COURT:  Can you determine causation from

21   chi-square ever?

22        THE WITNESS:  No.

23        THE COURT:  No.

24   BY MR. GIBBONS:

25   Q    Let's talk about your analysis.  You ran your

1    analysis on data beginning July 1 of 2020 and ending

2    December 6 of 2020?

3    A     That's correct.

4    Q     Did you consider any other date ranges for your

5    analysis?

6    A     No.

7    Q     So you found if the date range is July 1 of 2020

8    to December 6 of 2020, the adjusted data shows

9    African-Americans accounted for 77 percent of stops and

10   whites 14 percent of stops.

11   A     Yes.

12         THE COURT:  Mr. Gibbons, do you agree that the

13   burden is on the defendant to prove that race caused

14   this disparity?

15         MR. GIBBONS:  Your Honor, emphatically.

16         THE COURT:  Do you agree that the witness just

17   admitted that doesn't show that?

18         MR. GIBBONS:  Yes, Your Honor.

19         THE COURT:  And why are you continuing to ask

20   questions?

21         MR. GIBBONS:  I could rest, Your Honor.

22         THE COURT:  Well, no --

23         MR. GIBBONS:  I have a few more questions.

24         THE COURT:  You are the lawyer.  I already messed

25   up their case.  I don't want to mess up yours.

```
 1        MR. GIBBONS:  I will make it very brief.

 2        THE COURT:  That is okay.  Ask whatever you feel

 3   like you need, but I think that was a pretty

 4   significant answer there.

 5   BY MR. GIBBONS:

 6   Q    Dr. Coston, were you aware if you include the

 7   first full year of traffic stops from July 1 of 2020 to

 8   June 30th of 2021 the percentages of stops of

 9   African-Americans drops to 68 percent of stops and the

10   percentage of stops of whites rises to 24 percent of

11   stops?

12   A    That doesn't surprise me.  It is a different

13   sample.  Varies from sample to sample.

14   Q    So you chose the sample that showed the highest

15   raw statistical disparity?

16   A    I didn't chose the sample focused on the

17   disparity.  The end date for the sample was due to when

18   the time of the stop occurred.  And July first

19   obviously being the earliest data that was available.

20   Q    Dr. Coston, you are in the -- let's talk about

21   your employment.  You are a professor in the Department

22   of Gender, Sexuality, and Women Studies at VCU?

23   A    That's correct.

24   Q    In your official VCU biography you describe

25   yourself as an "activist scholar?"
```

1   A    That is correct.

2   Q    You are teaching research primarily involved LG,

3   LGBTQ issues?

4   Q    I have two main research, one of them is LGBTQ

5   issues, and other focuses on disparities in policing.

6   Q    Dr. Coston, are you active in social media going

7   back to at least 2018 and continuing to the present?

8   A    Yes.

9   Q    Your Twitter handle is "@ Eli Coston?"

10  A    I think so, or "@ Dr. Eli Coston."

11  Q    And when you tweet something, that is indicating

12  your opinion or thoughts about a particular topic?

13  A    Sometimes.  If I tweet it myself.  Retweets maybe

14  not.

15  Q    You have made several public statements on social

16  media recording policing in Richmond; is that correct?

17  A    Yes.

18  Q    And that involves work with the Richmond

19  Transparency and Accountability Projects, Or R TAP?

20  A    That's correct.

21  Q    You have also been heavily involved in trying to

22  institute a civilian review board for RPD?

23  A    That is correct.

24  Q    And in that capacity you have been public in

25  criticizing the police chief and the mayor because they

Coston - cross                                              **139**

1    didn't adopt your proposal?

2    A    I don't know that I would characterize it in that

3    way.  I have been critical of the inaction about moving

4    toward civilian oversight that was asked for by

5    community members, yes.

6    Q    So did you tweet on March 22, 2022 at 1:14 p.m.

7    "Richmond, Virginia, TAP, or the accountability

8    committee, now offering public comment to oppose the

9    mayor's proposal.  I will be speaking against it as

10   well?"

11   A    Yes.

12   Q    Did you tweet on June 2nd of 2020 at 12:5 p.m.

13   "Speakers are calling out the racism of police.  Black

14   people are being targeted by the police.  Out," which I

15   believe means "or our," police force is racist and

16   brutal."  Did you tweet that?

17   A    I don't remember.

18   Q    If it came from "@Eli Coston" with your picture as

19   your profile picture, would you dispute that is your

20   tweet?

21   A    I wouldn't dispute it.  I don't specifically

22   remember tweeting it.  I believe I was -- I believe I

23   was recapping what was happening at a City Council

24   meeting, in the public comments.

25   Q    Did you tweet on August 5 of 2018, "RPD still

Coston - cross                                    **140**

1    won't release data on traffic stops or Terry stops in

2    Richmond.  These practices are often racially biased."

3    A    Yes.

4    Q    You believe that that, that traffic stops and

5    Terry stops are racially biased?

6    A    Well, there are many studies that show that

7    especially Terry stops or racially biased.

8    Q    That was before you were retained as an expert in

9    this case to opine whether traffic stops in Richmond

10   were racially biased?

11   A    Yes.

12        MR. GIBBONS:  No further questions, Your Honor.

13        THE COURT:  All right.

14        Redirect?  Do you need a few moments to gather

15   your thoughts?

16        MS KOENIG:  I don't, Your Honor.

17        I do want to point The Court's attention to some

18   cases we cited in the ECF 66, which are also cited in

19   some other of the supplemental briefing.  But the law

20   says that is in some cases blunt statistical

21   evidence --

22        THE COURT:  I understand.

23        MS KOENIG:  -- can be used to demonstrate.

24        THE COURT:  I can infer from that --

25        MS KOENIG:  Correct.

**JA1391**

1        THE COURT:  -- there is a problem.

2        MS KOENIG:  Correct.

3        THE COURT:  Okay.

4                    REDIRECT EXAMINATION

5    BY MS KOENIG:

6    Q    Dr. Coston, I am going to talk to you little bit

7    about the deployment effect.  Tell us what is the

8    deployment effect.

9    A    So essentially when officers are deployed to

10   particular areas officers are trained to look for crime

11   in those areas.  What we see is when more officers are

12   deployed in more areas they tend to find more crime,

13   also engage in issuing summons or citations for lower

14   level offenses than were previously issued.

15   Essentially, police are trained to look for crime, and

16   so when you deploy more officers to an area they will

17   find more crime.  If you put a hundred officers in one

18   neighborhood, one officer in another neighborhood,

19   clearly you are going to have more citations, clearly

20   you are going to have more summones issued in a place

21   where there is a hundred officers versus where there is

22   one or where there is ten.

23        THE COURT:  Before we get too far into this, your

24   expertise is in the area of statistics.  How do you get

25   knowledge about the deployment?

1          THE WITNESS:  So, I also study policing.  I study

2     LGBTQ treatment.  Study policing in racial disparities

3     and how those interact with the criminal legal system.

4     BY MS KOENIG:

5     Q    Dr. Coston, if we could turn your attention to,

6     turn your attention to defendant's exhibit five, which

7     has already been admitted.

8          Does this article talk about the deployment effect

9     and how it can be sort of a negative feedback to where

10    you send more officers out they find more crime, they

11    send more officers out, they find more crime?

12    A    Yes.

13    Q    Essentially what we were just taking about?

14    A    Yes.

15    Q    So as a part of your work in analyzing such

16    statistics, is that how you have come across that kind

17    of theory?

18    A    Yes.

19    Q    Okay.

20         When we have the question of whether that there is

21    deployment effect, does it beg the question as to why

22    different areas are being policed or over-policed?

23    A    Yes.

24    Q    And how it could reinforce patterns of high crime

25    areas?

1   A     Yes.

2   Q     Sort of a continuous negative feedback, right?

3   A     Yes.

4   Q     Okay.

5   A     And likewise, there have been studies conducted

6   about how race is implicated in that feedback group as

7   well.

8   Q     I want to turn your attention now to questions

9   Mr. Gibbons was asking you about the duplicates.  So

10  when we talked about and looked at defendant's exhibit

11  14, which is the final sample you ultimately used for

12  analysis in this case, we talked about the control

13  number column, right?

14  A     Yes.

15  Q     Did we include the control number column so that

16  we, if we had to go back later and talk about specific

17  stops that we could refer to specific control numbers,

18  right?

19  A     Yes.

20  Q     Have you, have we ever been given by the

21  government any control stop list of what they believe

22  are duplicates?

23  A     No.

24  Q     Have we ever been given any control stops for what

25  they think are data that should be excluded?

Coston - redirect

1    A    No.

2    Q    And have we ever been given any control stop

3    numbers that they believe were, I think we have been

4    given three in briefing, of stops that the government

5    thought were incorrectly captured in the City data,

6    right?

7    A    That may be correct.  I am not sure if we were

8    given control numbers.  I know that there were specific

9    locations referenced in by Dr. Smith, but I am not

10   aware of seeing control numbers.

11   Q    From that we were able to ourselves determine the

12   control numbers of the three incidents, right?

13   A    Yes.

14   Q    Have we ever been given a list of control numbers

15   of the stops that the government thinks are outside of

16   the City of Richmond --

17   A    No.

18   Q    -- these hundreds of stops, right?

19   A    No.

20   Q    You went back after reading a report indicating

21   that that is something that the government was looking

22   into, and you verified the information that you had

23   that it was 81 stops that were outside of the City?

24   A    That's correct.

25   Q    Okay.

1          And you were a professor -- you teach some

2    statistics classes, right?

3    A     Yes.

4    Q     One of basic principles of teaching students of

5    how to start doing statistical analysis, you have to

6    chose the right analysis from the beginning?

7    A     That's correct.

8    Q     When we were talking, I want to make sure I am

9    understanding the point that you are trying to make in

10   terms of using American Community Survey data for the,

11   to create the heat map, right?

12   A     Yes.

13   Q     But you didn't use that because you could not

14   determine the overall population of drivers in

15   Richmond, correct?

16   A     That's correct.

17   Q     And that is why you couldn't do a chi-square

18   analysis on the variable simply of who was stopped

19   according to race, right?

20   A     Correct.  You could conduct a different analysis

21   if you knew the races of all the people who are driving

22   in Richmond.  But, again, that is not a knowable

23   number.

24   Q     But what you do know is that, as you said earlier,

25   it is significantly disproportionate, right?

Coston - redirect                                    **146**

```
 1    A     That's correct.

 2    Q     In terms of the race of the drivers that are

 3    ultimately stopped?

 4    A     The race of the drivers and the outcome of that

 5    stop, yes.

 6    Q     And when you are looking at the American Community

 7    Survey data in relation to the stop, we could possibly

 8    describe the conclusion, not conclusion, but the

 9    visualization that we see, we could arguably interpret

10    that as policing the borders, right?

11    A     Yes, I do.

12    Q     And we know from the information that is depicted

13    in figure one, which is where you plotted all of the

14    traffic stops according to race that ran our data set,

15    right?

16    A     Yes.

17    Q     We saw that white people were stopped throughout

18    the City, right?

19    A     Yes.

20    Q     And we saw that in despite the fact that white

21    drivers are pulled throughout the City, we still -- and

22    black drivers are pulled in the white parts of town as

23    well, right?

24    A     Yes.

25    Q     Okay.
```

1    A    This is why race is important, because white

2    drivers are stopped predominantly in white areas of

3    town, but black drivers are stopped everywhere.

4    Q    When we talk about the information in the

5    Department of Criminal Justice Services report, again

6    they didn't do the same statistical significance impact

7    analysis that you did, but ultimately the findings for

8    Richmond were the same as yours, right?

9    A    They also found disparities, yes, for black

10   drivers.

11   Q    And they, I want to make sure we are clear, you

12   were given from the, from the Federal Public Defender

13   Office the date that the analysis was to happen, right?

14   A    That's correct.

15   Q    We did receive a whole year of data from the

16   Richmond Police Department, right?

17   A    Yes.

18   Q    But we only did the analysis up until the date

19   that Mr. Moore was stopped, right?

20   A    Yes.

21   Q    Okay.

22        Talking a little bit about the end, not going to

23   go through the social media account, but when you were

24   working with R TAP how long did it take for Richmond

25   Police Department and City of Richmond to turn over the

1    data that you all had been seeking to do that analysis?

2    A    That took years.  Two and a half to three years I

3    think to receive all of it.

4    Q    Was that after many, many, many hours of meetings

5    and negotiations and requests to get them to turn over

6    that data?

7    A    Yes.  We submitted numerous Freedom of Information

8    requests to the police department.  Many of which

9    remember denied.  Some of which simply weren't

10   responded to.  It required a sit-down meeting between

11   the chief of police at the time, members of R TAP,

12   including myself, Mayor Stoney, and also the I T and

13   people from I T and City legal to actually come to an

14   understanding about what data would be released.  And a

15   time line for releasing that.  Even subsequent to the

16   meeting I think it took a full nine months before we

17   got all of the data that was requested subsequent to

18   that meeting.

19   Q    Was it a fair summary or assessment that Richmond

20   Police Department did not seem eager to turn over the

21   data that was requested?

22   A    In fact, the first time that they submitted the

23   data to us, the data did not receive, did not contain

24   all of the items that were initially requested and

25   agreed upon.  We had to send that back and wait another

Coston - redirect                              **149**

```
 1    several months before they turned over that

 2    information.

 3    Q    No further questions.

 4         THE COURT:  All right.

 5         Anything further?

 6         MS KOENIG:  Not from the defense, Your Honor.

 7         THE COURT:  May he be excused?

 8         MS KOENIG:  I agree with the Government,

 9    Dr. Coston will be allowed to stay to listen to the

10    remainder of the witness in an advisory capacity.

11         THE COURT:  You can stay.  Okay.

12         THE WITNESS:  Thank you.

13                   (Witness stood aside)

14         All right.  Well, do you have more witnesses?

15    MS KOENIG:  No.

16         THE COURT:  So --

17         MS KOENIG:  Sorry, Your Honor, I do have --

18         THE COURT:  Are you going to, will Mr. Chiles or

19    Dr. Chiles we moved off to a future date -- can you

20    help him get out of there?

21         MS KOENIG:  The only other exhibit, Your Honor,

22    aside from the exhibits --

23         THE COURT:  I can't understand you.

24         MS KOENIG:  Sorry, Your Honor.

25         The only other exhibits that have not yet been
```

**JA1400**

1    admitted that are on my list are defendant's exhibit

2    nine through 12, which relate to Dr. Chiles.  And then

3    defense exhibit 13, which is in ECF number 81, which is

4    the Richmond Police Department's response to the

5    subpoena that The Court issued about the police

6    precincts.  And I do ask The Court to take judicial

7    notice of that because it is already in The Court's

8    file.

9        THE COURT:  All right.  I will take notice.  I

10   guess it is admitted.

11       MS KOENIG:  No evidence at this stage.

12       THE COURT:  All right.

13       So you are not going to call then your other

14   witness, Mr. Hush?

15       MS KOENIG:  Right.

16       THE COURT:  All right.

17       So they are done for the day.  And we will start

18   off tomorrow morning, okay?

19       MR. GIBBONS:  Yes, Your Honor.

20       THE COURT:  And we will start at nine tomorrow.

21   Is that all right with everybody?

22       MR. GIBBONS:  Yes, Your Honor.

23       THE COURT:  Thank you.  You know, I will look

24   forward to seeing you then.  Thank you very much.

25       Recess for the afternoon.  Thank you all very much

Coston - redirect                             **151**

1    for coming and good job putting on the evidence.

2           I will see you in the morning.  Thank you.

3           I gave you a date to give your summary to

4    Mr. Gibbons, right?

5           MS KOENIG:  Yes, Your Honor.

6           THE COURT:  Okay.  And then your date to respond.

7           MR. GIBBONS:  Yes, Your Honor.

8           THE COURT:  Thank you all very much.

9                        HEARING ADJOURNED

10

11          THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

12                   GILBERT FRANK HALASZ, RMR

13                    OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

**JA1402**

1

2   Coston - direct                              18   16
    Coston - cross                              101   15
3   Coston - redirect                           142    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                        plaintiff,

        versus                    3:21CR42

KEITH RODNEY MOORE,

                        defendant,



Before:  HONORABLE JOHN A. GIBNEY, JR.
             United States District Judge



Day II (pages 152 - 345)


July 19, 2022

Richmond, Virginia



GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

**JA1404**

APPEARANCES


Erik Sean Siebert, Esq.

Shea Matthew Gibbons, Esq.

Assistant United States Attorneys

for the United States



Laura Jill Koenig, Esq.

Amy L. Austin, Esq.

**Assistant Public Defenders**

**for the defendant**

The defendant in his own proper person

```
 1          THE CLERK:  Case number 3:21 CR 42.

 2          United States versus Keith Rodney Moore.

 3          Mr. Erik Seibert and Mr. Shea Gibbons represent

 4     the United States.

 5          Ms Laura Koenig and Ms Amy Austin represent the

 6     defendant.

 7          Are counsel ready to proceed?

 8          MS KOENIG:  Defense is ready, Your Honor.

 9          MR. SIEBERT:  United States is ready, Your Honor.

10          THE COURT:  All right.

11          MS KOENIG:  Good morning, Your Honor.  Before we

12     start with the evidence in the case I wanted to bring

13     to The Court's attention an issue that has been brewing

14     between the parties for the last several days.

15          As I think the Government is essentially asking us

16     to raise this with The Court, which is fine.

17          So on Friday afternoon, this past Friday, July 15,

18     the Government disclosed to the defense a report a

19     report that is dated July 15th, 2022.  One of the

20     signatures indicates July 13 or it could be 15th, I

21     can't read it.  But on July 15 of 2022 the Government

22     disclosed a report by Agent Josh Valot, who is a

23     special agent, I believe with the ATF.  That report

24     details a review of the traffic stop data that we had

25     provided to the Government, and indicates that there
```

155

1    are counts of certain numbers of stops that the

2    Government believed happened outside of the City of

3    Richmond, as well as instances that the Government

4    thought appeared to be duplicate records in the

5    information.  That report had no identification of

6    which line items or which control numbers the

7    Government believed were erroneous.  And so over the

8    weekend we had Dr. Coston check Dr. Coston's work

9    specifically for the locations that the Government

10   perceived to be outside the City of Richmond.  During

11   that discussion with Dr. Coston Dr. Coston indicated to

12   us that before Dr. Coston had run the analysis in

13   January, December and January of this past year, that

14   Dr. Coston had taken the data that the Federal Public

15   Defender office had provided, which was both the raw

16   data that the Richmond Police Department had sent us,

17   as well as the Geocodio accuracies that the intern at

18   the Federal Public Defender office had done, and

19   corrected the items that were below a .6 accuracy.

20        But what Dr. Coston found in plotting all of that

21   data is that there were additional instances of stops

22   that were outside of the City of Richmond.  So

23   Dr. Coston as Dr. Coston testified yesterday had gone

24   through and manually checked each one of those stops as

25   it related to the street information that was provided

**JA1407**

1    in the location column in defense exhibit 14.
2    Dr. Coston had done that prior.  We don't know exactly
3    the date.  We tried to figure that out last night.  But
4    it was definitely prior to January 9 of 2002.
5        I did not learn that Dr. Coston had taken that
6    additional step until we started drilling down this
7    weekend once we had a report that said that the
8    Government had made these findings.  Certainly the
9    Government in its motion limine, which is ECF 70, had
10   reported these but never provided any substance, any
11   reports that indicated that they had done further
12   analysis.  Nothing in their expert report indicates
13   that the expert had found these alleged discrepancies,
14   alleged discrepancies or information.  And so
15   Dr. Coston's report in defense exhibit two reports that
16   Dr. Coston had excluded 82 stops as being outside of
17   the City of Richmond.  When Dr. Coston this past
18   weekend had verified to see if that was accurate
19   Dr. Coston found that there were 81 stops that were
20   excluded.  Once we did that verification I provided it
21   to the Government.  That is how Dr. Coston testified
22   yesterday to explain the process of when Dr. Coston did
23   these corrections.  And Dr. Coston testified yesterday
24   that Dr. Coston had excluded 81 of the stops as being
25   outside of the City of Richmond.

1          Also, the Government provided between 9:00 and

2    10:00 p.m. last night for the first time a list of

3    control numbers that the Government believed were

4    duplicate entries.  I provided data about an hour later

5    to Dr. Coston.  Dr. Coston by 7:00 a.m. this morning

6    was able to review that, and may be in a position to

7    say that some of those, or potentially many of them, or

8    nearly all of them, may be duplicate records.

9          What Dr. Coston was able to determine as of, you

10   know, between last night and this morning is that

11   76.8 percent of the alleged duplicates were from black

12   drivers, and 14.5 percent of the duplicates were white

13   drivers.

14         THE COURT:  That is almost the same percentage as

15   the number of stops.

16         MS KOENIG:  It is, Your Honor.  So it's very

17   possible that these alleged duplicates may have no

18   impact on Dr. Coston's findings.  But because it may

19   impact the sample size I believe for the accuracy of

20   Dr. Coston's report and the integrity of the data in

21   this case it would be important for Dr. Coston to be

22   able to run those numbers again, and the test again,

23   with these duplicates in mind.

24         So I indicated -- I discussed that with

25   Dr. Coston.  Because Dr. Coston is in this courtroom

**JA1409**

158

1    today and has meetings scheduled all day tomorrow, the

2    earliest --

3         THE COURT:  This hearing is going to be done

4    today.  This part of it.

5         MS KOENIG:  So, what I am telling The Court is

6    that because the information that we have that we

7    received on the duplicates was given to us on Friday

8    afternoon Dr. Coston -- we didn't get the actual

9    duplicates that Government believed, or the line items

10    that the Government believed were duplicate -- I think

11    it is appropriate for Dr. Coston to submit a supplement

12    on whether or not these duplicates impact any of the

13    other findings.

14         THE COURT:  What do you have to say about that,

15    Mr. Gibbons?

16         MR. GIBBONS:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. GIBBONS:  The data was provided to the United

19    States on January 14th, 2022.  In that e-mail Ms Koenig

20    sent a first e-mail saying, I am going to send you all

21    two more e-mails as well.  One will contain the raw

22    data as we received it from the Richmond Police

23    Department; the other will contain the spread sheets as

24    prepared for final analysis.

25         True to word, we received two emails.  One

**JA1410**

1   contained the raw data, one contained what we call

2   corrected data.  The Government used corrected data in

3   all of its analyses over the last six and a half

4   months.  Yesterday we found out that that was not

5   actually the data that Dr. Coston relied upon.

6   Yesterday was the first time we saw that data.  And

7   when --

8        THE COURT:  That was last night?

9        MR. GIBBONS:  That was yesterday morning, Your

10  Honor, at 8:00 a.m.  When I talked to Ms Koenig

11  yesterday morning, I said, what is the difference

12  between this data and the data we have?  And was told

13  the only difference is that the data in exhibit 14 had

14  the stops removed, the 81 stops separated out from the

15  data.

16        THE COURT:  Eighty-one --

17        MR. GIBBONS:  Outside of --

18        MS KOENIG:  -- potentially duplicate.

19        MR. GIBBONS:  -- outside Richmond.

20        THE COURT:  Eighty-one stops outside Richmond.

21  Okay.

22        MR. GIBBONS:  So on that assumption we did not

23  object to exhibit 14 on the basis that it contained

24  improvements or corrections that the United States had

25  no knowledge of.

160

1        Dr. Coston never apparently provided the final

2    data set to the defense until this weekend.  And the

3    Government never received it until yesterday morning.

4        We found out after the hearing last night, after

5    we went to double check some of the numbers how this

6    was a different data set than the Government had access

7    to the entire time.

8        Your Honor, we raised all of these concerns about

9    the stops outside Richmond and the duplicates in our

10   April 8 filing.  We did not identify control numbers,

11   but we raised the issue there.  We have concerns about

12   the forthrightness of Dr. Coston's report.  Dr. Coston

13   said in their report in talking about the location

14   data, I verified a random selection -- well, let me

15   read one more sentence.  I'm sorry, Mr. Court Reporter.

16       "For all locations with less than a .6 accuracy

17   score locations were checked and corrected by an intern

18   with the Public Defenders Office.  I verified a random

19   selection of these to insure accuracy and corrected

20   latitude and longitude, and found no discrepancies in

21   the corrections."

22       Dr. Coston did not disclose that they corrected a

23   minimum of 128 data entries.  Never disclosed that to

24   the Government at all, didn't put that in the report.

25       THE COURT:  What do you want me to do?

**JA1412**

1          MR. GIBBONS:  We are in a difficult position, Your

2     Honor.  We agree to withdraw the location arguments we

3     made to Dr. Coston and in our report.  That took dozens

4     of hours to put together on the data that we had.

5          THE COURT:  The location arguments are that --

6     what location argument?

7          MR. GIBBONS:  The 209 stops located outside the

8     City of Richmond.  I think the parties are in agreement

9     that 81 of those are outside the City of Richmond.

10    These extra 128 we don't have time to run that

11    analysis, so we are just going to drop that argument,

12    Your Honor.

13         We do believe that the failure to disclose the

14    final data set is a Rule 16 violation, either by the

15    defense, if they didn't know Dr. Coston had a

16    additional data set, but we are in a difficult position

17    because we are talking with two different data sets

18    that are 99 percent similar, but have significant

19    differences.

20         THE COURT:  Well, if they are 99 percent similar

21    there is one percent difference.

22         MR. GIBBONS:  That is why we are a little bit spun

23    up about this issue, because we have done dozens and

24    literally hundreds of hours of work on the old data set

25    that we believed was the final one and now come to find

1    out yesterday it's a totally different data set.

2         THE COURT:  So what do you want me to do?

3         MR. GIBBONS:  I don't believe there is anything we

4    can do at this point, Your Honor.  We just wanted to

5    notify The Court that when we were kind of talking past

6    each other yesterday, Dr. Coston and I, it was a

7    misunderstanding about --

8         THE COURT:  I understand how it makes a little

9    more sense now.

10        MR. GIBBONS:  That is all we wanted to say, Your

11   Honor.

12        THE COURT:  Thank you.

13        All right.

14        Well, it looks like there is a minor difference in

15   the data Dr. Coston had, that the Government -- that

16   the defense had provided to the Government back in the

17   winter and the evidence that was presented yesterday.

18   But it appears to me that it's very minor.

19        So, let's hear from the Government.

20        MR. GIBBONS:  Government calls Dr. Michael Smith.

21        THE COURT:  All right.  Dr. Michael Smith, the

22   long-awaited Dr. Michael Smith.

23        Thank you for coming, sir.

24                    MICHAEL SMITH

25             AFFIRMED AND TESTIFIED AS FOLLOWS:

Smith - direct                                    **163**

```
 1                    DIRECT EXAMINATION
 2   BY MR. GIBBONS:
 3   Q    Good morning, Dr. Smith.
 4   A    Good morning.
 5   Q    Please introduce yourself to The Court.
 6   A    I am Michael Smith, professor of criminology and
 7   criminal justice at the University of Texas in San
 8   Antonio.
 9   Q    Let's start with a little bit of your background
10   and history.  Did you formerly work as a Richmond
11   Police Department patrol officer?
12   A    I did.
13   Q    How long ago was that?
14   A    More than 30 years ago.  Late '80s.
15   Q    What effect does your work as a RPD patrol officer
16   35 years ago have on your scientific work today?
17   A    None whatsoever.
18   Q    You received a B S?
19   A    Yes.
20   Q    Where did you receive that bachelors from and
21   when?
22   A    Right here, Virginia Commonwealth University.
23   Q    Then you went on to receive your juries doctor; is
24   that correct?
25   A    I did.
```

Smith - direct                                    **164**

1    Q    Where was that and when was that?

2    A    University of South Carolina in 1993.

3    Q    Then after that you received an additional degree,

4    correct?

5    A    That's correct.

6    Q    Tell us about that.

7    A    PhD Justice Studies from Arizona State University

8    that I obtained in 1996.

9    Q    You have been actively engaged in the field of

10   criminology and racial justice research since 1996?

11   A    Correct.  I have.

12   Q    Approximately how many published articles, how

13   many articles have you published on the topics of

14   criminology and racial disparity in policing?

15   A    I don't know.  I haven't counted them, but I would

16   say between 15 and 20, maybe, just on this particular

17   issue.

18   Q    How many total in the field of criminology

19   generally?

20   A    More than 50.

21   Q    In fact, you wrote one of the very first

22   peer-reviewed racial disparity papers; is that correct?

23   A    That's correct.

24   Q    Tell us about that.

25   A    That was an analysis from here, from Richmond.

**JA1416**

1    The analysis was done probably in 1999.  I think the

2    paper came out in 2000.  To my knowledge it is the

3    first peer-revieweded paper in this field.

4    Q    How many times has that peer reviewed paper been

5    cited in the literature?

6    A    Close to 300 the last time I checked.

7    Q    Is it accurate to say that you were one of the

8    foremost authorities in the country on racial

9    disparities in policing?

10        MS KOENIG:  Objection.  Calls for something that

11   is speculation on the witness' behalf, and also not

12   appropriate vouching for the Government.

13        THE COURT:  Well, go ahead, toot your horn.  I

14   guess the answer will be yes.  You are not going to say

15   no, I am not an authority, are you?

16        THE WITNESS:  So I am not going to.  I think most

17   people in our field who work this area would agree that

18   I am one of the leading figures in the discipline.

19   Q    Let's talk about work with quantitative methods.

20   What is your familiarity with data collection

21   procedures?

22   A    I am very familiar with them.

23   Q    How long have you been performing quantitative

24   research in the field of criminal justice?

25   A    For more than 25 years.

Smith - direct                              **166**

```
 1    Q    Does that include methods of data quality control?
 2    A    Yes.
 3    Q    How often do you use statistics in your research?
 4    A    Regularly.  All the time.
 5         THE COURT:  So, Dr. Smith, would you -- I
 6    neglected to write this down.  You are -- what did you
 7    get your PhD in at Arizona State?
 8         THE WITNESS:  Justice studies.
 9         THE COURT:  What does that entail?
10         THE WITNESS:  I am trained as a sociolegal
11    scholar.  So, it is the intersection of law and social
12    science's.
13         THE COURT:  Okay.
14         And what school are you in at UT San Antonio?
15         THE WITNESS:  That is the University of Texas at
16    San Antonio.
17         THE COURT:  I mean what --
18         THE WITNESS:  I am in the department of
19    criminology and criminal justice.
20         THE COURT:  Thank you.
21         THE WITNESS:  Yes, sir.
22    BY MR. GIBBONS:
23    Q    In fact are you chair of that department?
24    A    No, not any more.  I was the chair.
25    Q    Okay.
```

**JA1418**

1    A    Back on faculty now.

2    Q    What is your level of experience performing

3    research with quantitative methods?

4    A    As I said, I have been doing it for more than 25

5    years.

6    Q    You talked about some illustrative examples of the

7    kind of work you do that involves quantitative methods?

8    A    Sure.   In this particular, with respect to this

9    particular issue in this case it is one of my primary

10   areas of research expertise.   As you mentioned earlier,

11   asked earlier, I published many papers on this

12   particular topic, on racial disparities in

13   police-civilian contacts.   All of them involved

14   statistical analysis going back to that very first

15   paper in 2000.

16   Q    Can you give a couple of examples of the types of

17   engagements that you do as an expert and as a

18   consultant?

19   A    Sure.

20        In the early 2000s I served as the United States

21   Department of Justice's special litigation section's

22   methodology expert in a series of consent decree cases

23   in the early 2000s.   I have served as parts, either

24   held or served as parts of teams that have examined

25   large-scale data sets and done these sorts of analyses

1    that are at issue in this case in many agencies.  Some

2    of the larger ones would include state level, state

3    police agencies in Arizona.  There is a highway patrol,

4    Washington State Patrol.  I did a major study with the

5    Miami Dade Police Department, with the Los Angeles

6    Police Department, with, most recently with the San

7    Jose Police Department in California.

8    Q    Does your work as an expert witness include

9    representing plaintiffs in civil rights lawsuits?

10   A    Now and then, yes.

11   Q    Tell us about that.

12   A    I am currently an expert in a case in the Southern

13   District of New York that involves allegations of

14   racial disparate treatment and targeting of Latino

15   motorists in Suffolk County, New York.  And I am the

16   designated expert for the plaintiff in that case.

17        THE COURT:  So, he asked you I think, do you don't

18   represent people.  You don't handle those as the

19   plaintiff's lawyer?

20        THE WITNESS:  No, sir.  I am an expert.

21        THE COURT:  As an expert, okay.

22        THE WITNESS:  Yes.

23   BY MR. GIBBONS:

24   Q    Dr. Smith, have you ever worked for the Government

25   in your capacity as a social scientist who studies

1    racial disparities in policing?

2    A    I mentioned that I have in the past served as a

3    consultant, an expert consultant to the USDOJ.  So in

4    that capacity I was paid for that work.  So, yes.

5         MR. GIBBONS:  Your Honor, I tender Dr. Smith as an

6    expert in racial disparities and law enforcement and

7    quantitative methods?

8         MS KOENIG:  No objection, Your Honor.

9         THE COURT:  Thank you.  He is recognized as an

10   expert.  You obviously have testified in litigation in

11   the past.

12        THE WITNESS:  I have.

13        THE COURT:  Have you had any cases that have gone

14   to trial, or all been settled?

15        THE WITNESS:  I had one -- I actually testify as

16   an expert relatively rarely.  I have in the past.  One

17   of those cases went to trial.  It wasn't a racial

18   disparity case, it was a use of force case.

19        THE COURT:  Thank you.

20   BY MR. GIBBONS:

21   Q    If we could pull up what has been marked a

22   Government's exhibit three.

23        This is your expert report, Dr. Smith?

24   A    Yes, it is.

25   Q    I believe this has already been admitted, Your

 1    Honor.

 2          THE COURT:  Right.

 3    BY MR. GIBBONS:

 4    Q    Exhibit four?

 5          THE COURT:  His CV.  I have looked at it.

 6          MR. GIBBONS:  Has that been that admitted already,

 7    Your Honor?

 8          THE COURT:  It is now.

 9          MR. GIBBONS:  Great.

10          This is your CV, Dr. Smith?

11          THE WITNESS:  Yes.

12    BY MR. GIBBONS:

13    Q    Dr. Smith, as an expert in the field of racial

14    disparities in law enforcement have you reached

15    opinions in response to the opinions reached by

16    Dr. Coston?

17    A    Yes, I have.

18    Q    What are those opinions?

19    A    Well, the primary, I guess the primary conclusion

20    is that the analysis that Dr. Coston did cannot be

21    reliably relied upon to draw the conclusion that race

22    was a contributing factor to the decision-making that

23    occurred in this case.

24    Q    What are your opinions with regard to Dr. Coston's

25    quantitative methods?

1    A    The primary quantitative analysis that she

2    conducted, that Dr. Coston conducted, was discussed at

3    length yesterday.  The chi-square analysis.  It is a

4    well established sort of bivariate technique.

5              THE COURT:  A bivariate?

6              THE WITNESS:  Bivariate, two variables.  Race and

7    race and search.

8              Obviously that test is a statistical test that has

9    been around for, I don't know, a couple hundred years

10   probably, but it is used extensively in this field as a

11   stepping stone, a means to more involved and more

12   detailed analysis that typically follow that, what I

13   would consider an intermediate step in examining this

14   question of whether race had an influence on the

15   outcome or on the decision to stop.

16   Q    We will talk more about that in detail, but first

17   I want to talk about data collection and quality

18   control.  Are you familiar with state-wide efforts to

19   collect traffic stop data?

20   A    Yes, I am.

21   Q    How are you familiar?

22   A    As I said, I worked on analytic teams that

23   examined state-wide data collection, or the data

24   produced by state-wide data collection efforts in

25   Arizona and in the State of Washington.  As part of the

1    Arizona work, our team actually advised the Arizona

2    Highway Patrol on the fields and the process.  We

3    helped design the system that was in place.

4    Q    What are some of the common issues with state wide

5    efforts to collect traffic stop data?

6    A    Well, you know, there are, it is a fraught, it is

7    a fraught industry.  So what I mean by that is that we

8    have upward of 18,000 police departments in the United

9    States.  And they range from one person police

10   departments with a single police chief, up to the NYPD

11   with 35,000 police officers, and everything in between.

12        So when you are talking about trying to coordinate

13   data collection across an entire state, you are talking

14   even in small states of dozens or hundreds, and

15   sometimes, in some cases in larger states, thousands of

16   police departments, with varying sizes and

17   capabilities.  And you are trying to get them all on

18   the same page to collect the same data elements in the

19   same way in a consistent manner accurately.  And then

20   to enter them accurately into some system, some data

21   base, some interface that then can be, where the data

22   can be warehoused and eventually analyzed.

23        There are multiple opportunities throughout that

24   entire process for error to be introduced.  In my

25   experience it is very, very common that that is the

1    case across statewide efforts.  It is even common with

2    single agencies for them to struggle with, particularly

3    early on when data collection efforts are new to enter

4    the data correctly and accurately and reliably.

5    Q    What methods of data quality control do

6    researchers in the field of racial disparities use with

7    newly collected stop data?

8    A    So there are a wide variety of what I would term

9    data audit techniques that I use, that the teams that I

10   work on, typically use to understand the nature of the

11   data we are operating under.  In fact, we undertake

12   those data audits, those extensive data audits before

13   we begin to analyze the data in any substantive way.

14   And so, we check.  We check first of all for the

15   accuracy or in the completeness of each of the data

16   fields that are collected.  So, race, age, type of

17   stop, whether a search was conducted.  Each one of

18   these fields that may appear in the data we audit to

19   see how much of those data are missing, first of all.

