IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4201

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, District Judge*

———————————

CORRECTED JOINT APPENDIX
VOLUME V OF VI (PAGES 1644–1846)

———————————

Geremy C. Kamens
Federal Public Defender

Patrick L. Bryant
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800

*Counsel for Keith Moore (continued)*

Jessica D. Aber
United States Attorney

Jacqueline R. Bechara
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Counsel for the United States (continued)*

Amy L. Austin
Laura J. Koenig
Assistant Federal Public Defenders
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
(804) 565-0880

*Additional Counsel for Keith Moore*

Shea M. Gibbons
Erik S. Siebert
Assistant United States Attorneys
919 East Main Street
Suite 1900
Richmond, Virginia 23219
(804) 819-5400

*Additional Counsel for the United States*

## Table of Contents

**Description**                                                    **Page**

### Volume I

District Court Docket Sheet (as of Aug. 23, 2024)......................................1

Indictment (May 4, 2021, Doc. No. 3).......................................................16

Moore's Motion to Suppress Evidence and Statements
    (June 21, 2021, Doc. No. 17) .............................................................18

Government's Opposition to Motion to Suppress Evidence and Statements
    (July 6, 2021, Doc. No. 22)...............................................................25

Moore's Reply to Government's Response to Motion to Suppress Evidence
    and Statements (July 13, 2021, Doc. No. 28) ...................................40

Transcript of Motion Hearing (July 26, 2021, Doc. No. 33)...................45

    Testimony of Dominic Collombo:

    Direct Examination by Mr. Elliker....................................................50
    Cross Examination by Ms. Koenig ....................................................64

    Testimony of Keegan Mills:

    Direct Examination by Mr. Elliker....................................................91
    Cross Examination by Ms. Koenig ..................................................100

    Testimony of Jakob Torres:

    Direct Examination by Mr. Elliker..................................................136
    Cross Examination by Ms. Koenig ..................................................143

i

Testimony of Nakia Williams:

    Direct Examination by Mr. Elliker ................................................145
    Cross Examination by Ms. Koenig ...............................................156

Testimony of Michael Spinos:

    Direct Examination by Mr. Elliker................................................176
    Cross Examination by Ms. Koenig ...............................................182

Testimony of John Gilbert:

    Direct Examination by Mr. Elliker................................................188
    Cross Examination by Ms. Koenig ...............................................198

Testimony of Lee Hush:

    Direct Examination by Ms. Koenig ...............................................201

Selected Government Exhibits to July 26, 2021, Motion Hearing

    Gov. Exhibit 3, Photograph of Moore's car, dated Dec. 5, 2020...................221

    Gov. Exhibit 6, Photograph of firearm seized from Moore's car .................222

    Gov. Exhibit 10, Moore's license plate..........................................223

Defense Exhibits to July 26, 2021, Motion Hearing

    Def. Exhibit A, Hanover Traffic Ticket, dated Oct. 9, 2020 ........................224

    Def. Exhibit C, 0485 Map ......................................................228

    Def. Exhibit I, Richmond Police Department
    Incident/Investigation Report, dated Dec. 5, 2020.........................229

Def. Exhibit J, 0485 Net Viewer Event Information ....................................238

Def. Exhibit K, 0497 Net Viewer Event Information....................................242

Def. Exhibit L, 0502 Net Viewer Event Information ....................................248

Def. Exhibit N, 0571 Net Viewer Event Information....................................253

Def. Exhibit O, 0574 Net Viewer Event Information....................................257

Def. Exhibit P, 0579 Net Viewer Event Information....................................262

Def. Exhibit Q, Axon Report for Keegan Mills ...........................................265

Def. Exhibit R1, University of Virginia Dot Map of Richmond ..................267

Def. Exhibit R2, University of Virginia Dot Map of Richmond ..................268

Def. Exhibit W, 0579 Net Viewer Event Unit .............................................269

Def. Exhibit X1, Boundaries of Richmond Police Precinct 1......................276

Def. Exhibit X2, Boundaries of Richmond Police Precinct 2......................277

Def. Exhibit X3, Boundaries of Richmond Police Precinct 3......................278

Def. Exhibit X4, Boundaries of Richmond Police Precinct 4......................279

Def. Exhibit Y1, Screen Capture of Richmond Police Department
Stops by Race and Stops by Ethnicity ..........................................................280

Def. Exhibit Y2, Screen Capture of Richmond Police Department
Stops by Gender and Vehicles Searched during a stop.................................281

Order (July 27, 2021, Doc. No. 31) .............................................................282

Supplement to Moore's Motion to Suppress Evidence and Statements
(Aug. 3, 2021, Doc. No. 32).................................................................283

Government's Supplemental Response to Motion to Suppress
Evidence and Statements (Aug. 12, 2021, Doc. No. 36) ..............................297

Transcript of Motion Hearing (Sept. 15, 2021, Doc. No. 137) ...........................317

Order (Sept. 15, 2021, Doc. No. 44).......................................................339

Moore's Second Supplement to Motion to Suppress Evidence and Statements
(Mar. 9, 2022, Doc. No. 66)...............................................................340

Def. Exhibit A, Dr. Eli Coston, Traffic Stops by the Richmond Police
Department: July 1, 2020 – December 6, 2020.....................................353

Def. Exhibit B, Emma Pierson et al., A large-scale analysis of racial
disparities in police stops across the United States,
dated July 2020..........................................................................367

Def. Exhibit C, McGuire Woods,
Zoning and Segregation in Virginia: Part 1 ..........................................379

Def. Exhibit D, Why is Richmond still segregated?,
Richmond Times Dispatch, dated May 3, 2015 .....................................387

Def. Exhibit E, Mark Bowes, Traffic Arrest Pattern; In Chesterfield,
29% Are Black and Almost 69% Are White, dated July 15, 2001 ........403

Def. Exhibit F, Richmond Transparency and Accountability Project,
Our Streets, Our Say: Policing in Richmond, dated June 2019 ............408

iv

Government's Motion to Exclude Defense Expert
(Apr. 8, 2022, Doc. No. 70) ...........................................................424

Gov. Exhibit A, Dr. Michael R. Smith, Expert Report ..................................446

Gov. Exhibit B, Richmond Police Department General Order 1-2,
dated Feb. 11, 2019, and General Order 1-4, dated Feb. 13, 2018 ........457

Government's Response to Moore's Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 8, 2022, Doc. No. 71) ................471

## Volume II

Moore's Response to Motion to Exclude Defense Expert
(Apr. 22, 2022, Doc. No. 72) ........................................................................483

Def. Exhibit G, Virginia Department of Criminal Justice Services,
Report on Analysis of Traffic Stop Data Collected Under
Virginia's Community Policing Act, dated July 1, 2021 ......................499

Def. Exhibit H, Michael R. Smith & Matthew Petrocelli,
Racial Profiling? A Multivariate Analysis of Police
Traffic Stop Data, dated Mar. 2001 .........................................................572

Def. Exhibit I, An act to amend and re-enact section 46 of the Code of
Virginia, dated Mar. 20, 1924 ................................................................596

Def. Exhibit J, Joseph Ferrandino, Minority Threat Hypothesis and
NYPD Stop and Frisk Policy, dated 2015 ..............................................597

Def. Exhibit K, Sunghoon Roh & Matthew Robinson, A Geographic
Approach to Racial Profiling: The Microanalysis and Macroanalysis of
Racial Disparity in Traffic Stops, dated June 2009................................618

Def. Exhibit L, Prabhaker Mishra et al., Selection of Appropriate
Statistical Methods for Data Analysis, dated Sept. 2019 ......................671

Def. Exhibit M, Steven J. Briggs & Kelsey A. Keimig,
The Impact of Police Deployment on Racial Disparities in
Discretionary Searches, dated 2017 .......................................................676

Moore's Reply to Government's Response to Second Supplement to Motion to
Suppress Evidence and Statements (Apr. 23, 2022, Doc. No. 73) ...............696

Government's Motion to Exclude Defense Expert
(June 20, 2022, Doc. No. 82) .........................................................707

Gov. Exhibit A, Moore's Expert Notice, dated June 16, 2022 .....................714

Moore's Response to Motion to Exclude Second Defense Expert
(July 6, 2022, Doc. No. 86) ..........................................................716

Def. Exhibit N, Curriculum Vitae for Dr. Marvin T. Chiles .........................724

Def. Exhibit O, Virginia Freedom of Information Act Request,
dated Feb. 1, 2022 ....................................................................729

Def. Exhibit P, Moore's Ex Parte Motion to Enforce Subpoena
Duces Tecum, dated May 20, 2022 .......................................................731

Def. Exhibit Q, Letter Regarding Ex Parte Subpoena Duces Tecum,
dated May 27, 2022 ....................................................................741

Def. Exhibit R, Marvin T. Chiles, "Here We Go Again": Race and
Redevelopment in Downtown Richmond, Virginia,
1977–Present, dated 2021 ..............................................................747

Def. Exhibit S, Marvin T. Chiles, Richmond's urban crisis: Racial transition
during the Civil Rights Era, 1960–1977, dated May 2016 ...................774

Def. Exhibit T, Marvin T. Chiles, "Tough on Conduct:" Punitive
Leadership in Urban Public Schools, A Case Study of
*Angry Principal* Dr. Roy A. West, 1986–1991, dated 2020 .................903

Def. Exhibit U, Marvin T. Chiles, "A Period of Misunderstanding,"
dated 2021.............................................................................935

## Volume III

Def. Exhibit V, Louis Bernard Cei, Law Enforcement in Richmond:
A History of Police-Community Relations, 1737–1974,
dated June 1975 ......................................................................971

Government's Reply in Support of Motion to Exclude Defense Expert
(July 11, 2022, Doc. No. 89).........................................................1246

**Volume IV**

Transcript of Motion Hearing, Day I (July 18, 2022, Doc. No. 100) ................1252

    Testimony of Dr. Eli Coston:

        Direct Examination by Ms. Koenig ...........................................................1268
        Cross Examination by Mr. Gibbons............................................................1351

Transcript of Motion Hearing, Day II (July 19, 2022, Doc. No. 101) ...............1404

    Testimony of Dr. Michael Smith:

        Direct Examination by Mr. Gibbons ........................................................1415
        Cross Examination by Ms. Koenig ...........................................................1477

    Testimony of Keon Turner:

        Direct Examination by Mr. Siebert ...........................................................1510
        Cross Examination by Ms. Austin .............................................................1525

    Testimony of James McDonough:

        Direct Examination by Mr. Siebert ...........................................................1535
        Cross Examination by Ms. Austin .............................................................1562

    Testimony of Josh Valot:

        Direct Examination by Mr. Gibbons ........................................................1573
        Cross Examination by Ms. Koenig ...........................................................1582

    Testimony of Dr. Eli Coston, resumed:

        Direct Examination by Ms. Koenig ...........................................................1586
        Cross Examination by Mr. Gibbons............................................................1590

Order (July 19, 2022, Doc. No. 99) ...................................................1599

Moore's Notice of Expert Report and Curriculum Vitae
(Aug. 5, 2022, Doc. No. 102).......................................................1601

    Attachment 1, Report to the Eastern District Court of Virginia .................1603

Government's Renewed Motion to Exclude Defense Expert
(Aug. 22, 2022, Doc. No. 103).....................................................1615

    Gov. Exhibit A, City of Richmond Neighborhood Statistics
(1980 Census), dated Nov. 1985 .........................................1625

Moore's Response to Government's Renewed Motion to Exclude
Second Defense Expert (Sept. 9, 2022, Doc. No. 107)...............................1629

Government's Reply in Support of Renewed Motion to Exclude Defense Expert
(Sept. 16, 2022, Doc. No. 108) ...................................................1639

**Volume V**

Transcript of Motion Hearing, continued (Oct. 28, 2022, Doc. No. 110) ..........1644

    Testimony of Dr. Marvin Chiles:

        Direct Examination by Ms. Koenig ............................................................1650
        Cross Examination by Mr. Gibbons............................................................1720

Opinion (Nov. 13, 2023, Doc. No. 124) ...............................................................1781

Opinion (Feb. 12, 2024, Doc. No. 126) ................................................................1792

Final Order (Feb. 12, 2024, Doc. No. 127)............................................................1817

Government's Motion to Reconsider and Memorandum in Support
    (Feb. 16, 2024, Doc. No. 128)........................................................................1818

Moore's Opposition to Government's Motion to Reconsider
    the Court's Final Order (Feb. 26, 2024, Doc. No. 130)...............................1824

Government's Reply to Motion to Reconsider
    (Feb. 29, 2024, Doc. No. 131)........................................................................1834

Memorandum Order (Mar. 11, 2024, Doc. No. 132) ..........................................1840

Notice of Appeal (Apr. 8, 2024, Doc. No. 134) ..................................................1844

    Attachment 1, Certification for Appeal.........................................................1846

**Volume VI (Digital Media)**

Additional Government Exhibits to July 26, 2021, Motion Hearing

Gov. Exhibit 4.mp4, Body-Camera Footage, dated Dec. 5, 2020

Gov. Exhibit 5.mp4, Body-Camera Footage, dated Dec. 6, 2020

Gov. Exhibit 12.mp4, Body-Camera Footage, dated Dec. 6, 2020

Additional Defense Exhibits to July 26, 2021, Motion Hearing

Def. Exhibit U3.mp4, Body-Camera Footage, dated Dec. 5, 2020

Def. Exhibit U4.mp4, Body-Camera Footage, dated Dec. 5, 2020

Def. Exhibit V3.mp4, Body-Camera Footage, dated Dec. 5, 2020

These files were confirmed virus-free through virus scan by Trellix Endpoint Security.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                    plaintiff,

        versus                  3:21CR42

KEITH RODNEY MOORE,

                    defendant,


Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge


Motions hearing (continued)


October 28, 2022

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

**JA1644**

APPEARANCES


Shea Matthew Gibbons, Esq.

Erik Sean Siebert, Esq.

Assistant United States Attorneys

for the United States



Laura Jill Koenig, Esq.

Amy L. Austin, Esq.

Assistant Public Defenders

for the defendant

The defendant in his own proper person


**JA1645**

1          THE CLERK:  Case number 3:21 CR 42.

2          The United States versus Keith Rodney Moore.

3          Mr. Shea Gibbons, Mr. Erik Siebert represent the

4     United States.

5          Ms Laura Koenig and Ms Amy Austin represent the

6     defendant.

7          Are counsel ready to proceed?

8          MR. GIBBONS:  United States is ready to proceed.

9          MS KOENIG:  Defense is ready, Your Honor.

10         THE COURT:  Good morning.

11         Say something in the microphone.

12         MR. GIBBONS:  Yes, Your Honor.

13         THE COURT:  Making sure both my speakers are

14     working.

15         THE CLERK:  They came and fixed it.

16         THE COURT:  We are here today for the continuation

17     of the case hearing on the motion to suppress in United

18     States versus Keith Rodney Moore.

19         Good afternoon Mr. Siebert, Mr. Gibbons, Ms

20     Koenig, and Ms Austin, and Mr. Moore.

21         Good to see all of you today.  I think where we

22     are is that you are prepared to call your next witness.

23         MS KOENIG:  I am, Your Honor.

24         THE COURT:  So there is a motion in limine or

25     Daubert motion on Dr. Chiles.  And the essential

1    element of the motion is that it is not very helpful to

2    The Court because Dr. Chiles is going to testify about

3    historic patterns in Richmond.  So what I will be

4    looking for -- and there is something to be said for

5    that position -- and one of the things that we are

6    looking for today would be evidence that he ties that

7    together.  I think in order to rule on the Daubert

8    motion I pretty much have to hear the testimony.  So I

9    will hear that and see what Dr. Chiles has to say and

10   what you have to say about tieing that into the present

11   situation in Richmond.

12       MS KOENIG:  Thank you, Your Honor.

13       Before we start with that with Dr. Chiles, we

14   have, each side has a hand full of a couple of

15   exhibits.

16       THE COURT:  Hand full of a couple exhibits.

17       MS KOENIG:  Hand full.  I corrected myself.  A

18   couple, not really a hand full.

19       THE COURT:  I'm sorry to hear your child is ill.

20       MS KOENIG:  He is not feeling great, so I don't

21   want to pass anything on to anybody else.

22       The Government has Government's six and seven that

23   should be before The Court.

24       THE COURT:  Okay.  So what we have here are

25   Government's exhibits six and seven.  I have actually

1    five, six and seven here.  Five looks like a real old

2    book of some kind.

3        MS KOENIG:  I understand that the Government will

4    be trying to introduce exhibit five through Dr. Chiles

5    on cross examination.

6        THE COURT:  All right.  Are six and seven coming

7    in without objection?

8        MS KOENIG:  Correct.

9        THE COURT:  Okay.  Mr. Gibbons, why don't you tell

10    me what -- Mr. Siebert, either one -- what six and

11    seven are here.

12        MR. GIBBONS:  Your Honor, these are maps that are

13    similar to those that we inserted into our motion to

14    exclude, our second motion to exclude Dr. Chiles.

15    These are maps that come from an open source web site

16    that is run by Lexis Nexis, and really what this is,

17    just, this is all of the homicides and manslaughters in

18    the City of Richmond.

19        THE COURT:  Okay.

20        MR. GIBBONS:  There is -- you can see the

21    precincts kind of outlined.  It is A little difficult

22    to see.  You will see better on the defense exhibits

23    that shows just the precincts.

24        Government's exhibit six, the dates for this are

25    January 1st, 2018.

1          THE COURT:  Through when?

2          MS KOENIG:  12/6/20, the day after the stop at

3   issue.

4          THE COURT:  Okay.

5          MR. GIBBONS:  And Government's exhibit seven is

6   1/1/99, 1999.  That is the first year for which data is

7   available from RPD.

8          THE COURT:  Okay.

9          MR. GIBBONS:  To 12/6/20 as well.

10          THE COURT:  Okay.

11          All right.  And what do these black dots show on

12   here?

13          MR. GIBBONS:  That is homicide or manslaughter.

14          THE COURT:  Okay.  Okay.

15          All right.  Thank you.

16          MR. GIBBONS:  That is all I have, Your Honor.

17          Thank you.

18          MS KOENIG:  Then, Your Honor, the parties are also

19   stipulating to defense exhibit 20, which should be

20   before Your Honor, which is the same underlayment of

21   the map that the Government has introduced in exhibit

22   six and seven, but without the dots.  It is labeled

23   with the various precinct numbers, three, four, one and

24   two.  Clockwise order.

25          THE COURT:  All right.

                     Chiles - direct              **7**

 1        So, apparently there is no objection to exhibit

 2   20.

 3        MR. GIBBONS:  No, Your Honor.

 4        THE COURT:  All right.

 5        So I will admit then exhibits, Government's

 6   exhibit six and seven and defense exhibit 20.  And then

 7   I have here also defendant's exhibit 19 which I guess

 8   will come in through the professor.

 9        MS KOENIG:  It is, Your Honor.

10        THE COURT:  Okay.  All right.

11        Let's get the show on the road.

12        MS KOENIG:  At this point I am ready to call

13   Dr. Chiles.

14        THE COURT:  All right.

15        THE COURT:  Come on up, Dr. Chiles.

16                      MARVIN CHILES

17              AFFIRMED AND TESTIFIED AS FOLLOWS:

18                    DIRECT EXAMINATION

19   BY MS KOENIG:

20   Q    I do want to confirm that The Court still has the

21   binder of defendant's exhibit that we had provided to

22   The Court at the last hearing or last set of hearings.

23   That could go one through 18, and then have some copies

24   of previously admitted exhibits.

25        THE COURT:  All right.  I don't have those with me

Chiles - direct                                      **8**

1   but we can those.  I don't have it here with me, but we

2   will get him started while she is getting those.

3         MS KOENIG:  Absolutely, Your Honor.

4         THE COURT:  We can move ahead.

5   BY MS KOENIG:

6   Q    Can you state your name for the record, please?

7   A    Marvin Chiles.

8   Q    You can straighten that out.  It should catch you.

9   You are good.

10  A    Marvin Chile's.

11  Q    Very good.  Speak clearly.  Good to go?

12  A    Yes.

13  Q    Dr. Chiles, can you spell your name for the

14  record, please?

15  A    M-A-R-V-I-N   C-H-I-L-E-S.

16  Q    Dr. Chiles, do you hold a series of degrees?

17  A    Yes.

18  Q    Tell us about those.

19  A    I have a bachelors, a masters, and a PhD.

20  Q    The PhD is what specifically in.

21  A    African-American history.

22  Q    And where odd you get that from.?

23  A    University of Georgia.

24  Q    When?

25  A    2020.

**JA1651**

Chiles - direct                                              **9**

```
 1    Q    What is your masters in?

 2    A    American history.

 3    Q    From where.

 4    A    James Madison.

 5    Q    When did you will get that?

 6    A    2016.

 7    Q    What is your current -- what do you do --

 8         THE COURT:  Let's go the whole way.  Where did you

 9   get your un-graduate?

10         THE WITNESS:  Liberty University.

11         THE COURT:  Liberty University.  Okay.

12   BY MS KOENIG:

13    Q    When did get that?

14    A    2014.

15         THE COURT:  And your major?

16         THE WITNESS:  Social science educations.

17         THE COURT:  Okay.  Great.  Thank you.

18   BY MS KOENIG:

19    Q    What do you to for work now.

20    A    Assistant Professor at Old Dominion University.

21    Q    Is that a tenure track position?

22    A    Yes.

23    Q    What are you an assistant professor in?

24    A    African-American history.

25    Q    Do you have a speciality research area?
```

**JA1652**

```
 1   A     Yes.  Race, politics in the 20th century, but

 2   specifically in Richmond.  So I focus on that now.

 3   Q     How long have you been studying history of race

 4   and politics in Richmond?

 5   A     Since 2014.

 6   Q     Have you published articles that require

 7   specialized knowledge on history of race and politics

 8   in Richmond?

 9   A     Absolutely.

10   Q     Are some of those articles listed in your CV?

11   A     Yes.

12         MS KOENIG:  Your Honor, we have submitted this as

13   a different exhibit nine, Dr. Chiles' CV.

14         THE COURT:  Okay.

15         MS KOENIG:  Move to admit it at this point.

16         THE COURT:  Well, all right.

17   BY MS KOENIG:

18   Q     Have you given presentations that required

19   specialized knowledge of race and history in Richmond?

20   A     Yes.

21   Q     Have you also taught courses at ODU that involve

22   the history of race and politics in Richmond?

23   A     Yes.

24   Q     Do you hold position of peer-reviewer of articles

25   that others published that require use of your
```

1    specialized knowledge of the history race and politics

2    in Richmond?

3    A    Yes.

4         MS KOENIG:  We move to qualify Dr. Chiles as an

5    expert in the area of history race and politics in

6    Richmond, Your Honor.

7         THE COURT:  All right.

8         MR. GIBBONS:  No objection, Your Honor.

9    BY MS KOENIG:

10   Q    Dr. Chiles, I want to show you -- and Ms Tuck, if

11   I could have access to pulling an exhibit up on the

12   screen, please.  And thank you.

13        THE COURT:  You are doing what?

14   Q    I just want to pull up an exhibit up on the screen

15   that has already been admitted.

16        I guess while we are waiting for that to be pulled

17   up, if you look in that white exhibit book in front of

18   you and flip to the tab that says R 2.  It is going to

19   be towards the very end?

20   A    Oh.

21        MS KOENIG:  Your Honor, this has already been

22   admitted at an earlier hearing in this case.  It was

23   previously identified as the racial dot map that the

24   University of Virginia's Weldon Cooper School for

25   Public Service generated using census data from 2010.

1          THE COURT:  Which exhibit is it?

2          MS KOENIG:  R 2, Your Honor, towards the end of

3     the exhibit book.  Here it is on the screen now.

4          THE COURT:  R 2.

5          MR. SIEBERT:  It is in the exhibit book, Your

6     Honor.

7          THE COURT:  What do you mean R 2?

8          MR. SIEBERT:  One through 18 is the beginning, and

9     then we have --

10         THE COURT:  Oh, okay.

11         Okay, what is Dr. Chiles' resume?

12         MS KOENIG:  It is defendant's exhibit nine, Your

13    Honor.

14         THE COURT:  Okay.  Thank you.  Go ahead.

15    BY MS KOENIG:

16    Q    Dr. Chiles, we can see blue dots in R 2 reflects

17    white people, right?

18    A    Yes.

19    Q    And we can see that the green dots in exhibit R 2

20    reflect black people, right?

21    A    Yes.

22    Q    I want to talk with you now about the history of

23    how those dots got to be where they are.

24         Let's start with where black persons lived in

25    comparison with white persons before slavery ended.

1    A    Before slavery ended, so the majority of free

2    black people in Richmond lived in what is now Jackson

3    Ward.  And also the Shockoe Slip area.  So those are

4    the two places that they lived.

5         The Jackson Ward area was seen as the outskirts,

6    or was the outskirts of Richmond just because the City

7    size was so small geographically.  And, yeah, that is

8    where they lived.

9         White people lived pretty much wherever they

10   wanted, but by and large working class, middle class

11   white people lived in the near west end or what is

12   today the near west end, Oregon Hill area, Carillon,

13   area.  And, yeah, right.  Live in the southern part of

14   Richmond, so, yes, they pretty much lived segregated

15   lives before slavery ended.

16        THE COURT:  And in those days the southern side of

17   the river was part of the City.

18        THE WITNESS:  No, no, not below the river towards

19   Manchester.  That was a different place.  That got

20   annexed later on.  But the southern end going westward.

21   So near the northern part where nowadays Jackson Ward

22   is, out going kind of east is where black people lived.

23   They were, they lived at, they lived in those places

24   primarily because of insurrection laws that had been

25   passed in the early 18 hundreds, really in response to

USCA4 Appeal: 24-4201    Doc: 22-5    Filed: 09/04/2024    Pg: 28 of 217

1    Gabriel's Rebellion.  And so whites were afraid, many

2    of them were afraid if they associated with free blacks

3    in any way, and slaves, in any that suggested that they

4    were, that they were warm to each other, that I could

5    be accused of helping to insight insurrection.

6         So, white and blacks primarily lived in separate

7    places in Richmond prior to slavery ending.

8    Q    Specifically had Virginia and the City of Richmond

9    passed laws in ordinances to order that?

10   A    Yes.

11   Q    Can you tell us about what the common said law in

12   1806?

13   A    Yes.  So they passed, they passed laws to, one

14   organize police forces, or what do you call them, not

15   necessarily, law enforcement in general.  That was to

16   surveil free slaves and slaves and to just insure that

17   they did not travel throughout the areas without

18   supervision.

19        And, yeah, the Commonwealth of Virginia did.  And

20   Richmond itself as a city, they did it later on.  But

21   the point was to make sure that black people couldn't

22   roam around free without supervision of whites.

23   Q    Did the Richmond City council also pass an

24   ordinance concerning Negroes?

25   A    Yes.

1   Q    Is that what you were referring to --

2   A    Yes.

3   Q    -- when you said that you were, they were barred

4   from moving freely?

5   A    Yes.

6   Q    After the civil war ended in 1865 what started

7   happening in the City of Richmond?

8   A    So immediately after, for one, there was a bumper

9   crop of free people, obviously slavery no longer

10  exists, so local police in Richmond began to crack down

11  on free black mobility.  So they just started arresting

12  black people indiscriminately, throwing them in what

13  was then called Negro Bullpens, which were just open

14  air cells.  People could like walk by and throw stuff

15  at them and taunt them.  And the point was to kind of

16  let former slaves know, hey, just because you are free

17  legally, you are not free actually.

18       It got to the point to where blacks, blacks in

19  Richmond wrote letters to President Andrew Johnson

20  actually asking for him to intervene.  And surprisingly

21  he did.  And kind of ended that practice of just

22  indiscriminately incarcerating free black people for

23  just things like not moving off of the sidewalk when

24  white walk by or not referring to a white person by,

25  you know, Mr. or Mrs. and things like that.

1       So, yes, that happened in the immediate aftermath

2    of the civil war in Richmond.  So, yes.  Hope that

3    makes sense.

4    Q    Did the City also start annexing territory?

5    A    Yes.  Yes.

6    Q    Before we get too far, I want to who you what is

7    marked as defendant's exhibit 19.  Do you recognize

8    what is in defendant's exhibit 19?

9    A    Yes.

10   Q    Can you tell us briefly what this is?

11   A    Yes.

12       So, sorry, this is a map of Richmond as a City and

13   how it grows going into 20th century, and annexations

14   they used to grow.

15   Q    Did you personally prepare this map?

16   A    No.

17   Q    Have you reviewed it for its accuracy in terms of

18   the knowledge that you have about the annexation?

19   A    Yes.  Every map I have seen of Richmond, all of

20   the annexation maps all look like this.

21   Q    So is it a fair and accurate representation of

22   what the various annexations looked like over time in

23   Richmond.

24   A    Yes.

25       MR. SIEBERT:  I move to admit defendant's exhibit

USCA4 Appeal: 24-4201    Doc: 22-5    Filed: 09/04/2024    Pg: 31 of 217

```
 1   19.

 2        MR. GIBBONS:  No objection.

 3        THE COURT:  Admitted.

 4   BY MS KOENIG:

 5   Q   So let's talk about annex.  Where did the City

 6   start annexing territory initially?

 7   A    Initially, just surrounding -- sorry -- so

 8   initially just surrounding the City.  So right and

 9   left, right, and left and right, east and west, rather.

10   And then they began to expand and further in a circle

11   in essence around the City.  That is because the

12   population continued to grow after the civil war.  More

13   people are moving to Richmond, black and white.  So,

14   yes, the annexing s much territory as possible just to

15   accommodate for the population growth.

16   Q    After the civil war did the City of Richmond and

17   the State of Virginia continue to enact laws to enforce

18   racial segregation and say where black people could

19   live or not live?

20   A    Yes.  So that's one of the biggest issues where

21   the City is growing at that time period was that people

22   were concerned with the races mixing in any way that

23   could suggest equality.  And also it was seen as

24   improper for cities to not have more organized growth.

25        So by the early 20th century the Commonwealth of
```

**JA1660**

1    Virginia, as well as the City -- and it wasn't just

2    Richmond in Virginia, it was other places as well --

3    began to pass laws and ordinances to restrict the races

4    from interacting in certain spaces.  So where they

5    could live, where they could travel, where they could

6    go.  If they did have to share space how they could

7    share that space.  So blacks would have this side,

8    whites that would have this side, et cetera, et cetera.

9    Q    In 1911 -- well before the State and the City

10   started segregating residences more formally, was there

11   a segregation of transits?

12   A    Yes.  Segregation of transit, it was more, it was

13   more, it was more so allowed private carriers or

14   carriers that provided public services to do it.  In --

15   by 1904 they allowed them to do.  So they say, hey, we

16   are encouraging you to begin to segregate because this

17   is something that other states are doing, other

18   localities are doing.  And a lot of push back was, a

19   lot of push back with respect from whites and blacks,

20   mostly black people because the segregation would mean

21   they would get worse services.

22        But by 1906 it was mandatory.  So if you provided

23   rail cars or street car access you would have to have

24   it on a segregated basis.  So separate cars.  And then

25   different cars and tracks would go to different sides

1    of town.  To just kind of reinforce that, hey, although

2    slavery is no longer here, segregation will be here to

3    replace it.

4    Q    So let's talk about where in the City of Richmond

5    that played out.  Where did the black cars for transit

6    go in the City of Richmond?

7    A    Mainly down town.  Down town to the Shockoe Slip

8    area because that is where black people lived.  Yes.

