**No. 24-4201**

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellant*,

**v.**

**KEITH RODNEY MOORE,**

*Defendant-Appellee*.

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 3:21-cr-42 (Gibney, J.)

———————————

## DEFENDANT-APPELLEE'S RESPONSE BRIEF

———————————

Patrick L. Bryant
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
1650 King St., Suite 500
Alexandria, VA 22314

Laura J. Koenig
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
701 E. Broad St., Suite 3600
Richmond, VA 23219

Brian T. Burgess
Rohiniyurie Tashima
Kaley Preciado
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
bburgess@goodwinlaw.com

*Counsel for Defendant-Appellee*
*Keith Rodney Moore*

November 20, 2024

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 2

ISSUES PRESENTED .......................................................................... 3

STATEMENT ........................................................................................ 3

    I.   The Richmond Police Department spends years targeting Black Richmonders. ...................................................................................3

        A.  Richmond's history of racial discrimination ......................................3

        B.  RPD's present-day practices ..........................................5

    II.  Focus Mission Team officers pull over three cars for traffic violations in the hopes of finding evidence of more serious offenses. ..........................7

    III.  The district court dismisses the indictment after Mr. Moore presents evidence to establish his selective-enforcement claim..............................10

SUMMARY OF ARGUMENT ............................................................ 15

STANDARD OF REVIEW ................................................................. 17

ARGUMENT ....................................................................................... 18

    I.   The preponderance-of-the evidence standard applies to selective-enforcement claims....................................................................18

    II.  The district court did not err in concluding that Mr. Moore proved his selective-enforcement claim.........................................................27

        A.  The district court did not err in concluding that Mr. Moore established discriminatory purpose. ...................................................28

            1.  Mr. Moore proffered significant circumstantial evidence of discriminatory purpose...........................................................29

            2.  The government's challenges to Mr. Moore's proffered evidence do not justify reversal.................................................33

         B.  The district court did not err in concluding that Mr. Moore established discriminatory effect.....................................................41

CONCLUSION ................................................................................... 48

CERTIFICATE OF COMPLIANCE ................................................... 49

CERTIFICATE OF SERVICE ............................................................ 50

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Cent. Radio Co. v. City of Norfolk*,
811 F.3d 625 (4th Cir. 2016) ............................................................32

*Conley v. United States*,
5 F.4th 781 (7th Cir. 2021) ........................................1, 21, 22, 23, 26

*Cooper v. Oklahoma*,
517 U.S. 348 (1996).............................................................................20

*District of Columbia v. Wesby*,
583 U.S. 48 (2018)...............................................................................39

*Dixon v. United States*,
548 U.S. 1 (2006).................................................................................20

*Fernandez v. RentGrow, Inc.*,
116 F.4th 288 (4th Cir. 2024) .............................................................24

*Fisher v. Univ. of Tex.*,
579 U.S. 365 (2016).............................................................................19

*Hunter v. Underwood*,
471 U.S. 222 (1985).............................................................................28

*Johnson v. Holmes*,
782 F. App'x 269 (4th Cir. 2019) ...................... 17, 27, 41, 42, 43, 46

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016) ...............................................................28

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977).............................................................................19

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) .........................................................24, 25

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989).......................................................................16, 19

*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*,
    827 F.3d 333 (4th Cir. 2016) ...............................................................19

*Riddick ex rel. Riddick v. School Bd. of Norfolk*,
    784 F.2d 521 (4th Cir. 1986) ..............................................................32

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ..............................................................18

*Strickland v. Washington*,
    466 U.S. 668 (1984)......................................................................25, 26

*United States v. Armstrong*,
    517 U.S. 456 (1996)......................................... 13, 16, 19, 20, 21, 23, 24, 44, 45

*United States v. Avery*,
    137 F.3d 343 (6th Cir. 1997) ..........................................................28, 29

*United States v. Bullock*,
    94 F.3d 896 (4th Cir. 1996) ......................................14, 23, 24, 25, 26

*United States v. Hare*,
    820 F.3d 93 (4th Cir. 2016) ..........................................18, 23, 24, 25

*United States v. Mason*,
    774 F.3d 824 (4th Cir. 2014) ......................................23, 24, 25, 26

*United States v. Olvis*,
    97 F.3d 739 (4th Cir. 1996) ..........................................42, 44, 45

*United States v. Pair*,
    84 F.4th 577 (4th Cir. 2023) ..............................................................17

*United States v. Sellers*,
    906 F.3d 848 (9th Cir. 2018) ..............................................21, 23, 46

*United States v. Suarez*,
    321 F. App'x 302 (4th Cir. 2009) ......................................23, 24, 25

*United States v. Venable*,
    666 F.3d 893 (4th Cir. 2012) ..............................................................45

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)............................................................28, 29, 32

*Washington v. Davis*,
  426 U.S. 229 (1976)...................................................................29, 30

*Whren v. United States*,
  517 U.S. 806 (1996)............................................................27, 39, 40

**Constitution and Statutes:**

U.S. Const. amend. IV ...................................................................39

U.S. Const. amend. XIV, § 1 ........................................................39

18 U.S.C. § 922(g) .........................................................................45

18 U.S.C. § 3231 .............................................................................2

18 U.S.C. § 3731 .............................................................................3

42 U.S.C. § 1983 ...........................................................................22

Va. Code § 46.2-612(B)(1) ...........................................................40

Va. Code § 46.2-722 .....................................................................40

Va. Code § 52-30.1 .........................................................................6

Va. Code § 52-30.2 .........................................................................6

**Other Authorities:**

1 W. LaFave, Search and Seizure § 1.4(f) (5th ed. 2012) .......................39

U.S. Census Bureau, *Richmond city, Virginia*, https://data.census.gov/
  profile/Richmond_city,_Virginia?g=050XX00US51760#race-and-
  ethnicity (last visited November 20, 2024) (describing Richmond
  population as of 2020 Decennial Census as including 98,140 white
  residents and 91,653 Black residents) .................................................5

Va. Dep't of Criminal Justice Servs., *Report on Analysis of Traffic Stop Data Collected Under Virginia's Community Policing Act* (July 2024),
https://rga.lis.virginia.gov/Published/2024/RD440/PDF......................................6

# INTRODUCTION

"Racially selective law enforcement is a quintessential equal protection violation." *Conley v. United States*, 5 F.4th 781, 788 (7th Cir. 2021). On December 5, 2020, four members of Richmond Police Department's Focus Mission Team patrolled a predominantly Black neighborhood in Richmond, Virginia. The officers' stated primary focus was to investigate firearm- and drug-related offenses. In doing so, the four officers chose to initiate multiple pretextual traffic stops for minor traffic violations, such as the failure to use headlights. The officers were not concerned about the traffic violations themselves and admitted as much before the district court. Instead, the officers initiated these stops in the hopes that, when they surrounded a driver on both sides and thoroughly examined the insides of the car with their flashlights, they would find evidence of more serious offenses, despite having no reason to suspect that their target had any involvement in such offenses.

Keith Moore, who is Black, was one of several drivers subjected to this practice. The Government defends its dragnet as non-discriminatory, but the evidence says otherwise. Not only are Black drivers in Richmond 5.13 times more likely to be stopped than white drivers, but they are also stopped in both predominantly Black and predominantly white neighborhoods while their white counterparts are stopped only in predominantly white neighborhoods. And out of the entire population of drivers who are stopped, Black drivers are arrested during

1

traffic stops at disproportionate rates—more often than would be expected by chance. Richmond's long history of discrimination and segregation, a history that includes the heavy and targeted policing of Black residents, provides important context and further supports this point. The district court recognized this "disgraceful disparity in enforcement of traffic laws," JA1815, concluding that Mr. Moore's equal protection rights were violated and dismissing the indictment against him.

