No. 24-4201

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellant*,

**v.**

KEITH RODNEY MOORE
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 3:21-cr-42 (Gibney, J.)

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* NATIONAL
POLICE ACCOUNTABILITY PROJECT AND JULIAN IN SUPPORT OF
DEFENDANT-APPELLEE

Lauren Bonds
Keisha James
Eliana Machefsky
Devontae W. Torriente
National Police Accountability Project
1403 Southwest Blvd
Kansas City, KS 66103
202-557-9791
keisha.npap@nlg.org

Jill Collen Jefferson
JULIAN
604 Court Street
Hattiesburg, MS 39401
601-202-1173
jillcollen@julianfreedom.org

*Counsel for Amici Curiae*

Pursuant to Federal Rule of Appellate Procedure 29(a)(3), the National Police Accountability Project (NPAP) and JULIAN move for leave to file the accompanying brief in support Defendant-Appellee. Counsel for all parties have been informed of the prospective *Amici Curiae*'s intended filing of this motion. Defendant-Appellee Moore consents, and Plaintiff-Appellant United States does not object, to the filing of the accompanying amicus brief.

## <u>INTERESTS OF *AMICI CURIAE*</u>

The **National Police Accountability Project (NPAP)** was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately 550 attorney members practicing in every region of the United States, including a number of members who represent clients who experience racial discrimination from law enforcement. Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police and corrections officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients.

Founded in 2020 by Attorney Jill Collen Jefferson and named after her mentor, civil rights leader Julian Bond, **JULIAN's** mission is to end caste systems in America and serves as the only U.S. organization of its kind to approach social justice from this angle. JULIAN does this to protect and uplift the voices of those on the bottom rungs of the American caste system. Focusing on litigation, policy advocacy, organizing, and education, JULIAN's intention is to revive the spirit, effectiveness, strategies, and impact of the civil rights movement. Equal protection under the law is a basic tenet of a just and free society. This simple fact is why JULIAN combines multiple methods to ensure the criminal justice system is functioning fairly and transparently.

## USEFULNESS OF THE *AMICUS* BRIEF

Amicus briefs are permitted "'where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance.'" *Tafas v. Dudas*, 511 F. Supp. 2d 652, (E.D. Va. 2007) (quoting *Bryant v. Better Bus. Bureau*, 923 F. Supp. 720, 727 (D. Md. 1996)); *see also Citizens Against Casino Gambling v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007) ("'An amicus brief should normally be allowed when . . . the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'") (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997)). Rule

29 provides a lenient standard and "discuss[ing] matters that are 'relevant to the disposition of the case'" is sufficient to satisfy it. *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 129 (3d Cir. 2002) (quoting Fed. R. App. P. 29(b)).

The concurrently filed brief explains why the district court did not err in its application of this Court's precedent to Defendant-Appellee's selective-enforcement claim. The brief also discusses data and statistical evidence that support Defendant-Appellee's claim that the Richmond Police Department ("RPD") acted with both discriminatory effect and discriminatory purpose at the time Defendant-Appellee was stopped by RPD. In addition, the brief highlights the racial disparities in RPD's enforcement of traffic stops against Black drivers compared to their White counterparts and compared to other law enforcement agencies in the Commonwealth of Virginia at the time Defendant-Appellee was stopped by RPD.

*Amici Curiae'*s participation is desirable because this case presents a significant question about discrimination against Black individuals by police officers as they carry out their duties, and how victims of such discrimination can mount successful selective-enforcement claims to remedy the resulting harm. *Amici Curiae* address arguments not fully explored by the parties regarding the merits of the district court's decision and emphasize the importance of the

statistical evidence Defendant-Appellee presented in this case in addition to

providing supplemental statistical evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, the National Police Accountability Project and

JULIAN respectfully request the Court grant their motion for leave to file their

proposed *amici curiae* brief.

