IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4201

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, Jr., District Judge*

AMICUS BRIEF IN SUPPORT OF APPELLEE

Geri Greenspan
Eden B. Heilman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
VIRGINIA
P.O. Box 26464
Richmond VA 23261
(804) 523-2146
ggreespan@acluva.org
eheilman@acluva.org

Jenn Rolnick Borchetta
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jborchetta@aclu.org

*Attorneys for Amici Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Amici American Civil Liberties Union Foundation and American Civil Liberties Union Foundation of Virginia make the following disclosure:

1. The amici are non-profit entities with no parent companies.

2. No publicly held corporation owns ten percent or more of any stake or stock in any of these three entities.

3. The amici are unaware of any publicly held corporation or entity that has a direct financial interest in the outcome of the litigation.

4.  This case does not arise out of a bankruptcy proceeding.


DATED: November 22, 2024

Respectfully submitted,

*/s/ Jenn R. Borchetta*
Jenn Rolnick Borchetta
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

*Counsel for Amici*

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES.................................................................. iii

IDENTITY AND INTERESTS OF AMICI....................................................1

SUMMARY OF ARGUMENT.....................................................................2

    I.    The Proliferation of Racially Disparate and Dangerous Traffic Stops as an Investigative Tactic Undermines *Wren's* Premise and Lends Urgency to Ensuring Equal Protection. ......................................................3

        a. Studies Suggest that Police Use Traffic Stops Disparately Against Black Drivers....................................................................4

        b. Studies Show that Police Use of Traffic Stops for Investigation Impinges Significant Interests, While Advancing Minimal Government Interests....................................................................6

        c. It is Critical that Courts Diligently Enforce *Wren's* Prohibition on Equal Protection Violations.................................................9

    II.    Mr. Moore Established that Officers Were Motivated in Part by Race in Using the Investigative Traffic Stop Tactic Against Him, and the Government Did Not Disprove Racial Motivation.................................10

        a. Statistical Evidence Shows Discriminatory Effect in that, in Richmond, Black Drivers are Associated with Investigative Traffic Stops while White Drivers are Associated with Ordinary Traffic Enforcement. ...............................................................12

        b. Circumstantial Evidence Shows that Officers Stopped Mr. Moore for an Investigative Traffic Stop Because of His Race, and this Establishes Discriminatory Purpose.................................16

        c. The Government Failed to Establish Necessity or Disprove Racial Motivation. ...................................................................25

CONCLUSION....................................................................................27

CERTIFICATE OF COMPLIANCE ......................................................29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ballew v. City of Pasadena*, 642 F. Sup. 3d 1146 (C.D. Cal. 2022) .......................15

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016)............................9

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001)........................... 10, 12, 16

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449 (1979) .............................................22

*Crane v. City of Arlington,* 50 F.4th 453 (5th Cir. 2022) ......................................4, 6

*Delaware v. Prouse*, 440 U.S. 648 (1979) ............................................................3, 4

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) ..............................................................................................................17

*Flowers v. Mississippi*, 588 U.S. 284 (2019) ..........................................................23

*Hendricks v. Cent. Reserve Life Ins. Co*., 39 F.3d 507 (4th Cir. 1994)....................16

*Hollingsworth v. Wagoner*, 919 F.2d 139 (4th Cir. 1990)........................................17

*Johnson v. Holmes*, 782 F. App'x. 269 (4th Cir. 2019) ...........................................12

*La Union Del Pueblo Entero v. Ross*, 771 F. App'x 323 (4th Cir. 2019).......... 21, 22

*Marshall v. Columbia Lea Reg'l Hosp*., 345 F.3d 1157 (10th Cir. 2003)......... 10, 17

*N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) 11, 16, 21, 27

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*., 600 U.S. 181 (2023)........................................................................................ 10, 25, 27

*Sylvia Dev. Corp. v. Cavlert County, Md.,* 48 F.3d 810 (4th Cir. 1995) .................23

iii

*Two Guys from Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582 (1961) .........10

*United States v. Cole*, 21 F.4th 421 (7th Cir. 2021) .....................................4

*United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972) .....................................10

*United States v. Drakeford*, 992 F.3d 255 (4th Cir. 2021) .........................................3

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) .............................................4

*United States v. Mason*, 774 F.3d 824 (4th Cir. 2014) .............................................10

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996) .....................................10

*United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972) .........................................10

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)
.................................................................................................... passim

*Washington v. Davis*, 426 U.S. 229 (1976) .............................................................17

*Wayte v. United States*, 470 U.S. 598 (1985) .............................................................9

*Whren v. United States*, 517 U.S. 806 (1996) .................................................. passim

**Other Authorities**

Amanda Geller et al., *Aggressive Policing and the Mental Health of Young Urban Men,* 104 Am. J. Pub. Health 2321 (2014) .............................................................7

Barry Friedman & Cynthia Benin Stein, *Redefining What's "Reasonable": The Protections for Policing,* 84 Geo. Wash. L. Rev. 281 (2016) .................................9

Ben Bradford et al., *Officers as Mirrors: Policing, Procedural Justice and the (Re)production of Social Identity*; 54 Brit. J. Criminology 527 (2014) ................8

David D. Kirkpatrick et al., *Why Many Traffic Stops Turn Deadly*, N.Y. Times (Oct. 31, 2021) .....................................................................................................7

