# No. 24-4201

## UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

### *United States v. Keith Moore*

On Appeal from
the United States District Court For
the Eastern District of Virginia at Richmond

## BRIEF OF *AMICUS CURIAE* RICHMOND TRANSPARENCY AND ACCOUNTABILITY PROJECT

## IN SUPPORT OF APPELLEE KEITH MOORE

MAISIE OSTEEN
LEGAL AID JUSTICE CENTER
626 E. Broad St., #200
Richmond, VA 23219
(804) 643-1086
maisie@justice4all.org

*Counsel for Richmond Transparency and Accountability Project,* Amicus Curiae

***RULE 26.1 DISCLOSURE STATEMENT***

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Amici Richmond

Transparency and Accountability Project makes the following disclosure:

1.  The amici are non-profit entities with no parent companies.
2.  No publicly held corporation owns ten percent or more of any stake or stock in any

    of these three entities.

3.  The amici are unaware of any publicly held corporation or entity that has a direct

    financial interest in the outcome of the litigation.

4.  This case does not arise out of a bankruptcy proceeding.


Dated: November 25, 2024.


/s/ *Maisie Osteen*
_____
MAISIE OSTEEN
Legal Aid Justice Center
626 E. Broad St., #200
Richmond, VA 23219
(804) 643-1086
maisie@justice4all.org


# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................1

i

INTEREST OF *AMICUS CURIAE* .......................................................................2

SUMMARY OF ARGUMENT ..............................................................................3

ARGUMENT ........................................................................................................4

   Account of Maria Burns.................................................................................6

   Account of Trisha Dutton .............................................................................10

   Account of Charles Grant .............................................................................12

   Account of Carl Lincoln ...............................................................................14

   Account of Donna Batton .............................................................................16

   Account of Lanette Sanders ..........................................................................17

CONCLUSION ....................................................................................................19

CERTIFICATE OF COMPLIANCE ...................................................................20

CERTIFICATE OF SERVICE ............................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Commonwealth v. Buckley*, 90 N.E.3d 767 (Mass. 2018) ...................................6, 13

*Crane v. City of Arlington, Texas*, 50 F.4th 453 (5th Cir. 2022)..............................5

*Delaware v. Prouse*, 440 U.S. 648 (1979) ...............................................................4

*Heien v. North Carolina*, 574 U.S. 54 (2014) ..........................................................4

*Love v. City of Port Clinton*, 524 N.E.2d 166 (Ohio 1988).....................................5

*Maryland v. Wilson*, 519 U.S. 408 (1997)................................................................4

*Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990)...............................4, 5

*State v. Johnson*, 890 S.E.2d 891 (N.C. 2023) .........................................................6

*Terry v. Ohio*, 392 U.S. 1 (1968)...........................................................................4, 5

*United States v. Howard*, 729 F.3d 655 (7th Cir. 2013)...........................................5

**Statutes**

Va. Code § 4.1-1302.....................................................................................................8

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae*, the Richmond Transparency and Accountability Project (RTAP), is a community organization founded in 2016. RTAP works to end policing that fuels mass incarceration, and advocates for programs that build safer, healthier communities. RTAP's members include legal experts, policy analysts, and everyday residents of Richmond who support policies that reduce physical, economic, and emotional trauma in the most heavily policed neighborhoods in the city. Through its work, RTAP regularly interacts with black individuals who have been subjected to the indignities and dangers created by the Richmond Police Department's racially disproportionate traffic enforcement methods, which result in black drivers being pulled over five times more frequently than white drivers, as shown below.

While the resolution of this case will most directly affect Keith Moore, the bar against racially selective law enforcement is also meant to ensure that whole classes of people are not treated like de facto criminals, and that all receive the equal protection guaranteed by the Fourteenth Amendment. RPD's selective stops of black people erode those protections.

*Amicus* respectfully submit this brief, which documents the first-hand experiences of black drivers in Richmond, to illustrate why the Court should prevent the government from launching prosecutions that stem from a racist law enforcement regime.

No counsel for any of the parties authored any part of this brief. No party, party's counsel, or person other than *amicus curiae* or its counsel contributed any funds to the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The district court's opinion correctly identified what many black people in Richmond already knew: The Richmond Police Department targets black individuals for selective law enforcement through traffic stops. These police interactions are often traumatic for black community members, and their prevalence creates fear and anxiety.

