IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4201

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

KEITH RODNEY MOORE,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable John A. Gibney, Jr., District Judge*

———————————

REPLY BRIEF OF THE UNITED STATES

———————————

Jessica D. Aber
United States Attorney

Shea M. Gibbons
Erik S. Siebert
Assistant United States Attorneys

Jacqueline R. Bechara
Assistant United States Attorney

2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

Page

Table of Authorities ........................................................................ iii

Argument.......................................................................................1

I.    The district court applied the wrong standard of proof in evaluating
      Moore's selective-enforcement claim. ............................................2

      A.    The district court was bound by this Court's precedent applying
            *Armstrong* to selective-enforcement claims..........................................3

      B.    Moore's reasons for applying a lower standard of proof are not
            persuasive. .....................................................................6

II.   Moore failed to establish that the officers who stopped his car acted
      with discriminatory purpose. ............................................................9

      A.    The Focus Mission Team's use of traffic stops to investigate
            more serious crimes did not show that the officers who stopped
            Moore had discriminatory intent..........................................................10

      B.    Citywide traffic stop statistics did not show that the officers
            who stopped Moore had discriminatory intent. ...................................14

      C.    Remote historical evidence did not show that the officers who
            stopped Moore in 2020 had discriminatory intent. ...............................19

III.  The district court erred in concluding that RPD's traffic stops had a
      discriminatory effect.....................................................................23

      A.    The district court erred in concluding that a statistical disparity
            alone showed discriminatory effect......................................................23

      B.    The district court erred in determining that remote historical
            evidence showed discriminatory effect...............................................27

i

Conclusion .................................................................................................28

Certificate of Compliance .......................................................................29

# Table of Authorities

Page

## Cases

*Conley v. United States*, 5 F.4th 781 (7th Cir. 2021)..................................7

*Gibbons v. Gibbs*, 99 F.4th 211 (4th Cir. 2024) ........................................8

*In re United States*, 397 F.3d 274 (5th Cir. 2005) ....................................8

*Johnson v. Holmes*, 782 F. App'x 269 (4th Cir. 2019) (per curiam)........ 6, 7, 25, 26

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc) ...................7, 9

*Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021).........................................5

*Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810 (4th Cir. 1995) .............................9

*United States v. Abney*, Nos. 94-5351, 94-5383,
    1994 WL 620799 (4th Cir. Nov. 2, 1994) ....................................13

*United States v. Alcaraz-Arellano*, 441 F.3d 1252 (10th Cir. 2006) ........................8

*United States v. Armstrong*, 517 U.S. 456 (1996) ............................................ passim

*United States v. Bass*, 536 U.S. 862 (2002) (per curiam)....................................9, 18

*United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc)............................7

*United States v. Everett*, 719 F.2d 1119 (11th Cir. 1983) (per curiam) .................13

*United States v. Fernandez Sanchez*, 46 F.4th 211 (4th Cir. 2022)........................27

*United States v. Hare*, 820 F.3d 93 (4th Cir. 2016).......................................... passim

*United States v. Hastings*, 126 F.3d 310 (4th Cir. 1997)................................. 10, 16

*United States v. Mubdi*, 691 F.3d 334 (4th Cir. 2012).........................................13

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996)........................................ passim

*United States v. Perez*, 30 F.4th 369 (4th Cir. 2022)..................................... 10, 14

*United States v. Perry*, 92 F.4th 500 (4th Cir. 2024)...........................................10

*United States v. Sanchez-Garcia*, 98 F.4th 90 (4th Cir. 2024) ..............................19

*United States v. Suarez*, 321 F. App'x 302
    (4th Cir. 2009) (per curiam) ........................................... 3, 6, 7, 25

*United States v. Washington*, 869 F.3d 193 (3d Cir. 2017)......................................5

*United States v. Wilson*, --- F.4th ---,
    2024 WL 5163081 (9th Cir. Dec. 19, 2024)........................................... 10, 26

*Washington v. Davis*, 426 U.S. 229 (1976) ...........................................14

*Watkins v. Angelone*, No. 97-9,
    1998 WL 2861 (4th Cir. 1998) (per curiam) .................................19

*Whren v. United States*, 517 U.S. 806 (1996)............................................ 11, 12, 13

## Other Authorities

Consolidated Opening Brief of Appellants, *United States v. Hare*,
    No. 14-4758 (L) (4th Cir. Apr. 20, 2015), Doc. No. 50 .................................5

**Argument**

This case began as a routine traffic stop.  After seeing the same fake, temporary license plate on three cars in the same night, Richmond Police Department ("RPD") Officers Dominic Collombo, Keegan Mills, Michael Spinos, and Nakia Williams initiated a stop of Keith Moore's car.  Moore fled, first by car, then on foot.  Eventually, officers detained him and found a gun in plain view in his car.  A federal grand jury charged Moore with possessing a firearm as a felon.

The district court correctly found, after an evidentiary hearing on Moore's motion to suppress, that the officers were "legally justified in stopping Moore's vehicle" after seeing the same fake, temporary license plate for the third time in a matter of hours.  JA1785.  Indeed, any reasonable officer under the circumstances would have initiated a stop to investigate the likely traffic offense.