20   That is one check that we undertake.  We do that across

21   all the fields.

22        Then we undertake an internal logic test or audit

23   to check to see whether or not variables that should be

24   related to one another in certain ways are in fact

25   related to each other in certain ways.

Smith - direct                                          **174**

1        So, as an example, if the data collection regime

2    asks the police department to indicate whether a search

3    was conducted and whether contraband was found, then

4    you should not have any instances where contraband was

5    found but a search wasn't conducted because contraband

6    is a product of the search.

7        So we call these internal logic checks.

8        So we do that across all potential variables that

9    could interact in a way that you would expect, or not

10    expect to see whether or not those data align, to see

11    whether there are internal consistencies or

12    inconsistencies across data fields.

13    Q    Go ahead.

14    A    Then the final type of check that we prefer to do

15    is to check the data that is collected by the police

16    department against an external data source.  This is an

17    overall validity check.  It helps answer the question

18    whether the police are accurately entering the data

19    into the system, whether they are doing that, doing

20    that accurately.  And it helps us understand whether or

21    not there are systemic patterns of differences that one

22    might not expect.

23        So, as an example, it's often a question in these

24    kinds of data collection processes, it is often a

25    question from stakeholder groups or from the community,

**JA1426**

1    there are lots of skeptics in the audience about

2    whether the police are really accurately entering

3    information, for example, on driver race.  You know,

4    the perception among some stakeholder groups of course

5    is that the police have every incentive not to enter

6    that data accurately.

7         So, an external audit would compare the stop data

8    that the police have entered into the system to some

9    external data source that should align with that stop

10   data.  For example, traffic citations.  So, in some

11   states traffic citations contain the race of the

12   driver.  The race of the driver is also entered into

13   the data collection system that is at issue.

14        We spent some time talking yesterday about control

15   numbers, and what we call case IDs, that is why they

16   are very important because they typically would, you

17   will be able to link a stop that has been cataloged in

18   the data collection system with the traffic, the

19   corresponding traffic citation that was issued in that

20   case to see whether or not the race that was indicated

21   on the traffic citation for the driver is the same as

22   the race that was indicated in the data collection

23   system.  An external audit check.  I do that in the way

24   that I just described with traffic citations.  You can

25   also, you know, in Miami Dade, for example, we took

1    random sample of drivers whose race ethnicity was

2    entered into the stop data system, and we obtained

3    their digital driver's license photos from DMV.  And we

4    had a panel of people review those driver's license

5    photos against the race and ethnicity indicator that

6    the officer provided in the data collection fields to

7    see whether or not there were obvious mismatches.

8    Officer indicates that the person is white when the

9    drivers license seems to indicate that they are

10   African-American, for example.

11        So that is another method that we use as an

12   overall check for validity.

13   Q    You talked about instances where there is missing

14   data in the traffic stop entry.  What is the data audit

15   standard for when a traffic stop entry contains one or

16   more cells of missing data?

17   A    Well, we typically like the agencies that we work

18   with, like to see less than a five percent missing data

19   rate in every field.  Often times, particularly early

20   on in the data collection process, if it is a new

21   system, or a new, you know, a new mandate, never been

22   in place before, you will see large percentages of

23   missing data.  And then through the process of

24   engagement with the agency that I worked with over the

25   years we work with them to help them get better to

**JA1428**

1    collect their data more accurately so that those

2    missing data percentages shrink.

3         Again, we hope -- there are certain rules of thumb

4    is less than five percent missing data.  Obviously the

5    smaller the better, but five percent is sort of the max

6    that we really wouldn't want to be able to see any

7    given data field.

8    Q    When you identify missing data when you go to

9    perform your analysis, what do you do with that data?

10   A    Well, if there is a case, when I say case, let's

11   say a traffic stop, that contains a missing piece of

12   information so the race of the driver isn't there,

13   there is a field, mandatory field that says you are

14   supposed to indicate whether a search was or was not

15   conducted and that is missing.  So if a single record,

16   single case, a single traffic stop has any piece of

17   missing information in it, then we exclude that case

18   from the analysis.

19        THE COURT:  Wait a second.  Suppose you were

20   checking to see race and they had forgotten to put in

21   gender.  You would exclude, still exclude that?

22        THE WITNESS:  Yes.

23        THE COURT:  Why is that?

24        THE WITNESS:  So that is, that is just a careful

25   data management practice that most experienced social

1    scientists follow.

2        THE COURT:  Well, but I don't understand how it

3    affects the validity of the racial data if they haven't

4    written down the gender.

5        THE WITNESS:  There was some discussion yesterday

6    about the idea that if a traffic, if a single record of

7    data contains missing information it at least raises

8    the question about whether there are other fields that

9    may not be accurately represented.  And so, granted, it

10   is a conservative approach to eliminate that data in

11   entire record, but that is the approach that most

12   social scientists that I am familiar with will take

13   with missing data.  And that is how I treat missing

14   data.

15       THE COURT:  I just don't understand if you are

16   concerned about race and there is -- I don't understand

17   why, why that --

18       THE WITNESS:  Well --

19       THE COURT:  -- why that says, well, we are going

20   to ignore those.

21       THE WITNESS:  Because often times, Your Honor,

22   race ends up being analyzed in conjunction with other

23   variables in that data set.  So if other variables that

24   interact with race are missing, then that would affect

25   the outcome of the analysis.

1      THE COURT:  So if you weren't checking for other

2   variables, then it wouldn't -- for instance if you were

3   looking to see whether there was an unusual number of

4   African-American women who were stopped, if we weren't

5   worried whether they were women, the identification

6   wouldn't affect that, would it?

7      THE WITNESS:  Probably not.  But in the analysis

8   that we typically do there are multiple interaction

9   effects that we examine.  It is almost never the case

10   that we would simply look at a variable in isolation

11   and not part of a larger set of analyses.  There is

12   more than one variable would be considered either in a

13   bivariate analysis like was conducted here, or in a

14   regression model.  So, again, the more conservative

15   approach is simply to eliminate any case that has

16   missing data in it it.

17   BY MR. GIBBONS:

18   Q    How do researchers in the field of racial

19   disparity research deal with duplicate data?

20   A    You have to diagnosis why -- first of all you have

21   to diagnosis what you are looking at.  Do you really

22   have truly duplicate cases?  If you truly have

23   duplicate cases, then it raises real questions about

24   why that is.  There is, you know, throws the data

25   collection process itself into question.

1        If the system is not designed to have duplicate
2    records in it, and it has duplicate records in it, then
3    that is a real problem, a real concern.  Obviously you
4    would eliminate those, but more fundamentally you would
5    be concerned that there is something wrong in the way
6    that the data were collected.
7        THE COURT:  So your concern that this, as with the
8    exclusion of things missing one of the cells, is
9    essentially that what you are worried about is that
10   there are overall sloppy collection techniques?
11       THE WITNESS:  That is part of the concern, Your
12   Honor, yes.
13       THE COURT:  What is the rest of it?
14       THE WITNESS:  Well, as I mentioned earlier, a
15   missing cell in and of itself, if that cell weren't of
16   concern to the analysis would probably be trivial.  But
17   because we interact so many of these variables with
18   each other, then it becomes non trivial or potentially
19   non trivial.
20       THE COURT:  So it has a statistical significance
21   in the way you run the statistical program.
22       THE WITNESS:  It could.
23       THE COURT:  But, I mean, like your main concern is
24   that these folks are doing that sloppy job gathering
25   the data.

USCA4 Appeal: 24-4201    Doc: 22-4    Filed: 09/04/2024    Pg: 196 of 406

1          THE WITNESS:  Statistically true of the larger,

2     the more missing data that there is the greater the

3     concern.   In cases of true duplicate records when there

4     shouldn't be duplicate records -- there are instances

5     you would expect to see duplicate records.   For

6     example, some traffic stop data collection regimes

7     collect data on everyone in the vehicle.   Driver and

8     passengers, for example.   So, the single traffic stop

9     which has the, which has an appropriate RMS system,

10    records management system, or CAD system, computer

11    aided system, would assign a unique ID number.   You

12    might expect to see multiple entries for that unique ID

13    number associated with the driver and let's say a

14    passenger, or a driver and two passengers, you know.

15    So you would see duplicate records under the same case

16    ID, but involving different individuals in the vehicle.

17    But when you have a data collection process where the

18    only information being collected is on the driver, you

19    might say, and you have duplicate records that appear

20    to be the same driver who has entries for him or her

21    more than once, then that is a systemic problem that is

22    of concern.

23    BY MR. GIBBONS:

24    Q    And if a researcher in the field of racial

25    disparity research happens to be stuck with wrong data

1    for one reason or another, what does that researcher do

2    about it?

3    A    Well, it depends how poor it is.  You know, there

4    is degrees of these things.  On some level the data may

5    be so poor that, you know, a reputable social scientist

6    would look and say these data are --

7         MS KOENIG:  I am going to object to that, they are

8    missing.  Testifying about what other people would do.

9    He can testify what he would do.

10        THE COURT:  I think what he is testifying is about

11   what the standard is in the field and tying this into

12   Dr. Coston's analysis of the data that he received.

13   And what he is saying, what I suspect he is going to

14   eventually say is Dr. Coston's methodology doesn't

15   comply with the standard in the field, and that it is

16   therefore unreliable so under Daubert I should not

17   consider it.

18        I think that is where we are going.

19        MR. GIBBONS:  Yes, Your Honor.

20        THE COURT:  So, what was the question?  The

21   question -- he was talking about there are degrees of

22   inaccuracies.  And what was the question about?

23        MR. GIBBONS:  The question was, if a researcher is

24   --

25        THE COURT:  What do you?

1        MR. GIBBONS:  What are, what do you do with it?

2        THE WITNESS:  I mentioned sort of a rule of thumb

3    of five percent, you know, missing data standard for

4    example.  It if it is under five percent then, of

5    course, as I said, we eliminate any case that is

6    missing a piece of information.  But, you know, I would

7    continue to proceed ahead to analyze those data.  If

8    the data were missing a larger percentage of

9    information, then at some point I believe, again

10   certainly myself and other researchers that I work with

11   regularly in this field -- would be concerned about

12   analyzing the data at all.

13       THE COURT:  So there is a degree of inaccuracy

14   above which you simply decide, well, this data is not

15   an appropriate subject of statistical investigation, is

16   that right?

17       THE WITNESS:  Yes, sir, Your Honor.

18       Usually there is conversation that is involved.

19   Often times, as I say, it's a continuum, right?  So

20   often times you will have data that falls above the

21   five percent threshold that we would like to see, but

22   nothing like, you know, not missing fifty percent of

23   the data.  So maybe 20 percent, let's say, my example.

24   Typically a conversation involved with the

25   stakeholders.  Sometimes that may be the City or the

1    police department.  Sometimes that might be, you know,

2    whoever commissioned the study or the analysis.  If it

3    is a federal grant you might have to have a

4    conversation with the granting agency.  But typically

5    there is a conversation that looks something like, hey,

6    we have taken a look at these data, we have audited the

7    data, we are missing 25 percent of the fields across

8    the data set.  We can proceed with the analysis, but

9    understand that that degree of missing data could

10   influence the outcome.  So depending on how that

11   conversation goes, we may or may not proceed.  If we do

12   proceed then we typically caveat the findings pretty

13   heavily in terms of what can be legitimately concluded

14   based upon them.

15        THE COURT:  Well, if the data is not reliable why

16   would you as reputable social scientist provide that to

17   your client who is presumably going to do something

18   with it?

19        THE WITNESS:  Because, you know, the primary

20   stakeholders' opinion matters, you know.  And they, you

21   know, have a voice and they should have a voice.  So

22   once the information is accurately presented to them

23   about what the data audit has revealed, and if it

24   reveals significant problems and they wish to proceed

25   with the analysis, then we would proceed.  But, again,

USCA4 Appeal: 24-4201    Doc: 22-4    Filed: 09/04/2024    Pg: 200 of 406

1    we will do that with full recognition on the part of

2    everyone that the data are missing significant pieces

3    of information or are otherwise unreliable, and

4    therefore the results have to be taken with a very

5    large grain of salt.

6         THE COURT:  So you would tell them, we will

7    proceed, you have got to understand you are getting a

8    Yugo and not a Mercedes?

9         THE WITNESS:  Yes, sir.

10   BY MR. GIBBONS:

11   Q    Dr. Smith, we talked about data collection

12   procedures and collecting the data.

13        Now I would like to go to the next step, which is

14   benchmarking.  Specifically with reference to racial

15   disparity research.  What is the main problem that

16   researchers face in benchmarking?

17   A    Well, the problem with benchmarking, we call that

18   the benchmarking problem.  The basic idea is that it is

19   relatively easy, we have been talking here this morning

20   about collecting data and the difficulties and the

21   complexities of that, which is all true, yet when the

22   processes mature enough and has sort of passed that,

23   you know, that five percent missing data reliability

24   check box and, you know, internal validity checks are,

25   you know, aligning and so forth, we would have fairly

1    high degree of confidence the data are being collected

2    appropriately.  So, then ascertaining the race, for

3    example, or ethnicity of the driver as indicated by the

4    officers when they make traffic stops is sort of

5    relatively easy, you know.  The cops are required to

6    enter this information.  They enter that information

7    reliably, and so we know that over a period of time

8    they have made X number of traffic stops and some

9    percentage of them are of white drivers and some

10   percentage African-American driers or Spanish drivers

11   and so forth.  So that is administrative data that sort

12   of serves as a foundation of the analysis.

13          But knowing that a percentage of -- that the

14   percentage of a population of stops is comprised of

15   some percentage of whites, blacks, Hispanics and Asian,

16   for example, is meaningless unless you can compare that

17   to a meaningful population.  That's in the, that is the

18   heart of the benchmarking problem.  So identifying what

19   that -- that meaningful population should be an

20   estimate, a reliable estimate, of the people who are at

21   risk or available to be stopped in that jurisdiction.

22          That is the definition of what a benchmark, good

23   benchmark, should be.

24          THE COURT:  Let me see if I understand correctly.

25          You said, I think, a second ago, ascertaining the

**JA1438**

1    race is the easy part.

2         THE WITNESS:  Yes.

3         THE COURT:  Because you can know how to identify

4    people's race.

5         But the difficult thing is comparing that to a

6    meaningful population of the people who are essentially

7    available to be stopped.

8         THE WITNESS:  That's correct, Your Honor.

9         THE COURT:  In this case, that would be the

10   motoring public during the relevant time period.

11        THE WITNESS:  That is exactly right.

12        THE COURT:  So if there are -- if there are a

13   hundred thousand drivers motoring in a particular area,

14   and you would need to know -- let's back up a second.

15        I am trying to see how the plays out.

16        Well, let's just look at our case here.

17        If, well, 77 percent of the people are stopped by

18   the police are African-American, would you, would it be

19   important to know whether 77 percent of the people who

20   were driving around are also African-American, in which

21   case it would not be surprising that 77 percent of

22   people stopped are African-American?

23        THE WITNESS:  That's right, Your Honor.

24        THE COURT:  But in contrast, if ten percent of the

25   people who are driving around are African-American and

Smith - direct                                        188

1    77 people, or percent of the people who were stopped

2    are African-American, that would be a more meaningful

3    statistic in terms finding some sort of discrimination.

4         THE WITNESS:  Correct.

5         THE COURT:  And okay.

6         Now, how do I make -- I may be getting ahead of

7    myself here.  I apologize.

8         How do you decide what kind of -- how do you

9    determine a disparity for motor vehicle stops,

10   benchmark for motor vehicle stops?  I take it you are

11   doing this in this Suffolk County case you are working

12   on?

13        THE WITNESS:  Actually, we are not.

14        THE COURT:  Why are you not?

15        THE WITNESS:  Because we don't have the data.

16        THE COURT:  So what are you going to testify

17   about?  Are you going to be the Dr. Coston in that

18   case, that was consulted by some statistician from a

19   university?

20        THE WITNESS:  Well, so the benchmark question is

21   the key in the -- if the -- if the question at issue is

22   whether the police are disproportionately targeting

23   minority drivers, then the only way to answer that

24   question is if you have an estimate of the population

25   of persons who are available to be stopped and the

**JA1440**

1    racial composition of those people.

2           THE COURT:  Right.

3           THE WITNESS:  We estimate that -- there have been

4    a variety of ways that have been attempted over the

5    years, and there is kind of three main ones that sort

6    of surfaced in the peer-reviewed literature over the

7    last 20 years, I would say, of ways to do that.

8           One is direct field observation.  Some might

9    consider that the gold standard of benchmarking.  That

10   literally means you put a research assistants typically

11   on street corners making observations of drivers.  More

12   sophisticated ways of doing that involve actually

13   looking at traffic violations as well.  So, I did an

14   observation study once in Miami Dade County, for

15   example, where we measured not only systematically the

16   perceived race and ethnicity of people passing by in

17   vehicles at selected intersections, but we also looked

18   at traffic violations at those selected intersections.

19   So we had researchers with radar guns looking at speed.

20   We looked at red light violations.  And we looked at

21   controlled intersections like stop sign violations as

22   well.  So there is a range of ways that you can do it.

23   But basically the idea is you are putting people out on

24   the roadways actually making observations of who is

25   driving and who is committing traffic violations at

1  certain places.  It's an excellent way to estimate who

2  is out there driving and who is out there violating

3  traffic laws.  The problem with it is very time

4  consuming and expensive to do.  So there haven't been

5  that many of those kinds of studies done.  Primarily

6  because of the time and expense that is involved.  That

7  is one technique, though.

8       Another technique that has again emerged I think

9  in the scientific literature was mentioned yesterday,

10  veil of darkness approach.  It is actually, it is

11  useful and doesn't require an external benchmark.  It's

12  an analysis of the stops themselves based on the time

13  of the day.  Now, there is some significant assumptions

14  built into that recently, for example, been called into

15  question.

16       But the basic idea with veil of darkness approach

17  is that the researcher compares stops of drivers by

18  different races during the day to stops of those

19  drivers of different races at night.  They use, we use

20  natural variation in daylight and daylight savings time

21  to do that type analysis.  So, for example, at

22  5:00 p.m. in December it is dark in a lot of places in

23  the country.  At 5:00 p.m. on July 1st it is broad

24  daylight in a lot of places.  So, the veil of darkness

25  uses that natural variation in daylight and in daylight

1    savings time to look at windows of stops that are

2    sometimes at night in full darkness, and sometimes at

3    day, in the day, depending on the time of the year, to

4    see whether or not those daytime and nighttime stops

5    vary by the race or ethnicity of the driver.  So the

6    basic picture here is that if you assume, and this is

7    one of the assumptions, the untested assumptions of the

8    veil of darkness approach.  But if you assume that

9    officers, that it is more difficult to ascertain the

10   race and ethnicity of the driver prior to the stop when

11   it's dark outside, if you make that assumption then the

12   nighttime set of stops represent a less biased estimate

13   of traffic stop behavior because presumably the

14   officers can't tell who they are stopping until they

15   walk up to the car.  And you compare that the stops

16   that are made during the day of that same racial group.

17   And if you see higher rates of stops of minorities, for

18   example, during the day compared to the percentage of

19   minorities who are stopped at night, then that is some

20   indication that there may be a biased mechanism

21   involved that.

22        I have done that analysis a number of times myself

23   and reported it in the peer-reviewed literature.  So it

24   is an accepted technique, Your Honor, to estimate the

25   benchmark, a benchmark of drivers compared stops.

Smith - direct                                                        192

1          The other technique that has appeared a number of

2    times in the literature is use of traffic crash data to

3    estimate the population of persons at risk for being

4    stopped.

5          So this technique was developed in the early

6    2000s.  I was actually part of the team that pioneered

7    this technique.

8          It has been replicated a number of times now in

9    the peer-reviewed literature as well.  So the idea and

10   this comes from traffic safety literature going all the

11   way back to the '50s.  The idea is that when people are

12   victims of traffic crashes, meaning they are not at

13   fault, they were just run into, that over time and over

14   a large enough sample of those not at fault drivers in

15   crashes that population provides a reliable estimate of

16   who is actually out there driving available to be run

17   into if you will look at it that way.

18         So, if 40 percent of your not-at-fault traffic

19   crash victims are African-American then that gives you

20   a pretty good idea that about holder groups percent of

21   your drivers are African-American.

22         So, this analysis then compares the percentage of

23   people who are not-at-fault drivers in two vehicle

24   crashes by race against, that is the benchmark, against

25   which police stops by race are compared.

1         So that is a long answer to the question, Your

2    Honor, but those are the three main techniques I think

3    emerged in the peer-reviewed literature in the last 20

4    years.

5         THE COURT:  Okay.  See if I have it correctly.

6    Three ways to do this.  One is to count noses.  Two

7    is -- three is to look at crashes.  And two is veil of

8    darkness.

9         THE WITNESS:  Yes.

10        THE COURT:  Okay.

11        THE WITNESS:  There are a few others that have

12   been attempted.  Looking at red light cameras, for

13   example, things like that.

14        THE COURT:  All right.  Go ahead.

15   BY MR. GIBBONS:

16   Q    You are doing my job for me, Your Honor.

17        THE COURT:  Well, no, I am not.  I am fouling up

18   your case for you, probably.  You wouldn't be alone.

19   BY MR. GIBBONS:

20   Q    Dr. Smith, census data was used, especially

21   initially, or is used as a benchmark.  Talk about the

22   advantages and disadvantages of using census data as

23   benchmark.

24   A    Census data is what I have termed a first

25   generation benchmark.  It was the earliest type

USCA4 Appeal: 24-4201    Doc: 22-4    Filed: 09/04/2024    Pg: 209 of 406

1    benchmarking that people in the field did.

2            THE COURT:  In a traffic stop.

3            THE WITNESS:  In traffic stop analysis.

4            So first generation benchmark.  We did this around

5    2000 in a few years on either side of it primarily.

6    Frankly, because the science had not evolved beyond

7    that.

8            When I did that first paper in Richmond in 2000,

9    for example, there was no peer-reviewed literature.

10   There was some agency reports, expert witness reports a

11   little bit that had been done.  But there was no

12   literature base, no scientific base to draw upon when

13   trying to figure out how do we, what do we compare

14   against the percentage of drivers who have been stopped

15   by the police who have given us, given race or

16   ethnicity.

17           So, you know, an easy way, and in some ways sort

18   of an intuitive way, is to say, let's just look at the

19   census data, look at, you know, who resides in a

20   particular jurisdiction and compare those racial

21   composition of who lives there to the composition of

22   who is stopped.

23           So, that is the first generation, sort of set of

24   analyses that were done using census data as a

25   benchmark.

Smith - direct                                                    195

1          We were pretty quickly, even then, for example,

2     look at my Richmond paper from 22 years ago, there is

3     some recognition, you know, some recognition that we at

4     least ought to look at the sort of age-adjusted

5     population, look at people who are 16 and older, for

6     example.  If you have to be 16 to get a driver's

7     license we thought then at least we ought to be looking

8     at the population that is 16 and older in a given

9     jurisdiction to at least rule out, you know, the three

10    year olds who can't drive a car.  So that is what we

11    did.

12         When I say we, this is literally what I did in the

13    early, in the early 2000s, but what other researchers

14    did in a number of other papers that were published in

15    those days.

16         It pretty quickly evolved, though, to the point

17    where we began to recognize that the census population

18    is really a poor benchmark.  It as poor estimate for

19    actually who is driving in a population.  That is

20    really what we care about.  We need to compare apples

21    to apples.  If we are comparing police stops we need to

22    be comparing that to who is available to be stopped.

23    Which means you have to be driving to be available to

24    be stopped.  You can't just be living there.

25         So, there were some many comparative studies that

JA1447

1    began to look at how do we, if we can estimate the

2    population using one of these techniques I just

3    mentioned, and we compare it to the census population,

4    we begin to see big divergences.  In some places

5    significant divergences.  So you can think about, you

6    know, any given large urban area that has suburbs.  We

7    have large numbers of people, at least pre COVID, who

8    commuted to work every day.  Those suburbs often look

9    very different from a race and ethnicity standpoint

10   than the residential population of the City being the

11   core, the urban core of the city where the stops are

12   occurring.  So research began to uncover that.  We

13   began to realize, hey, using the census as an estimate

14   for who is driving is really not good science.  And so,

15   you know, people who work in this area regularly,

16   analysts like me, who work in this area regularly,

17   stopped using the census as a benchmark at some point

18   around, you know, 2005 to 2010 primarily.

19   Q    How well does census data account for factors such

20   as police deployment patterns, or potential driving

21   differences among racial groups?

22   A    Well, it doesn't account for those at all.  So the

23   answer is, it doesn't account for them at all.

24   Q    Despite the movement away from census data and

25   racial disparity research, do you still occasionally

1    see census data being used in articles?

2    A    You know, I have not seen census data used as a

3    benchmark in the peer-reviewed literature, and I would

4    review a lot of these papers.  I want to say in the

5    last five to seven years I have not seen that.

6         Now, some people will submit papers using the

7    census benchmark.  Reviewers typically reject those for

8    the reasons I just articulated.  I can't say there has

9    not been a paper that used census as benchmark against

10   traffic stops, but it has certainly fallen out of

11   regular use in favor among experienced social

12   scientists who work in this field.

13   Q    Yesterday defense talked about a New York stop and

14   frisk article that relied on census data.  Why is that

15   comparison inapt?

16   A    So, a stop and frisk analysis compares the racial

17   composition of people stopped and frisked by the

18   police.  That is analogous to the traffic stop data

19   that the police collect.  In that case it seems, and

20   again, I haven't read than paper, but at least from the

21   representation in the courtroom yesterday, to the

22   census population of people who live in particular

23   areas of New York.

24        MS KOENIG:  I think I just heard -- objection, I

25   just heard Dr. Smith say he had not read the paper.  I

1    don't know that it as appropriate for him to comment on

2    something he hasn't read.

3         THE COURT:  Well, I think what he is commenting on

4    is not so much the paper but on how you benchmark stop

5    and frisk to something else.

6         Is that fair to say, Mr. Gibbons?

7         MR. SIEBERT:  I can rephrase the question.  I

8    think it will help.

9         THE COURT:  Rephrase.

10   BY MR. GIBBONS:

11   Q    Dr. Smith, what population of citizens does the

12   New York stop and frisk study analyze?

13        THE COURT:  He doesn't know.  He hasn't read it.

14        THE WITNESS:  There have been many studies that

15   have been done of NYPD stop and frisk practices, some

16   of which have used some version of the census, not

17   necessarily as a benchmark, but as part of the analysis

18   that is done.

19   Q    In particular that article that was referenced

20   yesterday, did that concern pedestrian stops?

21   A    Stop and frisk study, it concerns pedestrians, not

22   drivers.

23   Q    What is the difference between pedestrian

24   benchmarks and driving benchmarks?

25   A    Well, again, benchmark the science of benchmark,

1    benchmarking is about trying to identify the best

2    estimate that we have of who is driving in a

3    population.  Who is available to be stopped if it is a

4    traffic stop study.  Or in a pedestrian stop study, it

5    is trying to define the best estimate of who is

6    available to be are stopped on the street as a

7    pedestrian by the police.

8         And some would argue that census data is a better

9    estimate, closer estimate for pedestrian stop studies

10   than it would be for traffic stop studies because it is

11   a representation of who lives and circulating on foot,

12   presumably, in an area, particularly in an urban area.

13   Q    I would like to talk now about the reasons that

14   motorists be stopped by the police.  What are the risk

15   factors that would lead to a traffic stop from the

16   motorists' perspective?

17   A    Number one factor is how you drive.  So, violating

18   behavior is a significant risk factor.  The type of

19   vehicle that is driven.  So, traffic codes across the

20   country have lots of provisions that regulate the

21   condition of the vehicle that are citable if the

22   vehicle doesn't meet those conditions.  So that is a

23   risk factor for stops by the police.

24        The deployment or the concentration of police

25   officers in certain places in proximity to large

Smith - direct                          **200**

1    numbers of drivers matters.  So it's not uncommon to

2    see a cluster of traffic stops, for example, along

3    major thoroughfares because they carry not only higher

4    volume of, they carry high volume of cars, but they

5    also carry higher volumes of cops who are out there

6    looking for people who are violating traffic laws.

7           So that can matter.

8           Those are a few.  The main ones.

9    Q    Speaking across the nation, does it appear that

10   there is a raw statistical racial disparity in who

11   police stop?

12   A    So it's not uncommon for the traffic stop

13   literature to uncover racial disparities in traffic

14   stops even applying the appropriate benchmarks that I

15   mentioned.

16   Q    What can a researcher determine about whether bias

17   is an issue in that particular traffic stop when they

18   discover a raw statistical disparity?

19          THE COURT:  Are you asking if whether you can

20   conclude that a particular stop is based upon racial

21   bias?  Is that what you are asking from overall

22   statistics?

23          MR. GIBBONS:  Or or how inference is made given

24   the raw statistical few disparities in question, Your

25   Honor.

**JA1452**

Smith - direct                                    **201**

1          THE COURT:  Whether they are not with regard to a

2     particular stop, but with regard to a pattern of stops?

3          MR. GIBBONS:  Yes, Your Honor.

4          THE COURT:  Okay.

5          So the question is, from a statistical, or from a

6     numerical disparity of stops what can you conclude

7     about whether there is an overall problem, I guess?

8          THE WITNESS:  I understand the question, Your

9     Honor.

10         The crux of the issue in a lot of these cases.  So

11    I will say this.  Careful social scientists that work

12    routinely with these kinds of data and do these kinds

13    of analyses do not purport to reach conclusions about

14    discrimination or potential discrimination based

15    upon -- based on the findings of disparity in traffic

16    stops.

17    BY MR. GIBBONS:

18    Q    I would --

19         THE COURT:  What you are saying is that a

20    disparity in the number of stops does not justify a

21    conclusion that there is biased policing; is that

22    correct?

23         THE WITNESS:  That's correct.  And that is because

24    there are -- for a number of reasons.  First of all, it

25    is, you know, benchmarking is, as we have just been

**JA1453**

1    discussing, is an inexact science in and of itself.

2    Every benchmark as its limitations.  Some are worse

3    than others and have been largely discarded by the

4    scientific community.  Even the ones that remain

5    standing are estimates, right.  Who is driving out

6    there on any given day.  That is one problem or one

7    reason why careful researchers don't make claims about

8    discrimination based on estimates of bias -- of

9    disparity.

10           And then in the other reason is for, going back to

11    the previous question, that there are typically a host

12    of factors that can cause racially disparity results in

13    traffic stops.  Many of which have nothing, logically

14    nothing to do with potential bias decision making by

15    the police.  And some of those variables are often

16    times not well measured.  We don't have them in the

17    data, or they are -- they can't otherwise be measured

18    or controlled.  And so, you know, you are left with

19    some often times, back to the question you just asked,

20    you are often times left with disparities in traffic

21    stop study findings.  That is probably more common than

22    not across the literature.  But what you typically

23    won't find, in the peer-reviewed scientific literature

24    any way, are claims that those disparities mean that

25    the police are out there targeting people because of

1    their race.

2          THE COURT:  So then unfortunately, or fortunately,

3    depending how you look it, our country has come a long

4    way from the days of Sheriff Bull Connor down in

5    Alabama or Georgia, wherever he was, saying that he is

6    going to treat African-American people badly.  People

7    just don't say that any more.  How do you prove that

8    there is bias in policing without a smoking gun,

9    somebody saying, let's go arrest all the

10   African-Americans?

11         THE WITNESS:  Well, from a social science

12   standpoint, good social scientists don't make claims

13   that, we say, go beyond your data.  You know you have

14   to be humble in this field and recognize that you are a

15   social scientist, you are not working inside a

16   laboratory.  You are not a physicist or chemist who can

17   control the environment.  You are working with real

18   world data that is often messy.  And where a whole host

19   of real world factors can impact the results that you

20   are interested in analyzing.

21         So, what you have to be very careful of is

22   getting, not making claims that get out ahead of your

23   data where you say things that the data cannot support

24   from a scientific standpoint. So, you know, it is

25   proceedings like this and people like yourself and the

1    attorneys that ultimately have to decide, you know,

2    based on legal standards what equals discrimination or

3    what doesn't.  It is people like me that can only help

4    inform you that there are limits to what we can say and

5    not say about that ultimate question.

6         THE COURT:  Well, but I have got to make the

7    decision in this case.  And I guess there will are

8    probably other judges out there that that need to make

9    similar decisions in similar cases.  And going beyond

10   me, there are political leaders who need to make

11   similar decisions for moral grounds.  You don't want a

12   society that allows that.

13        But what are telling me is that a simple disparity

14   doesn't justify my making a decision that there is

15   biased policing.  So what do I need on top of that if,

16   assuming once again that I am not going to have police

17   officers saying let's go arrest all the

18   African-Americans, or whatever.

19        THE WITNESS:  Well, sometimes there is direct

20   evidence of that.  There is text messages, there is MDT

21   messages, there is radio chatter that provide direct

22   evidence of potential bias on the part of officers.

23   But absent that smoking gun, you know, a high quality

24   racial disparity analysis of traffic stops, for

25   example, looks at a variety of the dimensions across

1    the data.  From the initial stop decision, the initial

2    disparities potentially and who is stopped, to a

3    variety of post-stop outcome, some of which Dr. Coston

4    spoke to in his report.

5          But, in a much more in depth and more

6    sophisticated way that considers not just two variable

7    together, but multiple variable, multiple inputs where

8    we take account for and control for as many of the

9    known variables that are the variables that are known

10   to influence the outcome where we control for those in

11   a multivariate progression model typically.  And then

12   if you have a situation where you have multiple

13   indicators that align so there are disparities in the

14   traffic stop data itself applying the best available

15   benchmarks that we have for estimating the driving

16   population, and you have disparities in post-stop

17   outcomes, after taking into account all of the relevant

18   variables that potentially could influence those

19   outcomes, when those factors align.  Then as a social

20   scientist and as a police researcher who is often times

21   asked this question by policymakers, I get closer to

22   being able to be comfortable in saying you have a

23   problem.

24   BY MR. GIBBONS:

25   Q    Dr. Smith, you talked about the importance of

1    controlling for other variable in order to determine if

2    this initial statistical disparity actually means there

3    is bias present.  Can you offer an example of where

4    there existed statistical disparity after controlling

5    for that disparity disappeared?

6    A    Yes.  Let's take arrest as an example.

7         So it's not uncommon in the peer-reviewed

8    literature to find, for there to be findings in these

9    kinds of post-stop analyses that minorities,

10   African-American and/or Hispanics, are arrested more

11   often than whites.  That is a common finding.

12        And if do just a basic bivariate analysis you

13   cross, you know, the outcome, arrest, no arrest, with

14   race, you know, black or white, you often times find

15   disparity.  That is what I alluded to earlier as an

16   intermediate stop in the analysis.  That, you know, the

17   better quality studies that either I have done or I am

18   aware of don't stop there.  They go on to engage in

19   regression analysis where we look at a variety of

20   independent variables or factors that may contribute to

21   that arrest outcome; that are known from either the

22   theoretical literature or from the empirical literature

23   to predict that outcome, and we control for those,

24   statistically a regression equation, so that we can

25   isolate the effect of race by itself independently of

1    those other factors.

2          So I mentioned that at one point in my career I

3    worked -- I did, I was part of the analysis team that

4    analyzed the data from the Los Angeles Police

5    Department during the time that it was under a consent

6    decree with the United States Department of Justice for

7    potentially biased policing, among other things.

8          So, the team that I was a part of, and I was the

9    chief methodologist for that team, were hired by the

10   City of Los Angeles to analyze its data in response to

11   the requirement that it do that from the consent

12   decree.  So we analyzed nearly a million records, more

13   than a million as I recall now, traffic stops in Los

14   Angeles over a period of years.

15         And one of the findings initially, one of the

16   bivariate findings was exactly what I said.  That

17   minority, minority drivers in L A are more likely to be

18   arrested by the LAPD than non minority drivers.  When

19   we controlled for the appropriate variables in the

20   regression equations those disparities disappeared.

21         The variable that made the most difference, there

22   were a couple, but the one that made the most

23   difference was controlling for whether the driver had a

24   warrant on file when he or she was stopped.  So, if the

25   police stop a driver and they run that individual's

1      information through NCIC or the state level equivalent

2      and the driver comes back with a warrant for that

3      individual's arrest, that is virtually a non

4      discretionary arrest on the part of the officer.  The

5      officer will always, almost always make that arrest.

6      So if you have one racial group with more warrants on

7      file than another racial group and you don't control

8      for that then you will reach a spurious conclusion

9      based on the bivariate analysis that you have just run

10     that African-American drivers or Hispanic drivers are

11     more likely to be arrested.

12         THE COURT:  Well, arrest.  There are a lot of

13     things that come into play in a multicultural society.

14     So for instance in my neighborhood if you wanted to

15     arrest young men, if you wanted to stop young men

16     between 18 and 24 you could just drive around in your

17     police car and eventually you would see dozens of

18     little cars with no mufflers.  You would -- all of

19     those people, everybody that drives them commit some

20     sort of offense sooner or later.  And you just follow

21     that car and you would stop it you could arrest

22     77 percent of the people that you wanted to between the

23     ages of 18 and 24.  That kind of cultural bias exists

24     in, I am sure, in African-American drivers as well.

25     You can identify -- you can use proxies for race and

1    identify people.

2         Do you agree with that?

3         THE WITNESS:  Yes.

4         THE COURT:  So how do you -- and yet that would

5    come through in your regression analysis as, well, you

6    stopped somebody because the car had no muffler, or

7    stopped somebody because they didn't signal a turn.