9    So mainly down town.  What we now see as downtown.  And

10   going kind of towards the Jackson Ward area.  Because

11   that is where black people lived, and they worked in

12   the interior in the core of the City.

13       And the white cars would go out to what is now

14   like the far west end, not as far as it is today, but

15   the furthest that was west end.  Because that was a

16   newly expanded suburban area.  Same thing with parts of

17   north side.  Up near the Ginter Park area which were

18   numerous suburban street car, or considered to be

19   street car type of areas.  So, yes, that is where they

20   would go.

21   Q    Were blacks allowed to ride on white cars?

22   A    Only if they worked for white families.  Or if

23   they had like special passes of some sort.  So hey, I

24   am going to go to to this neighborhood or this business

25   on this side of town to go work for this firm or this

1    family.  Usually the maids of wealthy white people

2    would get a pass.

3         Also, sometimes workers who would go to work for

4    white businesses in other parts of town, like

5    construction, and things like that.  But by and large

6    no, for leisure you are not getting on the white car to

7    go out to the west end.  That is just not going to

8    happen.

9    Q    By 1911 was there an official segregation law on

10   the books that then officially segregated residential

11   areas in the City of Richmond?

12   A    Yes.

13   Q    Tell us about that.

14   A    So that law came about as a result of middle class

15   black people, one in particular, simply buying property

16   in white neighborhoods.  And before some black people

17   would buy property in white neighborhoods and rent them

18   out to white people.  So no harm, no foul, right.

19   However, by the time we get to the the 1910s some,

20   thinking of one in particular, bought property in white

21   neighborhoods, and they began to put black renters

22   there.

23        And then also that same person tried to establish

24   a business in a white neighborhood.  And there was a

25   push back, John Mitchell is who I am referring to, the

**JA1663**

1    newspaper editor, and as a result of that the

2    segregation ordinance, City council brought that into

3    play and eventually enacted it.  And the goal was to

4    make sure that blacks and whites resided exclusively in

5    neighborhoods that were already, already a majority of

6    that race, or pre-determined to be a majority of that

7    race.  So this neighborhood, for instance, was majority

8    white for the last 40 years.  No black person could

9    not -- could not live there.

10        Same thing for whites.  Excuse me.  Whites going

11   into black neighborhoods.  If this neighborhood was

12   black in the last 40 or 50 years whites couldn't just

13   go and live there.  They could buy property there.

14   That they could not stop, City Council could not stop,

15   but they could not live there.

16   Q    Was that law challenged as unconstitutional?

17   A    Yes.

18   Q    Was that in the City, Hopkins versus the City of

19   Richmond case?

20   A    Yes.

21   Q    Tell us that case.

22   A    So it was a black woman who was, a black woman and

23   a white man who were arrested for violating that rule

24   because they shared space in the same house in a white

25   part of town.  I suspect that they might have been

1    lovers, but they claim they were just room mates.

2    Needless to say a black attorney and a white attorney

3    teamed up to challenge that law on the grounds that it

4    violated the 14th amendment.

5          And they lost.  And because they lost that case --

6    and then they lost not just here locally, they also,

7    when they appealed, and because of that the NAACP got

8    involved, which was kind of an upstart organization at

9    the time.  And when they did get involved eventually

10   they were able to overturn how the segregation in

11   Richmond from a legal standpoint by late 1920s early

12   1930s.

13   Q    Did the Supreme Court specifically outlaw the

14   practice that Virginia and Richmond had enacted in

15   Buchanan versus Royal in 1917?

16   A    Yes.

17   Q    But did that stop Richmond and Virginia from

18   trying to continue segregating residences?

19   A    No, not at all.

20   Q    You talked about 1920s, 1930s.  Is that the case

21   that we are talk about, Benjamin Deem's case?

22   A    Yes.

23         So Benjamin Deems was, I believe, an insurance

24   agent.  Don't quote me on that.  But he was hired,

25   excuse me, wasn't hired, he was approached by attorneys

1    who tried to overturn segregation originally with

2    Hopkins versus Richmond.  They told him to buy a home

3    in a white neighborhood.  And then to occupy it.  That

4    is what he did.  Of course, he was slapped, not

5    slapped, but arrested, fined, and that is when he

6    challenged it in court and eventually he won.  So, yes,

7    it was challenged by Benjamin Deems who, again, did it

8    on purpose.  The goal was to try to get the law taken

9    off the books.

10   Q    Have you talked about these -- have you written

11   about these events?

12   A    Yes.

13   Q    Specifically, did you write about these events in

14   your article called Down Where the South Begins?

15   A    Yes.

16   Q    Flip in the exhibit book to defendant's exhibit

17   ten, which is going to be halfway through.

18   A    Got it.

19   Q    Do you recognize what is in defendant's exhibits

20   ten as an article Down Where the South Begins?

21   A    Yes.

22        MR. SIEBERT:  Judge, I move to admit defendant's

23   exhibit ten.

24        MR. GIBBONS:  No objection; however, we have an

25   ongoing objection to relevance.  We hope we get to the

**JA1666**

1    recent history quickly, Your Honor.

2          THE COURT:  Well, I share your hope.

3    BY MS KOENIG:

4    Q    What other steps did the City of Richmond, aside

5    from laws and ordinances, take to enforce residential

6    segregation in the 1930s 1940s?

7    A    Yes, a few things.  It was for one, a newer

8    emphasis on city planning.  So The Greater Richmond

9    Plan and later would be the master plan, these were

10   City plans that were adopted by the City council, then

11   eventually later the Housing Authority, Richmond

12   Housing Authority, which would come about in the 1930s.

13   And their goal was to better organize the City of

14   Richmond like other cities throughout the country.  So

15   they did this through two things.  One of the main

16   objectives of that was to remove black people from the

17   core of the City.  Remove them from downtown area and

18   reserve that space for business interests, and also

19   wealthy white occupancy.

20   Q    Where did black families get removed to?

21   A    So, yeah, by the World War II era, that would be

22   the east end, so Housing Project Development.  That

23   started originally in the 1930s, at lease the idea of

24   it started 1930s.  And it got off the ground by the

25   1940s.  But the Federal Government coming in, and also

1    providing funds and the Richmond Housing Authority,

2    would be the ones who were organizing it on behalf of

3    the City.  And yeah, they began to house working class

4    black families, working with under class black families

5    as a response, as a direct result of urban renewal,

6    right. so part of removing people from the core of the

7    City, poor people from the core of the City.  Something

8    would have to replace them.  Of course it would be

9    business, of course it would be wealthy white

10   occupancy.  Another thing would be interstates and

11   highways, these are pathways that could connect middle

12   class people who lived further out in the county or

13   moving further out in the counties.  Deprived them of

14   access to downtown areas.

15   Q    So black are being moved to the east end of the

16   City.

17   A    Yes.

18   Q    Whites moved to the west end and suburbs?

19   A    Well, so, they are not being moved per se they are

20   being encouraged to go elsewhere, primarily the

21   suburbs, through plans like block busting.

22   Q    Let's talk about what that, how they were being

23   encouraged.  Were there advertisements that were

24   helpful in that process?

25   A    Yes.  So newspapers in Richmond, only a few

1    newspapers.  There was one major black newspaper, and

2    two major white newspaper.  They would print different

3    housing advertisements based upon the neighborhoods.

4    So white neighborhoods, white -- vacant available homes

5    in white neighborhoods would be printed in those

6    newspapers.  And the other would be posted in black

7    newspapers.

8    Q    At the time Richmond had a black newspaper and had

9    some white newspapers, right?

10   A    Yes.

11   Q    So advertisements for white houses in white

12   neighborhoods were posted only in the white newspaper?

13   A    Yes.

14   Q    And the reverse was for black homes in black

15   neighborhoods posted in the black newspaper?

16   A    Yes.

17        I'm sorry.  Go ahead.

18   Q    That is okay.

19        Was there a payment, like real estate agents

20   compensated to do things like that?

21   A    Yes.  So black real estate agents actually worked

22   with white agents to do things like this, for instance.

23   If an area opened up, or let's say a group of real

24   estate guys, we are talking lenders, we are talking

25   people on the ground, they want to fill up parts of

1    Chesterfield and Henrico which were filling up with
2    suburban housing and suburban residency.  They would
3    try to encourage whites to relocate out of the City.
4    So they, white real estate agents would pay black ones
5    to send black families in white neighborhoods they
6    wanted to transition.  That is what block busting is.
7    So when they sent them there white people would be
8    alarmed.  Oh my God, blacks are moving in.  And when
9    that happened for sale signs would go up, and whites
10   would leave.  And many of them would relocate to
11   Chesterfield and an Henrico, Chesterfield and Henrico
12   primarily.  Some would move into south side of, the
13   south side of Richmond.  But most would go directly to
14   the suburban counties.  And filling those vacant homes
15   in those formally white neighborhoods would be
16   middle -- first, middle class black families and
17   eventually working class black families.
18        THE COURT:  Let's see if I have got this straight.
19        The real estate agents would cooperate with each
20   other to sell houses in predominantly white
21   neighborhoods to black people hoping that the white
22   people would move out?
23        THE WITNESS:  Yes.
24        THE COURT:  And that was a way of developing the
25   suburbs.  And then I guess they also made money by

1  selling the houses in white neighborhoods to black

2  people?

3         THE WITNESS:  Yes.  It was seen as everyone wins.

4  Right.

5         THE COURT:  Yes.

6  BY MS KOENIG:

7  Q     Did the Federal Government also participate

8  through process of red lining?

9  A     Yes.

10 Q     Tell us briefly what red lining is.

11 A     Briefly the Federal Housing Authority, which was

12 part of, which is a part of the Federal Government, it

13 was a department created by the Federal Government to

14 bring the housing industry back in, and one of the ways

15 was to provide insurance for mortgage loans.

16        THE COURT:  To recover from the depression?

17        THE WITNESS:  Yes.

18        THE COURT:  And then the arrival of people back

19 from World War II.

20        THE WITNESS:  Yes.  Yes.

21        So one of the ways that the FHA would insure homes

22 was that they needed, they needed to know which

23 neighborhoods or what area of a residential area were

24 safer to insure and those that were not.  So they

25 worked with local housing authorities to determine

1   which neighborhoods were safe to invest in, which were

2   ones were not.  And there is a box written on this,

3   actually, and other historians that have talked about

4   it.  But in urban areas throughout the south, Richmond

5   being one of them, every single black neighborhood was

6   listed as do not invest in, so don't.  So mortgage

7   activity in those neighborhoods were next to nil.

8           Whereas white neighborhoods and mixed, what would

9   be considered then would be mixed neighborhoods, so

10  like 20 percent black people lived there and it was

11  mostly white folks would get the majority of the

12  mortgage activity.

13          THE COURT:  They would get mortgage insurance --

14          THE WITNESS:  Yes.

15          THE COURT:  -- which allowed the lenders --

16          THE WITNESS:  Yes.

17          THE COURT:  -- to make the loans for that area.

18          THE WITNESS:  Yes.

19          THE COURT:  Otherwise they wouldn't take the risk

20  in an area without mortgage insurance.

21          THE WITNESS:  Yes.

22          THE COURT:  You said something earlier that I

23  chronologically didn't grasp.  You said that part of

24  the removal of African-Americans from white, from the

25  then predominantly African-American neighborhoods,

1    housing projects, was done by the location of highways.

2    I had understood that the bulk of that, at least in

3    Richmond, occurred when they ran interstate 95 through

4    the heart of the African-American community.

5         THE WITNESS:  That was one of them.

6         THE COURT:  Which was later then seemed like you

7    had chronologically placed that in earlier testimony.

8         THE WITNESS:  Yeah, so when people talk about,

9    what is it, interstate 95 and things like that in

10   Richmond, that is kind of the poster child for black

11   removal.

12        THE COURT:  What were the earlier roads?

13        THE WITNESS:  Earlier roads?  I could not tell you

14   the earlier roads.  I do know that the Richmond, that

15   the Richmond Housing Authority worked with the Federal

16   Government in 1930s to try to get blacks out of the

17   core of the City.  So it wasn't necessarily the roads

18   were the number one thing.  It was thee needs to be

19   more, needs to be more segregation in the City to

20   protect; one, the core of the City; and also to

21   maintain the racial integ -- it was called the racial

22   integrity of the City tie.  And so --

23        THE COURT:  What were the buildings that went up?

24   Tell me what went up in Richmond that occurred after

25   blacks folks were sort of herded into housing projects.

1    Are you talking about Thalhimers, Miller and Rhoads, or

2    what are you talking -- what was it?  I haven't -- I am

3    pretty familiar with Richmond.

4         THE WITNESS:  Right.

5         THE COURT:  And I am having trouble figuring out

6    for myself what it was that they built when they

7    displaced all the African-Americans.

8         THE WITNESS:  Yeah.  For some places it was roads,

9    others -- well, so, let's say downtown expressway, that

10   was one.  I 95 --

11        THE COURT:  That didn't happen until the '70s.

12        THE WITNESS:  Sorry.  Late '60s, early '70s.

13        THE COURT:  It just opened up when I moved here.

14        THE WITNESS:  Right.

15        And also, I mean, gosh, I could not tell you the

16   name of the buildings that were put up in place of

17   blacks being moved out of the core of the City, but the

18   fact is they were.  The goal was to open up the

19   downtown area to -- for better organization, better

20   business, organization of business, business buildings

21   being built.

22        THE COURT:  All right.

23        So, again you are kind of losing me here.  Well,

24   like, take for instance where the -- I mean, Jackson

25   Ward continues to be a neighborhood.

Chiles - direct                    32

```
 1          THE WITNESS:  Yes.

 2          Smaller than it was, but yes.

 3          THE COURT:  So where did -- what part of it went

 4     away?  Is it like where the coliseum is and all that?

 5          THE WITNESS:  Yes.  That didn't come into play

 6     until '68 I believe when that was built.  It was

 7     starting early '60s.  But, yes, a lot of that was taken

 8     away because of the highways in the 1950s.  And slum

 9     clearance.  But, yes, again, the agenda was to remove

10     poor blacks from the core of the City.

11          THE COURT:  All right.  Go ahead.

12     BY MS KOENIG:

13     Q    That's okay.

14          And are we also talking about the Shockoe Slip

15     area that is now fully a business district?

16     A    Yes.

17     Q    And that entire district was vacated over the

18     decades?

19     A    Yes.

20          THE COURT:  I mean I used to work down there.  All

21     that stuff goes back to the civil war.

22          THE WITNESS:  Right.

23          THE COURT:  So where did people live down there?

24          THE WITNESS:  Where?  They lived right along the

25     river down there.  That is where they lived.  So like
```

1   in shanties, not like organized neighborhoods.

2          THE COURT:  Those houses are no longer there.

3          THE WITNESS:  Absolutely not.

4          THE COURT:  As near as I cana tell there is not --

5   no houses were built to replace them.

6          THE WITNESS:  Not at all.

7          THE COURT:  Okay.

8   BY MS KOENIG:

9   Q    So, after World War II what -- was there a master

10  plan that was created?  Mentioned that earlier and I

11  want to talk more about that with you now.

12  A    Yes.  So the master plan again was to, the master

13  plan, it was a plan created by, I forgot the City

14  Planner's name, but went and shopped it around to

15  various cities.

16  Q    In your report you referred to him as Harlan

17  Bartholomew.

18  A    That is the guy's name.  And so shopped it around.

19  Richmond was one of the ones that adopted it.  So the

20  plan was to increase urban real estate value, and to

21  again maintain the, quote unquote, integrity of the

22  City through it's City core.

23         And the best way was to maintain racial

24  segregation and residency.  And so the plan was how do

25  you begin to get people from the core of the City out

1    to the outskirts of the City, because by the time

2    that that master pan was adopted Jackson Ward was no

3    longer on the outside of the City, it was center of

4    City now.  So there needs to be a way to get people

5    from the downtown area, or near the downtown area and

6    get them closer to the periphery of the City.  So that

7    is where essentially you get the emphasis on, okay,

8    let's get poor black people out to the east end,

9    because that was a largely un -- I mean super under

10   developed area at that time.

11   Q    Was the goal to merge Richmond with Henrico and

12   Chesterfield County?

13   A    Yes.  Sort of create a larger metropolitan area.

14   So cities throughout the post World War II had combined

15   City and suburb into one locality; Chicago, Cook

16   County, Davidson, you name it.  And so the best -- the

17   goal was to have your, what Lassiter calls island

18   suburbs pay for the urban core.  So you have suburban

19   rings on the outskirts, outskirts, like further out and

20   as you get closer to the City you have organized

21   patterns of segregated neighborhoods and black

22   neighborhoods and white neighborhoods.  But the further

23   out you go around suburbs, that is where the wealthy

24   people would live, and then some in City core as well.

25   And they would basically pay for the metropolitan

1    growth, the need for new roads, schools, you name it.

2    But the only way that could happen is if you had more

3    racial segregation, because that maintained

4    neighborhood integrity.  Because the neighborhoods that

5    were all white had higher property values than those

6    that did not because those were the ones that FHA and

7    other entities would invest, would invest not just

8    mortgages but mortgage insurance and they were

9    considered to be better risk for lending.

10        THE COURT:  Isn't it also a fact that when you are

11   doing planning one of the things you try to plan for

12   are areas that don't require public services.  So, for

13   instance, that is why you have industrial parks.

14        THE WITNESS:  Yes.

15        THE COURT:  Industrial parks are places that

16   provide jobs, and places where people live, that have

17   highly valued property, pay a lot of property tax, but

18   does not demand services other than really water and

19   sewer, sewage for the plants.

20        THE WITNESS:  Yes.

21        THE COURT:  And that is far more productive in

22   paying for the way the City works than having

23   residential neighborhoods.  Residential neighborhoods,

24   whether black, white, or anything else, demand immense

25   numbers of services.  Schools, for instance.

 1          THE WITNESS:  Yes.

 2          THE COURT:  So I don't see -- I don't get what you

 3   are saying about how maintaining white neighborhoods

 4   allowed the expansion of the City.  I think, as I read

 5   it one of the main errors of the 1970 zero annexation

 6   of the City is the City took predominantly residential

 7   areas and had to provide services to them without a

 8   concomitant expansion of the non-service demanding tax

 9   base.

10          THE WITNESS:  That is correct.

11          THE COURT:  So they did it to get white voters.

12   But it backfired on them.

13          THE WITNESS:  Yes.  That is two different things.

14          When I say master plan, when I talk about master

15   plan from the '40s, '40s going into the '50s, all that

16   stuff was baked into the project.  It wasn't

17   exclusively, hey, let's all focus on race.  Race was

18   part of the grand plan to create --

19          THE COURT:  Richmond tried to remain segregated as

20   long as it could.

21          THE WITNESS:  Yes.

22          THE COURT:  When I came here in '76 it was a

23   highly, highly segregated City.  And pretty much

24   remained so.  But, obviously it was supported by the

25   Government for many years.

1        Go ahead.

2    BY MS KOENIG:

3    Q    So what the matter plan was an idea to merge

4    Richmond and Henrico and Chesterfield?

5    A    Yes.

6    Q    In part to maintain a white majority by making the

7    City white population larger?

8    A    Yes.  A hundred percent.

9    Q    When talking about moving from one location to

10   another, was it the idea was that a lot of folks, white

11   folks, that lived in the suburbs would come work in the

12   City and then travel back to where they lived at the

13   end of the day?

14   A    Yes, yes.

15        THE COURT:  When you say merged into one city --

16        THE WITNESS:  Yes.

17        THE COURT:  -- do you mean actually do away with

18   the --

19        THE WITNESS:  Jurisdictional boundaries, yes.

20        THE COURT:  So it would be like what they did with

21   the Charlotte.

22        THE WITNESS:  Mecklenberg.  Absolutely.

23        THE COURT:  But, so the idea was that eventually

24   most or all of Henrico, and most or all of northern

25   Chesterfield would become part of the City of Richmond.

1      THE WITNESS:  Yes, absolutely.  Richmond tried,

2   their first attempt to do that was with Henrico County

3   in 1960s, I want to say 1961, 1962.  I could be wrong

4   on the years.  But they attempted a merger; however,

5   Henrico County voters by and large voted against it.

6   And ever since, ever since then and also they reached

7   out to Chesterfield County leadership.  They were not

8   responsive.  Ever since then it was, okay, we are going

9   to see you in annexation court and just bite off chunks

10  of your counties as much as we can until we get what we

11  want, and that is a major metropolitan area.  So the

12  goal was to get rid of jurisdiction lines and make what

13  is now Richmond, Henrico and Chesterfield into one

14  larger city.  That was the plan.

15  Q    And so --

16      THE COURT:  That was not, that was not a purely

17  Richmond factor.

18      THE WITNESS:  No.  No.  Sorry.

19      THE COURT:  You no longer have Princess Anne

20  County.

21      THE WITNESS:  That happened a little bit later.

22  Those two localities, Princess Anne County and, God,

23  Virginia Beach City, they merged willingly.  Like that

24  was kind of a marriage.

25      THE COURT:  I thought most of those Chesapeake and

1    South Norfolk and Suffolk and Nansemond County, and I

2    guess to a certain extent Newport News and Denbigh

3    County?

4         THE WITNESS:  Newport News.  Oh, it was Warwick

5    County.

6         THE COURT:  Warwick County.

7         THE WITNESS:  Yes.

8         THE COURT:  They merged voluntarily so their kids

9    wouldn't have to go to City schools.  And they would

10   have, maintain a white majority voting.

11        THE WITNESS:  Yes, by and large, yes.  So, yes.

12        In the Tidewater you have got a lot more willing

13   mergers.  In the Richmond area you didn't.  The same

14   thing in northern Virginia, places like Fairfax County,

15   to be exact, they were just not on board with merging

16   with Alexandria and other cities that wanted to take

17   parts of them, or take all them if not parts.

18        THE COURT:  But in Tidewater they shut out Norfolk

19   and Portsmouth.

20        THE WITNESS:  Yes, a hundred percent.

21        THE COURT:  To a certain extent Hampton.

22        THE WITNESS:  Have you read my book?

23        THE COURT:  No, it will shock you, but you talk

24   about history I know about.

25        THE WITNESS:  Fair enough.  Fair enough.

USCA4 Appeal: 24-4201    Doc: 22-5    Filed: 09/04/2024    Pg: 54 of 217

1      But, no, you are a hundred percent correct.  Like,

2   that is spot on.

3   BY MS KOENIG:

4   Q    And so when we are talking --

5       THE COURT:  Could we just take judicial notice of

6   this stuff and move on?

7       MS KOENIG:  We are about to move on, Your Honor.

8   BY MS KOENIG:

9   Q    So when we look at -- let's go back to defendant's

10  exhibit 19, which is still on the screen here.  We see

11  this dark color that is south, primarily south of the

12  river, James River?

13  A    Yes.

14  Q    And that seems to be indicated on the map,

15  that that is the area that was annexed by the City of

16  Richmond in 1970s?

17  A    Yes.

18  Q    Tell us about that annexation.  What was the

19  racial make up of this area in that dark sort of

20  burgundy color?

21  A    Historians say between 95 and 97 percent white was

22  what the demographics of that area were at the time.

23  And around, between 43 and 45,000 people lived

24  residentially, so, yes, majority white, and majority

25  suburban.

**JA1683**

1   Q    Once that happened in the '70s in Richmond are
2   there things that are happening in the City about
3   school segregation?
4   A    Yes.  The City of Richmond tried to backdoor their
5   way into a metropolitan area by combining the schools.
6   Because that was the only way they were going to
7   fulfill the mandate in Brown One and Brown Two.  So it
8   kind of served their interests both ways.  So for one
9   they get to finally live up to school deseg -- school
10  integration as opposed to desegregation.  And also they
11  could combine public service, a public service between
12  Richmond, Chesterfield and Henrico.  And that could at
13  least set the precedent for eventually getting that
14  metropolitan area they wanted.  But it blew up in their
15  faces.
16  Q    What do you mean it blew up in their face?
17  A    Chesterfield and Henrico challenged in court, in a
18  few years, and the Fourth Circuit Court of Appeals and
19  eventually the Supreme Court -- well, the Supreme Court
20  was a deadlock -- but the Fourth Circuit Court of
21  Appeals ruled against Richmond trying to use the
22  courts, the federal courts to do their bidding.  And
23  the idea that came to, that resonated to the top was
24  the Dillon Rule, right.  So that localities cannot use
25  the courts to try to bully other jurisdictions into

1    doing what they want them to do.  Jurisdiction has only

2    as many rights as the state government, that the state

3    government gives them, because they are subsidiaries of

4    the state government.

5    Q    And when you say the Dillon rule, it is

6    D-I-L-L-O-N rule, right?

7    A    Yes.

8    Q    That is the law that the legislature passed?

9    A    Well, no, it wasn't a law that they passed, it was

10   a, it was a, it was a court decision that was at least

11   1868, so old, so long ago, but it was an idea that

12   was -- that was the main idea that the federal, Fourth

13   Circuit of Appeals used.

14        THE COURT:  The Dillon rule says --

15        MS KOENIG:  I'm sorry.  I misspoke, Your Honor.

16        THE COURT:  -- local governments have only those

17   powers expressly given to them by the legislature --

18        THE WITNESS:  Yes.

19        THE COURT:  -- or necessarily implied.

20   BY MS KOENIG:

21   Q    And that is what Judge Merhige relied on and

22   Fourth Circuit relied on to tamp down this plan, right,

23   that Richmond wanted to --

24   A    Well, Judge Merhige in Richmond's favor.  The

25   Fourth Circuit Court of Appeals ruled against them and

1    it was the Dillon rule that they brought up as, hey,

2    Richmond, you only have as much power as the state

3    gives you.  You can't just use the federal courts to

4    bully your way into Chesterfield and Henrico using

5    schools.  When Richmond appealed to the Supreme Court

6    they lost.  Not lost, but it was a deadlock, one voter

7    abstaining, and that was Justice Powell, who was a

8    Richmond native and served on the school board, served

9    as a superintendent of schools here.

10         THE COURT:  Not the superintendent of schools.  He

11   was chairman of the school board.

12         THE WITNESS:  Okay, that's fine, chairman of the

13   school board, yes.  So he abstained and it was a

14   deadlock and at that point the case was closed.

15   BY MS KOENIG:

16   Q    And you wrote about all of this in your 2016

17   masters thesis, right?

18   A    Yes.

19         THE COURT:  What is this book you are talking

20   about?  I don't see a published on your curriculum

21   vitae.

22         THE WITNESS:  So I have a book that is under

23   contract with the University of Virginia --

24         THE COURT:  Courage to Change?

25         THE WITNESS:  Yes.

Chiles - direct                          **44**

 1        THE COURT:  Okay.  All right.

 2    BY MS KOENIG:

 3    Q    So if you can flip to defendant's exhibit 11.

 4        Do you recognize defendant's exhibit 11 as your

 5    masters thesis?

 6    A    Yes.  So long ago.

 7        MS KOENIG:  I move to admit this as defense

 8    exhibit 11.

 9        MR. GIBBONS:  No objection, Your Honor.  Same

10    relevance objection.

11        THE COURT:  It is kind of hearsay.  But I assume

12    he is going to explain this is all true --

13        MS KOENIG:  Right.

14        THE COURT:  -- and sort of give us the executive

15    summary.

16    BY MS KOENIG:

17    Q    Before you wrote your masters thesis, Dr. Chiles,

18    you did a fair amount of research, right?

19    A    Yes.

20    Q    Interviewing folks, looking at original sources,

21    things like that?

22    A    Yes.

23    Q    Did a lot of investigation before you wrote this

24    thesis?

25    A    Yes.  Absolutely.

**JA1687**

1   Q    What you put in this thesis is the result of your

2   research and findings of your research?

3   A    Yes.

4   Q    Let's talk about 1977 and the City of Richmond.

5        THE COURT:  Are we going to relate this to law

6   enforcement at some point?

7        MS KOENIG:  We are.  We are getting very close.

8        THE COURT:  Let's get even closer.

9   BY MS KOENIG:

10  Q    In 1977, Your Honor -- I'm sorry, Dr. Chiles --

11  was there a change about the leadership of the City of

12  Richmond?

13  A    Yes.

14       So the leadership as in the City Council was

15  majority black for the first time ever in history.

16  Five black, four white members, nine in sum.

17  Q    What happened as a result of the there being a

18  black majority for the first time ever on the City

19  council in Richmond?

20  A    Yes.  So black majority came in, came into power

21  into a city that was financially hamstrung.  Suburban

22  flight had just completely decimated its tax base.  Had

23  been doing it for decades up until that point.  But the

24  chickens were slowly coming home to roost on that.  And

25  they needed to find a way to, needed to find a way to

1    attract suburbanites back to the City.  Not just as
2    consumers and workers -- they were already doing
3    that -- but workers more so than consumers.  But they
4    needed to bring them back as residents.  They tried
5    various urban revitalization plans, the building of a
6    downtown mall, business parks to attract to come back
7    from the suburbs, and to come from out of town.  One of
8    the issues they ran into was crime.  As something
9    people cited, business leaders more specifically, cited
10   that was like one of the number one issues why they
11   would not invest in Richmond's quote unquote, rebuild
12   when black leadership came into power, so, yes, that
13   was the issue.
14   Q    So you talked about the revitalization project.
15   And I think you mentioned Project One?
16   A    Yes.
17        THE COURT:  Didn't mention it yet.  Referred to
18   it, but he didn't mention it.
19   BY MS KOENIG:
20   Q    Tell us what Project One was.
21   A    It was a City-sponsored endeavor in which they and
22   also a non-profit business coalition which was
23   Richmond, Jesus Christ, Downtown Development Unlimited,
24   DDU.  They came together with the City Council to build
25   business infrastructure downtown, so office buildings,

1    parking decks, things like that.  And the goal was to

2    attract industry back.  One --

3         THE COURT:  Richmond Metropolitan Authority is

4    what you are talking about.

5         THE WITNESS:  Sorry.

6         THE COURT:  Talking about the Richmond

7    Metropolitan Authority.

8         THE WITNESS:  No.

9         THE COURT:  Build parking decks and all that?

10        THE WITNESS:  No.  I'm talking about Downtown

11   Development Unlimited.  So it was chaired by Andrew

12   Brent, attorney here.  And it was a bunch of

13   businessmen who ran it, non-profit group, and their

14   goal was to attract industry back, and the best way to

15   do it was to get the City to invest in building new

16   business infrastructure.

17   BY MS KOENIG:

18   Q    So the feedback that they were getting is, we

19   don't want to invest in the City, it is too crime

20   ridden.

21   A    So from them, not specifically.  It was from the

22   people who, Richmond Renaissance, who built the

23   Downtown Mall.  That came along in the mid 1980s.  So

24   by the mid 1980s they, as in Richmond Renaissance and

25   the City, they are doing surveys of various

1   neighborhoods.  And just to kind of get to understand

2   what they looked like, what is the demographics, and

3   also talking to business leaders.  And in some of these

4   surveys they are saying, I mean flat out, hey, crime is

5   biggest issue here.  If you want to get more

6   investment, you have to tamp down on the crime problem.

7   Q    So what did the City do to do that?

8   A    They began creating task force, various task

9   forces that were designed to target high crime areas,

10  or what they think were high crime areas.  So, yes, the

11  City police, they would try to hire more officers and

12  to create various departments for them, various groups

13  that would go into high crime areas, mostly the housing

14  projects in the east end.  And they would set up shop

15  there, sit there try to catch people doing hand-to-hand

16  deals.  Also try to do drug raids.  There was what they

17  were targeting mainly drugs and guns is what they were

18  after.