This Court should affirm the district court's judgment. As the district court concluded, the preponderance-of-the-evidence standard, rather than the clear-evidence standard, applies to selective-enforcement claims. Contrary to the government's assertion, there is no precedent from this Court deciding this question, and the only on-point court of appeals precedent supports the district court. Applying the correct evidentiary standard, the statistical and historical evidence Mr. Moore provided more than met it—Mr. Moore established that his traffic stop was motivated by a discriminatory purpose and Richmond Police Department's actions have had a discriminatory effect on Black drivers.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231 and dismissed with prejudice the indictment against Mr. Moore on February 12, 2024. JA1817. The government timely appealed the district court's dismissal of the indictment and order

denying its motion for reconsideration.  JA1844.  This Court has jurisdiction under

18 U.S.C. § 3731.

## ISSUES PRESENTED

1.     Whether the preponderance-of-the-evidence standard applies to selective-enforcement claims.

2.     Whether Mr. Moore established that his stop was motivated by discriminatory intent.

3.     Whether Mr. Moore established that RPD's actions at issue here had a discriminatory effect.

## STATEMENT

### I. The Richmond Police Department spends years targeting Black Richmonders.

#### A.     Richmond's history of racial discrimination

There can be no dispute that Richmond bears the scars of centuries of racial

discrimination.  Founded in 1737, Richmond served as "a commercial outpost for

the Virginia Colony's black slave market," and slavery persisted in both the City and

Commonwealth of Virginia until the end of the American Civil War.  JA1603-1604.

With the abolition of slavery, Richmond transitioned to "a newer custom of racial

segregation by residence," JA1604, which ultimately led to Black Richmonders

being "pack[ed] … into specific areas in the East End, Northside, and Southside,"

JA1606.  "By the late 1970s, the Richmond areas w[ere] solidly segregated by

3

residence." JA1607. This divide has persisted to today, with predominantly Black neighborhoods falling within the Richmond Police Department's (RPD) First, Second, and Fourth Precincts and predominantly white neighborhoods falling within RPD's Third Precinct. *See* JA0267-0268; JA0276-0279; JA1699-1700 (noting that Black people and white people were "forced or coaxed to live in separate sides of the City from the past to the present" and "the result of that is in the present"); JA1725-1726. Indeed, even though Richmond's racial demographics have changed slightly, "by and large these areas are still identifiably that of [the] same race." JA1725-1726 ("[T]he amount of white distribution throughout the City has not changed the racial integrity of the City at all, at least based upon where the majority of the races of people live.").

This checkered history extends to RPD. Although pre-revolutionary policing focused on horse thieves, JA1610; JA1701, "[b]etween 1800 and 1865, white residents only supported RPD funding and salary increases during panics over runaway slaves and black rebellions," leading RPD to target black Richmonders. *See* JA1610. The "end of slavery only worsened the relationship between black Richmonders and RPD." JA1610. As laws were passed to curtail black Richmonders' rights, RPD "disproportionately arrested, publicly whipped (ended in 1881), and killed" Black Richmonders "between 1865 and 1900." JA1610-1611. Even through the mid-20th century, RPD targeted Black Richmonders and resisted

4

hiring Black officers. JA1610-1611. Although RPD had "more black officers than ever before" by the late 1970s and early 1980s, RPD enacted plans in which "dozens of RPD officers exclusively patrolled … high-density, low-income areas." JA1613 (citation omitted). Put differently, by the 1980s, RPD task forces were "focusing exclusively on black neighborhoods." JA1692.

## B.    RPD's present-day practices

RPD's practice of targeting Black Richmonders continues to this day. Despite comprising under half of Richmond's population, JA0213-0214, Black drivers constituted 77% of the drivers RPD stopped from July 1, 2020 to December 6, 2020. JA0357-0358. In contrast, white drivers—who likewise comprise just under half of Richmond's population, JA0213-0214[1]—represented only 14.16% of RPD's stops, meaning Black drivers were 5.13 times more likely than their white counterparts to be stopped. JA0357-0358. And RPD disproportionately stopped Black drivers not only in predominantly Black neighborhoods but also in predominantly white neighborhoods. *See* JA0363. In contrast, the "few clusters" of white drivers RPD stopped were pulled over "only … in neighborhoods that are predominantly White to begin with." JA0363.

---

[1] *See also* U.S. Census Bureau, *Richmond city, Virginia*, https://data.census.gov/pro file/Richmond_city,_Virginia?g=050XX00US51760#race-and-ethnicity (last visited November 20, 2024) (describing Richmond population as of 2020 Decennial Census as including 98,140 white residents and 91,653 Black residents).

Moreover, of all drivers stopped, approximately 69% received warnings and 7% were arrested. JA0358. But whether a driver ultimately faced arrest or a summons or citation is closely correlated with the driver's race. *See* JA0358. Within the 7% of stops that led to the driver being arrested, Black drivers were 12.67 times more likely to be arrested, a severe outcome that cannot be explained by mere chance variation. JA0358. In contrast, white drivers were arrested less often than expected by chance. JA0358-0359. And the reverse held true for summonses and citations: white drivers received summonses more often than if left to chance while Black drivers received summonses less often. JA0359. This pattern of disparate policing outcomes by race is not unique to Richmond. *See* Va. Dep't of Criminal Justice Servs., *Report on Analysis of Traffic Stop Data Collected Under Virginia's Community Policing Act* 9 (July 2024), https://rga.lis.virginia.gov/Published/2024/RD440/PDF (noting that "for Virginia residents, Black drivers were stopped at a higher rate than White drivers," "searched at higher rates than White drivers," and "arrested at higher rates than White drivers"). Indeed, in light of the racial profiling that has plagued police departments throughout Virginia for years, the Virginia General Assembly passed the Virginia Community Policing Act, Va. Code § 52-30.1, *et seq*., which prohibits law enforcement officers from "engag[ing] in bias-based profiling" and requires officers to collect certain data, including the driver's race, during a traffic stop. *Id.* § 52-30.2.

**II. Focus Mission Team officers pull over three cars for traffic violations in the hopes of finding evidence of more serious offenses.**

RPD's Focus Mission Team exemplifies RPD's practice of targeting Black drivers. On December 5, 2020, four members of the Focus Mission Team—Sergeant Michael Spinos and Officers Dominic Collombo, Keegan Mills, and Nakia Williams—were patrolling the Fourth Precinct in Richmond, Virginia. JA0050-0051; JA0068; JA0091; JA0145; JA0176-0177. The primary objective of the Focus Mission Team is not to enforce traffic laws. JA0067. Rather, the Focus Mission Team's primary focus is "[g]uns and drugs." JA0067. As the officers openly admitted, the Focus Mission Team uses traffic violations to initiate pretextual traffic stops so that they may search for evidence of firearm- or drug-related offenses during those stops. JA0067-0068; JA0132 ("During the course of a traffic stop we look inside the vehicle as much as we can."); JA0157 ("Q. When you were making those traffic stops you weren't really trying to get traffic violations, you were looking for evidence of … more serious crimes, right? A. Yes.").

As part of this practice, the officers stopped three people, including Mr. Moore, whose cars they later realized had the same temporary license plates (tags). All three drivers were Black. At approximately 5:45 PM that evening, the officers first pulled over a driver of a white Cadillac because his headlights were not on. JA0125; JA Volume VI (Def. Ex. U3 at 0:54-0:56); JA0053. To handle this minor traffic infraction, the four officers surrounded the car with two officers on the

7

driver's side and two on the passenger's. JA Volume VI (Def. Ex. U3 at 0:33-0:42; Def. Ex. U4 at 0:37-45). An officer noted that he was unable to read the car's tag, and the driver explained that he had just bought the car and that he and his partner were merely shopping for their children's Christmas presents. JA Volume VI (Def. Ex. U3 at 0:39-0:41, 0:54-56, 0:59-1:00). Given the Focus Mission Team's practice of stopping motorists to obtain evidence of firearm- and drug-related offenses, an officer asked the driver if he had any weapons in his car. JA Volume VI (Def. Ex. U3 at 1:10-1:16); JA0078. Although the driver responded that he did not, the officer repeated the question. JA Volume VI (Def. Ex. U3 at 1:36-1:39). The driver explained a second time that he did not have weapons or drugs in the car, at which point the officer shone his flashlight through the back windows to thoroughly look at the interior of the car. JA Volume VI (Def. Ex. U3 at 1:36-1:50); JA0079.

While the two officers spoke with the driver, the remaining two spoke with the passenger, his partner. Although the passenger likewise explained that they were merely shopping, an officer asked her too if she had any weapons before saying "I'm just going to pat you down" and proceeding to do so. JA Volume VI (Def. Ex. U4 at 0:50-52, 1:22-1:43). While the passenger stood outside the car with the two officers, another officer took the opportunity to shine his flashlight into both the front and back passenger windows to examine the inside of the car. JA Volume VI (Def. Ex. U4 at 5:10-5:13); JA0128. Although the officers ultimately determined

that the driver's license was suspended and that the car's tag (11134Y) was not included within the computer database, JA0053-0054; JA Volume VI (Def. Ex. U3 at 2:37-6:04), the officers decided to take no action, JA Volume VI (Def. Ex. U3 at 6:07-6:31); JA Volume VI (Def. Ex. U4 at 6:43-6:49); JA0081-0082.