Dated: November 21, 2024


<u>/s/ Keisha James</u>
Keisha James                           Jill Collen Jefferson
Lauren Bonds                           JULIAN
Eliana Machefsky                       604 Court Street
Devontae W. Torriente                  Hattiesburg, MS 39401
National Police Accountability Project 601-202-1173
1403 Southwest Blvd                    jillcollen@julianfreedom.org
Kansas City, KS 66103
202-557-9791
keisha.npap@nlg.org

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I am an attorney for *amici curiae*. This motion complies with the type-volume limits of Fed. R. App. P. 27(d)(2)(A) because it contains 711 words, excluding the portions exempted by the rules. The motion's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

Dated: November 21, 2024

*/s/ Keisha James*
Keisha James

No. 24-4201

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellant*,

**v.**

KEITH RODNEY MOORE
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 3:21-cr-42 (Gibney, J.)

**BRIEF OF *AMICI CURIAE* NATIONAL POLICE ACCOUNTABILITY
PROJECT AND JULIAN IN SUPPORT OF DEFENDANT-APPELLEE**

Lauren Bonds                              Jill Collen Jefferson
Keisha James                              JULIAN[1]
Eliana Machefsky                          604 Court Street
Devontae W. Torriente                     Hattiesburg, MS 39401
National Police Accountability Project    601-202-1173
1403 Southwest Blvd                       jillcollen@julianfreedom.org
Kansas City, KS 66103
202-557-9791
keisha.npap@nlg.org

*Counsel for Amici Curiae*

---

[1] Chuck Meire and Saman de Silva of JULIAN were instrumental in the creation of this brief.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-4201__        Caption: __US v. Moore_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Police Accountability Project and JULIAN_____
(name of party/amicus)

_____

who is _____Amici Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Keisha James                                    Date: November 21, 2024

Counsel for: National Police Accountability Project and JULIAN

Print to PDF for Filing          Reset Form

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**..................................................................**4**

**INTEREST OF *AMICI CURIAE*** ...........................................**5**

**SUMMARY OF ARGUMENT** ...........................................................**6**

**ARGUMENT** .............................................................................**7**

  **I.** IN THE SELECTIVE ENFORCEMENT CONTEXT, THE CLAIMANT MAY USE STATISTICAL EVIDENCE TO ESTABLISH DISCRIMINATORY EFFECT AND DISCRIMINATORY PURPOSE, AND THE DISTRICT COURT APPROPRIATELY APPLIED THIS CIRCUIT'S PRECEDENT TO MR. MOORE'S MOTION TO DISMISS..**7**

  **II.** RACIAL DISPARITIES IN RPD'S STOP DATA IN 2020 WERE EXTRAORDINARILY HIGH. ...................................................**12**

    **A.** **The original statistical analysis conducted by Dr. Coston highlighted RPD's extreme racial disparities during its enforcement of traffic stops during the period when Mr. Moore was stopped. .......................................**12**

      1. RPD was one of few agencies that failed four or more of the five tests in a Commonwealth-wide analysis.......................................**14**

        i. RPD was more likely to arrest Black people during vehicle searches than all other law enforcement agencies that were assessed......................**15**

        ii. RPD was more likely to arrest Black people during traffic stops than all other law enforcement agencies that were assessed. ..................................**16**

        iii. RPD was more likely to arrest Black people during searches of their person than most other law enforcement agencies that were assessed. .......**17**

        iv. RPD was more likely to arrest Black people during vehicle searches than most other law enforcement agencies that were assessed...................**18**

III.   RPD'S TRAFFIC ENFORCEMENT PATTERNS HAVE CHANGED

SIGNIFICANTLY SINCE 2021. ........................................................................19

CONCLUSION ..............................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625 (4th Cir. 2016)..5, 6, 8, 9

*Etherton v. Owners Ins. Co.*, 829 F.3d 1209 (10th Cir. 2016) .................................8

*Johnson v. Holmes*, 782 F. App'x 269 (4th Cir. 2019) .........................................7, 8

*Johnson v. Holmes*, No. 3:16-cv-00016, 2022 WL 3599850 (W.D. Va. Aug. 23, 2022) ...........................................................................................................8

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810 (4th Cir. 1995).................6, 8

*Thompson v. Badgujar*, Civ. No. DLB-20-1272, 2023 WL 6381509 (D. Md. Sept. 29, 2023) ........................................................................................................8

*U.S. v. Armstrong*, 517 U.S. 456 (1996) .................................................................6

*U.S. v. Hare*, 820 F.3d 93 (4th Cir. 2016) .................................................................8

*U.S. v. Olvis*, 97 F.3d 739 (4th Cir. 1996)..........................................................6, 8