David Weisburd et al., *Does Scientific Evidence Support the Widespread Use of SQFs as a Proactive Policing Strategy?*, 17 Policing: J. Pol'y & Prac. (2023).7, 9

Donald Braman et al., *Prosecutors in the Passing Lane: Racial Disparities, Public Safety, and Prosecutorial Declinations of Pretextual Stops*, 61 San Diego L. Rev. 87 (2024) ............................................................................................8

Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behav. 736 (2020)................................5

Frank Edwards et al., *Risk of Being Killed by Police Use of Force in the United States by Age, Race-Ethnicity, and Sex*, 116 Proc. Nat'l Acad. Sci. 16793 (2019)6

Frank R. Baumgartner et al., *Racial Disparities in Traffic Stop Outcomes*, 9 Duke F. L. & Soc. Change (2017) ..............................................................4, 5

J.L. Hirschtick et al., *Persistent and Aggressive Interactions with the Police: Potential Mental Health Implications,* 29 Epidemiol. & Psychiatr. Sci. 1 (2020).7

Monica C. Bell, *Police Reform and the Dismantling of Legal Estrangement,* 126 Yale L.J. 2054 (2017)...............................................................8

Tom R. Tyler et al., *The Consequences of Being an Object of Suspicion: Potential Pitfalls of Proactive Police Contact*, 12 J. of Empirical Legal Stud. 602 (2015) ..8

U.S. Dep't of Just., Civ. Rts. Div. & U.S. Att'y's Off. for the Dist. of Minn., Civ. Div., *Investigation of the City of Minneapolis Police Department* (June 16, 2023) ...............................................................................6

## IDENTITY AND INTERESTS OF AMICI

The American Civil Liberties Union Foundation ("ACLU") and the ACLU of Virginia are non-profit, nonpartisan organizations dedicated to the principles of liberty and equality enshrined in the Constitution and the nation's civil rights laws. Both organizations advocate for the right to be free from unreasonable, discriminatory, and otherwise excessive law enforcement conduct. Counsel for Amici have represented many individuals stopped, frisked, or searched in violation of the Fourth or Fourteenth Amendments, including in the class action case *Floyd v. City of New York*, which proved that that New York City Police Department's use of the stop-and-frisk tactic violated the Fourteenth Amendment's guarantee of equal protection.

Counsel for Amici certify that no person other than Amici, their members, or their counsel made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Fed. R. App. P. 29(a)(4)(E). This brief is accompanied by a motion for leave to file. Fed. R. App. P. 29(b)(2). All parties consent to Amici's motion.

## SUMMARY OF ARGUMENT

Amici submit this brief to guide the Court's analysis in two ways: first, to provide context regarding the harmful and racially disparate use of traffic stops as an investigative tactic, and second, to illuminate facts in the record beyond those explicitly identified in the District Court's decision that show Keith Rodney Moore was subject to a traffic stop at least in part because of his race.

Since the Supreme Court's decision in *Whren v. United States*, 517 U.S. 806 (1996), extensive evidence has suggested police are unreasonably targeting Black and brown people for investigation through traffic stops, and that this causes substantial and widespread harm to those stopped, with minimal benefits to legitimate law enforcement interests. It is therefore a matter of urgency to ensure that probable cause for a traffic violation does not excuse equal protection violations.

The stop of Mr. Moore demonstrates such a violation. The evidence establishes that the use of traffic stops in Richmond as an investigative tactic disparately affects Black drivers and supports an inference that the RPD officers who stopped Mr. Moore used that tactic against him in part because he is Black. The Government asks the Court to judge Mr. Moore's selective enforcement defense only from the moment police purportedly observed a traffic violation. Yet because equal protection of the law is of fundamental importance, the Fourteenth Amendment requires the Court to pull back the lens and look at the totality of circumstances

surrounding the decision to conduct the stop. When all relevant circumstances are considered, it is apparent that officers from the Richmond Police Department ("RPD") were, in stopping Mr. Moore, motivated in part by his race. The dismissal of the indictment was therefore not only appropriate but required.

For these reasons, in addition to the reasons offered by Mr. Moore, this Court should uphold the District Court's decision to dismiss the indictment.

I.    **The Proliferation of Racially Disparate and Dangerous Traffic Stops as an Investigative Tactic Undermines *Whren's* Premise and Lends Urgency to Ensuring Equal Protection.**

In *Whren*, the Supreme Court held that seizures based on probable cause of a traffic violation are reasonable under the Fourth Amendment, *Whren*, 517 U.S. at 819, while also recognizing that the Fourteenth Amendment prohibits selective enforcement of traffic violations based on race. *Id*. at 813. The Fourth Amendment holding was premised in part on the Court's expectation that the existence of probable cause sufficiently cabined police discretion to prevent unreasonable overreach, *id*. at 816-18, which is the central aim of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (opining that "[t]he essential purpose" of the Fourth Amendment is to "impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents"); *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021) ("The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent

arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). "Where probable cause has existed," the Court opined, the traditional Fourth Amendment balancing test between individual rights and government interests did not apply, except when searches or seizures were "unusually harmful" to privacy or security interests. *Whren*, 517 U.S. at 817-18. The Court reasoned that, in the ordinary course, probable cause of a traffic violation would "afford the quantum of individualized suspicion necessary to ensure that police discretion is sufficiently constrained." *Id*. at 817 (citing *Prouse*, 440 U.S. 654-55 (1979) (quotation omitted)).