*Amicus* interviewed black Richmonders to document their lived experiences, which are related below.[1] These accounts complement the persuasive statistical and historical evidence of discrimination in the record before the Court. In light of the harms inflicted by RPD's policy, the Court should recognize that a selective enforcement claim like Mr. Moore's properly disincentivizes the government from targeting people based on race, and accordingly affirm the district court.

---

[1] Community members interviewed for this brief feared there might be consequences for publicly criticizing the police department in a legal filing, so they are referred to by pseudonyms. Additionally, respondents were offered compensation for their time in the amount of $40.

## ARGUMENT

Courts and judges nationwide have recognized the harms inflicted by excessive traffic stops, which are disproportionately experienced by drivers of color. The Supreme Court has commented that car stops "interfere with freedom of movement, are inconvenient, and consume time." *Delaware v. Prouse*, 440 U.S. 648, 657 (1979). Stops "create substantial anxiety," as they constitute a "physical and psychological intrusion . . . upon the occupants of a vehicle." *Id.* Justice Stevens has reflected that "being stopped by the police is distressing even when it should not be terrifying, and what begins mildly may by happenstance turn severe." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 465 (1990) (Stevens, J. dissenting). Justice Sotomayor similarly observed that "traffic stops . . . can be 'annoying, frightening, and perhaps humiliating.'" *Heien v. North Carolina*, 574 U.S. 54, 73 (2014) (Sotomayor, J., dissenting) (quoting *Terry v. Ohio*, 392 U.S. 1, 25 (1968)).

The disturbance to autonomy is multiplied many-fold when people find themselves being ordered to leave the vehicle, handcuffed, and frisked. When forced out of a car, "countless citizens who cherish individual liberty and are offended, embarrassed, and sometimes provoked by arbitrary official commands may well consider the burden to be significant." *Maryland v. Wilson*, 519 U.S. 408, 419 (1997) (Stevens, J., dissenting). And as the Supreme Court stated in a seminal case, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security[.]" *Terry*, 392 U.S. at 24–25. Indeed, "it is

4

simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.'" *Id.* at 16–17. *See also Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988) ("The acts of 'subduing' and 'handcuffing' are undoubtedly offensive to a reasonable sense of personal dignity."). It has been said that "[h]andcuffs in a *Terry* stop and frisk are not and should not be the norm," *United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013), but the drivers' experiences recounted below suggest that such is now the case.

These cautionary statements ring especially true for people of color because, as the Richmond data in this case show, black drivers are pulled over disproportionately. Many federal and state judges understand this impact. The Fifth Circuit found that pretextual stops, frequently predicated on "minor traffic violations," "create grounds for violent—and often deadly, encounters that disproportionately harm people of color." *Crane v. City of Arlington, Texas*, 50 F.4th 453, 458 (5th Cir. 2022), *cert. denied sub nom. City of Arlington v. Crane*, 144 S. Ct. 342 (2023). As Justice Stevens understood, "those who have found—by reason of prejudice or misfortune—that encounters with the police may become adversarial or unpleasant without good cause will have grounds for worrying at any stop designed to elicit signs of suspicious behavior." *Sitz*, 496 U.S. at 465 (Stevens, J., dissenting). And "recent tragic events have shown that the fear people of color have of being stopped by police is justified:

African-Americans have been killed during routine traffic stops." *Commonwealth v. Buckley*, 90 N.E.3d 767, 781 (Mass. 2018) (Budd, J., concurring).

The following accounts underscore that "when a police officer disproportionately stops or searches black drivers, he or she not only violates the law but also delegitimizes the legal system." *State v. Johnson*, 890 S.E.2d 891, 899 (N.C. 2023) (Earls, J., dissenting). These black Richmond drivers have come to doubt the legitimacy of law enforcement because of how officers have, without consequence, discriminatorily targeted black people through facially legal uses of authority. African-American communities, and the city, state, and country, will be safer if this Court refuses to condone these discriminatory practices, helping to bring about equal treatment of all people under the law.

### Account of Maria Burns

Maria Burns is a black woman in her early thirties who moved to Richmond from New York when she was sixteen. She was working as a phlebotomist until April of this year, when she had to take leave because of health problems. She is the mother of a seven-year-old girl, whom she adopted from a close friend who was struggling with substance abuse.

Ms. Burns describes invasive policing as a constant fact of life in the low-income black neighborhoods where she has lived. She estimates that, just since July 2019, when she moved to the Hillside Court public housing complex, she has been pulled over by the Richmond Police Department at least ten times. Notably, on ***only***

6

*one* of these many occasions did Ms. Burns receive a ticket. (That was for having two, but not three, working brake lights, and the ticket was dismissed when the officer failed to appear for court.) During most of these stops, Ms. Burns was ordered out of her car, handcuffed, and frisked and her car was searched without her permission.