The district court also correctly found, after three days of testimony on Moore's selective-enforcement claim, that he "presented no evidence of the four officers' invidious or bad faith."  JA1812.  But the district court went on to dismiss the indictment with prejudice, finding that raw statistical disparities in citywide traffic stops and decades-old historical evidence of racial discrimination in Richmond proved that the officers selectively enforced the traffic laws against Moore because of his race.

1

The opening brief set forth three grounds of reversible error in the dismissal order. First, the district court erred by applying a preponderance-of-the-evidence standard, instead of a clear-evidence standard, in evaluating Moore's selective-enforcement claim. Second, Moore did not prove discriminatory purpose because the statistical and historical evidence lacked any connection to the officers in this case. Third, the district court committed multiple analytical errors in concluding that the same flawed statistical and historical evidence established discriminatory effect.

To date, Moore has never cited, and the government has not located, any decision upholding the dismissal of a federal indictment on such thin evidence. Instead, the overwhelming weight of authority confirms that Moore failed to meet his burden to obtain dismissal under the demanding standard of *United States v. Armstrong*, 517 U.S. 456 (1996). Therefore, the Court should reverse.

## I. The district court applied the wrong standard of proof in evaluating Moore's selective-enforcement claim.

This Court has consistently held that the clear-evidence standard for proving selective prosecution articulated in *Armstrong* is the standard for proving selective enforcement. Accordingly, the district court erred by requiring Moore to prove his selective-enforcement claim by only a preponderance of the evidence. Gov't Br. 28–35.

2

### A. The district court was bound by this Court's precedent applying *Armstrong* to selective-enforcement claims.

The district court's decision to apply a preponderance-of-the-evidence standard conflicts with this Court's consistent precedent applying *Armstrong*'s clear-evidence standard to selective-enforcement claims. *See United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016); *United States v. Mason*, 774 F.3d 824, 829–30 (4th Cir. 2014); *United States v. Suarez*, 321 F. App'x 302, 305 (4th Cir. 2009) (per curiam); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996). Moore emphasizes that *Hare*, *Mason*, and *Suarez* all rely on *Bullock*, which purportedly addressed the standard of proof only in dicta. Def. Br. 23–26. That characterization unduly minimizes *Bullock*, where the Court reasoned that, although "racially motivated law enforcement can violate the equal protection component of the Fifth Amendment's Due Process Clause," the defendant had "failed to meet the rigorous *standard for proving* such a violation." 94 F.3d at 899 (emphasis added) (citing *Armstrong*, 517 U.S. at 463). That the defendant "failed to lay any foundation for an equal protection challenge," *id.*, does not mean the Court ignored the applicable standard of proof altogether. Nor did the Court indicate that it left the question open for future resolution.

Even if *Bullock* left room for doubt, *Mason* and *Hare* dispelled any uncertainty as to the governing standard. In *Mason*, the Court reiterated that it "has adopted the standard the Supreme Court set forth in" *Armstrong* "for cases of racially

3

animated law enforcement."  774 F.3d at 829 (citing *Bullock*, 94 F.3d at 899).  The Court did not just cite *Bullock* without further reasoning.  Instead, the Court observed that "[b]oth the Supreme Court and this [C]ourt have explained why this is a difficult contention on which to prevail."  *Id.*  Namely, "[a] selective law enforcement claim 'asks a court to exercise judicial power over a special province of the Executive.'" *Id.* at 829–30 (quoting *Armstrong*, 517 U.S. at 464).  Given "'the great danger of unnecessarily impairing the performance of a core executive constitutional function,'" a criminal defendant "must demonstrate 'clear evidence' of racially animated selective law enforcement."  *Id.* at 830 (quoting *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)).  Continuing, the Court emphasized that "[t]his 'standard is intended to be a demanding and rigorous one.'"  *Id.* (quoting *Olvis*, 97 F.3d at 743).

*Mason*'s extended discussion of the standard of proof was not dicta.  Instead, that discussion was central to the Court's conclusion that the defendant's trial counsel did not render ineffective assistance "in appreciating the difficulty" of pursuing a selective-enforcement claim.  *Id.* at 829.  Counsel could not "be deemed ineffective for taking the Supreme Court's own statements as to its difficulty and as to its separation of powers implications into account."  *Id.* at 830.  Further, the Court applied *Armstrong* to the facts of the case in assessing whether the defendant was entitled to an evidentiary hearing on his ineffective-assistance claim.  *See id.* at 831–

4

32.  The Court concluded, however, that "[t]he facts of this case" did "not suggest a successful *Armstrong* claim." *Id.* at 832.  Thus, *Mason*'s explication of the standard of proof could not "have been deleted without seriously impairing the analytical foundations of the holding" and is not dicta.  *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (internal quotation marks omitted).