8    How do you deal with that?

9         THE WITNESS:  So, thank you.  A good question.

10        So, I mean you do that in regression model by

11   controlling for the reason for the stop and the

12   seriousness of the offense.  So those are the proxies

13   that you have just identified.  So you control for

14   equipment violation stops, for example.  If the outcome

15   of interest is was the person arrested, or were they

16   given a ticket, you control for the reason for the stop

17   and you control for the seriousness of the offense.  So

18   it matters, for example, if someone is stopped for

19   going five miles an hour over the speed limit there is

20   a qualitative difference between that and someone who

21   is driving 25 miles over an hour over the speed limit.

22   So ideally you want to control for those two factors

23   when you predict whether race in those factors

24   continues to predict the outcome of interest, whether

25   it is a ticket or physical arrest or search.

1       So, what we have done over the years, 20 years of

2    science, is we have gotten better at this, and we have

3    been able to through, this is how science proceeds,

4    right, in any field?  You know, when I did that first

5    paper in 2000 there was virtually no literature, no

6    road map.  Now there is.  There is a detailed road map

7    of the kinds of things that you should consider and

8    control for in a regression model when attempting to

9    predict what the coming outcome of interest may be.

10       There is very voluminous scientific literature on

11    that now that emerged in the last 25 years.  So that is

12    what we do, Your Honor.  The best studies have those

13    data, and they control for those proxies, as you put

14    it, before reaching a conclusion that there are

15    disparities or no disparities in the outcome of

16    interest.

17       THE COURT:  All right.  Go ahead.

18    BY MR. GIBBONS:

19    Q    So am I understanding that answer correctly to say

20    that if race was the true reason for the stop and there

21    was a pre-textual reason for the stop that was offered,

22    over a time using a sophisticated regression model that

23    evidence of the racial bias would emerge from that

24    regression model?

25    A    You could, you know, when you have the correct

1    variables in a model -- again this goes back to the

2    earlier question -- you can begin to rule out

3    alternative hypotheses for the disparity in the outcome

4    that you see.  That is basically the whole exercise.

5    It's not enough from a causation standpoint to say two

6    variables or correlated with one another.  That is just

7    step one in the causation stream.

8         What is also needed is, and what is crucial, is to

9    to be able to rule out that there are not other

10   variables that are also causing the outcome.  We call

11   that, you know, exogenous or spuriousness.  You have to

12   be able to, in order to reach the conclusion that A

13   causes B you have to know that A and B are correlated.

14   You have to know that A preceded B in time.  A occurred

15   before B.

16        And you have to know that there are not other,

17   these other variables that may also be at work, like

18   for existing warrants on file, for example, that aren't

19   being considered, or you have to consider those and

20   control for them in order to reach the calculation that

21   A caused B.

22        THE COURT:  All right.

23        Are we a good spot to stop?

24        MR. GIBBONS:  I was just going to suggest that.

25        THE COURT:  When we get back I hope we will focus

Smith - direct                                    212

1    in on Dr. Coston's study specifically.

2         MR. GIBBONS:  We have bounced around.  I will try

3    to narrow it down.

4         THE COURT:  I apologize for causing that.  All

5    right, let's take a break.  Thank you.

6                    (A recess was taken)

7         THE COURT:  All right.

8         Resume your questioning of Dr. Smith.

9    BY MR. GIBBONS:

10   Q    Dr. Smith, I would like to very briefly talk about

11   police deployment matters and then turn to Dr. Coston's

12   analysis.  How do police typically deploy patrol

13   officers?

14   A    In most urban areas this is done based on two

15   factors, crime and calls for service.

16   Q    What do criminal justice researchers know about

17   the incidental ratio effect of these police employment

18   patterns?

19   A    Well, the reality in the United States is that

20   race and crime calls for service are often correlated.

21   Q    And then how do you do criminal justice

22   researchers view the instances of race versus crime and

23   calls for service in --

24        THE COURT:  When you say they are correlated, tell

25   me what you mean by that in terms of African-Americans.

Smith - direct                                          213

```
 1          THE WITNESS:  So, if the police in most urban
 2     areas in the United States are deploying officers based
 3     on the crime and calls for service in particular
 4     precincts or areas of the city, those areas of the
 5     city, it is not uncommon for those areas of the city to
 6     also be disproportionally populated with minority
 7     citizens.  And so the end result then often times is
 8     that there is a higher concentration of police officers
 9     in minority communities than there are in majority
10     white communities.
11          THE COURT:  So here is the thing that I find
12     interesting about all this.
13          You could probably, do you know of an area of
14     Richmond called Windsor Farms?
15          THE WITNESS:  Yes, sir.
16          THE COURT:  You could probably drive around
17     Windsor Farms at 70 miles an hour and never see a
18     police officer because it's all full of rich people,
19     and I don't imagine there is much crime, or if there is
20     everybody has their own burglar alarm.  Contrast that
21     with Highland Park.  If you drove 70 miles an hour
22     through Highland Park you would be stopped in a heart
23     beat because there are police everywhere over there.
24     So my question is this.  The fact that there is police
25     everywhere means there is more arrests.  So it feeds
```

**JA1465**

1   itself in this sort of a never-ending cycle with, if it

2   is legitimate -- and I am not saying it's not -- to

3   send police where the crimes are.  Where you send more

4   police you find more crime.

5       THE WITNESS:  Well, I would actually dispute that.

6   Crime is a social fact that is out there.  I think when

7   you send more police to a neighborhood and you give

8   them, than in another neighborhood, and you give them

9   the mission to go find crime, then they will do that.

10  And they will make more arrests.  But arrests are not a

11  measure of crime.  Arrests are a measure of police

12  activity.  Crime is a social phenomena that occurs with

13  or without the police being present.

14      Now, we know from the social experiment that the

15  country has just gone through that what happens when

16  police disengage, or when, and when police departments

17  are at half their strength, there is a long history of

18  that, but most recently there is certainly a

19  correlation between violent crime, for example, and

20  lack of police.  But, police don't cause crime.  Police

21  uncover crime.  And the arrests are a measure of police

22  activity, they are not a measure of crime.

23      THE COURT:  Okay.

24      So a measure of police activity.  And if you send

25  police to where there is more crime there is more

Smith - direct                                    215

1    police activity and therefore more arrests?

2          THE WITNESS:  Yes.

3          THE COURT:  So if you send police to areas that

4    are -- if we are correct in assuming that there is more

5    crime in African-American areas of town, and you send

6    more police there, there will be more traffic stops

7    there.  It is inevitable.

8          THE WITNESS:  Yes.  So that is a --

9          THE COURT:  So the question then is whether that

10   is a sign of bias or a sign of responding to a

11   social need.

12         THE WITNESS:  Yes, sir, but -- that's right, but

13   what it also tells us is that that is why the census

14   can't be used as a benchmark for traffic stops.

15         THE COURT:  Right.  But what that -- but if the

16   City assigns more police officers to Highland Park, I

17   mean, two results that come from that.  People in

18   Highland Park, which is a predominantly

19   African-American area, deserve to have lives that are

20   free of crime.  They deserve to live in a safe

21   community.  So they send police over there.  But they

22   also deserve not to get an inordinate number of

23   tickets.

24         THE WITNESS:  This is the great debate going on

25   right now in the wake of George Floyd is exactly this

1    issue.  How do you deploy police officers from a policy

2    perspective to control increasing levels of violent

3    crime while at the same time not over-policing a

4    community, particularly a community of color since

5    violent crime tends to be concentrated where poverty

6    exists, and poverty tends to be correlated with race.

7        THE COURT:  There is an interesting book called

8    Locking Up Our Own.  It deals with the phenomenon,

9    among other things, of mandatory sentencing, and how

10   those things come about from purposes that are good to

11   results that are bad.  And I don't know how you

12   separate that out.

13       Well, I'm sorry.  Go ahead.

14   BY MR. GIBBONS:

15   Q    That is the work of a social scientist is to

16   separate out the different effects of police deployment

17   patterns underlying crime rates, calls for service and

18   also race?

19   A    To the extent that we can, absolutely.

20   Q    What can a researcher say about individual stops

21   with a city-wide statistical analysis?

22   A    Can you rephrase that question?

23   Q    Can anything be said about individual stops using

24   a city-wide statistical analysis?

25   A    I think if I could extrapolate on your question,

**JA1468**

1    if you are asking me can we conclude that there is

2    racial discrimination in an individual stop based on

3    aggregate analysis the answer is no.

4    Q    Turn now to Dr. Coston's analysis specifically

5    with regard to the mapping techniques.  How would you

6    describe how Dr. Coston visualized whether traffic

7    disparities are caused by race as opposed to other

8    causes?

9    A    Well, you know, Dr. Coston overlaid the incidents

10   of traffic stops on a map that included some

11   color-coded indicators for where people lived by race

12   in Richmond.

13   Q    What is the distinction between Dr. Coston's use

14   of heat mapping versus census data?

15   A    The census data is the underlay, underlay of the

16   map.  It is -- that is the racial characteristics of

17   the neighborhoods are driven by the American Community

18   Survey that he used.

19   Q    What are the problems with Dr. Coston's use of

20   heat mapping to determine whether there are racial

21   disparities in policing?

22   A    Because it is essentially using data as your

23   benchmark for traffic stops.  We talked at length this

24   morning, that is not appropriate, not an appropriate

25   benchmark to use residential census data as a

1    comparator against traffic stops.

2    Q    How does Dr. Coston rely on the definition of

3    "predominant populations of minorities" in conducting

4    this heat mapping analysis?

5    A    I don't really know the answer to that question.

6    Q    Why don't you know?

7    A    It's not really clearly defined in his report what

8    the racial percentage composition is in each of the

9    color coded regions on that map.

10   Q    Does Dr. Coston consider whether racial

11   disparities are caused by any other factor other than

12   race?

13   A    Well, not in that analysis, because it is just a

14   simply bivariate analysis.

15        THE COURT:  But does heat map look at -- go ahead.

16   I am sorry.

17   BY MR. GIBBONS:

18   Q    What does the failure of Dr. Coston to determine

19   an appropriate benchmark mean about the ability to make

20   inferences about racial bias?

21   A    You can not make inferences about racial bias in

22   traffic stops when you compare it to the census,

23   residential census population of a region.  That is

24   inappropriate to do.

25   Q    You were present for Dr. Coston's testimony

Smith - direct                                    219

1    yesterday, correct?

2    A      Yes, I was.

3    Q      And you were present Dr. Coston's criticism of

4    your 2001 or 2000 paper using the RPD data.  How do you

5    respond to those criticisms?

6    A      I didn't really hear it as a criticism.  He raised

7    the question of why in one of the regression models or

8    pointed out that in one of the regression models I had

9    used race as the dependent variable in one of the

10   models.  You will hear criticism, but I did hear him

11   say that is not typically done.  And I would agree with

12   him, that is not typically done.

13   Q      And knowing what you know now would you perform

14   that same research and statistical design the same way

15   you did way back in 2000?

16   A      Probably not, but again, there was no road map

17   back then, right.  And we were developing the science

18   as we went along.  And also, I would say also, there is

19   many examples in the published literature of

20   researchers using race as a dependent variable.  It is

21   not mathematically wrong to do that.  Kroger and

22   Ridgeway's seminal article on, that appeared in the

23   Journal of the American Statistical Association, for

24   example, on which it was founded the whole science of

25   veil of darkness used race as a dependent variable in

**JA1471**

Smith - direct                                          220

1    his regression equation.

2    Q    What conclusions can be drawn from Coston's use of

3    chi-square analysis?

4    A    You can conclude the two variables are related to

5    one another, that they are correlated.  There is an

6    association between them.

7    Q    What conclusion does --

8         THE COURT:  Wait a second.  Let's put that in

9    English.  What can you conclude?

10        THE WITNESS:  That the two variables are related.

11        THE COURT:  Two variables are African-American

12   people getting stopped.

13        THE WITNESS:  Well, the chi-square analysis had to

14   do with outcomes, like arrests or citations

15   or warnings, for example --

16        THE COURT:  Well, didn't he also look at just

17   plain stops?

18        THE WITNESS:  Not using chi-square.

19        THE COURT:  Okay.

20   BY MR. GIBBONS:

21   Q    What conclusions about causation can be reached

22   from the chi-square analysis?

23   A    There are no conclusions that can be reached

24   reliably.

25   Q    What is the statistical technique, very briefly,

USCA4 Appeal: 24-4201    Doc: 22-4    Filed: 09/04/2024    Pg: 236 of 406

1    called Cramer V?

2    A    It just a test for the strength of the

3    relationship in a chi-square model.

4    Q    What conclusions about causation can be drawn from

5    the use of Cramer V?

6    A    Same answer.  None.

7         THE COURT:  What if it was a higher degree of

8    correlation?  What if 90 percent of the traffic stops

9    were African-American?  Could you reach a conclusion

10   based on that?

11        THE WITNESS:  No.  Not when the -- so, just to be

12   clear, the chi-square analysis Dr. Coston performed,

13   the analysis from what I can tell was done

14   appropriately.  He talked, or Dr. Coston talked about

15   the underlying assumptions that are required for each

16   of these statistical tests, and that is exactly right,

17   there are a number of those.  He talked about the

18   minimum cell values and such, and the fact chi-square

19   is appropriate when you have two variables, race and

20   arrests, or race and search, that are categorical in

21   nature.  Either you are black or you are white, you

22   were searched or you weren't.  That is four-by-four or

23   two by two table, four cells.

24        So, you know, that is all appropriate to do that

25   sort of preliminary analysis to see whether or not

USCA4 Appeal: 24-4201   Doc: 22-4   Filed: 09/04/2024   Pg: 237 of 406

1    there is -- is there anything going on?  Is there a

2    relationship between race and arrests at all?  We have

3    got to start somewhere.  So one place --

4          THE COURT:  What if all the people who were

5    arrested were African-American?  What would you

6    conclude from that?

7          THE WITNESS:  I would concluded nothing unless I

8    knew that --

9          THE COURT:  Okay.  Thank you.  That is all I need.

10   Thank you.

11   BY MR. GIBBONS:

12   Q    Just to follow up on that question, do you need to

13   know the appropriate benchmark before you could make

14   any conclusions about the raw statistical disparity,

15   correct?

16   A    In the case of stops, yes.  In the case of an

17   arrest outcome, for example, you would need to know the

18   factors other than race and arrest that were driving

19   that outcome.  And there could be none.  But you

20   wouldn't know that unless you controlled for them in a

21   multi variate model, or there could be legitimate ones,

22   like a hundred percent of the African-Americans that

23   were arrested had pre-existing warrants on file and

24   therefore every one of them were arrested.  But you

25   wouldn't know that based simply on a chi-square

1    analysis with race and arrest.

2    Q    Is it generally accepted in the field of racial

3    disparity research to make inferences of bias based

4    solely on the chi-square test?

5    A    No.

6    Q    Is it generally accepted in the field of racial

7    disparity research for researchers to ignore the

8    presence of concinnity variables?

9    A    No.

10   Q    Is ignoring the presence of concinnity variables a

11   reliable method of conducting scientific research in

12   the field of racial disparity research?

13   A    No, it is not.

14   Q    Is it appropriate for Dr. Coston to make

15   conclusions about race affecting stops based on the

16   available data that they used?

17   A    No, it's not.

18   Q    Same question, but for arrests?

19   A    No, that is not appropriate.  Without controlling

20   for these other factors that also impact the arrest

21   outcome.

22   Q    Same question then for searches?

23   A    Same answer.  We haven't talked much about

24   searches.  But just as with arrests there are a number

25   of known factors that contribute to search outcomes.

1    For example, if someone is arrested, physically,

2    custodially arrested, they will almost always be

3    searched.  So unless you parse out of your data

4    searches based on arrest then you will reach a

5    potentially reach a spurious conclusion that race and

6    search are inappropriately, or discriminatorily related

7    when in fact they would simply be a function of the

8    fact that more persons of one race were arrested and

9    therefore searched than persons of another race.  So we

10   always control for the nature of the search, the type

11   of search that was conducted when we do search

12   analysis.  And that wasn't done in this case.

13   Q    Specifically with respect to Dr. Coston are you

14   familiar with the scientific literature about racial

15   disparities?

16   A    I am.

17   Q    There is a community of researchers within the

18   field of racial disparities?

19   A    In police outcomes, yes, that's correct.

20   Q    How long have you been a part of that research

21   community?

22   A    From its inception.  For more than 20 years.

23   Q    Are you familiar with Dr. Coston as a member this

24   research community and racial disparities?

25   A    No, I am not.

Smith - cross                                225

1   Q    Ever heard of Dr. Coston before you were retained

2   in this case?

3   A    I have not.

4   Q    Have you ever read an article in which Dr. Coston

5   has written by about racial disparities?

6   A    Not that I recall, no.

7   Q    Based on your experience in the field of racial

8   disparity research, what are, again, your general

9   opinions on Dr. Coston's analysis?

10  A    The ultimate conclusions that he reaches at the

11  end of his report, which are that race influenced the

12  decision to stop and the outcomes that resulted from

13  that stop, cannot be reached with the data that he had

14  available to him and the analysis that he performed.

15  Q    No further questions, Your Honor.

16       THE COURT:  All right.

17       Cross examination?

18                    CROSS EXAMINATION

19       MS KOENIG:  Just a minute to set up here, Dr.

20  Smith.

21       THE COURT:  Take your time.

22       And the reason you can't reach that conclusion is

23  because he didn't count all the other variables you

24  would look at in a regression analysis?

25       THE WITNESS:  That's correct, Your Honor.  Which

JA1477

Smith - cross                                226

1    we know empirically affect the outcomes.

2           THE COURT:  All right.

3    BY MS KOENIG:

4    Q    Okay.

5           Still morning.  Good morning, Dr. Smith.

6           Let's talk about the data in this case.

7           Did the Government provide you the spread sheets

8    of the raw data in the case?

9    A    No.

10   Q    So you have not looked at any of the data

11   underlying Dr. Coston's opinion?

12   A    I have not.

13   Q    You said you were retained, right?

14   A    Yes, ma'am.

15   Q    How much are you being paid?

16   A    $450 an hour.

17   Q    How many hours have you worked on the case so far?

18   A    I don't know, but I billed around $6,000 prior to

19   this trip.

20   Q    Okay.

21          THE COURT:  How much per hour?

22          THE WITNESS:  450.

23   BY MS KOENIG:

24   Q    You talked about that you had been, you have been

25   trained to do chi-square analysis?

Smith - cross                                              227

1    A    I have.

2    Q    You talked about using chi-square analysis as a

3    stepping stone, right?

4         I an see you shaking your head.  You have got to

5    say yes or nor.

6    A    Sorry.  Yes.

7    Q    That is okay.  You have to make a record.

8         So, when you said that the stepping stone, like if

9    you have an indication of statically significant

10   evidence of disparities, or that there are measurably

11   worse outcomes for particular races, you could use

12   chi-square analysis and then you would go get more

13   data, right?

14   A    Yes, or you would -- you may have that data, so --

15   Q    Or you would look at the data you already have or

16   you could use that to go get more?

17   A    Do further analysis with data you already have or

18   if you didn't have that data you would ideally attempt

19   to try to find additional data that would allow you to

20   do more sophisticated analysis.

21   Q    Like individual reports for each stop, right?

22   A    Well, that is typically not how you get data from

23   police agencies.  You don't typically get individual

24   reports of stops.

25   Q    What would you get?

JA1479

Smith - cross                                          228

```
 1   A     You would get data files, you might call raw data.
 2   That would include fields, the fields of interest that
 3   would inform the analysis that you did.
 4   Q     That wold presume that the police kept that data,
 5   right?
 6   A     Absolutely.
 7   Q     Do you know if in this case that the Richmond
 8   Police Department provided any of that more contextual
 9   data?
10   A     I do not know.
11   Q     Did ask you for it?
12   A     I did not.
13   Q     One of the main critiques of Dr. Coston's report
14   that you have is that Dr. Coston did not evaluate other
15   variable, such as whether the driver had an outstanding
16   warrant, the reason for the search and driver behavior,
17   demeanor, right?
18   A     Yes.
19   Q     And did you have any data on how many drivers in
20   this sample had outstanding warrants?
21   A     No.
22   Q     Did you ask for it?
23   A     No.
24   Q     Did you have any data on the reasons for searches
25   in this sample?
```

Smith - cross                              **229**

1   A     No.

2   Q     Did ask you for that data?

3   A     No.

4   Q     Did you have any data on driver behavior or

5   demeanor of the drivers in this sample?

6   A     No.

7   Q     Did you ask for it?

8   A     No.

9   Q     Okay.

10        Let's talk a bit about the 2001 study.  If you

11  look in the folder in front of you and turn to

12  defendant's exhibit seven.

13  A     Sorry.  Did you say seven?

14  Q     Seven, yes.

15        THE COURT:  Do you have the book?

16        MS KOENIG:  Yes, he does, Your Honor.

17        THE WITNESS:  I am there.

18  BY MS KOENIG:

19  Q     You talked a couple of different dates and I want

20  to make sure we are all talking about the same thing.

21  Early on in your testimony today you said that your

22  1999 paper that came out in 2000 was one of the few

23  peer reviewed articles on racial disparity; is that

24  right?

25  A     Actually 2001.

**JA1481**

Smith - cross                                           230

1    Q    I wanted to make sure we were looking at the --

2    the article you are referring to is the same.

3    A    It is the same paper.

4    Q    Okay.  We can't talk over each other.

5         So, when the article that you are looking at in

6    defense exhibit seven, that is the same article you

7    were referring to?

8    A    Yes.

9    Q    Okay.

10        So in that article, the study that you did was

11   based on six weeks of data from February to March of

12   2000 right?

13   A    Yes.

14   Q    That data was collected with the cooperation of

15   the Richmond Police Department, right?

16   A    They collected the data and provide it to me.

17   Q    But you helped to kind of set it up, right?

18   A    Actually didn't.  I was not involved in the

19   decisions about what type of data collection to collect

20   or what fields to collect.  I wasn't involved in that.

21   Q    Okay.  Then when the information was being

22   collected supervisors from the Richmond Police

23   Department had had meetings with their line officers

24   about the data collection, right?

25   A    I presume that is true.

**JA1482**

Smith - cross                                       231

1    Q    Well, we don't have to presume, right?  We can
2    look at your article.  So let's look at defendant's
3    exhibit seven.  Specifically look at page, Page ten and
4    11.
5    A    Okay.
6    Q    When looking at the bottom of page ten going on to
7    11, you said in your report, right, that in this case
8    the Richmond Police Department made a good faith effort
9    to assure officers that the information reported would
10   not be used against them for disciplinary purposes,
11   right?
12   A    Yes.
13   Q    In fact, the chief of police and the department
14   attorney met with all patrol roll calls before the
15   study began to explain its purpose and allay any fear
16   that the data would be collected or that the data
17   collected would be used to target individuals for
18   punishment --
19   A    Correct.
20   Q    -- is that right?
21   A    Yes, that's correct.
22   Q    All right.
23        Despite all that, right, the officers knew they
24   were being monitored.  And there was 64 percent
25   compliance rate, right?

Smith - cross                                    232

 1  A    Yes, I believe that is correct.

 2  Q    And surely the supervisors from the Richmond

 3  Police Department given that the police department's

 4  chain of command could have enforced compliance, right?

 5  A    Well, to the extent police departments are

 6  paramilitary organizations and, you know, there are

 7  orders that come down and the people who are below

 8  those that give the orders are, you know, normally

 9  expected to follow them.  It doesn't always mean that

10  they do, but certainly that is how the organization is

11  to function if it is functioning optimally.

12  Q    All right.

13       Let's talk about a couple of things that you have

14  noted in your report from 2011.  On page 11 you talk

15  about whether there is an expectation black drivers

16  commit more traffic infractions that white drivers and

17  vice versa, right?

18  A    Okay.  Yes.

19  Q    And you specifically noted that although it is

20  possible that minorities commit more traffic

21  infractions per capita than white, thus helping to

22  explain the higher minority stop rate, this possibility

23  appears unlikely.  Right?

24  A    Yes.  So let's talk a little bit it yesterday.

25  There is some research that has been done on this

Smith - cross                                    233

1    question, limited, some after this article came out,

2    too, by the way, that looked at that specific question

3    and found some evidence that there are differences in

4    the way racial groups violate traffic laws.  So, it is,

5    I would characterize that research as sort of mixed bag

6    at that point.

7    Q    You don't have any information showing that the

8    drivers in Richmond in 2020, the black drivers

9    committed more traffic infractions than white drivers,

10   right?

11   A    I do not have that information.

12   Q    Let's talk about direct field observations.  Have

13   you ever conducted a direct field observation study?

14   A    Well, yes, I helped oversee one.

15   Q    How many?

16   A    One.

17   Q    When was that?

18   A    In the early 2000's in Miami Dade County, Florida.

19   Q    How long did that take?

20   A    The actual field observation portion, probably

21   several months.

22   Q    How much did it cost?

23   A    I am not trying to avoid the question, I just

24   don't know how much.  I can hazard a guess.  Maybe

25   $30,000.

1    Q     Okay.

2          You have indicated, I think you testified on

3    direct examination, that because of the cost and amount

4    of time that it takes to do direct observation only a

5    few studies, relatively few studies have used direct

6    observation, right?

7    A     That is right.

8    Q     All right.

9          All right.  Veil of darkness benchmark.  Let's

10   turn to that.  You need to know what time of day the

11   stop is made, right?

12   A     Yes.

13   Q     Are you aware that the defense asked for that data

14   and the Richmond Police Department did not provide it

15   in this case?

16   A     I heard that yesterday.  I was not aware until

17   yesterday.

18   Q     Did you ask for that data in this case?

19   A     I did not.

20   Q     Talk about the crash data benchmark.  You

21   explained that a little bit on direct examination.  Do

22   you have the crash data report for Richmond from July

23   2020 to December of '20?

24   A     I do not.

25   Q     Did ask you for that data?

Smith - cross

235

```
 1    A     No.

 2          THE COURT:  Why didn't you look into all that?

 3    That would have helped to do a pretty decent study that

 4    night help the Richmond Police and help The Court and

 5    help everybody.

 6          THE WITNESS:  Just beyond the scope of my

 7    engagement with the Government.  My engagement revolved

 8    around the methods that Dr. Coston used and the

 9    problems with it.

10          THE COURT:  So you were hired essentially to poke

11    holes in the defendant's theory, not to poke holes, but

12    to point out problems with it and not no come up with

13    an analysis of data yourself.

14          THE WITNESS:  That's correct, Your Honor.

15    BY MS KOENIG:

16    Q    Dr. Smith, you would agree that cluster maps and

17    heat maps can be a useful technique for visualizing the

18    spatial distribution of events in a city?

19    A    I would agree.

20    Q    And you have criticized Dr. Coston's overlay of

21    black drivers over the racial composition of Richmond

22    neighborhoods as merely a rudimentary type of census

23    based benchmarking?

24    A    Right.

25    Q    Did you hear Dr. Coston testify yesterday that
```

**JA1487**

1    there was not a benchmarking that was used in that

2    analysis, it was simply a visual representation?

3    A    I heard him say that, or Dr. Coston say that, yes.

4    Q    You talked a little bit with the Government about

5    what it means to be predominantly a specific

6    neighborhood?

7    A    Yes.

8    Q    Look at -- I would like to put this up on the

9    screen, please, defendant's exhibit R 2 that had

10   previously been admitted at an earlier hearing.

11        So, Dr. Smith, you heard yesterday, right, that

12   the University of Virginia racial dot map for the

13   country is based on the 2010 census data?

14   A    Okay.  Yes.

15   Q    Did you know that before you came yesterday?

16   A    No.  I have never seen this before yesterday.

17   Q    Okay.  So, when you are looking at this map you

18   can see that the black residents are in green, right?

19   A    Yes.

20   Q    And that the white residents are in blue, right?

21   A    Yes.

22   Q    So when I look at the neighborhood in Richmond

23   it's not really that areas are predominantly one race

24   or another, right, it is almost that a neighborhood is

25   entirely black or entirely white according to this

Smith - cross                                    237

1    information, right?

2    A      In some cases that is true.  In some neighborhoods

3    that is true.

4    Q      All right.

5           So you don't use the University of Virginia Racial

6    dot map in any of your other work that you have ever

7    done?

8    A      No.

9    Q      Let's talk about your report, which is

10   Government's exhibit two.  Do you have that in front of

11   you?  It's not in that folder.  We can pull it up.

12          Do you have copy of your report with you?

13   A      No, I don't.

14   Q      If we could switch to the other screen, by chance.

15   Thank you.

16          Let's turn to page four, please.  Dr. Smith's

17   report.

18          Dr. Smith, do you remember writing in your report

19   that one might logically expect, for example, that

20   clusters of stops of black drivers might occur in such

21   transitional zones as black drivers commuting from

22   where they live, may live, to where they may work along

23   major thoroughfares?

24   A      I do remember writing that, yes.

25   Q      Are you aware that many white people in Richmond

Smith - cross                                    238

1    that live south of the river and in west end of town
2    travel to downtown to work?
3    A    I would presume that is true.
4    Q    So if we use the same kind of assumption that you
5    just made about black drivers, wouldn't you expect to
6    see clusters of white drivers in areas where they work,
7    such as the first precinct?
8    A    Yes, that is why traffic information is necessary
9    to benchmark against stops.
10   Q    Yet we have no clusters of stops of white drivers
11   outside a hand full of clusters in the third precinct,
12   right?
13   A    I don't -- I don't know.  I mean, I would have
14   to --
15   Q    We can look at Dr. Coston's report.  If we could
16   switch back to that.
17        Let's look at figure two of Dr. Coston's report.
18        We don't see any cluster of white drivers outside
19   of the third precinct in Richmond, right?
20   A    Part of the problem I am having is precinct
21   numbers.
22   Q    Okay.  It has been a little while since you were a
23   police officer?
24   A    The precincts were numbered differently then, too.
25   Q    So if we have the third precinct is the large

Smith - cross                                        239

1    precinct that covers the area that says Stratford

2    Hills?

3    A     Yes, far left of the map.  Right.

4    Q     Yes, that is third?

5    A     Yes.

6    Q     All right.

7          So we don't see any clusters of white drivers

8    outside of a hand full of small ones in the first

9    precinct, right?

10   A     So I see three clusters of white drivers in the

11   third precinct.  And that is why what I see.  And they

12   are smaller, which you would expect because there are

13   fewer stops of whites than there were of

14   African-Americans.

15   Q     All right.

16   A     So the dots are smaller.

17   Q     So when we talk about deployment patterns in the

18   City, looking at a map of the precincts that are out

19   laid, do you have any information as to why Richmond

20   Police Department has three of its police precincts in

21   the black areas of town and just one in the white area

22   of town?

23   A     I don't know why.  I can --

24   Q     I won't ask you to speculate.  You don't have any

25   information, is that right?

JA1491

Smith - cross                                    **240**

1    A     No, I don't.

2    Q     All right.

3          Let's also look -- in your report you indicated --

4    and this is on pages four and five of your report -- if

5    we could go back, Ms Dandridge and Ms Tuck, please.

6          Pages four and five of your report, going from the

7    bottom of pages four and five, you talked about how

8    there may be some other explanation as to why arrests

9    may be higher for certain drivers than others, right?

10   A     Yes.

11   Q     And one of the examples that you gave was if drunk

12   drivers were involved because drunk drivers would be

13   more likely to be arrested than somebody like a

14   speeder, right?

15   A     Correct.

16   Q     Okay.  So do you have any information about how

17   many drunk driving stops were in this sample?

18   A     I do not.

19   Q     Let's look at -- and switch back to me if that is

20   okay -- let's look at defendant's exhibit 14, which is

21   the raw data in this case.

22         So Dr. Smith, I want to show you what we see at

23   the top in column J, not column J, column Q.  Do you

24   see it says specific violation about column Q -- in

25   column Q?

```
 1   A     Yes.
 2   Q     You see there is a series of numbers that are
 3   listed below there?
 4   A     Yes.
 5   Q     Now, Dr. Smith you have a law license, right?
 6   A     I do.
 7   Q     You have been admitted to practice in Virginia
 8   since 1998, right?
 9   A     Yes.
10   Q     And you have been admitted to practice in the
11   Fourth Circuit since that same time, right?
12   A     Yes.
13   Q     Before you were admitted to practice in Virginia
14   you had to take the bar exam, right?
15   A     Sure did.
16   Q     And before you took the bar exam you had to learn
17   sufficient information about Virginia code, right?
18   A     Sure.  Yes.  I am familiar with 46 Code of
19   Virginia.
20   Q     Okay.  Also title 18.2 of the criminal code of
21   Virginia, right?
22   A     Yes.
23   Q     Great.  You know that Virginia code section 18.2
24   dash 270 and 18.2 dash 266, those are the drunk driving
25   codes for Virginia?
```

1    A    I don't recall the exact statute subsections of

2    the statute.  I will take your word that is true.

3    Q    All right.

4         So how many violations for drunk driving are

5    listed in the stops in this sample?

6    A    I don't know that.

7    Q    But would it surprise you to find there are just

8    ten violations for drunk driving listed?

9    A    No, I guess I wouldn't.  Not surprise me.

10   Q    For the record I will put on control numbers 150,

11   151, 152, 944, 1046, 1168, 1387, 1388, 1652, and 2551.

12   So, that information if we were to look at it, would it

13   surprise you to find that there are six black drivers

14   in that information, two white drivers, one Asian

15   driver, and a person of unknown race?

16   A    Would it surprise me?

17   Q    If that is what the data showed.

18   A    No.

19   Q    Okay.

20        One black man issued a warning, and all others

21   were arrested.  Would that surprise you?

22   A    No.

23   Q    So, if we have a total of seven arrests then, five

24   torr black drivers and two for white drivers, right,

25   and Dr. Coston reported a total of 164 arrest that are

Smith - cross                                   243

1    made, did you run an analysis to see if those seven

2    arrests for drunk driving impacted the overall analysis

3    of Dr. Coston's findings?

4         MR. GIBBONS:  Objection, Your Honor.

5         THE COURT:  I can't hear you.

6         MR. GIBBONS:  Objection.  This whole line of

7    questioning, he said he hasn't reviewed any of this

8    data.

9         THE COURT:  Well, we hasn't reviewed any of the

10   data, that is true, but go ahead.  Overruled.

11   BY MS KOENIG:

12   Q    You didn't run any analysis to see if the drunk

13   driving arrests impacted the findings, right?

14   A    No.

15   Q    Right.  And fair to say drivers with outstanding

16   warrants are more likely to be arrested, right?

17   A    Yes.

18   Q    Did the Government provide you any information

19   about how many individuals in the sample were arrested

20   based on outstanding warrants?

21   A    No.

22   Q    Did ask you for that data?

23   A    No.

24   Q    Without that data you can't quantify whether or

25   not that has any impact on your overall finding in this

Smith - cross                                    **244**

1    case, right?

2    A    In this particular case, no.

3    Q    You also said that researchers must control for no

4    discretion searches, like inventory searches?

5    A    Correct.

6    Q    An inventory searchers generally have to be

7    conducted pursuant to specific department policy,

8    right?

9    A    Yes.

10   Q    Not only are you a trained lawyer, but a former

11   Richmond Police officer, right?

12   A    Yes.

13   Q    Were you a police department officer anywhere else

14   besides Richmond?

15   A    Fairfax.

16   Q    How long were you an officer in Fairfax?

17   A    About two years.  Little over two years.

18   Q    How long were you an officer in Richmond?

19   A    A little under two years.

20   Q    Okay.

21        So, you know generally because of your work and

22   experience that generally a car has to be impounded

23   before an officer can do an inventory search, right?

24   A    Yes.

25   Q    In the traffic stop, that is going to happen most

**JA1496**

1    of the time when the driver is arrested and nobody

2    comes to up the car, right?

3    A    Sorry.  Can you rephrase that more, or ask it

4    again?

5    Q    Most of the time when an officer is going to

6    impound a car it is when somebody, the driver is

7    arrested and nobody else can come pick up the car,

8    right?

9    A    That is often the case, yes.

10   Q    Do you have any data about how many cars in this

11   sample were searched pursuant to inventory searches?

12   A    I do not.

13   Q    Did you ask for it?

14   A    No.

15   Q    You talked also about, in your report about a 2015

16   case from North Carolina, right?

17   A    Yes.

18   Q    The Johnson case, right?

19   A    Yes.

20   Q    The Johnson case involved, involved an agreement

21   between the local county sheriff's office and the

22   federal government to allow the local county to enforce

23   immigration laws, right?

24   A    I believe that is right.

25   Q    That's what we call 287 G agreement, right?

Smith - cross                                246

1   A     Correct.

2   Q     So, the Department of Justice brought a case

3   against that particular county in North Carolina,

4   right?

5   A     Yes.

6         THE COURT:  Alamance County?

7         MS KOENIG:  It is, Your Honor.

8   BY MS KOENIG:

9   Q     Alleging that that particular county had engaged

10  in discriminatory practices?

11  A     Right.

12  Q     In that case the expert, the Government had

13  experts and respondents or the defendants had experts,

14  too, right?

15  A     Yes.

16  Q     And the experts involved, you know, offered

17  competing analyses, right?

18  A     Yes.

19  Q     And the judge in that case, in that case found

20  that the Government in that case, the plaintiff, right,

21  the Government, the Department of Justice, their expert

22  had had access to data that would have controlled for

23  certain variables, right?

24  A     I don't recall that level of specificity in terms

25  of the facts of the case.

JA1498

1    Q    Do you recall then that the judge in that case

2    found it very significant in the judge's findings that

3    because the Government, the plaintiff's expert, had had

4    access to that data but simply failed to analyze it,

5    that that was a very significant piece of the judge's

6    ruling?