19  Q    Did that project have a name?

20  A    God.  Yes, it did.  What is the name?  I'm sorry.

21  I'm blanking on it right now.

22  Q    Was it called the SNAP Program?

23  A    SNAP, Strategic Neighborhood Something Something

24  Something.  Yes, but that was one of many.  They had

25  various other programs, other programs, but that was

1    the one that City Manager Robert Bobb, that was the one

2    he promoted the most.

3    Q    Did that effectively start militarizing the

4    Richmond Police Department on certain neighborhoods in

5    Richmond?

6    A    It didn't start it.  It didn't start militarizing.

7    It more so cemented it.  Militarization started in the

8    1960s with the threat, or let of fear riots coming to

9    Richmond in the aftermath of Martin Luther King dieing.

10   That is when the police really started to get tactical

11   training, started to get anti-riot gear.  They were

12   being prepared by City, being funded by City

13   leadership, prepared by police leadership to focus on

14   anti-riot things.  So that is when the militarization

15   really started with police.  But by the time we get to

16   the 1980s they are taking, they are focusing

17   exclusively on black neighborhoods.

18        Again, I mean, I guess you could you stay

19   militarizing, you know, doing raids.

20        THE COURT:  I am not sure what you mean by

21   militarizing.

22        THE WITNESS:  So body armor was, they are getting

23   more, what you call it, not military grade gear, but

24   their gear is not just a uniform, a gun, and badge.  It

25   is a hard helmet, it is what do you call it --

1          THE COURT:  Body armor?

2          THE WITNESS:  Yeah, body armor and things of that

3     nature.

4          Yes, so they are getting that stuff started in

5     1960s.

6          Now, how often they were using it, I don't know.

7     But they started getting it in the 1960s, that I do

8     know.  And by the 1980s the police are targeting, are

9     targeting crime what is the high crime areas.

10         As a result of the City manager setting out his

11    agenda said, hey, we need to tamp down on crime because

12    it is hurting investment in Richmond.

13         THE COURT:  So, and high crime areas happen to be

14    predominantly African-American --

15         THE WITNESS:  Yes.

16         THE COURT:  -- is that correct?

17         THE WITNESS:  Yes.  Yes.

18         MS KOENIG:  So --

19         THE COURT:  Tell me what, how they identified

20    African-American areas as high crime areas.

21         THE WITNESS:  How they identify them?

22         THE COURT:  Yes.

23         THE WITNESS:  1980s they did neighborhood surveys.

24    They went through, they went through, again, checking

25    to see where people lived, where did they work, how --

1    where did they work, how much they made, things like

2    that.  Also, I mean, I would assume they would have

3    some internal data.  Again, I cannot confirm this, but

4    I would assume that the police back then had some

5    internal data to which areas were high crime and which

6    areas weren't.

7          I would assume that they had that information.

8          THE COURT:  You don't know that?

9          THE WITNESS:  I don't know.  I don't know from

10   that time period where they got, say, or said, okay, we

11   know these five neighborhoods have the, are engaged the

12   most in drug dealing.  Like, I don't know how they

13   would come to that conclusion.  I would assume they

14   would get that information from officers on the ground.

15   They would have some sort of internal --

16   BY MS KOENIG:

17   Q    We won't ask you to assume, Dr. Chiles --

18   A    I'm sorry.

19   Q    That's okay.

20         THE COURT:  Here is the thing.

21         It's an interesting question that you raise that

22   they were targeting high crime areas.  And one of the

23   ways they identify high crime areas was through asking

24   public's opinion.

25         THE WITNESS:  Yes.

1        THE COURT:  I will tell you, I live in the area

2   that was an annexed in the 1970s.

3        I am a white person.  I lived in what was not

4   exclusively, but predominantly, a white area.  And many

5   of my neighbors were pretty well angered about being

6   annexed from Chesterfield County into the City.  And

7   they felt that there was, they were now opened up to

8   all kinds of crime.  And I will tell you that their

9   feelings were based on absolutely zero empirical data.

10  Just what they believed.  They said, well, I live in an

11  area with a lot of African-American people, I don't

12  know if they used must less polite terms, and there is

13  going to be crime everywhere.  But I don't know whether

14  that was an accurate presumption or not.  And neither

15  do you, apparently, because you assumed that they had

16  data that shows that there was more crime in black

17  areas than white.

18       THE WITNESS:  I like to think that I am rational

19  in some way.

20       THE COURT:  Well, you are rational, but, I mean,

21  why do you think that?

22  BY MS KOENIG:

23  Q    So, Dr. Chiles --

24       THE COURT:  Tell me, why do you think that?  Why

25  do you think -- do you believe there was more crime in

Chiles - direct                                    53

1    black areas of town than white areas of town?

2         THE WITNESS:  When?  In 1980s?

3         THE COURT:  Yes.

4         THE WITNESS:  Probably.

5         THE COURT:  Why is that?

6         THE WITNESS:  Poverty.  So history has

7    consequences.  That is something that we don't like to

8    admit nowadays.  So when people have been segregated,

9    confined, given, or provided, or given, yes, given an

10   inferior education that doesn't allow them to compete

11   in a traditional economy like everyone else, the result

12   is that crime is typically higher in those areas.

13   Again, you don't have to have a PhD from Harvard to

14   know that.

15        THE COURT:  Or even from Georgia.

16        THE WITNESS:  Or from Georgia.  A little step

17   down, right, but yes.

18        THE COURT:  Not at all.

19        THE WITNESS:  So when you have, so, yes, when you

20   have that happening for generations, literally

21   generations that happens, what is it, crime is going to

22   be the natural result, especially disproportionate to

23   the rest of the City.  So, of course, these things are

24   going to happen, more crime, more, higher crime area

25   than say the far west end because people in the east

1    end have systemic poverty going against them for so

2    long.  So that is what I would say to answer that

3    question.

4    BY MS KOENIG:

5    Q    Do you see, did you see, Dr. Chiles, the long-term

6    impact of removing blacks from certain parts of town

7    and denying them the access to gain mortgages?  Did we

8    see that impact play out in the data that you found in

9    the 1970s and 1980s?

10   A    Yes.  Yes.  Absolutely.  There is definitely a

11   connection between the two.

12   Q    What did you -- what does the data say about

13   mortgage activity in black areas and white areas in

14   Richmond in the 1980s?

15   A    Black areas had next to none.  They had close to

16   zero mortgage activity whereas white areas had all of

17   it, nearly all of it.  We are talking in the 80 percent

18   range of mortgage activity in the Richmond area.

19        So, it wasn't until the mid, the early to mid '80s

20   that local groups in Richmond stopped, real estate

21   community -- so we are talking about mortgage lenders,

22   real estate firms, those who were represented on the

23   board of realtors for much of the 20th century -- to

24   stop engaging in that behavior.  And they used the

25   Community Reinvestment Act as a way to do it.  So

1    basically threatening to get the Federal Government to

2    pull bank charters and bank mergers, because those

3    firms had been engaging red lining and block busting

4    illegally throughout 29th Century.

5    Q    And last year did you publish an article that

6    detailed all of your research and findings on those

7    more recent topics we have been talking about?

8    A    Some of them, yes.

9    Q    If you can look at defendant's exhibit 12.

10        Do you recognize that article that you have

11   entitled Here We Go Again as the article from 2021?

12   A    Yes.

13   Q    Is that article the publication of, as you said,

14   some of your findings, not maybe the complete

15   recitation, but some of your findings that we have just

16   discussed on the topics that we are happening in

17   Richmond from 1977 until closer to now?

18   A    Yes.

19        MS KOENIG:  I move to admit defendant's exhibit

20   12.

21        MR. GIBBONS:  No specific objection, but same

22   relevance objection, Your Honor.

23        THE COURT:  All right.  Admitted.

24   BY MS KOENIG:

25   Q    I want to bring your attention back to exhibit R

1    2.  That is on the screen.

2         You can look at it.  A little fuzzy in terms of

3    color on The Court's monitor.  But, where we see these

4    areas of green, and where we see the areas of blue, in

5    your knowledge, with your knowledge of the history of

6    residential segregation in Richmond based on race, is

7    it by happenstance that green dots are where they are

8    and blue dots are where they are?

9    A    No.

10   Q    What is it the cause of?

11   A    Again, the tide of history.  So, again, black

12   people were, one pushed to the outside of the City,

13   talking pre-slavery, or pre-end-of-slavery,

14   post-slavery, blacks had been pushed again by local

15   Government and private, and the private real estate

16   industry as well, out to the east end.  The blacks who

17   could avoid such fate, especially between 1950s and

18   1970s, began moving to the north side.  Those who were

19   more middle class, basically less affluent were moving

20   to the south side.  Just as an affordable housing

21   option because of urban renewal plans.  From much of

22   that we see that that is still the case today.  Again,

23   but, no, there is no, this is not by happenstance that

24   blacks and whites live segregated in Richmond.  And

25   where they live, I mean because if you look at the

1    historical patterns, that is where black people were

2    forced to live in the past.  So surprise, surprise,

3    black people are still living in there in abundance

4    today.

5         Other things that we haven't discussed, and I did

6    not put in the report about education or the lack

7    thereof, access to the tech-based or soft-skills based

8    economy, all those things play a factor.  But by and

9    large blacks and whites were basically forced or coaxed

10   to live in separate sides of the City from the past to

11   the present.  And the result of that is in the present.

12   Q    I want to talk with you now about the Richmond

13   Police Department and its history of conflict with the

14   back population of Richmond specifically.

15        Briefly move to the historical aspect.

16   A    Got you.

17   Q    After the revolutionary war what happened with the

18   Richmond Police Department?

19   A    Richmond Police Department was effectively turned

20   into a group by the citizenry here in Richmond on

21   focusing on free blacks and focusing on slaves to

22   prevent them from starting insurrections.  So there was

23   a huge fear in the early 1800s of slave insurrections.

24   A lot of that came from the history of revolution.

25   Other slave rebellions that happened throughout the

1    country.  And so the police were effectively turned on

2    to them.  Whereas prior to the revolution police in

3    Richmond, their focus was not on black people hardly at

4    all.  There were hardly any free black people right

5    before the revolution.  And also, slaves were seen as

6    the problem of their master, they were not the problem

7    of people around them necessarily.  So police would

8    focus more on horse thieves, and pig thieves and, you

9    know, Indian nations that would come through.

10        But, yes.  So after the revolutionary war police

11   started targeting blacks in Richmond.

12   Q    What happened with policing in Richmond after the

13   civil war ended?

14   A    After the civil war, I said it before, they began

15   to target black people because; one, they were free;

16   and there was a general anxiety about what that freedom

17   meant.  You know, were they going to completely flout

18   tradition and just, again, not to speak to whites the

19   way they were supposed to, were they going to up and

20   move to white areas.  Like, what's going to happen.  So

21   police in Richmond, again, they doubled down more so on

22   their enforcement of black people because again, there

23   is more free black people available than there were

24   before.

25   Q    Did the Richmond Police Department ever -- was it

1    ever accused of voter supression?

2    A    Yes.  Police Department in the late 1800s, so this

3    is just around the time of Jim Crow, disfranchisement

4    law, segregation, being formalized.  State

5    legislatures, city councils, in places of that nature,

6    voting was really important.  So black Richmonders --

7    again this is happening throughout the country,

8    Richmond is no no exception -- black Richmonders tried

9    their best to vote people into office, local, at the

10   local and state level who would not support Jim Crow

11   legislation, would not support disenfranchisement,

12   segregation.  And in some cases -- John Mitchell

13   documented this throughout his struggles in the late

14   1800s about black people going to the polls and being

15   chased away by angry white Democratic mobs.  In some

16   cases police were out there to help them to do the

17   deed, to basically prevent them from putting their

18   ballot in the ballot box.  So, yes.  Yes, I will just

19   leave it there.

20   Q    When the Richmond Police Department started

21   arresting white people was there a significant outcry

22   about that?

23   A    Yes.  So when they increased their arrest of white

24   people -- they always arrested white people, but by the

25   progressive era, so we are talking 20th century, the

1    police department in Richmond began to focus more on

2    things like on drug abuse, prostitution, alcoholism.

3    Again, this is something that is not unique to

4    Richmond.  When the police department did focus on,

5    focus on incar - excuse me -- focus on those illicit

6    activities, citizens in Richmond got mad.  They got mad

7    because they did not want police to target white

8    people.  They wanted them to focus, refocus on black

9    people.  They even threatened to like not fund the

10   police department.  They wanted public officials to

11   stop funding the police in the early 20th century

12   because their focus shifted slightly away from black

13   people.

14   Q    All right.

15        When the Richmond Police Department started

16   focusing on arresting whites and away from arresting

17   blacks, whites started vocally calling for defunding

18   the police?

19   A    Yes.

20   Q    What happened as a result of that public outcry?

21   A    The police -- well, one, changing of

22   administration at the City Council level; and then two,

23   the police began to refocus again back on the, yes,

24   they began to refocus back on who they were supposed to

25   be patrolling and surveilling.

1    Q    Did this, did you read a dissertation by Lewis --
2    I can't, I don't know how to pronounce his last name
3    but it is spelled C-E-I -- about this?
4    A    Yes.
5    Q    His dissertation, there are only two dissertations
6    that I have ever found that have, that have talked
7    about Richmond Police and race relations.  And that one
8    is by far the most comprehensive.  And that is where I
9    am getting this information.
10   Q    For the record, that is already in this record in
11   this case as exhibit Z to ECF number 86.
12        THE COURT:  All right.
13        MR. SIEBERT:  Your Honor, I would object to that
14   being admitted.  He didn't draft it, he didn't write
15   it, he didn't check any of the sources on that.  How
16   could that be admitted as evidence?
17        MS KOENIG:  I wasn't seeking to admit it as
18   evidence in the case.  Just referring that that is the
19   dissertation that has already been in record.  It is
20   the same one I have posted before.
21        THE COURT:  Let me just ask you.
22        This dissertation by Mr. Cei or Cei, Cei or Cei,
23   is that the kind of data on which historians typically
24   rely to reach conclusions about what happened in
25   history?

 1          THE WITNESS:  Yes.  So, historians work with what
 2     they have, like in any other set of scholars.  So,
 3     Mr. Cei or Cei, he had access to data that I don't have
 4     access to.  I mean, he had police records from, you
 5     know, the civil war period, post-civil-war period.  I
 6     am assuming, and I believe that I -- I am not
 7     assuming -- but I read in the dissertation that he got
 8     access to those while completing the dissertation in
 9     the '70s.  Where that information is today I do not
10     know.  But historians have to work with what they have.
11     So that is a vetted project.  Again, he earned a PhD on
12     it.  So there have been some level of validation that
13     the work was accurate for the most part.  So yes, the
14     short answer is yes.  Historians rely on what we have.
15     Q    Is Mr. Cei's dissertation the kind of information
16     and evidence that you would rely on as a historian?
17     A    Yes.
18          THE COURT:  I don't think the question is whether
19     he would rely on it.  The question is whether it is the
20     kind of thing that experts in his area typically rely
21     on.
22     BY MS KOENIG:
23     Q    And as a historian and expert in the history of
24     race and politics in Richmond is Mr. Cei's dissertation
25     the kind of evidence that one in that position, an

1    expert in your position, would rely on?

2    A    Yes.  If I am doing anything related to Richmond,

3    and both Richmond Police and race, and I am trying to

4    get it published, or I am teaching it, right, like I

5    have to rely on what I have.  So, yes, I would rely on

6    that dissertation.

7         MS KOENIG:  I think then we have met the criteria

8    under Federal Rule of Evidence, I think it is 702, for

9    admission.

10        I neglected to bring my cheat sheet.

11        703, Your Honor.  The basis of an expert's opinion

12   testimony, if experts in a particular field would

13   reasonably rely on these kinds of facts or data in

14   forming an opinion on the subject, they need not be

15   admissible for the opinion to be admissible.  But the

16   fact or data that would otherwise be admissible, the

17   proponent of the opinion may disclose them, if that

18   would aid the trier of fact in finding that

19   information.

20        THE COURT:  All right.  Well, you still have not

21   tried to put in Mr. or Dr. Cei's dissertation, but your

22   witness can rely on it.

23        MS KOENIG:  Thank you, Your Honor.

24   BY MS KOENIG:

25   Q    Dr. Chiles, was there a long resistance within the

1    Richmond Police Department to hiring black police

2    officers?

3    A     Yes.

4    Q     And did -- was there in the 1960's a proposal to

5    the Richmond Police, to the City of Richmond, to create

6    a police board?

7    A     Yes.

8    Q     Tell us about that.

9    A     So this is something that can be, that can be and

10   has been validated using media sources at the time, so

11   you don't just have to take Dr. Cei's dissertation at

12   the word on this issue.  So, for one, black residents

13   had been complaining to local leaders, black leaders,

14   and also to City Government to a lesser extent about

15   things like police brutality and just mistreatment by

16   police officers since the early 20th century.  Nothing

17   had come of it.  By the 1960's black residents, they

18   proposed the City Council adopt a police review board.

19   This board would be, would hold citizens, it would hold

20   police officers, and the goal was to try to vet police

21   brutality, or just issues between residents, black

22   residents and cops.  It was to kind of see where there

23   could be a middle ground.  Was there a truth to it, was

24   there no truth at all?  The City Council at the time

25   was very resistent to it.  They were resistant to it

1    primarily because the police department was a hundred
2    percent in resistence to it.  Was every cop against it?
3    Probably not.  But at the united front publicly there
4    was no traction for it at all.  They were not, they did
5    not want citizen oversight.  They didn't want that
6    citizen oversight because that citizen oversight would
7    be majority black.  Because those are the people who
8    were doing it.  And also the City was trending blacker
9    throughout the '60's as well.  So it wouldn't be just a
10   bunch of people from the white west end on the police
11   review board, it would be people from Church Hill on
12   the police review board.  And they wanted no part of
13   that.
14   Q    We talked about how when the City was becoming
15   blacker.
16   A    Yes.
17   Q    Certain parts of the City becoming a hundred
18   percent blacker?
19   A    Yes, absolutely.
20   Q    Did that in many ways relate to the housing
21   project in various parts of the City?
22   A    Yes, a hundred percent.
23   Q    Were residence of those housing projects almost
24   exclusively black?
25   A    Almost exclusively, yes.

1   Q    In the 1980s when we talk about the SNAP task

2   force --

3   A    Yes.

4   Q    -- what effectively happened with the Richmond

5   Police as it relates to the housing projects

6   themselves.

7   A    They targeted them.  Because those were seen as

8   places where the majority of crime happened.  So again,

9   you know, you would have cops who would post up on

10  corners and trying to catch people doing hand-to-hand

11  deals.  Try to -- people doing, what is it, selling

12  guns and drugs mainly is basically what that was.

13  Q    So is that the time when you start to see that

14  what is happening at the housing projects is the

15  Richmond Police Department just surveilling them?

16       THE COURT:  Doing what?

17       MS KOENIG:  Just surveilling the housing projects,

18  not responding to active calls, but sitting there

19  waiting, watching.

20       THE WITNESS:  Yes.

21  BY MS KOENIG:

22  Q    Did these things change when the Richmond Police

23  Department began hiring black officers?

24  A    No, not at all.

25  Q    You have written in your report a quote that came

1     I think from Mr. Cei's dissertation that said, that a

2     black police captain discussing the Richmond Police

3     Department culture in the late 1980s said, we have a

4     black mayor, a black city manager --

5           MR. GIBBONS:  Objection.  Hearsay.

6           THE COURT:  What is the question?

7           MS KOENIG:  That this quote is coming from

8     Mr. Cei's -- Dr. Chiles has just testified that after

9     Richmond started --

10          THE COURT:  What was the question?

11          MS KOENIG:  The question is, is this in part what

12    he was relying on, this information from Mr. Cei's

13    report in giving that expert testimony.

14          THE COURT:  All right.

15    BY MS KOENIG:

16    Q   A black assistant city manager and many high

17    ranking black public officials, yet it seems very

18    little has changed?

19    A    Yes.  So, yes.  Yes.

20          THE COURT:  Let me just ask you this.

21          Here is what the other side is going to say, and

22    there is some logic to this.  A lot of logic maybe.

23          If there is a lot of crime in black areas, why

24    shouldn't they send a lot of police there?

25          THE WITNESS:  I can't answer that.  I can only

1    answer, only say what the past is telling us.

2         THE COURT:  The past is telling us -- what you

3    told me so far is that there were -- is that for

4    reasons that aren't very good the government and the

5    business community forced African-Americans to move

6    into predominantly -- into almost exclusively racially

7    segregated areas.

8         THE WITNESS:  Yes.

9         THE COURT:  You told me that in your judgment

10   those areas for reasons of history, poverty, lack of

11   education and the like, were breeding grounds for

12   crime.

13        THE WITNESS:  Yes.

14        THE COURT:  And then you have told me that in

15   order to make people think Richmond was safer they

16   assigned police officers to go there.  Well, whatever

17   their motive was, what is wrong with sending police

18   officers to an area that has a lot of crime?

19        THE WITNESS:  I can't -- I don't -- I don't have

20   an opinion on that.

21        THE COURT:  Okay.

22        Why don't you tell me what is wrong that.

23        MS KOENIG:  Do you want me to answer that now,

24   Your Honor?

25        THE COURT:  Yes, answer that now.  That is really

1     the question the case is about.  I accept that based on

2     what he says this stop that we have in this case, and

3     the way the precincts are set up in the City places a

4     lot of police officers in predominantly

5     African-American areas.  And your witness has said that

6     for a lot of reasons those areas have higher crime

7     rates than other, than white areas.  So --

8          MS KOENIG:  I think what we are finding, Judge,

9     Your Honor, is that this -- so the pattern that we see

10    in the green dots and the blue dots in defense exhibit

11    R 2 is not by happenstance.  It's not by happenstance

12    and not separated from race that black people in the

13    City of Richmond, many of them, in fact perhaps the

14    majority of them, are forced into poverty and then kept

15    into poverty because of their race.  They are then

16    moved from the areas in which they might have been able

17    to claim a property ownership because roads and other

18    buildings, they were deemed to be unsightly, right,

19    need to be moved out of the area, slumps need to be

20    cleared, lose any access to the ability to gain wealth

21    that they have, they are not allowed to get mortgages,

22    and so they are moved to housing projects where they

23    are renters, and so what do you think is going to

24    happen?  Right?  What do we think is going to happen

25    when we do that?  I am not in any way submitting that

1    there are statistics that show that crime is only

2    happening in the areas of the housing projects.  It is

3    just that what happens from Dr. Chiles's testimony is

4    we know that the Richmond Police Department just starts

5    setting up in the housing projects.

6         THE COURT:  Okay.  Here is the thing.

7         But, that -- there is an abhorrent history in

8    Richmond and in Virginia and maybe in our nation at

9    large, of segregation which has both social and

10   educational and economic complexes or effects.  And it

11   results in a substantial, a substantially higher crime

12   rate in black areas than in white areas.  That seems to

13   be what your witness is testifying to.

14        So, you know, there are people in those areas that

15   are not criminals.  And they deserve to live in an area

16   where there is not a lot of crime --

17        MS KOENIG:  And I think --

18        THE COURT:  -- and they send police officers in

19   there.

20        MS KOENIG:  Fair enough.  I think so where this is

21   moving, Your Honor, is that where crime area -- if you

22   are here talking about like the possession of a gun and

23   the police targeting someone who has got the gun and

24   they happen to be black, I think that would be a very

25   different scenario than what are facing now, because we

1    are looking at traffic stops --

2         THE COURT:  Well, that is the other aspect of it.

3    It seems to me, you know --

4         MS KOENIG:  -- because the Government's map

5    showing homicide and manslaughter areas --

6         THE COURT:  That may be true with people making

7    left turns.

8         MS KOENIG:  It doesn't.  When you look at, when

9    you compare those maps to the figures in defense

10   exhibit 2, which is Dr. Costin's report, showing the

11   clusters of black drivers that are stopped throughout

12   the City of Richmond, and the heat map, there are

13   several areas that would not in any way explain just

14   because there are some violent crimes happening in one

15   part of town, why huge amounts of people, black people,

16   are being stopped in traffic stops on border areas

17   where white neighborhoods abut black neighborhoods.

18   That doesn't explain that.  There is no --

19        THE COURT:  I don't think Mr. Moore's stop was in

20   a border area, was it?

21        MS KOENIG:  Well, no, but we are talking about

22   patterns of enforcement, Your Honor, that is what we

23   are talking about here.

24        THE COURT:  What do you say about this?  Police

25   officers are trained to give people tickets when they

1    see violations of the law.  If you for a legitimate

2    reason send a lot of police officers into a high crime

3    area, they are going to see a lot of traffic

4    violations.  And then they are going to stop people.  I

5    mean, is that -- you have got to prove two things;

6    intent and effect.

7         MS KOENIG:  Right.

8         THE COURT:  And it is clear to me from the

9    evidence in this case that there is two sets of traffic

10   laws.  One for black people, and one for white people.

11        MS KOENIG:  Yes.

12        THE COURT:  And people, you know, white people

13   forget to renew their license plates all the time.  But

14   they don't get stopped for it.

15        MS KOENIG:  Right.

16        THE COURT:  But that is because, might that not be

17   because they are driving in areas in which there is a

18   lower rate of crime, and therefore there are fewer

19   police officers?

20        MS KOENIG:  I think that is where we get, that

21   where the evidence of where the stops are happening is

22   so important.  Because we saw from defense exhibit 2

23   that when we have -- first we have no evidence at all

24   that white drivers are less likely to commit traffic

25   infractions than black drivers.  Both Dr. Costin said

 1    that and Dr. Smith, the Government's expert, didn't

 2    disagree with that.  He indicated that he had no

 3    evidence to that effect.

 4        So if we operate on that presumption, which we

 5    have to, because that is the evidence in this case,

 6    that white drivers and black drivers are presumed to

 7    commit traffic infractions at roughly the same rate,

 8    and then we look at the blunt statistics that

 9    77 percent of all people that the Richmond Police

10    Department stop are black drivers, and then we look at

11    even if we are saying, okay, fine, there is some

12    activities that happens and maybe that explains a

13    little bit more that maybe because there is more

14    surveillance in certain areas, it doesn't explain why

15    more black drivers are stopped in the white part of

16    town.  But it just doesn't.  There is no way to get

17    around that but to look through the lens of race.

18        THE COURT:  I understand what you are saying.  I

19    have been sitting up here for 12 years with, you know,

20    dozens if not hundreds of young African-American men

21    who get stopped for stuff that happens all the time in

22    white areas, without a concomitant number of arrests.

23    I'm sorry to disturb your testimony.  Go ahead.  Sounds

24    like --

25        MS KOENIG:  I am pretty much done.

Chiles - direct                    **74**

1      THE COURT:  You are pretty much done?

2      MS KOENIG:  On my direct examination of Dr.

3  Chiles.

4      THE COURT:  How is he going to tie this into

5  current police activity?

6  BY MS KOENIG:

7  Q    Dr. Chiles is a historian, Your Honor.  So,

8  Dr. Chiles, do you have, when -- let's do this.

9      When you, over the course of your research did you

10  contact the Richmond Police Department trying to get

11  ahold of crime statistics?

12  A    Yes.  Years ago.  Not just crime statistics, but

13  correspondences from say the police department and City

14  Council and things that, things of that nature.  So

15  just general police records that are available to the,

16  to historians and researchers, yes.

17  Q    Did that include more recent time frames than what

18  we have talked about today?

19  A    Absolutely.

20  Q    Were you able to obtain such information?

21  A    No.

22  Q    Did anybody give you a reason as to why you

23  couldn't obtain such information?

24  A    Yes.  I was told, and I do not have the officer's

25  name, but I was told that the Richmond Police

Chiles - direct                                       75

1    Department are not required to keep data of that sort.

2    So they don't, or at least didn't.  And I was told to

3    contact the state archives to see if they have

4    anything.  So I did and the State Archives had nothing

5    either.  Yes.  That --

6          THE COURT:  What were you asking them for?

7          THE WITNESS:  Just any police records that could

8    be available to researchers from the 1980s, 1990s,

9    early 2000s to -- because that is what I focus on in my

10   own research that I publish.  I was told we don't have

11   any of that data.

12         THE COURT:  You don't have any records about like

13   the number of people they arrest?  Is that what you

14   ever saying?

15         THE WITNESS:  That is what I was told, yes.

16         I don't have -- we don't have that data, and we

17   are not required to keep it.  So you should probably

18   contact the State Archives.  So I did, and I struck out

19   there as well.

20         THE COURT:  Okay.

21   BY MS KOENIG:

22   Q    And so was your ability then to find more recent

23   data is very limited because of that?

24   A    Yes.  It definitely dissuaded me.  I was, I am

25   not -- this is -- I am not going to pursue this, this

**JA1718**

1   specifically as a topic any further.  So I didn't.

2   Q    Going back again to defendant's exhibit R 2 and to

3   our discussion about the history of race relations in

4   the Richmond Police Department.  Are you able to draw

5   any conclusion or tell us what your summary essentially

6   of what your knowledge tells us about residential

7   segregation in Richmond succinctly, and the over

8   policing of black residents by Richmond Police

9   Department.

10  A    Yes.  So they were a hundred percent connected and

11  they are connected in some this way.  Black Richmonders

12  throughout history have had negative interactions with

13  Richmond-based institutions, whether that is the City

14  council, police -- the police are just an extension of

15  that -- because of segregation, because of forced

16  segregation, and also past patterns of just discontent

17  between the police department and black people.  There

18  has been a historical discontent between them.  And I

19  don't believe that that just ends when a black police

20  chief is sworn in, I believe in 1989, first black

21  police chief, or black officers were hired.

22  Institutions develop character over time.  They develop

23  patterns of behavior and that doesn't stop the second

24  that a new person is brought in or some new people are

25  brought in.  Also relationships --

Chiles - cross                          77

1        THE COURT:  I am not sure that his area of

2   expertise goes this far.

3        MS KOENIG:  Thank you, Dr. Chiles.  The Government

4   may have some questions for you?

5        THE COURT:  We need to take a recess.

6                    (Recess was taken)

7        All right.  Let's wait until Mr. Moore gets back

8   in.

9        Come back up to the stand, sir, Dr. Chiles.

10                  CROSS EXAMINATION

11       THE COURT:  All right.  Cross examination,

12  Mr. Gibbons?

13  BY MR. GIBBONS:

14  Q    Good morning, Dr. Chiles.

15  A    Good morning.

16  Q    You wrote last year in your Here We Go Again

17  article "That Richmond is 'a City seeking to end its

18  complicity with American racism,'" didn't you?

19  A    Yes.

20  Q    And Richmond has changed quite a bit in the last

21  fifty years?

22  A    Yes.

23  Q    And in fact it is becoming far less segregated,

24  maybe let me rephrase that, far less racist?

25  A    Yes.

1   Q    And significant progress has been made, especially

2   since 1977 when African-Americans were more fully

3   involved in City Government?

4   A    Progress as in what?

5   Q    Racial progress.

6   A    As in what exactly?  Like, I mean, I want to

7   answer the question.

8   Q    Sure.  Well being of African-Americans in

9   Richmond.

10  A    In like what?

11  Q    I will move on.

12  A    Thank you.

13  Q    And over the course of the last 50 years the

14  distribution of where people live in Richmond,

15  specifically races living in Richmond has changed

16  significantly?

17  A    Yes.

18  Q    So, before the 1960s blacks were concentrated in

19  the City's core in the east end?