Approximately an hour later, the officers stopped a second driver who explained she was driving with a broken window because she had accidentally locked the keys inside with her baby when picking up diapers from a friend. JA Volume VI (Gov. Ex. 4 at 0:33-0:54); JA0056. The officers noticed the second car's tag was identical to that of the first car but observed that the VIN was correct and the tag belonged to her car. JA Volume VI (Gov. Ex. 4 at 0:56-1:29). As with the first driver, the officers surrounded her car and directed their flashlights through the front and back car windows to look inside. JA Volume VI (Def. Ex. V3 at 0:44-1:38; Gov. Ex. 4 at 0:34-0:57); JA0083. Despite recognizing that the tag was identical to the first car's, the officers took no action and permitted the second driver to leave. JA Volume VI (Gov. Ex. 4 at 1:33-1:36).

Later that evening, Mr. Moore was at a gas station in the East Highland Park neighborhood of Richmond. JA0058; JA1792. He was driving the car he had purchased from a local car dealership, which had placed on the car a temporary license plate that was still displayed on the car. *See* JA0223. After noticing Mr. Moore brake while exiting the station, the four officers pulled in behind Mr. Moore

and turned on emergency lights to initiate a traffic stop. JA0058; JA0071. As one officer testified, the officers' attention was initially drawn to Mr. Moore because he braked while exiting the station and the officers then noticed that Mr. Moore's tag was the same as those of two vehicles they had stopped earlier that evening. JA0058. After the officers initiated the traffic stop, Mr. Moore did not pull over and ultimately hit a curb and ran from the police. JA0058-0059. The officers pursued Mr. Moore on foot and pulled him forcibly to the ground to arrest him. JA Volume VI (Gov. Ex. 5 at 0:55-1:02). When the officers searched Mr. Moore's car, they discovered a firearm. JA0062.

### III. The district court dismisses the indictment after Mr. Moore presents evidence to establish his selective-enforcement claim.

Mr. Moore was indicted for possessing a firearm after having been previously convicted of a felony. JA0016. In addition to moving to suppress the firearm recovered from the car and statements he made after his arrest, Mr. Moore moved to dismiss the indictment, arguing that the Focus Mission Team's practice of targeting Black drivers violated his right to equal protection under the Fourteenth Amendment. JA0283, JA0291-0294. To support his selective-enforcement argument, Mr. Moore submitted evidence from two experts, Dr. Eli Coston and Dr. Marvin Chiles. The government likewise introduced testimony from its expert, Dr. Michael Smith.

1.    Mr. Moore's first expert, Dr. Coston, analyzed traffic stops RPD made from July 1, 2020 to December 6, 2020. JA0353. The data Dr. Coston analyzed was collected by RPD pursuant to the Virginia Community Policing Act. JA0355. In analyzing the data, Dr. Coston excluded "the small number of stops involving Asian, American Indian, or drivers of 'Unknown' races," which left 2,279 stops in the analysis. JA0355-0356. Dr. Coston considered what actions were taken because of the stop—namely, whether the driver was arrested or received a citation, summons, or warning. JA0356.

To determine whether there were statistically significant differences in traffic stops based on the driver's race, Dr. Coston performed a chi-square test, which measures the correlation between a driver's race and traffic stops. JA0356-0357. As noted *supra*, this analysis showed that 77% of drivers stopped in Richmond were Black and that, compared to white drivers who constituted 14.16% of stops, Black drivers were 5.13 times more likely to be stopped. JA0357-0358. Of all drivers stopped, approximately 69% received warnings and 7% were arrested. JA0358. But within the 7% of drivers of any race who were arrested, Black drivers were 12.67 times more likely to be arrested. JA0358. Based on the driver's race, there were "significant differences in the result of a stop"—"arrest, summons/citation, or warning." JA0358. More specifically, "there is a weak to moderate, but substantive effect of race of driver on the result of a stop," JA0358, meaning that there was a

"statistically significant and meaningful" relationship between race and outcome but other factors were at play that could have impacted the outcome of the stop, *see* JA1311-1312. In other words, "Black drivers faced the most severe outcome, arrest, more often than expected by chance; while White drivers experienced arrest less often than expected by chance." JA0358-0359.

In addition to the chi-square test, Dr. Coston also developed several maps. JA0361-0362. Several of these maps depicted clusters of traffic stops by race and geographic distribution. JA0361. Dr. Coston also produced heat maps that displayed the density of traffic stops of Black drivers, including one (Figure 5) that overlaid that data on racial demographics throughout Richmond. JA0362-0363; JA1329-1331. To create this map, Dr. Coston used racial demographics data from the American Community Survey, which is used to supplement census data and provides "more accurate data about the change in racial composition" compared to using 2010 census data. JA1331. These maps "indicate[d] that Black drivers are pulled over in areas where they are both the majority and the minority," while white drivers were generally stopped only in predominantly white neighborhoods. JA0363.

In an attempt to rebut Dr. Coston's expert testimony, the government proffered Dr. Michael Smith. He opined that the population of people living in an area can be a "poor representation" of people driving in that area and that, as Dr.

Coston also testified, the chi-square test measures correlation, rather than causation. JA0447, JA0450.

2.  Mr. Moore also introduced historical evidence of racial discrimination in Richmond. *See supra* pp. 3-5. Dr. Chiles explained how Richmond's history impacted RPD and RPD's own history of targeting Black Richmonders, JA1603-1613—more specifically, how "Richmond's racial history is largely defined by the maintenance of residential segregation and over-policing of black residents at the hands of RPD," JA1614. Historical segregation led to Richmond's neighborhoods being largely divided by race, a divide that remains to this day and is responsible for predominantly Black neighborhoods falling within three RPD precincts' ambit while the last RPD precinct serves predominantly white neighborhoods. *See supra* p. 4.

3.  After several lengthy hearings and considering all three experts' opinions, the district court granted Mr. Moore's motion to dismiss the indictment[2] and denied the government's motion to exclude Dr. Coston and Dr. Chiles, a decision the government does not challenge on appeal, Gov't Br. 24 n.4. JA1792-1793. After considering this Court's precedent and the Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456 (1996)—which applied a clear-evidence

---

[2] The court also granted Mr. Moore's motion to suppress certain statements he made after being arrested and denied Mr. Moore's motion to suppress other statements and the gun recovered from his car. JA1781-1791.

standard to selective-prosecution claims—the district court concluded that the preponderance-of-the-evidence standard instead governed selective-enforcement claims. JA1809-1811. More specifically, the district court observed that this Court in *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996), "cited the *Armstrong* standard for selective prosecution claims, but it did not discuss the differences between selective prosecution and selective enforcement claims, nor did it explicitly adopt *Armstrong* for selective enforcement cases." JA1809. The court likewise noted that subsequent citations to *Bullock* did not "articulat[e] the steps district courts in this circuit should take in analyzing selective enforcement claims." JA1809.

Turning to the discriminatory effect prong of the selective-enforcement challenge, the district court noted that "[s]tatistical evidence can show discriminatory effect" and highlighted Dr. Coston's extensive analysis of the relationship between traffic stops and race. JA1811-1812. The court concluded that Dr. Coston's analysis and Dr. Chiles's testimony "clearly evince disparities in the effects of RPD's policing practices" and "establish[] that RPD's actions cause a discriminatory effect." JA1812.

With respect to discriminatory purpose, the district court pointed to factors this Court has established as being probative of intent—specifically, evidence of a consistent pattern of RPD actions and the history of discrimination by RPD and

14

within Richmond.  JA1811-1812.  The court emphasized how "Dr. Coston determined the relationship between a driver's race and the primary result of a traffic stop" and highlighted how "three RPD precincts … overlap Black neighborhoods in Richmond" while the fourth precinct "aligns exactly with the boundaries of the white section of Richmond."  JA1814 (citation omitted).  The court noted that "no one from RPD testified that it had a strategy to quell major crime by stopping Black motorists" and that "no one explained why Black motorists are disproportionately stopped in white areas of Richmond, where the crime rate is lower."  JA1814-1815. Concluding that Mr. Moore had established that his equal protection rights were violated, the district court dismissed the indictment.  JA1815.