*United States v. Avery*, 137 F.3d 343 (6th Cir. 1997) ............................................9

*United States v. Moore*, ___F.Supp.3d___, No. 3:21cr42, 2024 WL 552794 (E.D. Va. Feb. 12, 2024)...................................................................................6, 7, 9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)..........9

*Wayte v. United States,* 470 U.S. 598 (1998) .......................................................5, 6

*Whren v. U.S.*, 517 U.S. 806 (1996) .........................................................................5

**<u>Statutes</u>**

Va. Code § 52-30.1.................................................................................................10

**<u>Rules</u>**

Fed. R. App. P. 29. ...................................................................................................4

## INTEREST OF *AMICI CURIAE*[2]

The **National Police Accountability Project (NPAP)** was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately 550 attorney members practicing in every region of the United States, including a number of members who represent clients who experience racial discrimination from law enforcement. Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police and corrections officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients.

Founded in 2020 by Attorney Jill Collen Jefferson and named after her mentor, civil rights leader Julian Bond, **JULIAN's** mission is to end caste systems in America and serves as the only U.S. organization of its kind to approach social

---

[2] Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no person other than *amici curiae*, their members, or their counsel contributed money intended to fund preparing or submitting this brief. Fed. R. App. P. 29.

justice from this angle. JULIAN does this to protect and uplift the voices of those on the bottom rungs of the American caste system. Focusing on litigation, policy advocacy, organizing, and education, JULIAN's intention is to revive the spirit, effectiveness, strategies, and impact of the civil rights movement. Equal protection under the law is a basic tenet of a just and free society. This simple fact is why JULIAN combines multiple methods to ensure the criminal justice system is functioning fairly and transparently.

## SUMMARY OF ARGUMENT

The district court properly applied this Court's precedent to Mr. Moore's selective enforcement defense. Mr. Moore's defense was appropriately supported by statistics that reveal significant racial disparities in the Richmond Police Department's ("RPD") enforcement of traffic stops against Black drivers compared to their white counterparts. Accordingly, the evidence supplied by Mr. Moore sufficiently demonstrates both discriminatory effect and discriminatory purpose, thereby meeting the threshold for a selective enforcement claim. In addition, the racial disparities in RPD's enforcement at the time Mr. Moore was stopped were exceptionally high as compared to other law enforcement agencies in Virginia at that time and as compared to RPD's enforcement in future years. *Amici curiae* respectfully urge this Court to affirm the district court's opinion.

**ARGUMENT**

**I. In the Selective Enforcement Context, the Claimant May Use Statistical Evidence to Establish Discriminatory Effect and Discriminatory Purpose, and The District Court Appropriately Applied this Circuit's Precedent to Mr. Moore's Motion to Dismiss.**

The Supreme Court has observed that "the [Equal Protection Clause of the] Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. U.S.*, 517 U.S. 806, 813 (1996). This Circuit's selective prosecution precedent guides its selective enforcement analysis. *See Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 634-45 (4th Cir. 2016) (referring to precedent on selective prosecution to identify the requirements of selective enforcement claims) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1998)). Accordingly, the standard for establishing a selective prosecution claim is a "demanding and rigorous one." *U.S. v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (internal quotations omitted) (citing *U.S. v. Armstrong*, 517 U.S. 456, 465, 468 (1996)). To prove selective prosecution, a claimant must show that the government acted with both (i) discriminatory effect and (ii) discriminatory purpose. *Id.* This is because, although the Constitution's equal protection guarantee prohibits "the government from deciding to prosecute based on a defendant's race[,]" selective prosecution claims carry "the great danger of unnecessarily impairing the performance of a core executive constitutional function . . . that support[s] prosecutorial decisions." *Id.* Thus, the claimant must demonstrate "clear evidence"

of those two prongs to successfully establish selective prosecution. *Id.* Relatedly, a person asserting selective enforcement "must show . . . that there was clear and intentional discrimination." *Cent. Radio Co.*, 811 F.3d at 635 (citing *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995)) (internal quotations omitted).