As detailed next, decades of experience and rigorous statistical analysis since *Whren* show that the use of investigative traffic stops causes disparate and significant harm, casting doubt on *Whren's* premise and underscoring the urgency of heeding *Whren's* holding that probable cause does not excuse equal protection violations.

### a. Studies Suggest that Police Use Traffic Stops Disparately Against Black Drivers.

Three decades after *Whren*, "pretextual stops have become a cornerstone of law enforcement practice," *Crane v. City of Arlington,* 50 F.4th 453, 457–58 (5th Cir. 2022) and occur "on a massive scale." *United States v. Cole*, 21 F.4th 421, 437 (7th Cir. 2021) (Hamilton, J., dissenting). One recent study looking at 55 million traffic stops found that "[r]acial disparities in traffic stops are large, ubiquitous

across the nation, and troubling." Frank R. Baumgartner et al., *Racial Disparities in Traffic Stop Outcomes*, 9 Duke F. L. & Soc. Change 21, 22 (2017). Another study analyzing a dataset with 95 million traffic stops found evidence that stops of Black drivers are frequently motivated by race, and that Black drivers are searched disproportionately compared to white drivers. Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behav. 736 (2020). The Baumgartner study showed that Black drivers were twice as likely to be searched as white drivers and that race is predictive of searches. Baumgartner et al., at 43–46. Both studies found that searches of Black and Latine individuals during traffic stops are based on less evidence than white individuals. Pierson et al*.,* at 738–39; Baumgartner et al*.,* at 43–46.

Collectively, these and similar studies suggest the existence of a problem that goes beyond disparities in traffic code enforcement. They raise a serious concern that police are using the discretion that *Wren* affords them to target Black and brown people for investigation through traffic stops without reasonable cause, and that they are not subjecting white people to the same tactic. That is, *Wren* gave police a tactic of investigative traffic stops, and police appear to be selectively using that tactic against Black and brown people.

**b. Studies Show that Police Use of Traffic Stops for Investigation Impinges Significant Interests, While Advancing Minimal Government Interests.**

Experience since *Whren* also shows that the use of investigative traffic stops by police has become extraordinarily harmful to both individual rights and physical safety, with sometimes tragic results. Philando Castile, for example, was fatally shot after being pretextually stopped for a broken taillight;[1] Tyre Nichols was fatally beaten after police stopped him for a traffic violation that recordings indicated never occurred.[2] The list of lives lost is long and ever growing.

These tragic traffic stops are an unfortunate reflection of broader patterns of police violence against people of color. Black men are twice as likely as white men to be killed by police. Frank Edwards et al., *Risk of Being Killed by Police Use of Force in the United States by Age, Race-Ethnicity, and Se*x, 116 Proc. Nat'l Acad. Sci. 16793, 16794 (2019). Many studies and investigations show that police use excessive force disproportionately against Black and brown people. *See, e.g*., U.S. Dep't of Just., Civ. Rts. Div. & U.S. Att'y's Off. for the Dist. of Minn., Civ. Div., *Investigation of the City of Minneapolis Police Department* (June 16, 2023) (one of

---

[1] Mitch Smith, *Video of Police Killing of Philando Castile Is Publicly Released*, N.Y. Times, June 20, 2017.

[2] *See* Emily Cochrane & Ben Stanley, What to Know About the Trial Over Tyre Nichols's Death, N.Y. Times, Oct. 3, 2024.

numerous federal investigations finding pattern of excessive force against Black, Latine, and Indigenous people).[3] As the Fifth Circuit recently observed, pretextual stops "create grounds for violent—and often deadly—encounters that disproportionately harm people of color." *Crane*, 50 F.4th at 458. *See also* David D. Kirkpatrick et al., *Why Many Traffic Stops Turn Deadly*, N.Y. Times (Oct. 31, 2021).

Stop encounters also implicate significant public health concerns beyond the loss of life. Individuals stopped by police face a 46% increase in the odds of developing a mental health condition and 36% increase in the odds of developing a physical health condition. David Weisburd et al., *Does Scientific Evidence Support the Widespread Use of SQFs as a Proactive Policing Strategy?*, 17 Policing: J. Pol'y & Prac., 10 (2023). Exposure to stops is associated with increased trauma and anxiety symptoms, after controlling for factors such as income and race, and more aggressive or invasive stops predict greater trauma symptoms. Amanda Geller et al., *Aggressive Policing and the Mental Health of Young Urban Men,* 104 Am. J. Pub. Health 2321, 2323-24 (2014). And being repeatedly stopped can increase the likelihood of experiencing symptoms of Post-Traumatic Stress Disorder. J.L. Hirschtick et al., *Persistent and Aggressive Interactions with the Police: Potential Mental Health Implications,* 29 Epidemiol. & Psychiatr. Sci. 1, 3 (2020). One recent study examining stop-and-frisk—a close cousin to pretextual traffic stops—

---

[3] Available at https://www.justice.gov/d9/202306/minneapolis_findings_report.pdf.

concluded that the harms from this tactic to public health likely outweigh its crime control benefits. David Weisburd et al., at 13.