When Ms. Burns asks officers why she has been pulled over, they give reasons that are shifting, likely pretextual, and sometimes blatantly false. She has been stopped for hanging an air freshener from her rearview mirror; for keeping her cellphone in a hands-free plastic holder mounted on the dashboard, which, the officer said, impermissibly obscured the driver's view through the windshield; and for playing the stereo too loudly. Once, when Ms. Burns was pulled over while driving a new car, the officer said that he was unable to see the temporary tag because its dealer-issued plastic container was too reflective. She has been told that her car smells like marijuana countless times. (Ms. Burns does not smoke marijuana.)

A typical stop happened in November of 2023, when Ms. Burns was using a rental car. One afternoon, while driving away from a convenience store near Hillside, Ms. Burns noticed a police car pull out behind her. It followed her down the road for over four miles, switching lanes as necessary to stay close by. Finally, the police car's lights came on. Ms. Burns pulled into a dollar store's parking lot.

The officer would not tell Ms. Burns why he pulled her over, and requested her license and registration. Ms. Burns explained that she would retrieve her driver's license and rental paperwork from her handbag, which was on the passenger seat. She

was explicit about her intentions, she explains, "because I was alone, and I don't want to be another black person who ends up on the news because they were 'reaching for something.'" The officer asked why Ms. Burns had advised him like that, and he accused her of acting nervous. He took her license and paperwork back to his car for about ten minutes.

When the officer returned, he told Ms. Burns he pulled her over because she didn't have a light on her rear license-plate holder to illuminate the tags. Ms. Burns was unsure whether the rental car was equipped with this, but the officer's reasoning seemed implausible since it was broad daylight, making it impossible to see such a light. Then the officer said, "I also noticed the smell of marijuana and you need to step out of your vehicle because that's probable cause for me to search it."[2] Ms. Burns informed the officer that she does not smoke marijuana, but got out of the car to avoid trouble. The officer ordered her to put her hands behind her back, handcuffed her, and leaned her up against the ram-bar attached to the front of his police car. Ms. Burns did not consent to the search.

The officer finished up, then came over and told Ms. Burns she needed to prove she had the right to drive the rental car. She referred him to her license and the paperwork she had already provided, which had her name and signature. Ms. Burns

---

[2] A Virginia statute passed in 2021 and thus in effect at the time of this stop provides that "[n]o law-enforcement officer . . . may lawfully stop, search, or seize any person, place, or thing . . . solely on the basis of the odor of marijuana." Va. Code § 4.1-1302(A).

was allowed to return to her car while the officer went back to his car and checked the paperwork again. At some point, another police car arrived, and the officers started talking with each other.

After nearly an hour had passed, the original officer came back and gave Ms. Burns yet another reason for why he had pulled her over: She had failed to come to a complete stop when she pulled out of the 7/11 parking lot. However, the officer said, he was going to let Ms. Burns go with the warning that "next time, you need to pay more attention."

In May 2022, Ms. Burns had an especially traumatic policing experience, albeit not while driving. Along with two of her brothers and two male cousins—all black men in their twenties—Ms. Burns was helping her grandmother get ready to move from Richmond to Delaware. The five family members were packing furniture into a U-Haul truck behind the grandmother's building, by the service entrance. A police officer arrived and began questioning the family because they were "acting suspicious." Additional officers showed up and eventually arrested Ms. Burns and her family, accusing them of having stolen the furniture. The five young people were held for nine hours before they saw a magistrate, who was stunned when he learned how little investigation the arresting officers had done. An officer present at the hearing claimed that there had been no time for investigation because Ms. Burns and her family had been "aggressive." The magistrate ordered them all released.

9

These stops have shaped how Ms. Burns thinks about the police. "I'm living in the projects because I need help," she says. "But you can just be standing around talking and the police will say it's suspicious activity if there's more than one black person. It seems like if a police car sees you pulling out of a neighborhood in the projects, one that's predominantly black, they label you. Based on how you look and where you live, they judge you. We're just trying to live life and make it."

### Account of Trisha Dutton

Trisha Dutton, a black woman in her thirties, is a mother of three and a community organizer. She lives in Richmond's Gilpin Court public housing complex.