Although *Mason* arose in the context of an ineffective-assistance claim, *Hare* reiterated the clear-evidence standard on direct appeal from the denial of a motion for selective-enforcement discovery.  Notably, the defendants in *Hare* disputed the applicability of *Armstrong* to selective-enforcement claims altogether.  *See* Consolidated Opening Brief of Appellants at 22–27, *United States v. Hare*, No. 14-4758 (L) (4th Cir. Apr. 20, 2015), Doc. No. 50.  Nonetheless, the Court reaffirmed that it "has adopted *Armstrong*'s standard for proving selective prosecution as the standard for proving selective enforcement."  *Hare*, 820 F.3d at 99 (citing *Bullock*, 94 F.3d at 899).  In doing so, the Court distinguished the standard for proving selective enforcement, which is settled, from the standard for obtaining selective-enforcement discovery, which the Court had not "specifically addressed." *Id.*; *cf. United States v. Washington*, 869 F.3d 193, 214–16 (3d Cir. 2017) (distinguishing between the standards of proof for substantive selective-enforcement claims and for discovery requests).

This Court has also applied the clear-evidence standard in unpublished decisions.  In *Suarez*, the Court observed that "[t]he standard for establishing a selective enforcement claim is 'demanding' and requires evidence that clearly contradicts the presumption that officers have not violated equal protection." 321 F. App'x at 305 (quoting *Armstrong*, 517 U.S. at 463, and citing *Bullock*, 94 F.3d at 899).  The Court held that the evidence in the record failed to show discriminatory purpose or discriminatory effect.  *See id.*  Likewise, *Johnson v. Holmes*, 782 F. App'x 269 (4th Cir. 2019) (per curiam), recognized that this Court in *Hare* "adopt[ed] the standard in" *Armstrong* "as the standard for selective enforcement cases."  *Id.* at 276; *see also id.* at 281 n.14 ("Although *Armstrong* and *Olvis* [involved] selective prosecution claims, they apply the same standard as selective enforcement claims."  (citing *Hare*, 820 F.3d at 99)).  The district court's decision violated this settled precedent.

### B.   Moore's reasons for applying a lower standard of proof are not persuasive.

Moore does not defend the district court's mistaken reasoning that the standard of proof for a selective-enforcement claim should be lower than the standard for a selective-prosecution claim because the latter requires a defendant to identify by name similarly situated individuals who were not prosecuted.  JA1808; *see* Gov't Br. 32–33 (explaining why that reasoning is incorrect).  Nonetheless, Moore offers several reasons why the Court should discard its prior precedent and

adopt a preponderance-of-the-evidence standard. Def. Br. 19–23. It is well-established, however, that "one panel cannot overrule a decision issued by another panel." *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc). And none of Moore's justifications supports a departure from this Court's consistent precedent.

Moore relies heavily on *Conley v. United States*, 5 F.4th 781, 796 (7th Cir. 2021), where the Seventh Circuit held that the defendant "could prove his selective enforcement claim by a preponderance of the evidence." The Seventh Circuit viewed its decision "as simply reaffirming the logic of" its prior decision in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc), where the court had "already held en banc that *Armstrong* does not apply in the selective enforcement context." *Conley*, 5 F.4th at 796 n.4 (citing *Davis*, 793 F.3d at 720–22). But this Court has already determined that *Armstrong does* apply to selective-enforcement claims. *See Hare*, 820 F.3d at 99; *Mason*, 774 F.3d at 829; *Suarez*, 321 F. App'x at 305; *Bullock*, 94 F.3d at 899; *see also Johnson*, 782 F. App'x at 276, 281 n.14.

Nor do Moore's proffered reasons merit revisiting this Court's precedent. He notes that the preponderance-of-the-evidence standard generally governs civil claims. Def. Br. 19. But the dismissal of an indictment in a criminal case is a materially different context. Gov't Br. 33–35; *cf. Conley*, 5 F.4th at 794 (reasoning that the defendant's habeas claim was a civil case). Moore also gestures to the

standard for proving affirmative defenses. Def. Br. 20. But a request for dismissal of the indictment based on selective enforcement is not a defense to the crime charged; it is a challenge to the initiation of the prosecution itself. *See Armstrong*, 517 U.S. at 463; *see also, e.g.*, *In re United States*, 397 F.3d 274, 286 (5th Cir. 2005).

Moore adds that the separation-of-powers concerns animating *Armstrong* "do not apply in the selective-enforcement context." Def. Br. 21. But this Court has specifically recognized that "[a] selective law enforcement claim 'asks a court to exercise judicial power over a special province of the Executive.'" *Mason*, 774 F.3d at 829–30 (quoting *Armstrong*, 517 U.S. at 464). It is precisely because of "'the great danger of unnecessarily impairing the performance of a core executive constitutional function'" that a defendant "must demonstrate 'clear evidence' of racially animated selective law enforcement." *Id.* at 830 (quoting *Olvis*, 97 F.3d at 743). Thus, selective-enforcement claims, like selective-prosecution claims, have "separation of powers implications." *Id.*; *see also United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (reasoning that "[s]imilar caution is required in reviewing a claim of selective law enforcement" as with a claim of selective prosecution).