7    A    I don't recall that from the opinion.

8    Q    All right.

9         On direct examination you talked about, in your

10   conservative practice in analyzing data fields if you

11   have an entry that any piece of the data is missing you

12   simply omit that entry altogether?

13   A    Yes.

14   Q    Is that a common practice in other fields, like

15   the medical field, when they are analyzing large

16   volumes of data?

17   A    I would say a common data management practice in

18   any sort of statistical analysis regardless of

19   discipline.

20   Q    Including market research?

21   A    If it is done by academics.  I can't speak for

22   what industry does.

23   Q    Including survey data, social survey data?

24   A    Again, if it is done by academics.

25   Q    Do you have any percentages of the missing amounts

Smith - cross                                        **248**

1    of data in this case?

2    A    I do not.

3    Q    Did ask you for that?

4    A    No.

5    Q    Do you need benchmarking to analyze whether people

6    are treated differently after they are stopped?

7    A    No.

8    Q    Is it feasible to control for every possible

9    variable?

10   A    No, not feasible to control for every possible

11   variable.

12   Q    You talked on direct examination that you have

13   done, you know, examinations of large scale data sets

14   in agencies around the country.  Did you ever do any of

15   those in context of a criminal case?

16   A    No.

17   Q    You talked a little bit more, when talking about

18   state-wide analyses of data, right, like the Virginia

19   Community Policing Act, I think you said that you were

20   familiar with that?

21   A    Generally, yes.

22   Q    All right.

23        So the Virginia Community Police Act was designed

24   to collect data to see if there is evidence of racial

25   profiling, right?

1    A    Presumably, yes.

2    Q    They ask, not only requires the collection of

3    data, but it requires the analysis of the data right?

4    A    Yes.

5    Q    So when you were talking about state-wide

6    collections of data and how it can be difficult, you

7    talked about disparities among different police

8    departments and different resources that they may have

9    access to?

10   A    Yes.

11   Q    The Richmond Police Department is not a

12   mom-and-pop police department?

13   A    That's correct.

14   Q    When you are talking about Dr. Coston's report you

15   made a lot about whether or not causation can be in

16   inferred -- and you can look at defendant's exhibits

17   two here if it helps refresh your recollection,

18   specifically the last page before the references.  The

19   last paragraph of the conclusion section.

20   A    Yes.

21   Q    Do you recall then that Dr. Coston said, while

22   this report cannot say whether a specific traffic stop

23   was the result of racial bias or racial profiling, this

24   report does conclude that race is a significant factor

25   in the decision to stop a driver, whether a person or

1    vehicle is searched, the outcome of the stop, and the

2    location where stops occur, right?

3    A    I recall that sentence, yes.

4    Q    Are you taking issue with that?  Do you think that

5    is not true?

6    A    Yes, I take issue with that.

7    Q    All right.

8         I will follow up on a series of questions the

9    Judge was asking you.  If all of the drivers, if the

10   data showed in this case that 90 percent of the drivers

11   that were stopped were black, and ten percent were

12   white, that would not be significant, that would not be

13   a significant factor in the decision that race played a

14   significant factor in the decision to stop a driver?

15   A    Not without knowledge of who is driving and

16   available to be stopped.

17        THE COURT:  Without knowledge of what?

18        THE WITNESS:  Who is actually driving on the

19   street and who is available to be stopped.

20   BY MS KOENIG:

21   Q    If the evidence in this case had shown that it was

22   90 percent of the arrests were black individuals after

23   a traffic stop and ten percent were white, would you

24   also say that is not a significant -- that race does

25   not play a significant, a factor in whether to arrest

                              Smith - cross                        251

1    someone?

2    A    By itself that statistic is not helpful.

3    Q    If you were to see data that said that 90 percent

4    of the people in the cars were searched were black, and

5    only ten percent white, again you find that not

6    significant?

7    A    By itself.  Correct.

8    Q    So let's talk about that.

9         So, you talked about how you have done several of

10   these studies.  And I think I heard you say, but I want

11   to make sure I heard properly, that you have, you would

12   never find, you as careful researcher would never find

13   that racial bias played a causal role in a pattern of

14   policing?

15   A    That's correct.

16   Q    Never?

17   A    Social scientist.  No.

18   Q    You don't think any social scientist would ever

19   say that?

20   A    I am sure some would.  I would not.

21   Q    All right.

22        So you have never said that then, right?

23   A    No, I have not.

24        THE COURT:  Well, so then if you don't reach a

25   conclusion like that, when you get hired by a locality

1    to help them out, of what assistance are you?

2         THE WITNESS:  Well, Your Honor, I hope we are a

3    lot.

4         THE COURT:  I mean, you obviously have a lot of

5    knowledge in this area.  But if they are trying to

6    figure out whether bias is a factor and how their

7    police officers do things, and you are never willing to

8    make that conclusion, even if a hundred percent of the

9    arrests are of African-Americans --

10        THE WITNESS:  Well, earlier --

11        THE COURT:  -- how does that help them?

12        THE WITNESS:  Sorry.

13        THE COURT:  Go ahead.

14        THE WITNESS:  Earlier I spoke about the

15   convergence or the alignment of findings with respect

16   to the various multiple kinds of analyses that go into

17   a major study of the type that we are sort of talking

18   about.

19        And the extent to which those observed

20   disparities, after controlling for appropriate factors

21   that might explain them, when those observed

22   disparities remain, we call those unexplained,

23   unexplained disparities, meaning we have controlled for

24   all -- all relevant variables available in the analysis

25   and there remains disparities, and if those disparities

1    align across multiple indicators, so, you see it in

2    stops, you see it in arrests, and you see it in

3    searches and so forth, I testified earlier that that

4    begins to suggest to me that you have a problem.  You,

5    the police department, has a problem.

6         THE COURT:  And the problem is bias.

7         THE WITNESS:  The problem is potential bias of one

8    kind or another.  You know, that doesn't necessarily

9    mean racial animus, but it could be a variety of things

10   that are probably not healthy.  So, I worked on

11   projects where I certainly found evidence of that sort

12   of alignment across multiple indicators controlling for

13   all the appropriate variables.  And I worked on

14   projects that, where we didn't find that sort of

15   alignment, right.

16        THE COURT:  So then what do these localities do

17   after they get your analysis?  They do training to make

18   sure that the police officers follow proper procedure?

19        THE WITNESS:  So typically our reports will

20   include a series of recommendations.  Depending on the

21   findings, of course.  It is not uncommon for those

22   recommendations to include training; not uncommon for

23   those recommendations to include better data

24   collection, because there are, it is often the case

25   that, particularly if the agency developed its data

Smith - cross        254

1   collection regime without the assistance of people like

2   me, that they will, they won't be capturing the kind of

3   information that they need to be capturing in order to

4   answer more definitively the question that you asked.

5   So a lot of times the recommendation is you need better

6   data and here is how to collect it better.  Here are

7   the fields that you need collect, or here is the

8   process you need to put in place.  So there are often,

9   again, a series of recommendations that follow the

10   findings.

11        THE COURT:  Thank you.

12   BY MS KOENIG:

13   Q     All right.

14        So when you are making those recommendations, you

15   talked about training and making recommendations for

16   training that would often include training about how to

17   treat people of different races more equally, right?

18   A     Yes, I think that is fair, yes.

19   Q     And I want to talk to you about how on earth we

20   would control for some of the factors that may exist in

21   Richmond.  How do we control for the fact that

22   neighborhoods have been segregated in Richmond for over

23   150 years?

24   A     Well, it is not a matter of controlling for

25   something like that.  I think the issue is

1    understanding that distribution, well, maybe that isn't

2    fair.  So we might actually control for that.

3    Q    How would you do that?

4    A    So you would have, you would get block level --

5    depending on what your unit of analysis is, you may get

6    block census data, for example.

7    Q    And you would use census data to do that?

8    A    Or neighborhood control.  Right.  To understand

9    the racial composition of the neighborhood and how that

10   may influence the outcome of interest, as one of a

11   number of factors.

12   Q    How would you control for three quarters of the

13   police precincts being devoted to black parts of town,

14   and just one being devoted to a white part of town?

15   A    That is potentially a deployment issue.  And so

16   you control for that in a number of ways.  One way is

17   to examine each of them independently of the others.

18   Another way is to actually, if you had actual

19   deployment data, so you knew, for example, how many

20   officers were deployed in each of these precincts and

21   when, then you could potentially directly control for

22   deployment.

23   Q    How would you control for black people having

24   potentially more arrest warrants out for them because

25   of the long systemic over criminalization of black

 1    individuals in the City?  You can't, right?

 2    A    Well, just, that is not a control variable, right,

 3    that you would include in a model like that.

 4    Q    Just a moment, Your Honor.

 5         THE COURT:  Sure.  Take your time.

 6    BY MS KOENIG:

 7    Q    One of the variables that you talked about on

 8    direct examination that you would try to control for is

 9    the driver's demeanor and the behavior of the driver,

10    right?

11    A    Ideally, yes.

12    Q    How do you do that?  How you find that data?

13    A    Typically that is self reported data from the

14    police it exists.

15    Q    Ever go back and look at body camera?

16    A    Well, that is increasingly being done.  It's not

17    on a regular practice, I would say, right now in the

18    field.

19    Q    No further questions, Your Honor.

20         THE COURT:  All right.  Redirect?

21                     REDIRECT EXAMINATION

22    BY MR. GIBBONS:

23    Q    Dr. Smith, is it the case that because statistical

24    analysis is the best that could be done with the

25    available data that it makes that analysis accurate or

1   reliable?

2   A     No, that is not the case.

3   Q     Despite Dr. Coston's disclaimer that they are not

4   using census data to determine if bias exists, you

5   disagree; is that correct?

6   A     I disagree, yes.

7   Q     Could you explain that, please?

8   A     So, the heat maps, focus on the heat maps for a

9   moment.  I think the primary conclusion from the heat

10  maps is that stops, this is what I heard, not only what

11  I read, but heard in testimony yesterday is that stops,

12  cluster stops of African-Americans or black drivers

13  cluster along racial boundaries between black and white

14  areas.  And that they cluster in white areas.  And that

15  there are no concomitant clusters of white stops in

16  black neighborhoods.  So, the underlying conclusion

17  then is that theres is bias, or that race influenced

18  the decision of the police to stop in these areas.  And

19  I think Dr. Coston says that directly.

20        Without information about who is driving in those

21  areas you can't reach the calculation that race had an

22  influence on the outcome here, in this case traffic

23  stops.  It may hypothetically be the case that there

24  are no or very few white drivers in black neighborhoods

25  in Richmond, for example.  In which case there are no

**JA1509**

1   or very few white drivers available to be stopped in

2   those neighborhoods.  That is why the benchmarking

3   question is so key in reaching conclusions about

4   potential bias in the initial decision to stop.

5   Q    That would explain, for example, the clusters of

6   white drivers in third precinct and in the other

7   precincts?

8   A    Yes.

9   Q    What is your view of the fit between data that

10  Dr. Coston relies upon and the conclusions that

11  Dr. Coston reaches?

12  A    I think Dr. Coston, with all due respect to a

13  colleague, an academic colleague, I tink Dr. Coston's

14  conclusions go beyond his data, beyond Dr. Coston's

15  data.

16  Q    No further questions.

17       THE COURT:  All right.  May this witness be

18  excused?

19       MR. GIBBONS:  I believe so, Your Honor.

20       THE COURT:  All right.

21       Dr. Smith, thank you very much for joining us.  I

22  appreciate it.  Headed back to Texas today?

23       THE WITNESS:  Yes, Your Honor.

24       THE COURT:  Well, have a safe trip.

25       THE WITNESS:  Thank you, sir.

**JA1510**

Turner - direct                          **259**

 1                    (Witness stood aside)

 2          THE COURT:  All right:  It is high noon.

 3          Why don't we take a lunch break and come back at

 4     12:45.

 5          You can go ahead.  Before we do that, let me ask

 6     you, do you have any idea how much evidence you have

 7     this afternoon?

 8          MR. GIBBONS:  We have three witnesses, and they

 9     will be much briefer.

10          THE COURT:  Well, that ills good to know.

11          MR. GIBBONS:  We estimate 2:00, 2:45?  2:30.

12          THE COURT:  That is perfect.  We will see then you

13     then at 12:45.

14          MS KOENIG:  You meant 12:45, not start at 2:45.

15          THE COURT:  Oh, did I say 2:45?  Thank you very

16     much.

17          Recess court.

18                    (A recess was taken)

19          THE COURT:  All right, good afternoon, everyone.

20          We are ready for your first your witness,

21     Mr. Seibert.

22          MR. SIEBERT:  Yes, Your Honor.  The United States

23     calls Keon Turner to the stand.

24                          KEON TURNER

25               AFFIRMED AND TESTIFIED AS FOLLOWS:

**JA1511**

1                         DIRECT EXAMINATION

2              THE COURT:  All right, Ms Turner, thank you for

3      coming.  You can take off the mask or keep it on when

4      on the witness stand.  But please be sure to just speak

5      directly into the microphone and that will help me.

6              THE WITNESS:  Thank you.

7              THE COURT:  Thank you.

8      BY MR. SIEBERT:

9      Q     Thank you.

10             Ms Turner, can you spell your first and last name

11     for the court reporter?

12     A     Keon, K-E-O-N, last name Turner, T-U-R-N-E-R.

13     Q     Ms Turner, how are you employed?

14     A     I am employed by the Virginia State Police.

15     Q     As a civilian?

16     A     As a civilian, yes.

17     Q     How long have been with the Virginia State Police?

18     A     Since October of 2008, so going on 14 years.

19     Q     What is your job at the Virginia State Police?

20     A     Manager of the data analysis team, which I --

21     don't know if you want me to go into detail -- we

22     manage data collection, such as crime reports, use of

23     force, the Community Policing Act.  Manage the

24     repository for that information.

25     Q     All right.  So is it fair to say you are

1  essentially the supervisor over the group at VSP,

2  Virginia State Police, that is in charge of collecting

3  all the data for the state-wide Community Policing Act?

4  A    That's correct.

5  Q    What is the Community Policing Act just very

6  quickly.

7  A    Well, the Virginia Policing Act came about with

8  house bill 1250. it is an act that initially --

9        THE COURT:  You need to slow down there.

10       THE WITNESS:  Sorry.

11       THE COURT:  Thank you.

12       THE WITNESS:  It was enacted on July 1 of 2020

13  based on house bill 1250.  It is an act that requires

14  that all traffic stops record certain data as listed in

15  the Community Policing Act, including reason for stop,

16  race, ethnicity, date of stop, location, and the result

17  of the stop.

18  Q    So as part of that VSP job with the Community

19  Policing Act, you were entrusted with one, coming up

20  with the criteria and standards for the state-wide

21  collection effort; is that fair?

22  A    Correct.

23  Q    Also in charge of serving as a repository for all

24  that data?

25  A    Correct.

1   Q    Correct?

2        And then you also are in charge of somewhat

3   quality control, and before you send it to another

4   agency of the State?

5   A    That is correct.

6   Q    What is that other agency?

7   A    Department of Criminal Justice Services, DCJS.

8   Q    So at times when you were reviewing data you have

9   to make decisions on whether the data is rejected back

10  to the local agency, or accepted?

11  A    Yes.  So when we receive the files, we initially

12  created a technical specification which laid out the

13  values that were allowed so that we could process it

14  through our data warehouse to aggregate the information

15  that we would then send to DCJS.  If that data was

16  invalid, we would reject it, and if it was valid we

17  would accept it.

18  Q    When did you first become aware of these

19  requirements that as supervisor of the DART team that

20  you were supposed to implement?  Approximately when?

21  A    We had about eight weeks to set this up.  It was

22  during COVID, so it was March 2020 where the

23  legislation was proposed, and we found out that it may

24  be signed.  It was not signed until April.  We had to

25  create that technical specification I spoke of in time

1    to disseminate to agencies.

2         The first tech spec went out in May of 2020, and

3    we should have started receiving data July 1 of 2020.

4    Q    How would you describe I guess the planning phase

5    or the phase right before the execution of July 1st

6    from VSP standpoint?

7    A    Extremely hectic.  Of course this was during

8    COVID.  We also didn't have all staff in the office.

9    Also there was civil unrest going on.  We had limited

10   staff as well.  This was an unfunded mandate, so we

11   were not given any additional finances to start this

12   data collection.  And we also had to get this set up

13   for nearly 400 agencies in the State.

14        THE COURT:  By 400, you mean Police departments?

15        THE WITNESS:  Police departments and sheriff's

16   offices.

17        THE COURT:  Right.

18   BY MR. SIEBERT:

19   Q    Was there anyone hired to assist the DART team

20   with this collection effort for Community Policing?

21   A    No.  My current analyst was there, and she was

22   typically with crime reporting.  She assisted.  There

23   was no position created at that time.  So it was just

24   herself and myself.

25   Q    As part of the planning phase your job and VSP's

1    job was to reach out to these local law enforcement
2    agencies and kind of let them know what was going to
3    happen, that there was criteria that they needed to
4    start collecting; is that correct?
5    A    That is correct.
6    Q    And the criteria that was established was directly
7    from the legislature, the Community Police Act.  You
8    didn't get to make up what you wanted.
9    A    Correct.  It was line-by-line verbatim from the
10   statute.
11   Q    When you reached out to these local law
12   enforcement, what was their response?
13   A    Stress.
14   Q    Why stress?
15   A    It was a very quick turn around to get data.  Also
16   we were not able to hold any type of training.  Most
17   people were stretched pretty thin during that time, and
18   especially again because it was COVID and civil unrest.
19   Q    All right.
20        I think you might have answered this, but in your
21   opinion was this sufficient time to plan, implement
22   this roll out?
23   A    Absolutely not.
24   Q    So, you mentioned some resource issues for the law
25   enforcement that needed to collect this data.  Did you

1   have any issues for both -- were these issues for both

2   big and small departments?

3   A    Yes.

4   Q    And can you describe both?

5   A    Typically with your small departments they may not

6   be fully electronic.  They may not have what is called

7   a CAD, or computer aided dispatch, in their vehicles.

8   So capturing this information at the time of stop

9   becomes a little more tedious.  They may have to

10  capture it manually by handwriting, and then have it

11  aggregated at their agency through a records personnel,

12  who will then send that information to us.

13       Just about 70 percent of law enforcement agencies

14  in Virginia have about 50 or less personnel.  So, with

15  also having COVID and other issues going on at that

16  time, they had limited manpower.  So they were doing

17  all this with limited manpower.

18       On the other side for your larger agencies they

19  may have CAD systems that can capture this

20  automatically or electronically, excuse me, but

21  typically that requires getting your technical

22  specifications to your vendor and taking anywhere from

23  six months to a year to have that module recruited in

24  their system.

25       THE COURT:  So you are telling me that all of the

USCA4 Appeal: 24-4201    Doc: 22-4    Filed: 09/04/2024    Pg: 281 of 406

1    local agencies have their own purchase of computer

2    programs?

3         THE WITNESS:  Correct.  We are not able to define

4    or guide agencies into what software to purchase.

5    There are about 20 different vendors, if not more,

6    operating in Virginia at any one time.

7    BY MR. SIEBERT:

8    Q    All right.

9         Let's go back to the criteria that was established

10   one second.  Since the first six months initial roll

11   out phase of the Community Policing Act has the

12   criteria subsequently changed multiple times?

13   A    Yes.

14   Q    Can you tell The Court about that?

15   A    It has changed multiple times for various reasons.

16   There was additional legislation in Senate bill 530

17   that required additional type of stops to be collected.

18   So it went beyond traffic stops.  And, also, now record

19   stop and frisk.  And it also recorded any involuntary

20   detention.  So it expanded significantly.  With that we

21   had to add additional parameters for the data

22   collection.  Once we started noticing issues we were

23   not able to tie those specific incidents back, so we

24   added in what is called a record ID.  So that we could

25   ID each stop as opposed to getting an aggregate of

Turner - direct                                    **267**

1    information that we couldn't follow.

2    Q    So a record ID would be like an infinite number to

3    a particular case or for a law enforcement agency?

4    A    Correct.

5    Q    But that did not exist in July 2020 to December of

6    2020?

7    A    Correct.  Didn't exist until July of 2021.

8    Q    Now, under these new changes the Virginia State

9    Police actually is going to have regulatory authority

10   to update and change their criteria as needed, is that

11   correct?

12   A    That's correct.

13   Q    Okay.  But they did not have that authority back

14   in July of 2020 to December?

15   A    We did not.  We were limited to explicitly what

16   was stated in the --

17        THE COURT:  So they changed the statute?

18        THE WITNESS:  Yes.

19   BY MR. SIEBERT:

20   Q    Why did they change that?

21   A    They changed it based on recommendations from both

22   VS and DCJS.

23   Q    Let me stop you there.  Were these recommendations

24   coming directly from you?

25   A    Yes.

**JA1519**

Turner - direct                              **268**

```
 1   Q    All right.  Go ahead.

 2        The changes, and why did they adopt this new

 3   system of regulatory authority?

 4   A    It was discussed with myself and my analyst and

 5   with DCJS personnel what we could do to make it better.

 6   We found a lot of issues but we weren't able to tie

 7   those issues directly back to a stop.  So that was

 8   creation of the record ID.  When we were reviewing the

 9   files that we received we noted that there would be

10   information we deemed being duplicate, would be the

11   same race, set, date.  There were also additional

12   issues such as quality control issues where we would

13   have missing information or not using the correct

14   value.  And as a way to support quality control we

15   needed a record ID so we could notify that agency that

16   this particular incident has invalid values or missing

17   data.  Prior to that change we could only reject the

18   entire file back to agency and say we couldn't accept

19   it.

20   Q    So the agency basically after being rejected would

21   have to come up on their own somehow to fill in missing

22   data or change the wrong data?

23   A    Correct.

24   Q    All right.

25        So let's talk about the data collection and
```

1    submissions you received in this July 2020 to December

2    of 2020 period.  Did you receive law enforcement

3    submissions during that time period?

4    A     Yes.

5    Q     Do you specifically hear, receive submissions from

6    Richmond Police Department?

7    A     Yes.

8    Q     How often were these submissions in that first six

9    months?

10   A     So the initial quarter was received all at one

11   time.  It was received by the due date.  So that would

12   be July 1 through September 30.  We received on

13   October 14th.  However, it had a lot of invalid values.

14   It had to be rejected.  And then ultimately we received

15   it again corrected.  We then received the October data

16   in November, and we received the November data in

17   December.  We did not receive the December data, and we

18   had to reach out to them to let them know we are

19   missing.

20         THE COURT:  Reach out to whom?

21         THE WITNESS:  Yes.

22         THE COURT:  Who did you reach out to?

23         THE WITNESS:  We reached out to Lt. Beasley.

24         THE COURT:  At where?

25         THE WITNESS:  Richmond P. D.

1    BY MR. SIEBERT:

2    Q    So you didn't receive the December 2020 data, so

3    you reached out.  When did you actually receive the

4    December 2020 data?

5    A    We did not receive it until July 14.  There were

6    still quality control issues, but they were quickly

7    fixed, and it was returned on July 15.

8         THE COURT:  What were the quality control issues?

9         THE WITNESS:  There were several issues.  Things

10   such as you using "Caucasian" instead of "white."  Or

11   using "African-American" or "A" instead of "black"

12   where we had specific values that should have been used

13   such as "W" for "white" or "B" for "black" or "A" for

14   "Asian."  So when we were receiving that information

15   and it doesn't meet the technical specs we can't inject

16   it into the data warehouse.

17        Other issues were things like missing statute

18   code.  Instead of having the actual statute code it

19   would say "failure to yield" or, you know, another type

20   of infraction.  And we actually needed the code section

21   itself to ingest it.

22   Q    So overall, how would you characterize these law

23   enforcement submissions during the first phase?

24   A    Initially, extremely poor.  And it was to be

25   expected.

Turner - direct                              **271**

1    Q    Does that go for Richmond Police as well?  I know

2    I have talked about law enforcement generally.  Is that

3    fair for Richmond Police as well?

4    A    Yes.

5    Q    The reason you say it is poor is all of the

6    reasons you just listed about incomplete reporting, is

7    that right?

8    A    That's correct.

9    Q    And inconsistent reporting.

10   A    Yes.

11   Q    Did see any problem with duplicative data?

12   A    Yes.  Typically if a person is given more than one

13   citation we had notified agencies to only send over the

14   most egregious offense, and agencies would send over

15   every single citation that that person received.  That

16   was an on-going issue.

17   Q    So, your job Virginia State Police when you

18   collected this data was to send back.  You never

19   discarded data?

20   A    No.

21        Either accept or reject.

22   Q    Okay.

23        Is Richmond Police now currently up to date in

24   terms of their submission?

25   A    Yes.

**JA1523**

Turner - direct                        272

1    Q    The gap we already talked about from December data

2    to July data, was it, is that the longest gap that was

3    missing?

4    A    Yes.

5    Q    Did you drill down on why there was problems with

6    the Richmond data?

7    A    It was typically the same problem with several

8    agencies.

9    Q    Well, stop there.  Was there internal and external

10   issues that were having an effect on the data

11   collection efforts --

12   A    Yes.

13   Q    -- of RPD?

14   A    Yes.

15   Q    What were those?

16   A    Initially we received data from a lieutenant who

17   had either retired or was promoted but no longer in

18   charge of it, which caused the longest gap.  But also

19   during that time period of course it is 2020 so we are

20   talking about a reduction of manpower, state-wide and

21   specifically in Richmond during civil unrest and, of

22   course, during COVID.  Those are the two major issues

23   that affected it.

24   Q    Was there also leadership issues at RPD that you

25   are aware of?

Turner - cross                                    273

```
 1   A    Yes, they had a lot of turnover, which is how we

 2   ended up, we being the contact initially was Lieutenant

 3   Beasley, and then it moved to Mr. Renne.

 4   Q    So is the step of the process is for you to send

 5   data to DCJS?

 6   A    That's correct.

 7   Q    That's the Department of Criminal Justice

 8   Services?

 9   A    Yes.

10   Q    What do they do?

11   A    So at that point they take the aggregated data,

12   and they are required to create a report.  That report

13   is then disseminated to the Governor, the General

14   Assembly, and the Commonwealth Attorney.

15   Q    Okay.

16        As we already talked about, you are part of the

17   process of recommending further changes to make better

18   data collection efforts across the state?

19   A    Correct.

20        MR. SIEBERT:  One second, Your Honor.

21        THE COURT:  Take your time.

22        MR. SIEBERT:  No further questions.

23        THE COURT:  All right.  Cross examination.

24                   CROSS EXAMINATION

25   BY MS AUSTIN:
```

**JA1525**

Turner - cross                                    **274**

```
 1   Q     Good afternoon, Ms Turner.
 2         THE COURT:  Do you work on Midlothian Turnpike?
 3         THE WITNESS:  I do.
 4   BY MS AUSTIN:
 5   Q     The Government Attorney asked you questions about
 6   Richmond Police Department submission of their data
 7   under the Community Policing Act from July '20 until
 8   December '20?
 9   A     Um hum.
10   Q     You said that it was a while, the December 20
11   report was somewhat delayed?
12   A     Yes.
13   Q     But isn't it true that by September 30th of 2021
14   Virginia State Police and you had received all the
15   months from July '20 to December '20?
16   A     Yes.
17   Q     And you have received those from the Richmond
18   Police Department and looked at it and either accepted
19   it or rejected it?
20   A     Yes.
21   Q     If you rejected it because there were mistakes; is
22   that right?
23   A     Invalid values.  I wouldn't know if they were
24   mistakes, because I am not familiar with the stops
25   themselves.
```

**JA1526**

Turner - cross                                    275

1    Q    Invalid values.  I am glad you made that point.
2    Meaning the Community Policing Act had a very strict
3    protocol for reporting data?
4    A    Right.
5    Q    If the police officer reported that data but used
6    the wrong terminology, you had to send it back?
7    A    Wrong data value, yes.
8    Q    Okay.  Then did you send it back for the purpose
9    of Richmond Police Department correcting that?
10   A    Yes.
11   Q    And then when they would re-submit it you again
12   had to make that decision whether you rejected it or
13   accepted it, correct?
14   A    Correct.
15   Q    Okay.
16        At some point you had accepted all the months from
17   July '20 to December '20?
18   A    Yes.
19        THE COURT:  When did you do that?
20        THE WITNESS:  July 15th would have been when we
21   received that December file, so speaking from that time
22   period, July 1 of 2020 to December 31 of 2020, all six
23   of those months were accepted by July 15th of 2021.
24        THE COURT:  Okay.
25   BY MS AUSTIN:

Turner - cross                                                      276

1   Q      You talked about how you are the, correct me if I

2   get terminology wrong, the Data Collection Manager at

3   Virginia State Police?

4   A      Right.  Management Data Analysis and Reporting.

5   Q      Okay.  In addition to data collection, gathering

6   data law enforcement agencies for the Community

7   Policing Act, what other purposes do you gather

8   information from law enforcement?

9   A      Information is gathered when there is a use of

10  force.  Information is gathered when there is a crime

11  that has been reported to law enforcement.  That would

12  also include hate crimes, or what is known as LEOK, law

13  enforcement officer killed or assaulted.  And we also

14  manage the reported management system for Virginia

15  State Police, as well as the evidence management

16  system.

17  Q      When up say the records management system for the

18  Virginia State Police?

19  A      Case management.

20  Q      Case management.  So that deals strictly with the

21  Virginia State Police?

22  A      Yes.

23  Q      You were receiving information from local law

24  enforcement agencies on use of force?

25  A      Um hum.

**JA1528**

1    Q    And how long had you been receiving that
2    information?
3    A    That was based on statutory requirement that came
4    about in 2015.  Officer involved shooting.  It was
5    elevated to use of force based on FBI requirement
6    during 2019.
7    Q    In that, when those provisions were passed and
8    that information had to be collected, did you work with
9    local law enforcement agencies at that time to make
10   sure they complied with protocol?
11   A    Yes.
12   Q    Okay.
13        So, this wasn't a new occurrence when the
14   Community Policing Act was passed that, well now there
15   is more information that law enforcement agencies have
16   to submit to you, correct?
17   A    Yes.
18   Q    And you had been in contact with local law
19   enforcement agencies over the years prior to passing of
20   the CPA in getting them to report correctly data
21   required by statute?
22   A    Yes.
23   Q    And that include the Richmond Police Department,
24   correct?
25   A    Yes.

Turner - cross                                    278

```
1    Q    When you talk about small law enforcement agencies
2    that might not be on line and have individual, I think
3    you called them CAD?
4    A    Um hum.
5    Q    That is the computer in vehicle.
6         Richmond Police Department is not considered one
7    of those small law enforcement agencies?
8    A    No.
9    Q    They are an agency that has the CAD in every
10   vehicle?
11   A    Correct.
12   Q    Okay.
13        You had been working with someone prior to passage
14   of the CPA, you had been working with someone at
15   Richmond Police Department whose responsibility it was
16   to pass data on to you?
17   A    Yes.
18        Much smaller data collection, but yes.
19   Q    And you said throughout, after the passage of the
20   Community Policing Act there were changes to the
21   legislation as to what needed to be collected?
22   A    Yes.
23   Q    And when those changes happened you than passed
24   those on to law enforcement agencies?
25   A    Correct.
```

## JA1530

Turner - cross                                   **279**

1   Q    Do you know when those changes, what changes you

2   referenced in your direct examination, what changes

3   were those?

4   A    The changes that occurred on July 1 were based on,

5   like I said, Senate bill 1530.

6   Q    July 1 what year?

7   A    2021.

8   Q    So let me stop you right there.  That is the first

9   change that was made, it was July of 2021?

10  A    Yes.

11  Q    Okay.

12       When you were in the process of sending

13  information back to a law enforcement agency saying

14  corrections need to be made, and then sent back to you,

15  you reviewed it one more time, of course, correct?

16  A    Um hum.

17  Q    Yes?

18  A    Yes.

19  Q    If it was accurate and complied with the statute

20  you then did what with that information?

21  A    That was forwarded to DCJS.

22  Q    Okay.  So the Richmond Police Department reports

23  to you from July 2020 to December 20.  Were all of

24  those reports forwarded to the Department of Criminal

25  Justice Services?

Turner - redirect                                    **280**

1   A    Yes, those particular six months would have been

2   received sometime in July of 2021.  We would have sent

3   it off in July.

4   Q    You sent it off because they were reviewed and

5   accepted?

6   A    Yes.

7   Q    One moment, Your Honor.

8        THE COURT:  Take your time.

9        MS KOENIG:  No further questions.

10       THE COURT:  Redirect?

11                  REDIRECT EXAMINATION

12       MR. SIEBERT:  Very briefly.

13       THE COURT:  Sure.

14  BY MR. SIEBERT:

15  Q    So just to be clear, VSP has no way to know the

16  information receiving from individual departments is

17  accurate?

18  A    That is correct.  We can only say that the data as

19  it is sent is either valid or invalid.

20  Q    But there is no way to know if every officer on

21  the street is actually complying with the CPA --

22  A    That is correct.

23  Q    -- or filling it out correctly?

24  A    That is correct.

25  Q    And you accept the accuracy of the data as you

1    receive it?

2    A     Yes.  We are only a repository.

3    Q     Going back to this December 2020 data set.  It was

4    received by Virginia State Police, but the importance

5    of it, I guess for today, is that it didn't make the

6    March cutoff; is that correct?

7    A     That's correct.

8    Q     And tell The Court about this March cutoff.

9    A     It would be legislation was written that a report

10   needed to be created by July 1 of the following year.

11   Which would have been July 1 of 2021.  That did not

12   provide enough time for agencies to submit data, and

13   for DCJS to review that data.  So DCJS and VSP, myself,

14   we discussed a cutoff date.  It was decided that the

15   first three months of the collection would make it into

16   the report.  So that would have been all data submitted

17   by April 15 of 2021.  The last month of Richmond was

18   December 2020 of RPD was not received until July.  It

19   would not have been included in the report.

20   Q     But other law enforcement agencies across the

21   state did have their December data included?

22   A     Yes.

23   Q     Now, just real brief.  You mentioned on cross

24   examination about other data collection efforts that

25   you have been involved in and VSP has been involved in?

Turner - redirect                                      **282**

1   A     Yes.

2   Q     How would you rate the level of stress or -- I

3   don't think that is the right word, the easiness of

4   putting this together for the Community Policing Act as

5   compared to the other data collection efforts you were

6   involved in?

7   A     Well, to provide some context.  Speaking

8   specifically to use of force data, typically there is a

9   pilot, there is a trial period where we collect that

10  information.  The technical specifications are sent

11  out.  And we were able to train agencies prior to

12  requesting the data.  So looking at use of force data,

13  we had about three years before we actually started

14  collecting that data correctly.  And that is because we

15  did have the time.  Using Community Policing Act we had

16  eight weeks.

17  Q     There was no pilot program period where you just

18  ignored the data, you immediately had to start using it

19  and collecting it?

20  A     Correct.

21        MR. SIEBERT:  No further questions, Your Honor.

22        THE COURT:  Okay.  Thank.

23        May she be excused?

24        MR. SIEBERT:  From the Government, yes, sir.

25        MS KOENIG:  Yes, Your Honor.

McDonough - direct                                   **283**

1           THE COURT:  Thank you very much for coming, ma'am.

2           THE WITNESS:  No problem.

3           THE COURT:  Have a good rest of the day.  Thank.

4           THE WITNESS:  Thank you.

5                       (Witness stood aside)

6      MR. SIEBERT:  United States calls Jim McDonough,

7   Your Honor.

8           THE COURT:  All right.

9           MR. SIEBERT:  I will go get him outside.

10          THE COURT:  All right.

11                      JAMES McDONOUGH

12              AFFIRMED AND TESTIFIED AS FOLLOWS:

13                      DIRECT EXAMINATION

14          THE COURT:  Thank you, sir.  Thank are for coming

15   today.  I appreciate it.

16          While you are testifying you are free to keep your

17   mask on or off, whichever you are more comfortable

18   with.  If you keep it on you need to speak loud and

19   right into to the microphone.

20          THE WITNESS:  I will.

21          THE COURT:  Whichever you want.  Makes no

22   difference to me.

23          THE WITNESS:  Yes, sir.

24   BY MR. SIEBERT:

25   Q    All right.

McDonough - direct                                    **284**

1           Mr. McDonough, state your first and last name and
2    spell it for the court reporter.
3    A     James McDonough.  I work for the Virginia
4    Department of Criminal Justice Services.
5    Q     Can you spell the last name for the court
6    reporter?
7    A     M-c-D-O-N-O-U-G-H.
8    Q     How long have you been with the Department of
9    Criminal Justice Services?
10   A     Thirty-two years.
11   Q     Just give the Judge a quick background that is
12   relevant to your current job.
13   A     Yes, sir.
14         I am the director of the Criminal Justice Research
15   Center at the Department of Criminal Justice Services.
16   I have been with that group for 32 years.  I have my
17   training in experimental psychology.  I have a PhD that
18   primarily focused on how you design and conduct
19   experiments.  I also have president and vice-president
20   of the Justice Research Statistics Association, which
21   is a national network of the state criminal justice
22   statistical analysis centers in all of the states in
23   the U.S.
24   Q     What is your exact job, and what do you do as the
25   director of criminal research center, or the manager

1    for criminal Research Center at DCJS?

2    A    We have a staff of five.  I oversee the assignment

3    of research studies that we are given by the Governor,

4    the Secretary, the legislature.  Essentiality I assign

5    the work, I quality control the work.  I review the

6    work that our analysts do and the reports that they

7    write.  And basically just provide oversight in terms

8    of seeing that it is done correctly.