20  A    Yes.

21  Q    And since then blacks predominantly in the

22  northern part of City center, eastern part of the City

23  center and the southern part of the City center,

24  correct?

25  A    Say that last part again. I am sorry.

Chiles - cross                                                    **79**

1    Q    Blacks have now been dispersed --

2    A    Yes.  Sorry, I'm sorry, yes.

3    Q    -- into the north, east and south parts of

4    Richmond; is that correct?

5    A    Yes.

6         THE COURT:  Well, I think he testified that

7    dispersal of blacks to this area occurred over time.

8         MR. GIBBONS:  Yes, Your Honor.

9         THE COURT:  Okay.

10   BY MR. GIBBONS:

11   Q    In fact, you wrote in your masters thesis that the

12   percentage Richmond population fell below 15 percent in

13   the 1990s?

14   A    Population.

15        THE COURT:  Of what?

16        MR. GIBBONS:  White people in Richmond, Your

17   Honor.

18        THE COURT:  Well, fell below 15?

19        MR. GIBBONS:  Fifteen percent.

20   BY MR. GIBBONS:

21   Q    Let's look at your thesis at page 117.

22        THE COURT:  What number is that?

23        MR. GIBBONS:  I don't know what the defendant's

24   exhibit number is.

25        MS KOENIG:  It is exhibit number --

**JA1722**

```
 1          THE COURT:  I can't hear you.

 2          MS KOENIG:  Sorry.

 3          THE COURT:  Is that 11?

 4          MR. GIBBONS:  Yes, Your Honor, defendant's exhibit

 5     11.

 6          THE WITNESS:  Is it 115?

 7          MR. GIBBONS:  117, I'm sorry.  Looking at last two

 8     lines of page 117.

 9          THE WITNESS:  Yes, I guess I did.

10          THE COURT:  Well, what you meant to say was

11     45 percent, isn't that right?

12          THE WITNESS:  Yes.  Yes.  I mean --

13          THE COURT:  That is a typographical error.  Cross

14     examination is more useful than that.

15          MR. GIBBONS:  Sure, Your Honor.  So just to be

16     clear you your masters thesis says, as of 2014 whites

17     made up 44 percent of City residents.  This rise from

18     below 15 percent in the 1990s?

19          THE COURT:  It is a typographical error.  He

20     obviously meant to say 45 percent.  Move on.

21     BY MR. GIBBONS:

22     Q    So what was the percentage of blacks?

23          THE COURT:  Let's move on.

24          MR. GIBBONS:  I'm sorry, Your Honor.  I just

25     wasn't sure what the percentage is.
```

1          THE COURT:  Well, he meant to say below

2   45 percent; is that right, Dr. Chiles?

3          THE WITNESS:  Yes.  So there is one thing I don't

4   have the, what do you call it, the census data in front

5   of me, so I can't say definitively.

6   BY MR. GIBBONS:

7   Q    So if it was 44 percent in 2014, and that was a

8   rise from what it was in 1990s, I'm trying to

9   understand what it was in the 1889s.

10  A    I don't have that information directly in front of

11  me.

12  Q    Okay.

13         But since 2010 there has been a gentrification

14  movement of whites moving back into the City of

15  Richmond?

16  A    Yes.  Absolutely.

17  Q    That wouldn't have been reflected in defendant's

18  exhibit R 2 that relied on the census data from 2010?

19  A    It should have been reflected.  It should have

20  been yes.

21  Q    So when you talk in your expert report on page

22  four about a gentrification movement of 2010s, that

23  would reflect gentrification from 2010 to 2020?

24  A    Roughly speaking, yes.

25  Q    Is that gentrification movement occurring up until

1    2022?

2    A    Yes.  Absolutely.

3    Q    So census data from 2010 wouldn't reflect a

4    significant influx of white residents that occurred

5    from 2010 to 2022?

6    A    I guess it depends on when it is collected.

7    Q    As whites have moved back into Richmond that has

8    changed the distribution of whites in the City of

9    Richmond?

10   A    Yes, absolutely.

11   Q    So if RPD was trying to align precinct boundaries

12   with where the defendant races congregate would be

13   somewhat of a moving target; is that correct?

14   A    Say that question again.  I am sorry.

15   Q    If RPD was trying to align precinct boundaries

16   with racial residential boundaries it would be a moving

17   target because the demographics of Richmond are

18   constantly changing?

19   A    Not constantly changing enough, no.  Again, since

20   the '70s, I mean you can look at the map, it says 2010

21   map, which was previously shown, the majority of black

22   people still live in the same areas that they did

23   prior, right?  So, yes, there is some dispersement,

24   there are some blacks who have moved to the suburbs,

25   there are some blacks who have moved to the west end,

1    but by and large these areas are still identifiably

2    that of same race.

3    Q    Again, there has been a significant influx of

4    white since 2010 not reflected in the census data that

5    would change those boundaries?

6    A    Yes, significant influx of whites, but that

7    doesn't change the -- that has not, at least from the

8    data that we have.  I believe that the dot map data for

9    2020 hasn't been released.  I tried to get it for my

10   book and I can't secure it from anyone.  But, again,

11   the amount of white distribution throughout the City

12   has not changed the racial integrity of the City at

13   all, at least based upon where the majority of the

14   races of people live.

15   Q    You don't have an idea what precinct boundaries

16   looked like in 1977?

17   A    In 1977, no, I do not.

18   Q    You don't have any idea what changes, if at all,

19   have been made to the precinct boundaries since '77 to

20   the present?

21   A    I have seen precinct boundary maps that were shown

22   to me at a previous date.  I don't have -- I can't map

23   it out for you, but I have seen it.

24   Q    The current precinct maps?

25   A    Yes.

1   Q    The historical precinct map you have no idea?

2   A    The historical precinct maps, I have not looked at

3   those, no.

4   Q    So you don't know one way or the other if the

5   precinct boundaries in the past have tracked racial

6   boundaries?

7   A    I can't speak to that at all, no.

8   Q    You don't have any evidence that Richmond has ever

9   changed a precinct boundary in response to shifting

10   racial demographics in Richmond?

11   A    Police precinct map, no.

12   Q    And RPD is not involved in residential

13   segregation; is that correct?

14   A    As far as actually segregating people, no, they

15   are not actually segregating anyone.

16   Q    And they haven't been for a very long time, if at

17   all?

18   A    Since -- no, they are not. They are not, you

19   know, there is no Jim Crow laws for them to enforce on

20   the books, if that is what you are asking. Then, no.

21   Q    So just to make the point, so whatever racial

22   segregation that exists within Richmond isn't a choice

23   of individuals, market forces, real estate market, and

24   decision by policy makers external to RPD.

25   A    To a large extent yes.

1    Q    You are not familiar with Richmond City crime

2    rates, are you?

3    A    I have seen crime data from the '80s.  I secured

4    some from the state, state police department in 2015,

5    2016, sorry, secured some.  I have seen it, but I am

6    not familiar with it.  I can't spit out facts for you,

7    no.

8    Q    And wouldn't know one way or another if RPD is

9    deploying its police report in response to crime rates

10   and calls for services?

11   A    No.

12        I don't have access so that either.

13   Q    I want to talk to you about a quote in your

14   report.  You wrote -- let me get the page number here.

15        This is pages 11 and 12 in your report.

16        MS KOENIG:  If I could approach and show him a

17   copy of the report.

18        THE COURT:  Go get it from her.

19        THE WITNESS:  Yes.

20   BY MR. GIBBONS:

21   Q    So the last few words of page 11 and going to page

22   12?

23   A    Yes.

24   Q    You wrote, "With plans to repopulate the City with

25   monied whites in view of the suburban sprawl in the

1    post World War II period the new police strategy as

2    dictated by black political leaders insure that it will

3    'that that' it will not take long for the neighborhoods

4    to recognize the increased police presence and more

5    aggressive enforcement" in the City's blackest area.

6    Is that what you wrote?

7    A    Yes, I wrote this.

8    Q    So just to be clear, you interpret the effort to

9    increase crime enforcement in high crime areas as an

10   attempt to repopulate the City with monied whites?

11   A    Yes, I do equate the two.  In the 1980s

12   specifically because, with the downtown redevelopment

13   plans, the revitalization plans, the Sixth Street

14   Market Place, that is the one that had the most

15   activity on the crime front, business leaders were

16   responding to the City and to non profit organizations,

17   Richmond Renaissance being one, crime is a problem in

18   Richmond.  And that, that, these reports that are at

19   VCU today, you can go look at them, those complaints

20   about crime correlate directly with urban

21   revitalization in the 1980s.  So I would say that is

22   not by happenstance.  That more crime enforcement

23   happens in black neighborhoods just as the City is

24   desperately trying, one building, new infrastructure to

25   recruit whites suburbanites back to the City, to be

1    residents and more so consumers.

2    Q    Sure.  And you didn't consider the possibility at

3    all that crime enforcement is increasing in these high

4    crime areas so that the minority is living in those

5    areas aren't deprived of the benefit of law

6    enforcement?

7    A    I didn't rule that out, no.

8    Q    You didn't even consider that.  You didn't put

9    that in your expert report?

10   A    No, the report, the report, the report that I

11   wrote, it was designed to investigate is there a

12   connection between racial segregation and the

13   relationship between black people and the police

14   department.  So, based upon what I got, that is what I

15   put in the report.

16   Q    So that alternate explanation for the phenomenon

17   that is occurring wasn't within what you are were

18   trying to say in the report, so you didn't include it?

19   A    Not trying to say, but more so making the

20   connection between what is the relationship

21   historically between black people in Richmond and

22   segregation and the police.  Is there a connection

23   between the three?  Between the three.  And this is the

24   connection that I found.  Wasn't that I was trying to

25   say this, it was, this is what the evidence showed,

Chiles - cross                                      88

```
 1   revealed itself to be.
 2        THE COURT:  I don't think it's an alternate
 3   explanation.  An additional reason.
 4   BY MR. GIBBONS:
 5   Q    Okay.
 6   A    I go back to the report, again on page 12, a few
 7   lines down.  You wrote, "This late 20th century
 8   development" and my parenthetical is increased
 9   policing, "was tied directly to RPD history of being
10   sicked on black people as Richmonders, both new and
11   old, long understood this to be their primary function
12   above all else."
13        Did I read that correctly?
14   A    I'm sorry.  You said page 12?
15   Q    Yes.
16   A    Is that in the conclusion?
17   Q    The second to the last sentence before the
18   conclusion.
19        Starting with "This late 20th century
20   development?"
21   A    Yes, I see it.  Got it.  What about it?
22   Q    So you state that new and old Richmonders have
23   long understood the primary purposes of RPD to be
24   sicked on black people.  Is that correct?
25   A    Yes.
```

1   Q    Who are these new and old Richmonders who

2   understand this?

3   A    The ones that were reflected in Dr. Cei's

4   dissertation, as well as the Richmonders who lived in

5   the mid to late '20th century, the ones who were

6   calling for more policing in the 1980s.  And again,

7   like I said, Richmonders in Dr. Cei's dissertation who

8   were, who were, who lived during the 1700 and 1800's,

9   so that is who I considered new and old.

10          THE COURT:  So say that again.

11          You say that people, new and old people both

12   considered the purpose of the police to be essentially

13   hassle African-American people; is that what you are

14   saying?

15          THE WITNESS:  Yes.  That is what I saw in

16   Dr. Cei's report.

17          THE COURT:  Do you think that is true?  That that

18   is what people see the purpose of police are?

19          THE WITNESS:  Today?

20          THE COURT:  Well --

21          THE WITNESS:  Or back then?

22          THE COURT:  Well, I can only speak as somebody who

23   lived through that entire era.  Do you think that that

24   is a widely held belief that police exist to make life

25   difficult for African-American people?

 1          THE WITNESS:  Well, no, that is not their primary
 2     function.  I don't think that is what people back
 3     then -- people, so, because, again, this is a lot of
 4     time we are talking about, about back then.  Police
 5     were designed to protect and serve, right.  However, in
 6     Richmond, at least in Dr. Cei's dissertation and other
 7     newspaper sources, and some archival sources I was able
 8     to look at, at the Virginia Museum of History and
 9     Culture showed that there was an understanding that
10     police were to work to surveil black areas, were to
11     surveil black people, like -- again, I am not coming to
12     that conclusion independently.  Someone else came to
13     that conclusion looking at more data than I had access
14     to.  So, that is why I said it.
15     BY MR. GIBBONS:
16     Q    Dr. Cei's dissertation was published in 1975?
17     A    Yes.  I believe it covered years all the way up
18     until right around the year that he defended it.
19     Q    So 1737 to 1974?
20     A    Yes.  There you go.
21     Q    How about the last 45 years?  New and old
22     Richmonders believed that RPD'S primary purpose is to
23     be sicked on black people in the last 45 years?
24     A    Well, based upon what I saw in the '70s through,
25     excuse me, the late '60s into the 80's, a lot of those

USCA4 Appeal: 24-4201    Doc: 22-5    Filed: 09/04/2024    Pg: 105 of 217

1    mentalities didn't necessarily go away.  At least at

2    that time period.  I can't speak to right now in the

3    present.  I can't speak to even the '90s because I

4    didn't write about it because I don't have the data to

5    write about it, so I don't feel comfortable speaking as

6    an authority on it.

7    Q    Sure.  The defendant was born in 1987.

8    A    Okay.

9    Q    Anything in his life time that speaks to that

10   point?  Do you have any sources or data from the

11   defendant's entire lifetime?

12   A    Beyond 1989 I don't have anything.  That is why I

13   didn't write about it.

14   Q    That is true not just for this one specific point.

15   That is true of your testimony generally, since 1989

16   you really can't point to any data to demonstrate some

17   kind of racial impact of policing or problems you are

18   discussing.

19   A    No.

20        THE COURT:  Well, is there a phenomenon that once

21   people start to do something they pretty much keep

22   doing it?

23        THE WITNESS:  Instructional character, yes.  Right

24   before recess I was getting to that.  Institutions are

25   made up of people.  People have habits.  And

1    institutions develop a character, develop a pattern of

2    behavior and a pattern of doing things.  Again, that

3    doesn't stop just because one -- more people come in.

4    Think about the 1977 election when black leaders get

5    elected to run the City.  Their mentality about running

6    the City in large part was the same as the old.  We

7    need to recruit white suburbanites back to the City.

8    The previous administrations had done it through

9    annexation, done it through building malls along the

10   perimeter City.  But the point is the agenda was still

11   the same in large part.  So that is because that

12   institution, that being City council, it developed a

13   character over time.  That even though there are new

14   people in that role, or in that position, it is still

15   active in that, so active the way it acted years

16   before.  Not all the way through.  But in many ways

17   they still did it.  So institutional character, yes,

18   that is a thing.

19        THE COURT:  And when people come and join an

20   institution the customs and mores of that instruction

21   that they learned they learn from people who were there

22   before them.

23        THE WITNESS:  Yes, absolutely.

24        THE COURT:  So, if there was a sense that we need

25   to clean up crime in black communities, focus our

1    efforts there, that is a belief that is passed down

2    from captains to lieutenants to sergeants and new

3    patrol officers.

4         THE WITNESS:  I would assume so.

5         THE COURT:  Well, don't assume anything.  I am

6    asking if that is your opinion.

7         THE WITNESS:  Yes, that is my opinion, yes.  I am

8    not sure that that is a historical opinion.

9         MR. GIBBONS:  I was going to say, Your Honor, it

10   seems more of an intuition that some kind learned or

11   trained observation.

12        THE COURT:  I tried a bunch of discrimination

13   cases in my life, and there is a phenomenon of

14   discrimination cases, called "similar-to-me" phenomenon

15   in which institutions that have presumably unbiased

16   ways of hiring people wind up hiring the same people

17   over, and over and over again because the people who

18   run them are most comfortable having people who are

19   just like them, and bringing along people just like

20   them to run the institution.  So it doesn't change as

21   dramatically as perhaps the written policy might

22   dictate.

23        MR. GIBBONS:  I think that is rebutted, Your

24   Honor, by the massive change in City and police

25   leadership from 1977 to the present.

1          THE COURT:  Well, only, it's only rebutted to the

2     extent that the police leadership, police leadership

3     may not think we ought run black people out of Richmond

4     like the old police, like the old City police.  But if

5     the police leadership continues to have the feeling we

6     need to send massive numbers of police into black

7     areas, that is a belief that could be passed along.  It

8     may well be that they have, they can look at the amount

9     of crime in black areas and decided, you know, there is

10    people over here who deserve to live here without

11    living in an area that is highly criminal.  And they

12    say, send police officers over there.  But I don't have

13    any evidence about why the police are sent anywhere in

14    the City right now.

15         Maybe I will at some point.  But I don't right

16    now.

17         MR. GIBBONS:  Well --

18         THE COURT:  I would have thought you would have

19    called the police officer, somebody from the police

20    department that would have said, here is why we have a

21    lot of police over there where this poor fellow got

22    arrested.

23         MR. GIBBONS:  I think Dr. Smith testified about

24    that extensively, Your Honor.

25         THE COURT:  Dr. Smith didn't testify to anything

1    about that.  Dr. Smith's main point of testimony is

2    that you can't believe any of the numbers.

3         MR. GIBBONS:  He also testified extensively that

4    it is a common practice of law enforcement nation wide

5    to send police where the crime is.

6         THE COURT:  Well, but he didn't say anything about

7    Richmond.  All right.  Go ahead.  I just -- I am -- I

8    was puzzled why we don't have the precinct, whoever

9    makes -- probably wouldn't be good idea to call the

10   police chief given what happened to him -- but I am

11   just surprised that you all didn't call somebody who

12   said, here is why we have all of these police officers

13   over there.  Because there are innocent people who live

14   over there, and people that are trying to turn north

15   side, Highland Park into a nice area.  And the police

16   are over there to help those people.  But I don't have

17   that.

18        MR. GIBBONS:  We thought we had adequately covered

19   that ground with Dr. Smith.

20        THE COURT:  Maybe you did.  I will have to go back

21   and read all that.

22        MR. GIBBONS:  Your Honor, that is why we put in

23   these maps.  Dr. Smith indicated to us privately that

24   we put these citations in our brief and our motion to

25   exclude Dr. Chiles, that these murder and homicide, and

1    manslaughter rates are really a decent proxy for crime

2    rates generally.  And that's why we put in the maps to

3    show where crime is occurring in Richmond.

4         THE WITNESS:  I understand that is where crime is

5    occurring, but I don't understand -- go ahead.  Doesn't

6    seem to me that what happened to this gentleman over

7    here was related to manslaughters in north side.

8         MR. GIBBONS:  Well, we can get into that in

9    argument.

10        THE COURT:  I expect we will hear a lot about

11   that.

12   BY MR. GIBBONS:

13   Q    Right.

14        So, Dr. Chiles, I want to go back to your report

15   another line in your report, page 11th, the first full

16   paragraph, the second sentence starting with "this

17   plan, however."  Opinion page 11th, full paragraph

18   beyond that sentence.

19   A    I see it.

20   Q    You wrote in your report, "This plan, however,

21   relied heavily on explicit calls from City businessmen

22   for RPD to increase policing of black neighborhoods."

23   Did I say that correctly?

24   A    Yes, you did.

25   Q    And this plan you are referring to is kind of a

1   development plan; is that correct?

2   A    Yes, there were several plans or surveys that were

3   taken throughout this time of various areas where City

4   businessmen were interested in investing in residence

5   -- not residence, excuse me -- properties, business

6   properties adjacent to downtown malls.  So, yes.  There

7   were several plans that came up during this time period

8   and, yes, so that is what I was referring to.

9   Q    You talk about explicit calls from City

10  businessmen for RPD to increase their policing of black

11  neighborhoods?

12  A    Yes.

13  Q    And in support of that proposition you cite some

14  census records from Jackson Ward; is that correct?

15  A    Yes.

16  Q    Note 49?

17  A    Yes.

18  Q    If we could pull up Government 5 G, or excuse me,

19  Government's exhibit 5.

20       Dr. Chiles, just looking through these records, is

21  this --

22       THE COURT:  That is this blue thing?

23       MR. GIBBONS:  Yes, Your Honor.

24       THE COURT:  Okay.  Thank you.

25  BY MR. GIBBONS:

Chiles - cross                                      **98**

1    Q    Is this the source you cited, summary file 3 G?

2    A    Yes.

3         THE COURT:  Hold on.  What are we looking at?

4    What page on this?

5         MR. GIBBONS:  Just generally, Your Honor.  We are

6    just looking through it so far.

7         THE COURT:  Okay.

8    BY MR. GIBBONS:

9    Q    And Government's exhibit 5 shows various figures

10   about Jackson Ward.  So that includes telephone

11   availability, the type of heating fuel used in homes,

12   and the type of transportation residents take to work?

13   A    Yes.

14   Q    And this is the main source you cited to support

15   your quote, "Explicit calls from City businessmen for

16   RPD to increase their policing of black neighborhoods,"

17   is that correct?

18   A    Yes.

19        THE COURT:  I'm sorry.  I am looking at this

20   exhibit.  Where does it say something about police

21   business people calling?

22        MR. GIBBONS:  That is my question, Your Honor.

23        THE WITNESS:  Yes.  So I responded.  When I did

24   get your comment back on the report initially, I did

25   respond saying, hey, this is not one of the sources I

**JA1741**

1    should have put in, I actually did put in -- I

2    submitted other sources to validate that.  So I pulled

3    this directly from, or these sets of sources directly

4    from my book, a project that I was working on at the

5    time, and this report was also compiled in around two

6    weeks time, so I think two or two and a half weeks

7    time, there was a mistake with submitting this in the

8    footnotes as opposed to other reports about crime in

9    Jackson Ward and business leaders saying we need more

10   patrolling and policing there.  So that was a mistake.

11   Q    So this is a pretty provocative claim, I believe,

12   in your report and you clearly don't have any evidence

13   to support that claim?

14   A    I said that, I submitted that, and I said that,

15   and sent that into her immediately after I got your

16   response.  I did give that source material up.  I don't

17   have it in front of me right now, but I did send that

18   in.

19        THE COURT:  So what he said was, you pointed out

20   to him that this doesn't support what he says, so he

21   sent in additional evidence.

22        MR. GIBBONS:  I haven't seen any additional

23   evidence, Your Honor.

24        THE COURT:  He said he cited it to you in some

25   sort of letter or something.

1          MS KOENIG:  This is in ECF number 107 and page

2    eight.  This is --

3          THE COURT:  All right.  Well, okay.  You can point

4    that out.

5          MS KOENIG:  I will do that.

6    BY MR. GIBBONS:

7    Q    Dr. Chiles, since 1977 there has been pretty

8    significant representation of African-Americans within

9    City Government?

10   A    Absolutely.

11   Q    And the chief of police, not currently, but on

12   December 5 of 2020 was African-American, correct?

13   A    Yes.

14   Q    Is it your testimony that all or nearly all of

15   City leaders since 1977 have intended to discriminate

16   against African-Americans?

17   A    Have intended to discriminate?  Professionally I

18   can't speak to that.  Personally I would assume no.

19   Q    Is it your testimony that Henry Marsh intended to

20   discriminate against African-Americans during his

21   involvement with Richmond City leadership?

22   A    No, he did not.

23   Q    Is it your testimony Doug Wilder intended to

24   discriminate against African-Americans during his

25   tenure in Richmond City leadership?

1          THE COURT:  I think it is difficult for anyone to

2    speculate about the intention of politicians, in

3    particular the one you just mentioned.

4    BY MR. GIBBONS:

5    Q    Same question for Tim Kaine?

6    A    Intention, no.  I do not think they intended to

7    discriminate against black people.  No, I do not.

8          THE COURT:  I just don't -- intent is an element

9    of the case, you are absolutely right about that.  I am

10   not sure that the mayors of the City of Richmond are

11   the people that -- it is hard to speculate about what

12   they intended because, as we all know, politicians have

13   many motives.

14         MR. GIBBONS:  To lay the foundation, Your Honor,

15   there needs to be a connection between what happened

16   long past, the recent past, and 2020.

17         THE COURT:  I see your point.  The question is

18   whether the police officers who were working when this

19   gentleman was arrested, the police department at that

20   time was a weapon of oppression.  That is really what

21   they are saying.

22         I mean, I think that is a tough burden to carry.

23   BY MR. GIBBONS:

24   Q    Dr. Chiles, are you aware that RPD has issued

25   several general orders that apply to all police

Chiles - redirect                              102

1    officers that forbid discrimination on basis of race?

2           THE WITNESS:  I know that now.  I didn't know that

3    prior to today.  No, I did not.

4    Q    And are you aware --

5           THE COURT:  Well, you know, I understand that

6    orders are entered.  I used to represent a lot of

7    police departments.  And I know that orders don't tell

8    the whole story.  I presided over a lot of

9    discrimination cases of companies that have anti

10   discrimination policies that really don't get followed.

11   You are absolutely right, there is a paper trail that

12   says we are not going to discriminate.  That, I don't

13   think that -- that is an element, but not the whole

14   story.  And I think -- and I don't think you are

15   implying that.

16          MR. GIBBONS:  Correct.

17          No further questions.

18          THE COURT:  Okay.  Thank you.

19          Do you have any brief redirect?

20                     REDIRECT EXAMINATION

21   BY MS KOENIG:

22   Q    Briefly, Your Honor.

23          Dr. Chiles on direct or cross examination you were

24   asked about gentrification of Richmond since 2010.

25   A    Yes.

1   Q     When talking about gentrification and whites

2   moving into the City, are their specific areas that you

3   have in mind?

4   A     Yes.  From what I understand the south side areas,

5   Blackwell area, also Church Hill.  South Church Hill

6   northward.  Those are places where whites are moving

7   in, or have moved in in significant numbers.

8         So these are places that come to mind immediately.

9   Also, some around the north side area near Virginia

10  Union.  But those are just places that have come up in

11  the research I have done for my book projects where

12  gentrification not only has happened but is currently

13  happening.

14  Q     When you were doing your research in the '70s

15  about the Richmond Police Department and including

16  looking into trying to get information from the

17  Richmond Police Department, never came across any

18  precinct plans or anything like that, right?

19  A     No.

20  Q     And in terms of asking about the other sources

21  that you, that Mr. Gibbons was just asking about, that

22  you provided to me once we reviewed the second motion

23  in limine to exclude your testimony --

24  A     Yes.

25  Q     -- as it relates to the footnote that Mr. Gibbons

1    referred to in your report --

2    A    Yes

3    A    -- you gave --

4    A    Yes.

5    Q    -- you gave to me a number of citations, right?

6    A    Um hum.

7    Q    Is that a "yes?"

8    A    Yes.

9    Q    And --

10   A    I'm sorry.

11        MS KOENIG:  Your Honor, this is page, or ECF 107

12   page eight.

13        So, for instance, you indicated specifically the

14   table of reported offenses 1976 to 1980, 2nd Street

15   area, Richmond 1980, and all of those sources that are

16   listed in that filing, those came directly from you,

17   right?

18   A    Yes.

19   Q    Okay.

20        When we are talking about the evidence that you

21   came across in the past of when the Richmond Police

22   Department did start targeting whites for crimes, I

23   think you mentioned like prostitution and alcohol

24   violations, drug violations, when whites were targeted

25   by the Richmond Police Department, what was the

1   response?

2   A   They didn't like it.  They did not like it and

3   actually wanted to scale back on police funding and

4   supporting for the police.  This happened again during

5   the, around the turn of the century in the middle of

6   the progressive era, at least as indicated by Dr. Cei's

7   dissertation.

8   Q   That is what happened, right --

9   A   Yes.

10   Q   -- the outcry resulted?

11   A   Yes.

12   Q   No further questions, Your Honor.

13   Thank you.

14   THE COURT:  All right.

15   May this witness be excused?

16   MS KOENIG:  One moment.  He may.

17   THE COURT:  Do you have any need to keep him,

18   Mr. Gibbons?

19   MR. GIBBONS:  No, Your Honor.

20   THE COURT:  All right.

21   Dr. Chiles, thank you very much for coming today.

22   Very interesting to hear you.  And you are going back

23   to Old Dominion today?

24   THE WITNESS:  Yes, sir, I am.

25   THE COURT:  Teaching a class today?

Chiles - redirect                        **106**

1          THE WITNESS:  I canceled class.  They got off

2    lucky, but I didn't.

3          THE COURT:  Well, good for them.

4          Well, have a safe trip, and thank you very much

5    for coming.

6          THE WITNESS:  Thank you very much.

7          THE COURT:  Do you have any other witnesses?

8          MS KOENIG:  I have none, Your Honor.

9          THE WITNESS:  Does the Government have any

10   witnesses.

11         MR. GIBBONS:  No, Your Honor.

12         THE COURT:  Okay.  I had gotten some sort of a

13   word from someone that you were going to have a witness

14   today?

15         MR. GIBBONS:  Well, Your Honor, we weren't sure if

16   the maps would be stipulated to.

17         THE COURT:  Okay.

18         MR. GIBBONS:  So we had the Special Agent on hand

19   to testify if a situation came in.  We don't need him.

20         THE COURT:  All right.  Thank you.  All right.

21         Well, then all the evidence is in.

22         MS KOENIG:  Yes.

23              (The witness stood aside)

24         THE COURT:  So, here is what I would like you to

25   spell out for me, Ms Koenig.

1          As I read the cases you have got to prove two

2     things.  One is the discriminatory intent.  And one is

3     the discriminatory effect.  And so what you have got to

4     prove is that the way the police department works in

5     Richmond is set up with the intent to discriminate

6     against blacks.  And as I read Judge Moon's opinion in

7     the Johnson case he says, and there doesn't seem to

8     have been challenged on appeal, that the percentages

9     then show that there is discriminatory intent.

10          MS KOENIG:  It's not just Judge Moon, Your Honor.

11     So I think first going to the prong about the

12     discriminatory effect, I do not think that that prong

13     should be reasonably in dispute.

14          THE COURT:  Okay.  Let's deal with intent first.

15          MS KOENIG:  I bring that up, Your Honor, because

16     there are many many many cases that I cite in the

17     pleadings, and several of those are Arlington Heights,

18     International Board of --

19          THE COURT:  I understand.

20          MS KOENIG:  Many many cases indicate that blunt

21     statistical evidence of racially disparate impact may

22     be sufficient to prove discriminatory intent of an

23     equal protection claim.

24          THE COURT:  So we have got the -- that is your

25     evidence of the intent, and then the effect are things

1    like, it seems to me like you are relying pretty much

2    on the same evidence to show the effect.

3        MS KOENIG:  That is why I want to go through the

4    statistical evidence first, Your Honor.  We know that

5    77 percent of all of the Richmond Police Departments

6    traffic stops from July 1st of 2020 through December 6,

7    2020 were of black drivers, which means black drivers

8    are 5.13 times more likely to be stopped than white

9    drivers.  We know that it is statistically significant

10   that black drivers are going to be arrested and

11   searched more often than expected by chance than white

12   drivers.  And those findings are consistent with the

13   Virginia Department of Criminal Justice Services own

14   findings.  As well as what RTAP found of the Richmond

15   Police Department data in 2017 and 2018.  That

16   specifically found that 75 percent of all people that

17   the Richmond Police Department arrested during traffic

18   stops were black.  Meaning that black drivers were

19   30.7 percent more likely to be arrested as a result of

20   a traffic offense than a white driver.

21       And that was consistent with Dr. Smith's, the

22   Government's own expert's report of data analysis from

23   2000.  So all the evidence that we have from the last

24   20 years, 20 some years, indicates that black drivers

25   will be stopped by the Richmond Police Department at

1    egregious rates well and above what their percentages

2    in the population.