## SUMMARY OF ARGUMENT

The district court carefully considered the significant evidence Mr. Moore proffered in support of his motion to dismiss the indictment, concluding that RPD selectively enforced traffic laws against Mr. Moore because of his race.  The government asks this Court to reinstate that indictment, claiming that the district court applied the wrong legal standard and incorrectly concluded that Mr. Moore met that standard.  But the district court correctly understood the law, and the government provides no basis to disturb the court's findings of fact.

First, the preponderance-of-the-evidence standard applies to selective-enforcement claims like Mr. Moore's.  Indeed, this standard is the default for

defenses asserted and "[e]xceptions to this standard are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action … against an individual." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989) (plurality). The government attempts to flip this norm, arguing that Mr. Moore should be subjected to a heightened clear-evidence standard as the government seeks to take away his liberty. The government relies on precedent addressing selective-prosecution claims, but there courts apply a heightened standard specifically to avoid "exercis[ing] judicial power over a 'special province' of the Executive," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), a concern not at play in selective-enforcement cases. And although this Court has cited in passing to *Armstrong*'s clear-evidence standard in selective-enforcement cases, it has yet to actually decide what standard should apply to selective-enforcement claims.

Second, Mr. Moore presented significant circumstantial evidence that his stop was motivated by a discriminatory purpose. The four officers who stopped Mr. Moore were members of RPD's Focus Mission Team, a team that patrols predominantly Black neighborhoods and targets drivers for minor traffic violations in the hopes that they will uncover evidence of more serious offenses during the stop. Moreover, Mr. Moore presented evidence that Black drivers are 5.13 times more likely to be stopped than white drivers and that, out of all drivers stopped, Black

16

drivers are arrested more often than could be explained by chance—in other words, there was a relationship between the outcome of traffic stops and the race of the driver. To further buttress his selective-enforcement claim, Mr. Moore also introduced historical evidence of RPD's history of "over-policing" Black residents, JA1614, and how Richmond's history of segregation and discrimination led to the City's predominantly Black neighborhoods falling neatly within three of RPD's precincts while the predominantly white neighborhoods fell precisely within the remaining precinct.

Third, Mr. Moore established that RPD's actions have had a discriminatory effect on Black Richmonders. The demographic data of Richmond and statistical evidence "serve[] as a proxy to show the general racial composition of drivers on the road" that could have been stopped but were not. *Johnson v. Holmes*, 782 F. App'x 269, 282 (4th Cir. 2019). Tellingly, while white drivers were pulled over in predominantly white neighborhoods, Black drivers were subjected to stops in both predominantly white and predominantly Black neighborhoods. Accordingly, Mr. Moore met his burden of proving that RPD selectively enforced traffic laws against him in violation of his Equal Protection rights. This Court should affirm.

## STANDARD OF REVIEW

This Court "review[s] a district court's factual findings on a motion to dismiss an indictment for clear error and its legal conclusions de novo." *United States v.*

*Pair*, 84 F.4th 577, 588 (4th Cir. 2023).  Whether a defendant has established a selective-enforcement claim is a legal conclusion reviewed de novo.  *United States v. Hare*, 820 F.3d 93, 98 (4th Cir. 2016).

## ARGUMENT

The only decision at issue in this appeal is the district court's dismissal of the indictment.  The district court issued that decision because it concluded that Mr. Moore "ha[d] shown both elements of a selective enforcement claim: discriminatory intent and discriminatory effect."  JA1793.  Although the court also denied the government's motion to exclude Mr. Moore's experts, the government does not challenge that decision on appeal.  Gov't Br. 24 n.4.[3]

## I.    The preponderance-of-the evidence standard applies to selective-enforcement claims.

The government disputes what standard should apply to selective-enforcement claims and argues for the imposition of the higher clear-evidence standard.  But the preponderance-of-the-evidence standard has long served as the default standard and respects the separation-of-powers concerns the Supreme Court

---

[3] The government occasionally references (at 7-8, 14, 17) the timing of Mr. Moore's selective-enforcement arguments and expert reports.  Although the government raised timeliness arguments before the district court, the government has chosen not to do so here and has accordingly waived any such argument.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) ("[P]erfunctory and undeveloped arguments … are waived." (citation omitted)).

raised in *United States v. Armstrong*, 517 U.S. 456 (1996). It should accordingly be applied here.

1.    The default standard of review both for claims brought against the government and defenses asserted is the preponderance-of-the-evidence standard. Indeed, for constitutional claims generally, including in civil litigation, the "[c]onventional rule[]" is that parties "need only prove their case by a preponderance of the evidence." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (requiring showing by "preponderance of the evidence" that government "would have reached the same decision" for other, constitutionally proper, reasons). "Exceptions to this standard are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action … against an individual." *Price Waterhouse*, 490 U.S. at 253. Equal protection claims are no different—they too are governed by the default preponderance-of-the-evidence standard. *See, e.g.*, *Fisher v. Univ. of Tex.*, 579 U.S. 365, 380 (2016) (considering whether plaintiff "has shown by a preponderance of the evidence that she was denied equal treatment"); *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340-42 (4th Cir. 2016) (applying standard to unequal apportionment claim).

19

This rule extends to the criminal context as well. Indeed, many affirmative defenses are governed by the preponderance-of-the-evidence standard in criminal cases. *See, e.g.*, *Dixon v. United States*, 548 U.S. 1, 17 (2006) (duress defense); *Cooper v. Oklahoma*, 517 U.S. 348, 362, 369 (1996) (competence for trial). For instance, the Supreme Court has prohibited states from prosecuting "a defendant who is more likely than not incompetent." *Cooper*, 517 U.S. at 369. In rejecting the government's preferred clear-and-convincing standard, the Court explicitly noted that the "prohibition against requiring the criminal defendant to demonstrate incompetence by clear and convincing evidence safeguards the fundamental right not to stand trial while incompetent." *Id.* (emphasis omitted). In contrast, states seeking to civilly commit individuals—a "drastic action against an individual"—must make the requisite showing "by clear and convincing evidence" to "protect[] the individual's fundamental interest in liberty." *Id.* at 368-69.

The Supreme Court, however, has designated selective-prosecution claims as an exception to the default preponderance-of-the-evidence rule, applying the clear-evidence standard because a "selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive." *Armstrong*, 517 U.S. at 464 (citation omitted). In other words, "[j]udicial deference to the decisions of these executive officers [prosecutors]" "stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Id.* at 465.

Accordingly, because prosecutors have "broad discretion" and are designated to help the Executive enforce criminal laws, prosecutors are assumed to "have properly discharged their official duties" absent "clear evidence to the contrary." *Id.* at 464 (citations omitted). Accordingly, to prevail on a selective-prosecution claim, defendants must provide "some evidence tending to show the existence of the essential elements of a selective-prosecution claim." *Id.* at 470 (citation and quotation marks omitted).

But "[s]elective prosecution is not selective enforcement." *United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018). The separation-of-powers concerns that drove the Court's decision in *Armstrong* do not apply in the selective-enforcement context. The presumption of regularity upon which *Armstrong* hinged is "not an excuse to rubberstamp any and all executive action as lawful" and is instead "driven by separation-of-powers concerns, which increase as courts venture closer to core executive activity." *Conley v. United States*, 5 F.4th 781, 791 (7th Cir. 2021). Although this "presumption has been applied to different degrees" in other circumstances, the Supreme "Court has not extended the presumption of regularity … to street-level police investigations." *Id.* Indeed, although police officers' "decisions certainly reflect law enforcement priorities, judicial inquiry into their motives is routine," *id.*, and would not "unnecessarily impair the performance of a core executive constitutional function," *Armstrong*, 517 U.S. at 465.