Similar to selective prosecution claims, a claimant alleging selective enforcement must "demonstrate that the government's enforcement process had a discriminatory effect and that it was motivated by a discriminatory motive." *Cent. Radio Co.*, 811 F3d. at 634-35 (4th Cir. 2016) (quoting *Wayte*, 470 U.S. at 608). However, as the district court here noted, whereas a defendant alleging selective prosecution "must provide clear evidence of the different treatment of similarly situated persons[,]" a defendant alleging selective enforcement "need not name similarly situated drivers who committed traffic violations but were not stopped." *United States v. Moore*, ___F.Supp.3d___, No. 3:21cr42, 2024 WL 552794, at *9 (E.D. Va. Feb. 12, 2024).

Notably, this Circuit has not limited its analysis of discriminatory effect in selective enforcement cases to the same "similarly situated" test described in selective prosecution cases. Although the selective enforcement standard resembles the selective prosecution standard, it diverges from it in this critical way. Instead, this Circuit has observed that, "to show that similarly situated individuals of a

different race were treated more favorably[,] [a] plaintiff may . . . (1) nam[e] similarly situated individuals of a different race who were treated differently by law enforcement; ***or (2) provid[e] statistics that address this question*.**" *Johnson v. Holmes*, 782 F. App'x 269, 277 (4th Cir. 2019) (emphasis added). The statistical evidence "must compare apples to apples," but the plaintiff alleging selective enforcement need not provide "statistics to be so detailed as to disprove any possible enforcement factor that [an opposing party] may assert." *Id.* at 277, 281. The plaintiff is not required to proffer evidence that is "completely unassailable both factually and as a matter of law." *Id.*

Thus, while proving discriminatory effect in selective enforcement cases is a rigorous task that resembles the one in selective prosecution cases, the two are not identical. This Circuit's reversal of the district court's exclusion of the plaintiffs' statistical evidence in *Johnson* did not provide much additional clarification regarding what the statistics must show; it primarily observed that "the district court applied an improperly narrow definition of 'similarly situated[.]'" *Id.* at 271. As the district court here observed, however, this Circuit "has yet to squarely address whether a defendant asserting that a police officer stopped him due to his race must identify comparator drivers who were not stopped to successfully assert a selective enforcement claim." *Moore*, 2024 WL 552794, at *2. That ambiguity is possibly because mandating such would be improper under this Circuit's precedent since it

would "require defendants, such as Mr. Moore, to put forth evidence that [this Circuit] has explicitly deemed impossible to collect: evidence of white individuals that Richmond Police Department (RPD) officers could have—but chose not to—stop." *Id.* (citing *Johnson*, 782 F. App'x at 270).

Nonetheless, proving selective enforcement is a demanding task for which providing statistical evidence is not itself sufficient. *See Olvis*, 97 F.3d at 745 ("[T]he Supreme Court specifically held that absent an appropriate basis for comparison, statistical evidence alone cannot establish any element of a discrimination claim.").[3] The data in support of Mr. Moore's selective enforcement claim, however, provide relevant statistical comparators to show discriminatory effect and additional

---

[3] For instance, in *U.S. v. Hare*, this Circuit denied the criminal defendants' motion for discovery for their selective enforcement claim because they offered statistical evidence that was more akin to isolated, anecdotal evidence "[which] provide[d] no appropriate basis for comparison, as it contain[ed] no data on similarly situated white individuals[.]" 820 F.3d 93, 99 (4th Cir. 2016). In *Thompson v. Badgujar*, the district court, relying on this Circuit's precedents, dismissed the plaintiff's selective enforcement claim against an officer due to insufficient statistical evidence. Civ. No. DLB-20-1272, 2023 WL 6381509, at *6 (D. Md. Sept. 29, 2023). The court held that the plaintiff's statistics failed to establish discriminatory effect due to the lack of statistically significant data, an absence of any evidence showing why the Black individuals noted in the police data they cited were stopped, arrested, or charged, and an overall omission of any relevant comparators. *Id.*, at *5. Similarly, the court also found no evidence of discriminatory purpose because the plaintiff's evidence cited "a relatively small sample size [without] basis for comparison" and "[did] not allege any direct or circumstantial evidence of discriminatory intent[.]" *Id.* at *6 (citing *Hare*, 820 F.3d at 100) (internal quotations omitted). Moreover, in *Cent. Radio Co.*, this Circuit concluded that the lower court properly dismissed the plaintiffs' selective enforcement claim "because there was insufficient evidence that the City was motivated by a discriminatory intent." 811 F.3d at 635. In so doing, the Court identified "several factors as probative in determining discriminatory intent, including: (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons[.]" *Id.* (citing *Sylvia Dev. Corp.*, 48 F.3d at 819) (emphasis added).