Stops can also lead to social and political harms, as those who experience unfair or aggressive police suspicion can feel socially excluded and experience estrangement from public authorities. Monica C. Bell, *Police Reform and the Dismantling of Legal Estrangement,* 126 Yale L.J. 2054 (2017); Ben Bradford et al., *Officers as Mirrors: Policing, Procedural Justice and the (Re)production of Social Identity*; 54 Brit. J. Criminology 527, 528-529 (2014). Those subjected to police suspicion are significantly more likely to have a negative view of the police, even after controlling for criminal activity, *i.e.* excluding instances in which suspicion may have been legitimate. Tom R. Tyler et al., *The Consequences of Being an Object of Suspicion: Potential Pitfalls of Proactive Police Contact*, 12 J. of Empirical Legal Stud. 602, 619 (2015).

Meanwhile, research suggests that traffic stops are not an efficient tool for recovering evidence of crime, and that they are less likely to recover such evidence when police use the tactic to target Black drivers. *See* Donald Braman et al., *Prosecutors in the Passing Lane: Racial Disparities, Public Safety, and Prosecutorial Declinations of Pretextual Stops*, 61 San Diego L. Rev. 87, 140 (2024). ("research shows that police, while using more aggressive and intrusive tactics with Black drivers, are significantly less likely to recover illegal firearms when searching

the vehicles of Black drivers than when searching vehicles of White drivers." (citation omitted)). This is consistent with research into the stop-and-frisk tactic, with studies finding low hit rates and only weak effects on crime reduction from use of that tactic, despite claims from its proponents that it was necessary to protect public safety. *See* David Weisburd et al, at 7-8, 11.; Barry Friedman & Cynthia Benin Stein, *Redefining What's* "*Reasonable": The Protections for Policing,* 84 Geo. Wash. L. Rev. 281, 302-03 (2016) (reviewing low yield of contraband from use of stop-and-frisk tactic).

### c. It is Critical that Courts Diligently Enforce *Whren's* Prohibition on Equal Protection Violations.

In the years since *Whren*, then, we have learned three things. First, the racially disparate and disproportionate use of traffic stops—and of investigative tactics such as searches during those stops—is a significant trend across the country. Second, the use of traffic stops for criminal investigation implicates significant interests among those targeted and society at large. And third, traffic stops are of limited use in addressing crime.  Given this knowledge, it is critical for courts to ensure that a stop based on probable cause of a traffic violation may still be challenged as an equal protection violation. *Whren*, 517 U.S. at 813.  Mr. Moore advances precisely that type of challenge here, and his equal protection defense should be considered against this backdrop.

## II.    Mr. Moore Established that Officers Were Motivated in Part by Race in Using the Investigative Traffic Stop Tactic Against Him, and the Government Did Not Disprove Racial Motivation.

An assessment of Mr. Moore's selective enforcement defense must be guided by "ordinary equal protection standards." *Wayte v. United States*, 470 U.S. 598, 608 (1985); *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016) (same). As the Supreme Court recently explained, the equal protection standard at its core "requires equality of enforcement before the law for all persons without regard to race or color." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 205 (2023). Selective enforcement of the law against Black people in the criminal system "violates this nation's constitutional values at the most fundamental level" and is "one of the central evils" that the equal protection clause is designed to root out. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). This is why it has long been the case that "[a] defendant cannot be convicted if he proves unconstitutional discrimination in the administration of a penal statute." *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) (citing *Two Guys from Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582, 588 (1961)). *See also, e.g., United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972).

Selective enforcement occurs when a government actor applies the law in a manner that has a discriminatory effect and does so with discriminatory purpose. *See English v. Clarke*, 90 F.4th 636, 640 (4th Cir. 2024). The discriminatory effect

10

element of a selective enforcement claim requires showing that similar groups "were not similarly targeted by law enforcement." *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014) (citing *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)). This element is concerned with comparative effect and not purpose. *See e.g.*, *Chavez v. Illinois State Police*, 251 F.3d 612, 641 (7th Cir. 2001) (describing the comparison needed to show discriminatory effect and determining whether that showing had been made before turning separately to an assessment of motivation).

The discriminatory purpose element of a selective enforcement claim is established through evidence that the enforcement decision was motivated in part because of a constitutionally protected characteristic, such as race. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Direct evidence of racial animus is not required, and discriminatory purpose can be established even where other legitimate motivations existed. *See Id.* (opining that an equal protection violation need not show race as the sole motivation because "[r]arely can it be said" that a government actor "made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."); *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (emphasizing that those asserting an equal protection violation "need not show that discriminatory purpose was the 'sole' or even 'primary' motive," for the

decision, "just that it was 'a motivating factor.'" (quoting *Arlington Heights*, 429 U.S. at 265-66)).

Mr. Moore met this standard because he has shown that RPD's use of investigative traffic stops has a discriminatory effect on Black people, and that the RPD officers who stopped him the night in question were targeting him pursuant to that racially disparate practice. The Government did not come forward with evidence either that the stop of Mr. Moore was narrowly tailored to serve a compelling government interest or that they would have stopped him even if he were not Black. As explained more fully below, this Court should therefore affirm the dismissal of the indictment.