Once, in 2013 or 2014, Ms. Dutton recalls, she was driving home after her 3–11 p.m. shift at McDonalds. She had almost reached her house when a police car in the opposite lane turned its lights on, made a sharp U-turn, and pulled her over. The bright lights made it hard to see, but eventually Ms. Dutton discerned the shapes of four officers approaching. One of them told Ms. Dutton that her brake light was out, but Ms. Dutton was sure they were all working. The officers asked Ms. Dutton some questions and let her go without giving her a ticket.

One night in 2018, Ms. Dutton's husband had a heart attack and was rushed to the Virginia Commonwealth University hospital by ambulance. Afterward, while driving to VCU in her own car, Ms. Dutton reached a stop sign on Chamberlayne Avenue. She made a "slow stop" and suddenly there were flashing lights. A police car pulled over and "four officers jumped out at me, with guns pointed," Ms. Dutton

recalls. "I was hysterical, already crying because of my husband's heart attack. I had my hands up and was like, 'What's going on?'" An officer told her that she had failed to stop at the sign. "Once he realized I was by myself, he holstered his gun and told the rest of them to get back in the car." The officers let her go.

Most recently, a few months ago, Ms. Dutton was pulled over again, in the middle of the afternoon. A female officer came to the driver's-side window. Ms. Dutton was talking to the officer when she noticed that another officer had opened the passenger-side rear door and was peering into the vehicle. "I couldn't get a word out because I was in shock," Ms. Dutton says. The female officer took Ms. Dutton's license to the police car for a while, then dismissed her without issuing a citation or explaining a reason for the stop.

Baseless stops "happen to a whole lot of people," Ms. Dutton reports, "but they're not going to come forward because the police there will know who you are." Meanwhile, she says, "there's plenty of white people coming through Gilpin, buying drugs, and police don't bother them."

These interactions have a corrosive effect. "It makes you not want to communicate with police or see them. It's so depressing. They consider the neighborhood a 'high-crime area,' but I feel like they still shouldn't have the right to stop you on a hunch."

**Account of Charles Grant**

Charles Grant is a black man in his forties, also a community organizer. He has lived in Richmond for thirty years but did not get a driver's license until 2017.

One night in 2018, Mr. Grant recalls, he was driving his girlfriend's Honda because his car was in the shop. Leaving her house on the north side, he drove down a small, dark back street as a shortcut on his way to Richmond-Henrico Turnpike. "I was shocked when I saw the blue lights behind me. I wasn't speeding or anything, and it wasn't a drug-infested area." Mr. Grant felt anxious about stopping on a dark deserted road, so he didn't pull over immediately. "I was thinking about the black men who get hung up, like Philando Castile, this brother who was shot in front of his girlfriend and his daughter when they got stopped. He even told the police he had a gun in the car. And before he could do anything, they shot him. He always comes to mind when I'm driving."[3] Mr. Grant kept going for "another 75 or 85 feet" until he reached a better-lit area.

The officers jumped out of their car, guns drawn, and commanded Mr. Grant to exit the vehicle, which he did. "I was anxious. I don't know why I'm being stopped. But I'm really calm in these moments, not aggressive; I don't talk back." The officers

---

[3] The killing of Philando Castile, which took place in Minnesota in 2016, is precisely one of the cases that led a justice of the Massachusetts Supreme Judicial Court to remark that "the fear people of color have of being stopped by police is justified." *Commonwealth v. Buckley*, 90 N.E.3d 767, 781 (Mass. 2018) (Budd, J., concurring).

pushed Mr. Grant up against the hood of his car, put him in handcuffs, and frisked him. Mr. Grant asked why he had been stopped. "They said, 'We're checking for guns,'" he recalls. Mr. Grant gave the officers permission to search his vehicle "and they tore it apart."

Mr. Grant looked over at a nearby apartment complex and noticed that "an older black gentleman" was watching the events from a window. As the search continued, the onlooker "started ribbing the police," saying, "He ain't doing nothing wrong. Y'all not right." The officers told the man to stop. Mr. Grant gave him a fierce look, hoping to end the intervention. "I didn't want to antagonize them." Still, Mr. Grant was grateful for the man's presence. "Maybe his watching had some effect on the police as far as their deciding not to escalate."

The officers did not accuse Mr. Grant of any infractions. One of them took Mr. Grant's driver's license back to their car and presumably checked for open warrants. Eventually, Mr. Grant was released from the handcuffs and allowed to go back to his car. "They were like, 'Have a nice day.'"