Ultimately, "'the rule that one panel cannot overrule' another would be weak tea indeed if all a later panel had to do was identify a fact, theory, or argument a previous panel did not address." *Gibbons v. Gibbs*, 99 F.4th 211, 215 (4th Cir. 2024)

(quoting *McMellon*, 387 F.3d at 356). Because this Court's precedent holds that *Armstrong*'s clear-evidence standard for proving selective-prosecution claims governs selective-enforcement claims, the district court erred in applying a preponderance-of-the-evidence standard.

In any event, the Court need not reach this issue here. Even under a preponderance-of-the-evidence standard, the district court erred in dismissing the indictment because Moore failed to meet his burden of proving selective enforcement.

## II. Moore failed to establish that the officers who stopped his car acted with discriminatory purpose.

Discriminatory purpose "implies that the government 'selected or reaffirmed a particular course of action at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group.'" *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (emphasis added) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)). In other words, "there is an element of causation that is a necessary part" of showing discriminatory purpose. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 n.2 (4th Cir. 1995). Here, Moore failed to prove discriminatory purpose because there is no connection between the statistical and historical evidence and the officers who stopped his car. This error alone warrants reversal of the dismissal order. *See, e.g.*, *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam) (summarily reversing based solely on the defendant's failure to show

some evidence of discriminatory effect); *United States v. Wilson*, --- F.4th ---, 2024 WL 5163081, at *7 (9th Cir. Dec. 19, 2024) (similar).

### A. The Focus Mission Team's use of traffic stops to investigate more serious crimes did not show that the officers who stopped Moore had discriminatory intent.

After "rigorous challenge," the district court found "an objectively reasonable basis," *Mason*, 774 F.3d at 831, for the traffic stop: "the officers suspected Moore had violated a traffic law." JA1785. The officers had probable cause to stop Moore for a traffic offense upon seeing the same fake, temporary license plate for the third time in a matter of hours. *See United States v. Perry*, 92 F.4th 500, 510 (4th Cir. 2024); *United States v. Perez*, 30 F.4th 369, 375 n.7 (4th Cir. 2022). That strongly suggested that Officers Collombo, Mills, Spinos, and Williams stopped Moore's car because of the likely traffic offense, not because of his race. Gov't Br. 36–39; *see also, e.g.*, *United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) (concluding that memoranda describing the defendant as "an active Republican" did not establish discriminatory purpose where the affidavit of the agent who referred the case for criminal investigation showed that the defendant's "property, substantial earnings, lifestyle and repeated failure to file tax returns led to the decision to prosecute").

Moore contends that the fact that the Fourth Precinct's Focus Mission Team conducted traffic stops in order to detect more serious crimes is evidence of the officers' discriminatory purpose. Def. Br. 29–30, 40. Although Moore raised this

10

argument below, JA294, JA348–349, the district court did not find the Focus Mission Team's practices to be evidence of discriminatory purpose. *See* JA1812–1815. Instead, the court repeatedly recognized that, even if the Focus Mission Team conducted traffic stops as a pretext for investigating more serious crimes, that practice was lawful. *See, e.g.*, JA67 ("[T]he Supreme Court has said these kind of pre-textual stops are allowed."); JA320 ("The Supreme Court made it pretty clear that pre-textual stops are acceptable."); JA1755 ("But the Supreme Court says they can use minor traffic violations to do that."). Ultimately, in ruling on the selective-enforcement claim, the court found that Moore "presented no evidence of the four officers' invidious or bad faith." JA1812. Instead, the court recognized that the officers "pulled Moore over for having suspicious temporary tags after stopping two other individuals the same night whose cars had the same exact temporary tag number." JA1812 n.19.

Further, Moore conflates two distinct concepts: conducting traffic stops as a pretext for investigating more serious crimes, and conducting traffic stops as a pretext for race-based discrimination. The Supreme Court has made clear that neither type of pretext renders a traffic stop unreasonable under the Fourth Amendment "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). To be sure, the Equal Protection Clause "prohibits selective enforcement of the law based on

11

considerations such as race." *Id.* at 813.  But in this case, there is only evidence of the first type of pretext, not the second.  The total lack of evidence that the officers stopped Moore's car because of his race dooms his claim of selective enforcement.

Officers Collombo and Williams acknowledged that the Focus Mission Team conducted traffic stops to investigate more serious crimes.  JA68, JA157.  There is no evidence, however, that the Focus Mission Team generally decided which cars to stop based on the driver's race.  Moore also introduced no evidence that the officers implemented an official RPD policy of stopping Black drivers because of their race.  Instead, RPD's official policy is that "[i]n all enforcement decisions, officers shall be able to articulate specific facts, circumstances, and conclusions, which support probable cause or reasonable suspicion for arrests, searches, seizures, and stops of citizens," and "[o]fficers shall not stop, detain, arrest, search or attempt to search anyone based solely upon the person's race."  JA467.