9    Q    As part of your portfolio you are in charge of the

10   Community Policing Act for DCJS; is that right?

11   A    Yes.

12   Q    Obviously you are familiar with the Community

13   Placing Act?

14   A    Yes.

15   Q    Just generally what is it, real quick?

16   A    It is a law that was passed in 2020 that requires

17   local law enforcement agencies when they make traffic

18   stops to collect data on the circumstances of the stop,

19   including the demographics of the drivers involved,

20   report that data to the state police repository.  And

21   we in turn at DCJS are required to receive that data

22   from state police, analyze it, and write an annual

23   report on the interpretation of the data.

24   Q    Are you familiar with when the Virginia Policing

25   Act went into effect in Virginia?

1    A    It went into effect on July 1st of 2020.

2    Q    You became aware of prior to its passing and

3    passing, that the act was coming and you started

4    preparing for that; is that fair?

5    A    Yes.  Prior to its passage we were aware the bill

6    had been introduced, so we started doing some

7    preliminary work, looking at how those types of data

8    collection efforts had been tried in the past and how

9    they went.

10   Q    Were you provided any funding to fulfill the goals

11   of the Community Policing Act?  When I say you,

12   obviously, DCJS.

13   A    We were provided funding to hire someone to work

14   on the project, but we didn't receive the money to hire

15   that person until several weeks before the first report

16   was actually due.

17   Q    That was the first report that was due in July of

18   2021?

19        So during the phase of July when it first went

20   into implementation, until December of 2020, you did

21   not have an individual funded for this Community

22   Policing Act?

23   A    No, we did not have a person funded and dedicated

24   to that.

25   Q    But you had, obviously, people working on it?

McDonough - direct                                    287

1    A    Yes.  Myself and one of our other statistical

2    analysts did most of that work.

3    Q    So how would you describe, I guess, the initial

4    phase of the planning phase of this in terms of DCJS?

5    A    The planning phase was first of all just trying to

6    find out anything we could in the scientific literature

7    about how those types of studies had been attempted

8    before.  And we also began to receive some preliminary

9    data from state police to look at so we could see what

10   kind of data were coming in, and start assessing how

11   well we thought it was and what we might be able to do

12   with it.

13   Q    In your estimation did DCJS and yourself have

14   sufficient time to plan for this roll out in July of

15   2020?

16   A    No.  It was a very rushed process.

17   Q    Was the scale of the project also significant in

18   how you had to deal with?

19   A    Yes.  It's one of the largest projects that we

20   have had in my experience working.

21   Q    Did you receive any training, or staff receive any

22   training, how to deal with implementing the Community

23   Policing Act?

24   A    No.

25   Q    During this initial phase, July of 2020 to

**JA1539**

McDonough - direct                                    288

1    December of 2020, did you start receiving submissions

2    as required by law from Virginia State police?

3    A    Yes, we did.

4    Q    And when?  Do you know rifle when started

5    receiving that data?

6    A    We started receiving some very, very early data in

7    January of 2020, and then it kind of dribbled in.

8    Q    You mean January of 2021?  I'm sorry.

9    A    Twenty-one, I'm sorry, yes.

10   Q    Okay.

11        I cut you off.

12   A    Then it sort of dribbled in between then and May

13   of 2021 when we received the final set of data that we

14   actually used for our report.

15   Q    How would you characterize these law enforcement

16   submissions, the quality of them?

17   A    The quality was very shoddy.  There was -- there

18   were a lot of missing reports, agencies that had not

19   gotten up to speed yet on collecting and reporting it.

20   The data that we did receive, it frequently had missing

21   values in what was supposed to be reported.  There were

22   values that were not valid values, for what should be

23   reported.  So it was very shoddy and preliminary.

24   Q    When you received data that either be incomplete

25   or missing fields, or incorrect, what did you do with

**JA1540**

1    that?

2    A     Typically when we saw those type of things we

3    would exclude those records from our analysis.

4    Q     So if you had a traffic stop that was, say, on

5    August 8, 2021 and it had every field in there except

6    for gender, would that be something you discard?

7    A     Yes, we would exclude a record if any of the

8    values that were required to be there were not.

9    Q     Why would you do that if you are looking for,

10   presumably the Virginia Policing Act is about racial

11   bias and racial bias in policing, why would you exclude

12   gender if that is only field missing?

13   A     Generally we wanted to work with only what we

14   thought was the most clean complete data we had.  And

15   in our experience when you have problems with one part

16   of a record it is probably more likely that there may

17   be other problems.  And we didn't want to get into

18   excluding records because one would be missing this

19   field and one would be missing just that field, and

20   having to make decisions about which ones to throw out.

21   We think the cleanest way to make the data the best it

22   would be is if there were any problems with the record

23   we would just exclude it.

24         THE COURT:  Let me ask you.  Did Dr. Coston rely

25   on data from DCJS?

McDonough - direct                              290

1          MR. SIEBERT:  I think the --

2          THE COURT:  I don't think he did.

3          MR. SIEBERT:  The defense has argued the Virginia

4    Policing Act data is further evidence of -- maybe Dr.

5    Coston didn't, but I think their supplemental argument

6    is that the Community Policing Act also shows a

7    disparity.

8          THE COURT:  All right.  Okay.

9          MR. SIEBERT:  I think the Community Policing Act

10   is a separate body of data.

11         THE COURT:  Go ahead.  That is fine.  Okay.

12   BY MR. SIEBERT:

13   Q    So was this a surprise to you that in the first

14   six months that you had to discard data?

15   A    No.  For a project of this size in our experience

16   it's not at all uncommon that you run into this these

17   start up issues.

18   Q    All right.

19         So, did you, were you able to run statistical

20   analysis, or your shop, the body that you supervise

21   individuals, able to run any statistical analysis on

22   this data?

23   A    We ran just descriptive statistics to say these

24   are what the numbers are.  We were not able to run any

25   type of test of sophistical significance given the low

**JA1542**

1    quality of the data.

2    Q    So DCJS's opinion is essentially, and you as a

3    supervisor, the data was so poor that you received

4    during this first six-month period you didn't even

5    attempt statistical analysis of any significance?

6    A    No.  Did not.

7    Q    Is it fair to say your report does not have any

8    statistical validity or significance in any anything

9    you have collected?

10   A    Yes.  It is purely descriptive, it is not a

11   statistical analysis.

12   Q    Okay.

13        Were you able to, based on the strength of the

14   data, make any conclusions about, like a benchmarking

15   standard for driving population in some place like the

16   City of Richmond?

17   A    Not any type of a valid benchmark, no.

18   Q    We are going to get into that in a second.

19        Let's talk about the DCJS annual report.  Can you

20   tell The Court very briefly what that is?

21   A    It is a report that DCJS is required to do

22   annually where we will look at the prior years data

23   collected by state police, analyze it, and then by

24   July 1 of each year produce a report with the results

25   of that analysis.

1   Q     You drafted this report?

2   A     Yes.

3   Q     You supervised and approved its final, I guess,

4   send-off to your higher up officials?

5   A     Yes.

6   Q     Where did -- who did this report go to?

7   A     The report goes to the Governor, the General

8   Assembly, and the State Attorney General.

9         MR. SIEBERT:  I believe the defense has already

10  introduced this.  I was going to pull up certain pages

11  of the report.  But, is it fair that I just provide

12  this to the witness?

13        THE COURT:  Give it to him.

14        MR. SIEBERT:  Marked as Government's exhibit one,

15  but the same thing as --

16        THE COURT:  All right.  Already admitted.

17        MS KOENIG:  For the record, defendant's exhibit

18  six, so it is clear what we are talking about.

19  BY MR. SIEBERT:

20  Q     So, just looking at that, you recognize what that

21  is, right?

22  A     Yes, sir.  This the report that we produced.

23  Q     Okay.

24        So before we get to the report, I just want to

25  deal with some quick threshold questions.  What were

McDonough - direct                                    293

1   your, what is the key take away from this report, or

2   the key take away from this report.

3   A    The key take away of this report is that we did

4   find that given the measure we used there were

5   instances where drivers of a given race were stopped at

6   a higher rate than their percentage of the population.

7   But given the quality of data, the lack of a valid

8   benchmark and ultimately a range of other issues, we

9   could not draw any conclusions at all regarding whether

10   or not racial bias, or bias based policing, played any

11   role in these disparities that we found.

12       THE COURT:  When you say a racial group over

13   represented, you are talking about African-Americans?

14       THE WITNESS:  Yes.

15       THE COURT:  Thank you.

16   BY MR. SIEBERT:

17   Q    You guys created what is reflected in the report

18   called "disparity index," is that right?

19   A    Yes.

20   Q    Give The Court in layman's terms what a disparity

21   index is.

22   A    Okay.

23       The disparity index is where we took the

24   percentage of each racial group that was represented in

25   the traffic stops for a given locality, and we compared

McDonough - direct                                        **294**

1    that to the percentage of the, each racial group's make

2    up of the population in that locality.  The driving age

3    population.  So we had something to compare the traffic

4    stop percentage to give us at least a very early going

5    in sense of how those things fall out.

6    Q    Okay.  So the disparity index does not show racial

7    bias, just says disparity?

8    A    Correct.

9    Q    In terms of getting this number explain how you

10   get to like one point O disparity.  What is that?

11   A    Essentially, if, for example, if 45 percent of the

12   traffic stops in a locality were African-Americans and

13   45 percent of the driving age population in that

14   locality were African-Americans, that would be a

15   disparity induction of one, meaning they are equal,

16   there is no sign of a disparity between the two.

17   Q    Okay.  One-on-one comparison is one point O?

18   A    Yes.

19   Q    The -- what was City of Richmond from the July

20   1st, 2021 report disparity index?

21   A    Disparity index 1.6.

22   Q    How --

23        THE COURT:  What does that mean?

24        THE WITNESS:  What it meant was that driving

25   African-American drivers were stopped at a higher rate

**JA1546**

McDonough - direct                                           295

1    than the rate of drivers -- African-American people,

2    African-Americans of driving age in the population of

3    the City of Richmond.

4          THE COURT:  So 1.6 times higher than with respect

5    to the percentage of the population, is that what you

6    are saying?

7          THE WITNESS:  Yes, although I wouldn't say it's

8    what we would expect, because we do not have a

9    benchmark to give us what we would consider to be an

10   accurate expected value.

11         THE COURT:  Well, aren't you effectively using the

12   population of African-Americans over the age of 16 as a

13   rough benchmark in this case?

14         THE WITNESS:  Yes, I would say very rough

15   benchmark.

16   BY MR. SIEBERT:

17   Q    That is why throughout the report, we will get to

18   it, you called this preliminary?

19   A    Yes.

20   Q    And are all over the report you talk about why you

21   can not show racial bias from the data or the disparity

22   index that you used?

23   A    Yes.

24   Q    What is the state average disparity index?

25   A    The state average is also 1.6.

1          THE COURT:  It it is interesting to me,

2     Mr. Seibert, all of these numbers show that a whole lot

3     more African-Americans get arrested than white people,

4     but nobody is willing to say, gee, there might be some

5     bias.

6          MR. SIEBERT:  Well, Judge, you want me, would you

7     like me to answer?

8          THE COURT:  I would like to hear what you think.

9     I have been listening to Dr. Miller testify and now

10    Mr. McDonough and I just don't -- it looks to me like

11    everybody sort of dodges the bullet on this.

12         MR. SIEBERT:  Well, one because these are all

13    preliminary studies, and in order to find racial bias

14    there would be rigorous testing because, Judge, we

15    haven't heard this yet, but I think my answer to you

16    would be the ramifications of making a finding about

17    racial discrimination in a case like this would have,

18    and it wasn't true, would have earthquaking, you know,

19    results.

20         THE COURT:  Well, might be some building shaking

21    then.

22         MR. SIEBERT:  Right.  But the point is, if it is

23    deemed properly based on evidence and you wrong about

24    it, imagine the study that Dr. Smith did in LA and that

25    the court improperly found, or he improperly found

USCA4 Appeal: 24-4201    Doc: 22-4    Filed: 09/04/2024    Pg: 312 of 406

1    based on weak statistical evidence the effect of that.

2    That is why the mayor, chief of police, in answer to,

3    you know, the population, that they don't want the

4    traffic stop they could make changes.  If this Court

5    does that essentially would make every traffic stop

6    involving an African-American, then the indictment

7    would be dismissed, right?

8        THE COURT:  Well, not necessarily.  I don't

9    know -- you are confusing -- well -- you are equating a

10   finding that there is bias with the remedy of dismissal

11   when in fact, for instance in this case, we have got

12   the gentleman driving around with a fake license plate

13   on and all that.  Maybe that gets stopped regardless of

14   bias.  This is -- these are very, very difficult

15   issues.

16       MR. SIEBERT:  I agree, Your Honor.  But it's not

17   our burden.  The burden of the defense.  If there is

18   racial disparity, that is a starting point.  This would

19   be a starting point for any real statistician to come

20   in here and dig in and look at all at variables.  There

21   is plenty of states doing that now.

22       THE COURT:  Dr. Coston agrees with that.

23       MR. SIEBERT:  I wasn't talking to Dr. Coston.  I

24   am just saying there is data collection efforts in I

25   think 40 states around the country to varying degrees.

1       Some are better than others.  If Virginia wants to be
2       serious about data collection, data collection efforts
3       they could start collecting better data and give this
4       individual an opportunity to make findings that are
5       more than just preliminary.
6               THE COURT:  Is it your contention that Virginia
7       still has an inadequate collection system going?
8               MR. SIEBERT:  I am not the expert in this field.
9       I think they still need to dig into -- Dr. Smith
10      provided many variables that need to be looked at that
11      weren't on this January, or the July 2020 to December
12      of 2021.
13              THE COURT:  Dr. Smith's testimony was essentially
14      that you don't have all the data.  And in particular
15      it's almost impossible to have a benchmark.  That is
16      pretty much what he said.  I suppose you could go look
17      at the crash data, you could possibly go look at the
18      veiled darkness data, whatever it is called, or you
19      could station people on every corner to count heads.
20      But, that is really a monstrous task.
21              MR. SIEBERT:  I think the reason this is
22      important, Judge, in my opinion, it's a starting point.
23      So now if a department is wide spread, that will at
24      least give the signal to start digging deeper.
25              THE COURT:  Well, all right.

 1      MR. SIEBERT:  The other problem is if you have

 2   individual rogue officers that are making the problem,

 3   go after them.  This will help identify and narrow down

 4   if there are certain parts of an area.  So there is bad

 5   actors on the individual level.  I think certainly this

 6   helps, you know, factor that in and have them dig

 7   deeper.  But to say that the Richmond Police force is

 8   designed, or their enforcement system to selectively

 9   enforce African-Americans I think is a step too far.

10   That is all we have heard throughout today.

11      THE COURT:  You know, ultimately this may be

12   a political question.  Go ahead.  Sorry.

13      MR. SIEBERT:  Yes, Your Honor.

14      THE COURT:  You are doing good.

15   BY MR. SIEBERT:

16   Q    So there is a disparity in expert bias?

17   A    No.

18   Q    Is it fair to say there is multiple variables that

19   could explain this disparity?

20   A    Yes, that is why we were so cautious because we

21   are aware there are multiple other variables that could

22   explain why you could have a mismatch between the

23   percentage of drivers of any given race stopped and the

24   percentage of those, of driver-age in that racial group

25   within a locality.

1          THE COURT:  Here is the thing.  The last witness

2     said there were 400 police agencies in the state.

3     Isn't that what he said?

4          MR. SIEBERT:  Yes.

5          THE COURT:  And if you add them all together it is

6     still 1.6, a 1.6 disparity index.

7          THE WITNESS:  Yes, that's correct.

8          THE COURT:  Seems to me like that means there is a

9     problem in Virginia that needs to be addressed.  I mean

10    I just -- everybody says we need more data, we need

11    more data.  We have 400 contributors of data to this

12    thing which collectively, including places that are as

13    conservative as Brunswick County and as liberal as

14    Fairfax, they all when you add them all together comes

15    out to a disparity in stops.  I just don't understand

16    why everyone is so cautious about saying the Emperor

17    has no clothes on.

18         THE WITNESS:  If I could, Your Honor, I certainly

19    understand.

20         THE COURT:  That wasn't a fair question.  I

21    apologize.

22         THE WITNESS:  As researchers what we were trying

23    to do is determine to the extent to which we could or,

24    couldn't make that statement based on the data that we

25    have.  And we believe that there are many other factors

1    that contributed to that 1.6, whether it be Richmond or
2    the State that could be contributing to that that are
3    not based on race.  Race might be in there somewhere,
4    but we don't know.
5        THE COURT:  Over 400 agencies, whatever foul up in
6    the data there are, it still comes to 1.6, and so we
7    doubt that 1.6 is an accurate number?
8        THE WITNESS:  Yes, we still doubt that that is an
9    accurate number reflecting what we are trying to
10   measure.
11   BY MR. SIEBERT:
12   Q    Well, let me ask one follow-up question.  I mean
13   could police deployment patterns be a significant
14   factor that change a variable that could cause this
15   disparity index?
16   A    Yes.  If, for example, police patrols are heavier
17   or denser in a high-crime area that might be
18   predominantly minority in population, well, that could
19   skew these numbers to why we are getting more stops of
20   African-American drivers.
21   Q    Could calls for service that police are required
22   to respond to also be another variable that could
23   factor in, that could be, I guess, factor in to the
24   disparity index?
25   A    Yes.

1          THE COURT:  So is Pierre Redding in the Richmond

2    Police Department going to tell us something about

3    deployment patterns?

4          MR. SIEBERT:  No, Your Honor.  A data collection

5    individual that we have actually cut to move forward on

6    this faster.  We incorporated some of Ms Turner's

7    testimony.

8          THE COURT:  All right.

9    BY MR. SIEBERT:

10   Q    So in drafting, I guess, this report were you and

11   DCJS concerned certain officials could use the report

12   to claim it showed racial bias?

13   A    No.  We stated that the report should not be used

14   to do that.

15   Q    Right.  But is that why you put that in there

16   because you thought it could be misused by officials --

17   A    Yes.

18   Q    -- to say the disparity index proves racial bias?

19   A    Yes.

20         THE COURT:  Go ahead.  Feel free to lead him.

21   BY MR. SIEBERT:

22   Q    So, you document throughout this limitations that

23   we were going to get to of what your findings are?

24   A    Yes.

25   Q    And you already mentioned this, but one of the key

1    limitations was the benchmark problem?

2    A     Yes.

3    Q     And tell The Court what that is.

4    A     Again, it is to determine whether or not there is

5    bias you would have to have some measure of what those

6    numbers would look like if there were not bias.  And we

7    use that driver age population as that benchmark.  But

8    given that there are no reliable benchmarks to our

9    knowledge in any of the attempts to do this, we just

10   recognize it as a very crude preliminary start toward

11   trying to develop one.

12   Q     So your benchmarking was taking out anyone under

13   the age of 16 from the census data?

14   A     Assuming they are not drivers.

15   Q     Would you ever consider just using all the census

16   data?  Was that ever a consideration?

17   A     No, we did not, because given how much noise there

18   is already in this data we assumed that using this

19   chunk of the population that is highly unlikely to be

20   out there driving and subject to being stopped would

21   only make the data even noisier and of less quality.

22   Q     All right.

23         So let's go to, very quickly, can you bring up

24   Government's exhibit one, I guess.  Can you blow up the

25   bold area.  That paragraph.

McDonough - direct                              **304**

1          THE COURT:   We are on Government's exhibit 1 A.

2    Q     Yes, Your Honor.

3          Can you read the bold there?

4    A     "The information presented in this report is

5    preliminary and should be interpreted with caution."

6    Q     This is the first page of your report?

7    A     Yes.

8    Q     Why are you saying that this is preliminary and

9    should be interpreted with caution?

10   A     We are saying that because it was very challenging

11   for the law enforcement agencies to begin collecting

12   and reporting this data many agencies had trouble

13   reporting it at all, or understanding exactly how it

14   was to be reported.  Of the data that were reported

15   there were various issues with the quality and the

16   completeness of the data.  And some smaller agencies

17   that did not have a lot of resources were not able to

18   report many stops at all, so few, or so few that it was

19   not possible to do any type of interpretation of the

20   data.

21   Q     Could we go to the next paragraph down?

22         There is another reason in mentioning that.  Tell

23   The Court about what the other limitations are.

24   A     Yes.  Another one of the limitations is that there

25   is no standard way right now for law enforcement

**JA1556**

1    officers when they are making a stop to determine what

2    the race or ethnicity of the driver is.  There is no

3    indication of that on a driver's license or a D M V

4    record, so it was left up to the officer's discretion

5    to make that decision, or if they wished, to ask the

6    driver what their race or ethnicity was.

7    Q    All right.  Go to 1 D.  Go to the second

8    paragraph.  Just blow that whole paragraph up.

9         Yes.

10        Can you read the bold on that?

11   A    Yes.  "Although this analysis identified

12   disparities in traffic stop rates related to race,

13   ethnicity, it does not allow us to determine or measure

14   specific reasons for these disparities."

15   Q    All right.

16        So, that applies to every police department in the

17   country, in the state, is that right?

18   A    Yes.

19   Q    Including RPD?

20   A    Yes.

21   Q    All right.

22        To next paragraph down.  Sorry.  Keep up what you

23   just had.

24        Talks about the various factors that could help

25   explain why members of a given race may be stopped at

McDonough - direct                                                  306

1    higher or lower rate.  What are those other factors?
2    A    Among them are different driving rates or patterns
3    by different racial groups.  Again, we don't know the
4    details to benchmark this.  We know these differences
5    exist, but some groups may be more likely or not to
6    drive than others at given locations based on
7    employment locations, whether or not they use public
8    transportation, different rate of policing in different
9    areas.  Again, high crime areas may have more police
10   presence, therefore more stops.  And individually you
11   see some cells may simply have different guidelines on
12   what discretion they give to their officers in when to
13   determine whether or not to make a stop.
14   Q    Okay.
15        Close that and go to the next paragraph down.  All
16   the way down to the recommendation paragraph.
17        THE COURT:  Hold on.  We are one.
18        MR. SIEBERT:  One B still, Your Honor.
19        THE COURT:  Okay.
20   BY MR. SIEBERT:
21   Q    So talks about major limitation of the study.
22   Could you tell The Court what that limitation was?
23   A    Sorry.  Could you repeat the question?
24   Q    Yes.
25        The first paragraph highlighted talks about the

1    major limitation of the study.  Tell The Court what

2    that major limitation was.  We touched on it a little

3    bit.

4    A    Yes, sir.  The major limitation is, again, the

5    benchmark problem.  We do not know what percentage of

6    any given racial group's driving, actual driving habits

7    or exposure to being stopped is.  That is what we need

8    to compare the actual number of stops to.

9    Q    All right.

10          Then the recommendation one, so this is a

11    recommendation that you are giving to state officials.

12    A    Yes.

13    Q    All right.  Tell The Court what is that

14    recommendation?

15    A    The first recommendation states the percentage and

16    DI's presented in this preliminary report should not be

17    interpreted to indicate that there are any individual

18    law enforcement agencies practicing bias based policing

19    given the limitations that we cite throughout the

20    study.  And therefore we recommend that these things be

21    used only to identify where there might be a potential

22    for it, but not to conclude that there is.

23    Q    All right.

24          You recommend that in the areas where there is a

25    disparity that requires further review and potentially

McDonough - direct                                    308

1    further action to either reduce or eliminate where

2    there is this disparity?

3    A    Yes.

4    Q    That is your recommendation to the General

5    Assembly, the Governor, the Commonwealth Attorney, and

6    the Virginia Attorney General?

7    A    Yes.

8    Q    All right.

9         We are not going through it, but later in the

10   report you give recommendations on what some other

11   studies that may be more accurate way to do this?

12   A    Yes.

13   Q    Just tell us quickly what those are.

14   A    Based on research we have seen done elsewhere

15   where they had more resources, time, whatever, breaking

16   out this type of data by whether or not the stop

17   occurred during daylight or darkness has been

18   recommended as a method.  The assumption being that in

19   the dark it may be less likely for a police officer to

20   discern the race of a driver prior to deciding whether

21   to stop.  We also recommended that if possible, if we

22   could obtain data on the race of drivers within a

23   locality that are involved in traffic accidents, that

24   would provide a better benchmark of how often are

25   different groups out there driving.  Because in those

1    cases police officers don't have the discretion to

2    respond or not.  They are called.  So presumably any of

3    those disparities that might exist in traffic stops

4    would not be included there.  And that would give us a

5    better representation how many drivers in different

6    groups are actually on the road.

7    Q    Okay.  Briefly, one C.

8         And let's highlight the bold all the way down to

9    the recommendation.  Sorry.  The second paragraph all

10   the way down to the recommendation.  This is the final

11   portion of your report; is that right, page 67?

12   A    Yes.

13   Q    These are your final recommendations?

14   A    Yes.

15   Q    And you are touching on the same issues audited

16   before regarding disparity; is that right?

17   A    Yes, we are basically summarizing most of what we

18   talked about earlier in the report.

19   Q    Okay.  The recommendation is what we previously

20   just reviewed about disparity indexes?

21   A    Yes.

22   Q    Okay.

23        Just almost done here.  Were you able to determine

24   any methods to analyze or assess subjective motivation

25   for individual officers?

1    A    No.

2    Q    In this -- this annual DCJS report was released

3    when?

4    A    It was released July 1 of 2021.

5    Q    Okay.

6         And last question.  Does this report in any way

7    suggest there is racial bias about police officers for

8    any stop conducted in the Commonwealth of Virginia from

9    2020 to 2021?

10   A    No.

11        MR. SIEBERT:  No other questions, Your Honor.

12        THE COURT:  Thank you.

13        Cross examination?

14                      CROSS EXAMINATION

15   BY MS AUSTIN:

16   Q    Good afternoon, Mr. McDonough.  Did I pronounce

17   that correctly, McDonough?

18   A    That's correct.  Yes.

19   Q    Your work at the Department of Criminal Justice

20   Services you said is in research.  You are director of

21   the research center, right?

22   A    Yes.

23   Q    So for the last thirty some years, correct?

24   A    Yes.  Roughly thirty years, give or take a year.

25   Q    Okay.  That is fine.  Over 30?

```
 1   A     Yes.

 2   Q     We can agree on that.

 3         And so has it been your role there at the Research

 4   Center that you constantly analyze data coming in and

 5   prepare reports?

 6   A     Yes.

 7   Q     Where does that data usually come from?

 8   A     It comes from a variety of usually state agencies,

 9   the Department of Corrections, the Virginia State

10   Police, the Supreme Court.  Various criminal justice

11   agencies in Virginia.

12   Q    Is that data transferred to your office usually by

13   means of a statute directing that you receive that

14   data?

15   A    No.  Most of it is not required by statute.  We

16   have very broad statutory requirement to analyze

17   criminal justice data.  But each one is not listed in

18   statute in terms of where it comes from.

19   Q    But analyzing data from different state agencies

20   is what your center does, --

21   A    Correct, yes.

22   Q    -- correct?

23        And so, when you stated you didn't have any

24   training on how to receive the data that was submitted

25   to you pursuant to the Community Policing Act your job
```

1    for the last 30 some years has been receiving data from

2    state agencies, correct?

3    A    Yes.

4    Q    And then analyzing that data?

5    A    Yes.

6    Q    And producing reports?

7    A    Yes.

8    Q    And you talked about when you started receiving

9    data under the Community Policing Act, that some of it

10   was shoddy, I think.  Did you say "shoddy?"

11   A    Yes.

12   Q    Okay.  And if found that to be the case you

13   discarded it or didn't use it; is that correct?

14   A    Yes, if we had the missing records or missing

15   values in records or values there were clearly not

16   within the range of what could be reported we would be

17   discard those.

18   Q    And do you -- is it your understanding that that

19   information went through quality control at Virginia

20   State Police before it came to you?

21   A    It went through some level of qualaity control,

22   yes.

23   Q    And then you performed another level of quality

24   control when you received it?

25   A    Yes.

1   Q    Yes?

2   A    Yes.

3   Q    Okay.

4        And then after that level of quality control at

5   the Department of Criminal Justice Services you then

6   set about with the help of your staff to analyze the

7   data?

8   A    Yes.

9   Q    And as a result of analyzing the data under the

10  Community Policing Act you had to submit a report by

11  July of 2021 that we have been referring to as

12  Government's exhibit one, correct?

13  A    Yes.

14  Q    Okay.

15  Q    And you and your staff analyzers, or sorry,

16  analysts, went through all of the data that was

17  received and produced a report that was published,

18  correct?

19  A    Yes.

20  Q    Okay.

21       What kind of quality control did you perform or

22  did this published report go through before it was

23  released?

24  A    It was viewed by our agency director.  It was

25  reviewed by the Secretary of Public Safety.  Those two

 1   reviews took place before the report would be, was

 2   officially published.

 3   Q    So the official report had quality control before

 4   published?

 5   A    It had review.  I wouldn't say it was a, you know,

 6   the same type of quality control we did where we get

 7   into the details.  The higher level you go, they are

 8   looking at in a more general sense, I guess, than the

 9   hard core research people do.

10   Q    But at some point after the higher level review

11   occurred, it was published?

12   A    Yes.

13   Q    It was published in key findings and conclusions

14   were contained within the report, right?

15   A    Yes.

16   Q    Is it true that one of the findings is that the

17   Department of Criminal Justice Services staff was able

18   to identify differences in traffic stop rates for

19   persons in different racial ethnic groups?

20   A    Yes.

21   Q    And there were differences between driver racial

22   ethnic groups regarding the reasons the stop was made,

23   whether a search of an individual or the vehicle

24   occurred, and what action was taken toward the driver.

25   Is that a finding in the report?

1    A    Yes.

2    Q    Just to be clear, Richmond Police Department

3    submitted all the required data before this report was

4    produced, correct?

5    A    No.  That's not correct.  The data that we

6    received from the Richmond Police Department through

7    the Virginia State Police covered the period from July

8    1 of 2020 through November 30 of 2020.  The data that

9    we used in the report, the full report, contained data

10   that were submitted by agencies between July 1 of 2020

11   and March 31 of 2021.  So we received fewer months of

12   data from the Richmond P D than we received from many

13   of the other localities.

14   Q    But you went ahead and prepared the report based

15   on the data received from all law enforcement agencies?

16   A    Yes.

17   Q    So you didn't perceive that as a problem in

18   preparing your report?

19   A    No.  We stated in the report that one of our

20   caveats or concerns which was behind the reasons that

21   we were very cautious about interpretation is because

22   we knew that there were multiple agencies that reported

23   different time periods depending on how quickly they

24   were able to get their data collection going and up and

25   running and reported to state police.  That was an

316

1    issue throughout the state.

2         THE COURT:  Well, is it fair to say that you knew

3    you had imperfect data, but you did your best with what

4    you had?

5         THE WITNESS:  Yes, sir, that is a very concise way

6    of stating it.

7         THE COURT:  All right.

8    BY MS AUSTIN:

9    Q    Thank you, Your Honor.

10        Then doing the best with what you had you came to

11   a conclusion that an analysis of traffic stops

12   state-wide that black drivers were stopped at higher

13   rates than white drivers?

14   A    Yes.

15   Q    And black drivers who were stopped were searched

16   at higher rates than white drivers?

17   A    Yes.

18   Q    And you found that black drivers who were stopped

19   were arrested at higher rates than white drivers?

20   A    Yes.

21   Q    And you didn't state in your report the data we

22   received is just so bad our results are inconclusive?

23   A    We didn't state it in those words, but I believe

24   we essentially said that enough, multiple times.

25   Q    But you didn't say it when you stated black

**JA1568**

1   drivers were stopped at higher rates than white

2   drivers.

3          You were able to conclude that.

4   A    We were able to conclude that the numbers that we

5   had showed that.  But what we said throughout the

6   report is that we know there are problems with those

7   numbers.

8          THE COURT:  Let me ask you.  Do you think that the

9   problem was the people couldn't tell whether the

10  drivers they stopped were black or white?

11         THE WITNESS:  We couldn't say that, sir.  In any

12  given situation we couldn't say that.  What we were

13  saying is that there was no standard, and law

14  enforcement officers typically are looking for a, you

15  know, some type of standard.  So we are not saying we

16  have any sense of like to what degree that may have

17  played a role, but we are saying we believe that it is

18  possible that is one of the things that could be

19  muddying the interpretation of the data.

20         THE COURT:  I will tell what.  You have been doing

21  this for 30 years, right?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Have you found in the Commonwealth of

24  Virginia a pattern of law enforcement officers who are

25  unable to tell the race of people that they stop?

**JA1569**

1            THE WITNESS:  No, sir, I haven't.

2            THE COURT:  Okay.  That was a yes or no question.

3            THE WITNESS:  Yes.

4            THE COURT:  You haven't.

5            THE WITNESS:  We have not.

6            THE COURT:  Okay.  You know, I have been

7     practicing law since 1976.  I haven't seen that either.

8            Let's move on.

9     BY MS AUSTIN:

10    Q    Thank you, Your Honor.

11           You talked about the disparity index.  When you

12    began your discussion about the conclusions and

13    recommendations isn't it true that in your report you

14    stated that these figures should only be used to

15    identify where the numbers indicate certain ethnic

16    racial groups are being disproportionately stopped?

17    A    Yes, that is what we stated.

18    Q    Regarding the disparity index you stated that the

19    State had a 1.6 --

20    A    Yes.

21    Q    -- index.

22           Meaning if it is 1.1 to 1.9 it represents a

23    moderate over representation for a group.  And how

24    likely it is that a driver would be stopped; correct?

25    A    Correct.

1    Q    Okay.

2         So Richmond had an -- overall state index,

3    disparity index is 1.6?

4    A    Yes.

5    Q    Meaning blacks, African-Americans, were

6    disproportionately -- there was a disparate index to

7    the stops regarding African-Americans?

8    A    Yes.

9    Q    Disproportionately high?

10   A    Yes.  Relative to their driver age percentage of

11   the population.

12   Q    Okay.

13        And then the state disability index is 1.6, but on

14   page 40 of your report -- well, on several pages of

15   your report in the table, this table 15 A, you break

16   down every single law enforcement agency and what the

17   black driver disparity index is; is that right?

18   A    For every locality that reported data to us, yes.

19   It did not every single locality law enforcement

20   agency.

21   Q    Okay.

22        And Richmond Police Department was 1.6 disparity

23   index, correct?

24   A    Yes.

25   Q    And as I understand it you have to submit a report

**JA1571**

1    pursuant to the Community Policing Act every year?

2    A    Yes.

3    Q    And on July 1, correct?

4    A    Yes.

5    Q    You just recently submitted a report?

6    A    No.  We have not yet submitted a report for July 1

7    of this year, is that the question you are asking?

8    Q    Yes.

9    A    No, we are working on one, but we have not yet

10   submitted one.

11   Q    Isn't it mandated by statute that it be in by the

12   first of July of every year?

13   A    Yes, it is.  But it is also understood that

14   sometimes these reports get backed up because of work

15   issues, staffing, things like that.

16   Q    So you can't report, or can you report to us what

17   your findings were, or will be, in the July 2st, 2022

18   report?

19   A    We haven't finished it yet.

20        THE COURT:  Well, the questions this.  We know you

21   haven't put it in writing yet.  Do you know what the

22   answer, what the disparity index is going to be for

23   Richmond for African-American drivers in the report

24   that is forthcoming, whenever it gets done?

25        THE WITNESS:  Your Honor, I don't have that in

```
 1   front of me what that number is.

 2          THE COURT:  He doesn't know what it is.

 3          MS AUSTIN:  Okay.

 4          May I have one moment, Your Honor?

 5          No further questions.

 6          MR. SIEBERT:  No further questions.

 7          THE WITNESS:  Thank you very much for coming, sir.

 8          Good to have a servant of the Commonwealth here.

 9   Thank you for coming.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  All right.  Call the next witness, if

12   any.

13          MR. GIBBONS:  Government calls Special Agent Josh

14   Valot.

15          THE COURT:  All right.

16                    (Witness stood aside)

17          MR. GIBBONS:  Our final witness, Your Honor.

18          THE COURT:  All right.  Thank you.

19                       JOSH VALOT

20             AFFIRMED AND TESTIFIED AS FOLLOWS:

21                    DIRECT EXAMINATION

22          THE COURT:  All right.

23          Now, when you testify you are welcome to keep your

24   mask on or take it off.

25          THE WITNESS:  Thank you.
```

322

1              THE COURT:  Is it V-A-L-O-T?

2              THE WITNESS:  Yes, it is, Your Honor.

3              THE COURT:  Okay.

4     BY MR. GIBBONS:

5     Q    Special Agent Valot, where are you employed?

6     A    Employed with the Bureau of Alcohol, Tobacco

7     Firearms and Explosives, ATF here in Richmond.

8     Q    Are you case agent for the case against Keith

9     Moore?

10    A    I am.

11    Q    As part of your work as case agent you reviewed a

12    spread sheet of data that was produced yesterday to the

13    Government by the defense?

14    A    I did.

15    Q    You analyzed that data at the request of the

16    prosecutors?

17    A    I did.

18    Q    What did that data represent?

19    A    The data represented traffic stops, information on

20    traffic stops from Richmond Police Department from

21    between July 1st of 2020 and December 6 of 2020.

22    Q    How many traffic stops are recorded for the

23    Richmond Police Department for this date range?

24    A    Of the information that we analyzed 2500 traffic

25    stops.