3        THE COURT:  Okay.  Let me ask you this question.

4    Suppose Mr. Moore instead of just doing -- what was --

5    did stop him because of a --

6        MS KOENIG:  Temporary tag.

7        THE COURT:  -- temporary tag?  Suppose instead of

8    that he had been driving down Brookland Park Boulevard

9    at 80 miles an hour and they stopped him for that.

10   Would you be arguing in that case that because he is

11   black and they arrested a disproportionate number of

12   black people that I should toss out -- I should say

13   that that stop was unlawful?

14       MS KOENIG:  So it's not that -- so, Your Honor, I

15   think the thing is that we have, as I mentioned

16   earlier, we have no evidence whatsoever that white

17   drivers commit less traffic infractions than black

18   drivers.  I will fully admit that I could be that white

19   driver driving 80 miles an hour on the interstate,

20   right, and no one pulls me over.  No one.  I am a white

21   driver with a car seat in the back.  Ha ha.  I am not

22   the target population for the Richmonder Police

23   Department to pull over.

24       THE COURT:  Well, you know, assume for a second he

25   committed some sort of egregious violation and was

1    pulled over for that.  And that it wasn't just a bad

2    license plate violation.  Suppose it was some sort of a

3    really bad violation and they pulled him over.

4        Would I be able to toss out his arrest that arose

5    out of that because the police are unfair to black

6    people?

7        MS KOENIG:  Your Honor, I think this argument is

8    the strongest when we are talking about relatively

9    minor traffic infractions.

10       THE COURT:  Your argument?

11       MS KOENIG:  Yes.

12       THE COURT:  I agree with that.

13       MS KOENIG:  So I am not -- I don't have -- I can't

14   say at what point in the future I might ultimately say

15   something, but at this point, Your Honor, I think the

16   evidence is strongest for this type of a challenge when

17   we are talking about relatively minor traffic

18   infractions.

19       THE COURT:  Okay.

20       MS KOENIG:  And so in terms of -- I think that the

21   discriminatory effect on how traffic laws are being

22   enforced against black drivers in the City of Richmond

23   is apparent.  And not just apparent but blatantly

24   apparent.  I think the discriminatory effect category

25   or element is satisfied.

```
 1          When we get to the discriminatory purpose, as
 2     numerous cases have indicated it is not easy, you know,
 3     it is, I can't, I couldn't find a case in which we have
 4     a member of the law enforcement agency that is being
 5     challenged that comes in and says, oh, yes, that is
 6     right, oh, we are discriminating against people.
 7          THE COURT:  So what you need to find is a law
 8     enforcement officer who has been terminated, who has
 9     been given the order.  That is how these kind of things
10     get proved.
11          MS KOENIG:  Well, it doesn't have to be --
12          THE COURT:  You have a Quisling in their ranks.
13          MS KOENIG:  But that is not what we have, what we
14     have to rely on here, Your Honor.  When we are looking
15     at, you know, the Iron Workers Local 86 case from the
16     Ninth Circuit that I cited, which has since the passage
17     of the Civil Rights Act of 1964 courts have frequently
18     relied upon statistical evidence to prove a violation.
19     And that is because in many cases the only avenue
20     available of, or only available avenue of proof is the
21     use of racial statistics to show what is happening.
22          THE COURT:  Well, that is because people are smart
23     enough not to say go arrest more blacks.
24          MS KOENIG:  We are not back in the 1960's where it
25     was freewheeling able to say whatever they wanted,
```

1    right?  People get charged with things like that.

2    People get found to be in violation.  And what we are

3    talking about is a civil rights problem of a different

4    magnitude.  Right.  So we have blunt statistical

5    evidence that is well sufficient in this case to show

6    that we have met our burden under Arlington Heights to

7    show that there is a discriminatory purpose.  We also

8    have extensive history about how residential

9    segregation came to be in Richmond.  And it is not when

10   you line up the map, when you compare Government's

11   exhibit, I mean defendant's exhibits 20 to defense

12   exhibit R 2, white part is precinct three.  Two, four,

13   one are the black parts of town.  We heard today, and

14   in Dr. Chiles's report, and in the articles that he has

15   written, that we have explicit and long-term evidence

16   of racial animosity as to why people are living in

17   those areas.  When we look at the Mission Team, Fourth

18   Precinct Focus Mission team has testified on July 26 of

19   2021 at pages 23 and 24 of the transcript, they are not

20   out to do traffic enforcement.  Their job is to try to

21   get guns and drugs off the street.  But they are using

22   minor traffic violations to pull over black drivers to

23   search for evidence or serious criminal activity.

24        THE COURT:  But the Supreme Court says they can

25   use minor traffic violations to do that.  You and I may

1    disagree with that, but they can't use to add the

2    additional factor in of race.

3        MS KOENIG:  So interestingly enough, when we look

4    at the case in which the Supreme Court said that that

5    is allowable, there was nothing like the body of

6    evidence in that case that is before this court.  But,

7    what we have in this case is we have months and months

8    and months of evidence, and years and years and years

9    of evidence, showing that what the Richmond Police

10   Department does is pull over black drivers.  And we

11   also know where these stops are happening is incredibly

12   important.  We have clusters of black drivers that are

13   stopped all over the City.  But clusters of white

14   drivers are only happening in the third precinct.  And

15   then we have the clusters of black driver stops that

16   are happening where the black and white parts of town

17   meet together.  It is so incredibly telling.  Why is

18   that happening?  We have proffered an explanation that

19   that it is policing the borders.  And we don't have any

20   other evidence to indicate that is not the case.

21       THE COURT:  Well, you do.  I mean, they have all

22   of these police officers in the sections of town that

23   Mr. Gibbons pointed out to us are where all the

24   homicides are happening.

25       MS KOENIG:  Some of the homicides are happening,

1      yes, Your Honor.

2          THE COURT:  You can look at the map.  It's not

3      just some of them.  You know, you don't have a lot of

4      homicides in Windsor Farms.

5          MS KOENIG:  That is why it is so important I think

6      to look at Government's six and seven as it relates to

7      the figures that are in defendant's exhibit two, which

8      is Dr. Costin's report.  Specifically, when you are

9      looking at figure two and you see that -- that there

10     are many clusters of black drivers that are stopped in

11     the third precinct in white neighborhoods.  Why?  If

12     the police are not over-patrolling those areas because

13     there is no homicide happening, why do we have that

14     happening?  When you look at the area where the

15     clusters are in the fourth precinct, which is where

16     Mr. Moore was stopped, and we see that there are huge

17     cluster areas, those are not in the same areas where

18     these murders are happening.

19         We have these cluster maps that show us that where

20     the clusters are often happening sometimes it is in

21     areas that the murders are happening, absolutely, but

22     how do we explain the ones that aren't but for race?

23         THE COURT:  Go ahead.

24         MS KOENIG:  What we also have is, we have I think

25     what the Government is doing is running from the

1    obvious answer.  What Dr. Smith tried to do was
2    basically say that in no circumstance would he ever
3    advise a law enforcement agency that they were acting
4    in a biased manner.  But if he found evidence of
5    statistical disparities he might advise them they need
6    to to some training to let their officers know that
7    they need to start treating people of different races
8    more equally.
9         So, the burden is initially on us, the defense, to
10   show that the discriminatory purpose was a motivating
11   factor.  Here the evidence is so explicit in terms of
12   the statistical evidence when we line that evidence up
13   with how the precincts are mapped out, and we compare
14   that to the racial, residential racial segregation in
15   Richmond.  So the burden then shifts to show the same
16   decision would have resulted even had the impressible
17   purpose not been considered.  And the Government hasn't
18   done a single thing to show that.
19        So at this point, Your Honor, I believe that you
20   have to rule for us.  The question I know The Court
21   asked us to consider at the end of the last hearing was
22   what would an appropriate remedy be if The Court were
23   to make such a finding?  I believe that The Court,
24   because it's not written in stone, the Supreme Court
25   has left the question open in Armstrong.  Several

1    circuits have weighed in.  Some circuits find dismissal

2    of the indictment is appropriate.  Other circuits and

3    other district courts with have found that suppression

4    of the evidence is the appropriate remedy.  If The

5    Court feels that a more creative remedy is appropriate,

6    we are happy to consider that.  But the remedy has to

7    be within the context of this case.

8         THE COURT:  Right.

9         MS KOENIG:  So that is where we are.  I think that

10   the -- we have met our burden, and that The Court

11   should so find.

12        THE COURT:  Okay.  Thank you.  It would be a

13   different story if somebody brought a 1983 case.

14        MS KOENIG:  Correct.

15        THE COURT:  Then I can enter an injunction.

16        MS KOENIG:  Correct.  That is not an appropriate

17   remedy in this case.

18        THE COURT:  I can't do that here.  You would have

19   thought somebody would have done that by now.  Maybe

20   somebody will try to figure that out.

21        MR. GIBBONS:  So, Your Honor, let me just start

22   before I respond to these points and get into my

23   argument, just review the facts very briefly.

24        So within a four-hour period the Focus Mission

25   Team sees three cars with the exact same license plate

1  number.  They pull over the first, I believe it was for

2  a defective headlight.  See that the registration

3  doesn't match the car.  Give that person a warning and

4  tell them to fix the headlight.  Let them on their way.

5  There is no search of the car as the defense has

6  repeatedly claims, there is absolutely no search of

7  that car.

8       THE COURT:  Well, they looked in it.

9       MR. GIBBONS:  But not a fourth amendment search.

10       Second stop an hour later.  They see a second car

11  with a broken window.  Same exact license plate.

12  Pulled it over.  The mom says she broke the window to

13  get into her car.  She locked her kid in the car.  Same

14  license plate.  Conduct is weird.  Gave her a warning.

15  No search.  Sent her on her way.

16       Two hours later they see Mr. Moore, same exact

17  license plate.  And they know it doesn't belong to his

18  car based on the two prior interactions within four

19  hours.  They attempt to initiate a traffic stop.  He

20  flees.  Goes through three stop signs at a high rate of

21  speed.  Crashes his car into the curb and then flees on

22  foot.  They find the firearm.

23       So, that is the background.  And when Ms Koenig

24  says the Government has not done a single thing to

25  rebut this legitimate law enforcement purpose.  I mean

1    that is it.  The police officers see a traffic

2    violation.  And if there is not just probable cause,

3    they know that there is something wrong with this tag

4    one way or another.

5         Attempt to issue a traffic stop, and here we are.

6         To start with, and just to reiterate, Your Honor,

7    we have pending motions to exclude on both Dr. Costin

8    and on Dr. Chiles.  And let me talk about why that is

9    the case, and why neither of those data or their

10   conclusions of their testimony are reliable properly

11   before The Court.

12        THE COURT:  Well, I think the Johnston case says I

13   can rely on the data, doesn't it?

14        MR. GIBBONS:  If the data is reliable.  But we --

15        THE COURT:  Yes.  Let me just say his explanation

16   of the data being unreliable was hog wash.

17        MR. GIBBONS:  Dr. Smith's explanation?

18        THE COURT:  Yes.  Dr. Smith was simply afraid to

19   testify that the emperor has no clothes.

20        MR. GIBBONS:  Talking about the Community Policing

21   Act data or other data, Your Honor?

22        THE COURT:  Yes.  I Community Policing Act data.

23   You remember he says they couldn't tell what race they

24   were.  You know, I may have been born during the day,

25   but it wasn't yesterday.

 1          MR. GIBBONS:  Well, the point we are trying to

 2     make, Your Honor --

 3          THE COURT:  Well, I believe it was yesterday since

 4     it was my birthday.  It was yesterday seventy-one years

 5     ago.

 6          MR. GIBBONS:  The point we are trying to make,

 7     Your Honor, is that comparing census records which are

 8     self -- race is self identified and traffic stop where

 9     race is identified by the police officer, it is just

10     apples and oranges.  I think that is what Dr. Smith is

11     trying to say.

12          THE COURT:  But he says they couldn't tell when

13     they were issuing a ticket what race the people were.

14     He couldn't be sure about it.  We have all -- I have

15     had -- Mr. Seibert has brought me a hundred cases where

16     they have identified the race of people, and they don't

17     seem to get it wrong.

18          MR. GIBBONS:  Your Honor, it is somewhere -- I

19     would have to look at the data again -- but somewhere

20     between seven and ten percent of that data there is an

21     unknown race checked in the Community Policing Act data

22     for Richmond.  So there is some uncertainty, I think

23     there is some hesitation on RPD officers to make

24     decisions in close calls.  And I think that is what

25     Dr. Smith was trying to say.

1          THE COURT:  Well, go ahead.

2          MR. GIBBONS:  We talked about, Your Honor, and we

3     called Kevin Turner, who works at Virginia State

4     Police, and Jim McDonough who works for Virginia

5     Department of Criminal Services, they talked about the

6     rush time line of the Community Policing Act and how

7     quickly this was rolled out, and how haphazard the data

8     collection in those first six months, which is the

9     first five months of data is the data that the defense

10    is relying on to prove that there is some kind of

11    unexplained statistical disparity.  We talked about

12    just that the pitfalls and unreliability of data.

13         THE COURT:  Well, you are going to have go far to

14    persuade me that 77 percent of the people who are

15    arrested were not black.

16         MR. GIBBONS:  Well, the 77 percent of the data

17    collected, that is what data shows.

18         THE COURT:  Data collected, you are right.

19         MR. GIBBONS:  But, Your Honor, we talked about

20    this and Dr. Costin admitted this during cross

21    examination, if you shift the time line to include the

22    first full year of that data instead of picking five

23    months of the most unreliable data the disparity

24    drops -- let me get this right -- the percentage of

25    blacks that were stopped drops from 77 percent to

1    68 percent; and the percentage of whites that were

2    stopped increases from 14 to 24 percent.  So if you

3    include, if you don't cherry pick the date range then

4    the disparity actually drops in half.  And if you

5    include the entire --

6         THE COURT:  Well, still a pretty big disparity.

7         MR. GIBBONS:  It is.  And this is where we get to

8    where the Fourth Circuit has repeatedly said some kind

9    of unexplained statistical disparity without more is

10   insufficient as a matter of law.

11        THE COURT:  So what the explanation for this?

12        MR. GIBBONS:  I think a partial explanation, and

13   that one we know is occurring, is police deployment

14   pattern.  That police are being deployed to higher

15   crime areas, which tend to be minority neighborhoods.

16   Now, there is no evidence, again the burden is on the

17   defense to explain these statistical disparities, there

18   is no evidence as to --

19        THE COURT:  Wait a minute.  You told me that that

20   is how these precincts were set up?

21        MR. GIBBONS:  There is no evidence in the record

22   as to how the precincts were set up.

23        THE COURT:  How they assign the police officers to

24   go out to those areas?

25        MR. GIBBONS:  There is no evidence, Your Honor.

1    But Dr. Smith repeatedly testified police go where the

2    crime is.

3        THE COURT:  Well, okay.

4        MR. GIBBONS:  We have these maps that show the

5    crime is disproportionately in these minority

6    neighborhoods.

7        THE COURT:  I understand what you are saying, and

8    that is the thing that has always bothered me about

9    this case.  I mean there are two sides to the coin

10   here.  Side one is I have been sitting here for 12

11   years, and I have never had a young white guy come in

12   who has got stopped or making an illegal left turn and

13   they found drugs in his car.  Never happened.  But, you

14   know, side two is you know people in those communities

15   deserve to live in an area that is safe and to have the

16   police try to find guns.

17       MR. GIBBONS:  Right, Your Honor.

18       If could I skip ahead.  I was going to talk about

19   this later, but the Ninth Circuit in this, United

20   States versus Turner case, and this is at 104 3d 1180,

21   and the cite is 1185, this is a Ninth Circuit case from

22   1897.  The defense in that case made a very similar

23   argument.  If the police set up some kind of traffic

24   stop sting operation in Beverly Hills versus south

25   central LA they are going to get different people

**JA1765**

1    because they don't patrol in Beverly Hills and they do

2    patrol in south central LA.  That there is some kind of

3    over policing, there is going to be some kind of

4    discriminatory impacts or disparities because they

5    police in south central L A.  The Ninth Circuit pretty

6    conclusively said that is not discriminatory effect as

7    a matter of law.  In fact, they said the defendant's

8    hypothetical, Beverly Hills versus south central LA, is

9    an argument that the minorities of the inner city of

10   Las Angeles must be denied the protection of law

11   enforcement by the Federal Government because the

12   likely subjects are likely to be minorities living in

13   that area.  So it can't be the case that enforcing the

14   law in predominantly minority areas is a violation of

15   the Constitution if those minority populations happen

16   to be high crime areas.  The Ninth Circuit has plainly

17   said that is not sufficient as a matter of law.

18        So all that we have here is some kind of

19   unexplained statistical disparity.  We don't know how

20   much of it is related to policing, how much is related

21   to race, if at all.  We just have this unexplained

22   statistical disparity.  And the Fourth Circuit in

23   multiple cases, in fact in Hair, Venable, and Orvis

24   have said that unexplained statistical disparity is

25   insufficient as a matter of law.

**JA1766**

1              THE COURT:  Well, I think the explanation is sort

2       of the opposite of why Willie Sutton robed banks.  The

3       police go where criminals are because that is where you

4       catch criminals.

5              MR. GIBBONS:  Right.  But Dr. Costin admitted on

6       the stand that none of her work could be interpreted as

7       causation, didn't intend to make any causative

8       arguments.  That is one of the key weaknesses of the

9       defense case.  They have done nothing to explain this

10      statistical disparity when in fact the law requires

11      them to do that.  So we don't know one way or the other

12      what is the cause of this naked statistical disparity.

13      And the defense hasn't put anything in besides

14      proffering of lawyer testimony that the police are

15      enforcing racial boundaries, which there is no evidence

16      of that in the record besides assertions of counsel.

17             So, again, on that point the unexplained

18      statistical disparity, or prohibition on that is the

19      sole evidence of effect and intent, is intended to meet

20      Armstrong's requirement that the defense produce a

21      similarly situated defendant.  And there has been no

22      attempt to do that, and the only evidence of that is

23      this unexplained statistical disparity.

24             THE COURT:  Well, can you address a different

25      question for me?  And it's one I addressed to Ms

1   Koenig.

2        Let's just assume for a second that I find that

3   there is a disparity and intent, but the police see a

4   crime happening.  Is the remedy for that to toss out

5   the charge?  I mean, suppose the guy was driving down

6   Brookland Park Boulevard at 80 miles an hour.  And

7   police caught him.  Yet he happened to be a black

8   person and the police were looking for black people.

9   Should I toss out that indictment?  I assume they are

10  going to say no.  And can you tell me why?

11       MR. GIBBONS:  Well, Your Honor, I think she has a

12  legal test correct.  It is a burden-shifting argument

13  similar to a Batson challenge.  They make a prima facie

14  case -- and we don't think that is met here -- and the

15  burden shifts to the Government to assert legitimate

16  non-discriminatory reasons.  And The Court balances

17  those explanations.

18       To that point, Your Honor, The Court, the Fourth

19  Circuit said in Mason that "Where there exists an

20  objectively reasonable basis for the officer's conduct

21  after rigorous challenge it is even less likely that an

22  Armstrong claim would get off the ground."

23       And then a little bit later, "Officers cannot just

24  cease enforcement efforts where there is an objective

25  reason to believe that there has been a violation of

1    the law."

2        An that is exactly what happened here.  The police

3    see this fake tag that they have seen three times now

4    in the last four hours, the same officers, same shift.

5    Are they supposed to just let this walk because of the

6    defendant's race?  I think the answer is no.  That they

7    are required to enforce the law, and in fact that is

8    exactly what they did in this instance.  And I believe

9    answers The Court's question.

10        Let me switch gears, Your Honor.

11        THE COURT:  Sure.  Go ahead.  Take your time.

12        MR. GIBBONS:  Another important piece here, Your

13    Honor, another failure of the defense's case and their

14    burden is the Supreme Court in McClusky said that the

15    party bringing the equal protection claim must show

16    discriminatory purpose in his case.  There has been

17    absolutely no evidence to that effect.  There has been

18    no evidence connecting unexplained statistical

19    disparities to the stop on December 5 of 2020, or

20    historical prejudice that occurred many decades ago.

21        THE COURT:  Well, I agree with you about

22    annexation and all that stuff that happened back in the

23    '70s.  But if I find that there is still a pattern of

24    racially-biased enforcement, are you saying that there

25    is no evidence that the stop of this gentleman was

1   because of that?

2        MR. GIBBONS:  Yes, Your Honor.  There is no

3   evidence of that.  The four officers that were involved

4   in that stop were here.  They testified.  They gave --

5   this was over a year ago -- they were cross-examined,

6   and there is no evidence of any kind of racial

7   prejudice or anything that some kind of over policing,

8   which we have already addressed, but over policing by

9   itself is not a Constitutional violation.  That that

10  somehow touched this stop on December 5, 2020.

11       In fact -- this is another one of Your Honor's

12  questions from the last, from the last hearing.  You

13  asked about mixed motives or what happens if there is

14  kind of awareness of discriminatory impact.  Or, excuse

15  me, of disparate impact.  And that is not enough under

16  Supreme Court case law under.

17       THE COURT:  You have to have intent, too.

18       MR. GIBBONS:  Right.  You have to not just be

19  aware there is an impact or disparate impact, you have

20  to intend that disparate impact to take place.

21       THE WITNESS:  In this particular case.

22       MR. GIBBONS:  In this particular case.  There is

23  just no evidence of that.  There is no evidence that

24  Henry Marsh and Doug Wilder, Tim Kaine, they are

25  involved in the through line from '89 to 2020.  And it

128

1    is just inconceivable they would permit, not only

2    permit this but intend this to to take place or allow

3    it to take place within RPD.

4        THE COURT:  Well, there is not even any evidence

5    that Mayor Stoney intended.

6        MR. GIBBONS:  That is one of the weaknesses of the

7    defense case.  There has to be connection to this case,

8    has to be connection that there was intent in this

9    case, and there is simply no evidence of that beyond

10   unexplained statistical disparity.

11       THE COURT:  Right.

12       MR. GIBBONS:  And just, the implications of the

13   defense's argument is massive.  If it's the case that a

14   simple unexplained statistical disparity is enough to

15   get an indictment dismissed without further evidence or

16   connection to this case, then any traffic stop in the

17   City of Richmond is ineligible to proceed to

18   indictment.  Because if there is an unexplained

19   statistical disparity here then no indictment can

20   result from any traffic stops.  And not just here in

21   Richmond, we heard from Dr. McDonough that Richmond's

22   unexplained statistical disparity in the DCJS report is

23   about middle of the road in the Commonwealth.  So this,

24   that the logical import of this argument extends not

25   just to Richmond, but throughout the Commonwealth.

1    That maybe zero traffic stops in the City or in the
2    Commonwealth of Virginia are eligible to be proceed to
3    indictment based on the defenses theory.
4         THE COURT:  Or even to give them a ticket.
5         MR. GIBBONS:  Give them a ticket, right.
6         And not just the Commonwealth of Virginia, but if
7    you take Dr. Smith at his word that this is really a
8    national problem that goes back decades, really no
9    traffic stops, or no enforcement can occur where some
10   kind of disparate impact has been identified or some
11   kind of unexplained disparity is present.
12        THE COURT:  So, what is wrong with that result if
13   everybody, if all the stops, if there is a national or
14   state-wide or City-wide practice of stopping
15   African-American people, why should they be allowed to
16   indict them?  Although, the other problem with the
17   whole case is that you are asking me to decide
18   sociological questions that are not legal ones, or
19   maybe they are or maybe they aren't.  They say they are
20   legal questions.  I think you think they are
21   sociological.
22        MR. GIBBONS:  This is really, as Dr. Smith
23   acknowledged on the stand, this is a problem that goes
24   back decades and centuries.  And the idea that
25   dismissing the indictment would solve or even address

1    these long-standing and thorny problems being addressed

2    throughout our political branches, that that would be

3    accomplished in one courtroom in Richmond is just --

4    making a ruling in this case, vis a vis, such a blunt

5    instrument for the massive blame that is before our

6    society.

7         Sorry, Your Honor.  A little scatter shot.

8         THE COURT:  Well, that is okay.  I keep asking you

9    questions.

10        MR. GIBBONS:  Your Honor, just to go back to

11   repeated Fourth Circuit law.  The Armstrong test has

12   been adopted in these types of cases, selective

13   enforcement cases, and the Fourth Circuit in Hair,

14   Mason, Ovis, Venable has created very, very high

15   standards for this type claim to get discovery about

16   and to succeed on.  And we believe that standard has

17   plainly not been met here, Your Honor.

18        One moment.

19        THE COURT:  Take your time.

20        MR. GIBBONS:  Nothing further.

21        THE COURT:  Thank you very much, Mr. Gibbons.

22   Good job.

23        MS KOENIG:  Your Honor, once the burden shifts to

24   the laws, the action defender, you have to show that

25   the same decision would have resulted even had race not

1    been considered.  I don't think that we have any

2    evidence here of that whatsoever.  So what we are

3    looking at is in terms of like the dates of the stop,

4    like when, as this court recognized, the numbers are

5    still incredibly high even if you look at the whole

6    year's worth of data, but the reason that we came and

7    stopped at December 6 of 2020 is because if I came in

8    with additional data beyond that everybody would be

9    screaming and yelling about the relevance of the date.

10        THE COURT:  Well, that is part, one of the

11    problems with being a lawyer.

12        MS KOENIG:  Ha ha ha.  So, but what we do know is

13    we do not have any evidence about the police deployment

14    patterns in this case.  We do not have -- but what we

15    do have is we have clear evidence about the traffic

16    enforcement in this case.  This is a selective

17    enforcement claim, not a selective prosecution claim.

18    And as I talked about several times in the briefing,

19    for example in ECF number 66 at page three, footnote

20    one, the standard is different.  We don't have to show

21    a similarly situated defendant when we are talking

22    about a selective enforcement claim as opposed to a

23    selective prosecution claim.  They are different than,

24    different considerations that are at play in a

25    selective prosecution claim which we have not brought

1    here.

2         But what we have is we have a pattern, right.  A

3    pattern and a practice that all comes together

4    especially when we look at the history that Dr. Chiles

5    testified about.

6         It's not that the police just happened to be in

7    high crime areas.  The City designed essentially those

8    places to be areas where you are going to stick blacks,

9    poor people who have been deprived of everything that

10   they otherwise would have been entitled to, and now we

11   are going to stop them over and over again for traffic

12   stops.  This is not by happenstance.  And Dr. Costin

13   testified that it is policing borders.  Not just me

14   standing up here saying that.  I wouldn't be able to

15   make that representation.  Dr. Costin testified to

16   that.  We can see it in the figures.  We can see it in

17   the evidence.  And I think that one thing that The

18   Court has to also look at is as it relates to this case

19   we know that what ultimately happened pretty quickly

20   within a matter of a few minutes, with the other two

21   people that were stopped for this same license plate

22   number, they were just let go, oh, no issue.

23         THE COURT:  Well, they had the good sense to not

24   run off.

25         MS KOENIG:  Again, we are talking about the

1    initial part, right.  Just the traffic enforcement part

2    of it.  Right.

3        So when we get to I think what I take from the

4    Government's argument, this parade is that let's just

5    keep on keeping on with what we have been doing all

6    these years.  Let's just keep over, over, over policing

7    the blacks.  Let's just let everybody do what they have

8    been doing before.  It is just so hard to fix it.  It

9    is so hard for us to try to do something that is going

10   to help make things more equal.  And that is exactly

11   what the equal protection clause is designed to do, is

12   to force change like it did in the '70s when the Fourth

13   Circuit didn't want to deal, or didn't want to let

14   Richmond just do what they had been doing all along

15   with continued segregation at that point.  When does it

16   stop?  I think it stops when we have evidence that

17   shows us that we are really more in parity with the

18   traffic stops that have happening.  If the ramification

19   is that someone gets pulled for a traffic stop and you

20   have got to find better reasons to try to cite them

21   with a crime, so be it.  Right.  So be it.

22       And so what we have in this case is we are not

23   just to just keep on keeping on.  We are asking The

24   Court to find enough is enough.

25       THE COURT:  All right.  Thank you.

1          Anything else, counsel, in this case?  Do you all

2     want to file more briefs in this case, or have you

3     exhausted your supply of ink?

4          MR. GIBBONS:  The government is happy with no

5     further briefing.  This has been going on for a very

6     long time.

7          THE COURT:  It has been going on for a long time,

8     hasn't it?

9          MS KOENIG:  Same here, Your Honor.

10         THE COURT:  All right.

11         Well, this is it.  A difficult case that raises a

12    lot of difficult questions.

13         Much and it is brings to the forefront something I

14    have been facing ever since I have been a judge, which

15    is why is it that we only have stops in cars with black

16    drivers?  And I just don't get it.

17         But it also brings to the front of how do we

18    protect the African-American community?  It is a tough

19    question.

20         Do you have anything further to add, Mr. Seibert?

21    I haven't heard from you yet.

22         MR. SIEBERT:  No, Your Honor.  I would just --

23         THE COURT:  Is that a VMI tie?

24         MR. SIEBERT:  My alma mater.

25         THE COURT:  Well, congratulations.

1          MR. SIEBERT:  I was going to add, Your Honor, just

2      I don't know if we covered this, but -- and I don't

3      want to open up anything if Ms. Koenig had to answer,

4      but the maps, right, I would encourage The Court to

5      overlay that on top of the maps --

6          THE COURT:  The crime maps.

7          MR. SIEBERT:  The crimes maps.  The murder and

8      manslaughter, I assume The Court would do to already,

9      but just overlay that across what Ms Koenig provided on

10     the traffic stops.  I think there is a correlation.

11     Police officers aren't walking the beat any more.  They

12     are all in motor vehicles.  So their main area is

13     driving around looking for cars.  I mean, that's how

14     they deter crime by presence.  Less likely crime to

15     occur when they are patrolling, right.  But I think

16     it's very telling.  I think, you know, Your Honor made

17     a comment about linking the redeployment or the

18     resource allocation.  I think this answers that

19     question.  That is the only thing I would add.

20         THE COURT:  Thank you, Mr. Siebert.

21         Ms Austin, do you have anything to add?

22         MS AUSTIN:  No, Your Honor.  Thank you.

23         THE WITNESS:  Okay.  Thank you.  All right.  Thank

24     you all very much.  And we will have to write an

25     opinion about this thing.

1        Thank you.

2        Good job, counsel on both sides.  I appreciate

3   your good work.

4        Let's adjourn

5

6                    HEARING ADJOURNED

7

8      THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

9

10                 GILBERT FRANK HALASZ, OCR

11                  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**index**

| Witness. | pg | ln |
|----------|----|----|
| Chiles - direct | 8 | 12 |
| Chiles - cross | 78 | 11 |
| Chiles - redirect | 103 | 10 |

**JA1780**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                          Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
          Defendant.

## OPINION

On December 5, 2020, four Richmond Police Department ("RPD") Fourth Precinct police officers tried to pull Keith Rodney Moore over in the Highland Park neighborhood of Richmond because his car had suspicious temporary tags. Instead of stopping, Moore drove away before abandoning his car and fleeing on foot. The officers pursued and caught him, and they took him into custody. Afterwards, the officers found a gun in the car Moore had abandoned. A grand jury ultimately indicted Moore for possessing a firearm and ammunition as a convicted felon.