The government, however, contends (at 33-34) that "an indictment breaks the chain of events," meaning that the "decision to conduct a traffic stop and the decision to prosecute are independent events." But the government ignores a key distinction between selective prosecution and selective enforcement. On the one hand, "[s]elective prosecution occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race." *Conley*, 5 F.4th at 789. In contrast, "[s]elective enforcement occurs when police investigate people of one race but not similarly-situated people of a different race." *Id.* In selective-enforcement cases, "the constitutional problem *precedes* the prosecutor's role," meaning that a subsequent indictment cannot wipe away the initial constitutional violation. *Id.* (emphasis added) (alterations and citation omitted). In other words, "[i]t does not matter if prosecutors … pursue each case equally because the pool of defendants itself was racially selected." *Id.*

Moreover, applying the preponderance-of-the evidence standard to selective-enforcement claims is consistent with how the Supreme Court has distinguished prosecutors from law enforcement officers. As the government notes (at 34), an officer can be held liable under 42 U.S.C. § 1983. But "[u]nlike police, prosecutors enjoy absolute civil immunity from damages for unconstitutional actions taken in their prosecutorial role." *Conley*, 5 F.4th at 793. As with the presumption of regularity, the "primary justification for prosecutorial immunity is that it preserves

core executive discretion." *Id.* But when prosecutors "conduct police-like activity outside their prosecutorial role," that absolute immunity vanishes and is replaced with "only qualified immunity, just like police officers." *Id.*; *see also Sellers*, 906 F.3d at 853 ("[L]aw enforcement officers do not enjoy the same strong presumption that they are constitutionally enforcing the laws that prosecutors do."). Accordingly, the "stark gap in civil relief available in selective-prosecution cases versus selective-enforcement cases supports a similar gap in the standards for proving such claims in the criminal context." *Conley*, 5 F.4th at 794.

2.      This Court has not yet determined which standard applies to selective-enforcement claims. In contending otherwise, the government points to (at 29-31) four cases in which this Court referenced *Armstrong*'s clear-evidence standard: *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996), *United States v. Mason*, 774 F.3d 824 (4th Cir. 2014), *United States v. Hare*, 820 F.3d 93 (4th Cir. 2016), and *United States v. Suarez*, 321 F. App'x 302 (4th Cir. 2009). But in noting the clear-evidence standard, *Mason*, *Hare*, and *Suarez* all relied on *Bullock*, a case in which this Court did not discuss, let alone decide, the issue of the competing standards.

In *Bullock*, the defendant had sought to introduce evidence of an officer's previous traffic stops. 94 F.3d at 899. In affirming the district court's decision to exclude that evidence, the Court noted that "Bullock failed to lay any foundation for an equal protection challenge based on racially selective enforcement" and included

*Armstrong* as part of a string citation. *Id.* In describing *Armstrong* in a brief parenthetical, this Court noted only that *Armstrong*'s "standard for establishing [a] Fifth Amendment selective-prosecution claim is 'a demanding one.'" *Id.* Given Bullock's "fail[ure] to lay any foundation," this Court had no need to decide what standard applies to selective-enforcement claims. *See id.* Indeed, *Bullock*'s reference to *Armstrong* was nothing more than dicta, given that it "could have been deleted without seriously impairing the analytical foundations of the holding." *Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021) (citation omitted). And because "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents," this question remains open in this Court. *See Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 298 (4th Cir. 2024) (citation omitted).

References to *Bullock* in *Hare*, *Mason*, and *Suarez* did not turn stray dictum into a holding of the Court. In *Hare*, this Court considered the standard for discovery in selective-enforcement claims and noted that "[t]his Court has adopted *Armstrong*'s standard for proving selective prosecution as the standard for proving selective enforcement." 820 F.3d at 99. Given that the issue in *Hare* was "whether *Armstrong*'s standard for *discovery* applies in the selective enforcement context," *id.* (emphasis added), *Hare*'s reference to *Bullock*'s dicta was likewise simply dicta. *See Payne*, 998 F.3d at 654-55. Moreover, this Court noted that appellants'

arguments that "their selective enforcement claim should not be held to the discovery standard articulated in *Armstrong*" were "well taken," although the Court ultimately concluded that appellants had not shown they were entitled to additional discovery. *Hare*, 820 F.3d at 100-01.

Similarly, *Suarez*, an unpublished decision, relied on *Bullock* for the contention that the Court had applied *Armstrong* outside of the selective-prosecution context, describing *Bullock* in a parenthetical as "applying *Armstrong* in traffic stop case." *See Suarez*, 321 F. App'x at 305. As in *Hare*, the reference to *Bullock* in *Suarez* "could have been deleted without seriously impairing the analytical foundations of the holding" and was accordingly dicta. *Payne*, 998 F.3d at 654-55 (citation omitted). And given that there was "nothing in the joint appendix to suggest that race played any part in the traffic stop," *Suarez* too had no occasion to consider or decide the competing standards. 321 F. App'x at 305.

Lastly, *Mason* concerned a habeas petitioner who challenged his conviction on ineffective-assistance-of-counsel grounds because counsel had not raised a selective-enforcement argument. 774 F.3d at 826-28. Given that *Mason* arose in the habeas context, before rejecting the petitioner's argument, this Court first explained the high bar the petitioner must clear under *Strickland v. Washington*, 466 U.S. 668 (1984)— that counsel's performance both fell below the standard of objective reasonableness and was prejudicial. 774 F.3d at 828. In laying out that

high standard, this Court noted that the *Strickland* prejudice analysis was "highly deferential" to "counsel's performance" and included a "strong presumption" that counsel's conduct was reasonable. *Id.* In concluding that counsel's decision to not pursue a selective-enforcement claim did not constitute ineffective assistance, this Court cited *Bullock* when stating in passing that *Armstrong*'s standard applied to "cases of racially animated law enforcement." *Id.* at 829-30.

However, as explained *supra*, this Court in *Bullock* did not actually decide which standard should apply to selective-enforcement claims, and that question remains open in this Court. Indeed, the Seventh Circuit has recognized as much. When considering whether applying the preponderance-of-the-evidence standard would create a circuit split, the Seventh Circuit noted that this Court had "cited *Armstrong*'s clear-evidence standard when assessing selective-enforcement claims" but recognized that this Court only "invoked *Armstrong* in passing without specifically rejecting a preponderance standard." *Conley*, 5 F.4th at 796 n.4.

In short, this Court has yet to decide whether the preponderance standard applies to selective-enforcement claims. For the reasons explained above, it should now hold that the default preponderance standard applies, rather than a heightened standard adopted to address the separation-of-powers concerns underlying a claim addressing the Executive's prosecution decisions.

## II.    The district court did not err in concluding that Mr. Moore proved his selective-enforcement claim.

The "Equal Protection Clause of the Fourteenth Amendment prohibits police officers from selectively enforcing laws based on race." *Johnson v. Holmes*, 782 F. App'x 269, 276-77 (4th Cir. 2019).  Although the Supreme Court in *Whren v. United States*, 517 U.S. 806 (1996), foreclosed Fourth Amendment challenges to objectively reasonable police actions motivated by pretext, the Court explicitly endorsed challenges to these pretextual actions under the Fourteenth Amendment.  *See id.* at 813 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.").  To ensure that the only constitutional avenue left to challenge pretextual actions is not reduced to an empty promise, defendants must be able to establish selective enforcement through evidence such as statistical and historical evidence.

Here, to prevail on a selective-enforcement claim, a defendant must show that the challenged action (1) was motivated by a discriminatory purpose and (2) had a discriminatory effect.  *Johnson*, 782 F. App'x at 277.  Because Mr. Moore established that the officers initiated the stop because of a discriminatory purpose and that their actions have a discriminatory effect, the district court did not err in dismissing the indictment.

**A.    The district court did not err in concluding that Mr. Moore established discriminatory purpose.**

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  There is no requirement that a defendant "prove that the challenged action rested solely on racially discriminatory purposes." *Id.* at 265; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (noting that "additional purpose … would not render nugatory the purpose to discriminate against all blacks").  When evaluating whether there was discriminatory intent, courts may consider various factors, including the "impact of the official action[,] whether it 'bears more heavily on one race than another,'" "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," and "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 266-67 (citation omitted).  Because "[o]ften, it is difficult to prove directly the invidious use of race," *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997), defendants may rely on circumstantial evidence in making this showing, *see Arlington Heights*, 429 U.S. at 266; *see also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) ("Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent

must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" (citation omitted)).

In other words, an "invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact … that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Statistical evidence of discriminatory effect may also be used to show discriminatory purpose. *See Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *Avery*, 137 F.3d at 355 ("[D]iscrimination can be proved through direct evidence … or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence.").