10

evidence to demonstrate discriminatory purpose. The data must be viewed in light of the proposition that "imposing a standard of proof that defies statistics" would be improper. *Johnson*, 782 Fed.App'x. at 281. Consequently, statistically significant evidence that demonstrates a correlation between race and enforcement, as supplied here, is probative of discriminatory effect. *Johnson v. Holmes*, No. 3:16-cv-00016, 2022 WL 3599850, at *4 (W.D. Va. Aug. 23, 2022) (citing *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1220 (10th Cir. 2016) ("Although correlation alone may be insufficient to establish causation . . . it is nonetheless relevant to identifying causal relationships."). And, although Mr. Moore has not alleged that the officers acted "invidious[ly] or [with] bad faith . . . inferences drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence may help show discriminatory purpose." *Moore*, 2024 WL 552794, at *11 (citing *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

Here, the analysis of Mr. Moore's expert Dr. Eli Coston, who assessed the racial disparities in the traffic stop data that RPD provided to Mr. Moore, demonstrates extreme disparities in RPD's enforcement of traffic stops against Black and White drivers, showing the discriminatory effect of Black drivers being stopped at far higher rates. The additional statistical evidence discussed herein also highlights those same extreme racial disparities. And, while such evidence of strong correlation

does not itself establish causation, it is nonetheless probative of discriminatory purpose as "evidence of a consistent pattern" of enforcement against Black drivers by RPD. *Cent. Radio Co.*, 811 F.3d at 635. Therefore, the district court appropriately applied the rigorous selective enforcement standard, and the evidence in support of Mr. Moore's allegations sufficiently demonstrates both discriminatory effect and discriminatory purpose.

## II. Racial Disparities in RPD's Stop Data in 2020 Were Extraordinarily High.

### A. The original statistical analysis conducted by Dr. Coston highlighted RPD's extreme racial disparities during its enforcement of traffic stops during the period when Mr. Moore was stopped.

The Virginia Community Policing Act ("VCPA") bans bias-based profiling by Commonwealth and local law enforcement officers and requires the collection and public release of various data related to traffic stops and investigatory detentions and their outcomes by any Virginia law enforcement officer.[4] The data used by Dr. Coston was collected under the VCPA, and such data exists for every policing agency in Virginia. JULIAN replicated Dr. Coston's methodology[5] across every law enforcement agency in Virginia that reports data under the VCPA. In this

---

[4] Va. Code § 52-30.1 *et seq*.
[5] JULIAN's methodology slightly differs from Dr. Coston's in that JULIAN excluded stops where the listed reason was "Calls for Service" since those stops do not rely on officer or agency discretion.

Commonwealth-wide context, the disparities in RPD's enforcement during the period when Mr. Moore was stopped is noteworthy.

JULIAN's analysis focuses on the first six-month period of VCPA reporting, July 1, 2020, to December 31, 2020. It utilizes the same five chi-squared tests performed by Dr. Coston in the original case. Those five tests examined the relationship between race and (i) stop outcome rates, (ii) person search rates, (iii) vehicle search rates, (iv) outcome rates for stops initiated for traffic violations, and (v) outcome rates for stops initiated for equipment violations. JULIAN used those same tests but excluded any agency with fewer than fifty stops and five observed outcomes (i.e., arrest, citation, no enforcement action, person search, vehicle search) per examined racial group. The analysis compares outcome rates between Black people and non-Hispanic White people in each agency. RPD did not qualify for a valid equipment violation test because although RPD arrested sixty-eight Black people during these stops throughout the period, RPD arrested only three non-Hispanic White people. JULIAN determined a disparity to be statistically significant if it indicated a less than one percent chance that results would be seen as divergent across race groups in the data if there was no relationship between race and the tested outcome.[6] When examining this period, RPD failed four of the five tests: stop

_____

[6] In the initial analysis, Dr. Coston declared significance if the p-value was less than .05, a commonly accepted statistical standard.

outcomes, person searches, vehicle searches, and traffic violation stops. This is evidence that relationships between race and stop outcomes exist for each of those categories.