> **a. Statistical Evidence Shows Discriminatory Effect in that, in Richmond, Black Drivers are Associated with Investigative Traffic Stops while White Drivers are Associated with Ordinary Traffic Enforcement.**

Mr. Moore can demonstrate discriminatory effect through statistics that address the question of whether there were "similarly situated individuals of a different race who were treated differently by law enforcement." *Johnson v. Holmes*, 782 Fed.Appx. 269, 277 (4th Cir. 2019) (citations omitted). Statistics relied upon to meet this standard must provide an appropriate basis of comparison by which to determine that law enforcement are treating or targeting one group differently from another. *See id*.; *Chavez v. Ill. State Police*, 251 F.3d 612, 640 (7th Cir. 2001). Mr. Moore provided statistics comparing the treatment of two very similar groups: white

individuals subject to traffic stops by RPD in a five-month period in 2020 versus Black individuals subject to traffic stops by RPD in that period. Between these two groups, Mr. Moore's statistical evidence showed that RPD's use of investigative traffic stops affects Black and white people differently.

Specifically, among traffic stops recorded by RPD in the five-month period leading up to and including the stop of Mr. Moore, Dr. Eli Coston's chi-square analysis found:

- Race was associated with the performance of a car search.[4] JA0359.

- Race was associated with the search of a person. JA0359.

- For stops based on traffic violations, race was associated with whether the driver received a warning, summons, or citation. JA0360.

- For stops based on equipment violations, race was associated with whether the driver was arrested, or received a warning, summons, or citation. JA0360; JA1315.

These findings were all statistically significant. JA0359; JA1309. Dr. Coston's analysis shows that the driver being Black was associated with outcomes consistent with criminal investigation, while the driver being white was associated

---

[4] Where the Kendall's tau and Cramer's V analyses indicated "a weak effect of race", e.g. JA0359, JA0360, that means race only explained some of the variance in whether a person was searched or arrested, as distinct from a significant effect, which would indicate dependence between variables. *See* JA1311-12. As previously discussed, the existence of factors other than race affecting a decision does not defeat a selective enforcement claim. *See supra*, Section II.b.

with outcomes consistent with traffic enforcement. JA0359. Specifically: Black individuals were arrested and searched more than would be expected by chance; white individuals less likely than by chance, JA0360; Black individuals were given warnings more often than expected by chance; white individuals less than expected by chance, JA0360; and Black individuals were given summons and citations less often than expected by chance; white individuals more than expected by chance. JA0360.

The findings from Dr. Coston's chi-square analysis show that traffic stops with investigative features affect Black drivers more than similarly situated white drivers. If RPD were subjecting both white and Black drivers to traffic enforcement, you would expect to see traffic warnings, citations, and summonses dispensed at similar rates. The fact that being Black is associated with fewer traffic enforcement actions—e.g., more warnings and fewer summonses or citations—suggests that white drivers were being subject to traffic enforcement while Black drivers were being subject to investigative traffic stops. Indeed, the Government's own expert has posited that dispensing a warning in lieu of a citation or summons is consistent with the use of investigative traffic stops as distinct from traffic enforcement. JA0588.

Dr. Coston's testimony that the chi-square test does not establish causation, *see* Gov't Br. at 17-19, 41, is of no moment because Dr. Coston's analysis shows a differential effect related to race, which is sufficient. The Government's

benchmarking arguments, *see* Gov't Br. at 12-13, 20-21, 45-46, are similarly a red-herring because the chi-square analysis does not rely on a benchmark, but instead compares the relationship between variables within a dataset. *See* JA1288-1290, JA1346. The Government's expert agreed that the chi-square test is an appropriate, "well-established" statistical technique, JA1423, JA1473, and that Dr. Coston's analysis shows a relationship between race and outcome in traffic stops. JA1427. Dr. Coston's statistical analysis therefore establishes a comparative effect. This might be the reason the Government ignores the chi-square analysis in arguing against a finding of discriminatory effect. *See* Gov't Br. at 53-57.

Dr. Coston's population-based comparisons provide additional evidence of this disparate effect. Importantly, and contrary to the Government's assertion, *See* Gov't Br. At 55-57, population-based comparisons are appropriate where that comparison is relevant to the question of disparate effect. *See*, *e.g. Ballew v. City of Pasadena*, 642 F. Sup. 3d 1146, 1171 (C.D. Cal. 2022) (noting that population comparisons are particularly appropriate when assessing traffic stops on surface roads given reasonable inferences that drivers on those roads are likely to be local). Dr. Coston's analysis showed clusters of RPD stops of Black drivers throughout Richmond, whereas stops of white drivers are more dispersed. JA0361. It also showed high density areas of stops of Black drivers in predominantly white neighborhoods and along the borders between predominantly white and

predominantly Black neighborhoods. JA0361-0362. There are further clusters of Black drivers in predominantly white, Black and Hispanic neighborhoods, while stops of white drivers are clustered only in predominantly white neighborhoods. JA0361-0363, JA1328. In the Fourth Precinct—where Mr. Moore was stopped and where a predominantly Black neighborhood abuts a predominantly white neighborhood—there is a high density of stopped Black drivers and a cluster of stopped Black drivers. JA0361-0363; JA1335. These findings, when considered in light of the findings from the chi-square analysis, further support the conclusion that RPD's use of traffic stops has a disparate effect on Black people.