Mr. Grant was "relieved but angry at the same time," he recalls. "I was stopped just for driving. Why was I suspected for using guns? It was so arbitrary, like they were just waiting for people to come by. I didn't get a ticket, not even a warning, or anything."

These kinds of stops happen to other black people too often, Mr. Grant says, and he has had other experiences, not during traffic stops, where Richmond police

13

have accused him of wrongdoing. "You kind of accept it as being normal, but at this point in my life, I know it's not normal, even if it's a fact of life." Mr. Grant tries not to let his wariness of police affect him. Through his work as a community organizer, he knows the chiefs of the Richmond and Virginia Commonwealth University police departments, and he can "engage them and have conversations." Still, "When I'm driving, when I see them, there's always that apprehension—is this the day I'm gonna get stopped? I shouldn't feel that way."

### Account of Carl Lincoln

Carl Lincoln is a black man in his fifties who lives in Petersburg, where he does outreach for a public health organization. In November 2023, Mr. Lincoln and his friend Melissa, who is a white woman, drove from Petersburg to visit another friend, Bill, who was living in an inexpensive hotel off Richmond Highway. Afterward, when Mr. Lincoln pulled out of the hotel's parking lot, he saw a Richmond police car parked across the street. A few moments later, he noticed that the car was following him. After three or intersections, the police car put its blue lights on and Mr. Lincoln pulled over.

A young male officer approached Mr. Lincoln's car and ordered him to step outside. Mr. Lincoln complied but asked why he had been stopped. The officer said that his friend's hotel was known for drug dealing and prostitution, and that Mr. Lincoln had looked at the police in a way that "seemed suspicious." The officer said they had to "check out the car." He did not ask for Mr. Lincoln's driver's license. The

14

officer peppered Mr. Lincoln with questions about his activities, asking him over and over what he was doing at the hotel. Mr. Lincoln explained in great detail how he had come to inform his friend Bill, at the request of Bill's mother, that there had been a death in Bill's family, but the officer was not satisfied, and he questioned Mr. Lincoln again and again. The officer asked him to search the car, and Mr. Lincoln gave his permission. "That's when he put the handcuffs on me," Mr. Lincoln recalls. Surprised, Mr. Lincoln asked if he was under arrest and was told that the cuffs were "just to keep me from running." The young male officer frisked Mr. Lincoln for what seemed like an inappropriately extended amount of time. "I was really getting irate," Mr. Lincoln recalls, "but I was trying not to set anything else in motion." By then, there were three cars and five officers on the scene. Mr. Lincoln's friend Melissa began crying amidst the stress of the situation.

The officers searching the car threw out the potato chips Mr. Lincoln had been eating and poured out a soda he had been drinking. Then the young officer who initiated the stop approached Mr. Lincoln, carrying a piece of paper from a convenience store, the type used to record lottery numbers. The officer told Mr. Lincoln that people store illegal drugs in that kind of paper and demanded to know what it was doing in the car. Here, Mr. Lincoln had enough. He told the young officer that he had done nothing wrong and if the officer wanted to take him to jail, he should go ahead and do so, but Mr. Lincoln would be calling his attorney and a reporter friend at Channel 6. At that point, an older officer approached the first officer and suggested

that he should "back off." The two officers talked for a few moments and then the first officer released Mr. Lincoln from the handcuffs. A third officer came over and apologized for a "mix-up" and told Mr. Lincoln to have a good evening. The stop lasted over an hour.

Mr. Lincoln was shaken by the experience. "I had tears in my eyes. I felt violated, and I felt embarrassed." He was particularly disturbed because the incident reminded him of something that happened years earlier: "It made me flash back to an incident when I was sixteen years old, working at a grocery store in Colonial Heights. I left work one day and suddenly half the police department descended on me, impounded my moped, and took me to jail," where Mr. Lincoln remained until his parents and their pastor were able to get him out. It turned out that a white woman at a nearby hotel had reported being robbed by a black man, and the police had cast an indiscriminate net. The young Mr. Lincoln was not charged. "I'll never forget that up-close experience of having to deal with racism by the police department, people we knew we were supposed to trust. Then to have something else happen forty years later, just as bad—it just really shook me."

### Account of Donna Batton

Ms. Batton is a black woman in her early thirties who has lived in Richmond since she was ten years old. She is a financial advisor and mother of three children. She has been stopped by the Richmond Police numerous times, often without being told why.