There is also no evidence that the officers specifically stopped *Moore's* car because of his race.  On December 5, 2020, Officers Collombo, Mills, Spinos, and Williams were on patrol in the Fourth Precinct because they were assigned to the Fourth Precinct, JA50, JA91, JA145, JA177, not for some invidious reason.  The officers had never seen Moore before that night.  JA85, JA133–134.  And the officers stopped Moore's car because it had the same fake, temporary license plate as two other cars they had stopped earlier that night.  JA58, JA71.  Any reasonable police

12

officer in the same circumstances would have stopped the car to investigate the fake tags. *Cf. Whren*, 517 U.S. at 813–15 (discussing the defendants' proffered test for "rooting out pretext"). Indeed, the district court observed that, where "we have got the gentleman driving around with a fake license plate on and all that," "[m]aybe that gets stopped regardless of bias." JA1549. "Officers cannot just cease enforcement efforts where there is an objective reason to believe that there has been a violation of the law." *Mason*, 774 F.3d at 831.

Moore emphasizes that, at the time of the stop, the officers lacked evidence that he knew the plates were fake. Def. Br. 40. He also pressed this claim below, JA86–87, but the district court implicitly rejected it when the court determined that the officers "[w]ere legally justified in stopping Moore's vehicle" because they "suspected Moore had violated a traffic law," JA1785 (internal quotation marks omitted). That conclusion was correct because, "[w]hile intent is an element of the crime which must be proved at trial, it is not necessary in order to establish probable cause." *United States v. Abney*, Nos. 94-5351, 94-5383, 1994 WL 620799, at *1 (4th Cir. Nov. 2, 1994) (quoting *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983) (per curiam)); *see also, e.g.*, *United States v. Mubdi*, 691 F.3d 334, 341 n.7 (4th Cir. 2012) ("The government's probable cause burden requires no more than a reasonable ground to believe that an offense has been committed, a standard far less exacting than that imposed on the government to prove guilt beyond a

13

reasonable doubt."), *vacated and remanded on other grounds*, 570 U.S. 913 (2013). Indeed, this Court has recognized that an officer "had a legitimate reason to stop" the defendant's car where "the vehicle's license plate was expired and—based on [the officer's] experience—*likely* fictitious." *Perez*, 30 F.4th at 375 n.7 (emphasis added).

### B.     Citywide traffic stop statistics did not show that the officers who stopped Moore had discriminatory intent.

The opening brief detailed why Dr. Coston's statistical evidence could not prove that Officers Collombo, Mills, Spinos, and Williams stopped Moore's car because of his race. Gov't Br. 39–46. Moore maintains that the district court could infer discriminatory purpose based on Dr. Coston's evidence of the statistical disparity in traffic stops by race. Def. Br. 30–31. But the Supreme Court has rejected "the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Even if the data showed some evidence that RPD's traffic stops have a disparate impact, Moore still had to establish discriminatory purpose. The statistical evidence here fell short of that requirement.

Moore renews the faulty proposition that, because 77 percent of the drivers stopped by RPD from July 1, 2020 through December 6, 2020 were Black, that means Black drivers were "5.13 times more likely" to be stopped than white drivers.

14

Def. Br. 31; *see* JA357.  Moore does not address the problem that, without evidence of the total numbers of Black drivers and white drivers on the road, 5.13 reflects only a multiple of the number of white drivers stopped, not the probability of a Black driver being stopped.  *See* Gov't Br. 55–56.

Further, absent any connection between the citywide traffic stop data and the officers who stopped Moore's car, the statistical evidence failed to show that the officers in this case stopped Moore's car because of his race.  Gov't Br. 39–41. Moore questions the significance of demonstrating such a connection.  Def. Br. 33– 34.  But such evidence is essential because, to prevail on a claim of selective enforcement, Moore must prove that the officers in *his* case acted with discriminatory purpose.  *See Wayte*, 470 U.S. at 610 (Discriminatory purpose "implies that *the decisionmaker* . . . selected or reaffirmed a particular course of action at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group."  (emphases added) (internal quotation marks omitted)).

Dr. Coston analyzed the traffic stops conducted by all RPD officers in all precincts from July 1, 2020 through December 6, 2020.  JA355.  But Officers Collombo, Mills, Spinos, and Williams were assigned to RPD's Fourth Precinct, and on December 5, 2020, they stopped Moore's car in the Fourth Precinct.  JA51. Without evidence of any connection between the citywide data and the officers in this case, the statistics cannot prove that the officers who decided to stop Moore's

car acted with discriminatory purpose. *See Hastings*, 126 F.3d at 314 (holding that the defendant had not established discriminatory purpose because, "even if there were some evidence of political animus on the part of the IRS's civil or criminal division," there was "no evidence that the government official *who actually made the decision to prosecute the case* was motivated by impermissible considerations" (emphasis added)).

The statistical evidence also fell short of Moore's burden given Dr. Coston's consistent testimony that the data could not establish a causal relationship "between race and the other variables that were examined." JA1386; *see* JA1299–1300 ("We cannot work backwards from those large scale patterns to say this is why one individual person . . . did the thing they did."), JA1385–1386 ("I am not making conclusions about causation."). Moore incorrectly asserts that "the chi-square analysis Dr. Coston conducted examined whether there was a relationship" between "race" and "the disparity in stops." Def. Br. 34. Dr. Coston did not perform a chi-square analysis on the relationship between a driver's race and the initial stop. *See* JA358 (Table 1 summarizing traffic stops by race of driver). Instead, their report uses basic division, not statistical analysis, to describe the drivers of each race who were stopped as an absolute number and as a percentage of all stops in the sample. JA358. Dr. Coston explained that "we would have to know [] what the population of drivers who were not stopped was . . . in order to actually conduct a statistical

test." JA1313. For this reason, Dr. Coston testified that, based on "just the frequency and percents[,] we can't determine statistical significance." JA1313.