1   Q    I am going to show you what has been marked
2   Government's exhibit 1.
3        This has been admitted as defendant's exhibit six,
4   also Government's exhibit one.
5        The Court already heard all about the DCJS report.
6   We will skip that.  Are you familiar with page 17 of
7   DCJS report?
8   A    I am.
9   Q    What is contained on page 17 of that report?
10  A    On page 17 it includes a table that has a list of
11  records that were excluded from their analysis.
12  Q    That is Government's exhibit 1 D as page 17?
13       THE COURT:  Okay.  Trying to figure out what that
14  was.  1 D.  I have got it right here.
15  BY MR. GIBBONS:
16  Q    Zoom in on the table, please.
17       So these are exclusions for which reasons for
18  which DCJS excluded data from the statewide data; is
19  that correct?
20  A    That's correct.
21  Q    What are some of the reasons or criteria on which
22  DCJS excluded statewide data?
23  A    There was no age listed, no gender identified.
24  There is no listing of the action taken by the officer.
25  There is no mention of additional persons who were

1   arrested.

2   Q    To be clear, you are not talking about the

3   suitability of those exclusions, you are just talking

4   about what the numbers are for those exclusions in the

5   data provided to the Government by the defense?

6   A    That is correct.

7        THE COURT:  I think what he was saying is these

8   are the reasons given by DCJS for not included?

9        MR. GIBBONS:  Yes.  The next, I was moving on to

10  the next question, Your Honor.  So he just identifying

11  which of the RPD stops, how many are excludable for

12  these reasons.

13       THE COURT:  Are all of these Richmond stops on

14  page 17?

15       MR. GIBBONS:  Page 17 is the criteria by which

16  DCJS has excluded.

17       THE COURT:  Okay.

18       MR. GIBBONS:  Then he is just going to give

19  numbers, RPD data.

20       THE COURT:  All right.

21  BY MR. GIBBONS:

22  Q    Go through each of these categories, if you will.

23       Did you for stops in which there was a missing

24  age?

25  A    I did.

1    Q    How many missing-age entries were there in the RPD

2    data?

3    A    147 missing entries, or entries missing in age.

4         THE COURT:  Missing age?

5         THE WITNESS:  Correct.

6         THE COURT:  Okay.

7    BY MR. GIBBONS:

8    Q    What about gender?

9         THE COURT:  Is this case about age?

10        MR. GIBBONS:  No, sir.

11        THE COURT:  Okay.  Thank you.

12        MR. GIBBONS:  We are giving the numbers, Your

13   Honor.

14        THE COURT:  All right.

15   BY MR. GIBBONS:

16   Q    What about missing gender?

17   A    Six entries with no gender.

18   Q    What about a blank for "listed action taken as

19   result of the stop?"

20   A    There is five.

21   Q    What about stops that lacked entry for whether a

22   person was searched?

23   A    Two stops.

24   Q    What -- did you check for stops in which there was

25   no listed entry for whether a person was arrested?

1    A    Yes.  There is 249 entries that did not have

2    anything listed for that.

3    Q    Were there some traffic stop entries that were

4    missing multiple items of data such that it would be

5    excludable on separate grounds?

6    A    Yes, there were.

7    Q    So how many total stops were missing at least one

8    item out of the 2500 stops?

9    A    There 346 stops.

10   Q    Let's talk about duplicates and pull up

11   Government's exhibit 5.

12        Special Agent Valot, did you also determine

13   whether there were any duplicate traffic stops within

14   the RPD data?

15   A    Yes.

16   Q    Exhibit 5 is the report of duplicate traffic stops

17   within RPD data?

18   A    Yes, sir.

19   Q    Your Honor, we move to admit Government's exhibit

20   five.

21        MS KOENIG:  No objection, Your Honor.

22        THE COURT:  Admitted.

23   BY MR. GIBBONS:

24   Q    What did you determine, Special Agent Valot?

25   A    Determined that there appears to be that a total

1    of 311 entries, although there is only 142 traffic

2    stops, so, of the 142 unique traffic stops a number of

3    them were entered two times, three times or in a few

4    occasions four times.

5    Q    So let's walk through a few.  Scroll down to

6    control numbers 1579 through 1582.

7         THE COURT:  Well, that is not a lot a whole lot

8    more legible.  This is on exhibit five?

9         MR. SIEBERT:  Yes, Your Honor, we will make it

10   bigger.

11   Q    In the middle, Special Agent, do you see control

12   1579 through 1582?

13   A    Yes, sir.

14   Q    Can you explain why these four stops are

15   duplicates of each other?

16   A    So all four of these stops appear to be duplicates

17   of each other.  They have the same date, they have the

18   same location where the traffic stop occurred, the

19   longitude longitude listed is the same.  The race of

20   the driver is identical.  The age of the driver is

21   identical.

22        THE COURT:  Of all the data?

23   BY MR. GIBBONS:

24   Q    Let's look at two more sets.  1915 and 1925.

25        I will get you a page number, Your Honor.

**JA1579**

1          THE COURT:  All right.  All right.  So these also

2    have all the same information.  So you conclude they

3    were identical; is that correct?

4          THE WITNESS:  They appear to be so, yes.

5          THE COURT:  The same thing I take it would be true

6    of 1936 and 1947; is that correct?

7          THE WITNESS:  Yes, sir, that's correct.

8    BY MR. GIBBONS:

9    Q    Looking briefly at 1915 and 1925, what do you

10   notice about the latitude longitude of those two stops?

11   A    The latitude longitude, corrected latitude

12   longitude for the second listed stop is different than

13   it is for the first stop.

14   Q    So, one of the Federal Public Defender interns or

15   Dr. Coston corrected latitude longitude for one of

16   these but not the other?

17   A    That's correct.

18   Q    Were all of these 311 traffic stop entries perfect

19   duplicates?

20   A    No, they were not.

21   Q    Could you explain that, please?

22   A    Well, as we just discussed there is a few that had

23   the latitude longitude, which was a little bit

24   different.  There was two stops in which there was an

25   age listed in one of the stops and in the other stop

1    there was, the age there was not a value there, just

2    zero.  There was a few stops that were triple stops,

3    listed three times for the stop, and one of the

4    violations listed was different than the other.

5    Q    Special Agent Valot, to summarize the work that

6    you did, you determined that 346 traffic stop entries

7    in the RPD data met at least one of the criteria that

8    led DCJS to exclude that entry on the state-wide data?

9    A    Yes, sir.

10   Q    Determined that 311 traffic stop entries contained

11   duplicate data?

12   A    Yes.

13   Q    If you eliminate those duplicates to one entry and

14   excluded the other traffic stop entries 169 entries

15   should be excluded?

16   A    That's correct.

17        THE COURT:  How many would you exclude if you only

18   excluded the duplicates.

19        THE WITNESS:  169.

20   BY MR. GIBBONS:

21   Q    Special agent, 169 --

22        THE COURT:  So there were duplicates.

23        THE WITNESS:  That's correct.  Duplicate and

24   triple.

25        THE COURT:  Multiple entries of the same thing?

Valot - cross                                    330

1        THE WITNESS:  Yes, sir.

2        THE COURT:  So, of those 169 you say, does that

3    include, are you excluding all of the entries under the

4    duplicates, or just if there are two of them, you

5    exclude one of them?

6        THE WITNESS:  That's correct.  One entry, one stop

7    and excluding the other.

8        THE COURT:  Okay.  Thank you.

9    BY MR. GIBBONS:

10   Q    So taking those two numbers together, Special

11   Agent Valot, 346 entries for data with missing or

12   invalid values, and 169 duplicates, how many total

13   traffic stops entries fall into one of these

14   categories?

15   A    507.

16   Q    507 out of the 2500 traffic stops contained

17   unreliable or missing data?

18   A    Correct.

19   Q    That is about 20 percent of the defense's data?

20   A    Correct.

21   Q    No further questions.

22       THE COURT:  Cross examination?

23                      CROSS EXAMINATION

24   BY MS KOENIG:

25   Q    Agent Valot, you are an officer with ATF, right?

JA1582

Valot - cross                                              331

1   A    I am an agent, yes, ma'am.

2   Q    Agent, I'm sorry.  You are not a data annalist,

3   right?

4   A    No.

5   Q    Did you actually run the spreadsheets yourself?

6   A    We ran them, myself and AUSA Gibbons ran them

7   together.

8   Q    You were observing Mr. Gibbons run the analysis,

9   right, and then you made a report based on that?

10  A    We did that last night, yes, ma'am.

11  Q    Okay.  And you also wrote a report that is dated

12  July 15 of 2022, right?

13  A    Yes, ma'am.

14  Q    Last Friday?

15  A    Yes.

16  Q    In that report you talked about reviewing a

17  spreadsheet that the Government had provided you with

18  traffic stop data from July 1st of 2020 through

19  December 5 of 2020, right?

20  A    Yes, ma'am.

21  Q    When did you actually look at those spreadsheets?

22  Was it July 15?

23  A    No, ma'am.

24  Q    When was that?

25  A    It was, I looked at it several times in the week

**JA1583**

Valot - cross                                                          332

1    leading up to writing that report.

2    Q    So starting July 8 or so?

3    A    Actually probably would have been, I believe that

4    it started at the end of, I think we received those

5    close to the end of June.  And I reviewed those

6    spreadsheets several times to make sure that I was

7    comfortable in running those queries.

8    Q    So that you received these spreadsheets the end of

9    June of 2022, right?

10   A    Yes, ma'am.

11   Q    And Mr. Gibbons or Mr. Seibert gave you specific

12   things that they wanted you to look for to verify some

13   facts and felt comfortable coming in here and

14   testifying to today, right?

15   A    Yes, ma'am.

16   Q    And so ultimately if we look at what you perceive,

17   or Mr. Gibbons or somebody perceived to be duplicate

18   entries, and we take out what may be non-unique

19   entires, we are eliminating 169 entries, right?

20   A    Yes, ma'am.

21   Q    All right.

22        You are certainly not trained in statistical

23   analysis, right?

24   A    No, I am not.

25   Q    No further questions.

**JA1584**

Valot - redirect                            333

1          THE COURT:  Thank you.  Redirect?

2                       REDIRECT EXAMINATION

3     BY MR. GIBBONS:

4     Q    The data values that you were looking for, is that

5     really a replication of what the Government raised in

6     its Daubert motion filed April 8 of 2022?

7     A    It is.

8     Q    Nothing further, Your Honor.

9          THE COURT:  All right.

10         Well, thank you for coming, sir.  I appreciate it.

11    Have a good rest of the day.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  Thank you.  Good to see you.

14                    (Witness stood aside)

15         THE COURT:  All right.  Does the Government rest?

16         MR. SIEBERT:  Yes, Your Honor.

17         THE COURT:  All right.

18         Now, the Government rests as to their part of

19    things.  We still have the potential other evidence.

20         MR. GIBBONS:  Yes, sir.

21         THE COURT:  They will be able to put on Dr. Chiles

22    if they deem it necessary.

23         MR. GIBBONS:  Yes, Your Honor.

24         THE COURT:  Now, do you have a rebuttal witness?

25         MS KOENIG:  I do, Your Honor.

Coston - direct                           **334**

1        THE COURT:  All right.  Let's hear your rebuttal

2   witness.

3        MS KOENIG:  I call Dr. Coston to the stand.

4        THE COURT:  All right.  Let's take a break before

5   we do Dr. Coston.  We are starting something new.

6                    (A recess was taken)

7                        ELI COSTON

8     RESUMED AND STAND AND TESTIFIED FURTHER AS FOLLOWS:

9                     DIRECT EXAMINATION

10  BY MS KOENIG:

11  Q    Doctor, I want to talk to you about two points.

12       So, we just heard you were in the courtroom when

13  Agent Valot testified?

14  A    Yes.

15  Q    You had reviewed Government's exhibit five, which

16  is the Government's exhibit that was believed to be

17  duplicate entries, right?

18  A    Yes, correct.

19  Q    Did you review that between last night and this

20  morning?

21  A    Yes.

22  Q    Is it possible that in fact they are correct that

23  there are out of these numbers 142 individual stops and

24  potentially 169 duplicates?

25  A    That is possible, yes.  There were two cases in

**JA1586**

Coston - direct                                    335

1    which there was a different code section noted, but I

2    wouldn't dispute their overall argument, no.

3    Q    Okay.

4         After receiving that data, and at some point

5    today, did you go ahead and run all of the statistical

6    analysis again without those 169 stops?

7    A    Yes, I did.

8    Q    I want to go through those with you.

9         THE COURT:  Let me just ask, did it change the

10   result any?

11        THE WITNESS:  No, it does not change any of the

12   results.

13        THE COURT:  Any further questions?

14        MS KOENIG:  The last thing I wanted to talk about,

15   Dr. Coston, is that in our report on --

16        THE COURT:  Is that because 169 is just a

17   relatively small part of the sample?

18        THE WITNESS:  It could have impacts if there had

19   been a large difference in the racial proportionality

20   versus the rest of the sample, but that wasn't the

21   case.  Sometimes when a sample size decreases you don't

22   have enough cases to have the power to determine

23   differences, but, no, that wasn't a problem here.

24        THE COURT:  Thank you.

25   BY MS KOENIG:

Coston - direct                                      336

1    Q    On page four of your report where it says

2    description of variables, there is a section that says

3    location.  In that paragraph you had described that you

4    had done spot checking, essentially for the corrections

5    that the intern from the Federal Public Defender had

6    done at geocodio data, right?

7    A    That is correct.

8    Q    Why did you specifically include mention of those

9    corrections in your report?

10   A    Because those were corrections that I myself had

11   done, or data cleaning that I engaged in.

12   Q    When you do a data study is it your normal

13   practice to do what you call data cleaning?

14   A    Yes, it is.

15   Q    In this case did you, how did that play out as it

16   relates to the location specifically?

17   A    So in regards to the location, again some of that

18   data was provided by an intern at the Public Defenders

19   Office, and I described how I verified that.  But I did

20   do additional data cleaning of my own.  Before I did my

21   analysis of the data you always run cross checks, you

22   know.  I also ran checks for the other variables in the

23   data set aside from geolocation data.  I also didn't

24   report that in my report because that is part of

25   typical data cleaning procedures, to look for problems

**JA1588**

1    or issues in the data.

2    Q    When you had done this data cleaning did you

3    initially determine that there were 82 stops that fell

4    outside of the City of Richmond?

5    A    I believe it was 81 when I double checked, but

6    yes, in the report I noted 82.  But it was 81.

7    Q    After we saw Agent Valot's report -- I sent it to

8    you right?  From July 15 of 2022, this past week end,

9    did you go back and double check that?

10   A    Yes.

11   Q    You found that there were 81 stops outside of the

12   City of Richmond?

13   A    That's correct.

14   Q    That is what you testified to yesterday?

15   A    Yes.

16   Q    And the data cleaning that you did in terms of

17   manual correcting stops that happened outside of the

18   City of Richmond, did that happen before you began

19   drafting the report that you submitted in this case?

20   A    Yes.  That was prior to me finalizing my analyses

21   and that was all done in December and early January.

22   Q    Can you say with certainty it was done by at least

23   January 9 of 2020?

24   A    Yes, because that is when I submitted my initial

25   draft report.

Coston - dross                                    338

1   Q    Why.  Right.  In reviewing Agent Valot's report

2   did we discuss this weekend, did you let defense know

3   for the first time that you had corrected more of the

4   stops in your initial data cleaning process?

5   A    Yes.

6   Q    And is that when we asked that you send us what

7   ultimately is in defendant's exhibit 14, the final

8   cleaned version of the data that you analyzed?

9   A    Yes.

10  Q    And you sent that to me, I think on Sunday

11  afternoon, July 17 of 2022?

12  A    I believe so, yes.

13  Q    Okay.  No further questions.

14       THE COURT:  All right.

15       Cross examination?

16                    CROSS EXAMINATION

17  BY MR. GIBBONS:

18  Q    Dr. Coston, these 311 potential duplicates, you

19  didn't notice these duplicates when you, before you ran

20  your analyses; is that correct?

21  A    That's correct.

22  Q    You didn't in fact do any determination or any

23  analysis of duplicates at all until this weekend.

24  A    I didn't do the analysis of duplicates.  I used

25  the Excel spreadsheet that was provided to me last

1    night.

2    Q    Didn't even look for duplicates even after the

3    Government raised the issue of over 300 duplicates on

4    April 8 of 2022?

5    A    I was not asked to do additional analysis at that

6    point in time, so, no, I did not.

7    Q    And you didn't mention on page four of the report

8    when you were talking about fixes you made to the

9    location in the data, you didn't mention that you had

10   on your own fixed at least 128 traffic stop entries

11   with regard to the location.

12   A    I didn't mention my own data cleaning, no.

13   Q    You didn't send the final data on which you relied

14   for your fillings to Ms Koenig until this weekend?

15   A    I don't believe I was asked for it prior to that

16   date.

17   Q    Nothing further, Your Honor.

18        THE COURT:  Thank you.  Follow up?

19        MS KOENIG:  Nothing else, Your Honor.

20        THE COURT:  Thank you.  You may be seated.  Thank

21   for coming back, Doctor.

22              (Witness stood aside)

23        MS KOENIG:  And the defense has no other evidence

24   at this point, Your Honor.

25        THE COURT:  Unless we come back with Dr. Chiles.

```
 1          MS KOENIG:  Right.  On this.
 2          THE COURT:  You can't -- when we come back on this
 3     you can't have anything other than Dr. Chiles, or if he
 4     should die, some other.
 5          MS KOENIG:  I appreciate that, Your Honor.
 6          Does The Court want to set a hearing date now for
 7     the next?
 8          THE COURT:  Hold on a second.  All right.
 9          Yes.  Well, I guess first -- what did I order
10     yesterday?
11          MS KOENIG:  Now that I am saying that.
12          THE COURT:  I told you to --
13          MS KOENIG:  Yes, we have Dr. Chiles' report.  We
14     have to provide Dr. Chiles' report to the Government by
15     August 8.
16          THE COURT:  Fourteen days.
17          MR. GIBBONS:  By August 22nd they are going to
18     respond whether or not they intend to call their own
19     expert, I believe.
20          THE COURT:  You remember.
21          MR. GIBBONS:  Yes, Your Honor.
22          MS KOENIG:  Perhaps, I guess it makes sense to set
23     a hearing once we know if the Government is going to
24     call a witness, and so we know that person's
25     availability.
```

JA1592

1          THE COURT:  Contact chambers and we will set a

2     date after we know if the Government wants to call a

3     witness.  If they want to call a witness they have to

4     go find a witness, and I can't imagine Richmond is a --

5     they have a lot of historical interests.  I don't think

6     that should be a problem.  Then here are some questions

7     that we need to answer in this case.  And my

8     questions are couple in a couple of different areas.

9          And I guess the way I sort of thought about it for

10    myself is what if this is a mixed motive case?  That is

11    what we call it in employment law where, yes, they had

12    motive, but also a good motive.  So what if they were

13    trying to, if they had a strategy that was we will

14    fight crime.  That is certainly a legitimate interest

15    of the Government and no one would contend that that

16    was in any way improper.

17         And their strategy, what if they adopted strategic

18    measures, like assigning police here and there and that

19    sort of thing, knowing that the strategy will result in

20    the arrest or stopping or some adverse effect on a

21    disproportionate number of African-Americans, or

22    putting, to sort of put it in blunter terms, what if

23    these areas where they have identified hot spots and so

24    forth, what if the Government decided that, Richmond

25    Government, decided this is a place where we need to,

1    we need to devote our limited resources to fighting
2    crime because the people in this area deserve to have a
3    life where they can go out at night and stroll around
4    and all that sort of thing.
5         But they did that knowing that one effect of that
6    would be that many African-American people would get
7    arrested.  Does that mean -- is that the kind of bias
8    that the law forbids?  Does that in some way require
9    dismissal of the indictment?  But, you know, I think
10   you need to think about some of the things we talked
11   about here purely in hypothetical terms, employment,
12   strategy, the effect of a grat deal of crime.
13        That is one question that needs to be answered.
14        The second question that needs to be answered is
15   let's assume for a second that there is a pattern of
16   bias on behalf of the Richmond Police Department.  What
17   effect does that have on this case where you had -- I
18   remember the motion to suppress evidence in this case.
19   Correct me if I am wrong on this, but as I recall,
20   Mr. Moore was driving a car with one of these fake
21   dealer tags on it.  And as the police had stopped
22   several people on it, and had figured out that somebody
23   was making some money selling fake dealer tags, or
24   maybe the dealer was stealing cars -- you know, using
25   the same tag instead of buying new ones, I don't know.

1    But there was something wrong with the tag.

2         So we had evidence that they stopped a couple

3    other people and said, hey, these tags aren't any good,

4    you need to get some real tags for your car.  And then

5    they sent these people on their way.

6         But with Mr. Moore, as I recall, it was a little

7    different.  Mr. Moore didn't stop when the police got

8    behind him.  He drove away a little bit, eventually got

9    out of the car, and he ran down the road and eventually

10   he was caught by the police officers and brought back.

11        And then there were statements that he made to the

12   police at various times.  Okay.  So let's assume for a

13   second that Mr. Moore -- that bias strategy that the

14   City had resulted in Mr. Moore getting stopped.  Does

15   that mean we have to throw out the evidence in this

16   case?  That is really the question.  Well, not that we

17   have to throw out the evidence, does that mean we have

18   to throw out the case when you have somebody who does

19   this kind of stuff that sort of makes people, that

20   makes him a target for police activity?

21        And then we also need to ultimately address the

22   suppression issue.  As I recall, correct me if I am

23   wrong, Mr. Seibert, that issue was fully briefed,

24   wasn't it?

25        MR. SIEBERT:  I believe fully briefed and argued

**JA1595**

1    with Mr. Elliker.

2        THE COURT:  This case has had a number of -- one

3    of the things this case has had more of than

4    prosecutors is law clerks.  Okay.  So we need to -- I

5    will need to address that at some point.  But I don't

6    think we need further briefing on the suppression

7    issue.

8        Okay.

9        All right.  So let me know what you decide to do

10   about Dr. Chiles' testimony.  And I urge the defendant

11   to think carefully about whether Dr. Chiles adds

12   anything to the evidence in this case.  Remembering

13   that the Richmond that existed a hundred years ago is a

14   different place than it is now.  You know, now it is an

15   area that has an African-American major, and one time

16   had a majority African-American City Council, and

17   African-American police officers, police chief.  So you

18   need to sort of think about how far along -- how long

19   the City has to suffer because of a racist past?  It is

20   clear that Richmond had a racist past.  And the

21   question is about the impact.  Think carefully about

22   that.

23       MR. SIEBERT:  I think the argument for the motion

24   to exclude the defense expert, Dr. Coston, could be

25   done at the later date as well.

1      THE COURT:  Do that in your brief in this case.

2  Okay?  I have read your brief.  Do you have anything to

3  add what is in there?

4      MR. GIBBONS:  Not really, Your Honor.

5      THE COURT:  Well, I will think about that.

6      I will let you will know whether I think I need

7  additional briefing.

8      I have spent a lot of time reading those briefs.

9  It is a Daubert issue.  Obviously if I exclude

10  Dr. Coston's testimony it pretty much shoots the

11  defense's claim in this case.  All right.  Anything

12  else, counsel?

13      MR. GIBBONS:  None from the United States.

14      MS KOENIG:  Not from defense.

15      THE COURT:  Thank you all very much.  We will

16  recess court for the day, or adjourn.  We are

17  adjourning court.  Thank you.