Moore has moved to suppress evidence of both the gun the police officers found in his car and statements he made after they took him into custody. (ECF No. 17.) Moore's flight gave the police officers probable cause to arrest him, and the Court will therefore deny his motion to suppress evidence of the gun he abandoned in his vehicle. But because the officers asked Moore questions that were likely to elicit an incriminating response both before he received his *Miranda* warnings and after he invoked his right to remain silent, the Court will grant his motion to suppress those statements. The Court will deny his motion to suppress statements he made voluntarily after receiving his *Miranda* warnings but before he invoked his right to remain silent.

## I. FACTS[1]

On December 5, 2020, four police officers—Officers Dominic Colombo, Nakia Williams, Keegan Mills, and Sergeant Michael Spinos—tried to pull Moore over. They suspected that Moore's car had phony temporary tags because they had twice stopped cars with the same temporary tag number, 11134Y, earlier that night.[2]

The officers activated their cruisers' lights to indicate that Moore should pull over so they could further investigate his suspicious temporary tags. Instead of pulling over immediately, Moore drove away, ran multiple stops signs, and eventually stopped his car on a curb. He then got out of the car and ran from the police. When he fled, Moore left his car running and his driver's side door open. At least three of the officers saw a handgun on the floorboard in front of the driver's seat.

Meanwhile, Colombo and Spinos chased Moore on foot, and Williams and Mills pursued him in their cruiser. After Moore stopped running, the officers forced him to the ground and handcuffed him. Officers John Gilbert and Jakob Torres then arrived to assist the other officers and transport Moore.

In the first few minutes after they handcuffed him, the officers asked Moore basic questions, and Moore did not respond. Officer Gilbert then asked "[w]hat you running for, man?" (Hr'g Tr. 49:18–22, 147:13–17, July 26, 2021; Gov. Ex. 14, at 4:13.) Moore did not respond to that question either.

About ten minutes after the officers initiated the stop, Mills told Moore that he was under

---

[1] The exhibits cited in this section refer to those admitted at the suppression hearing.

[2] During the first stop, the officers pulled over a Black man who had the temporary tag number 11134Y. They ultimately ended that stop without a warning. During the second stop, the officers pulled over a Black woman who had the same temporary tag number. They let her go after interacting with her for less than two minutes.

2

arrest and performed a pat-down search incident to that arrest.  During the search, Mills asked

Moore questions related to the pat-down, such as whether Moore had anything on him, or items

hidden in his underwear.  Shortly thereafter, Moore's cousin arrived.  Moore told her that the

police pulled him over at the gas station.  He also said, "I know a n****'s tellin' now, that shit's

crazy."  (Gov. Ex. 14, at 12:58–13:02.)  Mills asked, "[t]elling on you about what though?"  (*Id.*

at 13:06–13:08.)  Instead of answering Mills's question, Moore responded, "I'm talking to my

people."  (*Id.* at 13:08–13:10.)

Gilbert then placed Moore in the back of his police cruiser.  After Gilbert drove Moore

back to his car, Moore asked Gilbert if the police would have his car towed.  Gilbert responded

that Moore's car would probably be towed.

Spinos then spoke to Moore about Moore's car and the tags while Moore sat in the back

of Gilbert's patrol car.  After that conversation ended, Spinos told Williams to read Moore his

*Miranda* rights.  Immediately before Williams did so, Officer Torres asked Moore where he

bought the car.  Moore explained where he bought the car and how much he paid for it.

Williams then read Moore his *Miranda* rights.  She paused after each sentence and asked

Moore whether he understood his rights.  He affirmed his understanding after each sentence.

After she finished reading him his *Miranda* rights, Williams asked Moore if he wanted to have a

conversation with her.  Moore did not answer.  Williams again asked if Moore wanted to answer

any of her questions.  Moore replied, "Just get me down to jail, man."  (Gov. Ex. 12, at 19:28–

30.)  Williams said, "Alright, cool," and she walked away.  (*Id.* at 19:30–33.)

Moore then engaged Spinos in a conversation about why the officers had pulled him

over.  Spinos asked Moore whether a car dealer gave him his temporary tags, and Moore told the

officers that the Hanover County police did not say anything to him about his tags when they had

recently pulled him over for speeding.  In response, Williams asked, "[i]f that's the case, then why didn't you just stop, if you knew that you had already been through this with another agency?"  (*Id.* at 21:23–29.)  Moore answered that he did not stop because he "had a whole iron in the car."  (Hr'g Tr. 110:18–20, July 26, 2021.)  Williams told him that the incident "could have been dealt with a different way."  (Gov Ex. 12, at 21:40–42.)  Moore then told her, "I am not talking to you.  I'm done."  (*Id.* at 21:45–47.)

A few minutes later, while they sat in Gilbert's patrol car, Moore asked Gilbert who had his phone and his girlfriend's wallet.  After responding to Moore's questions, Gilbert asked, "[w]hat you run for today, man?"  (Gov. Ex. 14, at 29:19–21.)  Moore replied, "[y]'all know the deal man, when you got a gun in the car.  Y'all know the deal."  (*Id.* at 29:20–25.)  Gilbert then asked Moore how clean his record was, and Moore responded that he did not have any gun charges.  (*Id.* at 29:40–48.)  Gilbert then asked Moore if he was a convicted felon, and Moore responded, "[y]es, sir."  (*Id.* at 29:49–29:53.)  Gilbert then asked Moore, "[y]ou know you can't have a gun, right?"  (*Id.* at 29:58–30:02.)  Moore answered in the affirmative.  (*Id.* at 30:02–04; Hr'g Tr. 153:18–20, July 26, 2021.)  The officers detained Moore, and, on May 4, 2021, the grand jury returned a one-count indictment against Moore for his unlawful possession of a firearm as a convicted felon.

## II. <u>DISCUSSION</u>

Moore has moved to suppress evidence of both the gun the police officers found in his car and statements he made after they took him into custody.

### *A. The Gun*

Moore argues that the police violated his "Fourth Amendment right to remain free of unreasonable seizures when they pulled [him] over to investigate a temporary dealer tag."  (ECF

4

No. 17, at 3.)  He further argues that "[s]imply having temporary tags on a car is not a reasonable basis for a traffic stop" and asks the Court to "suppress all evidence that the police obtained after initiating the traffic stop in violation of" his Fourth Amendment rights.  (*Id.* at 4.)

Here, Moore's temporary tags had the same number as those of two other drivers the officers had stopped that night.  Suspecting that Moore had phony temporary tags, the officers pulled him over.  *See* Va. Code § 46.2-612(B)(1) (prohibiting a person from displaying "fictitious" tags).  Because the officers suspected Moore had violated a traffic law, the officers "[were] legally justified in stopping" Moore's vehicle.  *United States v. Hassan El*, 5 F.3d 726, 729–30 (4th Cir. 1993) ("[W]hen an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment.").  The officers, therefore, did not violate Moore's Fourth Amendment rights by trying to pull him over.

Additionally, the officers did not "seize" Moore until he stopped running and the officers took him into custody.[3]  By that time, Moore had committed multiple crimes for which the police could arrest him.  *See, e.g.*, Va. Code. § 46.2-817(A) (making it illegal to disregard a law enforcement officer's signal to stop one's car).  And he had abandoned his car and gun, losing any reasonable expectation of privacy in that property.  *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) ("The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property."); *see United States v. Hopkins*, 568 F. App'x 214, 216 (4th Cir. 2014) ("When Hopkins fled from the police, he

---

[3] *United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) ("[A] seizure 'requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority.' . . . A defendant who flees the police in response to an assertion of authority has not been seized." (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991))).

abandoned the car, thereby forfeiting any privacy interest in the car or its contents.").[4] Thus, the officers' seizure of Moore's gun did not violate the Fourth Amendment.

### B. Moore's Statements to RPD

Moore argues that the police violated his "Fifth Amendment right to remain silent by interrogating him both before and after *Miranda* warnings and after he invoked his right to remain silent." (ECF No. 17, at 5.) Specifically, he seeks to suppress:

> (1) everything [he] said pre-*Miranda* . . . because [the] officers had not read him his rights; (2) everything [he] said post-*Miranda* . . . because [the] police continued to interrogate him after he invoked his right to remain silent; and (3) everything [he] said post-*Miranda* . . . because [the] officers engaged in a prohibited two-step interrogation technique that effectively rendered his post-*Miranda* statements involuntary.

(ECF No. 22, at 9; ECF No. 17, at 5–7.)

#### 1. Pre-Miranda Statements[5]

Generally, the government cannot use pre-*Miranda* statements a defendant makes during a custodial interrogation in its case-in-chief. *See Leshuk*, 65 F.3d at 1108. "'Interrogation' . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Accordingly, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional

---

[4] *See also United States v. Stover*, 808 F.3d 991, 1000–01 (4th Cir. 2015) ("Since [the defendant] did not accede to police authority until confronted by an armed officer in front of [his car], the gun he discarded prior to that time was not the fruit of the seizure, but rather, like the cocaine in *Hodari D.*, was abandoned."); *id.* at 1001 ("[W]hen an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not apply.").

[5] Though the government has "determined that it would seek admission of only two sets of Moore's pre-*Miranda* utterances: his statements to his cousin who arrived on the scene . . . and his statements and questions to the officers regarding what would happen to his Chrysler 300," the Court addresses each statement Moore seeks to exclude. (ECF No. 22, at 10.)

equivalent." *Id.* at 300–01.  In other words, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

As an initial matter, the Fifth Amendment does not bar the voluntary statements Moore made to the police, including the comments he made to his cousin, before the officers read him his *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").  Nor does it bar responses to questions or statements normally attendant to arrest, such as questions about whether Moore had anything on him or statements explaining why the police arrested him. *See Innis*, 446 U.S. at 301.  Further, Moore responded to questions from the police that were *not* "reasonably likely to elicit an incriminating response," *id.*, such as questions about the price of his car.

The police officers asked several questions, though, that they "should [have] know[n] [were] reasonably likely to elicit an incriminating response" from Moore. *See id.*  This includes Gilbert's question, "[w]hat you running for man," and Torres's question about "where [Moore] got his car." (Hr'g Tr. 97:5–24, 147:13–15, July 26, 2021.)  Moore answered only Torres's question.  Even though Moore provided an innocent answer to Torres's question, the Fifth Amendment bars the admission of his response in the government's case-in-chief because the question could reasonably have led to an incriminating response, such as an admission that Moore stole the car.  *Innis*, 446 U.S. at 300–01 ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. . . . '[I]nterrogation' under *Miranda* refers not only to express questioning, but also to

7

USCA4 Appeal: 24-4201      Doc: 22-5      Filed: 09/04/2024      Pg: 158 of 217

any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."). The Court, therefore, will suppress Moore's response to Torres's question.

### 2. Post-Miranda Statements

"To invoke the right to remain silent . . . and thereby cut off questioning, the suspect's invocation must be 'unambiguous.'" *United States v. Abdallah*, 911 F.3d 201, 210 (4th Cir. 2018) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010)). "An invocation is unambiguous when a 'reasonable police officer under the circumstances would have understood' the suspect intended to invoke his Fifth Amendment rights." *Id.* (quoting *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011)). After an individual invokes his right to remain silent, "[o]fficers cannot fail to scrupulously honor a suspect's request in the hope that the suspect will subsequently waive that failure." *Id.* at 216.

Moore argues that he "invoked his right not to speak with the officers" shortly after Williams read him his *Miranda* rights by telling Williams, "I'm not talking to you. I'm done." (ECF No. 32, at 13; Hr'g Tr. 126:11–15, July 26, 2021.) The Court agrees that Moore unambiguously invoked his right to remain silent with these statements and, as such, will bar the government from introducing any statements Moore made after he invoked this right. This includes Moore's statements to Officer Gilbert about his status as a convicted felon and his understanding that he could not own a gun.

8

### 3. *Constitutionality of the Officers' Interrogation Technique*[6]

Moore also argues that the officers violated *Seibert* by deliberately employing a two-step interrogation technique whereby they used Moore's pre-*Miranda* statements to elicit the same information after he received his *Miranda* warnings.[7]   (ECF No. 17, at 6–7.)   *Seibert* only applies, however, when the police *deliberately* use the question-first strategy.   *Mashburn*, 406 F.3d at 309 (citing *Seibert*, 542 U.S. at 521 (Kennedy, J., concurring)).   In cases where police do not deliberately use the question-first strategy, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made."   *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).   The Court, therefore, must first determine whether the officers' "failure to convey *Miranda* warnings to [Moore] was deliberate or intentional."   *Mashburn*, 406 F.3d at 309.

Moore argues that the officers deliberately engaged in a two-step procedure, as demonstrated by the fact that Moore's pre-and post-*Miranda* statements all took place within the span of approximately thirty minutes, the questions involved the same police officers, and "the contents of the two interrogations overlapped nearly completely."   (ECF No. 17, at 6.)   But *Seibert* applies only when police officers "*intentionally* delayed delivering *Miranda* warnings to provoke [a defendant's] admissions."   *United States v. Dorsey*, 744 F. App'x 130, 134 (4th Cir. 2018) (emphasis added).   Indeed, "[w]ithout a showing of the officer's subterfuge, the mere fact that [a defendant] made pre-*Miranda* statements and post-*Miranda* statements does not render

---

[6] Because the Court will exclude any statements Moore made after invoking his *Miranda* rights, the Court evaluates under *Missouri v. Seibert*, 542 U.S. 600 (2004), only those statements Moore made after Williams's administered Moore's *Miranda* rights and before Moore invoked his right to remain silent.   This includes Moore's statements to Spinos about his tags and his ticket in Hanover County.

[7] Courts refer to this as a "question-first" strategy.   *See United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (citing *Missouri v. Seibert*, 542 U.S. 600, 615 (2004)).

JA1789

USCA4 Appeal: 24-4201   Doc: 22-5   Filed: 09/04/2024   Pg: 160 of 217

his post-*Miranda* statements involuntary and inadmissible." *Id.*

The record does not support a finding that the officers intentionally or deliberately undermined *Miranda*. Rather, the evidence indicates that the officers confronted a fluid situation that evolved within minutes, from an effort to make a traffic stop, to a pursuit of a fleeing suspect and an investigation into an illegal weapon. *See United States v. Davis*, 645 F. Supp. 2d 541, 554 (W.D.N.C. 2009) (finding no evidence that the police deliberately delayed giving *Miranda* warnings during a traffic stop). Without any evidence that the officers deliberately used the "question-first" strategy, the Court must consider whether Moore "knowingly and voluntarily" made his warned admissions under *Elstad*. 470 U.S. at 309.

Here, Moore voluntarily reengaged with the officers after he received and acknowledged that he understood his *Miranda* rights. (*See* Hr'g Tr. 109:16–18, July 26, 2021; Gov. Ex. 12, at 19:50–20:06.) Moore, who started asking questions to and engaging in a conversation with Spinos less than one minute after receiving his *Miranda* warnings, cites no evidence of police coercion. Moore thus "made a rational and intelligent choice . . . to waive . . . his rights" when he initiated a conversation with the police officers. *Elstad*, 470 U.S. at 314.[8] Given the lack of evidence that the officers deliberately undermined the *Miranda* requirements and the evidence that Moore decided to reengage with the officers despite understanding his right not to do so, the Court will deny Moore's motion to suppress statements he made *after* Williams read him his *Miranda* rights but *before* Moore invoked his right to remain silent. *See id.* at 384 ("Where the

---

[8] *See also Berghuis*, 560 U.S. at 385 ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").

prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

## VI.  CONCLUSION

For the foregoing reasons, the Court will grant Moore's motion to suppress his pre-*Miranda* statement regarding from where he purchased his car and statements he made after invoking his *Miranda* rights.  The Court will deny his motion to suppress in all other respects. (ECF No. 17.)

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 13 November ~~October~~ 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

11

**JA1791**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                          Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
                    Defendant.

## OPINION

Black drivers have a problem in Richmond, Virginia.  Richmond Police Department ("RPD") officers stop Black drivers five times more frequently than white drivers.  The defendant in this case, Keith Rodney Moore, is one of the Black drivers stopped by RPD officers.  On December 5, 2020, RPD officers pulled Moore over in the Highland Park neighborhood of Richmond.  Moore fled the scene, but the officers caught him, arrested him, and ultimately found a gun in Moore's car.

On May 4, 2021, a grand jury indicted Moore for possessing a firearm and ammunition as a convicted felon.  Moore has moved to dismiss the indictment, claiming that RPD's officers selectively stop Black people, and that this selective enforcement led to his current charges.  (ECF Nos. 32, 66.)  As part of his evidence, Moore introduced two experts, Dr. Eli Coston and Dr. Marvin Chiles.  The government has moved to exclude both.  (ECF Nos. 70, 82.)  These three motions—Moore's motion to dismiss the indictment, and the government's two motions to exclude—pend before the Court.

The Court will deny the government's motions to exclude the defense experts' testimony.  Both experts offer relevant evidence.  Coston's data and analysis is reliable.  And, using reliable sources to develop his testimony, Chiles provided insights into Richmond's institutional character.

Additionally, the Court will grant Moore's motion to dismiss the indictment on selective

enforcement grounds.   Moore presents abundant evidence that Black drivers represent a disproportionate share of the individuals pulled over for traffic stops in Richmond.  Moore has shown both elements of a selective enforcement claim:  discriminatory intent and discriminatory effect.

## I. MOTIONS TO EXCLUDE THE DEFENDANTS' EXPERTS

First, the Court will address the government's motions to exclude the testimony of Dr. Coston and Dr. Chiles.

### A. Legal Standard for Expert Testimony

Federal Rule of Evidence 702 permits expert testimony "in the form of an opinion or otherwise" by—

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education . . . if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[1]  In other words, the Court must ensure that expert testimony is both relevant and reliable.

---

[1] "Rule 702 applies whether the trier of fact is a judge or a jury." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3d Cir. 2020). But  the  standards relax when the judge sits as the trier of fact: "where the factfinder and the gatekeeper are the same, the court does not err in admitting evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *Larosa v. Pecora*, No. 1:07cv78, 2009 WL 3460101, at *3 (N.D.W. Va. Mar. 2, 2009) (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).  The Court also has "wide discretion" to determine "[w]hether an expert will assist the factfinder . . . 'particularly when the court sits as the trier of fact, for [it] is then in the best position to know whether expert testimony would help [it] understand the case.'" *Sun*

2

**JA1793**

## 1. Relevance

"Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. 579, 591 (1993)). The first step to determine relevance is to under what is "in issue." *See id.* On this, the parties differ, leading them to different conclusions about the relevance of any particular evidence.

The government views this case under the principles governing selective prosecution cases—cases where the state chooses to prosecute defendants of one race, but not to take cases to court involving people of another race. In selective prosecution cases, the party challenging prosecution must meet a very heavy burden to show that people who committed the same behavior face different legal consequences in court—some get prosecuted, and others go scot-free. A litigant asserting a selective prosecution claim must demonstrate nearly identical underlying criminal behavior of comparators, and he must show that discriminatory intent led to different treatment. *United States v. Armstrong*, 517 U.S. 456, 465, 458 (1996).

Here, Moore contends something different: that the police selectively stop Black drivers. Although stops do not necessarily lead to prosecutions,[2] they are nevertheless extraordinarily intrusive actions that make "most everyone . . . nervous." *See United States v. Palmer*, 820 F.3d 640, 652 n.7 (4th Cir. 2016). Most people driving down the road see themselves in a private cocoon, alone with their thoughts, their plans, their music, their audio books. Whatever comfort a driver and her passenger may feel in their car vanishes when the police approach. A sense of

---

*Yung Lee v. Clarendon*, 453 F. App'x 270, 278 (4th Cir. 2011) (quoting *Mercado v. Austin Police Dep't*, 754 F.2d 1266, 1269 (5th Cir. 1985)) (second and third alterations in original).

[2] Indeed, the evidence in this case shows that most traffic stops do not result in charges that go to traffic court.

3

discomfort of seeing blue lights behind one's car only begins the intrusion.  The police approach the car and typically look through it to see what the driver has with him or her.  They demand identification, and then check the person's record.  They ask questions: "Where are you going? Where are you coming from? Do you have anything illegal in your car?"  *E.g.*, *Rodriguez v. United States*, 575 U.S. 348, 352 (2015); *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018); *United States v. Ramirez-Solis*, 518 F. Supp. 3d 896, 902–03 (W.D. Va. 2021); *United States v. Williams*, 321 F. Supp. 594, 604 (D.S.C. 2018).

The Fourth Circuit has cited *Armstrong* in selective enforcement cases. But it has yet to squarely address whether a defendant asserting that a police officer stopped him due to his race must identify comparator drivers who were not stopped to successfully assert a selective enforcement claim.  The Fourth Circuit has, however, suggested that requiring evidence of similarly situated individuals in this context would create an impossible standard: "[a]s for the statistics' failure to identify individuals who were not stopped, such data is not recorded by the county—and, indeed, would likely be impossible to track.  How could something that was not done possibly be tracked?" *Johnson v. Holmes*, 782 F. App'x 269, 270 (4th Cir. 2019).  The Court doubts that the Fourth Circuit intends to require defendants, such as Moore, to put forth evidence that it has explicitly deemed impossible to collect: evidence of white individuals that RPD officers could have—but chose not to—stop.  *See id.*  Thus, the Court will not require Moore to provide evidence of similarly situated individuals to prove his selective enforcement claim.  Rather, to establish selective enforcement, Moore must prove, by a preponderance of the evidence, that RPD's stopping process has a discriminatory effect and was motivated by a discriminatory purpose.  In doing so, Moore can use statistics to establish his claim.  These issues define the evidentiary limits for determining the relevance of expert testimony.

4

2. *Reliability*

To prove reliability, the proponent must show that the expert bases their testimony "on scientific, technical, or other specialized knowledge and not on belief or speculation," and any of the expert's "inferences must be derived using scientific or other valid methods." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232–33 (4th Cir. 2019) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)).

*Daubert* provides four non-exhaustive guideposts for the Court to consider in its reliability analysis: (1) whether the theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) whether the technique's "known or potential rate of error" affects its usefulness; and (4) whether the community has widely accepted the theory or technique. *Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 593–94). "[A] trial court has 'broad latitude' to determine whether these factors are 'reasonable measures of reliability in a particular case.'" *Id.*

**B. Dr. Eli Coston**

Dr. Coston, an assistant professor at Virginia Commonwealth University, "ha[s] specialty research areas in statistics and methodology, race and gender, as well as the criminal legal system." (Hr'g Tr. 18:9–11, July 18, 2022). Dr. Coston reviewed data that RPD provided to Moore. Coston assessed racial disparities in RPD's traffic stops and concluded that "[t]hroughout almost every step of a traffic stop, from the likelihood that a driver is pulled over, to the actions taken during the stop, to the eventual outcome of that stop, Black drivers are at a significant disadvantage compared to White drivers." (ECF No. 66-1, at 11.)

Coston testified that RPD data revealed that, in Richmond, Black drivers were "5.13 times more likely to be stopped" than white drivers. (Hr'g Tr. 56, July 18, 2022.)   Of stopped drivers,

77 percent of the drivers were Black, and 14.6 percent were white.  (Hr'g Tr. 57:11–12, July 18, 2022.)  Dr. Coston conducted a chi-square analysis of the RPD data and determined that there was a "statistically significant relationship" between a stopped driver's race and whether that driver was ultimately arrested.  (Hr'g Tr. 58:4–5, July 18, 2022.)  Then, Dr. Coston explained that "[w]hen we talk about statistical significance we are saying that the relationship that exists in our sample also exists in a larger population."  (Hr'g Tr. 67:2–4, July 18, 2022.)  In other words, a statistically significant relationship is reliable to extrapolate from and make conclusions about the broader population.

After the Court asked whether "there was a strong substantive relationship between race and being stopped," Dr. Coston explained that "there exists a large disparity here.  With this particular type of data, though, just the frequency and percents we can't determine statistical significance."  (Hr'g Tr. 62:2–5, July 18, 2022.)  Dr. Coston clarified that, to determine the statistical significance of the relationship between a driver's race and the rate at which they were stopped, "we would have to know also what the population of drivers who were not stopped was." (Hr'g Tr. 62:11–13, July 18, 2022.)

The government moves to exclude Coston's testimony because Coston relied on flawed data, committed statistical errors in their analysis, employed an unreliable benchmark, and used a statistical technique that cannot show causation.  Having reviewed Coston's report and the data on which Coston relies, the Court finds the expert testimony reliable and thus admissible.

*1. The Data*

The government first argues that Dr. Coston relied on flawed data gathered under the Virginia Community Policing Act ("VCPA").  The VCPA—signed in April 2020—prohibits law enforcement officers from taking actions based solely on an individual's "real or perceived race."

6

2020 Va. Acts ch. 1165 (Apr. 11, 2020) (codified at Va. Code § 52-30.1).

During the relevant time period—July 1, 2020, through December 6, 2020—the VCPA required officers to collect the following information during traffic stops:

> (i) the race, ethnicity, age, and gender of the person stopped;
> (ii) the reason for the stop;
> (iii) the location of the stop;
> (iv) whether a warning, written citation, or summons was issued or whether any person was arrested;
> (v) if a warning, written citation, or summons was issued or an arrest was made, the warning provided, violation charged, or crime charged; and
> (vi) whether the vehicle or any person was searched.

*Id.* (codified at Va. Code § 52-30.2, -30.4).[3]   The VCPA also established a publicly available Community Policing Reporting Database to aggregate the collected data and required the Virginia Department of Criminal Justice Services ("DCJS") to periodically review and report on the data to the Governor, General Assembly, and Attorney General.  Va. Code § 9.1-192(B) (then-codified at Va. Code § 9.1-191, also codified at *id.* §§ 15.2-1609.10, 15.2-1722.1, 52-30.3).

Some local agencies faced challenges implementing the VCPA's mandate to record data. (*See, e.g.*, Hr'g Tr. 263:4–266:6, July 19, 2022.)  Many police departments' initial submissions contained technical errors, missing information, or duplicate[4] entries.  (*See id.* at 270:22–271:16.) RPD managed to avoid many of the data collection challenges smaller state agencies faced, thus

---

[3] Amendments to the law, effective July 1, 2021, expanded both the scope of the activities to which this data collection applies and the type of information officers must collect.  2020 Va. Acts, Spec. Sess. I, ch. 37 (Oct. 8, 2020).  The 2021 amendments also require officers to submit the data they collect to "the Department of State Police for inclusion in the Community Policing Reporting Database."  *Id.*

[4] The Virginia State Police Data Analysis & Reporting Team ("DART") asked officers to record only the most egregious offense with which they charged an individual and to submit the entire traffic stop record as one entry.  But in some cases, officers who cited one individual for multiple offenses would nevertheless submit an entry for each cited offense.  This resulted in multiple entries for the same traffic stop.  (Hr'g Tr. 271:11–16, July 19, 2022.)

mitigating the potential for error in the data set and making the data useful. For example, each RPD vehicle had a Computer Aided Dispatch System,[5] and the Virginia State Police Data Analysis & Reporting Team ("DART") manager had previously established direct contact with an RPD representative regarding data collection prior to the implementation of the VCPA. (*Id.* at 278:6–11, 13–18.) Further, when RPD submitted files that contained invalid records, RPD "quickly fixed" any quality control issues. (*Id.* at 270:5–7.)[6]

Dr. Coston is an expert in the field of statistics.[7] Coston is fully capable to use RPD's data to form a trustworthy and reliable opinion. Thus, despite the inherently imperfect nature of any data collection system that relies on individual input, the RPD data on which Coston relied passes muster under *Daubert*.[8] Clearly, this evidence helps "'the trier of fact to understand the evidence or to determine [the] fact in issue'" in this case. *See Nease*, 848 F.3d at 229 (quoting *Daubert*, 509

---

[5] This system allows officers to electronically input data during a traffic stop. (*Id.* at 278:1–5.)

[6] RPD's delay in submitting some of the VCPA data does not affect the Court's analysis of whether the final, corrected data proves sufficient under *Daubert*.

[7] The government does not challenge Dr. Coston's expertise in the field of statistics.

[8] The government raises—and the Court firmly rejects—two other arguments regarding the data quality in this case. The government first argues that the collected race data is unreliable because the officers had to either ask the individual for their race or "guess" it without any guidance or training on racial identification. (ECF No. 70, at 6.) But the government presents no evidence that law enforcement officers cannot distinguish between Black and white individuals, and, regardless of their ability to do so, RPD police officers' *perception* of an individual's race remains markedly relevant to a selective enforcement analysis. The Court has practiced law for many years, both as a judge and as a trial attorney; police officers simply do not have a problem identifying the race of people they meet.

Second, the government asserts that during the initial data collection under the VCPA, RPD expended many of its resources responding to the pandemic and to racial justice protests. (ECF No. 70, at 7.) Though the Court does not doubt that RPD did so, the government has not shown how these challenges affected the quality of the data RPD ultimately submitted.

U.S. at 591).

### 2. Statistical Errors

The government also argues that Dr. Coston improperly relied on duplicate data and records that omitted certain data points. Specifically, of the 2,582 analyzed traffic stops, the government identifies "321 instances of exact duplicates in [Dr.] Coston's data set" and 346 stops that did not include at least one data point (for example, age, gender, or whether a search or arrest occurred). (ECF No. 70, at 12.) After receiving the government's analysis of the alleged duplicate entries, Coston removed the alleged duplicates and conducted the analysis again. Because Coston's conclusions remained the same after removing the duplications,[9] the initial reliance on these duplicates did not render the analysis unreliable. The Court also finds immaterial the fact that some of the entries did not include one or more data point unrelated to race. Moore brings a selective enforcement claim based on *race*: it is that data point—not whether the driver was male, female, eighteen years old, or sixty years old—that affects the Court's analysis in this case. The Court, therefore, concludes that the alleged statistical issues did not undermine the reliability of Dr. Coston's conclusions.

### 3. Benchmark

Dr. Coston used census data, often referred to as "benchmark data," in analyzing the facts in this case.[10] Use of census information in racial profiling cases is widely accepted and often

---

[9] This finding does not surprise the Court, given that 76.8% of the alleged duplicate entries identified the driver as Black and 14.5% of the entries identified the driver as white. These statistics mirror Dr. Coston's finding that 77% of traffic stops in Richmond from July through December 2020 involved Black drivers and 14% of traffic stops in Richmond from the same time period involved white drivers.

[10] Dr. Coston used this benchmark only for certain aspects of the analysis. (*Cf.* ECF No. 66 1, at 5, 10; Hr'g Tr. 126:20–23, July 18, 2022 (Dr. Coston "did [not] use the benchmarking for the statistical analyses").)

9

cited in published works and thus satisfies *Daubert's* requirements. Census data, the government contends, does not accurately represent the racial composition of drivers in each area:  first, the data includes "many people . . . who are not even licensed to drive"; second, the demographics of the individuals who drive in a particular region do not necessarily reflect the demographics of the individuals who live in that region. (ECF No. 70, at 2; *see also* ECF No. 70-1 (Dr. Michael Smith's rebuttal report).)  Rather than relying on census data, the government argues that Dr. Coston should have used more reliable benchmarks such as direct observation, a "veil of darkness" analysis,[11] or data from traffic accidents.

DCJS refers to this as the "benchmark problem," (*see* ECF No. 72-1, at 68), but the government's suggestion does not solve it. "No one has yet found an accurate way to" determine "the number of drivers in each racial . . . group who are actually driving on the road and subject to being stopped." (*Id.*)  Few studies use the first method the government suggests—direct observation—because it requires significant investments of both time and money. (Hr'g Tr. 96:7–9, July 18, 2022; Hr'g Tr. 233:18–234:7, July 19, 2022.)  And Dr. Coston could not use the second method—a "veil of darkness" analysis—because RPD failed to provide data that would have allowed Dr. Coston to do so. Finally, "there is no Richmond-specific traffic crash benchmark data available." (ECF No. 72, at 12.)