### 1.   Mr. Moore proffered significant circumstantial evidence of discriminatory purpose.

The record contains significant circumstantial evidence of discriminatory intent—specifically, that Mr. Moore's traffic stop was a pretextual stop on the basis of his race.  Indeed, Mr. Moore was stopped by four members of RPD's Focus Mission Team, a team that is devoted not to enforcing traffic laws but to investigating firearm- and drug-related offenses. JA0067.  As two of the officers who stopped Mr. Moore testified, they routinely patrol the Fourth Precinct—a precinct home to predominantly Black neighborhoods—and stop drivers for traffic

29

violations so that they can look for evidence of more serious offenses. *See* JA0067-0068; JA0157 ("Q. When you were making these traffic stops you weren't really trying to get traffic violations, you were looking for evidence of … more serious crimes, right? A. Yes."). As part of this practice, "[d]uring the course of a traffic stop [the officers] look inside the vehicle as much as [they] can" and do so on "all" of their traffic stops. JA0132. The officers' body-camera footage of the first two drivers stopped confirm this practice. For both stops, purportedly for minor traffic violations, all four officers surrounded the cars with two officers on each side; the officers then shone their flashlights into the cars' windows and carefully searched the interiors. *See supra* pp. 7-9. And despite pulling the first driver over for not using headlights, the officers proceeded to ask both the driver and his partner repeatedly if they had drugs or weapons in the car and even patted down the driver's partner. *See supra* p. 8; *see generally* JA Volume VI (Def. Ex. U3); JA Volume VI (Def. Ex. U4).

In addition to this evidence, Mr. Moore introduced statistical evidence through Dr. Coston, which permitted an "invidious discriminatory purpose [to] be inferred from the … fact … that the law bears more heavily on one race than another." *Washington*, 426 U.S. at 242. More specifically, despite both Black and white residents each making up just under half of Richmond's population, JA0213-0214, Black drivers account for 77% of drivers stopped compared to white drivers'

14.16%, meaning that Black drivers in Richmond are 5.13 times more likely to be stopped than their white counterparts. JA0357-0358. Black drivers were also arrested "more often than expected by chance" while white drivers were conversely "arrest[ed] less often than expected by chance." JA0358-0359. There was a "substantive effect" of the driver's race on the result of that stop, including arrests, meaning that, although other factors could have impacted the outcome of the stop, there was a "statistically significant and meaningful" relationship between race and the outcome of a stop. *See* JA0358; JA1311-1312.

That Black drivers are 5.13 times more likely to be stopped and are arrested and searched at statistically disproportionate rates, JA0357-0359, while white drivers are inversely arrested and searched "less often than expected by chance," JA0358-0359, reveals the pretextual nature of traffic stops of Black drivers. As one of the officers who stopped Mr. Moore agreed, the officers "weren't really trying to get traffic violations" and were instead using these traffic stops in a predominantly Black precinct as a way to "look inside the vehicle as much as we can." JA0157; JA0132. Indeed, Dr. Coston's maps further support that these stops are pretextual and not the mere result of neighborhood demographics—in contrast to "the few clusters" of white drivers who were pulled over "only ... in neighborhoods that are predominantly White to begin with," the clusters of stops of Black drivers were "distributed throughout the city[] and not contained within predominantly Black

31

neighborhoods." JA0363. In other words, although white drivers were pulled over in neighborhoods that were predominantly white, "Black drivers are pulled over in areas where they are both the majority and the minority." JA0363. As the district court noted, "nothing explains the fact that even in predominantly white neighborhoods, RPD stops Black drivers at roughly the same disproportionate rate." JA1807.

The historical evidence Dr. Chiles proffered provides additional evidentiary support of discriminatory purpose by providing the historical context in which the statistical evidence should be understood. The "historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267; *see also Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016) (including as factor "probative in determining discriminatory intent" "historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents" (citations omitted)). The "history of discrimination," although "not dispositive," is still "relevant to a court's determination of the [actor's] intent." *See Riddick ex rel. Riddick v. School Bd. of Norfolk*, 784 F.2d 521, 539 (4th Cir. 1986).

Here, there is no dispute that Richmond's history is beset with racial discrimination. The impact of that history has not vanished with time. Indeed,

segregation led to Richmond being sharply divided by race, JA1607; JA1699-1700, a divide that has persisted even as Richmond's racial demographics have shifted slightly, JA1725-1726. The end result—Richmond's "areas are still identifiably that of [the] same race" with changes in the "distribution" of white residents throughout Richmond "not chang[ing] the racial integrity of the City at all, at least based upon where the majority of the races of people live." JA1725-1726. This segregation informs how predominantly Black neighborhoods fall within the First, Second, and Fourth Precincts while the Third Precinct encompasses predominantly white neighborhoods. *See* JA0267-0268; JA0276-0279; JA1725-1726.

As the district court concluded, this evidence considered in the aggregate was more than sufficient to establish that the officers were motivated by a discriminatory purpose when they stopped Mr. Moore. *See* JA1812-1815.

### 2. The government's challenges to Mr. Moore's proffered evidence do not justify reversal.

Despite affirmatively declining to challenge the district court's denial of its motion to exclude Mr. Moore's experts, the government spends much of its argument disputing the evidence they presented or the evidence's relevance. But none of the government's arguments justify setting aside the district court's fact-finding as it weighed competing expert testimony.

1.    The government first attempts to minimize (at 39-41) the statistical evidence Dr. Coston presented by arguing that there was no connection between the

33

traffic-stop data and the officers involved in this case because "[t]here is no evidence that these officers were aware of the citywide data" or "shared the motives of the officers who conducted the citywide stops." But the government provides no explanation as to why the officers being "aware" of the data is relevant, and it fails to explain why they should be exempted from the data's implications. Indeed, all four officers were members of the Focus Mission Team, which used traffic violations as a pretext to pull drivers over and subject them to thorough examinations of their vehicles in the hopes of discovering evidence of drug- or firearm-related crimes. *See supra* pp. 7-9. And, as Dr. Coston explained, RPD officers arrested Black drivers "more often than expected by chance" and 77% of the drivers RPD officers stopped were Black. JA0357-0359.

The government next contends (at 41-43) that the district court should not have relied on the statistical evidence because Dr. Coston did not opine as to a causal relationship between race and the disparity in stops. What the government overlooks is that the chi-square analysis Dr. Coston conducted examined whether there was a relationship between those two variables. JA1291-1292. Indeed, as Dr. Coston explained, the statistically significant results "mean[] that what we see occurring in the data is more likely than we would expect to find by chance" or alternatively "less likely" than what would be expected by chance. JA1292; *see also* JA1309 (explaining that "statistical significance indicates ... that these results didn't happen

just by chance").  In contrast, if the results are "what we expect to see by chance, then there is no relationship at all." JA1293.  Here, Dr. Coston determined that there was a "statistically significant relationship" between race and the outcome of a stop, meaning that "race was in fact related to the outcome of the stop" and was not merely the product of chance.  JA1308-1309.  As explained *supra*, Dr. Coston determined that Black drivers also were arrested and searched more often than expected by chance, indicating that there was a relationship between race and those outcomes. *See* JA0357-0359; JA1311.

The government attempts to explain away this disparity by arguing (at 49-50) that RPD allocates resources based on where violent crime occurs and that "murders and homicides disproportionately occurred in Richmond's First, Second, and Fourth precincts."  But the government cannot seriously contend that it investigates murders by pulling over uninvolved drivers for forgetting to use headlights.  The officers here pulled over motorists for minor traffic infractions even though they were not "really trying" to enforce the traffic laws.  JA0157.  Moreover, the government's theory of allocating resources based on crime rates in predominantly Black precincts fails to explain why "Black drivers are pulled over in areas where they are both the majority and the minority." JA0363.  And as the district court put it, the "absence of certain evidence is telling"—"[n]o one testified that modern criminology demonstrates that picking on motorists somehow makes cities safer."  JA1814-1815.

35

2.    Turning to Dr. Chiles's evidence,[4] the government argues (at 46-48) that evidence of residential segregation is not relevant, but that argument overlooks how "history has consequences." JA1696. Richmond's history of segregation and discrimination feeds into how Richmond's racial demographics developed over time and how the boundaries of RPD's precincts remain divided such that three precincts "overlap Black neighborhoods in Richmond" and the fourth precinct "aligns exactly with the boundaries of the white section of Richmond." JA1814 (citation and quotation marks omitted); *see also* JA0267-0268; JA0276-0279. Although Dr. Chiles did not know whether RPD's precincts previously tracked Richmond's racial demographics, JA1727, he explained that "since the '70s, … the majority of black people still live in the same areas that they did prior," meaning that, even with some demographic changes, "by and large these areas are still identifiably that of [the] same race," JA1725-1726; *see also* JA1726 (testifying that "significant influx of white[] [residents]" since 2010 "has not changed the racial integrity of the City at all, at least based upon where the majority of the races of people live").