       1. RPD was one of few agencies that failed four or more of the five tests in a Commonwealth-wide analysis.

JULIAN performed the same tests discussed above for 340 other law enforcement agencies in Virginia that reported data pursuant to the VCPA during the same six-month period. Nineteen departments in total qualified for the same tests as RPD during the same period. RPD was one of only seven agencies out of those nineteen that failed four or more of the five tests Commonwealth-wide. The vast majority of Virginia's law enforcement agencies–330 of them–showed less evidence of disparities. This indicates that the racial disparities identified initially by Dr. Coston showed that RPD was an outlier when compared to the rest of Virginia's law enforcement agencies.

To offer further evidence of RPD's traffic enforcement being more racially disparate than other agencies in Virginia, JULIAN created disparity ratios for each test. These ratios compare the rate of stop outcomes (arrest, person search, vehicle search) for Black people and non-Hispanic White people who are stopped by an

agency.[7] For example, twice as many Black people had their person searched once stopped by an agency than non-Hispanic White people.[8]

> i. RPD was more likely to arrest Black people during vehicle searches than all other law enforcement agencies that were assessed.

During the same period, twenty-three law enforcement agencies qualified for a test to determine if race and outcomes initiated for traffic violations were related. The disparities in twelve of those agencies, including RPD, were statistically significant. RPD had the most extreme disparity ratio of these twenty-three agencies. Black people were 13.00 times more likely to be arrested than non-Hispanic White people stopped by RPD during this period, whereas the median disparity ratio across all qualifying agencies was 1.36.

---

[7] A disparity ratio of 1.00 indicates equal outcome rates. A disparity ratio below 1.00 indicates that non-Hispanic White people experienced an outcome more frequently than Black people. A ratio greater than 1.00 indicates that Black people experienced an outcome more frequently than non-Hispanic White people.

[8] Two percent of the Black people stopped by an agency have their person searched, but only one percent of the non-Hispanic White people stopped by the agency have their person searched.



**Traffic Violation Arrest Disparity Ratio - RPD vs Median of Qualifying Departments**

*July 1, 2020 - Dec 31, 2020. Black people were 13.00 times more likely to be arrested during stops for traffic violations than white people when stopped by RPD vs. 1.36 times from the median qualifying department.*

These data reinforce Dr. Coston's findings of significant racial disparities in RPD's traffic enforcement outcomes by demonstrating that the disparities were not only statistically significant, they were also among the most extreme in the Commonwealth. In two of the five tests performed, RPD had the most extreme racial disparity in the Commonwealth. In another two tests, RPD had a racial disparity that was greater than most other law enforcement agencies in the Commonwealth. By every metric, RPD's racial disparities were far above the median. This shows that RPD was more likely than other law enforcement agencies to arrest and search Black people.

> ii.   RPD was more likely to arrest Black people during traffic stops than all other law enforcement agencies that were assessed.

During the period of July 1, 2020, to December 31, 2020, thirty-four law enforcement agencies qualified for a test to determine if race and stop outcomes were

related. The disparities in twenty of these agencies, including RPD, were statistically significant. RPD had the most extreme disparity ratio of these thirty-four agencies. Black people were 3.56 times more likely to be arrested than non-Hispanic White people stopped by RPD during this period, whereas the median disparity ratio across all qualifying agencies was 1.46.



July 1, 2020 - Dec 31, 2020. Black people were 3.56 times more likely to be arrested than white people when stopped by RPD vs. 1.46 times from the median qualifying department.

iii.    RPD was more likely to arrest Black people during searches of their person than most other law enforcement agencies that were assessed.

During the same period, eighty-six law enforcement agencies qualified for a test to determine if race and person search rates were related. The disparities in twenty-seven of those agencies, including RPD, were statistically significant. RPD had the twentieth most extreme disparity ratio of these eighty-six agencies. Black

people were 2.94 times more likely to be arrested than non-Hispanic White people stopped by RPD during this period, whereas the median disparity ratio across all qualifying agencies was 1.68.



*July 1, 2020 - Dec 31, 2020. Black people were 2.94 times more likely to have their person searched than white people when stopped by RPD vs. 1.68 times from the median qualifying department.*

    iv.    **RPD was more likely to arrest Black people during vehicle searches than most other law enforcement agencies that were assessed.**

During the same period, ninety-two law enforcement agencies qualified for a test to determine if race and vehicle search rates were related. The disparities in forty-one of those agencies, including RPD, were statistically significant. RPD had the twentieth most extreme disparity ratio of these ninety-two agencies. Black people were 2.47 times more likely to be arrested than non-Hispanic White people stopped by RPD during this period, whereas the median disparity ratio across all qualifying agencies was 1.79.