The trial court was well within its discretion to credit Mr. Moore's expert and to not credit the Government's expert. *See Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 513 (4th Cir. 1994); *Chavez*, 251 F.3d at 641. Dr. Coston's findings that RPD's use of investigative traffic stops affects Black drivers differently than similarly situated white drivers establish discriminatory effect. As shown below, the officers who stopped Mr. Moore engaged in a pattern of stops mirroring those disparate effects.

### b. Circumstantial Evidence Shows that Officers Stopped Mr. Moore for an Investigative Traffic Stop Because of His Race, and this Establishes Discriminatory Purpose.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of

intent as may be available." *Arlington Heights,* 429 U.S. at 266. In applying this standard, courts should avoid "consideration of each piece of evidence in a vacuum, rather than engaging in the totality of the circumstances analysis as required by *Arlington Heights*." *McCrory*, 831 F.3d at 233. Under this totality test, circumstantial evidence can sustain a selective enforcement claim even in the absence of direct evidence of racial motivation. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) (collecting cases applying circumstantial evidence test to selective enforcement claims); *Hollingsworth v. Wagoner*, 919 F.2d 139 (4th Cir. 1990) (in unpublished table decision, reversing grant of summary judgement on equal protection claim where circumstantial evidence "could allow a factfinder to infer" that the challenged decision was "at least partially motivated by a racially discriminatory purpose."). Circumstantial evidence supporting an inference of discriminatory purpose can include, *inter alia*, that a law enforcement tactic "bear[s] more heavily on one race than another," *Washington v. Davis*, 426 U.S. 229, 242 (1976), and an officer's pattern of behavior in conducting stops. *See Marshall*, 345 F.3d at 1168 ("a police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose.").

The totality of relevant facts supports a finding of discriminatory purpose in this case. The pertinent facts giving rise to an inference of discriminatory purpose

can be sorted into two, reinforcing categories: (1) that the officers who stopped Mr. Moore were using a law enforcement tactic of investigative traffic stops targeted at Black people and that the stop of Mr. Moore was consistent with that tactic; and (2) that the officers' pattern of investigative traffic stops is also consistent with the racially disparate effects evident in the statistical analysis. Historical evidence of racial discrimination that persists today provides additional context from which to infer discriminatory purpose.

> ### i. Testimony and Video Evidence Show Officers Were Using a Tactic of Investigative Traffic Stops Targeted at Black Drivers and their Stop of Mr. Moore Followed that Tactic.

There is no dispute that the officers who stopped Mr. Moore were using traffic stops to investigate drugs and guns on the night they stopped Mr. Moore, and the evidence shows their stop of Mr. Moore was an investigative traffic stop. First, officers admitted to using traffic stops as an investigation tactic as a general practice, in pursuing their mission of interdicting drugs and guns. The officers were members of the Focus Mission Team ("FMT"), which is focused on addressing drug and gun crime, not traffic infractions. JA0067-0068, JA0157. The officers testified they have a general practice of using traffic stops to investigate drugs and guns, JA0067-0068, JA0157, and that this tactic includes inspecting the inside of stopped cars "as much as [they] can." JA0132; JA0079. They also admitted they were using this tactic during traffic stops the night they stopped Mr. Moore. JA0067-0068, JA0157

Second, the officers who stopped Mr. Moore were involved in two other traffic stops just before encountering Mr. Moore, and both stops were investigative traffic stops consistent with the officers' general use of that tactic—as distinct from traffic enforcement. In an encounter on Meadowbridge Road, they stopped a Black driver for allegedly not having headlights activated. JA0125. The officer who approached the driver immediately asked whether the driver had guns or drugs in the car, and the officer repeated this question multiple times during the stop. JA0078; *see* Def. Ex. U3. While this questioning was in progress, other officers shined flashlights into the car, Def. Ex. U4, a tactic they used to inspect the car's interior. JA0158. A Black passenger who exited the car was frisked, despite the frisking officer's statement that safety was not a concern. Def. Ex. U4. One officer returned to the squad car and queried criminal information databases. Def. Ex. U3; JA0079-0080. Traffic-related searches revealed the car's temporary license plate tag to be expired, and that the driver had a suspended license. Def. Ex. U3. After inspecting the car's interior, questioning the occupants about guns and drugs repeatedly, and frisking the passenger, the officers found no guns or drugs. Despite the existence of two traffic violations, the officers let the driver go with a warning. JA0054-JA0055; JA0081.

In a second encounter, the officers stopped a Black driver who had the same expired temporary tag. *See generally* Def. Ex. V3. After approaching the car, the officers noticed that a window was shattered and there was a baby in the backseat.

JA0083; *see generally* Def. Ex. V3. One officer approached the driver and, while he explained that the temporary tag was expired and matched another they observed earlier in the night, a second officer used his flashlight to inspect the interior of the car. JA0083; *See generally* Def. Ex. V3. The officers found no guns or drugs and, despite the traffic violation, let the driver go with a warning. JA0057.

The same officers stopped Mr. Moore shortly thereafter. The officer who initiated the stop saw Mr. Moore—a Black man—in his car in a gas station. JA0070-0071. He observed Mr. Moore notice the police car, at which point Mr. Moore "put on his brakes, and looked like he didn't want to pull out." JA0058. After observing Mr. Moore "reach[ ] down in front of him" toward "the floorboard," the officers pulled into an adjacent parking lot, waited for Mr. Moore to pull out of the gas station parking lot, and then pulled out behind him. JA0058. At that point, they observed the same expired tag as in the prior two encounters and initiated a traffic stop. JA0058.