One occasion that left a particular impact took place in December 2023, when she was driving late at night in a rental car with her brother in the Jackson Ward neighborhood. Ms. Batton saw flashing lights and heard a siren, so she pulled over. The officer who came to her window "was nervous, talking fast, and stuttering," which in turn made Ms. Batton nervous. "If everything is okay," she wondered, "then why are you so jumpy, like you're getting ready to mess me up?" The officer said there was something wrong with the rental car's registration and ordered Ms. Batton and her brother out of the car. "He put us in handcuffs. It was raining and I didn't have a coat." Ms. Batton realized there were six police officers on the scene. They searched the car without asking for permission. She was eventually released with a summons for driving an unregistered vehicle. Months later, a judge dismissed the case, telling Ms. Batton, "Don't rent from that company again."

Experiences like this affect Ms. Batton's attitude toward law enforcement. "The blue lights are traumatizing. I get heart palpitations when I see the police sitting there in their cars, waiting," she says. "I don't want them near me. I don't want them in my neighborhood."

### Account of Lanette Sanders

Lanette Sanders is a black woman in her forties who moved to Virginia in 2005, after gentrification pushed her out of New York City. By profession, she is a social worker who serves both victims of crimes as well as people with criminal convictions.

17

Ms. Sanders used to drive a flashy car, a burgundy Infiniti Q45 with tinted windows. When she bought it, someone jokingly called it a "drug dealer car," but she wanted it anyway. "My husband is six feet, four inches tall, and my daughter is 5'11. We needed a full-size car, and it was comfortable." During the years she drove the Infiniti, she got pulled over regularly—she estimates an average of eight times annually. Ms. Sanders says that officers who pulled her over always seemed surprised when realized they had pulled over a woman, often with a child in the car-seat. "I'd say, 'You were expecting an African American male?'" Officers would tell her that a taillight or the light above the license-plate holder was not working, even when she was certain that everything was functional. Except for once when she was speeding and another time her inspection had lapsed, the officers did not write her citations.

The frequent stops frustrated Ms. Sanders. "First, they take your license and registration. Then they call for backup, and when the other car comes, they spend time talking to them. By the end, you're late for work." Four years ago, Ms. Sanders got fed up and bought a "more neutral" car, and she no longer gets pulled over the same way. Still, there's a racial component to this kind of policing. "In the city, especially in let's say, Mosby Court, they're profiling people based on what a car looks like, if it's playing certain music. But if that same car was in another jurisdiction, where fewer black people live, does it get the same attention? I would say, no."

Ms. Sanders has a nuanced perspective on crime and law enforcement: When she was two years old, her father was murdered, and the person who killed him was

18

not punished. She grew up in low-income black neighborhoods severely affected by gun violence—"I can't tell you how many people I've lost," she says—and there was a time when she strongly supported harsh punishment. Yet, she also observed how friends and family were snatched away from her community by pervasive stop-and-frisk policing and draconian sentencing laws. Ms. Sanders became interested in policy responses that she believes can help prevent crime; she has launched prisoner reentry initiatives and restorative justice programs meant to interrupt cycles of harm and retribution. But she has a straightforward description of omnipresent traffic policing in black neighborhoods: "It's harassment."

## CONCLUSION

As these accounts show, the Richmond Police Department's selective enforcement causes fear, distress, and gross disruption of regular life for black community members, even in the supposedly mundane instances that do not end in violence that makes the news. While statistical evidence is crucial in this case, dry scientific language fails to convey the "substantial anxiety" and the degree of "physical and psychological intrusion" involved. *Delaware v. Prouse*, 440 U.S. 648, 657 (1979). Building criminal cases by repeatedly subjecting one racial group to such intrusions, as Richmond police do, violates the Fourteenth Amendment. This Court should affirm the judgment below.

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29 and 32 and Fourth Circuit Rules 29 and 32, I hereby certify that this brief complies with the specified type-volume limitations. The text of the brief was prepared in Times New Roman 14-point font. It consists of 4,591 words, excluding those items listed in Federal Rule of Appellate Procedure 32(f). This certification is based on the word count function of the Microsoft Office Word processing software.

Dated: November 25, 2024.

_/s/Maisie Osteen_____
MAISIE OSTEEN
Legal Aid Justice Center
626 E. Broad St., #200
Richmond, VA 23219
(804) 643-1086
maisie@justice4all.org

20

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be made  by the CM/ECF system.

Dated: November 25, 2024.

*/s/Maisie Osteen*
MAISIE OSTEEN
Legal Aid Justice Center
626 E. Broad St., #200
Richmond, VA 23219
(804) 643-1086
maisie@justice4all.org