Dr. Coston performed chi-square analyses only on the relationship between a driver's race and the post-stop outcome (arrest, summons/citation, or warning) and the relationship between a driver's race and whether a person or the vehicle was searched during the stop. *See* JA359–360 (Tables 2, 3, and 4 summarizing chi-square tests). But Moore challenged as racially motivated the officers' initial decision to stop his car, not the post-stop decisions to search his car and arrest him for possessing a firearm as a felon. *Cf.* JA1785–1786 (district court finding that, when "the officers took him into custody," "Moore had committed multiple crimes for which the police could arrest him" and "had abandoned his car and gun, losing any reasonable expectation of privacy in that property").

Moreover, Dr. Coston admitted that a chi-square analysis can never establish causation. JA1386. And Moore has shown no connection between the data reflecting post-stop outcomes for all RPD officers in all precincts from July 1, 2020 through December 6, 2020 and the officers who stopped Moore's car in the Fourth Precinct on December 5, 2020. Thus, the post-stop evidence suffers from the same defects as the initial stop data in failing to establish that Officers Collombo, Mills, Spinos, and Williams acted with discriminatory purpose.

17

Additionally, Dr. Coston testified that they "didn't use the benchmarking for the statistical analyses." JA1377. As set forth further *infra*, both the initial stop data and the data regarding post-stop outcomes did not satisfy *Armstrong* because it lacked similarly situated comparators. Gov't Br. 43–46, 53–54; *see Olvis*, 97 F.3d at 745 ("[A]bsent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim." (citing *Armstrong*, 517 U.S. at 469–70)).

Moore submits that Dr. Coston's heat map provided circumstantial evidence of discriminatory purpose because the map showed that RPD pulled over more Black drivers than white drivers in both predominantly Black and predominantly white neighborhoods. Def. Br. 31–32; *see* JA363 (Figure 5). But officers stopped Moore's car in the Fourth Precinct, JA51, which is a predominantly Black neighborhood, *see* JA363. Moore does not articulate how data reflecting traffic stops of Black drivers in white neighborhoods supports his claim that Officers Collombo, Mills, Spinos, and Williams stopped Moore's car in the Fourth Precinct because of his race. *Cf. Bass*, 536 U.S. at 863–64 (reasoning that nationwide statistics showing that "the United States enters into plea bargains more frequently with whites than it does with blacks" did not establish some evidence of discriminatory effect "since respondent *was* offered a plea bargain but declined it").

18

### C.  Remote historical evidence did not show that the officers who stopped Moore in 2020 had discriminatory intent.

The opening brief also explained that Moore's historical evidence failed to meet his burden of proving discriminatory purpose because there was no connection between this evidence and the present-day RPD, let alone the officers who stopped his car.  Gov't Br. 46–52.

Moore maintains that Dr. Chiles's evidence provides "the historical context in which the statistical evidence should be understood."  Def. Br. 32.  But Dr. Chiles had no evidence past 1989.  *See* JA1734 ("Beyond 1989 I don't have anything.").  Moore adds that Dr. Chiles's testimony established that Richmond's history of residential segregation by race persists today.  Def. Br. 33.  Dr. Chiles admitted, however, that he had not reviewed information more recent than the 2010 census data.  *See* JA1726.  Regardless, Dr. Chiles acknowledged that RPD is not currently involved in residential segregation and has not been for a long time.  JA1727.  Dr. Chiles further admitted that, "[t]o a large extent," any residential segregation in Richmond is the result of market forces and individual decisions outside RPD.  JA1727.  Ultimately, none of Dr. Chiles's historical evidence was probative of the officers' decision to stop Moore's car in December 2020.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977); *United States v. Sanchez-Garcia*, 98 F.4th 90, 99–100 (4th Cir. 2024); *Watkins v. Angelone*, No. 97-9, 1998 WL 2861, at *6 n.3 (4th Cir. 1998) (per curiam).

19

According to Moore, Richmond's history of residential segregation "informs how predominantly Black neighborhoods fall within the First, Second, and Fourth Precincts while the Third Precinct encompasses predominantly white neighborhoods." Def. Br. 33; *see also* Def. Br. 36. But there is no evidence in the record showing that RPD devised its precinct boundaries because of the racial composition of the underlying neighborhoods. Moore cites the 2010 census dot maps, JA267–268; the depictions of each RPD precinct, JA276–279; and Dr. Chiles's testimony, JA1725–1726. But the maps and precinct depictions contain no evidence of how or why RPD established the precinct boundaries. And Dr. Chiles conceded that he had not reviewed historical precinct maps and did not know whether RPD's precinct boundaries had tracked racial boundaries in the past. JA1727.