18              HEARING ADJOURNED.

19      THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

20             GILBERT FRANK HALASZ, RMR

21              Official Court Reporter

22

23

24

25

346

```
 1

 2     Smith - direct                        163   25
       Smith - cross                         226   18
 3     Smith - redirect                      257   21
       Turner - direct                       260   24
 4     Turner - cross                        274   24
       Turner - redirect                     281   11
 5     McDonough - direct                    284    5
       McDonough - cross                     311   14
 6     Valot - Cross                         331   23
       Valot - redirect                      334    1
 7     Coston - direct                       335    8
       Coston - cross                        339   17
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA1598**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
          Defendant.

### ORDER

This matter comes before the Court on the defendant Keith Rodney Moore's motion to dismiss the indictment and the government's motions to exclude Moore's experts, Dr. Eli Coston and Dr. Marvin Chiles. (ECF Nos. 32, 66, 70, 82.) The Court held a hearing on the motions on July 18 and 19, 2022. For the reasons stated from the bench, the Court FINDS that Moore's expert disclosure for Dr. Chiles does not comply with Federal Rule of Criminal Procedure 16. The Court thus SETS the following deadlines:

1.    Moore SHALL file a Rule 16-compliant summary on or before **Monday, August 8, 2022.** The summary must provide sufficient detail to allow the government to respond.

2.    The Court GIVES LEAVE for the government to file a supplemental *Daubert* motion challenging Dr. Chiles's testimony **on or before Monday, August 22, 2022.** Moore SHALL file any response to the supplemental motion **on or before Tuesday, September 6, 2022.** The government SHALL file any reply to the supplemental motion **on or before Friday, September 9, 2022.**

3.    The government SHALL file a document designating any rebuttal expert, or explaining that it does not intend to designate a rebuttal expert, **on or before Monday, August 22, 2022.** Moore SHALL file any *Daubert* motion challenging the government's rebuttal expert's testimony **on or before Tuesday, September 6, 2022.** The government SHALL file

any response to the motion **on or before Tuesday, September 20, 2022.**  Moore SHALL file any reply to the motion **on or before Friday, September 23, 2022.**

4.      The parties SHALL contact Chambers on or before **Tuesday, August 23, 2022**, to schedule a *Daubert* hearing on Dr. Chiles's testimony and any *Daubert* motion to be filed by the defendant.

The Court DEFERS DISPOSITION of Moore's motion to dismiss the indictment and the government's motions to exclude.  The Court will rule on the motions after the *Daubert* hearing on Dr. Chiles's testimony.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 19   July 2022
Richmond, VA

/s/ _____
John A. Gibney, Jr.
Senior United States District Judge

2

JA 1600

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21cr42** |
| | ) | |
| **KEITH RODNEY MOORE,** | ) | |
| **Defendant** | ) | |

## NOTICE OF EXPERT REPORT AND CURRICULUM VITAE

Keith Moore, through counsel, files the attached report and curriculum vitae for Dr. Marvin Chiles in accordance with Federal Rule of Criminal Procedure 16 and with this Court's Order in ECF No. 99. The report provides a written summary of Dr. Chiles's anticipated testimony and the bases and reasons for Dr. Chiles's testimony. The curriculum vitae details Dr. Chiles's qualifications to provide such testimony.

Respectfully submitted,
KEITH RODNEY MOORE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219

1

**JA1601**

(804) 565-0880
amy_austin@fd.org

**JA1602**

# Report to the Eastern District Court of Virginia

## Introduction to Report:

Using newspaper accounts, court cases, archival collections, and peer-reviewed articles and monographs, this report makes the historical finding that in Richmond, Virginia, racial segregation has been systemically implemented to the detriment of black residents through public policy at the federal, state, and local levels. Byproducts of this are the separation of black and white people into distinct legal castes; unequal treatment under law inflicted upon black people; residential segregation of whites and blacks; endurance of systemic poverty among blacks; and historical animus between black residents and local law enforcement (Richmond Police Department—RPD). This report has been completed at the request of Judge John A. Gibney, Senior United States District Judge presiding over the *United States v. Keith Rodney Moore* case.

## Racial Segregation and Public Policy, 1865-Present:

Founded in 1737 by businessman and slave owner William Byrd II, the City of Richmond was a commercial outpost for the Virginia Colony's black slave market. Between the 1660s and 1737, the Virginia Colony, then governed by the House of Burgesses, passed a series of laws defining black people as a slave race—a people who were to have no rights or privileges beyond the whims of their owners. Slavery was a life sentence of forced servitude for black Virginians. The only exception to this rule were free blacks who were privately manumitted by their owners. The Virginia Colony banned slaves from owning personal property, engaging in commerce, and congregating without the supervision of whites. No such laws were inflicted upon white people as a race, poor, rich, or in-between.[1] The American Revolution (1775-1783) compelled the House of Burgesses to make Richmond Virginia's capital in 1781. While the Revolution liberated the North American colonies from British tyranny, the segregation of white and black people into distinct racial castes under law still existed in Richmond, Virginia, and most of the nation.

The New Republic (1783-1820) and Antebellum (1820-1865) years begot the expansion of racial segregation in Richmond. During these periods, racial segregation expanded beyond the legal racialization of peoples into distinct castes (free—white and unfree—black) and breached the realm of residence. As the city's black population (slave and free) grew to almost equal the white population, the Virginia Legislature—formerly House of Burgesses—instituted newer laws by 1806 requiring free blacks to either leave the Commonwealth within 6 months of their manumission, or be subject to rules (mainly white guardianship) where the ultimate punishment was re-enslavement.[2] By 1859, the

---

[1] William Waller Hening, ed., *The Statutes at large; Being a Collection of All the Laws of Virginia*, (Richmond, VA, 1810), 1-281; A. Leon Higginbotham, Jr., "Virginia Led the Way in Legal Oppression," *Washington Post*, May 21, 1978, https://www.washingtonpost.com/archive/opinions/1978/05/21/virginia-led-the-way-in-legal-oppression/664bcdf4-8aaf-475f-8ea7-eb597aee7ecd/; and Marie Tyler-McGraw, *At The Falls: Richmond, Virginia, and Its People*, (Chapel Hill: University of North Carolina Press, 1994), 38.

[2] Midori Takagi, *Rearing Wolves to Our Own Destruction: Slavery in Richmond, Virginia*, 1782-1865, (Charlottesville, VA: University of Virginia Press, 1999), 19-21; Benjamin Campbell, *Richmond's Unhealed History*, (Richmond, VA: Brandywine Publishers, Inc., 2012), 101; Tyler-McGraw, *At The Fall*, 64 and 108; and Gregg D. Kimball, *American City, Southern Place: A Cultural History of Antebellum Richmond*, (Athens, GA: University of Georgia Press, 2000), 129.

Richmond City Council passed its own "Ordinance Concerning Negroes," barring free and enslaved blacks from consorting with one another without 'proper' white supervision.[3] These new restrictions even impacted white non-slave owners. They were sometimes brought up on insurrection charges for consorting with slaves without the permission of their master, and for dealing with free blacks outside the purview of their legal white guardians.[4] Culture was downstream of law. Working-and-middle-class whites residentially segregated themselves from blacks by clustering in Union Hill and Fulton Hill in the East End, Oregon Hill in the Near West End, and Navy Hill just north of downtown. These whites used not-so-subtle tactics to keep upwardly mobile free blacks from moving near them, thus blacks congregated in the decrepit northern city limits of Jackson Ward and the backwater Shockoe Creek area of downtown.[5] By 1865, the legal division of people into racial castes evolved into a newer custom of racial segregation by residence.[6]

Between 1865 and 1930, white Richmond leadership (public and private) worked diligently to maintain residential segregation by race through newer laws that circumvented the legal changes brought about by Congressional Reconstruction (1865-1877). The Confederate defeat on April 9, 1865; Richmond's subsequent territorial expansion between 1867-1914; and the city not having any laws prohibiting blacks and whites from living near one another generated white desires to maintain existing residential segregated housing patterns through law, and not just custom.[7] Blacks who tried to relocate beyond their enclaves and oppose segregated mass transit to racially identifiable areas of town between 1865 and 1900 faced resistance from white residents. This white resistance compelled the city council and Virginia Legislature to legally segregate city transportation in 1906 and housing in 1911 and 1929.[8]

Residential and transportation segregation worked in tandem to help maintain the "racial integrity" of Richmond's black and white areas. When the Virginia Legislature considered forcibly segregating mass transit as early as 1901, the Virginia Passenger and Power Company (VPPC)—Richmond's streetcar provider since 1888—resisted, arguing that such laws would require the purchase of newer streetcars and laying of newer rail lines that served both races on separate sides of town. But that was the point. The Virginia Legislature's insistence on segregating transit services was a response to pressure from aspiring New South race-baiting white politicians, such as Richmond's John E. Epps, who entered electoral politics on the promise to help make Richmond a fully segregated city. VPPC segregated its services in 1904, and the state required it of all urban areas two years later. Segregated transit helped solidify segregated housing, as white streetcars served the

---

3 Tyler-McGraw, *At The Falls,* 131.

4 Takagi, *Rearing Wolves to Our Own Destruction*, 67.

5 Tyler-McGraw, *At The Falls,* 114-5.

6 Takagi, *Rearing Wolves to Our Own Destruction,* 38-9 and 96.

7 Campbell, *Richmond's Unhealed History*, 142 and 167; and Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, and Race,* (Knoxville, TN: University of Tennessee Press, 1984), 28.

8 Marvin Chiles, "Down Where the South Begins: Black Richmond Activism before the Modern Civil Rights Movement, 1899-1930, *Journal of African American History*, Vol. 105, No.1, (Winter 2020): 66-82; T. B. Benson, "Segregation Ordinances," *Virginia Law Register*, New Series, Vol. 1, No. 5 (September 1915): 330-56; "Municipal Segregation Ordinances," *Virginia Law Review*, Vol. 3, No. 4 (January 1916): 304-9; and Benjamin Campbell, *Richmond's Unhealed History*, 143.

burgeoning white suburban frontier in the West End and Northside, while black streetcars served black neighborhoods around the downtown area.[9]

Legal activism made Richmond's residential segregation code legally untenable. Black Richmond attorney Joseph Roland Pollard, white attorney Alfred E. Cohen, along with funding from *Richmond Planet* Editor John Mitchell, Jr.,[10] and the National Association for the Advancement of Colored People in New York fueled two separate legal attacks against Richmond's segregated housing ordinance—*Hopkins v. Richmond* (1915) and *Deans v. Richmond* (1929). The latter resulted in local and federal court victories that ended Richmond's segregated housing ordinance after city officials insisted on keeping it after losing in the circuit courts in winter 1929.[11] This decision, along with cases throughout the nation—*Buchanan v. Warley* (1917), *Harmon v. Tyler* (1927), *Hurd v. Dodge* (1948), and *Shelley v. Kraemer* (1948)—combined to make residential segregation (via private restrictive covenants or government legislation) a violation of the Fourteenth Amendment, which protects individuals' rights to use their property (through use and sale) as they see fit. This did not, however, end racially segregated housing in Richmond or anywhere else for that matter.[12]

Richmond's real estate community (realtors and mortgage lenders) along with policymakers colluded to maintain racially segregated housing between the Great Depression (1929-1938) and post-World War II era (1945-1970). They did this by enacting what scholar Christopher Silver later detailed as the "Greater Richmond" form of city planning. Relying on the public-private partnership of industry and city government, the plan involved local white elites controlling Richmond real estate through creating and buttressing racially identifiable, class-defined enclaves throughout the city using federal public housing funds for the black poor and private enterprise for middle-and-upper-class black housing.[13] The intended result was to remove blacks in aggregate from the central city to make room for industry and upper-class white residency, as annexations between 1914-1942 shifted black neighborhoods, once located along Richmond's periphery, to the city's core.

This began in 1933, when the Richmond Chamber of Commerce, with support from the Richmond Real Estate Exchange, secured federal funds to begin building segregated public housing for blacks outside of the city's core.[14] This, along with the subsequent creation of a local housing authority in 1939, led to the construction of the all-black Gilpin Court in 1941, Hillside Court in 1952, Whitcomb and Fairfield Courts in 1958, and Mosby Court in 1962.[15] Adjacent to these developments were slumlords (representing the private

---

[9] August Meier and Elliott Rudwick, "Negro Boycotts of Segregated Streetcars in Virginia, 1904-1907," *Virginia Magazine of History and Biography*, Vol. 81, No. 4 (Oct., 1973), 479-487; Blair L.M. Kelley, *Right to Ride: Streetcar Boycotts and African American Citizenship in the Era of Plessy v. Ferguson*, (Chapel Hill: University of North Carolina Press, 2010), 117-64;

[10] The *Richmond Planet* was a black owned newspaper.

[11] Chiles, "Down Where the South Begins," 73-5; *Hopkins v. City of Richmond* 86 S. E. (1915) 139; and *City of Richmond v. Deans*, 37 F.2d 712 (4th Cir. 1930).

[12] *Buchanan v. Warley*, 245 US 60 38 S. Ct. 16 L. Ed (1917) 70–82; *Harmon v. Tyler*, 273 US 668, 47 S. Ct. 471, 71 L. Ed (1927), 831; "Unconstitutionality of Segregation Ordinances," *Yale Law Journal*, Vol. 27, No. 3. (January 1918): 393-7; *Hurd v. Hodge*, 334 U.S. 24, 68 S. Ct. 847; 92 L. Ed. 2d 1187, (1948); and Joe T. Darden, "Black Residential Segregation Since the 1948 *Shelley v. Kraemer* Decision," *Journal of Black Studies*, Vol. 25, No. 6, (July 1995): 680-91.

[13] Silver, *Twentieth-Century Richmond*, 57-156.

[14] Silver, *Twentieth-Century Richmond*, 131-41.

[15] Silver, *Twentieth-Century Richmond*, 149-54.

sector) who helped pack poor blacks who did not qualify for public housing into specific areas in the East End, Northside, and Southside. These areas remained majority black and poor until the gentrification movement in the 2010s.

Working and middle-class blacks were not spared from the Greater Richmond plan. In fact, the plan evolved because of them.

By 1945, white city leaders (private and public) subscribed to famed urban planner Harland Bartholomew's 1946 "Master Plan," which instructed city leaders across the nation to preserve the centrality of their inner cities through zoning policies.[16] A part of this "zoning" was designating where socially-mobile blacks could live. Aiding this was the creation of the Home Owners' Loan Corporation by the President Franklin D. Roosevelt administration in 1933. They classified urban neighborhoods across the country from best (A) to worst (D). Under this system, lending institutions could refuse mortgage loans to D areas. "Richmond's [D] areas were exclusively black; none housed whites." Furthermore, "neighborhoods were grade D simply because they were black," said Christopher Silver.[17] This policy was furthered by Title I and II of the Federal Housing Act of 1934, which blocked federal mortgage insurance for homes located in 'slum' regions. These 1930's housing policies incentivized local real estate barons to refuse black Richmonders mortgages and dissuade whites from living in neighborhoods near blacks, even as the city continued expanding through annexation in the 1940s.[18] In the 1950s, city leaders expanded their Greater Richmond plans further with the Main-to-the-James Development Strategy. Using federal highway funds issued through the President Dwight D. Eisenhower administration, later renewed through the President John F. Kennedy administration, city leaders cleared "slum" neighborhoods—in Richmond, code for black—through eminent domain for newer interstates, expressways, and highways to the expanding, ultra-white and affluent suburbs in Chesterfield and Henrico Counties.[19] This plan dislocated homeowning blacks from Idlewood and Carver in the Near West End and Fulton Hill in the East End.[20]

Helping to effectuate this plan was the local real estate community, who racially steered upwardly mobile blacks to the Northside and Southside, and then white Richmonders to the Chesterfield and Henrico suburbs. Long deemed by scholars as "blockbusting," white realtors convinced many middle-class white Northsiders to relocate to the crabgrass frontier. To speed up the process, they worked with black realtors to gin up interest in black home ownership in the Northside between the 1940s and 1970s. Some

---

[16] Silver, *Twentieth-Century Richmond*, 160-4.

[17] Silver, *Twentieth-Century Richmond*, 143.

[18] Campbell, *Richmond's Unhealed History*, 143-44; Silver, *Twentieth-Century Richmond*, 28; Tyler-McGraw, *At The Falls*, 113

[19] Ed Grimsley, "Downtown Virginia," 23-9, *The Commonwealth Magazine, The Magazine of Virginia*, Virginia Chamber of Commerce, Vol. XXXIV, No.5, May, 1967, James C. Wheat Papers, Virginia Museum of History and Culture, Richmond, Virginia; Richmond District," *The Virginia Road Builder*, April 26, 1965; Robert L. Horn, Executive Director to the Richmond Regional Planning Commission to the Richmond City Council, June 1, 1965, Folder 11, Mss1 W5603 b FA2, James C. Wheat Papers. and "Continuous Transportation Planning process Richmond Regional Area," Mss1 W5603b FA2, Series 1 Expressways (1 of 2), James C. Wheat Papers.

[20] Silver, *Twentieth-Century Richmond*, 213-30 and 317; "Idlewood Ave. Residents Urged To Pack City Hall" and "Marsh Leads Drive To Save Homes," *Richmond Afro-American*, November 19, 1966, 1, 2, and 18; "Marsh Questions $$ Angle," *Richmond Afro-American*, November 26, 1-2; "Idlewood Express Route is Again Criticized by Marsh," *Richmond Times-Dispatch*, November 28, 1966, 1-2; and "Mundle's Popularity Continues to Drop," *Richmond Afro-American*, December 31, 1966, 1-2.

examples involved white realtors allegedly paying black couples, or sometimes just two young well-kempt black people (male and female), to walk around in white neighborhoods to scare whites into moving. Another tactic was strategically placing ads for homes they wanted to sell to whites in white newspapers, and placing ads they wanted to sell to blacks in black newspapers. Black realtors were privy to this activity. In many cases, they helped white realtors for a slight fee. This practice was so rampant that black realtor Milton Randolph claimed in 1968 that it was undeniable that, "The Establishment [white Richmond leaders] has created controlled areas into which the Negroes are allowed to move."[21]

Racial segregation came to define the entire Richmond region by the late 1970s. Richmond's white political leadership wanted to maintain their white majority in lieu of suburban flight between the 1950s and early 1970s. Thus, the city council annexed 23 square miles, with around 45,000 white residents, from Chesterfield County on January 1, 1970. This annexation resulted from nearly two decades of failed merger attempts by Richmond to combine with Chesterfield and Henrico. In December 1970, Judge Robert Merhige enjoined the three localities into a lawsuit facing Richmond's (*Bradley v. Richmond*, 1970) refusal to integrate its public schools. Judge Merhige later ordered the three localities to form one unitary or combine public school district in 1971. Richmond white leaders desired this outcome because the courts could do for them what they could not do for themselves: merge with their ultra-white suburban neighbors through a taxpayer-funded government service. However, the Fourth Circuit Court of Appeals overturned the decision in June 1972 based on the famous Dillon Rule. Under this precedent established by John F. Dillon of Iowa in 1868, and adopted in Virginia as early as 1896, the Dillon Rule contends that local governments have only as much power as their state grants them, as they are subsidiaries of their state legislatures. Under this logic, neither Richmond nor the federal courts could force Richmond's suburban neighbors into interjurisdictional cooperation with Richmond; that power rested with the state. The subsequent U.S. Supreme Court's 4-4 tie, with Justice Lewis F. Powell abstaining, temporarily ended white Richmond leaders' hopes of a majority white and suburban metropolitan Richmond. Cementing this was the Virginia Legislature's perpetual moratorium on annexations, which is still in effect today. By the late 1970s, the Richmond areas was solidly segregated by residence.[22] With the Chesterfield and Henrico suburbs being protected from future mergers and annexations, real estate values rose, and Richmond's white real estate community helped white families relocate. Residentially, Richmond's inner city was identifiably black, working to middle class, while the suburban counties were identifiably white and middle to working class.

A combination of federal law and local activism helped curb systemic residential segregation between the 1960s and 1980s. Congress passed the Fair Housing Act of 1968 (FHA), Home Mortgage Disclosure Act of 1975 (HMDA), and Community Reinvestment

---

[21] Dr. James A. Sartain meeting with Milton Randolph, undated, Mss1S4772a, James A. Sartain Papers, Virginia Museum of History and Culture, Richmond, Virginia; and "Scare Tactics Cited In Area House Sales," *Richmond News Leader*, November 23, 1968, 9.

[22] Progress Report on Planning the Consolidation of the Richmond, Chesterfield, and Henrico School Divisions, April 7, 1972, Consolidation, 1961- 1972; "Reversal of the Richmond Busing Decision," Education Summary, June 23, 1972, 1-3, Busing 1970-1972; *Bradley v. Richmond* School Board, 834-75; CEPS Newsletter, January 1972, Box 2; "Reversal of the Richmond Busing Decision," Education Summary, June 23, 1972, Box 1, M283, Virginia Alden Crockford Papers, Virginia Commonwealth University, Richmond, Virginia.

Act of 1977 (CRA).[23] Combined, these laws prohibited the use of race to determine the financing, insuring, renting, purchase and sale of any dwelling by both private and public agencies (via FHA); outlawed racial zoning (otherwise known as redlining) by requiring federally-insured mortgage lenders—those covered under Federal Deposit Insurance Corporation and Federal Savings and Loan Insurance Corporation—to keep and make public record of every mortgage they approved (via HMDA); and required banking regulators to encourage real estate communities to invest mortgage and business loans in moderate and low-income urban areas (via CRA). Atop this triangle was the Federal Reserve System which provided the necessary forms for record, and should it be necessary, levied fines to ensure compliance.[24] Most importantly, any mortgage lender found in violation of the FHA, HMDA, and CRA were subject to fines, having their charters revoked, and being blocked from mergers with other compliant financial institutions.[25]

Between 1978 and 1981, a grassroots organization named the Richmond Urban Institute (RUI) petitioned Congress to block the merger of Norfolk-based Virginia National Bank and First and Merchants Bank from Richmond, claiming that they flagrantly violated the FHA, HMDA, and CRA. Richmond's Federal Reserve Board heard RUI's evidence that showed that while Richmond was "about evenly divided between white and black," more than-80% of mortgage activity was in the majority white Far and Near West End and surrounding Chesterfield and Henrico suburbs. Nearly 3/4[ths] of Richmonders (all black) lived in areas with no mortgage activity at all. Majority black areas in the East End, Southside, and Northside had virtually no mortgage activity at all. Representatives from Richmond's Board of Realtors claimed that lenders merely met the market demands of the white middle and upper classes.[26] Yet the evidence was clear that,

---

[23] Nicholas Dragen Bloom, *Suburban Alchemy: 1960s New Towns and The Transformation of the American Dream*, (Columbus, OH: Ohio State University Press, 2001); Anny Forsyth, *Reforming Suburbia: The Planned Communities of Irvine, Columbia and the Woodlands*, (Berkley, CA: University of California Press, 2005); Ocean Howell, "The Merchant Crusaders: Eichler Homes and Fair Housing," *Pacific Historical Review*, Vol.85, No.3, (August 2016): 379-407; and "Proxmire Bill Would Require Lenders To Open Their Books on Mortgages: And Reveal Where Loans Are Made," *Washington Post*, April 26, 1975, E14.

[24] Proposed Neighborhood Assistance Act of 1979, Summary, Neighborhood Assistance Act, Box 26, M258, Richmond Urban Institute Papers; "Fed Issues Lender 'Redlining' Rules," *Washington Post*, June 2, 1976, E2; and Patricia A. McCoy, "The Home Mortgage Disclosure Act: A Synopsis and Recent Legislative History," *Journal of Real Estate Research*, Vol. 29, No. 4 (2007), 381-98.

[25] "To Stop Redlining," *New York Times*, June 14, 1976, 30; "Some Banks Accused of Ignoring U.S. Law on Mortgage Disclosure," *New York Times*, October 9, 1976, 22; "Mortgage Lenders Apply to Avoid Revealing Information on Redlining," *New York Times*, September 27, 1976, 19; "Urban Parley Acts To Halt Redlining and Blockbusting," *New York Times*, April 21, 1975, 23; "'Redlining' by Lenders Is Called Cause of Old Communities' Decay," *New York Times*, May 26, 1975, 20; "Some Banks Accused of Ignoring U.S. Law on Mortgage Disclosure," *New York Times*, October 9, 1976, 22; "Washington & Business: Redlining Fight," *New York Times*, October 21, 1976, 67; "Mixed Results Seen for Loan Disclosures," *Washington Post*, March 5, 1977; and 'Redlining'--Byrne vs. Banks: 'Redlining," *New York Times*, January 28, 1978, NJ1; Rebecca F. Guy, Louis G. Pol and Randy E. Ryker, "Discrimination in Mortgage Lending: The Home Mortgage Disclosure Act," *Population Research and Policy Review* Vol. 1, No. 3, (October 1982): 283-96; "Redlining Data Is Criticized," *Atlanta Constitution*, June 18, 1976, 13D; and "S&Ls Change Lending Pattern Mortgage Lenders Putting More Cash in Once 'Redlined' Area of D.C.," *Washington Post*, October 3, 1976, 1.

[26] Missioner's Report, August 24, 1981, Co-Missioner, Benjamin Campbell Reports, 1980-1982, Box 3, M258, Richmond Urban Institute Papers; Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, A Research Project Conducted by HOME of Richmond, Virginia, March 1980,

as RUI's comprehensive study found: "metropolitan Richmond contains two separate, distinct, and unequal sales housing markets—one for whites and another for blacks."[27] RUI's weaponization of federal law effectively ended racial steering by Richmond's real estate community by the mid-1980s.[28]

Still, the vestiges of Richmond's history with racial segregation remains etched into the city's landscape and culture. While upwardly-mobile blacks can and have taken advantage of federal law and grassroots activism to live wherever their money can afford them, the majority of working-class and underclass blacks remain in racially homogenous enclaves in Richmond. A major reason is the skills mismatch which separates them from the growing biotech, medical, administrative, education, and managerial labor force that now dominates Richmond's middle class in ways that industrial manufacturing did decades ago. This skills mismatch is a product of segregated housing in the past. While the black middle class fled the city, beginning in the 1980s, working-and-underclass blacks remained trapped in Richmond's underperforming school district.[29] Furthermore,

Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Benjamin Campbell Testimony Before Representatives of the Federal Reserve Board, December 5, 1981, Federal Reserve Board, Housing Issue, 1981-1982, Box 12, M258, Richmond Urban Institute Papers.

[27] Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, A Research project Conducted by HOME of Richmond, Virginia, March 1980, Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Home's Marketing Program To Let Consumers Choose, December 1979, Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, A Research project Conducted by HOME of Richmond, Virginia, March 1980, Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Investment Patterns in Richmond, 1979, Published May 9, 1981, Home Mortgage Patterns in Richmond, 1979, Box 19, M258, Richmond Urban Institute Papers; Community Reinvestment Agreement, October 1, 1983, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers; "Lenders Discover Advantages and New Market with Community Reinvestment Act," *Journal of Housing*, March 1980; "Community Groups and CRA: Case Studies of Action Strategies," *Neighborhood Revitalization Project*, Vol. 1, No.1, July 1980, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers; and Community Reinvestment Act Statement of Community Services: Central Fidelity Bank, August 1, 1985, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers.

[28] "Average Income Necessary to Purchase an Average House in Richmond," undated chart made by RUI, Federal Reserve Board, Housing Issue, 1981-1982, Box 12, M258, Richmond Urban Institute Papers; Community Reinvestment Agreement, October 1, 1983, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers; Community Reinvestment Act Statement of Community Services: Central Fidelity Bank, August 1, 1985, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers.

[29] Julian Maxwell Hayter, "City Profile of Richmond, Virginia," *Thriving Cities*, University of Virginia Institute for Advanced Studies in Culture, 2016, https://static1.squarespace.com/static/5a0f45fad74cff16c9f6e45e/t/5b4fab87f950b72639899c00/1531947915667/City-Profile-Richmond.pdf; "Richmond, Virginia, Social Enterprise Feasibility Enterprise Analysis: Reducing Poverty and Building Community Wealth Through Social Enterprise," Final Report Submitted to the City of Richmond, June 2016, https://www.rva.gov/sites/default/files/2019-10/SocialEnterprise_6-16.pdf; John V. Moeser, Nina Mauney, Evelyn Jeong, and Emily Routman, "Unpacking the Census: 2017 Updates--Master Copy," Poverty in Metropolitan Richmond, Bonner Center for Civic Engagement, 2019, https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1038&context=poverty; Marvin T. Chiles, "Tough on Conduct: Punitive Leadership in Urban Public Schools, A Case Study of Angry Principal Dr. Roy A. West, 1986-1991,*" Spectrum: A Journal on Black Men*, Fall 2020, Vol.8, No.1, 55-85; Genevieve Siegel-Hawley, Kendra Taylor, Kimberly Bridges, Erica Frankenberg, Andrene Castro, Shenita Williams & Sarah Haden, "School Segregation by Boundary Line in Virginia: Scope, Significance and State Policy Solutions," Center for Education and Civil Rights, November 2020, 7-10,

as Richmond continues to grow more multicultural and economically prosperous in the 21st century, racially segregated housing and its corollary effects remains an issue.

## Issues with Black Residents and Richmond Police, 1865-Present:

The Richmond Police Department (RPD) developed throughout the centuries to surveil and incarcerate black residents at the behest of white residents. Richmond police were not born in opposition to its black residents, rather the burdens of history pitted the two against one another.[30]

"Profoundly," said RPD historian Louis Cei in 1975, nothing "influenced the [Richmond Police] force's attitude and development" more than "the presence of the Negro."[31] That was not always so, as policing in Richmond began in the 1730s with Virginia's Colonial governors forcing white property holders to serve as night watch against Indian raiders and poor white thieves. In 1782, after the American Revolution, Richmond received both official city governance and a paid police force manned by white war veterans. The increased black (slave and free) population in Richmond compelled white residents to anoint RPD as the enforcement arm of white supremacy. After the failed Gabriel's Rebellion in 1800 and Nat Turner Rebellion in 1831, the Richmond city council, with help from the Virginia militia, expanded RPD from a skeleton night force to a tax-funded department who patrolled 24 hours a day.[32] Between 1800 and 1865, white residents only supported RPD funding and salary increases during panics over runaway slaves and black rebellions. Thus, blacks were the most harassed and arrested people by RPD between 1782 and 1865, most of which happened in black communities.[33] This time period is important because while RPD was not born as a racist institution per se, circumstances shaped them into an anti-black body with a strong anti-black identity. RPD officers were compelled to enforce a dual legal code, one for whites and another for blacks. Furthermore, the days of slavery revealed a crucial fact about RPD. That was, as Cei once claimed: "No matter how important crime control appeared, the true mission of the force revolved around suppressing the city's Negro population."[34]

The end of slavery only worsened the relationship between black Richmonders and RPD. With Confederate General Robert E. Lee's surrender in April 1865, white Richmonders (mainly the local white media) compelled RPD to control the new bumper crop of freed people through the passage and enforcement of vagrancy laws.[35] This, along

---

https://scholarscompass.vcu.edu/cgi/viewcontent.cgi?article=1013&context=edlp_pubs; and "Va. Education Disparities - Report: Virginia's High-Poverty Schools Don't Have Same Opportunities For Students," *Richmond Times-Dispatch*, October 31, 2017 2B.

[30] This report was done without primary source material from the Richmond Police Department. I have tried to secure information from them in the past, as recent as 2018, however I was told that they do not have archival material or collections that are available for research purposes.

[31] Louis Bernard Cei, "Law Enforcement in Richmond: A History of Police-Community Relations,"1737-1974, (PhD diss., Florida State University, 1975), 7.

[32] Tyler-McGraw, *At The Falls*, 64 and 80.

[33] Tyler-McGraw, *At The Falls*, 131.

[34] Cei, "Law Enforcement in Richmond," 2-43. Quote on p.43.

[35] *Richmond City Hustings Court Minute Book* 27, 127, (*Library of Virginia*, Richmond Virginia); Testimony of Albert Brooks, Alexander Davis, Stephen Jones, Wellington Booker, William Ferguson, and Bernard H. Roberts, Statements Relating to Abuses of Freedmen in Richmond," Records of the Assistant Commissioner for the State of Virginia Bureau of Refugees, Freedmen, and Abandoned Lands, 1865-1869, M1048, roll 59, (*Library of Virginia*); and Testimony of Robert W. Johnson, Richard Cooper, and

with later laws stripping blacks of their Fifteenth Amendment voting rights for felony and petty larceny convictions, resulted in blacks being disproportionately arrested, publicly whipped (ended in 1881), and killed by RPD between 1865 and 1900. RPD was even accused of voter suppression, as they reportedly assaulted black men who wanted to vote in contested city elections in the 1890s.[36] Progressive Era (1890-1929) reforms on police malfeasance, as well as civilian crimes of drug distribution, alcohol consumption, and prostitution only strengthened RPD's Negrophobia, as black neighborhoods were primary targets for RPD enforcement. In fact, when RPD increased their focus on white crime, the white Richmond public openly called to defund them as retaliation.[37]

White desires for RPD to focus primarily on black people is best seen in the controversy over hiring a black police officer. In 1936, a cadre of respected black Richmond ministers called for then Mayor J. Fulmer Bright to hire black officers and assign them to black neighborhoods to ease animosity between RPD and black Richmonders.[38] "As long as I am Mayor of Richmond," Bright told the local media in response to the request, "there will be no Negroes on the police force."[39] He reasoned that whites would not support the hiring of black police because it was antithetical to everything they believed about policing in Richmond. To them, whites committed crimes, but blacks were criminals. This was the baseline understanding behind the popular support RPD received in the mid-20th century.

The post-World War II era bred more resentment between blacks and RPD. While this era saw the hiring of the city's first black policemen in 1946, RPD remained at odds with black residents, particularly in their enforcement of segregation law in opposition to protests (sit-ins) commonly attributed to the Modern Civil Rights Movement (1954-1968).[40]

---

Madison Carter, Statements Relating to Abuses of Freedmen in Richmond, Records of the Assistant Commissioner for the State of Virginia Bureau of Refugees, Freedmen, and Abandoned Lands, 1865-1869, M1048, roll 59, (*Library of Virginia*).

[36] "Jackson Ward Wholesale Robbery-Republicans Counted Out, Contest to Be Made," *Richmond Planet*, June 6, 1896, 1; "The Jackson Ward Robbery," *Richmond Planet*, May 26, 1900, 1; "The Election Today, Chairman Ellyson Says The Usual Democratic Victory," *Richmond Planet*, May 24, 1900, 1; "Jackson Ward Cases to be Reviewed," *Richmond Planet*, June 2, 1900, 1; "The Question of Jurisdiction,' *Richmond Planet*, June 9, 1900, 1; "Judge Witt Takes His Time," *Richmond Planet*, June 16, 1900, 1; "To The Supreme Court, Mr. Royall Will Apply," *Richmond Planet*, June 26, 1900, 1; and "The Jackson Ward Cases," *Richmond Planet*, June 30, 1900, 1.

[37] Cei, "Law Enforcement in Richmond," 64-93, 138-248.

[38] "Richmond Crime Parley," *Richmond Times-Dispatch*, September 29, 1936, 4; and "City Pastors Seek Negro Policemen," *Richmond Times-Dispatch*, October 13, 1936, 1

[39] Quote in "Bright Firm in Opposing Negro Police," *Richmond Times-Dispatch*, October 15, 1936, 1; and "Richmond's Most Obstinate Man," *Richmond Magazine*, August 5, 2016, https://richmondmagazine.com/news/richmond-history/richmonds-most-obstinate-man/.

[40] Marvin T. Chiles, "A Period of Misunderstanding: Reforming Jim Crow in Richmond, Virginia, 1930-1954," Virginia Historical Society: *Virginia Magazine of History and Biography*, Vol. 129, No.3, (Fall 2021): 244-78; "Plan Appeal on Jim Crow Fines," *Richmond Afro-American*, March 6, 1943, 3; "Supreme Court to Review Va. Bus Segregation Case," *Richmond Afro-American*, January 26, 1946, 1, 21; "Trailways Bus Company Denied Right to Seat Passengers in Violation of Law," *Richmond Afro-American*, January, 25, 1947, 1, 4; "Who Is Now Defying The Law," *Richmond Times-Dispatch*, February 24, 1960, 14; "Store Is Picketed; Negroes Ask Boycott," *Richmond Times-Dispatch*, February 25, 1960, 1 and 3; "Negroes to Spread Boycott," *Richmond Times-Dispatch*, February 25, 1 and 4; "Anti-Trespass Laws Signed to Meet Sit-Down Protests," *Richmond Times-Dispatch*, February 26, 1960, 1; "Whites, Negroes Confer on Protests," *Richmond Times-Dispatch*, February 27, 1960, 2; "Judge Says 'This Is No Race Issue,' *Richmond Afro-American*, March 12, 1960, 1; "Va. U. Students to Appeal Fines," *Richmond Afro-American*, March 12, 1960,

Black Richmonders became more assertive in their demands for equal treatment from RPD in the 1960s, given the national criminal justice reforms created by U.S. Supreme Court decisions. *Gideon v. Wainwright* (1963) required states to provide the accused with legal counsel while being indicted.[41] The following year, *Escobedo v. Illinois* (1964) ensured that police suspects had the right to legal counsel during interrogations.[42] *Miranda v. Arizona* (1966) completed this trinity, as law enforcement were to remind suspects of their Fifth Amendment rights to recuse themselves from self-incrimination.[43]

With police tactics now under a national microscope, black Richmonders, undoubtedly inspired by the above and the on-going civil rights movement, led a call for a Police Review Board in summer 1966. As shaped by the Richmond NAACP, Urban League, Gilpin Court Civic Association, Creighton Court Civic Group, and others, the Police Review Board would have been a 9-member body (4 police officers chosen by the police chief and 5 citizens appointed by the city council) who would field, archive, and investigate complaints of police brutality. After that, they would recommend resolutions with the complainant or punishment for the accused officer. This was not an extraneous request, as police review boards had been in place in cities such as Minneapolis, Minnesota; Philadelphia, Pennsylvania; and New York City since the late 1950s, making it, at the time, a policy of common sense reform designed to instill and solidify public trust in police.

RPD leadership, the majority white city council, and the City Attorney's Office "unequivocally opposed" the board, citing that it would lower officer morale. Many black activists felt, however, that the board was rejected because it promised the "underprivileged" with oversight powers to correct the historic injustice inflicted upon them by RPD.[44] To be clear: RPD opposed this proposal in light of black leadership asking for better policing. "Negroes [in Richmond] want more police protection, not more police brutality," said John M. Brooks of the Richmond NAACP after RPD and elected officials in City Hall denied the proposal. RPD leadership reasoned that their opposition to the review board was grounded in empirical data, as between 1960 and 1966, they logged just 121 complaints after 322,000 arrests, with most of the complaints being from whites. Black leaders felt that this statistic reflected black fear of retaliation for reporting police brutality, as the local NAACP and other organizations fielded the complaints that would have become a part of the public record with the Police Review Board.[45]

RPD's refusal to support citizen oversight strengthened its anti-black identity, creating a divide that not even black political leadership could avoid between the 1970s and 1990s. In lieu of the failed Police Review Board movement of 1966, the mostly white city council militarized RPD—with the purchase of anti-riot weapons and training—in anticipation that the riots that engulfed other majority-black cities would touch down in

---

19; "Students Fined $20 Each," *Richmond Afro-American*, March 19, 1960, 1 and 16; "Sit-In Case Conviction Is Upheld," *Richmond Times-Dispatch*, April 25, 1961, 1 and 3; and "34 Students in Sit-Ins Plan Appeal," *Richmond Times-Dispatch*, April 26, 1961, 8.

[41] *Gideon v. Wainwright*, 372 US 335 (1963).

[42] *Escobedo v. Illinois,* 378 US 478 (1964).

[43] *Miranda v. Arizona*, 384 US 436 (1966).

[44] Quotes "Police Group Opposes Review Unit," *Richmond Times-Dispatch*, July 12, 1966, 2; and "City Attorney's Office Calls Police Review Board Illegal," *Richmond Times-Dispatch*, September 21, 1966, 2.

[45] "Council Kills Police Review Board Bill," *Richmond Times-Dispatch*, September 27, 1966, 1-2; and Cei, "Law Enforcement in Richmond," 37, 55-6, 132.

Richmond.[46] By the late 1970s and early 1980s, Richmond's political leadership was mostly black, and RPD had more black officers than ever before. Yet, as was said by a black police captain about RPD culture in the late 1980s: "We have a black mayor, a black city manager, a black assistant city manager, and many high ranking black public officials, yet it seems very little has changed."[47]

Between 1977 and 1990, city leadership and business leadership (mostly white) engaged in expansive downtown revitalization plans (Project One and Sixth Street Marketplace) to attract white suburban residents and out-of-town industry to Richmond.[48] This plan, however, relied heavily on explicit calls from city businessmen for RPD to increase their policing of black neighborhoods.[49] Delivering on this request were black city managers Emmanuel Deese, and later Robert C. Bobb in the mid-1980s. Richmond's "war on drugs" led to the first ever Narcotics Division created in 1984, the Select Neighborhood Action Patrol Division created in 1986, and the Drugs and Firearms Strike Force created in 1987. These divisions within RPD worked with the Richmond Redevelopment and Housing Authority to enact plans such as Operation Hot Spot, in which dozens of RPD officers exclusively patrolled, as was said in a *Richmond Times-Dispatch* editorial, "high-density, low-income areas—notably housing projects—that have been breeding grounds for crime."[50] With plans to repopulate the city with monied whites

---

[46] The Kiplinger Washington Letter, Circulated Privately to Businessmen, August 4, 1967, Mss1 W5603b FA2, Series 1, Racial Problems (1 of 2), 40, James C. Wheat, Jr., Papers; Council Crime Report, Conducted by Councilman Phil J. Bagley, B.A. Cephas, and Mayor Morrill M. Crowe, January 21, 1968, Mss1 W5603b FA2, Series 1, Racial Problems (1 of 2), 40, James C. Wheat, Jr., Papers; Frank R. Barnett, president of the National Strategy Information Center, Inc., to Mr. J.C. Wheat, Jr., J.C. Wheat and Co., Inc., February 21, 1968, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41; "The Negro Veteran, Urban Stability and The National Purpose," National Strategy Information Center Third Draft, February 14, 1968, 1, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41; "Urban Coalition Formed to Meet Crisis in Cities," United States Municipal News, Vol. 34, No.16, August 15, 1967, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41;  Director of Public Safety to City Manager, December 14, 1964, Folder 22, Mss1 W5603 b FA2, James C. Wheat, Jr., Papers;  Meeting of School-Community Coordinators, April 16, 1968, Mss1S4772a, James A Sartain Papers; Cei, "Law Enforcement in Richmond," 235-48
[47] "Subtle Racism is Practiced in Richmond Force, Cop Claims," *Richmond Afro-American*, October 3, 1987.
[48] Marvin T. Chiles, "Here We Go Again: Race and Redevelopment in Downtown Richmond, 1977-Present" *Journal of Urban History*, https://journals.sagepub.com/doi/abs/10.1177/0096144221992374.
[49] Jackson Ward, Summary Tape File 3G, The Neighborhood Revitalization Division of the Department of Planning and Community Development, City of Richmond Neighborhood Statistics, November 1985, Box 5, M303, Richmond Renaissance Papers; For more on crime and perceptions of crime in Jackson Ward, see Table 1, Reported Offenses: 1976-1980, Second Street Study Area Richmond, Virginia, 1980, Economic and Market Analysis, 1-10; and A Commercial Revitalization Plan for the Second Street Commercial Area, 3-7, 2nd Street Commercial Revitalization, 1981, Box 4, M303, Richmond Renaissance Papers; Economic and Market Analysis: Second Street Commercial Revitalization Study, Richmond, Virginia, by John E. Scott and Associates, January 19, 1981, 2nd Street Commercial Revitalization, 1981, Box 4 and 5, M303, Richmond Renaissance Papers; Clarence L. Townes to Mr. Jeff Nowakowski, November 13, 1984, Media-Negative TV Reporting, 1984, Box 13, M303, Richmond Renaissance Papers; and "Candidates Blame News Media For Downtown's Image Problem," *Richmond Times-Dispatch*, April 5, 1990, 27.
[50] "Police Forming Narcotics Division," *Richmond Times-Dispatch*, February 18, 1984, B1; "Police Help Bobb Explain Concept of Overstaffing," *Richmond Times-Dispatch*, August 12, 1986; and Quote  "SNAP! BAM! BOBB!" *Richmond Times-Dispatch*, August 15, 1986, 10; "Drug Dealer, Beware! City Declares 'War,' Expanding SNAP," *Richmond Afro-American*, December 17, 1988, 1; and  "Drug War: Bobb Plans All-Out Fight," *Richmond Afro-American*, April 8, 1989; "Crackdown Promising, Police Say," *Richmond Times-Dispatch*, December 17, 1990, B-1.

in lieu of the suburban sprawl of the post-World War II period, the new police strategy, as dictated by black political leaders, ensured that "it will not take long for the neighborhoods to recognize the increased police presence and the more aggressive enforcement" in the city's blackest areas.[51] Increased policing of historically black and poor areas was often celebrated and encouraged by the white and black media, as well as by black and white Richmond leadership as a sign of progress. This late 20th century development was tied directly to RPD history of being sic'd on black people, as Richmonders, both new and old, long understood this to be their primary function above all else. This did not change with the appointment of Marty Tapscott to be the first black RPD chief in city history in 1989, or the increased number of black policemen along with him.[52]

**Conclusion**

Richmond's racial history is largely defined by the maintenance of residential segregation and over-policing of black residents at the hands of RPD. This report seeks not to indict every white Richmonder, or RPD officer, as racist or bigoted. Rather, it argues that current issues with residential segregation and RPD-black animus exist within a historical ecosystem shaped by people and interests of a bygone era. Furthermore, to understand and find common ground in the present requires adherence to the knowable past.

---

[51] "City Manager Advocates SNAP To Reduce Crime in Richmond," *Richmond Afro-American*, August 16, 1986, 1.