Moreover, although census data does not provide a flawless comparison, Moore has

---

[11] The "veil of darkness" analysis compares the number of minority drivers stopped during daylight hours to those stopped during nighttime hours. "Theoretically, if more minority drivers are stopped during daylight hours when police can more easily ascertain their race, then this provides evidence of possible racial bias, particularly if there are no differences in the rates at which white drivers are stopped during the day compared to at night." (ECF No. 70-1 (Dr. Smith's rebuttal report), at 2.)

JA1801

demonstrated that researchers in the racial profiling field rely on census data as a benchmark.[12] (ECF No. 72, at 12 (citing the DCJS 2021 report (relying on age-adjusted census data); Dr. Smith's 2001 report; a 2009 report on racial profiling in Houston, Texas; and a 2015 report on racial profiling in New York City).); *see Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 593–94) (explaining that one "guidepost[] in assessing expert testimony is whether "the community has widely accepted the theory or technique."). In light of its use in this field (including by the government's expert), the Court finds Dr. Coston's use of this benchmark reliable.

*4. Statistical Methods*

Dr. Coston used a chi-square analysis[13] to determine whether a relationship existed between a driver's race and the primary result of the stop and then, after doing so, used Kendall's Tau and Cramer's V to determine the strength of that relationship.[14] The government's expert, Dr. Smith, critiques this analysis, arguing that it "can only tell . . . that two variables are related to one another; it cannot be used to conclude that one variable has any causal effect on the other." (ECF No. 70-1, at 5.)

---

[12] The DCJS 2021 report, which also relied on census data (in that case, adjusted for age), "yielded the same results as Dr. Coston's analysis." (*Id.* at 13; *see also* ECF No. 66-1, at 11; ECF No. 72-1, at 8 ("[S]tatewide, Black and Hispanic drivers in Virginia were disproportionately stopped by law enforcement when compared to other drivers between July 1, 2020, and March 31, 2021.").)

[13] The chi-square analysis indicates whether "there is a significant relationship between the variables." (ECF No. 66-1, at 5.) A chi-square analysis is appropriate where, as here, "the data contain[] high levels of multicollinearity (indicating interrelationships among the independent variables)." (*Id.* at 4.)

[14] "[T]he Cramer's V or Kendall's Tau indicates how strong [an] association is (with larger numbers in terms of absolute value indicating a stronger association)." (ECF No. 66-1, at 5.)

11

But Dr. Coston uses these analyses for that exact permitted purpose: that is, to determine the relationship between two variables. Dr. Coston does not purport to determine whether race *caused* a particular stop (and, in fact, a regression analysis would not have reached causation either).[15]  (Hr'g Tr. 134:25–135:1, 12–19, July 18, 2022; Hr'g Tr. 65:23–66:3, July 19, 2022 (Dr. Smith's conclusion that a researcher cannot "conclude that there is racial discrimination in an individual stop based on aggregate analysis"); ECF No. 70-1, at 7).)[16]  Because Dr. Coston performed the chi-square test, Kendall's Tau, and Cramer's V in accordance with generally accepted research standards, these methods are acceptable under *Daubert*. *See Nease*, 848 F.3d at 229 (holding a court has wide discretion in assessing whether certain guideposts—including whether the research community has accepted the technique—make an expert's testimony reliable).  Based on the foregoing, the Court finds Dr. Coston's testimony reliable and will deny the government's motion to exclude it.

### C. Dr. Marvin Chiles

Dr. Chiles, an assistant professor of history at Old Dominion University, offers testimony that no one can refute: he explains Richmond's history of segregation and bigotry.  Dr. Chiles specializes in "[r]ace [and] politics in the 20th century . . . specifically in Richmond."  Hr'g Tr.

---

[15] In its statutorily mandated 2021 report, DCJS noted that data limitations hindered "the ability of DCJS staff to conduct any complex statistical analysis of the data, or to draw any firm conclusions about the existence and prevalence of the practice of bias-based profiling in a given agency or jurisdiction."  (ECF No. 72-1, at 4–5.)  In relying on the RPD data from July through December 2020, Dr. Coston similarly concludes that they "cannot say whether a specific traffic stop was the result of racial bias or racial profiling."  (ECF No. 66-1, at 12.)

[16] Coston also explains that one could not use the data RPD provided to perform a regression analysis because, based on that data, that analysis would have failed to comply with the rules and assumptions underlying that test.  In other words, inappropriately using the RPD data in a regression analysis would yield unreliable results. (Hr'g Tr. 44:17–45:17, 46:16–47:1, July 18, 2022.)

10:1–2, Oct. 28, 2022.)  He said that "the tide of history" caused Black and white Richmonders to move to the neighborhoods in which they live: "[it] is not by happenstance that [B]lacks and whites live segregated in Richmond."  (Hr'g Tr. 56:11–57:11, Oct. 28, 2022.)

To show that community members presently feel the effects of "Richmond's overtly racist past," Dr. Chiles discussed the historical process of "forc[ing] or coaxi[ng]" Black and white individuals into the neighborhoods they reside in today.  (ECF No. 107, at 8; Hr'g Tr. 57:8–11, Oct. 28, 2022.)  Dr. Chiles explained that the city's transit system in the early twentieth century "reinforce[d]" the idea that "although slavery is no longer [in Richmond], segregation will be here to replace it."  (Hr'g Tr. 19:1–3, Oct. 28, 2022.)  He also discussed the ramifications of the 1911 law that "officially segregated residential areas in the City of Richmond," explaining that although the *Buchanan v. Warley* Court explicitly outlawed racially based zoning laws in 1917, Richmond continued to encourage residential segregation throughout the twentieth century.  (*Id.* at 20:9–24:19.)  Chiles testified that Richmond's City Council sought to "remove [B]lack people from the core of the City," and Black families moved east, while white families moved to the west and suburbs.  (*Id.* at 24:7–19, 25:15–21.)  This movement occurred, in part, due to "block busting," selective advertising, redlining, and development of Richmond's downtown.  (*Id.* at 25:19–33:7.)

Turning to police activity, in 1977, Richmond's City Council and "a non-profit business coalition" sought to "attract industry back" to Richmond.  (*Id.* at 46:21–47:16.)  Members of this joint endeavor surveyed "various neighborhoods" in Richmond to determine how to do so.  (*Id.* at 47:18–48:6.)  Because the surveys' responses indicated that "crime [was Richmond's] biggest issue," Richmond "began creating task force[s] . . . designed to target high crime areas, *or what*

13

*they [thought] were high crime areas*."[17]  (*Id.* at 48:1–10, 21–22 (emphasis added).)  This program prompted RPD to "focus[] exclusively on [B]lack neighborhoods."  (*Id.* at 49:5–7.)  Dr. Chiles clarified that, in the late twentieth century, Black neighborhoods experienced "more crime" because individuals in those neighborhoods "ha[d] been segregated, confined, [and] given . . . an inferior education that doesn't allow them to compete in a traditional economy like everyone else . . . . [W]hen you have that happening for generations . . . crime is going to be the natural result, especially disproportionate to the rest of the City."  (*Id.* at 53:6–14, 19–23.)  He explained that, as a result, RPD began "sitting [at housing projects], waiting, watching" for crime."  (*Id.* at 66:17–20.)

### 1. Relevance of Dr. Chiles's Testimony

Essentially, the government says that all the bad things Richmond did are ancient history, and that they have nothing to do with traffic enforcement in 2020.  Thus, it says that Dr. Chiles's testimony fails the relevance part of the *Daubert* test.

Moore counters that "the fact that the first, second, and fourth police precincts line up almost exactly with the [B]lack neighborhoods in Richmond, while the third police precinct lines up almost exactly with the white neighborhoods in Richmond is relevant to Mr. Moore's equal protection challenge."  (ECF No. 86, at 1.)  After RPD told Moore that it had no records "that would assist the Court in more directly understanding the relationship between the racial segregation of Richmond's neighborhoods and the location of the police precincts," Moore contacted Dr. Chiles.  (*Id.* at 3–4.)

---

[17] At the hearing, the Court asked Chiles "how [the City] identified African-American areas as high crime areas."  (*Id.* at 50:19–20.)  Chiles responded that he could not confirm that the City had data—outside of the survey responses that detailed public opinion—that helped it determine which neighborhoods were high-crime neighborhoods.  (*Id.* at 50:19–52:21.)

**JA1805**

USCA4 Appeal: 24-4201      Doc: 22-5      Filed: 09/04/2024      Pg: 176 of 217

At the October 28, 2022, hearing, Dr. Chiles discussed Richmond's history of racial segregation in its residential neighborhoods before reviewing RPD's history of policing Black individuals. First, Dr. Chiles detailed Richmond's racial segregation in the nineteenth and twentieth centuries. He then detailed the history of RPD's "[m]ilitarization" in Black neighborhoods. (Hr'g Tr. 48:22–50:11, October 28, 2022.)

The Court agrees with Moore's contention that RPD's failure to keep records "makes Dr. Chiles's circumstantial evidence much more probative than it otherwise might be." (*See* ECF No. 107, at 5 n.1.) Dr. Chiles's testimony regarding the history of racialized policing in Richmond is important to Moore's defense because RPD did not maintain the documents that would have "present[ed] direct evidence" of racial discrimination in establishing Richmond's police precincts. (*See* ECF No. 86, at 4–5); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). In *Arlington*, the Court said that "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267. Accordingly, Dr. Chiles's testimony is relevant and necessary to assess Moore's selective enforcement claim.

### 2. Supportability of Dr. Chiles's Testimony

The government also asserts that Rule 702 restricts Dr. Chiles's testimony "because his sources do not match his rhetoric." (ECF No. 103, at 4.) In this respect, the government says that one of Dr. Chiles's findings cites an irrelevant source that does not support this assertion. (*Id.* at 6.) Dr. Chiles, however, explained his citation error. (Hr'g Tr. 98:23–100:5, 103:20–104:18, October 28, 2022.) Moreover, when the government confronted Dr. Chiles with this error, he provided additional source material to support his claim. The government provides no reason to disbelieve or reject Dr. Chiles's citation error in light of this explanation. Accordingly, the

15

irrelevant source does not call into doubt Dr. Chiles's conclusions.

In addition, the government argues that Dr. Chiles "wrongly ascribes all police enforcement to racism," and he fails to consider "another far more plausible explanation . . . that criminal activity is unfortunately disproportionately concentrated in Richmond's minority neighborhoods." (ECF No. 103, at 4, 6.)  To support its contention, the government provides a map showing "the locations of Richmond city murders," noting that "89% of the murders in Richmond since January 1, 2018[,] occurred in precincts 1, 2, and 4." (*Id.* at 7–8.)  Interestingly, however, the government did not call a witness from RPD to explain that the department has a legitimate strategy of stopping Black drivers.  Nor does the government produce evidence that stopping Black drivers cuts into the murder rate, or the rate of any other felony.  And nothing explains the fact that even in predominantly white neighborhoods, RPD stops Black drivers at roughly the same disproportionate rate.

Chiles detailed the overtly racist past of Richmond that prompted RPD's enhanced focus on certain minority neighborhoods in Richmond.  RPD's focus on Black neighborhoods occurred shortly after it purportedly "decentralized all of its patrol functions and instituted a Neighborhood Precinct Plan" in which three of four RPD precincts "correspond to the nearly entirely [B]lack neighborhoods in Richmond." (*Compare id.* at 47:21–49:19, *with* ECF No. 66, at 6.)  Accordingly, the Court finds that Dr. Chiles's testimony corroborates Moore's contention that "[RPD] is pulling over [B]lack drivers five times more often than white drivers because those drivers are [B]lack." (ECF No. 107, at 10.)[18]

---

[18] The government asserts that Moore "ignores Dr. Coston's admission . . . that adjusting the date range for traffic stops to include more than just the first five months of flawed data collection significantly reduces the raw statistical disparity." (ECF No. 108, at 4 n.2.)  At the October 28, 2022, hearing, the Court rejected the government's assertion, explaining that the data

16

Dr. Chiles's testimony forms part of the mosaic of a background leading to disproportionate traffic stops of Black drivers. The Court, therefore, admits his testimony.

## II. MOTION TO DISMISS THE INDICTMENT

The Court will next turn to Moore's motion to dismiss the indictment against him under the Fourteenth Amendment. Moore asks the Court to dismiss the indictment because RPD selectively enforces traffic laws against Black people, and the practice of selective stops led to his charges.

The Equal Protection Clause of the Fourteenth Amendment "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). To establish an Equal Protection violation, a claimant must show that the action he challenges (1) had a discriminatory effect and (2) was motivated by discriminatory intent. *Vill. of Arlington Heights*, 429 U.S. at 264–66.

As discussed above, to put the Court's analysis in the proper context, it must first return to the critical distinction between selective prosecution claims and the selective enforcement claim that Moore alleges here: in a claim of selective stops, a defendant need not name similarly situated drivers who committed traffic violations but were not stopped. In contrast, to successfully assert a selective prosecution claim, a defendant must provide "clear evidence" of the "different treatment of similarly situated persons." *Armstrong*, 517 U.S. at 465, 470.

Moore argues that the Fourth Circuit has yet to "h[o]ld after pointed consideration that a challenger must prove selective *enforcement* by 'clear evidence.'" (ECF No. 73, at 2 (citing *United States v. Mason*, 774 F.3d 824 (4th Cir. 2014)) (emphasis added).) The Fourth Circuit has

---

from the "first full year" reveals a significant disparity between the percentage of Black and white individuals that the police pulled over. (Hr'g Tr. 120:19–121:10, Oct. 28, 2022.)

JA1808

discussed *Armstrong*'s requirement that defendants point to similarly situated individuals who were not prosecuted when reviewing a selective enforcement claim. *See United States v. Suarez*, 321 F. App'x 302 (4th Cir. 2009). But Moore asserts that the Fourth Circuit's "passing reference" to *Armstrong* in that case does not bind this Court in its analysis of his selective enforcement claim. (ECF No. 66, at 5 n.3.)

The Court agrees with Moore. As noted above, the Fourth Circuit has discussed *Armstrong* in selective enforcement cases, but it has not squarely held that a Black driver pulled over due to his race must specifically identify similarly situated white drivers who were not stopped to prevail on his selective enforcement claim. In fact, the Fourth Circuit has suggested that to adopt the government's position would create an impossible standard: no one could show drivers who committed traffic violations but were *not* stopped. *See Johnson*, 782 F. App'x at 270.

Shortly after the Supreme Court decided *Armstrong*, the Fourth Circuit reviewed a selective enforcement case. *See United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996). In *Bullock*, the Fourth Circuit cited the *Armstrong* standard for selective prosecution claims, but it did not discuss the differences between selective prosecution and selective enforcement claims, nor did it explicitly adopt *Armstrong* for selective enforcement cases. *See id.* at 899. And in subsequent selective enforcement cases, the Fourth Circuit cited *Bullock* and discussed the *Armstrong* standard without articulating the steps district courts in this circuit should take in analyzing selective enforcement claims. *E.g.*, *Mason*, 774 F.3d at 829 (4th Cir. 2014) (citing *Bullock*, 94 F.3d at 899); *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (citing *Bullock*, 94 F.3d at 900)).

But in *Johnson v. Holmes*, the Fourth Circuit did address the evidentiary burden in a selective enforcement case. In *Johnson*, plaintiffs brought a § 1983 Equal Protection action, asserting that a police officer had selectively enforced traffic laws against them. 782 F. App'x at

18

JA1809

270–71.  Like Moore, the plaintiffs supplied statistical evidence to support their contention that the police unlawfully considered their race in choosing to stop them.  The *Johnson* court explained that "[t]he ultimate question presented in this case is exactly what . . . statistics must show in order to meet the similarly situated requirement," and it opined that the county had not recorded data of drivers "who were not stopped" because this data "would likely be *impossible* to track."  *Id.* at 279.  The Fourth Circuit reversed the district court's decision to exclude the statistical evidence because it could not "conclude on the current record that no legitimate enforcement factors [were] identifiable on the face of the statistics."  *Id.* at 282.  Thus, though Fourth Circuit precedent remains unclear about the precise standard that Moore must satisfy when asserting his selective enforcement claim, it has not foreclosed the possibility of using statistical evidence to satisfy Moore's burden.

Like the plaintiff in *Johnson*, Moore has no way of showing that RPD officers observed white drivers who committed similar offenses and then chose not to stop them.  *See id.*  Thus, although *Armstrong* concluded that "[t]he similarly situated requirement does not make selective-prosecution claims impossible to prove," *see* 517 U.S. at 464, imposing that requirement *does* create an insurmountable burden for Moore and other Black drivers who assert selective enforcement claims.  *See Chavez v. Ill. State Police*, 251 F.3d 612, 638–39 (7th Cir. 2001) ("In a civil racial profiling case . . . the similarly situated requirement might be impossible to prove.  In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.").

The Court also looks to other courts' decisions dealing with selective enforcement claims. For example, the U.S. Court of Appeals for the Seventh Circuit explicitly grappled with the impossibility of rigidly applying *Armstrong* to selective enforcement claims. The Seventh Circuit held that claimants asserting selective enforcement must prove (1) discriminatory intent and (2) discriminatory effect only by a preponderance of the evidence. *Conley v. United States*, 5 F.4th 781, 791–92 (7th Cir. 2021). To prove discriminatory effect, claimants need not identify similarly situated individuals of a different race who were not targeted or "satisfy *Armstrong*'s burden to identify comparators to prove discriminatory effect on the merits." *Id.* at 792. Instead, the Seventh Circuit concluded that "statistics can be a 'useful tool' that can establish discriminatory effect and provide powerful evidence of discriminatory intent if race can be isolated from other confounding variables." *Id.* at 796–97.

The Court finds *Conley* persuasive. Thus, to show that RPD selectively enforced traffic laws against him due to his race, Moore must prove, by a preponderance of the evidence, that RPD's "enforcement process 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *See Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 634–635 (4th Cir. 2016) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). And in light of the Fourth Circuit's decision in *Johnson*, the Court considers the testimony of both Dr. Coston and Dr. Chiles together as evidence of the discriminatory effect and discriminatory intent of RPD's stops to analyze Moore's challenge.

### A. Discriminatory Effect

Statistical evidence can show discriminatory effect. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886). The statistics provided in this case make abundantly clear the disparate impact of traffic stops on Black drivers in Richmond. From July 2020 through December 2020,

20

"Black drivers were 5.13 times more likely to be stopped" than white drivers. (ECF No. 66-1, at 5.)  Once RPD officers stopped those Black drivers, they were far more likely to search Black drivers and their cars than they were to search white drivers.  And, once stopped, "Black drivers were 12.67 times more likely than White drivers to be arrested as a result of the stop." (*Id.* at 6.) Black drivers felt the discriminatory effect of RPD's traffic enforcement throughout Richmond: regardless of whether Black drivers moved through a predominantly Black or a predominantly white neighborhood, they were more likely to be pulled over than a white driver.  Dr. Coston determined that these relationships exist after analyzing six months of data beginning in July 2020. (*See* ECF No. 72, at 7 (citing ECF No. 66-6, at 11) (explaining that police officers arrested a disproportionate percentage of Black drivers).)  Moreover, Dr. Chiles's testimony regarding Richmond's history of racialized policing informs the Court's understanding of why three of Richmond's four police precincts overlay the City's predominately Black communities.

Dr. Coston's analysis and Dr. Chiles's supplemental testimony clearly evince disparities in the effects of RPD's policing practices; the experts' testimony establishes that RPD's actions cause a discriminatory effect.  Moore thus succeeds in satisfying this element of his selective enforcement claim.

### B. Discriminatory Purpose

Moore must also prove that such effect was, "at least in part," motivated by a discriminatory purpose. *Cent. Radio Co.*, 811 F.3d at 635.  Here, Moore has presented no evidence of the four officers' invidious or bad faith.[19]  But "inferences . . . drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence" may help show

---

[19] RPD officers pulled Moore over for having suspicious temporary tags after stopping two other individuals the same night whose cars had the same exact temporary tag number.

discriminatory purpose. *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997); *see also Vill. of Arlington Heights*, 429 U.S. at 266 (examining discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available"). The Fourth Circuit has "recognized several factors as probative in determining discriminatory intent." *Cent. Radio Co.*, 811 F.3d at 635. These include:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Id.* (quoting *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 819 (4th Cir. 1995)). The Court finds that, through Dr. Coston's and Dr. Chiles's testimony, Moore successfully presents evidence of the first two factors: (1) "evidence of a 'consistent pattern' of actions" by RPD that "disparately impact[s]" Black drivers in Richmond; and (2) the "history of discrimination" by RPD and in Richmond itself. *See id.*

Moore's statistics evince that RPD police officers stop Black drivers at a rate that far exceeds the rate at which they stop white drivers.[20] This correlation, on its own, does not prove causation.[21] "But that does not mean evidence of a correlation is *per se* irrelevant." *Johnson v. Holmes*, No. 3:16cv16, 2022 WL 3599850, at *4 (W.D. Va. Aug. 23, 2022) (citing *Etherton v.*

---

[20] (ECF No. 72-1, at 8) ("Black and Hispanic drivers in Virginia were disproportionately stopped by law enforcement when compared to other drivers between July 1, 2020, and March 31, 2021").)

[21] "Correlation is not causation." *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 173 (2003) (Kennedy, J., concurring); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 934 (D.S.C. 2016) (collecting cases explaining "that an association is insufficient to prove causation").

*Owners Ins. Co.*, 829 F.3d 1209, 1220 (10th Cir. 2016)).

In analyzing the statistics in this case, Dr. Coston never asserted that race caused a particular stop. Instead, Dr. Coston determined the relationship between a driver's race and the primary result of a traffic stop. As discussed, the government "highlight[ed] any inconsistencies on cross-examination," but the Court nonetheless finds Dr. Coston's testimony reliable. *See supra* Part III.B; *Johnson*, 2022 WL 3599850, at *4 ("In [*Valencia*], the Fifth Circuit held that the district court did not abuse its discretion in admitting expert testimony about correlations . . . . 'Whether a particular opinion is relevant and reliable thus does not simply turn on whether the expert asserts a casual or correlative relationship, but is closely tied to the law and facts at issue in a given case.'" (quoting *Valencia*, 600 F.3d at 42)).

To further support his claim, Moore cites to Richmond's racially segregated and discriminatory history. He reviews the Confederate foundations of RPD before discussing Richmond's racialized zoning, redlining. And he discusses the establishment of three RPD precincts that overlap Black neighborhoods in Richmond and a fourth RPD "precinct [that] aligns exactly with the boundaries of the white section of Richmond." (ECF No. 66, at 6, 12.) He also asserts that studies have shown that RPD officers have "stop[ped] far more [B]lack drivers than white drivers for traffic offenses" "[f]or at least twenty years." (*Id.*) Moore also argues that "Virginia would not have enacted the Community Policing Act but for a valid concern regarding racial profiling in Virginia." (ECF No. 72, at 7.) And, at the October 28, 2022, hearing, Dr. Chiles testified that the historical segregation of the City of Richmond is the product of "the tide of history." (Hr'g Tr. 56:11–57:11, Oct. 28, 2022.)

The absence of certain evidence is telling. The government did produce evidence that serious crimes occur in predominantly Black neighborhoods. But no one from RPD testified that

it had a strategy to quell major crime by stopping Black motorists.  No one testified that modern criminology demonstrates that picking on motorists somehow makes cities safer.  And, most significantly, no one explained why Black motorists are disproportionately stopped in white areas of Richmond, where the crime rate is lower.

The data showing that RPD stops Black drivers five times as often as it stops white drivers, coupled with the evidence of Richmond's history of discrimination, reveals that RPD's discriminatory purpose contributed to its officers' decision to stop Moore.  Moore therefore succeeds in meeting his burden of showing discriminatory purpose.

*     *     *

As noted above, in 2020, the Commonwealth of Virginia began to require police to keep track of the race of people stopped.  This data was essential to this case.  It shows a disgraceful disparity in enforcement of traffic laws, with Black drivers getting the short end of the stick. Richmond is not the only locality with this problem; the state wide statistics show a remarkable record of picking on Black drivers.  And subsequent reports by the Commonwealth show that the trend continues.  One would think that Virginia's citizens would cry out in protest over this situation, but they don't.

Moore, however, did raise this issue.  He has successfully shown both the discriminatory effect and discriminatory purpose elements required for his selective enforcement claim.  The Court will therefore grant his motion to dismiss the indictment.

24

### III. CONCLUSION

For the foregoing reasons, the Court will deny the government's motions to exclude Dr.

Eli Coston and Dr. Marvin Chiles, (ECF Nos. 70, 82), and grant Moore's motion to dismiss the

indictment, (ECF Nos. 32, 66).

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 12 February 2024
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
            Defendant.

**FINAL ORDER**

This matter comes before the Court on three motions: (1) a motion to dismiss the indictment, (ECF Nos. 32, 66), filed by the defendant, Keith Rodney Moore; (2) a motion to exclude defense expert Dr. Eli Coston, (ECF No. 70), filed by the government; and (3) a motion to exclude defense expert Dr. Marvin Chiles, (ECF No. 82), filed by the government. For the reasons stated in the accompanying Opinion, the Court ORDERS as follows:

1. The Court GRANTS the motion to dismiss the indictment, (ECF Nos. 32, 66), and DISMISSES WITH PREJUDICE Count One of the Criminal Indictment, (ECF No. 1).

2. The Court DENIES the motion to exclude defense expert Dr. Eli Coston, (ECF No. 70).

3. The Court DENIES the motion to exclude defense expert Dr. Marvin Chiles, (ECF No. 82).

4. The Court DIRECTS the Clerk to close the case.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 12 February 2024
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21cr42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Motion of the United States to Reconsider
And Memorandum in Support**

While this Court's decision to dismiss the indictment against a felon with an illegal gun

was undoubtedly motivated by good intentions, the United States respectfully requests that it

reconsider its finding that the Richmond Police Department (RPD) violated his Constitutional

rights by selectively stopping his vehicle based on his race.  First, the Court acknowledged that

there was *no evidence whatsoever* that the officers who stopped the defendant were motivated in

any way by his race or even that the stop for temporary tags was inappropriate.  Yet the Court

concluded that Black drivers are stopped more frequently than White drivers, and, therefore, that

RPD had orchestrated an intentionally discriminatory campaign to stop more Black drivers.  The

Court should reconsider the absence of evidence in the record to support this sweeping

conclusion, which substitutes statistics for the realities of policing and ignores the Government's

expert.  The United States provided ample evidence that RPD focuses its limited resources on the

most violent areas of the City – whatever the races of their residents – in an effort to prevent

crime and protect the public.  The Court also did not fully consider that its opinion might result

in the unintended consequence that RPD (and other police departments) will change their

1

**JA1818**

focused strategies, which appear to be working, and deploy resources in a less efficient manner for fear of being accused of racial animus.

\* \* \*

Although the United States disagrees with the Court's findings on both analytical prongs, the second step of the equal-protection analysis is in most need of reconsideration. Mr. Moore had to show that RPD's traffic stops "w[ere] motivated by discriminatory intent." Mem. Op. at 17 (*citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977)). The Court found "no evidence" that the four individual officers who stopped Mr. Moore on December 5, 2020, acted with "invidious or bad faith." Mem. Op. at 21. Instead, as the Court recognized, the stop was fully justified by a traffic violation: "RPD officers pulled Moore over for having suspicious temporary tags after stopping two other individuals the same night whose cars had the *same* exact temporary tag number." *Id.* n.21 (emphasis added). And when RPD attempted to pull over Mr. Moore's car, he drove away, ran multiple stop signs, wrecked his car on the curb, jumped out, and attempted to flee on foot. ECF No. 124 at 2. Officers apprehended Mr. Moore two blocks later and found an illegal handgun on the floorboard in the front seat of the vehicle he was driving. *Id.*

Notwithstanding these findings, the Court determined that Mr. Moore satisfied his burden as to discriminatory intent by attributing a discriminatory animus *to the entire police department*. Cobbling together centuries-old history of the City of Richmond and a limited dataset of less than six months showing RPD traffic stops more frequently involve Black drivers, the Court inferred that RPD has orchestrated a law enforcement strategy targeting Black drivers. Mem. Op. at 23–24. But the record lacks *any* evidence of discriminatory decisionmaking at *any* level

2

**JA1819**

of RPD.  There are no RPD policies, memoranda, or even text messages in the record[1] to suggest

that any member of RPD made any effort to discriminate against Black drivers.[2]

Likewise, the discriminatory history relied upon by the Court, as offered by the defense's

own historical expert, runs from 150 years ago until 40 years prior to Mr. Moore's traffic stop.

ECF No. 110 at 91.  This dated history, which the Court unfairly imputed on the modern day

RPD, ignores the defense's own expert's acknowledgement that Richmond has undergone

significant changes in the last fifty years.  ECF 110 at 77.  To be clear, the criminal justice

system is not perfect and police misconduct "erodes the community trust necessary for effective

policing."  Attorney General Merrick B. Garland, Remarks on Civil Rights Violations by the

Louisville Metro Police Dep't (Mar. 8, 2023) (available at justice.gov).  But the Court's ruling

could seemingly hold every police department in the country liable for discriminatory practices.

This matter was litigated extensively over more than two and a half years.  The United

States filed seven briefs and the Court held five substantive hearings with witness testimony and

argument.  Yet the Court's opinion ignores virtually all the evidence presented by the United

States.  The Court references the defendant's two experts throughout its opinion, but it does not

even mention the United States's expert, Dr. Michael Smith, a professor of criminology and

criminal justice at the University of Texas in San Antonio.  Dr. Smith, a national expert on racial

disparities in policing with 25 years of experience, disputed the statistical methods used and

---

[1] The United States was surprised to learn from the defendant's expert disclosure that the Court had granted *ex parte* subpoenas for discovery to RPD, as it was unaware that the Court had made the requisite findings.  *See* ECF No. 82 at 4 n.3.  "The standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for proving the claim itself." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (internal citation omitted).

[2] According to a May 2023 article in the *Richmond Times-Dispatch*, RPD's force is comprised of approximately 35% Black police officers.  Sean McGoey, *Richmond-area Police Departments trying to thread the recruiting needle*, Richmond Times-Dispatch (May 22, 2023).

3

**JA1820**

conclusions reached by the defendant's experts.  ECF No. 101 at 20.  Dr. Smith informed the

Court that traffic stops involve multiple variables and that the defendant's experts' opinions

lacked support.  He explained that "a disparity in the number of stops does not justify a

conclusion that there is biased policing."[3]  ECF No. 101 at 50, 225.  The Court's opinion ignores

this countervailing evidence.  Put simply, as the Court acknowledges in principle:  correlation is

not causation.  Mem. Op. 22 n.21.