3.    Lastly, the government objects (at 50-51) to the use of studies showing that RPD officers stopped Black drivers more frequently than they did white

---

[4] The government also argues (at 43-46) that the statistical evidence lacked an appropriate basis for comparison. For the reasons explained *infra* § II.B, this argument is likewise without merit.

drivers—specifically, a 2000 study of RPD traffic stops that the government's own expert, Dr. Michael Smith, authored and a report from the Richmond Transparency and Accountability Project.  Dr. Smith's study noted that "[r]acial profiling is one of the most significant issues in American law enforcement," JA0572, and explained that Black drivers "were stopped more frequently by the Richmond police than their relative percentages in the population," JA0580.  As Dr. Smith explained, at the time, "the average Black stop rate of 57 stops per 1,000 Black citizens was 46% higher than the average White stop rate of 39 stops per 1,000 White citizens."  JA0580-0581.  The government argues (at 51 (quoting JA0590)) that its expert's study "did not have baseline traffic violation data available as means for comparison." Although Dr. Smith noted that "[s]uch baseline data may prove useful for comparison purposes," JA0590, Dr. Smith relied on census data, JA0578.  And as Dr. Coston explained, census data can serve as a useful benchmark.  *See* JA1346 (describing use of American Community Survey's "supplement to census data" as "benchmark").

The government also fixates on the Richmond Transparency and Accountability Project's June 2019 report.  As a preliminary matter, the district court's opinion does not indicate that the court relied on this report.  *See* JA1814. Instead, the court's reference to studies showing "that RPD officers have 'stop[ped] far more [B]lack drivers than white drivers for traffic offenses' '[f]or at least twenty

years,'" quoted a line from Mr. Moore's briefing that in turn relied on an article that discussed several studies, including Dr. Smith's.[5]  JA1814 (quoting JA0351 (citing JA0404)) (alterations in original); JA0404 (Richmond Times Dispatch article discussing Dr. Smith's study showing that 64% of RPD stops were of Black drivers). In any event, the government's objections (at 51) to the Richmond Transparency and Accountability Project's report boil down to complaints about the thoroughness of its methodological descriptions.  Although the report does not explain how it calculated that "Black people were 30.7% more likely to be arrested during a traffic stop than white people," JA0418 (emphasis omitted), this finding is in line with those of Dr. Coston—that "in the 7% of cases in which arrest of the driver occurred, Black drivers were 12.67 times more likely than White drivers to be arrested as the result of a stop," JA0358.  And, as discussed *supra*, Dr. Coston found that there was a relationship between a driver's race and whether the driver was arrested— specifically, that Black drivers were arrested "more often than expected by chance," *see* JA0357-0359; JA1311—further demonstrating the pretextual nature of RPD's traffic stops of Black drivers.

4.    Unable to adequately contest the record evidence of discriminatory purpose, the government (at 36-39) opens its challenge of the district court's

---

[5] The cited article was Exhibit E of Mr. Moore's filing, but its exhibit marker was mislabeled as Exhibit F, which may have contributed to this confusion.

decision on its theory that the officers had probable cause to initiate a traffic stop. Although the government makes much (at 36-37) of the district court's statement in the suppression context that the officers were justified in stopping Mr. Moore's vehicle, it fails to recognize that the Fourth and Fourteenth Amendments protect different rights—the right to not be subjected to unreasonable searches and seizures and the right to equal protection, respectively.  U.S. Const. amend. IV; U.S. Const. amend. XIV, § 1.  That probable cause of a traffic violation may render the decision to seize an individual reasonable does not insulate the government from equal protection challenges.  *See Whren*, 517 U.S. at 809-13.

Since the Supreme Court decided *Whren*, a "number of commentators have criticized the path [the Court] charted," noting that *Whren*'s "apparent assumption … that no significant problem of police arbitrariness can exist as to actions taken with probable cause[] blinks at reality." *District of Columbia v. Wesby*, 583 U.S. 48, 70 (2018) (Ginsburg, J., concurring in the judgment in part) (quoting 1 W. LaFave, Search and Seizure § 1.4(f) (5th ed. 2012)).  Although *Whren* forecloses challenges premised on pretext under the Fourth Amendment, *Whren* explicitly left open and endorsed challenges to racial profiling under the Fourteenth Amendment.  More specifically, the Court in *Whren* explained that "the Constitution prohibits selective enforcement of the law based on considerations such as race.  But the constitutional basis for objecting to intentionally discriminatory application of laws is the *Equal*

*Protection Clause*, not the Fourth Amendment." *Wren*, 517 U.S. at 813 (emphasis added).

That is precisely the challenge Mr. Moore raised. And, as discussed *supra*, record evidence shows that the Focus Mission Team targeted Black drivers, including Mr. Moore, to enforce traffic laws in the hopes that these traffic stops would lead to evidence of firearm- or drug-related offenses. *See also* JA0067-0068; JA0132; JA0157. Indeed, the Focus Mission Team stopped Mr. Moore despite having no evidence that Mr. Moore or either of the first two drivers they stopped knew that their tags were fictitious. JA0081; JA0083-0084; JA0129; JA0132-0133; *see also* Va. Code § 46.2-612(B)(1) (prohibiting "[d]isplay … [of] license plate or decal that he *knows* is fictitious" (emphasis added)); Va. Code § 46.2-722 (prohibiting "hold[ing] or us[ing] any license plate or decal *knowing* it to have been altered, forged, or falsified" (emphasis added)).

\*\*\*

Despite making up less than half of Richmond's population, Black Richmonders constitute 77% of RPD's traffic stops and are subjected to these stops even in predominantly white neighborhoods. The Focus Mission Team officers were clear—their goal in performing traffic stops is to fish for evidence of more serious offenses, even though they have no basis for believing their target has any involvement in firearm- or drug-related offenses. Mr. Moore's circumstantial

40

evidence more than met his burden of establishing that his stop was motivated by discriminatory intent.

**B.    The district court did not err in concluding that Mr. Moore established discriminatory effect.**

In addition to establishing that his stop was motivated by a discriminatory purpose, Mr. Moore also established that RPD's actions have had a discriminatory effect on Black Richmonders.  To establish discriminatory effect, a defendant must "show that similarly situated individuals of a different race were treated more favorably." *Johnson*, 782 F. App'x at 277.  A defendant may make this showing by "providing statistics that address this question"—namely, statistics that show "similarly situated white individuals who could have been targeted for the enforcement action but were not." *Id.* (brackets and citation omitted).  Mr. Moore did just that.

1.    Here, Mr. Moore showed that Black drivers constituted 77% of all drivers RPD stopped while white drivers made up only 14.16% of stops, JA0357-0358, despite both Black and white residents making up just under half of Richmond's population, JA0213-0214. Black drivers are 5.13 times more likely to be stopped than white drivers and are more likely to be arrested during those stops. JA0357-0359.  Meanwhile, white drivers were less likely to be arrested and were inversely more likely to receive mere summonses.  JA0358-0359.  Moreover, although white drivers were stopped in predominantly white neighborhoods, Black

drivers were stopped in both predominantly Black neighborhoods and predominantly white neighborhoods. JA0363. In other words, white drivers are stopped in neighborhoods in which they constitute the majority while "Black drivers are pulled over in areas where they are both the majority and the minority." JA0363.

These statistics were sufficient to demonstrate that similarly situated individuals were treated differently and "compare[d] apples to apples." *Johnson*, 782 F. App'x at 277. In *Johnson*, the plaintiffs offered statistical evidence showing "the general demographic data" of the relevant county, the number of traffic stops and summonses the defendant officer conducted and issued, respectively, and the number of summonses other officers issued. *Id.* at 274-75. The data included the race of the drivers who received summonses. *Id.* Although this Court remanded "for further fact-finding and analysis," *id.* at 283, it noted that the statistics plaintiffs introduced "avoid the pitfall of the statistics at issue" in other cases, including *Armstrong* and *United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996). *Johnson*, 782 F. App'x at 281, 283-84. In doing so, the Court noted that, although the county "does not (and could not) record the races of specific drivers who could have been stopped but were not, nor does it record the races of drivers who were stopped but not ticketed, the percentage of white drivers stopped and ticketed by the other officers patrolling the same locations as [the defendant officer] serves as a proxy to show the

42

general racial composition of drivers on the road that [the officer] could have pulled over but did not." *Id.* at 282.