*July 1, 2020 - Dec 31, 2020. Black people were 2.47 times more likely to have their vehicle searched than white people when stopped by RPD vs. 1.79 times from the median qualifying department.*

### III.    RPD's Traffic Enforcement Patterns Have Changed Significantly Since 2021.

Outcomes of RPD traffic stops during the first year after the implementation of the VCPA differ substantially from the stop outcomes today. During the first two six-month periods after VCPA implementation (July 1, 2020 - December 31, 2020, and January 1, 2021 - June 30, 2021), data showed statistically significant racial disparities in four of the five statistical tests performed. However, when JULIAN analyzed stop outcomes in six-month periods from July 1, 2021, to September 30, 2023,[9] RPD only performed enough searches and arrests to qualify for two statistical tests. Neither test showed a significant racial disparity.

This decline in statistical evidence of racial disparity is driven by an overall decline in both stops and tested enforcement outcomes. The majority of RPD's

---

[9] Twenty-seven months total, due to the last period containing only three months of data.

reported stops, arrests, person searches, and vehicle searches occurred during the first year of VCPA data collection, which is the same period during which Mr. Moore was stopped. The majority of RPD's reported stops (7,345 of 12,227 or 59.8%) occurred during the first year of the VCPA. However, searches and arrests declined more substantially; more than 80% of the measured outcome for each statistical test occurred during the first year of VCPA data collection.

Specifically, 336 of 384 (87.5%) of RPD's reported arrests, 515 of 567 (90.8%) of RPD's reported person searches, 684 of 731 (93.6%) of RPD's reported vehicle searches, 188 of 226 (83.2%) of RPD's reported arrests from stops initiated from traffic violations, and 96 of 103 (93.2%) of RPD's reported arrests for stops initiated from equipment violations occurred between July 1, 2020, and June 30, 2021. These declines show that RPD was much more likely to perform searches or arrests during the period when Mr. Moore was stopped than in later years. These data indicate a significant change in RPD's enforcement outcomes. During the period before July 1, 2021, RPD not only conducted more stops, but it also conducted arrests and searches substantially more often than in the periods since.

The decline in these measured outcomes highlights the importance of the disparities in this case. As demonstrated by Dr. Coston and confirmed by JULIAN's analysis, the disparities in RPD's stop outcomes were statistically significant. Moreover, RPD's disparities were extreme in the context of other law enforcement

agencies in the Commonwealth at that time, and the disparities were extreme when compared to RPD's performance in more recent periods. Thus, at the time Mr. Moore was stopped, that stop was more likely to result from RPD's discriminatory practices than if Mr. Moore was stopped by most other law enforcement agencies in Virginia or stopped by RPD in later years.

## <u>CONCLUSION</u>

For the foregoing reasons, *amici curiae* JULIAN and the National Police Accountability Project support Defendant-Appellee's request for affirmance of the district court opinion.

Dated: November 21, 2024

<u>/s/ Keisha James</u>
Keisha James                                    Jill Collen Jefferson
Lauren Bonds                                    JULIAN
Eliana Machefsky                                604 Court Street
Devontae W. Torriente                           Hattiesburg, MS 39401
National Police Accountability Project          601-202-1173
1403 Southwest Blvd                             jillcollen@julianfreedom.org
Kansas City, KS 66103
202-557-9791
keisha.npap@nlg.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I am an attorney for *amici curiae*. This brief contains 3,535 words, excluding the items exempted by Fed. R. App. P. 32(f). This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Fed. R. App. P. 29(5).

Dated: November 21, 2024

/s/ Keisha James
Keisha James

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Keisha James, hereby certify that I filed the foregoing Brief of *Amici Curiae* National Police Accountability Project and JULIAN in Support of Defendant-Appellee on November 21, 2024, via the Court's CM/ECF system, which delivered an electronic copy to all counsel of record for all parties.

Dated: November 21, 2024

/s/ Keisha James
Keisha James

*Counsel for Amici Curiae*