The officers' admissions and conduct point to an inference that they targeted Mr. Moore for an investigative traffic stop because he is Black, to wit: Their mission is drug and gun interdiction; they have a general practice of using traffic stops to investigate potential drug and gun possession; they were using that tactic the night they stopped Mr. Moore; they targeted two other Black drivers with that tactic the same night; they used expired tags as the basis for deploying the tactic against those

Black drivers but did not enforce that violation; and they invoked expired tags to initiate a stop against Mr. Moore as well, only after observing him to be Black and following him based a hunch that he was trying to avoid the police.

The pretextual nature of Mr. Moore's stop adds more circumstantial evidence to support this conclusion. A pretextual reason for a decision can buttress an inference of discriminatory purpose. *La Union Del Pueblo Entero v. Ross*, 771 F. App'x 323, 324–25 (4th Cir. 2019) (concurrence) (noting that courts have found discriminatory intent when, among other evidence, the "decisionmaker was aware that an action was likely to disproportionately impact a minority group . . . and the decisionmaker provided pretextual reasons for the action" (citing, *inter alia*, *McCrory*, 831 F.3d at 221)). The officers' purported reason for stopping Mr. Moore was the expired tag, but their failure to fully investigate or take enforcement action regarding the tag against either Mr. Moore or the other two drivers with the same expired tag shows that excuse to be pretextual.

This evidence supports an inference of racial motivation and, when combined with the statistical findings discussed next, establishes discriminatory purpose.

> **ii. The Officers' Pattern of Investigative Traffic Stops Mirrors the Disparate Effects Associated with Race in the Statistical Evidence.**

The FMT officers' use of investigative traffic stops on the night of Mr. Moore's stop mirrors the racial disparities shown in the statistical analyses. Each of

the stops they made was of a Black driver. And each of the stops featured police conduct consistent with the use of traffic stops as an investigative tactic: RPD officers assigned to a gun and drug enforcement unit inspected stopped cars; asked incriminating questions about drugs and guns; conducted searches of criminal databases; conducted a pat-down frisk in the absence of safety concern; and despite traffic violations, issued only warnings before targeting Mr. Moore for the same violation. This is consistent with the chi-square analysis that showed an association between race and stop outcomes, such as searches and warnings. *See supra*, 12-14. The consistencies between the statistically significant racial disparities found in the chi-square analysis in traffic stops—on the one hand—and the pattern of stops of Black drivers preceding the stop of Mr. Moore—on the other—support an inference that RPD targeted Mr. Moore for an investigative traffic stop because he is Black. The chi-square analysis and the population-based comparisons also show that the use of investigative traffic stops, and traffic stops generally, bears more heavily on Black people. *See supra* JA0359-03563; JA1309. Viewed in total, this evidence compels a finding of discriminatory purpose.

The statistical disparities also suggest that the officers who stopped Mr. Moore did so despite the foreseeable discriminatory effects from their use of investigative traffic stops. While foreseeable discriminatory effects are not alone sufficient to establish discriminatory purpose, it is appropriate to consider foreseeability as one

piece of circumstantial evidence. *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464–65 (1979) ("actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose"); *La Union*, 771 F. App'x at 324–25. Black drivers in Richmond are more than five times as likely to be stopped as white drivers. JA0357-58. The traffic stops conducted by the Fourth Precinct FMT officers who eventually stopped Mr. Moore occurred in an area of Richmond predominantly occupied by Black residents. JA0209. Given these significant racial disparities, it was foreseeable that the officers' practice of investigative traffic stops would have a discriminatory effect. And this in turn supports an inference that the officers who stopped Mr. Moore did so in part because of that effect.

***

The circumstantial evidence from the officers' and experts' testimony, camera recordings, and statistical findings establish that the officers who stopped Mr. Moore were motivated at least in part because of his race. As discussed next, historical evidence provides further support for this conclusion.

### iii. The Officers' Pattern is Consistent with a Long History of Enforcement of Racial Segregation in Richmond.

"[A]ny history of discrimination by the decisionmaking body or the jurisdiction it represents" can provide evidence of discriminatory purpose. *Sylvia Dev. Corp. v. Cavlert County, Md.,* 48 F.3d 810, 819 (4th Cir. 1995) (citing, *inter alia*, *Arlington Heights*). *Cf. Flowers v. Mississippi*, 588 U.S. 284, 304–05 (2019)

(noting relevance of historical evidence in determining discrimination in the context *Batson* challenges). The pattern of traffic stops preceding Mr. Moore's stop and the statistical disparities in the traffic stop data are a reflection of Richmond's well-documented history of racial discrimination in both housing and policing, which interact in ways that amplify the effect of both forms of discrimination on Richmond's Black residents. The trial court credited the evidence provided by Mr. Moore's expert, Dr. Marvin Chiles, who described how the enforcement of housing segregation and the over-policing of Black communities have been used over centuries to control where Black residents of Richmond lived, worked, and travelled. JA1655-1710; JA1604-1614. The effects of this history are still seen today in Richmond's largely segregated neighborhoods. Dr. Chiles explained that "by and large Blacks and Whites were basically forced or coaxed to live in separate sides of the City from the past to the present. And the result of that is in the present." JA1700.