Nonetheless, Moore relies on Dr. Chiles's testimony that, since the 1970s, "the majority of black people still live in the same areas that they did prior." JA1725. Moore seems to be implying that, if the racial distribution of residents in Richmond is roughly the same today as it was in the 1970s, then that means RPD acted with discriminatory purpose in establishing the precinct boundaries. But Moore introduced no evidence about how RPD devised the precinct boundaries. Indeed, Dr. Chiles conceded that he had no evidence that RPD ever changed a precinct boundary in response to shifting racial demographics in Richmond. JA1727.

20

The government introduced maps supporting the alternate explanation that RPD's precinct boundaries reflect the neighborhoods experiencing the most violent crime. *See* JA1621–1622 & n.4. Moore responds that this information fails to "explain away" the statistical disparity in traffic stops. Def. Br. 35. To be sure, Dr. Coston's statistical analysis fails to account for any confounding variables, such as police deployment patterns. *See* JA1383. But the government in the district court, JA1621–1622, and on appeal, Gov't Br. 49–50, submitted the crime data as evidence undermining Dr. Chiles's assertions that RPD polices predominantly Black neighborhoods for a discriminatory purpose. And, contrary to Moore's suggestion, the burden was not on the government to produce evidence disproving racial animus. *See Olvis*, 97 F.3d at 746 (holding that "the district court also erred in apparently imposing a duty on the government to 'explain [the] evidence of statistical disparity' that [the defendants] had presented"). "Instead, it is the defendant who bears the burden of making a credible showing that the statistical evidence amounts to [clear] evidence of discriminatory intent." *Venable*, 666 F.3d at 903.

Finally, the opening brief explained that the district court erred in finding discriminatory purpose based on Moore's assertions that (1) "studies have shown that RPD officers have 'stop[ped] far more [B]lack drivers than white drivers for traffic offenses' '[f]or at least twenty years,'" JA1814 (quoting JA351); and (2) "'Virginia would not have enacted the Community Policing Act but for a valid

concern regarding racial profiling in Virginia,'" JA1814 (quoting JA489). Moore does not defend the district court's reliance on the enactment of the Virginia Community Policing Act as evidence of discriminatory purpose, implicitly conceding this was error. *See generally* Def. Br. 29–41.

Addressing the "studies" cited by the district court, Moore suggests that the court did not actually rely on the Richmond Transparency and Accountability Project ("RTAP") report. Def. Br. 37. The opening brief addressed both Dr. Smith's 2000 study and RTAP's 2019 report, Gov't Br. 50–52, because the district court, citing Moore's filing, referenced "studies," plural. JA1814 (quoting JA351). To the extent Moore now disclaims reliance on the RTAP report, the government agrees that it does not establish discriminatory purpose in this case. The report did not provide any information about the initial stop decision; instead, it stated that "Black people were 30.7% more likely to be arrested during a traffic stop than white people." JA418. Moore notes that this statistic is consistent with Dr. Coston's analysis showing a statistically significant relationship between a driver's race and an arrest outcome. Def. Br. 38. The claim here, however, is that the officers' initial decision to stop Moore's car, not the outcome of the stop, was racially motivated. Moreover, like Dr. Coston's data, the RTAP statistic lacks any connection to the officers in this case, does not show a causal relationship between race and arrests, and lacks evidence of similarly situated comparators.

22

Moore does not dispute that, if the statistical and historical evidence in this case were sufficient to satisfy his burden of proving discriminatory purpose, then the same would be true for any Black driver stopped by an RPD officer. Because well-established precedent requires some connection between circumstantial evidence of discriminatory purpose and the challenged official action, Moore failed to meet his burden even by a preponderance of the evidence.

## III. The district court erred in concluding that RPD's traffic stops had a discriminatory effect.

Relying on the same flawed statistical and historical evidence, the district court committed multiple errors in finding that Moore met his burden of proving discriminatory effect. Gov't Br. 53–58. If the Court does not reverse the dismissal order based on Moore's failure to prove discriminatory purpose, then it should remand for the district court to conduct a proper discriminatory-effect analysis in the first instance.

### A. The district court erred in concluding that a statistical disparity alone showed discriminatory effect.

The district court began its analysis with the erroneous premise that Moore was not required to show evidence of similarly situated individuals in order to prove selective enforcement. JA1810–1811; *see* Gov't Br. 32–33, 55. Moore does not defend this error and implicitly accepts that this showing was required. *See generally* Def. Br. 41–47.

23

Next, the district court credited Moore's assertion that, because 77 percent of the drivers stopped by RPD from July 1, 2020 through December 6, 2020 were Black, that meant that "Black drivers were 5.13 times more likely to be stopped than white drivers."  JA1812; *see* JA357.  The opening brief explained that, without evidence about the total numbers of Black drivers and white drivers, including those who were not stopped, Moore's statistics could not determine the likelihood that a Black driver would be stopped relative to the likelihood that a white driver would be stopped.  Gov't Br. 55–56.  Instead, the 5.13 figure simply reflects the number of Black drivers stopped as a multiple of the number of white drivers stopped.  *See* JA357–358.  Moore does not address this analytical error and instead repeats it.  *See* Def. Br. 31, 41, 43.