[52] "Richmond Gets First Black Police Chief," *Richmond Afro-American*, June 8, 1989, 1; and "More Blacks Needed on Police Force," *Richmond Afro-American*, March 5, 1988, 1.

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA      )
                                        )
             v.                          )      Criminal No. 3:21-cr-42
                                        )
KEITH RODNEY MOORE,          )
                                        )
            Defendant.          )

**UNITED STATES' RENEWED MOTION TO EXCLUDE DEFENSE EXPERT**

The United States of America respectfully renews its Motion to Exclude Defense Expert Dr. Marvin Chiles. Dr. Chiles' expert testimony about the history of Richmond is inadmissible under Federal Rule of Evidence 702 because it will not help the Court understand the relevant evidence or determine a fact at issue, nor is his opinion supported by the evidence he cites. Because Dr. Chiles' testimony is inadmissible under Rule 702, the Court should exclude his testimony without an additional hearing.

**I.**      **PROCEDURAL BACKGROUND**

The prior procedural history is thoroughly explained in the first motion to exclude Dr. Chiles. ECF 82. Since the filing of the first motion, the Court concluded that the defendant's initial expert disclosure did not meet the requirements of Fed. R. Crim. Pro. 16, and instructed the defendant to file a new disclosure by August 8, 2022. ECF 99. The defendant's updated expert disclosure, ECF 102-1, claims that Dr. Chiles will express two categories of opinions: those related to residential segregation, and those related to tensions between black residents and the Richmond Police Department (RPD). In both cases, Dr. Chiles begins in the 1700s, chronicles his view of Richmond's history, and ends in the mid-1980s.

In response, the United States renews its motion to exclude.

**JA1615**

## II.  LEGAL AUTHORITY

Federal Rule of Evidence 702, which sets forth the requirements for an expert to testify, allows the introduction of expert testimony if, in relevant part, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a); *see also U.S. v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003) (outlining the elements of Rule 702 and citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

## III.    ARGUMENT

### A.  The Proffered Testimony is of "Little Probative Value"

The defendant is still attempting to satisfy his heavy burden of proving discriminatory effect and purpose—or "clear and intentional discrimination" by "clear evidence"[1]—by claiming that Richmond's distant political history is relevant to a traffic stop based on a fake temporary tag in 2020.  The defendant was born in 1987, and there is nothing in Dr. Chiles' report that occurred in his lifetime. As the Court repeatedly stated during July 2022 evidentiary hearing, Richmond is simply a different place than it used to be, and long-ago wrongs do not indicate present-day racism by the officers who seized and searched the defendant in this case. Indeed, the Supreme Court has stated, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent."

---

[1] *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016); *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014).

**JA1616**

*McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Based on this precedent, the Fourth Circuit disallowed an attempt to prove racist intent in 1988 with facts from the Civil War, the 1880s, and the 1960s. *Watkins v. Angelone*, 133 F.3d 920 (4th Cir. 1998) (unpublished).[2] If a gap from the 1960s to 1988 was insurmountable in *Watkins*, so too should the gap from the mid-1980s to 2020 demonstrate the insufficiency of Dr. Chiles' proposed testimony.

Another significant problem with Dr. Chiles' testimony is that much of the attributed racism is not due to Richmond city officials or RPD. For example, a close reading of Dr. Chiles' report reveals that the residential discrimination was significantly driven by private parties, including realtors and mortgage lenders, and Dr. Chiles is often ambiguous as to who performed discriminatory actions. In a case exclusively about alleged prejudice of Richmond police in 2020, the fact that a non-governmental official, at sometime, acted prejudicially does nothing to help the defendant meet his burden of proving that he was stopped "because of, not merely in spite of," his race, *Wayte v. United States,* 470 U.S. 598, 610 (1985) (cleaned up), especially after officers had already seen the same fake vehicle tag for the third time on the same shift.

Dr. Chiles also does nothing to account for any changes that have happened since the mid-1980s. Bygone topics like white flight and annexation receive extensive treatment, but more recent topics like whites returning to Richmond in the last 15 years garner barely a mention. This last point is significant because the defendant has long claimed that RPD created its police precincts in 1977 with "[t]hree of those precincts correspond[ing] to the nearly entirely black neighborhoods of Richmond," ECF 66 at 6, and that "the Richmond Police Department [is] effectively patrolling

---

[2] ("Watkins also proffers historical evidence for the proposition that juries in Danville act with racist intent. Among the facts cited by Watkins was that Danville was the capital of the Confederacy in the waning days of the Civil War, that many black citizens were assaulted in an effort by the Democrat Party to defeat the Readjuster-Republican coalition in the 1883 election, and that civil rights activists suffered at the hands of local officials in the 1960s. This history cannot support a challenge to a 1988 jury: 'unless historical evidence is reasonably contemporaneous with a challenged decision, it has little probative value.' *McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20 (1987).")

the boundaries of the white neighborhoods." *Id.* at 9. But the demographics and racial distribution of Richmond have changed so much since 1977, coincidentally the same year when African Americans achieved a majority on the City Council and the first black mayor began service,[3] that if the police were doing what the defendant claims they would constantly be altering precinct boundaries to track the latest movements of minorities. This is absurd. But Dr. Chiles' intentional omission of any recent history is telling. His omission supports that he could identify no evidence of recent RPD prejudice or that what evidence he could identify disproves the argument he is attempting to press with the Court. Each alternative is detrimental to the defendant's claim as he bears the heavy burden under *Armstrong* to prove an equal protection violation, and, of course, the further in the past Dr. Chiles' evidence is, the less relevant and probative it is. *McCleskey*, 481 U.S. at 298 n.20 ("unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value").

### B.  Dr. Chiles' Conclusions are Not Well Supported and Fail to Even Consider Alternative Explanations

Even if the Court were to deem Dr. Chiles' decades-old historical support as "reasonably contemporaneous," his testimony would still fail under Rule 702 because his sources do not match his rhetoric and he wrongly ascribes all police enforcement to racism.

Very little of Dr. Chiles' proposed testimony post-dates 1977 and is thus not reflective of the new Richmond that is "seeking to end its complicity with American racism." Marvin T. Chiles, "Here We Go Again: Race and Redevelopment in Downtown Richmond, 1977-Present" Journal of Urban History (ECF 86-5 at 1). What little of his report that addresses events that occurred during or close to the defendant's lifetime is unsupported by the sources on which Dr. Chiles relies.

---

[3] ECF 102-1, Expert Report of Dr. Chiles ("By the late 1970s and early 1980s, Richmond's political leadership was mostly black, and RPD had more black officers than ever before.")

4

## JA1618

Moreover, although courts of appeals have not prohibited historians as experts, a historian still needs to rely on reliable methods and cannot reasonably purport to opine about the motivations of countless people, perform end run around the rules of evidence for proving facts about past events, and then use broad generalizations about the past to impugn the motives of officers whose conduct the expert has not even examined. "We have no doubt that a historian's 'specialized knowledge' could potentially aid a trier of fact in some cases," but "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events.  And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013).

To understand the import of this, it is helpful to appreciate the logical structure of Dr. Chiles' argument. To bridge the massive gap between the racism and prejudice of 50+ years ago to today, Dr. Chiles uses the example of downtown revitalization plans and supposed accompanying "explicit calls from city businessmen for RPD to increase their policing of black neighborhoods." ECF 102-1 at 11. He then argues that African American city leaders increased their policing of black neighborhoods around the same time as part of the "war on drugs" and as part of their "plans to repopulate the city with monied whites." *Id.* at 11-12. Thus, he claims, criminal enforcement in or around black neighborhoods "was tied directly to RPD history of being sic'd on black people, as Richmonders, both new and old, long understood this to be their primary function above all else." *Id.* at 12.

Dr. Chiles' evidence fails to support his accusations that Richmonders understood RPD's "primary function above all else" to be "sic'd on black people," that black political leaders had "plans to repopulate the city with monied whites," or that the alleged increased enforcement in the

1980s was in response to racist calls to rein in African Americans so that downtown revitalization projects could move forward.

Indeed, what few supporting citations Dr. Chiles includes are often wrong or misleading. For example, Dr. Chiles places great emphasis on the supposed "explicit calls from city businessmen for RPD to increase their policing of black neighborhoods" that black city leaders "deliver[ed] on." *Id.* at 11. When counsel for the United States spent several hours unearthing the supporting documents for this audacious claim from VCU Special Collections, the citation turned out to be nothing more than census statistics detailing residents' education, income, and method of heating their house. *See* Jackson Ward, Summary Tape File 3G, The Neighborhood Revitalization Division of the Department of Planning and Community Development, City of Richmond Neighborhood Statistics, November 1985, Box 5, M303, Richmond Renaissance Papers, as cited in ECF 102-1 at 11 n.49 (attached as Exhibit A). Dr. Chiles may attempt to claim this as a simple citation error, but it forms an unfortunate pattern of the defense experts claiming far more than the data support, and this alone casts substantial doubt on the viability of the defendant's historical expert. With or without supporting evidence for this claim, Dr. Chiles' testimony falls squarely within the Supreme Court's clear statement that expert testimony is inadmissible when "there is simply too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146.

Dr. Chiles' complete failure to consider other explanations, similar to Dr. Coston's failure to do so, further exemplifies the wide chasm between evidence and his opinion. While Dr. Chiles appears to attribute all enforcement of the law in black neighborhoods to racism reaching back centuries, another far more plausible explanation is that criminal activity is unfortunately disproportionately concentrated in Richmond's minority neighborhoods and RPD is attempting to

**JA1620**

provide the crime protection that all Richmonders deserve with limited resources and officers.

As evidence that criminal activity is disproportionately occurring in the first, second, and fourth precincts—the precincts the defendant has repeatedly stated are primarily comprised of African Americans, the United States presents the locations of Richmond city murders, both since 1999 when crime data is first consistently available for Richmond and over the last several years.[4]



These data on murders are particularly instructive because homicides bear undeniable physical evidence that a crime was committed, and thus are both less likely to be biased and

---

[4] The short time constraints prohibited any expert analysis and/or mapping, but these public maps are published by LexisNexis, and are available at https://communitycrimemap.com/map. The data were filtered to show only homicides and manslaughters, the density map option was selected, and RPD's police precincts were overlaid. The date range for the first map is January 1, 1999 to August 16, 2022, the former of which is the first year for which crime data is consistently available from RPD. Richmond Police Department, Crime Incident Information Center, apps.richmondgov.com/applications/CrimeInfo. The date range for the second is January 1, 2018 to August 16, 2022. The data are reliable in that they closely correspond to the data that RPD itself publishes. For example, the LexisNexis site contains a record of 302 homicides for 2018 to the present, while the RPD crime data website shows 300. This minor discrepancy could be due to murders that occur within Richmond but are not within RPD's jurisdiction, such as murder investigations handled by the Virginia State Police.



more indicative of the presence of criminal activity.[5] Note that there is little variation in the general distribution of the murders over the last 20+ years; 89% of the murders in Richmond since January 1, 2018 occurred in precincts 1, 2, and 4.[6]

As noted by Dr. Smith, the government's expert and one of the foremost authorities in the country on racial disparities in law enforcement, police go where the crime is, and given the evidence above about where crime is occurring in Richmond, it is little surprise that the above maps bear a striking resemblance to Dr. Coston's map showing traffic stop locations in 2020. *See* ECF 66-1 at 9, Figure 1.

---

[5] Beck, A.J. & Blumstein, A. "Racial disproportionality in U.S. state prisons: Accounting for the effects of racial and ethnic differences in criminal involvement, arrests, sentencing, and time served." *Journal of Quantitative Criminology,* 34, 853-883 (2018); Loftin et al. "The accuracy of supplementary homicide reports rates for large U.S. cities. *Homicide Studies.*" 19, 6-27 (2015)..

[6] Richmond Police Department, Crime Incident Information Center, apps.richmondgov.com/applications/CrimeInfo.

**JA1622**

It is not only the case that law enforcement want to stop crime because they are driven and motivated to do so, but city and police leaders are accountable to the public to address crime to make it safe for law-abiding citizens everyone to be safe in their homes and as they work, travel, and pursue recreation.

These maps, and an understanding of modern policing methods, completely undercuts Dr. Chiles' uninformed assertion that the law is enforced in African American neighborhoods only due to racism. Nor does this mean that a multitude of minority and progressive city leaders over the last several decades intended to discriminate against blacks in attempting to enforce the law, as Dr. Chiles and the defendant claim.

### Conclusion

The Court should exclude the testimony of Dr. Chiles because, in the words of the Supreme Court, historical evidence is likely of "little probative value." Dr. Chiles also exaggerates the evidence in support of his claims, and many of his opinions are based on nothing more than his own *ipse dixit*. Dr. Chiles also fails to consider or address the more likely explanation for additional law enforcement in traditionally minority neighborhoods—that's where crimes are disproportionately being committed in Richmond, as evidenced by murders going back decades. Further, Dr. Chiles' historical evidence does nothing to show discriminatory effect or purpose in 2020, and his testimony bears no relevance given the facts and circumstances of the defendant's particular stop. For these reasons, the Court should exclude the testimony of Dr. Chiles.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:    _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916

9

**JA1623**

Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

**JA1624**



# CITY OF RICHMOND
# NEIGHBORHOOD STATISTICS
(1980 Census)

Prepared By:
The Neighborhood Revitalization
Division
of
The Department of Planning
and
Community Development

November, 1985

CITY OF RICHMOND NEIGHBORHOOD INFORMATION SYSTEM

DATA FROM 1980 CENSUS OF POPULATION - SUMMARY TAPE FILE 3G

NEIGHBORHOOD:  JACKSON WARD

10. INCOME IN 1979

| INCOME | HOUSEHOLDS | FAMILIES |
|---|---|---|
| LESS THAN $2,500 | 161 | 46 |
| $2,500 TO $4,999 | 166 | 43 |
| $5,000 TO $7,499 | 84 | 15 |
| $7,500 TO $9,999 | 122 | 77 |
| $10,000 TO $12,499 | 55 | 25 |
| $12,500 TO $14,999 | 65 | 41 |
| $15,000 TO $17,499 | 46 | 21 |
| $17,500 TO $19,999 | 44 | 30 |
| $20,000 TO $22,499 | 25 | 0 |
| $22,500 TO $24,999 | 1 | 0 |
| $25,000 TO $26,499 | 0 | 0 |
| $27,500 TO $29,999 | 0 | 0 |
| $30,000 TO $34,499 | 8 | 8 |
| $35,500 TO $39,999 | 7 | 7 |
| $40,000 TO $49,999 | 10 | 10 |
| $50,000 TO $74,999 | 5 | 0 |
| $75,999 OR MORE | 0 | 0 |

MEAN INCOME        $ 9092        $ 11574

TOTAL PERSONS BELOW POVERTY LEVEL:   701

11. OCCUPATION OF PERSONS (16 YEARS AND OVER)

| CATEGORY | PERSONS | PERCENT |
|---|---|---|
| MANAGERIAL & PROFESSIONAL | 71 | 10.1 |
| TECHNICAL/SALES/ADMIN. SUPPORT | 108 | 15.3 |
| SERVICES | 293 | 41.5 |
| FARMING/FORESTRY/FISHING | 19 | 2.7 |
| PRECISION PRODUCTION & CRAFTS | 52 | 7.4 |
| OPERATORS/FABRICATORS/LABORERS | 163 | 7.4 |

12. EDUCATION - YEARS OF SCHOOL COMPLETED
    (PERSONS 25 YEARS AND OVER)

| | | |
|---|---|---|
| ELEMENTARY (0 TO 8 YEARS) | 570 | (42.9%) |
| HIGH SCHOOL 1 TO 3 YEARS | 406 | (30.6%) |
| HIGH SCHOOL 4 YEARS | 201 | (15.1%) |
| COLLEGE 1 TO 3 YEARS | 78 | ( 5.9%) |
| COLLEGE 4 OR MORE YEARS | 73 | ( 5.5%) |

13. SCHOOL ENROLLMENT (PERSONS 3 YEARS AND OVER)

| | |
|---|---|
| NURSERY SCHOOL | 9 |
| KINDERGARTEN & ELEM. | 48 |
| HIGH SCHOOL | 43 |
| COLLEGE | 26 |

CITY OF RICHMOND NEIGHBORHOOD INFORMATION SYSTEM

DATA FROM 1980 CENSUS OF POPULATION - SUMMARY TAPE FILE 3G

NEIGHBORHOOD:  JACKSON WARD

14. PLACE OF WORK (WORKERS 16 YEARS AND OVER)

| PLACE | WORKERS | PERCENT |
|-------|---------|---------|
| CITY OF RICHMOND | 534 | 68.5 |
| ELSEWHERE IN STATE | 68 | 8.7 |
| OTHER STATES | 0 | 0.0 |
| NOT REPORTED | 178 | 22.8 |

15. TRANSPORTATION TO WORK (WORKERS 16 YEARS & OVER)

| MODE | WORKERS | PERCENT |
|------|---------|---------|
| DRIVE ALONE | 171 | 24.2 |
| CARPOOL | 119 | 16.9 |
| PUBLIC TRANSPORTATION | 251 | 35.6 |
| WALKED ONLY | 151 | 21.4 |
| OTHER MEANS | 7 | 1.0 |
| WORKED AT HOME | 7 | 1.0 |

OCCUPIED HOUSING UNITS WITH
   NO VEHICLE AVAILABLE       475 (65.2%)

16. YEAR HOUSEHOLDER MOVED INTO UNIT

| YEAR | TOTAL | RENTERS | HOMEOWNERS |
|------|-------|---------|------------|
| 1979 TO 1980 | 152 | 152 | 0 |
| 1975 TO 1978 | 227 | 195 | 32 |
| 1970 TO 1974 | 87 | 87 | 0 |
| 1960 TO 1969 | 123 | 110 | 13 |
| 1950 TO 1959 | 58 | 26 | 32 |
| PRIOR TO 1949 | 81 | 16 | 65 |

17. RESIDENCE IN 1975 (PERSONS 5 YEARS AND OVER)

| | |
|---|---|
| LIVED IN SAME HOUSE/APARTMENT | 865 |
| ELSEWHERE IN CITY OF RICHMOND | 694 |
| ELSEWHERE IN VIRGINIA | 98 |
| ELSEWHERE IN U.S. | 116 |
| LIVED ABROAD | 0 |

18. AGE OF HOUSING (YEAR ROUND HOUSING UNITS)

| YEAR BUILT | NUMBER OF UNITS |
|------------|-----------------|
| 1979 TO 1980 | 0 |
| 1975 TO 1978 | 7 |
| 1970 TO 1974 | 0 |
| 1969 TO 1969 | 40 |
| 1950 TO 1959 | 54 |
| 1940 TO 1949 | 137 |
| PRIOR TO 1939 | 622 |

CITY OF RICHMOND NEIGHBORHOOD INFORMATION SYSTEM

DATA FROM 1980 CENSUS OF POPULATION - SUMMARY TAPE FILE 3G

NEIGHBORHOOD:  JACKSON WARD

19. HEATING EQUIPMENT (YEAR ROUND HOUSING UNITS)

| TYPE OF HEAT | NUMBER OF UNITS |
|---|---|
| STEAM OR HOT WATER | 124 |
| CENTRAL WARM AIR | 90 |
| ELECTRIC HEAT PUMP | 21 |
| OTHER BUILT-IN ELECTRIC | 28 |
| FLOOR, WALL, OR PIPELESS FURNACE | 8 |
| ROOM HEATERS WITH FLUE | 290 |
| ROOM HEATERS WITHOUT FLUE | 93 |
| FIREPLACES, STOVES, PORTABLE HEATERS | 201 |
| NONE | 5 |

20. HEATING FUEL  (OCCUPIED HOUSING UNITS)

| TYPE | NUMBER OF UNITS |
|---|---|
| UTILITY GAS | 278 |
| BOTTLED, TANK, OR LP GAS | 0 |
| ELECTRICITY | 52 |
| FUEL OIL, KEROSENE, ETC. | 317 |
| COAL OR COKE | 24 |
| WOOD | 50 |
| OTHER FUEL | 7 |
| NO FUEL USED | 0 |

21. TELEPHONE AVAILABILITY - (OCCUPIED HOUSING UNITS)

| AVAILABILITY | NUMBER OF UNITS |
|---|---|
| WITH PHONE | 435 |
| WITHOUT PHONE | 293 |

22. KITCHEN AVAILABILITY  (YEAR ROUND HOUSING UNITS)

| | |
|---|---|
| COMPLETE KITCHEN FACILITIES | 791 |
| NO COMPLETE KITCHEN FACILITIES | 69 |

**NOTE - INFORMATION IN TABLES 10 THRU 22 IS BASED ON A SAMPLE SURVEY.
215 OUT OF  1651 PERSONS (13.0%) WERE SURVEYED
IN THIS NEIGHBORHOOD.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )    **Case No. 3:21cr42** |
| | ) |
| **KEITH RODNEY MOORE,** | ) |
| Defendant | ) |

**MR. MOORE'S RESPONSE GOVERNMENT'S RENEWED
TO MOTION TO EXCLUDE SECOND DEFENSE EXPERT**

Keith Moore, through counsel, responds as follows to the government's renewed motion to exclude the defense's expert, Dr. Marvin Chiles, *see* ECF No. 103:

> **I.**    **Dr. Chiles's testimony is relevant under Federal Rule of Evidence 401 and admissible under Federal Rule of Evidence 702.**

The government has renewed its motion to exclude Dr. Marvin Chiles, an Assistant Professor of African American history at Old Dominion University with specialized knowledge in the history of racialized policing and residential segregation in Richmond, Virginia—*see* ECF No. 102, from testifying in this case, *see* ECF No. 103. The government first argues that Dr. Chiles's testimony is not admissible under Federal Rule of Evidence 702.

The challenge that Mr. Moore has brought in this case is to the Richmond Police Department's selective enforcement of Virginia's traffic laws against black drivers in Richmond, Virginia—which violates the Equal Protection Clause. *See* ECF Nos. 32, 66, 72, and 73. As the parties and the Court have discussed before, the fact that the first, second, and fourth police precincts line up almost exactly with the black neighborhoods in Richmond, while the third police precinct lines up almost exactly with the white neighborhoods in Richmond is relevant to Mr. Moore's equal protection challenge. *See, e.g.*, ECF No. 72 at 13-14. That the city of Richmond

1

**JA1629**

feels it needs to devote three quarters of its police precincts to policing the black neighborhoods of Richmond is highly relevant to the Richmond Police Department's selective enforcement of the traffic laws of Virginia against black drivers.  As Mr. Moore set forth in ECF No. 72, "when you send police out to investigate crime, one can expect to see more traffic stops.  Thus, deployment of police to high crime areas where minorities live will have the impact of overpolicing racial minorities.  *See, e.g.*, Ex. K at 28 ("Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony because they are more likely to drive in high crime areas where they reside and more vigorous law enforcement is a common practice.")."  ECF No. 72 at 14.

During its work investigating the Richmond Police Department's selective enforcement of the traffic laws in Virginia against black drivers, the defense discovered that the Richmond Police Department decentralized its patrol functions and instituted a "Neighborhood Precinct Plan" in 1977.  *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022).  Thus, on February 1, 2022, the defense submitted a FOIA request to the Richmond Police Department asking for:

"1) all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;

2) a copy of the Neighborhood Precinct Plan from 1977; and

3) any amendments or modifications of the Neighborhood Precinct Plan from 1977."

*See* ECF No. 86-1.  It was only when the Richmond Police Department failed to respond to this FOIA request—even to ask for more time to respond to the FOIA request—that the defense sought a subpoena from the Court for the same materials.  *See, e.g.*, ECF No. 86-2 (ex parte motion to enforce subpoena duces tecum).

**JA1630**

On May 27, 2022, in response to the Court's Order that the Richmond Police Department comply with the subpoena and file a document explaining why the Court should not hold Ms. Peters in contempt for failing to comply with the subpoena, the Richmond Police Department's Senior Assistant Attorney wrote a letter to the Court. The defense has provided a copy of this letter to the government. In the letter, the Senior Assistant reported that the Richmond Police Department does not have any documents responsive to the subpoena. *See* ECF No. 86-3. The police department did not maintain a copy of the Neighborhood Precinct Plan from 1977, any amendments or modifications thereto, or any planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department. *Id.* Rather, what the police department had were maps of the current police precincts that the defense has already submitted as evidence in this case, *see* 7/26/21 Exs. X-1, X-2, X-3, and X-4, and a history of the police department that includes a reference to the creation of the police precincts in 1977. The defense has also provided these documents to the government.

It was after learning that the Richmond Police Department had not kept any records that would assist the Court in more directly understanding the relationship between the racial segregation of Richmond's neighborhoods and the location of the police precincts that the defense contacted Dr. Chiles. Dr. Chiles's report clearly and thoroughly summarizes his findings:

> Using newspaper accounts, court cases, archival collections, and peer-reviewed articles and monographs, this report makes the historical finding that in Richmond, Virginia, racial segregation has been systemically implemented to the detriment of black residents through public policy at the federal, state, and local levels. Byproducts of this are the separation of black and white people into distinct legal castes; unequal treatment under law inflicted upon black people; residential segregation of whites and blacks; endurance of systemic poverty among blacks; and historical animus between black residents and local law enforcement.

ECF No. 102-1 at 1. That evidence is not only relevant, but critical to this Court's resolution of the selective enforcement challenge in this case.

3

**JA1631**

The government's citation to *Watkins v. Angelone*, 133 F.3d 920 (4th Cir. 1998) (unpublished), does not indicate otherwise. In *Watkins*, the defendant had been convicted of capital murder and sentenced to death. For the first time on appeal challenging the district court's denial of his habeas challenge to his state court conviction, Mr. Watkins asked to present evidence he alleged "would support a finding of systematic discrimination and establish a prima facie case under both the Sixth and Fourteenth Amendments. This new evidence consists mainly of statistical data that purports to demonstrate a pattern of discriminatory sentencing of black capital defendants in Danville. The district court declined to review this evidence because it was not presented to the state court during the two evidentiary hearings it held on the venire discrimination claim." *Id.* at *5. It is not that the Fourth Circuit found that such historical evidence of racism could not be considered if presented in a timely fashion. Rather, the Fourth Circuit found that "Watkins cannot offer these new facts for the first time on federal collateral review, so we must decline to review that evidence here as well." *Id.* at *6 n.3. Mr. Moore is offering Dr. Chiles's testimony while this Court is still developing the trial record in this case. Thus, *Watkins* is inapposite.

As to the legal relevance of Dr. Chiles's testimony, as the defense has stated before and as the Supreme Court has made quite clear, because discriminatory intent is rarely explicit, evaluating whether discriminatory intent exists requires an expansive inquiry and permits courts to consider cumulatively different kinds of evidence—direct and circumstantial, statistical and anecdotal, as well as historical and contemporaneous evidence. Determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: (1) the impact of the official action and whether it bears more heavily

on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the legislature's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. 429 U.S. at 266¬68; *United States v. Fordice*, 505 U.S. 717, 728 (1992) ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation."); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976) (discussing historical cases involving laws enacted with the purpose of racial discrimination); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1400-01 (2020) (discussing broader history of racially discriminatory law in constitutional challenge). Dr. Chiles's testimony is thus relevant.

The Court is, of course, free to determine what weight to assign to Dr. Chiles's testimony[1]. But, the Court should do so keeping in mind that the reason that we do not have the most direct evidence of how the police precincts came to be how they currently are is because the Richmond Police Department did not keep that information. Thus, the defense has to present more circumstantial evidence to demonstrate its point. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 486 (1984) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."); *Arlington Heights*, 429 U.S. at 266 (observing that determining whether intent was

---

[1] The government has tried to make much of a footnote in *McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987). In that footnote, the Supreme Court observed: "Of course, the 'historical background of the decision is one evidentiary source' for proof of intentional discrimination. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S., at 267, 97 S.Ct., at 564. But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." What the government appears perhaps to not appreciate is that the evidence Dr. Chiles has through his careful study of the history of the Richmond Police Department and the history of residential segregation in Richmond is the only evidence undersigned counsel is aware of since the police department did not keep the relevant records. This loss of evidence thus makes Dr. Chiles's circumstantial evidence much more probative than it might otherwise be.

**JA1633**

discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent **as may be available**") (emphasis added).

     **II.**     **Dr. Chiles's report is a summary of his anticipated testimony, not a treatise.**

     The government next argues that Dr. Chiles's conclusions are not well-supported. *See* ECF No. 103 at 4-9. First, the government takes issue with Dr. Chiles's conclusion that "Richmond's racial history is largely defined by the maintenance of residential segregation and over-policing of black residents at the hands of RPD. This report seeks not to indict every white Richmonder, or RPD officer, as racist or bigoted. Rather, it argues that current issues with residential segregation and RPD-black animus exist within a historical ecosystem shaped by people and interests of a bygone era." *See* ECF No. 19-1 at 12. Dr. Chiles has reached this conclusion through years of careful study of African American history, and specifically how racism has shaped the city of Richmond and its police force.

     For instance, while the government cites, *see* ECF No. 103 at 4, a line from the first sentence of one of Dr. Chiles's articles, *see* ECF No. 86-5 at 1, describing Richmond as a "city seeking to end its complicity with racism," the government's reliance on that phrase obfuscates Dr. Chiles's work in that article. In 2021, Dr. Chiles authored the article that the defense has produced to the government and the Court in ECF No. 86 entitled *"Here We Go Again": Race and Redevelopment in Downtown Richmond, Virginia, 1977-Present*. The Journal of Urban History, a peer-reviewed journal, chose to publish Dr. Chiles's work, which began as a part of his dissertation several years before. *See* ECF No. 86-5 at 27. And what the article goes on to explain is that modern Richmond has tried to separate from its racist past through public policy reform but has consistently failed to do so.

**JA1634**

For example, Dr. Chiles describes in detail how historical revitalization plans failed to change the systemic racism that has defined Richmond since its inception. In the 1970s and 1980s, white business owners "wanted to use redevelopment—a tactic formerly used to reinforce white supremacy—as a mechanism for racial and economic healing." *Id.* at 8. Those efforts failed, in part because "Black Richmonders clamored for better city services and the political success of their newly elected city councilmembers. However, they did not believe that shoveling thinly stretched tax dollars to white developers satisfied those desires." *Id.* at 10. Disagreements about how to go about making effective changes led to efforts to redraw voting district boundaries and white councilmembers conducting "secret investigations with the hopes of ousting their black colleagues from office. While their efforts failed to unseat a single black councilmember, they helped further the racial divide at one of the most critical times in city history." *Id.* at 12. Later revitalization efforts fared no better: "Jackson Ward residents noticed that a large brick wall separated them from the Marketplace. This was no protective barrier from construction: it was a design separation between Jackson Ward and the growing Marketplace." *Id.* at 14.

Dr. Chiles's investigations revealed that Richmond's more recent revitalization attempts have fared no better. In December 2018, the city of Richmond announced a $1.5 billion revitalization project in Navy Hill. Richmond residents "learned that the wealthiest capitalists in Virginia crafted the Navy Hill Project and sold it to the majority black city council. Like Project One and the Sixth Street Marketplace, the council promised to allocate current (an undisclosed portion of the around $800 million in capital improvement surplus) and future tax revenue (an estimated $476 million) to sustain the 'financing district' until it turned a profit. If the project took the full thirty years to become solvent, the city would owe at least $600 million to its bondholders. Even worse, the projected revenue for the city would be less than the amount spent on maintaining

7

**JA1635**

the project over the next twenty years." *Id.* at 17. And so, while Navy Hill **had been** a majority black middle-class neighborhood in the 1900s before it was bull-dozed to make way for Interstate-95, "instead of investing in its majority black (97%) and impoverished public school system, leaders in Richmond and elsewhere continue to court white corporations who have done next to nothing to improve the cemented patters of racial segregation and disparate levels of poverty." *Id.*

The point is that Dr. Chiles is extremely qualified because of his years of training and historical investigation to present evidence that makes patently clear the relationship between Richmond's overtly racist past and the discriminatory effects black Richmonders acutely feel today. The government's observation that one of Dr. Chiles's footnotes did not encompass every source Dr. Chiles is aware of in support of a particular statement mistakes not only the purpose of Dr. Chiles's report in this case—to **summarize** his anticipated testimony—but vastly underestimates the depth of Dr. Chiles's knowledge on the subjects at hand. For instance, if asked on the stand about the government's criticism of footnote 49 in ECF No. 102-1, Dr. Chiles would point the government to: the Table of Reported Offenses: 1976-1980, Second Street Area Richmond, 1980, Economic and Market Analysis, pp.1-10; A Commercial Revitalization Plan for Second Street Commercial Area, pp.3-7, 2nd Street Commercial Revitalization, 1981, Box 4, M303, Richmond Renaissance Papers; and "Jackson Ward," a paper presented at the Liaison Committee of Richmond Renaissance, Box 16, M283, Clarence Townes Papers, Virginia Commonwealth University—all of which Dr. Chiles has seen and reviewed with his own eyes and is quite qualified to rely on as an expert.

These documents, along with the information in footnote 49 of ECF No. 102-1, use Jackson Ward specifically to explain Richmond's 1980s crime problem as rooted in systemic black poverty; systemic black poverty rooted in systemic racial segregation; and most importantly, the

**JA1636**

calls for more policing in the 1980s, which did in fact come. These economic and crime reports were done to reverse white flight, which required the Richmond Police Department to commit both rhetoric and forces to anti-crime measures. To argue that the reports are irrelevant because they do not mention policing specifically is like taking a piece out of a jigsaw puzzle and claiming that because the piece is not the entire puzzle, the puzzle does not exist. And that is essentially the heart of the government's argument here: the government attempts this puzzle trick over and over to make the larger claim that past events have no connection to the present. Dr. Chiles's work makes clear that that is just not so.

The government's second criticism of Dr. Chiles's work is that Dr. Chiles's report does not discuss criminal activity that the government alleges is disproportionately happening in the black precincts in Richmond. *See* ECF No. 103 at 7-9. In so arguing, the government relies on murder statistics in Richmond from 1999 to 2022 to justify why 77% of the drivers Richmond Police Department officers stopped in the five months before stopping Mr. Moore were black. Given that 59% of the stops were for traffic violations and another 36% of the stops were for equipment violations, *see* ECF No. 66-1 at 6, Table 1, and that the government's own expert conceded at the earlier evidentiary hearing that there is no evidence that black people commit traffic offenses more than white people, the government's argument about murders in Richmond belies the truth. The truth is that Richmond Police officers were in 2021, and have been for decades, selectively enforcing Virginia's traffic laws against black drivers in Richmond at such disproportionately high rates that this Court can infer discriminatory intent in such enforcement.

Richmond Police Department homicide detectives or even line patrol officers are not pulling black drivers over five times more than white drivers because they are trying to advance active homicide investigations. They are not pulling black drivers over five times more than white

**JA1637**

drivers because the Richmond Police Department sends more officers to the black parts of town than the white parts of town. We know that the Richmond Police Department pulls over black drivers far more often than white drivers even in the white part of town. *See* ECF No. 66-1 at 9, Figure 2. The truth is that the Richmond Police Department is pulling over black drivers five times more often than white drivers because those drivers are black. The history and expertise that Dr. Chiles has to share with this Court corroborate that.

### Conclusion

The Court should deny the government's motion. Dr. Chiles's testimony is the best evidence available, albeit circumstantial, of the relationship between the city of Richmond's history of racialized policing and the existing police precinct locations. It is relevant and must be considered by the Court in evaluating Mr. Moore's selective enforcement challenge.

<div style="margin-left: 40%;">

Respectfully submitted,
KEITH RODNEY MOORE

By: _____ /s/ _____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

</div>

**JA1638**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21-cr-42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' REPLY IN SUPPORT OF
## RENEWED MOTION TO EXCLUDE DEFENSE EXPERT

The United States of America respectfully files this reply in support of its Renewed Motion to Exclude Defense Expert Dr. Marvin Chiles. The Court should grant the motion to exclude the defendant's historical expert because his testimony is not relevant and probative to the defendant's attempted traffic stop in 2020, nor does it come close to meeting the defendant's burden of proof.

**I.     ARGUMENT**

As an initial matter, and despite the defendant's technical arguments about why this Court should ignore statements from the Supreme Court and the Fourth Circuit about the lack of relevance and probative value of decades-old historical evidence, the defendant's expert witness evidence is of no evidentiary value. Indeed, the statements the defendant urges the Court to ignore represent common sense and echo the Court's repeated statement that Richmond is a different place than it used to be, and merely restating old wrongs is not a blank check for dismissing present-day crimes. The relevant question before the Court is whether the attempted stop of the defendant on December 5, 2020 was the result of "clear and intentional discrimination." *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (party asserting equal protection violation "must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'") (citing *Sylvia Dev. Corp. v.*

## JA1639

*Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995); *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Dr. Chiles' evidence by its very nature is ill-suited to answer this question.

One of the main reasons his testimony is ill-suited is that, according to his expert report, the connection between past racism and alleged present-day racism by RPD in general—much less the officers involved in this case in particular—is tenuous at best. For example, Dr. Chiles relies on decades-old revitalization efforts that have nothing to do with the officers in this case, political squabbles that do not involve these officers, moving patterns that do not involve these officers, and architectural choices to argue that the specific officers involved in the stop in this case in 2020 attempted a racially discriminatory traffic stop. But even for the past events that Dr. Chiles claims are discriminatory, there is at best a limited connection to city leaders or to RPD itself—much less the officers in this case. Neither city leaders nor RPD control residential moving patterns, and they were not involved in the construction of a brick wall between the Jackson Ward neighborhood and the Sixth Street Marketplace. *See* ECF 86-5 at 14 (the defendant failed to mention that the "wall was later torn down after discussions between Jackson Ward residents and Richmond Renaissance," the interracial nonprofit revitalization group behind the Sixth Street Marketplace project). The extreme distance between these events and the attempted stop of the defendant exemplifies the uselessness of Dr. Chiles' testimony.[1]

Nor should the limited evidentiary value of Dr. Chiles' testimony be ignored simply because RPD did not retain 45-year-old records the defendant claims would be helpful to his case. The defendant's assertion that documents related to 1977 precinct boundaries are instrumental to

---

[1] The same is true of attempts to link the failed Navy Hill project to any sort of discrimination by RPD. The defendant claims that the Navy Hill neighborhood was a majority-black neighborhood *over 100 years ago*, but fails to link the proposed project to discrimination of any kind, let alone by RPD. The defendant also fails to mention that project was rejected by seven of the nine members of the city council over Mayor Stoney's recommendation that the project continue. Kate Andrews, "Richmond's $1.5B Navy Hill Project is Dead" (Feb. 11, 2020), https://www.virginiabusiness.com/article/richmonds-1-5b-navy-hill-project-is-dead/.

his case simply assumes that 1977 precinct boundaries aligned with racial boundaries and have somehow continued to align with racial boundaries through to the present day despite significant shifts in the racial distribution of the residential population. There is no evidence of this in the record, and the defendant's arguments about the extra relevance of Dr. Chiles' testimony is based on the unproven assumption that whatever 45-year-old documents RPD allegedly failed to maintain support the defendant's argument.

In seeking to rely on historical evidence that the defendant fails completely to connect to the decisions of the officers in his case, the defendant invokes *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977). In that case, in evaluating a legislative body's or zoning board's decisions, the Court noted that "[t]he historical background of the decision is one evidentiary source" of "invidious discriminatory purpose" when the historical background "reveals a series of official actions taken for invidious purposes." *Id.* at 266. But while this rule might support looking at these officers' prior actions to evaluate their intent behind their actions in this case or—possibly—other reasonably recent actions by other Richmond police officers, *Arlington Heights* cannot reasonably be stretched to allow the defendant to impute the motivations of others from decades ago, who have no connection to the officers in this case, to the officers' decisions in this case. The defendant's argument relies on inferences that are even worse than the guilt-by-association theory of culpability that has no home in American law, given that the officers in this case are not even associated with the long-ago decisions the defendant invokes. Defendant relies on an extraordinarily expansive notion of collective guilt that has no basis in law.

The defendant's burden in this case is very high, and the testimony of Dr. Chiles does not help the defendant meet this burden. The defendant must prove that the officers in this case "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in

3

**JA1641**

spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (citing *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979)). The government has shown repeatedly that crime rates and calls for service are one of the key determinants for where police patrol, and that is the most likely explanation for whatever raw statistical disparity exists with regard to race and traffic stops.[2] The persistent failure of the defendant's experts to even consider the possibility that factors other than racism explain the raw disparity in whole or in part demonstrates the unreliability and the unhelpfulness to the Court of their testimony, and the defendant's inability to meet his heavy burden under *Armstrong. See United States v. Hare,* 820 F.3d 93, 99 (4th Cir. 2016) ("'absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim.'") (quoting *United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996)); *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (defendant cannot tout "unexplained evidence of racial disparity" to prove "racial animus"); *Johnson v. Holmes*, 782 F. App'x 269, 281 (4th Cir. 2019) ("Crucially, in [*Armstrong*, *Hare*, and *Olvis*], the proffered statistics faltered because they said nothing about individuals of other races who committed the same crimes but were treated more favorably").

---

[2] The defendant keeps repeating that blacks are five times more likely to be pulled over than white drivers. *See, e.g.*, ECF 107 at 9-10. The defendant ignores Dr. Coston's admission during the evidentiary hearing that adjusting the date range for traffic stops to include more than just the first five months of flawed data collection significantly reduces the raw statistical disparity. According to the data publicly available on the Commonwealth of Virginia's site, simply adjusting end date for the time frame to June 30, 2021 instead of December 6, 2020 as Dr. Coston does, the raw statistical disparity significantly reduces—from 76% of stops being of black drivers, 15% of white drivers, and 8% unknown race—to 64% of stops being of black drivers, 24% of white drivers, and 6% unknown race. Virginia Open Data Portal, "Community Policing Act Data Collection," https://data.virginia.gov/stories/s/Virginia-Community-Policing-Act-Data-Collection/rden-cz3h/; *see also United States v. Raynor*, No. CRIM. 3:13MJ215, 2013 WL 5770529, at *8 (E.D. Va. Oct. 24, 2013) (Novak, M.J.) (rejecting an equal protection claim regarding a traffic stop in part because the defendant had "cherry-picked a statistical time frame to suit the conclusion that they wanted to reach—that Officer Purdy stopped vehicles due to the race of the driver."). That a simple adjustment to the timeframe to include more reliable data slashes the raw statistical disparity by nearly half demonstrates the fickle nature of the defendant's claimed raw disparity.

4

**JA1642**

Because crime rates[3] and calls for service correlate so strongly with traffic stop data, it is simply incredible to believe that for decades African American and progressive city leaders (some of whom are prominent civil rights leaders), chiefs of police, and individual officers would consistently and intentionally choose policies "because of" their disparate impacts on African Americans. Dr. Chiles and the defendant argue that the racism of the 1960s endures in an unbreaking chain at least to December 5, 2020, but making that argument requires the complicity of generations of political and police leaders, which is absurd.

### Conclusion

The Court should exclude the testimony of Dr. Chiles because, in the words of the Supreme Court, historical evidence unconnected to the facts at issue is of "little probative value." There is no indication it is probative of the decision of Fourth Precinct officers to attempt a traffic stop on December 5, 2020, and the defendant's ill-fated attempt to prove intentional discrimination has lingered long enough. The Court should exclude the testimony of Dr. Chiles.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:    _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

---

[3] In its previous filing, the government used murders as indicative of crime rates generally. ECF 103 at 7-9; *see also* ECF 70 at 16 (showing traffic stops correlate with other types of crime rates).

5

**JA1643**