Finally, the Court's decision may well unravel the progress RPD has made in reducing

violent crime in Richmond.  Violent crime disproportionately occurs in—and affects the

residents of—the First, Second, and Fourth Precincts, which have a high percentage of Black

residents and, in some instances, a majority.  ECF No. 103 at 7-8.  Although the Court forecast

"a never-ending cycle," in which officers would find more crime in predominantly Black

neighborhoods simply by having a greater presence there, ECF No. 101 at 214, the Court failed

to consider the evidence that RPD allocates its limited police resources to the areas of the city

reporting the greatest number of violent crimes.  *See* ECF No. 33 (testimony about Focus

Mission Team's efforts to prevent serious crimes); ECF No. 70 at 16.  As a result, traffic stops,

an ordinary method of law enforcement, often correlate with the racial composition of the

enforcement area.  ECF No. 70 at 16.  But there is simply no evidence in the record that RPD

selects enforcement areas *because of* the race of their residents.  *Cf. McCleskey v. Kemp*, 481

U.S. 279, 298 (1987).

At the same time, violent crime in the City decreased by 7% from 2022 to 2023 and has

been on a steady decline over the last seven years.  *See* Marysa Tuttle, *Richmond Police Chief*

---

[3] The United States also presented evidence that the Virginia Department of Criminal
Justice Services has found the same about traffic stop data: "[a]lthough this analysis identified
disparities in traffic stop rates related to race/ethnicity, it does not allow us to determine or
measure specific reasons for these disparities."  ECF No. 70 at 3.

*provides 2023 crime data for car thefts, shootings in end-of-year*, WRIC-ABC News (Jan. 25, 2024).

Policing today is a thankless and dangerous profession. And while this Court may have been well-intentioned, the practical effect of this opinion may well be to discourage RPD (and others) from actively policing the most violent areas of our City. *See United States v. Curry*, 965 F.3d 313, 346 (4th Cir. 2020) (Wilkinson, J., dissenting) (warning against "the risk" that "impenetrable and impractical legal regimes will drive police officers from disadvantaged communities—a situation that comes with dire consequences, not only for the wellbeing of our most vulnerable fellow citizens, but for society as a whole"). To require RPD to equally divide its resources across the City, regardless of an area's crime rate, would have the harmful consequence of reducing public safety by diverting resources from our most dangerous neighborhoods, places where law-abiding Richmonders want to live, work, and watch their children play in peace. *Cf.* Sean McGoey, *Jury Convicts 2 in Gilpin Court shooting that killed 15-year-old bystander*, Richmond Times-Dispatch (June 22, 2023).

The United States respectfully requests that the Court reconsider the scope and outcome of its decision.

Respectfully submitted,

By: *Jessica D. Aber*

Jessica D. Aber
United States Attorney
Virginia Bar No. 72680
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Va. 23219
Phone: 804-819-5400
Email: jessica.d.aber@usdoj.gov

5

**JA1822**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2024, I filed electronically the foregoing with the

Clerk of Court using the CM/ECF system, which will serve all counsel of record.


Jessica D. Aber
United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:21cr42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| Defendant | ) | |

**MR. MOORE'S OPPOSITION TO THE GOVERNMENT'S MOTION
TO RECONSIDER THE COURT'S FINAL ORDER**

Keith Moore, through counsel, opposes as follows the government's motion, *see* ECF No. 128, asking the Court to reconsider its opinion and decision dismissing the indictment against Mr. Moore because the Richmond Police Department selectively enforced Virginia's traffic laws against Black drivers, *see* ECF Nos. 126 and 127, including Mr. Moore. The Court should deny the government's motion.

**I.    The government fails to provide a valid basis for reconsideration of the Court's detailed and well-supported opinion.**

As an initial matter, the government's motion to reconsider fails to address the strict legal standard governing whether this Court can, let alone should, reconsider its decision dismissing Mr. Moore's indictment. *See, e.g.*, *United States v. Clenney*, No. 1:09CR135, 2009 WL 10677501, at *3 n.1 (E.D. Va. July 15, 2009) (observing that proponent of motion to reconsider did "not set forth the appropriate standard governing a motion for reconsideration, nor has [it] argued that [it] has satisfied any such standard.").

Motions to reconsider final decisions in criminal cases generally are available only in very limited circumstances. *See Pacific Ins. v. American Nat. Fire Ins.*, 148 F.3d 396, 403 (4th Cir. 1998) (observing that reconsideration is an "extraordinary remedy which should be used

1

**JA1824**

sparingly.") (quoting 11 Wright et al., Federal Practice and Procedure § 2810.1, at 124 (2d ed. 1995); *United States v. Cintron*, 724 F.3d 32, 36 n.5 (1st Cir. 2013); *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010); *United States v. Young*, 260 F. Supp. 3d 530, 555 (E.D. Va. 2017); *United States v. Diaz-Martinez*, 3:18cr97, 2019 WL 2305151, at *1 (E.D. Va. May 30, 2019).

In particular, a motion to reconsider cannot simply repackage arguments that have already been considered and rejected by the Court. *See, e.g.*, *United States v. Danielczyk*, 917 F. Supp. 2d 573, 576 (E.D. Va. 2013) ("A party's mere disagreement with the court's ruling does not warrant a Rule 59(e) motion, and such motions should not be used 'to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance.'") (quoting *Pac. Ins.*, 148 F.3d at 403); *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983); *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000) (observing reconsideration motion cannot be used to "repackage familiar arguments to test whether the Court will change its mind"); *cf. Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003) (noting that "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment."). In this case, the government has merely restated arguments it made previously, and thus fails to provide a valid basis for reconsideration of the Court's detailed and considered judgment.

**II.     The Court's decision was well-supported by the evidence in this case.**

The government urges the Court to reconsider its decision because of an "absence of evidence in the record" to support the Court's conclusion. *See* ECF No. 128 at 1. But the government's motion ignores appalling evidence that the Richmond Police Department is discriminating against Black drivers, and has done so *for years*.

**JA1825**

Expert testimony from Dr. Coston established that 77% of the drivers the Richmond Police Department pulled over in the six months leading up to Mr. Moore's arrest in this case were Black, compared to the 14.6% of drivers pulled over who were White. Black drivers were thus 5.13 times more likely to be stopped in Richmond than White drivers. *See* July 18, 2022 Tr. at 56-57. The data further revealed a statistically significant relationship between the driver's race and the outcome of the traffic stop; Black drivers were ticketed (rather than warned), searched, and arrested more often than White drivers than one would expect if left to chance. *Id.* at 57-66.

Dr. Coston's results mirrored what Virginia's Department of Criminal Justice Services found in analyzing the same data for the Richmond Police Department that Dr. Coston reviewed. *See* ECF No. 72-1 at 40, 59-60. Dr. Coston's results also reflected what the government's own expert found when analyzing similar data that the Richmond Police Department gathered in 2000. *See* ECF No. 72-2 at 9. Because of the absence of evidence that Black drivers in Richmond committed more traffic infractions than White drivers, *see* July 18, 2022 Tr. at 54; July 19, 2022 Tr. at 233, these statistics made "abundantly clear the disparate impact of traffic stops on Black drivers in Richmond." ECF No. 126 at 20.

In its motion to reconsider, the government laments that the Court did not cite the government's expert testimony in its opinion. *See* ECF No. 128 at 3. But the weight afforded by the Court to the expert testimony it received does not provide a valid basis for reconsideration. *See Thompson v. Afamasaga*, 2019 WL 1290856, at *2 (D. Haw. Mar. 20, 2019) ("In large part, Plaintiff simply disagrees with the court's rulings, including credibility determinations, which is not a sufficient basis for reconsideration . . . ."). Moreover, in the context of Federal Rule of Evidence 702, expert opinion is subject to exclusion if it is substantially grounded in the expert's

3

**JA1826**

"subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

The Court made clear during Dr. Smith's testimony that it was not credible for multiple reasons. Indeed, Dr. Smith never reviewed the data that Dr. Coston analyzed; he did not review or ask for "contextual" data that he thought critical to his opinion in this case; and he had no explanation for why more White drivers were not pulled over in areas of Richmond where they worked as Dr. Smith would have expected. Most importantly, Dr. Smith testified he would never find that racial bias played a causal role in a pattern of policing, even if the statistics showed that police pulled over 90, or even 100, percent Black drivers compared to White drivers. July 19, 2022 Tr. at 226-29, 237-38, 251.

The problem with Dr. Smith's testimony is that he essentially conceded that his hypothesis—that racial bias played no role in policing in Richmond—was not subject to challenge *regardless* of the statistical evidence. That refusal to consider whether his theory was false contradicts the essence of reliable expert testimony. *See, e.g., Daubert*, 509 U.S. at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry"). After Dr. Smith admitted that he would never find that racial bias played a causal role in a pattern of policing no matter what the statistical data showed, the Court understandably questioned Dr. Smith's value as an expert in determining whether racial bias was a factor in police action. *See* July 19, 2022 Tr. at 251-54. It is no surprise that Dr. Smith's testimony was entirely unpersuasive.

The government also recycles its argument that Dr. Chiles' testimony was simply historical and thus irrelevant to the present day. As when it made this assertion the first time, the

**JA1827**

government's argument ignores the contemporary impacts from historical discrimination that, in particular, created the deeply racially segregated nature of Richmond's residential neighborhoods. *See, e.g.*, McGuireWoods Zoning and Segregation Work Group, *Zoning and Segregation in Virginia: Part 1* (Feb. 2021), filed as ECF No. 66-3 at 2 ("In many localities, neighborhoods are more racially segregated today than they were 50 years ago. . . .  In combination with other discriminatory laws and governmental actions, zoning segregated Virginia communities."); ECF No. 66-4 at 2-3 ("Redlining the construction of public housing and the location of public housing, highway construction, urban renewal, and economic development projects destroyed or bisected Richmond's black neighborhoods, displacing thousands of low income African-Americans, and squeezing them into East End Richmond, where most of the public housing has been located. Today [in 2015], Richmond is more segregated than ever."); ECF No. 102-1 at 7 ("While upwardly-mobile blacks can and have taken advantage of federal law and grassroots activism to live wherever their money can afford them, the majority of working-class and underclass blacks remain in racially homogenous enclaves in Richmond.").

The racial dot maps that Mr. Moore introduced demonstrate, commensurate with the personal experience of those living in Richmond, that the vast majority of White people living in Richmond live in the Richmond Police Department's third precinct, while Black people living in Richmond live in the Richmond Police Department's first, second, and fourth precincts.  *See* July 26, 2021 Motions Hr'g Exs. R-1, R-2, X-1, X-2, X-3, X-4.  Dr. Chiles's evidence explained the racially discriminatory history behind that segregation.  *See* Oct. 28, 2022 Tr. 12-55.  As Dr. Chiles summarized, "by and large Blacks and Whites were basically forced or coaxed to live in separate sides of the City from the past to the present.  And the result of that is in the present."  *Id.* at 57.

**JA1828**

Further, Dr. Chiles testified that after the Revolutionary War, policing in Richmond focused on targeting Black people living and working in Richmond. *Id.* at 58. In the twentieth century, when policing began to focus on criminal activities such as drug abuse, prostitution, and alcoholism—including crimes committed by White citizens, the White citizens of Richmond threatened to defund the police department. *Id.* at 60. The Richmond Police Department's focus then turned back again to Black people in Richmond, including posting police patrol units to just watch Black citizens living in public housing projects. *Id.* at 60, 65-66. Moreover, hiring Black police officers did not impact the police department's focus on Black citizens in Richmond. *Id.* at 66.

The government did not counter this well-documented evidence in any way because it cannot. The history of over-policing Black communities in this country is intimately bound together with racial prejudice and discrimination. *See* Khalil Gibran Muhammad, The Condemnation of Blackness: Race, Crime, and the Making of Modern Urban America 5-10 (2010). Indeed, over a century of disproportionate enforcement resulted in higher crime rates which were then used as an "objective" basis to justify greater enforcement and stiffer punishments imposed on Black people. *Id.* at 234 ("Since the 1890s, disproportionately high crimes rates among blacks have been the starting point and linchpin of modern discourse on black criminality.").

In contrast to the eighteen exhibits that the defense introduced into evidence over the course of three days of hearings (in addition to the many attachments to briefings submitted over the course of this litigation), the government introduced four exhibits: Dr. Smith's report in this case, a list of duplicate traffic data, and two maps. *See* ECF Nos. 96, 98, and 109. The two maps showed the locations of murders and manslaughters in Richmond from 1999 through the day of Mr. Moore's arrest in this case. *See* Oct. 28, 2022 Tr. at 5-6. The government presented no evidence

JA1829

tying murder and manslaughter rates to committing traffic violations. Further, and critically, the government presented no evidence at all purporting to explain why more Black drivers were stopped than White drivers in the White parts of Richmond, where the violent crime rate was lower.

Through expert testimony, Mr. Moore plainly demonstrated that the Richmond Police Department's selective enforcement of Virginia's traffic laws has a discriminatory effect on Black drivers. Regarding discriminatory purpose, the Court correctly found that through Dr. Coston's and Dr. Chiles's testimony, "Moore successfully present[ed] evidence of the first two factors: (1) 'evidence of a 'consistent pattern' of actions' by RPD that 'disparately impacts' Black drivers in Richmond; and (2) the 'history of discrimination' by RPD and in Richmond itself." ECF No. 28 at 22 (quoting *Central Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016)). Contrary to the government's argument, the Court's findings were well supported by both the evidence in this case and applicable law. The Court should deny the government's motion asking the Court to reconsider its well-considered and well-supported decision.

### III. The government's argument that the Richmond Police Department must be able to continue to discriminately stop Black drivers in order to fight violent crime in Richmond is unjustified and offensive.

The government's motion for reconsideration repeats the argument that if the Richmond Police Department cannot disproportionately stop Black drivers in Richmond for traffic offenses, it will "unravel the progress RPD has made in reducing violent crime in Richmond." ECF No. 128 at 4. *See also* Oct. 28, 2022 Tr. at 135; ECF No. 103 at 6-9; ECF No. 108 at 5. Similar rationales based upon "objective" measures of "black crime statistics" have long been used as a tool "to support discriminatory public policies" in this country. Muhammad, *supra*, at 8. Setting aside for a moment that the government provided no evidence beyond two data maps to justify its

**JA1830**

argument that selectively enforcing traffic laws against Black drivers in Richmond diminishes violent crime in Richmond, the government's argument about violent crime, as Judge Gregory opined in his concurrence in *United States v. Curry*, "contributes to the volumes of work gifted by others who felt obliged to bear their burden to save minority or disadvantaged communities from themselves." 965 F.3d 313, 331-32 (4th Cir. 2020). Judge Gregory further explained that such an argument:

> insists on a Hobson's choice for these communities [of color]: decide between their constitutional rights against unwarranted searches and seizures or forgo governmental protection that is readily afforded to other communities. But those inclined to shrug their shoulders at citizens who wave their Constitutions in the air during uncertainty must not forget "[h]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 635 (Marshall, J., dissenting); *cf. Korematsu v. United States*, 323 U.S. 214 (1944). Indeed, it is in moments of insecurity that our constitutional bells ring the loudest.

965 F.3d at 333. "Predictive policing is merely a covert effort to attempt to justify racial profiling." *Id.* at 344 (Thacker, J., concurring). Nothing "prevents the police from using, in good faith with constitutional principles, smart policies to identify where crimes may occur and accordingly dispatching officers to those neighborhoods. But it is how they, upon arrival, engage with the people in those neighborhoods that is important here." *Id.* at 334 (Gregory, J., concurring).

The facts in this case provide just such an example of how the police engaged with Black drivers in harassing and offensive ways. On the night of December 5, 2020, the Fourth Precinct's Focus Mission Team was out on the streets of the Fourth Precinct looking to get guns and drugs off the street. *See* July 26, 2021 Tr. at 23-24. To do that, the officers used minor traffic violations to pull over drivers to search their cars for evidence of more serious, actually criminal, offenses. *Id.* at 24. Before encountering Mr. Moore, the Focus Mission Team officers pulled over a Black male driver who did not have his headlights on. *See* July 26, 2021 Motions Hr'g at 68. The body

8

**JA1831**

camera footage of that traffic stop shows the police engaging with two Black citizens in the car who were simply out Christmas shopping for their kids. *See* July 26, 2021 Motions Hr'g Ex. U-3 at 00:00:38. Several police officers surrounded the car, using their flashlights to peek through the windows to look at the interior of the car. *See* July 26, 2021 Tr. at 35. On another traffic stop that night, the police officers pulled over a young Black woman with a baby in the backseat who had been at a friend's house to pick up Pampers. *See* July 26, 2021 Motions Hr'g Ex. V-3 at 00:00:50. The police pulled her over for driving with an expired temporary tag. *Id.* at 85-86. The Court itself observed that one of the officers was "vigorously" looking with his flashlight into the interior of the car. *Id.* at 39. Imagine the outcry in Richmond that would have occurred had the police used these tactics on White drivers at Willow Lawn and its surrounding neighborhoods?

The government's argument urges the Court to adopt what the Fourth Circuit has expressly condemned: a pass for policing tactics that reserve for "only for a certain race or class of people" the constitutional protections that **everyone** in the United States is entitled to. *United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013) ("To conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept carte blanche the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people. We denounce such an assertion."); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment"). As this Court found, there is no evidence that "modern criminology demonstrates that picking on motorists somehow makes cities safer." ECF No. 126 at 24. There is a "long history of Black and brown communities feeling unsafe in police presence," *Curry*, 965 F.3d at 332 (Gregory, J., concurring),

9

**JA1832**

and there is no basis at all for the Court to reconsider its decision finding that "Black drivers have a problem in Richmond, Virginia," ECF No. 126 at 1.

**CONCLUSION**

The Court should deny the government's motion to reconsider its decision dismissing Mr. Moore's indictment.

Respectfully submitted,
KEITH RODNEY MOORE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

Geremy C. Kamens
Va. Bar No. 41596
Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
(703) 600-0880 (fax)
Geremy_Kamens@fd.org

**JA1833**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21cr42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Reply of the United States to its
Motion to Reconsider**

Whether they live in Oak Grove, Gilpin Court, or Windsor Farms, Richmond residents want and deserve to live without fear of violence. When crime occurs, residents necessarily demand that the Richmond Police Department ("RPD") solve it and prevent future incidents. *See, e.g.*, "Residents react to six people shot near Richmond club, demand more police support in communities," WRIC-ABC (July 4, 2022); "Richmond Police didn't respond to 911 call. Then gunshots rang out: 'This could've been prevented,'" WTVR-CBS (Mar. 29, 2023); "His home was shot into. Now, he wants Richmond Police to address its critical staffing shortage," WRIC-ABC (Apr. 5, 2023). In response, RPD sensibly deploys its limited resources to calls for service and patrolling high crime areas, including through traffic stops, where they can have the greatest impact. *See* ECF No. 33 at 24; ECF No. 70 at 16; ECF No. 70, Ex. A at 3. If it doesn't, citizens understandably complain that the police are not solving or preventing crime.

That is exactly what occurred on the evening of December 5, 2020, when Mr. Moore failed to stop for a lawful traffic stop, engaged police in a high-speed pursuit through a residential neighborhood, wrecked his vehicle, fled on foot, and as seen below, RPD recovered a firearm from his vehicle. ECF No. 33 at 14-19, 102.

1

**JA1834**



*Id.* at 19 (Gov't Ex. 6).

RPD does not, as Mr. Moore contends, "discriminately stop Black drivers in order to fight violent crime." Resp. at 7. The Court already found that the individual RPD officers here acted in good faith, without regard to Mr. Moore's race, when they stopped him for a legitimate traffic offense and then he fled with an illegal gun. Mem. Op. at 21. As for the wider Department, the only RPD policies in the record expressly prohibit racism:

> All citizens of this country, under the Constitution, are guaranteed certain basic rights. It is the policy of the Richmond Police Department to safeguard these rights without bias. . . .

RPD, Gen. Order on Constitutional Rights at 1 (eff. Feb. 11, 2019) (ECF No. 70-2).

> Department employees shall exercise duties, responsibilities, and obligations in a manner that does not discriminate on the basis of race. . . . Officers are strictly prohibited from engaging in bias-based policing/profiling. All complaints of bias-based policing/profiling shall be thoroughly investigated. . . .

RPD, Gen. Order on Bias Reduction at 1, 2 (eff. Feb. 13, 2018) (ECF No. 70-2). There is absolutely no evidence in the record that RPD had any policy – explicit or implicit – directing officers to stop Black drivers.

2

**JA1835**

The only evidence that Mr. Moore and the Court rely upon to show RPD's traffic stops were motivated by discriminatory intent is the rate of Black drivers relative to white Drivers who were pulled over from July 1 to December 6, 2020 in Richmond.  The Court heard evidence from Dr. Michael Smith, a national expert on racial disparities in policing with 25 years of experience, that "a disparity in the number of stops does not justify a conclusion that there is biased policing." ECF No. 101 at 50, 225.  In his response, Mr. Moore continues to discount this conclusion because Dr. Smith "admitted that he would never find racial bias played a causal role in a pattern of policing no matter what the statistical data showed."  Resp. at 4.

But this reflects a fundamental lack of understanding of statistical analysis.  Dr. Smith testified that finding a causal role first requires "knowledge of who is driving and available to be stopped."  ECF No. 101 at 250.  This is called a benchmark.  Dr. Smith testified that census data – which the defendant's expert relied on solely – is widely regarded as scientifically invalid for comparing police traffic data.  ECF No. 101 at 193-200.  There are other possible benchmarks, like field observation, veil of darkness, or even traffic crash data.  *Id.* at 190-92.  In plain terms, absent a baseline point of comparison, Dr. Smith could not find that racial bias (or any other factor) played a causal role.[1]  While the Court found that some researchers nonetheless have used

---

[1] As the Court noted, the defendant's own expert agreed that they *could not* prove a causal connection between race and the RPD traffic stops:

>       THE COURT: . . . The question was, are you aware that DCJS said you can't reach any
>                 conclusions about causation from the data that they have?
>
>       DR. COSTON: I am not making conclusions about causation.
>
>       THE COURT: Okay. Well, isn't one of the things we have to prove in this case is that
>                 race caused this disparity?
>
>       DR. COSTON: I am trying drawing conclusions about the large scale patterns and
>                 relationships between race and the other variables that were examined, but
>                 I can't -- I am not characterizing those as a causal relationship.

**JA1836**

census data as a benchmark, Mem. Op. 10-11, the fact that Dr. Smith disagrees with that methodology does not render his entire opinion incredible.

Although the statistics during these six months in 2020 reflected that a high percentage of Richmond drivers who were stopped were Black, this data does not establish that RPD was motivated by discriminatory intent and violated the Equal Protection Clause when it stopped Mr. Moore for an admittedly legitimate traffic offense. It does mean that citizens, police, public officials, and scholars should delve into these statistics, as the DCJS Report recommends. *See* ECF No. 72-1 at 67-72.[2] The Court said it best during the second day of expert testimony:

. . .

THE COURT: Mr. Gibbons, do you agree that the burden is on the defendant to prove that race caused this disparity?

GOV'T:        Your Honor, emphatically.

THE COURT: Do you agree that the witness just admitted that doesn't show that?

GOV'T:        Yes, Your Honor.

THE COURT: And why are you continuing to ask questions?

GOV'T:        I could rest, Your Honor.

ECF No. 100 at 134-36.

___

[2] *See also* Virginia Dep't of Criminal Justice Servs. Report at 68 (quoting academic research) ("Our inability to devise a universally acceptable method for measuring racial and ethnic proportions within an ever-changing driving population remains one of the most controversial methodological challenges in racial profiling research. . . . Racial profiling studies based on poorly constructed benchmarks cause political and public relations problems and sometimes result in ill-fated legislation. (Withrow and Williams, 2015, p.1). Most of the analyses reported show that police traffic stops are not proportional to the racial distribution of that jurisdiction's resident population, but most studies do not conclude that the police are engaged in racial profiling. (McMahon et. al., 2002, p. 1)").

**JA1837**

GOV'T:     The other problem is if you have individual rogue officers that are making the problem, go after them. This will help identify and narrow down if there are certain parts of an area. . . But to say that the Richmond Police force is designed, or their enforcement system to selectively enforce African-Americans I think is a step too far. That is all we have heard throughout today.

THE COURT: You know, ultimately this may be a political question.

ECF No. 101 at 299.

The Court has cast a spotlight on these issues for the Commonwealth. The United States respectfully requests that the Court reconsider the scope and outcome of its decision in this case. The United States also respectfully requests that the Court resolve this motion expeditiously to facilitate possible further review in the Fourth Circuit given the public interest in the prompt resolution of this criminal case.

Respectfully submitted,

By _____

Jessica D. Aber
United States Attorney
Virginia Bar No. 72680
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Va. 23219
Phone: 804-819-5400
Email: jessica.d.aber@usdoj.gov

5

**JA1838**

CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2024, I filed electronically the foregoing with the

Clerk of Court using the CM/ECF system, which will serve all counsel of record.

Jessica D. Aber
United States Attorney

6

**JA1839**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
          Defendant.

## MEMORANDUM ORDER

The Court dismissed this case because the evidence showed that the City of Richmond's Police Department ("RPD") officers disproportionately pull over Black drivers. The government now asks the Court to reconsider its conclusion. (*See* ECF No. 128.)

The motion to reconsider fails for several reasons. First, it does little more than reargue points the Court has already considered. Second, it asks the Court to reevaluate the testimony of the government's expert, whom the Court found unpersuasive. Third, it is based on a factual contention that lacks evidentiary support: that stopping Black drivers somehow drives down serious crime in the City. The Court, therefore, will deny the government's motion.

### A. The Government Does Not Meet the Legal Standard for a Motion to Reconsider

"It is within the sole discretion of the Court as to whether the granting of a motion to reconsider is appropriate." *United States v. Dickerson*, 971 F. Supp. 1023, 1024 (E.D. Va. 1997). "A motion to reconsider cannot appropriately be granted where the moving party simply seeks to have the Court 'rethink what the Court ha[s] already thought through—rightly or wrongly.'" *Id.* (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inf.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). Because no provision in the Federal Rules of Criminal Procedure governs motions for reconsideration, district courts are "guided by the standard set in the Civil Rules." *Id.*; *see* Fed. R. Civ. P. 59(e). The government must therefore provide at least one of the

following three grounds for reconsideration: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available [at the time of the Court's ruling]; or (3) to correct a clear error of law." *Dickerson*, 971 F. Supp. at 1024 (quoting *Hutchison v. Staton*, 994 F.2d 1075, 1081 (4th Cir. 1993)).

The government's motion does not purport to "accommodate an intervening change in controlling law," and it does not introduce new evidence. *See id.* It instead disagrees with the Court's "analytical" findings on Keith Rodney Moore's selective enforcement claim. (ECF No. 128, at 2.)[1] Its three arguments in this regard fail.

First, the government points out that no one in RPD said in writing that RPD officers should discriminate against Black drivers. Of course, at this point in our nation's history, no one in their right mind would write down such a suggestion. But the evidence in the record shows conclusively that, at the relevant time, Black drivers got the lion's share of stops; Black drivers made up 77 percent of the stops and were over 5 times more likely to be stopped than white drivers. That RPD did not have a written directive to disproportionately stop Black drivers does not mean that it did not have a practice of doing exactly that. An "invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *See Washington v. Davis*, 426 U.S. 229, 242 (1976). Here, Moore relied on statistical, historical, and circumstantial evidence to show selective enforcement. So the first ground for reconsideration fails.

Second, the government asks the Court to reexamine its view of the government's proffered expert witness, whom the Court did not find credible or persuasive. The Court

---

[1] This sort of argument is precisely why courts generally forbid motions that simply ask the judge to "rethink" what has been decided. Nowhere is this procedural error more apparent than in the government's argument about "benchmarks," raised solely in its reply memorandum. This argument was thoroughly addressed in the Court's Opinion dismissing the case, and will not be addressed here.

2

observed the expert's demeanor on the witness stand, and considered the substance of his testimony. It found that he did not come to the case with an open mind. The government's expert essentially testified that no amount of evidence could persuade him that the police dealt unfairly with Black motorists. He criticized Moore's expert for using a statistical method that he himself had used. And he could not suggest any legitimate reason for the disproportionate effect of traffic stops on Richmond's Black drivers. The Court rejected his testimony and sees no reason to reconsider its finding.

Third, the government suggests that RPD officers stop a lot of Black motorists because they are executing some sort of grand strategy to stop crime in parts of Richmond with a high Black population. This argument fails for three reasons. First, the government presented no evidence that such a strategy exists. Second, the government presented no evidence that stopping drivers cuts down the number of crimes committed. Third, the existence of this undisclosed strategy does not begin to explain another undisputed fact in the record: RPD officers disproportionately stop Black drivers in predominately white sections of the City, as well as in predominately Black communities. This cannot be part of the City's supposed anticrime strategy.

The Court notes that the Virginia Department of Criminal Justice Services has released new information suggesting a gradual decrease in the percentage of traffic stops of Black drivers. *See* Luca Powell, *Police Pulling Over Fewer Black Drivers*, Richmond Times-Dispatch, March 11, 2024, at A1–A2. This new information takes the air out of the argument that the police use traffic stops to quell crime in the City. In any event, the evidence in this case revealed that, in the six months leading up to Moore's arrest, Black drivers were over five times as likely to be stopped in Richmond than white motorists. And the government never supplemented the

3

**JA1842**

record with evidence that reveals a decreasing disparity between white and Black drivers stopped by RPD officers.  So, the third ground for reconsideration fails.

### B. The Government's List of Frightening Effects of the Court's Decision

Additionally, the government threatens horrible consequences of the Court's decision.[2]  It suggests that RPD may become discouraged and stop fighting crime, and may even redirect its efforts away from protecting Black citizens.  Again, the Court will note that no government witness testified that RPD has some strategy to prevent violent crime by targeting Black drivers throughout Richmond.  And, more importantly, the Court has a responsibility to protect the constitutional rights of Moore and other Black drivers.  If the City has a grand scheme to stop crime by stopping Black motorists, the scheme cannot exist at the expense of human freedom.

The government argues, correctly, that Black citizens deserve a City with less crime.  Much to the credit of the Police Department, they are receiving that.  But they also deserve a City where they can go to church, school, and the grocery store without fear of the police picking on them.  The time has come for this practice to end.

The Court DENIES the government's motion.  (ECF No. 128.)

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: <u>11 March 2024</u>
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

---

[2] The government does not suggest this as a ground to change the Court's prior Opinion, but rather to remind the Court that its decisions have a real effect on life in the City.

4

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 3:21-cr-42 |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

**Notice of Appeal**

The United States hereby gives notice of its appeal to the United States Court of Appeals for the Fourth Circuit under 18 U.S.C. § 3731 from the order of the District Court dismissing the indictment and denying the United States' motions to exclude defense experts, issued on February 12, 2024 (ECF No. 127), and the order of the District Court denying the United States' motion for reconsideration, issued on March 11, 2024 (ECF No. 132). A certification in compliance with 18 U.S.C. § 3731 is attached to this notice of appeal.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____

Jacqueline R. Bechara
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700
Fax:     (703) 299-3980
Email:   jacqueline.bechara@usdoj.gov

**Certificate of Service**

I certify that on April 8, 2024, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: _____/s/_____
Jacqueline R. Bechara
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:  (703) 299-3700
Fax:      (703) 299-3980
Email:   jacqueline.bechara@usdoj.gov

2

**JA1845**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )   Criminal No. 3:21-cr-42 |
| KEITH RODNEY MOORE, | ) |
| | ) |
| Defendant. | ) |

**Certification for Appeal**

The United States Attorney certifies under 18 U.S.C. § 3731 that the government's appeal

in the above-captioned matter filed on this day is not taken for purpose of delay and that the

evidence is a substantial proof of a fact material in the proceeding.

Respectfully submitted,

*Jessica D. Aber*

Jessica D. Aber
United States Attorney

**JA1846**