Mr. Moore similarly offered demographic data of Richmond and statistics concerning traffic stops and their outcomes, as well as the race of the individuals stopped. This evidence "serves as a proxy to show the general racial composition of drivers on the road" that could have been stopped but were not, meaning that the requirement of showing similarly situated comparators was met. *Johnson*, 782 F. App'x at 282. As discussed *supra*, census data can serve as a useful benchmark, *see* JA1346, and Dr. Coston used demographic data from the American Community Survey to "look[] at where people are getting pulled over, and in relationship to the racial composition of that particular neighborhood." JA1379. Although "[w]here people drive isn't necessarily where they live, … where people are pulled over is relevant to the demographics of those neighborhoods," JA1379, particularly given the Focus Mission Team's practice of patrolling predominantly Black neighborhoods to find drivers to stop. Additionally, Black drivers are 5.13 times more likely to be stopped than white drivers and Black drivers are pulled over not only in areas where they constitute the majority but also where they are in the minority. *See* JA0357; JA0363; JA1348-1351. Indeed, that all of the clusters of white drivers who were pulled over occurred "only … in neighborhoods that are predominantly White to begin with," while the clusters of black drivers who were

43

stopped occurred throughout the City and were "not contained within predominantly Black neighborhoods" indicates that Black drivers are not being treated the same as similarly situated white drivers.  *See* JA0363.

The government resists this conclusion and contends (at 43-46) that the district court should have rejected the statistical evidence as lacking an appropriate basis for comparison.  But as explained *supra*, Mr. Moore's proffered statistical evidence demonstrated that similarly situated individuals were treated differently. The selective-prosecution cases the government relies on (at 43-45) do not suggest otherwise.  In *Armstrong*, the defendants submitted evidence that "in every one of the 24 … cases closed by the [government] during 1991, the defendant was black." 517 U.S. at 459.  The Court rejected this evidence and disagreed with the court of appeals' "presumption that people of all races commit all types of crimes," reasoning that this presumption was "contradicted by the most recent statistics of the United States Sentencing Commission" and that these "presumably reliable statistics" "show[ed] [m]ore than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black."  *Id.* at 469-70 (emphasis and citation omitted).

Similarly, in *Olvis*, this Court concluded the defendants had not shown the unindicted white conspirators were similarly situated because the white conspirators "projected significantly different prosecutorial profiles."  97 F.3d at 744-45.  And, similar to *Armstrong*, this Court also noted the defendants' study showing that more

than 90% of "all the federal crack cocaine trafficking prosecutions in federal court since 1992 … involved black defendants," *id.* at 745, a point the government had addressed before the district court by "present[ing] testimony … that the percentage of black[] [people] indicted for crack cocaine offenses was high because black[] [people] primarily were involved in the distribution of crack cocaine." *Id.* at 742.

This Court relied on similar reasoning in *United States v. Venable*, 666 F.3d 893 (4th Cir. 2012), when it rejected a selective-prosecution claim premised on evidence that 86.71% of the people charged federally for violating 18 U.S.C. § 922(g) were Black. *Id.* at 898-99. In relying on *Olvis*, this Court in *Venable* characterized that decision as explaining that "[w]ithout an appropriate basis for comparison, the percentage of African American crack cocaine defendants proved nothing, unless it could be presumed that crack cocaine violations were committed proportionately by all races, an assumption rejected by the Supreme Court in *Armstrong*." *Id.* at 903. In contrast, not only did Mr. Moore introduce census demographic data that served as a "proxy" of drivers on the road who could have been pulled over, but as Dr. Coston explained, "there is very limited data that would suggest that Black drivers commit more traffic infractions than White drivers." JA0353.

To the extent the government seeks (at 44) "the total population of drivers who could have been stopped but were not," this Court has emphasized the

impossibility of collecting statistics of individuals who were not stopped for traffic offenses because "[h]ow could something that was not done possibly be tracked?" *Johnson*, 782 F. App'x at 279 ("As for the statistics' failure to identify individuals who were not stopped, such data is not recorded by the county—and, indeed, would likely be *impossible* to track." (emphasis in original)); *see also Sellers*, 906 F.3d at 853 ("Asking a defendant claiming selective enforcement to prove who *could* have been targeted but was *not*, or who the ATF *could* have investigated, but did *not*, is asking him to prove a negative; there is simply no statistical record for a defendant to point to." (emphasis in original)). Indeed, given that "the very entity who decides what data to record is the same entity that would benefit from vague or incomplete statistics in selective enforcement cases like this one," the government "could evade liability by simply omitting necessary information from [its] records." *Johnson*, 782 F. App'x at 281. "The law should not create or allow such an incentive." *Id.*

In any event, the drivers who could have been stopped but were not are not the only available comparators in this case. The statistical evidence showed a disparity in the outcomes of stops (e.g., arrests, summonses and citations, or warnings) based on the race of the driver. *See supra* pp. 5-6. Although the government objects (at 45-46) to Dr. Coston using the census benchmarks for the maps and not for the statistical analysis, Dr. Coston's analysis of the outcome of stops used the entire population of drivers who were actually stopped—both Black

46

drivers and white drivers. Out of the total population of stopped drivers, 7% were arrested. JA0358. But within that 7% of drivers who were arrested, Black drivers were 12.67 times more likely to be arrested while white drivers were "arrest[ed] less often than expected by chance." JA0358-0359. This disparity was reversed with respect to summonses and citations "with White drivers receiving summons more often than expected by chance and Black drivers less often than expected by chance." JA0359. Given that the statistical evidence included the entire population of drivers who were stopped, that Black drivers were arrested more often than would be expected by chance and received summonses less often than would be expected by chance while white drivers experienced the exact inverse demonstrates how Black drivers are not treated similarly to their white counterparts.

2.      Finally, the government contends (at 57-58) that the district court erroneously relied on Dr. Chiles's historical evidence when assessing discriminatory effect. The district court, however, only relied on Dr. Chiles's testimony as "supplemental," noting that his testimony "regarding Richmond's history of racialized policing informs the Court's understanding of why three of Richmond's four police precincts overlay the City's predominantly Black communities." JA1812. This evidence highlights the disparate effect on Black drivers in that "Black drivers are pulled over in areas where they are both the majority and the minority." JA0363.

47

***

Mr. Moore provided substantial circumstantial evidence of discriminatory purpose and effect, evidence that the government has not meaningfully challenged. The Focus Mission Team officers patrolled predominantly Black neighborhoods in Richmond in the hopes that pulling over a Black driver for a minor traffic violation, surrounding that driver with officers, and thoroughly examining the interior of the driver's car would lead to evidence of firearm- and drug-related offenses, despite the officers having no reason to believe the driver they had targeted had any involvement in such offenses. Mr. Moore has met his burden of proving selective enforcement. This Court should accordingly affirm the district court's decision.

## CONCLUSION

The judgment of the district court should be affirmed.

November 20, 2024                    Respectfully submitted.

                                     /s/ *Brian T. Burgess*

Patrick L. Bryant                    Brian T. Burgess
OFFICE OF THE FEDERAL PUBLIC         Rohiniyurie Tashima
DEFENDER                             Kaley Preciado
1650 King St., Suite 500             GOODWIN PROCTER LLP
Alexandria, VA 22314                 1900 N Street, N.W.
                                     Washington, DC 20036
Laura J. Koenig                      (202) 346-4000
OFFICE OF THE FEDERAL PUBLIC         bburgess@goodwinlaw.com
DEFENDER
701 E. Broad St., Suite 3600
Richmond, VA 23219

48

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 10,999 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.


 /s/ *Brian T. Burgess*
Brian T. Burgess

## CERTIFICATE OF SERVICE

I, Brian T. Burgess, hereby certify that on November 20, 2024, I electronically

transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

I certify that all participants in this case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

/s/ *Brian T. Burgess*
Brian T. Burgess