Dr. Chiles's testimony also showed that RPD has historically over-policed Black communities. For example, in the first half of the 20th century, when the RPD attempted to enforce laws related to drug abuse, prostitution and alcoholism among the White residents of Richmond, the White citizens in Richmond "got mad. They got mad because they did not want police to target white people. They wanted them to focus, refocus on black people." JA1702-1703. Further, in the 1980s, RPD created certain units specifically to patrol public housing developments with predominantly

Black residents. JA1613; JA1708-1709. RPD's increased "policing of historically black and poor areas was often celebrated and encouraged" by the media and Richmond leadership in the late 20th century. JA1614. After detailing the history of RPD's relationship to Black residents of Richmond, Dr. Chiles concluded that "Richmond's racial history is largely defined by the maintenance of residential segregation and over-policing of black residents at the hands of RPD." JA1614.

The Fourth Precinct FMT's practice of using pretextual traffic stops for investigative purposes, and the RPD's decision to deploy officers in this way and in this location, are similar to the tactics that Dr. Chiles described as reinforcing the segregation and control of Richmond's Black residents. This historical context, combined with the foreseeable disparate effects of this practice on Black drivers in Richmond, further supports the inference that race at least partially motivated the FMT's actions in targeting Mr. Moore for an investigative traffic stop.

### c. The Government Failed to Establish Necessity or Disprove Racial Motivation.

It is not Mr. Moore's burden to disprove possible non-discriminatory reasons for the Government's action. While a decision maker might be able defend a decision that has a discriminatory effect, *see Arlington Heights*, 429 U.S. at 270 n.21, the Government has not presented such a defense here. For example, the Government could acknowledge the enforcement tactic is race-based; if it were to choose this path, it then must demonstrate the tactic is narrowly tailored to achieve a compelling

government interest. *See Students for Fair Admissions, Inc.*, 600 U.S. at 206–07. Otherwise, the Government would need to show that it would have made the same enforcement decision regardless of race. *Arlington Heights*, 429 U.S. at 270 n.21 (decision maker's burden requires "establishing that the same decision would have resulted even had the impermissible purpose not been considered."). The Government showed neither.

The trial court found that the Government presented no evidence that the FMT's use of investigative traffic stops against Black drivers was furthering the goals of the RPD. JA1814-1815. Specifically, the District Court noted:

> [N]o one from RPD testified that it had a strategy to quell major crime by stopping Black motorists. No one testified that modern criminology demonstrates that picking on motorists somehow makes cities safer. And, most significantly, no one explained why Black motorists are disproportionately stopped in white areas of Richmond, where the crime rate is lower.

*Id*. The Government advanced no argument that RPD would have targeted Mr. Moore for that stop were he not Black. The Government also advanced no argument that targeting Black drivers for investigative traffic stops is narrowly tailored to serve compelling interests. Given what is generally known about the minimal crime reduction benefits and the devastating effects of stops, *see supra,* Section I.b., it is fair to assume that the Government cannot make such a showing. Regardless, it is the Government's burden to provide evidence of a compelling need if it exists, and the Government provided none.

26

Beyond complaints about hypothetical and unavailable data, the Government seems to rest its case entirely on the suggestion that probable cause of a traffic violation defeats a selective enforcement claim. *See* Gov't Br. at 36-39. Yet accepting this argument would be contrary to a central holding in *Wren*, *see Wren*, 517 U.S. at 813, not to mention decades of precedent repeatedly holding that the existence of a legitimate motivation alone does not defeat an equal protection claim. *See Arlington Heights*, 429 U.S. at 265; *McCrory*, 831 F.3d at 220. Moreover, with selective enforcement, probable cause usually exists for the arrest or charge, and the issue is whether otherwise valid criminal legal action was discriminatory in its application. The decision at issue here is the selective use of investigative traffic stops. Even if a traffic violation occurred, that fact does nothing to disprove that the officers who stopped Mr. Moore were selectively using an investigative traffic stop against him because of his race.

Where a decision is based in part on race, the Government must provide evidence sufficient to meet what is a demanding burden to disprove discrimination. *Students for Fair Admissions, Inc*, 600 U.S. at 208. The Government's silence and hypotheticals do not suffice.

## CONCLUSION

For the foregoing reasons, Amici urge this Court to uphold the decision of the District Court to dismiss the indictment.

DATED: November 22, 2024

Respectfully submitted,

*/s/ Jenn R. Borchetta*
Jenn Rolnick Borchetta
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jborchetta@aclu.org

Geri Greenspan
Eden B. Heilman
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond VA 23261
(804) 491-8584
ggreespan@acluva.org
eheilman@acluva.org

*Counsel for Amici*

Brandon Buskey
AMERICAN CIVIL LIBERITES UNION
     FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*On the Brief*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,451 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

Dated: November 22, 2024

/s/ Jenn R. Borchetta
Jenn Rolnick Borchetta
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

*Counsel for Amici*

## CERTIFICATE OF SERVICE

I certify that on November 22, 2024, the foregoing document was filed through the CM/ECF system and thereby electronically served *via* ECF on all counsel of record in this matter.

Dated: November 22, 2024

*/s/ Jenn R. Borchetta*
Jenn Rolnick Borchetta
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

*Counsel for Amici*