Further, like many studies deemed insufficient by the Supreme Court and this Court, Moore's statistical evidence contained no appropriate basis for comparison. Gov't Br. 43–46, 53–54 (discussing *Armstrong*, *Bass*, *Hare*, *Olvis*, and *Venable*). To prove that officers selectively enforced the traffic laws against Moore because of his race, he had to provide evidence of similarly situated drivers of other races who could have been stopped for traffic violations but were not.  *See Armstrong*, 517 U.S. at 469 (explaining that a selective-prosecution discovery motion requires "some evidence that similarly situated defendants of other races could have been prosecuted, but were not"); *Hare*, 820 F.3d at 99 (holding that the defendants'

24

statistical evidence provided "no appropriate basis for comparison" because it "contain[ed] no data on similarly situated white individuals who could have been targeted for stash house sting investigations but were not"); *Suarez*, 321 F. App'x at 305 (rejecting selective-enforcement claim where there was "no evidence" that "the officers failed to stop individuals of other races for exceeding the speed limit by more than ten miles per hour").

Moore does not meaningfully distinguish these cases. Instead, he suggests that it would be impossible to introduce evidence of similarly situated drivers who could have been stopped for traffic offenses but were not. Def. Br. 45–46. But Dr. Smith described multiple scientifically accepted methods to estimate the population of drivers who could be stopped in a jurisdiction. JA447–448. And while Moore emphasizes the Court's decision in *Johnson*, that case only reinforces the shortcomings in the data here. *Johnson* explained that, in *Armstrong*, *Hare*, and *Olvis*, "the proffered statistics faltered because they said nothing about individuals of other races who committed the same crimes but were treated more favorably." *Johnson*, 782 F. App'x at 281. By contrast, because the plaintiffs in *Johnson* alleged that one officer, Holmes, selectively enforced the traffic laws based on race, the plaintiffs could "compare data about Holmes's traffic stops and summonses by race with similar data from the rest of the police force and from individual officers assigned to the same sectors as Holmes." *Id.* at 282. In this way, "the percentage of

25

white drivers stopped and ticketed by the other officers patrolling the same locations as Holmes serve[d] as a proxy to show the general racial composition of drivers on the road that Holmes could have pulled over but did not." *Id.* Moore produced no comparable evidence here.

Instead, Moore maintains that census data satisfied his burden. Def. Br. 43. But Dr. Coston only used the census data for the maps, not for the statistical analyses. JA1377. Regardless, the purpose of "identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination." *Olvis*, 97 F.3d at 744 (internal quotation marks omitted). Census data is an inadequate metric because it fails to rule out other factors that may contribute to whether an individual is stopped for a traffic offense. *See* JA447, JA1555; *see Wilson*, 2024 WL 5163081, at *7 (reversing selective-prosecution discovery order because, "[i]n defining the control group with only two shared facts—(1) arson (2) within the Central District [of California]—the district court did not account for many other facets of the crimes"). In passing, Moore suggests there is little evidence "that Black drivers commit more traffic infractions than White drivers." Def. Br. 45 (quoting JA353). But the district court did not rely on this proposition in finding that the statistical evidence proved discriminatory effect. *See* JA1811–1812. In any event, Moore fails to develop any argument as to how this information met his burden here. *See, e.g.*, *United States v. Fernandez Sanchez*, 46 F.4th 211, 219 (4th

26

Cir. 2022) (A party "waives an issue by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue." (internal quotation marks omitted)).

Moore also asserts that the statistical evidence contained an appropriate basis for comparison because the analyses of post-stop outcomes reflected both the total sample of drivers who were stopped and the drivers who were arrested, received summonses, and received citations. Def. Br. 46–47. But data regarding post-stop outcomes does not show that the initial stop decision was racially motivated. *Cf. Armstrong*, 517 U.S. at 470 (concluding that a newspaper article discussing "the discriminatory effect of federal drug sentencing laws[] was not relevant to an allegation of discrimination in decisions to prosecute").

**B.    The district court erred in determining that remote historical evidence showed discriminatory effect.**

Moore offers no doctrinal justification for relying on decades-old historical evidence to conclude that RPD's traffic stops had a discriminatory effect in 2020. *See* Gov't Br. 57 (questioning the relevance of historical evidence to proving discriminatory effect). Moore submits that the district court relied on Dr. Chiles's testimony as merely "supplemental" evidence of discriminatory effect. Def. Br. 47. Thus, Moore implicitly concedes that the historical evidence could not meet his burden. Given the errors in the district court's analysis of the statistical evidence, the court necessarily erred in finding the statistical and historical evidence together established discriminatory effect.

27

## Conclusion

The Court should reverse the dismissal order and remand with instructions to reinstate the indictment.

<div style="margin-left:45%">

Respectfully submitted,

Jessica D. Aber
United States Attorney


_____/s/_____
Jacqueline R. Bechara
Assistant United States Attorney

</div>

**Certificate of Compliance**

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 6,500 words (and is specifically 6,490 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, signature block, this certificate, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

<div align="center">/s/</div>
_____
Jacqueline R. Bechara
Assistant United States Attorney